**Sam P. Israel (SPI0270)**
**Eleonora Zlotnikova (EZ8814)**
**Timothy Savitsky (TS6683)**

**Sam P. Israel, P.C.**
**1 Liberty Plaza–35th Floor**
**New York, New York 10006**
**T: (646) 787-9880| F: (646) 787-9886**
**samisrael@spi-pc.com**

*Attorneys for Plaintiffs*
*Kenneth King and Yien-Koo King*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KENNETH KING, and YIEN-KOO KING.** <br> **Plaintiffs,** <br><br> -against- <br><br> **ANDREW WANG, SHOU-KUNG WANG, BAO WU TANG, JIAN BAO GALLERY, ANTHONY CHOU, CHEN-MEI-LIN, WEI ZHENG, YE YONG-QING, YUE DA-JIN and JOHN DOES 1-9,** <br><br> **Defendants.** | **Index #:** 14-CV-7694 (JFK) <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

1.      Plaintiffs Kenneth King ("**KK**") and Yien-Koo King ("**YK**") (collectively, the "**Plaintiffs**" or the "**Kings**") allege, by and through their counsel Sam P. Israel, P. C., for their complaint against defendants Andrew Wang ("**AW**"), Shou-Kung Wang ("**SK**") (together, the "**Wang Defendants**"), Bao Wu Tang, Jian Bao Gallery, Anthony Chou, Chen-Mei Lin, Wei Zheng, Ye Yong-Qing, Yue Da-Jin (collectively, the "**Defendants**"), as follows:

## NATURE OF THE ACTION

2.      This action is brought by a husband (KK) and wife (YK) against a group of con artists who have systematically stolen, lied and cheated their way to millions of dollars' worth of highly valuable, ancient Chinese artwork either formerly owned by

YK's father—the renowned artist and collector, Chi-Chuan Wang ("**C.C. Wang**") and made a part of the C.C. Wang Estate (the "**Estate**") of which YK is a beneficiary  or belonging to the Plaintiffs themselves, and to which the Wang Defendants had access as members of the Plaintiffs' extended family.

3.       With criminal ingenuity, AW managed to get himself appointed as an Estate fiduciary in the C.C. Wang Surrogate Court proceedings. So empowered, he commenced engineering serial transfers of Estate-owned artworks by purporting to sell them on behalf of the Estate *via* arms-length transactions when he was truly collecting marginal sums on ostensible sales to personal "friends," then repossessing the pieces conveyed to his *straw men* in order to sell these very works overseas at their genuine prices. Even as the Wang Defendants achieved millions of dollars by denuding the Estate through these transfers, for over ten years defendants SK and his son AW (the Plaintiffs' brother and nephew respectively) have deceived the Plaintiffs, the Public Administrator of the C.C. Wang Estate and others (including authorities in New York's Probate Court) through an array of still further artifices designed to gain access to the Estate's assets and facilitate a widespread pattern of systemized looting. As detailed *infra*, this pattern of systemized looting is already well evidenced by the sworn-to testimony of the Wang Defendants as well as incontestable documentary proof.

4.       The Plaintiffs had their first glimpse of this SK/AW-driven enterprise when certain long missing Estate paintings resurfaced alongside other works sold by AW (under the imprimatur of his court appointment) from his own Chinese art gallery. Yet by then, the Defendants had already secreted a vast portfolio of historically significant art works that either belonged to the Plaintiffs (having been gifted to YK by her father or purchased by the Plaintiffs outright) or to the Estate (which assets the Plaintiffs and other victimized Estate beneficiaries were poised to inherit) even as their illicit efforts show no signs of abatement. The Wang Defendants have expertly stolen, embezzled and converted property owned by the Plaintiffs and the Estate over the course of at least ten years, deploying a network of accommodating individuals and shadowy entities to extract, then pump ill-gotten gains into a pattern of open-ended misconduct.

5.      As is detailed below, through an association in fact comprised of, *inter alia*, a decedent's estate, foreign and domestic individuals and entities, the Wang Defendants, individually and in concert, conducted and/or participated in this pattern of predicate activities in violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq.* (the "**Act**" or "**RICO**"). Among other predicate acts cognizable under RICO, and undertaken in furtherance of schemes designed to denude the Estate of assets and misappropriate the Estate's and Plaintiffs' property were violations of the following statutes: 18 U.S.C. § 1341 and 1343  which concern Wire/Mail Fraud to obtain control over C.C. Wang's assets, including his art collection; violations of 18 U.S.C. §§ 2314 and 2315 in AW's international and domestic travels in furtherance of plans to transfer art works abroad and the transportation in interstate and foreign commerce of amounts greater than $5,000.00 derived from assets that the Defendants knowingly converted from the Estate and/or in furtherance of one or more of their schemes to defraud, and; money laundering 18 U.S.C. §1956 in AW's deployment of an overseas art gallery and auction houses to pass as legitimate conduits for ill-gotten gains.

6.      Even as further details of the Defendants' thieving emerge, an estate which once had a true value well over $60 million has been transformed into one besieged with tax liabilities commensurate with its former holdings and nearly impoverished by their absence. And, in their mission to illegally hide, sell and otherwise extract any and all Wang family assets, the Defendants siphoned off the Plaintiff's own personal property as well. Altogether, the Plaintiffs have suffered grave damage both directly and, as with other victimized Estate beneficiaries, to their testamentary expectancies.

7.      Additional claims sounding in common law conversion, fraud and breaches of fiduciary duties and demanding both legal and equitable relief are also propounded in turn.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over the Plaintiffs' claims arising under 18 U.S.C. § 1962, *et seq.* pursuant to 18 U.S.C § 1964, 28 U.S.C. § 1331, and principles

of pendent jurisdiction. Supplemental jurisdiction over the common law and State law claims alleged herein is available under 28 U.S.C. §1367(a) as they arise from the same core of operative facts as those arising under 18 U.S.C. § 1962, and are therefore properly brought before the Court.

9.      Personal jurisdiction and venue lie within this District pursuant to 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b): the Defendants, either individually, through their agents or as part of their conspiracy, have transacted business within this District, committed tortious acts against the Plaintiffs within this District, and/or committed tortious acts outside of this District causing injury to the Plaintiffs here and (i) some or all of the Defendants reside, are found, have an agent, or transact their affairs and business within the Southern District of New York, and/or (ii) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of New York such that, in accordance with 18 U.S.C. § 1965(b), the ends of justice require that all Defendants be brought before this Court.

## THE PARTIES

10.     Plaintiff Kenneth King (KK) is an individual residing at 190 East 72nd Street, Apt. 2C, New York, New York 10021.

11.     Plaintiff Yien-Koo King (YK) is an individual residing at 190 East 72nd Street, Apt. 2C, New York, New York 10021.

12.     Defendant Andrew Wang (AW) is an individual residing at 200 East 69th Street, Apt. 5H, New York, NY 10021-5738, and a preliminary executor and co-fiduciary of the Estate.

13.     Defendant Shou-Kung Wang (SK) is an individual residing at 110-05 71st Avenue, Forest Hills, New York 11375, and AW's father.

14.     Upon information and belief, defendant Anthony Chou is an individual allegedly residing at Apt. #8, Sunshine Square, YaYunChun, District, Beijing City, P. R. China 100014.

15.     Upon information and belief, defendant Chen Mei-Lin is an individual allegedly residing at #777 Lane, Apt. #28-A, Xin-Ja Ave. Jing-An District, Shanghai City, P. R. China 10014.

16.     Upon information and belief, defendant Wei Zheng is an individual allegedly residing at 97-37 63rd Road, Apt. #2F, Rego Park, NY 11374.

17.     Upon information and belief, defendant Ye Yong-Qing is an individual allegedly residing at Room #10, Building #29, An-Shang Park No. Three, Shanghai City, P.R. China 200092.

18.     Upon information and belief, defendant Yue Da-Jin is an individual allegedly residing at the Rui-Jing Palace, Rui-Jing Road, Nanjing City, P. R. China.

19.     Upon information and belief, defendant Bao Wu Tang is entity wholly owned by defendant AW and conducts business within the People's Republic of China.

20.     Upon information and belief, defendant Jian Bao Gallery is an entity wholly owned by defendant SK and which conducts business within the State of New York.

21.     John Does 1-9 are, upon information and belief, natural persons serving as agents of AW and SK, who received money or other recompense to pose as a *bona fide* purchasers of Estate artwork, but who, in reality, were merely conduits for AW and SK's surreptitious sales and transfers of prized artwork belonging to the Estate and the Plaintiffs for personal enrichment.

## FACTUAL ALLEGATIONS

### I.     *THE C.C. WANG LEGACY*

22.     C.C. Wang (born Wang Jiqian) was a renowned Chinese-American artist and collector, known by many as the last in a centuries-old line of Chinese scholar-artists. He devoted his life to art, and had served as the adviser to the prestigious committee organizing the ground-breaking London exhibition of art from the Palace Museum in Beijing, China. During his lifetime, C.C. Wang was the only person to ever examine all of the paintings in the imperial collection.

23.     But C.C. Wang was perhaps best known as a seminal figure and collector

in the world of Chinese art antiquities. In his lifetime, C.C. Wang had acquired an Estate comprised of, *inter alia,* several hundred fine and rare Chinese paintings, sculptures and antiques, worth upwards of $60 million. Indeed, C.C. Wang's collection of ancient Chinese paintings had been consistently listed as one of the greatest collections in the world. In 1998, twenty five paintings from his collection, including the famous hanging scroll "Riverbank" by 10th century master Dong Yuan, were given to the Metropolitan Museum of Art. The Metropolitan Museum of Art in New York City established the "C.C. Wang Family Collection" room to honor his lifetime contributions to the museum.

24.     In 1949, C.C. Wang fled the communist regime in China and immigrated to the U.S., bringing with him his wife and two youngest daughters, but leaving behind his oldest daughter and only son, SK (a Defendant in this proceeding). One of the daughters who came to the U.S. would pass away, and the other, YK (a Plaintiff in this proceeding) would go on to establish a prolific career in art, working for years as a sculptor and a public relations agent for her father, until C.C. Wang passed away.

25.     At CC Wang's instance, YK formed CY Art Ltd.—a company wholly owned by her and formed for the purpose of acquiring office supplies, promoting C.C. Wang's art, and facilitating art transactions. CC Wang was the President of the company.

26.     Though CY Art, Ltd. did not own significant assets, it maintained a safety deposit box, which was used to store artworks, some of which belonged to YK and some to C.C. Wang.

27.     Meanwhile, his son—defendant SK—remained in China and worked in a factory until 1979 when he arrived in New York with no marketable skills, poor English, and a deep disdain for his sister, YK. To SK's ongoing dissatisfaction, C.C. Wang turned over all business management responsibilities to YK and her husband, KK in 1997. SK's anger over this appointment would yield serial underhanded acts which, though hatched long ago, only recently were made manifest.

28.     Further, whereas SK and AW have been transparent in their personal animus toward the Plaintiffs as well as express in their adherence to cultural mandates, even before C.C. Wang died they were openly insistent that his male progeny could be the only successors to the family treasure. Still, their efforts to achieve this result were not only clandestine, but they plagued the administration of the Estate and left it unable to account for critical assets. In fact, together with his son, AW, SK plotted for and succeeded at diverting nearly the entirety of the C.C. Wang fortune.

29.     At the time of his death, C.C. Wang had amassed a collection of over 400 fine art works. Art experts have called it, among other things, "the greatest collection of Chinese masters outside China."

30.     Yet, most of these 400 paintings are now missing from C.C. Wang's Estate, having been misappropriated by the Defendants by stealth through myriad fraudulent schemes.

## II.     THE BEGINNINGS OF THE SK/ AW CONSPIRACY: THE DEFENDANTS' INITIAL THEFT AND EMBEZZLEMENT OF ARWORKS

31.     Commencing in the mid-1980s and until C.C. Wang began to suspect that SK had failed to account for all of his artworks and terminated his employment, SK worked as C.C. Wang's bookkeeper and assistant. Prior to his termination, he was entrusted with access to a vast array of valuable artworks as well as his father's funds. Long afterwards it was discovered conclusively that SK actually removed and embezzled approximately 160 paintings from C.C. Wang's collection within this time frame.

32.     After SK was denied further access to his father's books and records, YK began to handle them even as she continued to manage C.C. Wang's art collection and financial affairs. Among his family members, AW was adamant that he should inherit all of the Estate's assets because his father was C.C. Wang's first-in-line male progeny, irrespective of anything his grandfather had to say on the subject or the wills C.C. Wang already drafted naming YK as a co-executor and beneficiary. Then employed as a Chinese

art appraiser at Sotheby's, AW was fixated upon his aunt's dominion over this invaluable Chinese artworks as well as her prospective testamentary entitlements.

33.     In or about April of 2003 when C.C. Wang's doctors determined that he altogether lacked sufficient mental capacity to execute his own "Do Not Resuscitate" order, the Wang Defendants launched what would become a comprehensive scheme to exploit his infirmity to procure fraudulent documents, including a substitute will, and thereby overcome YK's stewardship of family assets. First SK secretly moved C.C. Wang to his home in Queens, New York to prevent any contact between YK and her 96 year old father. Under SK's exclusive control, C.C. Wang was quickly manipulated into affording his son and AW unbridled access to his assets.

## A. THE JANUARY, 2003 DISAPPEARANCE OF TWENTY-ONE (21) PAINTINGS FROM THE CY ART LTD. "SAFE DEPOSIT BOX" LOCATED AT NORTHFORK BANK IN MANHATTAN

34.     On or about January 31, 2003, YK took an inventory of the contents of a safety deposit box to which only she and her father had access, and which was held under the name of their corporate entity, CY Art Ltd. She discovered that twenty-one (21) paintings were missing from the vault, including works that she personally owned.

35.     She noticed—at this point six months before C.C. Wang's death and during his worsening dementia—the following twenty-one paintings disappeared from the "CY Art Vault":

i.      *Figures and Calligraphy* – by Chen Hongshou (1598-1652), handscroll [D1601], valued $75,000;

ii.     *Album of Calligraphy*— by Dong Qichang (1555-1636), album of 23 leaves [A0600], valued $65,000;

iii.    *Landscape After Tang Yin* – by Hua Yan (1682-1765) [D1502], valued $150,000;

iv.     *Landscape* – attributed to Huang Gongwang (1269-1354), album leaf, mounted as hand scroll [D0101], valued $ 65,000;

v.      *Landscape* – attributed to Ma Yuan (13th Century), hand scroll [D0701], valued at $200,000;

vi. *Flowers and Fruits of the Four Seasons* – by Shen Zhou (1427-1509), hand scroll [D2101], valued $180,000;

vii. *Grapes* – attributed to Wen Riguan (13th Century), hand scroll [D2201], valued $65,000;

viii. *Tilling the Fields* – by Zhou Chen (ca. 1450-1536), hand scroll [D1401], valued $180,000;

ix. *Romantic Spirit of the Eastern Jin* – by Fang Congyi (14th Century), hand scroll [D0202], valued $600,000

x. *Mountains and Streams in the Clear Distance* – by Hongren (1610-1664), hand scroll [D1802], valued $250,000

xi. *Dream of Zhuangzi* – by Liu Guandao (13th Century), hand scroll [D1901], valued $400,000;

xii. *Album of Landscapes* – by Ma Yuan (13th Century), with facing leaves of Imperial poetic inscriptions, album of 10 double-leaves [EA0400], valued $2,500,000;

xiii. *Album of Landscapes for Daoist Yu* – by Shiao (Yuanji, 1642-1707), album of 12 leaves [A0300], valued $3,000,000;

xiv. *Landscape* – by Shitao (Yuanji, 1642-1701), hand scroll [D0602], valued $1,000,000;

xv. *Landscape* – by Tang Yin (1470-1523), hand scroll [D0401], valued $ 300,000;

xvi. *Mountain Forest* – by Wang Fu (1362-1416), hand scroll [D1302], valued $150,000;

xvii. *Snowscape* – by Wang Hui (1642-1717), hand scroll [D0501], valued $300,000;

xviii. *Snowscape* – by Wen Zhengming (1470-1559), hand scroll [D0502], valued $600,000;

xix. *Auspicious Omens* – attributed to Xiao Zhao (1126-1173), hand scroll [D1102], valued $180,000;

xx. *Narcissi* – by Zxhao Mengjian (1199-ca. 1267), hand scroll [D1002], valued $750,000; and

xxi. *Landscape Painted for Xianyu Shu* – by Zhao Mengfu (1254-1322), hand scroll [D0801], valued $800,000.

36.     The paintings numbered 1, 4, 6, 8, 9, 10, 11, 13, 14, and 18 above are owned by corporations, in turn, owned by the Plaintiffs.  As detailed below, five were returned to YK many years later by AW. The remaining paintings belonged to

C.C. Wang, and were to become part of his Estate upon his death. Altogether, to date, sixteen of these twenty-one paintings have not been recovered by the Kings or the Estate.

### B. THE JANUARY, 2003 DISAPPEARANCE OF FOUR (4) PAINTINGS FROM C.C. WANG'S APARTMENT IN MANHATTAN

37.     On or about January 31, 2003, the same day YK discovered that paintings were missing from the CY Art Vault, YK saw AW and SK leaving C.C. Wang's apartment building with two bags. Upon  entering the premises, she learned that another four paintings were now missing from C.C. Wang's apartment::

     i.   *Clear Morning Over Lakes and Mountains* – attributed to Juran (10th Century), hanging scroll [H0503], valued $2,500,000;

     ii.   *Pine and Chrysanthemums in Tao Garden* – by Wu Li (163201718), hanging scroll [H0803], valued $300,000;

     iii.   *Gathering Firewood in the Snow* – by Tang Yin (1470-1523), hanging scroll [H0806], valued $240,000; and

     iv.   *Pine Pavilion Mountain* – by Ni Zan (1301-1374), hanging scroll [H0105], valued $2,000,000.

38.     Paintings 1, 2, and 4 above are owned by corporations, in turn, owned by the Plaintiffs.

39.     According to a former Sotheby's employee's (Arnold Chang's) February 17, 2004 appraisal of the 25 works, they were then collectively worth $16,775,075.

### C. AW AND SK ADMIT TO TAKING TWENTY-ONE PAINTINGS FROM THE CY ART LTD. "SAFE DEPOSIT BOX" AND FOUR PAINTINGS FROM C.C. WANG'S APARTMENT AND USE THEM AS LEVERAGE TO EXERCISE CONTROL OVER THE ESTATE

40.     AW would soon come to admit to YK that he and SK indeed had custody of the twenty-one paintings taken from the CY Art Ltd. safe deposit box, as well as the four paintings taken from the apartment. In a tape-recorded conversation on February 4, 2003, AW explained that even though certain of the paintings belonged to YK outright and that she was to share in the value of the others upon C.C. Wang's death, he and his

father *did not trust* YK with control of family assets. AW referred to the ailing man's assets as a "piece of cake" that he wanted to "enjoy."

41.     AW then told YK that he would not sell any of the paintings if YK turned over control of the balance of the *family's assets*.  Based upon this, YK would come to turn over sixty-four of C.C. Wang's paintings in the spring of 2003. Yet,  for their part, SK and AW did not turnover or distribute any of the twenty-five paintings until May 2005 when they merely released five of them, namely the following:

     i.    *Landscape After Tang Yin* – by Hua Yan (1682-1765) [D1502], valued $150,000;

    ii.    *Landscape* – attributed to Huang Gongwang (1269-1354), album leaf, mounted as hand scroll [D0101];

  iii.    *Mountains and Streams in the Clear Distance* – by Hongren (1610-1664), hand scroll [D1802];

   iv.    *Landscape* – by Shitao (Yuanji, 1642-1701), hand scroll [D0602]; and

    v.    *Auspicious Omens* – attributed to Xiao Zhao (1126-1173), hand scroll [D1102].

42.     AW would also come to raid the sixty-four paintings YK turned over.

43.     Whereas the Plaintiffs have sought to recover the paintings in Surrogate's Court procedures, AW has come to fully recant his tape-recorded statements about having personal custody of the 25 paintings that were taken, as well as deny his receipt of many of the works turned over by YK as per his demand for control over *family assets*. In myriad proceedings in that forum as well as in sworn discovery responses AW has insisted upon his *non-involvement* in the disappearance of these works, yet he has done so inconsistently and perjured himself in the process.

44.     For instance, as detailed below, an August 2011 televised interview has surfaced in which an art-collector reveals that SK and AW independently sold one of the CY Art Vault paintings to him, namely, *Album of Landscapes* – by Ma Yuan (the "Ma Yuan Landscape Album"), for well over $5,500,000.

### D. SK AND AW PROPOUND A FAKE WILL AND INSERT AW AS A FIDUCIARY OF THE ESTATE, THUS GAINING ACCESS TO ALL OF THE ESTATE'S PAINTINGS

45.    C.C. Wang died on July 3, 2003 with YK, SK and one other sibling in his immediate family surviving him. YK was not only C.C. Wang's daughter, but at the time of his death—and for many years preceding it, she was also his business partner, and public relations agent. In due course she propounded his long extant June 13, 2000 will and July 10, 2002 codicil. As was known to all relevant parties for many years preceding C.C. Wang's demise, YK is named executor and a principal beneficiary in these documents.

46.    One week after YK submitted C.C. Wang's June 13, 2000 will and July 10, 2002 codicil to the New York County Surrogate's Court, SK and AW produced an as yet undisclosed *second* will, the document ostensibly replacing the June 13, 2000 and July 10, 2002 instruments by purportedly having been executed on or about February 18, 2003. This second will was allegedly made four months before C.C. Wang's death, and after his physicians declared him mentally incapable of even executing his own medical forms. For his part, the attorney SK hired and directed to draft the new will, would acknowledge in sworn testimony that he had no familiarity with C.C. Wang or his prior testamentary instruments and his pre-signing conferences as well as all of his drafting were conducted exclusively through communications with SK and never involved C.C. Wang.

47.    Further in keeping with this maneuvering to control his father's assets, on July 1, 2003 SK also coerced the heavily medicated and dying C.C. Wang to revoke a revocable trust—less than 48 hours before his death (while he was staying at SK's home in Queens, New York).

48.    As for the alleged new will: AW is ostensibly designated as the executor of C.C. Wang's Estate and he, his father, and his brother (Stephen Wang) are made chief beneficiaries. Yet, none of C.C. Wang's prior eight testamentary instruments executed during his lifetime spoke to any of these arrangements. Further, despite YK's status as a

beneficiary in each of C.C. Wang's previous wills, the alleged February 2003 will purported to completely disinherit her.

49.    Shortly thereafter (in July 2003) YK initiated a proceeding contesting SK's alleged second will in the Surrogate's Court. Regardless of any challenge YK mounted to its legitimacy, however, SK and AW had lain the foundation to access the Estate's assets. On August 4, 2003, the court issued temporary letters of administration to the Public Administrator and preliminary testamentary letters to AW. The Public Administrator was tasked with inventorying the  Estate to ascertain that which would be available for distribution, and in November 2003 AW was given leave to undertake discovery proceedings pursuant to SCPA § 2103 in service of this purpose.

50.    Next, even as the two C.C. Wang wills remained in contest (as they remain on the date of this Complaint), AW— upon assuming the role of Estate fiduciary— exercised dominion and control over the Estate's assets without any meaningful oversight by the Public Administrator. He and his father (SK) were unrelenting in their exclusion of YK from any decision about the preservation or disposition of any of the art owned by YK or C.C. Wang.

51.    Further, as alleged in detail below, the Wang Defendants proceeded to wrest control of the Estate's property from the Plaintiffs by phantom transactions and the channeling of ill-gotten proceeds through AW's personally owned and operated Bao Wu Tang Art Gallery (the "**AW Gallery**") in Beijing, China and SK's Jian Bao Gallery ("**JBG**").

52.    At all relevant times, the Wang Defendants were equipped to, and did, transfer and sell paintings owned by the Estate with a common goal of personal enrichment to the Plaintiffs' detriment, and with the effect of causing the near complete dissipation of Estate assets. The Plaintiffs and expectant Estate beneficiaries sustained tens of millions of dollars in losses as a consequence.

### E. *CONVERSION OF THE MA YUAN LANDSCAPE ALBUM THROUGH THE JIAN BAO GALLERY*

53.     The acquisition and illicit sale of one of the multi-million dollar Estate works-of-art, the *Ma Yuan Landscape Album*, was accomplished by AW and SK through a corporation known as the Jian Bao Gallery. Nearly 30 years ago the *Ma Yuan Landscape Album* was purchased at a Sotheby's auction for over $300,000.00 on C.C. Wang's behalf using funds provided by C.C. Wang. It was at the time of his death one of the most valuable works in C.C. Wang's collection. It remained in C.C. Wang's possession until his death in July 2003.

54.     In proceedings before the New York County Surrogate's Court, AW and SK gave numerous sworn statements and repeated deposition testimony that the *Ma Yuan Landscape Album* was in "SK's possession", both Wang Defendants insisting that SK acquired the valuable asset from C.C. Wang in the spring of 2003 and was keeping it secure while Estate proceedings were ongoing.

55.     Yet, when later presented with a 2011 China-televised interview of an art-collector named Zhu Shaoliang, who claimed to have purchased the Ma Yuan album from C.C. Wang's family after his death, AW generated an entirely new account, testifying that the work had *not* been "returned to SK in the spring of 2003" and neither he nor his father ever personally retained it. AW now claims C.C. Wang made an ostensible last minute sale of the work to a "collector from Beijing" in the spring of 2003 shortly before his death. He even insists that his and his father's prior sworn admissions to having possession of the multi-million dollar asset are not to be believed.

56.     Meanwhile, all of the revenue C.C. Wang was supposed to have achieved from this sale according to AW's new account—allegedly the *exact same* amount ($310,000.00) paid by C.C. Wang for the album two decades earlier—was ostensibly transferred by C.C. Wang to Taiwan. The China-televised interview, however, indicates Mr. Zhu purchased the *Ma Yuan Landscape Album* from the "Wang Family" for a record high price *after* C.C. Wang's death. According to the 2011 interview, the price paid by Zhu

Shaoliang was significantly more than the $5.5 million. (AW [an Estate fiduciary] insists that he has none of the relevant paperwork.)

57.     The interview offers an even further account of the amount of proceeds achieved from the *Ma Yuan Landscape Album*:

> Host: In 2003, Mr. Wang Jiqian passed away. Zhu Shaoliang persistently contacted Wang's family, in the hope of buying one of the finest paintings of the Song Dynasty, which was in Mr. Wang Jiqian's collection. Following repeated discussions and negotiations, Zhu Shaoliang finally obtained this priceless work of the Southern Song, "Yu Ti Ma Yuan Shanshui Ce" (Ma Yuan's Landscape Album Inscribed by the Emporer).

> Zhu Shaoliang: At the time, the sale price of the Ma Yuan piece was a record high price, without precedent, either in the auction market or the arena of private transactions. This price was one that no one at that time would have accepted. I accepted it.

58.     For his part, AW attributes this whole cluster of inconsistencies between his (and his father's) prior sworn testimonies regarding the disposition of the *Ma Yuan Landscape Album* to an alleged instruction by his grandfather to *keep the sale secret*. According to AW—the person tasked by C.C. Wang with managing the art works (YK) was to never learn about any of it at the very instance of her father.

59.     Upon substantial information and belief, the *Ma Yuan Landscape Album* was actually sold by SK and AW after C.C. Wang's death as part of their fraudulent scheme to acquire Estate assets for themselves. Not only did AW and SK lie about the transaction, but the Plaintiffs did not discover its true circumstances until no earlier than 2012.

### III.     *THE MULTIPLE SCHEMES TO LOOT AND USURP C.C. WANG'S ASSETS THROUGH STRAW MEN*

60.     At a time when AW ostensibly sought to sell Estate artwork to pay ongoing expenses for the administration of the Estate, no records exist of his ever offering them at any major U.S. auction house such as Sotheby's, Christie's, and Acker Merrill & Condit. According to AW, in or about 2004 each of these institutions rejected the full ninety-eight Estate paintings he proposed to sell.

61.     AW made these assertions in order to obtain the Public Administrator's approval for his transactions with personal "friends" of his in the Chinese art community. It would be discovered much later, however, that these sales were truly made to *straw men* purchasers; AW contrived to sell Estate paintings to himself at fire sale prices, then resell them for far greater amounts abroad.

62.     Thus, between 2005 and 2009 AW purported to facilitate sales transactions for all ninety-eight Estate-owned paintings to just five individuals:

- Anthony Chou,
- Chen-Mei-Lin,
- Wei Zheng,
- Ye Yong-Qing, and
- Yue Da-Jin (collectively referred to as the "**Straw Men**")

63.     Illustrative of the sham nature of these acquisitions, one of the buyers was said to reside in New York County, yet AW had the painting he allegedly purchased shipped to someone in Kowloon, Hong Kong.

64.     The bills of sales for the transactions with his friends reveal that the paintings were sold for *far* below their actual market value. In fact, some of the paintings sold to the *straw men* would be subsequently sold at auctions for prices up to twenty-two times the amounts paid by AW's alleged friends. But AW arranged to have wildly understated appraisals prepared by his former cronies in the art trade working at Sotheby's to assuage any concerns of the Public Administrator's office as well as to secure its imprimatur of legitimacy. AW was effectively given a license to liquidate Estate assets for his personal enrichment.

65.     It would be later revealed that in advancing this scheme, AW and SK used the AW Gallery to promote, store, display, and traffic in these Estate paintings. For instance, the Plaintiffs would come to learn in the fall of 2013 that at least eleven of the ninety-eight paintings purchased by AW's ostensible friends suddenly appeared in a 2009 exhibition at AW's Gallery.

66.     Further, at least forty-three of the 160 paintings that mysteriously disappeared during SK's tenure as C.C. Wang's assistant and bookkeeper in the 1990s reappeared in 2009 and were displayed alongside certain of the same Estate paintings sold to the five *straw men*. Thus, C.C. Wang paintings that disappeared in the 1990s now resurfaced at the *same* galleries as Estate paintings sold by AW were displayed.

67.     Though the Plaintiffs were unaware of the source of SK's apparent wealth, they had no idea during the period when the straw man sales occurred (2004-2009) that SK, AW and certain other individuals were in the midst of stealing from and otherwise denuding the Estate of assets, no more that SK and AW had made arrangements to launder the proceeds achieved by these illicit transfers into *legitimate* funds by channeling the money through the AW Gallery in Shanghai and various auction houses throughout China.

68.     Thus, for more than a decade, the Defendants conducted, engaged in, and reinvested into, an ongoing pattern of racketeering activity comprised of, among other illicit activities, the transmission of false documents through domestic mails and wires and the laundering of their ill-gotten gains illegal through overseas channels. SK and AW meticulously concealed their multiple schemes even as they yielded his and his father's personal enrichment by millions of dollars and occasioned losses to the estate, its beneficiaries and the Plaintiffs of amounts no less substantial.

### A. THE BOGUS JUNE 16, 2005 SALE OF ESTATE PAINTINGS TO STRAW MAN ANTHONY CHOU AND THE ENSUING RESALE OF THE WORKS ABROAD

69.     On or about June 16, 2005, AW claimed to have sold seventeen Estate paintings to an individual known as "Anthony Chou" for a total of $909,689.41.

70.     The following is a list of paintings that were transferred from the Estate to "Anthony Chou" on June 16, 2005 with corresponding sales prices in the right most column:

|  | Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|---|
| 1. | Wang Yuanqi | *Landscape after Huang GongWang* | OTE# 83 | $30,000 |
| 2. | Zha ShiBiao | *Landscape* | OTE# 92 | $ 10,800 |
| 3. | Yao Shou | *Landscape* | OTE# 100 | $55,000 |
| 4. | Hua Yan | *Swallows with Bamboo & Plumb in Snow* | OTE#108 | $36,000 |
| 5. | Gong Xian | *Ten Thousand Valleys* | OTE#127 | $90,000 |
| 6. | Dong QiChang | *Four Landscapes* | OTE#135 | $36,000 |
| 7. | Anonymous | *Horse and Groom* | OTE#137 | $9,600 |
| 8. | Attributed to Shen Mou | *Landscape after Wu Zhen* | OTE#147 | $14,400 |
| 9. | Wen ZhengMing | *Calligraphy* | OTE#152 | $60,000 |
| 10. | Jiufeng Daoren | *Horses and Grooms* | OTE#154 | $72,000 |
| 11. | Anonymous | *Dragon* | OTE# N/A | $165,000 |
| 12. | Style of Tang Yin | *Gathering at Lanting Pavilion* | OTE#210 | $7,200 |
| 13. | Shen Zhou | *Garden Scenes* | OTE#220 | $200,000 |
| 14. | Liu Yan Chong | *Album of Landscapes* | OTE#241 | $28,800 |
| 15. | Attributed to Various Artists | *Calligraphy in Letters* | OTE#247 | $24,000 |
| 16. | Liu Yan Chong | *Washing the Elephant* | OTE#1001 | $24,000 |
| 17. | Lu Ji | *Flower and Birds of Winter* | OTE#1000 | $39,000 |

71.     According to the contract of sale, this group of seventeen paintings was purportedly shipped to an individual known as "Billie Wae" at Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong. The telephone number stated for "Billie Wae" in the June 16, 2005 contract is not a functioning telephone number, but rather a fax number.

72.     The contract of sale also states that Anthony Chou resides at Apt. #8, Sunshine Square, YaYunChun, District, Beijing City, P. R. China 100014.

73.     This address listed for Anthony Chou in the contract of sale does not exist.

74.     Two of the works ostensibly sold to Anthony Chou were a painting titled *Landscape after Huang GongWang*, by Wang Yuanqi, for $30,000, and *Ten Thousand Valleys*, by Gong Xian, for $90,000. These paintings are highlighted in the above chart.

75.     In 2013, the Plaintiffs discovered that the *Landscape after Huang GongWang* painting resurfaced at the Chieftown, Beijing Fall 2008 auction.

76.     Only three years after AW sold this painting to his friend Anthony Chou for $30,000 — AW doing so in his capacity as an Estate fiduciary — the painting was re-sold for approximately $272,625.36[1] as lot 690 at the Chieftown auction. The resale price was 900% higher than the price paid to the Estate. Upon information and belief, AW pocketed the proceeds from this sale.

77.     Similarly, in 2013, the Plaintiffs discovered that the *Ten Thousand Valleys* painting was sold for approximately $851,505.60 as lot 472 at the Chieftown Hong Kong Spring 2009 auction.

78.      The *Ten Thousand Valleys* painting was re-sold only four years after AW's bogus sale to Anthony Chou at 950% higher than the price paid to the Estate.

79.     The Anthony Chou transactions are not merely suspect by reason of the sale and resale price differentials, but also due to their physical trajectories. For instance, a painting allegedly sold to Anthony Chou as part of the 2005 transaction named titled *Dragon* by Anonymous resurfaced at the AW Gallery in 2009, as part of an exhibition of the "Wang family collection."

80.     Not only was the painting physically reposed with AW at the time but he identified it as having remained *Wang property* — i.e., a part of his family's collection.

81.     Likewise, a painting entitled *Calligraphy* by Wen Zheng Ming, was "sold" to Anthony Chou only to resurface at a Capital Museum exhibition in China in 2009. It too was identified as artwork belonging to the Wang "family collection" by the AW Gallery.

---

[1] All auction prices are based upon an exchange rate of $1 USD = 6.16 RMB and $1 USD = 7.75 HKD.

82.     Thus, having earlier sold both of the foregoing paintings on behalf of the Estate in presumably arms-length transactions, in 2009 AW held himself out as their owner.

83.     The Defendants defrauded the Plaintiffs, the Estate, and the Public Administrator by and through the instrumentalities of U.S. mails and wires, as well as advancing their deceit through myriad perjured submissions filed with the Surrogate Court.

### B. THE BOGUS APRIL 13, 2005 SALE OF ESTATE PAINTINGS TO STRAW MAN CHEN MEI-LIN AND SUBSEQUENT RESALE ABROAD

84.     On or about April 13, 2005, AW purportedly sold twenty four Estate paintings to Chen Mei-Lin for a total of $1,393,422.00 as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|--------|-------------------------------------|------------------------------|------------|
| Attributed to ShiTao | Landscape-Qing Dynasty | OTE#94 | $18,000 |
| Attributed to Huang GongWang | Landscape | OTE#97 | $24,000 |
| ShiTao | Orchids | OTE#98 | $28,800 |
| Xu Wei | Vines | OTE#102 | $24,000 |
| Wang ShiMin | Untitled | OTE#112 | $36,000 |
| NiZan | Trees on a River Shore | OTE#129 | $275,000 |
| Wang Hui | Summer Woods | OTE#130 | $85,000 |
| Wu Li | Landscapes | OTE#136 | $54,000 |
| Style of Qiu Ying | Children Playing | OTE#139 | $4,800 |
| Anonymous | Scholar with Qin Approaching Pavilion | OTE#142 | $19,200 |
| Qian Du | Watching the Clouds Arise | OTE#153 | $15,600 |
| Shen Chou | Landscape after Zhao Mengfu | OTE#157 | $132,000 |
| Various Ming Dynasty Artists | N/A | OTE#163 | $170,000 |
| Anonymous | Crane Under Pine | OTE#211 | $14,400 |
| Niu ShiHui | Fish | OTE#212 | $18,000 |

| Zhou TianQiu | Orchids | OTE#222 | $21,600 |
| Tang Yin | Planting Bamboo | OTE#223 | $165,000 |
| Chen YuanSu | Orchids | OTE#229 | $14,400 |
| Attributed to LuZhi | Distant Streams | OTE#233 | $14,400 |
| XieSHiChen | Fisherman | OTE#230 | $12,000 |
| TanYing | Mountain Pavilion | OTE#238 | $180,000 |
| WangYuanQi | Landscape | OTE#239 | $33,600 |
| Anonymous after Qian Xuan | Three Gentleman After Drinking | OTE#240 | $14,400 |
| WangJian | Fan Landscape after Dong Yuan | OTE#245 | $6,000 |

85.     Two of the works "sold" to Chen Mei-Lin, namely Qian Du, *Watching the Clouds Arise*, and Anonymous, *Three Gentlemen after Drinking*, had respective sales prices of $14,400.00 and $15,600.00.

86.     In 2013, the Plaintiffs discovered that *Three Gentlemen After Drinking*, was valued by the Chieftown, Beijing Spring 2008 auction house at approximately $1,298,216.00: 8,000% higher than the price paid to the Estate.

87.     In 2013, the Plaintiffs discovered that *Watching the Clouds Arise* was sold for approximately $181,750.24 as lot #671 at the Chieftown, Beijing Fall 2008 auction: 1165% of the Estate's sale price.

88.     A third painting supposedly sold to Chen Mei-Lin entitled *Summer Woods* by Wang Hui was displayed by the AW Gallery at a museum exhibition in 2009 as part of the Wang "family collection." Chen Mei-Lin is not mentioned in the exhibition's publication and the work is described as being part of the AW Gallery's collection.

89.     A fourth painting supposedly sold to Chen Mei-Lin entitled *Trees on a River Shore* by NiZan was displayed by the AW Gallery at a museum exhibition in 2009 as part of the Wang "family collection." Chen Mei-Lin is not mentioned in the exhibition's publication and the work is described as being part of the AW Gallery's collection.

90.     A fifth painting supposedly sold to Chen Mei-Lin entitled *Landscape after Zhao Mengfu* by Shen Chou was displayed by the AW Gallery at a museum exhibition in 2009 as part of the Wang "family collection." Chen Mei-Lin is not mentioned in the exhibition's publication and the work is described as being part of the AW Gallery's collection.

91.     A sixth painting supposedly sold to Chen Mei-Lin by the artist Wang ShiMin was displayed by the AW Gallery at a museum exhibition in 2009 as part of the Wang "family collection." Chen Mei-Lin is not mentioned in the exhibition's publication and the work is described as being part of the AW Gallery collection.

92.     A seventh painting supposedly sold to Chen Mei-Lin entitled *Landscapes* by Wu Li was displayed at a Poly Museum art exhibition in 2010 in which AW and Bao Wu Tang are credited with providing artwork in the exhibition's publication. Chen Mei-Lin is not mentioned in the Poly Museum publication at all.

93.     Whereas the contracts of sale for Chen Mei-Lin identifies that he resides at #777 Lane, Apt. #28-A, Xin-Ja Ave. Jing-An District, Shanghai City, P.R. China 100014, the address does not exist. However, but for the inversion of some numbers, it is nearly identical to AW's own personal address in Shanghai: Xin-*Zha* Road, #777 Lane, Building No. 1, Apt. #28A, *200041* (differences italicized).

94.     Faced with the allegation stated in ¶93, SK **admitted for the first time**—in a verified submission to the Surrogate's Court sworn to on August 28, 2014—that the paintings allegedly sold to Chen Mei-Lin for $1.4 million were "shipped" to AW's "own address and that this address was used by AW in opening the safe deposit box in Shanghai in 2005." SK's sworn statement goes on to claim that the paintings were shipped to AW's own address in Shanghai as an "accommodation to the buyer [Chen-Me Lin]."

95.     Since the purported sale to Chen Mei-Lin in 2005, the August 28, 2014 verified statement is the first time either AW or SK have admitted to shipping Estate assets to themselves.

96.     In contrast to SK's sworn statement that use of AW's address was an accommodation to the buyer, the contract of sale executed by AW, the Estate, and Chen Mei-Lin, lists what is indisputably AW's Shanghai address as though it was Chen-Mei Lin's actual address. The contract makes no mention of an "accommodation" nor has such a theory been advanced before SK's August 28, 2014 sworn submission.

97.     It was only after the Kings noticed that the address listed for Chen-Mei Lin in the April 2005 contract of sale was the same as the address used by AW to open a safe deposit box in Shanghai in May 2005 that the notion of an "accommodation" was introduced. The contract is fraudulent, the sale was fraudulent, and the shipment of $1.4 million worth of artwork was fraudulent.

98.     Further, all of the ostensible Chen Mei-Lin acquired paintings were, somehow, *also* purportedly shipped to Billie Wae at Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong, according to terms of the April 2005 contract.

99.     At all relevant times, AW used US mails and wires, by means of telephone calls, fax transmissions, regular mail and overnight courier services, as instrumentalities for advancing his deceit upon the Plaintiffs, the Estate, the PA and the Surrogate Court.

### C. THE BOGUS FEBRUARY 16, 2005 SALE OF ESTATE PAINTINGS TO STRAW MAN WEI ZHENG

100.    On or about February 16, 2005 AW purportedly sold seventeen Estate works to an individual named Wei Zheng for a total price of $400,500 as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|
| Attributed to Xugu-Pipa | N/A | OTE#84 | $2,400 |
| Lin Lian | Water Fowl | OTE#85 | $21,600 |
| Attributed to NiZan | Bamboo & Rock | OTE#106 | $24,000 |
| ShiTao | Vegetables | OTE#115 | $30,000 |
| Anonymous | Album Leaf | OTE#138 | $6,000 |
| Anonymous | Album Leaf | OTE#140 | $4,800 |

| Anonymous | Fan Painting | OTE#141 | $6,000 |
|---|---|---|---|
| Anonymous | Fan Painting | OTE#145 | $7,200 |
| Anonymous | Fan Painting | OTE#146 | $14,400 |
| Anonymous | Fan Painting | OTE#148 | $14,400 |
| Tang Yin | Landscape | OTE#150 | $240,000 |
| Anonymous | Scholar in Boat | OTE#160 | $4,800 |
| Zhang ZhaoXiang | Peonies | OTE#200 | $2,080 |
| Li ShiZhou | Landscape | OTE#232 | $9,600 |
| Style of Zhou Lianggong | Maple Trees & Rocks | OTE#237 | $1,800 |
| Wang Hui-Fan | Landscape | OTE#246 | $6,000 |
| Attributed to Qi BaiShi | Shrimps | OTE#1005 | $650 |

101.    The two highlighted paintings, namely, *Vegetables* by Shi Tao and *Bamboo & Rock*, by NiZan, were "sold" on behalf of the Estate to Wei Zheng in 2004 for $30,000 and $24,000 respectively.

102.    In 2013, the Plaintiffs discovered that *Bamboo & Rock* was resold for approximately $510,720.00 as lot 435 at the Chieftown, Beijing Spring 2008 auction: 2,100% higher than the price paid to the Estate.

103.    In 2013, the Plaintiffs discovered that *Vegetables* was sold for approximately $371,800.00 as lot 465 at the Chieftown, Hong Kong Spring 2009 auction: 1,239% higher than the price paid to the Estate.

104.    A third painting supposedly sold to Wei Zheng entitled *Landscape* by Tang Yin was displayed by the Bao Wu Tang art studio at a museum exhibition in 2009 as part of the Wang "family collection."

105.    A fourth painting supposedly sold to Wei Zheng entitled Fan Painting by Anonymous (OTE#148) was displayed by the Bao Wu Tang art studio at a museum exhibition in 2009 as part of the Wang "family collection."

106.    The contract of sale states Wei Zheng's resides at 97-37 63rd Road, Apt. #2F, Rego Park, NY 11374.

107.    Yet, even as Wei Zheng allegedly resides in Rego Park, NY and the paintings he purchased were stored in Newark, NJ, the paintings were inexplicably shipped to Billie Wae at Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong.

108.     This is the same Billie Wae persona that was used for the Anthony Chou straw man sales.

109.    In a verified submission to the New York County Surrogate's Court sworn to on August 28, 2014, SK claimed that despite the signed contract executed in February 2006 indicating his status as a "Buyer" of estate property, Wei Zheng was not a buyer at all, but rather an "agent for potential foreign buyers."

110.    The August 28, 2014 submission is the first statement made by either SK or AW which advanced the position that Wei Zheng was merely an "agent for potential foreign buyers."

111.    In fact, when AW was questioned about Wei Zheng's ostensible purchases at a deposition on December 17, 2013 he stated "I arranged for the sale [with Wei Zheng], but this sale didn't go through. . . . It did not go through. The buyer changed his mind."

112.    As the threads of their stories unravel, defendants AW and SK have failed to effectively navigate their own fabrications. Comprising over a decade's worth of inconsistencies, their explanations are not merely irreconcilable, they are irredeemably false.

D.  **THE BOGUS SEPTEMBER 22, 2005 SALE OF ESTATE PAINTINGS TO STRAW MAN YONG-QING YE.**

113.    On or about September 22, 2005, AW supposedly sold eighteen (18) paintings to Yon-Qing Ye for a total price of $489,772.00.

114.    The contract purporting to effectuate this sale was transmitted by facsimile to the Public Administrator on September 22, 2005 at 12:17 pm.

115.    The eighteen paintings sold to Yong-Qing Ye on September 22, 2005 are as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|
| Attributed to Bian Wu | Wild Geese Among Reeds | OTE#86 | $5,000 |
| Yun Shouping | Landscape with Pines | OTE#87 | $21,600 |
| Attributed to Chen Hongshou | Two Scholars | OTE#93 | $14,000 |
| Attributed to Bada Shanren | Wild Geese and Rocks | OTE#114 | $7,200 |
| Wang Hui | Woodcutter of Mt. Luofu | OTE#121 | $75,000 |
| Wang Yuanqi | Landscape after Dong Yuan | OTE#123 | $80,000 |
| Wang Yuanqi | Landscape after Huang Gonwang | OTE#128 | $48,000 |
| Ma Yuan | Scholar and Crane Fan painting | OTE#158 | $60000 |
| Ma Yuan | Scholar by a Pine Stream Fan painting | OTE#159 | $60,000 |
| Xu Wei | Calligraphy in cursive script | OTE#161 | $150,000 |
| Yu Zhiding | Immortals on Mt. Tiantai | OTE#227 | $60,000 |
| Gu Heqing | Album of Landscapes | OTE#242 | $7,200 |
| Attributed to Qiu Ying | Meeting of the Lotus Society | OTE#1003 | $48,000 |
| Zhing Shengmo | Landscape with Pavilion | OTE#101 | $21,600 |
| Style of Wang Weng | Landscape | OTE#109 | $4,800 |
| Attributed to Li Song | Drinking Banquet | OTE#133 | $25,000 |
| Wang Yuanqi | Landscape after Huang Gongwang | OTE#120 | $75,000 |
| Zou Zhilin | Landscape | OTE#122 | $16,800 |

116.    Three of the works "sold" to Yong-Qing Ye on September 22, 2005, namely Xu Wei, *Calligraphy in cursive script* (which sold for $150,000.00); *Drinking Banquet* (which

sold for $25,000.00); and, *Woodcutter of Mt. Luofu* (which sold for $75,000.00) were resold for such vastly higher prices that their initial prices were undoubtedly unrelated to the works' market values.

117.  In 2013, the Plaintiffs discovered that *Calligraphy in cursive script*, was auctioned for $2,688,000 as lot 2871 at the June 3, 2010 Beijing Poly International Auction Co., Ltd. auction: the sales price was 1,792% higher than the sale price AW charged his friend for the same work.

118.  In 2013, the Plaintiffs discovered that *Drinking Banquet* was auctioned for approximately $1,210,950 as lot 466 at the Chieftown, Hong Kong Spring 2009 Auction at 4,843% of the amount AW realized for the Estate as its disinterested fiduciary.

119.  In 2013, the Plaintiffs discovered that *Woodcutter of Mt. Luofu* was auctioned for approximately $1,019,200.00 as lot 692 at the Chieftown, Beijing Fall 2008 Auction, the price amounting to 1359% of the Estate sale price.

120.  Meanwhile, the address listed for Yong-Qing Ye in the Estate's contract of sale—Room #10, Building #29, An-Shang Park #3, Shanghai City, P. R. China 200092—does not even exist.

### E. THE BOGUS FEBRUARY 16, 2006 SALE OF ESTATE PAINTINGS TO STRAW MAN YONG-QING YE.

121.  On or about February 16, 2006, AW supposedly sold eight (8) paintings to Yong-Qing Ye for $354,045.00.

122.  The eight paintings sold to Yong-Qing Ye on February 16, 2006 are as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|--------|-------------------------------------|------------------------------|------------|
| ShiTao | Banana Palms and Rock | OTE# 88 | $14,400 |

| Ren Yi and XuGu | Fishman, Goldfish and Bird | OTE# 99 | $12,000 |
| Bada ShanRen Chu Ta | Pines and Rock | OTE# 119 | $95,000 |
| Ren Yi | Three Knight Errants | OTE#126 | $7,800 |
| Wang Jian | Landscape in Handscroll | OTE#156 | $100,000 |
| Ding YunPeng | Scene from Tao YuanMing | OTE#224 | $21,600 |
| Qi BaiShi | Grapes | OTE#1010 | $36,000 |
| Qi BaiShi | Bird on Pine Branch | OTE#1008 | $60,000 |

123.     Three of the works "sold" to Yong-Qing Ye on February 16, 2006, namely, ShiTao, *Banana Palms and Rock (*which sold for $14,400.00); Ren Yi, *Three Knight Errants* (which sold for $7,800.00); and Ding YunPeng *Scene from Tao YuanMing* (which sold for $21,600.00.) were resold for such vastly higher prices that their initial prices were undoubtedly unrelated to the works' market values.

124.     In 2013, the Plaintiffs discovered that *Banana Palms and Rock* was sold for approximately $304,640.00 as lot 689 at the Chieftown Beijing Fall 2008 auction: the resale achieved an amount equal to 2115% of AW's Estate sale price.

125.     In 2013, the Plaintiffs discovered that *Three Knight Errants* was sold for approximately $70,500.00 as lot 548 at the Chieftown, Beijing Spring 2008 auction: the resale achieved an amount equal to 904% of AW's Estate sale price.

126.     In 2013, the Plaintiffs discovered that *Scene from Tao YuanMing* was sold for approximately $303,850.00 as lot 449 at a Chieftown, Hong Kong Spring 2008 auction: 1407% the estate sale price.

### F. THE BOGUS AUGUST 17, 2009 SALE OF ESTATE PAINTINGS TO STRAW MAN YU DA-JIN

127.     On or about, August 17, 2009 AW purportedly sold fourteen (14) estate works to Yue Da-Jin for a total price of $489,772.00.

128.    The contract purporting to effectuate this sale was transmitted to the Public Administrator via facsimile on August 18, 2009 at 8:24 am.

129.    The fourteen works ostensibly sold to Yue Da-Jin are as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|
| Huang Shen | Weaving Lady | OTE#90 | $11,880 |
| Mo Shi-Long | Calligraphy | OTE#110 | $4,860 |
| Xia Chang | Bamboo and Rock | OTE#124 | $67,500 |
| Fang Cong-Yi (Cloudy Landscape) | Cloudy Landscape | OTE#131 | $63,000 |
| Ni Zan (Attributed) | Album of Poems | OTE#134 | $45,000 |
| Liang Kai | Gibbons | OTE#143 | $6,480 |
| Wen Shu (Chao Wen-Shu) | Butterflies, Flowers, and Rocks | OTE#155 | $27,000 |
| Gao Feng-Han (Kao Feng-Han) | Peonies and Rocks | OTE#201 | $12,960 |
| Zeng Jing (Tseng Giang) | Portrait | OTE#202 | $2,520 |
| Wang Yuan-Qi | Landscape after Huang GongWang | OTE#218 | $25,200 |
| Wu Wei | Scholars and Attendants in Landscape | OTE#225 | $29,700 |
| Yang Wen-Cong | Landscape | OTE#244 | $4,320 |
| Yan Hui (Attributed) | Sixteen Lohans | OTE#219 | $180,000 |
| Anonymous | Birds in Landscape | OTE#89 | $4,500 |

130.    Four of the works "sold" by AW on behalf of the Estate to Yue Da-Jin on August 17, 2009, namely Huang Shen, *Weaving Lady*; Ni Zan *Album of Poems*; Xia Chang *Bamboo and Rock*; and Fang Cong-Yi *Cloudy Landscape* have reappeared in AW's gallery or in other locations under his sponsorship.

131.    *Weaving Lady* and *Album of Poems* both were both displayed at a 2010 Poly Museum art exhibition in which AW is credited with supplying the art in the exhibition's

publication—Yu Da-Jin, the apparent straw man purchaser is nowhere mentioned in the publication.

132.    The works *Bamboo* and *Rock and Cloudy Landscape* were displayed by AW's Bao Wu Tang art studio at a Capital Museum art exhibition in Hong Kong in 2009 as part of the Wang "family collection."

## IV.    *160 ADDITIONAL PAINTINGS CONVERTED BY* SK *AND AW*

133.    During the 1980s and 90s, C.C. Wang relied on SK to control his assets and manage his paintings. But according to C.C. Wang's records, when SK was fired (in 1997), 160 Estate paintings went missing.

134.    Whereas AW has denied knowledge of the whereabouts of these works, between 2008 and 2010 many of the paintings (as many as 43) have surfaced in settings closely associated with him or where he played a supervisory role, including in museum shows he curated and at Hong Kong and Beijing auctions were sold with other works formerly within his custody or control. These Estate  assets include:

   A. *Meng Yun Garden & Calligraphy* by Tang Yin/Wen Zhengm:  Andrew Wang has stated in the surrogate's court proceedings that he had "no information or records" regarding this work but, upon information and belief, this very painting appeared in a Poly Museum exhibition which included works from AW's own collection (the Bao Wu Tang Collection) in 2010.

   B. *Cao Shu Calligraphy* by Wang Duo: whereas Andrew Wang stated in surrogate's court proceedings that he had "no information or records" of this work, upon information and belief,  the painting appeared in a Capital Museum exhibition catalogue in 2009 among the Bao Wu Tang Collection, including   works that were "sold" to AW's friends in 2005 and 2006.

   C. *Dense Forest Landscape iSo Dachi* by Wang Yuanqi: whereas Andrew Wang stated this work was "donated to Washington University," upon information and belief, it appeared at both the Capital Museum's 2009 Bao Wu Tang exhibition and at a Poly June 3, 2010 auction where it was

auctioned directly after one of the paintings sold to AW's friends (Xu Wei, *Calligraphy*).

D. *Playing Qin in Palm Pavilion* by Shen Zhou: Andrew Wang, at all relevant times, has stated that this painting was owned by SK. Upon information and belief, the painting also appeared at a 2009 Chieftown Spring Auction in Beijing.

E. *Calligraphy* by Ni Yuanlu: Andrew Wang stated that he had "no information or records" about this painting. Yet, upon information and belief, the painting appeared in the very same 2009 Chieftown Spring Auction in Beijing as the Shen Zhou, *Playing Qin in Palm Pavilion* painting allegedly owned by SK.

F. *Portrait of a Scholar* by Jin Tingbiao: Andrew Wang stated that SK owned this painting. In a spring 2008 Chieftown Auction in Hong Kong this painting was, upon information and belief, auctioned along with two paintings supposedly sold to AW's friends and three paintings from the Missing 160 list.

G. *Carrying Nephew* by Wang Zhen: Andrew Wang stated that this painting was owned by SK. This painting was, upon information and belief, auctioned at the spring 2008 Chieftown Auction in Hong Kong along with two paintings supposedly sold to AW's friends and three other paintings from the Missing 160 list.

H. *Calligraphy in Cursive Script* by Zhang Ruitu: Andrew Wang stated that this painting was owned by SK. This painting was, upon information and belief, auctioned at a June 3, 2010 Poly Auction along with the Wang Yuanqi, *Dense Forest Landscape iSo Dachi* painting from the Missing 160 list.

135. Upon information and belief, the Wang Defendants have converted each of the foregoing Estate assets, SK first embezzling them in or about 1997, with his son Andrew Wang next selling them over the course of the ensuing seventeen years.

**V.   THE SCHEME TO STEAL *PROCESSION OF THE TAOIST IMMORTALS***

136. Upon information and belief, in or about 2008, with the assistance of his

self-professed insider "friends" at the Bank of Communications in Shanghai (the "Bank"), AW managed to unilaterally access a safe deposit box to which only he and YK held keys and which the Bank was supposed to require the presence of both of them before allowing either access to the safe deposit box. The box contained the single most valuable Estate painting, *Procession of the Taoist Immortal*s. Upon hearing in Chinese art communities, here and abroad, that the work was no longer in the safe deposit box and was instead in AW and SK's possession, YK commenced proceedings in a Chinese court seeking to compel an examination of the contents of the safe deposit box.

137.    When the assigned Judge ordered AW to appear at the bank for an examination of the safe deposit box, AW falsely insisted that opening the safe deposit box would be *contrary to United States law* and that therefore he would not tender his key to access it.  A transcript of the relevant March 11, 2009 hearing in Shanghai captures AW's refusal and his admonishing advice that the mere act of opening the safe deposit box would be against U.S. law.

138.    At the court's instruction, however, and despite AW's absence, the Kings appeared at the bank vault at 9:00 am on April 20, 2009 at which time the vault was opened by the presiding judge's order as a Chinese official made a video recording of the opening so as to create an indisputable record of what was in the vault. A review of the video-tape inarguably reveals that the *Procession of the Taoist Immortals*—a 1000 year old masterpiece valued at millions of dollars—had been stolen from the vault and in its place was a crude reproduction.  At the time of this discovery, AW was nowhere to be found.

**VI.    *AW'S 2009 CONVERSION OF THE DENSE FOREST LANDSCAPE ISO DACHI BY WANG YUANQI***

139.    In addition to the straw men transactions identified above, a highly valuable work which was part of C.C. Wang's collection called *Dense Forest Landscape (Iso Dachi)* resurfaced in 2010.

140.    As the fiduciary tasked with marshalling all extant assets of the C.C. Wang Estate AW has continually maintained that this work was donated to the University of

Washington and was no longer part of the Estate.

141.     Upon contacting the University of Washington, however, AW's lying was once again made manifest.  The University does not now, nor has it ever had the *Dense Forest Landscape Iso Dachi*. In fact, *Dense Forest Landscape Iso Dachi* by Wang Yuanqi, was auctioned on June 3, 2010 in China as for approximately $1.5 million (9,184,000 RMB).

142.     As it happens, the year preceding this auction, the *Dense Forest Landscape Iso Dachi* was displayed at AW's own Bao Wu Tang Capital Museum Exhibition (in fall of 2009) as part of an exhibition that showed only works that were part of C.C. Wang's family collection.

143.     At the June 3, 2010 auction, the *Dense Forest Landscape Iso Dachi* was even put up for auction *alongside* another Estate asset, namely the *Xu Wei Calligraphy* painting (indisputably an Estate asset—albeit one purportedly sold to straw man "Yong-Qing Ye") This is not a coincidence; AW had both of these paintings auctioned.

144.     Thus, this $1.5 million dollar painting, falsely claimed to have been donated to the University of Washington, was actually in AW and SK's possession for the past ten years, never accounted for, and auctioned by AW on June 3, 2010 along with the *Xu Wei Calligraphy* painting for a total of $4.23 million.

## COUNT I

## CIVIL RICO (18 U.S.C. § 1962 (a) and (c))

### (Against all Defendants)

145.     The Plaintiffs incorporate by reference the allegations set forth above as though they were fully set forth herein.

146.     To state a violation under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1962 *et seq.*, a plaintiff must plead the defendant's commission of two or more predicate acts (3) constituting a pattern (4) of racketeering activity (5) thereby directly or indirectly investing in, or maintaining an interest in, or

participating in or conducting (6) an enterprise (7) the activities of which affect interstate or foreign commerce and (8), that he or she was injured in his or her business or property by reason of the racketeering activity.

147.   In particular, Section 1962(a) prohibits using income received from a "pattern of racketeering activity" to acquire an interest in or to establish an enterprise engaged in or affecting interstate commerce and Section 1962(c) prohibits conducting or participating in the conduct of an enterprise through a pattern of racketeering activity.

148.   In assessing whether the misconduct is adequately related and of sufficient continuity to comprise a RICO pattern courts in this circuit consider whether the alleged misconduct extended over a substantial period of time, the number of predicate acts and their variety, the number of participants, the number of victims, and the presence of separate *schemes*.

149.   The Defendants committed various predicate acts with the common design of obtaining control of artworks with the ultimate goal of defrauding Plaintiffs of money. Among other predicate acts alleged above and cognizable under RICO, are: violations of 18 U.S.C. § 1341 and 1343  which concern Wire/Mail Fraud of the kind used to obtain control over C.C. Wang's assets, including, among other things,  his art collection; violations of 18 U.S.C. §§ 2314 and 2315 are also apparent in AW's internationally and domestic travelling in furtherance of the fraudulent scheme, and his (and/or the *straw men's* transportation in interstate and foreign commerce funds [and art work] in excess of $ 5,000 that the Defendants knowingly converted from the Estate or in furtherance of one or more of their schemes to defraud; violations of 18 U.S.C. § 2314 either by the Defendants' transportation of stolen moneys in interstate and foreign commerce having a value in excess of $ 5,000.00, while knowing the same to have been stolen, converted transported in interstate or foreign commerce or in their execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $ 5,000.00 or more; violations of 18 U.S.C.S. § 2315 by the defendants' receipt of stolen property, and; money laundering.

34

150.    The foregoing acts were all in furtherance of schemes to defraud the Plaintiffs and other Estate beneficiaries and they thus qualify as predicate acts for purposes of 1962(a) and (c). They were both related and continuous in: A) sharing similar purposes, participants, victims, methods or other distinguishing characteristics and the specific acts of mail fraud, wire fraud and money laundering served either to execute the fraud, or mask it, and; B) not being isolated or sporadic.

151.    First, in the mid-1980s, when C.C. Wang relied on SK to control his assets and manage his paintings, SK secreted approximately 160 paintings from C.C. Wang's collection.

152.    Whereas AW has denied knowledge of the whereabouts of these works many of them have recently surfaced in settings closely associated with him or where he played a supervisory role, including in museum shows AW curated and at Hong Kong and Beijing auctions where they were sold with other works formerly within his custody or control.

153.    Upon information and belief the Wang Defendants have converted these Estate assets, with SK first embezzling them in or about 1997, and his son Andrew Wang next selling them over the course of the ensuing seventeen years.

154.    In or about 2003, SK launched an ambitious scheme to exploit C.C. Wang's diminished mental capacity, including the outright theft of works within his father's custody and the fraudulent inducement of C.C. Wang's execution of documents designed to change C.C. Wang's financial affairs and long standing estate plan and to facilitate the further diversion of Wang family assets to their *proper destination*, namely into the hands of C.C. Wang's <u>male</u> successors—SK and his son AW.

155.    Even as his death was imminent, AW manipulated his grandfather into affording him entry to a safety deposit box to which only YK and her father had access and which was held under the name of their corporate entity, CY Art Ltd. In this manner, AW stole 21 paintings belonging to CY Art Ltd., only to then abscond with another four

works from C.C. Wang's apartment upon delivering his grandfather home.

156.    Then, approximately four months before C.C. Wang's death at age 97—but after his physicians had already declared C.C. Wang mentally incapable of even executing his own medical forms—SK held his father captive at his home in Queens New York and forced C.C. Wang to execute the Wang Defendants' wholly contrived will.

157.    This as yet unseen *second* will, would ostensibly replace the June 13, 2000 and July 10, 2002 instruments in having been purportedly executed on or about February 18, 2003 and it designated AW as the executor of the C.C. Wang Estate. Critically, despite her status as a beneficiary in each of the eight testamentary instruments previously executed by C.C. Wang during his lifetime, this newly contrived *will* purported to completely disinherit YK.

158.    AW next proceeded to exploit his identification as an executer in the bogus will to be officially appointed by the surrogate court as an Estate fiduciary poised to administer assets to which he genuinely had no entitlement, nor authority to control. Among other things, AW now had dominion over paintings the Kings turned over in compliance with requirements attendant to the Estate's administration.

159.    In exercising his authority, AW exploited the office of the Public Administrator and other Estate resources (such as legal counsel and Estate bank accounts) in order to facilitate a pattern of racketeering activity comprised of  fraudulent transfers, misappropriations and concealments. For his part AW's methods have been consistent: through a decade long series of complex transactions, and by means of interstate and foreign mails and wires, he has deployed individuals and entities throughout the U.S. as well as in China, to secretly transfer and transport millions of dollars-worth of misappropriated ancient Chinese paintings. These assets were truly owned either by the Estate or YK (outright or per her testamentary entitlements), and the cash yielded by their liquidations was channeled through overseas business accounts and exchanged currencies in order to shield their machinations from scrutiny.

160.    18 U.S.C. § 1961(4) defines a RICO "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Here, an association-in-fact, consisting of SK and AW—as its primary architects and beneficiaries, together with a core group of at least five individuals and two entities operated for the common and continuing purpose of implementing the Defendants' schemes to defraud the Plaintiffs, the Public Administrator, and other will beneficiaries in furtherance of their perceived entitlement—as C.C. Wang's <u>male</u> successors—to the Wang family assets. Defendants Anthony Chou, Chen-Mei-Lin, Wei Zheng, Ye Yong-Qing, and Yue Da-Jin have played specific roles in the procurement and transfer of those assets to AW in China, thereby effectuating AW's *sales to himself*, and laying the groundwork for AW's subsequent laundering of the monies achieved by his re-sales of those works overseas.

161.    When presented with the self-serving appraisals AW had prepared for him by his former cronies in the art trade at Sotheby's, the Public Administrator's office unknowingly approved these circular transfers of Estate artworks for amounts well below their actual value to fraudulently rendered addresses; and, ostensibly under its imprimatur, AW had the authority to extract these Estate assets for his and his father's personal enrichment.  AW provided the funds needed for the straw men to purchase the works and when the works were shipped to AW overseas, he masked the funds he received from reselling them by layers of transactions, including filtering them through the AW Gallery—a vehicle for mixing freshly "cleaned" money with money legally obtained through the purchase or sale of other art works.

162.    Illustrative of the true nature of the six contracts executed with the Estate's "buyers" is AW's use of his own address as the residence for  one of the straw men. When questioned, his own father has only recently (on August 28, 2014) admitted under oath that AW provided his own address in Shanghai for ostensible purchaser Chen Mei-Lin's shipping address, but kept it a secret. While SK proceeded to attempt to excuse his son's ploy as an *accommodation* to an ostensible privacy conscious purchaser, unless AW's father was lying himself, it is now irrefutable that AW has mislead the PA and others

involved in the Surrogate's Court proceedings for years. And the revelation has arisen only now that the Wang Defendants have been confronted in those proceedings with a well-spring of the defendants' contradictions.

163.    Further, whereas there are *hundreds* of potential China-based auction houses and *thousands* of individual auctions where the straw man acquisitions may have been resold or consigned between 2005 and 2014, the Estate assets that AW "sold" to these buyers have typically appeared for resale at the very same auction houses—namely the Chieftown and Poly auction houses—as well as on the same dates. Moreover, these works have been consigned alongside other works that either disappeared from the Estate or were known to be in the possession of AW and SK.

164.    At all relevant times, the Defendants used US mails and wires, by means of telephone calls, fax transmissions, regular mail and overnight courier services, as instrumentalities for advancing their deceitful schemes with the Plaintiffs, the Estate, the PA and the Surrogate Court.

165.    Among other things, upon information and belief, the Defendants committed wire and wire fraud when they sent telefaxes, made telephone calls and transmitted mail in furtherance of their multiple schemes to falsify the ownership of artworks and thereby defraud the Plaintiffs and other will beneficiaries of their ownership rights therein.

166.    By his own account, Andrew Wang sold ninety-eight Estate paintings to his friends. He arranged for these *non*-arm's length deals in 2005, 2006 and 2009. At least twelve of the works, which were sold by the Estate for a mere $509,000—were later resold, less than three years later, for $9.46 million. A thirteenth painting, the *Dense Forest Landscape Iso Dachi*, which AW falsely testified was donated to the University of Washington, was auctioned at the Poly Auctions International Auction Co., Ltd., June 3, 2010 auction for $1.5 million.

167.    Finally, as yet unidentified persons working in the Bank of Communications (where AW has *close friends*—according to his sworn testimony) have facilitated AW's inside theft of the *Procession of the Taoist Immortals*.

168.    Meanwhile, Defendant *JBG* was SK's conduit for selling the *Ma Yuan Landscape Album*, an estate asset, after C.C. Wang's death.

169.     Ultimately, SK, an erstwhile factory worker of modest means, has come to amass a fortune, including a New York home worth over $2 million, as the fruit of his and AW's illicit schemes. For his part, AW has come to enjoy preeminence in the Chinese art community, personally owning and operating the Bao Wu Tang gallery in Beijing, China as a repository of highly valued Chinese artwork-capitalizing upon works that were stolen from the estate of C.C. Wang as well as using it to reinvest the proceeds derived from sales of the Estate's assets into the perpetuation of his and his father's criminal enterprise.

170.    For the purposes of an estate's administration, N.Y. S.C.P.A. § 103(39) defines an *interested person* as: "[a]ny person entitled or allegedly entitled to share as beneficiary in the estate . . . ." By definition, the Kings have actual interests in the instant Estate's assets and standing to seek relief as alleged intended recipients of properties comprehensively looted by the Defendants.

171.    Moreover, as with YK's entitlements as a beneficiary, the Plaintiffs' extant independently owned and acquired business interests and property have been injured by the aforesaid violations of 18 U.S.C. § 1962, including by reason of the Defendants' misappropriations of property the Plaintiffs owned outright—whether having been gifted to YK by C.C. Wang before he died or else independently purchased by the Kings.

172.    Accordingly, the Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial, then trebled under 18 U.S.C. § 1964(c), which amount is reasonably believed to exceed the sum of $60,000,000.00.

173.    Additionally, injunctive relief is warranted and should be so-ordered because the pattern of racketeering activity has extended over a substantial period of time and continues as of the date hereof. Pursuant to 18 U.S.C. § 1964(a), this Court should restrain and enjoin further violations by Defendants of 18 U.S.C. § 1962.

## COUNT II

## CONSPIRACY TO VIOLATE RICO (18 U.S.C. § 1962(d))

### (Against all Defendants)

174.     The Plaintiffs incorporate by reference the allegations set forth above as though they were fully set forth herein.

175.     Section 1962(d) prohibits conspiring to violate either 1962(a), (b) or (c). When read in conjunction with the language of 1962(c), RICO's conspiracy provision proscribes an agreement "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

176.     A RICO conspiracy is proven where a defendant is shown to have "embraced the objective of the alleged conspiracy," and agreed to commit two predicate acts in furtherance thereof.

177.     Participation in the conspiracy can be shown entirely through circumstantial evidence.

178.     To demonstrate a RICO conspirator's knowledge of the RICO conspiracy, it is sufficient to show that each defendant knows the general nature of the enterprise and knows that the enterprise extends beyond his/her general role. The actions alleged above ranging from the restructuring of family assets, to drafting paperwork intended to negate YK's interest in the artworks, to issuing false denials regarding his misconduct when serving as the Estate's representative are of the type that "logically would lead SK to suspect" that he was part of a larger conspiracy with AW.

179.     In this case, there was a conspiracy to conduct the enterprise's affairs through a pattern of racketeering activity, and the Defendants committed two crimes that qualify as RICO predicate acts when they arranged for, received and/or transmitted fraudulent paper-work concerning the phony will, the creation of which helped establish the framework to defraud the Plaintiffs.

180.     There was and continues to be an agreement by and among the Defendants to commit at least two acts of racketeering activity by conscious adherence to fraudulent

schemes pursuant to which at least two mailings and or uses of interstate wires in furtherance of the schemes were foreseeable.

181.    At all relevant times, the Defendants used US mails and wires, by means of telephone calls, fax transmissions, regular mail and overnight courier services, as instrumentalities for advancing their deceitful schemes with the Plaintiffs, the Estate, the PA and the Surrogate Court.

182.    Among other things, upon information and belief, the Defendants committed wire fraud when they sent telefaxes and/or made telephone calls in their schemes to falsify the ownership of the artworks for the purpose of defrauding Plaintiffs and other will beneficiaries of their ownership rights therein.

183.    The Defendants wired funds to three different bank accounts in connection with the fraudulent sale of the 98 paintings to the five straw men including: (a) the Estate's bank account located at North Fork Bank, 750 Third Avenue, New York, NY 10017; (b) an escrow account in the name of Brown Raysman Millstein Felder & Steiner LLP located at Citibank Private Bank, 153 East 53rd Street, New York, NY 10043; and (c) Capital One Bank 750 Third Avenue, New York, NY 10017 to an account in the name of "Estate of Chi-Chuan Wang." In this way, the Defendants used wire transfers, international shipping couriers, and Estate resources to injure the Plaintiffs and remaining estate beneficiaries through their fraudulent disposition of assets.

184.    The Plaintiffs' business and property has been injured by reason of a violation of 18 U.S.C. § 1962(d) and they are entitled to treble damages under 18 U.S.C. § 1964(c). Pursuant to 18 U.S.C. § 1964(a), this Court should restrain and enjoin further violations of 18 U.S.C. § 1962. Injunctive relief is warranted because the pattern of racketeering activity has extended over a substantial period of time and it is continuing.

### COUNT III
### FOR A CONSTRUCTIVE TRUST

(Against Andrew Wang)

185.    The Plaintiffs repeat and reallege each of the foregoing allegations as

though they were fully set forth herein.

186.    New York law generally requires that a party establish four elements before a constructive trust may be imposed: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.

187.    A constructive trust has been found to be appropriate where defendants have allegedly used fraud, undue influence, force, to prevent revocation of a will favorable to them.

188.    At times relevant to this action, Defendants on their own behalf and/or allegedly on behalf of the Estate sold or exchanged certain of the artworks belonging to the Plaintiffs and otherwise took personal possession of the Plaintiffs' property against their wishes and by the abuse of AW's position as an Estate fiduciary.

189.    The Plaintiffs have cause to believe that if not prevented from doing so, AW will further transfer and/or waste their property or proceeds they achieved from the disposition of Estate and personally-owned property and thereby leave the Plaintiffs without the means to recover the value of same, no less satisfy a potential judgment in their favor.

190.    The Plaintiffs have no other remedy adequate at law.

191.    In that certain of the artworks belong to the Plaintiffs outright and that the Plaintiffs have equitable interests in Estate works of art that were only obtained by AW by and through wrongful means, YK and KK have real interests in the assets and standing to seek relief as alleged intended recipients of properties within the custody and control of AW.

192.    The Court should impose a constructive trust upon any property within AW's custody or control which either belongs to the Plaintiffs or derives from the sale or disposition of property belonging to the Estate or the Plaintiffs or in which they have equitable interests.

**COUNT IV**

**<u>CONVERSION</u>**

(Against All Defendants)

193.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

194.    The Plaintiff is the legal and/or equitable owner of certain artworks identified above.

195.    As set forth above, AW and SK collectively, and individually, wrongfully took possession of artworks which either belong to the Plaintiffs outright or in which the Plaintiffs have equitable interests and thereby acquired the Plaintiffs' property against their will.

196.    Among other things, on January 31, 2003 AW removed 21 paintings reposed in a vault maintained jointly by the Decedent and YK under the name of YK's company, CY Art, and further misappropriating another four works directly from Decedent's residential apartment. AW first denied that he had custody of any of these Estate assets, but subsequently confided that he had them after all, an admission evidenced by a covert tape recording.

197.    AW and SK have refused and continue to refuse to return certain of the artworks over which they maintained and/or continue to maintain within their custody and control, thereby deliberately exercising unlawful dominion and control over the Plaintiffs' property.

198.    Further, as detailed in the preceding factual allegations, all of the Defendants collectively, and individually, wrongfully converted Plaintiffs' property which either belong to the Plaintiffs outright or in which the Plaintiffs have equitable interests to their own use and, in so doing, intended to permanently deprive Plaintiffs of their use and enjoyment of same.

199.    Accordingly, the Plaintiffs are entitled to recover actual damages from the

Defendants arising from the deprivation of their property in an amount to be determined at trial but which the Plaintiff reasonably believes to exceed the sum of $20,000,000.00 dollars, together with an award of punitive damages as are available by reason of the egregious nature of the Defendants' misconduct under common law.

## COUNT V

## COMMON LAW FRAUD AND CONSPIRACY TO DEFRAUD
(Against All Defendants)

200.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

201.    As alleged in detail above, each of the Defendants knew of, and --by means of their coordinated efforts-- substantially participated in, multiple deceitful actions, including the restructuring of family assets, drafting paperwork intended to negate YK's interest in the artworks, issuing false denials regarding their efforts as the Estate's representative and selling Estate artwork at U.S. auction houses at fire sale prices, effectively assuming personal ownership of them (through straw men) then reselling the works for far greater amounts abroad. They did so for the specific purpose of defrauding the Plaintiffs.

202.    By reason of the foregoing fraud and deception, the Plaintiffs are entitled to recover actual damages which the Plaintiffs reasonably believe to exceed the sum of $60,000,000.00 dollars, together with an award of punitive damages as additional relief available here by reason of the wrongful and deliberate nature of the Defendants' misconduct.

## COUNT VI

## BREACHES OF FIDUCIARY DUTY
## AND AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
(Against All Defendants)

203.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

204.     AW has committed myriad violations of fiduciary duties, including serial misappropriations of Estate assets.

205.     By his own account, Andrew Wang sold ninety-eight Estate paintings to his friends. He arranged for these *non*-arm's length deals in 2004, 2005, and 2009. Twelve of the works, which were sold by the Estate for a mere $509,000 — were later resold, less than three years later, for $9.46 million. A thirteenth painting, the *Dense Forest Landscape Iso Dachi*, which AW falsely testified was donated to the University of Washington, was auctioned at the Poly Auctions International Auction Co., Ltd., June 3, 2010 auction for $1.5 million.

206.     In December 2013, AW purported to detail — under the penalties of perjury in the surrogate's court proceedings — that ten years earlier (in Spring of 2003) C.C. Wang himself sold the *Ma Yuan Landscape Album*, an Estate asset that AW had taken from the CY Art Vault in the incident described above and which has been valued at no less than $2.5 million. Yet, AW's prior testimony was that the work was reposed with his father, and that SK continued to retain the painting beyond C.C. Wang's demise.

207.     The location and/or disposition of this $2.5 million worth of Estate value remained unaccounted for during this fiduciary's watch until now. It is only now, for the first time, that AW confidently announces that the *Ma Yuan* was sold before the 10 year controversy over its whereabouts even took hold. This contrivance is obviously designed to mask the conversion of highly valuable Estate property AW left with his father for *safe keeping*.

208.     Andrew Wang misappropriated the 1000-year-old *Procession of the Taoist Immortals.*

209.     Defendants have exploited AW's position of trust and expected candor in marketing and selling the Plaintiffs' property to their financial detriment and to the financial detriment of other estate beneficiaries.

45

210.    In so doing, AW has breached fiduciary duties owed Plaintiffs and other Estate beneficiaries.

211.    For his part, SK has knowingly given substantial assistance to AW and did so to financial detriment and to the Plaintiffs' financial detriment of other estate beneficiaries and AW and SK have both exploited AW's position and opportunities for their sole benefit.

212.    The Plaintiffs are entitled to recover actual damages which the Plaintiffs reasonably believe to exceed the sum of $60,000,000.00 dollars, together with an award of punitive damages available here by reason of the wrongful and deliberate nature of the Defendants' misconduct.

## COUNT VII
## REPLEVIN
(Against All Defendants)

213.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

214.    At all relevant times, the Defendants have held and currently retains artworks belonging to YK and the Estate; neither YK nor the Estate have ever relinquished ownership to the artworks.

215.    When entrusting the Artworks to AW was expressly understood that they would not be dissipated by AW and SK for their personal gain.

216.    Neither AW nor SK ever purchased the artworks at issue from YK or the estate; nor had they provided YK or the Estate with any consideration in exchange for the artworks.

217.    Despite due demand therefore, neither AW nor SK has restored the artworks to YK or the Estate, as their lawful owner(s).

218.    To the extent that AW, SK Bao Wu Tang, Jian Bao Gallery, Anthony Chou, Chen-Mei Lin, Wei Zheng, Ye Yong-Qing and/or Yue Da-Jin retain any of the Kings' or

Estate's artworks within their possession, custody and/or control they should be ordered and compelled to restore the artworks to their lawful owner and pay attendant damages.

**COUNT VIII**

**N.Y. DEBT. & CRED. L. §270 *Et. Seq.***
**(Against All Defendants)**

219.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

220.    Upon information and belief, the Defendants transferred assets, including property belonging to the Estate and YK in order to hinder or delay the Plaintiffs from collecting on a prospective judgment against them or to prevent the Plaintiffs from receiving their just distributions from the Estate.

221.    Upon information and belief, by their transfers of assets the Defendants rendered the party so denuded unable to satisfy a judgment and/or the Estate unable to satisfy C.C. Wang's testamentary intent, in violation of sections 276, 273-a, 273, and 275 of the Debtor-Creditor law (McKinney).

222.    In particular, New York Debtor Creditor Law section 276 states that "[e]very conveyance made and every obligation incurred with actual intent… to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors".

223.    The Plaintiffs are beneficiaries of the estate of C.C. Wang, as well prospective creditors of one or more of the Defendants by reason of actions cognizable under theories for relief denominated as Counts I-VII herein.

224.    Upon information and belief, property belonging to the Estate and YK or one or more of the other Defendants was improperly transferred to the Wang Defendants with the specific intention of defrauding the Plaintiffs and others in violation of N.Y. Debt. & Cred. L. §276.

225.   In the alternative, irrespective of Defendants' actual intent, property belonging to the Estate and/or one or more of the other Defendants was conveyed without fair consideration (as defined in NYDCL § 272(a)) "by a person who [was] or [would be] thereby rendered insolvent" (as defined in NYDCL § 271))  such that the transfer was fraudulent under NYDCL § 273. [2]

226.   The Plaintiffs have suffered damages by reason of fraudulent conveyances in that the activities of one or more of the Defendants have rendered it impossible to collect upon and enforce a judgment against one or more of the other defendants and/or for the Plaintiffs to receive their entitlements as genuine beneficiaries of the Estate.

227.   The Plaintiffs are entitled to judgment against the Defendants pursuant to NYDCL §§ 276 and 279 (a) setting aside the transfers of the Estate's assets identified above; (b) ordering each of them to account for and deliver the value of the property fraudulently conveyed to the party from which the conveyance was received (in order to provide it with sufficient funds to pay the claims of the plaintiffs), and; (c) awarding the Plaintiffs their attorney's fees.

WHEREFORE, Plaintiffs respectfully request an order and judgment:

A.  Awarding damages under counts I and II in an amount to be determined at trial, then trebled under 18 U.S.C. § 1964(a) and restrain and enjoin further violations of 18 U.S.C. §§ 1962(a) and (c);

B.  To the extent that AW and/or SK retain any of the artworks within their possession, custody and/or control they should be ordered and compelled to restore the artworks to YK or the Estate, as their lawful owner and pay attendant damages;

C.  Awarding actual damages under counts IV-VI, which amounts the Plaintiffs reasonably believe to exceed the sum of $20,000,000.00 dollars, together with an award of punitive damages available here by reason of the wrongful and deliberate nature of the Defendants' misconduct;

---

[2] Pursuant to NYDCL § 271, a person is "insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they come due."

D. Awarding a constructive trust upon any property within the Defendants' custody or control which either belongs to YK or the Estate or derives from the sale or other disposition of property belonging to one or the other of them;

E. Declaring that Andrew Wang breached fiduciary duties owed to YK and the Estate;

F. Awarding damages for AW's and SK's *breaches of fiduciary duties* and *aiding and abetting such breaches* respectively in an amount determined after a trial;

G. Pursuant to NYDCL §§ 278 and 279 (a) setting aside the transfers of assets set forth above and (b) ordering each of the above-named Defendants to account for and deliver the value of the property fraudulently conveyed to the party from which the conveyance was received and awarding the Plaintiffs their attorney's fees; and

H. Awarding attorney's fees, costs and interest, together with such other and further relief, where available by statute or at common law, as the Court deems just and proper.

**SAM P. ISRAEL, P.C.**

Dated: New York, New York
September 23, 2014

By: _____
Sam P. Israel, Esq. (SPI 0270)
1 Liberty Plaza- Thirty Fifth Floor,
New York, New York 10006
Main-646-787-9880; Fax: 646-787-9886; Email:
SAMISRAEL@SPI-PC.COM

*Attorneys for Plaintiffs Kenneth King and Yien-Koo King*

49