UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YIEN-KOO KING, NORTHWICH INVESTMENTS, LTD., and SOON HUAT, INC.

                                   Plaintiffs,

                -against-

ANDREW WANG, SHOU-KUNG WANG, BAO WU TANG, JIAN BAO GALLERY, ANTHONY CHOU, CHEN-MEI-LIN, WEI ZHENG, YE YONG-QING, YUE DA-JIN and JOHN DOES 1-9,

                                   Defendants.

Index # 14-Civ.-07694 (JFK)

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

1.      Plaintiffs Yien-Koo King ("**Yien-Koo**"), Northwich Investments, Ltd., ("**Northwich**"), and Soon Huat, Inc. ("**Soon Huat**") (collectively, the "**Plaintiffs**") allege, by and through their counsel Sam P. Israel, P. C., for their first amended complaint against defendants Andrew Wang ("**AW**"), Shou-Kung Wang ("**SK**") (together, the "**Wang Defendants**"), Bao Wu Tang, Jian Bao Gallery, Anthony Chou, Chen-Mei Lin, Wei Zheng, Ye Yong-Qing, Yue Da-Jin (collectively, the "**Defendants**"), as follows:

## NATURE OF THE ACTION

2.      This action is brought by Yien-Koo and two corporations owned by her and her husband, Kenneth King ("**Kenneth**") against a group of con artists who have systematically stolen, lied and cheated their way to millions of dollars' worth of highly valuable, ancient Chinese artwork. The named defendants comprise AW, a fiduciary of a Chinese art-collector's estate (the "**Estate**") and seven accomplices. The artwork they stole was either formerly owned by (a) Yien-Koo's father—the renowned artist and collector, Chi-Chuan Wang ("**C.C. Wang**")—and made a part of his Estate or (b) the Plaintiffs themselves. The Wang Defendants exploited their positions as family members and fiduciaries to engage in serial criminal activities and decade-long efforts

to steal tens of millions of dollars' worth of Chinese artifacts. The Plaintiffs now seek justice and relief for themselves and the Estate because those efforts were largely successful.

3.     Together, the Defendants participated in schemes to illegally acquire and transport $60,000,000.00 worth of artwork from New York to Hong Kong over a seven-year period. In certain instances, several defendants outright stole scores of classical Chinese paintings (exceeding $20,000,000.00 in aggregate value) and illegally shipped the stolen works to China. In other instances, defendant AW exploited his position as an Estate fiduciary by fraudulently selling classical paintings to five putative "buyers" at artificially low prices over a five-year period through six transactions.

4.     One of these five "buyers," Defendant Wei Zheng, has already come forward to admit that though he signed a contract with the Estate identifying himself as the purchaser of $400,500.00 worth of Chinese art, he never paid for or received the artwork. He acknowledges he was not the real buyer, but claims he has "no idea" who was—Wei Zheng only signed his fake contract on AW's insistence. Once shipped to China, AW and his father, SK, retook possession of the works from the five purchasers. Many works were then resold by AW and SK at Chinese auction houses for *sixteen-fold* the Estate's selling price. Other works have made their way into AW and SK's private collections.

5.     Even as the Wang Defendants achieved millions of dollars by denuding the Estate through these transfers, for over ten years, defendants SK and his son AW (Yien-Koo's brother and nephew, respectively) have deceived the Plaintiffs, the Public Administrator of New York County and others (including authorities in New York's Probate Court) through an array of still further artifices designed to gain access to the Estate's assets and facilitate a widespread pattern of systemized looting. This pattern is already well evidenced by the sworn-to testimony of the Wang Defendants as well as incontestable documentary proof.

6.     The Plaintiffs had their first glimpse of this SK/AW-driven enterprise when certain long-*missing* Estate paintings resurfaced alongside paintings AW *sold* (on

the Estate's behalf) in AW's own Chinese art gallery. Yet by then, the Defendants had already secreted a vast portfolio of historically significant art works that either belonged to the Plaintiffs or to the Estate. The Wang Defendants have expertly stolen, embezzled and converted property owned by the Plaintiffs and the Estate over the course of at least ten years, deploying a network of accommodating individuals and shadowy entities to extract, then pump ill-gotten gains into a pattern of continuing misconduct.

7.    As is detailed below, through an association in fact comprised of, *inter alia,* a decedent's estate, foreign and domestic individuals and entities, the Wang Defendants, individually and in concert, conducted and/or participated in this pattern of predicate activities in violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq.* (the "**Act**" or "**RICO**"). Among other predicate acts cognizable under RICO, and undertaken in furtherance of schemes designed to denude the Estate of assets and misappropriate the Estate's and Plaintiffs' property, were violations of the following statutes:

- 18 U.S.C. §§ 1341 and 1343 which prohibit the wire and mail fraud the Defendants used to obtain control over C.C. Wang's assets, including his art collection;

- 18 U.S.C. §§ 2314 and 2315 which prohibit AW's international and domestic travels and shipments in furtherance of plans to transfer art works abroad and the transportation in interstate and foreign commerce of amounts greater than $5,000.00 derived from assets that the Defendants knowingly converted from the Estate and/or in furtherance of one or more of their schemes to defraud;

- 18 U.S.C. §1956 which prohibits the extortion AW and his father used to coerce Yien-Koo to turn over valuable assets to the Wang Defendants; and

- 18 U.S.C. §1956 which prohibits the money laundering conducted by AW's overseas art gallery and auction houses to pass as legitimate conduits for ill-gotten gains.

8.    Even as further details of the Defendants' thieving emerge, an estate which once had a true value well over $60 million has been transformed into one which

is besieged with tax liabilities commensurate with its former holdings, but impoverished by their absence. And, in their mission to illegally hide, sell and otherwise extract any and all Wang family assets, the Defendants siphoned off the Plaintiffs' own property as well. Altogether, the Plaintiffs and Estate have suffered grave damage directly while Yien-Koo has—as with other victimized Estate beneficiaries—suffered damage to her testamentary expectancy.

9.    Additional claims sounding in common law conversion, fraud and breaches of fiduciary duties and demanding both legal and equitable relief are also propounded in turn.

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction over the Plaintiffs' claims arising under 18 U.SC. § 1962, *et seq.* pursuant to 18 U.S.C § 1964, 28 U.S.C. § 1331, and principles of pendent jurisdiction. Supplemental jurisdiction over the common law and State law claims alleged herein is available under 28 U.S.C. §1367(a) as they arise from the same core of operative facts as those arising under 18 U.S.C. § 1962, and are therefore properly brought before the Court.

11.    Personal jurisdiction and venue lie within this District pursuant to 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b): the Defendants, either individually, through their agents or as part of their conspiracy, have transacted business within this District, committed tortious acts against the Plaintiffs within this District, and/or committed tortious acts outside of this District causing injury to the Plaintiffs here and (i) some or all of the Defendants reside, are found, have an agent, or transact their affairs and business within the Southern District of New York, and/or (ii) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of New York such that, in accordance with 18 U.S.C. § 1965(b), the ends of justice require that all Defendants be brought before this Court.

## THE PARTIES

12.     Plaintiff Yien-Koo King is an individual residing at 190 East 72nd Street, Apt. 2C, New York, New York 10021. Yien-Koo is a statutorily defined "person interested" in the Estate of Chi-Chuan Wang by virtue of her inclusion in C.C. Wang's last will and testament currently on file with the New York County Surrogate's Court. Her status as a person interested in C.C. Wang's estate has been duly recognized by the New York County Surrogate's Court.

13.     Plaintiff Northwich Investments, Ltd. is a corporation duly registered and in good standing as an international corporation under the laws of the British Virgin Islands. Northwich was incorporated on April 14, 1998 and its registered office address is 3rd Floor, Omar Hodge Building, Wickhams Cay I, P.O. Box 362, Road Town, Tortola, British Virgin Islands. Yien-Koo King is currently its sole shareholder.

14.     Plaintiff Soon Huat, Inc. is a corporation duly registered and in good standing under the laws of the British Virgin Islands. Kenneth King, who resides with Yien-Koo at her address set forth above is currently its sole shareholder.

15.     Defendant Andrew Wang (AW) is an individual residing at 200 East 69th Street, Apt. 5H, New York, NY 10021-5738, and a preliminary executor and co-fiduciary of the Estate. Andrew Wang is the grandson of C.C. Wang.

16.     Defendant Shou-Kung Wang (SK) is an individual residing at 110-05 71st Avenue, Forest Hills, New York 11375. SK is the eldest son of C.C. Wang, AW's father, and Yien-Koo's brother.

17.     Upon information and belief, defendant Anthony Chou is an individual allegedly residing at Apt. #8, Sunshine Square, YaYunChun, District, Beijing City, P. R. China 100014.

18.     Upon information and belief, defendant Chen Mei-Lin is an individual allegedly residing at #777 Lane, Apt. #28-A, Xin-Ja Ave. Jing-An District, Shanghai City, P. R. China 10014.

19.     Upon information and belief, defendant Wei Zheng is an individual residing at 97-37 63rd Road, Apt. #2F, Rego Park, NY 11374.

20.     Upon information and belief, defendant Ye Yong-Qing is an individual allegedly residing at Room #10, Building #29, An-Shang Park No. Three, Shanghai City, P.R. China 200092.

21.     Upon information and belief, defendant Yue Da-Jin is an individual allegedly residing at the Rui-Jing Palace, Rui-Jing Road, Nanjing City, P. R. China.

22.     Upon information and belief, defendant *Bao Wu Tang* is entity wholly owned by defendant AW and conducts business within the People's Republic of China.

23.     Upon information and belief, defendant *Jian Bao* Gallery is an entity wholly owned by defendant SK and which conducts business within the State of New York.

24.     John Does 1-9 are, upon information and belief, natural persons serving as agents of AW and SK, who received money or other recompense to pose as a *bona fide* purchasers of Estate artwork, but who, in reality, were merely conduits for AW and SK's surreptitious sales and transfers of prized artwork belonging to the Estate and the Plaintiffs for personal enrichment.

## FACTUAL ALLEGATIONS

### I.   *THE C.C. WANG LEGACY*

25.     C.C. Wang (born Wang Jiqian) was a renowned Chinese-American artist and collector, known by many as the last in a centuries-old line of Chinese scholar-artists. He devoted his life to art and had served as the adviser to the prestigious committee organizing the groundbreaking London exhibition of art from the Palace Museum in Beijing, China. During his lifetime, C.C. Wang was the only person to ever examine all of the paintings in the imperial collection.

26.     But C.C. Wang was perhaps best known as a seminal figure and collector in the world of Chinese art antiquities. In his lifetime, C.C. Wang had acquired an Estate comprised of, *inter alia,* several hundred fine and rare Chinese paintings, sculptures and antiques worth upwards of $60 million. His collection of ancient Chinese paintings had been consistently listed as one of the greatest

collections in the world. In 1998, twenty-five paintings from his collection, including the famous hanging scroll "Riverbank" by 10th century master Dong Yuan, were given to the Metropolitan Museum of Art in New York City. The Metropolitan Museum of Art established the "C.C. Wang Family Collection" room to honor his lifetime contributions to the museum.

27.     C.C. Wang first immigrated to the U.S. in 1949 when he fled the communist regime in China. He brought with him his wife and two youngest daughters. One of the daughters who came to the U.S. would pass away. The other, Yien-Koo (a Plaintiff in this proceeding), would go on to establish a prolific career in art, working for years as a sculptor and a public relations agent for her father.

28.     Meanwhile, C.C. Wang's son—defendant SK—remained in China and worked in a factory until 1979, at which point he too immigrated to the United States. Yet by the time he arrived in New York, he had no marketable skills, poor English, and a deep disdain for whom he believed to be C.C. Wang's favored child, his sister, Yien-Koo.

29.     Soon after his arrival, SK began assisting his father in cataloguing and managing his considerable art collection. In 1997, however, C.C. Wang suspected that SK had been embezzling artwork from his collection and could no longer be trusted. To SK's deep dissatisfaction, C.C. Wang turned over all business management responsibilities to Yien-Koo and her husband, Kenneth. SK's anger over this appointment would yield serial underhanded acts, which, though hatched long ago, only recently were made manifest.

30.     By the time C.C. Wang turned to Yien-Koo and her husband to guard his assets in 1997, SK had already secretly pillaged many of them. At C.C. Wang's instance, Yien-Koo formed CY Art Ltd.—a company wholly owned by her and formed for the purpose of acquiring office supplies, promoting C.C. Wang's art, facilitating art transactions, and storing C.C. Wang's art. C.C. Wang was the President of the company.

31.     Though CY Art, Ltd. did not hold legal title to significant assets, it maintained a safe deposit box which it used to store artworks. Some of these stored works belonged to Yien-Koo's personally owned corporation while others belonged to C.C. Wang. Still other Chinese paintings were kept by C.C. Wang in his Manhattan apartment and in various storage locations in the United States and abroad.

32.     At the time of his death, C.C. Wang had amassed a collection of over 400 fine art works. Art experts have called it, among other things, "the greatest collection of Chinese masters outside China." By way of illustration, the value of the art stored in the CY Art safe deposit box was appraised in 2004 to be $12,000,000.00. But as detailed below, this artwork has vanished.

33.     In fact, most of these 400 paintings are now missing from C.C. Wang's Estate, having been misappropriated by the Defendants by stealth through myriad fraudulent schemes.

## II.     *THE BEGINNINGS OF THE SK/ AW CONSPIRACY: THE WANG DEFENDANTS' INITIAL THEFT AND EMBEZZLEMENT OF ARWORKS*

34.     Commencing in the mid-1980s, SK worked as C.C. Wang's bookkeeper and assistant. As part of his duties, SK was entrusted with access to a vast array of valuable artworks as well as his father's funds.

35.     In or about 1997, C.C. Wang had begun to suspect that SK had failed to account for all of his artworks and terminated his employment. It was discovered long afterwards that SK actually removed and embezzled approximately 160 paintings from C.C. Wang's collection.

36.     Soon after SK was denied further access to his father's books and records, Yien-Koo began to handle them in addition to C.C. Wang's art collection and financial affairs. SK's replacement by Yien-Koo, however, widened an already existing rift between the two siblings.

37.     SK and AW have been transparent in their personal animus towards Yien-Koo and their express adherence to traditional cultural mandates. Even before C.C. Wang died, the Wang Defendants were openly insistent that his *male* progeny could be

8

the only successors to the family treasure. Still, their efforts to achieve this result remained mostly clandestine. Employing a variety of tactics including embezzlement, extortion, fraud, forgery, and outright burglary, they have plagued the administration of the Estate and left it unable to account for critical assets. In fact, together with his son, AW, SK plotted for and succeeded at diverting nearly the entirety of the C.C. Wang fortune.

38.     Among his family members, AW was adamant that he should inherit all of the Estate's assets because his father was C.C. Wang's first-in-line male progeny. And AW firmly believed in this entitlement irrespective of anything his grandfather—or the numerous wills naming Yien-Koo as a co-executor and beneficiary—had to say about the subject. That C.C. Wang had chosen to leave Yien-Koo an *equal share* of his estate (both SK and Yien-Koo were bequeathed 35% of C.C. Wang's Estate) was something neither SK nor AW could allow. Then employed as a Chinese art appraiser at Sotheby's, AW became fixated upon his aunt's dominion over the invaluable Chinese artworks and her prospective testamentary entitlements.

39.     In January 2003, five months before C.C. Wang passed away at the age of 96, AW and SK seized their opportunity to correct C.C. Wang's perceived slight to Chinese tradition.

40.      In or about January of 2003, C.C. Wang's physical and mental health began to sharply decline. On January 25, 2003, C.C. Wang's close friend and colleague, Peter Way, hosted a dinner party in Chinatown, which C.C. Wang attended. Noticing C.C. Wang's strange behavior at the party, Peter Way recalled that: "At that time, I commented to Yien-Koo that it appeared to me that her father did not seem to understand where he was and that he had 'lost it.'"

41.     C.C. Wang was hospitalized in March 2003. On April 1, 2003—after several days of interviews and questioning—his physicians determined that he lacked the mental capacity to execute his own medical forms.

42.     C.C. Wang returned from the hospital to his apartment later that spring, where AW and SK watched over him. During that time, he received a visit from his

friend and pupil, Chao Pao Yung. Mr. Chao recalled under oath that C.C. Wang's mental health was obviously weakened. Though the two were good friends, C.C. Wang had significant trouble remembering who Mr. Chao was during the visit. Then, as Mr. Chao was preparing to leave, C.C. Wang grabbed his hand and explained "my son and my grandson do not treat me well."

43.     AW and SK were undoubtedly aware of C.C. Wang's mental weakness. As Mr. Chao was leaving the apartment he overheard AW and SK discussing "the signature for [C.C. Wang's] power of attorney" and if they could utilize C.C. Wang's power of attorney without C.C. Wang's or Yien-Koo's approval.

44.     Two days after Mr. Chao's visit, SK abruptly moved C.C. Wang to his home in Queens, New York to prevent any contact between Yien-Koo and her 96-year-old father.

45.     The Wang Defendants launched what would become a comprehensive scheme to exploit his infirmity to procure fraudulent documents, including a substitute will, and thereby overcome Yien-Koo's stewardship of family assets.

46.     Under SK's exclusive control, C.C. Wang was quickly manipulated into affording his son and AW unbridled access to his assets.

**A.**     *The January 31, 2003 Theft of Twenty-One (21) Paintings From the CY Art Ltd. "Safe Deposit Box" Located at Northfork Bank in Manhattan.*

47.     Prior to his death, C.C. Wang and Yien-Koo jointly operated, and had exclusive access to, a safe deposit box which stored several dozen classical Chinese paintings. The safe deposit box was located at Northfork Bank on the first floor of the Manhattan building in which C.C. Wang lived. The box was held in the name of CY Art Ltd.—a corporation jointly operated by Yien-Koo and C.C. Wang.

48.     On or about January 31, 2003, Yien-Koo took an inventory of the contents of CY Art's safe deposit box and discovered that certain artworks were missing. Though she knew that C.C. Wang had full access to the box, the volume of unaccounted for paintings was alarming. Yien-Koo immediately closed the box, took an inventory of the

remaining contents, and discovered that twenty-one (21) of its most valuable paintings were gone. Most of these missing paintings were the legal property of Northwich while others belonged to C.C. Wang personally.

49.     The 21 paintings which apparently had been taken from the vault were as follows:

i.      <u>Figures and Calligraphy</u> – by *Chen Hongshou* (1598-1652), handscroll [D1601], valued $75,000;

ii.     <u>Album of Calligraphy</u> – by *Dong Qichang* (1555-1636), album of 23 leaves [A0600], valued $65,000;

iii.    <u>Landscape After Tang Yin</u> – by *Hua Yan* (1682-1765) [D1502], valued $150,000;

iv.     <u>Landscape</u> – attributed to *Huang Gongwang* (1269-1354), album leaf, mounted as hand scroll [D0101], valued $ 65,000;

v.      <u>Landscape</u> – attributed to *Ma Yuan* (13th Century), hand scroll [D0701], valued at $200,000;

vi.     <u>Flowers and Fruits of the Four Seasons</u> – by *Shen Zhou* (1427-1509), hand scroll [D2101], valued $180,000;

vii.    <u>Grapes</u> – attributed to *Wen Riguan* (13th Century), hand scroll [D2201], valued $65,000;

viii.   <u>Tilling the Fields</u> – by *Zhou Chen* (ca. 1450-1536), hand scroll [D1401], valued $180,000;

ix.     <u>Romantic Spirit of the Eastern Jin</u> – by *Fang Congyi* (14th Century), hand scroll [D0202], valued $600,000

x.      <u>Mountains and Streams in the Clear Distance</u> – by *Hongren* (1610-1664), hand scroll [D1802], valued $250,000

xi.     <u>Dream of Zhuangzi</u> – by *Liu Guandao* (13th Century), hand scroll [D1901], valued $400,000;

xii.    <u>Album of Landscapes</u> – by *Ma Yuan* (13th Century), with facing leaves of Imperial poetic inscriptions, album of 10 double-leaves [EA0400], valued $2,500,000;

xiii.   <u>Album of Landscapes for Daoist Yu</u> – by *Shi Tao* (Yuanji, 1642-1707), album of 12 leaves [A0300], valued $3,000,000;

xiv.    <u>Landscape</u> – by *Shi Tao* (Yuanji, 1642-1701), hand scroll [D0602], valued $1,000,000;

xv. <u>Landscape</u> – by *Tang Yin* (1470-1523), hand scroll [D0401], valued $ 300,000;

xvi. <u>Mountain Forest</u> – by *Wang Fu* (1362-1416), hand scroll [D1302], valued $150,000;

xvii. <u>Snowscape</u> – by *Wang Hui* (1642-1717), hand scroll [D0501], valued $300,000;

xviii. <u>Snowscape</u> – by *Wen Zhengming* (1470-1559), hand scroll [D0502], valued $600,000;

xix. <u>Auspicious Omens</u> – attributed to *Xiao Zhao* (1126-1173), hand scroll [D1102], valued $180,000;

xx. <u>Narcissi</u> – by *Zxhao Mengjian* (1199-ca. 1267), hand scroll [D1002], valued $750,000; and

xxi. <u>Landscape Painted for *Xianyu Shu*</u> – by *Zhao Mengfu* (1254-1322), hand scroll [D0801], valued $800,000.

50. The paintings numbered 1, 4, 6, 8, 9, 10, 11, 14, and 18 above are owned by plaintiff Northwich, while painting number 13, is owned by Kenneth King's corporation, plaintiff Soon Huat, Inc. The remaining paintings were the personal property of C.C. Wang. Of the works taken, five paintings (Nos. 3, 4, 10, 13, and 19) were returned to Yien-Koo many years later by AW. The remaining sixteen have not been recovered by the Plaintiffs or the Estate, and their precise whereabouts remain unknown.

**B.** ***The January 31, 2003 Theft of Four (4) Paintings from C.C. Wang's Apartment in Manhattan.***

51. Aware of C.C. Wang's diminished mental health, Yien-Koo went upstairs to her father's apartment to search for the 21 missing works. Instead of finding the paintings from the safe deposit box, she discovered that four additional paintings which should have been in C.C. Wang's apartment, were also gone. These four paintings were:

i. <u>Clear Morning Over Lakes and Mountains</u> – attributed to *Juran* (10th Century), hanging scroll [H0503], valued $2,500,000;

ii. <u>Pine and Chrysanthemums in Tao Garden</u> – by *Wu Li* (163201718), hanging scroll [H0803], valued $300,000;

iii. <u>Gathering Firewood in the Snow</u> – by *Tang Yin* (1470-1523), hanging scroll [H0806], valued $240,000; and

    iv.   <u>Pine Pavilion Mountain</u> – by *Ni Zan* (1301-1374), hanging scroll [H0105], valued $2,000,000.

52.    Paintings numbers 1, 2, and 4 above are owned by plaintiff Northwich.

53.    Painting number 3 was owned by C.C. Wang.

54.    According to a February 17, 2004 appraisal of the 25 missing works, undertaken by a former Sotheby's employee (Arnold Chang) they were at that time collectively worth $16,775,075.

**C.**    ***AW Admits to Taking Approximately Twenty Paintings From the CY Art Ltd. Box and Uses Them as Leverage to Exercise Control Over Yien-Koo and C.C. Wang's Estate.***

55.    As of the date hereof, the theft of the 25 paintings is not a mystery. AW took them.

56.    During a sworn deposition in 2005, AW admitted that "on January 31st [of 2003]" he went to the CY Art safe deposit box, allegedly with the 96-year old C.C. Wang at his side, and filled "two bags" with "small scrolls" of Chinese paintings "from the vault."

57.    AW testified that he then carried these two bags of paintings—later appraised to be worth over $12,000,000.00—"upstairs" to his grandfather's apartment. He claims he placed the bags of Chinese art "under [C.C. Wang's] bed." In total, AW recalled that the two bags of paintings from the CY Art safe deposit box contained "between fifteen to twenty" paintings.

58.    AW has also testified that, several days after January 31, 2003, he took the two bags of paintings from C.C. Wang's apartment to his "father's house" in Queens, where he had his own room, his "own closet and [his] own cabinet" in which he could store the bags of paintings.

59.    Yien-Koo confronted AW in February 2003 once she realized which paintings were missing.  In a conversation tape recorded on February 4, 2003, AW explained that even though certain of these paintings belonged to Yien-Koo outright

and that she was to share in the value of the others upon C.C. Wang's death, he and his father *did not trust* Yien-Koo with control of family assets.

60.     AW referred to the ailing man's assets as a "piece of cake" that he wanted to "enjoy."

61.     During this conversation, AW threatened that he would only refrain from selling the paintings he took from the CY Art safe deposit box if Yien-Koo turned over control of the balance of the *family's assets*.

62.     While recalling this February 4, 2003 confrontation at a deposition, AW testified: "I said if you [Yien-Koo] bring back the stuff that you have taken, then I [AW] will bring back the stuff that I have taken. I said that to her, yes." And when asked if by the "stuff that [he] had taken," he was referring to the "twenty plus paintings" from the CY Art safe deposit box, AW responded "Right."

63.      Based upon this, Yien-Koo would come to turn over 64 of C.C. Wang's paintings to SK in the spring of 2003. Yet, for their part, SK and AW did not turn over or distribute any of the 25 stolen paintings until May 2005, when they merely released five of them.

64.     Yien-Koo first sought to recover these paintings in Surrogate's Court in 2004. Her efforts have been stayed for nearly 13 years.

65.     Yien-Koo is currently 82 years old.

66.     Meanwhile, Yien-Koo's nephew has come to fully recant his tape-recorded statements about having personal custody of the 25 stolen paintings.  AW now claims he is not certain as to what became of the "fifteen to twenty" paintings he took from the CY Art box. He and SK purport to know only that they do not have the artworks.

67.     Upon substantial information and belief, AW and SK are in possession of the stolen paintings.

68.     Upon substantial information and belief, AW and SK shipped these stolen paintings to China between 2003 and May 11, 2005—on which date AW gave 5 paintings stolen from the CY Art box back to Yien-Koo at a hotel in Shanghai, China.

69.     Northwich, Soon Huat, and the Estate have been directly injured as a result of these thefts and shipments.

**D.      SK and AW Propound a Fake Will and Insert AW as a Fiduciary of the Estate, Thus Gaining Access to All of the Estate's Paintings.**

70.     C.C. Wang died at the Cabrini Hospice in Manhattan on July 3, 2003 with Yien-Koo at his bedside.  He was survived by Yien-Koo, SK, one other sibling, and several grandchildren from his pre-deceased daughter.

71.     In due course, Yien-Koo propounded C.C. Wang's long extant June 13, 2000 will and July 10, 2002 codicil to the New York County Surrogate's Court. As was known to all relevant parties for many years preceding C.C. Wang's demise, Yien-Koo is named as executor and a principal beneficiary in these documents and entitled to 35% of C.C. Wang's Estate (equal to SK's share). Indeed, Yien-Koo had been named as a beneficiary in each of C.C. Wang's eight prior testamentary instruments.

72.     One week after Yien-Koo filed C.C. Wang's 2000 will and 2002 codicil, SK and AW produced an as of yet undisclosed *second* will. According to SK and AW, the document ostensibly replaced the June 13, 2000 and July 10, 2002 instruments. Their instrument had been allegedly executed on February 18, 2003—four months before C.C. Wang's death, and near the time his physicians declared him mentally incapable of even executing his own medical forms.

73.     For his part, the attorney SK hired and directed to draft the new will, would acknowledge in sworn testimony that he had no familiarity with C.C. Wang or his prior testamentary instruments. The pre-signing conferences as well as all of his drafting were conducted exclusively through communications with SK and never involved C.C. Wang.

15

74.     According to the alleged new will, AW is ostensibly designated as the executor of C.C. Wang's Estate and he, his father, and his brother (Stephen Wang) are made chief beneficiaries.

75.     None of C.C. Wang's prior eight testamentary instruments executed during his lifetime spoke to any of these arrangements. In fact, AW and his brother had never before been mentioned in any of C.C. Wang's wills prior to February 18, 2003. And despite Yien-Koo's status as a beneficiary in each of C.C. Wang's previous wills, the alleged February 2003 will purported to completely disinherit her.

76.     AW and SK's machinations did not stop with the theft of the CY Art safe deposit box paintings or the February 2003 will. On July 1, 2003—less than 48 hours before C.C. Wang's death—SK coerced, or otherwise forged the signature of, the heavily medicated and dying C.C. Wang.

77.     He did so to revoke a revocable trust (the "**Trust**") which possessed tens of millions of dollars' worth of assets (and of which Yien-Koo had a 35% stake).

78.     C.C. Wang had amended the Trust three times since its creation, and each time the amendment was executed before a notary public or witnesses. Yet the supposed multi-million-dollar Trust *revocation* had no witnesses and was not executed before a notary public.

79.      In fact, upon information and belief, the signed revocation is a forgery that does not bear resemblance to C.C. Wang's well-documented and true signature.

80.     Upon further information and belief, SK and AW forged the signature on this alleged deathbed Trust revocation.

81.     The day before C.C. Wang died, SK used the fake revocation to rapidly relocate the Trust's assets. Bank records show that on July 2, 2003, SK: liquidated the entirety of a Charles Schwab Account held in the Trust's name, cashed out $140,000.00 of the trust's money market funds, wired $140,000.00 to another account to which he

was a signatory and traded in all of the Trust's other Charles Schwab investments (valued at over $700,000.00) for cash.

82.     In or about July 2003, Yien-Koo initiated a Surrogate's Court proceeding contesting SK's alleged second will.

83.     Regardless of any challenge Yien-Koo mounted to its legitimacy, however, SK and AW had lain the foundation to access the Estate's assets. On August 4, 2003, the court issued temporary letters of administration to the Public Administrator and preliminary testamentary letters to AW. The Public Administrator was tasked with inventorying the Estate to ascertain that of which would be available for distribution. By November 2003, AW was also given leave to undertake discovery proceedings pursuant to SCPA § 2103 in service of this purpose.

84.     Months later, SK and AW would mail the forged signature to both the New York County Public Administrator and Yien-Koo King as part of their effort to convince them that the Trust had been revoked and abandoned by C.C. Wang.

85.     Next, even as the two C.C. Wang wills remained in contest (as they remain as of the date of this Amended Complaint), AW assumed the role of Estate fiduciary and exercised dominion and control over the Estate's assets without any check on his discretion and an absence of meaningful oversight by the Public Administrator.

### E.     *The Conversion of the Ma Yuan Landscape Album Through the Jian Bao Gallery.*

86.     The *Ma Yuan* Landscape Album is one of the 21 works that Yien-Koo identified as missing from the CY Art safe deposit box. At the time of its theft in 2003, the *Ma Yuan* was valued at $2,500,000.00 and belonged to C.C. Wang. It came to be the only art piece stolen from the CY Art safe deposit box that AW and SK admitted to having in their possession after C.C. Wang's death.

87.     The acquisition and illicit sale of this multi-million-dollar asset was accomplished by AW and SK through a corporation known as the *Jian Bao Gallery*.

88.     Nearly 30 years ago the *Ma Yuan* Landscape Album was purchased at a Sotheby's auction for over $300,000.00 on C.C. Wang's behalf using funds provided by C.C. Wang. It was one of the most valuable works in C.C. Wang's collection.

89.     Given the value (approximately $2,500,000.00) and importance of the work (it was created in the 13th century), both SK and AW were questioned extensively about its whereabouts in proceedings before the New York County Surrogate's Court. During depositions conducted on November 17th and 18th, 2003, the Wang Defendants repeatedly testified that the *Ma Yuan* Landscape Album was in "SK's possession" and was owned and controlled by SK's *Jian Bao Gallery.*

90.     Specifically, on November 17, 2003, AW testified that the *Ma Yuan* Landscape Album was a work owned by his father, SK, to whom he directed all questions about its status.

91.     On November 18, 2003, when SK was questioned about the 25 paintings from the CY Art safe deposit box, he denied knowledge of all of them except the *Ma Yuan* Landscape Album.

92.      SK insisted that C.C. Wang gave him the artwork in the spring of 2003—after AW's trip to the CY Art box and removal of two bags worth of paintings. He further insisted that he was keeping it secure while Estate proceedings were ongoing in compliance with a court-ordered preliminary injunction. He claimed the work was under the control of his *Jian Bao Gallery.*

93.     SK's testimony that he then had possession of the *Ma Yuan* in November 2003 was repeated multiple times without equivocation.

94.     Upon information and belief, SK and AW sold the *Ma Yuan* and kept the proceeds. In a 2011 interview aired on Chinese national television, an art-collector named Zhu Shaoliang acknowledged that he purchased the *Ma Yuan* Landscape Album from C.C. Wang's family (after his death) for more than $5,000,000.00 USD.

95.     In the interview Mr. Zhu explains the price he paid in purchasing the *Ma Yuan* from the "Wang family", in pertinent part, as follows:

> Host: In 2003, Mr. Wang Jiqian [C.C. Wang] passed away. Zhu Shaoliang persistently contacted Wang's family, in the hope of buying one of the finest paintings of the Song Dynasty, which was in Mr. Wang Jiqian's collection. Following repeated discussions and negotiations, Zhu Shaoliang finally obtained this priceless work of the Southern Song, "Yu Ti Ma Yuan Shanshui Ce" (Ma Yuan's Landscape Album Inscribed by the Emperor).

> Zhu Shaoliang: At the time, the sale price of the Ma Yuan piece was a record high price, without precedent, either in the auction market or the arena of private transactions. This price was one that no one at that time would have accepted. I accepted it.

96.     AW was deposed again in December 2013—more than ten years after he first claimed he knew nothing of the *Ma Yuan,* other than that it belonged to SK.

97.     When confronted with the assertions made in the foregoing 2011 interview—and the apparent fact that the *Ma Yuan* was now in the hands of a Chinese collector—AW generated an entirely new account of the painting flatly contradicting his and his father's 2003 testimony about its location.

98.     Now AW testified the work had *not* been "returned to SK in the spring of 2003," as he and his father had previously stated under oath. In light of the interview proving the *Ma Yuan*'s sale, AW took the inconsistent position that his father never had the Landscape Album at all. According to the new account, C.C. Wang made an ostensible last minute sale of the *Ma Yuan* to a "collector from Beijing."

99.     Like all of the activities SK and AW attribute to the long ago deceased C.C. Wang, the sale of the *Ma Yuan* supposedly occurred in the spring of 2003, shortly before his death.

100.    When asked if there was any record of the sale or if the sale could be identified from C.C. Wang's bank account, AW falsely testified that all of the revenue

C.C. Wang received from the sale (supposedly $310,000.00)—was wired directly to C.C. Wang's relative in Taiwan.

101.    And when asked why he and his father continually swore under oath that they possessed the *Ma Yuan* back in 2003, AW blamed C.C. Wang. According to AW, the cluster of inconsistencies in his (and his father's) prior sworn testimonies about the *Ma Yuan* Landscape Album's location was due to an alleged instruction by his late-grandfather to keep the purported sale of the *Ma Yuan* a secret.

102.    Upon information and belief, the *Ma Yuan* Landscape Album was actually sold by SK and AW after C.C. Wang's death as part of their fraudulent scheme to acquire Estate assets for themselves. Not only did AW and SK lie about the transaction, but the Plaintiffs did not discover its true circumstances until no earlier than 2012.

103.    As described in the following paragraphs, AW and SK reinvested the funds derived from the sale of the *Ma Yuan* Landscape Album and other works stolen on January 31, 2003 to fraudulently purchase assets from the C.C. Wang's Estate at artificially low prices.

### III.    *THE MULTIPLE SCHEMES TO LOOT AND USURP C.C. WANG'S ASSETS THROUGH STRAW MEN*

104.    Estate administration proceedings concerning whether C.C. Wang validly executed the February 2003 will and the whereabouts of C.C. Wang's missing assets commenced in the fall of 2003.

105.    During the pendency of those proceedings, AW purported to sell 98 pieces of Estate classical artwork to pay ongoing administrative expenses.

106.    Andrew claimed that major U.S. auction houses such as Sotheby's, Christie's, and Acker Merrill & Condit all refused to auction the 98 paintings he proposed to sell.

107.    AW made these assertions in order to obtain the Public Administrator's approval for his transactions with personal "friends" of his in the Chinese art

community. It would be discovered much later, however, that these sales were truly made to *straw men* purchasers; AW contrived to sell Estate paintings to himself at fire sale prices, then resell them for far greater amounts abroad.

108.    Thus, between 2005 and 2009 AW purported to facilitate sales transactions for all 98 Estate-owned paintings to just five individuals:

- Anthony Chou,
- Chen-Mei-Lin,
- Wei Zheng,
- Ye Yong-Qing, and
- Yue Da-Jin (collectively referred to as the "**Straw Men**")

109.    The bills of sales for the transactions with his friends reveal that the paintings were sold for *far* below their actual market value. In fact, some of the paintings sold to the Straw Men were subsequently sold at auctions for prices up to 22 times the amounts allegedly paid by AW's alleged friends.

110.    At least eleven of the 98 paintings sold to the Straw Men were publically resold at auctions in China within three years. Though AW sold these eleven-resurfacing works to the Straw Men for a combined price of $483,400.00, they went on to generate revenue at auction of approximately $7,785,541.20.

111.    But astronomical resale values are not the only indicia of the underlying fraud in the Straw Men contracts. All works sold by AW to the five Straw Men were shipped to the same address in Hong Kong, regardless of the buyer's actual places of residence.

112.    Thus, for example, even though he lives in an apartment in Rego Park, Queens, Defendant Wei Zheng had $400,500.00 worth of artwork shipped to an individual named "Billie Wei" in Hong Kong.

113.    Other indicia from the contracts of sale prove that AW was secretly on both sides of the transactions. A contract for the sale of approximately $1,400,000.00 worth of classical Chinese artwork surreptitiously lists AW's *own apartment address* as though it were the straw man's (defendant Chen Mei Lin's) living address.

114.    Moreover, recent testimony from one of AW's confederate's has irrefutably confirmed that AW submitted fraudulent contracts to the Public Administrator for approval. Defendant Wei Zheng, who signed an agreement with the Estate on February 16, 2005 to purchase $400,500.00 worth of artwork has admitted that his contract with the Estate is a sham.

115.    The contract Wei Zheng signed with AW and the Public Administrator describes him as the purchaser of $400,500.00 worth of artwork. The bill of sale Wei Zheng signed further represents that he had paid for and received the artwork from the Estate. Yet, Wei Zheng has come to testify that the documents he signed and AW submitted to the Public Administrator for approval are all false: he has "no idea" who actually purchased the paintings or where they are now.  He testified that he signed the documents in his own name as a favor for AW and that he has "never" once purchased classical Chinese art in his entire life.

116.    AW is the only representative from the Estate or the Surrogate's Court ever met with, corresponded, or spoke to any of the Straw Men at the time the multi-million dollar transactions were entered into.

117.    Aside from the (i) resale values, (ii) internal indicia that the Straw Men contracts were fraudulent, and (iii) testimony of Wei Zheng that he was not a true buyer, the (iv) subsequent appearances of the Estate-sold artwork in China show that the paintings fell under the common control of a single enterprise—not five unrelated purchasers.

118.    The Plaintiffs learned in the fall of 2013 that at least eleven of the 98 paintings sold to several different Straw Men appeared in a three-week museum exhibition which received national media coverage in China.

119.    The Beijing-based Capital Museum (首都博物馆) hosted a three-week exhibition commencing in November 2009 entitled "*Bao Wu Tang*—an Important Overseas Chinese Painting and Calligraphy Collection Exhibition" (宝五堂－海外华人重要书画珍藏展).

120. *Bao Wu Tang* is Andrew Wang's personal art gallery and its name translates to the "Hall of Five Treasures."

121. In his preface to the exhibition's hard-cover book publication, AW touted the 27 works on display, including the 11 works that were supposed to have been sold to the Straw Men, as having been culled from "the collection of my late grandfather Mr. Wang Jiqian [and] from partial collections of family members."

122. AW, his Gallery, and the "Wang Family" are the only entities which received credit for the work on display. Supporting the fact that the works came from AW, an article published by Artron.net states that AW's actions proved that the "Wang family descendants inherited" C.C. Wang's desire for "public service."

123. The Straw Men who AW convinced the Public Administrator and Estate would be the new owners of the works are not mentioned.

124. Thus, once in China and out of the Estate's custody and control, AW and SK used AW's *Bao Wu Tang* gallery to promote, store, display, and traffic the fraudulently acquired paintings.

125. In addition to their display at the Capital Museum, works sold to the Straw Men resurfaced at auction houses between 2008 and 2012.

126. There are hundreds of potential auction houses in China at which the Straw Men's works could have resurfaced. Yet all eleven resurfacing works have improbably appeared at the *same two* auction houses between 2008 and 2012: the "Chieftown" and "Poly International" auction houses. In other words, works sold to the five separate Straw Men were being resold in clusters at the same auction houses, on the same days, and at the same time—establishing they were controlled by a common enterprise (*i.e.* the Defendants' enterprise).

127. Meanwhile, the Estate to which he was trusted to act as a fiduciary is currently insolvent by a margin exceeding $20,000,000.00 due to his thefts.

128. Further, the Plaintiffs recently discovered that forty-three of the 160 paintings that disappeared during SK's tenure as C.C. Wang's assistant and bookkeeper

have improbably resurfaced at auction houses and at museum exhibitions right alongside the 98 paintings sold to Straw Men.

129.    By and through the foregoing activities, for more than a decade, the Defendants conducted, engaged in, and reinvested into, an ongoing pattern of racketeering activity comprised of, among other illicit activities, the transmission of false documents through domestic mails and wires and the laundering of their ill-gotten gains through illegal overseas channels.

130.    SK and AW meticulously concealed their multiple schemes even as they yielded his and his father's personal enrichment by millions of dollars and occasioned losses to the Estate, its beneficiaries and the Plaintiffs.

A.    *The Bogus June 16, 2005 Sale of Estate Paintings to Straw Man Anthony Chou and the Ensuing Resale of the Works Abroad.*

131.    On or about June 16, 2005, AW claimed to have sold seventeen Estate paintings to an individual known as "Anthony Chou" for a total of $909,689.41.

132.    The following is a list of paintings that were transferred from the Estate to "Anthony Chou" on June 16, 2005 with corresponding sales prices in the right most column:

|  | Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|---|
| 1. | *Wang Yuanqi* | Landscape after Huang GongWang | OTE# 83 | $30,000 |
| 2. | *Zha ShiBiao* | Landscape | OTE# 92 | $ 10,800 |
| 3. | *Yao Shou* | Landscape | OTE# 100 | $55,000 |
| 4. | *Hua Yan* | Swallows with Bamboo & Plumb in Snow | OTE#108 | $36,000 |
| 5. | *Gong Xian* | Ten Thousand Valleys | OTE#127 | $90,000 |
| 6. | *Dong QiChang* | Four Landscapes | OTE#135 | $36,000 |
| 7. | Anonymous | Horse and Groom | OTE#137 | $9,600 |
| 8. | Attributed to *Shen Mou* | Landscape after Wu Zhen | OTE#147 | $14,400 |
| 9. | *Wen ZhengMing* | Calligraphy | OTE#152 | $60,000 |
| 10. | *Jiufeng Daoren* | Horses and Grooms | OTE#154 | $72,000 |
| 11. | Anonymous | Dragon | OTE# N/A | $165,000 |
| 12. | *Style of Tang Yin* | Gathering at Lanting Pavilion | OTE#210 | $7,200 |

| 13. | *Shen Zhou* | Garden Scenes | OTE#220 | $200,000 |
| 14. | *Liu Yan Chong* | Album of Landscapes | OTE#241 | $28,800 |
| 15. | Attributed to Various Artists | Calligraphy in Letters | OTE#247 | $24,000 |
| 16. | *Liu Yan Chong* | Washing the Elephant | OTE#1001 | $24,000 |
| 17. | *Lu Ji* | Flower and Birds of Winter | OTE#1000 | $39,000 |

133.    According to the contract of sale, this group of seventeen paintings was shipped to an individual known as "Billie Wae" at Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong.

134.    The telephone number stated for "Billie Wae" in the June 16, 2005 contract is not a functioning telephone number, but rather a fax number.

135.    The contract of sale also states that Anthony Chou resides at Apt. #8, Sunshine Square, YaYunChun, District, Beijing City, P. R. China 100014.

136.    This address listed for Anthony Chou in the contract of sale does not exist.

137.    Two of the works ostensibly sold to Anthony Chou (highlighted above) were paintings titled "Landscape after *Huang GongWang,*" by *Wang Yuanqi,* for $30,000, and "Ten Thousand Valley*s,*" by *Gong Xian*, for $90,000. These paintings are highlighted in the above chart.

138.    In 2013, the Plaintiffs discovered that the "Landscape after *Huang GongWang*" painting resurfaced at the Chieftown, Beijing Fall 2008 auction.

139.    Though AW—in his capacity as an Estate fiduciary—supposedly sold this painting to his friend Anthony Chou for $30,000 three years earlier, the painting was re-sold for approximately $272,625.36[1] as lot 690 at the 2008 Chieftown auction.

140.    The resale price was 900% higher than the price paid to the Estate.

141.     Upon information and belief, AW pocketed the proceeds from this sale.

142.    Similarly, in 2013, the Plaintiffs discovered that the "Ten Thousand Valleys" painting had resurfaced at the Chieftown Hong Kong Spring 2009 auction.

---

[1] All auction prices are based upon an exchange rate of $1 USD = 6.16 RMB and $1 USD = 7.75 HKD.

143.    Though AW—in his capacity as an Estate fiduciary—sold this painting to his friend Anthony Chou for $90,000.00, the painting was resold for approximately $851,505.60 as lot 472.

144.    Thus, the "Ten Thousand Valleys" painting was re-sold only four years after AW's bogus sale to Anthony Chou at 950% higher than the price paid to the Estate.

145.    The Anthony Chou transactions are not merely suspect by reason of the sale and resale price differentials, but also due to the physical *trajectories* the artworks took after their sale. For instance, a painting allegedly sold to Anthony Chou as part of the 2005 transaction named titled *Dragon* by Anonymous resurfaced at AW's *Bao Wu Tang* exhibition in 2009, as part of a "national celebration" of the "Wang family collection."

146.    Likewise, a painting entitled "Calligraphy" by *Wen Zheng Ming*, that was "sold" to Anthony Chou also resurface at AW's *Bao Wu Tang* exhibition in 2009. It too was identified as artwork belonging to the "Wang family collection" by the AW Gallery and the Capital Museum.

147.    Anthony Chou is not mentioned in the museum publication or credited by Andrew during any of his interviews as having contributed to the exhibition.

148.    Thus, having earlier sold both of the foregoing paintings on behalf of the Estate in presumably arms-length transactions, in 2009 AW publicly held himself out as their owner.

149.    Upon information and belief, AW, through means of U.S. wires, transmitted the fraudulent documents to the Public Administrator on June 16, 2005.

150.    Upon information and belief, AW caused $909,689.41 to be transferred to the Estate's bank account on June 16, 2005 in furtherance of the scheme to fraudulently acquire the Estate's assets.

**B.**     ***The Bogus April 13, 2005 Sale of Estate Paintings to Straw Man Chen Mei-Lin and Subsequent Resale Abroad.***

151.    On or about April 13, 2005, AW purportedly sold 24 Estate paintings to Chen Mei-Lin for a total of $1,393,422.00 as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|
| Attributed to ShiTao | Landscape-Qing Dynasty | OTE#94 | $18,000 |
| Attributed to Huang GongWang | Landscape | OTE#97 | $24,000 |
| ShiTao | Orchids | OTE#98 | $28,800 |
| Xu Wei | Vines | OTE#102 | $24,000 |
| Wang ShiMin | Untitled | OTE#112 | $36,000 |
| NiZan | Trees on a River Shore | OTE#129 | $275,000 |
| Wang Hui | Summer Woods | OTE#130 | $85,000 |
| Wu Li | Landscapes | OTE#136 | $54,000 |
| Style of Qiu Ying | Children Playing | OTE#139 | $4,800 |
| Anonymous | Scholar with Qin Approaching Pavilion | OTE#142 | $19,200 |
| Qian Du | Watching the Clouds Arise | OTE#153 | $15,600 |
| Shen Chou | Landscape after Zhao Mengfu | OTE#157 | $132,000 |
| Various Ming Dynasty Artists | N/A | OTE#163 | $170,000 |
| Anonymous | Crane Under Pine | OTE#211 | $14,400 |
| Niu ShiHui | Fish | OTE#212 | $18,000 |
| Zhou TianQiu | Orchids | OTE#222 | $21,600 |
| Tang Yin | Planting Bamboo | OTE#223 | $165,000 |
| Chen YuanSu | Orchids | OTE#229 | $14,400 |
| Attributed to LuZhi | Distant Streams | OTE#233 | $14,400 |
| XieSHiChen | Fisherman | OTE#230 | $12,000 |
| Tang Ying | Mountain Pavilion | OTE#238 | $180,000 |
| WangYuanQi | Landscape | OTE#239 | $33,600 |
| Anonymous after Qian Xuan | Three Gentleman After Drinking | OTE#240 | $14,400 |
| Wang Jian | Fan Landscape after Dong Yuan | OTE#245 | $6,000 |

152.   Two of the works "sold" to Chen Mei-Lin, namely *Qian Du*, "Watching the Clouds Arise," and Anonymous, "Three Gentlemen after Drinking," (highlighted above) had respective sales prices of $14,400.00 and $15,600.00.

153.   In 2013, the Plaintiffs discovered that "Three Gentlemen After Drinki*ng*" was valued by the Chieftown, Beijing Spring 2008 auction house at approximately $1,298,216.00: 8,000% higher than the price paid to the Estate.

154.    In 2013, the Plaintiffs discovered that "Watching the Clouds Arise" was sold for approximately $181,750.24 as lot #671 at the Chieftown, Beijing Fall 2008 auction: 1,165% of the Estate's sale price.

155.    A third painting supposedly sold to Chen Mei-Lin entitled "Summer Woods" by *Wang Hui* was displayed by AW's *Bao Wu Tang* gallery at the Capital Museum exhibition in 2009 as part of the "Wang family collection."

156.    A fourth painting supposedly sold to Chen Mei-Lin entitled "Trees on a River Shore" by *NiZan* was displayed by AW's *Bao Wu Tang* gallery at the Capital Museum exhibition in 2009 as part of the "Wang family collection."

157.    A fifth painting supposedly sold to Chen Mei-Lin entitled "Landscape after *Zhao Mengfu*" by *Shen Chou* was displayed by AW's *Bao Wu Tang* gallery at the Capital Museum exhibition in 2009 as part of the "Wang family collection."

158.    A sixth painting supposedly sold to Chen Mei-Lin by the artist *Wang ShiMin* was displayed by AW's *Bao Wu Tang* gallery at the Capital Museum exhibition in 2009 as part of the "Wang family collection."

159.    Chen Mei-Lin is not mentioned in the museum publication or credited by Andrew during any media interviews as having contributed to the 2009 exhibition.

160.    A seventh painting supposedly sold to Chen Mei-Lin entitled "Landscapes" by *Wu Li* was displayed at a Poly Museum art exhibition in 2010 in which AW and *Bao Wu Tang* are credited with providing artwork in the exhibition's publication.

161.    As with the Capital Museum publication, Chen Mei-Lin is not mentioned in the Poly Museum publication at all.

162.    Whereas the contracts of sale for Chen Mei-Lin identifies that he resides at #777 Lane, Apt. #28-A, Xin-Ja Ave. Jing-An District, Shanghai City, P.R. China 100014, the address does not exist. However, but for the inversion of some numbers, it is nearly

identical to AW's own personal address in Shanghai: Xin-*Zha* Road, #777 Lane, Building No. 1, Apt. #28A, *200041* (differences italicized).

163.    Once AW's address was discovered on the Estate's contract with Chen Mei Lin, SK and AW admitted—in a verified submission to the Surrogate's Court sworn to on August 28, 2014—that the paintings allegedly sold to Chen Mei-Lin for $1.4 million were, in fact, "shipped" to AW's "own address."

164.    The sworn statement goes on to claim that the paintings were shipped to AW's "own address" in Shanghai as an "accommodation to the buyer [Chen-Me Lin]."

165.    AW and SK have gone on to falsely claim that Chen Mei Lin's contract with the Estate used AW's "own address" in Shanghai, because Chen Mei Lin was living in AW's apartment at the time. According to AW, this is because Chen Mei Lin's apartment was being "renovated."

166.    At the time AW orchestrated the $1.4 million sale with "Chen Mei Lin" and sought the New York County Public Administrator's approval, he had not disclosed that the purported buyer of $1.4 million in Estate assets was sleeping in his—the Estate fiduciary's—apartment.

167.    It was only after the Kings noticed that the address listed for Chen-Mei Lin in the April 2005 contract was the same as the address used by AW had used for himself on other forms, that AW first raised the notion that "Chen-Mei Lin" was living with him at the time of the 2005 sale.

168.    The contract is fraudulent, the sale was fraudulent, and the shipment of artwork from the Estate to China was fraudulent.

169.    Further, all of the ostensible Chen Mei-Lin acquired paintings were, somehow, *also* purportedly shipped to Billie Wae at Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong, according to terms of the April 2005 contract.

170.    Upon information and belief, AW, through means of US wires, transmitted the fraudulent documents to the Public Administrator on April 13, 2005.

171.     Upon information and belief, AW caused $1,393,422.00 to be transferred to the Estate's bank account on April 13, 2005 in furtherance of the scheme to fraudulently acquire the Estate works.

172.     At all relevant times, AW used US mails and wires, by means of telephone calls, fax transmissions, regular mail and overnight courier services, as instrumentalities for advancing his deceit upon the Plaintiffs, the Estate, the Public Administrator and the Surrogate's Court.

   **C.**     ***The Bogus February 16, 2005 Sale of Estate Paintings to Straw Man Wei Zheng.***

173.     On or about February 16, 2005, AW purportedly sold 17 Estate works to an individual named Wei Zheng for a total price of $400,500 as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|
| Attributed to *Xugu-Pipa* | N/A | OTE#84 | $2,400 |
| *Lin Lian* | Water Fowl | OTE#85 | $21,600 |
| Attributed to *NiZan* | Bamboo & Rock | OTE#106 | $24,000 |
| *ShiTao* | Vegetables | OTE#115 | $30,000 |
| Anonymous | Album Leaf | OTE#138 | $6,000 |
| Anonymous | Album Leaf | OTE#140 | $4,800 |
| Anonymous | Fan Painting | OTE#141 | $6,000 |
| Anonymous | Fan Painting | OTE#145 | $7,200 |
| Anonymous | Fan Painting | OTE#146 | $14,400 |
| Anonymous | Fan Painting | OTE#148 | $14,400 |
| *Tang Yin* | Landscape | OTE#150 | $240,000 |
| Anonymous | Scholar in Boat | OTE#160 | $4,800 |
| *Zhang ZhaoXiang* | Peonies | OTE#200 | $2,080 |
| *Li ShiZhou* | Landscape | OTE#232 | $9,600 |
| Style of *Zhou Lianggong* | Maple Trees & Rocks | OTE#237 | $1,800 |
| *Wang Hui-Fan* | Landscape | OTE#246 | $6,000 |
| Attributed to *Qi BaiShi* | Shrimps | OTE#1005 | $650 |

174.   The two paintings, namely, "Vegetables" by *ShiTao* and "Bamboo & Rock," by *NiZan* (highlighted above) were "sold" on behalf of the Estate to Wei Zheng in 2005 for $30,000 and $24,000 respectively.

175.   In 2013, the Plaintiffs discovered that "Bamboo & Rock" was resold for approximately $510,720.00 as lot 435 at the Chieftown, Beijing Spring 2008 auction: 2,100% higher than the price paid to the Estate.

176.   Similarly, in 2013, the Plaintiffs discovered that "Vegetables" was resold for approximately $371,800.00 as lot 465 at the Chieftown, Hong Kong Spring 2009 auction: 1,239% higher than the price paid to the Estate.

177.   A third painting supposedly sold to Wei Zheng entitled "Landscape" by *Tang Yin* was displayed by AW's *Bao Wu Tang* gallery at the 2009 Capital Museum exhibition as part of the "Wang family collection."

178.   A fourth painting supposedly sold to Wei Zheng entitled "Fan Painting" by Anonymous (OTE#148) was displayed by AW's *Bao Wu Tang* gallery at the 2009 Capital Museum exhibition as part of the "Wang family collection."

179.   The contract of sale states Wei Zheng resides at 97-37 63rd Road, Apt. #2F, Rego Park, NY 11374.

180.   Yet, even as Wei Zheng resides in Rego Park, NY and the paintings he purchased were stored in Newark, NJ, the paintings were shipped to Billie Wae at Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong.

181.    This is the same Billie Wae persona that was used for the Anthony Chou straw man sales.

182.   Wei Zheng was deposed in the Surrogate's Court matter on January 7, 2015 and January 23, 2015.

183.   Wei Zheng required an interpreter at his deposition because he claimed he was unable to speak, read, or otherwise understand English.

184.    Wei Zheng is a "homecare" worker for the sick and elderly, who claims he has "never" purchased classical Chinese artwork in his entire life on his own behalf, or on behalf of anyone else.

185.    Wei Zheng was a long-time friend of AW.

186.    According to Wei Zheng, AW drafted the February 16, 2005 contract in English. AW then asked him to sign the contract on behalf of someone else.

187.    Wei Zheng testified that he did not understand the nature of the documents he was signing because he cannot read English. Though he could not read or understand the documents, he claimed he "trusted" AW.

188.    When asked how he knew where to sign his name on the $400,500.00 contract of sale with the Estate (since he cannot read English), Wei Zheng testified that AW was sitting next to him and "pointed out" where he needed to sign.

189.    Wei Zheng testified that he never paid any money to the Estate and could never have afforded to pay $400,500.00 for classical Chinese artworks.

190.    Wei Zheng claimed he does not know if or how the Estate was ever paid on the contract he signed and does not know what happened to the artwork listed in the contract.

191.    He claimed he never expected to receive the 17 artworks since he was not the real buyer.

192.    Separate from the contract of sale, Wei Zheng signed a bill of sale which was counter-signed by AW and the New York County Public Administrator.

193.    The handwritten date on the bill of sale is February 16, 2005.

194.    The false bill of sale was wired by AW to the Public Administrator on or about February 16, 2005.

195.     Notwithstanding Wei Zheng's sworn testimony that he never paid for the artwork, bank records establish that AW caused $400,500.00 to be transferred to the Estate's bank account on February 16, 2005 through use of his personal escrow agent.

196.     Wei Zheng testified under oath that he has "no idea" who actually made the payment on February 16, 2006 or who received the paintings listed on the February 16, 2005 bill of sale or the contract of sale.

197.     Though (a) he signed the bill of sale on February 16, 2005 and (b) $400,500.00 was transferred to the Estate on the same day he signed the bill of sale, Wei Zheng testified that whoever actually purchased and received the Estate's artworks "was none of my business."

198.     No other buyer is listed on either the contract of sale or bill of sale. The Public Administrator did not receive a contract of sale or bill of sale for the listed works from anyone other than Wei Zheng. In all respects, AW and Wei Zheng fraudulently held out the latter as though he was the purchaser and recipient of the Estate works listed on the February 16, 2005 contract and bill of sale.

199.     Upon information and belief, Wei Zheng was fully aware that AW was the true purchaser of the paintings listed in the contract of sale and February 16, 2005 bill of sale. Wei Zheng conspired and aided AW in committing fraud upon the Estate by falsely representing to the Estate and the New York County Public Administrator that he was the purchaser of $400,500.00 worth of artwork.

**D.**     *The Bogus September 22, 2005 Sale of Estate Paintings to Straw Man Yong-Qing Ye.*

200.     On or about September 22, 2005, AW supposedly sold eighteen (18) paintings to Yon-Qing Ye for a total price of $789,810.00.

201.     The contract purporting to effectuate this sale was transmitted by facsimile to the Public Administrator on September 22, 2005 at 12:17 pm.

33

202.    The 18 paintings sold to Yong-Qing Ye on September 22, 2005 are as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|
| Attributed to *Bian Wu* | Wild Geese Among Reeds | OTE#86 | $5,000 |
| *Yun Shouping* | Landscape with Pines | OTE#87 | $21,600 |
| Attributed to *Chen Hongshou* | Two Scholars | OTE#93 | $14,000 |
| Attributed to *Bada Shanren* | Wild Geese and Rocks | OTE#114 | $7,200 |
| *Wang Hui* | Woodcutter of Mt. Luofu | OTE#121 | $75,000 |
| *Wang Yuanqi* | Landscape after Dong Yuan | OTE#123 | $80,000 |
| *Wang Yuanqi* | Landscape after Huang Gonwang | OTE#128 | $48,000 |
| *Ma Yuan* | Scholar and Crane Fan painting | OTE#158 | $60,000 |
| *Ma Yuan* | Scholar by a Pine Stream Fan painting | OTE#159 | $60,000 |
| *Xu Wei* | Calligraphy in Cursive Script | OTE#161 | $150,000 |
| *Yu Zhiding* | Immortals on Mt. Tiantai | OTE#227 | $60,000 |
| *Gu Heqing* | Album of Landscapes | OTE#242 | $7,200 |
| Attributed to *Qiu Ying* | Meeting of the Lotus Society | OTE#1003 | $48,000 |
| *Zhing Shengmo* | Landscape with Pavilion | OTE#101 | $21,600 |
| *Style of Wang Weng* | Landscape | OTE#109 | $4,800 |
| Attributed to *Li Song* | Drinking Banquet | OTE#133 | $25,000 |
| *Wang Yuanqi* | Landscape after Huang Gongwang | OTE#120 | $75,000 |
| *Zou Zhilin* | Landscape | OTE#122 | $16,800 |

203.    Three of the works (highlighted above) "sold" to Yong-Qing Ye on September 22, 2005, namely *Xu Wei*, "Calligraphy in Cursive Script" (which sold for $150,000.00); *Drinking Banquet* (which sold for $25,000.00); and, *Woodcutter of Mt. Luofu* (which sold for $75,000.00) were resold for such vastly higher prices.

204.    In 2013, the Plaintiffs discovered that *Xue Wei*'s "Calligraphy in Cursive Script," was auctioned for $2,688,000 as lot 2871 at the June 3, 2010 Beijing Poly International Auction Co., Ltd. auction: 1,792% higher than the sale price AW charged his supposed friend for the same work.

34

205.    In 2013, the Plaintiffs discovered that "Drinking Banquet" was auctioned for approximately $1,210,950 as lot 466 at the Chieftown, Hong Kong Spring 2009 Auction: 4,843% of the amount AW realized for the Estate as its fiduciary.

206.    In 2013, the Plaintiffs discovered that "Woodcutter of Mt. Luofu" was auctioned for approximately $1,019,200.00 as lot 692 at the Chieftown, Beijing Fall 2008 Auction: 1,359% of the Estate sale price.

207.    Meanwhile, the address listed for Yong-Qing Ye in the Estate's contract of sale—Room #10, Building #29, An-Shang Park #3, Shanghai City, P. R. China 200092—does not even exist.

208.    Upon information and belief, AW, through means of U.S. wires, transmitted the fraudulent documents to the Public Administrator on September 22, 2005.

209.    Upon information and belief, AW caused $489,772.00 to be transferred to the Estate's bank account on September 22, 2005 in furtherance of the scheme to fraudulently acquire the Estate works.

**E.    *The Bogus February 16, 2006 Sale of Estate Paintings to Straw Man Yong-Qing Ye.***

210.    On or about February 16, 2006, AW supposedly sold eight (8) paintings to Yong-Qing Ye for $354,045.00.

211.    The eight paintings sold to Yong-Qing Ye on February 16, 2006 are as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|---|---|---|---|
| *ShiTao* | Banana Palms and Rock | OTE# 88 | $14,400 |
| *Ren Yi and XuGu* | Fishman, Goldfish and Bird | OTE# 99 | $12,000 |
| *Bada ShanRen Chu Ta* | Pines and Rock | OTE# 119 | $95,000 |
| *Ren Yi* | Three Knight Errants | OTE#126 | $7,800 |
| *Wang Jian* | Landscape in Handscroll | OTE#156 | $100,000 |
| *Ding YunPeng* | Scene from Tao YuanMing | OTE#224 | $21,600 |

35

| Qi BaiShi | Grapes | OTE#1010 | $36,000 |
| Qi BaiShi | Bird on Pine Branch | OTE#1008 | $60,000 |

212.    Three of the works "sold" to Yong-Qing Ye on February 16, 2006, namely, *ShiTao*, "Banana Palms and Rock" *(*which sold for $14,400.00); *Ren Yi*, "Three Knight Errants" (which sold for $7,800.00); and *Ding YunPeng* "Scene from Tao YuanMing" (which sold for $21,600.00) were resold for such vastly higher prices that their initial prices were undoubtedly unrelated to the works' market values.

213.    In 2013, the Plaintiffs discovered that "Banana Palms and Rock" was sold for approximately $304,640.00 as lot 689 at the Chieftown Beijing Fall 2008 auction: the resale achieved an amount equal to 2,115% of AW's Estate sale price.

214.    In 2013, the Plaintiffs discovered that "Three Knight Errants" was sold for approximately $70,500.00 as lot 548 at the Chieftown, Beijing Spring 2008 auction: the resale achieved an amount equal to 904% of AW's Estate sale price.

215.    In 2013, the Plaintiffs discovered that *Scene from Tao YuanMing* was sold for approximately $303,850.00 as lot 449 at a Chieftown, Hong Kong Spring 2008 auction: 1,407% the estate sale price.

216.    Upon information and belief, AW caused the contract of sale and bill of sale with Yong-Qing Ye to be transferred to the Public Administrator of New York county by U.S. wires on February 16, 2006 in furtherance of his scheme to fraudulently acquire Estate assets.

217.    Upon information and belief, AW caused $354,045.00 to be wired to the Estate's bank account on February 16, 2006 in furtherance of his scheme to fraudulently acquire Estate assets.

F.      ***The Bogus August 17, 2009 Sale of Estate Paintings to Straw Man Yu Da-Jin.***

218.    On or about, August 17, 2009 AW purportedly sold fourteen (14) estate works to Yue Da-Jin for a total price of $489,772.00.

219.     The contract purporting to effectuate this sale was transmitted by AW to the Public Administrator via facsimile on August 18, 2009 at 8:24 am.

220.     The fourteen works ostensibly sold to Yue Da-Jin are as follows:

| Artist | Title as Stated in Contract of Sale | Estate Identification Number | Sale Price |
|--------|-------------------------------------|------------------------------|------------|
| *Huang Shen* | Weaving Lady | OTE#90 | $11,880 |
| *Mo Shi-Long* | Calligraphy | OTE#110 | $4,860 |
| *Xia Chang* | Bamboo and Rock | OTE#124 | $67,500 |
| *Fang Cong-Yi* | Cloudy Landscape | OTE#131 | $63,000 |
| *Ni Zan* (Attributed) | Album of Poems | OTE#134 | $45,000 |
| *Liang Kai* | Gibbons | OTE#143 | $6,480 |
| *Wen Shu (Chao Wen-Shu)* | Butterflies, Flowers, and Rocks | OTE#155 | $27,000 |
| *Gao Feng-Han (Kao Feng-Han)* | Peonies and Rocks | OTE#201 | $12,960 |
| *Zeng Jing (Tseng Giang)* | Portrait | OTE#202 | $2,520 |
| *Wang Yuan-Qi* | Landscape after Huang GongWang | OTE#218 | $25,200 |
| *Wu Wei* | Scholars and Attendants in Landscape | OTE#225 | $29,700 |
| *Yang Wen-Cong* | Landscape | OTE#244 | $4,320 |
| *Yan Hui* (Attributed) | Sixteen Lohans | OTE#219 | $180,000 |
| Anonymous | Birds in Landscape | OTE#89 | $4,500 |

221.     Four of the works "sold" by AW on behalf of the Estate to Yue Da-Jin on August 17, 2009, namely *Huang Shen*, "Weaving Lady"; *Ni Zan* "Album of Poems"; *Xia Chang* "Bamboo and Rock"; and *Fang Cong-Yi* "Cloudy Landscape" have reappeared through AW's *Bao Wu Tang* Gallery in various museum exhibitions under his sponsorship.

222.     "Weaving Lady" and "Album of Poems" both were both displayed at a 2010 Poly Museum art exhibition in which AW is credited with supplying the art in the exhibition's publication. Yu Da-Jin, the apparent straw man purchaser is nowhere mentioned in the publication.

223.    The works "Bamboo and Rock" and "Cloudy Landscape" were displayed by AW's *Bao Wu Tang* art studio at a Capital Museum art exhibition in 2009 as part of the Wang "family collection."

224.    Upon information and belief, AW caused $489,772.00 to be wired to the Estate's bank account on August 18, 2009 in furtherance of his scheme to fraudulently acquire Estate assets.

## IV.    *160 ADDITIONAL PAINTINGS CONVERTED BY SK AND AW*

225.    During the 1980s and 90s, C.C. Wang relied on SK to control his assets and manage his paintings. But according to C.C. Wang's records, when SK was fired (in 1997), 160 Estate paintings went missing.

226.    Whereas AW has denied knowledge of the whereabouts of these works, between 2008 and 2010 many of the paintings (as many as 43) have surfaced in settings closely associated with him or where he played a supervisory role, including in museum shows he curated and at Hong Kong and Beijing auctions were sold with other works formerly within his custody or control. These Estate assets include:

A.  "Meng Yun Garden & Calligraphy" by *Tang Yin/Wen Zhengm*:   AW has stated in the Surrogate's Court proceedings that he had "no information or records" regarding this work but, upon information and belief, this very painting appeared in a Poly Museum exhibition which included works from AW's own collection (the *Bao Wu Tang* Collection) in 2010.

B.  "Cao Shu Calligraphy" by *Wang Duo*: whereas AW stated in Surrogate's Court proceedings that he had "no information or records" of this work, upon information and belief,  the painting appeared in a Capital Museum exhibition catalogue in 2009 among the *Bao Wu Tang* Collection, including  works that were "sold" to AW's friends in 2005 and 2006.

C.  "Dense Forest Landscape in the Style of Dachi" by *Wang Yuanqi*:  whereas AW stated this work was "donated to Washington University," upon information and belief, it

appeared at both the Capital Museum's 2009 *Bao Wu Tang* exhibition and at a Poly June 3, 2010 auction where it was auctioned directly after one of the paintings sold to AW's friends (Xu Wei, *Calligraphy*).

D. "Playing Qin in Palm Pavilion" by *Shen Zhou*:  AW, at all relevant times, has stated that this painting was owned by SK. Upon information and belief, the painting also appeared at a 2009 Chieftown Spring Auction in Beijing.

E. "Calligraphy" by *Ni Yuanlu*:  AW stated that he had "no information or records" about this painting. Yet, upon information and belief, the painting appeared in the very same 2009 Chieftown Spring Auction in Beijing as the *Shen Zhou*, "Playing Qin in Palm Pavilion" painting allegedly owned by SK.

F. "Portrait of a Scholar" by *Jin Tingbiao*: AW stated that SK owned this painting. In a spring 2008 Chieftown Auction in Hong Kong this painting was, upon information and belief, auctioned along with two paintings supposedly sold to AW's friends and three paintings from the Missing 160 list.

G. "Carrying Nephew" by *Wang Zhen*: AW stated that this painting was owned by SK. This painting was, upon information and belief, auctioned at the spring 2008 Chieftown Auction in Hong Kong along with two paintings supposedly sold to AW's friends and three other paintings from the Missing 160 list.

H. "Calligraphy in Cursive Script" by *Zhang Ruitu*: AW stated that this painting was owned by SK. This painting was, upon information and belief, auctioned at a June 3, 2010 Poly Auction along with the *Wang Yuanqi*, "Dense Forest Landscape in the Style of Dachi" painting from the Missing 160 list.

227.   Upon information and belief, the Wang Defendants have converted each of the foregoing Estate assets, SK first embezzling them in or about 1997, with his son AW next selling them over the course of the ensuing seventeen years.

## V.   *THE SCHEME TO STEAL PROCESSION OF THE TAOIST IMMORTALS*

228.   On or before April 19, 2009 AW managed to—once again—gain access to a

safe deposit box containing a painting owned by Northwich. The box held the most valuable painting in Northwich's entire collection—*Wu Zhongyuan*'s "Procession of the Taoist Immortals" valued in the millions of dollars.

229.    In early 2005 after two years of Estate litigation, AW and Yien-Koo participated in settlement negotiations to resolve all issues by and between: (i) Yien-Koo, (ii) Northwich, (iii) Soon Huat, (iv) Kenneth, (v) the Estate of C.C. Wang, (vi) SK, and (vii) AW**.**

230.    AW acted in both his individual capacity and in his capacity as Estate fiduciary when negotiating the settlement.

231.    While acting in this dual capacity, AW induced Yien-Koo to deposit Northwich's painting (the *Wu Zhongyuan*) in a bank vault pending the finalization of the omnibus settlement.

232.    Once the settlement was completed, AW and Yien-Koo planned to jointly donate the *Wu Zhongyuan* and share any credit received by virtue of the donation.

233.    AW had unilaterally chosen the Bank of Communications in Shanghai (the "Bank") as the location for the deposit.

234.    He informed Yien-Koo that the Bank would require them to both be present before allowing either access to the safe deposit box where the *Wu Zhongyuan* would be stored.

235.    The *Wu Zhongyuan* was indisputably the legal property of Northwich at the time of the deposit.

236.    Years later and upon hearing in Chinese art communities that the work was no longer in the safe deposit box and was instead in AW and SK's possession, Yien-Koo commenced proceedings in a Chinese court seeking to compel an examination of the contents of the safe deposit box.

237.    When the assigned judge ordered AW to appear at the Bank for an

examination of the safe deposit box, AW falsely insisted that opening the box would be *contrary to United States law* and that he therefore would not tender his key to access it. A transcript of the relevant March 11, 2009 hearing in Shanghai captures AW's refusal and his admonishing advice that the mere act of opening the safe deposit box would be against U.S. law.

238.    At the court's instruction, however, and despite AW's absence, the Kings appeared at the Bank at 9:00 a.m. on April 20, 2009 at which time the vault was opened by the presiding judge's order. A Chinese judicial official made a video recording of the opening so as to create an indisputable record of what was in the vault.

239.    A review of the videotape inarguably reveals that the *Wu Zhongyuan* had been stolen from the vault and in its place was a crude, mechanically-printed reproduction.

240.    In or about November 2009, AW began giving interviews with the Chinese media portraying himself as the owner and possessor of the *Wu Zhongyuan*.

## VI.    *AW'S 2009 CONVERSION OF THE DENSE FOREST LANDSCAPE ISO DACHI BY WANG YUANQI*

241.    In addition to the Straw Men transactions identified above, a highly valuable work which was part of C.C. Wang's collection entitled "Dense Forest Landscape in the Style of Dachi" resurfaced in 2010.

242.    As the fiduciary tasked with marshalling all extant assets of the C.C. Wang Estate, AW has continually maintained that this work was donated to the University of Washington and was no longer part of the Estate.

243.    Upon contacting the University of Washington, however, AW's lying was once again made manifest.  The University does not now, nor has it ever had the "Dense Forest Landscape in the Style of Dachi." In fact, "Dense Forest Landscape in the Style of Dachi" by *Wang Yuanqi*, was auctioned on June 3, 2010 in China as for approximately $1.5 million (9,184,000 RMB).

41

244.    As it happens, the year preceding this auction, this very same painting was displayed at AW's own *Bao Wu Tang* exhibition at the Capital Museum. It was displayed and claimed by AW to be part of C.C. Wang's "family collection."

245.    At the June 3, 2010 auction, this "Dense Forest Landscape in the Style of Dachi" was even put up for auction alongside a former Estate asset that had been sold to one of the Straw Man, namely the *Xu Wei* "Calligraphy."

246.    The *Xu Wei* painting (purportedly sold to Straw Man "Yong-Qing Ye") was the immediately preceding lot number before "Dense Forest Landscape in the Style of Dachi." Whereas the *former* Estate painting ("Calligraphy") was lot number 2871, the *missing* Estate painting ("Dense Forest Landscape in the Style of Dachi") was lot number 2872.

247.    Thus, a missing painting never delivered to the Estate was improbably auctioned immediately after a painting which AW had supposedly sold to a Straw Man on behalf of the Estate. Both were controlled by AW's enterprise.

248.    "Dense Forest Landscape in the Style of Dachi" was sold on June 3, 2010 along with the *Xu Wei*'s "Calligraphy" painting for a combined total of $4.23 million.

## COUNT I
## CIVIL RICO (18 U.S.C. §1962(a) and (c))
(*All Plaintiffs Against All Defendants*)

249.    The Plaintiffs incorporate by reference the allegations set forth above as though they were fully set forth herein.

250.    To state a violation under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1962 *et seq.*, a plaintiff must plead the defendant's commission of two or more predicate acts (1) constituting a pattern (2) of racketeering activity (3) thereby directly or indirectly investing in, or maintaining an interest in, or participating in or conducting (4) an enterprise (5) the activities of which affect interstate or foreign commerce and (6), that he or she was injured in his or her business or property by reason of the racketeering activity.

251.   In particular, Section 1962(a) prohibits using income received from a "pattern of racketeering activity" to acquire an interest in or to establish an enterprise engaged in or affecting interstate commerce.

252.   Section 1962(c) prohibits conducting or participating in the conduct of an enterprise through a pattern of racketeering activity.

253.   Among other predicate acts alleged above and cognizable under RICO, are: violations of 18 U.S.C. § 1341 and 1343  which concern Wire/Mail Fraud of the kind used to obtain control over C.C. Wang's assets, including, among other things,  his art collection; violations of 18 U.S.C. §§ 2314 and 2315 are also apparent in AW's internationally and domestic travelling in furtherance of the fraudulent scheme, and his (and/or the *straw men's* transportation in interstate and foreign commerce funds [and art work] in excess of $5,000 that the Defendants knowingly converted from the Estate or in furtherance of one or more of their schemes to defraud; violations of 18 U.S.C. § 2314 either by the Defendants' transportation of stolen moneys in interstate and foreign commerce having a value in excess of $5,000.00, while knowing the same to have been stolen, converted transported in interstate or foreign commerce or in their execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000.00 or more; violations of 18 U.S.C.S. § 2315 by the defendants' receipt of stolen property, and; money laundering.

254.   The foregoing acts were all in furtherance of schemes to defraud the Plaintiffs and other Estate beneficiaries and they thus qualify as predicate acts for purposes of 1962(a) and (c). They were both related and continuous in: (i) sharing similar purposes, participants, victims, methods or other distinguishing characteristics and the specific acts of mail fraud, wire fraud and money laundering served either to execute the fraud, or mask it, and; (ii) not being isolated or sporadic.

255.   The Defendants committed various predicate acts with the common design of obtaining control of artworks with the ultimate goal of defrauding the Plaintiffs and the Estate of their money and property.

256.    First, in the mid-1980s, when C.C. Wang relied on SK to control his assets and manage his paintings, SK secreted approximately 160 paintings from C.C. Wang's collection.

257.    Whereas AW has denied knowledge of the whereabouts of these works many of them have recently surfaced in settings closely associated with him or where he played a supervisory role, including in museum shows AW curated and at Hong Kong and Beijing auctions where they were sold with other works formerly within his custody or control.

258.    Upon information and belief the Wang Defendants have converted these Estate assets, with SK first embezzling them in or about 1997, and his son AW next selling them over the course of the ensuing seventeen years.

259.    In or about 2003, SK launched an ambitious scheme to exploit C.C. Wang's diminished mental capacity, including the outright theft of works within his father's custody and the fraudulent inducement of C.C. Wang's execution of documents designed to change C.C. Wang's financial affairs and long standing estate plan and to facilitate the further diversion of Wang family assets to their *proper destination*, namely into the hands of C.C. Wang's <u>male</u> successors—SK and his son AW.

260.    Even as his death was imminent, AW manipulated his grandfather into affording him entry to a safety deposit box to which only Yien-Koo and her father had access and which was held under the name of their corporate entity, CY Art Ltd. In this manner, AW stole 21 paintings belonging to CY Art Ltd., only to then abscond with another four works from C.C. Wang's apartment upon delivering his grandfather home.

261.    Then, approximately four months before C.C. Wang's death at age 97—but after his physicians had already declared C.C. Wang mentally incapable of even executing his own medical forms—SK held his father captive at his home in Queens New York and forced C.C. Wang to execute the Wang Defendants' wholly contrived will.

262.    This as yet unseen *second* will, would ostensibly replace the June 13, 2000 and July 10, 2002 instruments in having been purportedly executed on or about February 18, 2003 and it designated AW as the executor of the C.C. Wang Estate. Critically, despite her status as a beneficiary in each of the eight testamentary instruments previously executed by C.C. Wang during his lifetime, this newly contrived *will* purported to completely disinherit Yien-Koo.

263.    AW next proceeded to exploit his identification as an executer in the bogus will to be officially appointed by the Surrogate's Court as an Estate fiduciary poised to administer assets to which he genuinely had no entitlement, nor authority to control. Among other things, AW now had dominion over paintings the Kings turned over in compliance with requirements attendant to the Estate's administration.

264.    In exercising his authority, AW exploited the office of the Public Administrator and other Estate resources (such as legal counsel and Estate bank accounts) in order to facilitate a pattern of racketeering activity comprised of fraudulent transfers, misappropriations and concealments. For his part AW's methods have been consistent: through a decade long series of complex transactions, and by means of interstate and foreign mails and wires, he has deployed individuals and entities throughout the U.S. as well as in China, to secretly transfer and transport millions of dollars-worth of misappropriated ancient Chinese paintings. These assets were truly owned either by the Estate or Yien-Koo (outright or per her testamentary entitlements), and the cash yielded by their liquidations was channeled through overseas business accounts and exchanged currencies in order to shield their machinations from scrutiny.

265.    18 U.S.C. § 1961(4) defines a RICO "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Here, an association-in-fact, consisting of SK and AW—as its primary architects and beneficiaries, together with a core group of at least five individuals and two entities operated for the common and continuing purpose of implementing the Defendants'

schemes to defraud the Plaintiffs, the Public Administrator, and other will beneficiaries in furtherance of their perceived entitlement—as C.C. Wang's <u>male</u> successors—to the Wang family assets. Defendants Anthony Chou, Chen-Mei-Lin, Wei Zheng, Ye Yong-Qing, and Yue Da-Jin have played specific roles in the procurement and transfer of those assets to AW in China, thereby effectuating AW's *sales to himself*, and laying the groundwork for AW's subsequent laundering of the monies achieved by his re-sales of those works overseas.

266.    When presented with the self-serving contracts, the Public Administrator's office unknowingly approved these circular transfers of Estate artworks for amounts well below their actual value to fraudulently rendered addresses. And, ostensibly under its imprimatur, AW had the authority to extract these Estate assets for his and his father's personal enrichment.  AW provided the funds needed for the Straw Men to purchase the works and when the works were shipped to AW overseas, he masked the funds he received from reselling them by layers of transactions, including filtering them through the AW Gallery—a vehicle for mixing freshly "cleaned" money with money legally obtained through the purchase or sale of other art works.

267.    Illustrative of the true nature of the six contracts executed with the Estate's "buyers" is AW's use of his own address as the residence for one of the Straw Men. When questioned, his own father has only recently (on August 28, 2014) admitted under oath that AW provided his own address in Shanghai for ostensible purchaser Chen Mei-Lin's shipping address, but kept it a secret. While SK proceeded to attempt to excuse his son's ploy as an *accommodation* to an ostensible privacy conscious purchaser, unless AW's father was lying himself, it is now irrefutable that AW has mislead the PA and others involved in the Surrogate's Court proceedings for years. And the revelation has arisen only now that the Wang Defendants have been confronted in those proceedings with a well-spring of the defendants' contradictions.

268.    Further, whereas there are *hundreds* of potential China-based auction houses and *thousands* of individual auctions where the Straw Men acquisitions may

have been resold or consigned between 2005 and 2014, the Estate assets that AW "sold" to these buyers have typically appeared for resale at the very same auction houses—namely the Chieftown and Poly auction houses—as well as on the same dates. Moreover, these works have been consigned alongside other works that either disappeared from the Estate or were known to be in the possession of AW and SK.

269.    At all relevant times, the Defendants used U.S. mails and wires, by means of telephone calls, fax transmissions, regular mail and overnight courier services, as instrumentalities for advancing their deceitful schemes with the Plaintiffs, the Estate, the PA and the Surrogate Court.

270.    Among other things, upon information and belief, the Defendants committed wire and wire fraud when they sent telefaxes, made telephone calls and transmitted mail in furtherance of their multiple schemes to falsify the ownership of artworks and thereby defraud the Plaintiffs and other will beneficiaries of their ownership rights therein.

271.    By his own account, AW sold ninety-eight Estate paintings to his friends. He arranged for these *non*-arm's length deals in 2005, 2006 and 2009. At least twelve of the works, which were sold by the Estate for a mere $509,000—were later resold, less than three years later, for $9.46 million. A thirteenth painting, the "Dense Forest Landscape Iso Dachi," which AW falsely testified was donated to the University of Washington, was auctioned at the Poly Auctions International Auction Co., Ltd., June 3, 2010 auction for $1.5 million.

272.    Finally, as yet unidentified persons working in the Bank of Communications have facilitated AW's inside theft of the "Procession of the Taoist Immortals."

273.    Meanwhile, Defendant *JBG* was SK's conduit for selling the *Ma Yuan* "Landscape Album," an estate asset, after C.C. Wang's death.

274.    Ultimately, SK, an erstwhile factory worker of modest means, has come to amass a fortune, including a New York home worth over $2 million, as the fruit of his

and AW's illicit schemes. For his part, AW has come to enjoy preeminence in the Chinese art community, personally owning and operating the *Bao Wu Tang* gallery in Beijing, China as a repository of highly valued Chinese artwork-capitalizing upon works that were stolen from the estate of C.C. Wang as well as using it to reinvest the proceeds derived from sales of the Estate's assets into the perpetuation of his and his father's criminal enterprise.

275.   In 2015, AW was been ranked as number 46 out of the top 100 most prominent art collectors in China.

276.   For the purposes of an estate's administration, N.Y. S.C.P.A. § 103(39) defines an *interested person* as: "[a]ny person entitled or allegedly entitled to share as beneficiary in the estate . . . ." By definition, the Kings have actual interests in the instant Estate's assets and standing to seek relief as alleged intended recipients of properties comprehensively looted by the Defendants.

277.   Moreover, as with Yien-Koo's entitlements as a beneficiary, the Plaintiffs' extant independently owned and acquired business interests and property have been injured by the aforesaid violations of 18 U.S.C. § 1962, including by reason of the Defendants' misappropriations of property the Plaintiffs owned outright—whether having been gifted to Yien-Koo by C.C. Wang before he died or else independently purchased by the Kings.

278.   Accordingly, the Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial, then trebled under 18 U.S.C. § 1964(c), which amount is reasonably believed to exceed the sum of $60,000,000.00.

279.   Additionally, injunctive relief is warranted and should be so-ordered because the pattern of racketeering activity has extended over a substantial period of time and continues as of the date hereof. Pursuant to 18 U.S.C. § 1964(a), this Court should restrain and enjoin further violations by Defendants of 18 U.S.C. § 1962.

## COUNT II
## CIVIL RICO (18 U.S.C. § 1962 (a) and (c))
*(Yien-Koo, on Behalf of the Estate of C.C. Wang, Against Andrew Wang)*

280.    Plaintiff Yien-Koo King incorporates by reference the allegations set forth above as though they were fully set forth herein.

281.    Yien-Koo is a statutorily defined "person interested" in the Estate of C.C. Wang and has capacity and standing to advance claims sounding violations of RICO on behalf of the Estate.

282.    AW's predicate conduct against the Estate of Chi-Chuan Wang is, *inter alia*, as follows:

| Number | Predicate Conduct | Violated Statute (18 U.S.C.) | Location in Complaint |
|---|---|---|---|
| 1 | AW shipped, by means of international commercial carrier, a stolen Estate asset, the *Ma Yuan* Landscape Album, from New York to China between November, 2003 and 2011. The *Ma Yuan* was valued at over $2,500,000.00 at the time of its theft. | §§1341, 2314 (Shipping of Stolen Goods) | ¶68 |
| 2 | AW sold a stolen Estate asset, the *Ma Yuan* Landscape Album, to a Chinese collector named Zhu Shaoliang between November, 2003 and 2011 for more than $5,000,000.00. | §1957 (Monetary Transaction with Property Derived from Unlawful Activity) | ¶102 |
| 3 | AW shipped, by means of international commercial carrier, 13 Estate-owned artworks taken from the CY Art safe deposit box and C.C. Wang's apartment on January 31, 2003 from New York between 2003 and May 11, 2005. These stolen and fraudulently acquired goods were valued at approximately $5,000,000.00 at the time of their theft. | §§1341, 2314 (Shipping of Stolen Goods) | ¶68 |
| 4 | Between 2005 and 2009, AW reinvested the funds gained from the sale of works stolen from the CY Art safe deposit box into the RICO enterprise for the purpose of fraudulently purchasing artwork from C.C. Wang's Estate. | §1956(a)(2) (Money Laundering) | ¶103 |

| 5 | By means of U.S. wire, AW faxed Wei Zheng's fraudulent bill of sale of Estate assets to the Public Administrator on or about February 16, 2005. | §§ 1341, 1343 (Mail and Wire Fraud) | ¶¶191-196 |
|---|---|---|---|
| 6 | By means of U.S. wire, AW transferred $400,500.00 to the Estate's bank account on or about February 16, 2005 in furtherance of his scheme to defraud the Estate into believing Wei Zheng was the purchaser of Estate assets. | § 1343 (Wire Fraud) | ¶¶191-196 |
| 7 | By means of international commercial carrier, AW caused 17 fraudulently acquired Estate's assets to be shipped from New York to Hong Kong on or about February 16, 2005. | §§1341, 2314 (Shipping of Stolen Goods) | ¶¶191-196 |
| 8 | By means of U.S. wire, AW faxed Chen-Mei Lin's fraudulent bill of sale of Estate assets to the Public Administrator on or about April 13, 2005. | §§ 1341, 1343 (Mail and Wire Fraud) | ¶¶151-172 |
| 9 | By means of U.S. wire, AW transferred $1,393,422.00 to the Estate's bank account on or about April 13, 2005 in furtherance of his scheme to defraud the Estate into believing Chen Mei Lin was the purchaser of Estate assets. | § 1343 (Wire Fraud) | ¶¶151-172 |
| 10 | By means of international commercial carrier, AW caused 24 fraudulently acquired Estate's assets to be shipped from New York to Hong Kong on or about April 13, 2005. | §§1341, 2314 (Shipping of Stolen Goods) | ¶¶151-172 |
| 11 | By means of U.S. wire, AW faxed Anthony Chou's fraudulent bill of sale of Estate assets to the Public Administrator on or about June 16, 2005. | §§ 1341, 1343 (Mail and Wire Fraud) | ¶¶131-150 |
| 12 | By means of U.S. wire, AW transferred $909,689.41 to the Estate's bank account on or about June 16, 2005 in furtherance of his scheme to defraud the Estate into believing Anthony Chou was the purchaser of Estate assets. | §§ 1341, 1343 (Mail and Wire Fraud) | ¶¶131-150 |
| 13 | By means of international commercial carrier, AW caused 17 fraudulently acquired Estate assets to be shipped from New York to Hong Kong on or about June 16, 2005. | §§1341, 2314 (Shipping of Stolen Goods) | ¶¶131-150 |
| 14 | By means of U.S. wire, AW faxed Yong Qing Ye's fraudulent bill of sale of Estate assets to | § 1343 | ¶¶200-209 |

| | the Public Administrator on or about September 22, 2005. | (Wire Fraud) | |
|---|---|---|---|
| 15 | By means of U.S. wire, AW transferred $489,772.00 to the Estate's bank account on September 22, 2005 in furtherance of his scheme to defraud the Estate into believing Yong Qing Ye was the purchaser of Estate assets. | § 1343 (Wire Fraud) | ¶¶200-209 |
| 16 | By means of international commercial carrier, AW caused 18 fraudulently acquired Estate's assets to be shipped from New York to Hong Kong on or about September 22, 2005. | §§1341, 2314 (Shipping of Stolen Goods) | ¶¶200-209 |
| 17 | By means of U.S. wire, AW faxed Yong Qing Ye's fraudulent bill of sale of Estate assets to the Public Administrator on or about February 16, 2006. | § 1343 (Wire Fraud) | ¶¶210-217 |
| 18 | By means of U.S. wire, AW transferred $354,045.00 to the Estate's bank account on February 16, 2006 in furtherance of his scheme to defraud the Estate into believing Yong Qing Ye was the purchaser of Estate assets. | § 1343 (Wire Fraud) | ¶¶210-217 |
| 19 | By means of international commercial carrier, AW caused 8 fraudulently acquired Estate assets to be shipped from New York to Hong Kong on or about February 16, 2006. | §§1341, 2314 (Shipping of Stolen Goods) | ¶¶210-217 |
| 20 | By means of U.S. wire, AW faxed Yue Da Jin's fraudulent bill of sale of Estate assets to the Public Administrator on or about August 18, 2009. | § 1343 (Wire Fraud) | ¶¶218-224 |
| 21 | By means of U.S. wire, AW transferred $489,772.00 to the Estate's bank account on or about August 18, 2009 in furtherance of his scheme to defraud the Estate into believing Yu Da Jin was the purchaser of Estate assets. | § 1343 (Wire Fraud) | ¶¶218-224 |
| 22 | By means of international commercial carrier, AW caused 14 fraudulently acquired Estate assets to be shipped from New York to Hong Kong on or about August 18, 2009. | §§1341, 2314 (Shipping of Stolen Goods) | ¶¶218-224 |
| 23 | AW sold the "Dense Forest Landscape in the Style of Dachi" on June 3, 2010, thereby engaging in a monetary transaction with property derived from | §1957 (Monetary Transaction with Property Derived | ¶¶241-248 |

| | specified unlawful activity. | from Unlawful Activity) | |
|---|---|---|---|

283.    Yien-Koo, and by extension the Estate, did not discover that the *Ma Yuan* Landscape Album had been shipped to China and sold to Zhu Shaoliang until in or about 2012.

284.    Prior to Yien-Koo's discovery, SK and AW had held out the *Ma Yuan* Landscape Album as remaining safely in SK's personal custody and control and subject to the ongoing Surrogate's Court proceedings and restraining order.

285.    With its transport to and sale in China, the Estate has been injured by AW's predicate activity through the loss of its asset.

286.    The Estate, through Yien-Koo, is entitled to treble damages caused by AW's fraudulent transfer of the *Ma Yuan* to be proven at trial, but reasonably believed to exceed $15,000,000.00.

287.    Further, AW (along with SK) reinvested proceeds from the sale of the *Ma Yuan* and other works stolen on January 31, 2003, in order to complete his schemes to fraudulently purchase assets from the Estate between 2005 and 2009.

288.    Without the use of proceeds derived from their stolen and fraudulently acquired artwork, SK and AW would not have been able to perpetrate the Straw-Man fraud between 2005 and 2009, since this fraud required millions of dollars to execute.

289.    Accordingly, the injuries from the Straw Man sales are the proximate cause of AW's reinvesting of illicit funds back into the enterprise.

290.    Yien-Koo King did not uncover the Straw Man scheme and AW and SK's reinvestment of unlawfully generated funds until in or about 2013.

291.    The Estate, through Yien-Koo, is entitled to treble damages caused by AW's money laundering and other illegal activities to be proven at trial, but reasonably believed to exceed $120,000,000.00.

292.    Yien-Koo King discovered in or about 2013, that an Estate painting, "Dense Forest Landscape in the Style of Dachi," which AW had previously represented was donated to the University of Washington, had not been donated.

293.    She further discovered that the missing "Dense Forest Landscape in the Style of Dachi" was in AW and SK's possession because it was auctioned as lot number "2872" at the June 3, 2010 auction, while one of the paintings acquired by AW's enterprise through the Straw Men (*Xu Wei*'s "Calligraphy" ostensibly sold to Yong Wing Ye) was being auctioned as lot number "2871."

294.    "Dense Forest Landscape in the Style of Dachi" sold for $1.5 million and the June 3, 2010 auction.

295.    The Estate, through Yien-Koo as a statutorily-defined "person interested," is entitled to treble damages caused by AW's theft and sale of this work to be proven at trial, but reasonably believed to exceed $4.5 million.

296.    Indeed, AW went on to sell the fraudulently acquired and stolen works for tens of millions of dollars.

297.    Meanwhile, he has left the Estate besieged by tax liabilities of approximately $20,000,000.00.

298.    The Estate received approximately $4 million from the Straw Men sales even though the true value of the sold works exceeds $40 million.

299.    Due to AW's successful efforts to conceal his fraudulent sales, Yien-Koo, and by extension the Estate, did not recognize AW's fraud and position on both sides of the Straw Men sales until 2013.

300.    The Estate, acting through Yien-Koo as a statutorily-defined "person interested," is entitled to statutory treble damages caused by these sales and money laundering in an amount to be proven at trial, but reasonably believed to exceed $120,000,000.00.

**COUNT III**
**CIVIL RICO (18 U.S.C. § 1962 (a) and (c))**
(*Yien-Koo, on Behalf of the Estate of C.C. Wang, Against Shou-Kung Wang*)

301.    The Plaintiffs incorporate by reference the allegations set forth above as though they were fully set forth herein.

302.    At all times, SK has acted in collaboration with his son, AW, to steal from and defraud the Estate of C.C. Wang.

303.    SK and the remaining Defendants have committed various predicate acts with the common design of obtaining control of artworks with the ultimate goal of defrauding Plaintiffs and the Estate of money and assets.

304.    SK's predicate conduct against the Estate of Chi-Chuan Wang is, *inter alia*, as follows:

| Number | Predicate Conduct | Violated Statute (18 U.S.C.) | Location in Complaint |
|---|---|---|---|
| 1 | SK (along with AW) shipped, by means of international commercial carrier, a stolen Estate asset, the *Ma Yuan* Landscape Album from New York to China between November, 2003 and 2011. The *Ma Yuan* was valued at over $2,500,000.00 at the time of its theft from the CY Art safe deposit box. | §§1341, 2314 (Shipping of Stolen Goods) | ¶68 |
| 2 | SK (along with AW) sold a stolen Estate asset, the *Ma Yuan* Landscape Album, to a Chinese collector named Zhu Shaoliang between November, 2003 and 2011 for more than $5,000,000.00. | §1957 (Monetary Transaction with Property Derived from Unlawful Activity) | ¶102 |
| 3 | SK (along with AW) shipped, by means of international commercial carrier, 13 Estate-owned artworks taken from the CY Art safe deposit box and C.C. Wang's apartment on January 31, 2003 from New York between 2003 and May 11, 2005. These stolen and fraudulently acquired goods were valued at more than $5,000,000.00 at the time of their theft. | §§1341, 2314 (Shipping of Stolen Goods) | ¶68 |

| 4 | Between 2005 and 2009, SK (along with AW) reinvested the funds gained from the sale of works stolen from the CY Art safe deposit box into the RICO Enterprise for the purpose of fraudulently purchasing artwork from C.C. Wang's Estate. | §1956(a)(2) (Money Laundering) | ¶103 |

305.    Yien-Koo, and by extension the Estate, did not discover that the *Ma Yuan* Landscape Album had been shipped to China and sold to Zhu Shaoliang until in or about 2012.

306.    Prior to Yien-Koo's discovery, SK had represented to Yien-Koo and the Estate that the *Ma Yuan* Landscape Album as remaining in his personal custody and control.

307.    With its transport to and sale in China, the Estate has been injured by SK's predicate activity through the loss of the asset.

308.    The Estate, through Yien-Koo, is entitled to treble damages caused by SK's fraudulent transfer of the *Ma Yuan* to be proven at trial, but reasonably believed to exceed $15,000,000.00.

309.    Further, SK (along with AW) reinvested proceeds from the sale of the *Ma Yuan* and other works stolen on January 31, 2003, in order to complete their schemes to fraudulently purchase assets from the Estate between 2005 and 2009.

310.    Without the use of proceeds derived from their stolen and fraudulently acquired artwork, SK and AW would not have been able to perpetrate the Straw-Man fraud between 2005 and 2009, since this fraud required millions of dollars to execute.

311.    The Estate, through Yien-Koo, is entitled to treble damages proximately caused by SK's money laundering and other illegal activities to be proven at trial, but reasonably believed to exceed $120,000,000.00.

**COUNT IV**
**CONSPIRACY TO VIOLATE RICO (18 U.S.C. § 1962(d))**
(*All Plaintiffs Against All Defendants*)

312.    The Plaintiffs incorporate by reference the allegations set forth above as though they were fully set forth herein.

313.    Section 1962(d) prohibits conspiring to violate either 1962(a), (b) or (c). When read in conjunction with the language of 1962(c), RICO's conspiracy provision proscribes an agreement "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

314.    A RICO conspiracy is proven where a defendant is shown to have "embraced the objective of the alleged conspiracy," and agreed to commit two predicate acts in furtherance thereof.

315.    Participation in the conspiracy can be shown entirely through circumstantial evidence.

316.    To demonstrate a RICO conspirator's knowledge of the RICO conspiracy, it is sufficient to show that each defendant knows the general nature of the enterprise and knows that the enterprise extends beyond his/her general role. The actions alleged above ranging from the restructuring of family assets, to drafting paperwork intended to negate Yien-Koo's interest in the artworks, to issuing false denials regarding his misconduct when serving as the Estate's representative are of the type that "logically would lead SK to suspect" that he was part of a larger conspiracy with AW.

317.    In this case, there was a conspiracy to conduct the enterprise's affairs through a pattern of racketeering activity, and the Defendants committed two crimes that qualify as RICO predicate acts when they arranged for, received and/or transmitted fraudulent paper-work concerning the phony will, the creation of which helped establish the framework to defraud the Plaintiffs.

318.    There was and continues to be an agreement by and among the Defendants to commit at least two acts of racketeering activity by conscious adherence

to fraudulent schemes pursuant to which at least two mailings and or uses of interstate wires in furtherance of the schemes were foreseeable.

319. At all relevant times, the Defendants used U.S. mails and wires, by means of telephone calls, fax transmissions, regular mail and overnight courier services, as instrumentalities for advancing their deceitful schemes with the Plaintiffs, the Estate, the PA and the Surrogate Court.

320. Among other things, upon information and belief, the Defendants committed wire fraud when they sent telefaxes and/or made telephone calls in their schemes to falsify the ownership of the artworks for the purpose of defrauding Plaintiffs and other will beneficiaries of their ownership rights therein.

321. The Defendants wired funds to three different bank accounts in connection with the fraudulent sale of the 98 paintings to the five Straw Men including: (a) the Estate's bank account located at North Fork Bank, 750 Third Avenue, New York, NY 10017; (b) an escrow account in the name of Brown Raysman Millstein Felder & Steiner LLP located at Citibank Private Bank, 153 East 53rd Street, New York, NY 10043; and (c) Capital One Bank 750 Third Avenue, New York, NY 10017 to an account in the name of "Estate of Chi-Chuan Wang." In this way, the Defendants used wire transfers, international shipping couriers, and Estate resources to injure the Plaintiffs and remaining estate beneficiaries through their fraudulent disposition of assets.

322. The Plaintiffs' business and property has been injured by reason of a violation of 18 U.S.C. § 1962(d) and they are entitled to treble damages under 18 U.S.C. § 1964(c). Pursuant to 18 U.S.C. § 1964(a), this Court should restrain and enjoin further violations of 18 U.S.C. § 1962. Injunctive relief is warranted because the pattern of racketeering activity has extended over a substantial period of time and it is continuing.

## COUNT V
## FOR A CONSTRUCTIVE TRUST
### (All Plaintiffs Against Andrew Wang)

323. The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

324.    New York law generally requires that a party establish four elements before a constructive trust may be imposed: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.

325.    A constructive trust has been found to be appropriate where defendants have allegedly used fraud, undue influence, force, to prevent revocation of a will favorable to them.

326.    At times relevant to this action, Defendants on their own behalf and/or allegedly on behalf of the Estate sold or exchanged certain of the artworks belonging to the Plaintiffs and otherwise took personal possession of the Plaintiffs' property against their wishes and by the abuse of AW's position as an Estate fiduciary.

327.    Further, AW induced Yien-Koo and Northwich to deliver *Wu Zhongyuan*'s "Procession of the Taoist Immortals" based upon knowingly false representations.

328.    Northwich and Yien-Koo deposited the *Wu Zhongyuan* in the Bank based upon those representations.

329.    By stealing the work out of the Bank after fraudulently inducing its deposit, AW has been unjustly enriched.

330.    The Plaintiffs have cause to believe that if not prevented from doing so, AW will further transfer and/or waste their property or proceeds they achieved from the disposition of Estate and personally-owned property and thereby leave the Plaintiffs without the means to recover the value of same, no less satisfy a potential judgment in their favor.

331.    The Plaintiffs have no other remedy adequate at law.

332.    In that certain of the artworks belong to the Plaintiffs outright and that the Plaintiffs have equitable interests in Estate works of art that were only obtained by AW by and through wrongful means, Yien-Koo, Soon Huat, and Northwich have real

interests in the assets and standing to seek relief as alleged intended recipients of properties within the custody and control of AW.

333.    The Court should impose a constructive trust upon any property within AW's custody or control which either belongs to the Plaintiffs or derives from the sale or disposition of property belonging to the Estate or the Plaintiffs or in which they have equitable interests.

**COUNT VI**
**<u>CONVERSION</u>**
*(All Plaintiffs Against Andrew Wang and Shou-Kung Wang)*

334.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

335.    The Plaintiff is the legal and/or equitable owner of certain artworks identified above.

336.    As set forth above, AW and SK collectively, and individually, wrongfully took possession of artworks which belong to Northwich, Soon Huat, and the Estate of C.C. Wang.

337.    Among other things, on January 31, 2003, AW removed 21 paintings reposed in a vault maintained jointly by the Decedent and Yien-Koo under the name of Yien-Koo's company, CY Art, and further misappropriating another four works directly from Decedent's residential apartment. AW first denied that he had custody of any of these Estate assets, but subsequently confided that he had them after all, an admission evidenced by a covert tape recording.

338.    Moreover, AW unlawfully and fraudulently removed Northwich's "Procession of the Taoist Immortals" from a safe deposit box in or about 2009 in violation of Northwich's rights at law and in equity.

339.    AW and SK have refused and continue to refuse to return certain of the artworks over which they maintained and/or continue to maintain within their custody and control, thereby deliberately exercising unlawful dominion and control over the

Plaintiffs' property.

340.    As detailed in the preceding factual allegations, all of the Wang Defendants collectively, and individually, wrongfully converted Plaintiffs' property which either belong to the Plaintiffs outright or in which the Plaintiffs have equitable interests to their own use and, in so doing, intended to permanently deprive Plaintiffs of their use and enjoyment of same.

341.    Accordingly, the Plaintiffs are entitled to recover actual damages from the Defendants arising from the deprivation of their property in an amount to be determined at trial but which the Plaintiff reasonably believes to exceed the sum of $20,000,000.00 dollars, together with an award of punitive damages as are available by reason of the egregious nature of the Wang Defendants' misconduct under common law.

**COUNT VII**
**COMMON LAW FRAUD AND CONSPIRACY TO DEFRAUD**
(*All Plaintiffs Against All Defendants*)

342.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

343.    As alleged in detail above, each of the Defendants knew of, and—by means of their coordinated efforts—substantially participated in, multiple deceitful actions, including the restructuring of family assets, drafting paperwork intended to negate Yien-Koo's interest in the artworks, issuing false denials regarding their efforts as the Estate's representative and selling Estate artwork at U.S. auction houses at fire sale prices, effectively assuming personal ownership of them (through straw men) then reselling the works for far greater amounts abroad. They did so for the specific purpose of defrauding the Plaintiffs.

344.    By reason of the foregoing fraud and deception, the Plaintiffs are entitled to recover actual damages which the Plaintiffs reasonably believe to exceed the sum of $60,000,000.00 dollars, together with an award of punitive damages as additional relief

available here by reason of the wrongful and deliberate nature of the Defendants' misconduct.

**COUNT VIII**
**COMMON LAW FRAUD**
(*Northwich Against Andrew Wang*)

345.   Among other things and as set forth above, AW fraudulently induced Yien-Koo and Northwich to deposit *Wu Zhongyuan*'s "Procession of the Taoist Immortals" in the Bank based upon false representations and settlement negotiations.

346.   AW represented to Yien-Koo and Northwich that by (a) depositing the "Procession of the Taoist Immortals," in the Bank (which he himself had chosen) and (b) sharing the rights to the "Procession of the Taoist Immortals" with him, Yien-Koo would be able to end the Estate litigation on reasonable terms and that AW would cooperate with the remainder of the settlement.

347.   AW made these representations in his individual capacity and his capacity as Estate fiduciary.

348.   Yien-Koo and Northwich reasonably relied upon these representations by delivering the "Procession of the Taoist Immortals" to the Bank on or about May 12, 2005.

349.   In reality, AW had no desire to complete any settlement with Yien-Koo. By May 2005, AW had already commenced his scheme to acquire all of the Estate's assets for himself by use of the fraudulent Straw Men sales. AW knew that once the Straw Men sales were fully effectuated, there would be nothing left in the Estate worth settling over.

350.   AW's representations of settlement were designed solely to transfer the "Procession of the Taoist Immortals" from Northwich's custody and control to a location which he could later access.

351.   Following the deposit AW managed to remove the work from the safe deposit box to Northwich's direct injury.

352.   Due to AW's efforts to conceal his fraudulent scheme, Yien-Koo did not learn of either the theft, or AW's involvement in the theft and possession of the "Procession of the Taoist Immortals" until years after its deposit and removal.

353.   AW has now come to publically admit to the Chinese government, media, and art community that he is in possession of this multi-million asset.

354.   By reason of the foregoing fraud and deception, Northwich is entitled to recover actual damages which the Plaintiffs reasonably believe to exceed the sum of $10,000,000.00 dollars, together with an award of punitive damages as additional relief available here by reason of the wrongful and deliberate nature of the AW's misconduct.

**COUNT IX**
**BREACHES OF FIDUCIARY DUTY**
**AND AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES**
*(Yien-Koo, Individually and on Behalf of the Estate of C.C. Wang Against All Defendants)*

355.   The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

356.   AW has committed myriad violations of fiduciary duties, including serial misappropriations of Estate assets.

357.   By his own account, AW sold ninety-eight Estate paintings to his friends. He arranged for these *non*-arm's length deals in 2004, 2005, and 2009. Twelve of the works, which were sold by the Estate for a mere $509,000—were later resold, less than three years later, for $9.46 million. A thirteenth painting, the *Dense Forest Landscape Iso Dachi*, which AW falsely testified was donated to the University of Washington, was auctioned at the Poly Auctions International Auction Co., Ltd., June 3, 2010 auction for $1.5 million.

358.   In December 2013, AW purported to detail—under the penalties of perjury in the surrogate's court proceedings—that ten years earlier (in Spring of 2003) C.C. Wang himself sold the *Ma Yuan* Landscape Album, an Estate asset that AW had taken from the CY Art Vault in the incident described above and which has been valued at no less than $2.5 million. Yet, AW's prior testimony was that the work was reposed

with his father, and that SK continued to retain the painting beyond C.C. Wang's demise.

359.    The location and/or disposition of this $2.5 million worth of Estate value remained unaccounted for during this fiduciary's watch until now. It is only now, for the first time, that AW confidently announces that the *Ma Yuan* was sold before the 10 year controversy over its whereabouts even took hold. This contrivance is obviously designed to mask the conversion of highly valuable Estate property AW left with his father for *safe keeping*.

360.    Andrew Wang misappropriated the 1000-year-old "Procession of the Taoist Immortals."

361.    Defendants have exploited AW's position of trust and expected candor in marketing and selling the Plaintiffs' property to their financial detriment and to the financial detriment of other estate beneficiaries.

362.    In so doing, AW has breached fiduciary duties owed to Yien-Koo and other Estate beneficiaries.

363.    For his part, SK has knowingly given substantial assistance to AW and did so to financial detriment and to the Plaintiffs' financial detriment of other Estate beneficiaries and AW and SK have both exploited AW's position and opportunities for their sole benefit.

364.    The Plaintiffs are entitled to recover actual damages which the Plaintiffs reasonably believe to exceed the sum of $60,000,000.00 dollars, together with an award of punitive damages available here by reason of the wrongful and deliberate nature of the Defendants' misconduct.

## COUNT X
## REPLEVIN
*(All Plaintiffs Against All Defendants)*

365.    The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

366.     At all relevant times, the Defendants have held and currently retains artworks belonging to Plaintiffs and the Estate; neither the Plaintiffs nor the Estate have ever relinquished ownership to the artworks.

367.     When entrusting the Artworks to AW was expressly understood that they would not be dissipated by AW and SK for their personal gain.

368.     Neither AW nor SK ever purchased the artworks at issue from Plaintiffs or the Estate; nor had they provided Yien-Koo or the Estate with any consideration in exchange for the artworks.

369.     Despite due demand therefore, neither AW nor SK has restored the artworks to Plaintiffs or the Estate, as their lawful owner(s).

370.     To the extent that AW, SK Bao Wu Tang, Jian Bao Gallery, Anthony Chou, Chen-Mei Lin, Wei Zheng, Ye Yong-Qing and/or Yue Da-Jin retain any of the Kings' or Estate's artworks within their possession, custody and/or control they should be ordered and compelled to restore the artworks to their lawful owner and pay attendant damages.

## COUNT XI
## N.Y. DEBT. & CRED. L. §270 *Et. Seq.*
### *(All Plaintiffs Against All Defendants)*

371.     The Plaintiffs repeat and reallege each of the foregoing allegations as though they were fully set forth herein.

372.     Upon information and belief, the Defendants transferred assets, including property belonging to the Estate and Plaintiffs in order to hinder or delay the Plaintiffs from collecting on a prospective judgment against them or to prevent the Plaintiffs from receiving their just distributions from the Estate.

373.     Upon information and belief, by their transfers of assets the Defendants rendered the party so denuded unable to satisfy a judgment and/or the Estate unable to satisfy C.C. Wang's testamentary intent, in violation of sections 276, 273-a, 273, and 275 of the Debtor-Creditor law (McKinney).

374.    In particular, New York Debtor Creditor Law section 276 states that "[e]very conveyance made and every obligation incurred with actual intent… to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors".

375.    Yien-Koo is a person interested in the   Estate of C.C. Wang, as a prospective creditor of one or more of the Defendants by reason of actions cognizable under theories for relief denominated as Counts I-X herein.

376.    Upon information and belief, property belonging to the Estate, Northwich, and Soon Huat or one or more of the other Defendants was improperly transferred to the Wang Defendants with the specific intention of defrauding the Plaintiffs and others in violation of N.Y. Debt. & Cred. L. §276.

377.    In the alternative, irrespective of Defendants' actual intent, property belonging to the Estate and/or one or more of the other Defendants was conveyed without fair consideration (as defined in NYDCL § 272(a)) "by a person who [was] or [would be] thereby rendered insolvent" (as defined in NYDCL § 271)) such that the transfer was fraudulent under NYDCL § 273. [2]

378.    The Plaintiffs have suffered damages by reason of fraudulent conveyances in that the activities of one or more of the Defendants have rendered it impossible to collect upon and enforce a judgment against one or more of the other defendants and/or for the Plaintiffs to receive their entitlements as genuine beneficiaries of the Estate.

379.    The Plaintiffs are entitled to judgment against the Defendants pursuant to NYDCL §§ 276 and 279 (a) setting aside the transfers of the Estate's assets identified above; (b) ordering each of them to account for and deliver the value of the property

---

[2] Pursuant to NYDCL § 271, a person is "insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they come due."

fraudulently conveyed to the party from which the conveyance was received (in order to provide it with sufficient funds to pay the claims of the plaintiffs), and; (c) awarding the Plaintiffs their attorney's fees.

WHEREFORE, Plaintiffs respectfully request an order and judgment:

A. Awarding damages under Counts I, II, III, and IV in an amount to be determined at trial, then trebled under 18 U.S.C. § 1964(a) and restrain and enjoin further violations of 18 U.S.C. §§ 1962(a) and (c);

B. To the extent that AW and/or SK retain any of the artworks within their possession, custody and/or control they should be ordered and compelled to restore the artworks to Yien-Koo, Northwich, Soon Huat or the Estate, as their lawful owner and pay attendant damages;

C. Awarding actual damages under counts IV-VI, which amounts the Plaintiffs reasonably believe to exceed the sum of $60,000,000.00 dollars, together with an award of punitive damages available here by reason of the wrongful and deliberate nature of the Defendants' misconduct;

D. Awarding a constructive trust upon any property within the Defendants' custody or control which either belongs to YK or the Estate or derives from the sale or other disposition of property belonging to one or the other of them;

E. Declaring that Andrew Wang  breached fiduciary duties owed to YK and the Estate;

F. Awarding damages for AW's and SK's *breaches of fiduciary duties* and *aiding and abetting such breaches* respectively in an amount determined after a trial;

G. Pursuant to NYDCL §§ 278 and 279 (a) setting aside the transfers of assets set forth above and (b) ordering each of the above-named Defendants to account for and deliver the value of the property fraudulently conveyed to the party from which the conveyance was received and awarding the Plaintiffs their attorney's fees; and

H. Awarding attorney's fees, costs and interest, together with such other and further relief, where available by statute or at common law, as the Court deems just and proper.

## Sam P. Israel, P.C.

Dated: New York, New York                By: */s/ Sam P. Israel*
September 27, 2016

**Sam P. Israel (SPI0270)**
**Timothy Savitsky (TS6683)**
**Sam P. Israel, P.C.**
**180 Maiden Lane–6th Floor**
**New York, New York 10038**
**T: (646) 787-9880 | F: (646) 787-9886**
**samisrael@spi-pc.com**

*Attorneys for Plaintiffs*
*Yien-Koo King, Northwich Investments, Ltd., and*
*Soon Huat, Inc.*

67