Iandkin

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x
     YIEN-KOO KING, NORTHWICH
3    INVESTMENTS, LTD., and SOON
     HUAT, INC.,
4
                    Plaintiffs,              New York, N.Y.
5
             v.                              14 Civ. 7694(JFK)(JLC)
6
     ANDREW WANG, SHOU-KUNG WANG,
7    BAO-WU TANG, JIAN BAO GALLERY
     ANTHONY CHOU, CHEN MEI-LIN,
8    WEI ZHENG, YE YONG-QING, YUE
     DA-JIN and JOHN DOES 1-9,
9
                    Defendants.
10   ------------------------------------x
     ANDREW WANG, Individually and
11   doing business as BAO-WU TANG,
     and SHOU-KUNG WANG,
12   Individually and formerly
     doing business as JIAN BAO
13   GALLERY,
14                  Defendants and
                    Third-Party Plaintiffs,
15
             v.
16
     YIEN-KOO KING, Individually,
17   KENNETH KING, RAYMOND KING,
     LYNN KING, THE PUBLIC
18   ADMINISTRATOR OF THE COUNTY OF
     NEW YORK as Temporary
19   Administrator to the Estate of
     Chi-Chuan Wang, Deceased; and
20   Does 1 through 10,
21                  Third-Party Defendants.
     ------------------------------------x
22
                                             October 23, 2018
23                                           9:49 a.m.
     Before:
24
                          HON. JAMES L. COTT,
25                                           Magistrate Judge

Iandkin

1                                APPEARANCES

2

SAM P. ISRAEL, P.C.
3        Attorneys for Plaintiffs
         and individual third-party defendants
4   BY:  SAM PETER ISRAEL
         TIMOTHY SAVITSKY

5

6   KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
         Attorneys for Defendants and third-party plaintiffs
7   BY:  AKIVA MEIR COHEN
              – and –
8   LIU & SHIELDS LLP
    BY:  CAROLYN J. SHIELDS

9

10  SCHRAM, GRABER & OPELL, P.C.
         Attorneys for Third-Party Defendant
11       The Public Administrator of the County of New York
    BY:  GLENN A. OPELL

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iandkin

1              THE CLERK:  In the matter of King v. Wang.

2              Counsel, state your name for the record.

3              MR. ISRAEL:  Good morning, your Honor.  Sam Israel

4     with Timothy Savitsky for Yien-Koo King.

5              THE COURT:  Good morning, gentlemen.

6              MR. COHEN:  Good morning, your Honor.  Akiva Cohen and

7     Carolyn Shields for SK Wang.

8              THE COURT:  Good morning.

9              And there is someone that is joining us.  Do you want

10    to state your name for the record.

11             MR. OPELL:  Yes.  Glenn Opell, G-l-e-n-n O-p-e-l-l,

12    for the Public Administrator of New York County.

13             THE COURT:  So, counsel, the first thing I need to

14    bring to your attention is the following, which is in preparing

15    for today and reviewing the amended complaint last night, I

16    discovered in paragraph 26 of the amended complaint that

17    Mr. C.C. Wang's collection includes something called River

18    Bank, which was given to the Metropolitan Museum of Art, and

19    the Metropolitan Museum of Art has established the C.C. Wang

20    Family Collection to honor the lifetime contributions to the

21    museum.  So, my wife is the general counsel of the Metropolitan

22    Museum.  I have no idea whether that implicates anything

23    whatsoever in this case, but I thought, as a threshold matter,

24    I should disclose that.  And if you all think that creates some

25    issue or appearance, there are ten other magistrate judges in

Iandkin

1  our court.  I have no idea whether the Metropolitan Museum is

2  in some way involved in any fashion.

3           Is that something anybody who is here knows or has a

4  view about?

5           MR. ISRAEL:  May I speak, your Honor?

6           THE COURT:  Yes, Mr. Israel.  Go right ahead.

7           MR. ISRAEL:  It is not involved in the case, and in

8  fact you are not the first judge who has identified the

9  Metropolitan Museum -- as having a contact with the

10  Metropolitan Museum and I forgot the specific capacity but

11  maybe it was on the Board of Trustees or something.  And it was

12  not an issue in that instance and nor is it in this instance as

13  far as plaintiff is concerned.

14           THE COURT:  All right.  Mr. Cohen.

15           MR. COHEN:  I'm not sure that is necessarily accurate.

16  The Met is a --

17           THE COURT:  If you wouldn't mind standing.

18           MR. COHEN:  I apologize.  The Met is a beneficiary

19  under I think whatever version of the propounded -- of the

20  wills might get admitted to probate.  This case is seeking to

21  recover I believe the claim is something on the order of 60

22  million in damages for the estate, which would have a direct

23  financial benefit or could have a direct financial benefit to

24  the Met.

25           THE COURT:  Is the Met a named beneficiary in some

Iandkin

fashion?

MR. COHEN:  I believe so, but honestly, this is the
first that I'm hearing of the --

THE COURT:  I apologize for not raising this before
but I didn't identify this until I was preparing for the
hearing today.

MR. COHEN:  It's fine.  And from my perspective and
sitting here today, I don't see it as a conflict that would
cause anybody to ask for recusal, but I just don't know whether
the Met is a beneficiary.  And given the fact that Ms. King is
suing on behalf of the estate, it might simply be a conflict
that it doesn't matter whether any of us see it as a conflict
that your Honor want to recuse for.  It might become an issue
down the road.  I just don't know because this is the first --

THE COURT:  I just don't want there to be any
appearance of impropriety, and, you know, my wife obviously
wouldn't personally benefit.  But as the general counsel of the
museum, if the museum had an interest, she would have a lot of
responsibility related to that, and I always in anything that
implicates the museum generally disassociate myself from it.

But the museum isn't a party in this lawsuit, but this
lawsuit is an overlay of the probate proceeding.  And I don't
know anything about the probate proceeding, and I only asked my
wife last night when I got home if she knew of Mr. Wang in this
room, and she said of course I do.  But other than that, she

Iandkin

1   said the museum to her knowledge had no direct involvement in

2   this lawsuit.

3          So, anyway, I want to do whatever you all want, but I

4   thought as a threshold matter I should raise it.

5          Yes, Mr. Opell

6          MR. OPELL:  Yes, your Honor.  Off the top of my head,

7   the only instrument of which the Met is a beneficiary under is

8   a charitable remainder muni trust, and it is not a part of the

9   C.C. Wang's estate.  So they are an ultimate remainder

10  beneficiary, and so I don't think that in any way implicates

11  these proceedings here.

12         If they are somehow a beneficiary under the will, or

13  if that trust is somehow affected by the will, I don't recall

14  off the top of my head.  And I should note that the Public

15  Administrator, my client, is not a party in interest to the

16  probate proceeding.  We have no interest in whether the will

17  gets probated or not.  So, I just say that for my defense based

18   on my lack of remembering it.

19         THE COURT:  Well, let me just be direct with all

20  counsel who are here.  Shall we proceed before me today, or

21  does anyone have an objection to doing so?  Because if you do,

22  we'll obviously reassign this to another judge and you will be

23  heard promptly by somebody else.

24         MR. COHEN:  No, your Honor.  I think we should

25  absolutely proceed before you today.  I don't think, one way or

Iandkin

1   the other, anybody has any questions about your impartiality in

2   handling this.

3          We can -- if your Honor would like, we can go back and

4   at whether there is any pour-over from any of the instruments

5   into that crud that would impact the Met's financial position,

6   and you can decide that.  But I think, for everybody's sake, we

7   should go through with the conference today either way.

8          THE COURT:  Mr. Israel, you are amenable to that as

9   well?

10         MR. ISRAEL:  I am amenable.  Also, just for the

11  record, our recollection of the will comports with Mr. Opell's.

12  We don't believe that the Met is a direct beneficiary of the

13  will.

14         THE COURT:  All right.  Why don't we do this.  Why

15  don't we proceed.  Why don't I ask counsel to provide me with

16  any information you can about the Met's status as it relates to

17  the estate, and if you think, upon further review of that, that

18  might require me to recuse myself, do not be shy about

19  suggesting as much, or if you think it does not, you can tell

20  me that as well, because I don't want to do anything that I

21  shouldn't be doing here and I want to be as transparent as

22  possible.  Obviously, I don't have anything at stake in this

23  case, and I just want to ensure that justice is served.  That's

24  my only responsibility here.

25         All right.  I think having made that record and

Iandkin

satisfying myself at least for the moment that everyone is

willing to proceed, let's proceed.

          And I have a few things that I wanted to say by way of

background.  We have an ambitious agenda ahead of us today and

a lot to accomplish in this hearing this morning.  I want to

sort of nip something in the bud, if I can, a little bit.  I

know that this is a very acrimonious case I think in large part

because of the nature of the dispute between family members,

and that, by definition, always I think is highly charged and

personal and the like.  And, you know, while I've only seen

snippets and glimpses of some of what is at least alleged to be

some of the interactions between counsel, I'm going to say

something, without trying to make any judgments about any

lawyers here because I expect you all to practice at the

highest standards of the bar and I'm sure you will.

          But it's very important to me in any proceeding that I

preside over, especially when there is this sort of family

dispute that exists here, that the lawyers do their level best

not to channel what I'm going to characterize as the bitterness

between the parties that inevitably exists when family members

fight over money.  Obviously, there is a lot of money at stake

here so the stakes are high.

          Having said that, as someone who also is involved in

the criminal justice system, I always think it is important for

everybody to be mindful of what is at stake and what is not at

Iandkin

stake.  For example, no one's liberty is at stake in this

dispute.  And I always find, after working on criminal matters,

when I go back to doing civil litigation, it gives me greater

perspective on all the disputes that come before the Court.

I don't mean to diminish in the slightest the

seriousness of the lawsuit, and there are obviously very

serious allegations in the lawsuit.  It is a RICO case and

there are fraud allegations, etc.  So, we are talking about

conduct that is being, you know, challenged, that I think the

plaintiffs would characterize perhaps even as quasi-criminal in

nature.

But be that as it may, what I would just suggest is

going forward the lawyers do your level best to take the high

road, to imagine a young, newly minted lawyer is at your side

through everything that you all do in the lawsuit and you want

to teach that young lawyer good habits.  And one of those, I

think, and what I, when I swear in new lawyers in this court,

always say is the following:  Lawyers have twin

responsibilities.  You are to be a zealous advocate for your

client.  By the way, the word "zealous" is not in the model

rules of professional conduct as it used to be in the model

code, but lawyers who have practiced awhile always say "I'm

just being a zealous advocate for my client," but, in fact,

that's not even the charge the model rules give you any more.

But be that as it may, I will characterize one role

Iandkin

you all play is zealous advocates, and you all are certainly
doing that, but you all have an equal responsibility to be an
officer of the court, and that is to serve the interests of
justice and to assist the court in making decisions that are
fair, because that is what my responsibility is.  So I'm not
trying to give a homily here.  I'm just trying to strike the
right tone as we proceed.

           So I think, enough said.  I'm not interested in the
blame game.  I'm not interested in, you know, reasons for delay
and all the rest, some of which was described at least in part
in the correspondence to the Court.  I want to move forward,
but I also wanted to just kind of set the tone for you all in
terms of my own perspective about litigation and the conduct of
lawyers.  I have no expectation other than you will be zealous
advocates but you will also do so with civility and
professionalism.

           Enough said.

           Now, the next thing I want to say preliminarily, and
then we'll get right into the agenda for today, is you had your
initial conference with Judge Keenan after all the various
iterations up and back to the Circuit, etc., back in May, and
he issued the case management order on May 16th, and you have a
discovery deadline of January 4th and it is already almost the
end of October.  So I'm very worried here because a lot of the
issues that have been raised seem to be pretty broad-based and

Iandkin

1    we have, especially with respect to the attorney subpoena

2    issue, some legal issues that I think will make it very

3    difficult to resolve all of that today.

4            My practice in general, just so you know, is when

5    there are discovery disputes is to call parties in and work

6    through them and resolve them on the record in court.  It's

7    much more expeditious.  It's much more in the interest of

8    counsel for it to be done that way and, frankly, for the Court

9    as well.  But there are some issues here today that I'm not

10   sure we are going to be able to resolve in that fashion, we're

11   going to have to talk about that.

12           But I raise the scheduling order because it was issued

13   in May, and October 10th is the first time I'm hearing about

14   anything.  And, again, I'm not blaming anybody, but you're all

15   giving yourselves and the Court very little time to really kind

16   of navigate a number of I think fairly complex issues.  And you

17   all obviously have lived with this case for many, many years

18   and I have not, so you know it far better than I.  And I always

19   say that it's risky for litigants to come to court and have a

20   judge in some respects somewhat arbitrarily make some

21   decisions, because the basis for my decisions are going to be

22   much narrower in some respects because I can't see the full

23   field of the case.  And, indeed, even with respect to the

24   disputes before me this morning, I don't have the full set of

25   document requests and objections and the like.  I just have

Iandkin

1    summaries of them.  But I think they give me a flavor of what

2    the issues are.  And obviously the scope of some of them are

3    broad, and some of the responses are very specific and some

4    others are somewhat vague.

5         So, I think we have no choice but to literally go

6    through what I have identified as nine different categories

7    with respect to the documents.  That's one task we have.  The

8    second task is to see where you all are with respect to the

9    interrogatories.  I know there was some supplementation, but if

10   there are still open issues, I think we need to resolve that.

11   I'm hopeful we can resolve all or almost all of that today.

12        With respect to the subpoena to the attorneys,

13   obviously we need to talk about that as well.  But I think at

14   least some of that may be more complicated and a fuller record

15   may need to be developed on that before I can be in a position

16   to make informed rulings.

17        All right.  Those are my preliminary remarks, probably

18   longer than I anticipated, for which I apologize, but I think

19   it was important for me to say a fair amount of what I just

20   did.  Unless anyone has any objections or wants to say anything

21   preliminarily, I think we should just go to the list of

22   document categories and go through them one at a time and at

23   certain point take a break for the benefit of the court

24   reporter, for the Court and counsel as well.  Let's see how far

25   we can get before we need a break.

Iandkin

|      |                                                              |
|------|--------------------------------------------------------------|
| 1    | Mr. Israel and Mr. Cohen, anything we need to talk           |
| 2    | about preliminarily before we dive right into the particulars? |
| 3    | MR. COHEN:  Only with respect to scheduling.  I don't        |
| 4    | know how long this is going to run today.  I was not          |
| 5    | anticipating this type of working through on specifics.  To the |
| 6    | extent that it runs for several hours, and it may, my only    |
| 7    | issue is I have to be in Nassau Supreme Court at 2 o'clock for |
| 8    | a custody trial of which I am a party, and so that may pose a |
| 9    | scheduling issue as we go deeper.  Hopefully not --          |
| 10   | THE COURT:  I certainly hope we are not going to be          |
| 11   | here for that long.  What time do you need to leave to be there |
| 12   | with time to spare?                                          |
| 13   | MR. COHEN:  I need to be on a train in the 12 o'clock        |
| 14   | hour, and I haven't looked at the train schedules.          |
| 15   | THE COURT:  All right.  I had in my own mind allocated       |
| 16   | about an hour and a half for the conference.                 |
| 17   | MR. COHEN:  Perfect.                                         |
| 18   | THE COURT:  And I was trying to be mindful of your          |
| 19   | schedule by scheduling it at 9:45.                          |
| 20   | MR. COHEN:  I appreciate that.                              |
| 21   | THE COURT:  But I'm hopeful that we will be done            |
| 22   | somewhere between 11 and 11:30.  That depends on how much you |
| 23   | all talk.                                                    |
| 24   | MR. COHEN:  Thank you, your Honor.                          |
| 25   | THE COURT:  So, keep your remarks brief and we will        |

Iandkin

1    move it along more quickly, I suppose.

2          So, why don't we get started then and go to the first

3    category, which -- and I'm going to use the exhibits that you

4    prepared, and I'm going to have both of them in front of me,

5    because the one that the defendant submitted is a little bit

6    more detailed in terms of their response.  And then I think

7    we'll just try methodically to go through them one at a time.

8    And I suggest that counsel order this transcript, because my

9    rulings as to these categories will be set forth here on the

10   record as we go through them.

11         So the first category is documents related to sale,

12   possession, display, or handling of classical Chinese art,

13   since 2003.

14         So, who wishes to be heard and where is the dispute

15   and what has or hasn't been produced and how can I resolve this

16   issues?  Mr. Israel.

17         MR. ISRAEL:  Yes, your Honor.

18         At first, it sounds as though it might be overbroad,

19   because we're talking about all documents relating to the sale

20   of antiquities -- antiquity Chinese art.  However, we're

21   actually talking about a fairly contained universe of artwork.

22   All indications are that the defendant, Miss Andrew Wang, has

23   actually traded in estate artwork, as opposed to other artwork,

24   in this area.  So it seems like all the trades that would have

25   been covered by this request actually go to the heart of the

Iandkin

1   case and go to estate artwork that was sold, as we've alleged,

2   sold illicitly, and therefore we haven't attempted to cabin the

3   request any further because we believe that entire universe of

4   documents would be probative.

5           THE COURT:  Well, can I ask you a broad question,

6   which is -- because I know there has been some reference to

7   this in the correspondence to the Court -- what document

8   production was made during the probate proceedings that has

9   been incorporated by reference, if you will, into this case

10  that you have received, and is any of what's been produced

11  related to this category?

12          MR. ISRAEL:  Some of it may have been incidentally

13  related to this category, but this request, as it stands, was

14  never actually propounded in the estate proceedings.  And the

15  estate proceedings was dealing with estate artwork that was in

16  the abstract, and it was never actually dealt with as to where

17  the paintings are, how they have been disposed of in particular

18  by Mr. Wang, and that's why we had the request.  It's not

19  redundant of what we received in the probate proceeding.

20          THE COURT:  Can I ask you, just in general, what is

21  the scope and nature of the production you have received from

22  the estate proceeding so I have an understanding of that?

23          MR. ISRAEL:  In general, there has been a 2103

24  proceeding in the Probate Court which deals with finding out

25  the disposition of assets of the estate.  In this case,

Iandkin

1    however, dealing with Mr. Wang may be paintings that were

2    sold -- or actually we've alleged they're paintings that were

3    sold to third parties that ultimately found their way back to

4    Mr. Wang, and Mr. Wang sold them overseas.  In addition, there

5    could be other transactions that might be trades between

6    paintings.  Chinese -- ancient Chinese paintings that would be

7    also caught in this category, but none of which have we seen in

8    the context of the probate proceedings.

9          Also, the probate proceedings have an end date.  The

10   discovery ended quite a while ago.  The 2103 proceeding was

11   taking place for years, and it's been years since anything was

12   caught by a discovery demand that might have even conceivably

13   fallen within this category.

14         THE COURT:  What, if anything, has been produced to

15   you in this category?

16         MR. ISRAEL:  Would you mind if I defer to my

17   colleague, Mr. Savitsky, who might have more direct knowledge

18   about this?

19         THE COURT:  That's fine.

20         MR. SAVITSKY:  Your Honor, Tim Savitsky.

21         We were not counsel in the probate proceeding that is

22   being referred to in which documents were produced related to

23   classical Chinese artwork.  So, we don't -- it was produced by

24   Andrew as a respondent to the Public Administrator's proceeding

25   to find out what assets of C.C. Wang were not turned over to

Iandkin

1    the estate in 2003.  In addition to that, there was a question

2    over whether or not anyone held artwork that belonged to C.C.

3    Wang that was sold in violation of a temporary restraining

4    order which turned into a preliminary injunction in that

5    proceeding to collect C.C. Wang's assets.  That was all started

6    in 2003.

7              So over the course of that 13-year span, there were

8    documents produced related to requests that were propounded by

9    the Public Administrator, but it's difficult to -- we know that

10   these questions that we asked or demands that we propounded are

11   not the same as the ones the Public Administrator propounded.

12             THE COURT:  Well, do you have in your possession any

13   documents related to the sale, possession, display, or handling

14   of classical Chinese art since 2003?

15             MR. SAVITSKY:  We do, your Honor.

16             THE COURT:  You do.  So how do we expand on what you

17   have?  What is it that you think you don't have, I guess is the

18   better way for me to phrase that?

19             MR. SAVITSKY:  What we believe happened was -- so the

20   probably central scheme in this case is the sale by Andrew

21   Wang, as an estate fiduciary of C.C. Wang's estate, of 98

22   paintings -- classical paintings made before 1900 and then the

23   reselling of them by him in China.  So he is the estate

24   fiduciary.  He sells the artwork to these five people who only

25   he knows and only he has had contact with.  The Public

Iandkin

Administrator, as co-fiduciary, sees them just on paper, on the contracts.  She saw their names and approved the contract sales.

             We would like all information related to Andrew's activities in China and also related to the sale of classical Chinese artwork.  The truth is the only information that we have regarding how he has been buying and selling and displaying and auctioning this ancient Chinese artwork comes from news articles, because he's become somewhat of -- and we don't use this term loosely -- a celebrity in China.  There are dozens of news articles about him and about his display of artwork, about his pronouncing himself to be the heir of C.C. Wang's Chinese art collection.  And we know we have those documents because we are able to pluck them from the public record.  But we don't have is Andrew's actual transaction and business activities relating to classical Chinese artwork in China.

             THE COURT:  Well, can I you ask you, though, and I know in the pleadings there are various artworks identified:  Is there a finite number of artworks that fall into this category?  Is it 98?  Is it something else?  What are we talking about?

             MR. SAVITSKY:  It would be large, but the total number of artwork that we believe C.C. Wang ever owned -- classical -- we believe is about 400 pieces of Chinese art.  The total

Iandkin

number of artworks that were sold by Andrew, we believe to

himself, is 98 paintings.  However, together -- so the way it

was discovered that the self-dealing might have happened is

that Andy held an exhibition in 2009 at a -- something called

the Captain Museum, and it was hosted by the Hanhai,

H-a-n-h-a-i, Auction Company.  And the auction company

displayed these artworks.  It was about 30 works.  And half of

them were artworks that Andrew had sold as fiduciary of the

estate.  And then there is the other 15, which we -- which have

different stories behind them.  But all of the 30 works

displayed are categorized and listed as belonging to the Bao-Wu

Tang Gallery, and that is a codefendant in this case.  And

Bao-Wu Tang is Andrew's personal art gallery.

     So he sells artworks as fiduciary.  15 of them show up

as part of his gallery in the 2009 exhibition years later along

with 15 other classical Chinese artworks.  what we are looking

to find out is what is the entire ownership in the universe of

Bao-Wu Tang's classical art collection, because we think it was

stolen from C.C. Wang, and has Andrew Wang been buying and

selling classical Chinese artwork personally and through Bao-Wu

Tang in the past ten years.

     THE COURT:  Well, the way you just articulated in the

last sentence or two is a little bit more precise than at least

as the way it is described here.  The way this is written is

extremely broad.  And I'm trying to figure out some limiting

Iandkin

principles.  I have no doubt that you are entitled to discovery

in this way, in this category, but the way this is written,

"documents related to sale, possession, display, or handling of

classical Chinese arts since 2003," is extremely broad.  And

the way you just narrowed it I guess I would say to what I am

going to call the inventory, if you will, at the gallery, that

strikes me as a little bit more defined.  Is there any reason

why we can't follow through on this category, which may be the

broadest of all in some respects, to pursue it in that way?

MR. SAVITSKY:  Well, I would just say, your Honor,

like Mr. Israel stated, classical Chinese artwork, artwork

created before 1900, is very rare.  Andrew Wang has stated in

previous depositions that he does not have a large collection

of artwork.  So it is as if we asked for all documents related

to a stamp collection of stamps before 1900.  Normally, someone

would not have so many documents on that.  It would be a

limited thing that you're seeking highly valuable stamps.  So

even though it is requesting all documents related to Chinese

art, we don't see why his response would be so over-voluminous

that it makes the request --

THE COURT:  All right.  Let me hear from Mr. Opell,

since he's been standing, and then I will hear from Mr. Cohen.

MR. OPELL:  Thank you.

Your Honor, there are basically two categories that

the classical Chinese art falls into, and those are -- category

Iandkin

one is the classical Chinese art that was either in C.C. Wang's

possession when he died or turned over by the parties, the

Kings on the one hand and Andrew and SK on other hand, to the

estate.  They claim that these were assets of the estate.

I don't think there is any question as to the identity

of those paintings that were turned over or the identity of the

paintings that were in C.C. Wang's possession that day.  There

was an inventory made, and everyone -- I think everyone has

that inventory.

The second category are paintings of classical

Chinese -- are classical Chinese paintings where ownership is

disputed.  In some instances, the Wang side says that they own

these paintings, in other instances the Kings say that they or

their corporations own these paintings, and in other instances

they each say the other one stole the painting from C.C. Wang.

And there is no question as to what those paintings are,

because there was a very comprehensive list that was put

together at the time the estate tax return was prepared of the

classical Chinese artworks, and I know that everyone has that

inventory.

So, I think we can define what these paintings are

based on those inventories, and I think everyone has already

been given that information.

THE COURT:  Well, when you say everyone has been given

that information, has everyone been given information related

Iandkin

1    to the sale, possession, display, or handling of these finitely

2    defined groups of paintings?  That's the question.

3              MR. OPELL:  No.  I think with regard to the sales of

4    the paintings, that is something that is part of discovery that

5    probably should be exchanged.  The Public Administrator has

6    already provided some of that.  Because Andrew and the Public

7    Administrator were the fiduciaries, we were handling the sales

8    of the artwork.  A lot of information has been disclosed during

9    the course of this discovery proceeding in the Surrogates

10   Court.  But, no, I think information such as the contracts of

11   sale for any paintings that were sold, any of the shipping

12   information that anyone has, financial documents related to the

13   transactions, I think that's fair game.

14             THE COURT:  And should be disclosed?

15             MR. OPELL:  Yes.

16             THE COURT:  And to your knowledge, has it been

17   disclosed?

18             Is that right, Mr. Israel?

19             MR. ISRAEL:  It has not been disclosed in terms of

20   what happened after the official estate sales.  So Mr. Opell is

21   correct that there are documents with regard to the official

22   estate sales and the Public Administrator was involved with

23   those, and we do have those documents, some of which we have

24   from Mr. Opell's office.  However, there are no documents

25   concerning what happened to those pointings after they were

Iandkin

1    sold by the estate.

2           So they are sold.  Then -- they are sold to

3    purchasers, allegedly, who were third parties and who were

4    overseas.  And what happened to those paintings such that they

5    ended up in Mr. Wang's possession, which there is no doubt they

6    ended up in his possession and he was selling them or

7    displaying them, at a minimum?  We have nothing concerning

8    that.

9           THE COURT:  All right, Mr. Cohen.

10          MR. COHEN:  Your Honor, very briefly.

11          To cut through this whole thing, the inventory that

12   Mr. Opell was referencing is what's known as the Alan Appel

13   inventory.  Mr. Appel was an attorney of Bryan Cave way back in

14   the 2003 timeframe, was retained to help -- Bryan Cave was

15   retained for the tax purposes, and he actually went through a

16   whole process where he gathered information from the Kings and

17   from the Wangs about what was in the estate or what anybody

18   claimed C.C. Wang had ever owned based on inventories that C.C.

19   Wang had done over the years.

20          And each of the parties put down their position as to

21   the paintings.  This one belongs to a Taiwanese cousin.  This

22   one belongs to my corporation.  This one belongs to a

23   corporation that C.C. owned and that he gifted to me.  This one

24   my father bought with his own funds or borrowed funds in the

25   1980s.  That's known as the Alan Appel inventory.

Iandkin

1       Here's our response to that request:  "Subject to, and

2   without waiver of the above general --

3       THE COURT:  Hold on.  You are reading too fast for me

4   and I'm sure for the court reporter.  Read a little slower.

5       MR. COHEN:  "Subject to, and without waiver of the

6   above general and specific objections, defendant will produce

7   nonprivileged documents sufficient to identify any Chinese art

8   listed on the Alan Appel inventory that was in his custody,

9   possession, or control at any point since 2003.  To the extent

10  that that the demand seeks unspecified additional documents

11  regarding such art, defendant stands ready to meet and confer."

12      We're more than happy to provide any documents

13  relating to the sale or display of any art that was on the Alan

14  Appel inventory.  What we don't want to have to do, your Honor,

15  Yien-Koo King is now the preliminary executor of the estate.

16  She has access in her own right as of right to every piece of

17  information that the estate has as a fiduciary of the estate.

18  We don't want to be in a position where we have to re-turn over

19  every document that the estate has that she already has access

20  to.

21      With respect to the display or sale of any of those

22  pieces after they left the estate, I know what the allegations

23  are.  Andrew denies them.  He did not buy those paintings.  He

24  does not own them.  He did not later resell them.  So, he

25  doesn't have any documents to turn over.  There aren't going to

Iandkin

1    be any documents turned over about that.  But we don't object

2    to producing whatever documents he has about those later sales.

3    Frankly, he doesn't have any.

4         But with respect to the limitation of this to the

5    inventory of the estate documents, that's really what we were

6    asking for right from the outset.  And the position that had

7    been taken was, no, we want any ancient Chinese art whether it

8    was in the estate, out of the estate.  And the difficulty with

9    that, your Honor, is part of what Andrew Wang does is he

10   authenticates Chinese art.  So they're asking for every

11   third-party authentication that he has ever done for anybody,

12   and that was part of what was so objectionable about this

13   request.

14        So to the extent that they are limiting the request to

15   documents that were part of the estate, to paintings that were

16   part of the estate and that could conceivably be at issue in

17   this litigation, we're more than happy to provide such

18   documents.

19             THE COURT:  So, is there a dispute?  I'm a little --

20             MR. COHEN:  Given the limitation, no.

21             MR. ISRAEL:  There is a dispute, your Honor.

22             THE COURT:  What is the dispute, then?

23             MR. ISRAEL:  First of all, there is no doubt that

24   Mr. Wang had possession of these paintings that are shown in

25   galleries and in museums.  We have photographs of that.  We

Iandkin

1    have declarations by him about having custody of these

2    paintings.

3            THE COURT:  But these are paintings that have what

4    relationship to the estate?

5            MR. ISRAEL:  They are owned by the estate, or they

6    were owned by the estate.

7            THE COURT:  I didn't hear Mr. Cohen say that he wasn't

8    going to produce documents related to that.

9            MR. ISRAEL:  Well, first he said one thing which is

10   deeply troubling, which is that he has no documents concerning

11   the disposition of these painting, which we know to be untrue

12   because we've seen documents online that relate to the

13   disposition of these paintings and the display of these

14   paintings in the forms of books and articles written by

15   Mr. Wang, where he acknowledges that he has them.  Number two,

16   photographs of him displaying the paintings.  So why is it they

17   would have no documents that concern the distribution,

18   distribution, and sale of these paintings is really beyond me.

19           THE COURT:  I have no idea.

20           MR. ISRAEL:  But, secondly, your Honor, to the extent

21   that there are sales of paintings where the money is reinvested

22   in other paintings, other Chinese artworks from the same era,

23   the fact of the matter is in the RICO claims, in the 1962(a),

24   the reinvestment of profits from a pattern of racketeering

25   activity is covered by that claim, and it's fair game in terms

Iandkin

1   of discovery because if money is achieved on the sale of these

2   paintings by using a strawman to get the paintings and then

3   resold, then it begs the question of what happened to that

4   money.

5          Before this all started, Mr. Wang was a very -- was,

6   by his own account, a very modest businessman.  He had no sales

7   of Chinese -- ancient Chinese artwork.  All of a sudden he has

8   grown into a mammoth player in the field.  And the way he was

9   able to achieve that was by selling artwork from the estate.

10  And we've got a good record of that.  This isn't something that

11  just was thrown out, you know, into the wind.  We've got good

12  evidence of that already.

13         What we need to see is the specifics of the resales,

14  the displays of those paintings, and the reinvestment of the

15  money that's achieved by the sale of those paintings.  And that

16  leads to another category, which I won't get into right now

17  because I know we are not on it yet.  But each of our questions

18  that we have, each of the demands that we have are narrowly

19  tailored in that respect -- documents that deal with the sale,

20  the display, and so on and so forth.  Now, if in fact that this

21  didn't happen, which is kind of beguiling to even make that

22  suggestion for the reason that I just said, then I suppose

23  their response would be we have no documents.

24         THE COURT:  Well, that's what Mr. Cohen just said.

25         MR. ISRAEL:  I think he did just say that.  And when

Iandkin

1    he --

2              THE COURT:  It is hard to -- you know, as a judge, I

3    can't order someone to produce documents that don't exist.

4              MR. ISRAEL:  I understand that.

5              THE COURT:  So, I mean -- and there are legal

6    consequences to him saying there aren't documents if he were to

7    in fact then find documents.  So, the record is going to be

8    whatever the record is.

9              MR. ISRAEL:  That's right, except for two things.  I

10   just want to make sure that when he denies it, he's denying it

11   with respect to specific demands that we have.  So the way he

12   just characterized it isn't necessarily what we're asking for.

13   I want to have a record of him saying we have no documents

14   concerning the display, the sale, the distribution, or the

15   possession of those paintings.  If we have it like that and he

16   denies it, you're absolutely right, then we'll be coming to

17   your Honor and seeking the consequences, seeking some kind of

18   judicial action based upon that misrepresentation, because we

19   have documents that would show that that would be the case.

20   But we at least need to have a record of the denial of having

21   any documents with relation to those specific --

22             THE COURT:  Can I ask you why wouldn't it be better to

23   pursue that through requests for admission?

24             MR. ISRAEL:  Because we're at the preliminary stage.

25   Let's say they do have documents and they produced documents.

Iandkin

Of course, that would be fodder for depositions and for further
inquiry.  So in the first instance we have to make those
demands.  If he is going to say he doesn't have them, then you
are right.  Then the issue will have been drawn on that.  If,
however, he does have documents, which I think upon reflection
they might actually produce because it is a little bit hard to
commit to oath that you have no documents, so they might
rethink it and produce something, and if they do that, then
those documents would be something that we would propound
questions upon.

THE COURT:  OK.  We need to move this along.  I'm a
little bit confounded by how to make an attempt to resolve this
given what all counsel have been saying here.  This is really
trying to get my arms around something that's quite amorphous
in a lot of ways.

Yes, Mr. Cohen.

MR. COHEN:  I think the way to resolve this is simply
to limit the requests to documents relating to the art that was
on that Alan Appel inventory.

I've said it.  I'll say it again.  We will happily
provide all documents that we have possession, custody, and
control over relating to the estate art that was in Andrew's
possession, custody, and control, its sale, display --

THE COURT:  Its resale, if ever resold?

MR. COHEN:  Its resale if ever resold by Andrew,

Iandkin

1    absolutely.

2            THE COURT:  Well, let's do this.  Let's say at least

3    tentatively that is how that category will be resolved without

4    prejudice to the plaintiff pursuing something beyond that if

5    you believe things continue to be withheld.  But why don't we

6    characterize this as that Alan what you did call it inventory?

7            MR. COHEN:  Alan Appel.

8            THE COURT:  Alan Appel inventory.  Let's use that as

9    the springboard.  Let's have Mr. Cohen produce to you

10   everything he has in that regard, and if you think there is

11   more missing, that will at least enable, it seems to me, you to

12   be more particularized in what your follow-ups may be.  OK?

13   Let's do that.  All right?

14           And let me -- Mr. Cohen, how quickly is that going to

15   be done?

16           MR. COHEN:  Well, my office is already working on

17   pulling together the files that we have.  Andrew is gathering

18   documents from his father and from his --

19           THE COURT:  I want to set deadlines here because we

20   have a discovery schedule.

21           MR. COHEN:  My only concern is -- you said Andrew is

22   going back to China at the end of the month?

23           MS. SHIELDS:  Right.

24           THE COURT:  He is going to have a lot of work to do,

25   then.  This can't be 30 days.  This has to be shorter than

Iandkin

1    that.  You have a discovery cutoff of January 4th.

2                When are you all taking depositions in this case?

3                MR. COHEN:  Understood, your Honor.  These requests

4    unfortunately were not propounded until August.

5                THE COURT:  But it is October now, so that is more

6    than 60 days.  You get 30 under the rules.  So, we have to move

7    this along.  It is the 23rd today.  Can you make production on

8    a rolling basis and complete it by the 6th of November, two

9    weeks?

10               MR. COHEN:  We can definitely make production on a

11   rolling basis.  I would hope that we could complete it by the

12   6th of November.  Really, I have to double-check with my

13   client.

14               THE COURT:  Well, I am going to order the 6th, and if

15   you can't do that, then you will have to seek an extension.

16   Part of my responsibility is to set deadlines, and we're

17   operating in a fairly tight timeframe.  You know, I'm

18   assuming -- I have not talked to Judge Keenan, but when you

19   have a May conference and he gives you a January 4th all

20   discovery to be completed date, I think he means it.  It

21   doesn't mean that can't in theory get extended, although we

22   have to see where this case proceeds, and I'm not inclined to

23   want to extend it very much, if we do, because we'll just have

24   more arguments, and, also, it is a 2014 filed case about, you

25   know, an estate that's been probated since 2003.  So, delay is

Iandkin

 1    not appealing to me, and I'm disinclined to extend anything and

 2    I want to keep everybody on a short leash.  And if you haven't,

 3    you need to start scheduling depositions because then you have

 4    Thanksgiving and the holiday season and all of that kind of

 5    stuff.  So, this is going to be a challenge for you all.  I

 6    hope you don't have other things to do in the next two months.

 7    That was a joke.

 8              MR. COHEN:  Understood, your Honor.

 9              THE COURT:  Let's moves along to number two, and maybe

10    these categories will go a little more quickly.

11              So the next one is all documents related to each of

12    the alleged purchasers of estate assets.

13              Let me kind of cut through this and ask Mr. Israel,

14    what are you looking for?  What does that mean?  Tell me what

15    you are looking for that you don't have.

16              MR. ISRAEL:  We want to have documents that set forth

17    the identities and the addresses of these people, and we want

18    to have them in Chinese, because that's the only way we could

19    track them down as opposed to in English, and we want to have

20    the specific addresses and the other particulars that would

21    enable us to try to contact these people and to serve discovery

22    demands on them.

23              THE COURT:  OK.  Mr. Cohen, can you produce that or is

24    there a problem?

25              MR. COHEN:  To the extent that it is limited to

Iandkin

identities, addresses and contact information, we're more than

happy to provide whatever we have.  The issue is just that it

was all --

THE COURT:  All documents, all communications, that's

what the phrase is.  By definition, it is so broad that it is

very hard for a court or for an adversary in any direction to

really know how to manage it.  That's why I always say tell me

what you really want.  Because I'm sure you want more than

that, but at least if that's what you're looking for most

specifically at this moment in time, I direct Mr. Cohen to

produce that to you, what you've just set forth in terms of the

contact information in Chinese, so that you have a way to

contact people.  That's what you care about the most, is that

right?

MR. ISRAEL:  That is, your Honor.

Just one caveat to what I was saying before.  In their

responses, they said that they don't have the information on

these people and that they don't know them.  I only raise this

issue now, and I appreciate your order.  The reason I raise it

is because we know and we presented, right in our letter,

evidence that that is false.  So the concern here is that we'll

be right back to you again when they reiterate their comment --

their statements earlier that they don't know these people and

they don't have contact information for them.  So I would like

to air that issue as long as we are on the subject now, since

Iandkin

 1    we have evidence that they do know and in the past they've said

 2    they know these people, Andrew Wang has.

 3              THE COURT:  Yes.

 4              MR. ISRAEL:  And to now say that he doesn't know these

 5    people and he has no information on them is a nonstarter, and

 6    if we get that back in response to the reframed order that you

 7    have just presented, we'd be back here again in a week from

 8    now.

 9              THE COURT:  I have very little doubt that you are

10    going to be back at some point in this case.  But it seems to

11    me we have to take things incrementally.  So let's see what

12    comes back to you, and if it is in some way dissatisfying,

13    before you write me, you have to talk to Mr. Cohen.  OK?

14              MR. ISRAEL:  Fair enough.

15              THE COURT:  And if you can't work it out, then you

16    write me, then you come back, then we have another conference.

17    As you well know, that's how this works.  And I -- you know, I

18    realize, you know, when I got into this, this is going to be,

19    you know, a case that I'll say takes up probably a larger

20    percentage of my docket bandwidth than some others.  So be it.

21    That's the nature of it.  There is a lot of money at stake

22    here.  There is a lot history here.  I get that.

23              But let's proceed to the third category.

24              Mr. Cohen, I want you to assume that unless I say

25    otherwise, everything that I'm directing you to respond to

Iandkin

and/or produce must be done no later than November 6th.  OK?

MR. COHEN:  Understood, your Honor.

THE COURT:  OK.  And earlier, if possible, and anything and everything on a rolling basis.

MR. COHEN:  There will be no holding everything back for a grand production, your Honor.

THE COURT:  OK.  Great.

All right.  "all communications with employees of the museum, the auction company, etc."  now, that's extremely broad.  So, again, what are you looking for?

MR. ISRAEL:  Your Honor, these would be communications regarding the artwork that we claim that Mr. Wang has resold or, at a minimum, displayed at these auction houses.  And, again, there is a record of this activity happening post estate sale.  So it is the estate artwork that was displayed and/or sold by Mr. Wang post estate sale.

THE COURT:  When you say "communications with employees," that's really broad.  You don't mean "Would you call DHL and see if they can ship this to this place on this day" kind of communication, do you?

MR. ISRAEL:  No.  Of course not.

THE COURT:  So what do you mean?

MR. ISRAEL:  We mean that there is a communication with an auction house saying we have this painting and we want to display it, things like that.  I am speaking in a very kind

Iandkin

1    of general term.  But communications that are concerning the

2    artwork that's at issue.  If he's having it with an auction

3    house, it seems to me that he is going to be having it with the

4    appropriate person who is responsible for the --

5            THE COURT:  So you are talking about what I'll

6    characterize as sort of transactional documents with an auction

7    house.  Is that a fair characterization?

8            MR. ISRAEL:  Unless to the extent that Mr. Wang were

9    to claim that it is not transactional because he is just

10   displaying something.  If we use "transactional" in the sense

11   that it subsumes an event of whether it is displaying, selling,

12   or trading artwork, then I think that would be fine.

13           THE COURT:  OK.

14           MR. ISRAEL:  We would accept that broader definition

15   of transactional.

16           THE COURT:  It doesn't matter whether I do.  It is

17   what Mr. Cohen thinks.  Mr. Cohen.

18           MR. COHEN:  Your Honor, as long as this is limited to

19   the paintings at issue, we are more than happy to provide those

20   documents.  The issue is simply --

21           THE COURT:  When you say "the paintings in issue,"

22   let's just be precise.

23           MR. COHEN:  Anything on the Alan Appel inventory, more

24   than happy to provide any communications with any auction house

25   relating to those paintings.

Iandkin

1        THE COURT:  All right.  That sounds like a start.  I

2   think let's do that, and, again, let's see what you get.  And

3   if you think there is more to be had, you will tell me -- you

4   will discuss with Mr. Cohen, you will try and particularize it,

5   and if you can't resolve it, you will tell me.

6        MR. ISRAEL:  Fair enough.

7        THE COURT:  OK.  All documents concerning Bao-Wu Tang.

8   That's really broad.  So, again, what do you have in mind?

9        Do you want to cut through this in some way,

10  Mr. Cohen?

11       MR. COHEN:  My apologize.  There is just one issue

12  with Bao-Wu Tang.  So, this is one of those translation issues.

13  Bao-Wu Tang -- and I'm just conveying my understanding from

14  people who know Chinese better than me -- there are actually

15  two Chinese characters that would be pronounced "Wu."  One of

16  them is the name Wu and one of them is the number five.  C.C.

17  Wang, the most famous painting in his collection was a painting

18  known as "The Wu."  It was a painting by the artist Wu Zhong

19  Yuan known as the "Procession of the Taoist Immortals."  And so

20  C.C. Wang's sort of collection in his studio was known as

21  Bao-Wu Tang, which is, I'm told, translated as the "studio of

22  the treasured Wu," meaning where that painting is the treasured

23  painting.

24       When it came time to do the exhibition in I believe it

25  was the Capital Museum exhibition in 2009, the Capital Museum

Iandkin

1  reached out to collectors to gather paintings that had been in

2  C.C. Wang's collection, and so they called it the "Bao-Wu Tang

3  Show," referring to C.C. Wang's studio.  I am told there was a

4  misprint on the invitations and on the printed material, and

5  instead of the character for Wu, the name, they printed the

6  character for Wu, the number, so it became the show of the

7  studio of five treasures.  At that point, Andrew Wang said,

8  wow, that's a really cool name; I'm going to call my studio,

9  how I refer to my professional activity, Bao-Wu Tang, Studio of

10  the Five Treasures, using a different character Wu.

11         So when there are requests that ask for Bao-Wu Tang,

12  there is a slight vagueness in translation issue.  When you are

13  asking for all documents relating to C.C. Wang's collection,

14  referred to as Bao-Wu Tang, or all documents referring to how

15  Andrew conducted his professional activities, which is

16  essentially writing articles and building up his name

17  recognition in the Chinese art world under the brand "Bao-Wu"

18  with the character for five Tang, is a separate thing.  So not

19  to cut through this but --

20         THE COURT:  This deals with number or name, or both?

21         MR. ISRAEL:  Mr. Wang has a gallery, called Bao-Wu

22  Tang.

23         THE COURT:  That's what you were referring to?

24         MR. ISRAEL:  What we want are the documents that

25  concerned Bao-Wu Tang's handling, disposition, trading or

Iandkin

1   display of the artworks we have been talking about.  We have

2   documents that show that Bao-Wu Tang, the gallery owned by

3   Mr. Wang, has in fact displayed these paintings.  They haven't

4   been produced to us yet.  We don't have them from a probate

5   proceeding.  These are the things we want -- sale, display, any

6   other transaction that these paintings -- that took place with

7   Bao-Wu Tang, the gallery, and anyone else, that we believe

8   would be highly responsive, and we need to have those

9   documents.  It is not very controversial, I think.

10           THE COURT:  OK.  Mr. Cohen, no problem with that,

11   right?

12           MR. COHEN:  No problem with that.  And just to be

13   clear, the gallery was not the one displaying those paintings.

14   Because of the misprint, that's where the name Bao-Wu Tang

15   ended up on the capital Museum paraphernalia.

16           THE COURT:  Who is displaying them?  The gallery?

17           MR. COHEN:  The Capital Museum.  The gallery doesn't

18   have a studio space.  It is simply a professional -- it is a

19   business name.  It is a --

20           THE COURT:  OK.  But if the gallery played a role in

21   having this artwork that we're talking about displayed, then

22   documents related to that will be responsive to this category.

23           MR. COHEN:  And what I'm saying, your Honor, is my

24   understanding is that professional name didn't exist until

25   after the display was set up because it was based on that

Iandkin

1     misprint.

2              Regardless, we're happy to provide anything relating

3     to the display of paintings from the Alan Appel inventory,

4     whether it was done under Bao-Wu Tang's name, whether it was

5     done under Andrew's name, whether it was done under some other

6     name that Andrew had a connection with.  We are more than happy

7     to provide those documents.

8              THE COURT:  I think we are clear on that.

9              All right.  The next category, number five:  All

10    documents concerning interviews Andrew Wang has had with art

11    media regarding Chinese art.

12             I don't know what a "document concerning an interview"

13    even means.  What does that mean?

14             MR. ISRAEL:  It might mean things like notes, it might

15    be preparatory notes, it might be notes that he took down after

16    the interview, anything relating to it.  I will tell you why it

17    is important.  I don't mean to point.  I am sorry about that.

18             The reason why it is important is because in these

19    interviews he discussed the very paintings we're talking about.

20    He discussed having them, he's discussed selling them, things

21    of that nature.  So it's not unusual -- I know that if I give

22    an interview, I have notes, I have things that reflect the

23    contents of what I'm going to be talking about.  Those things

24    wouldn't be privileged, they would be probative.  To the extent

25    they don't exist, it is easy enough for him to say there are no

Iandkin

1    responsive documents.

2            THE COURT:  OK.  Well, with that limitation,

3    Mr. Cohen, will you produce any notes that Mr. Wang has about

4    any interviews he may have had with the art media?

5            MR. COHEN:  Certainly, your Honor.  My only request --

6    and I've asked for this a couple of times -- is that to the

7    extent that they know of existing interviews that they have in

8    mind, they tell us what those are, because it's frankly

9    unlikely that Andrew Wang is going to be able to recall off the

10   top of his head how many interviews he gave, which interviews

11   he might have discussed paintings from C.C. Wang's collection.

12   So we just ask, can you tell us which interviews that you know

13   of that I can say to him, listen, you gave an interview to

14   artchina.com, you know, in May of 2009.  Can you please go back

15   to your files and as you are looking for any documents relating

16   to interviews, specifically focus on that timeframe because if

17   you have any, there might be something in that timeframe.

18           THE COURT:  Any problem identifying things that you do

19   know about, Mr. Israel?

20           MR. ISRAEL:  To the extent -- well, I have a problem

21   with it only to the extent that it is used as a limiting

22   principle on other interviews that may have taken place.  We

23   can supply the information that we have now.  My concern is

24   that they will just produce documents, if they have, if they

25   produce anything, regarding that interview when there could

Iandkin

have been a world of interviews.  He has been very public about

making these statements about the artwork that is at issue

here.

THE COURT:  Well, let my ask you this, Mr. Cohen.  To

the extent your client may have some record that he keeps of

his contacts with the press, that would be something that would

be responsive here.

MR. COHEN:  Correct.

THE COURT:  So if he has that himself, that may help

him jog his own memory and won't be limiting what Mr. Israel

may give you.  And what Mr. Israel gives you, you know, four

interviews Mr. Israel knows about, but Mr. Wang has a file of

the 25 interviews he has done in the last ten years or

whatever.

MR. COHEN:  I do not intend to use it as any sort of

limiting principle.  I am just asking for it as an aid to allow

my client to search.

THE COURT:  OK.  Mr. Opell, yes, sir.

MR. OPELL:  And to be limited to the paintings on the

Appel inventory.

MR. COHEN:  Correct.

MR. ISRAEL:  Just one more thing.

I'm sorry, your Honor.  May I say something?

THE COURT:  Yes.

MR. ISRAEL:  In the request, we do actually list the

Iandkin

1    names of the interviews.  They are there.  It was just pointed

2    out to me by my colleague.

3              THE COURT:  All right.

4              MR. ISRAEL:  So the names are there already.

5              THE COURT:  OK.  So you have some information,

6    Mr. Cohen, you can work with.  But I think that category has

7    now been resolved at least for these purposes.

8              We are on to number six.

9              "All documents concerning specifically identified

10   auction houses believed to have auctioned artwork sold by the

11   estate and/or stolen from the estate."  So, again, what

12   specifically are you looking for with respect to the auction

13   houses, Mr. -- let me ask Mr. Israel first what he is looking

14   for before you respond.

15             MR. ISRAEL:  It may have an overlap with one of the

16   requests that we already covered, and I recognize that now as

17   we are going through it.  But we want to have information on

18   the auction houses that would have been involved in the

19   resale --

20             THE COURT:  Right.  I think we talked about that

21   already.

22             MR. ISRAEL:  I think we have, your Honor.

23             THE COURT:  All right.  So I am going to assume that

24   is covered by what we have already discussed.

25             Number seven.  "Documents related to 12 paintings" --

Iandkin

1    hooray, we're now limited to, you know, something very discrete

2    for the first time.  "Documents related to 12 paintings that

3    are believed to have been purchased by Andrew Wang and/or

4    Bao-Wu Tang between 2003 and 2014 with the proceeds from stolen

5    art."  I mean, embedded in that obviously is Mr. Cohen doesn't

6    agree that it is stolen art, so you have to be careful when you

7    phrase something that you are embedding it into your

8    allegation.

9             MR. ISRAEL:  You are right.

10            THE COURT:  With that in mind, is there an

11   understanding of what the 12 paintings are, to start?  Because

12   that would be helpful if we could define them, because you

13   obviously know what you have in mind.  If you tell Mr. Cohen

14   what the 12 paintings are, then he can produce, presumably,

15   documents he has related to those 12 paintings.

16            Yes, sir.

17            MR. COHEN:  Your Honor, this is where we have

18   previously requested the interviews.  These are paintings that

19   they say that Andrew has mentioned in the interviews.  As to

20   one or two of them, my client has some idea of what it might be

21   referring to.  As to the other I think ten or eleven of them,

22   he said I don't know what this is referring to.  We've asked,

23   can you give us copies of the interviews so that --

24            THE COURT:  Forget that, though.  I mean, if there is

25   a document request that says documents related to 12 paintings,

Iandkin

1    it seems to me, Mr. Israel, you should identify the 12

2    paintings.

3            MR. ISRAEL:  We did, your Honor.  They are in the

4    request.

5            THE COURT:  What is the problem, Mr. Cohen, if the 12

6    paintings have been identified already?  He doesn't have to

7    guess.

8            MR. COHEN:  The difficulty, your Honor, is Chinese

9    paintings, unlike, say, Western art, where you have a painter

10   and you have a painting name and it is, you know, the Mona Lisa

11   is the Mona Lisa, Chinese paintings essentially are who the

12   artist was and then a description of the image.  So the same

13   painting can be referred to as "wind blowing through bamboo" or

14   "bamboo and rocks," and so it's sometimes hard to tell just by

15   looking at the name --

16           THE COURT:  Do you have pictures of these paintings?

17           MR. COHEN:  If we have pictures --

18           THE COURT:  I'm asking.

19           MR. COHEN:  We do not.  I don't know if they do.

20           What we've asked is can you give us the -- identify to

21   us the interviews, give us the link to them, the transcript,

22   whatever it is so that I can sit down with my client and say

23   this painting that you discussed in this interview, what were

24   you talking about.

25           THE COURT:  OK.  Mr. Opell, can you shed some light

Iandkin

here?

        MR. OPELL:  Well, I would just ask the parties, aren't

these paintings on the Appel inventory.  They are not, OK.

        MR. COHEN:  No, which is, frankly, a separate issue,

your Honor, as to the request for documents about assets that

frankly are not relating to the allegations in this case on the

theory that -- and this gets into the other category of

documents, on financial documents, where the theory appears to

be that any asset that Andrew Wang or SK Wang have owned over a

15-year period is fair game for discovery because either they

could have sold it to provide the funds to buy the painting --

to buy these paintings in the supposed strawman sales or they

could later have been acquired with the proceeds of selling off

these paintings.

        THE COURT:  OK.  Well, let's not get ahead of

ourselves, although I would love to because we are already past

the hour mark already.

        How are we going to resolve this issue of the 12

paintings, Mr. Israel?  You have identified them?

        MR. ISRAEL:  Yes.  Your Honor --

        THE COURT:  They are outside the Appel inventory?

        MR. ISRAEL:  Right.

        THE COURT:  I gather that is not problematic from your

standpoint because you are alleging that they are connected to

the claims you have in this case, which defines the scope of

Iandkin

1  discovery, correct?

2          MR. ISRAEL:  Yes, your Honor.  And also at the

3  appropriate time, I want to give you a case that we

4  mentioned -- we neglected to include in our letter.  I am not

5  going to throw it at you now.

6          Just a footnote here, there is a case that we believe

7  addresses the point that was just made by Mr. Cohen.  However,

8  the names and the artist of the painting should be sufficient

9  for them to be able to produce documents relating to those

10  paintings.

11          THE COURT:  Can I ask you this?

12          MR. ISRAEL:  Yes.

13          THE COURT:  How is it that you know about these

14  particular 12 paintings?  What gives you information to

15  identify them?  Is it interviews Mr. Wang did?  Is it something

16  else?  Because at the end of the day they are going to find

17  this out, like there doesn't need to be a secret about that.

18  And the more you can provide so that Mr. Cohen can go to

19  Mr. Wang with specificity, the more likely it is that you are

20  actually going to get something responsive.

21          MR. ISRAEL:  Unless it is work product, and we're not

22  ready to reveal the contents of work product at this point,

23  because we're doing other things with sources and with

24  documentation that is work product that has to remain private

25  right now.

Iandkin

1           However, having said that, to my mind, having the

2       names of the paintings and the artists shouldn't be something

3       that would preempt -- should be something that would permit

4       somebody to say, gee, I have documents relating to that

5       painting by that artist and produce them.  It seems to me that

6       that wouldn't be the -- that there shouldn't be any problem

7       doing that without our disclosing work product.

8           THE COURT:  Mr. Cohen, you have the identification of

9       the 12 paintings.  You will respond however you think best

10      given what you know to date.  And if it's not as complete as it

11      can be because you need more information, then I suggest you go

12      back to Mr. Israel and have a further conversation, and

13      otherwise respond the best you can and we'll see where the

14      chips fall.  OK?

15          MR. COHEN:  Thank you, your Honor.

16          THE COURT:  All right.  So now we have number eight,

17      which is, "Documents related to a number of specific real

18      estate purchases and sales involving Andrew Wang, Shou-Kung

19      Wang and trust entities."  So that's also very broad.  A number

20      of specific real estate purchases, were they identified, and

21      what documents related to them in particular are you looking

22      for?

23          MR. ISRAEL:  They were identified.

24          THE COURT:  OK.

25          MR. ISRAEL:  And the reason we want those documents

Iandkin

1   turns on -- relates to the case that I mentioned before, the

2   identity of which I didn't put on the record, but if you permit

3   me, I would put it on the record because it would explain why

4   it is that --

5           THE COURT:  I am happy to have you put a case on the

6   record but I can't read it on the record --

7           MR. ISRAEL:  No, of course not.  I am not suggesting

8   that, your Honor.  Just for the purposes of having a complete

9   record.

10           THE COURT:  All right.

11           MR. ISRAEL:  I would refer to Conopco, Inc. v. Wein,

12   and it's not officially reported.  The case number is 05 Civ.

13   09899, and this was a decision by Magistrate Judge Katz.  And

14   not to talk to you about the specifics of the decision and the

15   thinking, I think if you read the case, you'll understand that.

16   But in this case the --

17           THE COURT:  I'm sorry.  What is the date of the

18   decision?

19           MR. ISRAEL:  Oh, I'm sorry.  The date is July 23,

20   2007.

21           THE COURT:  Is it on Westlaw or Lexis?

22           MR. ISRAEL:  It is in Lexis.  We pulled it off Lexis.

23           THE COURT:  Given us the cite, if you would.

24           MR. ISRAEL:  Here it is.  It is 2007 US Dist. Lexis

25   53314, and there is also a Westlaw cite, which is 2007 WL

Iandkin

1    2119507.

2              THE COURT:  All right.  We can take a look at it.  But

3    what does it stand for, and what are you arguing from it?

4              MR. ISRAEL:  What we're saying is that the purchase of

5    this property, and it is a limited number of parcels of real

6    property, houses, took place right after the resale of this

7    artwork.  So under this case, and others -- this is just one

8    case which is very close on point but there are other cases --

9    the use of the proceeds -- the sale -- the sudden acquisition

10   of wealth becomes relevant in a case like this where you are

11   claiming a fraudulent act took place and resulted in profits

12   and then that profits came to be presented or manifested in the

13   acquisition of other property or the sudden occurrence of

14   wealth.  These cases deal with it.

15             So the acquisition of these very expensive pieces of

16   real property right after the sales that we're claiming took

17   place becomes evidence of the sales themselves and the fraud

18   that took place.

19             THE COURT:  What in particular with respect to the

20   real estate transactions are you looking for?  What sorts of

21   documents?  Can you be more specific?

22             MR. ISRAEL:  We want to have the financial

23   information -- where the money came from, the money that was

24   used to pay for the property.  We want to have bank accounts,

25   and we want to have the actual specifics of the sale.  Because

Iandkin

1   that will serve as evidence of the point that I'm just making.

2            THE COURT:  Well, I'm not sure I'm totally on board

3   with essentially opening Mr. Wang's entire financial books and

4   records to you.  I think that's -- we have to have some

5   limiting principles here because that's extremely broad, and

6   there are a lot of issues that are implicated if you make

7   someone's books and records entirely open.  I don't disagree

8   with you -- I haven't read Judge Katz's decision.  I don't

9   disagree with the general principle.  I think it is fairly

10  commonsensical that if someone comes into a lot of money and

11  that is implicated by other transactions, you know, as you

12  allege occurred here as it relates to the estate and the

13  artwork related to the estate, that your clients have an

14  interest in, then you have a right to have some access to that.

15  So we have to figure out what the proper limiting principles

16  are so that you can have access to some financial information

17  and books and records but not, you know, Mr. Wang's bank

18  statements from 2003 to 2017 month by month.  That it seems to

19  me is too broad.  On the other hand, I'm not denying you the

20  right to have some information.

21            Now, I don't know what the right limiting principle

22  is.  We need to figure that out.  Maybe Mr. Cohen has a

23  proposal.

24            MR. COHEN:  Yes, your Honor.  And, frankly, my

25  proposal is that this request we're simply not there on yet.

Iandkin

1          Just looking -- I love technology -- looking at the

2     case that Mr. Israel was citing, the court there said that the

3     financial records being sought, there had been a sufficient

4     preliminary showing that certain aspects of Ween's purportedly

5     personal financial affairs are not strictly personal and were

6     tied to the RICO allegations.  There was a preliminary showing.

7          And what that showing was was Jerry Acevedo, Wang's

8     personal and business accountant, testified that Wang's

9     personal accounts were the source of the initial funds used to

10    purchase products from manufacturers who plaintiff contends

11    were defrauded.  The money would be transferred -- and now I'm

12    not quoting, I'm summarizing, the money would be transferred

13    from the personal accounts to one of the corporate accounts.

14    Then the money would be paid out to the manufacturers.  Then

15    when the goods were sold, the money would go into a different

16    corporate account and then transferred back to Ween's personal

17    accounts.

18          THE COURT:  What are you suggesting that the

19    plaintiffs need to show here in order to have --

20          MR. COHEN:  Well, what they need to show is, number

21    one, either money coming in from the Wangs to purchase these

22    paintings.  Their allegation is that these are -- one of the

23    sales that they're interested in is a sale from before these

24    purchases, or there were a series of sales before these

25    purchases that they are alleging the money was used to actually

Iandkin

1    fund the purchases that they are alleging were made by Andrew

2    or SK and not by the actual buyers.  Well, what they should be

3    looking for is the estate has documents, they have bank

4    accounts showing where the wires in to purchase those paintings

5    came from.  Trace that money back.  If that money links up to

6    one of Andrew or SK Wang's accounts, then you have a basis, you

7    have a preliminary showing, that, hey, maybe these sales are

8    relevant.

9              THE COURT:  How can they look it up from his accounts?

10    They wouldn't have access to that information.

11             MR. COHEN:  Well, they access to the estate's bank

12    records.  The estate's bank records would show here's what this

13    wire came from.  Right?  Here's the transferring account,

14    here's where the money came in from.  And then they could get

15    discovery of those accounts.

16             Frankly, if they wanted to serve a document request on

17    us, formally or informally, and say the bank record reflects

18    that the money came in from the following account, give me all

19    your documents relating to that account, that would be a

20    totally nonobjectionable request, because there would be a

21    specific basis.  And if that is in fact one of Andrew Wang's

22    accounts, then they're absolutely entitled to that discovery.

23    But they can't simply say, look, we think you put money into

24    this so we want discovery of all your financial transactions

25    and we think you sold these and took money out so we want

Iandkin

1   discovery of all of your financial purchases afterwards.  And,

2   yes, they have limited it to specific purchases, but there is

3   no limiting principle that says that those purchases are

4   relevant and stock purchases, art purchases, any other asset

5   transaction is not.

6           To get to the point where they are entitled to that

7   discovery, they need to trace the money coming in, which, when

8   they do, my expectation, my understanding from my client, is

9   not going to trace to any of Andrew Wang's personal accounts or

10  SK Wang's personal accounts because he's not the buyer --

11  they're not the buyers.  But they need to do that work before

12  they can ask us to open our personal financial books on sales

13  of real estate that they think may possibly somehow be

14  connected.

15          And so, your Honor, I think the limiting principle is

16  do the work with the stuff that you're absolutely clearly

17  entitled to first, see where that gets you, and then make your

18  argument that what you've gotten from there entitles you to

19  more.

20          THE COURT:  Mr. Israel.

21          MR. ISRAEL:  Your Honor, what we just said is

22  inaccurate.  I mean, for one thing, we have somebody -- you

23  have to look at the series of events that took place here.  You

24  have Andrew Wang, who professes to have no money --

25          THE COURT:  When you say he professes that, where did

Iandkin

1 | he profess it?

2 |           MR. ISRAEL:  In deposition.

3 |           THE COURT:  In the estate case?

4 |           MR. ISRAEL:  Yes, that is right.

5 |           THE COURT:  You haven't deposed him in this case?

6 |           MR. ISRAEL:  Not in this case.  In the estate case I

7 | did.

8 |           THE COURT:  Are you planning to?

9 |           MR. ISRAEL:  Yes.

10 |           THE COURT:  When are you planning to do that?

11 |           MR. ISRAEL:  As soon as they will give me a date for

12 | him.  I have been trying to get a date --

13 |           THE COURT:  We will get to that.

14 |           MR. ISRAEL:  OK.  But we have all of a sudden the sale

15 | of a house at a modest amount of money.  Then we have the

16 | transactions that take place, the sale of the paintings, the

17 | resale of the paintings, and then the purchases of

18 | multimillion-dollar houses.  This is the sequence of events.

19 |           We have no records that show where the money came from

20 | for these houses all of a sudden that he's buying, and it

21 | belies his testimony so far that he had the money on hand to do

22 | that.  What we do have is an interstitial activity that

23 | involves the sale of estate artwork.

24 |           THE COURT:  What did he say in the deposition you

25 | already took, if anything, about how he was able to make the

Iandkin

1    real estate transactions that he did make?

2            MR. ISRAEL:  We didn't cover that.

3            THE COURT:  You didn't cover it?

4            MR. ISRAEL:  No.  We didn't have that information at

5    the time, for one thing.  This is going back years.

6            THE COURT:  When was his deposition?

7            MR. ISRAEL:  2003, 2013, but they concerned different

8    issues.

9            THE COURT:  I see.  I guess, let me say something,

10   though, which is –– and I've experienced this in almost every

11   case –– lawyers rightfully want to have as many documents as

12   they can have in their hand before they take a deposition, for

13   all the obvious reasons.  But it's an imperfect system we

14   operate in, and I promise you, you will never have all the

15   documents you want to have in hand when you take Mr. Wang's

16   deposition.  And I would suggest we schedule it sooner rather

17   than later.  And if that deposition where you pursue this line

18   of inquiry leads you to think that there are more documents,

19   then it seems to me you have the right to hold that deposition

20   open even on objection, get the documents that Mr. Wang has

21   identified, at least in part in the deposition, and then

22   proceed to a second round of questioning.

23           Why isn't in some respects that a more effect way than

24   sort of a blunderbuss request that is very broad based and very

25   hard to laser beam focus?

Iandkin

1          MR. ISRAEL:  A few things, your Honor.  First of all,

2     I do recognize the sensitivity of asking for financial

3     information, and I have been on the other side of that debate

4     many a time where I was resistant to producing financial

5     information.  This is a kind of a unique situation, though,

6     because the financial information goes to the heart of the

7     claims themselves.  This isn't sort of like post-judgment

8     discovery or something like that.  We're not trying to find

9     assets to seize, we're trying to find proof of elements of our

10    claim.

11         And when I go into the deposition with Mr. Wang, what

12    he's likely to say is, gee, I don't know, I had that money and

13    I paid for the -- and I paid for these houses with money that I

14    saved.  And the fact of the matter -- I can almost guarantee

15    you that's what he's going to say.

16         THE COURT:  There are a lot of questions -- I can

17    think of dozens and I'm sure you can, too -- to follow up on a

18    statement like that.

19         MR. ISRAEL:  I can, your Honor.  I appreciate that.

20    But think how much more efficient it is and how much more

21    utility there would be to having documents that chronicles

22    where this money came from to buy the house, that chronicles

23    what happened to the money from the estate sales, and these

24    documents seem to me go to the heart of the investment of

25    racketeering income. (Continued on next page)

IANBKIN2

1          THE COURT:  But the thing is, when you talk about

2     where money came from, bank accounts don't speak that way, if

3     you will, right?

4          MR. ISRAEL:  They do.

5          THE COURT:  They do.

6          MR. ISRAEL:  I'll tell you why, because if you have

7     all of a sudden a bank account record that shows money coming

8     in from an overseas sale of artwork, for instance, and money

9     going out from that same account to purchase a house, you've

10    got pretty good evidence so far that the sale took place and

11    went to purchase the house and it's not inconceivable by any

12    means that the bank records here, which are wire transfers,

13    that would make that case very palpable.

14         THE COURT:  Well, you know when these particular real

15    estate transactions took place, correct?

16         MR. ISRAEL:  Yes.

17         THE COURT:  So why can't this request be narrowed

18    then?

19         MR. ISRAEL:  That's good.

20         THE COURT:  Why can't it be extremely circumscribe

21    then?

22         MR. ISRAEL:  We can do that.

23         THE COURT:  You identify when the real estate

24    transaction is and then you work backwards from that and define

25    very precisely very discrete financial information like not, I

IANBKIN2

1   want the bank statements from the three months before.  I don't

2   know what the right limiting concept would be, but you'll think

3   of it better I.  That's how I think you should approach it.

4            MR. ISRAEL:  That makes sense.  Can I ask for one

5   thing on that so I can set a schedule for that to give him this

6   request and modify.

7            THE COURT:  Yes.

8            MR. ISRAEL:  And, again, a response to that within so

9   many days, and we still find it's unavailing that process, then

10  we can we can raise the issue with you again.

11           THE COURT:  Yes, and maybe I'll read the case you

12  cited between now and then.

13           MR. ISRAEL:  OK.

14  Q.  How much time do you need to propound additional

15  supplementary specific requests in this regard?

16           MR. ISRAEL:  Unless something else would come up, just

17  for that issue, I would need three business days.

18           THE COURT:  Let's say Friday the 26th.

19           MR. ISRAEL:  We can do that.  Yes, sir.

20           THE COURT:  And responding by the 6th.

21           MR. COHEN:  Understood.

22           THE COURT:  The 6th is the magic date.

23           MR. COHEN:  Understood.

24           THE COURT:  You are's going to get a lot no later than

25  the 6th and hopefully earlier.  We've turned the corner.  I

IANBKIN2

1    think we're getting close.  Mr. Cohen may make a train in the

2    12-to-1 time zone.

3            No. 9.  This is sort of something we started talking

4    about a little bit and maybe there's a way to do something

5    similar with nine as you did with eight, Mr. Israel.  The topic

6    of No. nine, for the record, is financial documents related to

7    trust and corporate entities controlled or created by the

8    defendants.  Again, that's really broad, and I know you have

9    something much more circumscribe and specific in mind.  So

10   maybe I can just ask you to try and define what that is with

11   greater specificity and rephrase that set of document requests

12   that are 119 to 122 at the moment and re-serve them more

13   circumscribe by Friday as well.

14           Can you do that?

15           MR. ISRAEL:  Yes, sir.

16           We can do that, and may I, just to be clear, we do

17   have the trust listed in the request, and the goal here is to

18   find out information regarding trusts that were formed to hold

19   assets at or about the time these sales took place, but we can

20   certainly do that by Friday as well.

21           THE COURT:  Let's do that.  And before we go to the

22   interrogatories I just want to commend to you all a particular

23   case, because I noticed at least in several of Mr. Cohen's

24   particular responses that he said some of the requests were not

25   reasonably calculated to lead to admissible evidence.

IANBKIN2

1          Do you know what I'm about to say, Mr. Cohen?  I
2     suspect you don't.
3          MR. COHEN:  I have a sense, your Honor.
4          THE COURT:  Well, that is no longer the law.  As of
5     the amendments to the Federal Rules in 2015, the rules have
6     changed.  That is no longer the standard.  So don't cite it
7     anymore.  OK?
8          It also sounds to me, having not seen the full-blown
9     set of objections and responses to the document requests that
10     you probably didn't comply with the revised Rule 34 and I'm
11     going to commend to you a case to you written by Judge Peck
12     called *Fischer v. Forrest*, also unpublished.  The WL cite is
13     2017 WL 773694.  It's from February 28, 2017.  The Docket No.
14     is 14 Civ. 1304, and this is another one of Judge Peck's
15     wake-up calls to the bar decisions which he was famous for
16     issuing, but it's very much focused on document responses,
17     requests and responses and objections.  So I commend it to you
18     because my suspicion is, based on the markup that I got in
19     Document No. 102-1, that it wasn't perfectly comporting with
20     the revised rules, but we'll let that go in the interest of
21     time.
22          Where are we on the interrogatories, gentlemen?
23          MR. COHEN:  We have served a supplemental response,
24     supplementing Mr. Wang's interrogatory responses with respect
25     to the interrogatories that are now concededly separate

IANBKIN2

interrogatories asking for, for example, information regarding

business associates of the buyers or their employer or their

past employers.  He does not have that information.  He

continues to diligently search for it, but we've supplemented

the interrogatories to provide that information rather than

objecting to it on Local Rule 33.3 grounds when it was first

drafted as sort of, provide the following information about the

buyers.

          We continue to object to requests that ask, for

example, for a list of paintings that were sold.

          THE COURT:  Well, how would you suggest that be

provided otherwise, because sometimes interrogatories are the

most convenient and useful way to provide information rather

than something else?  Why can't it be provided through a list

of some kind?

          MR. COHEN:  Well, first of all, your Honor, to the

extent that they requested -- and they've already requested

documents relating to any of the Chinese art on the Alan Appel

that was displayed or sold, we're providing that.  We're happy

to provide it.  The local rule doesn't allow for such

interrogatories.  If your Honor wants to direct that --

          THE COURT:  Well, no, I disagree with that.  Because I

think the local rule sort of -- it focuses on sort of a series

of transactions, if you will.  At the beginning it's supposed

to be very narrow, what you provide in response to

IANBKIN2

1    interrogatories, but once there is a certain inefficiency to

2    providing information some way other than interrogatories, then

3    my reading of Local Rule 33.3. allows for it.  And there's

4    plenty of case law to suggest that if an interrogatory is the

5    most efficient way to produce information then you should use

6    it.  Providing a list is certainly something you don't want

7    someone to have to do in a deposition, for example.  If you're

8    producing a document that has the same information that the

9    answer to the interrogatory will, then you've done it and you

10   can just cite to that fact in your response to the

11   interrogatory.

12           What I'm trying to do here to cut through it is to

13   figure out, are there any open issues with respect to the

14   interrogatories.  You've just said what you supplemented.  Let

15   me ask Mr. Israel, what hasn't been done with respect to the

16   interrogatories that you still want to be press forward with in

17   front of the Court at this moment, if anything?

18           MR. ISRAEL:  May I ask Mr. Savitsky to address this?

19           THE COURT:  Sure.  So what's open that needs me to

20   resolved, if anything, today?

21           MR. SAVITSKY:  Well, the first issue is that we are

22   seeking documents related to the storage of artwork.

23           THE COURT:  We're not talking about documents.

24           MR. SAVITSKY:  I'm sorry.  Locations.

25           THE COURT:  We're talking about interrogatory

IANBKIN2

```
1    responses.  What are you looking for in an interrogatory?
2               MR. SAVITSKY:  The location of where Mr. Wang stores
3    Bao-Wu Tang artwork and stores his artwork.  That was an issue
4    of contention.  Our position is that in seeking to get
5    evidence, we want to know where Mr. Wang has been storing
6    artwork and we believe that these self-dealt paintings would
7    be --
8               THE COURT:  I'm going to sort of ride herd over you
9    all now.  It's 11:15, we've been going an hour and a half.
10   Mr. Cohen has to get to Nassau County.  We got to move this
11   quickly.  OK?  You want information about where Mr. Wang stores
12   art?
13              MR. SAVITSKY:  Yes, yes, the location.
14              THE COURT:  What's the problem with that?
15              MR. COHEN:  The only problem, your Honor, to the
16   extent it's broader than the Alan Appel inventory, you said you
17   want to limit it to Alan Appel inventory.
18              THE COURT:  Why should it be broader?
19              MR. SAVITSKY:  Because this is a RICO enterprise and
20   we believe that the self-dealt artwork is also in proposed in
21   those locations.
22              THE COURT:  Produce it with respect to the inventory.
23   If you want something beyond that, you'll tell me after that.
24              MR. SAVITSKY:  The other issue we had, your Honor, we
25   wanted information on the five straw men.  They were initially
```

IANBKIN2

1   named as codefendants.  We couldn't find any information on

2   them, other than what was provided to us in the contracts.  So

3   one of the interrogatories asks for their English names, their

4   Chinese names, their last known addresses, and their last known

5   place of employment.

6           THE COURT:  Stop there.

7           Any problem producing that?

8           MR. COHEN:  No, to the extent that Mr. Wang is aware

9   of it.

10          THE COURT:  If he doesn't know he doesn't know, but in

11  the case of the interrogatory, we will not answer it.

12          MR. COHEN:  We did.

13          THE COURT:  What did you say?  Did you give this

14  information?

15          MR. COHEN:  We provided whatever information he had

16  and he said this is the information he has and he's continuing

17  to diligently search.

18          THE COURT:  What are you going to do?

19          MR. SAVITSKY:  Your Honor, we had an issue with this

20  the response.  What he has said in the sworn interrogatories,

21  he doesn't have in information because there was an

22  intermediary who arranged the purchases and had the direct

23  contact with the buyers, the Zie Fu, and he's deceased.  So we

24  can't get the information.  He only gives the address Mr. Fu,

25  the middleman who has the contact.  The problem we have is when

IANBKIN2

1    Andrew gave his sworn deposition in 2013, he was asked about

2    each of the five buyers and he said Mr. Anthony Chou is his

3    friend from Beijing or Shanghai.  He's not sure.  He talks

4    about their past work experiences, one of them was a collector

5    of cars.  We asked him about another one of the straw men, Yue

6    Da-Jin and he said, oh, we ran in the same circle and we had a

7    mutual friend, Mr. Zhou, who got us together for the sale.

8              THE COURT:  So your point is that because he knows

9    these people, he should know where they live.

10             MR. SAVITSKY:  Yes, and my point is that his sworn

11   interrogatory is completely contradicted by the deposition

12   testimony given.

13             THE COURT:  Good evidence for you then is it?  Why

14   didn't you stop while you were ahead?  Why isn't that a good

15   thing for you?  You have your bad guy contradicting themselves

16   all over the place.  Why do you keep pushing the issue?  It

17   sounds to me like the record on that point is good for you,

18   isn't it?

19             MR. SAVITSKY:  It is good for us, your Honor.

20             THE COURT:  So then stop while you're ahead.

21             MR. SAVITSKY:  We're just frustrated by what we find a

22   pattern of.

23             THE COURT:  I don't want to hear that sort of thing.

24   I said that at the beginning.  I'm just trying to deal with

25   what we need to deal with.

1          Anything else interrogatory-wise we need to address

2     today?

3          MR. SAVITSKY:  Your Honor, just that we're proceeding

4     on a ruling asking for a list of questions is -- I'm sorry, the

5     list of locations or witnesses in the interrogatories, because

6     there's about 15.  I just want to clarify if that ruling

7     extends.

8          THE COURT:  My ruling is, Mr. Cohen, that I have no

9     problem if indeed there is case law, I'll cite you one because

10    I did some research, decision of Judge Francis' of a few years

11    ago of in re Weatherford International Security Litigation,

12    2013 WL 5788680, Southern District, October 28, 2013, 11 Civ.

13    1646.  It's a Judge Kaplan case.  It's a Judge Francis

14    decision.  He talks about interrogatories sometimes being a

15    more practical vehicle for providing information that is

16    entirely consistent with Local Rule 33.3, and I would say in

17    general the kinds of lists that I think are being talked about,

18    it's most efficient to the extent Mr. Wang has the information

19    to just respond by providing it in the interrogatories.

20          Is that sufficient guidance?

21          MR. SAVITSKY:  It is, your Honor.

22          THE COURT:  OK.

23          MR. COHEN:  Your Honor did not need the cite.  The

24    ruling is absolutely fine.  Thank you, your Honor.

25          THE COURT:  OK.  I think we have now closed the loop

IANBKIN2

1    on all the open document requests and interrogatories for the

2    moment without prejudice to the parties coming back for further

3    rulings if necessary.

4            MR. ISRAEL:  I'm sorry, your Honor, except with

5    respect to the attorney.

6            THE COURT:  We're not there yet.

7            MR. ISRAEL:  I just wanted to.

8            THE COURT:  That's the last thing we're going to do.

9            MR. COHEN:  Your Honor, unfortunately I just need to

10   clarify something.  To the extent that there are certain

11   interrogatories that are not limited -- that are relating to

12   assets or art but not expressly limited to the Alan Appel

13   inventory, that limitation is carried throughout.

14           THE COURT:  I would say yes for the time being, but I

15   don't want you to get too comfortable with that, Mr. Cohen,

16   because Mr. Israel and his colleague may convince me down the

17   road that that was too limiting, but I want the record to be

18   more fully developed so they can make a better judgment about

19   that.  I'm, frankly, not in a position to be able to know with

20   certainty how far beyond that we should be going now.

21           MR. COHEN:  Understood.

22           THE COURT:  All right.  So now we're left with the

23   subpoena to attorneys issue.  This is a complicated issue that

24   I don't think I can resolve on the correspondence that's been

25   submitted to me.  It does seem to me that Mr. Cohen suggested

IANBKIN2

1    in his letter that there was a willingness to provide some

2    information in response to the subpoenas.  So why don't we talk

3    about what you are willing to do and then let's talk about what

4    else Mr. Israel wants that you're not willing to do and let's

5    figure out how we navigate all of that.

6           MR. COHEN:  So, your Honor, with respect to the

7    subpoenas that were sent to the attorneys on the various

8    transactions, we're willing to allow them to provide whatever

9    documents are in their possession, custody, or control,

10   regarding the source or the disposition of funds that were used

11   to pay for these real estate transactions or obtained from

12   these real estate transactions, which it seems to me is

13   everything that Mr. Israel was asking for.

14          The difficulty --

15          THE COURT:  Well, hold on, before you talk about the

16   difficulty, but those lawyers have not yet made that

17   production.

18          MR. ISRAEL:  They have not yet made that production,

19   your Honor.

20          THE COURT:  But hold on a second.  So Mr. Israel at a

21   minimum, shouldn't you take that production?

22          MR. ISRAEL:  Oh, yes.

23          THE COURT:  So when's that production going to be

24   made?  You're coordinating with these attorneys.

25          MR. COHEN:  We've told the attorneys to hold off

IANBKIN2

1  pending order of the Court on the motion.  So we do believe

2  that those documents are irrelevant and objectionable and we

3  have problems with it.  We have offered to make that production

4  to resolve the issue and to simply move forward and that would

5  be the production and the attorneys wouldn't have to appear for

6  deposition.

7  THE COURT:  We're going to take this one step at a

8  time.  Let me say in general, and I'll leave Mr. Klein to the

9  side, because I think it's a different category, all right?

10  But with respect to the other five, it seems to me since no

11  depositions have yet been taken in this case; is that correct?

12  MR. ISRAEL:  That's right.

13  THE COURT:  The lawyers' depositions, if they're

14  needed shouldn't be taken until I can be convinced that they

15  have unique information that hasn't otherwise been developed

16  during the course of deposition discovery and I would hope,

17  Mr. Israel that you would agree with that.

18  MR. ISRAEL:  I do agree, your Honor, with the one

19  exception we put aside for now.  Mr. Klein.

20  THE COURT:  Klein.

21  MR. ISRAEL:  Klein.

22  But you're absolutely right and we had no interest in

23  going forward with these depositions and we're going to tell

24  the counsel who we're seeking documents from that it would

25  probably be unnecessary to go forward with these depositions.

IANBKIN2

1    We just want the documents.

2             THE COURT:  So what do you want beyond what Mr. Cohen

3    has said that these lawyers are willing to produce?  Can you

4    particularize it.

5             MR. ISRAEL:  Well, that's it.  What was just said was

6    what we want.

7             THE COURT:  So then I think except as to Mr. Klein,

8    we've resolved the subpoenas at least for the moment if,

9    Mr. Cohen, the production that you've described is made, and I

10   would again say that it should be made by November 6 at the

11   latest.

12            MR. COHEN:  And we will so direct those attorneys that

13   this is the universe of documents that those subpoenas are

14   limited to, and they need to make that production by

15   November 1, and that way hopefully we'll be able to make sure

16   that they get in by November 6.

17            THE COURT:  That's fine.

18            And you heard Mr. Israel say on the record that he has

19   no intention at the present time for any depositions to be

20   taken.  So I think once the production is made, the subpoena

21   can be deemed satisfied and then if there's some follow-up, you

22   all will meet and confer about it and deal with it.

23            That's good.  Now, we're left with Mr. Klein.

24            I cannot make rulings on the crime-fraud exception and

25   the basis for that on the record in front of me.  And so what I

IANBKIN2

1    think -- and it seems to me unlike the other attorneys, at

2    least as I understand it from the allegations that Mr. Israel

3    has made in the pleadings here that Mr. Klein had more direct

4    involvement in the alleged straw man scenarios.  So that makes

5    him more potentially of a fact witness, which means his

6    deposition is more likely to be needed, although, I would again

7    suggest that it should come at the end after other depositions

8    have been taken so that you can best articulate why you need it

9    and how it might be limited, so how it would minimally infringe

10   on attorney-client-type issues, rather than if it were taken in

11   the next to 30 days, I can only imagine that that could wreak

12   havoc.

13          So what's your best proposal as to how we deal with

14   the Klein subpoena and potential deposition, understanding that

15   my leanings are that I think he probably will need to be

16   deposed?  But I also think that probably shouldn't be

17   determined definitively until other deposition discovery has

18   taken place and Mr. Klein has made some limited production,

19   which I understand from Mr. Cohen he's willing to make,

20   presumably with a privilege log so that the record is better

21   developed, so that if you're actually going to have to make a

22   motion to compel of some kind, I'm not sure it's something we

23   can deal with at a conference.  I think it's something we'll

24   have to deal with in writing and potentially with *in camera*

25   submissions, although I don't want to get too far ahead or

IANBKIN2

project, but something like this more likely lends itself to

that scenario than the other attorneys.  That's my preliminary

reaction, not a ruling, but you all tell me what you think.

          MR. ISRAEL:  Your Honor, if you were actually to order

that, what you just said, bearing in mind that we don't have

dates yet for briefs, to the extent it's necessary for our --

for to us prove to you or to show that you we do need

Mr. Klein's deposition, I would agree with what you just said,

namely to do depositions of other fact witnesses first, have

the limited production with the privilege log that omits, for

now, privilege communications, allow us then to brief the issue

of whether or not we should be entitled to pierce the privilege

based upon the crime-fraud exception or some other theory, and

present it with those arguments after we receive the

non-privileged production.  I think that makes sense.

          The only thing I would ask for is to put some dates to

it so that we have a framework to go forward on this basis so

we take a deposition by X-date of -- I'm sorry, not that we

would take his deposition.  We received the production of the

Klein documents.  If, as you've already ruled on the date that

you indicated, that those would accompany the other

productions, and that after that -- and we proceed at pace with

other depositions and then when we near the end of those other

depositions we make our application to you to do the deposition

of Mr. Klein and put in our best case for why we should be

IANBKIN2

1  allowed to proceed with that.

2          Does that make sense, what I just said?

3          THE COURT:  I think so, because I think you're sort of

4  following what I proposed in general terms.

5          MR. ISRAEL:  I am.

6          THE COURT:  Mr. Cohen.

7          MR. COHEN:  Your Honor, the only thing I would suggest

8  is that some of these requests be limited at the outset.  So

9  for example, Demand No 6 of the subpoena to Mr. Klein is all

10 documents related to Brown Raysman Millstein Felder & Steiner,

11 LLP, concerning estate assets of Andrew Wang, PA, or the

12 purchasers.  Brown Raysman was litigation counsel to Mr. Wang

13 from 2003 until it merged with Thelan in 2006.

14         THE COURT:  I think that's very broad.  I think

15 Mr. Israel has more particular things in mind with respect to

16 Mr. Klein, and so at least as the letter he wrote in response

17 to your letter to me says, I think the way the letter and I'm

18 not going to read it into the record now, but Mr. Israel's

19 October 17 letter articulated why he thinks Mr. Klein is in a

20 separate category.

21         MR. COHEN:  Yes, and to the extent the subpoena and

22 the document requests can be limited to the subject of these

23 alleged strawman sales --

24         THE COURT:  Why don't we start with that.

25         MR. COHEN:  We're in a workable situation.

1           THE COURT:  Why don't we start with that, because I

2   think that goes to the heart of what implicates Mr. Klein as a

3   fact witness here.

4           MR. COHEN:  Yes.

5           THE COURT:  I also think it's very likely he's going

6   to be deposed.  So before there's motion practice even about

7   that, I really think you all should consider, and I direct you

8   to meet and confer before we set some briefing schedule,

9   because what may happen is -- and I actually think the better

10  way to develop the record may be that his deposition be taken,

11  that you ask certain questions, Mr. Israel, of Mr. Klein that

12  Mr. Cohen or whoever is representing him direct him not to

13  answer on privilege grounds, and then we have an actual record

14  of the particular questions and information, rather than even

15  categories.  Then it's easier for me to rule and say, those ten

16  questions should be answered and those ten questions shouldn't

17  be answered or whatever.  I really think that would be the best

18  way in this case to resolve that.

19          So I'm not sure I want to set a date for a briefing

20  schedule.  I think we need to figure out when these depositions

21  are going to be taking place, and I think you should all plan

22  on Mr. Klein's deposition taking place with the understanding

23  that some questions won't be answered, consistent with a

24  privilege log and consistent with his indication implication of

25  privilege, and then you'll make a judgment too, because if he

IANBKIN2

1    invokes privilege 20 times, you may think strategically, I'm

2    going to ask about six of them, because that's what I care

3    about most and I might have a better shot at that time instead

4    of going for it all.  That's harder to do sometimes.  It

5    depends, of course, on what the questions.

6          But it seems to me what I should say is the following:

7    Mr. Klein should respond to his subpoena by November 6.  It's

8    limited to the straw man issue, if you will.  If he is going to

9    invoke privilege and not produce certain documents, he needs to

10   also produce a privilege log at that time, and then you should

11   advise him that he's going to be deposed sometime between

12   November 6 and January 4, probably toward the end of the

13   deposition discovery, which means somewhere in mid-December, I

14   would guess and that the deposition should proceed and that if

15   there are answers not provided due to privilege and you all

16   can't work it out, then you'll send me the transcript and make

17   a motion and if we go past January 4, which we probably would,

18   and I rule that some of the questions should be answered, then

19   his deposition will be reconvened shortly after that period.

20   That's what I suggest.

21          OK?

22          MR. ISRAEL:  Understood, your Honor.

23          THE COURT:  Anything you want to be heard further on

24   that?

25          MR. COHEN:  One small bit of housekeeping on that.

IANBKIN2

1   With respect to Mr. Klein's deposition, I assume that too would

2   be limited in scope to the areas of the alleged straw man

3   sales?

4          THE COURT:  It's going to be limited to that effect

5   unless and until I hear otherwise.  Let me be clear, that

6   doesn't mean that there are 30 questions that Mr. Israel is

7   going to ask on the 1st or 2nd before he gets there.  I mean,

8   when he asks, how long have you known Mr. Wang, you can't

9   object, right?

10          MR. COHEN:  Understood.

11          THE COURT:  Is that related to the straw man?  There

12   has to be a certain allowance for preliminaries, if you will.

13   Can he ask about representing Mr. Wang in --

14          MR. COHEN:  In probate.

15          THE COURT:  In something completely unrelated to the

16   claims and defenses of the lawsuit as the rule provides, the

17   answer is no.  So as I understand it, the way this has been

18   articulated, that the claims that Mr. Israel thinks Mr. Klein

19   has information about are the claims related to this straw man

20   set of allegations.  So that defines the scope, but I can

21   imagine you all calling me in the middle of that deposition

22   sometime in December and you arguing that somehow he's gone

23   outside the scope.  If it comes to that, so be it, and I'll

24   make my best judgment based on what you're going to have to

25   give him a little bit of latitude and remember the time of the

IANBKIN2

deposition that I said that because you want to pick and choose

when you call a judge from a deposition room.  But it would not

shock me if you all called me from a deposition room, and

hopefully it I'll be in a settlement conference and not be able

to speak to you.  By the time I get back you will have worked

it out somehow.  That's always what happen when lawyers call

from a deposition and I'm not available, but I don't mean to

make light of it.  If it comes to that, we'll deal with that.

OK?

MR. COHEN:  Thank you, your Honor.

THE COURT:  I think we've covered everything, have we

not?

MR. ISRAEL:  I think we have, your Honor.

THE COURT:  Mr. Cohen, anything else?

MR. COHEN:  Nothing further your Honor.

THE COURT:  Let me say one more thing.  I know we're

probably speaking into the wind here, but as a magistrate judge

I am duty-bound to raise this at this conference, and that is,

I don't know if you all have given any thought to try to

resolve this case, but if you haven't and if you think that the

Court could in some way be helpful in that regard, I would

strongly encourage you to consider that, because at the end of

the day we have a lot of money at stake and people have risks

on both sides and the sooner one gets to the settlement table

sometimes the better.  And the longer you wait, the harder it

IANBKIN2

is.

Now, this has been going on since 2003, so it's not exactly a new case.  I don't know what efforts, if any, have ever been made in that regard, but I am certainly happy to offer my services.  If you think it would be helpful, perhaps this is a better case for a private mediator.  I don't know. I'm certainly available, and even available to provide an all-day settlement conference, if we plan for it in advance. It may be not something that's even remotely feasible.  I have no idea.  But I always offer that and certainly invite you all.

And what I also know is that parties are often reluctant to be the first to say, sure, because then there's the issue of showing weakness and all of that.  I am not a fan or believer in that.  I think both sides in this case have an equal interest in wanting to get to a settlement table.  If there was any way to do it, but if there's $60 million at stake and one side wants 59 and is only going to offer the other 1, it's probably not worthwhile.  You all know best and have talked to your clients.  But I would encourage you to go back to your clients and say, we just spent a lovely morning with Magistrate Judge Cott.  He offered settlement services.  If you're interested, what do you think?

Your clients may be very hardened in their positions and I leave it to your professional judgment as to whether there's any value to doing it.  I certainly don't want to waste

IANBKIN2

1   your time, your clients' time, or my time, for that matter, if

2   it's a foolish enterprise.  I also wants you to think seriously

3   about, because all that's going to happen in this case for the

4   next year is further skirmishes, more motion practice

5   potentially before me and inevitably before Judge Keenan, who

6   you've probably worn-out with motion practice already and

7   potentially and eventually I assume a trial in this case and

8   that's probably a long way off.

9           So, as I would like to suggest to the parties, there

10  are four main reasons for settlement.  I'll tell you my four

11  main reasons.  You can share them with my clients.  I'll call

12  them the 4 C's.  And they are control, certainty, cost, and

13  closure.  And those words sort of speak for themselves.

14          So I leave you to think about this, talk to your

15  clients, and even talk to each other as officers of the Court.

16  Remember what the judge said, any interest, any interest?  And

17  if your clients don't want to, that's totally fine, but I also

18  wanted to make sure you knew that that was something you could

19  take advantage of if you wished to.

20          MR. ISRAEL:  Thank you.

21          MR. COHEN:  Have a good day, everybody.

22          MR. ISRAEL:  Thank you, your Honor.

23          (Adjourned)

24

25