J1i5kinC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KENNETH KING, *et al.*,

                Plaintiffs,           New York, N.Y.

          v.               14 Civ. 7694 (JFK)(JLC)

ANDREW WANG, *et al.*,

                Defendants.

------------------------------x

                             January 18, 2019
                             10:30 a.m.

Before:

                 HON. JAMES L. COTT,

                           Magistrate Judge

                    APPEARANCES

SAM P. ISRAEL, P.C.
     Attorneys for Plaintiffs
BY:  SAM P. ISRAEL
     TIMOTHY SAVITSKY

KASOWITZ, BENSON, TORRES, LLP (NYC)
     Attorneys for Defendants
BY:  KIM CONROY
     TIMOTHY B. KELLY

J1i5kinC                           conference

1              (Case called)

2              MR. ISRAEL:  Sam Israel and Tim Savitsky for plaintiff

3      Yien-Koo Wang King on behalf of the Estate of C.C. Wang.

4              THE COURT:  Good morning, gentlemen.

5              MR. KELLY:  Good morning, your Honor.  Tom Kelly and

6      Kim Conroy for Kasowitz, Benson, Torres on behalf of Andrew

7      Wang and S.K. Wang.

8              THE COURT:  Good morning.  You may be seated.

9              So, I think we have a full agenda this morning.  You

10     will have to steer me through a little bit but first thing I

11     wanted to raise is the protective order.  I didn't, after I

12     issued my order I didn't get anything further from the parties

13     so do you all wish to be heard further about that at this

14     point?  Primarily the defendants, I guess I should say, in the

15     sense that I think I indicated that I was not inclined to have

16     attorneys eyes only effectively be the default unless you could

17     make some particularized showing to convince me why that was

18     necessary and then there was nothing further submitted.

19             So, are you abandoning that or do you want to make a

20     further argument on that point?

21             MR. KELLY:  Your Honor, we didn't intend for it ever

22     to be the default.  We wanted it for a narrow set of --

23             THE COURT:  I don't think it reads very narrowly.  I

24     think that is Mr. Israel's problem with the language proposed.

25             Is that correct?

J1i5kinC                         conference

1              MR. ISRAEL:  That's correct, your Honor.

2              THE COURT:  So, I am pulling it up now.

3          I guess what Mr. Israel did is he added what I will

4    call limiting principles to the language so what he added is:

5    *Either party to this action, prior to the production by it of*

6    *any document it believes to contain confidential information,*

7    *including, without limitation, an individual sensitive personal*

8    *financial information.*

9              Do you have a problem with that?  You may want to look

10   at this.  That's his addition:  *Shall have the right to mark*

11   *such document with a label "confidential."  Both the first page*

12   *and all subsequent pages of the document shall be so marked.*

13   *Either party to this action shall also have the right to mark a*

14   *document as confidential attorneys eyes only that it believes*

15   *to be highly sensitive and proprietary because such materials*

16   *contain proprietary data which might cause competitive injury*

17   *if disclosed to the opposing party directly.*

18             That last phrase was also something Mr. Israel added.

19             MR. KELLY:  So, the disagreement is to whether the

20   sensitive personal information can be deemed attorneys eyes

21   only or only confidential.

22             THE COURT:  Right.  I understand that.

23             MR. KELLY:  Right.

24             THE COURT:  My view is, given the nature of this

25   case --

1         MR. KELLY:  Right.

2         THE COURT:  -- it may well be, as I think your letter

3   suggested, that in the typical case financial information of

4   this kind would be attorneys eyes only but I don't see how, on

5   the surface anyway, that can be the default in this case given

6   the nature of the dispute, and my order requested that you

7   particularize the basis for requiring sensitive financial

8   information to be attorneys eyes only because otherwise,

9   Mr. Israel and Mr. Savitsky will get documents produced and

10  they're going to want to talk to their clients and say, *Are you*

11  *familiar with this account at this bank or whatever?* and by

12  your scenario they're not allowed to have those conversations.

13        MR. KELLY:  I think, your Honor, last time we were

14  here we discussed treatment of attorneys eyes only for a

15  specific small piece of sensitive personal information which

16  was Mr. Wang's address in Shanghai and --

17        THE COURT:  That was a very discrete, specific thing.

18        MR. KELLY:  Right.

19        THE COURT:  And they agreed to that.

20        MR. KELLY:  Right.  I didn't mean to be suggesting all

21  financial information falls into this category or that, but if

22  we need to do it on a case by case basis that's fine with us

23  too.

24        THE COURT:  Well, but that's the thing.  If you do it

25  on a case-by-case basis you are going to have meet and confers

J1i5kinC                              conference

1    and conferences with me on a daily basis and we can't have

2    that.  I certainly don't have the time for that and, frankly,

3    you all, I assume, have other cases besides this one and you

4    can't -- it is just unmanageable.  You have to have general

5    principles here.

6              MR. KELLY:  Right.

7              THE COURT:  The nature of this dispute, this is a

8    family dispute.

9              MR. KELLY:  Right.

10             THE COURT:  So, this is not a case of parties who are

11   arm's length from each other, these are relatives.  Right?  So,

12   that's what makes this, I would say, more complicated in some

13   ways, but also why the general principles shouldn't apply,

14   absent some showing.  You all, the last time around, raised

15   concerns about that address and Mr. Israel was willing to

16   accommodate that.  If there are some, I will call them

17   financial documents that you have some concern about producing

18   to Mr. Israel that you, for some reason, think he shouldn't be

19   able to talk to his clients about, I suppose you could say that

20   but I don't think the protective order's language should have a

21   default that it is produced definitively as attorney's eyes

22   only.

23             I guess that's where I come out.

24             MR. KELLY:  Okay.

25             So, our issue with the language that was there was

J1i5kinC                    conference

1    that it effectively has no application in the case, this sort

2    of trade-secrets-type information.  This isn't a trade secrets

3    case but we have no intention of bogging the Court down or

4    plaintiffs with, you know, excessive use of an attorneys eyes

5    only designation.

6             So, you know, I think Mr. Israel's proposal should be

7    fine as long as we have an opportunity to, you know, in some

8    instance if there is some piece of information that falls out

9    of his category to either ask the Court or ask opposing

10   counsel.  We have no intention of blanket designating anything

11   attorneys eyes only or going down that kind of path.

12            THE COURT:  Okay.  Let me be clear that in my sense of

13   the case from what I know, you are going to be producing some

14   information with respect to bank accounts and the like.

15            MR. KELLY:  Right.

16            THE COURT:  I believe Mr. Israel and Mr. Savitsky

17   should be able to talk to their clients, just as you should be

18   able to talk to your clients about whatever financial

19   information is produced.  And so, that's the default, if you

20   will.  And I think the language in paragraph 1, as amended by

21   Mr. Israel, is what I am going to approve.  And then if you

22   have an issue because there is something that you somehow think

23   should fall outside of it, like the address issue, for

24   example --

25            MR. KELLY:  Right.

J1i5kinC                        conference

1          THE COURT:  -- you will talk to Mr. Israel about it,

2     hopefully you will work it out.  He may say I will agree to

3     that in the short-term but I may need to talk to my client

4     about it in the long term, in which case you will put a pin in

5     it and come back to it or whatever.  I don't want you to get

6     bogged down.  There is too much to get bogged down in with this

7     case.

8          I will sign the protective order with paragraph 1 as

9     amended by Mr. Israel but, as I indicated in my order, I am

10     amenable to the mechanism of whatever does fall into the

11     attorneys eyes only category you working out what gets produced

12     to experts and the like in the mechanism you all proposed.  So,

13     that means that I am going to modify paragraph 5 consistent

14     with your change.

15          So, I will make it an order rather than a stipulation

16     and order since you didn't exactly stipulate to everything.  So

17     you win one and you win one.  Okay?  So, that's where we are on

18     that and I will file that today.

19          MR. KELLY:  Great.

20          THE COURT:  Okay.

21          MR. ISRAEL:  Thank you, your Honor.

22          THE COURT:  One down and 94 to go.

23          So, that is the first order of business.  The second

24     order of business is the plaintiff's response to the

25     interrogatories and document requests that were raised

J1i5kinC                           conference

1     initially in the letters on January 8th and January 9th.  So,

2     where do we stand with that?

3              Ms. Conroy?

4              MS. CONROY:  If I may?  Thank you.

5              First, thank you, your Honor.  I newly joined --

6              THE COURT:  Welcome to our experience here.

7              MS. CONROY:  Thank you.

8              We engaged in our meet and confer, as required, and

9     while we made some minimal progress I think there are still a

10    lot of outstanding issues that the parties were unable to reach

11    resolution on with regards to documents that plaintiffs were

12    willing to produce.

13             THE COURT:  Well, let's take things one at a time.

14             First of all, Mr. Israel, have you provided

15    interrogatory responses?

16             MR. ISRAEL:  We have not, your Honor, and I apologize

17    but my client is coming back on the 26th of this month.  We

18    have only learned that definitively yesterday.  They're in

19    China.  And, as remarkable as it may sound in today's world

20    with telecommunications being such as they are, we have had a

21    very, very difficult time in reaching them where they are

22    specifically in China.

23             THE COURT:  They don't have e-mail?

24             MR. ISRAEL:  We have tried e-mail and I don't know if

25    they censor it or what they do but we aren't able to get

J1i5kinC                         conference

1   attachments through to China.  So, we were able to get

2   attachments through our interrogatories.  It hasn't been for

3   want of trying, I assure you.  We have been trying very hard.

4   We don't want to have to stand here and defend our position.

5          They're coming back on the 26th and we told them that

6   the minute they come back we have to sit down and get through

7   these interrogatories and finish them but we are not a -- we

8   are not doing this to delay or for any other reason other than

9   it has just been impossible, really, to get the data that we

10  need from them.

11         THE COURT:  Can you have the responses in by the 31st?

12         MR. ISRAEL:  Yes.

13         THE COURT:  All right.  January 31st is the deadline

14  for your interrogatory responses and you tell your clients that

15  they'll be personally sanctioned if they haven't been able to

16  sign these interrogatories by this date because it is well in

17  excess.  They're allowed to go to China, but if they're going

18  to litigate a case in an American court, they have to follow

19  the rules of American litigation practice which they know well

20  because they've litigated in lots of courts, bankruptcy court,

21  court, surrogate court, federal court.  They know a lot about

22  the judicial system.

23         So, January 31st, we are not changing the date.  If,

24  by the end of the business day on the 31st they don't have

25  these interrogatory responses, your client should know, and I

J1i5kinC                    conference

1   direct you to put them on notice, that they personally, because

2   it is not your fault if you can't reach your clients, if

3   they're in China, sobeit.  I'm not telling them they can't be

4   in China, but if they're in China in a way that makes it

5   impossible for you to communicate with them, it is at their

6   peril.

7           So, January 31st, answers to interrogatories.  Let's

8   go back to documents -- and I am sure part of the problem with

9   at least some documents you think a lot of it is too broad, I

10  understand, but some of the issues are also they're in China so

11  we are going to have to navigate around that.

12          MR. ISRAEL:  May I just have one caveat to what you

13  just said?

14          THE COURT:  Yes.

15          MR. ISRAEL:  As we said, I understand your direction

16  and your order that we have the responses by the 31st and we

17  will do that.  If for some reason we cannot get the physical

18  signature but we have gone through everything with our client

19  and can assure our adversary and the Court that it is accurate

20  and that we will record and it will be substituted with a

21  signed copy, is that okay?  In other words, we would aver --

22          THE COURT:  The answer is no.

23          They're going to physically be in New York as of

24  January 26th.  They live in Manhattan, your offices are in

25  Manhattan.  They can come physically to your office or you can

J1i5kinC                         conference

 1    go to their apartment and you can get them to sign, as the

 2    rules require under Rule 33, these interrogatories with their

 3    signatures.  That's not a hardship.

 4              MR. ISRAEL:  Okay.

 5              THE COURT:  Okay.

 6              MR. ISRAEL:  Okay, your Honor.

 7              THE COURT:  So, that's what they have to do.

 8              MR. ISRAEL:  Okay.  Got it.

 9              THE COURT:  So, now we are square on the

10    interrogatories so I think the bulk of what we need no talk

11    about today are documents and where the disagreements are.  And

12    I know there are various categories but I have to let you all

13    lead me through where you are.  So, Ms. Conroy, back to where

14    you started.

15              MS. CONROY:  Sure.  Thank you, your Honor.

16              Obviously you have seen the letters and attachments,

17    they are quite voluminous.  So, in effort to try to make this

18    more manageable, so to speak, we went back, like I said we had

19    a meet and confer, and for the most part were not able to agree

20    on the majority of the documents that we sought or reach

21    agreement on narrowing of any, some kind of middle way.

22              So, with that being said, there is really four

23    buckets, so to speak, of documents that we sought that

24    plaintiffs are taking the position for one reason or another

25    that they're unwilling to provide.  I think going to the first

J1i5kinC                        conference

1   one is the easiest one which is documents that are specifically

2   referenced in the amended complaint.  We have a number of

3   requests --

4                THE COURT:  Documents that were referenced in the

5   plaintiff's amended complaint in the 2014 action?

6                MS. CONROY:  Correct, your Honor.

7                THE COURT:  Documents that they reference in their

8   complaint that they haven't produced to you?

9                MS. CONROY:  No; correct, your Honor.

10               There are a number of allegations or documents in one

11  case, it is a videotape, in one case it is a telephone call so

12  I should qualify that.

13               We have a number of requests that we specifically are

14  asking, for instance, provide the documents and communications

15  relied on in paragraph -- I am taking it off the top of my

16  head, paragraph 35 supporting your allegation that upon

17  information and belief A, B, C.  We have a number of requests

18  like that.

19               THE COURT:  Okay.

20               MS. CONROY:  That's, to me, the easiest kind of

21  bucket.  Similarly, documents relied on in making your

22  allegations in putting together your amended complaint.

23  That's --

24               THE COURT:  Well, the second thing you said is broad.

25  The first thing you said is narrow.  In other words, if the

J1i5kinC                    conference

1    request is essentially whatever underlying documents are that

2    support the allegations in paragraph 35, produce them.

3              That's what you are saying?

4              MS. CONROY:  Correct.

5              THE COURT:  So, let's stop right there.

6              MS. CONROY:  Sure.

7              Mr. Israel or Mr. Savitsky, who wants to respond to

8    that?

9              MR. ISRAEL:  If it is just -- like you just said, your

10   Honor, there is a nuance here and to say that -- I'm not sure

11   the exact language they used but we have been very careful in

12   going through their requests and when they ask for things that

13   are presented in a way which effectively is what informs your

14   making this allegation, as I am sure your Honor can appreciate,

15   that's going into our thinking as to why we would be making

16   this allegation.  It is different if you are asking for a

17   category of documents from which one can reach whatever

18   conclusion one reaches.  The latter category I have no problem

19   with.  Makes sense.  If they're doing it that way it is limited

20   to a subject.  When they're trying to get into our heads and

21   say give us what you were thinking to create this thing, that's

22   where the problem is.

23             THE COURT:  I appreciate the distinction you are

24   making and you are talking about your work product, but my

25   understanding of what is being sought here is not your work

J1i5kinC                        conference

1    product but are any documents that underlie allegations in your

2    amended complaint which they are entitled to.

3           MR. ISRAEL:  I think what we need to do, your Honor

4    and I don't mean to burden the Court more than it is already

5    burdened, but I think we have to see the actual request

6    because, to my mind, we agreed to produce documents that fall

7    within that category that we just were talking about and not

8    documents that get into our thinking on what goes behind some

9    of our allegations.

10          THE COURT:  I'm not sure I was actually given the full

11   document request and the objections in this round of letters.

12   I am not sure I have those.

13          MS. CONROY:  I thought they were -- we actually

14   attached the responses and objections to our --

15          THE COURT:  Did you?

16          MS. CONROY:  -- to our letter.  You should have

17   received that by hand.  I apologize if that wasn't included in

18   the exhibit.

19          THE COURT:  I didn't print them out.

20          MS. CONROY:  It certainly wasn't online because it was

21   over the limit.

22          THE COURT:  Can you read me an example?

23          MS. CONROY:  Sure, your Honor.

24          Our request number 2 is documents and communications

25   referenced in the amended complaint.

J1i5kinC                    conference

1              THE COURT:  Say that again.

2              MS. CONROY:  Documents and communications referenced

3     in the amended complaint.

4              THE COURT:  Documents and communications.  So,

5     documents in the amended complaint, that's a very concrete and

6     finite thing.  There are eight documents that are mentioned in

7     a 67-page complaint and you don't have them they should produce

8     them.  Communications is a little trickier.  What do you mean

9     exactly by communications?

10             MS. CONROY:  Sure.  I can give an example.

11             They, throughout their complaint which is quite

12    lengthy at times, they reference communications that occur

13    between certain parties to support their allegations.  For

14    instance, I believe they reference a February 2013 conversation

15    between, purportedly, our client and their client that was

16    recorded and they didn't specifically say that.  They reference

17    other communications purportedly between, alleging our clients

18    had with the PA, alleging that our clients had with some of the

19    straw men.  So, to the extent that they have documentation to

20    that effect that they're referencing in their complaint, I

21    think we are owed that.

22             THE COURT:  I think what has happened in the 21st

23    Century with respect to discovery in federal cases is the

24    following:  It has become unnecessarily complicated.

25             Back in the day when I was a young litigator, I would

1    get served a document request and I would pick up the phone and

2    I would call my adversary and I would say, *Tell me what you*

3    *really want*.  And the adversary would say, *I want A, B, C, D*

4    *and E*.  And I would say, *A, B, and C, no problem*.  *D I don't*

5    *have, and E I have a problem*.  And then we would go from there.

6    I think here, I mean I think you have 83 document requests.

7    That's a lot of document requests.

8                MS. CONROY:  I understand.

9                THE COURT:  I really think what has to happen here is

10   what's happening right now, which is if you say to

11   Mr. Israel and Mr. Savitsky Here is what you have referenced in

12   your complaint, these 11 documents and these 14 communications

13   and we want all the documents that either reference or related

14   to those communications.  They don't have a basis to object to

15   that and they have that, presumably.  And, it is surprising to

16   me they haven't been produced and they should be produced.

17   And, Mr. Israel is saying to me they have been produced.

18               So, that's not a big issue.  I think when you get

19   beyond that, if some of them are worded in the way Mr. Israel

20   suggested which is requests that effectively elicit counsel's

21   work product, then that is going to raise issues but that may

22   be beyond what you are really looking for.

23               Do you not have, in your possession, the documents

24   that are referred to in the amended complaint?

25               MR. KELLY:  Well.

J1i5kinC                    conference

1          MS. CONROY:  Well, with all due respect, plaintiffs

2     made a production I think for the first time at 7:00 last night

3     so we hadn't gotten any documents.  So, if they're in my

4     possession as of last night, I can't say one way or the other.

5          THE COURT:  Were these things produced last night?

6          MR. ISRAEL:  I understand they had been but to the

7     extent they haven't been, they will be produced on a rolling

8     basis the next couple of days.  We had our meet and confer

9     yesterday.  At the end of the meet and confer we started to

10    send them documents and will continue to do that.

11         It is not our intention to withhold those documents,

12    your Honor.

13         THE COURT:  Okay.  If that's going to get worked out,

14    I'm not worried about that.  What's the next thing?  You said

15    four buckets; is that the first bucket?

16         MS. CONROY:  If I can still --

17         THE COURT:  Still in the first bucket?

18         MS. CONROY:  Can I still stick in the first bucket for

19    minute just to clarify?

20         THE COURT:  Sure.

21         MS. CONROY:  So, in an effort -- and I know you are

22    right, your Honor, what me and Mr. Kelly did was try to present

23    to the effect of what your Honor was talking about what are we

24    looking for some of these do seem broad and, if you wouldn't

25    mind, I would like to go through those to make sure that we are

J1i5kinC                    conference

1    all on the same page as to what will or will not be produced.

2                THE COURT:  That's fine.

3                MS. CONROY:  Great.  And I apologize for looking down,

4    I wrote them down.

5                There are, on paragraph 77 in the complaint, there is

6    an allegation that there were tens of millions of dollars worth

7    of assets referenced in the trust that is part of the

8    allegation for the predicate act that plaintiffs are alleging

9    so we were looking for, again, documents that reflect that

10   allegation, that there are in fact tens of millions of dollars

11   in the trust.

12               THE COURT:  Okay.  Was there an objection to that?

13               MS. CONROY:  Yes, your Honor.

14               THE COURT:  What is the objection?

15               MS. CONROY:  There are a number of objections to it.

16   Everything I am asking for is stuff that we were told in our

17   request that wouldn't be provided.  It was:  Seeks documents

18   that have no relevancy.  It also said the captioned action

19   concerns whether defendant Andrew Wang breached his fiduciary

20   duty to the estate by stealing and self-dealing with the

21   estate's assets.

22               THE COURT:  Why don't you sit.  It might be easier to

23   speak into the microphone and sit.

24               MS. CONROY:  And we have a copy of the responses and

25   objections, if your Honor would like.  It also says -- these

J1i5kinC                    conference

1    are a combination of request responses because, like I said, I

2    tried to minimalize them.  So, these are requests that combine

3    9 and 10.  It says, YK objects to the request to the extent it

4    seeks documents for the purposes of pursuing claims that are

5    barred by YK's discharge in bankruptcy and the statute of

6    limitations.

7             THE COURT:  I am a little confused.  The request was

8    related to allegations in a paragraph of the amended complaint.

9             MS. CONROY:  Yes, your Honor.

10            THE COURT:  So, Mr. Israel, why would documents

11   underlining an allegation in your pleading be irrelevant?  I

12   don't understand how that can be an objection.

13            MR. ISRAEL:  It is very simple.

14            What we do in the complaint is we give a history of

15   everything that preceded over the last 15 -- more than 15

16   years, something like 17, 18 years.  We give a history of that

17   to put us in current context.

18            THE COURT:  Going back to 1997.

19            MR. ISRAEL:  Right.

20            THE COURT:  Right.

21            MR. ISRAEL:  So, what we do is we summarize things

22   that took place and then proceeded to trial, probate trial.

23   Some of the probate trial, most of the probate trial was

24   resolved by our winning and a finding that the will that was

25   being probated was fraudulent and a bunch of other things.  But

1  there have been other things that have been attendant to that

2  probate trial which are a 2103 proceeding which seeks to

3  recover assets that belong to the estate and a some other

4  proceedings.

5       What we put in the complaint was for context.  And I

6  know the immediate reaction is, hey, you got it in your

7  complaint, it must be relevant otherwise it wouldn't be in your

8  complaint.  However, when we are just giving background to

9  something you can say in a complaint right after World War II

10  we did this, this, and this, and it wouldn't make World War II

11  and any documents related to World War II probative of claims

12  at issue.

13       The fact of the matter is, this case doesn't invite a

14  relitigation of the probate trial.

15       THE COURT:  Well, it actually does a little bit, I

16  think, unfortunately and I know you are resistant to that and

17  you are making a motion before Judge Keenan to that effect.

18  But, the Wang complaint, the 2018 complaint incorporates, by

19  reference, a lot of what went on in the surrogate's trial as a

20  predicate for the RICO claim, doesn't it?  Effectively, it

21  does.  You have arguments that Judge Keenan will decide whether

22  it is inappropriate for them to re-spin them in a federal

23  lawsuit.  I get that.  But, unless and until the complaint is

24  dismissed -- and Judge Keenan was very precise in his order, he

25  stayed deposition discovery but he didn't stay document

discovery -- so there is an overlap here with the surrogate's

court proceeding.  I know are you resistant do it but I can't

second guess Judge Keenan, right?  It is not for me to do that.

MR. ISRAEL:  It hasn't been ruled on.

THE COURT:  Your motion.

MR. ISRAEL:  Right, our motion hasn't been ruled on.

THE COURT:  I know.

MR. ISRAEL:  And it is not to say because it hasn't

been ruled on that the thinking in the motion and that is

behind the motion is in invalid.  It just means it hasn't been

ruled on.  The thinking that is in the motion applies equally

here which is to say that if you are looking for documents from

a proceeding that has already been adjudicated and upheld on

appeal, what you are doing is you are looking to make a

collateral attack on that judgment and that jury verdict --

just let me finish.

If you are looking at those things for independent

reason that have to do with the allegations in these

proceedings, in the complaint and the counterclaims -- I call

them counterclaims but the other complaint -- that's different.

But I haven't heard anything like that.  Instead what I have

heard is they're looking to go back to that original proceeding

and the reason we have finality in a case, the reason we

respect a jury verdict is because you have your remedies.  You

can appeal, which they did.  They lost the appeal and they were

J1i5kinC                      conference

1   denied a further appeal to the Court of Appeals.  Do we have to

2   continue to relive the phenomenon that went into this trial

3   that stems back to facts that go back two decades?

4            THE COURT:  But here is the thing:  You can't

5   effectively stay your document production in the 2018 action

6   because you think you have a meritorious motion to dismiss

7   because, I assume -- there is no transcript on the docket --

8   you aired some of the this out with Judge Keenan at the time he

9   set the schedule for your motion and he issued the order where

10  he stayed deposition discovery.  I assume you argued for a stay

11  of discovery entirely before him in the 2018 action because you

12  suggested to him that it was an end run around the finality of

13  the surrogate's court proceeding.

14           MR. ISRAEL:  No.

15           THE COURT:  No?

16           MR. ISRAEL:  No, that's not what happened.

17           What happened was we asked for a stay pending a

18  resolution of our claims.  We did not get into all of this

19  information.  The information was addressed in our motion to

20  dismiss but I didn't stand there and go into -- plus, we didn't

21  begin to go into the discovery demands.  Judge Keenan saw, I

22  believe, that they're looking for things that were already

23  litigated years ago and that led to a jury verdict.  I think --

24  I mean I am guessing, I can't speak for the Judge, but I think

25  that it is just wrong to try to use this as a vehicle to

1    litigate those things when that's not even what their claims

2    are about.  Their claims are not about that.

3           THE COURT:  Well, I certainly -- I can't speak for

4    Judge Keenan and if, essentially, you are arguing that had he

5    known what you now know because of what's been requested he

6    might have ruled differently, I mean, you can obviously make

7    whatever application you think is appropriate to him in that

8    regard but a magistrate judge can't second guess the district

9    judge's order in a case that's issued.

10          So, I'm not staying document discovery in the 2018

11   action because Judge Keenan already ruled on that point.  If

12   you want him to revisit that because now you have in hand what

13   they're asking for and you think that it somehow would change

14   his mind about things, then you should take whatever action you

15   think is appropriate in that regard.

16          MR. ISRAEL:  But there was no motion, just so we are

17   clear.  I hear what you are saying and I respect that,

18   absolutely, but there was no motion that we made at that time.

19   We informally, while we were sitting with the Judge said,

20   basically, wouldn't it make sense to do this?  And he said my

21   normal practice -- not what I do every time, my normal

22   practice -- is to not allow depositions to go forward and I

23   allow document discovery.  He did say that.

24          THE COURT:  That's what his order said.

25          MR. ISRAEL:  Yes.  There was no formal motion and what

1   we will do is make a motion to the Judge but for the time being

2   what I would ask you to look at, your Honor, is there is a

3   question of relevance.  Is it relevant to their claims to go

4   back and look at the other things that were litigated before?

5   Is it relevant what the, for instance about what the doctor

6   said in the trial in the surrogate's court trial?  Is it

7   relevant to their claim for RICO violations?  How could it

8   possibly be?  What a doctor said at a trial that goes back to,

9   that deals with the capacity and the mental capacity and

10  whether there was a fraud with regard to a will from X number

11  of years ago, how is that relevant to their RICO claims?  Of

12  course it's not.  It is just not.

13          THE COURT:  Well, they are claiming fraud, right?

14  They are, in some respects -- well, I'm not going to say that.

15  Let's try and focus ourselves specifically on requests.  Okay?

16          MR. ISRAEL:  Okay.

17          THE COURT:  I think that's what we need to do.  I'm

18  not going to speak in broader terms.  That's not for me to do

19  today.  I adjudicate discovery disputes.  So, what's the

20  current document or set of document requests that's on the

21  floor?

22          MS. CONROY:  The one we were currently talking about?

23  Because there is more after that.

24          THE COURT:  Yes.

25          MS. CONROY:  The one we were talking about in

J1i5kinC                    conference

1    particular that I think goes to the broader issue is, was

2    basically documents and communications that reflect the tens of

3    millions of dollars worth of assets referenced in paragraph 77

4    of their complaint.

5            THE COURT:  Right.  And you are saying that's a

6    contextual allegation, not a substantive allegation.

7            MR. ISRAEL:  I have a different response.

8            THE COURT:  Okay.

9            MS. CONROY:  But can I respond to just very quickly.

10           Mr. Israel just made a whole bunch of arguments about

11   whether or not it went to our affirmative case.  I can sit here

12   and argue in fact that it does but putting that aside, your

13   Honor, these are allegations in their complaint about their

14   claims against us.  As defendants, I should have the right to

15   test the veracity and the strength of their allegations

16   specifically referenced in their complaint.  That has nothing

17   to do with my affirmative actions, that has to do with the

18   strength of their allegations that support their actions.

19           And, going back to the surrogate court issue and we

20   touched upon this a little bit in our letter, there is a little

21   bit of a sword and shield going on here that I think, quite

22   honestly, it is unfair and needs to be flushed out.

23           There are numerous paragraphs in here about the

24   background of the will, how my clients used the mental --

25   purportedly used the mental incapacity of the decedent C.C.

1    Wang to their advantage, to deprive the estate of it all in a

2    scheme to deprive the estate of its goods to their benefit.  It

3    is literally listed -- the phony will, that's a quote, it is

4    literally listed in the predicate acts asserted against S.K.

5    Wang.

6              So, the suggestion here that this is background and

7    this doesn't go to the very hear of their claim, quite frankly,

8    we are going to have to agree to disagree.  You wouldn't put in

9    almost 20 paragraphs of it, put it in your predicate acts in

10   your causes of action and sit here in good faith and say that's

11   just background.

12             THE COURT:  Okay.

13             Did you want to say something else?

14             MR. ISRAEL:  I was going to say something about the

15   prior point but about this, it is not like this is something

16   there that we are asserting that warrants equivocation or

17   challenge.  It is a given the things that I put down.  It is a

18   matter of record.  There is court records that reflect that.

19   I'm not making this stuff up or suggesting.  This is just

20   background.

21             THE COURT:  Okay, but that means if you are relying on

22   court records for the allegations in paragraph 77 then that's

23   what you tell then and you identify which court records and

24   that's the end of that.  That's easy.

25             MR. ISRAEL:  Okay.

J1i5kinC                    conference

1          THE COURT:  That's really what we are talking about.

2          MR. ISRAEL:  All right.  We can do that.

3          THE COURT:  Okay?

4          MR. ISRAEL:  Yes.

5          THE COURT:  You will do that?

6          MR. ISRAEL:  Yes.

7          THE COURT:  Okay.

8          Next?

9          MR. ISRAEL:  The other thing though, to get back to

10    the prior point, the things that we are talking about in the

11    prior point about what was the millions of dollars that were in

12    the estate I think which she was talking about, are things that

13    came up also in the surrogate's court proceeding and the

14    documents that support that are identical to the documents they

15    have, meaning that Andrew Wang and S.K. Wang had.  Both of us

16    received documents in that proceeding and both of us, the

17    quality and the completeness of those documents were something

18    which are questionable for both of us.  We receive documents,

19    there have been five lawyers, five law firms that preceded us

20    in representing the Kings.  Five law firms.  To say that, you

21    know, that they want a kind of a pristine reproduction of the

22    documents we received in that proceeding and that they

23    received, seems to me, is unfair.

24          What they're talking about in this specific instance

25    that we just went through are documents that came up in that

1    proceeding in the surrogate's court proceeding that they have

2    just as much as we have and they know and if they were to talk

3    to their colleague Akiva Cohen -- he is on their team, he has

4    appeared in this case -- he is as aware of those assertions as

5    we are and has access to the same documents we have.

6            THE COURT:  We have been through this a little bit in

7    prior proceedings.

8            My understanding is both sides have a significant

9    number of documents from the surrogate's proceeding but, that

10   being said, what needs to happen in this case is in response to

11   document requests you should say, if it's appropriate, the

12   documents that we would otherwise produce responsive to

13   document request number blank are Bates stamps number 100

14   through 123 from the surrogate's court proceeding.  And then

15   they would know that's what you are relying on.

16           That's how this should work.

17           MR. ISRAEL:  I'm not sure that --

18           THE COURT:  You don't have to physically produce it

19   again but you need to make sure they understand that this is

20   what you mean and what you are relying on.  That's what needs

21   to happen in both directions; not just from you but from them

22   to you as well.

23           Why isn't that the right way to think about it?

24           MR. ISRAEL:  It makes eminently good sense.

25           The two problems that I have with that -- it makes

1  sense but not only the documents that I think that we have were

2  Bates stamped, I think we received naked documents -- naked I

3  mean they don't have numbers indicating their source -- but we

4  do know that they came from people in the surrogate's court.

5  That's number one; and number two, we don't have the documents

6  necessarily the ones that are Bates stamped, sequentially.

7  They may have been taken out in lumps and used in this case or

8  for this particular motion and not maintained in a pristine

9  numbers 1 through 30.

10         THE COURT:  I'm not going to micro-manage how you

11  manage your documents.

12         MR. ISRAEL:  I'm not asking you that.

13         THE COURT:  If it were me, I would probably start over

14  and take the treasure trove of surrogate's court documents and

15  mark them S-1 through S-1 million and agree with the other side

16  to do that so you are all singing off the same sheet of music.

17  That's what I would do.  But I don't know what your resources

18  or inclinations are.

19         MR. ISRAEL:  It's a lot of work, it would overwhelm

20  our practice to have to go through -- I have like a room just

21  filled with documents that we got from the surrogate's

22  proceeding.  I mean I have to have somebody go in there and

23  reproduce the room.

24         MS. CONROY:  Your Honor, if I may?

25         I offered, just to this point which I touch upon in

1    our letter, this was a specific issue we talked about on our

2    meet and confer.  I understand that, as has been talked about

3    in all these papers there was 15 years of litigation, there

4    were multiple counsel before us.  Taking counsel at his word,

5    apparently some documents were produced with Bates stamps, some

6    were without.  We asked if, at defendant's cost, we could make

7    a copy to make sure everybody was on the same level playing

8    field with regards to the documents from the surrogate's court

9    that was in play.  They said that was impractical; they had it

10   organized in a way that it was their work product.  We said

11   fine, is there a list that you have of the productions that

12   were made by the parties that we can go back and double check

13   to try to figure that out?  That wasn't something they were

14   willing to provide either.

15          To the extent that this is impracticable for counsel,

16   like I said on the meet and confer, I am happy to talk to

17   counsel and work out paying for some independent contractor to

18   make copies and organize this stuff so no work product is

19   shown.  I offered --

20          THE COURT:  At your cost.

21          MS. CONROY:  At our cost.  We want to ensure --

22          THE COURT:  In other words you would have a vendor

23   take everything in Mr. Israel's room, you would not be involved

24   in that so you wouldn't know how it was organized --

25          MS. CONROY:  Correct.

J1i5kinC                    conference

1          THE COURT:  -- the vendor would take all the documents

2    and number them 1 through whatever and then give each side both

3    of them.

4          MS. CONROY:  Correct.

5          THE COURT:  That's great.

6          MR. ISRAEL:  Yes, that might work.

7          MS. CONROY:  And we asked for that because a lot their

8    objections, like you just heard, *Well, this is in the*

9    *surrogate's, this is in the surrogate's.*  And not casting any

10   aspersions on prior counsel or how it was done or surrogate's

11   court -- and I will with agree with Mr. Israel on this, it is a

12   lot of documents in that court were not necessarily maintained

13   in the best, and it wasn't electronic, and trying to figure out

14   especially without Bates stamps who produced what, what was the

15   universe, has been challenging.  So, that was one of the

16   things -- and we still maintain that we are willing to do that.

17         THE COURT:  Mr. Israel, I don't understand why you

18   won't agree to that.

19         MR. ISRAEL:  I didn't say I wouldn't agree to it.  I

20   am hearing it in a refined form that we are talking about and I

21   would agree but I want to know one other issue I am concerned

22   with and I can probably figure it out, but there is work

23   product wedged in among these documents.  So what I will have

24   to do is go through them -- and I guess I am going to have to

25   do that -- to weed out work product because, like I said, they

J1i5kinC                    conference

1      weren't maintained in the exact form we --

2                  THE COURT:  Your firm's work product?

3                  MR. ISRAEL:  Yes, my firm's work product.

4                  THE COURT:  In terms of what?  Like things you have

5      written on documents?

6                  MR. ISRAEL:  This document means this, this and this,

7      and a memo that is connected to the document and things like

8      that.

9                  THE COURT:  Okay.  So you will have to purge the room

10     of your work product before it's given to the vendor.

11                 MR. ISRAEL:  That's right.

12                 But, it seems to me that's a win-win for you and it

13     is, frankly, a win-win for the defendant, too, because then you

14     are all working from a common set of documents and that's

15     probably the core documents for the case.  And let me be

16     clear -- and I am going to state something I know you know but

17     I think it is important to say it in this context -- which is

18     there cannot be a document that isn't produced during discovery

19     that is then utilized after discovery because this is not a

20     game.  This, *oh, they didn't ask for this so we have got these*

21     *great documents and we are not going to give them*, this is not

22     that kind of case.  And so, when you get to the point of

23     summary judgment motions and/or trial in this case, there can't

24     be some documents that sort of surface for the first time for

25     either side.

1          I am directing this to both sides.  There has to be a

2     level playing field, if I can put it that way, where you are

3     all operating from the same set of documents and then making

4     whatever arguments you are going to make.  So, that's clear to

5     everybody.

6          MR. ISRAEL:  Absolutely.

7          MS. CONROY:  And for qualification, your Honor, to

8     that point, it is funny because that brings into question

9     certain documents related to a third-party that haven't been --

10    that we have requested that aren't produced to us purportedly

11    because the selection of documents from the third-party are

12    being asserted as work-product.  I would ask if they're going

13    to be used in some form of discovery, be it at a deposition or

14    otherwise before the end, we be given any such documents at

15    least 48 hours beforehand.

16         MR. ISRAEL:  Your Honor --

17         THE COURT:  I don't know what we are talking about and

18    I really don't like it when lawyers start to digress into some

19    other area when we are in one are.  Now you are talking about

20    some third-party in an amorphous way, I don't know what that's

21    about.  So, we can come back to that but I don't know what that

22    means.

23         MS. CONROY:  Okay.

24         THE COURT:  I think we have agreed right now that the

25    surrogate's court document collection that plaintiff has, once

J1i5kinC                    conference

whatever work product is removed, you will coordinate with

defense counsel to provide it to a third-party vendor and then

that vendor, at defendant's expense, is going to Bates stamp

all of those documents from surrogate's 1 to surrogate's

whatever the last number is and then you will both have them,

and then you will both be able to say we are relying on S-148

to S-162 as the documents underlying paragraph so-and-so in the

amended complaint.

          MR. ISRAEL:  We should also have their surrogate's

documents though because we don't have a complete set of what

happened in the surrogate's court so lets make that reciprocal.

          MS. CONROY:  Okay.

          THE COURT:  I assume that is in everyone's interest

that the collection of the surrogate's materials include

whatever you have and whatever they have.  I suspect a lot of

it is overlapping but if it isn't then, of course, that's in

everybody's interest.

          MR. ISRAEL:  And to be clear, when we talk about their

documents, meaning the defendants, it would assume documents

that Akiva Cohen has because he is counsel of record also in

this matter -- not in the courtroom today -- but he is and he

represents Andrew Wang and S.K. Wang.  I happen to believe that

he has everyone's documents.  He will have both sides.  So, I

want to make sure that we get his documents, too, because I

think that is the most comprehensive set of surrogate's court

J1i5kinC                        conference

materials.

MS. CONROY:  Your Honor, if we have documents we are
not going to parse them out from one attorney to the next.  If
we have documents in our custody and control, obviously if
Mr. Cohen as co-counsel, we will be collecting them.  I don't
really understand what the issue is here.

MR. ISRAEL:  That's what the issue is.

MS. CONROY:  I don't think we have ever not agreed to
this.  We are happy to do so.

MR. ISRAEL:  Okay.  Good.

THE COURT:  Okay.  What's next?

MS. CONROY:  Like I said, there is a handful of
documents to that, along the same lines that are referenced, so
I will go to the next one.

In paragraph 40 of the complaint, your Honor, of the
amended complaint I am talking about in the complaint solely at
this juncture, they have referenced that there was
specifically, they reference purportedly that Mr. C.C. Wang's
friend, close friend and colleague noticed Mr. C.C. Wang's
strange behavior and they quote him in their complaint --

THE COURT:  They quote who?  Mr. Wang?

MS. CONROY:  Correct.

THE COURT:  Yes.

MS. CONROY:  So, we ask for documents concerning those
observations in the quote.  And that's in their complaint.

J1i5kinC                         conference

1           THE COURT:  Okay.

2           What is the response?

3           MR. ISRAEL:  As far as I know there are no documents.

4      He said it to somebody and it was repeated.  He said

5      it to a witness who testified at the trial and we don't have

6      any documents that reflect that except for our own work

7      product.

8           THE COURT:  When you say your own work product, what

9      does that mean?

10          MR. ISRAEL:  Our work product would be our recapturing

11     and taking notes on what we were told during our investigation

12     into what took place prior to C.C. Wang's death.

13          MS. CONROY:  Your Honor, how can they rely on work

14     product that they then put in their complaint and tell me I

15     can't have it?  You can't put in allegations and then claim

16     that, oh, based on the fact I am alleging in my complaint work

17     product --

18          THE COURT:  Hold on.  Hold on.  Let's not get in a

19     lather here.  Mr. Israel is a very precise lawyer so I think he

20     is not doing what you just said.

21          MS. CONROY:  Hope not.

22          THE COURT:  Let's not bury the lead.  The lead was I

23     don't have any documents responsive.  Okay?  That's what he

24     said.  Because he said that the quote is something that a

25     witness testified to at the surrogate's court proceeding.  So,

1   it comes from testimony at the surrogate's court proceeding.

2   That's the answer to what underlies this allegation.  It is

3   from testimony in the surrogate's court proceeding.  Whatever

4   analysis or whatever other words you want to use for what was

5   said and what his thinking is doesn't inform what he alleged in

6   a complaint.  What he alleged in a complaint is what someone

7   testified to.  Right?

8               MS. CONROY:  I misunderstood.  I thought that he had

9   said that it was based on an interview that he had about the

10  comments, your Honor, so that's what I was talking about.

11              MR. ISRAEL:  I need to correct myself, if you will

12  allow me to interrupt for one second.

13              THE COURT:  Go right ahead.

14              MR. ISRAEL:  Apparently there was an affidavit that

15  was filed 15 years ago that was available to both sides where

16  these comments were made also.

17              So, do we have a copy of the affidavit?

18              MR. SAVITSKY:  I think so.

19              MR. ISRAEL:  So, we will produce the affidavit, it is

20  from 15 years ago.  They should have it as much as we have it

21  but to the extent that it exists, we will produce it.  It was

22  also testified to at trial.

23              THE COURT:  Okay.  So, that's the answer to that.

24              MS. CONROY:  Sure.  That's fine.  That's all I want.

25              THE COURT:  Qualified answer.  Okay, next.

J1i5kinC                    conference

1           MS. CONROY:  The next bucket goes to paragraph 59

2     through 63 of their complaint, your Honor.  It describes a

3     conversation that was purportedly had, I referenced this a

4     little bit earlier, in February 2013, between purportedly

5     between -- 2003, sorry, my colleague is correcting me, that it

6     was purportedly had between my client and their clients

7     relating to the assets and relating to the allegations of theft

8     purportedly by my client.  So, to the extent there are any

9     documents relating to that conversation, or recording anything

10    alike, that's what we ask for.

11          MR. ISRAEL:  If they exist, we will produce them.  I'm

12    not aware of any, it was a conversation.  Our client knows the

13    conversation their client knows the conversation.

14          THE COURT:  Okay, but you all shouldn't have to come

15    to court to have one lawyer tell me what a document request is

16    and the other side say we will produce it if we have it.

17          MR. ISRAEL:  Agreed.

18          THE COURT:  We don't need to have a conference in

19    court for that.

20          MR. ISRAEL:  I agree.  If it was brought up on the

21    phone I would have said what I'm saying now.

22          MS. CONROY:  We can agree to disagree.  We did talk

23    about it on the phone and what I got told is no so that's why

24    we are here.

25          THE COURT:  Okay.  Well, we have a transcript so you

J1i5kinC                    conference

1   heard what Mr. Israel said, you will order the transcript, and

2   then you will rely on that.

3           MR. ISRAEL:  We also produced 1,700 pages yesterday,

4   your Honor.

5           THE COURT:  But if you produce something at 7:00 the

6   day before a conference there is no way counsel can come here

7   knowing what you produced to have them informed.

8           MR. ISRAEL:  Fair enough.

9           THE COURT:  Right?

10          MR. ISRAEL:  Fair enough.

11          THE COURT:  So, there is nothing that -- I think

12  having the conference today caused you to produce yesterday.

13  If we had it next week you would have produced it next week.

14  That's why we have conferences.

15          What's next?

16          MS. CONROY:  In particular with regard to that

17  conversation, maybe Mr. Israel is unaware but in his complaint

18  it says that that was a taped conversation so we would like the

19  tape of that conversation.

20          MR. ISRAEL:  His client made the tape.

21          THE COURT:  So the answer is that's your answer then.

22          MR. ISRAEL:  Yes.

23          THE COURT:  But let's parse this a little bit more

24  finely.  The fact that their client made the tape doesn't

25  necessarily mean that you don't have the tape.  Are you saying

J1i5kinC                         conference

 1   you don't have the tape?

 2              MR. ISRAEL:  We don't have the tape.

 3              THE COURT:  Then that's the answer.

 4         How can you not have the tape?  I don't understand

 5   that.  How can you plead it without having the tape?

 6              MR. ISRAEL:  Because assertions have been made that

 7   the tape exists and certain things were said in the tape and

 8   that's what the basis for our allegation is.

 9              THE COURT:  But you don't have the tape.

10              MR. ISRAEL:  We don't have the tape.

11         We don't have it, do we?

12              MR. SAVITSKY:  We don't have it --

13              MS. CONROY:  Or other counsel for plaintiffs have the

14   tape.

15              THE COURT:  Who are other counsel?  These are the

16   counsel.  You mean prior counsel?

17              MS. CONROY:  Prior counsel.

18              THE COURT:  I mean, that's part of what makes this a

19   bit of a messy case because you are all like cousins fifth

20   removed.  So, I can't rely necessarily on all your ancestors to

21   have given you every last document, right?  And that goes both

22   ways.  So, you all have to live with that and your clients have

23   to live with that.  That's just a fact of life in this case.

24   We can't do anything about that.

25              MS. CONROY:  That's fine.

J1i5kinC                    conference

1              THE COURT:  Okay.  What is next?

2              MS. CONROY:  So, just so I am clear the tape, nobody

3     has possession of it on that side.

4              THE COURT:  It sounds like Mr. Israel is saying that

5     he doesn't have the tape.

6              MR. ISRAEL:  I am just told now,and I apologize I have

7     to turn to him but he knows some of the things in discovery I

8     don't know.

9              THE COURT:  Okay.

10             MR. ISRAEL:  He tells me that it was played at a

11    deposition.  The tape was actually played in a deposition so it

12    is reflected in a transcript, correct, so some lawyer has it.

13             THE COURT:  But the answer to the request then is a

14    reference to the deposition where the tape was placed, that's

15    the answer and they will see if they can find that.

16             MR. ISRAEL:  Fair enough.  We will do that.

17             THE COURT:  Next.

18             MS. CONROY:  Thank you, your Honor.

19             Then there is an allegation in paragraph 63 which

20    says, based upon this, Y.K. would come to turn over 64 C.C.

21    Wang's painting to S.K. in the spring of 2003 yet, for their

22    part, S.K. and A.W. did not turn over or distribute any of the

23    25 stolen paintings until May 2005.

24             So, one of our requests was any documents concerning,

25    reflecting that their client turned over -- purported turned

J1i5kinC                        conference

1   over these 64 paintings that they said were turned over.

2               THE COURT:  Are there any such documents?

3               MR. ISRAEL:  Yes, there are, and we produced them.

4               THE COURT:  Yesterday?

5               MR. ISRAEL:  Yesterday; and we have also produced them

6   in these very proceedings before that as attachments to

7   filings.  But, yes, they were produced yesterday, and if there

8   is any doubt about it we would be happy to produce them again

9   today.  It's a critical document in the case.

10              MS. CONROY:  If counsel represents --

11              THE COURT:  Let me suggest this, Ms. Conroy.

12              MS. CONROY:  Sure.

13              THE COURT:  I obviously don't expect you to have

14  reviewed the documents that were produced last night.

15              MS. CONROY:  We have not.

16              THE COURT:  Why don't you, in the next few days, see

17  what has been produced then have a further meet and confer.

18              MS. CONROY:  Sure.

19              THE COURT:  These are not trade secrets, these

20  documents; these are critical documents.  If you don't find

21  them in the treasure trove you were given last night,

22  Mr. Israel, I am sure, will be happy to identify them and

23  produce them if you don't otherwise have them.

24              MR. ISRAEL:  Absolutely.

25              THE COURT:  Okay.

J1i5kinC                    conference

             MS. CONROY:  Is that for just for that category or --

             THE COURT:  That's for that category because that's

what we are talking about.

             MS. CONROY:  I wasn't sure if it was for all the ones

referenced in the complaint.

             THE COURT:  I don't know that I think we can speak

that broadly.

             MS. CONROY:  Understood, your Honor.

             Okay, the next ones were in paragraph 67 of their

complaint they say upon substantial information and belief that

our clients are in possession of stolen paintings so we ask for

any documents or communications reflecting their substantial

information and belief.

             MR. ISRAEL:  Yes, and we are giving them to them.  If

we haven't given them all we are going to continue to give it

to them.  We can't go to trial without them having those

documents.

             THE COURT:  I know.  But, you know what?  There is a

May fact discovery cutoff date that Judge Keenan set and now we

are close to February and, as is true in most cases, you are

going to take all the depositions in this case between April

1st and May 8th, probably.  And what I think we going to have

to do in this case is set a date by which all documents have to

be produced and we should talk about that at the conclusion of

today.

1          MS. CONROY:  I agree, your Honor.

2          THE COURT:  Or else things are going to dribble out

3     and you are going to keep coming back here and saying we are

4     going to do this, we are going to do that but we have to sort

5     of draw a line in the sand and say no document after this date

6     that hasn't been produced can be used.

7          That's for both sides.  I don't know what the right

8     date yet is.  We are going to talk about that.  We will take a

9     short break in a few minutes because I will give my friend here

10    a little bit of a break, we have been going an hour already, I

11    suspect we are not close to the end.  So, that is something I

12    think we should think about, but let's go another five minutes

13    or so and we will take a short break.

14         MS. CONROY:  Well, we have a number.  It may be, based

15    on how it has been going today just back and forth now, I am

16    happy to, if we want to adjourn and sit down with

17    Mr. Israel for the short break and go through the remaining as

18    far as our requests for the complaint then we might be able to

19    skip all of those, if he will agree to it.

20         THE COURT:  That's fine.  Why don't we take a short

21    recess and have you discuss what else is on your list and you

22    will hear what his response is and it may be we have given it

23    to you or we gave it to you last night or we will give it to

24    you, in which case we don't have to spend time in court going

25    through it.

J1i5kinC                          conference

1           MS. CONROY:  Right, and then we can just talk about

2     the handful that were truly contested.

3           THE COURT:  And there were others issues that all

4     raised in your correspondence that you haven't raised with

5     respect to metadata and other such things.

6           MS. CONROY:  We were at the request stage.

7           MR. ISRAEL:  We have some too, of course.

8           THE COURT:  That's fine, but we do need to finish.  I

9     allocated in my mind two hours today so I would like to be done

10     by 12:30.  Okay?  I don't know -- we didn't plan on an all-day

11     hearing.  I assume you don't want to spend the day here.

12           So, let's take about a 10-minute break or so and why

13     don't you all talk while we break to see if we can work out

14     some of the issues.

15           MS. CONROY:  Sure.  Sounds good.

16           MR. ISRAEL:  Okay.

17           (recess)

18           THE COURT:  Okay.  Case settled?

19           MS. CONROY:  Unfortunately no, your Honor.

20           THE COURT:  Rats.

21           MS. CONROY:  We did get through a majority of category

22     1 and were able to agree to that, so that's good.

23           THE COURT:  Okay.

24           MS. CONROY:  And I will send confirmatory e-mail to

25     counsel after this related to that so that everybody is on the

J1i5kinC                    conference

1  same page.

2              THE COURT:  So that shortens our agenda.

3              MS. CONROY:  Correct.

4              THE COURT:  The next category are documents that

5  relate directly to the allegations of the complaint are, per

6  se, referenced in there.  We got through one category which is

7  documents concerning the ownership, possession, sale, or theft

8  alleged.  Any documents concerning the defendant's purported

9  ownership sale, transfer or thefts of any of the artwork at

10  issue in the complaint.  Any documents -- as I understand it,

11  the documents relating to any of the allegations concerning our

12  client's actions with regard to any of the wills or codicils as

13  evidenced derived solely from the surrogate court actions that

14  that should be, relate, and that's all going to be produced.

15  So, I think that's taken care of.

16              We asked for -- there are certain specific statements

17  in the complaint, for instance, attributed to the decedent that

18  were purportedly about our clients.  For instance, there is an

19  allegation in the complaint that C.C. Wang said that our

20  clients were treating him very poorly.  Any documents relating

21  to those statements we asked for and to the extent they exist

22  counsel said they would produce them.  And we left off there.

23              We are seeking documents also relating to -- the core

24  of, honestly kind of the core of their allegations which is

25  that our clients took possession and transferred certain stolen

J1i5kinC                        conference

1     artwork.  We asked for any documents relating to our client's

2     purported sale, resale, ownership, transfer of the artwork in

3     question.  On the flipside of that we, with regards to our

4     affirmative claims, we have asked for the same category of

5     documents, sale, resale, transfer of any documents of any of

6     the estate or artwork listed on the appellate inventory as in

7     the possession or control of Y.K. to also be produced.

8                  That's where we left off.

9                  THE COURT:  Those strike me as core documents in the

10    case.

11                  MS. CONROY:  I agree.

12                  THE COURT:  Those strike me as core documents to the

13    extent each side has them.  What's the issue?

14                  MS. CONROY:  That where we left off.  We were told

15    they were too broad.

16                  MR. ISRAEL:  I am not sure what the question is right

17    now.  What, specifically, are we being asked for?  She listed a

18    lot --

19                  THE COURT:  Documents that you have in your possession

20    related to the alleged sale that her clients made of artwork

21    that have you characterized as stolen.

22                  MR. ISRAEL:  Okay.  Yes, we produced and we are going

23    to continue to produce -- there is no -- I have to take some

24    water.

25                  There is no issue about that, your Honor.  There is no

J1i5kinC                    conference

 1   issue.

 2           MS. CONROY:  As well, the resale of the purported

 3   artwork.

 4           MR. ISRAEL:  Yes; no, there is no issue about that.

 5   We have to do that to prove our case.

 6           THE COURT:  Exactly.

 7           MS. CONROY:  I agree, your Honor.

 8           We have also asked for.

 9           MR. ISRAEL:  You are out of water.

10           THE COURT:  We don't have water because the cafeteria

11   is closed because of the shut down.

12           MR. ISRAEL:  Jeez.

13           THE COURT:  So, we don't have water here.

14           MR. ISRAEL:  Thank you very much.

15           MS. CONROY:  We also asked for documents concerning

16   the sale, transfer, or resale of any artwork in the custody and

17   control of Y.K. that was on the appellate inventory.

18           THE COURT:  That, again, shouldn't be controversial.

19   Is it?

20           MS. CONROY:  I agree, your Honor.  That's where we

21   left off and when we left off at that point counsel had said

22   they weren't going to agree to produce that.

23           MR. ISRAEL:  The way it was just said there isn't a

24   problem.

25           THE COURT:  Okay.

1          MR. ISRAEL:  If there was an objection, I suspect it

2    had to do with the exact way that it was phrased.  If we are

3    talking about just the way she said it now then there is no

4    problem with it.

5          THE COURT:  Okay.  This is why I said what I did

6    earlier which is forget what people write, get on the phone and

7    say *What do you really want*? and then you have the conversation

8    likes you just had in the jury room that you are now having in

9    front of me.

10         But, with all due respect, I don't want to have to

11   preside over a meet and confer, I want you all to have your own

12   meet and confer.  I am just here to resolve disputes following

13   meet and confer.  So, let's not overlitigate things that you

14   don't need to.

15         What is next?

16         MS. CONROY:  I agree.

17         To the extent it had to do with the artwork I think

18   that covers a lot.  I would just ask also, I guess to the

19   extent -- well, that would also include communications with the

20   PA about these assets so I think that's fine.

21         We asked for documents concerning any damages that are

22   being alleged.

23         THE COURT:  Documents concerning damages.  That's very

24   broad.  What do you mean?

25         MS. CONROY:  Well, they're alleging, I think, in one

J1i5kinC                    conference

1    instance, $20 million, a total of $60 plus million for these

2    artworks, so to the extent that they're alleging that these

3    were money -- we are just asking for documents that show the

4    valuations of what they're asking for the artwork --

5            THE COURT:  Appraisals and things of that sort?

6            MS. CONROY:  Correct, the basis for the numbers.

7            MR. ISRAEL:  It is premature.

8            THE COURT:  What do you mean by premature?  It is not

9    premature.  This is discovery.  It is not bifurcated discovery.

10           MR. ISRAEL:  No, I understand that, but some of that

11   analysis hasn't been completed yet.  We can't give them stuff

12   before it is done.  I have people who are going to be working

13   on this giving us the exact difference in the value.

14           THE COURT:  Did you not plead a specific amount in

15   your complaint?

16           MR. ISRAEL:  We pled a specific amount.

17           THE COURT:  So what is the basis for the amount you

18   pled?  That's what they want to know and they're entitled to.

19           MR. ISRAEL:  All right.  I can give them what the

20   basis is for the amount that we pled.  That's fine.

21           THE COURT:  Great.

22           MR. ISRAEL:  It has to do with the resale value of the

23   art overseas and we can do that.

24           THE COURT:  Okay.

25           MR. ISRAEL:  We can give them the statements from

1    overseas.

2            THE COURT:  Then that's what you will do.

3            MS. CONROY:  And I will be open, if we want to do it

4    now, your Honor, or we are happy to do it and not burden the

5    Court.  So, the position during the meet and confer the other

6    day was because they were going to file a motion for stay of

7    discovery pending our discovery relating to our claims that

8    they weren't -- that plaintiff was taking the position that

9    they weren't going to produce any documents.

10           THE COURT:  That's why I issued my text only order

11   promptly.

12           MS. CONROY:  Right.

13           THE COURT:  Because I wanted you to be on notice that

14   I was not in position to grant the stay for the reasons I said

15   and which we have already talked about today, in the hopes that

16   perhaps that would encourage you all to have conversations in

17   advance of today.  You haven't had that.

18           MS. CONROY:  And I think we tried.  I think it would

19   be, I think in everybody's best interest, your Honor, to not to

20   burden the Court and we can send counsel today a summary of the

21   document categories similar to what I did just now of the

22   request so that they can consider those rather than burden the

23   Court in the first instance since the parties haven't talked

24   about it given the position by plaintiffs.

25           THE COURT:  I think that's the wise course.  I think

1    there may be some overlap and to the extent there isn't

2    overlap, then I think you need to meet and confer about it.

3             MS. CONROY:  Sure.

4             THE COURT:  And then if you don't reach agreement, you

5    can bring it back to my attention.

6             MR. ISRAEL:  I think what we should do is we should

7    have, at the end of this, counsel should provide us with a list

8    of what their understanding is of what the agreements are in

9    terms of production so we can have a kind of a clarity and

10   understanding what's going to happen as opposed to leaving it

11   kind of open-ended.

12            THE COURT:  Well, that's why I think Ms. Conroy has

13   been putting on the record at least what you all have agreed

14   to.  What do you mean exactly?

15            MR. ISRAEL:  I don't know.  I am hearing a lot of

16   intangibles in between certain things, like I am hearing

17   counsel say, well, we have agreed do this, we have agreed to do

18   that already, and I am not sure we have agreed to do the things

19   that have been represented that we have agreed to do.

20            THE COURT:  Then you have to stand up and tell me

21   right now what you are not agreeing to do.  That's the whole

22   purpose of you going into the jury room and having a meet and

23   confer and coming out and agreeing to certain things.  If she

24   recited something you are not agreeing to, tell me right now

25   what it is.

1          MR. ISRAEL:  All right.  I just want to be clear on

2     one point, your Honor.

3          We have a 2103 proceeding that's going on now in the

4     surrogate's court and the things that we are doing discovery on

5     in the surrogate's court and I don't believe it is appropriate

6     for us to be reproducing everything we are doing in the

7     surrogate's court.

8          Am I mistaken about that?

9          THE COURT:  I don't know how to answer that question.

10    It depends on what is being sought in this case and whether

11    what is being produced in the surrogate's court would also be

12    responsive to what is being sought here.  So, I don't know how

13    to answer that question.  The answer is depends, like many

14    questions in the law, right?

15         MR. ISRAEL:  Right.

16         THE COURT:  So, I suspect there probably are some

17    documents being produced in the 2103 proceeding that are

18    relevant to the allegations in your pleading their pleading and

19    there are probably some that are not.  But I am speaking

20    broadly because I don't know anything about the 2103 proceeding

21    and I don't know with precision what we are talking about.  I

22    don't think you have to assume that every document being

23    produced in the 2103 proceeding necessarily, by definition,

24    means it must be produced in this case.

25         Do you disagree, Ms. Conroy?

J1i5kinC                    conference

1          MS. CONROY:  I do not, your Honor.

2          THE COURT:  So, I don't think we need to worry about

3     that.  I think they've served 83 document requests which is a

4     lot of requests.  We have gone through some categories of them

5     and some specific ones.  We have put on the record you have

6     said many times I have no problem with it, your Honor; I have

7     no problem; if it is phrased that way or whatever.  We have the

8     transcript.  You get the transcript.  You produced a lot of

9     documents last night, it sounds like, which they haven't

10    reviewed.  If they do review them they'll perhaps realize some

11    of what you are talking about you have already given them.  You

12    are now going to have this arrangement where you are going to

13    have a third-party vendor catalog, if you will, this entire

14    surrogate's court document collection so that's going to

15    advance the ball substantially as well.

16          So, I think a lot of progress, frankly, is being made.

17          MR. ISRAEL:  I agree.

18          THE COURT:  But, that said, there are always going to

19    be particular categories that the parties may well not agree

20    to.  At the end of the day we are going to do two things.  One

21    is I will set a date for a February conference because I think

22    we should do that in this case; and second, we are going to set

23    a date for when all documents must be produced so that everyone

24    knows that we can't just dribble documents out in perpetuity

25    without any end date because I think we need that in this case.

J1i5kinC                     conference

1            MS. CONROY:  Your Honor, to the point --

2            THE COURT:  Hold on.  You are both talking at the same

3     time.

4            MS. CONROY:  Sure.

5            THE COURT:  Go ahead.

6            MR. ISRAEL:  All right.

7            At the beginning of this case there was a motion to

8     dismiss that was partially based on the probate exception

9     because certain things that go to what the estate has right

10    now, what the corpus of the estate is is a probate function and

11    isn't covered and is limited to the things that the probate

12    court does such as what the assets are within the estate.  This

13    was ruled on by the judge originally in a motion to dismiss.

14    So the concern that I have is by going through now an analysis

15    of what is in the estate, we are actually usurping what is

16    going on in the probate's court and we risk inconsistent

17    results.  That's specifically what the probate exception refers

18    to.

19           THE COURT:  But you have filed a lawsuit in federal

20    court.

21           MR. ISRAEL:  Right.

22           THE COURT:  You have an *ad damnum* clause where you are

23    seeking damages for a certain amount of money.

24           MR. ISRAEL:  Right.

25           THE COURT:  You want a judgment in this court for a

J1i5kinC                    conference

1    certain amount of money, correct?

2              MR. ISRAEL:  Yes, sir.

3              THE COURT:  So, as a result of that, the defendants

4    have the right to understand why the amount that you are

5    seeking, what the basis for that is and that is not within the

6    probate exception, that is within the heartland of what all

7    lawsuits, ultimately, are about.  People have to establish

8    liability and, if they do, then they get damages of a certain

9    amount and we litigate both of those together and get through

10   discovery.  And so the value of the inventory, if you will, may

11   well be germane to calculating what the basis for the judgment

12   you ultimately want to recover in this case is and we have to

13   deal with that accordingly.

14             MR. ISRAEL:  Your Honor, I wasn't talking about that.

15   I was talking about the things that the Judge specifically

16   excepted from our complaint, said that they don't belong in

17   this in this action because they're subject to the proceedings

18   in the surrogate's court.

19             THE COURT:  Give me an example.

20             MR. ISRAEL:  Unfortunately I knew you were going to

21   ask that but I don't have the motion, the decision.

22             THE COURT:  Why are you saying this to me?  What is it

23   that you want me to do in response?

24             MR. ISRAEL:  I guess there is nothing.  I guess there

25   really is nothing I am asking to you do in response and I am

J1i5kinC                    conference

1   beginning to wonder why I raised it myself, your Honor.

2              THE COURT:  Okay.

3              MR. ISRAEL:  I am not exactly sure.  I know, though,

4   that some of the things in broad strokes that are being covered

5   trespass upon the ruling in that original motion to dismiss and

6   which, by the way, was confirmed by the Second Circuit in terms

7   of this limitation that we can't get into probate issues.  And

8   I don't have it with me but I am concerned that some of the

9   things we are covering right now might run a foul of that

10  limitation.  That's all.

11             THE COURT:  Well, let that inform the case as you go

12  forward.  I frankly think both with respect to your pleading

13  and the defendant's pleading that there is quite a fine line

14  between what these cases are about and what the surrogate's

15  case is about.  It is not like there is a vast distance between

16  the two, they're very close in scope and substance, frankly, so

17  it is very hard, as a Judge, to try and navigate through the

18  mine fields of discovery but if they're particular -- when you

19  go back and reflect on this further, if you think rulings from

20  the District Court and the Second Circuit have somehow narrowed

21  the scope in a way that certain documents for both sides should

22  just be left to the side, talk to defense counsel about that.

23             MR. ISRAEL:  Okay.  I will, your Honor.

24             THE COURT:  All right.  What's next?

25             MS. CONROY:  So, I think we got through the majority

J1i5kinC                         conference

1    but just for clarification so that I don't want to address

2    Mr. Israel's concern about stuff we spoke to I will put on the

3    record my understanding of what was agreed to.

4                  THE COURT:  I thought you had already done that.

5                  MS. CONROY:  No, I hadn't done all of it.

6                  THE COURT:  All right.  Go right ahead.

7                  MS. CONROY:  Sure.  Not a problem.

8              So, with regards to documents that were specifically

9    referenced in the complaint, as I understand it, counsel has

10   agreed, to the extent not already produced, to produce

11   documents concerning the Mai-Yan landscape and the allegations

12   86 to 106 including the 2011 interview and how their client

13   learned of it, when, how.  And, again, counsel represented with

14   some of these categories that some of it might have already

15   been produced so I leave that as a caveat.

16             Counsel agreed to produce documents concerning any

17   appraisal or valuation of the artwork referenced in the

18   complaint.

19             Counsel agreed to produce any documents concerning

20   their client's knowledge, to the extent she has any, of Billy

21   Way or knowledge of Billy Way.  Billy Way is referenced

22   throughout the complaint in multiple paragraphs as the place

23   where all the artwork purportedly sold through the straw men,

24   were shipped in China, your Honor, just for context.

25             Plaintiffs also agreed to produce documents concerning

J1i5kinC                        conference

1    the galleries, museum exhibitions, and auction houses that are

2    reflected throughout the complaint.  You may recall, your

3    Honor, again in connection with the strawman sales, a lot of

4    their allegations are that their client learned, for the very

5    first time in 2013, about these various auction house sales,

6    resales, or exhibitions in certain galleries in China either

7    directly on behalf of A.W. Wang or S.K. Wang.  So, any

8    documents relating to those allegations and how their client

9    first learned about it, which is directly referenced in the

10   complaint, as being in 2013.

11          And then, any documents concerning, again, any of this

12   relates kind of to our client's knowledge or possession or

13   opening of anything in the C.Y. art safe or taking of the

14   paintings from the decedent's house.  Those are direct

15   allegations in the complaint so, again, we asked for those and,

16   as I understand it, counsel is willing to produce all of those

17   documents to the extent they haven't already been produced and

18   there is no objection to that.

19          THE COURT:  All right.  Before you go further --

20          MS. CONROY:  Sure.

21          THE COURT:  Mr. Israel?

22          MR. ISRAEL:  That's fine.

23          THE COURT:  Okay.

24          MR. ISRAEL:  I agree with that.

25          THE COURT:  That's fine.

J1i5kinC                          conference

1          MS. CONROY:  Sorry.  Just one more.

2          Any documents concerning the wiring of funds in

3  connection with the strawman sales.  That's directly referenced

4  in their predicate act and throughout their complaint, your

5  Honor; that the funds purportedly came from our client so we

6  asked for documents concerning that.

7          MR. ISRAEL:  Sure.  Fair game.  They got it.

8          THE COURT:  Okay.

9          MS. CONROY:  I think that goes to the crux of the

10  categories and, like I said, we will send an e-mail and

11  promptly deal with the documents on the meet and confer in our

12  affirmative action.

13          Going to, your Honor mentioned earlier, the metadata.

14  So, as I understand it, and I apologize if I got this wrong

15  since I am newer to this case, but I understand that your

16  Honor, for whatever reason, Rule 26 disclosures haven't been

17  exchanged in this case.

18          THE COURT:  Is that right?

19          MR. ISRAEL:  Yes.

20          MS. CONROY:  It is really weird, your Honor.

21          MR. ISRAEL:  You know what it is?  It is because we

22  immediately jumped at the motion to dismiss.  We had motion to

23  dismiss after motion to dismiss after appeal to the Second

24  Circuit after motion to reargument.

25          THE COURT:  Right.

J1i5kinC                          conference

1              MR. ISRAEL:  But, we made the same observation so we

2      should set up a time to do that.

3              THE COURT:  You both should do that.

4              MS. CONROY:  I agree, your Honor.

5              THE COURT:  How quickly can you do it?

6              MR. KELLY:  The 31st, when his clients are back from

7      China.  Does that make sense?

8              MR. ISRAEL:  That's fine.

9              MS. CONROY:  That's fine.

10             THE COURT:  Rule 26 due January 31.

11             MS. CONROY:  Perfect.

12             It is very funny because, based on my experience, a

13     lot of times with the Rule 26, it leads into this discussion,

14     is a natural progression that goes into an ESI --

15     electronically stored information -- discussion that really

16     hasn't happened yet.

17             THE COURT:  Is it premature for me to be --

18             MS. CONROY:  I don't think so.

19             THE COURT:  No.

20             MS. CONROY:  As I understand it -- and I will happily

21     given counsel a chance to talk about this.  As I understand it,

22     documents have been -- certain documents have been produced but

23     the parties haven't agreed on search terms, we haven't agreed

24     on custodians.  I know that we have gone through this exercise

25     of producing stuff from e-mail.

J1i5kinC                         conference

1          THE COURT:  You have?

2          MS. CONROY:  We have.

3          THE COURT:  Have you made any production yet?

4          MS. CONROY:  Yes, we have, your Honor.

5          THE COURT:  Okay.

6          MS. CONROY:  My understanding is that has not been

7     done on the plaintiff's side yet.  And so there is

8     objections -- there were flat out objections to metadata and

9     ESI which I thought were vastly premature given that searches

10    hadn't even been run, search terms agreed to or even proposed,

11    the volume wasn't known.  Usually if there is a blatant

12    objection to ESI --

13         THE COURT:  So we are not here to argue about

14    custodians or search terms, we are here to argue about the

15    broader subject.

16         MS. CONROY:  I think that that needs to be in place.

17    Because when I brought this up on our meet and confer I just

18    got shut down and said, no, we are not doing it, it is too

19    burdensome.  But I said searches haven't even been done, and to

20    be quite honest --

21         THE COURT:  Okay.  I don't mean to cut you off.

22         MS. CONROY:  No problem.

23         THE COURT:  But it is now 12:15.

24         So, Mr. Israel, what is your view about ESI in this

25    case?  Broadly, not how many custodians or how many search

 1   terms.  Is it your opinion you don't want to provide ESI?

 2           MR. ISRAEL:  No.  You have metadata for specific

 3   documents that are of interest, that things may have happened

 4   with those documents and you need to have the information.

 5   Metadata for our entire, everything we have seems to me a

 6   little excessive, don't you think?

 7           THE COURT:  Well, I don't know what that means yet.  I

 8   don't know who are your custodians, who are you searching and

 9   how are you searching their collection?  Does Ms. King have

10   e-mail?  Did she have e-mail in 2003?  Have you searched it?

11   Have you searched it from 2003 to 2017?  What did you search it

12   for?  I mean, I don't know the answer to any of these questions

13   but those are the sorts of things I need to know before we can

14   kind of manage this issue.

15           MR. ISRAEL:  It seems like it is premature.  The one

16   thing I would say, though, is in the abstract to tell somebody,

17   which is what I was told we need all of your metadata, it is

18   like a meaningless suggestion.  "All of our metadata."  What

19   does that mean?

20           MS. CONROY:  Your Honor, I am sure you are well aware

21   of this.  We are talking -- this is a certain file that if it

22   is extracted by a vendor, it is simply a file that the vendor

23   takes in conjunction with the electronic discovery that's

24   identified.  So, this is why I do agree that there is a

25   certain -- to the extent I am being told it is burdensome and

1   is premature without knowing the volume or any of the steps

2   taken, I don't know how I can be told flat out that I can't get

3   the metadata.

4           MR. ISRAEL:  Don't you ask for it for specific things,

5   like I need metadata for this because this is something that

6   may have been altered or something else related to this

7   document?  Do you just say you want the metadata for everything

8   you are producing?  Isn't that weird?

9           MS. CONROY:  If a document is altered --

10          THE COURT:  Let's not get bogged down into metadata

11  right now, okay?  Let's talk more broadly.  Is there

12  electronically stored information from the plaintiffs that you

13  have produced, to date?

14          MR. ISRAEL:  Yes.

15          THE COURT:  You have produced, for example, e-mails of

16  Ms. King.

17          MR. ISRAEL:  We produced them as they have been given

18  to us so the answer is yes, but we haven't gone through her

19  computer in response to discovery demands because she has been

20  away so we haven't had access to it.  We will do that.  What we

21  have done so far though includes e-mails, things that they've

22  given to us, transferred to us and those have been produced.

23          THE COURT:  Okay.  Well, that's a good start, but it

24  seems to me you need to figure out what your protocol is going

25  to be as far as besides Ms. King who else, Mr. King, other

J1i5kinC                    conference

1    relatives.  I don't know.  It is not for me to say but it seems

2    to me you need to say to Ms. Conroy and Mr. Kelly, this is our

3    plan for ESI on our end, this is what we plan to do.  And you

4    need to tell them that and you need to tell them that

5    relatively soon.

6           MR. ISRAEL:  You mean in terms of the source of the

7    materials that we are going to be pooling our production from?

8           THE COURT:  What I mean is they serve you with

9    document requests.  One way for to you determine what you have

10   to produce in response to them is to provide ESI, which you

11   will be collecting from your custodians whoever they may be,

12   right?

13          MR. ISRAEL:  Right.

14          THE COURT:  And the way you will collect them is based

15   on how you are going to search for them.

16          MR. ISRAEL:  Right.

17          THE COURT:  And so, you are going to tell Ms. Conroy

18   we are going to search these three custodians with these five

19   search terms.

20          MR. ISRAEL:  Okay.

21          THE COURT:  And we are going to be able to tell you

22   and produce to you, by this date, what we have in that regard.

23   And then she is going to say, that's fine, but I think there

24   should be one more custodian or three more search terms, or

25   whatever.  And then you are going to have a discussion about

1    it.  And hopefully you will resolve it and if you don't, I will

2    hear about it.

3              MR. ISRAEL:  And they'll do the same thing.

4              THE COURT:  And they'll do the same thing.

5              MS. CONROY:  We have, and we have been talking to them

6    about search terms and we talked about meeting and conferring

7    to agree to joint search terms.

8              THE COURT:  I'm not going to adjudicate custodians or

9    search terms today because you haven't talked about it and you

10   need to talk about it.  Okay?

11             MR. ISRAEL:  I understand that.

12             THE COURT:  Metadata is the next stage, if you will,

13   after you have done all of that.

14             MS. CONROY:  Right.

15             THE COURT:  So, it is premature to even used the word

16   today much less try and figure it out but there may well be, in

17   a case like this in which there are allegations of forged

18   documents and fraud and the like, that people will want to get

19   behind certain documents.  But, it is premature to know what

20   those are.  You are not wrong, Mr. Israel, when you say what

21   you did about are we going to produce metadata for the whole

22   collection.  The answer is no --

23             MR. ISRAEL:  Right.

24             THE COURT:  -- of course not.  But before you play a

25   burdensome card or whatever, I would need to know and your

1    adversary would need to know in advance of my knowing why you

2    are suggesting something is burdensome or not.  Okay?  And I

3    don't know how to think about it in the abstract and we are not

4    there yet.

5         So you all need to, in the next couple of weeks,

6    really work through the threshold issues of ESI, if you will,

7    and see where it takes you.  That's what I would say.

8         MR. ISRAEL:  My understanding is much enriched by what

9    you just said, your Honor.  I understand much better.

10   Originally I thought we were just being asked for metadata

11   which, as you just mentioned, seems a bit unusual.

12        THE COURT:  There will be metadata that is implicated

13   in the case but let's lay the foundation first.

14        MR. ISRAEL:  Okay.  Okay.

15        THE COURT:  Okay?

16        MR. ISRAEL:  Okay.

17        THE COURT:  Okay.

18        MS. CONROY:  That's all, your Honor.

19        THE COURT:  Let's come back to that when we need to,

20   which is not today.

21        MR. ISRAEL:  We have issues, too.  Are we going to --

22        THE COURT:  Hold on.  I know that.

23        MR. ISRAEL:  Okay.

24        THE COURT:  We are going to exhaust Ms. Conroy first

25   and we will hear whatever else you have.

J1i5kinC                    conference

1           MS. CONROY:  I agree with you totally, your Honor.

2           THE COURT:  Okay.  So, you all will air that out and

3  see where it takes you.

4           MS. CONROY:  Thank you very much, your Honor.

5           THE COURT:  What else do you have, Ms. Conroy?  Is

6  that the end?

7           MS. CONROY:  I believe that is all.

8           (Counsel conferring)

9           MS. CONROY:  I will just put it on the record now so

10  confront the issue, I don't know that we have to speak about

11  it.  As part of our, part of our document request, your Honor,

12  we also made a request for inspection of the artwork.

13          THE COURT:  Well, it seems to me that what is good for

14  the goose is good for the gander.  Aren't you both going to

15  have to engage in inspections along the way?

16          MS. CONROY:  I think that's fine, your Honor.

17          THE COURT:  Is there an objection to that, Mr. Israel?

18          MS. CONROY:  There was no response to it so we are

19  just pointing that out.  They didn't actually respond or object

20  in their responses or objections.

21          THE COURT:  I see.  Don't you want to inspect their

22  art and they inspect your art, so to speak?

23          MR. ISRAEL:  Well, we wanted to inspect their art for

24  a long time and they haven't been willing to do it.

25          THE COURT:  Okay, but you are going to both do it.  I

1    mean, you both have to do it and you will have to see if you

2    can figure out a protocol.  I suspect the lawyers should be

3    involved in that.

4              MS. CONROY:  Yes, your Honor.

5              MR. ISRAEL:  One question about that, your Honor.  How

6    is it relevant to the questions that they are posing, to their

7    complaint?  It is not in their complaint.  They're talking

8    about transactions that took place that would require us to not

9    have the artwork.

10             THE COURT:  Part of the issue in this case, as I

11   understand it and you can correct me if I am wrong, is who has

12   what, how did you get it, when did you get it, etc.  Right?

13             MR. ISRAEL:  No.

14             MS. CONROY:  Yes, your Honor.  We would say yes.

15             MR. ISRAEL:  No, that's not it.

16             MS. CONROY:  And did you rightly take it?  Did you

17   wrongfully sell it?  Yes, I do think that --

18             THE COURT:  There are 98 paintings, right?

19             MR. KELLY:  It is more broader than that, your Honor.

20             Our claims encompass art outside of the 98 that was on

21   the appellate inventory that we discussed that is subject to

22   the TRO in the surrogate's court case.  We have alleged that

23   artwork that was represented to be in Ms. King's control was

24   illegally sold; it is in our complaint at paragraph 117.  We

25   then found since we filed the complaint that more works from

J1i5kinC                    conference

1     this list that she has represented are in her control have been

2     sold as recently as December 8th of last year.

3              THE COURT:  The problem I think with the inventory is

4     going to be that the art is not in one place, it is going to be

5     scattered, some of it is going to be in China.  There are going

6     to be logistics related to that.  So, as a theoretical matter,

7     I can understand why this would be important.  As a practical

8     matter, I don't know how easy it going to be to accomplish.

9              MR. ISRAEL:  Your Honor?

10             THE COURT:  Hold on one second, Mr. Israel.

11             MS. CONROY:  Which we agree with.

12             I think the first step to that is being to able to

13    identify and exchange where this artwork is and then to the

14    extent there are costs or burden involved, I think there is

15    something that the parties can take on for themselves.  If, for

16    instance Ms. King says, well, 15 of these paintings are in

17    Shanghai, I can't bring them here easily, it would be cost

18    prohibitive -- I am making stuff up right now, whatever the

19    case may be -- I think that is something for us to consider

20    whether or not we want to go and take the burden of the cost

21    over there as she is making them available for us to inspect

22    and I think vice versa.

23             MR. ISRAEL:  Your Honor, may I?

24             THE COURT:  Yes.

25             MR. ISRAEL:  I have to add some clarity, at least I am

1    going to try to.  This case is not about the entire pool of

2    C.C. Wang paintings.

3            THE COURT:  Your case.

4            MR. ISRAEL:  Their case isn't either.  Their case is

5    not either.  I have read their complaint, I know exactly what

6    their complaint says and it is not.  What it is about is a

7    discrete set of paintings.  They say we stole certain

8    paintings.  We say they stole and sold paintings to themselves

9    and sold them overseas for a certain amount of money.  There

10   are discrete paintings.  Now, some of the paintings that

11   they're claiming that we stole have already been litigated and

12   were subject to a bankruptcy discharge and a settlement in that

13   bankruptcy, no question about it.  Then there are paintings

14   that aren't subject to a discharge, aren't time barred and that

15   we are proceeding against and all of those paintings are a

16   discrete number of paintings.  To just say, hey, let's check

17   the inventory out is way beyond the scope of what this case is

18   about.  It is just to fish around and try to find new theories

19   as to how things may have been taken.

20           They have specific paintings that they're claiming

21   were stolen.  We have litigated, there was a discharge, and now

22   we are talking about now let's open up the appellate inventory

23   and see if there is anything else of interest in there that we

24   can try to make a claim upon.

25           It wildly exceeds the scope.

J1i5kinC                         conference

1           THE COURT:  With all due respect, this issue was not

2     presented to me in any correspondence, I'm not going to address

3     it today.  If you all want to submit something further to me

4     about it, you can, but there is nothing in front of me about

5     this.  This was raised as a little bit of an afterthought and

6     now it has become a big deal.  I'm not going to rule on

7     anything related to this today.  You all will have to talk

8     about this and if there are ongoing disputes about it, you will

9     tell me.

10          MR. ISRAEL:  Okay.

11          MS. CONROY:  Okay, your Honor.

12          THE COURT:  What else do you have, Mr. Israel?

13          MR. ISRAEL:  The first thing, and perhaps the most

14    salient thing in our letter, we identified on the trust

15    document that's been produced for S.K. Wang there are

16    redactions.  The redactions are of the assets in the trust

17    which are really the critical thing that we are looking for in

18    the trust.  It doesn't even say redacted.

19          THE COURT:  We are looking on page 2 of your letter?

20          MR. ISRAEL:  Yes, sir.

21          THE COURT:  Okay.

22          MR. ISRAEL:  And it is just a kind of, you know,

23    unexplained redaction that is there.

24          THE COURT:  Okay.  Stop.  I am going to be cutting

25    people off now.  I'm sorry to do that.

J1i5kinC                        conference

1            Off the record.

2            (Discussion off record)

3            THE COURT:  Ms. Conroy, why is this redacted?

4            MS. CONROY:  Okay.  We met and conferred about this.

5     They asked if we redacted.  We said, no, it was produced

6     exactly as it was given to us, it was our understanding it was

7     not redacted.  They said can you confirm it wasn't redacted?

8     We said yes we will go back and confirm.

9            So, I'm not sure why there is representation that we

10    didn't say we wouldn't go back and confirm or we wouldn't go

11    back and ask.  We confirmed specifically that the law firm,

12    that Kasowitz, did not redact anything without putting a

13    redaction stamp.  It was our understanding from our client that

14    that's how the client received it and that we would go back to

15    the client and would go back to see if we can get the originals

16    to confirm.

17           So, we already said we would look into this and double

18    check their concern.

19           THE COURT:  And if you can find the original

20    unredacted.

21           MS. CONROY:  If it is.  We are not conceding it is

22    redacted because we don't know it is redacted.  They're

23    claiming it is redacted.  No one has told us it is redacted.

24           THE COURT:  If you find the unredacted version of this

25    document you will produce it.

J1i5kinC                    conference

1           MS. CONROY:  A hundred percent.

2           THE COURT:  And you will be looking for it?

3           MS. CONROY:  Yes, your Honor.

4           THE COURT:  That's all I can ask.

5           MR. KELLY:  But we do not agree to the premise that it

6   was ever redacted.  We asked our client, he did not redact it.

7   It is the last page of a formation document for a trust that

8   says here are the assets.  It was never filled in by the law

9   firm.

10          THE COURT:  Who produced it?

11          MR. KELLY:  Andrew Wang gave it to me.  I have the

12  copy he gave me, it is not the original copy.

13          THE COURT:  Who did he get it from?

14          MR. KELLY:  From lawyers.  He had it in his

15  possession --

16          THE COURT:  So the lawyers redacted it?

17          MR. KELLY:  It was never filled in with anything, your

18  Honor.

19          THE COURT:  It was never filled in.

20          MR. KELLY:  Yes.

21          THE COURT:  Okay.  If that's the answer, that's the

22  answer.

23          MR. KELLY:  We have gone to the client.  He is going

24  to look to see if there was any other copies in his possession.

25  He has not found one yet.

J1i5kinC                      conference

1          THE COURT:  All right.

2          So if, Mr. Israel, there is an unredacted version,

3    counsel have represented it will be produced.  If there is no

4    unredacted version because it is how Mr. Wang received it from

5    his counsel, they will tell you that and confirm that.

6          MR. ISRAEL:  Could we have an order saying they have

7    to produce the original to us?

8          THE COURT:  If there is no original -- when you say

9    the original, what do you mean?  That the law firm created?

10         MR. ISRAEL:  The document that was signed by the

11   defendants.  The document that was signed by the defendants.

12   It is very unlikely that it would have a schedule on it that

13   lists assets which is the critical piece of the trust document

14   left blank.  Clearly this document has been altered and it has

15   been removed so we just want to see the original to see what

16   the assets are.  We are not accusing their firm, we are saying

17   this is what happened.  The principal obviously did this.

18         THE COURT:  I thought I heard Mr. Kelly say that if

19   there is an original that was unredacted they will produce it.

20   If there is none, they will tell you that.  So, it may be what

21   they have represented is.  Contrary to what you think, the

22   lawyer never filled this out.  I don't know if that's true or

23   not true but that is what he is representing.  So, when you say

24   I want the original, the original may look exactly like this.

25   They will give you either that but you don't need the original

1     if it's that.  They'll confirm, as officers of the Court,

2     they're standing up in front of me, a federal judge and

3     representing it.  Okay?  So, they would be in a whole lot of

4     trouble.

5             MR. ISRAEL:  Can we have a deadline for them to do

6     that, your Honor?

7             THE COURT:  A deadline?

8             MR. ISRAEL:  Yes, meaning that they'll do it by a date

9     certain because this is kind of important to us.  They'll do it

10    by, let's say, next week, the end of the week that they'll

11    confirm that there is no original and report to us?

12            MR. KELLY:  Your Honor, our client is in route back

13    from China as we speak.  He is going to arrive this week.  I

14    can assure the Court we can do it by the 31st.

15            THE COURT:  Let's say the 31st.  That seems to be the

16    magic date in the case.

17            MR. KELLY:  I would like to address that there has

18    been an assertion that there is something untoward about it,

19    that this is unusual.

20            THE COURT:  With all due respect, I don't think we

21    need to do that.  I want to just focus on what is open and what

22    can I resolve today, not making records, if you will.  Okay?

23            What is next.  So, that's that.  What's next?

24            MR. ISRAEL:  The other thing is, and we gave you a

25    fairly elaborate explanation of how we know that certain

J1i5kinC                     conference

1   companies have been omitted from their list of companies that

2   are owned by Andrew Wang and S.K. Wang.  We now know that two

3   companies were left off their list of companies that are

4   controlled by them.  What we need to have is an accurate list.

5   And I don't know how we get to that point, what the remedy is

6   and what I should ask you for, specifically.  All I know is

7   they're not giving us the list of all these companies.  Once

8   they said, oh, mea culpa, we left off the company, they added

9   the company, it wasn't the one we were referring to, it was yet

10  another company.  So now we know two companies that were left

11  off.  What can we do?  I am posing this rhetorically so that we

12  actually get an accurate list of the companies that he owns and

13  controls.

14          THE COURT:  Ms. Conroy, can you answer Mr. Israel's

15  rhetorical question?

16          MS. CONROY:  Yes, your Honor.

17          THE COURT:  Even though rhetorical questions don't

18  usually get an answer.

19          MS. CONROY:  This is all I can say, your Honor.  They

20  raised on the meet and confer this other company.  We said we

21  are unaware, do you have something that you want to give us so

22  we can inquire to our client about it.  They were like, no,

23  we're not giving you anything about it and then put it in the

24  letter.

25          We are happy to go back and ask the client about it

1    and ask why and supplement, it was nothing done on purpose and

2    we said that.  When we asked, How do you know about it --

3    because we didn't know about it on the meet and confer -- asked

4    do you have something you can give us so we can inquire and go

5    back?  They didn't want to give it to us.

6              So, we learned about whatever evidence they had when

7    they submitted the letter to you.

8              THE COURT:  Do you have, Mr. Israel, a non-work

9    product document that you can produce that would enable them to

10   go to Mr. Wang to confirm either more information about this

11   company or otherwise?

12             MR. ISRAEL:  This was our work product that we waived

13   the protection on when we included it in our letter to you.  We

14   were reluctant to do it but we did it with the one company to

15   prove that is exists and it is relevant to what took place

16   here.

17             MS. CONROY:  To be clear, I am happy to go back.  We

18   are not unwilling, nor were we during or meet and confer, to go

19   back to the client about it.

20             THE COURT:  All right.  So you are going to go back to

21   him --

22             MS. CONROY:  Yes.

23             THE COURT:  -- and you will see what says.

24             MS. CONROY:  Yes, your Honor.

25             THE COURT:  And you will advise Mr. Israel?

1            MS. CONROY:  Yes, your Honor.  No problem.  Yes.

2            THE COURT:  Okay.

3            MR. ISRAEL:  That's it, your Honor.

4            THE COURT:  That's it.  I love those words.

5       Let's talk about a couple of things.  As we have

6  discussed previously, I do think, given the nature of

7  everything, this is a case that I want to affirmatively and

8  proactively schedule conferences rather than just wait for you

9  all.  So, I was thinking that we would schedule a conference in

10 mid-February about 30 days out or so.  Today is the 18th.  How

11 about the 22nd of February, does that work?

12           MS. CONROY:  That works for us, your Honor.

13           MR. ISRAEL:  Works for us, your Honor.

14           THE COURT:  Okay, so let's say 10:30 on February 22nd.

15      So, what I encourage you to do is you are going to

16 have disagreements between now and then.  Sort of stack them up

17 and we will deal with them all then.  If there is something

18 that is, I will call it emergent, you can bring it to my

19 attention before then and we will have a telephone conference

20 if it really is something I think I need to resolve right away.

21 But, be sparing in that, I would say.  But assume that we will

22 have a lengthy session on the 22nd as we have today.

23      Okay.  So that's that.

24      I also think we should set a date by which all

25 document discovery is produced in this case, that's in both

1     side's interest.  So, what do you all think makes sense working

2     backward from the May 8th deposition deadline?  Mid-March?

3                 MR. KELLY:  Your Honor, I am going to express a

4     concern right now.  We just received the first production last

5     night.  We haven't received interrogatories, we haven't

6     exchanged preliminary disclosures.

7                 THE COURT:  Are you doing both of those by the 31st?

8                 MR. KELLY:  Right.  I am saying for the discovery

9     process to play out so that if we find something we are going

10    to have a follow-up question --

11                THE COURT:  I am thinking about 45 days beyond that.

12    This is the kind of case if we let it go it's to the detriment

13    of both sides, it seems to me, and we all know, especially in a

14    case like this, frankly, you all have much more information

15    than most litigators have in most cases because of the

16    surrogate's court proceeding and the relationship that case has

17    to both of the lawsuits that are pending in federal court.  So,

18    this is not a case where you all don't know a lot of things.

19    You know a lot of things but you still need to know and learn

20    more.  It is an imperfect process.  We all know that.  Whatever

21    date we pick you are not going to literally have every document

22    in hand that you want to have for the depositions you are going

23    to take.  You are just not because you never do.  It doesn't

24    mean that parties don't have an ongoing duty to supplement.

25    That's what the rules require.  So, if we pick March 15 it

J1i5kinC                    conference

1    doesn't mean on April 12, if some document lo and behold shows

2    up, and if you don't produce if it is responsive, especially if

3    it is a document that you think needs to be produced because it

4    is going to be used by one or the other side in the case, but I

5    do think we should set a hard date because this is a 2014 case,

6    in the first instance, about matters that have gone on for 20

7    years.  And so, this case needs to move as quickly and

8    efficiently as possible and that's in everybody's interest.

9           I have to assume that all of those things being equal,

10   when you have a family dispute like this, it wears on people.

11   I know your respective clients obviously have tremendous

12   animosity to each other, that's plain, but it can't be in

13   anyone's interest that this goes on for any longer than it

14   needs to.

15          So, I do think that we need to set a date, mindful of

16   what you just said, Mr. Kelly, and I am sure Mr. Israel has

17   concerns, too, about what is being hidden and all of that and

18   that's the nature of the allegations in the case going both

19   ways, but my job is to manage this and so I want to set a

20   deadline and I was going to propose March 15th.

21          MS. CONROY:  I think that's right, your Honor, because

22   I think that leaves enough time, if there are any issues that

23   the parties have with what's been produced to that date, it is

24   sufficient time to bring it to the Court's attention and

25   potentially have remedies before leaving enough time for any

J1i5kinC                    conference

1   supplemental depositions to occur.

2           MR. ISRAEL:  I was going to say the end of the month

3   but I guess it is really not a distinction without a difference

4   so, yes, that's fine.

5           THE COURT:  So, March 15th will be the deadline for

6   all document discovery.  You said we have already produced and

7   we are going to continue to produce and you have said the same,

8   in sum and substance, but everyone needs to know that's the

9   hard date.

10           MS. CONROY:  For clarification, your Honor, if I may?

11   If we are saying March 15th for party production, right,

12   because if there is a production on the 15th and there is a new

13   third-party I didn't know about can we --

14           THE COURT:  I suppose that's all right.

15           MS. CONROY:  We can set a deadline for third-party.

16           THE COURT:  I don't want to have too many satellite

17   issues here.

18           MS. CONROY:  Fair enough.  We can set third-party

19   discovery for 30 days out for April 15th, that's fine.

20           THE COURT:  What are we talking about?

21           MS. CONROY:  My only concern is if we are hitting --

22   if party productions -- if discovery is March 15th, the

23   deadline, and I'm getting a late date production from

24   plaintiffs in the beginning of March that all of a sudden is

25   mentioning people I have never heard about before, I have no

J1i5kinC                    conference

 1   ability to subpoena them.

 2           THE COURT:  Is it likely that's going to happen?

 3           MS. CONROY:  I don't know.

 4           THE COURT:  Who are the third-parties?

 5           MS. CONROY:  I just got the first production of 1,700

 6   pages last night.

 7           THE COURT:  But who are the third-parties you are

 8   thinking about?  What categories of people are you talking

 9   about?

10           MS. CONROY:  To be specific, your Honor, and as far as

11   our complaint, right, like you said, this is a back and forth

12   on both sides, neither side trusting reach other and believing

13   that they were siphoning off assets.  So, to the extent that we

14   have allegations about how Ms. King did that and the people

15   that assist her in that scheme, you know, I don't know all of

16   those, per se, until they've produced documents that are

17   requested.

18           THE COURT:  Well, it makes me a little nervous because

19   if there is going to be full blown third-party discovery in

20   earnest that's not going to start until March 15th, you are not

21   going to meet Judge Keenan's May 8th deadline.

22           MS. CONROY:  Fair enough.  Okay.

23           THE COURT:  So, I would say March 15th is the deadline

24   for all document discovery, party and non-party.  If there is

25   some exception to be made because there is some late known

J1i5kinC                    conference

1   third-party that requires some post March 15th subpoena, you

2   can seek relief from the court in that regard.

3           MS. CONROY:  So then can we set a deadline -- I

4   understand all fact discovery -- document discovery due March

5   15th; can we say that the parties have to substantially produce

6   all of their documents by the end of February?

7           THE COURT:  No.  I'm not going to do that.

8           MS. CONROY:  All right.  Fair enough.

9           THE COURT:  I'm not going to do that.  In this case I

10  think that's a recipe for disaster, frankly.

11          MS. CONROY:  Okay.

12          THE COURT:  I understand why you are asking but I am

13  not going to go that way.  All right.  I think we are all set

14  for today then and I will sign a protective order, as discussed

15  earlier, and we will put an order on the docket with the other

16  dates so that Judge Keenan is aware of them as well.

17          Anything else we need to put on the record?

18          MS. CONROY:  No.  Thank you for coming in when you

19  were sick.

20          MR. ISRAEL:  Thank you, your Honor.  Both sides, I am

21  sure, appreciate the attention you are putting into the case

22  and I know it is a lot and we appreciate it.

23          THE COURT:  Well, that's my job but I am happy to do

24  it.  Let's go off the record for a second.  Thank you, Pam.

25          (Discussion off record)
                            o0o