J34KKINC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    KENNETH KING, et al.,

4                    Plaintiffs,

5              v.                              14 CV 7694 (JFK)(JLC)

6    SHOU-KUNG WANG, et al.,

7                    Defendants.

8    ------------------------------x
                                              New York, N.Y.
9                                             March 4, 2019
                                              11:05 a.m.
10
     Before:
11
                         HON. JAMES L. COTT,
12
                                              Magistrate Judge
13
                              APPEARANCES
14
     SAM P. ISRAEL, P.C.
15        Attorneys for Plaintiffs
     BY:  TIMOTHY SAVITSKY
16
     KASOWITZ BENSON TORRES & FRIEDMAN LLP
17        Attorneys for Defendants
     BY:  KIM CONROY
18        THOMAS B. KELLY

19

20

21

22

23

24

25

J34KKINC

1      (Case called)

2          MR. SAVITSKY:  Timothy Savitsky, from the firm Sam P.

3  Israel, on behalf of the plaintiff, Yien-Koo Wang King, in 14

4  CV 07694, and for Kenneth King, Raymond King, and Yien-Koo

5  King, as defendants in 18 CV 08948.  Good morning, your Honor.

6          THE COURT:  Good morning, Mr. Savitsky.  Where is

7  Mr. Israel?

8          MR. SAVITSKY:  Your Honor, Sam is pretty seriously

9  ill.  I've been working at the firm for five years, and I've

10  never seen him miss the amount of work that he's missed over

11  the past three weeks.  I think he's been in eight days, never

12  for the full day, and they don't know -- he doesn't know

13  exactly what is wrong with him.  He's on medications, but they

14  just don't know what the situation is.

15          THE COURT:  I'm sorry to hear that.

16          MR. SAVITSKY:  He does apologize, and if he could come

17  in, he absolutely would, but I'm prepared to discuss these

18  issues with your Honor.

19          THE COURT:  Okay.

20          Back table, please?

21          MS. CONROY:  Kim Conroy and Thomas Kelly, Kasowitz

22  Benson Torres & Friedman, for the defendants.

23          THE COURT:  Okay.  Why don't you be seated.

24          I'm a little concerned and a little frustrated,

25  frankly, about the state of play right now.  Let me review

J34KKINC

1    what's happened, and then you all can correct me if I have

2    misstated this.  Judge Keenan consolidated discovery in the two

3    lawsuits back in November.  At that time, he stayed deposition

4    discovery in the second action, but he did not stay document

5    discovery.  We discussed that at some length at our last

6    conference, in January, on the 18th.  At that time, Mr. Israel

7    indicated that he was going to essentially seek further review

8    from Judge Keenan of that ruling, because he believed he had a

9    meritorious motion to dismiss the second action, and that

10   discovery of any kind should not proceed related to that.

11           But, of course, he didn't then make an application to

12   Judge Keenan until last night, at 10:42 p.m., and I assume,

13   Mr. Savitsky, that was your application, not Mr. Israel's,

14   given that he has been taken ill, which, again, I'm sorry to

15   hear, and that may explain a little bit of the timing here.

16   And if that's the case, by the way, you should never hesitate

17   to advise the Court and your adversary that you have a

18   situation here where lead counsel is unavailable.  I mean,

19   people have lives to lead, and if people have personal

20   situations, we'll deal with them.  For example, if he could

21   have participated today if we had done this conference by

22   telephone, for example, I would have been happily willing to

23   rearrange.  So in the future, we can do that if that's a way to

24   get him involved, because, obviously, he's going to need to be

25   involved in these things.

J34KKINC

1          But the application for a stay was not filed until

2     late last night, so I've barely had a chance to even review it.

3     I'm sure Ms. Conroy and Mr. Kelly have, if even seen it, only

4     barely had a chance to review it, and it can't realistically be

5     something that the Court can properly consider today.  Frankly,

6     I'm not sure that it is something that is before me.  I

7     believe, frankly, it is before Judge Keenan until he tells me

8     otherwise, because what the King parties, I'll call them, are

9     seeking is a review of Judge Keenan's decision.  And I can't

10    review Judge Keenan's decision, only Judge Keenan can review

11    Judge Keenan's decision.  But, meanwhile, it's very clear that

12    the mere application for a stay doesn't get you a stay, but it

13    seems to me, Mr. Savitsky, you all have been operating under

14    the assumption that because you were thinking about making a

15    stay application, and now you've made it, somehow you are

16    precluded from responding to any document discovery requests in

17    the second action.  That's clearly not true.

18          Now, if the requests are burdensome, as it suggests in

19    the papers that they are, 1100 search terms, 73 broad document

20    requests, it's one thing to say I'm not going to respond

21    because I'm going to make a stay application.  That's not

22    permissible.  It's another thing entirely to say, Judge, a

23    thousand of the 1100 search terms are burdensome,

24    inappropriate, irrelevant, or whatever, but that's what you all

25    need to do.

J34KKINC

1          Now, here are a couple of other things that give me

2   concern:

3          When the King parties filed their motion to dismiss in

4   the second action, that would have been a logical time to, as

5   point 4 of the brief in that memo say, because the motion is

6   meritorious, there should be a stay, and Judge Keenan should

7   revisit it.  That would have been three weeks ago, and that

8   wasn't done.

9          And then, when the Wang parties filed their first

10  amended complaint and asked for more time to respond to your,

11  I'll call it, reinstate the motion to dismiss, they now have

12  until March 22nd to respond.  You undoubtedly are going to want

13  to reply.  So the motion is not going to be even fully

14  submitted before Judge Keenan until early April, and we're

15  operating on a schedule now of a fact discovery deadline of

16  May 8th.  And we're operating under that deadline, in part,

17  because the first lawsuit was filed in 2014, so it's five years

18  old, and we're dealing with parties who are octogenarians, so

19  this is not a case that we should be litigating at a leisurely

20  pace.  And I am going to be disinclined to extend discovery

21  deadlines in this case, because this case needs to move

22  forward.

23          I think everyone is moving more slowly than they

24  realize they need to be because you're going to run out of

25  time.  I'm not going to extend this for three or six more

J34KKINC

```
1    months for more document discovery.  This was not well thought

2    out in a lot of ways.  And I'm not blaming just the King

3    parties here, because I, frankly, don't understand why the

4    Wangs' 2018 action warrants counterclaims in the 2014 action.

5    And I know Kasowitz wasn't in the case in 2014, but that

6    doesn't really matter, for purposes of a case management

7    assessment, of what's going on here.

8              So, frankly, the way I see everything today is the

9    case has become a mess in the last month since we were last

10   together because all you all are doing is litigating this like

11   some big commercial dispute, leisurely, not recognizing that

12   schedules mean schedules, deadlines mean deadlines, and if

13   you're going to seek a ruling, for example, from Judge Keenan

14   after our January 18th conference, you don't file papers on

15   March 3rd, and you don't file papers in a 16-page memorandum of

16   law and all this other stuff.  You get it before the Court

17   quickly, so the Court can act quickly, and that didn't happen

18   either.  Now, maybe, in part, because of Mr. Israel's illness,

19   and I'm sorry if that's part of the reason, but that wasn't

20   presented to the Court, so I'm not aware of that, nor is Judge

21   Keenan, until what you've just represented now in that regard.

22             So I'm, frankly, concerned taking the overview of

23   everything before we get into the nitty-gritty.  I mean, the

24   defendants, in the first action, have given me a litany of all

25   sorts of things that haven't been produced, but I don't know
```

J34KKINC

1     how to analyze all of that in the broader context we're dealing

2     with here.

3            So, Mr. Savitsky, do you want to be heard in regard to

4     what I have just said?

5            MR. SAVITSKY:  Yes, your Honor.  There is something

6     very important about the record that I need to correct.

7            One of the main reasons why we waited to file our

8     motion to stay is because we did not receive the first set of

9     document demands and the first set of interrogatories in the

10    defendants' affirmative case until February 12th.

11           THE COURT:  What difference does that make?

12           MR. SAVITSKY:  Because in order to do the analysis for

13    a motion to stay, the scope of the document demands and

14    interrogatories are one of the three critical issues that are

15    involved.  It's the defendants' position that they have certain

16    document demands and interrogatories in the original action

17    because they go to their defenses, and then they have their

18    interrogatories and document demands in their present action,

19    which they served two weeks ago, and they're not due yet.  That

20    is another point, your Honor.  Their letter -- the first four

21    pages of their letter --

22           THE COURT:  Are about things that are not due yet?

23           MR. SAVITSKY:  -- are not due yet, and it's premature,

24    we haven't issued a response yet, and they did not indicate

25    that in their letter at all.

J34KKINC

1          So it is, in part, because one of the three prongs was

2     what their document demands and interrogatories were in scope,

3     and we waited to receive those, we did receive those, and then

4     we filed within two weeks.

5          The other point, your Honor, the other issue with

6     Sam's sickness:  We have four barred attorneys in our firm.

7     Every case that our firm runs runs through Sam, so he needs to

8     be there operating everyone's cases.  So when he's out, it

9     creates a chain reaction where we're behind on everything.  We

10    have other cases, too.

11         We filed the motion to stay on Sunday because we were

12    working on it Saturday, I was working on it Sunday, we're

13    working on other things during the week.  We're not trying to

14    delay, your Honor, we are working very hard.  I understand your

15    concern completely, but the record needs to be clear that we

16    didn't receive their first set of document demands in the

17    affirmative case until two weeks ago.

18         THE COURT:  Well, why, for example, after the

19    January 18th conference, has there been no progress on the

20    protocol we discussed about the defendants, at their cost,

21    retaining a vendor and copying all the surrogate court papers,

22    so that all parties had a unified group of documents?  Why is

23    that something I'm even seeing anything about in the papers

24    today?

25         MR. SAVITSKY:  Your Honor, I just think it appeared to

J34KKINC

1    be a miscommunication.  At our meet-and-confer, which was the

2    first time that we had addressed this issue since the

3    conference, apparently, the defendants' counsel thought that

4    they were waiting on us to give them a green light, and we were

5    waiting on them to tell us when they wanted to come in to

6    collect the documents.

7              THE COURT:  Have you worked that out now?

8              MR. SAVITSKY:  We have.  I've already given them a

9    date for Thursday.

10             THE COURT:  All right.

11             MR. SAVITSKY:  And we'll be getting -- Mr. Cohen, from

12   the Kamerman Uncyk Soniker & Klein firm, which has also

13   appeared in this action, we will be getting their paper, which

14   we haven't gotten yet, they will be scanning our papers, and I

15   think that's resolved.

16             THE COURT:  Okay.

17             Mr. Kelly or Ms. Conroy, do you want to be heard

18   preliminarily about the gestalt of the situation here?

19             MS. CONROY:  I understand, your Honor.  I understand

20   the frustration.

21             If I could just say, as to the representation that

22   these categories were first made known to plaintiffs, that's

23   actually not true.  A lot of these categories, most of these

24   categories, your Honor, were, in fact, included in our first

25   requests months ago.  And during our January 18th conference,

J34KKINC

```
1   if you recall, it was a long conference, your Honor wasn't
2   feeling well, they had taken the position at that conference
3   that they weren't going to talk about categories that relate --
4   that overlapped with defenses in our affirmative action, and I
5   had put on the record, I said, your Honor, in light of the fact
6   of your ruling that you weren't going to allow the stay because
7   they had requested it last time too, you weren't going to allow
8   the stay, I thought it was prudent to allow the parties time to
9   meet and confer since we hadn't before January 18th, given
10  their position about asking for the stay.
11          Your Honor agreed with that, that that was prudent.
12  Thereafter, they took this position then again, and no progress
13  has been made on those categories.
14          THE COURT:  Well, is it true that their responses to
15  your document requests are not due until March 15th?
16          MS. CONROY:  It is true that we served another set of
17  requests, and that is true that it's not due.  To that point,
18  though, on our meet-and-confer, because so many of the
19  categories overlap with our first requests, I specifically said
20  I understand your responses aren't formally due, but to the
21  extent there's overlap, we should at least meet and confer
22  about the categories that we can find some agreement on in as
23  far as they were asked for in the first action, and they
24  wouldn't have any meet-and-confer with us at all.
25          THE COURT:  Well, how many document requests have you
```

served in the 2018 action?

MS. CONROY:  There were a number.  However, given the
last time -- given the conference on January 18th, and your
Honor made a very good point that people put in numerous
amounts of requests, but the better part of valor is to get on
the phone and try to work that out.  So what I tried to do in
advance of our meet-and-confer is I sent counsel a limited set
of categories and said, okay, here are the actual categories
we're looking for.  Those are the categories I've now submitted
in our letter submission in advance of this conference.

THE COURT:  Well, look, I want to be productive here
today, but I also want everybody to be mindful that
notwithstanding Mr. Israel's illness, about which I'm
concerned -- and I'm concerned about his health more than I'm
concerned about the case, frankly -- we have a May 8th deadline
in this case, and we set a March 15th document deadline, and
when courts set deadlines, either Judge Keenan's May 8th
deadline or my March 15th deadline, we don't just set deadlines
randomly, we set them because that's how cases have to be
managed and controlled.

I want to honor those dates.  I don't want to just
push things back unless there's some very good reason to do so.
Frankly, as far as the motion to dismiss the 2018 action is
concerned, I don't see how Judge Keenan, frankly, is going to
resolve it before fact discovery is concluded in the two cases,

J34KKINC

1    given the timeline you all put it on.  I mean, that's not fair

2    to Judge Keenan, frankly.  He's supposed to drop everything

3    else, and the day after your motion is fully submitted after

4    your reply papers are in on April whatever, then the next day,

5    they turn to it in his chambers?  I don't think so.  That's not

6    generally how it works.  It's not an order to show cause.  Even

7    if they move quickly on it, they're likely to take whatever

8    time they need to take on it, and then we're going to be past

9    the fact discovery deadline.  I think we have to be pragmatic

10   about what you all are going to have to work with when you take

11   your depositions, if you want to take depositions, because, as

12   in all cases, you want to have a treasure trove of documents.

13   This case is 20 years old.  You all already have a ton of

14   documents.

15        So I'm going to navigate with you the best I can now,

16   and maybe at one more conference, the remaining issues that

17   we're going to deal with related to document discovery, but

18   after that, you're going to be left to your own devices, it

19   seems to me.  I'm not willing to move the goalpost down the

20   field until August, or November, or something for this case.

21   I'm just not.  It doesn't make sense to me.

22        We have to accommodate certain things, yes.  Kasowitz

23   is new to the case, not so new anymore.  That's a fact that we

24   will accommodate.  And Mr. Israel has been ill, I'm certainly

25   happy and willing to accommodate that, and I certainly hope

it's not serious, but we have to deal with things as they are

presented.  And, as I say, this is the first that I am hearing

about that.  So I don't have any basis to accommodate that

until applications are made in that regard.

I think we should proceed with whatever disputes that

are raised in the letters today to the extent we can, but I

have to be clear that until Judge Keenan stays document

discovery in the 2018 case, there is no stay, and/or he refers

it to me to revisit his earlier decision, which I wouldn't

think he'll do, but if he does, that's fine, and I can revisit

it, I suppose, but what I'm more focused on is whether the

document requests that are outstanding are overly broad, are

overly burdensome, or what have you.  That's something that's

more easily scrutinized by the Court, and mindful that at least

some of them are not due yet, although there is overlap.  But

like I said the last time, lawyers can, in a case like this,

probably come up with a thousand document requests, but what's

really important is what are the core documents you really

need, both sides.

My job is, frankly, to ensure that both sides have the

core documents, so the playing field is as level as possible,

not things on the margins, especially parties who have been

litigating against each other for as long as they have been.

You all already have a lot of documents, so it's hard to know

where to draw lines.  For today's purposes, when there are some

J34KKINC

1    document requests that are not even due yet, but then they

2    overlap with some that are overdue and haven't been responded

3    to, it's a little bit that the defendant is premature in some

4    respects and the plaintiff is delinquent in other respects.  So

5    where does that twain meet?  I don't know.

6         So then we have to get into the weeds, I think,

7    because I don't know any other way to do this, other than to do

8    it in some concrete way rather than just talk abstractedly

9    about all of this.  And I suppose we can go through some of the

10   list that is in the Kasowitz letter that was sent to the Court

11   last week, although I understand that some of those requests

12   really are premature to consider.  But that's the only thing I

13   can suggest we do in that regard today.  There's some more

14   discrete issues that have been raised in the parties' letters

15   as well that I'm happy to deal with.

16        So, unless you have other suggestions as to how to

17   proceed.

18        MR. SAVITSKY:  No, your Honor.  I think that makes

19   sense.

20        We only have two issues in our papers --

21        THE COURT:  Yes.  We'll deal with yours because they

22   are very discrete, and maybe we'll deal with them first, and

23   then we'll deal with Ms. Conroy's and Mr. Kelly's letter and

24   requests sort in light of the totality of the circumstances

25   here to figure out how to best navigate with them.  Let's deal

1    with the issues that are raised in your letters first.

2              MR. SAVITSKY:  Thank you, your Honor.

3              The first issue we have is that there is an entity

4    called the Shou-Kung Wang Irrevocable Trust that was created in

5    2013.  We know it purchased a $6 million parcel of land on Long

6    Island in 2013.  And we received the trust agreement, the

7    original trust agreement, but the schedule of assets on the

8    trust agreement, which is the things that are held in trust and

9    the reason why the trust agreement comes into existence in the

10   first place, has just blanks where the numbers of assets are

11   and the letters.  So it's subdivided into 1, 1-A, 2, 3, 4, and

12   then it's just blanks.

13             THE COURT:  Blanks as in they were redacted or blanks

14   as in there was never anything there, if you know?

15             MR. SAVITSKY:  Your Honor, I would say, based off of

16   my experience and our firm's experience, almost certainly

17   redacted because a lawyer would not draft a 32-page trust

18   agreement, have the clients come in and sign the trust

19   agreement, and not put assets in the trust because, your Honor,

20   there is no trust without assets, it's void.  And they need to

21   be put it in at the time the document is executed.

22             So I absolutely am not in any way accusing the

23   Kasowitz firm of redacting anything on those pages without

24   indicating that information was redacted, but it's beyond

25   reasonable to assume that this critical evidence, which we

1    believe has some of the self-dealt works because some of them

2    are highly valuable, and they were put into an irrevocable

3    trust by these two RICO defendants, that it was just blank when

4    it was drafted.  It's as if you were getting a copy of

5    someone's Social Security card or driver's license in

6    discovery, and there's a big white box where the Social

7    Security number should be or where the person's name on the

8    driver's license should be, and them saying, well, no, that's

9    just how it was issued to me, I never really got a Social

10   Security number, I just got the card.  To have a trust

11   agreement and to have 1, 2, 3, 4, 1-A, 2-B on that schedule of

12   assets, but then just blank, it's irrational to think that's

13   how it was made.

14            THE COURT:  Who wants to be heard?

15            MS. CONROY:  Your Honor, we went over this last time.

16   I don't know if you recall.

17            THE COURT:  This very schedule?

18            MS. CONROY:  This very schedule.  They asked for this

19   exact relief last time, and your Honor ruled on this exact

20   relief.

21            THE COURT:  I don't recall that it was this exact

22   schedule.

23            MS. CONROY:  It was the same, your Honor.  It was the

24   same trust document.  They had accused us of initially

25   redacting.  We confirmed they hadn't been redacted.  We also

J34KKINC

went back to our client, confirmed it was the only copy in

their records.  Counsel last time came here and made the exact

same arguments and requested the exact same relief, that they

see the original, and your Honor said counsel for defendants is

making the representation, I believe them, they produced a copy

in the files.

           THE COURT:  Well, it can't be that this schedule had

nothing listed.

           MS. CONROY:  The copy that we have, your Honor, that

our clients have, there is nothing listed.  We produced the

exact document that is in his files.  That is what we got.

We --

           THE COURT:  Who generated the trust agreement in the

first place?

           MS. CONROY:  It's an attorney by the name of Mr. Nudo,

who counsel is aware of.

           THE COURT:  An attorney by the name of?

           MS. CONROY:  Nudo.

           THE COURT:  How do you spell the last name?

           MS. CONROY:  N-u-d-o.

           THE COURT:  Mr. Nudo?

           MS. CONROY:  Yes.

           THE COURT:  Have you reached out to Mr. Nudo?

           MS. CONROY:  We did.

           THE COURT:  What is his explanation for why this

J34KKINC

1   schedule has --

2           MS. CONROY:  He has not returned our phone calls, your

3   Honor.

4           THE COURT:  He has not returned your phone calls?

5           MS. CONROY:  He has not returned our phone calls.

6           THE COURT:  Third-party subpoena to Mr. Nudo,

7   Mr. Savitsky?

8           MR. SAVITSKY:  Your Honor, we've looked into Mr. Nudo,

9   and we found two things:  One, we found that his PO box -- he

10  has a PO box listed for his address, and I'm not certain he's

11  still practicing law anymore.  We know that in 2015, he was

12  censured by the Second Department for doing something with an

13  affidavit and signing it.  I believe the Second Department's

14  decision was that it was a fraud.  I don't know if he got his

15  license revoked, but I know he was publicly censured, and I

16  can't find any active address for him as a practitioner of law,

17  and that's where our issue is with serving him right now.

18  But --

19          THE COURT:  What is his full name, Ms. Conroy?  Do you

20  know his first name?

21          MS. CONROY:  Not off the top of my head, but I'm happy

22  to get it.  I think it's Nicholas, but I could be wrong.

23          MR. SAVITSKY:  I think that's correct.

24          THE COURT:  So you haven't made an attempt to serve a

25  third-party subpoena on him?

1      MR. SAVITSKY:  Not on his PO box, so, no, we haven't.

2   We've been, for the past week and a half, looking for his

3   address, a personal address for him, but I haven't found one

4   yet, your Honor.

5      THE COURT:  Well, if the current defense counsel asked

6   their client for the document that you have, and they have

7   produced it, and they're representing that to the Court as

8   officers of the Court that that's what they have and that's

9   what they've produced, there are certain arguments and

10  inferences you can make as a result of the state of the record,

11  which are, frankly, in your favor, if you follow me, in some

12  ways.  So the record, as it is, suggests that the Wangs may

13  have some problems with respect to the state of this document,

14  right?

15     MR. SAVITSKY:  We believe if we're not able to inspect

16  the original, that we're entitled to an adverse inference.

17     THE COURT:  Right, you're going to make such an

18  argument.  So I'm sure counsel for the Wangs probably are not

19  particularly happy that this is the state of the record either.

20     In a way, be careful what you wish for, because maybe

21  the record is better incomplete as it is for your purposes than

22  it would be if you tracked down the original through Mr. Nudo,

23  since the Kasowitz firm doesn't have some other version of this

24  that they're withholding.

25     MR. SAVITSKY:  Absolutely.

1          THE COURT:  And if their client has some other version

2     of this that they're withholding, what is a lawyer to do if the

3     client says this is all I have?  If they're not telling their

4     own lawyer what they have, there's only so much you can do, as

5     you know, right?

6          MR. SAVITSKY:  There is, your Honor, but if it's shown

7     that this document likely -- if you meet the elements for

8     spoliation and show the document likely exists, whether he

9     destroyed it and he had control over it, then we just want to

10    be clear that they're under an obligation to produce the

11    original.  And this is the distinction -- let me clarify.  It

12    was their position, the last time we discussed this, that they

13    don't have any obligation to produce the original.  That is

14    different from them saying, we don't have the original and

15    we've given you everything we have.  So we just --

16         THE COURT:  That's what Ms. Conroy just said.

17         MR. SAVITSKY:  Today, yes, your Honor.

18         But this issue was raised because when we spoke about

19    it, it was, no, we don't need to produce the original, not that

20    we have the original or Mr. Nudo has the original, and we're --

21    I'm sorry, let me clarify that.  There's a difference between

22    saying we don't have an obligation to produce the original and

23    we don't have the original.  What I'm hearing today is that

24    there is no original that they have any control over, he just

25    has the copy, even though he's the trustee of that trust, is

1  the settler.

2              THE COURT:  You mean Mr. Wang?

3              MR. SAVITSKY:  Mr. Wang and his father, correct.

4  Andrew Wang, the son, is the trustee of this trust, and S.K.

5  Wang is the settler of the trust.

6              THE COURT:  Are you going to depose Andrew Wang in

7  this case?

8              MR. SAVITSKY:  We do plan, absolutely.

9              THE COURT:  Are you going to ask him about this

10 document?

11             MR. SAVITSKY:  We will, your Honor.

12             THE COURT:  So that's the state of the record.  And

13 you will explore it further and either choose to serve a

14 third-party subpoena or you won't.  But the record before the

15 Court today from Ms. Conroy is:  They do not have an original,

16 they have produced what they have and what they have gotten

17 from their client.  Is that correct?

18             MS. CONROY:  Yes, your Honor.

19             THE COURT:  All right.

20             So I think the book is closed on this for my purposes

21 today.  Not for your purposes in the lawsuit, but for my

22 purposes today, there's nothing further to discuss.

23             MR. SAVITSKY:  That clarifies everything, your Honor.

24 Thank you.

25             MS. CONROY:  And just for a hundred percent clarity of

J34KKINC

```
 1    the record, if for some reason we identify or locate an
 2    original, we'll let counsel know.  We're not hiding anything.
 3              THE COURT:  Not only let him know, you will produce
 4    it.
 5              MS. CONROY:  If we have it.
 6              THE COURT:  Well, you've said you don't have it.
 7              MS. CONROY:  We don't have it.
 8              THE COURT:  So why are you complicating the record and
 9    saying something that you have a legal obligation anyway to do?
10              MS. CONROY:  Sorry, your Honor.  Understood.
11              THE COURT:  That would make Mr. Savitsky and me,
12    frankly, a little suspicious.  So don't say stuff like that.
13    You've represented you don't have it, period.  If you have it
14    at some point, because it falls out of the sky, you're going to
15    produce it.  Okay?
16              MS. CONROY:  Yes.  I was only referring to if we hear
17    back from Mr. Nudo.  We've been trying to get a hold of him.
18    That's my only reference.
19              THE COURT:  If you reach Mr. Nudo, and he has the
20    original, and he gives it to you, you will produce it.
21              MS. CONROY:  Yes.
22              THE COURT:  Okay.  Next.
23              MR. SAVITSKY:  The next very discrete point that we
24    have is that there are two corporate B.V.I. -- two offshore
25    corporations, they're British Virgin Islands companies.  One is
```

J34KKINC

1    called Le Style Ltd., and the other is called Le Tao Ltd.  Le

2    Tao Ltd., we know, was the entity which transferred the initial

3    funds to purchase that $6 million house that went into the SK

4    trust, and it was signed -- there was a wire signed by Andrew

5    Wang, money comes in from overseas from HSBC in Hong Kong, I

6    think it was $600,000, from this entity called Le Tao Ltd.

7    signed by Andrew.  We have the wire instruction.  That comes

8    in.  And there is another entity called Le Style Ltd., and this

9    entity, in 2009, wired $500,000 into the estate of CC Wang --

10   that's who the estate of YK represents -- for the purchase of

11   paintings, the paintings that we argue are self-dealt.

12        And we believe that Andrew and his father, Shou-Kung

13   and Andrew Wang, own Le Style Ltd.  They admit they own Le Tao,

14   but we also believe they own Le Style Ltd., which is the entity

15   that paid for the artwork that we claim are self-dealt.  And

16   we've asked for business records, the incorporation documents,

17   anything, on Le Style Ltd. and Le Tao Ltd., and the response

18   that we've gotten -- and this is similar, I think, to the SK

19   trust, but I'll just go through it -- the response that we've

20   gotten is to the extent we find anything in our clients' files,

21   we'll produce it.  Le Style Ltd., in my opinion, your Honor,

22   it's the single most important thing in this case because if

23   you can prove that he owned the company, which paid for the

24   estate's artwork, when he was the fiduciary of the estate,

25   without disclosing that, he self-dealt.  It's just a

1    documentary evidence chain of self-dealing.

2          We need to find out what documents he has in Le Style

3    Ltd.  We know he owns Le Tao, he admits it.  It's whether or

4    not he owns Le Style, and we don't think the response of, well,

5    to the extent we have any documents about Le Style's

6    incorporation, we'll produce them is sufficient because, your

7    Honor, they have an obligation to reach out to the B.V.I. trust

8    company that they use.

9          THE COURT:  That's this Portcullis?

10         MR. SAVITSKY:  Exactly.

11         They hired a trust company -- and this is a big thing

12   that happens in the B.V.I.  You get a trust company to do your

13   transactions and sign your documents in the British Virgin

14   Islands, so your name doesn't appear on the transactions.  It's

15   Portcullis who's acting as trustee.  Andrew Wang does not have

16   to sign for certain documents.

17         THE COURT:  How are you aware of Portcullis?

18         MR. SAVITSKY:  Because the International Consortium of

19   Investigative Journalists released the Panama papers -- you may

20   have heard of this -- and that there was a -- this group is

21   responsible for publishing a database on thousands of offshore

22   companies and their owners.  On their database, which I think

23   was published in 2013, but I'm not certain about this, they

24   report that a company called Le Style Ltd. was incorporated on

25   August 2, 2006, by Mr. Andrew Wang and Mr. Shou-Kung Wang.

J34KKINC

1    They're both co-owners and co-officers of this company that

2    paid for the estate's artwork.  It's the whole --

3              THE COURT:  What's that connection to Portcullis?

4              MR. SAVITSKY:  Portcullis is the entity which holds

5    the records in trust for Andrew.  So if Andrew says I don't

6    have Le Style records, I don't have Le Tao records, well,

7    Portcullis would because they are the trust entity in the

8    British Virgin Islands who does all their administrative

9    operations.

10             THE COURT:  But what control do the Wangs have over

11   Portcullis?  You're saying Portcullis is effectively their

12   agent?

13             MR. SAVITSKY:  Exactly.

14             THE COURT:  I see.

15             MR. SAVITSKY:  They are their hired agent.  Like I

16   said, this is a common practice in the British Virgin Islands,

17   to have a trust entity.  The way to get the records, which we

18   hope not to do, is to move in the British Virgin Islands for an

19   order compelling the production of those, but there's obviously

20   a lot of expense to that, there would be a lot of hurdles, and

21   Andrew should just have these records, and he should have -- he

22   does, in fact, have control of them.

23             So our issue is, which is what's different from the

24   original trust issue, is that the response we've gotten from

25   the defendants is, we'll produce what we've got, what's in our

1   files, but I can look through and say, oh, I've got Le Style or

2   I've got Le Tao's records, but that's not good enough because

3   they have an obligation to go to their trust agent in the

4   British Virgin Islands and say we need these records because

5   it's under their possession, custody -- or custody and control.

6   They have a legal right to those records, and they have the

7   practical ability to acquire them.

8          THE COURT:  Were there no documents related to

9   Le Style produced in the Surrogate's Court action?

10         MR. SAVITSKY:  We did not know about Le Style until

11  very recently.  The only documents that we have that were

12  produced in relation to the Surrogate's Court is a -- which was

13  produced recently in this action, actually, but it related to

14  the Surrogate's Court action.  The wire records from Le Style

15  to the estate on this contract with -- his name was -- on the

16  contract was Mr. Yue Da-Jin.  It's our position that person

17  doesn't exist; it's just a name on a contract.  So then we

18  looked at who paid for Yue Da-Jin's paintings that got shipped

19  to Hong Kong, and it's a company called Le Style Ltd.  That

20  company is owned by Andrew Wang and Shou-Kung Wang.

21         THE COURT:  Okay.

22         Ms. Conroy or Mr. Kelly?

23         MS. CONROY:  Your Honor, they asked for the

24  incorporation documents.  We said, yes, we'd produce them.

25  This is the first time in the letter to you that they ever

J34KKINC

         1    raised Portcullis to us.  Literally, their letter to the Court

         2    is the first time, I mean, they've even raised that company's

         3    name.

         4            On our meet-and-confer, they just asked when are we

         5    producing?  I said we'll produce before the deadline.  So, as I

         6    hear the request right now, it's see if you have the

         7    incorporation documents, and if you don't, put a request out to

         8    Portcullis, which I'm fine to do, but I can't confirm his

         9    representation that we automatically own this company or not.

        10    I didn't know about the relationship with it until they raised

        11    it for the first time.

        12            THE COURT:  Okay.  But you're prepared to reach out to

        13    Portcullis, as necessary, to produce incorporation documents if

        14    you can't produce a full set of them on your own?

        15            MS. CONROY:  Sure.

        16            THE COURT:  So I don't think there's a dispute, then.

        17            MS. CONROY:  No.

        18            MR. SAVITSKY:  Not anymore, your Honor.  Thank you.

        19            THE COURT:  Okay.  But you don't need to come to court

        20    and make a speech, so Ms. Conroy hears it in a letter and then

        21    in court.  You all need to talk to each other before because

        22    she'll say, okay, Portcullis, it's an agent, I get the

        23    argument, we have certain obligations that we're responsible

        24    for tracking down, and I will look into that and don't raise it

        25    with the judge yet because I don't know if we have a

J34KKINC

1     disagreement.  That would have been a better way to resolve

2     this.

3               MR. SAVITSKY:  Your Honor, this Portcullis was

4     actually raised in our last letter for the prior conference,

5     and we asked for these documents, and we did tell them last

6     week that we had an issue with this.  But --

7               THE COURT:  Well, I'm not interested in blame games;

8     I'm interested in progress.  So the resolution of this is

9     Ms. Conroy is going to track it down and produce what she

10    finds, and if you're unhappy, then you'll talk to her about it

11    before you bother me about it, and if it's unresolved after all

12    that, then you'll tell me.

13              So I think we've dealt with your issues.  Was there

14    anything else in your letter?

15              MR. SAVITSKY:  Yes, your Honor.  It was just those two

16    issues.

17              THE COURT:  Okay.

18              If that's true, then why did I get a five-page letter?

19    Page 4 of which just to make somebody look bad, is that the

20    idea?  That's not really helpful, frankly.  This whole section

21    about the Wangs offered contradictory sworn accounts of their

22    access to information, that little section on page 4, I don't

23    get why that's in this letter.

24              MR. SAVITSKY:  Your Honor, it's in the letter because

25    what we've been trying to do is apprise the Court there is a

1  reason to believe that evidence was spoliated, and in discovery

2  proceeding, that is relevant to the demands that we're seeking,

3  the types of documents that we're seeking, and the

4  interrogatories that we're asking for.  So it's put in for

5  background.  We're not here --

6      THE COURT:  I'm not interested in background.  I'm

7  only interested in being told where there are disputes that the

8  Court needs to resolve.  I'm not interested in background.

9      If there's going to be spoliation issues here, they're

10 going to come up, presumably, either at the end of discovery or

11 in motions in limine before Judge Keenan in advance of trial,

12 whenever that's going to be.  At the rate we're going, it's

13 going to be years away still.  Let's just leave it at that.

14     I will just say in the future, utilize the submissions

15 to the Court solely for the purposes of adjudicating disputes,

16 framing what the dispute is, and then leaving it for me to be

17 prepared, so I know what I should be asking you all about.

18     We're done with that.  Now, Ms. Conroy, we have your

19 letter, but I have concerns about it for the reasons I've said

20 earlier.  Let me start by asking this:  Are there really 1100

21 search terms that you all are fighting about?

22     MS. CONROY:  I would -- if I could take us back, I

23 don't know that we're fighting.  The majority of the search

24 terms, your Honor, are the artwork on the Appel Inventory and

25 the corresponding artists, the Chinese translation.  That's

J34KKINC

1    literally the bulk of the search terms.  Unfortunately, there

2    are a lot of them.

3            The rest of the search terms, in large part, which are

4    roughly, then, just a couple of hundred, are names, most of

5    which appear in plaintiffs' complaint.  One way or the other, I

6    gave the categories.  If there was a wholesale dispute about

7    the categories -- and what I got told is there wasn't enough

8    time.  We need more time to assess that.

9            So I don't know that there are disputes about the

10   search term lists because that's not what was told to me.  What

11   was told to me is that I haven't had a chance to really look

12   through this, I've got to think about it.

13           THE COURT:  Okay.

14           MS. CONROY:  But the categories really fall, your

15   Honor -- there are two categories.  There's the Appel Inventory

16   list with the corresponding artists, sometimes there's

17   variations of those names, and then the Chinese translations of

18   both the paintings and the artists, and then really the smaller

19   subset, which is more your traditional search terms, shall we

20   say, most of which, I'd say 80 percent, are names of people at

21   issue in this case.

22           THE COURT:  Okay.  Well, I asked that just because if

23   it's sort of indicative of how broad everything is, it's going

24   to be very hard for the Court to kind of navigate through

25   things.  If it is sort of straightforward like that, then that

J34KKINC

<table>
<tr><td>1</td><td>strikes me as the sort of thing you all should just be able to</td></tr>
<tr><td>2</td><td>work out, because both sides are going to want to have whatever</td></tr>
<tr><td>3</td><td>may exist with respect to the artwork that's in question here.</td></tr>
<tr><td>4</td><td>Certainly, in the main action, even if the second action is</td></tr>
<tr><td>5</td><td>dismissed, it's still going to be front and center, no?</td></tr>
</table>

1  strikes me as the sort of thing you all should just be able to

2  work out, because both sides are going to want to have whatever

3  may exist with respect to the artwork that's in question here.

4  Certainly, in the main action, even if the second action is

5  dismissed, it's still going to be front and center, no?

6  MR. SAVITSKY:  No, your Honor.  It wouldn't be front

7  and center because there are 500 works on this Appel Inventory

8  list.  Not everything was owned by C.C. Wang, not everything

9  was even in contest.  They make the representations that

10  everything on the Appel Inventory was something that was part

11  of the estate or should have been part of the estate.  That's

12  just not true.

13  So to put in 1100 or a thousand search terms, a lot of

14  which is in Chinese, is overly burdensome.  It is a fishing

15  expedition.  They're going out, and they're saying we want you

16  to search for these thousand terms, and with the Boolean

17  connectors, in 26 days because our responses to their document

18  demands would be due by March 15th, your Honor.  We just got

19  these terms five days ago.

20  THE COURT:  Who are the custodians that you're going

21  to be searching through?

22  MR. SAVITSKY:  We would be searching through Yien-Koo

23  Wang King's emails.

24  THE COURT:  So one custodian?

25  MR. SAVITSKY:  We haven't had a meet-and-confer on the

J34KKINC

1    custodians.

2            THE COURT:  Look, I'm not going to preempt that

3    process.  You all are going to work through those issues.

4            I just picked that randomly because, in skimming your

5    estate papers, you say 1100 search terms, 73 document demands,

6    19 more interrogatories, all were served on February 12th.

7    That's overly burdensome, all of that should be stayed because

8    we have a meritorious motion.

9            MR. SAVITSKY:  Well, the search terms came only last

10   week, not February 12th.  But the document in the

11   interrogatories were February -- yes, your Honor.

12           THE COURT:  My point is what you're arguing in your

13   motion for a stay is, now that we see what it is, as you said,

14   it's overly burdensome, Judge, right?

15           MR. SAVITSKY:  That's correct.

16           THE COURT:  That's what you're saying to Judge Keenan

17   in the first instance in these papers.

18           But I'm more in the weeds than Judge Keenan is about

19   how document discovery is otherwise proceeding here, and I want

20   to take ownership of all of that here.  He'll make the broader

21   call as to whether he is going to revisit the stay that he only

22   imposed in a limited fashion or not.  I assume he'll do that in

23   the first instance.

24           My job is, unless the status quo changes, you have

25   obligations to produce in a 2018 lawsuit until you're told

J34KKINC

1    otherwise, but you don't have obligations if they are overly

2    burdensome and you can convince the Court that they are overly

3    burdensome.

4                MR. SAVITSKY:  They absolutely -- they are, your

5    Honor.

6                THE COURT:  Okay.  Well, we're not going to have that

7    discussion front and center today.  We're going to have it

8    later this month, okay?  Because between now, March 4th, and

9    March 15th, you all are going to have more than one

10   meet-and-confer, I suspect, to try and sort some of this out,

11   and especially in light of the admonition I expressed at the

12   outset of this conference, which is you can't be assuming

13   you're going to get further extensions for anything in this

14   case.  And the timelines are going to overtake you all, so you

15   have to be pragmatic.  Both sides are going to have to make

16   choices, maybe choices you're not going to even like.  You

17   probably haven't even started thinking about depositions yet.

18   I suggest you start thinking about them.  It's March 4th.

19   You're 60 days away from the end of fact discovery.  You all

20   need to sit down and make a schedule for when depositions in

21   April are going to take place.

22                Have you done that yet?

23                MR. SAVITSKY:  We haven't, your Honor.

24                THE COURT:  You better do it soon.  I'm serious.  This

25   is not hopscotch, this is not dominoes, this is litigation in

J34KKINC

1    federal court, in a lawsuit that's been pending for a long

2    time.  We're not going to kick the can down the road here.  You

3    people need to figure out what you are going to do in the

4    limited time you have.  Okay?  Make your best calls, fight

5    about the things that matter the most, but be forewarned:  You

6    cannot unilaterally choose not to respond or to do certain

7    things that are contrary to what the state of the court-ordered

8    record is here.  So you all can't just say, well, we made an

9    application for a stay, and until it's decided, we're not going

10   do anything.  Absolutely not.  That is a violation of a court

11   order, and you could be sanctioned for it.

12          Am I clear about that?

13          MR. SAVITSKY:  Absolutely, your Honor.  But that is

14   not -- I push back on that representation that that was our

15   position at the meet-and-confer.  It wasn't, your Honor.  Our

16   representation was that these things were overly broad and it

17   was premature to discuss the first four pages of her letter.

18          THE COURT:  Okay, that's fine.  So between now and

19   March 15th, you all have to sort this all out and make your

20   best professional judgments about it, and we'll have a

21   conference before the end of this month to take stock of where

22   you are and make sure you're on track.  That's my

23   responsibility.  Okay?  So we're going to do that the last week

24   of March.

25          Now, Ms. Conroy, let's go back to your letter and the

J34KKINC

first four pages, some of which, I gather, technically are not

due until March 15th, but you would argue some of which are

overdue because they overlap with things that you previously

requested that haven't been produced; is that correct?

            MS. CONROY:  Yes, your Honor.

            THE COURT:  Okay.

            What efficiencies are there between now and the 15th

of March for me to direct some intermediate production?  That's

effectively what I could be doing, right?

            MS. CONROY:  Yes, your Honor.

            THE COURT:  Okay.  How would that advance things?

            MS. CONROY:  Well, your Honor, with all due respect,

we agree that obviously we have to advance the ball, but we

can't get any traction or willingness to produce any documents

relating to our action.  So if they're willing to meet with us

and produce some documents, great.  But if the position is

going to be maintained, well, this is irrelevant, all this, I'm

not going to produce it any which way other than a motion to

compel.  I'm not sure what more we can do.

            THE COURT:  Well, you're going to have these

conversations between now and March 15th.  If documents haven't

been produced, either responsive to your first set of requests

or the most recent set of requests, when we meet the last week

of March, you will have itemized for me everything you think

that is not overly burdensome or not overly broad that they

J34KKINC

1    have not provided to you, and Mr. Savitsky or Mr. Israel, I

2    hope, if he's feeling better, will be here, and they're going

3    to have to defend why they didn't produce things.  And if they

4    didn't produce certain things, then I'm going to direct them to

5    do it, and they may be sanctioned for not doing it because the

6    state of the record would require it.

7         MS. CONROY:  Thank you, your Honor.

8         THE COURT:  I want to be crystal clear about that,

9    Mr. Savitsky, from a due process standpoint, I am putting you

10   on notice today that if you all make judgments on your own that

11   are not defensible and I think are sanctionable, I reserve the

12   right to impose sanctions after the next hearing if the

13   positions you all have taken have been inappropriate.  Okay?

14        MR. SAVITSKY:  Okay, your Honor.

15        THE COURT:  All right.

16        MS. CONROY:  I would just add that that should then,

17   besides documents, also relate to interrogatory responses.  The

18   same position was taken with regard to interrogatory responses,

19   that the only answers they had to provide responses for went to

20   their affirmative action as opposed to the Wangs' affirmative

21   action.

22        THE COURT:  They cannot take the position that they

23   only respond to their affirmative action.  However, another

24   thing that I read in quickly perusing the papers is that they

25   are arguing, among other things, that you are utilizing

J34KKINC

1  interrogatories as a backdoor way of trying to get information

2  that you otherwise can't yet get that would be obtained only

3  through depositions.  So I will scrutinize carefully whether

4  your interrogatories really comply with Rule 33.3, which, as

5  you know, really limit what you can obtain by interrogatory and

6  whether what you're seeking is better obtained or more

7  efficiently obtained through deposition discovery, which Judge

8  Keenan has, in fact, stayed until he adjudicates, presumably,

9  the motion.

10         What I anticipate potentially happening is:  If he

11  adjudicates the motion and denies it, then there will obviously

12  have to be some limited period of time where deposition

13  discovery, which has been stayed, can proceed with respect to

14  your claims in the second action.  But unless and until that

15  happens, there won't be deposition discovery as to your claims,

16  but you all have to schedule the depositions with respect to

17  the first action.  And I'm confident that if I made you hand in

18  today by 5:00 o'clock -- I'm not doing this -- but if I made

19  you hand in today a list by 5:00 o'clock of who each side was

20  going to depose, today, knowing what you know, and having what

21  you already do have, given the history of this case, you could

22  both come up with ten people that you wanted to depose, which

23  is all you get under the rules.

24         So let's not overlitigate all this stuff.  You know

25  what you need to do here.  That's what you need to do.  And

J34KKINC

1    we're dealing with people whose memories fade, and each year

2    that goes by makes it harder to litigate the case.  So that's

3    why I'm so adamant about really holding your collective feet to

4    the fire here and your having to live with whatever the record

5    is.  When you write your letter on May 1st saying, Judge, we

6    heard everything you said back in January, and March, and

7    whenever else, but we still want more time, I'm fairly

8    confident the answer is going to be, sorry, but, no, for all

9    the reasons I've been saying every time around.  So you really

10   can't count on it.

11          Now, if Mr. Israel is really unwell, to the point that

12   it is so hamstringing their ability to both litigate

13   affirmatively and defend, that is certainly something I will

14   account for.  That -- I want to be crystal clear about that,

15   and I want you to please tell Mr. Israel that I wish him a

16   speedy recovery, and I hope that this situation doesn't

17   interfere with his health.  So I will certainly do everything I

18   can to accommodate that, within reason and fairness to

19   everybody, just as if Ms. Conroy or Mr. Kelly had either

20   personal or family circumstances that dictated that.  I am the

21   first person who will always accommodate that.

22          That said, leaving that to the side, we have to really

23   march forward in this case.

24          So I think at least as to some of what's in your

25   letter to me, we are going to revisit this after March 15th and

J34KKINC

1   after your meet-and-confers to see what really is unproduced

2   and outstanding, and you can't assume you're not going to have

3   any obligations, Mr. Savitsky -- you are -- and you better get

4   with Ms. Conroy and Mr. Kelly in the next few days and say what

5   I said the last time, which is, what do you really want and how

6   can we most efficiently produce it?  Because I want to see

7   progress.

8            So what can we do other than the long litany of D&C,

9   which is documents and communications, I'm guessing?  That's

10  not an abbreviation I've ever heard.

11           MS. CONROY:  Sorry.  I know it wasn't defined.

12           THE COURT:  It was not defined, but my law clerk and

13  I --

14           MS. CONROY:  Sorry.

15           THE COURT:  -- figured it out, I think, if that's what

16  it was.  It must be a big firm law speak or something.

17           MS. CONROY:  Or it could just be my shorthand

18  forgetting to define it, which is more likely than not.

19           THE COURT:  That's fine.

20           What else is outstanding today that I can adjudicate?

21           MS. CONROY:  Well, the initial disclosures, your

22  Honor.

23           THE COURT:  So what's the story with that,

24  Mr. Savitsky?

25           MR. SAVITSKY:  The story with that, your Honor, is

J34KKINC

1    that we served the initial disclosures in our affirmative

2    action, and then we were told on -- at the last

3    meet-and-confer, for the first time, they said, hey, we never

4    got initial disclosures for --

5              THE COURT:  We talked about it at the last conference.

6    So that was before what you're talking about, isn't it?

7              MR. SAVITSKY:  It is, your Honor.

8              THE COURT:  I thought I directed the initial

9    disclosures by a date certain.  Wasn't it January 31st?  Am I

10   misremembering?

11             MS. CONROY:  Yes, your Honor.

12             MR. SAVITSKY:  You did, your Honor.

13             THE COURT:  How come they weren't produced?

14             MR. SAVITSKY:  Well, your Honor, we sent the initial

15   disclosures in our affirmative case, and we had -- there was

16   oversight that there was no initial disclosures in their

17   affirmative case.

18             THE COURT:  So when are you going to produce them?

19             MR. SAVITSKY:  By the end of the week.

20             THE COURT:  All right.  By Friday, at noon.  Okay?

21             MR. SAVITSKY:  All right.

22             THE COURT:  Life goes on.  You're not going to lose

23   sleep over not having them until Friday.

24             MR. KELLY:  Of course not, your Honor.  But we have

25   asked for them in the interim since the last -- since the due

J34KKINC

1    date, and, your Honor --

2            THE COURT:  I'm not interested.  With all due respect,

3    I'm not interested.  Friday, at noon.  If you don't get them

4    Friday at noon, you can seek sanctions.  Okay?

5            MS. CONROY:  Thank you, your Honor.

6            THE COURT:  All right.

7            What else?

8            MS. CONROY:  Next is the inspection.  Your Honor, you

9    may recall, at our last conference, at the very end, I raised

10   that.  Along with our initial document requests, we had also

11   put in a request for inspection of artwork.

12           THE COURT:  Right.

13           MS. CONROY:  We had informally -- either party had

14   informally -- us included -- put it in our last set of letters.

15   Your Honor gave his general thoughts about what a framework

16   should be like and some instructions that you thought might be

17   helpful to us, but, ultimately, tabled the issue and said,

18   look, try to work it out, and if you can't, bring it back up to

19   me.  That's where we're at.

20           We asked about an inspection, if plaintiffs' counsel

21   would be willing, both -- we would be willing, and we got told

22   no.  Hence, the reason why we're here today asking for that

23   relief, your Honor.

24           THE COURT:  Well, let me ask this question:  The

25   inspection should take place before depositions, I assume?

J34KKINC

1          MS. CONROY:  We would like to, yes.

2          THE COURT:  Is it necessary for purposes of

3     depositions?  In other words, from a sequencing standpoint,

4     explain to me why you physically need to inspect artwork in

5     advance of depositions as opposed to physically inspect after

6     depositions.

7          MS. CONROY:  Well, your Honor, without getting too

8     much into the weeds, with regard to a lot of the names of these

9     artwork, your Honor, there are variations for the translations,

10    and as we've been told by more than -- not just our clients,

11    but experts, to really be able to identify and know specific

12    artwork in question, you have to see the artwork.

13         THE COURT:  Right.  But my question, in part, is, and

14    maybe I should have been a little clearer about this:  Do you

15    need the inspection for purposes of expert discovery as opposed

16    to for purposes of fact deposition discovery?  That's my

17    question.

18         MS. CONROY:  Well, definitely for expert discovery.  I

19    think for fact -- it should definitely come in for fact

20    discovery, and I'll split that in two.

21         Focusing on the Kings' case against my clients, your

22    Honor, I think that there have been a lot of representations

23    about the exchange of artwork, artwork owned, who had what, and

24    there's a history of representations made by both our clients,

25    to be quite honest with you.  So I do think that for purposes

J34KKINC

1    of the depositions of both parties, the artwork in question and

2    the artwork in their possession is actually a key fact.

3              Now, one could argue, well, you can get their

4    testimony, and look at it after, and impeach them, I hear that,

5    but we would like to see it in the first instance.

6              As to our affirmative action, I think it's just the

7    other side of the same coin.  There's representations about

8    artwork that's in her possession, or plaintiffs' possession,

9    that she claims to have we think have been divested, there's

10   claims about who owns what artwork and in whose possession it

11   is.  So we would like, before the depositions, since that was

12   never an option in any of the surrogate court actions -- your

13   Honor, this isn't discovery that was taken in the past -- we

14   would like, in this first instance because we are here and this

15   is a federal case, to have that opportunity.

16             THE COURT:  But I guess as I'm listening to you talk,

17   it makes me more convinced that the inspections should take

18   place after the depositions, not before that, because you

19   already have inventories.  It's not like you don't know what

20   the paintings are, right?  The question is:  Where are they,

21   how did they get there, what transactions underlay the various

22   paintings?  That's what you all are fighting about, right?

23   Isn't that right?

24             MS. CONROY:  Yes.  I mean, that's -- yes, your Honor.

25             THE COURT:  So, in the depositions of Mr. Wang and of

J34KKINC

 1    Ms. King, among others, you're going to go through at length, I

 2    assume, all the inventory, if you will, and where they're

 3    located, and how long they've been kept there, and all of that.

 4    So the facts related to the inspections that need to take place

 5    will, I think, potentially come into greater clarity as a

 6    result of the questions at depositions than they would if you

 7    did the inspections ahead of the depositions.  Is that not

 8    right?

 9            MS. CONROY:  I can definitely see the utility in that,

10    your Honor.  Like I said, our position was wanting to see --

11    because there have been so many prior representations about

12    artwork in both parties' possession, but if it's after-the-fact

13    depositions, we'd be fine with that, too.  We just want an

14    agreement on actually inspecting the artwork.

15            MR. SAVITSKY:  Your Honor, we don't have agreement on

16    inspection.  Again, I need to clarify certain points.  When you

17    asked if that was correct about isn't everyone trying to find

18    out where the artwork is, and counsel said yes, but my answer

19    is, no, it's not.

20            THE COURT:  Your answer is no, it's not for your

21    lawsuit?

22            MR. SAVITSKY:  Or theirs.

23            THE COURT:  Her answer is, yes, it is for her lawsuit.

24    So you're disagreeing because your positions are different

25    because your claims are different.

1            MR. SAVITSKY:  I'm disagreeing because their claims

2    are -- the only claim they have for recovery is because of the

3    probate trial.  They say that the probate trial ended the wrong

4    way, there was fraud related to it.  That is their only RICO

5    act that they claim happened in the past ten years.  And

6    whether or not the trial is a RICO act, which we argue it can't

7    be, as a matter of law, based off a 2018 Second Circuit opinion

8    that said -- I won't get into it, but the point is, your Honor,

9    that even under their lawsuit, who owns what does not recover

10   them damages.  They claim that the fraud, the predicate act

11   that they want recovery on was the probate trial.  What

12   paintings YK received or -- YK as in Yien-Koo King, or Kenneth

13   King, or anyone else received between 1997 and 2003 is utterly

14   irrelevant, and it's hugely expensive.

15            This investigation, the on-site inspection, has to

16   happen in the People's Republic of China.  It may have to

17   happen in Taiwan, or Macau, or wherever -- the other countries

18   that they listed.  It has nothing to do with their claims, and

19   they want to take us to China.  This is not just me speaking on

20   our meet-and-confer.  They said, well, we have to investigate

21   what's being stored in China.  This case will go on for another

22   decade.  It's already been going on for 19 years, it will go on

23   for another ten if we just look at this 500-painting bucket of

24   potential artwork and start looking at every transaction for

25   those paintings, even though their only predicate act happened

J34KKINC

1    in the probate court in relation to the trial.

2              MS. CONROY:  Let's put the RICO action aside.  I think

3    counselor forgets we have more than a RICO action.  The

4    simplest -- the easiest version of this is the conversion

5    claim, your Honor.  We have specific allegations that artwork

6    that was in dispute, that is artwork of the estate, recently

7    got disposed of by plaintiff, your Honor.  So this isn't only

8    about the RICO action; this is legitimately and specifically

9    about artwork -- disputed artwork on the Appel Inventory that

10   had been represented by plaintiff as being in her custody,

11   which, as we attached to our letter, your Honor, the

12   Surrogate's Court judge just recently stripped his client of

13   her role as fiduciary over there pending this allegation and

14   found that the allegations and the facts as asserted make it

15   more likely than not that she has violated the TRO and gotten

16   rid of -- recently gotten rid of estate assets.

17             THE COURT:  You're litigating that in the Surrogate's

18   Court.  Why do I need to worry about that in the federal

19   lawsuit?

20             MS. CONROY:  Well, in the federal lawsuit, your Honor,

21   we're also arguing conversion.  She's taking the position she

22   has certain things; we take the position she doesn't.  I think

23   it's our right to be able to inspect the artwork about what she

24   has and what she doesn't have.

25             THE COURT:  Beyond the 98 paintings?

J34KKINC

1              MS. CONROY:  It is the 98 paintings.  The 98

2     paintings, your Honor.  Definitely the 98 paintings in dispute,

3     but we think there's more.

4              MR. KELLY:  Can I clarify?

5              THE COURT:  No, you can't, and you can all sit down.

6              We're not going to rule on when the inspections are

7     going to take place today.  I'm not ordering any inspections to

8     take place today.  We're going to revisit this after fact

9     discovery is over.  Then we'll see what the state of play is

10    because if your lawsuit has been dismissed, you're certainly

11    not getting inspections, and your lawsuit might get dismissed,

12    Ms. Conroy.

13             So I think, in order to let that process run its

14    course, and also because I'm not convinced that there is any

15    particular need to have inspections in advance of these fact

16    discovery depositions -- I can see how they may be relevant for

17    expert discovery depositions, but we're not there yet -- so I'm

18    not going to opine today that the inspections need to take

19    place by this date certain.  You've got enough to do between

20    now and May 8th.  You're not taking trips to China to go look

21    at warehouses or something.  You all know what art is in play

22    here.  You've been making applications in the Surrogate's Court

23    about particular pieces of art.  You don't need to go somewhere

24    to see where they are.  I don't see why you need to do that in

25    advance of the depositions you're going to take of Ms. King or

J34KKINC

1    that Ms. King needs to know where things are in advance of any

2    depositions of Mr. Wang at this point.  You're going to have to

3    live with that state of play, as far as I'm concerned, because

4    I think that's factually unnecessary and allows the case

5    organically, if I can say it that way, to evolve more naturally

6    without expenses being incurred that may be unnecessary.

7            So we're going to have to revisit the timing of the

8    inspections, but I'm not going to impose some deadline on that

9    today.  I find that every time you all get all hot under the

10   collar about this, you all stand up at the same time and

11   practically start yelling on top of each other whenever we get

12   to this subject, so I'm not going to sort that out today,

13   because I think the record needs to be more fully developed on

14   that point.  And I think when we get to that point, it may be

15   that you're required to submit something beyond just a

16   paragraph in a letter.  It may be that you all have to tie the

17   legal claims you each have to justify why you physically need

18   to travel all over the world to physically have lawyers see

19   certain things.  I really need to understand that a lot better

20   than I do today from the very modest submissions that have been

21   made by the parties in the correspondence to the Court to date.

22           So I'm not going to rule on any of that today, and I

23   think you should assume that you are not going to get

24   inspections until after May 8th when fact discovery is over.  I

25   think that's how we're going to proceed, unless you make some

J34KKINC

more detailed showing of how there's going to be prejudice in

advance of the conclusion of fact discovery in the 2014 action

if two-way inspections don't take place.  And it hasn't been

made to date, so if you want to make an attempt to do that, you

can, but short of that, I'm not going to rule on that until

after fact discovery is completed and we sort of take stock of

where we are at that point.

Okay?

MS. CONROY:  Okay.  Thank you, your Honor.

THE COURT:  All right.

Anything else you want to raise today?

MS. CONROY:  No.  I think counsel already said that we

have an agreement now on the surrogate court prior productions,

so I don't think anything other than -- I guess going to your

Honor's point -- excuse me, going to your Honor's point about

trying to advance the ball:  We were just trying to set some

internal deadlines by which the parties had to have come to

their positions with regards to categories of documents or

search terms for us to come back, but it sounds like your Honor

is already going to set deadlines and set another conference

for us --

THE COURT:  We're going to have another conference the

last week of March.  And I expect, and hope, frankly, you'll

tell me we don't need it because you've worked things out, but

that's probably delusive on my part to think that way.  But

J34KKINC

1   there has to have been production between now and then, and if

2   there isn't, you'll bring it to my attention, and we'll deal

3   with it.  And as I said to Mr. Savitsky, there may be sanctions

4   unless -- if there's been a lack of production that can't be

5   justified, then there will be sanctions.  So we have got to

6   move this forward.  What I would say is between now and the

7   next conference, you should establish your deposition schedule

8   between now and May 8th.  And you need to, I gather, finalize

9   your Surrogate's Court document collection process, and you

10  need to work through all the outstanding discovery, you're

11  going to make your Rule 26 disclosures by Friday, and there are

12  outstanding interrogatories, and there are outstanding document

13  requests, and you need to -- frankly, you should go sit in the

14  jury room when we're done today and have a face-to-face, if you

15  have time to do that.  I would start by doing that, and let you

16  stay here if you'd like.

17          But you really need to be talking to each other.  I

18  know Mr. Savitsky has to talk to Mr. Israel about some of these

19  things, and if his health continues to be ailing, then I'll

20  deal with that if there's some application that is generated by

21  that, but that's the only thing, as far as I'm concerned from

22  what's in front of me, that would necessitate changing any of

23  the framework that we have in place right now.

24          Let me ask Mr. Tam when we can see you the last week

25  of March.

J34KKINC

1          (Pause)

2          THE COURT:  Can we do three weeks from today, the

3     25th, in the afternoon?

4          MR. SAVITSKY:  Okay.

5          MS. CONROY:  I believe that's fine, your Honor.

6          THE COURT:  So why don't we say 2:30 on March 25th.

7     That way, Mr. Tam gets to see you before he goes on vacation,

8     and he loves these conferences.

9          MS. CONROY:  I'm sure he does.

10         THE COURT:  All right.  So I think we're done for

11    today.

12         With respect to the March 25th conference, then I

13    would want you to submit, I'll say -- realistically, you have

14    until the 15th, and then I would want you to talk instead of

15    just running to me.  So you're going to talk on the 18th or

16    19th after you get things.  So I guess we'll say the 21st?

17         MS. CONROY:  Sure.

18         THE COURT:  Okay?

19         So any pre-March 25th conference letters in which you

20    want to identify what the agenda is going to be, you should

21    submit by the 21st.  And then we'll do our best to get up to

22    speed and see what you've told us.

23         Anything else for today?

24         MR. SAVITSKY:  No.  Thank you, your Honor.

25         MS. CONROY:  No, your Honor.

J34KKINC

1            THE COURT:  Okay.  Have a great day, and I hope

2    Mr. Israel feels better.

3            MR. SAVITSKY:  Thank you.  I appreciate that.

4                            *  *  *