J3PTKINC — CORRECTED

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KENNETH KING, et al.,

4                   Plaintiffs,

5           v.                          14 CV 7694 (JFK)(JLC)

6   ANDREW WANG, et al.,

7                   Defendants.

8   ------------------------------x
                                        New York, N.Y.
9                                       March 25, 2019
                                        2:30 p.m.
10
    Before:
11
                        HON. JAMES L. COTT,
12
                                        Magistrate Judge
13
                            APPEARANCES
14
    SAM P. ISRAEL, P.C.
15       Attorneys for Plaintiffs
    BY:  SAM P. ISRAEL
16       TIMOTHY SAVITSKY

17  KASOWITZ BENSON TORRES
         Attorneys for Defendants
18  BY:  KIM CONROY
         THOMAS B. KELLY
19

20

21

22

23

24

25

1              (Case called)

2              THE COURT:  Good afternoon to both of you.

3              I think we're here today to make the best of a very

4    bad situation.  This case is spiraling out of control in ways

5    that are almost unmanageable for the Court.

6              As a threshold matter, let me note that I asked for

7    the parties to submit their letters in advance of this

8    conference by close of business on March 21st.  And close of

9    business means 5 or 6 p.m., that's when close of business is in

10   the court, that doesn't mean when we go home.  The letter from

11   the defendants came in at 11:58 p.m. and the letter from

12   plaintiffs came in at 12:21 a.m.

13             I asked for the close of business on Thursday because

14   I was out on Friday.  This made it much more difficult for me

15   to prepare for today's conference.  It is frustrating to the

16   Court when parties just willy-nilly ignore orders of the Court,

17   so I would appreciate it when I say something is due on a date

18   and time, that the parties comply with that.  It doesn't make

19   things easier.  And now that you have written letters that make

20   me feel that I am here herding cats, and there is an incredible

21   mess that needs to be cleaned up, not withstanding the deadline

22   of last Friday that Judge Keenan set.

23             Your clients are old, this case is old.  We are

24   holding your feet to the fire because this case has to move.

25   We're not going to keep extending deadlines here, folks, we

J3PTKINC - CORRECTED

1    have to get this case concluded.  You all are playing games.

2    You all are not conducting email searches.  You all are saying

3    you already have it, you don't have it, it's too broad, it's

4    not broad.  You're not cooperating with each other.  You need

5    me to baby-sit you.  We have conferences in this case in a way

6    that takes a disproportionate amount of the Court's bandwidth.

7    It's really unreasonable to send the letters you have sent to

8    the Court and basically say here, Judge, figure this out.  It's

9    very, very exasperating.

10        I frankly don't know how to begin this conference

11   today, I really don't, but I will start with the defendants

12   because your letter come in at 11:58 p.m., so your letter was

13   23 minutes ahead of the plaintiffs.  So we get to start with

14   your letter and your request, which I count over the course of

15   your six-page letters there are five sets of what I will call

16   requests.  That's where I guess we have to start.  And then

17   we'll take them one at a time and I will hear the plaintiffs'

18   response, then once we have concluded that I will hear from the

19   plaintiffs if they have anything that they wish to have the

20   Court act on.

21        I'm here to make rulings, that's what I'm here to do.

22   I'm not here to just have discussions about things.  The

23   parties I'm sure are equally frustrated with each other, and

24   that's great.  That's typical of this case since I have been

25   with this case.  That's reflective of what the letters here

J3PTKINC - CORRECTED

1    request.

2            The first request that I see that is a concrete

3    request is on the bottom of page 2 where it says that the Wang

4    parties request that the King parties be ordered to confirm

5    that in fact they are not in possession of any document

6    productions from the surrogate's court proceedings, and then do

7    bear the cost of reproduction.

8            That goes back to whole discussion we had, I think it

9    was in January, of the plaintiffs had this whole room full of

10   documents, the defendants said we'll get a vendor, we'll

11   chronicle it all and put it all together.  And then they were,

12   I think it's fair to say, hoodwinked into thinking that there

13   were things in there that were actually going to be of value to

14   them rather than things that were substantively going to

15   provide information to them.

16           I gather, Ms. Conroy, that's essentially the

17   complaints you have here.

18           MS. CONROY:  Yes, your Honor.  And may I state for the

19   record I apologize for our delay in the letter.  I didn't

20   realize that close of business -- I think we just mistook it

21   for the 12 p.m. deadline.  That's not an excuse, but it will

22   not happen again upon any further instruction, your Honor.

23           But yes, that is our request.  You are correct in the

24   recitation of the facts.  You recall there was a back and forth

25   about prior production in the surrogate's court about burden.

J3PTKINC - CORRECTED

1   Plaintiffs argued it was burdensome, that they had work product

2   intermixed, and we offered then to send a vendor to pay for it.

3   Your Honor told them that you have to get your work product

4   out, give them the production; got the vendor, the vendor

5   picked up the boxes, except the boxes consisted largely of

6   briefs, exhibits to various motions, depositions and trial

7   exhibits, and the appellate record from the lower case, didn't

8   have production.  So yes, your Honor, we do feel that we were

9   hoodwinked and our client unnecessarily charged.

10          THE COURT:  So Mr. Israel or Mr. Savitsky who wishes

11  to be heard?

12          MR. ISRAEL:  Initially, your Honor, I want to note

13  this letter may have struck you -- the letter from the

14  defendants may have struck you as creating all kinds of issues

15  about us, about the plaintiff, but I'm here to tell you that

16  these are just false assertions in this letter.

17          I can go through them systematically.

18          THE COURT:  I don't want you to go through --

19          MR. ISRAEL:  I will answer the question.

20          THE COURT:  Just a minute.  Let's be clear.  We're not

21  spending until 5 o'clock here today.  We're going to be very

22  laser beam focused.  Here's the question, Mr. Israel:  There

23  was this room that you had.  The production wasn't what was

24  represented.  You're saying that's false.  Okay.  What was

25  produced to them that the vendor Bates stamped in the light

J3PTKINC - CORRECTED

1    that they didn't already have, like appellate records and other

2    public filing?  What substantive documents were produced that

3    they didn't otherwise have or have easy access to?

4             MR. ISRAEL:  We made available our entire surrogate's

5    files that we have, which is what they asked for.  Nothing was

6    withheld.  We made it all available, and there is no mystery to

7    it.  We just made this available for them to copy.

8             Now they may say well, they consist of filings and so

9    on and so forth, but that's what they said they wanted and

10   that's in fact what they're pleading.

11            THE COURT:  That's not true.  That's not what they

12   said they wanted.  Why would they ask you for a copy of your

13   brief in surrogate's court?  They either have that from prior

14   counsel or could easily get it.  They want documents that

15   respond to their document request.  That's what they want.

16   That's what they expected.  They tell me they didn't get it.

17   You then should now identify to me with specificity what they

18   did get that was responsive to their document requests.

19            MR. ISRAEL:  They wanted the surrogate's court file,

20   your Honor.  We made our entire surrogate's file available for

21   them to copy.

22            THE COURT:  You're repeating yourself.  The

23   surrogate's file, you mean like what is docketed in the

24   surrogate's court?

25            MR. ISRAEL:  Everything.  Not just that, but

J3PTKINC - CORRECTED

1   substantive documents within.

2            THE COURT:  Like what?  Give me one example.

3            MR. ISRAEL:  Could I have a second?  I want to talk to

4   my colleague.

5            THE COURT:  I assume Mr. Savitsky is the one that

6   should respond, not you.

7            MR. ISRAEL:  I have been out sick, but let me just ask

8   him.

9            (Pause)

10           MR. ISRAEL:  Please allow my colleague to answer the

11  question, your Honor.

12           THE COURT:  Go aright ahead.

13           MR. SAVITSKY:  Your Honor, we could not have

14  represented that we had a room full of independent production

15  because we didn't have a room full of independent production

16  and we have never had a room full of independent production.

17  What we represented was that we had a room full of documents

18  about the surrogate's court case.

19           And know your Honor doesn't want us to repeat, but I

20  need to clarify they specifically demanded documents that were

21  filed in the surrogate's court.  They have sought -- one of the

22  document requests which is in Ms. Conroy's letter which we'll

23  get to specifically asks for every single affidavit filed in

24  any of the 19 previous surrogate's court filings by Yien-Koo

25  King.  They asked for everything.  They are suing on the basis

J3PTKINC - CORRECTED

1    that the surrogate's court trial in 2017 was fraudulently

2    executed.  So we gave them the records that we had pursuant to

3    the surrogate's court file; not just the exhibits that went in

4    in the surrogate's court, but everything that we used as

5    counsel during that trial.

6            THE COURT:  What does that mean, everything you used

7    as counsel?

8            MR. SAVITSKY:  We had a subset of production.  The

9    Kings have changed counsel, as Mr. Wang has, over the course of

10   the past 16 years.  And we became counsel in 2013 and we

11   received a certain portion of the 50 or 60,000 pages of

12   document production that had occurred prior to us.  We didn't

13   receive 50 or 60,000 pages of document production.

14           So when we're responding to these documents -- and

15   this goes really to the heart of how we have been responding to

16   that.  They are asking for things that have been subject to

17   production three or four times in the past.  So one of the

18   refrains in our document production objections have been, A,

19   you have this, and B, you have equal access to it, so to the

20   extent it's something filed in the court, you can access that

21   yourself because you were party to the legal proceeding in

22   which that was filed.

23           THE COURT:  What documents were you all going to

24   otherwise withhold that had work product on it?  What are we

25   talking about in that category?

J3PTKINC - CORRECTED

1          MR. SAVITSKY:  Because we have a room full of

2     documentation, there are lists of things that had annotation of

3     counsel about what is important, there are sets of potential

4     trial exhibits that are not final trial exhibits that have our

5     notations on it, there are Excel sheets, there are markups on

6     things that we had received and were preparing.

7          So what we had to do is go through it, and it was

8     considerable, and pick out of -- I think we produced 18,000

9     pages of documents, and we had to remove everything that had

10    our notations on it.  But they have been asking for these types

11    of records, and Ms. Conroy told us at the last meeting well,

12    Akiva doesn't have everything, and she told me during the meet

13    and confer Mr. Cohen, Akiva Cohen, who is also counsel of

14    record in this case, he doesn't have all the documents because,

15    your Honor, he didn't try the probate court case, so he doesn't

16    have those records.  So what we did was provide everything that

17    we had in relation to this case, everything that we had minus

18    things that we saw had work product or attorney-client

19    privilege written on them.

20         THE COURT:  What have you done to produce documents in

21    response to the document requests that have been served on you

22    in this case?  What have you done other than say you can have

23    access to the documents that are available in this file?  What

24    have you actually done to respond by producing documents, if

25    anything?

J3PTKINC - CORRECTED

1          MR. SAVITSKY:  Well, we have spoken multiple times to

2     our clients in recent weeks.  Because of multiple

3     hospitalizations, it's been difficult to do.  But prior to that

4     we have gone over the document requests and asked:  Do you have

5     documents that are responsive to this?  And if we haven't

6     produced it, it's because the answer that we were given is:

7     No, we don't have documents responsive to that.  Or if we did,

8     yes, that was produced, and our counsel has that.

9          So not us, because like I said, in 2013 when we came

10    in there were boxes that were being transferred from lawyer to

11    lawyer over the past 16 years.  So what Ms. Conroy did -- and

12    this is why I'm kind of surprised that she feels unequipped and

13    doesn't have these documents, they subpoenaed -- they sent out

14    22 third-party subpoenas to all of the Kings prior counsel that

15    have appeared on behalf of the Kings since July 2003, and they,

16    your Honor, have the production, and they have --

17         THE COURT:  They what?

18         MR. SAVITSKY:  They have the production, the prior

19    production that was not given to us, and the responses I think

20    are indicative of that.

21         THE COURT:  You're saying that prior counsel who you

22    have succeeded did not pass along to you documents at the time

23    they represented your clients?

24         MR. SAVITSKY:  No, what we did receive were things in

25    relation to that probate trial in 2017.  So we received --

J3PTKINC - CORRECTED

1    because that was originally supposed to happen in 2010, that

2    trial.  So there was -- I think it was Gibson Dunn who was the

3    counsel for the Kings at that time.  And when we took over,

4    there was another law firm, Eaton & Van Winkle, that we were

5    replacing.  And we didn't get documents from them, and my

6    understanding is Eaton & Van Winkle, when we asked where their

7    documents were, that that attorney said he didn't have the

8    production.  He didn't give it to us.  He was at the law firm

9    immediately before us.  We didn't get any of those case files

10   from him.  I am not sure what happened.

11           THE COURT:  Is that not extremely odd?  You've

12   inherited a longstanding litigation, and the lawyers you

13   succeeded passed you not a single piece of paper related to

14   case, is that what you're saying?

15           MR. SAVITSKY:  Not a single piece of paper, but the

16   entire case file, yes, exactly, and the production, yes, and

17   most of their filings, yes.

18           THE COURT:  Was there some sort of retaining lien?

19           MR. SAVITSKY:  I believe that was part of it, your

20   Honor, but the other issue is it's difficult to look at this in

21   terms of a normal case because, like I said, it's not one case,

22   there are 19 separately indexed cases with different counsel

23   throughout these.

24           THE COURT:  Well, as far as I'm concerned, there are

25   two cases, the '14 action and the '18 action.  That's all that

J3PTKINC - CORRECTED

1    is relevant to my way of thinking, and that's what we have to

2    deal with here.  And the problem I think we're having is the

3    default is too much of:  You have things from other cases, but

4    we're in these cases, and these cases have to be litigated as

5    stand-alone cases.  And yes, you can incorporate by reference

6    prior productions if they're responsive to what has been

7    requested, but not otherwise.  And that's one of the problems

8    we're having here.

9         MR. SAVITSKY:  And like I said, your Honor, you asked

10   what are the things that we have done.  A, we went through our

11   files, and everything that we had in that room, like I said,

12   which was somewhat considerable, was produced to the other

13   side.  And we never represented we had the full production form

14   the other side.  We couldn't have because we never had it.

15        THE COURT:  What do you mean the full production from

16   the other side?

17        MR. SAVITSKY:  I'm sorry, from the other case, from

18   the other -- the prior cases that involved the Appel inventory

19   and that that involved CC Wang's probate.

20        THE COURT:  My understanding when we had this

21   discussion wasn't simply that by hiring a vendor to take an

22   inventory of what you all had that that simply meant that that

23   was going to be a collection of the publicly filed surrogate's

24   court documents, it wasn't going to simply be that because I'm

25   not sure if the defendants would have undertaken this

J3PTKINC - CORRECTED

1      otherwise.

2              MR. SAVITSKY:  Your Honor, we did not offer for them

3      to come over and make a copy, we said you have got

4      everything -- my understanding is different.  I was at that

5      conference, but this issue did not get -- this hasn't been

6      raised in the meet and confers with Ms. Conroy.

7              THE COURT:  Has or hasn't?

8              MR. SAVITSKY:  Has not been raised in meet and confers

9      with Ms. Conroy.  The tone of the meet and confer was very

10     different from the tone of the letter.  We were not -- we would

11     have worked something out and we would have -- certainly we're

12     not hiding what we have in our offices, because we thought it

13     was strange that they were willing to pay for that when

14     Mr. Cohen already had documents.

15             THE COURT:  It seems to me that this -- and I'm not

16     going to go back and find the discussion of this in the

17     transcript right now.  I think that would not be a useful

18     exercise at this time.

19             But let me start off with something that is very

20     important that you know, but I will state absolutely

21     unequivocally:  Any document that is not produced by either

22     side in discovery in these two cases cannot be used in these

23     litigations either on motion practice or at trial.  Is that

24     clear?

25             MR. SAVITSKY:  Absolutely, your Honor.

J3PTKINC — CORRECTED

1          THE COURT:  Is that clear to the back table?

2          MS. CONROY:  Yes, your Honor.

3          THE COURT:  So I'm trying to navigate the minefield

4     that you all have created to ensure that there is no

5     sandbagging, that there is no hiding of documents, that there

6     is no playing fast and loose with how one construes requests.

7          Now I am deeply troubled, if it is in fact true, and

8     skipping ahead a little bit -- although it is relevant to what

9     we are discussing -- that you have to date on March 25 of this

10    year not undertaken any electronic searches of any kind of your

11    clients.  Is that an accurate statement?

12         MR. SAVITSKY:  Have we logged into our client's email?

13    We have not done that, your Honor, no.

14         THE COURT:  What have you done to search Mrs. King and

15    her husband's emails to determine if anything in their emails

16    is responsive to the document requests in this case?

17         MR. SAVITSKY:  Your Honor, there are certain

18    specific -- what we have done is we have had them, we have gone

19    over each of the document demands and said they are looking for

20    emails.  For instance, an example is they say that --

21         THE COURT:  I'm stopping you.  Classic lawyer

22    non-response to a very simple question, like my asking you what

23    is one plus one and your answer is let me talk to you, Judge,

24    about the operation of mathematical principles:  You see, this

25    is how it works when you add things together.  No, I asked you

J3PTKINC - CORRECTED

1    one plus one equals two, and you either say two or not two.

2            The question is:  Have you undertaken a search of

3    Mrs. King's emails by conducting any sort of electronic search

4    with one search term, five, 50, or a thousand?  I don't care.

5    I want to know if your law firm or a vendor has examined their

6    email.  And what I mean by that, to be precise, is not that you

7    called them up on the phone and said they're asking for this,

8    do you have anything, and the answer is no, and you're assuming

9    the answer is no because somehow they looked themselves.  That

10   doesn't count.  I want to know if your law firm or a vendor has

11   accessed their emails to determine whether they have responsive

12   documents to produce to the other side.

13           That's a simple question.

14           MR. SAVITSKY:  No, we have not, your Honor.

15           THE COURT:  That's -- I don't know what the right

16   adjective for it is -- outrageous at this juncture of this

17   case, on March 25th, after multiple conferences where we talked

18   about this multiple times, I don't understand how you could

19   possibly justify it other than to say the demands they have

20   made at the back table of a thousand search terms or whatever

21   are overly burdensome -- which, by the way, they may or may not

22   be, but since you never I think even talked to a vendor about

23   returning search terms, we're probably talking about two

24   custodians to start, Mr. and Mrs. King, and don't know how

25   burdensome it would be for a vendor to run a thousand terms for

J3PTKINC - CORRECTED

1  two custodians; probably not so much.  But you have no idea

2  because you have never talked to a vendor, correct?

3          MR. SAVITSKY:  That's correct, your Honor.

4          THE COURT:  Okay.  Another bad answer for you.  You

5  all are going down a really bad path right now.  Do you

6  understand why I'm as exercised about this as I am?

7          MR. SAVITSKY:  I do, your Honor.

8          THE COURT:  How can you not have conducted any

9  electronic discovery in this case?  We had a conference back in

10 December, at the end of which Mr. Israel said some version of:

11 Judge, thank you, I feel edified, I understand how this is

12 supposed to work now.  And then three months later, after the

13 cut off of document discovery, you have done no electronic

14 searches.  How can that be?

15         MR. SAVITSKY:  Because, your Honor, we got the 1500

16 search terms on February 27, and our clients have been in the

17 hospital.  We really --

18         THE COURT:  Your clients have been in the hospital

19 from February 27 to March 25?

20         MR. SAVITSKY:  No, not the entire time, your Honor,

21 but --

22         THE COURT:  Both of them have been in the hospital?

23         MR. SAVITSKY:  The wife has been with her husband,

24 yes.

25         THE COURT:  The husband is ill, the wife is not ill?

1          MR. SAVITSKY:  I don't know.  The wife was --

2          THE COURT:  You need to know.  With all due respect,

3     you need to know.

4          MR. ISRAEL:  I have dealt with them directly.  Let me

5     answer the question.  Both of them, in fact, have been very

6     sick, and both of them have been in the hospital.  I dealt with

7     them directly.  Mr. Savitsky has had less contact with them

8     than I have.  But they have been in the hospital in China and

9     New York City.  And just now Ken King just came out of the

10    hospital, just a matter of days -- two or three days ago.  I

11    spoke to him over the weekend.  They just came out of the

12    hospital.

13         And point of fact, your Honor, just in terms of what

14    we produced, and if we have done a search of their documents,

15    we got originally a ton of documents from them, and we have

16    gone through our documents that we got from them.  So the only

17    thing we haven't done is a more research search of their

18    email --

19         THE COURT:  Hold on.  A more recent search?

20         MR. ISRAEL:  Yeah.

21         THE COURT:  Did you do a search ever?

22         MR. ISRAEL:  Yeah, we did a search that we have

23    maintained on our system.

24         THE COURT:  An electronic search --

25         MR. ISRAEL:  Yes.

J3PTKINC - CORRECTED

1              THE COURT:  -- of their documents?

2              MR. ISRAEL:  Of the documents that we got from them,

3      yeah.

4              THE COURT:  No, no, no.  They either have a laptop or

5      a desktop or something like that at home, one or more, I don't

6      know.  Do you know what they have?

7              MR. ISRAEL:  I assume they have a computer, and I

8      don't know the breakdown because they have been in the hospital

9      since --

10             THE COURT:  They have not been in the hospital for 17

11     years, Mr. Israel.

12             MR. ISRAEL:  I know that.

13             THE COURT:  With all due respect, this case has been

14     going on for so long that for you all to stand here on the

15     close of document discovery and to have to represent as

16     officers of the Court that you have not conducted any

17     electronic searches of your client's computer to determine

18     whether they have responsive information, I mean I don't know

19     what to do.

20             I know what the defendants want me to do, and I don't

21     understand why you think you shouldn't be sanctioned or your

22     clients shouldn't be sanctioned or some combination.  You were

23     put on notice of this before.  This is not a secret.  I don't

24     like sanctioning people.  But we have to move this case

25     forward, and for all I know, they have very relevant documents

1    on their computer that you yourself have never seen.

2              MR. ISRAEL:  Your Honor, may I just quick -- may I

3    respond to that?

4              THE COURT:  Yeah.

5              MR. ISRAEL:  I'm not kidding when I say my clients

6    were in the hospital and they were sick.  During the time that

7    this thing has been pending during the last month I have been

8    out been out of the office because I have been sick for most of

9    this period, so Mr. Savitsky has had to do this by himself.

10             And I can tell you, your Honor, he has been working

11   nonstop, and I have been checking in with him, to produce

12   documents.  And we have searched the documents.  We got a lot

13   of documents from them originally.  We didn't do an up-to-date

14   search because we haven't been to because they have been in the

15   hospital.  This isn't a fable, it's absolutely the truth.  I

16   dealt with them.  I dealt with their son also about this issue.

17   Their son flew into New York now because they're so badly --

18   they're so intensely ill.

19             THE COURT:  Why can't the son bring to you the

20   computer, desktop or laptop, to your offices, and you retain a

21   vendor who will conduct a search of some search terms that

22   we'll work out today, and that will happen this week.

23             MR. ISRAEL:  We could do that.  Like I said, it's not

24   that we haven't wanted to do that, your Honor, we haven't been

25   able to do it because of my client's sickness, but we could do

J3PTKINC - CORRECTED

1     it now.  The fact is that they're out of the hospital now and

2     we can do that.  And we have their son here now coming into New

3     York, so we would be able to do that.

4             Really, your Honor, if you only knew -- we haven't

5     been slacking off on this thing, we have been doing everything

6     what we can.

7             THE COURT:  It's not a question of slacking off.  And

8     I hope you know, Mr. Israel, at the last conference when you

9     weren't here, I was very concerned about you not being here,

10    and I'm glad you sound better.  I'm not trying to put it to

11    anybody, but we have deadlines and a case and requirements.

12    And unless I am told things like -- I mean at the end of

13    Mr. Savitsky's letter I'm told at the very end of the letter

14    that Mr. King has fallen ill, and that affects the responses to

15    interrogatories.  That's what I'm told.  I'm not told that

16    prevented us from getting access to a computer, I'm not told

17    that the son is going to be available, could I work through

18    him.  I'm not told anything that you're now telling me.  So I

19    have a barren record in front of me.

20            MR. ISRAEL:  We didn't know if we would see him again,

21    your Honor.  That's how bad it was.  His wife was very sick.

22    Both of them.  I was on the phone with them when they were out

23    of the hospital, and we really didn't know if they would

24    survive, to be honest with you.  It was very touch and go.

25    They're old people.  Mr. King had a heart attack ten years ago,

J3PTKINC - CORRECTED

 1    and since then he's never been in good health.  Now he's 86

 2    years old and he's just in dire shape.

 3              THE COURT:  And the last thing he needs is prolonged

 4    litigation.

 5              MR. ISRAEL:  I know that.  The last thing he needs is

 6    to hear about this, but he has to.

 7              THE COURT:  You lawyers need to do a better job of

 8    moving this case towards resolution, not litigation, frankly.

 9    And I told this to you before.  This can't be helping his

10    health one bit.

11              MR. ISRAEL:  It isn't.  It isn't at all.  But we're

12    lawyers, we are doing everything we can do to honor our

13    obligations.  And there hasn't been any kind of cavalier

14    disregard of what we have to do.

15              I came back to the office on Friday -- today is

16    Monday, I came back on Friday.  I have been out for a long

17    time.  And we went over everything very carefully.  And I was

18    satisfied that we did everything that we could do given the

19    circumstances.

20              THE COURT:  But you haven't talked to the other

21    side --

22              MR. ISRAEL:  We have.

23              THE COURT:  -- about anything about what you told me,

24    have you?

25              MR. ISRAEL:  Yes, we have.  And I was on the phone for

J3PTKINC — CORRECTED

1    one of these calls.  We had one meet and confer discussion

2    where I was on the phone, I participated, there was another one

3    where I wasn't.  And we did cover all this stuff.  I know, I

4    heard it myself.

5              THE COURT:  But hold on.  I mean their letter, among

6    other things, expresses tremendous frustration in there having

7    been no electronic discovery produced.  That's been discussed

8    in meet and confers?

9              MR. ISRAEL:  It's false.  We produced emails.  We

10   produced maybe as much as a thousand emails.  And we did

11   discuss this in our meet and confers.

12             THE COURT:  Emails of what kind?

13             MR. ISRAEL:  Emails from our client, emails to public

14   administrators from us, emails to other third parties from us

15   acting on behalf of our clients.  Our clients weren't doing

16   this stuff by themselves, we were doing it for them.

17             THE COURT:  Any emails produced from your clients that

18   have anything to do with any items on the Appel inventory?

19             MR. ISRAEL:  I don't believe that there are emails

20   that concern the Appel inventory.

21             THE COURT:  How do you know?

22             MR. ISRAEL:  Because we went through this with them.

23             THE COURT:  You went through what with them?

24             MR. ISRAEL:  Documents concerning --

25             THE COURT:  Let me unpack your words, because words

J3PTKINC - CORRECTED

1    matter.  You went through this with them because you had a

2    telephone conversation with two elderly people in ailing health

3    in which you asked them questions about communications.  You

4    didn't say we need to get access to your computer to go through

5    your emails.

6              MR. ISRAEL:  Your Honor, one or both were in the

7    hospital at various times, and we haven't had that opportunity

8    to do that, just the reality of it.  We did discuss with them

9    about what they have, and also with their son.  We worked with

10   them.  And the fact of the matter is now they're finally out of

11   hospital and we can do that.  It isn't for want of trying, your

12   Honor.  The fact of the matter is that we did go over this with

13   them and asked them for documents, and we haven't been able to

14   physically look at their computers yet, and we can do that now.

15             THE COURT:  Well, Ms. Conroy, let's go back to what

16   triggered this original discussion and not where we deviated,

17   and we'll come back to that in a minute.  We'll come back to

18   what I call the King room at the Israel law firm --

19             MS. CONROY:  Understood.

20             THE COURT:  -- and the production that was made, and

21   you heard what Mr. Savitsky has to say.  What's your response?

22             MS. CONROY:  So my response is this, your Honor:  You

23   may recall from our previous conference one of our earliest

24   requests were with regard -- because we kept getting responses

25   about it's already been produced, and we said okay, can you

J3PTKINC — CORRECTED

1     give us the production then that had been previously produced,

2     the production of documents.

3              Their response to us was that this was too burdensome

4     because it interspersed with our work product.  That's when we

5     then came before you and we offered through the vendor, we came

6     before, your Honor heard, and then they agreed at that last

7     conference.  So the understanding was that we -- my client was

8     taking on the payment to send a vendor over there to collect

9     prior productions from the surrogate's court the same way we

10    then took whatever files we had from prior counsel, organized

11    prior production.  The vendor came and picked up ours, picked

12    up theirs.

13             THE COURT:  To be precise, when you're saying prior

14    production, what do you mean precisely by that?

15             MS. CONROY:  Precisely I mean documents that were

16    produced pursuant to a subpoena or an RP in the surrogate's

17    court action.  In the probate action we understood that

18    productions have been made by the parties, not just our clients

19    but other parties, that were relevant to the claims, so --

20             THE COURT:  So production to be distinguished from

21    court filings.

22             MS. CONROY:  Correct.

23             THE COURT:  That's a separate category.

24             MS. CONROY:  Separate category, your Honor.

25             THE COURT:  Right.

J3PTKINC - CORRECTED

1      MS. CONROY:  That's what we understood, and we went

2  back and forth.  You may recall, your Honor, your Honor said

3  this seems to make sense, the defendants are willing to pay for

4  it, and then the vendor can put a new Bates number in and

5  everybody will have the same stuff that everybody has.

6      That was paraphrasing.  I don't mean to paraphrase

7  your Honor.

8      THE COURT:  That's fine, and I remember that.

9      MS. CONROY:  So going to that, our first request, when

10  we got their production, it consisted, like I said in my

11  letter, of 318 documents.  That wasn't what we were expecting

12  and what we agreed to pay for.

13      So with regards to that, what I'm asking -- that's why

14  in my letter I simply ask if they have production or undertake

15  the work of getting their production together and give it to

16  us.  And if they don't, then we think that they should bear the

17  cost of the vendor that we paid for, because we didn't agree to

18  pay for that, your Honor, quite honestly.

19      THE COURT:  Mr. Savitsky, what documents that were

20  collected by the vendor fall into the category of production?

21  Anything?

22      MR. SAVITSKY:  Yes.  Well, yes, because what was

23  produced were subsets of production.

24      THE COURT:  But to be clear -- and you heard I was

25  asking Ms. Conroy a very specific question about this -- in the

J3PTKINC — CORRECTED

surrogate's court case or cases, there were productions

pursuant to the discovery rules in that court, pursuant to

subpoenas in that court, et cetera.  What the defendants

assumed would be the case was that what they would find in the

King room at your law firm were collections of productions, not

briefs and appellate records, but productions.  What production

or productions were there that you're aware of that mitigates

against what Ms. Conroy is now saying?

          MR. SAVITSKY:  I mean there was 8,000 pages of Bates

stamped pages from prior productions in the forms that had been

collected, but they had just been organized into binders.  So

there was -- maybe they were taken from production, but it's

just the production, and put into maybe 400 exhibits.  We gave

them four binders that were like this thick each that were

Bates stamped pages of production in it.  It wasn't the entire

production that happened in the case because we just never had

that.  It's not the appellate record, it's not a legal brief,

it's not a memo, although we gave them certain documents like

that, but to make it sound like everything we gave them was

court filing, court filing, court filing, that's not true, your

Honor.

          They got thousands and thousands of pages of Bates

stamped documents that had not been filed or produced but that

had been collected and asserted.  We gave them everything,

because our understanding is that we had a room full of

J3PTKINC – CORRECTED

1    surrogate's court documents that they seemed to be asking for,

2    and they ask for all court filings, your Honor, because they

3    asked for communications with the public administrator.

4           So in that production we have letters with the public

5    administrator.  They asked for communications and letters about

6    the Kings' bankruptcy filing in 2008.  So in that production

7    there are letters.  It's not the complete record that's on the

8    ECF.  We didn't print things out and then booby trap our

9    production by just putting in things for no reason, but we have

10   got -- they specifically are asking for these items, and that's

11   what we understood to be collecting.

12          THE COURT:  Ms. Conroy, you tell me there are no

13   productions.  Ms. Savitsky tells me there are productions.  So

14   boil it down.  What is it that I'm supposed to do now?  Have

15   some in camera review of thousands of documents to see whether

16   they constitute production or not?  I'm not doing that.  That

17   seems like an inefficient use of judicial resources at this

18   time.  Reserve this question until later in the proceedings?

19   What is it the right and proper result here?  I can't resolve

20   this on the record before me now.  How can I?

21          MS. CONROY:  I think you can, your Honor.

22          THE COURT:  How can I?

23          MS. CONROY:  If may I, I think we're talking about two

24   different buckets.  What Mr. Savitsky just went over was

25   document requests for this, requests for that, that we asked

J3PTKINC - CORRECTED

1    for.  Yes, there are requests for certain categories of

2    documents that we asked for that they have to produce

3    regardless of vendor or not vendor.  We're talking about

4    something very specific here, it was about one category of

5    documents that were supposed to be productions from the

6    surrogate's court.

7         If you heard Mr. Savitsky correctly, what he said was

8    there are different things there that have different Bates

9    stamps.  Yeah, your Honor, because it's the appellate record,

10   it's exhibits to deposition transcripts.  Yeah, there are

11   certain documents that have a Bates number, but's not a

12   production that was what -- this one category of documents is

13   what we agreed to pay for if they assembled.

14        THE COURT:  How much did you pay?

15        MS. CONROY:  I can submit the invoice.

16        THE COURT:  You don't know standing here?  What kind

17   of money are we talking about here, hundreds of dollars,

18   thousands of dollars?

19        MS. CONROY:  My understanding from the vendor was that

20   it was approximately six boxes of documents that were -- six

21   boxes that were picked up from them.  So I can't imagine --

22        THE COURT:  I thought it was four binders.  Was it six

23   boxes?

24        MR. SAVITSKY:  It was four boxes and we gave -- you

25   asked what was the production inside of it, and said there was

1    non-filed binders that were not filed with the surrogate's

2    court that consisted of production and solely production, Bates

3    stamped, so there were four binders of just Bates stamps with

4    exhibit tabs on them that had not been filed.

5            THE COURT:  Meaning documents that were produced in

6    the surrogate's court proceeding in discovery?

7            MR. SAVITSKY:  Yes, it was a subset of production, not

8    the entire production it.

9            THE COURT:  It's what you had.

10           MR. SAVITSKY:  Right, and that we organized for our

11   purposes at the surrogate's court trial.

12           THE COURT:  Okay, I don't care about that.

13           But he's telling me, Ms. Conroy, that in fact what you

14   did get in part was production, not just court filings or

15   whatever.  If that's true, that's what I did expect.  And if he

16   gave you everything he had in that category, then I don't

17   understand why you have a legitimate argument to be reimbursed,

18   because that was my understanding, which was you had

19   production, they had production, you were all going to agree to

20   Bates stamp it beginning at one all over again.  And then you

21   would all be working from the same collection of documents and

22   your client was willing to pay for that.  And if that's

23   happened, we're not going to disturb that.

24           So that's why I say I'm not sure that I can resolve

25   this now, because Mr. Savitsky is in fact, as an officer of the

J3PTKINC - CORRECTED

1    Court, representing to me that at least some quantum of the

2    material that was produced as part of this vendor-tasked

3    project was production from the surrogate's court proceeding,

4    which is what I understood was supposed to happen.

5             MS. CONROY:  Your Honor, yes.  I guess if you give me

6    a transcript of a deposition, a deposition transcript, and then

7    you give me the 40 exhibits to that deposition, yeah, they're

8    going to have Bates stamps on there.  Technically speaking,

9    sure.  Is that what we asked for and thought we were getting?

10   No.

11            THE COURT:  What did you think you were getting?

12            MS. CONROY:  We thought we were get productions by a

13   party, like okay, here is what the King -- this is what we have

14   from the Kings that they produced in the surrogate's court

15   action, here are the production from Christie's that were

16   produced in the surrogate's court action that we have, here are

17   the productions from Mr. Smith.  If they didn't have any of

18   these productions, they could have just said so.  This would

19   have been -- we would never had the argument.

20            They never said we don't have the productions, what

21   they told us was that it's too much work for us, we have work

22   product interspersed, it's too much work for us to try to do

23   that.  That's what they told us.  So I can't sit here, your

24   Honor, and tell you that an exhibit that -- a transcript that

25   they produced with a deposition --

J3PTKINC – CORRECTED

1      THE COURT:  The problem is this case is almost 20

2  years old and we're never going to have a collection of

3  documents that is going to satisfy either side that you have

4  the quantum of documents, the totality of documents.  It's just

5  not going to happen.  But there are certain things that must be

6  done to determine what at least the contours of the proper

7  collection should be.  That goes back to what we were talking

8  about earlier about the electronic discovery, and I'll come

9  back to that.

10      I will, in the interest of time, deny without

11  prejudice your application on having reimbursement for this,

12  because the record is not developed enough for me to make a

13  judgment.  If you want me to make some considered judgment, we

14  can revisit that at some point down the road, but not today.

15      MS. CONROY:  Understood.  Thank you, your Honor.

16      THE COURT:  All right.  Let's do this, the next

17  request that I see, which is on page 4, is where you request

18  that the King parties be ordered to hire a third party ESI

19  vendor and to have that vendor search for and produce

20  responsive non-privileged documents based upon the Wang

21  parties' proposed search terms by this Friday.  That gives them

22  four days to accomplish this.

23      Now you have heard what Mr. Israel and Mr. Savitsky

24  has said about the health of their clients, their son coming

25  in, they can get the computer, they can hire a vendor.  So some

J3PTKINC - CORRECTED

1    of what I think you're asking for here may be done on consent.

2    I gather you all have not discussed this before, is that

3    correct?

4              MS. CONROY:  Correct, your Honor.

5              THE COURT:  What you have just heard has not been told

6    to you in advance of today, in terms of the clients and their

7    lack of availability, et cetera.

8              MS. CONROY:  In part, your Honor, not the whole story

9    that we heard today.  Mr. Israel did inform us.  I want to say

10   I believe the day was March 11, because interrogatory responses

11   were due, and he had then informed us that they were going to

12   be delayed because Mr. King was in the hospital.  Then we had a

13   back and forth about that, but we need not get into that.

14             Suffice to say, when he told us that, we then granted

15   to them a short extension to give us the responses because of

16   Mr. King's health and the representation that his wife was by

17   his bedside and it was potentially dire.  Obviously we then

18   were accommodating.

19             But if I may, your Honor, make a statement about the

20   Kings' health.  Like Mr. Israel had represented I think back in

21   January, I think Ms. King was sick in China and that delayed

22   the interrogatories the first time, which then got extended to

23   January 31st, which they were both then available and did give

24   interrogatory responses as of January 31.  So at least at that

25   time neither one were in the hospital.

1              Our initial request for production in the King action,

2       I will call it, was made back in November.  That was well

3       before it was represented Ms. King was in the hospital.  I

4       believe we were told at the end of December.  And so my only

5       point, your Honor, is that I am not doubting -- obviously

6       everyone, here at least a lot of the parties here are elderly,

7       and obviously elderly people suffer from medical issues more

8       often than not.

9              I guess our point simply is that there has been a

10      request out there since November.  In this day and age, the

11      minute you get a request for production, you go to your client

12      and you go:  Tell me where your electronic discovery is.  Tell

13      me where your emails are.  Show it to me.  And you grab it from

14      them, normally, or you at least grab access to it for a

15      multitude of reasons, even before you decided what you're going

16      to agree to produce or not, if not solely, usually for the fact

17      of preservation.

18             So in my mind, irrespective of the health concerns

19      that each of the Kings have unfortunately suffered, the fact

20      that counsel still doesn't even have access to their client's

21      electronic discovery when requests were first served in

22      November is inexcusable, your Honor, quite honestly.

23             THE COURT:  So what do you want me to do?

24             MS. CONROY:  Well, like I said --

25             THE COURT:  What I just read, by Friday they get a

J3PTKINC - CORRECTED

1    vendor, they have the search terms that you have proposed, a

2    thousand of them, and that vendor, between now and Friday,

3    search the computer that the Kings have and provide information

4    to Mr. Savitsky and Mr. Israel, which they in turn provide to

5    you, absent privilege issues.  That's your request?

6            MS. CONROY:  That's one part of my request, yes.

7            THE COURT:  What's the other part?

8            MS. CONROY:  I think some form of sanctions is

9    warranted.

10           THE COURT:  We'll come back to sanctions.

11           Counsel for plaintiff, what's your response?  So what

12   are willing to do and what timeline?

13           MR. ISRAEL:  We'll do it.  It seems like it would be

14   extremely hard do, especially since it's really Mr. Savitsky

15   who is interfacing and getting this thing done, but I mean if

16   that's what the Court orders us to do, we'll do it.  I mean it

17   seems like it will be a very compressed period for a lot of

18   work.  That's all I would say about it.

19           THE COURT:  It may not be a lot of work, because if

20   it's one computer, then it's going to produce whatever it is

21   going to produce.

22           MR. ISRAEL:  It's a thousand terms that I'm concerned

23   about.  Whatever we get from them we're going to have to go

24   through it ourselves to make sure there's no privileged

25   documents in there.  And that's a laborious undertaking to go

J3PTKINC - CORRECTED

through however many documents come from a thousand search
terms.  We have tried just a few of those terms on our computer
and it yielded hundreds of documents.

THE COURT:  That I'm not sure that is analogous, with
all due respect.

MR. ISRAEL:  But we searched for the terms that they
are giving us now.

THE COURT:  With all due respect, you're the lawyers.
You're the lawyers.  It's not the same.  It's really not the
same.  It's not even apples to oranges, it's like apples to
Brussels sprouts or something.  It's not a fair comparison,
with all due respect.

MR. ISRAEL:  I don't understand.

THE COURT:  Because you're lawyers and you're
litigating a case.  What they may have communicated on the
merits with, art dealers or whomever ten years ago, is
substantive evidence in the case.  Your communications are not
substantive evidence in the case, they're something very
different, they're work product.

MR. ISRAEL:  I'm sorry, I wasn't being clear.  What I
was talking about is when we searched the substantive documents
that we have on our computer, because we had received
documents -- when we were hired and subsequent to then we
received documents from our client, and those are among the
documents that we searched to production things to the

J3PTKINC - CORRECTED

1    defendants.  And when we do searches on those documents, that

2    database, the King's documents, any one of these terms yields

3    hundreds of pages.

4            It's an extraordinary undertaking, a thousand terms,

5    your Honor.

6            THE COURT:  Well, does it need to be a thousand terms,

7    Ms. Conroy?

8            MS. CONROY:  A couple of things to that, your Honor.

9    I do agree with you that it is apples to oranges.  If

10   Mr. Israel's representation is true, then what he is telling

11   you now is that since the start of this case he has had ESI in

12   their possession that they just haven't searched --

13           THE COURT:  That's not what he said.

14           MS. CONROY:  Anyway, what I would have to say about

15   our searches is this, your Honor:  They didn't have to take our

16   searches.  They could have proposed their own searches.  They

17   could have searched ESI any way they wanted, told us, and then

18   we could have had a dispute, agreement, compromise, whatever.

19           I think the fact that we are now past the second

20   deadline for document discovery and it still hasn't been done,

21   quite honestly, this is something of their own making.  The

22   situation they are in now is of their own making, and to cry

23   burden about it because you just haven't done it, it's almost

24   like rewarding bad behavior.

25           So quite honestly, and for the record, your Honor, on

J3PTKINC — CORRECTED

1   our meet and confer, I had even offered to Mr. Savitsky:  Why

2   don't you get a vendor?  Why don't you get hit counts, maybe we

3   could talk?  And he just wouldn't do it.  So every form

4   compromise, even if there were no compromise, even if they had

5   done the searches themselves, it might have been something

6   different, but it's not, and we're here.  At this point I think

7   part of those solution should be they should be forced to go

8   through our terms.  And they haven't tried to do anything else,

9   they haven't tried to put together their own.

10         And your Honor, from the last time we were here, we

11   reduced that search term list, because you may recall they had

12   said it was broad, we haven't had a chance to look.  We then

13   sent them a revised list that cut down more terms, and I said:

14   Tell me what terms you think are too broad, not relevant.

15   Let's have a discussion about it.  And they said no, we're not

16   doing it.  So that's where we're at.

17         MR. ISRAEL:  This is not true.

18         MS. CONROY:  It's a hundred percent true, your Honor.

19         MR. ISRAEL:  I was on the call.  Your Honor, this is

20   not a fair characterization of our discussions at all.  It is

21   not.  We tried very hard to get them to give us a realistic

22   number of search terms and we would have searched.  We're

23   talking about a period of a few weeks since this issue first

24   came up.  It's not like we have been sitting on the search.

25         THE COURT:  The issue first came up in the fall.

J3PTKINC - CORRECTED

1          MR. ISRAEL:  About the search terms?

2          THE COURT:  Yes.  We talked about this back in

3   December.  I'm very confident of that.  I'm very confident of

4   that.  I don't have the transcript from December, but I know we

5   talked about it.

6          Don't you remember the conference we had, Mr. Israel,

7   where you asked me a lot of questions about how this would

8   work, and I said well, first of all, there are sort of

9   threshold things that have to be done here, which are who are

10  the custodians, what are you going to -- I don't remember how

11  we talked about this, is it just the Kings, do they just have

12  one computer, et cetera.  And you were like oh, that's helpful,

13  now I understand how that will be.  But the problem is from

14  that conversation to today, nothing has happened by way of

15  production of electronic discovery.

16         And to your privilege issue, if you all entered into a

17  502(d) order, which I have mentioned several times, you

18  wouldn't have to vet all of it between now and when you

19  produced it without waiving any right you have.  If privilege

20  does get produced, you could pull it back.  So I would strongly

21  encourage you to consider doing that.

22         You know what I'm talking about.

23         MR. ISRAEL:  I do know what you're talking about.

24         Your Honor, we just got the terms on February 27.  It

25  has not been since December.  We got them on February 27, these

J3PTKINC – CORRECTED

1    thousand terms.  It hasn't been that long.

2             THE COURT:  That's a month.

3             MR. ISRAEL:  It is a month, it's true.

4             THE COURT:  The discovery cutoff was Friday.

5             MR. ISRAEL:  It's a month.  And we received a ton of

6    documents from them on Friday, maybe at 8:00 o'clock at

7    night --

8             THE COURT:  What a shock, as if that's never happened

9    before.

10             MR. ISRAEL:  Your Honor, we're doing everything we

11    can.  I can't help that my clients are elderly and sick.  I

12    can't help that I was sick for most of the month, which is the

13    case.

14             THE COURT:  But on all of that you have my sympathy,

15    especially for you, you're a lawyer in front of me, and I don't

16    know your clients, but that has to then be communicated, which

17    is we can't do this any faster, I'm a small law firm,

18    Mr. Savitsky is working 15 hours a day, et cetera, and we need

19    more time to make this happen.  Then that has to be

20    communicated first to Ms. Conroy so that she will look

21    unreasonable to the Court if she's not accommodating illness of

22    client and lawyer, et cetera.  But my understanding is most of

23    what was told to me was not told to the back table.

24             MR. ISRAEL:  That's not true, it was conveyed to them.

25    I personally wrote to them, in fact.  It must have been about

J3PTKINC - CORRECTED

1    like ten days ago we had this.

2           THE COURT:  But you know what, we have been at this

3    almost an hour, and as you know from other times, I'm not

4    really into the blame game.

5           MR. ISRAEL:  I know.

6           THE COURT:  That's not my thing.  I want to move the

7    case forward on the merits.

8           Here's we're going to do:  Because I have nothing in

9    front of me to suggest that you're hiring a single vendor to

10   conduct a search of your clients' single computer, and "they"

11   being the two custodians, is overly burdensome, unless and

12   until that is represented to me with specificity, my order is

13   that I am going to direct you all to retain a vendor and to

14   conduct an electronic search of the search terms the defendants

15   have provided and to provide the results to the other side by a

16   week from today.

17          Now if for some reason you have some arguments, that

18   doesn't mean you conduct no search, it means you conduct

19   something lesser than that, tell the other side what you did,

20   have a meet and confer, and then if you aren't able to work it

21   out, then I will revisit this beyond what I am now ordering.

22   But you have to hire a vendor to do this this week and do it,

23   and you have these terms.  And a lot of the terms are different

24   works of art.  That's a huge number.  There are hundreds of

25   them.  They are likely, I suspect, to be in the same emails,

J3PTKINC - CORRECTED

1    presumably, I would think.  I could be wrong.

2              So the record hasn't been developed, and you could

3    have developed it, to show burden.  So unless you do, the order

4    stands as I have said.  Do you understand?

5              MS. CONROY:  Just for clarity, your Honor, clarity of

6    the record, that's to search for electronic documents,

7    including email accounts, correct?

8              THE COURT:  Yes, and I assume it's primarily going to

9    be that.

10             MS. CONROY:  And just for clarity, too, in our, what I

11   will call the Wang action, Mr. Raymond King is also a party.

12   So they will be searching Mr. and Mrs. and Mr. Raymond King as

13   well.

14             THE COURT:  Raymond King, the son?

15             MS. CONROY:  Correct, your Honor.

16             THE COURT:  Because he's a defendant in your action?

17             MS. CONROY:  Correct, your Honor.  If in the first

18   instance you want to say just the two, that's fine, but your

19   Honor, they haven't --

20             THE COURT:  My problem is we have a cutoff of

21   March 22nd from Judge Keenan.  He made a decision.  He denied

22   the stay application.  He extended it a week.  And now we're

23   past that, and now we're doing more than that.  But if we just

24   do Mr. and Mrs. King, you're going to come back and say now do

25   Raymond King, then we're going to bump up against the May 8

J3PTKINC - CORRECTED

1    fact discovery deadline, and you all will want to move that.

2             As far as I'm concerned, I don't want to move that.

3    And that's why we're getting to April, you all have to start

4    taking depositions, because you will run out of time if you

5    want to take depositions; maybe you don't, I don't know.  But

6    you will run out of time.  And one of your other requests is we

7    don't want to take depositions until we have all the documents,

8    basically, we'll want two weeks lead time, and I don't know how

9    realistic that is.  We'll come back to that.

10            So your question is:  Is the vendor going to conduct a

11   search of these terms?  Do they all apply to Raymond King as

12   well?  Why would they all apply to Raymond King?

13            MS. CONROY:  We could select out the ones for Raymond

14   King.  Your Honor, I was just asking because the discovery was

15   consolidated, and the position has been:  We don't have to

16   produce any discovery that is related to your action, and no

17   ESI, we have done it all.  So I am happy to identify the ones

18   that relate just to Raymond King.  I'm just asking are we going

19   to get electronic discovery from Mr. King as well, since the

20   order only mentions Mr. and Mrs. King.

21            THE COURT:  What does Raymond King -- I just don't

22   know enough about his personal involvement in all of the

23   various allegations here to suggest what the scope of an

24   electronic search of his computer might entail, for example.

25            MS. CONROY:  Okay.  Do you want to talk about it now

1   or do you want us to then --

2              THE COURT:  You brought it up, so I think we have to

3   talk about it now.  Let's make it more complicated, okay?

4   Whenever a lawyer has a chance and a judge is making a ruling

5   in this case, let's make it more complicated, let's throw

6   something else in while the judge is trying to move forward.

7              MS. CONROY:  Honestly, your Honor, I'm not, he's just

8   a defendant you didn't mention.  That's the only reason why I

9   mentioned it.

10             THE COURT:  Because we have been talking about Mr. and

11  Mrs. King the whole time.

12             MS. CONROY:  Understood, your Honor.

13             THE COURT:  Right?

14             MS. CONROY:  Yes.

15             THE COURT:  What's your thought about that?  What are

16  you going to do about Raymond King?  Produce nothing?  Continue

17  with:  We are imposing a stay ourselves, even though Judge

18  Keenan denied it multiple times?

19             MR. ISRAEL:  We never did that, your Honor.  Your

20  Honor, I just want to disabuse the Court of this notion that we

21  imposed the stay ourselves.  We never did that.  We never said

22  we're not going to do it because the motion was pending.  I

23  know that was represented to you, your Honor, it's one of

24  things I find deeply frustrating about this case is that it was

25  represented to you, and we never said we are not doing

J3PTKINC - CORRECTED

1   discovery because a motion to dismiss is pending.  Period, full

2   stop, we never did that.  We never said there was a stay of

3   discovery.  We didn't do that.  We applied for a stay of

4   discovery, it was denied, but we never imposed our own stay.

5   We kept working throughout the whole thing to produce

6   documents, your Honor.

7           THE COURT:  So is your vendor going to look at

8   Mr. Raymond King's computer as well?

9           MR. ISRAEL:  He lives in Washington State.  He's

10  coming in now to see his parents.  I don't know the physical

11  realty of having a vendor now in Washington State do a search,

12  and I'm sure the thousand terms wouldn't even conceivably apply

13  to Raymond King.  But I would say in any other case let us

14  confer about it and come up with reasonable terms, I just don't

15  know that that could happen here because of the personalities

16  involved.

17          THE COURT:  Well, that last comment is the most

18  troubling thing, and we're back to that whole issue from

19  December.  And I don't want to hear that, Mr. Israel.  If

20  you're telling me you can't get along with Mr. Kelly and

21  Ms. Conroy, that is deeply troubling and unfair.  I mean I

22  don't know what goes on behind closed doors with the lawyers in

23  this case, but that is unacceptable.  So disabuse yourself of

24  the notion that it's the lawyers' fault because I can't get

25  along with them, otherwise we would work it out.

J3PTKINC – CORRECTED

1      MR. ISRAEL:  That's not what I meant, but I understand

2  your point very, very well.

3      THE COURT:  You just said because of the personalities

4  of the lawyers in this case.  What else could that mean but:  I

5  don't get along with Ms. Conroy and Mr. Kelly, they're

6  difficult personally and they're making this problematic.

7  That's what that meant.  Okay?  Let's call it what it is.  And

8  that is unacceptable.  And they might say the same about you.

9  I'm not interested in that.  You're officers of the Court.  You

10  created a tremendous amount of work for Judge Keenan and me in

11  this case and will continue to do so.  That's our job.  But

12  there are a lot of lawyers who litigate a case like this

13  without having to be in monthly conferences with the Court.

14      Now if that's a byproduct of you all not getting

15  along, my answer to that is:  Get along.  All right?  This is a

16  lawsuit.  If you have been ill, I hope that gives you some

17  proper perspective on things.  Lawsuits are not wars, they are

18  not sporting events, they are not battles, they are to see that

19  justice is served and a right result is there, and it is not

20  advocacy at all costs.  Let's be clear about that, and let's

21  take a recess.

22      (Recess taken)

23      THE COURT:  Okay.  So any good reason why the order

24  about the vendor shouldn't include Raymond King, Mr. Savitsky?

25      MR. SAVITSKY:  Yes, your Honor.

J3PTKINC - CORRECTED

1          THE COURT:  What's the reason?

2          MR. SAVITSKY:  The reason is because he -- this is a

3     thousand search terms in Chinese and English, and the order

4     that your Honor issued is not that we conduct a search over the

5     next seven days, but we then produce responsive documents.

6          THE COURT:  Right, and you will stipulate to and/or I

7     will simply order under 502(d) that whatever gets produced and

8     can be pulled back and there will be no waiver of any

9     privilege, and that's how it's going to work.  Because that's

10    why the rule exists.  And I mentioned it before and you don't

11    pay attention, so how about this time around when it really

12    matters, because now the rubber will meet the road, so to

13    speak, and you will have to do this.  So if there are documents

14    that might otherwise be privileged, they get produced in bulk,

15    and then at your leisure you review them and you say I want

16    that back and you get it back.

17         MR. SAVITSKY:  I understand, your Honor, but we have

18    privileged communications in multiple cases across I think

19    maybe five or six separately indexed, separately commenced

20    cases, and they all involve the exact same thousand terms, if

21    we produce everything, it's not so simple as it's just --

22         THE COURT:  Let's be clear about this.  Obviously if

23    there's emails between the Kings and you or Mr. Israel, that

24    would be privileged and not produced.  And that's easy.  And

25    I'm sure the vendor can probably run a search that creates a

J3PTKINC — CORRECTED

1    separate file, but you wouldn't know because you haven't even

2    talked to a vendor about any of this, correct?

3            MR. SAVITSKY:  That is absolutely correct, your Honor.

4            THE COURT:  So before you start getting on your high

5    horse with me about all of this, and I keep trying to help you

6    all about giving you different suggestions, try and do some

7    homework and figure this out.  Hire a vendor and say to the

8    vendor:  There's undoubtedly going to be communications between

9    my law firm and the Kings, and that shouldn't be part of the

10   production, can you ferret it out?  And the answer I think is

11   going to be yes.  Okay?

12           But notwithstanding that, you should also -- I would

13   encourage you to enter into a 502(d) stipulation, and/or I

14   could just order it, which I think as a matter of law I can do

15   so sua sponte, but it would be much better if the lawyers

16   tailored their agreement as essentially a codicil to your

17   protective order, if you will, yourself, because you may have

18   particular interests in the like.  And I'm sure Kasowitz has

19   done this a million times if your firm hasn't, because it's a

20   fairly standard big firm practice.

21           Ms. Conroy, have you done a 502(d) order before?

22           MS. CONROY:  I have, your Honor, and I am more than

23   willing to enter into it.

24           THE COURT:  So I would direct you all this week in the

25   course of this process to have discussions on how to submit a

J3PTKINC - CORRECTED

502(d) stipulation to me, or alternatively tell me you couldn't

work it out and submit dueling ones, if you like, and I will

enter one.  And that is in your interest, because what will be

protecting your fear that they will somehow avail themselves of

privileged information that they can then use in litigation.

The whole purpose of this is to prevent that from happening.

Interestingly, it's in a rule of evidence, and it

didn't go through the normal rule-making process, it was done

as a matter of congressional enactment because this was such a

big problem ten years ago in commercial litigation.  And so

many, many dozens of lawyers now have availed themselves of

just this protection for just the concerns that you care about,

and I know I mentioned it before.

MR. SAVITSKY:  Understood, your Honor, but I do have

another point on this about Raymond King and his production.

You have been saying "computer," but what we have agreed to and

spoken about is a search of emails.

They searched, they said, Andrew's emails.  There's

been no search of Andrew's computer based on what they have

said.  So what is being imposed now in less than 27 days or

less than 30 days since we got the thousand search terms is a

broader and more expansive demand on us across three custodians

who hadn't been suggested until after our last conference.

THE COURT:  Who hadn't been suggested, as if their

identity was a mystery.

1          MR. SAVITSKY:  That's true, your Honor, but we hadn't

2     had the meet and confer.  And you said at the last conference

3     it's premature for me to address, A, whether any of these terms

4     are overbroad or irrelevant or anything like that, so you all

5     have that discussion, and it's premature for me to have a

6     discussion on who the custodians are because this is too fresh.

7          But it feels like -- coming in here it feels like an

8     ambush, because I know they are saying we hoodwinked them,

9     they're saying we're the ones that deserve to get sanctioned.

10    And I know you read Mr. Israel's statement to be that we had

11    very contentious communications in meet and confers.

12    Absolutely the opposite.  What is in the letter is the opposite

13    of what we had.  And the point of this is not to show some type

14    of duplicity, the point is to show they are misrepresenting the

15    things we said, and they have been doing it since the last

16    conference, your Honor.

17         THE COURT:  Discovery in this case has gone on for

18    months.  You had your pretrial conference in which Judge Keenan

19    set the conference in discovery schedule in this case last

20    June, is that not right?

21         MR. SAVITSKY:  It is, your Honor.

22         THE COURT:  It is unfathomable to me in March of 2019,

23    after nine months, that you have not undertaken any effort to

24    make a production of electronic discovery.

25         MR. SAVITSKY:  In nine months, they wait until 27 days

J3PTKINC - CORRECTED

1    before the deadline and say hey, here's a thousand words, about

2    a quarter of them are in Chinese, get us something within two

3    weeks.  That's not reasonable given the size of our firm and

4    given the amount of work that we have to do in this cases and

5    the parallel cases.

6         In the interim, we have to reply to the motion to

7    dismiss in the Wang action.  Our reply is due on Friday.  We

8    also have a motion to dismiss in the Kings' action pending on

9    one of the 2003 proceedings, and we're also still dealing with

10   third-party discovery and subpoenas and responses to those.

11        THE COURT:  It's a big case, Mr. Savitsky.

12        MR. SAVITSKY:  It is, and that's why waiting until

13   less than 30 days beforehand to submit 1500 search terms and

14   then wait one conference for us to come back and hammer us in

15   the letter as if we have been putting our hands in our pockets

16   and not doing anything isn't true.

17        THE COURT:  Have you had a meet and confer with

18   Ms. Conroy about the search terms?

19        MR. SAVITSKY:  Yes, and I said let's start this way:

20   We'll give 50, you give 50, and we'll move forward from there.

21   I said that weeks ago.  And they said no.  They said we are not

22   amenable to breaking down our term search terms.  And all we

23   got was maybe a week later after we made our points, she

24   said -- and it was only a week ago, she said we'll come down

25   from approximately 1500 to maybe it's a little over a thousand

1    search terms now; still in Chinese, still three custodians.

2    All of this was brand new meet and confer stuff that is being

3    treated, quite frankly without reviewing these terms, as if we

4    have just been obstinate and recalcitrant for no reason, and

5    it's not true.

6            THE COURT:  Why didn't you proactively conduct some

7    searches using search terms that you knew would be

8    uncontroversial and produce that as a foundational way to

9    proceed?

10           MR. SAVITSKY:  Because, your Honor, I don't know what

11   they view is important.

12           THE COURT:  What was that?

13           MR. SAVITSKY:  I don't know what they view is

14   important out of 1500 search terms, for me to make my decision

15   what they actually want and need, because I don't think these

16   are relevant anyway.

17           THE COURT:  You had 50, right?  You were proposing 50?

18           MR. SAVITSKY:  We proposed exchanging lists of 50,

19   that's correct.

20           THE COURT:  Did you give them a list of 50?

21           MR. SAVITSKY:  We did not give them a list of 50.

22           THE COURT:  With all due respect, Mr. Savitsky, I

23   think you're arguing from something that doesn't have a very

24   sturdy foundation.

25           Ms. Conroy, do you want to be heard?

J3PTKINC – CORRECTED

1              MS. CONROY:  Not today, your Honor.

2              THE COURT:  Okay.  So as far as I'm concerned, the

3     order that I issued before the break stands.  The order is that

4     the King parties will hire a third-party vendor and the vendor

5     will search for and produce responsive non-privileged documents

6     based upon the Wang parties' proposed search terms, and I will

7     give you to the following Monday, which is April 1st.  To do

8     so -- that includes Raymond King -- I suggest you all submit a

9     502(d) order if you're worried about any privileged documents

10    being produced as part of that production.

11             If, after the vendor has been hired and some search

12    has been undertaken you determine there is some issue of burden

13    here, then you must have a meet and confer with Ms. Conroy and

14    Mr. Kelly to discuss it.  And they will be required to be

15    reasonable in addressing whatever that may be, which is

16    hypothetical, so it may or may not be as burdensome as you

17    think.

18             Just because you say there's a thousand search terms

19    doesn't by definition mean it will be burdensome.  You will

20    only be able to know whether it is burdensome after the vendor

21    can tell you why it is burdensome, in my opinion.  Until then

22    you're not going to know.  And because nothing has been done on

23    this front and you have not been proactive in this regard, and

24    I'm not convinced that the meet and confers that were had on

25    this subject flesh this out in a meaningful way, this is

J3PTKINC - CORRECTED

1    effectively the sanction that you are imposed, both the time

2    frame and the cost incurred.  I'm not otherwise beyond that

3    going to impose some separate sanction which they are also

4    seeking at this time.  So that application is denied.

5              MS. CONROY:  Thank you, your Honor.

6              THE COURT:  Moving on to request number three, which I

7    will I say begins on page 4 and continues with all of these

8    requests that I don't know if they're given as examples or we

9    need to go through them seriatim.

10             Ms. Conroy, how are we proceeding?  These are examples

11   of things we asked for, here are their objections, we think we

12   should get them.  Are we going through them one at a time?

13             MS. CONROY:  We could you go through it however you

14   like, your Honor.  Honestly, if it's more conducive to the

15   Court, you have our letter, you have their letter.  If the

16   Court wants to make a ruling, I am happy to stand by whatever

17   ruling.  If the Court wants to hear from the parties as to why

18   with regard to each category, we're happy to do that, too.

19   Honestly at this point I think everyone here can obviously know

20   your frustration, and rightfully so, and at this point I'm open

21   to do whatever.

22             THE COURT:  What do you want, Mr. Savitsky, one at a

23   time, I hear from each side?

24             MR. SAVITSKY:  Yes, your Honor.  I think these are the

25   outstanding points.

J3PTKINC - CORRECTED

1          THE COURT:  Should we order dinner now or later?

2     Won't this take hours?

3          MR. SAVITSKY:  Your Honor, if going through them is

4     burdensome, it's even more so -- it's even more so sifting

5     through 19 years of documents.  They go back without

6     restrictions 1997 they want us to be looking through and

7     collecting this stuff.  We're on a tight schedule, and just

8     like the thousand terms that we got, these terms that she's

9     asking -- Ms. Conroy is asking us to go through we also got

10    last month; only 30 days.  Nine months of discovery and we get

11    hit with over 100 document requests that are broad that require

12    significant thought about whether or not we're legally required

13    to respond to them in a week.  So I understand your Honor's --

14         THE COURT:  What do you mean in a week?

15         MR. SAVITSKY:  We have to respond to the Wang search

16    terms within a week and there will be ESI --

17         THE COURT:  No, these are document requests that were

18    served longer ago than a week, they were served in February.

19         MR. SAVITSKY:  Mid February.

20         THE COURT:  You choose not to respond to some of them,

21    invoking burden, overbreadth, privilege, whatever.  You met and

22    conferred, you couldn't work it out.  They're effectively

23    making a motion to compel.  But in this Court, in order to

24    avoid the delays and formalities of such motions, we deal with

25    them more informally, as you know, in these sorts discovery

1   hearings where the courts make rulings to move things forward.

2          So let's go through them quickly.  Request 59, funds

3   received by the King defendants from the sale of Appel

4   inventory artwork.  That's overly broad and previously

5   produced.  The Wangs say that it's reasonable and relevant to

6   their claims.

7          When you say funds received by the King defendants

8   from the sale of the Appel inventory, what documents are you

9   looking for?  What does that mean you want?

10          MS. CONROY:  Literally what we are looking for, your

11   Honor, is similar to the documents they were looking for from

12   us, meaning any bank statements or documents that identify the

13   source of how any fund that they received and from whom,

14   relating to any sale of artwork on the Appel inventory.  That's

15   it.

16          THE COURT:  From 1997 to the present?

17          MS. CONROY:  I don't think that there were sales back

18   then, but yes, that's the relevant time period.

19          THE COURT:  So why is that overly broad?

20          MR. ISRAEL:  It's not.  We don't have any documents.

21   We checked.  We don't have any documents.

22          THE COURT:  So then why is it on the list?  It doesn't

23   say I don't have any documents.  I'm told your objection was

24   overly broad and previously produced, not that there were not

25   documents.

J3PTKINC — CORRECTED

1            MR. ISRAEL:  I spoke to counsel on the phone myself
2       and told her that these are pro forma objections that we put
3       there in there.  We went through each one of those things.
4            THE COURT:  Let me pause there.  Pro forma objections
5       are not appropriate.  You don't just put in objections.
6            MR. ISRAEL:  No, no, no, reserving rights, that's all
7       we're doing with some of that language.  And we discussed each
8       of these points, and the fact is we don't have any documents.
9            THE COURT:  You have no documents that reflect any
10      money that your clients received from the sale of any artwork
11      on the Appel inventory, is that what you're representing?
12           MR. ISRAEL:  Yes, your Honor.
13           THE COURT:  Well, then that's that.
14           MS. CONROY:  Your Honor, can you ask them if they
15      searched for the documents?
16           THE COURT:  I mean I'm not here to conduct a
17      deposition.
18           MS. CONROY:  Understood, your Honor.
19           THE COURT:  You can ask Mrs. King at her deposition,
20      you can ask Mr. King at his deposition, you can ask anyone you
21      want those sorts of questions.  I'm not going to cross-examine
22      Mr. Israel, who is not under oath, who is a lawyer who has
23      certain obligations as a lawyer to ensure, in responding to
24      document requests, that there's an accurate response.  If there
25      isn't, there's all sorts of trouble that will flow from that,

1    to say the least.  So I'm not here to get behind his answer.

2    That's not my job.  What do you mean?  Will I ask him if he

3    searched?  What does that mean?  Why would I assume that he

4    didn't search?  What does that mean?

5              MS. CONROY:  I can tell you exactly what it means,

6    your Honor, and I will use an example from one of the lists

7    from the next request.  If you see in my next request it is for

8    communications concerning, and there's a number of names listed

9    there, your Honor.

10             THE COURT:  Right.

11             MS. CONROY:  Those are individuals that we have reason

12   to believe artwork was sold to.  On our meet and confer we

13   discussed this.  On our meet and confer it was represented that

14   their clients do not have communications with these people.

15   When I went back further and asked for confirmation that they

16   searched for these people's names or communications, I was told

17   no.  So their representations to me were based solely on

18   talking to their client and their client saying yeah, I don't

19   have any.

20             THE COURT:  Let me ask, these five names in request 40

21   through 45, are they have search terms?

22             MS. CONROY:  Yes.

23             THE COURT:  So you will get --

24             MS. CONROY:  We'll get them.  Fair enough.

25             THE COURT:  You will get answer then.

J3PTKINC — CORRECTED

1          MS. CONROY:  Fair enough.  But going back to bank

2     statements, I understand if the representation -- that's what I

3     meant by that, which is was the collection done of bank

4     statements or the relevant documents that would show that to

5     show that there in fact are no such documents.

6          THE COURT:  Well, I mean you're now asking me to ask a

7     lawyer how a lawyer conducts their legal work in representing a

8     client to determine what answers to document requests should

9     be, and I'm frankly somewhat skittish about going down that

10    road with Mr. Israel or any lawyer, for that matter.

11         If a lawyer makes a representation to a judge in court

12    as an officer of the court that there are no documents, I

13    accept that representation.  I don't feel that I need to drill

14    down past that.  If you think that is somehow an inaccurate

15    representation and you have some factual basis for articulating

16    it, then you can tell me or you can tell Mr. Israel offline why

17    he made a representation that you think is inaccurate, and

18    maybe he wants to cure that misrepresentation because you have

19    documents you're going to show him that there are inconsistent

20    to what he said to the Court or whatever.

21         MS. CONROY:  Okay.

22         THE COURT:  But I'm not here to ask Mr. Israel or you

23    or any lawyer in any case, frankly, why their answer is what it

24    is.  I don't think that's a question a judge, frankly, should

25    be asking lawyers in the first instance.  I have to trust

J3PTKINC - CORRECTED

1    lawyers to make representations.  You're officers of the Court

2    just as much as you are advocates for your client.

3           So if a lawyer says "Judge, we have no documents,"

4    it's not for me to say:  Why do you not have documents?  How do

5    you know that's the right answer?  Who did you talk to and what

6    did you do?  I used to take a lot of depositions back when I

7    was a lawyer, and I loved taking them because it was the whole

8    funnel method of taking depositions where you ask every

9    possible question.  I could do that with lawyers, too, but I

10   don't think that we should spend our time doing that.

11          MS. CONROY:  Fair enough, your Honor.

12          THE COURT:  So we'll skip down to request 46, 49, 62,

13   that's the second bullet point on page 5.  Artwork on the Appel

14   inventory that is in Asia, including when and how they were

15   transferred, and any declarations, customs reports, or required

16   documentation, and any taxes paid for such sales.

17          MR. ISRAEL:  We don't have any documents there either,

18   your Honor.

19          THE COURT:  You have no documents related to artwork

20   on the Appel inventory that is in Asia?

21          MR. ISRAEL:  That is right.

22          MS. CONROY:  Okay, your Honor.

23          THE COURT:  Do you have evidence to suggest otherwise

24   other than you're suspicious of the answer?

25          MS. CONROY:  We have evidence that -- I mean this is

J3PTKINC - CORRECTED

1    where we get into it.  In our action we have evidence that she

2    had in fact sold -- that Mrs. King had in fact sold or the

3    defendants have sold certain artwork that is on the Appel

4    inventory.

5        THE COURT:  You have documents related to that

6    yourself?

7        MR. KELLY:  Yes, your Honor.  They were sold at public

8    auctions in China.  There are auction catalogs that show the

9    art.  So the premise of our case, largely, is that these

10   restrained artworks were illegally sold by the defendants in

11   China.  And if the representation is that there's no documents,

12   we have to --

13       THE COURT:  But the way, you both could be telling me

14   the truth.  What you're telling me could be absolutely true,

15   and for all I know, Mr. Israel has no knowledge of what you are

16   representing to me because his clients have never told him

17   that.  Right?  That could be true.

18       MR. KELLY:  Yes.

19       THE COURT:  I don't know.  At this point the purpose

20   is to get to the truth.  The whole discovery process is to

21   assist in the process.  That's what we're doing here, right?

22       So if you have a document or documents that relate to

23   sales of Appel artwork in China, which I would assume at some

24   point you're going to utilize in the litigation, either in

25   questioning witnesses, at depositions or in motion practice or

J3PTKINC — CORRECTED

1    at trial, and I also would think it would be responsive to some

2    of their document requests themselves.  This is not going to be

3    a state secret, this is going to be produced.  And then you can

4    edify Mr. Israel about why his answer couldn't be accurate

5    because you in fact have documents yourselves.  And he may say

6    this is the first I'm seeing these documents or whatever.  And

7    he may then go back to his clients and say we're actually in

8    some trouble here I didn't even know about.  I don't know.  But

9    I wouldn't play hide the ball until the end of the game because

10   it doesn't necessarily serve your interest as well as you think

11   it might.  That would be what I would say in that regard.  If

12   you really want to move this forward, it may well be that you

13   are dumbfounded by Mr. Israel's response to that question, but

14   his answer may be completely accurate based on what he has and

15   what his clients may or may not have given him.

16        By the way, I think this is all is going to change a

17   lot in the next week if in fact the vendor ferrets out

18   documents that may be responsive here to a lot of the bullet

19   pointed requests.  So it's somewhat premature to go through

20   this, but if the answer at the moment is there are none

21   responsive, that is their answer at the moment, they have a

22   duty to supplement.  So if there are documents that are

23   identified that are not privileged through this electronic

24   search process, then so be it.  Okay?

25        MS. CONROY:  Sure.

J3PTKINC - CORRECTED

1           THE COURT:  All right.  Now we're up to 50, 51 and 53,

2     the source of funds related to funding any estate litigation.

3     Before we get to any of that, I don't understand why you need

4     that.

5           MS. CONROY:  We dropped that, your Honor.

6           THE COURT:  Because I would probably sustain any

7     objection to that one.

8           MS. CONROY:  We dropped that, your Honor.

9           THE COURT:  Well, it's in your letter.

10          MS. CONROY:  No, that was the request.  So you see the

11    Wang-suggested compromise, we dropped that.  It was solely

12    relating to the real estate.

13          THE COURT:  So the issue we need to address now is

14    documents demonstrating the source of funds, including bank

15    statements related to the real estate to the time period after

16    the Kings initiated their bankruptcy.  That's still in play?

17          MS. CONROY:  Yes.

18          THE COURT:  What is that relevant for?

19          MS. CONROY:  Well, it's our position, your Honor, that

20    we think some of the funds relating to these wrongful artworks

21    in fact funded the purchase of these apartments.  So that's why

22    we're asking for two people that just filed for bankruptcy came

23    out and then bought a $6 million home, it begs the question.

24          So we were looking -- that's why we were asking for

25    the source of funds.  And the idea that it's not relevant is

1     actually I think belied by earlier discovery in this case, to

2     the extent the that plaintiffs were seeking that very same

3     information from us, both parties are alleging the same thing.

4     We produced it, they haven't.

5              THE COURT:  Wait.  I'm not sure I understand the flip

6     side of that.  What did you produce on behalf of Mr. Wang that

7     is analogous to this?

8              MS. CONROY:  They asked for documents relating to --

9     funds relating to certain real estate, and we produced those.

10             THE COURT:  That he purchased, you mean?

11             MS. CONROY:  Yes.

12             THE COURT:  So Mr. Savitsky or Mr. Israel, what's your

13    response to the modified version of these requests?

14             MR. SAVITSKY:  Number one, these transactions that

15    they're referencing are from I think eight years ago.  Our

16    clients had represented to us they just don't have documents

17    from eight years ago indicating the funds.

18             Number two --

19             THE COURT:  They don't have documents?

20             MR. SAVITSKY:  Indicating how real property was

21    purchased eight to twelve years ago.

22             THE COURT:  What about bank statements, isn't that

23    obtainable?

24             MR. SAVITSKY:  They said bank statements are only

25    available going back six years from the bank.  We know that

J3PTKINC - CORRECTED

1    very well.  They represented they don't have documents on how

2    something was purchased twelve years ago, but I would add to

3    that that the reason we were seeking the information from

4    Andrew, from Andrew Wang and Shou-Kung Wang about the purchase

5    of artwork is because we know they had use certain

6    cooperations, like a corporation of Kao Limited that was used

7    to purchase a $6 million home, and we know that one of the

8    straw men entities was called Style Limited.

9            So what we were looking for in part was the accounts

10   that were used to purchase property, are these the same

11   accounts that we know were used to purchase the estate sales.

12   Because this is a self-dealing case, and are they the same, and

13   if so, then yes, they're self dealing.

14           So the relevancy of our demand is very different from

15   the relevancy of their demand, and as I said, they don't have

16   these documents.

17           THE COURT:  Right.  I understood the point you're

18   making about your discovery requests, but I also understand why

19   the defendants are seeking information from your clients about

20   how they were able to afford expensive apartments right after

21   they were in bankruptcy if not for potentially, they are

22   alleging, the sale of certain artwork.  That's what they're

23   saying, and your client's position is:  It's too long ago, we

24   don't have any documents.  That's your client's position --

25           MR. SAVITSKY:  Your Honor.

J3PTKINC — CORRECTED

1              THE COURT:  —— based on your assessment as their

2     lawyers, if I could phrase it that way to start down the path

3     Mr. Conroy would like me to without going full bore down that

4     path.

5              MR. SAVITSKY:  When they were discharged in the face

6     of the Wangs' filed claim for I think $28 million, which has

7     now been discharged, even though that's what they're bringing

8     this case for, in that case, the bankruptcy trustee discharged

9     their claims and allowed —— and I forget the word, but excluded

10    certain property from property that it was going to collect

11    from the estate.  And it wasn't in the millions of dollars.

12    It's not so incongruent, like the Kings came out of bankruptcy

13    with a hundred thousand dollars and it doesn't make sense.

14    They did have funds that were exempted from their bankruptcy

15    discharge.  But like I said, that doesn't change the fact that

16    they simply don't have records.

17             THE COURT:  At the end of the day, if there's nothing

18    to be produced, there's nothing to be produced.

19             What about the tax returns?  And in particular, let me

20    be clear, if there's any production with respect to tax returns

21    it would be limited, it's not going to be the entire tax

22    return, it would be I'll call it schedule —— whatever schedule

23    it is that has the asset, not the return itself.  I assume

24    that's, frankly, all you want.

25             MS. CONROY:  Correct, your Honor, that's all.

J3PTKINC — CORRECTED

1    THE COURT:  I forget the letter, schedule A, Schedule

2  B, whatever the schedule is, that would list the assets.

3    MS. CONROY:  Correct, we asked -- to the extent it

4  showed the assets, that's exactly what we asked for.

5    THE COURT:  And so what about that, Mr. Savitsky?

6    MR. SAVITSKY:  Well, your Honor, I don't know if our

7  clients have tax returns going back that far, but --

8    THE COURT:  How far do they have tax returns going

9  back?  I think you're supposed to keep them six or seven years,

10  aren't you?

11    MR. ISRAEL:  I think so.

12    THE COURT:  So we're at 2018 tax returns, and they

13  should presumably have them going back to 2012 or 2011 that

14  might be probative at least of some issues in the case.  So why

15  shouldn't the relevant schedule listing assets from those tax

16  returns be produced?

17    MR. SAVITSKY:  Your Honor, because it's not probative

18  to what their claims are in the case.  So they have a claim for

19  conversion between 1997 and 2003 of assets, claim for

20  conversion.  Then they have a RICO claim for racketeering

21  activity, and then they have -- it culminates with the probate

22  trial in 2017 saying that they submitted a forged document and

23  that they lied under oath when they testified, and that they

24  defrauded their own medical expert into saying that the

25  decedent didn't have testamentary capacity.  Tax returns from

J3PTKINC - CORRECTED

1   2018 are not relevant to a claim from 1997.  They're not.  And

2   they're not relevant to a pattern of racketeering activity in a

3   probate trial.

4           THE COURT:  I thought there was just recently

5   litigation in the surrogate's court over the fact that your

6   client sold artwork without permission of the court, right?

7           MR. SAVITSKY:  Your Honor --

8           THE COURT:  So wouldn't that be reflected on an asset

9   schedule from a recent tax return, potentially?

10          MR. SAVITSKY:  No, for two reasons.  One, because the

11  sales that are brought in that action were alleged to have

12  happened in I think 2011, the auctions, and our clients did not

13  auction --

14          THE COURT:  No, something more recently that divested

15  Ms. King of her status as executor.

16          MR. SAVITSKY:  Your Honor, they were based off -- it

17  did not divest her of her status as executor.  She still is the

18  preliminary executrix.

19          THE COURT:  What was the temporary restraining order

20  entered then in the surrogate's court?

21          MR. SAVITSKY:  That was in 2003.

22          THE COURT:  I'm talking about one in this year that

23  was sent to the Court as an exhibit.  What does that represent?

24  What was she restrained from doing?

25          MR. SAVITSKY:  Performing preliminary executrix

J3PTKINC - CORRECTED

1    actions other than prosecuting this RICO case.

2              THE COURT:  Why was that entered by the surrogate's

3    court?

4              MR. SAVITSKY:  Because they claim in 2010, I think,

5    Mrs. King sold -- or 2011, possibly the latest would be 2012,

6    sold artwork in violation of the TRO before she became the

7    preliminary executrix.  So that has to do with things that

8    happened long, long ago, they're just not relevant to claims

9    here, and that's being litigated in a removal proceeding in the

10   surrogate's court; not that there's a legal claim there.  Their

11   legal claims here are -- there's no relevancy tied to --

12             THE COURT:  I will cut you off because otherwise we'll

13   be here forever.

14             Ms. Conroy or Mr. Kelly, why should you get these

15   schedules?

16             MS. CONROY:  I will let Mr. Kelly speak to the

17   bankruptcy and the schedules.  I would say briefly, your Honor,

18   with regards to whether or not they don't have them within a

19   certain time frame, I will say that our allegations are a

20   pattern up through the current day.  As the surrogate's

21   court -- and we gave you the decision, and the surrogate's

22   court judge goes through the allegations with regard to those

23   sales are thought to be and alleged to be ongoing.  So we do

24   think that, as to the representation that this all about 2010

25   and 2012, that is actually not right.  We're alleging this is a

1    pattern and practice that is continuing to this day.

2              THE COURT:  What is a pattern and practice?

3              MS. CONROY:  As to divesting artwork from the Appel

4    inventory.

5              THE COURT:  How does that go to the claims and

6    defenses in your case?

7              MS. CONROY:  Number one, it goes to claims and

8    defenses because the Appel inventory is the disputed artwork

9    that belongs to the estate.  So to the extent there is a

10   pattern here of representing to the estate we sell art in

11   possession of things and we're not getting rid of it, when in

12   fact in secret they are, goes directly to the pattern of what

13   we are alleging to wrongfully sell the artwork.

14             THE COURT:  What is the asset inventory on a tax

15   return going to do to shed light on that?

16             MS. CONROY:  I would have to see it, but my thought

17   was, your Honor, to the extent that they're claiming on -- and

18   I will put them together because the next request is the same

19   one, in essence, because all those companies are King

20   controlled companies.  The reason why we want to see the assets

21   is for this very -- if they're listing as part of their estate

22   or in their ownership artwork that then is being sold, or we

23   can show was sold, then I think it's clear who sold it, right,

24   if it's in their possession that they're claiming, but I will

25   let Mr. Kelly go on, if he may.

1          MR. KELLY:  May I add one thing to that?

2          Putting aside that we disagree with the

3    characterization of our claims, we have allegations of illegal

4    sales as recently as December 2018.  To the extent that they

5    have claimed that a lot of this art belongs to or is owned by

6    these subsidiary entities that they control, if those entities

7    are filing tax returns showing income of $5 million and their

8    assets are these art works, we think that would be relevant to

9    determining when sales happened, if sales happened.  And then

10   if there are -- I don't know if there are a list of assets that

11   they're claiming, that could also be relevant, but I think the

12   point of seeing if there's income passed through the entities

13   is directly on point with our claims.

14         MR. SAVITSKY:  Your Honor, their claim is for

15   conversion of these artworks back in 1998, 1999 and 2000.

16         THE COURT:  It's not so limited.  You heard what

17   Mr. Kelly said and I read their pleadings.  It's not as limited

18   as what you're saying.

19         MR. SAVITSKY:  It's not, your Honor, but a predicate

20   act requires renewed injury to the entity that's claiming it.

21   So to say it's part of a pattern, it's not really.  It's post

22   judgment -- they're doing two things, they're looking for

23   post-judgment discovery on a conversion claim, and number two,

24   they are seeking to prosecute in this Court a TRO claim or

25   removal proceeding that is already pending in the surrogate's

J3PTKINC — CORRECTED

1    court.

2              For him to say oh, we think they are reselling the

3    artwork after the fact and we're entitled to that information,

4    it's not that clear, because a predicate act required an actual

5    injury at the time of the conduct.  They cannot show that

6    they're being injured to their business or property.  I think

7    it's a legal point that does require briefing if we go down

8    this road, but it's not the case what we'll get 15 years or 17

9    years of tax returns.

10             THE COURT:  What's the legal point that requires

11   briefing?

12             MR. SAVITSKY:  Whether or not this is in any way

13   relevant to their claim, whether a later sale is a new

14   predicate act on which they're allowed to conduct discovery.

15             THE COURT:  We're not litigating the merits of the

16   claim, we're talking about whether discovery is relevant to the

17   claims and defenses in a lawsuit.  That's what we're talking

18   about.

19             MR. SAVITSKY:  Exactly, your Honor.

20             THE COURT:  And discovery and the concept of relevance

21   generally in discovery is still quite broad.

22             MR. SAVITSKY:  It is, your Honor.

23             THE COURT:  So if your clients are listing as an asset

24   a particular piece of art, let's say, and that's a piece of art

25   that's in controversy between the parties, then that is, I

1    would say, of relevance to the litigation.  Of what relevance

2    and what ramification it has for the claims and defenses is not

3    something that gets adjudicated when you're deciding whether

4    something should or shouldn't be produced as discovery.

5           MR. SAVITSKY:  I do know that, your Honor, as you

6    pointed out earlier —— maybe it was in our first meeting that

7    the law changed within the past two years on what the scope of

8    document demands were.  And it's not just the subject matter of

9    the transactions, it's the claims or defenses.  And what we are

10   arguing is that these sales or the possession of artwork that

11   they're claiming was taken all the way back in 2003 and which

12   our clients agreed that they had but they contest it's not a

13   conversion, to dig into their personal finances is

14   post-judgment ——

15          THE COURT:  Let's be clear, we're not digging into

16   personal finances, we're producing schedules from tax returns.

17   And let's be clear, you keep trying to describe their case in

18   the narrowest way possible, which is obviously, as an advocate,

19   a strategy, but that doesn't fly in the context of a discovery

20   discussion.  Their claims are broader than what you're saying.

21          My ruling is that the assets listed on tax returns,

22   and nothing beyond the schedule, is to be produced.  And it

23   should go back to the year 2007.

24          MS. CONROY:  Thank you, your Honor.

25          THE COURT:  That's my ruling.  If you don't like it,

J3PTKINC — CORRECTED

1    go to Judge Keenan.  We have a process.  That's how this works.

2    We're not going to have briefing.  This is a simple:  I make my

3    call.  If you don't like it, you can go to another judge who is

4    above me in the pecking order.

5             MR. SAVITSKY:  Your Honor, the bankruptcy, Chapter VII

6    bankruptcy commenced in 2008, not 2007.  I'm just trying to

7    figure out, going back 2007, if it's --

8             THE COURT:  Fine, 2008.

9             MS. CONROY:  That's fine, your Honor.

10            THE COURT:  Now what's the difference between what we

11   just dealt with, and you started to blur together the next

12   category?

13            MS. CONROY:  It's the exact same thing, your Honor,

14   it's these entities are King-controlled companies.

15            THE COURT:  You mean they're the tax returns of the

16   company as opposed to the individual tax returns?

17            MS. CONROY:  Correct.

18            THE COURT:  Same ruling.

19            MS. CONROY:  Thank you, your Honor.

20            THE COURT:  If you don't like the ruling,

21   Mr. Savitsky, you have remedies.

22            MS. CONROY:  And in the interest of time, the last two

23   categories relating to documents requested from Ms. King, we're

24   putting those -- we're not going to argue about those, your

25   Honor, especially in light of some earlier comments you made

J3PTKINC - CORRECTED

1    regarding the documents being available in another public

2    forum.  So we don't need to argue about that, that's where

3    we --

4                THE COURT:  So we're done with request number three.

5                MS. CONROY:  We're done with everything for our

6    requests.

7                THE COURT:  There are two more requests in our letter

8    on the last page.  The next one is that you don't believe it's

9    appropriate that the King parties' depositions be set earlier

10   than two weeks after the King parties finalize their document

11   requests.  And you simply seek the Court's assent to this

12   minimal prerequisite.  So you want me to rule that any

13   depositions of the King parties shouldn't be held in until two

14   weeks after their finalization of their production.  What does

15   that mean, for goodness sake, in the context of all that we

16   have just discussed?

17               Here's what I would say:  It is March 25.  You have

18   between March 25 and May 8, if you choose to, to depose them.

19   Work it out.

20               MS. CONROY:  Understood.

21               THE COURT:  You pick a date.  You want to pick May 5th

22   because it's the closest to the end?  But given their health

23   issues and the like, you need to lock in dates with counsel and

24   people need to protect dates for these depositions sometime

25   between March 25 and May 8.

J3PTKINC - CORRECTED

1          And we talked about this the last time.  My law clerk
2    was reminding me during the break that I had said to you
3    somewhat flippantly:  This is isn't hopscotch, this is
4    litigation in federal court, you have to comply with schedules.
5    So you have been on notice for a long time that these
6    depositions, if they're going to take place, have to take place
7    between now and May 8.
8          So I'm not going to assent to this minimal
9    prerequisite.  I will tell you you will take your deposition
10   anytime between now and May 8.  If you want to wait until after
11   the electronic discovery production, as I'm sure you will, and
12   that's in the next week anyway, you will end up taking these
13   depositions in the last week of April or the first week of May
14   anyway.  That's what that means.
15         So I'm not assenting or putting my imprimatur on
16   anything in that regard because lawyers should just work out
17   deposition schedules.  One thing judges don't like to be is a
18   deposition scheduler.  That is not something that I really
19   think is in the handbook of how to be a magistrate judge.  I do
20   it sometimes, but it's frankly annoying because you shouldn't
21   have a judge control your schedule, you should control your own
22   schedule.  So I'm not doing that.
23         Then the last one is the last paragraph on that page,
24   which is the Wang parties request that Kenneth King and Raymond
25   King be ordered to produce documents responding to the

J3PTKINC — CORRECTED

1      long-outstanding subpoenas, to the extent such documents are

2      not already subject to production in the Wang action, and that

3      the Court issue an order barring the King parties from serving

4      any subpoena on Mr. Wang's wife or son.

5              Do you want to be heard on A and B?

6              MS. CONROY:  Sure.  A I think is taken care of, given

7      the ESI, so I don't think had that's an issue, your Honor.

8              THE COURT:  All right.

9              MS. CONROY:  And then we can talk about the next one.

10     Quite honestly, there was a request for the first time I think

11     last week asking us if we would accept subpoenas for Mr. Andrew

12     Wang's 17-year-old son and his wife, and again for the very

13     first time.  So the reason why this is even here is because

14     there was a condition that is kind of mooted now, but just with

15     regard to these subpoenas, they haven't been served, the

16     deadline is passed, so I don't really think it's an issue, to

17     be honest with you.

18             THE COURT:  The document discovery deadline was

19     March 22nd and no subpoena for them to produce documents was

20     served?

21             MS. CONROY:  No.

22             THE COURT:  How is it an issue then?

23             MS. CONROY:  It's not.  I don't think this is an

24     issue.

25             THE COURT:  Well, it's about to be because

J3PTKINC - CORRECTED

1     Mr. Savitsky is standing up, unless he's going to tell me it's

2     not an issue.

3               MR. SAVITSKY:  My understanding, your Honor, is

4     third-party production is April, it was a month after the party

5     document production.

6               THE COURT:  What's your basis for that?

7               MR. SAVITSKY:  My memory of the last conference.  I

8     can look through --

9               THE COURT:  I think we talked about this, and I think

10    I specifically said, making Ms. Conroy somewhat unhappy,

11    March 15 means that's the party document deadline but then

12    we'll have more time, and I said no.

13              MS. CONROY:  Yes.

14              THE COURT:  Isn't that right?

15              MS. CONROY:  Yes, you did.

16              THE COURT:  With all respect, unless my memory and

17    Ms. Conroy's memory are wrong, and we can look at the

18    transcript, but document discovery in this case over as of

19    March 22nd.  That was Friday.  So you're done.

20              MR. SAVITSKY:  My memory was what you said originally,

21    happened, but Mr. Kelly continued and asked again about the

22    point and you said April 15.  I could be wrong, but it's

23    whatever is in the transcript.

24              THE COURT:  Why do you want documents from a

25    17-year-old?

J3PTKINC - CORRECTED

1              MR. SAVITSKY:  Your Honor --

2              THE COURT:  Other than harassment?

3              MR. SAVITSKY:  Harassment, your Honor?  Our clients

4    brought a case on behalf of the estate, our client, an

5    85-year-old --

6              THE COURT:  Mr. Savitsky, why do you want documents

7    from a 17 year old.  That's my question.  Not anything else but

8    that question.

9              What does Mr. Andrew Wang's 17-year-old son have that

10   would be germane to this case?

11             MR. SAVITSKY:  Knowledge of the artwork that Andrew

12   owns.  And I can tell you why.

13             THE COURT:  As a minor?

14             MS. CONROY:  Yes, exactly.  Because of that Shou-Jung

15   Wang Irrevocable Trust, of which he is a beneficiary, and which

16   was redacted by someone, because it's a two-page trust document

17   that leaves an inheritance to a minor, yet with no assets in

18   his schedule.

19             THE COURT:  We have been through that.

20             MR. SAVITSKY:  We have.  And the person who has that

21   knowledge is Minyan (ph) Wang, because he is the ultimate

22   beneficiary.  Andrew Wang is a famous, famous, famous art

23   collector in China, and in New York he's not famous.  He's no

24   one.  But he has --

25             THE COURT:  I'm cutting you off.

J3PTKINC - CORRECTED

1          In any event, my ruling is, consistent with what I
2    think I said previously, that any document discovery -- my
3    ruling was March 15, Judge Keenan extended it to March 22nd.
4    It is now March 25th.  You may not, without the permission of
5    the Court, serve any third-party subpoenas to the 17-year-old
6    son, the wife, or anyone else, because document discovery, both
7    party document discovery and third-party document discovery,
8    has concluded.
9          MR. SAVITSKY:  This goes to -- we want to depose
10   Andrew's wife and Minyan Wang.
11         THE COURT:  Did I say anything about depositions?
12         MR. SAVITSKY:  No, your Honor, but this is -- this was
13   what we were seeking from those individuals.
14         THE COURT:  That is what you were -- what does that
15   mean?  You were seeking what?
16         MR. SAVITSKY:  We were seeking documents, and I
17   understand that you have ruled on that consistent with your
18   prior order.  I get that.
19         We're also seeking for them to be deposed, and
20   Ms. Conroy has told us that she won't do that, that doesn't
21   work for them, to have Andrew's son deposed because he's 17
22   years old.  And I asked her, do you have a case for that --
23   like I asked for every single one of these points, do you have
24   a case for that, and we have not gotten a case or any
25   authority.

1          THE COURT:  Is there anything in the letters, either

2    yours or Ms. Conroy's, about deposing the wife or the son?

3          MR. SAVITSKY:  To the extent that -- it's not in this

4    letter, no, your Honor.

5          THE COURT:  It's not in her letter.  Is it in your

6    letter?

7          MR. SAVITSKY:  No.

8          THE COURT:  So is it before me?

9          MR. SAVITSKY:  No.

10          THE COURT:  Correct.  Guess what?  I'm not ruling on

11    it today.

12          MR. SAVITSKY:  Understood.

13          THE COURT:  If you have a further meet and confer, you

14    send a notice of deposition to her, she says we're not

15    producing them, you say why, she gives you her answer, you say

16    give me authority, she either does or doesn't.  Then you write

17    me a letter and then you say we want to depose these two

18    people, here's our authority, legal and otherwise, why we

19    should.  I will get her response, then I will rule.  That's how

20    it works.

21          MR. SAVITSKY:  It's in the letter, your Honor.

22          THE COURT:  Which letter?

23          MR. SAVITSKY:  Ms. Conroy's.

24          THE COURT:  Where?

25          MR. SAVITSKY:  It says documents and deposition

J3PTKINC — CORRECTED

1    testimony on behalf of Andrew Wang's wife and his 17-year-old

2    son.

3              THE COURT:  Where?

4              MR. SAVITSKY:  It's in the last paragraph beginning

5    with the sentence -- so they asked for --

6              THE COURT:  Which sentence are you talking about?

7              MR. SAVITSKY:  It's the sentence that begins in the

8    middle of the paragraph.  Ms. Conroy knows because she wrote

9    this, because it's in the paragraph that is in response, the

10   King parties' counsel stated they would only produce responsive

11   documents, so on and so forth, next line down, on behalf of

12   Andrew Wang's wife and son for -- they seek -- we're seeking

13   documents and deposition testimony on behalf of Andrew's wife

14   and his 17-year-old son, documents and depositions.

15             Then at the bottom of their letter, point two, the

16   Wangs are requesting the Court to issue an order that we can't

17   serve any subpoena, including for deposition testimony.  So it

18   is in the letter, your Honor.  I stand corrected.

19             THE COURT:  And you responded to it, of course, in

20   your letter.

21             MR. SAVITSKY:  We submitted -- I did not read her

22   letter before -- there's been no response to the letters.

23             THE COURT:  Okay.

24             MS. CONROY:  Your Honor, we can reserve the deposition

25   argument for later.

1          THE COURT:  We're definitely reserving it because the

2     issue is not fully joined.  If you have an argument why it's

3     anything other than harassment, Mr. Savitsky, I would be

4     interesting in hearing it.  I would be interested in

5     understanding why Mr. Andrew Wang can't answer all the

6     questions you would have for his son.  You seem to think that

7     his son has unique knowledge that his father doesn't have.  I

8     would like you to articulate for me -- not now at the two-hour

9     mark of this conference when the issue is not joined, but at

10     some future conference that we'll be fortunate enough to

11     reconvene and hold together.  Not today.

12          So I think we're done with your letter.

13          MS. CONROY:  We're done, your Honor, thank you.

14          THE COURT:  What else is in your letter that we

15     haven't touched on?

16          MR. SAVITSKY:  It's not referenced.

17          THE COURT:  If it's not in your letter, then I'm not

18     sure I want to hear it.  Why don't lawyers answer questions

19     that are asked?  My question was:  What's in your letter that

20     we haven't responded to or need to address today?  Is there

21     anything?  Maybe there is.  I don't know.  There was a lot of

22     overlap here.  Is there anything independent of what we have

23     gone through today in your letter, Mr. Savitsky, that requires

24     the Court to rule today?  That's my question, not something

25     that's not in the letter that you want to raise.  We'll get to

J3PTKINC - CORRECTED

1    that.

2              MR. SAVITSKY:  No, nothing in our letter.

3              THE COURT:  Great.

4              MR. SAVITSKY:  Just --

5              THE COURT:  Just?

6              MR. SAVITSKY:  Well, then I had a clarification

7    question, but I'm going over what you asked me.  Sorry.

8              THE COURT:  Okay.  So as I always ask, although I do

9    it at my own peril, is there anything else you want to raise

10   beyond what was in the correspondence today?  Sounds like there

11   is.  You can tell me what it is and then I will decide whether

12   or not I want to deal with it or not, depending on what it is.

13             MR. SAVITSKY:  Your Honor, it just that there's been

14   issues that we received -- there's been issues that have come

15   up since Friday based off of production that has happened, and

16   I'm asking for a clarification, if you're willing.

17             We received I think 15,000 pages or something along

18   those lines in production on Friday at 8:00, and from that

19   production we have new questions that we didn't anticipate

20   before that production came about.

21             THE COURT:  What does that mean you have new

22   questions?

23             MR. SAVITSKY:  There are things that we would

24   investigate that we couldn't have known about prior to the

25   production that was just made.

J3PTKINC — CORRECTED

1          THE COURT:  Investigate to your heart's content.

2          MR. SAVITSKY:  Unfortunately there's an email address

3    for Andrew's entity which displayed these self-dealt paintings,

4    I will call them, in 2009 called baowutang@yahoo.com, and we

5    did not know this email account existed.  And we asked Andrew

6    to search his email accounts for certain documents related to

7    the Capital Museum exhibition.

8          And what we received on the 25th was I believe an

9    email that had Bao Wu Tang CC'd to it on behalf of Andrew Wang,

10   so one email for this account, and it was not represented that

11   this email account was searched by the other parties.  And to

12   us, it's probably one of the most important email accounts

13   because Bao Wu Tang is a defendant in this action, your Honor,

14   and Bao Wu Tang -- we have one email with Bao Wu Tang where I

15   believe it's just a CC.

16         THE COURT:  Well, before you go further, have you had

17   any discussions with counsel about this?

18         MR. SAVITSKY:  I like I said, we got 14, 13,000 pages.

19   I was just going over this very recently.

20         THE COURT:  So the answer to my question is?

21         MR. SAVITSKY:  No.

22         THE COURT:  So judges don't like exploring issues

23   before parties have discussed them themselves, especially this

24   sort of thing.  So why don't you talk to Ms. Conroy and

25   Mr. Kelly about your concerns that there's some email address

J3PTKINC - CORRECTED

1    that presumably should have been identified earlier so that

2    there should have been some potential investigation or

3    production related to it, and see where that takes you.  And

4    depending where that takes you, then you will take your chances

5    with me if it doesn't work out with that.

6          MR. SAVITSKY:  Understood.  I will state that I will

7    do the same thing for my second point which related to a

8    corporation.  Same thing, we'll meet and confer, and then --

9          THE COURT:  Let me also be clear that one

10   consideration is I assume you're going to be deposing Andrew

11   Wang.

12         MR. SAVITSKY:  Yes.

13         THE COURT:  So you can explore some of these issues in

14   that deposition.  And in exploring them in the deposition, it

15   may result in a request for production post deposition if

16   certain things are identified by Andrew during the course of

17   the deposition which might make your argument stronger as to

18   why it should be produced.  So don't be premature necessarily

19   pursuing this issue, you may want to develop the record as

20   fully as possible before you seek any remedy from the Court,

21   and only after you have explored what that may entail from the

22   other side.  Are you with me?

23         MR. SAVITSKY:  I am absolutely, your Honor, thank you.

24         THE COURT:  Ms. Conroy and Mr. Kelly, anything else

25   today?

J3PTKINC - CORRECTED

1              MS. CONROY:  No, your Honor.

2              THE COURT:  Mr. Israel, I trust you are feeling a

3    little better?

4              MR. ISRAEL:  Yes, a little bit better, thank you.

5              THE COURT:  I'm glad to hear that.  And as I said the

6    last time, and I hope this doesn't affect litigation going

7    forward, but if you or lawyers or parties have issues, health

8    or otherwise, that are somehow going to impede what the Court

9    is otherwise imposing, I need to know.  I want to be as

10   accommodating as I can, but balance that with the strictness of

11   trying to stick to a schedule, which is frankly my

12   responsibility.

13             And you all can push up against it if you want, but my

14   job, especially in a case as old as it is and with parties as

15   old as they are, as hard as it is for all of you in the moment

16   that you're in now, to try to get you past this moment.

17             You have written a letter to Judge Keenan that you

18   have a statute of limitations argument you want to make.  You

19   will have other arguments you want to make on the merits.  The

20   case could continue to get litigated for years and years

21   longer, and we have to figure out the most efficient way to

22   litigate this case.  And the most efficient way I know to do my

23   job that Judge Keenan has given me in this case is hold your

24   feet to the fire and hold these deadlines.  And you might not

25   like it, you might bridle against it, but in the end you will

J3PTKINC - CORRECTED

1   be appreciative because what I have done is moved the case

2   forward for you, and that's in both sides' interest equally.

3          So that's why I'm trying to be tough a bit, but I also

4   want to be accommodating if there are reasons.  I'm the first

5   person to say it's only about money and it's only a lawsuit.

6   That's my perspective on everything.  You all are in the moment

7   and you have clients.  I have complete perspective and I'm here

8   to be fair and objective and I have nothing at stake other than

9   to make rulings to the best of my ability, to try to be fair

10  and impartial, as I hope you think that I am.  That's all I'm

11  trying to do here.  And I'm trying to combine that with keeping

12  a vision of the bigger picture here.

13         As I beat this drum multiple times, you all need to,

14  despite everything else you're doing, see if there's any way

15  this can get resolved, because everyone would be the

16  beneficiary of that.  And I know the parties made an attempt

17  many years ago and it went south in a very bad way and probably

18  left a lot of bitterness with everyone involved, but it's not

19  too late to revisit that, and I really think the parties should

20  consider doing that.  And at some point we'll talk more

21  concretely about that, but for now we want to get through

22  discovery, and we're getting close to the end.

23         I'm not inclined to schedule another conference at the

24  moment but leave it to you all, if there are issues, to write

25  to me and then we will schedule another conference in April,

J3PTKINC - CORRECTED

1   unless you think we should set a control date.  But since we're

2   at the end of document discovery, unless you will have specific

3   issues that you undoubtedly expect, should set an April date?

4   You tell me.  Do you want another date, a specific other date?

5   Is that useful to have?

6            MR. ISRAEL:  You Honor, I don't believe it's

7   necessary.  I think we could get right to the core --

8            THE COURT:  If you need a conference, we'll schedule

9   one.

10            MS. CONROY:  Agreed.

11            THE COURT:  So we won't put a new date in now.  If

12   things come up, you let me know and we'll have another

13   conference.

14            Have a good afternoon.

15            MS. CONROY:  You too, your Honor.

16            MR. SAVITSKY:  Thank you, Judge.

17            (Adjourned)

18

19

20

21

22

23

24

25