**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ x

YIEN-KOO KING, NORTHWICH     :
INVESTMENTS LTD., and SOON HUAT,  :
INC.         :

          :  Civ. Action No.: 1:14-cv-07694 (LJL)

      Plaintiffs,   :

          :  **STATEMENT OF UNDISPUTED**
-against-      :  **MATERIAL FACTS PURSUANT TO**
          :  **LOCAL CIVIL RULE 56.1**
ANDREW WANG, SHOU-KUNG WANG,  :
BAO WU TANG, JIAN BAO GALLERY,   :
ANTHONY CHOU, CHEN-MEI-LIN, WEI  :
ZHENG, YE YONG-QING, YUE DA-JIN   :
and JOHN DOES 1-9,     :

          :

      Defendants.   :
------------------------------------------------------ x

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants Andrew

Wang and Shou-Kung Wang (the "Defendants") respectfully submit this Statement of

Undisputed Material Facts in support of their motion for summary judgment.[1]

## I.   Background

1.      Chi-Chuan Wang ("CC") was an internationally known collector and connoisseur

of, and expert in, Classical Chinese painting and calligraphy (artwork created between the 10th

and 17th centuries), and an accomplished artist in his own right.  (Ex. 1 at ¶ 3.)

2.      CC was the father of Yien-Koo King ("YK") and Shou-Kung Wang ("SK").  (Ex.

2 at ¶ 2.)

3.      CC was the grandfather of Andrew Wang ("AW").  (Ex. 3 at ¶ 15.)

4.      AW is SK's son.  (Ex. 3 at ¶ 16.)

---

[1]  Defendants submit the Declaration of Thomas B. Kelly, dated February 14, 2020 ("Kelly Dec.") in support of their
motion for summary judgment.  Exhibits to the Kelly Dec. are referred to as "Ex. __."

5.       CC, his wife, and daughters, including YK, immigrated to the United States in 1949.  (Ex. 4 at 26:2-43:14.)

6.       CC and his family settled in New York City.  (Ex. 3 at ¶¶ 27-28.)

7.       CC left SK behind in China.  (Ex. 4 at 26:2-43:14.)

8.       SK and his family, including AW, immigrated to the United States in the late 1970s.  (Ex. 4 at 26:2-43:14.)

**II.       The Administration of the Estate by AW and the PA**

9.       CC passed away in July 2003.  (Ex. 1 at ¶ 3.)

10.       Upon CC's death, SK submitted for probate a will dated February 18, 2003 (the "2003 Will") in the Surrogate's Court of the State of New York (the "Surrogate's Court").  (Ex. 1 at ¶ 4; Ex. 5.)

11.       Upon CC's death, YK submitted for probate a separate will dated June 13, 2000 (the "2000 Will") and a codicil dated July 10, 2002 (the "2002 Codicil").  (Ex. 1 at ¶ 4; Ex. 6.)

12.       The primary difference between the wills is that the 2003 Will disinherited YK, while the 2000 Will gave YK preferences over SK and other beneficiaries.  (Ex. 1 at ¶ 4; Ex. 5; Ex. 6.)

**A.       The Surrogate's Court Appoints AW and the PA as Co-Fiduciaries**

13.       On August 4, 2003, per the terms of the 2003 Will, the Surrogate's Court of the County of New York (the "Surrogate's Court") issued Preliminary Letters Testamentary to AW that appointed AW as Preliminary Executor of the Estate.  (Ex. 7 at 2202.)

14.       In the same August 4, 2003 Order, due to a dispute over the validity of the 2003 Will, the Surrogate's Court issued Letters of Temporary Administration of the Estate to Ethel Griffin, Public Administrator of the County of New York (the "PA") as a co-fiduciary of the Estate.  (Ex. 7 at PA-SCT-000002202; Ex. 8 at 9:23-10:5.)

2

15.     YK and SK both consented to the PA's appointment as Temporary Administrator to serve as co-fiduciary with AW as Preliminary Executor.  (Ex. 1 at ¶ 6)

16.     The PA has served as Temporary Administrator and co-fiduciary of the Estate since 2003 and continues to serve co-fiduciary of the Estate.  (Ex. 8 at 10:6-10.)

17.     The law firm of Schram, Graber & Opell, P.C., or its predecessor firm(s), has served as legal counsel to the PA since 2003.  (Ex. 8 at 7:13-8:23.)

18.     Ethel Griffin died in 2015.

19.     As Temporary Administrator, the PA was empowered to take legal action on behalf of the Estate, including against its co-fiduciary, AW, and in fact did so in the Surrogate's Court.  (*See, e.g.,* Ex. 9.)

20.     In an Order of the Surrogate's Court dated January 21, 2011, *In re Matter of the Estate of Chi-Chuan Wang, Glen, S.*, at 9, Surrogate Glen stated that the PA was the proper party to pursue an SCP 2103 turnover proceeding against AW, SK, and YK because "the Public Administrator, unlike her co-fiduciary, is not implicated in the very turnover matters that are to be pursued.")  (Ex. 17 at KING-SCT-000003489.)

**B.     The PA's Effort to Marshal Estate Assets**

21.     Since the outset of the Surrogate's Court proceedings, the parties have each accused the other of fraud, undue influence, and outright theft concerning hundreds of artwork from the Estate valued at millions of dollars.  (Ex. 1 at ¶ 11.)

22.     In the face of dueling accusations between "the warring family factions," the Surrogate's Court directed the PA to investigate the allegations made by the various family members against each other concerning CC's art collection.  (Ex. 1 at ¶ 7.)

23.     On October 21, 2003, the PA commenced a proceeding under the New York Surrogate's Court Procedure Act § 2103 against YK, KK, SK, and AW seeking information concerning Estate assets and to recover Estate assets from the parties.  (Ex. 9.)

24.     On October 23, 2003, the Surrogate's Court issued an order restraining YK, KK, AW, SK and certain others from selling, transferring, encumbering, leasing, consigning, or otherwise disposing of artwork and other personal property belonging to the Estate, subject to disputes over ownership, or alleged to have been gifted by CC to either SK, YK, or others.  (Ex. 10.)

25.     Once appointed, the PA and her attorneys attempted to marshal CC's assets, including his collection of artwork.  (Ex. 8 at 20:19-21:10; Ex. 11 at ¶ 4.)

26.     The Estate's assets consisted primarily of CC's art collection and personal creations.  (Ex. 2 at ¶ 3.)

27.     The Estate fiduciaries also had an obligations to inventory and appraise all Estate property.  (Ex. 2 at ¶ 7.)

28.     In the fall of 2003, the PA requested that the parties deliver all artwork they conceded belonged to the Estate.  (Ex. 2 at ¶ 8.)

29.     After the PA was appointed, the Estate took possession of approximately 500 artworks that were agreed by all stakeholders to be Estate property.  (Ex. 4 at 192:10-22; Ex. 12.)

30.     These included approximately 133 Classical Chinese artworks, approximately 360 modern Chinese artworks (including works by CC), and five other artworks, as well as a variety of Chinese decorative art objects.  (Ex. 11 at ¶ 4; Ex. 13; Ex. 14.)

31.     Early on in the Surrogate's Court proceedings, an attorney for the PA, Alan Appel, endeavored to create an inventory of all artworks in the Estate for tax purposes as the "Appel Inventory."  (Ex. 12.)

32.     The Appel Inventory listed all artwork potentially within the scope of the Estate, including artwork the beneficiaries agreed belongs to the Estate, as well as artwork over which there is disagreement as to whether it is property of the Estate.  (Ex. 12.)

33.     The Appel Inventory also lists the relevant parties' positions as to ownership of each artwork as well as which party was in possession of the artwork at the time the list was compiled.  (Ex. 12.)

34.     The full scope of the Estate's assets remains in dispute.  (Ex. 4 at 192:10-22; Ex. 12.)

35.     In early 2004, the parties turned over to the Estate approximately 133 Classical Chinese artworks in their possession that were acknowledged to be Estate property.  (Ex. 11 at ¶ 7.)

**C.     The PA and AW's Obligations to Pay Estate Taxes and Administration Expenses**

36.     In discharging their obligations to the Estate, AW and the PA, with their attorneys, prepared and submitted an estate tax return to the IRS on behalf of the Estate.  (Ex. 15.)

37.     In order to prepare federal and state estate tax returns and pay estimated taxes by April 2004, the co-fiduciaries had to obtain in, formation concerning all transfers, made after January 1, 1977, regardless of the validity of such transfer.  (Ex. 2 at ¶ 7.)

38.     On or around October 2004, the Estate filed its estate tax returns pursuant to which, net of prior payments, the Estate owed approximately $3,300,000 in federal and $1,200,000 in state taxes.  (*See* Ex. 18; Ex. 19.)

39.     In addition to these amounts owed to the IRS, the Estate faced administrative expenses, including legal fees and fees to store and insure the Estate-owned artwork and other possessions.  (Ex. 8 at 20:19-21:10; Ex. 11 at ¶ 10.)

40.     After calculating the outstanding debts and liabilities, the Estate determined it lacked liquid assets sufficient to pay the taxes owed to the IRS and to cover administration expenses.  (Ex. 11 at ¶ 10; Ex. 20; Ex. 21.)

41.     The Estate was required to liquidate assets, including artwork, to raise funds to pay the taxes owed to the IRS and to cover the other Estate expenses.  (Ex. 8 at 20:19-21:10; 23:22-25:3; Ex. 11 at ¶ 10; Ex. 22 at 77:11-79:9; 80:8-81:6; 116:4-9.)

42.     Financial pressure on the Estate increased in 2007, when the IRS issued a Notice of Deficiency to the Estate claiming an additional $22,529,000 was owed in federal estate taxes. (Ex. 23.)

43.     The IRS Notice of Deficiency is largely based on YK's claim, disputed by the Estate, that CC gifted her millions of dollars of artwork during his lifetime on which no gift taxes were ever paid.  (Ex. 23.)

       **D.     The PA and AW Enlist Sotheby's to Value and Auction Estate Assets**

44.     The Surrogate's Court's August 4, 2003 Order directed the fiduciaries to retain an expert in the field of Chinese art to catalog and evaluate CC's art collection.  (Ex. 7 at PA-SCT-000002202.)

45.     YK, through her counsel, recommended that the Estate engage Sotheby's to perform an appraisal of the artwork in CC's Estate.  (Ex. 2 at PA-SCT-000002251; Ex. 24 at Rose-SCT-00007325.)

46.     YK specifically suggested Arnold Chang ("Chang") of Sotheby's to perform the appraisal of Estate artwork.  (Ex. 24 at Rose-SCT-00007325.)

47.     Chang was a long-time student of CC's who was intimately familiar with CC's collection.  (Ex. 24 at Rose-SCT-00007325; Ex. 25 at 14:18-17:8.)

48.     After discussions with the major art auction houses Christie's and Sotheby's, the Estate engaged Sotheby's to perform an appraisal.  (Ex. 8 at 19:14-20:18; Ex. 26 at ¶ 17.)

49.     The Estate and Sotheby's entered into an appraisal agreement on June 17, 2004.  (Ex. 11 at KING-SCT-000003230.)

50.     On October 1, 2004, Sotheby's issued an appraisal of 133 Classical Chinese artworks in the Estate (the "2004 Sotheby's Appraisal").  (Ex. 13.)

51.     The 2004 Sotheby's Appraisal was performed by Chang, recommended specifically by YK, with the assistance of Mee-Seen Loong.  (Ex. 13 at Sotheby's 000621; Ex. 24.)

52.     In conducting the appraisal, Chang physically inspected and examined each artwork.  (Ex. 11 at ¶ 9; Ex. 25 at 55:9-56:20; Ex. 27 at 15:14-16:13; 102:22-103:10.)

53.     The 2004 Sotheby's Appraisal assigned an aggregate appraised value – as of the date of CC's death – of $4,400,350 to the 133 Classical period artworks.  (Ex. 13 at 622.)

54.     The 2004 Sotheby's Appraisal was drawn at Fair Market Value for estate tax purposes.  (Ex. 13 at Sotheby's 000620-621.)

55. The value reported for the artwork contained in the 2004 Sotheby's Appraisal was the same value at which the pieces could be expected to "change hands between a willing buyer and willing seller" in a sale. (Ex. 26 at ¶ 18.)

56. The 2004 Sotheby's Appraisal was submitted to the IRS by the Estate in connection with the Estate's tax filings. (Ex. 28.)

57. The 2004 Sotheby's Appraisal was reviewed by the IRS's Art Appraisal Committee and was accepted for tax purposes pursuant to a letter from Karen E. Carolan, Chief, Art Appraisal Services, to the Estate, dated February 13, 2007. (Ex. 28.)

58. The Estate needed to sell whatever artwork it could to pay estate taxes and other administration expenses. (Ex. 8 at 23:22-25:3; Ex. 11 at ¶ 10.)

59. Given that interest and penalties accrued on the estate taxes owed, the Estate expeditiously sought to address the liabilities. (Ex. 8 at 23:22-25:3.)

60. Given the Estate's need to pay estate taxes and administration expenses, the PA and AW asked Sotheby's to auction the Estate's Classical Chinese artworks. (Ex. 11 at ¶ 10.)

61. Sotheby's was only willing to accept 39 of the best Classical artworks – as well as modern works and art objects – from the Estate's collection for auction. (Ex. 11 at ¶ 10, 13; Ex. 13.)

62. Sotheby's auctioned 39 works on March 31, 2006. (Ex. 11 at ¶ 10.)

63. At the auction, only a few pieces sold for prices that "far exceeded" Sotheby's valuations set forth in the 2004 Sotheby's Appraisal, and several sold for less. (Ex. 11 at ¶ 13.)

64. The results of the Sotheby's sale were the "best indicator" that the 2004 Sotheby's Appraisal values were accurate and an appropriate barometer to be relied upon by the PA. (Ex. 11 at KING-SCT-000003230; ¶ 13.)

### E.      The Sales of the 98 Paintings

65.      Sotheby's advised the PA that Asia was the appropriate market for the works not selected for auction.  (Ex. 11 at ¶ 11; Ex. 26 at ¶ 9.)

66.      As alleged in the FAC, AW is a "prominent art collector" in Asia.  (Ex. 3 at ¶ 275.)

67.      The PA and AW then agreed that AW should attempt to find private buyers in Asia for the works that Sotheby's did not want to include in an auction.  (Ex. 8 at 26:14-27:20; Ex. 11 at ¶ 11.)

68.      The PA and AW agreed upon a procedure to sell the remaining works and which the PA felt ensured the prices AW proposed were the appropriate prices.  (Ex. 8 at 77:17-78:4; Ex. 11 at ¶ 11.)

69.      First, the PA required the proposed sales to be at least 20% higher than the 2004 Sotheby's Appraisal values, unless specific circumstances justified a lower price, to account for any upward change in the market since the date of CC's death.  (Ex. 11 at ¶ 11; Ex. 30.)

70.      In several instances, the proposed prices conveyed by AW were for more than 20% above the Sotheby's appraised values.  (Ex. 54; Ex. 55.)

71.      Second, the PA retained an independent art appraiser – Elin Lake-Ewald ("Lake-Ewald") of O'Toole-Ewald Art Associates, Inc. ("OTE") – to review the proposed sales.  (Ex. 8 at 36:9-37:8; 77:17-78:4; Ex. 11 at ¶ 11; Ex. 31.)

72.      This procedure was followed by AW and the PA for the sales of the 98 Paintings. (Ex. 11 at ¶ 12.)

73.      The PA required AW to submit to her, in writing, the terms of any proposed sale, including, the appraised value of each such artwork, and the purchaser's offer for each asset. (Ex. 31.)

74.    All of this information was submitted to Peter Schram ("Schram"), counsel for the PA, who then transmitted it to the PA.  (Ex. 31.)

75.    Upon obtaining an offer for a group of artworks, AW's counsel, Martin Klein ("Klein") conveyed the proposal to Schram who would send the offers to OTE and the PA.  (Ex. 8 at 68:10-69:21; Ex. 11 at ¶ 11; Ex. 32; Ex. 33; Ex. 34; Ex. 35; Ex. 36; Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 41.)

76.    After the PA received a proposal, she consulted with OTE, and based on her consultation with OTE, decided whether to approve the proposed sales.  (Ex. 8 at 28:23-30:8; Ex. 31.)

77.    Upon its receipt of the terms of a proposed sale, the PA sent the information to OTE, who then conducted an independent review of the proposed sale prices.  (Ex. 42; Ex. 43; Ex. 44; Ex. 45; Ex. 46; Ex. 47; Ex. 48 at 44:13-21; 46:12-15; 171:7-19; 184:10-186:6.)

78.    When reviewing proposed prices, Lake-Ewald considered relevant information at the available time, including her review of:  (Ex. 26 at ¶ 16.)

- The 2004 Sotheby's Appraisal.  (Ex. 26 at ¶ 16; Ex. 48 at 65:8-66-23; 103:2-17; 186:13-187:19; 203:11-204:2.)

- Auction results for comparable works and auction records subsequent to the 2004 Sotheby's Appraisal.  (Ex. 26 at ¶ 16; Ex. 48 at 65:8-66-23; 103:2-17; 186:13-187:19; 203:11-204:2.)

- Advice and input of subject matter experts including Robert Ellsworth and Peter Rosenberg, both of whom are noted dealers/collectors of Classical Chinese artwork.  (Ex. 26 at ¶ 16; Ex. 48 at 65:8-66-23; 103:2-17; 186:13-187:19; 203:11-204:2.)

- Consulted directly with Chang, who performed the 2004 Sotheby's Appraisal, and who was intimately familiar with the artworks based on his personal relationship with C.C.  (Ex. 69.)

79.     Lake-Ewald testified that the identity of the proposed buyers was not material to her decision if proposed prices were reasonable.  (Ex. 48 at 171:20-173:14.)

80.     Lake-Ewald testified: "the price is whatever the price is that I've researched." (Ex. 48 at 173:2-14.)

81.     Only after receipt of Lake-Ewald's opinions of the sales, were the sales approved by the PA.  (Ex. 8 at 14:13-15:5; Ex. 49; Ex. 50; Ex. 51; Ex. 52; Ex. 53.)

82.     Schram testified:  "I would not review the terms of [a] sale with the Public Administrator.  That wasn't my job, and I certainly had no expertise to evaluate the terms of the sale.  As it would be forwarded to the Public Administrator, who would consult with Elin Ewald, or I would forward it to Elin Ewald, and then the decision would come back to me and I would let Marty Klein know."  (Ex. 8 at 80:19-81:12.)

83.     Klein forwarded both proposed and finalized contracts to Schram.  (Ex. 8 at 69:16-21.)

84.     98 Estate artworks were sold pursuant to this process in six separate sales between 2005 and 2009.  (Ex. 49; Ex. 50; Ex. 51; Ex. 52; Ex. 53; Ex. 64.)

85.     YK's attorney, Hugh Mo, was made aware of the procedure followed by the Estate to sell the 98 Paintings by July 29, 2005.  (Ex. 31.)

86.     The Estate raised a total of approximately $4.3 million from the sales.  (Ex. 49; Ex. 50; Ex. 51; Ex. 52; Ex. 53; Ex. 64.)

87.     According to counsel for the PA, this procedure was followed by AW and the PA for the sales of "every one" of the 98 Paintings.  (Ex. 11 at ¶ 12.)

88.     According to counsel for the PA, all of the artwork was sold with the PA's approval.  (Ex. 8 at 14:13-15:5.)

89.     To facilitate the buyers' payments from mainland China, AW, accepted payment at a bank account he controlled in Hong Kong, and, upon his receipt of the funds, forwarded the payment to the Estate's bank account in the U.S.  (Ex. 22 at 18:4-12, 22:7-21, 240:20-242:21, 245:2-14, 316:20-24.)

90.     Transfers through Hong Kong were necessary because "the only way to … transfer the money out of China is going through a company in Hong Kong," and "Chinese citizens … cannot set up a company in Hong Kong."  (Ex. 22 at 241:20-22; 245:2-14.)

91.     AW testified that "If I don't set up the company, the money cannot be transferred here to the estate. And they always ask a favor to use my company or to set up the company for the transfer."  (Ex. 22 at 242:8-21.)

92.     Artworks were delivered to Hong Kong "for the purpose of saving taxes for the buyers."  (Ex. 22 at 256:3-5.)

93.     Each group of artworks was shipped to the respective buyer "c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road, Kowloon, Hong Kong."  (Ex. 33; Ex. 55; Ex. 59; Ex. 61; Ex. 72.)

94.      Billie Wae was the office manager for AW's accountant, C.K. Lam, in Hong, Kong.  (Ex. 22 at 127:14-128:9.)

95.     Artworks were shipped to Ms. Wae because -- having been his accountant for 20 years -- Ms. Wae was someone AW trusted and, accordingly, Ms. Wae's office was a reliable place AW could ship the paintings.  (Ex. 22 at 319:10-18.)

      1.      **Sale #1: 17 Paintings on 02/16/2005 to Raymond Ye**

96.     On January 27, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a proposal for the purchase of 17 Estate-owned artworks by Mr. Wei Zheng ("Zheng") for $395,730.00.  (Ex. 54.)

97.     On February 8, 2005, Klein emailed Schram a proposed contract for the sale of art to Zheng.  (Ex. 55.)

98.     The contract of sale listed Zheng's address as 97-37 63rd Road, Apt. #2F, Rego Park, NY 11374.  (Ex. 55.)

99.     The contract of sale listed Zheng's shipping address as: Mr. Wei Zheng, c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road, Kowloon, Hong Kong.  (Ex. 55.)

100.    AW contacted Zheng to request Zheng's assistance finding buyers for Estate artworks.  (Ex. 26 at ¶ 9.)

101.    Zheng acted as a "matchmaker" and put AW in contact with the intended buyer, his friend Tan Yun.  (Ex. 26 at ¶¶ 9, 14.)

102.    Tan Yun was a collector in mainland China.  (Ex. 26 at ¶ 9.)

103.    Zheng received no fee for introducing AW and Tan Yun.  (Ex. 26 at ¶ 11.)

104.    After Tan Yun and AW agreed upon a price, Tan Yun asked Zheng to sign the purchase and sale agreement and bill of sale on his behalf.  (Ex. 26 at ¶ 12.)

105.    According to Zheng, he signed the documents as a matter of convenience for Tan Yun because Tan Yun lived in mainland China and an original signature was required.  (Ex. 26 at ¶ 12.)

106.    The sale to Tan Yun was never finalized because shortly after the agreements were signed, Tan Yun was diagnosed with a terminal illness and no longer wished to purchase the paintings.  (Ex. 26 at ¶ 9.)

107.    When Tan Yun backed out of the sale, AW found a replacement buyer, Raymond Ye, who stepped in to purchase the paintings.  (Ex. 16 at KINGPROD5 - 01144, ¶ 4; Ex. 22 at 109:16-110:8; Ex. 26 at KING-SCT-000006520.)

108.    On February 16, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $400,480.00.  (Ex. 56.)

109.    On May 20, 2015, Glenn Opell ("Opell"), counsel for the PA, submitted an Affirmation in the Surrogate's Court that discussed, among other things, Wei Zheng's May 19, 20115 deposition testimony and Mr. Opell's assessment of Zheng's credibility.  (Ex. 26.)

110.    In his Affirmation, Opell stated that: "nothing learned in the Wei Zheng deposition changes the sound policies and procedures described in the Schram Affirmation that the PA instituted to ensure the integrity of the third party estate art sales."  (Ex. 26 at ¶ 7.)

111.    Opell further stated that suggestions that Zheng was a knowing participant in a fraud perpetrated by AW to conceal the true identity of buyers of Estate artwork was belied by Zheng's behavior and responses at his deposition.  (Ex. 26 at ¶ 14.)

112.    Opell further stated that he could not ascertain from Zheng's deposition that he was lying or duped into believing such things in order to further the conspiracy.  (Ex. 26 at ¶ 14.)

113.    Opell further stated that that Sam Israel's (YK's attorney), conclusions from Zheng's deposition were entirely premature and founded in conjecture.  (Ex. 26 at ¶ 14.)

114.    According to Opell, Zheng appeared genuine at his deposition when he stated he believed he was acting as an intermediary for AW and Tan Yun.  (Ex. 26 at ¶ 14.)

14

115.    According to Opell, Zheng appeared genuine at his deposition when he stated that Tan Yun had no prior relationship with AW.  (Ex. 26 at ¶ 14.)

116.    According to Opell, Zheng appeared genuine at his deposition when he stated that Tan Yun cancelled the sale because of his terminal diagnosis.  (Ex. 26 at ¶ 14.)

### 2.    Sale #2: 24 Paintings on 04/13/2005 to Chen Mei-Lin

117.    On March 11, 2005, Klein, from his office in New York, NY faxed to Schram at his office in New York, NY, a proposal for the purchase of 24 Estate-owned artworks by Mr. Chen Mei-Lin ("Mei-Lin") for $1,393,422.40.  (Ex. 58.)

118.    On March 22, 2005, Klein emailed Schram a revised proposed contract for the sale of art to Mei-Lin.  (Ex. 59.)

119.    The contract of sale listed Mei-Lin's address as: #777 Lane, Apt. #28-A, Xin-Ja Ave. Jing-An District, Shanghai City, P.R. China 100014.  (Ex. 59.)

120.    The contract of sale listed Mei-Lin's shipping address as: Mr. Chen Mei-Lin, c/o Billie Wai, Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong.  (Ex. 59.)

121.    On March 17, 2005, Lake-Ewald emailed the PA and Schram her opinion of the proposed sale.  (Ex. 44.)

122.    On April 22, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $1,393,422.40.  (Ex. 60.)

### 3.    Sale #3: 17 Paintings on 06/16/2005 to Anthony Chou

123.    On April 29, 2005, Klein, from his office in New York, NY faxed to Schram, at his office in New York, NY, a proposal for the purchase of 16 Estate-owned artworks by Mr. Anthony Chou ("Chou") for $856,689.41.  (Ex. 38.)

124.    On May 5, 2005, Lake-Ewald sent Klein a letter regarding the review of the proposed terms of the sale to Chou.  (Ex. 45.)

125.    On May 10, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a copy of a May 5, 2005 letter from Lake-Ewald regarding the proposed Chou sale, with the original proposal for the sale, and asked Schram "to advise whether the Public Administrator is giving her consent to the sale."  (Ex. 62.)

126.    On May 25, 2005, Klein emailed Schram the bill of sale and proposed contract of sale for the PA's signature regarding the sale to Chou.  (Ex. 33.)

127.    The file name for the document that is the Chou bill of sale is "CHou (sic) bill of sale."  (Ex. 33.)

128.    The contract of sale listed Chou's address as: Apt. #8, Sunshine Square, YaYunChun District, Beijing City, P.R. China 100014.  (Ex. 33 at 7574.)

129.    The contract of sale listed Chou's shipping address as: Mr. Anthony Chou, c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road, Kowloon, Hong Kong. (Ex. 33 at 7574.)

130.    On June 16, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $909,689.41.  (Ex. 63.)

### 4.    Sale #4: 18 Paintings on 09/22/2005 to Yong-Qing Ye

131.    On July 27, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a proposal for the purchase of 20 Estate-owned artworks by Mr. Yong-Qing Ye ("Ye") for $830,400.  (Ex. 65.)

132.    On August 17, 2005, Lake-Ewald sent Schram her opinion of 8 of the paintings. (Ex. 66.)

133.    On August 25, 2005, Lake-Ewald sent Schram her opinion of 12 of the paintings. (Ex. 67.)

134.    On August 29, 2005, Schram faxed Klein the PA's signature pages to the Ye contract and bill of sale.  (Ex. 68 at KING 007001-7003.)

135.    In his August 29, 2005 fax, Schram informed Klein that the PA had approved the sale of 18 of the paintings for and asked Klein to confirm that two pieces of artwork, that were part of the initial proposal, would be removed from the final sale.  (Ex. 68.)

136.    Schram's fax to Klein informed Klein that the PA approved the sale to Ye "based on Elin Ewald's report [.]" (Ex. 68.)

137.    On September 21, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $789,810.00.  (Ex. 70.)

### 5.    Sale #5: 8 Paintings on 02/16/2006 to Yong-Qing Ye

138.    On December 13, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a proposal for the purchase of eight Estate-owned artworks by Mr. Yong-Qing Ye ("Ye") for $346,800.  (Ex. 39.)

139.    On December 15, 2005, Lake-Ewald provided the PA with a letter setting forth her opinion of the proposed sale.  (Ex. 46.)

140.    The contract of sale listed Ye's address as: Mr. Yong-Qing Ye, Room #10, Building #29, An-Shang Park #3, Shanghai City, P.R. China 200092.  (Ex. 72.)

141.    The contract of sale listed Ye's shipping address as: Mr. Ye Yong-Qing, c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon Hong Kong.  (Ex. 72.)

142.    On February 16, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $354,045.00.  (Ex. 73.)

6.      **Sale #6: 14 Paintings on 08/17/2009 to Yue Da-Jin**

143.      On April 23, 2008, Klein, from his office in New York, NY faxed to Schram at his office in New York, NY, a proposal for the purchase of 14 Estate-owned artworks by Mr. Yue Da-Jin ("Da-Jin") for $538,800.00.  (Ex. 40.)

144.      On May 2, 2008, Dionis Rodriguez, on Lake-Ewald's behalf, faxed Schram Lake-Ewald's opinion of proposed prices of artwork for the sale to Da-Jin.  (Ex. 82.)

145.      On June 4, 2008, Klein emailed Schram a proposed contract and bill of sale and asked the PA to countersign.  (Ex. 74.)

146.      The contract of sale listed Da-Jin's address as: The Rui-Jing Palace, Rui-Jing Road, Nanjing City, China.  (Ex. 74 at WANG002260.)

147.      The contract of sale listed Da-Jin's shipping address as: Mr. Yue Da-Jin, c/o Ms. Billie Wai, Unit 704, Forseas Building, #208-212 Nothan Road, Kowloon, Hong Kong.  (Ex. 61.)

148.      On February 26, 2009, Klein emailed Schram to inform him that the proposed sale to Da-Jin fell through and asked if AW could give the buyer a 10% discount.  (Ex. 75 at AWSK_00015263 - 15264.)

149.      Schram responded "Yes."  (Ex. 75 at AWSK_00015263 - 15264.)

150.      The PA approved discounts ranging from 1% to 37% (though generally 8%) of the prices previously set forth reviewed by Lake-Ewald.  (Ex. 40; Ex. 52 at WANG000648 - 649.)

151.      On August 12, 2009, the bank account for the Estate of Chi-Chuan Wang at Capital One Bank in New York, NY received a wire transfer for $489,772.00.  (Ex. 78.)

### III.     SK Owned the Ma Yuan *Landscape Album* at All Relevant Times

152.     SK purchased Ma Yuan *Landscape Album* at Sotheby's in 1987 through his "doing business as" name, Jian Bao Gallery, with his business partner at the time, George J. Goodstadt, Inc.  (Ex. 79; Ex. 80.)

153.     The invoice for the Sotheby's auction sale for $319,000 is directed to the account of "Jian Bao Gallery c/o George J. Goodstadt, Inc."  (Ex. 80.)

154.     The invoice further states that it is to be shipped to "Jian Bao Gallery c/o George J. Goodstadt, Inc., 80 Post Road East, Westport CT, 06880."  (Ex. 80.)

155.     Two contemporaneous checks from SK to Sotheby's, dated December 8, 1986 and February 27, 1987 total $119,000.  (Ex. 81.)

156.     Contemporaneous notes, and testimony from SK, indicate that $200,000.00 of the purchase price was paid from a bank account of Tao-Hsuan Chen and Hui-Chen Wang, relatives of the Wang family over whose assets CC Wang controlled.  (Ex. 81.)

### IV.     Undisputed Facts Concerning Paintings Owned By Northwich Soon Huat, and the Estate Allegedly Stolen in 2003

157.     Plaintiff's first amended complaint (the "FAC") alleges that in 2003 SK and AW stole 25 artworks belonging Northwich, Soon Huat, and CC (the "21+4") from a safe deposit box located at North Fork Bank and/or from CC's apartment.  (Ex. 3 at ¶¶ 47-69.)

158.     The FAC states that 13 of these 25 artworks were the property of dismissed plaintiffs Northwich or Soon Huat, not the Estate.  (Ex. 3 at ¶¶ 50, 52.)

159.     YK testified that she never saw AW or SK in possession of the 21+4.  (Ex. 4 at 144:17-25.)

160.    The FAC states that five of the 25 paintings were returned to Plaintiff by AW (two of which were purportedly owned by Northwich, and one of which was purportedly owned by Soon Huat).  (Ex. 3 at ¶ 50.)

161.    YK testified that her claim that AW and SK stole the 21+4 is based on the fact that she saw AW "carrying a big bag," and in her view, "you can put two and two together." (Ex. 4 at 144:17-25.)

162.    YK testified that the day after she allegedly saw AW and SK leaving CC's building with the 21+4, she "emptied out the box and took everything home," but made no record of what she personally took out of the box.  (Ex. 4 at 109:6-110:21.)

163.    YK testified January 31, 2003, the date she alleges AW and SK stole the 21+4, CC was in declining mental and physical health and would "forget where he put" paintings.  (Ex. 4 at 149:25-151:12.)

164.    YK testified that despite CC's declining health, she continued to allow him access to a safe deposit box she controlled and that she claims contained artwork worth millions of dollars.  (Ex. 4 at 153:16-154:23.)

**V.      The Surrogate's Court Appoints YK as Preliminary Executrix**

165.    On May 9, 2017, Surrogate Mella revoked the preliminary letters issued to AW. (Ex. 83.)

166.    On February 15, 2018, the Surrogate's Court issued preliminary letters testamentary to YK and appointed YK as Preliminary Executrix of the Estate.  (Ex. 84 at 1.)

**VI.     The Surrogate's Court's Limitation of YK's Authority as Preliminary Executrix**

167.    Pursuant to order of the Surrogate's Court, dated February 11, 2019, YK's authority as Preliminary Executrix was limited solely to pursuit of this lawsuit pending

resolution of a petition by SK to revoke YK's preliminary letters testamentary (the "Revocation Order").  (Ex. 84 at 3.)

168.    The Revocation Order was based on allegations that YK was "dishonest and unfit to serve" as executrix because (i) in violation of a temporary restraining order, sold $34 million worth of Estate-owned artwork in her possession for her personal benefit, and (ii) advanced legal positions as executrix that were in her personal interest but were inimical to the interests of the Estate, i.e., in breach of her fiduciary duty to the Estate.  (Ex. 84 at 1-2.)

## VII.    The King Bankruptcy

169.    In 2007, YK and KK filed for bankruptcy in the United States District Court for the Southern District of New York.  (Ex. 85.)

170.    YK and KK's schedules of assets and liabilities filed did not disclose ownership of either Northwich Investments, Ltd. or Soon Huat, Inc.  (Ex. 76 at 4-8, 21, 86.)

171.    YK and KK received a discharge from the Bankruptcy Court in 2010.  (Ex. 87.)

## VIII.    Undisputed Facts Concerning YK's Discovery of Her RICO Injury

172.    In a March 8, 2010 affidavit (the "March 2010 Affidavit") YK swore to the Surrogate's Court that she learned of an exhibition at the Beijing Capital Museum entitled *Bao Wu Tang* – an Important Overseas Chinese Painting and Calligraphy Collection Exhibition" (the "*Bao Wu Tang* Exhibition") in November 2009.  (Ex. 77 at ¶¶ 8-9.)

173.    YK received a copy of the exhibition catalog published in connection with the *Bao Wu Tang* Exhibition in November 2009.  (Ex. 77 at ¶¶ 8-9.)

174.    Contrary to her allegations in the FAC, in the March 2010 Affidavit, YK swore that, that:

> While in Shanghai, China in early November 2009, I became
> aware of an art exhibition, entitled "Bao Wu Tang – The Hall of
> Five Treasures," that would be displayed at the Beijing Capital

> Museum in Beijing, China from November 10, 2009 through
> November 29, 2009 (the "Exhibition").  The highly publicized
> Exhibition was the subject of extensive discussion within the
> Chinese art circle…. When I went to Beijing in late November
> 2009, a friend provided me with a catalog of the Exhibition,
> produced by the Beijing Capital Museum, which included images
> and descriptions of the artwork displayed in the Exhibition.  An
> internet image of the Exhibition brochure is available at:
> http://book.kongfz.com/10249/78885593/.

(Ex. 77 at ¶¶ 8-9.)

175.    The March 2010 Affidavit discussed the prefaces to the catalog, the very prefaces

that "touted the 27 works on display, including 11 that were supposed to have been sold to the

Straw Men."  (Ex. 3 at 118; Ex. 77 at ¶ 10.)

176.    Y.K.'s allegation that she only learned of the *Bao Wu Tang* Exhibition and its

contents in 2013 is also contrary to her sworn deposition testimony that she personally attended

the *Bao Wu Tang*  Exhibition in 2009.  (Ex. 89 at 631-634.)

177.    The preface to the *Bao Wu Tang* Exhibition's catalog does not state that the

artwork on display was the property of AW; it only states that the "exhibition gather[ed] together

works from the collection of my late Grandfather Mr. Wang Jiqian [and] from partial collections

of family members [.]"  (Ex. 3 at ¶ 121; Ex. 77 at ¶ 10.)

178.    In a 2013 deposition in the Surrogate's Court proceeding, in response to

questioning about the *Bao Wu Tang*  Exhibition by counsel to the Public Administrator, YK

testified that she personally attended the *Bao Wu Tang*  Exhibition and closely inspected the

artwork on display, testifying that, apart from one reproduction, "everything else was real …

[e]verything else was genuine." (Id.) (Ex. 89 at 631-634.)

179.    Not only did YK attend the *Bao Wu Tang* Exhibition, but, according to February

12, 2019 email produced in this action, she and KK "even had someone film the show."  (Ex.

18.)

180.    Billing records produced by YK's former counsel at McLaughlin & Stern, LLP confirm that on January 6, 2010 the firm met with the King's "regarding the Baowutang paintings dispute" and on January 7, 2010 "[r]esearched and reviewed the Bao Wu Tang Video[.]"  (Ex. 29 at 23.)

181.    At her deposition in this action, YK testified regarding her procurement crew to videotape the *Bao Wu Tang* Exhibition as follows:

> Q.    So did you or did you not hire a video crew to make a –
> A.    I did not myself, no.
> Q.    Did your husband hire a video crew to make a video?
> A.    No, we didn't know anybody in that field.
> Q.    So who did you hire to make a video of the exhibition?
> A.    I think we mentioned to somebody.  I don't even remember who.
> Q.    What did you mention to somebody about a video?
> A.    That we would love to have a film of the exhibition.
> Q.    Do you recall who you mentioned that to?
> A.    I don't recall.
> Q.    Have you ever seen a film of the exhibition?
> A.    No.

(Ex. 4 at 203:25-204:21.)

182.    Sam Israel, YK's counsel in this action and the signatory of the FAC (Ex. 3 at 67), defended YK's deposition at which YK admitted to attending the *Bao Wu Tang* Exhibition (Ex. 89 at 533:2-19.)

183.    The undisputed facts establish that YK learned of the November 2009 *Bao Wu Tang* Exhibition – not in 2013, but in November 2009; that YK attended the *Bao Wu Tang* Exhibition in November 2009; that, in 2009, YK procured a videotape of the *Bao Wu Tang* Exhibition; that YK obtained a copy of the exhibition catalog for the *Bao Wu Tang* Exhibition in November 2009; and that YK took legal action in the Surrogate's Court it March 2010 regarding

AW's purported display of Estate-owned paintings at the *Bao Wu Tang* Exhibition in March 2010. (Ex. 77 at ¶¶ 8-9.)

184.    The PA was alerted to alleged misconduct by AW in connection with the November 2009 *Bao Wu Tang* Exhibition, including his purported display of Estate artwork, by, at the latest, March 2010, by YK's filing of the March 2010 Affidavit in the Surrogate's Court. (Ex. 77 at ¶¶ 8-9.)

185.    On May 9, 2011 YK filed with the Surrogate's Court a Petition for a Compulsory Limited Accounting And Related Relief Under SCPA 2205 and 2206 ("Petition for Accounting").  (Ex. 71.)

186.    In the Petition for Accounting, YK sought "a limited account only with respect to certain works of art which allegedly comprise a part of the tangible personal property of the estate."  (Ex. 71 at ¶ 8.)

187.    To justify the Petition for Accounting YK argued, *inter alia*, that "[s]everal works of art which are allegedly part of the estate have recently been depicted in the catalogues, exhibited and/or offered for sale at various auction houses, studios and in museums in China and Hong Kong and petitioner has reason to believe that some or all of such works have been sold without obtaining full market value, without proper accounting to the PA and/or the estate, and otherwise by reason of improper, unauthorized unilateral acts of Mr. Wang."  (Ex. 71 at ¶ 8(g).)

188.    Attached as Exhibit 1 to the Petition for Accounting "is a list of artwork which is allegedly part of the estate and which petitioner has reason to believe has been exhibited for sale and/or sold by Mr. Wang at various auction house, studios and in museums in China and Hong Kong."  (Ex. 71 at ¶ 8(h).)

189.     Exhibit 1 to the Petition for Accounting identifies 79 pieces of art, which substantially overlap with the 98 Paintings which are at issue in this litigation.  (Ex. 71 at AWSK_00009197.)

## IX.     The Regan Report

190.     Patrick Regan submitted an expert report on behalf of Plaintiff on October 11, 2019 (the "Regan Report").  (Ex. 90.)

191.     The Regan Report consists of two appraisals: (i) a fair market appraisal of the 98 Paintings, as of October 10, 2019 (the "FMV Appraisal"); and (ii) a retail appraisal of 14 of the 98 Paintings, as of August 2009 (the "Retail Appraisal" and together with the FMV Appraisal, the "Appraisals").  (Ex. 90 at ¶ 1.)

192.     Regan did not offer an opinion in the Regan Report as to the value of 84 of the 98 paintings as of the dates they were sold between 2005 and 2009.  (Ex. 91 at 212:7-213:3.)

193.      In forming his opinions as to the value of the 98 Paintings, Regan relied heavily on sales from mainland Chinese auction houses.  (Ex. 91 at 284:20-285:4.)

194.     With respect to the 14 remaining paintings, which are the paintings sold in August 2009 to Yue Da-Jin, Regan offered an opinion as to the "retail value" of fourteen of the 98 Paintings (the "14 Paintings") as of August 2009.  (Ex. 90 at ¶¶ 28-29.)

195.     In connection with his valuation of the 14 Paintings, Regan opined that,

> "In 2009 … the most likely and appropriate marketplace for Chinese paintings of this type and caliber would have been auctions in China and New York – rather than Private Retail Markets – since that was where the best and highest prices for Classical Chinese paintings were usually achieved.

(Ex. 90 at ¶ 24.)

196.    Regan's admitted in his deposition that, when he issued his opinion, he was unaware that Sotheby's had rejected the Estate's attempts to auction the 98 Paintings in New York.  (Ex. 91 at 251:17-252:22.)

Dated:  New York, New York
        February 14, 2020

By: /s/ *Thomas B. Kelly*
Mark P. Ressler
(mressler@kasowitz.com)
Thomas B. Kelly
(tkelly@kasowitz.com)
Kim Conroy
(kconroy@kasowitz.com)

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.:  (212) 506-1700
*Attorneys for Andrew Wang and*
*Shou-Kung Wang*