**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ x

YIEN-KOO KING, NORTHWICH     :
INVESTMENTS LTD., and SOON HUAT,  :
INC.     :
     :  Civ. Action No.: 1:14-cv-07694 (LJL)
     Plaintiffs,  :
     :
     :
-against-     :
     :
ANDREW WANG, SHOU-KUNG WANG,  :
BAO WU TANG, JIAN BAO GALLERY,  :
ANTHONY CHOU, CHEN-MEI-LIN, WEI  :
ZHENG, YE YONG-QING, YUE DA-JIN  :
and JOHN DOES 1-9,     :
     :
     Defendants.  :

------------------------------------------------------ x

 

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
# MOTION FOR SUMMARY JUDGMENT

 

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.:  (212) 506-1700

*Attorneys for Defendants*
*Andrew Wang and Shou-Kung Wang*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF UNDISPUTED FACTS ...............................................................................4

The Sales of the 98 Paintings .....................................................................................................5

Plaintiff's Allegations .................................................................................................................8

The 2005 Zheng Sale ..................................................................................................................9

The Wire Transfers ...................................................................................................................10

Delivery of the Artwork to Hong Kong ...................................................................................10

The *Bao Wu Tang* Exhibition ...................................................................................................10

The Ma Yuan *Landscape Album* ..............................................................................................11

AW's and SK's Alleged "Reinvestment" of Funds To Purchase Estate Artwork .....................11

Plaintiff's Discovery of AW's Alleged Self-Dealing................................................................11

Procedural History and Plaintiff's First Amended Complaint ..................................................12

LEGAL ARGUMENT ..............................................................................................................14

I.       PLAINTIFF'S CLAIMS ARE TIME-BARRED ..........................................................14

II.     PLAINTIFF CANNOT ADDUCE EVIDENCE SUFFICIENT TO PROVE A CLAIM
UNDER 18 U.S.C. § 1964(C) ......................................................................................17

       A.    Plaintiff Cannot Adduce Evidence of a RICO Enterprise .....................................18

       B.    Plaintiff Cannot Adduce Evidence of A Pattern of Racketeering Activity ..........19

            1.    Plaintiff Cannot Adduce Evidence of Wire Fraud or Shipping of Stolen
Goods Against AW.........................................................................................20

                a.    Plaintiff Cannot Adduce Evidence of a Scheme to Defraud .........21

                b.    The Bills of Sale Evince Only Intrastate Use of Wires .................23

            2.    The Evidence Demonstrates that the Ma Yuan Was Owned By SK at All
Relevant Times...............................................................................................23

            3.    Plaintiff Cannot Adduce Evidence of Predicate Acts Concerning Estate
Assets Allegedly Stolen in 2003.....................................................................24

       C.    Plaintiff Cannot Adduce Evidence Of Causation .................................................26

      D.      Plaintiff Cannot Adduce Evidence of a RICO Injury ............................................28

III.    PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED: ............................30

CONCLUSION .....................................................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*,
  748 F.3d 110 (2d Cir. 2014) ........................................................................25

*Agency Holding Corp. v Malley-Duff & Assoc., Inc.*,
  483 U.S. 143 (1987) ....................................................................................15

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ....................................................................................26

*Black Diamond Land Mgt. LLC v. Twin Pines Coal Inc.*,
  707 F. App'x 576 (11th Cir. 2017) .............................................................24

*Boykin v. 1 Prospect Park ALF, LLC*,
  993 F. Supp. 2d 264 (E.D.N.Y. 2014) .......................................................14

*Boyle v. United States*,
  556 U.S. 938 (2009) ....................................................................................19

*Celotex v. Catrett*,
  477 U.S. 317 (1986) ....................................................................................15

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
  187 F.3d 229 (2d Cir. 1999) .......................................................................23

*Cortlandt St. Recovery Corp. v. Hellas Telecom., S.a.r.l*,
  790 F.3d 411 (2d Cir. 2015) .......................................................................17

*Crawford v. Franklin Credit Mgmt. Corp.*,
  758 F.3d 473 (2d Cir. 2014) .......................................................................18

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013) ..................................................................18, 19

*D'Addario v. D'Addario*,
  901 F.3d 80 (2d Cir. 2018) .........................................................................17

*Dornberger v. Metro. Life Ins. Co.*,
  961 F. Supp. 506 (S.D.N.Y. 1997) .............................................................29

*First Capital Asset Mgt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) .......................................................................18

*Flair Int'l Corp. v. Heisier*,
    1999 WL 132181 (2d Cir. 1999) ........................................................................ 14

*GICC \*488 Capital Corp. v. Technology Finance Group, Inc.*,
    67 F.3d 463 (2d Cir. 1995), *cert. denied,* 518 U.S. 1017 (1996) ........................... 20

*Gonzales v. Nat'l Westminster Bank PLC*,
    847 F Supp. 2d 567 (S.D.N.Y. 2012) ................................................................... 17

*Gross v. Waywell*,
    628 F. Supp. 2d 475 (S.D.N.Y. 2009) .................................................................. 23

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
    2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016) ......................................................... 19

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
    492 U.S. 229 (1989) ........................................................................................... 20

*Hemi Grp., LLC v. City of N.Y.*,
    559 U.S. 1 (2010) .............................................................................................. 26

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010) ......................................................................... 15, 26

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    907 N.E.2d 268 (2009) ....................................................................................... 17

*Jerome M. Sobel & Co. v Fleck*,
    2004 WL 48877 (S.D.N.Y. Jan. 8, 2004) ............................................................. 20

*Kerik v. Tacopina*,
    64 F. Supp. 3d 542 (S.D.N.Y. 2014) ................................................................... 29

*King v. Lasher*,
    572 F. Supp. 1377 (S.D.N.Y. 1983) ................................................................... 24

*Koch v. Christie's Intern. PLC*,
    699 F.3d 141, 151 (2d Cir. 2012) ....................................................................... *16*

*Leung v. Law*,
    387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005) ......................................................... 28

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998) ..................................................................... 15, 16, 30

*Natl. Group for Communications and Computers Ltd. v. Lucent Tech. Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) ................................................................. 16

*Peralta v. Peralta,*
    2018 WL 1384509 (S.D.N.Y. Mar. 16, 2018)..........................................................26, 27, 28

*Red Ball Interior Demolition Corp. v. Palmadessa,*
    874 F. Supp. 576 (S.D.N.Y. 1995) .......................................................................26, 27, 28

*Matter of Rothko's Estate,*
    43 N.Y.2d 305 (1977)..............................................................................................29

*Sergeants Benevolent Ass'n Health and Welfare Fund v Sanofi-Aventis U.S. LLP,*
    806 F.3d 71 (2d Cir. 2015) .......................................................................................28

*Staehr v. Hartford Fin. Servs. Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008) .....................................................................................15

*Standard Federal Bank v. Healy,*
    7 A.D.3d 610 (2d Dep't 2004)..................................................................................29

*U.S. v. Starr,*
    816 F.2d 94 (2d Cir. 1987) .................................................................................21, 22

*United States Fire Ins. Co. v. United Limousine Serv., Inc.,*
    303 F. Supp. 2d 432 (S.D.N.Y. 2004) .......................................................................21

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000) ...............................................................................21, 22

*United States v. Turkette,*
    452 U.S. 576 (1981) ................................................................................................19

*Wang v. Yien-Koo King,*
    2020 WL 417690 (S.D.N.Y. Jan. 27, 2020)...........................................................24, 30

*World Wrestling Entertainment. Inc. v. Jakks Pacific. Inc.,*
    328 F. App'x 695 (2d Cir. 2009) ...............................................................................15

**Statutes**

18 U.S.C. § 1343 ...........................................................................................................21, 23

18 U.S.C. § 1962(a) .............................................................................................................13

18 U.S.C. § 1962(c) ..................................................................................................13, 17, 18

18 U.S.C. § 1962(d)..................................................................................................13, 18

18 U.S.C. § 1964 .................................................................................................17, 18, 29

18 U.S.C. § 2314 ..........................................................................................................21, 24

RICO.........................................................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 17(a)(3) ...................................................................................14, 17

Fed. R. Civ. P. 26 ..................................................................................................29

Fed. R. Civ. P. 56 ..............................................................................................1, 15

Local Rule 56.1 .............................................................................................1, 6, 12

N.Y. C.P.L.R. § 214(4)..........................................................................................17

Defendants Andrew Wang ("AW") and S.K. Wang ("SK" and with AW, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56 to dismiss this action in its entirety.  No issue of fact exists as to Defendants' liability to plaintiff, Yien-Koo King ("YK"), in her capacity as Preliminary Executrix of the Estate of Chi-Chuan ("CC") Wang ("Plaintiff" or the "Estate"), for purported violations of the Racketeering and Corrupt Practices Act ("RICO"), conversion, common law fraud, breach of fiduciary duty, or aiding and abetting breach of fiduciary duty.  Defendants' motion should be granted in its entirety.[1]

## **PRELIMINARY STATEMENT**

Contentious family disputes that wind up in court can sometimes bring out the worst in litigants, leading to overwrought allegations that cannot be supported by provable facts.  That is precisely the situation here, where plaintiffs have twisted an acrimonious probate fight into wildly exaggerated and false allegations of an international criminal racketeering conspiracy led by a 90-year-old man, SK, and his son, AW, to "steal" assets from the estate of C.C. Wang, who was the father of SK (and plaintiff YK).  In other words, this case is a textbook example of civil RICO abuse.

Stripped of its hyperbole, the complaint described a narrow family dispute over family assets, alleging, at its core, that in 2003 SK and AW took a group of paintings belonging to YK and the Estate (claims that were previously dismissed as time-barred), and that between 2005-09, while serving as the Estate's Preliminary Executor, AW engaged in self-dealing in connection with sales of Estate-owned artwork.  But Plaintiff can no longer rely on her inflammatory

---

[1] Defendants submit the Declaration of Thomas B. Kelly, dated February 14, 2020 ("Kelly Dec.") in support of their motion for summary judgment.  Exhibits to the Kelly Dec. are referred to as "Ex. __."  Defendants also submit a Rule 56.1 Statement of Undisputed Material facts.

allegations; she must adduce provable facts.  As demonstrated below, Plaintiff has no evidence to establish that this family battle, however rancorous, amounts to a violation of federal racketeering or any other laws.  To the contrary, undisputed facts affirmatively negate her claims.

*First*, affirmative evidence demonstrates that Plaintiff's claims are time-barred.  The evidence shows that her allegation that she learned of AW's purported self-dealing in 2013 (a date within the limitations period) is an outright lie.  Contrary to her claim that she learned of AW's purported self-dealing when, upon reviewing a catalog, she noticed that AW had displayed artwork sold by the Estate at a museum exhibition, YK in fact personally attended the exhibition in *2009*, received a copy of the catalog in *2009*, and procured a video of the exhibition in *2009*. YK's RICO claim was time-barred when she filed her initial complaint in this action, in September 2014, and also when she first obtained standing to pursue claims on behalf of the Estate, in February 2018.

*Second,* YK cannot adduce evidence sufficient to establish the existence of a RICO enterprise.  There is no evidence, as required, that the alleged enterprise members associated together at all, much less worked together to achieve a common, fraudulent purpose.

*Third,* YK cannot adduce evidence of a pattern of racketeering activity—specifically, evidence sufficient to establish the underlying predicate acts she alleges AW and SK committed. She simply has no record evidence showing a "scheme to defraud" the Estate in connection with AW and SK's purported acts of wire fraud and shipping of stolen goods.  The facts demonstrate instead that, in connection with sales of Estate-owned artwork in which AW participated as the Estate's Preliminary Executor, the Estate's co-fiduciary, the Public Administrator of the County of New York, implemented procedures that effectively stripped AW of control over sales of

Estate artwork.  Taking unilateral decision-making out of AW's hands, these procedures required that all sales by the Estate be vetted in a multi-layer, two-step process:  first by an independent, third-party art appraiser, and then by the PA.  Moreover, the evidence demonstrates that numerous of the alleged predicate acts of wire fraud did not employ interstate wires as the statute requires.

*Fourth*, YK cannot adduce evidence to establish causation of an injury to the Estate "by reason of" a predicate act.  No such injury is provable by reason of AW's allegedly fraudulent sales because of the two-step vetting process described above:  first, the prices at which the artwork was sold were pre-determined by the PA, and, second, no sale was approved by the PA absent review by the independent, third-party appraiser.  Nor was there any injury caused by the Estate by reason of allegedly fraudulent wire transfers because no one—neither Estate, nor any third-party—relied on the transfers.  At most, even if they could be proven (and they cannot), any such allegedly fraudulent wire transfers and shipments of stolen goods merely "facilitated" AW's purported self-dealing.

*Fifth,* YK cannot establish that the Estate suffered any injury.  The crux of YK's claim is that the Estate was injured because it sold 98 paintings at sub-market prices between 2005-09. But YK's damages expert provided no opinion at all as to the fair (or any) value of 84 of the 98 paintings as of the dates the Estate sold them.  With respect to the remaining 14 paintings, YK's expert offered an opinion as to the "retail value" of that group as of the date of their sale in 2009, but the evidence demonstrates that "retail value" is not a relevant measure of the value of the artworks to the Estate, as it wrongly assumes that auction markets were even available for the sales.

## STATEMENT OF UNDISPUTED FACTS

CC Wang was an internationally known collector and connoisseur of, and expert in, classical Chinese painting and calligraphy (artwork created between the 10th and 17th century), and an accomplished artist in his own right.  (Ex. 1, ¶ 3.)  CC was the father of YK and SK, and the grandfather of AW (who is SK's son).  (Ex. 2, ¶ 2; Ex. 3, ¶ 15.)  CC, with his wife and daughters, including YK, immigrated to the United States in 1949 and settled in New York City, leaving SK behind in China.  (Ex. 4 at 26:2-43:14.)  SK and his family, including AW, immigrated to the United States in the late 1970s.  (*Id*.)  But this was not to be a happy family reunion.  The family was riven by tension and rivalry between, on the one side, YK (ultimately joined by her husband Kenneth King ("KK") and their son Raymond King ("RK")), and on the other side, SK (with AW and other family members).  That bad blood has been boiling for decades.

When CC died in July 2003, the siblings' rivalry exploded into a scorched-earth battle over CC's Estate that continues in the Surrogate's Court of the County of New York (the "Surrogate's Court") to this day.  Upon CC's death, the siblings submitted competing wills for probate.  SK submitted a will dated February 18, 2003 (the "2003 Will") and a codicil dated February 10, 2003 (the "2003 Codicil"), and YK submitted a will dated June 13, 2000 (the "2000 Will").  (Ex. 1 at ¶ 4; Exs. 5-6.)

Since the outset of the Surrogate's Court proceedings, the parties have each accused each other of fraud, undue influence, and outright theft concerning hundreds of artwork from the Estate valued at potentially millions of dollars.  The mill of accusations in the Surrogate's Court proceedings has been spinning without letup for the last 17 years.

In August of 2003, the Surrogate's Court, per the terms of the 2003 Will, issued Letters Testamentary to AW and appointed him Preliminary Executor of the Estate.  (Ex. 7.)  Given

YK's challenge of the 2003 Will, the Surrogate's Court simultaneously issued Letters of

Temporary Administrator to Ethel Griffin, Public Administrator of the County of New York (the

"PA"), and appointed her as the Estate's Temporary Administrator, and, along with AW, co-

fiduciary.  (*Id.*)  In the face of dueling accusations between "the warring family factions," the

Surrogate's Court directed the PA to investigate the allegations made by the various family

members concerning CC's art collection.  (Ex. 1, ¶ 7.)  On October 21, 2003, the Public

Administrator commenced a proceeding under the New York Surrogate's Court Procedure Act §

2103 against YK, KK, SK, and AW to provide information concerning Estate assets and to

recover Estate assets from the parties.  (Ex. 9.).

In April 2017, after trial in the Surrogate's Court, a jury found that CC lacked

testamentary capacity when he signed the 2003 Will, that the 2003 Will was the result of undue

influence by SK and AW, and that the 2003 Will was caused or procured by the fraud by SK

"and/or" AW.  As a result, AW's preliminary letters testamentary were revoked.  (Ex. 83).  On

February 15, 2018, preliminary letters testamentary were issued to YK.  (Ex. 84 at 1.)

**The Sales of the 98 Paintings**

The crux of Plaintiff's RICO and other claims against SK and AW is that between 2005-

09, while Preliminary Executor of the Estate, AW facilitated the sale of 98 Estate-owned

artworks (the "98 Paintings") to himself through a "straw man" scheme.  (Ex. 3, ¶¶ 104-224;

282.)  The undisputed facts regarding the sales of the 98 Paintings are as follows:

In early 2004, SK and YK turned over to the Estate 133 classical Chinese artworks that

everyone acknowledged were Estate property.  (Ex. 11, ¶ 7; Ex. 13.)  The PA then engaged

Sotheby's to appraise the artworks, as of the date of CC's death in 2003, for estate tax purposes

(the "Sotheby's Appraisal").  (Ex. 13.)  In October 2004, the Estate filed its estate tax returns

pursuant to which, net of prior payments, the Estate owed approximately $5,500,000 in federal and state taxes. (*See* Ex. 15; Ex. 19). Accordingly, the PA determined "the Estate needed to sell whatever artwork it could to be in a position to pay estate taxes and other administration expenses."[2]  (Ex. 11, ¶ 10; Ex. 8 at 23:22-25:3.)

AW and the PA attempted to sell all of the artwork at auction at Sotheby's, but Sotheby's was only willing to auction the 39 "best" pieces. (Ex. 11, ¶ 10; Ex. 13.) At Sotheby's auction of the 39 pieces in 2006, few sold above Sotheby's valuation of the pieces as of July 2003, and several sold for less. (Ex. 11, ¶ 13.) According to counsel for the PA, the results of the 2006 Sotheby's auction are the "best indicator that the Sotheby's appraisal values [dated as of July 2003] were accurate – and [were] an appropriate barometer to be relied upon by the Public Administrator" in connection with the sales of the 98 Paintings. (*Id.*, ¶ 13.)

Sotheby's advised the PA that Asia was the appropriate market for the remaining artwork. Given AW's background with the Chinese art market, the PA requested that he attempt to find private buyers for the artwork in Asia. (*Id.*, ¶ 11.) To ensure the Estate received fair prices for the artwork, prior to AW approaching potential buyers, the PA and AW agreed upon a set of procedures to govern the sales. (*Id.*) If a buyer was found by AW, the proposed sale would be submitted in writing to the PA and would be reviewed by a second, independent art expert retained by the PA (O'Toole-Ewald Art Associates, Inc., "OTE"). (*Id.*) As a gatekeeping requirement, the PA required all sales prices to be at least 20% higher than it was valued by Sotheby's, unless OTE agreed that an exception should be made. (*Id.*) According to counsel for

---

[2] As set forth in greater detail Defendants' Rule 56.1 Statement, these amounts, and the financial pressures on the Estate, grew exponentially in 2007 when the IRS issued a Notice of Deficiency to the Estate, claiming it was owed an additional $22,529,000 in estate taxes, or unpaid gift taxes, largely based on YK's claim, disputed by the Estate, that CC gifted her millions of dollars of artwork during his lifetime on which no gift taxes were ever paid. (Ex. 23.) The Estate's claim to ownership of the artwork admittedly in YK's possession, and other claims regarding ownership of artwork, have not been resolved in the Surrogate's Court.

the PA, this procedure was followed by AW and the PA for the sales of "every one" of 98 Paintings.[3]  (*Id.*, ¶ 12.)

Ms. Lake-Ewald of OTE testified that her review of the  proposed sales prices was based on her assessments of reported sales of comparable works, consultation with experts in the field (including Arnold Chang, the appraiser who conducted the Sotheby's Appraisal), and her own research.  (Ex. 48 at 44:13-21, 46:12-15, 171:7-19, 184:10-186:6.)  She testified that the identity of the proposed buyers was not material to her reviews of the proposed sales prices.  (*Id.*, 171:20-173:14.)  In her words, "the price is whatever the price is that I've researched."  (*Id.* at 173:2-14.)

Between 2005-09, the Estate sold the 98 Paintings in six groups to five buyers: (i) a February 2005 sale of 17 paintings to a buyer identified as Wei Zheng (later replaced by Raymond Ye) for $395,730.00 (Ex. 55); (ii) an April 2005 sale of 24 paintings to Chen Mei-Lin for $1,393,422.40 (Ex. 59); (iii) a June 2005 sale of 17 paintings for $909,689.41 to Anthony Chou (Ex. 64); (iv) a September 2005 sale of 18 paintings for $789,810.00 to Yong-Qing Ye (Ex. 65); (v) a February 2006 sale of 8 paintings for $346,800.00 to Yong-Qing Ye (Ex. 39); and (vi) an August 2009 sale of 14 paintings for $538,800.00 to Yue Da-Jin (Ex. 40).

The Estate received payment for the sales by six wire transfers: (i) a February 16, 2005 transfer of $400,480.00; (ii) an April 22, 2005 transfer of $1,393,422.40; (iii) a June 16, 2005 transfer of $909,689.41; (iv) a September 21, 2005 transfer of $789,810.00[4]; (v) a February 16, 2005 transfer of $354,045.00; and (vi) an August 12, 2009 transfer for $489,772.00.  (Exs. 56; 60; 63; 70; 73; 78.)  Wire transfer remittances for each transfer were received by Martin Klein, AW's attorney, and forwarded to counsel for the PA, Peter Schram, who testified that he did not

---

[3] With respect to the sale to the buyer Yue Da-Jin, after OTE's initial review in 2006, the PA approved discounts averaging 8% on a group of 14 paintings, including one paintings that was discounted 37% after it failed to sell at the Sotheby's auction.  (Exs. 40; 43; 52; 76-77.)

[4] Two items included in the initial proposal were withdrawn from the sale, resulting in a lower total sales price.

"review the terms of [the sales] with the Public Administrator."  Rather, he simply served as an intermediary for information between Klein, Ms. Lake-Ewald, and the PA.  (Ex. 8 at 80:19-81:12.)

In connection with each sale, Klein, prepared proposed bills of sale or otherwise communicated terms of a proposed sale (the "Bills of Sale") that were faxed or emailed from his office in New York, to Schram, at his office in New York.  (Exs. 38-40; 54; 58; 65.)  Schram did not evaluate or approve the sales, but passed the proposals to Ms. Lake-Ewald at OTE and Ethel Griffin for review.  (Ex. 8 at 80:19-81:12.)  Klein also prepared drafts of the contractual documents for each sale and faxed or emailed these documents to counsel for the PA.  (Exs. 33; 55; 59; 68; 74.)  Unfortunately, Ethel Griffin, the PA who approved these sales, passed away in 2015.  Plaintiff has not—because she cannot—adduce any evidence as to what the PA did or did not consider or rely upon in determining to approve the sales of the 98 Paintings.

**Plaintiff's Allegations**

In September 2016, YK filed an amended complaint (the "FAC") that, in contrast to her initial complaint, included RICO and a variety of state law claims on behalf of the Estate.  (Ex. 3.)  Plaintiff alleges AW conspired with the buyers of the 98 Paintings to enact a "straw man" scheme, in which the buyers served as a front for AW to secretly purchase the 98 Paintings for himself for allegedly less than fair market value prices.  (*Id.*, ¶¶ 104-224.)  Plaintiff also alleges that SK and/or AW defrauded the Estate by wrongfully absconding with an Estate-owned artwork by the artist Ma Yuan entitled *Landscape Album.*  (*Id.*, ¶¶ 86-103.)  Finally, the FAC alleges that SK and AW invested funds gained from the sale of art allegedly stolen in 2003, into AW's "scheme" to purchase Estate artwork.  (*Id.*, ¶ 103.)

With respect to AW's alleged self-dealing, Plaintiff's allegations are predicated on claims that (i) the contract between the Estate and the buyer Wei Zheng was a "sham" because Wei Zheng testified that he was not the ultimate buyer of the artwork at issue and that the buyer he arranged to purchase the artwork backed out of the sale (*Id.*, ¶¶ 114-115); (ii) that an AW controlled-entity in Hong Kong served as an intermediary for transfers of money from the buyers in mainland China to the Estate; (iii) that the artworks were not shipped to the buyer's addresses in mainland China, but to AW's accountant's office in Hong Kong (*Id.*, ¶¶ 111-112); and (iv) that some of the paintings sold by the Estate were displayed at a museum exhibition in China of artwork from C.C. Wang's collection in which AW was involved (*Id.*, ¶¶ 155-160, 177-178, 223, 244).

**The 2005 Zheng Sale**

In or around late 2004, after the PA requested AW attempt to locate buyers for the remaining artwork, AW contacted Wei Zheng to seek Zheng's assistance in finding a buyer for Estate paintings because Zheng had contacts with potential Chinese art collectors.  (Ex. 26, ¶ 9.) Zheng acted as a "matchmaker" for AW in connection with the February 2005 sale, and connected AW with a buyer in Asia named Tan Yun, who had no prior relationship with AW. (Ex. 26, ¶¶ 9, 11, 14.)  AW and Tan negotiated the prices for the February 2005 sale.  Tan requested that Zheng execute transaction documents on his behalf as Tan lived in mainland China and an original signature was required.  (Ex. 26, ¶ 12.)  The sale to Tan was never finalized because shortly after the agreements were signed, Tan was diagnosed with a terminal illness and no longer wished to purchase the paintings.[5]  (Ex. 26, ¶ 9.)  When Tan backed out of

---

[5] Glenn Opell, counsel to the Public Administrator, submitted a sworn affidavit to the Surrogate's Court, stating that Mr. Zheng "appeared genuine" in his description of his role in the February 2005 sale and that that Plaintiff's contention that "Mr. Zheng was a knowing participant in a fraud perpetrated by [AW] to conceal the true identity of the buyers was belied by Mr. Zheng's behavior and his response at his examination."  (Ex. 26, ¶ 14.)

the sale, AW found a replacement buyer, Raymond Ye, who stepped in to Tan's place, and who executed a revised signature page to the Zheng contract.  (Ex. 16, ¶ 4; Ex. 26, KING-SCT-0000006520.)

**The Wire Transfers**

To facilitate the buyers' payments from mainland China, AW, accepted payment at a bank account he controlled in Hong Kong, and, upon his receipt of the funds, forwarded the payment to the Estate's bank account in the U.S.  (*See* Ex. 22 at 18:4-12, 22:7-21, 240:20-242:21, 245:6-14, 316:20-24.)

**Delivery of the Artwork to Hong Kong**

Artworks were delivered to Hong Kong "for the purpose of saving taxes for the buyers."  (Ex. 22 at 256:3-5.)  The contracts of sale each state that the artworks would be shipped to the respective buyer "c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road, Kowloon, Hong Kong."  (Ex. 22 at 127:14-128:9; Exs. 33; 55; 59; 61; 72.)  Billie Wae was the office manager for AW's accountant, C.K. Lam, in Hong, Kong.  Artworks were shipped to Ms. Wae because she was someone AW trusted, and, accordingly, Ms. Wae's office was a reliable place AW could ship the paintings.  (Ex. 22 at 319:10-18.)

**The *Bao Wu Tang* Exhibition**

Further, Plaintiff contends that a number of the paintings sold by the Estate appeared at a November 2009 exhibition of art from CC's collection at the Beijing Capital Museum entitled "*Bao Wu Tang* – an Important Overseas Chinese Painting and Calligraphy Collection Exhibition" with which AW was involved, and that this is evidence of AW's self-dealing.  (Ex. 3, ¶¶ 118-124).  But it is not.  As YK admits, the Exhibition did not purport to display works

owned by AW, but "gather[ed] together works from the collection of my late Grandfather Mr. Wang Jiqian [and] from partial collections of family members[.]"  (Ex. 3, ¶ 121; Ex. 77, ¶ 10).

**The Ma Yuan *Landscape Album***

The FAC alleges that SK and AW wrongfully absconded with an Estate-owned artwork by the artist Ma Yuan entitled *Landscape Album*.  (Ex. 3, ¶¶ 282, 304.)  The undisputed facts establish that SK, not CC, purchased the artwork from Sotheby's in 1987 through his "doing business as" name, Jian Bao Gallery, with his business partner at the time, George J. Goodstadt, Inc., and has been the owner of the artwork at all relevant times.  (Exs. 79-80.)

**AW's and SK's Alleged "Reinvestment" of Funds To Purchase Estate Artwork**

The complaint alleges that SK and AW used funds from sales of works allegedly stolen from a safe deposit box in 2003 to purchase the 98 Paintings from the Estate.  (Ex. 3, ¶¶ 282, 304.)  The Court previously dismissed YK's claims regarding artwork allegedly stolen in 2003, and, regardless, there is no evidence that AW or SK sold such artwork or used the proceeds from the sales to purchase Estate-owned artworks.

**Plaintiff's Discovery of AW's Alleged Self-Dealing**

According to the FAC, in 2013, YK learned of a 2009 exhibition at the Beijing Capital Museum entitled "*Bao Wu Tang* - an Important Overseas Chinese Painting and Calligraphy Collection Exhibition" (the "*Bao Wu Tang* Exhibition").  The *Bao Wu Tang* Exhibition was allegedly named after AW's "personal art gallery" and the artwork displayed "came from AW." (Ex. 3, ¶¶ 120-122.)  YK alleges that she became aware of AW's purported self-dealing—in 2013—via an exhibition catalog that was published in connection with the *Bao Wu Tang* Exhibition (the "Catalog").  (*Id.*, ¶ 121.)  The Catalog purportedly revealed AW's self-dealing because "in [AW's] preface to the exhibition's hard-cover book publication, AW touted the 27

works on display, including 11 that were supposed to have been sold to the Straw Men [.]" (*Id.*) YK asserts that her discovery of the *Bao Wu Tang* Exhibition and her reading of the preface to the Catalog was evidence—to her—of self-dealing by AW because "AW, his Gallery, and the 'Wang Family' [were] the only entities which received credit for the work on display" but the "Straw Men who AW convinced the Public Administrator and the Estate would be the new owners of the works are not mentioned." (*Id.*, ¶¶ 122-123.)

The undisputed facts establish that in YK lied to the Court regarding her purported "2013" discovery of the *Bao Wu Tang* Exhibition.  Indeed, YK discovered the exhibition when it happened in November 2009; YK attended the *Bao Wu Tang* Exhibition in November 2009; YK procured a videotape of the *Bao Wu Tang* Exhibition in 2009; and YK obtained a copy of the Catalog for the *Bao Wu Tang* Exhibition in November 2009.  (Ex. 77, ¶¶ 8-9; Ex. 89 at 631:24-634:21.)  YK also took legal action in the Surrogate's Court regarding AW's purported display of Estate-owned paintings at the *Bao Wu Tang* Exhibition in March 2010 and again in December 2011.  (Ex. 77, ¶¶ 8-9.)[6]

**Procedural History and Plaintiff's First Amended Complaint**

YK and KK, solely in their individual capacities, commenced this action on September 23, 2014.  (Dkt. 1.)  The initial complaint did not advance claims on behalf of the Estate.  (*Id.*, ¶¶ 10-11.)  On July 13, 2015, the Court dismissed the complaint based on YK's and KK's lack of standing to pursue claims on behalf of corporate entities in their control and for failure to state a RICO claim.  (Dkt. 27 at 9-15.)  On August 26, 2016, the Second Circuit reversed, holding that YK had adequately pleaded a RICO claim and granted YK and KK leave to re-plead to add the relevant corporate defendants.  (Dkt. 32.)  On September 27, 2016, YK filed the FAC, which

---

[6] Additional facts concerning YK's discovery of AW's purported self-dealing are set forth in Defendants' Rule 56.1 Statement.

purported to advance claims—for the first time—"on behalf of the Estate," as well as personally

and on behalf of Northwich Investments, Ltd. ("Northwich") and Soon Huat, Inc. ("Soon Huat").

(Dkt. 36.)

The FAC alleged claims against AW and SK for violations of 18 U.S.C. §§ 1962(a), (c),

and (d) and state-law claims for conversion, common law fraud and conspiracy to defraud,

breach of fiduciary duty, aiding and abetting breach of fiduciary duty, replevin, violations of

New York Debtor and Creditor Law § 270, and for a constructive trust. (Ex. 3, ¶¶ 249-379.)

The FAC was dismissed in its entirety on June 20, 2017 on grounds that YK lacked standing to

sue on behalf of the Estate and that Northwich's and Soon Huat's claims were time-barred. (Dkt.

53 at 11-21.) The Court found that YK lacked standing to sue on behalf of the Estate because, at

that time, YK was not a fiduciary of the Estate and her "status as a beneficiary of the Estate"—

which in limited circumstances may confer standing—"had not been determined as of the

commencement of the action." (*Id.* at 11-15.) On July 5, 2017, Plaintiff filed a motion for

reconsideration and re-argument of the Court's June 20, 2017 dismissal of the FAC. (Dkt. 54.)

On March 26, 2018, the Court granted, in part, Plaintiff's motion to reconsider the June

20, 2017 dismissal of this case. (Dkt. 65.) In reversing its earlier dismissal, the Court took

judicial notice that on February 15, 2018, YK was appointed as preliminary executrix of the

Estate, and, accordingly, "now has standing to sue on behalf of the Estate."[7] (*Id.* at 12.). The

Court further held that, for statute of limitations purposes, YK's newly conferred standing

constituted a "'substitution' of the real party in interest" and thus "related back" under Fed. R.

Civ. P. 17(a)(3) to her commencement of the action (solely on her personal behalf) on September

---

[7] The Court dismissed as time-barred all claims by Plaintiffs Northwich and Soon Huat as well as Plaintiff's claims for replevin, imposition of a constructive trust, and violations of New York Debtor and Creditor Law § 270 for lack of jurisdiction. (Dkt. 65 at 29.)

23, 2014.  (*Id.* at 12-17.)  The Court also held that Plaintiff's RICO claims were timely based on

the September 23, 2014 date the initial complaint was filed, relying on Plaintiff's allegation that

"Y.K. did not discover that these stolen paintings had been shipped to and sold in China until

2012 or 2013." (Dkt. 65 at 18.)

## **LEGAL ARGUMENT**

Summary judgment must granted as to all or part of a claim when the movant shows,

based on admissible evidence in the record placed before the court, "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Alternatively, "where the nonmovant will bear the ultimate burden of proof at

trial on an issue, the movant's burden will be satisfied if he can point to an absence of evidence

to support an essential element of the nonmoving party's claim."  *Flair Int'l Corp. v. Heisier*,

1999 WL 132181, at *2 (2d Cir. 1999).  "[I]t is incumbent upon [the non-moving party] to

identify specific admissible evidence demonstrating a genuine issue for trial . . . [the] non-

moving party must do more than simply show that there is some metaphysical doubt as to the

material facts."  *Boykin v. 1 Prospect Park ALF, LLC*, 993 F. Supp. 2d 264, 272 (E.D.N.Y. 2014)

(citations omitted).  "[A] party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory

allegations or denials . . . cannot by themselves create a genuine issue of material fact where

none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  When the

nonmoving party fails to make a showing on an essential element of its case, summary judgment

must be granted.  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

## I.    **PLAINTIFF'S CLAIMS ARE TIME-BARRED**

RICO claims are governed by a four-year statute of limitations.  *Agency Holding Corp. v.*

*Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156 (1987).  "The limitations period begins to run

when the plaintiff discovers or should have discovered the RICO injury." *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 58 (2d Cir. 1998). "The RICO statute of limitations ... runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entertainment. Inc. v. Jakks Pacific. Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009) (citing *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008)). Finally, if some inquiry is made, the court "will impute knowledge of what [a plaintiff] in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.'" *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 151 (2d Cir. 2012) citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005). Plaintiff's claims are time-barred.

*First*, YK had actual notice—or at the very least was on inquiry notice—of her alleged RICO injury as of November 2009 when she discovered AW's alleged self-dealing regarding the 98 Paintings. As set forth above, the FAC's critical allegation for limitations purposes—that YK discovered the *Bao Wu Tang* Exhibition in 2013—is false. YK was not only provided a "catalog of the Exhibition …which included images and descriptions of the artworks displayed," in November 2009, but *she personally attended* the *Bao Wu Tang* Exhibition that same month.[8] (Ex. 77, ¶¶ 8-9; Ex. 89 at 631:24-634:21.) This action was required to be commenced by November 2013, and was thus untimely when filed on September 23, 2014 (the earliest possible date this action could be considered "commenced.")

To the extent the Court finds that YK's knowledge of the *Bao Wu Tang* Exhibition gave rise to only inquiry notice, this action is still untimely because there is no basis for equitable

---

[8] Indeed, YK commenced an action in the Surrogate's Court on the basis of the allegation in 2011.

tolling.  Equitable tolling requires that YK prove: (1) wrongful concealment by defendants (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim.  *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d at 60.  "[D]ue diligence by plaintiff [is required] *throughout* the period to be equitably tolled."  *Natl. Group for Communications and Computers Ltd. v. Lucent Tech. Inc.*, 420 F. Supp. 2d 253, 268 (S.D.N.Y. 2006) (emphasis added).  YK cannot establish any "fraudulent concealment" by AW; indeed, AW allegedly publicly displayed the artwork at a museum.  Moreover, Plaintiff's conduct in prosecuting this RICO claim was anything but diligent.  YK waited nearly five years after attending the *Bao Wu Tang* Exhibition to file the initial complaint (in her individual capacity), and nearly seven years to bring claims on behalf of the Estate.  Of course, throughout this entire time period, the Estate was co-administered by the PA—a fiduciary independent of AW—who oversaw the sales of the 98 Paintings and could have brought the Estate's RICO claims at any time.[9]  Finally, YK is not entitled to equitable tolling because, she herself has not come to this court "in equity;" rather, she misrepresented basic facts regarding her discovery of her claims and allowed the Court to rely on those misrepresentations in allowing this case to move past a motion to dismiss.

*Second*, September 23, 2014 is not the proper date by which to assess the timeliness of Plaintiff's RICO claim.  YK did not gain standing to pursue an action on behalf of the Estate until February 15, 2018, the date she was appointed Preliminary Executor of the Estate.  (Dkt. 65 at 10.)  Prior to that date, her claims on behalf of the Estate were a legal "nullity," and the relevant commencement date is no earlier than February 15, 2018.  *See Cortlandt St. Recovery Corp. v. Hellas Telecom., S.a.r.l*, 790 F.3d 411, 422-23 (2d Cir. 2015) ("[I]n the absence of a

---

[9] As a result of YK's filings in the Surrogate's Court, the PA was also, at very least, on "inquiry notice" of potential claims in 2010.

plaintiff with standing, this lawsuit was a nullity, and there was therefore no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise.")  Even if the her claims on behalf of the Estate could be deemed to "relate back" to an earlier filing, YK only brought claims on behalf of the Estate when she filed the FAC in September 2016, and there is no basis for the Estate's claims to "relate back" to YK's filing of personal claims in 2014.[10]  (*See e.g.,* Ex. 71, ¶ 8g-h.)

## II.  **PLAINTIFF CANNOT ADDUCE EVIDENCE SUFFICIENT TO PROVE A CLAIM UNDER 18 U.S.C. § 1964(C)**

18 U.S.C. § 1964(c) authorizes a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 ...."  To make a out claim under this section, Plaintiff must prove not only (1) that Defendants violated section 1962(c) and (2) that the Estate suffered an injury to its "business or property," but also (3) that the Estate's injury was caused "by reason of" the RICO violation.  *D'Addario v. D'Addario*, 901 F.3d 80, 96 (2d Cir. 2018).  "To establish a substantive RICO violation under § 1962(c), a plaintiff must show that the defendant conducted, or participated [directly or indirectly] in the conduct, of a RICO enterprise's affairs through a pattern of racketeering activity."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014).  As set forth herein, Plaintiff cannot adduce evidence sufficient to proceed to trial on her claims for violations of section 1962(a) or (c) against AW or SK, and, similarly, evidence submitted by Defendants with this motion

---

[10] For the same reasons, Plaintiff's state law claims, which are subject to three-year and two-year limitations periods, are time-barred.  *See, e.g.,* N.Y. C.P.L.R. § 214(4); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (2009) (applying a 3-year limitations period to breach of fiduciary duty claims because the remedy sought was monetary in nature and thus construed as alleging an "injury to property"); *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 570 (S.D.N.Y. 2012) ("[u]nder New York law, an action based on fraud must be brought within six years of the commission of the alleged fraud, or two years from when a plaintiff was aware (had specific notice) or should have been aware of enough facts such that they could have discovered the fraud with reasonable diligence (had 'inquiry notice')."

conclusively demonstrates that Defendants are entitled to judgment on Plaintiff's claims as a matter of law.[11]

A.   **Plaintiff Cannot Adduce Evidence of a RICO Enterprise**

18 U.S.C. § 1961(4) defines enterprise as: "an individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." The FAC alleges, but no evidence demonstrates, the existence of an association-in-fact enterprise "consisting of SK and AW – as its primary architects," along with defendants Anthony Chou, Chen Mei-Lin, Wei Zheng, Ye Yong-Qing, and Yue Da-Jin and purported "entity" defendants "Bao Wu Tang" and "Jian Bao Gallery." (Ex. 3, ¶¶ 7, 265.) "'[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'" *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (affirming dismissal for failure to allege a RICO enterprise) (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d at 174). An association-in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Plaintiff cannot satisfy her evidentiary burden because she cannot adduce evidence that purported enterprise members possessed a "common purpose," nor "evidence of an ongoing organization, formal or informal" amongst the alleged enterprise members, nor "evidence that

---

[11] Plaintiff's bare claims under section 1962(a), to the extent it is even pending before the court, should be dismissed for the same reasons as her claims under section 1962(c). Further, because Plaintiff's claims under 1962(a) and (c) fail, so too do her RICO conspiracy claims under section 1962(d). *See First Capital Asset Mgt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (dismissing conspiracy claims under section 1962(d) when plaintiff could not establish a substantive RICO violation).

the various associates function[ed] as a continuing unit." *Turkette*, 452 U.S. at 583.  Similarly, there is no evidence that the alleged enterprise members "associated together" in any material way.  *Boyle,* 556 U.S. at 946.  At most, AW associated with the other alleged enterprise members individually, and there is no evidence of collective association or action.  Further, there is no evidence of association between or amongst the buyers, SK, Bao Wu Tang, or Jian Bao Gallery.

Nor is there any evidence that the enterprise members shared "a common purpose to engage in a particular fraudulent course of conduct."  *Cruz*, 720 F.3d at 121 (quotation omitted).  Indeed, there is no evidence that four of the five buyers—Anthony Chou, Chen Mei-Lin, Ye Yong-Qing, or Yue Da-Jin (the "Buyers")—did anything other than purchase artwork from the Estate.  Because there is no evidence of fraudulent conduct by these buyers, they cannot have shared a "common purpose" to engage in fraudulent conduct.[12]

At most, even if plaintiff could adduce evidence to support her allegations, all she has alleged is "a series of similar but essentially separate frauds" that were independent of one another, each of which could be "effective without the perpetration of any other act of fraud," and the acts of fraud alleged "in no way require coordination or collaboration among the actors perpetuating the fraud[.]"  *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.,* 2016 WL 6110565, at *6 (S.D.N.Y. Aug. 4, 2016).  Accordingly "no RICO enterprise exists."  *Id.*

**B.**     **Plaintiff Cannot Adduce Evidence of A Pattern of Racketeering Activity**

To prove a "pattern," a civil RICO plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239 (1989).  The requisite continuity may be

---

[12] As to defendant Wei Zheng, as set forth above, counsel for the PA, *i.e.*, a representative of the Estate, has recognized there is no evidence that Mr. Zheng was a "knowing participant" in the alleged fraud by AW (*see supra* at n.5).  There is no evidence at all that he acted with a "fraudulent purpose."

found in "either an 'open-ended' pattern of racketeering activity (*i.e.,* past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.,* past criminal conduct 'extending over a substantial period of time')." *GICC \*488 Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 466 (2d Cir. 1995), *cert. denied,* 518 U.S. 1017 (1996). Court's reject findings of "closed-end" continuity when all that is present is a narrow scheme, advanced by few participants, with a single victim. *See, e.g., Jerome M. Sobel & Co. v Fleck*, 2004 WL 48877, at \*2 (S.D.N.Y. Jan. 8, 2004). Plaintiff comes nowhere close to establishing the necessary pattern.

*First,* Plaintiff cannot establish the continuity element of her RICO claim because the undisputed facts indicate that the alleged "scheme," was, at most, advanced by a single actor (AW), against a single alleged victim (the Estate), with a single, narrow goal (to obtain artwork from the Estate). This is insufficient to establish "closed-end" continuity required to demonstrate a pattern of racketeering activity. *See Sobel,* 2004 WL 48877, at \*1.

*Second,* Plaintiff cannot adduce sufficient evidence to establish—and, in fact, the evidence affirmatively disproves—the required elements of the alleged predicate acts asserted against AW and SK. That is fatal to Plaintiff's RICO claim.

1. <u>Plaintiff Cannot Adduce Evidence of Wire Fraud or Shipping of Stolen Goods Against AW</u>

Plaintiff alleges 12 predicate acts of wire fraud and six predicate acts of shipping stolen goods by AW in connection with the alleged "straw man" scheme: (i) six faxes of fraudulent bills of sale allegedly sent by AW to the Estate (the Bills of Sale); (ii) six wire transfers by AW of sale proceeds to the Estate (the "Wire Transfers"); and (iii) six shipments of stolen goods (the "Shipments"). (Ex. 3, ¶ 282.)

a.  <u>Plaintiff Cannot Adduce Evidence of a Scheme to Defraud</u>

A violation of the wire fraud statute requires proof of:  (i) a scheme or artifice to defraud;

and (ii) a mailing or a wire transmission in furtherance of that scheme.  18 U.S.C. § 1343.  A

violation of 18 U.S.C. § 2314 ("Transportation of Stolen Goods") similarly requires evidence of

a "scheme or artifice to defraud."  A "scheme to defraud," can be found only where there is a

plan to deprive a person "'of something of value by trick, deceit, chicane or overreaching.'"

*United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *McNally v. United*

*States,* 483 U.S. 350, 358 (1987)).  "Critical to a showing of a scheme to defraud is proof that

defendants possessed a fraudulent intent."  *U.S. v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).

Scienter must be supported by facts "'giving rise to a strong inference that the defendant knew

the statements to be false and intended to defraud the plaintiff'" at the time they were made.

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 444 (S.D.N.Y.

2004) (quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 79–80 (2d Cir. 1990)).

In reversing convictions under the mail and wire fraud statutes, the Second Circuit

emphasized that

> Misrepresentations amounting only to a deceit are insufficient to
> maintain a mail or wire fraud prosecution.  Instead, the deceit must
> be coupled with a contemplated harm to the victim.  Moreover, the
> harm contemplated must affect the very nature of the bargain itself.
> Such harm is apparent where there exists a "discrepancy between
> benefits reasonably anticipated because of the misleading
> representations and the actual benefits which the defendant
> delivered, or intended to deliver.

*Starr*, 816 F.2d at 98.

Plaintiff cannot adduce sufficient evidence to establish a "scheme to defraud."  The crux

of the alleged fraudulent scheme is that AW "effectuat[ed] sales" of the 98 Paintings "to

himself" by selling the 98 Paintings "to his friends" (the purported "Straw Men"), "provid[ing]

the funds needed for the Straw Men to purchase the works," shipping the artworks to China, and masking "the funds he received from reselling [the 98 Paintings] through the AW Gallery – a vehicle for mixing freshly 'cleaned' money with money legally obtained through the purchase and sale of other art works."  (Ex. 3, ¶¶ 265-266, 271.)

But Plaintiff cannot adduce sufficient evidence to prove this purported scheme.  Rather, indisputable facts concerning sales of the 98 Paintings affirmatively negate any conclusion that AW (let alone SK or any buyer) possessed an "intent to defraud" or to deprive the Estate of something of value by "trick, deceit, or chican[ery]."  *Autuori*, 212 F.3d at 115.  There is no dispute that AW followed the sales procedures specified by the PA.  AW's adherence to these procedures reflects his commitment to ensuring that the prices received by the Estate for the 98 Paintings were fair, and were not an "intent to defraud" the Estate.  AW's compliance with the rigorous vetting protocol required by the PA is plainly not the behavior of a person with intent to "trick" the Estate, or of someone trying to deprive the Estate of value, or someone who "contemplated harm" to the Estate.  *See Starr*, 816 F.2d at 98.

Plaintiff's contention that the *Bao Wu Tang* exhibition and the alleged appearance of artworks at auction in China demonstrates that AW was the end buyer is completely wrong.  AW did not claim to own the artworks in that exhibition, but rather, as Plaintiff herself informed the Surrogate's Court, he merely wrote in the preface to the exhibition's catalog that "[t]his exhibition gathers together works from the collection of my late Grandfather Mr. Wang Jiqian [and] from partial collections of family members[.]"  (Ex. 3, ¶ 121; Ex. 77, ¶ 10).  AW's statement that the artwork in the exhibition was "from the collection" of C.C. Wang is an accurate statement of the provenance of the artwork, and it in no way constitutes an admission, or even suggestion, that AW was the owner of any of the works of art displayed.  Moreover,

Plaintiff's purported evidence with respect to the *Bao Wu Tang* Exhibition, including the Catalog from that exhibition, is inadmissible hearsay, and must be disregarded.

<strong>b.</strong>    <u>The Bills of Sale Evince Only Intrastate Use of Wires</u>

Plaintiff cannot establish wire fraud with respect to the Bills of Sale (Ex. 3, ¶ 282 (Predicate Acts Number 5, 8, 11, 14, 17, and 20)) because, as the evidence shows, they were faxed by AW's attorney, Martin Klein, to the PA's attorney, Peter Schram, within the state of New York.  (*See* Exs. 38-40; 54; 58; 65.)  Wire fraud, however, requires proof of use of wires in "interstate or foreign commerce" in furtherance of a scheme to defraud. 18 U.S.C. § 1343. "[P]urely intrastate communication [is] beyond the statute's reach."  *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 243 (2d Cir. 1999) (quoting *Smith v. Ayres,* 845 F.2d 1360, 1366 (5th Cir. 1988)); *see Gross v. Waywell,* 628 F. Supp. 2d 475, 495-96 (S.D.N.Y. 2009).  Because the faxes at issue were sent *intrastate*, as opposed to *interstate*, they—and all similar faxes of information related to the transactions between Klein and Schram—fall outside the scope of RICO and cannot constitute RICO predicate acts.

<strong>2.</strong>    <u>The Evidence Demonstrates that the Ma Yuan Was Owned By SK at All Relevant Times</u>

Plaintiff alleges two predicate acts premised on allegations that AW and SK shipped the allegedly stolen Ma Yuan *Landscape Album* to China and sold it.  (Ex. 3, Predicate Acts 1-2.) As set forth above, SK, not the Estate, has at all relevant times been the owner of the *Landscape Album*.  Regardless, at the very least, the evidence demonstrates that SK has a genuine claim to ownership of the Ma Yuan *Landscape Album*, such that neither he, nor AW, could possess fraudulent intent to steal the property.  *See e.g., King v. Lasher*, 572 F. Supp. 1377, 1383-384 (S.D.N.Y. 1983) ("To state a violation of 18 U.S.C. § 2314 plaintiffs must allege that defendants knew that the property which was transported in interstate commerce was stolen."); *see also*

23

*Black Diamond Land Mgt. LLC v. Twin Pines Coal Inc.*, 707 F. App'x 576, 582-83 (11th Cir. 2017) (affirming dismissal of RICO claim when good faith dispute over ownership negated the "the contention that Defendants believed (much less 'knew') that the [goods at issue] were wrongfully taken").

3.    Plaintiff Cannot Adduce Evidence of Predicate Acts Concerning Estate Assets Allegedly Stolen in 2003

Plaintiff alleges that, between 2005-09, AW and SK shipped 13 artworks allegedly stolen from the estate in 2003 to China, sold the artworks, and reinvested the proceeds into AW's purported "straw men" scheme.  (Ex. 3, ¶¶ 282, 304.)  The Court previously dismissed YK's claims "related to artworks [allegedly] stolen in 2003" as time-barred because YK admitted she discovered them stolen in 2003.  (Dkt. 53 at 20.)  Regardless, Plaintiff admits in the FAC that she "first sought to recover these paintings in Surrogate's Court in 2004;" thus, even if YK could prove these allegations (which she cannot), in the face of similar accusations, Judge Keenan held that YK's own shipments of art stolen from the Estate were not actionable because all the shipments "did, therefore, was further an 'injury that happened or could have happened independently' of them, which is insufficient to create a new and independent injury.  *See Wang v. Yien-Koo King*, 2020 WL 417690, at *4-5 (S.D.N.Y. Jan. 27, 2020) (Keenan, J.) (quoting *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002)).

While the FAC does not identify what paintings these predicate acts refer to, when they were sold, or to whom, presumably they refer to some of the paintings allegedly stolen by AW and/or SK from a safe deposit box and/or CC's apartment in January 2003 (the "21 + 4") in and before 2003.  (Ex. 3, ¶¶ 34-35, 47-69.)  Because Plaintiff cannot adduce evidence to support these claims, they cannot be considered part of a RICO scheme for purposes of demonstrating a

RICO pattern.[13]  Plaintiff actually admits that she never saw AW or SK in possession any of these paintings, and her claim that AW and SK stole the 21+4 is based only on the fact that she saw AW "carrying a big bag," and, in her view, "you can put two and two together."  (Ex. 4 at 144:17-25.)  Plaintiff also admits that the day after she allegedly saw AW leaving CC's building with the "21+4", she "emptied out the box and took everything home," but made no record of what she personally took out of the box.  (*Id.* at 109:6-110:21).  Plaintiff further admits that prior to when the 21+4 were allegedly taken by AW and SK, CC was mentally declining and would "forget where he put" paintings, but she continued to allow him access to a safe deposit box she controlled and that, according to her, contained artwork worth millions of dollars.[14]  (*Id.* at 153:16-154:23).  But Plaintiff can adduce no evidence to establish that any of the 21+4 or were in the safe deposit box on the day the FAC alleges AW removed them (or that they were even owned by CC as of the date of his death).  (Ex. 3, ¶¶ 47-49, 51.)  There is no evidence, apart from unreliable conjecture from YK, that AW or SK "took" the 21+4 in January 2003 or ever.  (Ex. 3, ¶ 55.)  Such rank speculation does not constitute the kind of admissible evidence required to meet Plaintiffs evidentiary burden.  *See Hicks*, 593 F.3d at 166 ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment").  Finally, there is no evidence that AW or SK ever sold these artworks or used proceeds from such sales to purchase the 98 Paintings from the Estate.

---

[13] The FAC, on its face, states that thirteen of these 25 artworks were the property of dismissed plaintiffs Northwich or Soon Huat, not the Estate, five of the 25 paintings were returned to Plaintiff by AW (two of which were purportedly owned by Northwich, and one of which was purportedly owned by Soon Huat).  (Ex. 3, ¶¶ 48, 50.)  YK and KK are judicially estopped from claiming, in this action, that they owned these corporations.  YK and KK filed for bankruptcy in 2007, and, in connection with that action, did not disclose ownership of either Northwich or Soon Huat, or any of the paintings listed in the FAC as property of those companies.  (Ex. 86).  YK and KK's received a discharge from the Bankruptcy Court in 2012.  (Ex. 87.)  Accordingly, YK are KK judicially estopped from testifying to the contrary in this action – even if in support of the Estate's RICO claim.  *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 120 (2d Cir. 2014) (holding that a party is judicially estopped from taking a litigation position inconsistent with a previously filed asset schedule.)

### C.    <u>Plaintiff Cannot Adduce Evidence Of Causation</u>

Summary judgment is required because Plaintiff cannot prove, as she must, an injury caused by reason of a RICO violation. *See Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 11 (2010). As to causation, "the central question … is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). A plaintiff must "(1) show that the RICO violation was the proximate cause of his injury, meaning there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct and (2) the RICO violation as the but-for (or transactional) cause of [its] injury, meaning that but for the RICO violation, he would not have been injured." *Peralta v. Peralta*, 2018 WL 1384509, at *10 (S.D.N.Y. Mar. 16, 2018) (quotations omitted). Moreover, "[a]n act which proximately caused an injury is analytically distinct from one which furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act." *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995); *see also Peralta,* 2018 WL 1384509, at *10.

*First,* affirmative record evidence negates any assertion that the Bills of Sale, the Wire Transfers or the Shipments, "led directly" to an injury to the Estate, *i.e.,* led to the Estate's sale of the 98 Paintings for less than their purported "true value." (Ex. 3, ¶ 299.) As set forth above, the minimum prices at which the Paintings were to be sold was established prior to their sale; AW submitted proposed sales at the price the PA requested; all sales were reviewed by an independent art appraiser, OTE; and the PA's sign-off on the sales was dependent on the approval of the OTE, not AW. To the extent Plaintiff claims the Estate was injured by reason of sales for less than appropriate value, such injury cannot be deemed to be caused by AW when AW followed firm pre-established procedures for the sales, which were reviewed by an independent expert.

*Second*, as set forth above, the transmissions of the Bills of Sale on which the PA purportedly relied were purely *intrastate*, and therefore do not constitute wire fraud under RICO. *See supra* at 8.  Accordingly, any injury arising from reliance on the Bills of Sale was not caused "by reason of" a RICO predicate act.

*Third,* the Estate was not injured "by reason of" the Wire Transfers or the Shipments. (*See* Ex. 3, ¶ 282 (Predicate Acts No. 7, 10, 13, 16, 19, 22).)  As a matter of logic, no injury was caused to the Estate by its receipt of money in payment for the 98 Paintings.  Moreover, there is a fatal temporal flaw in Plaintiff's contention that the Wire Transfers or the Shipments "led to" injury to the Estate, as both the Wire Transfers and the Shipments occurred after the Estate signed contracts for the sale of the paintings.  Because the Wire Transfers and Shipments occurred after the Estate approved the Bills of Sale, they cannot constitute the "but-for (or transactional)" causes of the sales and they could not lead to any injury arising from the sale. *Peralta*, 2018 WL 1384509 at *10

*Fourth*, the Wire Transfers and the Shipments are, at most, merely "furthered" or "facilitated" the sales of the artwork, which is not sufficient to prove causation.  *Red Ball,* 874 F. Supp. at 584.  Even if the Court accepts that the Wire Transfers and Shipments did more than "further' the scheme, there is no evidence that "plaintiff's original loss" – the purported sale of the 98 Paintings at a loss – was dependent on the Estate's receipt of funds via the Wire Transfers or on the Shipments.  Plaintiff therefore cannot establish that the Estate's alleged injury "could not have occurred without the commission" of the Wire Fraud or the Shipments.  *Leung v. Law*, 387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005).

*Finally*, the Wire Transfers could not cause injury to the Estate because there is no evidence that anyone—neither the Estate nor any third-parties—relied on those transfers.[15] "Although reliance on the defendant's alleged misrepresentation is not an element of a RICO mail-fraud claim, the plaintiffs' theory of injury in most RICO mail-fraud cases will nevertheless depend on establishing that someone—whether the plaintiffs themselves or third parties—relied on the defendant's misrepresentation." *Sergeants Benevolent Ass'n Health and Welfare Fund v Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015). The lack of evidence of any reliance, by anyone, on the Wire Transfers negates any finding that they caused the Estate any injury.

### D.   Plaintiff Cannot Adduce Evidence of a RICO Injury

Plaintiff claims the Estate was injured by the sales of the 98 Paintings because it "received approximately $4 million … even though the true value of the sold works exceeds $40 million." (Ex. 3, ¶ 299.) Plaintiff's damages expert, Patrick Regan, offered no opinion as to the value of 84 of the 98 Paintings as of the dates they were sold between 2005 and 2009. Rather, Regan submitted an opinion of the "fair market value" of the 98 Paintings as of October 11, 2019. *See* Ex. 90, ¶¶ 18, 22, 26-27.) RICO requires, but plaintiff has not even attempted to prove, an actual quantifiable injury and "concrete financial loss" in connection with these 84 paintings.[16] *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014); *see also Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 521 (S.D.N.Y. 1997) ("Under § 1964(c), a plaintiff must be 'injured in his business or property' in order to recover. This requires a showing of some actual, out-of-pocket financial loss.") The purported value of the 98 Paintings on October 11,

---

[15] Similarly, because Ethel Griffin passed away, Plaintiff can adduce no evidence as to what she so much as considered, let alone relied upon, in approving the sales, including the Bills of Sale.
[16] The 85 paintings as to which no relevant damages opinion was proffered are the February 2005 sale of 17 paintings for $395,730.00; the April 2005 sale of 24 paintings for $1,393,422.40; the June 2005 sale of 17 paintings for $909,689.41; the September 2005 sale of 18 paintings for $789,810.00; and the February 2006 sale of eight paintings for $346,800.00.

2019 is not evidence that the Estate suffered a loss as a result of the sales of these 84 paintings when they were sold between 2005-09.  Because Plaintiff's alleged injuries in connection with these sales are factually unsubstantiated, the Estate lacks standing to assert claims for losses arising from these sales.[17]

With respect to the 14 remaining paintings, which are the paintings sold in August 2009 to Yue Da-Jin (the "14 Paintings"), Regan offered an opinion as to their "retail value" as of August 2009.  (Ex. 91, ¶¶ 28-29.)  Regan's valuation, however, failed to take into account critical facts regarding the sale of the 14 Paintings.  According to Regan:

> [] In 2009 … the most likely and appropriate marketplace for Chinese paintings of this type and caliber would have been auctions in China and New York – rather than Private Retail Markets – since that was where the best and highest prices for classical Chinese paintings were usually achieved.

(Ex. 90, ¶ 24.)

But the "most likely and appropriate marketplace" for the 14 Paintings was, definitively, not at auctions in China and New York.  Schram affirmed that the Estate attempted to auction these artworks at Sotheby's, but they were rejected by the auction house.  (Ex. 11, ¶ 10.)

---

[17] Plaintiff's state law claims for conversion breach fiduciary duty, and fraud seek "actual damages" and "punitive" damages arising out of AW's alleged misconduct. (Ex. 3, ¶¶ 341, 344, 364.)  Accordingly, for the same reasons set forth above, Plaintiff cannot establish actual damages on any of her common law claims.  Per Plaintiff's Rule 26 Initial Disclosures, she also seeks so-called "appreciation damages" on her breach of fiduciary duty claim, which she purports entitles her to the value of the 98 Paintings "at the time of judgment." (Ex. 57 at 9.)  Undisputed evidence, however, requires judgment to be entered dismissing this theory.  The New York Court of Appeals has held that "appreciation damages" are not available to a plaintiff when a fiduciary was authorized to sell the asset at issue, only when a fiduciary was under a duty to retain the asset.  *See Matter of Rothko's Estate*, 43 N.Y.2d 305, 321 (1977) ('The reason for allowing appreciation damages, where there is a duty to retain, and only date of sale damages, where there is authorization to sell, is policy oriented. If a trustee authorized to sell were subjected to a greater measure of damages he might be reluctant to sell (in which event he might run a risk if depreciation ensued).")  Here, it is undisputed that AW and the PA were "authorized to sell" the 98 Paintings.  In fact, AW and the PA were not only authorized, but required as fiduciaries to sell the 98 Paintings in order to raise funds to pay estate taxes and administration expenses.  *See e.g., Standard Federal Bank v. Healy*, 7 A.D.3d 610, 612 (2d Dep't 2004) (holding that a fiduciary "may be held liable on a theory of breach of fiduciary duty for the failure to make required tax payments.")

Regan's *ex-post* determination of the "most likely and appropriate marketplace" for the 14 Paintings, disregarded this critical fact.

## III.   PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED:

Based on the facts and reasoning set forth above, Plaintiff's state law claims should be dismissed with prejudice.  At the very least, because summary judgment is appropriate on Plaintiff's federal claims, her state law claims should be dismissed for lack of jurisdiction. "Both the Second Circuit and the Supreme Court have held that when the federal claims are dismissed the state claims should be dismissed as well."  *Wang v. Yien-Koo King*, 2020 WL 417690, at *9; *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F3d at 61.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that the Court enter an Order dismissing this case in its entirety, and for such other just and further relief as the Court may deem proper.

Dated:  February 14, 2020
        New York, New York

By: /s/ *Thomas B. Kelly*
Mark P. Ressler
(mressler@kasowitz.com)
Thomas B. Kelly
(tkelly@kasowitz.com)
Kim Conroy
(kconroy@kasowitz.com)
Jonah M. Block
(jmblock@kasowitz.com)

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.:  (212) 506-1700

*Attorneys for Defendants Andrew Wang and Shou-Kung Wang*

31