UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YIEN-KOO KING,<br><br>        **Plaintiff,**<br><br>  -against-<br><br>ANDREW WANG, SHOU-KUNG WANG, BAO WU TANG, JIAN BAO GALLERY, ANTHONY CHOU, CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE DA-JIN and JOHN DOES 1-9,<br><br>        **Defendants.** | **1:14-Civ-07694-(LJL) (JLC)** |

## DECLARATION OF YIEN-KOO WANG KING

**YIEN-KOO WANG KING**, in her capacity as Preliminary Executor of the Estate of Chi-Chuan Wang, declares pursuant to 28 U.S.C. 1746, under the penalties of perjury, as follows:

1. I am the daughter of Chi-Chuan Wang ("C.C. Wang") and presently serve as the as the preliminary executor of his estate (the "Estate"). I am 84 years old.

2. I currently maintain this action in my capacity as preliminary executor for the benefit of the Estate and its beneficiaries.

3. I submit this affidavit in support of my motion for partial summary judgment (the "Motion") against Andrew Wang on Count IX of the Amended Complaint filed in this action, namely breach of his fiduciary duty to the Estate.

4. I submit this declaration upon my personal knowledge.

**A.** *Creation of the Estate of Chi-Chuan Wang and Seventeen-Year Probate Contest*

5. This lawsuit and all others related to my father's Estate originate from his decision in 1997 to revoke my brother's, Defendant Shou-Kung Wang ("SK"), authority to manage C.C.'s collection of paintings and other assets. Whereas my brother blames my husband (Kenneth King) and I for this revocation (because my father asked us to replace SK), in reality, my father cut-off SK's access to his assets after discovering that SK had been stealing from him.

6. SK has harbored a desire for revenge against my husband and I ever since.

7. To that end, SK and his son (Defendant Andrew Wang, "Andrew") coerced and defrauded my father in January and February 2003 into executing documents purporting to disinherit me from his Estate based upon allegations that it was I, not SK, who had stolen from C.C.

8. On or about May 20, 2003, shortly after being released from New York Presbyterian Hospital, CC was moved out of his apartment in Manhattan ("Apartment 8A") and into SK's home in Forest Hills, Queens.

9. I was granted only one limited and supervised visitation with my father after the move and SK refused to allow Kenneth to visit C.C. at all.

10. C.C. lived in SK's home until the day before his death, July 2, 2003, at which point he was moved to the Cabrini Hospice in Manhattan. He died on July 3, 2003.

11. C.C. Wang owned a significant number of valuable assets at the time of his death. One of the parcels of real property he controlled (and which is held in the

named of the Chi-Chuan Wang Revocable Trust) was a condominium located at 445 5th Avenue, Unit 24H, New York, NY.

12. C.C. also owned well-over 250 Chinese seals, several financial accounts, and many hundreds of Chinese paintings and sculptures. Yet the precise number of assets C.C. Wang owned and their identities has been disputed since his death.

13. Within a month of C.C.'s death, I filed his last will and testament dated June 13, 2000 along with a codicil dated July 10, 2002 with the New York County Surrogate's Court. Both documents named me as the executor of C.C.'s Estate and bequeathed me an equal share of his Estate as SK, 35%.

14. Shortly thereafter, SK and Andrew filed an instrument dated February 18, 2003 (the "Fraudulent Will") which purported to completely disinherit me from the C.C.'s Estate and bequeathed 40% of the Estate to SK, 10% to Andrew, and 10% to SK's other son, Stephen Wang. Neither Andrew nor Stephen had ever been included in either of my father's previous eight testamentary plans, and I had never been excluded. The Fraudulent Will also named SK and Andrew as co-executors.

15. In July 2003, I commenced a proceeding in the New York County Surrogate's Court to contest the validity of the Fraudulent Will.

16. Andrew was appointed as the preliminary executor by the Surrogate's Court during the pendency of that contest.

17. As part of the initial proceedings in the Surrogate's Court, Andrew and his co-fiduciary (the Public Administrator of New York County, the "PA") began collecting and inventorying C.C. Wang's assets.

18. In late 2003/early 2004, my husband and I delivered 81 classical Chinese paintings to the Estate. To memorialize the Estate's receipt of these works, the Public Administrator, Martin Klein (Andrew's attorney, "Klein"), and I signed photographs of each of the paintings I delivered. These photographs were true and accurate representations of the paintings as of the date of delivery to the Estate. Attached hereto as **Exhibit 1** are true and accurate copies of certain of the images signed by the PA, Klein, and me to memorialize their delivery.

19. The paintings I delivered were assigned an identification number beginning with the prefix "OTE" and photographed. My husband and I were both present for the photographing of many of these paintings, but we did not receive copies of the photographs from the PA, Andrew, or anyone else at the time.

20. I would later come to learn, in or around 2012 or 2013, that the PA and Andrew had sold nearly all of of the Estate's classical Chinese paintings. Prior to this, it was never disclosed to me which paintings owned by the Estate had been sold, how many had been sold, how much they were sold for, when they were sold, or who they were sold to. I did not even know for sure if any sales occurred. I was not provided with any of the Estate's financial information.

21. Though I remember requesting this information from the PA on several occasions through my attorneys, we were told that we were not entitled to it because, among other reasons, I was disinherited under the Fraudulent Will Andrew and SK had filed.

4

22. Now that the Fraudulent Will has been rejected and Andrew removed as fiduciary, I bring this action because the evidence clearly shows that the Estate's paintings were sold to Andrew himself.

**B.** *The May 2005 Exchange of Paintings to Settle Estate Litigation Between the Kings and the Wangs.*

23. In May 2005, after a series of depositions and as the parties were preparing to go to trial to determine the validity of the Fraudulent Will, I agreed on a settlement plan with Andrew and SK which we believed would resolve all outstanding litigation.

24. The plan required my husband and I to deliver 46 paintings to Andrew in return for Andrew and SK's delivery of five paintings to me. These exchanged paintings were to be held temporarily by Andrew and me until the settlement was passed through the Court.

25. Because many of the paintings were already located overseas, Andrew, my husband, and I agreed to meet in Shanghai, China to complete the exchange.

26. A settlement meeting was held at the Jinan Hotel on May 11, 2005 in Shanghai.

27. At the meeting, with the help of my son and my husband, I delivered forty-six rare and valuable classical Chinese paintings to Andrew, as preliminary executor.

28. Andrew individually inspected and signed-for the scrolled paintings over the course of 3 hours, placed all 46 in a suitcase and a nylon bag (which I had given him upon his request since he could not fit all of the paintings in the suitcase). He then took everything back home to his apartment in Shanghai.

29. Attached hereto as **Exhibit 2** is a true and correct copy of the document admittedly and initialed (46 times) by Andrew.

30. We had also received the five bargained-for paintings from Andrew.

31. We had been prepared to settle (and gave up an enormous number of paintings to Andrew to do so. When we returned to the United States, however, the settlement still had not been completed. After months of waiting, we learned that Andrew wanted another seven or so paintings. When we refused, we learned that Andrew had started claiming that he did not get all 46 paintings for which he signed and which we hand-delivered to him.

32. Approximately eight months after the exchange, I submitted a petition in the Surrogate's Court to remove Andrew because he had apparently breached his duty to the Estate and stolen the 46 paintings for himself (the "2006 Removal Petition").

33. Andrew responded my 2006 Removal Petition by serving and filing an affidavit filled with outright lies, concerning the immensely valuable Chinese paintings which I had delivered to him in good faith.

34. He claimed he only received and was "still holding" fifteen (15) paintings from the list of 46 paintings he signed, and specifically identified those 15 by name and artist.

35. Attached hereto as **Exhibit 7** is a true and correct copy of the affidavit Andrew filed in the Surrogate's Court in August 2006, denying his receipt of the 46 paintings.

36. Andrew claimed that the reason he signed and initialed for all 46 works is that my husband and I forced him to do this at the start of the meeting, and then failed to give him all of the paintings.

37. This is completely untrue and evidence how little respect Andrew has for oaths of truthfulness and the American legal system. No one—especially not an estate fiduciary in a highly litigated probate proceeding for a multi-million dollar estate—would sign for 46 contested rare and classical Chinese paintings without actually receiving them. With the help of our son Raymond, my husband and I hand-delivered to Andrew every single work on the list. Andrew simply decided he did not want to turn them over to the Estate.

38. One of the 31 paintings which Andrew swore in affidavits, interrogatory responses, and during depositions that he never got was the 700-year-old masterpiece by the 14th-century painter *Wu Zhen* entitled "Wild Bamboo."

39. Another was a very famous work by the artist *Guo Xi* titled "Travelers in the Autumn Mountains."

40. True and correct photographs of these two paintings are attached hereto as **Exhibit 3**.

41. My 2006 Removal Petition based upon Andrew's fraud at the exchange was stayed by the Surrogate's Court for 14 years.

C. *The November 2009 Capital Museum Exhibition Entitled Bao Wu Tang: A Magnificent Collection of Chinese Paintings.*

42. In November 2009, the Capital Museum of Beijing, in association with the Hanhai Beijing Auction Co. Ltd., hosted a three-week-long exhibition entitled "Bao Wu Tang—an Important Overseas Painting and Calligraphy Collection Exhibition" (the "Bao Wu Tang Exhibition").

43. I learned of the exhibition while in China in 2009 and was able to attend on one of the final days it occurred.

44. I have obtained photographs from the Capital Museum website which depict my nephew Andrew standing on stage at the Capital Museum speaking in front of microphones. Behind Andrew is a backdrop with the name of the Bao Wu Tang Exhibition. A true and correct copy of this image is attached hereto as **Exhibit 4.**

45. A 131-page full color and hard-covered exhibition catalogue was published for the exhibition. I managed to purchase this at some point after the exhibition was over. Inscribed on the BWT Catalogue's cover is the English phrase "Bao Wu Tang—Magnificent Collection of Classical Chinese Paintings and Calligraphy from Abroad."

46. The Bao Wu Tang Exhibition displayed approximately 30 paintings. Much later I discovered that 15 of these paintings were paintings which were supposedly sold by the Estate to Wei Zheng, Chen Mei-Lin, Anthony Chou, Yong Qing Ye, and Yue Da-Jin.

47. Another three paintings displayed, and which I immediately recognized, were paintings that I had given to Andrew four years earlier at the 2005 exchange in Shanghai, but which Andrew had denied receiving.

48. Attached hereto as **Exhibit 5** are photographs which are true and accurate depictions of the *Guo Xi* "Travelers in the Autumn Mountains" and the *Wu Zhen* "Wild Bamboo" paintings—both of which I hand-delivered to Andrew Wang in May 2005 and both of which he swore under oath to not receiving from me—as they were displayed at the November 2009 Bao Wu Tang Exhibition. The paintings displayed were the originals.

**D.  *March 8, 2010 Motion to Supplement the Removal Petition and Due Diligence in Seeking Information Related to the Estate's Sales.***

49. On March 8, 2010 I filed a motion in the Surrogate's Court seeking leave to supplement the 2006 Removal Petition, which sought Andrew's removal for denying his receipt of all 46 paintings at the May 2005 settlement exchange.

50. Based upon what occurred at the Bao Wu Tang Exhibition, I sought the Surrogate's Court's permission to include new allegations in the 2006 Removal Petition that Andrew had displayed the very same paintings he denied receiving at the exchange at the 2009 Bao Wu Tang Exhibition.

51. However, at the time of the March 8, 2010 application, I still had not received any information on the Estate's six private sales and had not recognized that there was any basis for self-dealing.

52. Specifically, it still had not been disclosed to me or my attorneys (i) which or how many of the Estate's paintings had been sold; (ii) at what price they were sold;

(iii) to whom they were sold, or (iv) when they were sold. The sales were not something I had any involvement in or knowledge of and I did not even know whether they had actually occurred.

53. In March 2010, my efforts and the efforts of my attorneys focused on exposing Andrew's lies concerning what had occurred in May 2005 and advancing the 2006 Removal Petition in the hope of obtaining more information on the Bao Wu Tang Exhibition through discovery.

54. Accordingly, my March 2010 application to supplement the 2006 Removal Petition, made no allegations of self-dealing on Andrew's part.

55. Despite my March 2010 application to supplement the removal petitions, the Court continued to stay that proceeding indefinitely.

56. When my attorney next sought to acquire more information from the PA about the Estate's sales over the next several months, we were flatly denied. The PA's attorney responded to our requests for information by explaining that I "had no interest in the estate under the will currently offered for probate" and no right to the information I was requesting. Attached hereto as **Exhibit 6** is a true and correct copy of a letter dated December 18, 2010 from counsel for the PA, Peter Schram, to my attorney refusing to provide any information on the Estate's sales because of the existence of the Fraudulent Will which had disinherited me and gave control of the Estate to Andrew.

57. Through persistent demands, I finally received records of the Estate's sales in or around 2013 and my counsel was able to depose Andrew in December 2013 about his involvement in them. This action was commenced nine months later.

Dated: New York, New York
February 14, 2020

                                                        _____
                                                            Yien-Koo Wang King

11