SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------- x

In the Matter of the Proceeding to Remove Andrew Wang as          :   File No. 2550/2003
Preliminary Executor of the Last Will and Testament of            :
                                                                  :
          CHI-CHUAN WANG                                          :   **AFFIDAVIT OF**
          a/k/a C.C. WANG,                                        :   **ANDREW WANG**
                                                                  :
                                        Deceased.   :

-------------------------------------------------------------------------- x

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF QUEENS         )

     **ANDREW WANG,** being duly sworn, deposes and says:

    1.    I am the Preliminary Executor of the Estate of Chi-Chuan Wang ("C.C. Wang").

I submit this affidavit in opposition to the petition to remove me as Preliminary Executor filed

May 16, 2006 (the "Petition").

    2.    I did not take art from the Kings in my personal capacity, give Estate art to the

Kings, take Estate assets out of the jurisdiction, or withhold assets or information from the

Estate.  Each of these accusations is false.

    3.    The Petition alleges that the document attached to it as Exhibit B is a receipt or an

acknowledgment by me of an exchange of art in Shanghai China in May 2005.  Although I

signed a document during settlement discussions with the Kings last year, it was not Exhibit B.  I

believe that the Kings have deliberately altered the document that I signed to give false support

to their false accusations.

    4.    Moreover, the Petition's allegation that I violated the October 23, 2003 temporary

restraining order (the "TRO") when I sold my apartment has no basis whatsoever.  My apartment

is not property of the Estate and I did not buy it from C.C. Wang.  It was neither a gift from CC

KING-SCT-000010683

Wang nor did CC give me the money to purchase my apartment. The TRO has no application to this transaction.

**Background for the Petition**

5.     My grandfather C.C. Wang disinherited his daughter Yien Koo King ("Y.K.") in his February 18, 2003 Will because she and her husband Kenneth King had stolen millions of dollars and a substantial portion of his art collection. Some of the art in the "C.C. Wang Family Collection" belonged to other family members including my father, my cousin James Tcheng's father and an elderly cousin in Taiwan named Hui Chen. None of it belonged to the Kings.

6.     My father Shou Kung Wang ("S.K.") and I have been trying to recover the art collection, or at least a portion of it, since C.C. Wang first asked for our help in January and February 2003.

7.     C.C. Wang died in July 2003.

8.     Starting in July 2003, Y.K. contested his Will and falsely accused my father and me of dishonesty. The Kings have continued to accuse me of wrongdoing ever since, including accusations that I am withholding 25 specific paintings. These allegations have either been unsupported or disproved.

9.     On August 4, 2003, I was granted preliminary letters testamentary. The Public Administrator of New York County was also appointed to act as a co-fiduciary.

10.     Three years later, I have discharged all of my obligations as a co-fiduciary of the Estate without any question about my integrity other than the ceaseless, unsupported accusations of the Kings. The allegations against the Kings, in contrast have proven to be true.

**The TRO**

2

KING-SCT-000010684

11.     One of the central disputes in the Estate arises from the Kings' claim that C.C. Wang gave them corporate stock, millions of dollars, and a large portion of his art collection as gifts before he died. I knew that this was not true because C.C. had talked to me about the Kings' betrayal and had instructed me to get the art back from them. I also knew that the Kings would make it difficult for the Estate to disprove their claim of ownership. They had used many corporations and transactions to move assets between 1998 and 2003 and they were the only ones who had the documents and other information about the transfers.

12.     In October 2003 counsel for the Public Administrator asked the parties to consent to a TRO to preserve the assets until the disputed claims of ownership were resolved. My father and I agreed to the restraint and at first the Kings agreed as well. The Kings then changed their mind and sought to carve out from the TRO 93 pieces of art held by Northwich Investments Limited ("Northwich") and Soon Huat Inc. ('Soon Huat") -- two of the offshore corporations that Y.K. and Kenneth King claimed to own or control. Surrogate Preminger denied the Kings' request and the Kings' appeal was also denied.

**Settlement Discussions With the Kings Prior to May 2005**

13.     Even though I believed that the Kings had no right to the art or the money or the corporations, I tried for many years to settle with them. The Kings had leverage because they had hidden many of the assets in Asia (they eventually testified that they had handed over the 93 pieces of Northwich and Soon Huat art to Kenneth King's brother in Malaysia) and had control over the most important painting in the collection: the "Procession of the Taoist Immortals" by the artist Wu Zhongyuan (the "Wu"). The Wu is not only worth the most money of all the art in C.C. Wang's collection, perhaps as much as $5 million, it is also priceless given its age and its

3

KING-SCT-000010685

significance to C.C. and the Chinese art community generally. It is the piece by which the collection was most distinguished.

14.     I participated in settlement meetings with both attorneys, including meetings facilitated by Bryan Cave, (tax counsel for the Public Administrator,) and Surrogate Preminger, and without attorneys, in direct negotiation with King family members. In all of the meetings the discussions were about the Kings returning some but not all of the art they held and perhaps receiving some share of the distribution of Estate assets under the Will.

15.     Surrogate Preminger instructed me repeatedly that because of the expense of litigation it was my obligation to negotiate with the Kings, even if a settlement would leave them with a significant and in my view disproportionate share of C.C. Wang's Estate.

16.     My efforts to settle with the Kings throughout 2003 and 2004 failed because each time it seemed that we had come close to a deal the Kings demanded more from the Estate. The settlements efforts were made more difficult by a constant turnover in the Kings' legal counsel. In 2004 the Kings fired their first set of lawyers and hired Hugh Mo and another attorney, Randy Mastro. We started over but again, after several months delay, the settlement discussions fell apart. I formed the belief that the Kings did not want to settle at all but wanted to wear down the Estate with unnecessary expense until it could no longer pursue them for the return of the assets they had stolen.

17.     By October and November 2004, we were finally able to begin depositions of the Kings. In the course of inquiring about the flow of C.C. Wang's assets between the various offshore corporations that the Kings had formed, we learned that the Kings had taken money out of the corporate accounts to pay their attorneys. For this reason and because I had learned that

4

KING-SCT-000010686

the Kings were trying to sell art in Asia, I brought a motion to hold the Kings in contempt of the TRO. The Kings did not have a defense except to try to revive their earlier accusations against my father.

18.      Surrogate Preminger ruled that all proceedings other than the probate would be stayed and that the parties should proceed with discovery and trial on that issue alone. We started to take depositions on a fast schedule.

19.      Y.K. admitted on her deposition that C.C. Wang had not given her the art or other assets as gifts. This was an admission that her affidavits and interrogatories and the positions she had taken before Surrogate Preminger and the appellate Court were all false. It meant that we had been pursuing costly litigation for years based on a lie.

20.      By this time we were almost done with depositions (we were about to take the deposition of a third party witness, James Soong, who had been a friend of C.C. Wang's for many years) and were close to trial. Y.K. had also admitted on her deposition that C.C. Wang had capacity in February 2003 and that the reasons he had given for disinheriting her in his Will Statement were essentially true. I formed the impression that the Kings were desperate to avoid the probate trial.

21.      Y.K. became very emotional about some of the facts that were coming out in discovery, including a conversation she had with C.C. Wang in which she told him that it would hurt her marriage for her to return art to him as he asked. Y.K. begged me to settle the disputes between the families and stop the litigations. She promised me that this time she was ready and would negotiate in good faith.

5

KING-SCT-000010687

**The May 2005 Shanghai Settlement Meeting**

22.     As a result of the change in the Kings' position, we obtained the consent of the Public Administrator and wrote to the Court requesting a stay of discovery and trial to give us time to pursue settlement.  The Court granted our request.

23.     I met with the Kings in May 2005 in China because that was where they said they had taken the Wu.  I believed that our settlement talks were confidential, but I knew that any actual settlement would have to be public and approved by everyone involved.

24.     I reached a preliminary agreement with the Kings, the main points of which were: (1) the Kings would return 46 of the 93 Northwich and Soon Huat paintings; (2) the Estate would let the Kings keep whatever other paintings they had taken; (3) the Kings would put the Wu in joint custody for donation to a museum in the name of the C.C. Wang Family Collection; (4) the Kings would return seven additional paintings owned by my father; (5) my father would give the Kings one of his paintings at Y.K.'s special request; and (6) the Estate would give the Kings one of C.C.'s New York City apartments.

25.     I said that I would present the settlement to my immediate family and my elder aunt Hsien Chen.  To the extent that we were letting the Kings keep art that arguably belonged to Hui Chen, I would need to obtain her consent as well.  The Kings said they would obtain the consent of my Tcheng cousins.  We acknowledged that the settlement would need to be formally approved and then documented by our lawyers.

26.     On May 10, I accomplished the most important step toward settlement in securing the safety of the Wu.  The Wu is now in a bank in Shanghai from which it cannot be moved without our joint consent.

6

KING-SCT-000010688

27.     The next day I met with the Kings in a conference room that they had booked in a Shanghai hotel. the only painting I brought with me was the Xiao Shizao that Y.K. had specially requested. Even though the painting belongs to my father, he agreed to give it to Y.K. to help settlement.

28.     The Petition alleges that I brought 5 paintings to the meeting and that the paintings were all presumptively Estate property. This not true. I brought only the Xiao Shizao and it has no connection to the Estate. The Jian Bao Gallery, my father's gallery, bought the painting at a Sotheby's auction in 1987 for $121,000. A copy of the invoice from Sotheby's to the Jian Bao Gallery is annexed hereto as Exhibit 1.

29.     I believe that I did not violate the law or the TRO by giving Y.K. the Xiao Shizao in settlement because it is not an Estate asset, C.C. never owned it, and it was not a gift from him or bought by him. The painting was already in China where my father had sent it to an expert to study its authenticity.

30.     I did not give Y.K. any other paintings and I did not take any paintings, Estate or otherwise, out of New York. I did not plan to give the Kings any more art than they already had, with the sole exception of my father's Xiao Shizao painting.

31.     I acted honestly, openly and solely in my fiduciary capacity when I engaged in settlement discussions with the Kings in Shanghai in May 2005. My purpose, which I believed to be well known to the Court and to the Public Administrator, was to recover art from the Kings and to stop the litigation that has depleted the Estate.

7

KING-SCT-000010689

**The Document Petitioners Attach as**
**Exhibit B to the Petition Has Been Altered**

32.     Kenneth King brought a several page document with him to the May 2005

settlement meeting.  One page of the document had on it a list of 46 Northwich and Soon Huat

paintings that the Kings agreed to turn over in the settlement.  The rest of the document was a list

of about 60 paintings. As I understood it, Kenneth King or his brother would deliver these

paintings to Y.K., or Y.K. already had them.  As stated above, the only painting I had in my

possession was the one by the artist Xiao Shizao, owned by my father, who had agreed to give it

to Y.K. to help to bring about a settlement.

33.     Kenneth King asked me to initial next to each painting that he had agreed to

return to the Estate and to sign at the bottom of the list.  I was reluctant to sign because I did not

trust Kenneth King.  He has prepared many lists on many occasions and they are often confusing.

In pressuring me to sign his document, he told me that the document was for his records only,

and that it was a settlement document that could not be used for any other purpose.

34.     Kenneth King also insisted that Y.K. initial and sign the list of the art that would

go to her.  She said she did not want to sign.

35.     While I was considering what to do, Kenneth and Y.K. began to argue bitterly.

Kenneth became loud and angry.  He shouted curse words at Y.K. and called her vile names.

Y.K. began to cry and I was both embarrassed and afraid for my aunt.  I knew because Y.K. had

told me (and had also told C.C.) that she was afraid that Kenneth would leave her if she returned

the art, and I knew that and that she was emotionally fragile.  I agreed to initial and sign the

document in order to end the fight and because I believed that there would be no chance of

8

settlement if I did not sign. I believed that the document was a record of our agreement, not a receipt for art actually exchanged.

36.    The document that I signed, however, is not Exhibit B. The document that Kenneth King presented to me for signature at the settlement meeting  was several pages long. I do not recall seeing the words "46 Pieces Received by Andrew Wang" where I was asked to sign. I doubt that I would have signed it had I seen those words as I had not yet gotten any paintings from the Kings other than the Wu on the previous day. Reading the words today, I would interpret them as meaning that these were pieces to be received by me. I would likewise interpret the words "received by Yien Koo Wang King" as meaning that in the settlement she would receive art from Kenneth or his brother to whom the Kings had entrusted the art, but not from me. I only had my father's painting by Xiao Shizao, which I delivered to Y.K.

37.    I asked Kenneth King for a copy of the document we signed, but he did not give me one.

**The "Missing" Paintings**

38.    I noticed that the list of documents that would go to Y.K., or which she would keep in the settlement, included the paintings numbered 1 through 4 on the bottom portion of Exhibit B. These paintings were on the Kings' list of 26 paintings, which became a list of 21 plus 5, and then a list of 21 plus 4 "missing" paintings that I supposedly took from C.C. Wang's safe deposit box and from his apartment. Over the years since the Kings first accused me of taking the paintings several have been accounted for: one was donated to a museum, another returned to James Tcheng's father because he owned it and several are still in C.C.'s apartment

9

or with my father because he owns them.  Of the 26 paintings on the Kings' original list, we have

not been able to find or account for 17 paintings.

39.      When I saw that the list of art that would go to Y.K. under the settlement included

four of these unaccounted for paintings, the Hong Ren, the Hua Yan, the Huang Gongwang, and

the Shitao, I interpreted the document as confirmation of my suspicion that the Kings had taken

the paintings and had them in their possession all along.  I had suspected that the Kings had the

"missing" paintings because they were the only ones who had access to C.C.'s art and affairs for

a long period of time, and because I knew from C.C. and from Y.K. herself that the Kings had

taken art out of C.C. Wang's storage facilities without his permission after C.C. became

suspicious of them.

40.      Although the Kings had denied having these pieces for a number of years, I

assumed that the Kings were willing in the context of settlement to admit having them in order to

establish title so that they could sell them.

41.      I did not believe that it would be difficult to obtain consent and approval for a

settlement that allowed Y.K. King to keep a large portion of the Northwich and Soon Huat art.

Of the four "missing" paintings, three are Northwich or Soon Huat art and only one, the Hua

Ran, is a painting that the Kings concede belongs to the Estate.  I did not believe I would have

difficulty obtaining consent and approval for a settlement that allowed her to keep these

paintings, including the Hua Ran, given its relative value (the Kings claim it is worth $150,000),

and the difficulty and expense of pursuing litigation to recover it.  The concession did not appear

significant to me in comparison to the tremendous importance of closing a settlement that

included recovering a significant portion of the collection, including the Wu.

10

KING-SCT-000010692

**The Kings' Delivery of 15 Pieces of Art**

42.     The Petition alleges that Y.K. gave me all 46 pieces of art as agreed.  This did not happen.  If I had received all 46 pieces of art from the Kings in May of 2005, then the settlement would have been concluded and we would not be still litigating.

43.     At the meeting in Shanghai Kenneth King handed 15 paintings to me.  He then said that he needed to take a break for lunch and we agreed to come back to the conference room that afternoon.  I came back but the Kings did not.

44.     Because the Kings had smuggled the paintings into China.  I understood that I could not legally take them back to the United States.  I told my counsel to inform the Public Administrator that the Kings had turned over some paintings, but that I could not move them and did not know what position the Kings would take given that the settlement appeared to have fallen apart.  When it looked as if the settlement was not going to take place, we appeared for a hearing before Surrogate Preminger in November or December 2005.  I understand that at the hearing my attorneys acknowledged to Surrogate Preminger that the Kings had returned the Wu and other art.  The Kings did not raise any objections or make any accusations against me at that time.

45.     The paintings that I received and that I am still holding are:

    1.   Anonymous, *Evening Ferry* (painting 1 on the list);

    2.   Cheng Zhengkui, *Blue Brook* (5);

    3.   Dai Wenjin, *Fisherman* (6);

    4.   Ding Yunpeng (Nanyu), *Sweeping the Elephant* (7);

    5.   Liang Kai, *Chopping Wood* (14);

11

KING-SCT-000010693

6.  Ma Shouzhen, *Orchid, Bamboo & Rock* (18);

7.  Ma Yuan, *Tasting Tea beside Bamboo and Rock* (20);

8.  Ni Zan (Gaoshi), *Heavenly Pavillion among Brooks & Mtns* (23);

9.  Sheng Mou, *Boating by a River Bank* (26);

10. Shitao, *Bamboo & Plum* (28);

11. Tang Yin, *Dew on Tong Tree Landscape* (29);

12. Wu Cangshi, *Rock & Banana Tree* (36);

13. Wu Wei, *Scholar under a Pine Tree* (37);

14. Wu Zhen (Mei Daoren), *Solitary Fisherman* (39); and

15. Zhao Mengfu (Songxue), *Laozi and his Attendant under Pine Tree* (43).

46.    I did not take these paintings from the Kings on my own account.  I did not sell the paintings, "commingle" them with my personal assets or convert them.

**The Apartment**

47.    I do not believe that I violated the TRO by selling my apartment, which I had owned since 1998.  The apartment was not property of the Estate.  It was also not a gift from CC, and CC did not give me the money I used to purchase the apartment.

Dated: August 4, 2006

/s/

Andrew Wang

Sworn to before me this
___ day of August, 2006

Notary Public

12

KING-SCT-000010694

# SOTHEBY'S

1334 YORK AVENUE GALLERIES
NEW YORK, N.Y.  10021

(212) 606-7000

Page No   1

Invoice No.  5648 019

Bill to Account:         6053965
JIAN BAO GALLERY
C/O GEORGE J. GOODSTADT, INC.
80 POST ROAD EAST
WESTPORT          CT   06880

Customer No. 6053965

(203) 454-0167

Sale Name:   CHINESE PAINTINGS
Sale No :    5648
Sale Date:   12 08 87

All Payments Must Be
Made in U.S. Dollars

| Lot Number | Description | Amount |
|---|---|---|
| 0065 | STYLE OF XIAO ZHAO (MID-12TH CENTURY), GAO XUN'S AUSPICIOUS OMENS FOR DYNASTIC | 121,000.00 |
| | SUB TOTAL | 121,000.00 |
| | TOTAL DUE | 121,000.00 |

SHIP TO
JIAN BAO GALLERY
C/O GEORGE J. GOODSTADT, INC.
80 POST ROAD EAST
WESTPORT          CT   06880

AUCTIONEER(S) CONDUCTING SALE : DAVID N. REDDEN
(DEPARTMENT OF CONSUMER AFFAIRS LICENSE #736142)

**Sales Tax Due as Applicable**

All of the above property is sold to and purchased by the above-invoiced party as purchaser in accordance with the Conditions of Sale and Terms of Guarantee printed in the catalogue for the sale. The invoiced amount includes the Buyer's Premium in effect on the date of sale added to the hammer price as part of the total purchase price.

KING-SCT-000010695



65

□ 65
Style of Xiao Zhao (mid-12th Century)

CAO XUN'S AUSPICIOUS OMENS FOR DYNASTIC REVIVAL

handscroll in six sections separated by text; ink and
color on silk
Signed *Chen Xiao Zhao*, and with a partially obliter-
ated inscription. Numerous collectors' seals, includ-
ing *Shao, Xing, Zhuang Jiong Sheng, He Ting Suo Cang
Shu Hua Jin Shi Tu Shu Zhi Yin, Zhang Cang Jiang Jun,
Wu Shi Qing Guan Suo Cang Shu Hua, He Ting Shang
Jian*, and several others. 16th century (?)
*height 11 ¾ in   30 cm.*

This scroll illustrates the last six episodes from Cao
Xun's (1098–1174) 'Auspicious Omens' narrative.
The original text describes twelve auspicious omens
surrounding Emperor Gaozong's early years. These
supernatural events are seen to legitimize Gaozong's
claim to the throne. The original illustrated text
presumably included twelve illustrations, but a six-
section version is recorded as early as the sixteenth
century. Compare three sections in the Tianjin Art
Museum, reproduced in *Tianjinshi yishu bowuguan cang-
huaji xuji* (Beijing, 1963), Pl. 1–6; and four additional
sections reproduced by Xie Zhiliu in *Tang Wudai Song
Yuan mingji* (Shanghai, 1957), pl. 65–81. In addition,
a Ming copy (consisting of four sections) by Qiu Ying
in the Beijing Palace Museum is reproduced by Xiao
Yanyi in 'Qiu Ying's Copy of Xiao Zhao's Auspicious
Omens Scroll', *Gugong bowuyuan yuankan*, no. 2 (1982),
pp. 45–48, Pl. 1–3. Julia K. Murray's thorough
article 'Ts'ao Hsun and Two Southern Sung History
Scrolls', *Ars Orientalis*, Vol., 15 (1985), pp. 1–29, re-
produces all of the published examples and provides
the information upon which this note is based.

$70,000–$80,000

明人仿蕭照　　中興瑞應圖　　設色絹本　　手卷

KING-SCT-000010696







65

KING-SCT-000010697