**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

YIEN-KOO KING,

                         **Plaintiff,**

       **-against-**

ANDREW WANG, SHOU-KUNG WANG, BAO WU
TANG, JIAN BAO GALLERY, ANTHONY CHOU,
CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE
DA-JIN and JOHN DOES 1-9,

                        **Defendants.**

1:14-Civ-07694-(LJL) (JLC)

**STATEMENT OF UNCONTESTED MATERIAL FACTS IN UPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT FINDING
ANDREW WANG LIABLE FOR BREACH OF HIS FIDUCIARY DUTY**

**SAM P. ISRAEL, P.C.**
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

Pursuant to Fed. R. Civ. P. Rule 56.1, Plaintiff Yien-Koo King ("Yien-Koo" or "YK") hereby submits this Statement of Material Facts for which there is no genuine dispute based on the evidence adduced in discovery and the outcomes of prior litigations between the Parties. References are made to the Wang Defendants' answer to the amended complaint, relevant deposition and trial testimony, affidavits, supporting documents, and interrogatory responses attached in support of the Plaintiff's Motion for Partial Summary Judgment (the "Motion").

I.     **1985-2003: Undisputed Facts Concerning the Initial Formation of the Wangs' Enterprise, as Well as the Wangs' Motive, Knowledge, Intent, and Preparation to Acquire Estate Assets Through Predicate Activity.[1]**

1.     Chi-Chuan Wang (born Wang Jiqian, hereinafter "C.C. Wang" or "CC"), a Chinese-American artist, scholar, and collector of Chinese art and who was internationally renowned for his important contributions in his field, died in New York City on July 3, 2003. [2] He was 96.[3]

2.     CC was a seminal figure and collector in the world of Chinese art and antiquities.[4] In his lifetime, he had acquired an Estate comprised of, *inter alia,* several hundred fine and rare Chinese paintings, sculptures and antiques—some dating back as early as the 10th Century.[5] His collection of ancient Chinese paintings had been

---

[1] The headings contained within this Rule 56.1 Statement are provided for clarity and organizational purposes, but are not intended to themselves advance statements of undisputed fact.

[2] Savitsky Decl. Exh. 2 (Defendants' Answer to the Amended Complaint admitting allegations of ¶¶25 and 70 of the Amended Complaint (Savitsky Decl. Exh. 1)).

[3] Savitsky Decl. Exh. 2 (admitting allegations of ¶¶25 and 70 of the Amended Complaint).

[4] Savitsky Decl. Exh. 2 (admitting allegations of ¶26 of the Amended Complaint, except as to the value of C.C. Wang's collection).

[5] Savitsky Decl. Exh. 2 (admitting allegations of ¶26 of the Amended Complaint, except as to the value of C.C. Wang's collection).

consistently listed as one of the greatest collections in the world. [6] In 1998, twenty-five paintings from his collection, including the famous hanging scroll "Riverbank" by 1000 year-old master Dong Yuan, were given to the Metropolitan Museum of Art in New York City.[7] So grateful was the Met for CC's lifetime contributions that it established the "C.C. Wang Family Collection" to honor him in 1998.[8]

3.      C.C. Wang first immigrated to the U.S. in 1949 when he fled the installment of Mao Zedong's communist regime in China.[9] He brought with him his wife and two youngest daughters. [10] One of the daughters who came to the U.S. would pass away. [11] The other, Yien-Koo Wang King ("Yien-Koo," the Plaintiff in this proceeding), would go on to establish a prolific career in art, working for years as a sculptor and a public relations agent for her father.[12]

4.      Yet CC's son, Defendant Shou-Kung Wang ("SK"), remained behind in China in 1949.[13] The unanswered question of why his father left him behind bothered SK for decades.[14] SK suffered punishment and indignities by members of the Communist Party who mocked him, CC's only son, for having been abandoned when the rest of his

---

[6] Savitsky Decl. Exh. 2 (admitting allegations of ¶26 of the Amended Complaint, except as to the value of C.C. Wang's collection).

[7] Savitsky Decl. Exh. 2 (admitting allegations of ¶26 of the Amended Complaint, except as to the value of C.C. Wang's collection).

[8] Savitsky Decl. Exh. 2 (admitting allegations of ¶26 of the Amended Complaint, except as to the value of C.C. Wang's collection).

[9] Savitsky Decl. Exh. 2 (admitting allegations of ¶27 of the Amended Complaint).

[10] Savitsky Decl. Exh. 2 (admitting allegations of ¶27 of the Amended Complaint).

[11] Savitsky Decl. Exh. 2 (admitting allegations of ¶27 of the Amended Complaint).

[12] Savitsky Decl. Exh. 2 (admitting allegations of ¶27 of the Amended Complaint).

[13] Savitsky Decl. Exh. 2 at ¶29 (Defendants' Answer to the Amended Complaint).

[14] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 6:22-8:3).

family fled the People's Republic of China.[15] For "30 years" SK claims to have endured "suffering [for] the sin/crime" of his father.[16]

5.      In 1979, changes in the relationship between the United States and Chinese governments finally gave SK an opportunity to emigrate from China to New York.[17] SK left his home country that year with his wife and children to come live with CC in Manhattan.[18]

6.      Though he had experience as an electronic technician in China, SK worked in the U.S. by assisting C.C. in cataloguing and managing his considerable art collection.[19] By the mid-1980s, SK worked as C.C.'s bookkeeper and assistant.[20] As part of his duties, he was entrusted with access to C.C.'s vast array of valuable paintings, as well as his father's funds.[21]

7.      At last reunited with his family and his 30 years of suffering in Communist China behind him, SK thought he would be happy in New York. He wasn't. Instead, he grew dissatisfied with his work arrangement with CC.[22] In the words of SK's son and CC's grandson, Defendant Andrew Wang ("Andrew"), SK's did not like that he "ha[d] to work for himself, he ha[d] to earn salary to feed me and my brother and sister and we were only allowed to buy apartment or house until much later time after separating [from

---

[15] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 6:22-7:11).

[16] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 6:22-7:11).

[17] Savitsky Decl. Exh. 4 ("China Policy," *Milestones: 1977-1980*, U.S. DEP'T OF STATE OFFICE OF THE HISTORIAN, *available at* https://history.state.gov/milestones/1977-1980/china-policy)

[18] Savitsky Decl. Exh. 2 at ¶29 (Defendants' Answer to the Amended Complaint).

[19] Savitsky Decl. Exh. 2 at ¶29 (Defendants' Answer to the Amended Complaint).

[20] Savitsky Decl. Exh. 2 at ¶34 (Defendants' Answer to the Amended Complaint).

[21] Savitsky Decl. Exh. 2 at ¶34 (Defendants' Answer to the Amended Complaint).

[22] Savitsky Decl. Exh. 5 (4/21/17 AW Probate Trial Trans. at 504:17-505:22).

C.C.] for 30 years."[23] It upset SK that he "was not treated as we thought because my father [SK] was only son."[24] Andrew believed that C.C. was paying SK much less than what SK—an "electronic technician"[25] who spoke "little English"[26]—could have made if he had "worked for somebody else."[27] "[O]nly giving $1000 to" SK per month was "not enough for his children."[28] To Andrew, CC's requirement that SK work under these conditions violated "our tradition, our culture" because "you're not supposed to treat your son like that."[29]

       8.      Nevertheless, SK agreed to work for his father and, in so doing, developed a deep familiarity with CC's classical Chinese paintings.[30] Beginning in or around 1985, SK used a computer to create and maintain lists of CC's collection.[31] He did this to "help [CC] to organize his collection [and] to do the recording work."[32]

       9.      A "serial number [system] that [SK] designed" was used to keep track of the various paintings on the lists.[33] For example, SK would designate a hanging wall scroll with the letter "A," a smaller hand-scroll with the letter "B," or an album/booklet of paintings with the letter "C."[34] SK also maintained photographs of at least some of the listed paintings.[35]

---

[23] Savitsky Decl. <u>Exh. 5</u> (4/21/17 AW Prob. Tr. Trans. at 504:17-505:22).

[24] Savitsky Decl. <u>Exh. 5</u> (4/21/17 AW Prob. Tr. Trans. at 504:17-505:22).

[25] Savitsky Decl. <u>Exh. 5</u> (4/21/17 AW Prob. Tr. Trans. at 522:8-11).

[26] Savitsky Decl. <u>Exh. 3</u> (11/18/2003 SK Dep. Trans. at 3:25-4:9).

[27] Savitsky Decl. <u>Exh. 5</u> (4/21/17 AW Prob. Tr. Trans. at 517:2-26).

[28] Savitsky Decl. <u>Exh. 5</u> (4/21/17 AW Prob. Tr. Trans. at 517:2-26).

[29] Savitsky Decl. <u>Exh. 5</u> (4/21/17 AW Prob. Tr. Trans. at 505:4-505:9).

[30] Savitsky Decl. <u>Exh. 3</u> (11/18/2003 SK Dep. Trans. at 90:17-92:17).

[31] Savitsky Decl. <u>Exh. 3</u> (11/18/2003 SK Dep. Trans. at 91:14-92:6).

[32] Savitsky Decl. <u>Exh. 3</u> (11/18/2003 SK Dep. Trans. at 90:17-91:13).

[33] Savitsky Decl. <u>Exh. 3</u> (11/18/2003 SK Dep. Trans. at 100:20-102:18).

[34] Savitsky Decl. <u>Exh. 3</u> (11/18/2003 SK Dep. Trans. at 100:20-102:18).

[35] Savitsky Decl. <u>Exh. 3</u> (11/18/2003 SK Dep. Trans. at 103:6-25).

10.     Whenever a classical Chinese painting was purchased and SK knew about it, he "would add it to the list."[36] Whenever CC wanted to offer paintings to someone for gift or sale, he would tell SK and SK could compile an accurate list of those paintings.[37] If a painting ultimately left CC's collection, it was SK's job to "delete it or cross it out" of the list.[38]

11.     But SK eventually lost his position managing CC's art and financial affairs.[39] In 1997, CC "took all of the paintings away" from SK by moving them out of C.C.'s apartment in Manhattan ("Apartment 8A").[40] Then, in 1998, SK claims he learned that he would no longer be involved in his father's financial affairs either.[41] According to SK, that realization came when CC "took away the checkbook that [SK] regularly took care of" in Apartment 8A and told SK that "he [CC] would handle [the checkbook] himself."[42]

12.     The reason for CC's revocation of SK's responsibilities has been the subject of dispute between the parties for nearly 17 years.[43]

13.     It is not in dispute, however, that five years later, in 2003, C.C. and his son were "still having a communication problem because after years, you know, the problem with the Kings."[44] SK's "problem with the Kings" was that when C.C. revoked SK's authority to manage his art collection and finances, he appointed Yien-Koo and her

---

[36] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 94:10-95:3).

[37] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 95:15-96:14).

[38] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 94:10-95:3).

[39] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 142:21-145:13).

[40] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 144:6-145:8).

[41] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 142:21-143:3).

[42] Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 142:21-143:3).

[43] Declaration of Yien-Koo Wang King, dated February 14, 2020, ("YK Decl.") at ¶¶5-6.

[44] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 616:15-617:21).

husband Kenneth King to replace SK.[45]  SK "was not happy" with this decision and was still having certain "disagreements" with CC years later.[46]

14.     For example, Andrew testified that, on January 31, 2003, CC entrusted him, rather than SK, to handle and store a bag of 15 to 20 classical Chinese paintings taken from CC's safe deposit box at North Fork Bank in Manhattan.[47]  Andrew claimed in prior trial testimony  that he believes he was chosen for this task because, unlike other family members, he did not "really care that much [about]" and was "not involved in those family matters, not with money, not with the artworks, not even with other kind[s] of business in the family."[48] Later he testified, CC "specifically instructed" Andrew "not to tell my father [SK] about the bag" of paintings he and Andrew had removed from the safe deposit box.[49]

15.     Yet on the same day that the 15-20 Chinese paintings were removed from storage at North Fork Bank, Andrew put them in his car and drove them to SK's house in Queens. [50]  Andrew was living with SK at the time. [51] Andrew claims to have kept this promise to never tell SK about these paintings.[52]

16.     What occurred in the months following the removal of the 15 to 20 classical Chinese paintings from CC's safe deposit box on January 31, 2003 would eventually become the subject of a sixteen-year probate dispute.[53]

---

[45] YK Decl. at ¶¶5-6.

[46] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 616:26-617:11).

[47] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 618:15-619:11).

[48] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 618:15-619:11).

[49] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 618:15-619:11).

[50] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 615:3-616:20).

[51] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 615:3-616:20).

[52] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 616:21-617:4).

[53] Savitsky Decl. Exh. 8 (1/2/20 Decision and Order of Appellate Division, First Department dismissing SK's petition to probate the Fraudulent Codicil).

17.    At 96, and only a few months before his death in July, CC executed two documents helmed by SK which purported to disinherit Yien-Koo King from his Estate, while simultaneously increasing the share to be received by SK and his children.[54]

18.    These were a purported codicil drafted by SK[55] dated February 10, 2003 (the "Fraudulent Codicil") followed by a purported will dated February 18, 2003 (the "Fraudulent Will").[56] Both documents shared the same material terms which (a) nearly doubled SK's family share of his father's Estate to 60%, (b) disinherited SK's sister (Plaintiff, YK); and (c) named SK and Andrew as co-executors in charge of managing CC's Estate assets.[57]

19.    After a seventeen-year dispute, the Appellate Division of the New York State Supreme Court affirmed a unanimous jury's finding that, in January and February 2003, the Wang Defendants conceived of and executed a "scheme" to fraudulently and coercively induce the 96-year-old CC Wang into executing both the Fraudulent Codicil and the Fraudulent Will.[58] The court further adjudicated that, at least at the time the Fraudulent Will was signed, CC lacked the required testamentary capacity to alter his Estate plans.[59]

---

[54] Savitsky Decl. Exh. 8.

[55] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 553:17- 554:4, 555:16-25).

[56] Savitsky Decl. Exh. 8 (1/2/20 Decision and Order of Appellate Division, First Department dismissing SK's petition to probate the Fraudulent Codicil).

[57] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 556:4-559:2); Savitsky Decl. Exh. 8 (1/2/20 First Department decision).

[58] Savitsky Decl. Exh. 7 (Decision and Order of Appellate Division, First Department).

[59] Savitsky Decl. Exh. 6 (May 2017 Decree); Exh. 7 (6/7/18 Decision and Order of Appellate Division, First Department).

20.     Approximately one month after C.C. Wang executed the Fraudulent Will, he was hospitalized at New York Presbyterian Hospital.[60]

21.     While CC was hospitalized SK and Andrew claimed that they began "representing" his art interests.[61]

22.     They demanded that YK turn over certain paintings which belonged to C.C. over to them in this newly claimed capacity.[62]

23.     On March 29, 2003, YK and Kenneth King hand delivered 42 classical Chinese paintings directly to SK in CC's Apartment 8A in Manhattan.[63] SK signed a list of the paintings, verifying their receipt by him.[64]

24.     Two weeks later, YK and Kenneth King hand-delivered at least 21 classical Chinese paintings directly to SK in CC's Apartment 8A in Manhattan.[65] SK signed a list of the paintings verifying their receipt by him.[66]

25.     C.C. was released from New York Presbyterian in April 2003.[67] Shortly afterward, SK moved him out of his apartment in the Upper East Side of Manhattan ("Apartment 8A"), to SK's house in Forest Hills, Queens.[68]

---

[60] Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 589:8-13 and 4/25/17 Prob. Tr. Trans. at 901:9-16).

[61] Savitsky Decl. Exh. 9 (6/24/19 SK Dep. Trans. at 78:22-79:11).

[62] Savitsky Decl. Exh. 9 (6/24/19 SK Dep. Trans. at 78:22-79:11).

[63] Savitsky Decl. Exh. 9 (6/24/19 SK Dep. Trans. at 78:4-81:11); Savitsky Decl. Exh. 10 (6/24/19 SK Dep. exhibits SK-10 and SK-11).

[64] Savitsky Decl. Exh. 9 (6/24/19 SK Dep. Trans. at 78:4-81:11); Savitsky Decl. Exh. 10 (6/24/19 SK Dep. exhibits SK-10 and SK-11).

[65] Savitsky Decl. Exh. 9 (6/24/19 SK Dep. Trans. at 81:14-82:23).

[66] Savitsky Decl. Exh. 10 (6/24/19 SK Dep. exhibits SK-10 and SK-11).

[67] YK Decl. at ¶¶8-9.

[68] YK Decl. at ¶¶8-9.

26.     Kenneth King, Yien-Koo's husband, was not allowed to visit C.C. in Queens.[69]

27.     C.C. would live in SK's house until the day before his death.[70]

28.     C.C. was moved to the Cabrini Hospice facility in Manhattan on July 2, 2003. He died the next day.[71]

**II.     2003-2004: Undisputed Facts Concerning the Creation of the Estate of Chi-Chuan Wang, Appointment of Andrew Wang as Preliminary Executor, and the Turnover of Assets to the Estate.**

29.     C.C. Wang was survived by Yien-Koo, SK, one other sibling, and several grandchildren.[72]

30.     Though CC owned a significant number of valuable assets at the time of his death, their precise number and identities have been subject to dispute. The parties agree, however, that CC:

    a.  Amassed a collection of over 400 fine art works, which art experts have called "the greatest collection of Chinese masters outside China."[73]

    b.  Owned approximately 250 Chinese seals.[74] If you are a Chinese artist or art collector, your set of custom Chinese seals is "like your signatures" which can be affixed to paintings you created or which are in you collection.[75]

---

[69] YK Decl. at ¶9.

[70] YK Decl. at ¶10.

[71] YK Decl. at ¶10.

[72] Savitsky Decl. Exh. 2 (Defendants' Answer to the Amended Complaint admitting allegations of ¶70 of the Amended Complaint).

[73] Savitsky Decl. Exh. 2 (Defendants' Answer to the Amended Complaint admitting allegations of ¶32 of the Amended Complaint).

[74] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 55:24-56:8; 60:2-61:3).

[75] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 55:24-56:8; 60:2-61:3).

    c.   Held title to certain real property, such as a condominium located at <u>445 5th Avenue, Unit 24H</u>. This apartment is held in the name of the Chi-Chuan Wang Revocable Trust (although its expenses are paid for by the Estate of Chi-Chuan Wang).[76]

    d.   Owned more than 300 personally created paintings and Chinese paintings from other, contemporary artists;[77] and

    e.   Amassed a collection of over one hundred (and perhaps as many as 400) classical Chinese paintings.[78] The phrase "classical Chinese paintings" refers to Chinese paintings created "before 1911—[before] the Republic of China was formed."[79] The number and identity of the classical Chinese paintings CC owned on July 3, 2003 has been subject to dispute since the creation of his Estate.

31.    Within a month of CC's passing, Yien-Koo filed a final will and testament executed by CC on June 13, 2000 (the "2000 Will"), and a codicil thereto, executed on July 10, 2002, in the New York County Surrogate's Court.[80] Both documents named her as the executor of C.C. Wang's Estate.[81]

32.    SK and Andrew subsequently filed the Fraudulent 2003 Will, created on February 18, 2003, in an attempt to have its provisions enforced by the Surrogate's Court.[82]

---

[76] YK Decl. at ¶11.

[77] Declaration of the Public Administrator of New York County, dated February 14, 2020 ("PA Decl.") at ¶9(c).

[78] PA Decl. at ¶9(a).

[79] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 25:22-26:3).

[80] Savitsky Decl. <u>Exh. 2</u> at ¶¶ 71-72 (Defendants' Answer to the Amended Complaint).

[81] YK Decl. at ¶13; Savitsky Decl. <u>Exh. 8</u> (1/2/20 First Department decision and order dismissing SK's petition to probate the Fraudulent Codicil).

[82] Savitsky Decl. <u>Exh. 8</u> (1/2/20 First Department decision and order dismissing SK's petition to probate the Fraudulent Codicil).

33.     The Fraudulent 2003 Will's provisions designated Andrew and SK as co-executors of C.C. Wang's Estate and identified Andrew and his brother (Stephen Wang) as chief beneficiaries along with SK.[83]

34.     None of C.C. Wang's prior *eight* testamentary instruments executed during his lifetime had ever appointed Andrew as a co-executor or even included him or his brother Stephen (SK's sons) as named beneficiaries to Estate assets.[84] Nor had any of them excluded Yien-Koo as a beneficiary.[85]

35.     Thus, in July 2003, Yien-Koo initiated a Surrogate's Court proceeding contesting the validity of the Fraudulent 2003 Will to prevent its probate.[86]

36.     While that contest was pending, in August 2003, the Surrogate's Court granted Andrew's application for preliminary letters testamentary because he was named a "co-executor" by the Fraudulent 2003 Will.[87] The Surrogate's Court also appointed the New York County Public Administrator (the "PA") as temporary administrator to act jointly with Andrew as co-fiduciary of the Estate.[88]

37.     Andrew would retain this status for the next fourteen (14) years.[89] He was finally stripped of his fiduciary responsibilities in May 2017 after a unanimous jury determined he had acquired them through his and SK's fraud.[90]

---

[83] Savitsky Decl. Exh. 2 at ¶74 (Defendants' Answer to the Amended Complaint).

[84] Savitsky Decl. Exh. 2 at ¶ 75 (Defendants' Answer to the Amended Complaint).

[85] YK Decl. at ¶14.

[86] YK Decl. at ¶15.

[87] PA Decl. Exh. 1 (Aug. 4, 2003 Order of the New York County Surrogate's Court).

[88] PA Decl. Exh. 1 (Aug. 4, 2003 Order of the New York County Surrogate's Court).

[89] Savitsky Decl. Exh. 6 (First Department decision and order dated May 9, 2017 affirm jury verdict rejecting the Fraudulent Will).

[90] Savitsky Decl. Exh. 6 (First Department decision and order dated May 9, 2017 affirm jury verdict rejecting the Fraudulent Will).

38.     The Surrogate's August 4, 2003 Order authorized Andrew and the PA (together, the "Co-fiduciaries") to jointly administer the Estate and its assets.[91] The Co-fiduciaries' responsibilities included collecting Estate assets, arranging for the payment of Estate taxes, and ultimately preparing remaining Estate assets to be distributed, if possible, to the beneficiaries named in whichever of the competing CC wills was accepted for probate.[92]

39.     By late 2003, the PA—with the aid of her legal counsel, Peter Schram, Esq.[93]—began to oversee the collection of Estate property, especially Chinese artwork, that was still in the hands of C.C. Wang's surviving family members.[94]

40.     New York-based art consulting firm O'Toole-Ewald Art Associates ("OTE"), was hired to catalogue the Chinese paintings turned over to the Estate.[95] OTE took photographs of the Estate's Chinese paintings and assigned identification numbers to each of them.[96] For example, the Estate's classical paintings were assigned numbers OTE 83 through OTE 247 and OTE 1000 through OTE 1003.[97]

41.     A description of the relevant assets turned over to the Estate during that process and the undisputed circumstances surrounding their delivery are set forth below.

     a.   In 2003, SK delivered to the Estate "most[]" of the 63 classical
       Chinese paintings which had been hand delivered to him by

---

[91] PA Decl. Exh. 1 (Aug. 4, 2003 Order of the New York County Surrogate's Court).

[92] Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 20:19-21:10).

[93] Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 8:11-23).

[94] Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 41:4-45:45); Savitsky Decl. Exh. 13 (Schram Exhibit 4 from Schram Deposition; WANG000310-311).

[95] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 19:4-21:15 (Ewald recalling being hired by the PA); 25:25-26:23 (Ewald admitting she catalogued Estate paintings); 27:11-31:2 (Ewald recalling OTE took photographs of all the works shown to her); Savitsky Decl. Exh. 15 (Exhibit ELE-3 from the Ewald Deposition).

[96] Savitsky Decl. Exh. 14 (6/14/19 Ewald Dep. Trans. at 30:3-31:2).

[97] PA Decl. Exh. 19 (Sotheby's Appraisal).

the Kings in March and April 2003.[98] SK's stated reason for withholding some of the 63 classical Chinese paintings from the Estate, were that certain paintings belonged "to my [SK's] cousin in Taiwan . . . . [a]nd some are mine."[99]

b.  In 2003 and early 2004, YK hand delivered approximately 80 additional classical Chinese paintings to the Co-fiduciaries of the Estate.[100] Simultaneously with the turnover of these paintings, YK presented <u>Martin Klein, Esq.</u> (the attorney representing Andrew in his capacity as preliminary executor) and <u>Ethel Griffin</u> (the PA) with true and accurate photographs of the classical Chinese paintings being delivered.[101] In turn, Mr. Klein and the PA signed the photographs in acknowledgment of the Estate's receipt.[102] All told, the Estate received exactly *133 classical Chinese paintings* by 2004 from the Wangs and the Kings. Sotheby's eventually provided a fair market appraisal stating that these 133 paintings were worth $4,400,350.00 as of July 3, 2003 (the date of CC's death).[103]

c.  On October 21, 2003,  Klein sent a letter to Schram that "Andrew has advised us that he will be at Apartment 8A and will make an inventory of [CC's personal Chinese] seals."[104] Ultimately, Andrew turned over *108 of CC's seals* to the Estate[105] and each of these seals continues to be stored in the PA's office in downtown Manhattan.[106] At his deposition in 2019, Andrew testified that he had located in Apartment 8A

---

[98] Savitsky Decl. <u>Exh. 9</u> (6/24/19 SK Dep. Trans. at 82:17-83:14).

[99] Savitsky Decl. <u>Exh. 9</u> (6/24/19 SK Dep. Trans. at 82:17-83:14).

[100] YK Decl. at ¶18.

[101] YK Decl. at ¶18.

[102] YK Decl. at ¶18; PA Decl. at ¶11.

[103] PA Decl. at ¶19.

[104] Savitsky Decl. <u>Exh.  16</u> (10/21/2003 Klein letter to Schram)

[105] Savitsky Decl. <u>Exh.  17</u> (List of 108 C.C. Wang seals produced by the Wang Defendants in this action; WANG000064- WANG000071); Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 60:12-22 ("I know there are 250 [seals] altogether . . . . Because I turned them over.")).

[106] Savitsky Decl. <u>Exh.  17</u> (List of 108 C.C. Wang seals); PA Decl. at ¶¶9(b), 17-18.

"250 pieces" of C.C. Wang's personal seals.[107] The inventory of the 108 seals turned over by Andrew was stored in Martin Klein's office and was produced in response to discovery demands in this action.[108] Thus, Andrew did not turn over 140 of C.C. Wang's seals.

d.  The Co-fiduciaries also collected various personal items owned by CC that had been stored in Apartment 8A.[109] The Estate's hired appraiser, Kenneth Jay Linsner ASA, SCV (who is now the Wangs' retained expert in this RICO action) appraised the personal effects located in CC's Apartment 8A to be worth $249,565.00.[110] The appraised items included: jewelry, books, furniture, picture decorations, sculptures, clothing, and carpets.[111]

e.  The Co-fiduciaries collected more than 300 additional Chinese paintings and other works of art (such as sculptures) by C.C. Wang and other contemporary artists.[112] Sotheby's eventually appraised these works of art to be worth $1,313,300.00 as of July 3, 2003.[113]

f.  The Co-fiduciaries claimed a Cooperative Apartment located at 445 5th Avenue, Unit 24H, New York, NY ("Unit 24H") to be valued at $370,000 on the Estate's Form 706, United States Estate Tax Return in 2004.[114]

---

[107] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 60:12-22).

[108] Savitsky Decl. Exh. 17 (List of 108 C.C. Wang seals); PA Decl. at ¶¶17-18.

[109] PA Decl. Exh. 4 (Fair market value appraisal certification of Kenneth Linsner).

[110] PA Decl. Exh. 4 (Fair market value appraisal certification of Kenneth Linsner).

[111] PA Decl. Exh. 4 (Fair market value appraisal certification of Kenneth Linsner; WANG_KING 00000295).

[112] PA Decl. ¶9(c).

[113] PA Decl. ¶20.

[114] PA Decl. ¶21.

42.     OTE also took photographs of the paintings alongside a card bearing the paintings' OTE identification numbers:[115]



43.     For his part, Andrew's attorney, Klein, maintained a record of the 108 "C.C. Wang Seals" that Andrew had turned over to the Estate and which were produced by him in this action:[116]



---

[115] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 25:25-26:23 (Ewald admitting she catalogued Estate paintings); 27:11-31:2 (Ewald recalling OTE took photographs of all the works shown to her)); YK Decl. at ¶19.

[116] Savitsky Decl. Exh. 17 (List of 108 C.C. Wang seals).

44.     The 108 seals identified in Andrew's production are currently being stored in the PA's office in downtown Manhattan and have never been used on any paintings since they were turned over to the Estate.[117]

45.     In or about 2007, an IRS art appraiser with the Art Appraisal services reviewed the Sotheby's appraisal and found that the total claimed value for the Estate's 133 Classical Chinese paintings was supportable.[118] Since the sales of the 98 paintings had occurred prior to the IRS audit, the IRS used the photographs taken by the Estate and used in the Sotheby's appraisal.[119]

### III.     2004:  The Undisputed Facts Concerning the Co-Fiduciaries' Decision to Privately Sell Classical Chinese Paintings and Andrew's Testimonies About the Sales Process, Generally.

#### A.     The Co-Fiduciaries' Decision to Sell Certain Estate Paintings Privately.

46.     When an estate has "taxes and other administration expenses due," the fiduciaries of the estate are, generally, tasked with "marshal[ling] assets and sell[ing] them in order to be in a position to pay those expenses."[120]

47.     In late 2004, after various appraisals of the Estate's assets had been completed, the two Co-fiduciaries discussed the possible sale of the Estate's assets so as to be in a position to pay the Estate's expenses.[121]

---

[117] PA Decl. at ¶¶17-18.

[118] PA Decl. at ¶19.

[119] Savitsky Decl. Exh. 18 (September 2006 email by Klein to Andrew regarding IRS's need for photographs of Estate paintings for audit).

[120] Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 20:19-21:20).

[121] Savitsky Decl. Exh. 19 (October 7, 2004 emails in which Andrew directs Klein to "tell the PA that I will raise enough cash to cover all legal expe[e]nses upon my return in mid November.").

48.     Ethel Griffin, the PA at the time, has passed away and is thus unable to testify about what occurred during the relevant period or about her communications with Andrew or the representations he made to her.[122]

49.     However, the attorney representing Ethel Griffin in connection with her estate administration duties at that time, Schram, has been available to testify in this action. [123]

50.     Still, there are disputes in the record as to the substance of the conversations between the Co-Fiduciaries. Schram testified that he could not recall any discussions:  (a) with Sotheby's about selling estate-owned artworks;[124] (b) concerning who would find potential buyers for Estate assets,[125] or (c) about who would select which paintings would be sold to private buyers.[126]

51.     But regardless of how it was decided that the Estate would sell certain of its Chinese paintings to private buyers, the ultimate decision was made jointly by both Co-fiduciaries around late 2004.[127]

52.     Yien-Koo—as a non-fiduciary who had purportedly been disinherited under the Fraudulent Will—was made aware of the Estate's financial condition, decisions, and sale activities "only in the most general terms."[128] Accordingly, she was

---

[122] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 97:21-22).

[123] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 8:11-23).

[124] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 25:17-22).

[125] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 70:20-21).

[126] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 70:24-71:3).

[127] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 14:13 – 15:5); Savitsky Decl. <u>Exh. 20</u> (December 6, 2004 email between Klein and Andrew discussing the potential private sale of Estate assets).

[128] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 33:4-34:5).

not provided with the Estate's tax returns, Sotheby's appraisal records, or sales documentation related to the private sales.[129]

53.     Prior to 2011, Yien-Koo received no information from any of the Co-fiduciaries or their attorneys identifying: (i) which paintings were being sold, (ii) how many were being sold, (iii) to whom they were being sold to, (iv) at what prices they were being sold, (v) when the sales were completed, or even (vi) whether the sales were of classical or contemporary paintings.[130]

54.     Though this self-dealing action concerns the Estate's sale of 98 classical Chinese paintings between 2005 and 2009, Plaintiff Yien-Koo did not first become aware of the terms of any of the Estate's sales, or which paintings had been sold, until in or about 2013.[131]

55.     Rather, the Co-fiduciaries' attorneys disclosed only that private buyers were being located to sell an undisclosed number of the Estate's paintings and that the Estate had hired an independent appraiser to review the appropriateness of any proposed sales.[132]

     **B.**   *Overview of the Sale and Payment Process for the Private Sales.*

56.     Though Plaintiff Yien-Koo did not know it at the time, the Co-fiduciaries would ultimately enter into six contracts to sell a total of 98 classical Chinese paintings

---

[129] Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 33:4-34:5); YK Decl. at ¶20.

[130] YK Decl. at ¶¶20-21; Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 33:4-34:5).

[131] YK Decl. at ¶¶20-21.

[132] Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 93:4-95:4); Savitsky Decl. Exh. 13 (Schram Dep. Exhibit 16 comprising a letter dated from Schram to Yien-Koo's attorney dated December 18, 2010; KING7 – 001018-1019).

between February 2005 and August 2009.[133] The sales were made to five purportedly different persons for approximately \$4.3 million (the "98 Paintings").[134]

57.     The six executed contracts were between the Co-fiduciaries and five purported buyers:[135]

- "Wei Zheng" in February 2005 (17 paintings for \$400,500.00);

- "Chen Mei Lin" in April 2005 (24 paintings for \$1,393,422.00);

- "Anthony Chou" in June 2005 (17 paintings for \$909,689.41);

- "Yong-Qing Ye" in September 2005 (18 paintings for \$787,810.00);

- "Yong-Qing Ye" again in February 2006 (8 paintings for \$354,045.00); and

- "Yue Da Jin" in August 2009 (14 paintings for \$489,772.00).

58.     For the first two sales in February and April 2005, the Co-Fiduciaries entered into escrow agreements with Brown Raysman Millstein, Felder, & Steiner, LLP ("Brown Raysman") and purported buyers named "Wei Zheng" and "Chen Mei-Lin," respectively.[136]

59.     Brown Raysman also served as Andrew and SK Wang's personal legal counsel.[137]

---

[133] PA Decl. at ¶19.

[134] PA Decl. at ¶23.

[135] PA Decl. at ¶¶24-42.

[136] Savitsky Decl. Exh. 21 (6/26/19 Klein Dep. Trans. at 105:15-106: 19); PA Decl. Exh. 8 at KING 005964-5972 (Wei Zheng final sales documents and escrow); PA Decl. Exh. 12 at KING 006507-6516 (Chen Mei-Lin final sales documents and escrow).

[137] Savitsky Decl. Exh. 21 (6/26/19 Klein Dep. Trans. at 106:17-19).

60.     Under both escrow agreements, the purchase prices for the first two contracts of sale with "Wei Zheng" and "Chen Mei Lin" were first wired to Brown Raysman before being wired to the Estate's bank account.[138]

61.     The escrow agreements did, however, provide return wire instructions in case a refund was necessary.[139]

62.     Wei Zheng's agreement provided that in the event a refund was necessary, the purchase price should be wired to a Citibank, N.A. account held in the name of "Wei Zheng," with an address in Queens, NY.[140]  This wire refund information was provided by Andrew to Klein, who inserted it into the escrow agreement with Zheng on February 12, 2005.[141]

63.     Chen Mei-Lin's escrow agreement provided that in the event a refund was necessary, the purchase price should be wired to a Shanghai bank account held in the name of "Chen Mei-Lin" with an address in Shanghai, China.[142] Again, this wire refund information was provided by Andrew to Klein.[143]

64.     The return address in Shanghai in the Chen Mei Lin escrow agreement was Andrew's own home address in Shanghai.[144]

---

[138] PA Decl. Exh. 8 at KING 005964-5972 (Wei Zheng final sales documents and escrow); PA Decl. Exh. 12 at KING 006507-6516 (Chen Mei-Lin final sales documents and escrow); PA Decl. at ¶¶25, 31. Savitsky Decl. Exh. 46 (WANG001682-1685).

[139] PA Decl. Exh. 8 at KING 005969 (Wei Zheng final sales documents and escrow); PA Decl. Exh. 12 at KING 006512 (Chen Mei-Lin final sales documents and escrow).

[140] PA Decl. Exh. 8 at KING 005969 (Wei Zheng final sales documents and escrow).

[141] Savitsky Decl. Exh. 22 (Email chain between Andrew and Klein between February 10-15, 2005).

[142] PA Decl. Exh. 12 at KING 006512 (Chen Mei-Lin final sales documents and escrow).

[143] Savitsky Decl. Exh. 23 (Email chain between Andrew and Klein on March 22, 2005).

[144] Savitsky Decl. Exh. 31 (CS032, November 19, 2014 email of Carolyn Shields).

65.    During a deposition of Andrew in a Surrogate's Court proceeding held over four days in December 2013 (the "2013 Deposition"), Andrew was questioned about how the foreign buyers were able to pay the purchase prices to the Estate's U.S. account.[145] Under oath to tell the whole truth, he testified that the money received by the Estate for the sales of paintings came from "[o]verseas back to here" and that the buyers could have various ways to transfer money out of China to the U.S. in order to make their purchases.[146]

66.    But Andrew testified he did not know how the buyers actually transferred payments to the Estate, only that they "have their way":[147]

>    Q: Back to here. From China?
>
>    A: I don't know, from anywhere. We just gave them the account. They just wire the money here.
>
>    Q: Well, it couldn't be from China, right, because China doesn't allow you to make the money transfers outside the country?
>
>    A: They have their way. If a company that have import and transport, or export business, they could get a government quota to wire the money directly to foreign countries. You know, they could give other reasons instead of buying artworks.

67.    Andrew then testified that this was the "standard procedure for . . . all of the private sales" and explained that "we have to receive the money first. The money has to be wired here first and then the artwork would go."[148]

---

[145] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 944:19-945:5).

[146] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 944:19-945:5).

[147] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 944:19-945:5; *see also id.* at 727:21-729:22).

[148] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 949:19-950:17).

68.     Yet during his <u>2019 Deposition</u>, Andrew gave contradicting testimony about how the five buyers wired money to the Estate. He claimed for the first time that he knew exactly how the purported buyers transmitted payments to the Estate for the purchase of the 98 allegedly self-dealt paintings. [149] The money was wired to the U.S. by his own off-shore companies: [150]

> Q: Did you ever use [your company] Le Style Limited to pay money to the estate?
>
> A: It's possible that if it was the estate sales.
>
> Q: Why is it possible?
>
> A: Because the buyer has to transfer money to Hong Kong. And it might use the company to—to---you know, let the buyer for – you know, the transfer---proper transfer of the payments to the estate.
>
> Q: So the money was sent—do you recall a specific instance in which that happened?
>
> A: I don't recall the five sales. The last dated a while – I don't know which one that the funds went through that account. I don't know if that's the company I used for the — for the — for the proper transfer.
>
> Q: Well whether you used Le Style or another company, do you recall ever using a company to pay money to the estate?
>
> [Objection]
>
> A: Again, it's the estate sales that I help the buyers to transfer funds from China in order to pay the estate purchases. So the only way to pay, you know, transfer the money out of China is going through a company in Hong Kong.
>
> Q: Okay. Did you do that for more than one sale?

---

[149] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 240:2-243:2).

[150] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 240:2-243:2).

A: I think so.

Q: How many?

A: I don't know how many. I think all of the five sales —
maybe four sales went through the company because if ever
the money come out from China, that's the only way it can
come out.

Q: So as far as you remember, for each of the five sales of
estate artwork, your account acted as an intermediary for the
funds to be transferred from the buyer to the estate?

A: I wouldn't say "intermediary." It's just a favor to the buyer.
That's all. If I don't set up the company, the money cannot be
transferred here to the estate. And they always ask a favor to
use my company or to set up the company for the transfer. []

Q: Did you ever disclose this fact that the money was coming
from your accounts to the Public Administrator.

[Objection].

A: I don't recall.

69.    Andrew was a fiduciary of the Estate of C.C. Wang between August 2004
and May 2017.[151] When asked if he had records of any transactions between his overseas
company and any of the five buyers, Andrew said he did not.[152] He testified that he would
not have kept such records because the sales occurred 14-15 years ago.[153]

70.    This testimony concerning Andrew's use of an offshore company to pay the
purchase prices to the Estate with respect to "all of the five sales"[154] is inconsistent with
testimony he gave in December 2013. It reveals Andrew knew exactly how the payments

---

[151] PA Decl. <u>Exh. 1</u> (August 2004 Order granting preliminary letters); Savitsky Decl. <u>Exh.
6</u> (May 2017 Decree).

[152] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 245:20-246:246:22).

[153] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 245:20-246:246:22).

[154] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 240:2-243:2).

were made since he admits integral involvement through use of his own corporations to pay wire funds from Hong Kong to the U.S.

71.     Andrew's 2019 testimony is also inconsistent with his 2013 Deposition testimony because, in 2013, Andrew had expressly testified that he did not own *any* companies whatsoever at the time of the Estate sales between 2005 and 2009. [155]

72.     Specifically, Andrew testified during his 2013 Deposition that, as of the date of the deposition, the only  company he held an interest in was a new company called "BWT Asian Arts."[156] He made no mention of any company or companies he now admits he "set up"[157] for the purpose of wiring money to the Estate in relation to the sale of the 98 Paintings between 2005 and 2009.[158]

73.      In fact, under oath to tell the whole truth, Andrew testified that he did not have any interests in any other companies at all between 2003 and 2013: [159]

> Q: Any other companies that you presently own any--.
>
> A: No.
>
> Q: --interest in?
>
> A: No.
>
> Q: From the period commencing with the date of your grandfather's death until today, other than BWT, are there any entities that you held an interest in?
>
> A: You mean from 2003 until now?
>
> Q: Correct.

---

[155] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 97:14-98:23).

[156] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 97:14-98:23).

[157] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 242:8-21).

[158] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 97:14-98:23).

[159] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 97:14-98:23).

A: No.

74.     Unbeknownst to the PA or Yien-Koo at the time of that 2013 Deposition, Andrew had used an off-shore company called "<u>Le Tao Limited</u>" to sign a $5,900,000.00 Residential Contract of Sale to purchase a mansion on Long Island less than 8 months earlier:[160]

| CONTRACT OF SALE made as of | April 30, 2013 | between |
|---|---|---|
| **Fortuna Valentino**<br>Address: **117 Old House Lane, Sands Point, New York 11050** | | |
| Social Security Number/Fed. I. D. No(s): ▮▮▮▮**2023** | | hereinafter called "Seller" and |
| **Le Tao Limited**<br>Address: **Unit 704 Four Seas Building 208-2012, Nathan Road KLN, Hong Kong** | | |
| Social Security Number/Fed. I. D. No(s): | | hereinafter called "Purchaser." |

75.     The 2013 Residential Contract of Sale, executed by Andrew, was eventually amended to list the "Shou-Kung Wang Irrevocable Trust" as the purchaser.[161]

76.     Andrew also used his other company "<u>Le Style Limited</u>" to transfer the purchase price to the Estate in relation to completing the Estate's sale to "Yue Da Jin" in August 2009.[162]

77.     Andrew did not disclose Le Style Limited at his 2013 Deposition either. [163]

---

[160] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 130:17-131:21; 251:3:21-257:12, 258:16-259:264:15); Savitsky Decl. <u>Exh. 25</u> (Exhibits AW-20 and AW-21 from 6/25/2019 AW Dep. comprising Residential Contract of Sale dated April 30, 2013 and Amendment).

[161] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 223:8-228:20 (AW testifying that the SK Wang Irrevocable Trust received the property Le Tao Limited purchased on April 30, 2013); Savitsky Decl. <u>Exh. 25</u> (Exhibit AW-21 from 6/25/2019 AW Dep. comprising Amendment to Residential Contract of Sale).

[162] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 308:3-309:22); Savitsky Decl. <u>Exh. 25</u> (Exhibit AW-30 from 6/25/2019 AW Dep. Trans. comprising the Estate's account statement for August 2009; WANG001673).

[163] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 97:14-98:23).

78.    Andrew testified during his 2019 Deposition that he did not keep any financial or transactional records between Le Style Limited and "Yue Da Jin."[164] It is undisputed that no transactional records between Le Style Limited (his company in 2009) and a person named "Yue Da jin" exist in the Record.[165]

### C.  *Overview of the Shipping Process for the Private Sales*

79.    Upon receipt of payment for each of the six sales, the Co-fiduciaries, in accordance with the terms of the six contracts, arranged for the international shipping of the 98 purchased paintings from the Crozier Fine Arts storage facility in Newark, New Jersey[166] to the same single office address in Hong Kong:

*c/o* "Billie Wae"
Unit #704, Forseas Building,
#208-212 Nathan Road, Kowloon, Hong Kong[167]

80.    At the time of the sales, Andrew represented to his attorney, Klein, via email that "China would collect custom tax" if the paintings were shipped directly to the buyers' listed addresses in Beijing and Shanghai.[168] Andrew represented that, therefore, the buyers asked him to ship the paintings to Hong Kong.[169] Andrew directed Martin Klein to "use the same address in HK," to ship the paintings and that the buyers would then collect the paintings from there.[170]

---

[164] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 245:20-246:22).

[165] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 245:20-246:22).

[166] Savitsky Decl. Exh. 26 (February 11, 2005 email by Andrew regarding shipping); Savitsky Decl. Exh. 27 (February 17, 2005 shipping slip for "Mr. Wei Zheng"; WANG001193).

[167] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 254:16-255:8).

[168] Savitsky Decl. Exh. 28 (WANG002108-2111).

[169] Savitsky Decl. Exh. 28 (WANG002108-2111).

[170] Savitsky Decl. Exh. 28 (WANG002108-2111).

81.     During his <u>2013 Deposition</u>, Andrew was asked questions about the Estate's use of Unit 704 as the shipping address for all 98 Paintings. [171] He answered by providing additional explanation about the "service" which Unit 704 supposedly offered.[172]

82.     Under oath to tell the whole truth, Andrew testified that Unit 704 was just "a business office, that you can let  [] receive fax, mails and also, you know . . . [y]ou just use the office to receive your mail, to receive packages and you pay for their service."[173]

83.     According to Andrew, "the office received the package and they would make arrangement for the receipt of the buyer."[174]

84.     In 2013, when asked if Andrew knew Billie Wai, Andrew simply said "That's a person that she is receiving the artworks." [175] And when then asked if he knew "Billie Wai, from [] before this series of transactions," Andrew responded "I contact that person for that shipment. You know, I just---that is the time I contacted with."[176]

85.     But Andrew gave a contradicting description of Unit 704 during his <u>2019 Deposition</u> in this RICO action. He testified that Unit 704 office is actually an accountant's office in Hong Kong.[177] *His* accountant's office. [178]

86.     And Billie Wai, Andrew divulged in 2019, is his accountant.[179]

---

[171] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 943:19-944:13).

[172] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 943:19-945:21).

[173] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 943:19-945:21).

[174] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 943:19-946:19).

[175] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 945:6-946:12).

[176] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 945:6-946:12).

[177] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 254:16-256:18; 311:13-19).

[178] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 128: 7-17; 311:13-19).

[179] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 311:13-19) ("And I even went to the bank to look for it, and including my accountant Billie Wai's office").

87.     Though it does not appear on any of the contracts of sale signed by the Estate, the name of Andrew's accounting firm in Hong Kong is "CK Lam."[180]

88.     Andrew never disclosed to Klein or Schram that Unit 704 in Hong Kong— where all 98 Paintings had been shipped— belonged to his accountant."[181]

89.     But Andrew did recall that CK Lam has been his accountant for "[m]any years . . . In fact, my grandfather used them from the 1990s . . . It has been a family friend for a long time, CK Lam. And we form the companies there. We close the company there. I just get it connected with my grandfather, so introduction."[182]

90.     It is therefore undisputed in this self-dealing action that Andrew (a) paid for the 98 Paintings using an overseas account(s) and then (b) shipped the 98 Paintings to his own accountant's office in Hong Kong—all without his Co-fiduciary's knowledge or consent.

91.     Andrew has not produced any documentary evidence or third-party testimony that any of the five purported buyers sourced these funds paid by his company to the Estate or ultimately received any of the 98 Paintings after they were delivered to Andrew's accountant.[183]

92.     In fact, Andrew has not produced a single email or other written communication with any of the purported five buyers[184] whom he claims (a) were

---

[180] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 128: 7-17; 254:16-256:18; 311:13-19).

[181] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 256:13-18) (Andrew does not remember telling Klein or Schram that Unit 704 "belongs to my accountant"); Savitsky Decl. Exh. 12 (Schram Dep. at 85:12-86:7); Savitsky Decl. Exh. 21 (Klein Dep. Trans. at 168:21-169:8).

[182] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 128:4-17).

[183] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 245:16-246:22).

[184] Savitsky Decl. at ¶7.

"always ask[ing] a favor to use my company" to pay the Estate over $4 million and (b) he allowed to use his accountant's office for shipping receipts.[185]

### D. *Overview of Andrew's Contradicting Testimonies Regarding the Process of Locating and Communicating with the Five Purported Buyers of Estate Assets.*

93.     At his 2013 Deposition, Andrew was asked questions about how he located the five purported buyers of Estate paintings and whether he knew them. Andrew testified, under oath to tell the whole truth, that in 2005 "we were trying to find buyers, and I contact the people in China and Asia."[186] He further testified that the buyers "could be friends, in terms of friends, it could be friend's friends, it's like through connections."[187]

94.     Andrew testified that some of the buyers of the 98 Paintings were his friends and that he knows "[m]ost buyers" in the market.[188]

95.     Andrew was asked if he knew Mr. Yong Qing Ye, a purported buyer of Estate paintings.[189] Andrew answered that he "kn[e]w him in person, yes" and that Mr. Ye is "a friend of mine" from Shanghai.[190] Andrew further testified that he has known Mr. Yong Qing Ye "[s]ince 1990."[191]

96.     Andrew testified that he knew Mr. Yue Da-Jin, a purported buyer of Estate paintings, "[t]hrough a friend in China."[192] When next asked "[w]hat's the name of the

---

[185] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2).

[186] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 942:16-943:11).

[187] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 707:9-21).

[188] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 545:5-13; 707:9-21).

[189] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 956:19-957:9).

[190] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 956:22-957:9).

[191] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 957:3-5).

[192] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 953:12-954:6).

friend?" Andrew testified "I remember his last name is Xu. Mr. Xu, but I don't remember. But, you know, we were just in the same circle at that time."[193]

97.    When asked if he knew <u>Mr. Anthony Chou</u>, Andrew responded "[y]es, I know him."[194] Andrew represented that he knew Mr. Chou "either from Beijing or from Shanghai" and that "he [Chou] has a few places."[195] When asked in what "context" Andrew knew Mr. Chou, he answered "he is just another buyer doing business buying and selling artworks." [196] But Andrew testified that Mr. Chou "usually buy [] from a different auction house."[197]

98.    When asked if he knew <u>Mr. Chen Mei-Lin</u>, Andrew testified "[y]es . . . I know him, he is a collector in China, southern part of [] China." [198]  When Andrew was asked if he had ever done business with Mr. Chen Mei-Lin before, he responded "[n]o. This is only—you know he has a lot of money at that time. He was in the car business, selling imported foreign cars. And so before he [became] involved in the art, artwork investment, but now he [is] no longer in the field, I believe."[199]

99.    Notwithstanding the fact that Andrew said he knew all of these purported purchasers at his 2013 Deposition, Andrew gave contradicting testimony in 2019. At his 2019 Deposition in this action, Andrew testified that he could not find any purchasers on his own and it was the PA who referred him to a man who, she explained to Andrew,

---

[193] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 953:12-954:6).

[194] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 948:9-949:2).

[195] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 948:13-19).

[196] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 948:18-949:2).

[197] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 948:18-949:2).

[198] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 961:12-13).

[199] Savitsky Decl. <u>Exh. 24</u> (2013 AW Dep. Trans. at 961:12-24).

was "the son of a very well-known artist in China" that could help the Estate find purchasers for its artwork.[200]

100.    In his interrogatory responses in this action in 2018 and at the 2019 Deposition, Andrew testified that based on the PA's reference, <u>Mr. Er Shi Fu</u>, ultimately became "the intermediary who arranged the purchases and had the direct contact with the buyers."[201]

101.    Andrew's 2019 Deposition testimony was that he met with Mr. Fu and gave him "all the information" that Mr. Fu needed to set up sales for the Estate.[202] Andrew testified that he communicated with Mr. Fu "[b]y telephone calls" and sent Mr. Fu a copy of the 2004 Sotheby's Appraisal. [203]

102.    Andrew has not produced any emails or other communications with Mr. Fu and testified that Mr. Fu did not have an email account.[204]

103.    Schram, counsel for the PA at the time of the sales, never heard of a person named Er Shi Fu from the PA or anyone else at any point between 2003 and 2009.[205]

104.    As legal counsel to the PA, Ethel Griffin, between 2005 and 2009, Schram testified that "in my opinion the chances of that testimony" regarding the PA's suggestion of a Chinese intermediary named Er Shi Fu "being true is somewhere between zero and nil."[206]

---

[200] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 76:9-79:9).

[201] Savitsky Decl. <u>Exh. 25</u> (6/25/2019 AW Dep. Exhibit AW-1 at 4); Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 106:17-107:25).

[202] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 94:3-15).

[203] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 86:16-25; 92:11-21).

[204] Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 86:16-25).

[205] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 58:8-14; 104:12-106:23).

[206] Savitsky Decl. <u>Exh. 12</u> (Schram Dep. Trans. at 105:17-106:9).

105.    Because of Mr. Fu's claimed role in finding buyers, Andrew testified that he never communicated or emailed directly with the five purported buyers.[207] Instead, he claimed the process by which the Estate paintings were sold to private buyers was "just like selling a house here in this country. You only deal with the agent. You don't deal with the buyer directly."[208]

106.    Andrew further explained that all communications between himself and the buyers came through Mr. Fu because he was "not supposed to deal directly with buyers because I was the agent or the middleman involved."[209]

107.    When asked if it was true that he "didn't meet any of [the buyers] before Er Shi Fu set [Andrew] up with them" Andrew testified "Correct."[210]

108.    And when asked if he had "any other relationship with these five buyers other than through Er Shi Fu," Andrew testified "No."[211]

109.    Andrew testified that the information about the buyers' addresses was provided to him by Mr. Fu and Andrew was therefore "not in the position to ask [for] detailed addresses."[212]

110.    Yet back at Andrew's 2013 Deposition, he testified that Yong Qing Ye was Andrew's "friend" from Shanghai since 1990.[213] And he claimed he was connected to Mr. Yue Da Jin through Andrew's other friend called "Mr. Xu"—not a middle-man selected by the PA.[214] Mr. Anthony Chou was supposedly known by Andrew "either from Beijing

---

[207] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 93:12-93:18).

[208] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 93:12-93:18).

[209] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 109:11-15; 106:17-22).

[210] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 94:16-21).

[211] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 122:16-19).

[212] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 106:17-22).

[213] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 957:3-5).

[214] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 953:12-954:6).

or Shanghai" but Andrew was unsure which because he claimed to know that Mr. Chou "has a few places."[215] It was also Andrew's testimony in 2013 that Mr. Chen Mei-Lin was supposedly "in [the] car business selling imported foreign cars."[216] Andrew explained in 2013 that Mr. Chen "you know he ha[d] a lot of money at that time," but that he is no longer in the field.[217]

111.    The Wang Defendants have produced more than 80,000 bates-stamped pages of documents in this case, including certain of Andrew's emails dating back to October 2004.[218]

112.    Other than the signed sale documentation itself, the Wang Defendants have not produced any emails, letters, or other communications with any of the purported purchasers of Estate paintings (*e.g.*, Wei Zheng, Chen Mei Lin, Anthony Chou, Yue Da Jin, or Yong Qing Ye).[219] It is undisputed that no such records exist.

113.    The Wang Defendants have not produced any emails, letters, or other communications with Er Shi Fu. It is undisputed that no such records exist or ever existed.

114.    There is no reference to any person named "Er Shi Fu" or "Mr. Fu" on any document in the Record created prior to September 7, 2018, which is the date of Andrew's original response to Yien-Koo King's First Set of Interrogatories in this action.[220]

---

[215] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 948:13-19).

[216] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 948:13-19).

[217] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 948:13-19).

[218] Savitsky Decl. at ¶6; Savitsky Decl. Exh. 19 (October 2004 email by Andrew).

[219] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 95:3-22); Savitsky Decl. at ¶7.

[220] Savitsky Decl. Exh. 25 (6/25/2019 AW Dep. Exhibit AW- 1 at 4); Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 106:17-107:25).

115.     Though Andrew testified in 2019 that the buyers were "always ask[ing for] a favor to use my company" to wire money to the Estate on their behalf, he has produced no records or communications evidencing this arrangement.[221]

116.     And though Andrew testified in 2019 that had the buyers pick up their paintings from Andrew's accountant's office in Hong Kong, there are no communications or emails in the Record evidencing this arrangement either.[222]

117.     Nor are their any email or other communications in the Record between Andrew and his accountant, Billie Wai.[223]

118.     As a result of the purported use of someone named "Mr. Er Shi Fu" and the PA's hiring of OTE to review the sales proposals, Andrew testified in 2019 that he did not play any role "at all" in determining prices or negotiating for higher prices with the five purported buyers:[224]

> Q: Did the information you gave [Klein] include the proposed sales prices for the paintings?
>
> A: We didn't talk about the prices because we have auction house appraisal book. And I said there were buyers who are interested to buy those pieces. And I give to Marty Klein how many pieces the buyer wants to buy or are interested, and he would prepare the contract with [Schram] and [Ewald]. Regarding [] the prices, [Ewald] and the art consultant would evaluate and finalize the final sale values. So I had no control over that.

* * * * *

---

[221] Savitsky Decl. at ¶7; Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2).

[222] Savitsky Decl. at ¶¶7-8.

[223] Savitsky Decl. at ¶8.

[224] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 89:25-95:22) (AW testifying he did not forward the prices of Estate paintings to the PA); 75:9-76:13.

Q: But [in] your calls with Er Shi Fu, [] he gave you the names of the paintings the buyer was looking for and the prices?

A: No, he just gave me the name of the buyers and also the number of the paintings. You know, we have the --- on the appraisal book, each painting has a number. So I just copy down the number and tell [Klein] to prepare the list of paintings for potential sale.

Q: Who decided what the prices would be?

A: The PA and her art consultant.

Q: Did you have any role in that?

A: Not at all.

119.    Therefore, it cannot be genuinely disputed that Andrew played no role in negotiating with any of the five purported buyers for higher sale prices for any of the 98 Paintings. [225]

**E.    *Other Contradictory Statements by Andrew and Shou-Kung Wang Regarding Andrew's Relationship with the Buyers.***

120.    In 2013, one of the beneficiaries of the Estate of Chi-Chuan Wang, Dr. James E. Tcheng, filed a petition (the "Removal Petition") in the Surrogate's Court seeking Andrew's removal as preliminary executor of the Estate.[226] The Removal Petition alleged that Andrew had, among other things, sold the 98 Paintings to himself.[227]

121.    At paragraph 115 of the Removal Petition, Dr. Tcheng alleged that Andrew's self-dealing was evidenced, in part, by the fact that one of the Estate's six private-sale contracts listed Andrew's *own* Shanghai apartment address—#777 Lane,

---

[225] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 90:25-93:11) (AW testifying he did not forward the prices of Estate paintings to the PA).

[226] Savitsky Decl. Exh. 29 (Verified Petition of James E. Tcheng dated May 12, 2014 ("Tcheng Petition")).

[227] Savitsky Decl. Exh. 29 (Tcheng Petition).

Building No. 1, Apt. 328A, 200041 Shanghai—as the sale contract's designated residential address for the purported buyer. [228]

122.    The "buyer" who was, according to the executed sales contract, supposedly residing in Andrew's Shanghai apartment at the time of the $1.393 million sale, was "Mr. Chen Mei-Lin."[229]

123.    In response to the allegation in Dr. Tcheng's Removal Petition, Andrew's father, SK, signed and filed a verified answer ("SK's Verified Answer") to the Removal Petition "[a]dmit[ting] that one of the addresses to which Estate paintings were shipped was [Andrew's] own address."[230]

124.    SK further attested that this use of Andrew's own overseas address in the Estate's contract of sale with Chen Mei Lin was done by Andrew "as an accommodation to the buyer."[231]

125.    Similarly, Andrew testified in 2019 that his hitherto undisclosed companies were used to wire the purchase prices to the Estate just as "a favor" to the buyers.[232]

126.    Notwithstanding these sworn statements, Andrew also gave testimony in in 2019 that he had no pre-existing relationships[233] or direct communications with any of the five buyers.[234] Andrew's 2019 testimony is that the process was "just like selling a

---

[228] Savitsky Decl. Exh. 29 (Tcheng Petition).

[229] Savitsky Decl. Exh. 29 (Tcheng Petition).

[230] Savitsky Decl. Exh. 30 at ¶¶113-115 (SK Verified Answer to Tcheng Petition, sworn to on August 28, 2014).

[231] Savitsky Decl. Exh. 30 at ¶¶113-115 (SK Verified Answer Tcheng Petition, sworn to on August 28, 2014).

[232] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2).

[233] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 122:16-19).

[234] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 122:16-19).

house here in this country. You only deal with the agent [Mr. Fu]. You don't deal with the buyer directly." [235]

127.     At paragraph 119 of SK's Verified Answer to the Removal Petition, SK "admit[ted] that [Andrew] had friendships with some of the buyers and that AW testified 'Yes' in answer to the question 'So some of the buyers were friends; right?.'"[236]

128.     Despite SK's sworn admission, neither Andrew nor SK ever disclosed at the time of the sale that the address listed in the Co-fiduciaries $1.4 million contract with Chen Mei Lin was actually the address of Andrew's own apartment in Shanghai.[237]

129.     Carolyn Shields, Esq. was Andrew's former attorney who represented him with respect to Dr. Tcheng's Removal Petition.[238]

130.     On November 19, 2014, Shields transmitted an email to counsel for the PA and counsel for Yien-Koo, setting out Andrew's position with respect to certain aspects of the Estate's sales of the 98 Paintings.[239]

131.     One issue clarified in Shields' email was Andrew's position "with respect to Andrew's address appearing on the first page of the agreement with Mr. Chen [Mei-Lin]."[240]

132.     Shields represented that "Andrew Wang's address appears in the agreement [as Mr. Chen Mei-Lin's residential address] because the buyer [who Andrew

---

[235] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 93:12-93:18).

[236] Savitsky Decl. Exh. 30 at ¶119 (SK Verified Answer Tcheng Petition, sworn to on August 28, 2014).

[237] Savitsky Decl. Exh. 2 at ¶¶163, 166 (Defendants' Answer to Amended Complaint).

[238] Savitsky Decl. Exh. 30 (SK Verified Answer Tcheng Petition, sworn to on August 28, 2014).

[239] Savitsky Decl. Exh. 31 (November 19, 2014 email of Carolyn Shields).

[240] Savitsky Decl. Exh. 31 (November 19, 2014 email of Carolyn Shields).

elsewhere testified to not even knowing] was temporarily staying in Andrew's home while his own home was being renovated."[241]

133.    The Wang Defendants have not produced any records of communications between themselves and Mr. Chen Mei Lin.[242]

134.    Ms. Shields' November 19, 2014 email makes no mention of Mr. Er Shi Fu or any intermediary, middle-man or agent facilitating communications between Andrew and Chen Mei-Lin.[243]

**IV.    2004-2009: Undisputed Facts Concerning Predicate Activity Occurring Through Six Private Sales of Estate Paintings to the Wang Defendants.**

**A.    *December 6, 2004 - January 6, 2004: The Aborted Sale of Estate Chinese Paintings to a Person Allegedly Named "Mrs. Zhang," then "Mrs. Raymond Qu."***

135.    In October 2004, Andrew emailed Klein representing that he "would like to pay more taxes, as much as we can to avoid interest . . . Please tell the PA that I will raise enough cash to cover all legal exp[e]nses upon my return in mid-November."[244]

136.    On December 6, 2004, Andrew sent an email to Klein that he "might bring one or two clients" to the Crozier Fine Arts ("Crozier") storage facility housing the Estate's assets "for the review of possible sales."[245]

137.    Klein requested that if Andrew's client was interested in purchasing artwork, he would need the person's name, address, and whether they were affiliated

---

[241] Savitsky Decl. Exh. 31 (November 19, 2014 email of Carolyn Shields).

[242] Savitsky Decl. ¶7.

[243] Savitsky Decl. Exh. 31 (November 19, 2014 email of Carolyn Shields).

[244] Savitsky Decl. Exh. 19 (WANG001878-1879).

[245] Savitsky Decl. Exh. 20 (WANG001888).

with a gallery or corporation.[246] He would also need the identity of the paintings they wished to buy and at what prices.[247]

138.    Andrew explained that "[b]oth persons I know are private buyers, no gallery or companies are involved."[248]

139.    One week later, Andrew transmitted a proposal to Klein, stating that he "worked several days with my TWO clients who are willing to make some purchases."[249] He represented that he could not "convince [the buyers] to add 20% to every painting[] as some appraisal values are high enough" and asked Klein to discuss this issue with the PA's attorney, Schram.[250]

140.    Andrew attached to his email sale proposals for thirty (30) of the Estate's paintings at prices ranging from 5% higher than the Sotheby's appraisal ("Sotheby's Appraisal") value at the minimum to 20% higher at the maximum. The Sotheby's Appraisal valued the paintings as of the date of C.C. Wang's death, July 3, 2003.[251]

141.    Klein responded by explaining that the PA was "concerned" that private sales would not yield "the best price for the Estate" and "that is why she felt that a sales price of AT LEAST 20% above Sotheby's appraised value" would provide a "necessary level of comfort that she needed to defend a challenge that the Estate did not receive the best price for the art."[252] Klein advised Andrew that "[t]his should also be a concern for you in case any beneficiary later complains that the sale price was too low."[253] Finally,

---

[246] Savitsky Decl. Exh. 20 (WANG001888).

[247] Savitsky Decl. Exh. 20 (WANG001888).

[248] Savitsky Decl. Exh. 20 (WANG001888).

[249] Savitsky Decl. Exh. 32 (WANG001890).

[250] Savitsky Decl. Exh. 32 (WANG001890).

[251] PA Decl. Exh. 19 (2004 Sotheby's Appraisal).

[252] Savitsky Decl. Exh. 32 (WANG001890).

[253] Savitsky Decl. Exh. 32 (WANG001890).

Klein suggested that Andrew try to secure an explanation "in writing" from his "client" for any painting for which he/she was not willing to pay at least 20% more than the Sotheby's appraised value.[254] Andrew responded "OK." [255]

142.    Andrew never forwarded any "in writing" explanation from any client to Klein or the PA. [256] Instead, on December 20, 2004, he emailed Klein that he "ha[d] made some adjustment for the possible sales" and attached a list of 42 Estate paintings with new mark-ups above the Sotheby's Appraisal values. [257]

143.    This time, the proposed mark-ups ranged from 10% to 25%.[258] Andrew claimed "I need a quick approval from the PA so I can move on with other sales." [259] But Andrew had still not disclosed the name of any potential "client" to Klein or the PA.[260]

144.    Klein soon responded that the "PA will not approve sales until we have presented all of the information, which includes the name of the purchaser and their address."[261]

145.    Andrew responded that he would "try to get you their address and contact tel# by tomorrow. I believe that each buyer will bu[y] at least 10 pieces."[262] Andrew then warned that if the buyers "are not willing to pay more than 10%, then I have to drop the

---

[254] Savitsky Decl. Exh. 32 (WANG001890).

[255] Savitsky Decl. Exh. 32 (WANG001890).

[256] Savitsky Decl. Exh. 33 (WANG001896-WANG001898).

[257] Savitsky Decl. Exh. 33 (WANG001896-WANG001898).

[258] Savitsky Decl. Exh. 33 (WANG001896-WANG001898).

[259] Savitsky Decl. Exh. 33 (WANG001896-WANG001898).

[260] Savitsky Decl. Exh. 33 (WANG001896-WANG001898).

[261] Savitsky Decl. Exh. 34 (WANG001894).

[262] Savitsky Decl. Exh. 34 (WANG001894).

sale." But he asked Klein to try and tell the PA that the Sotheby's "appraisal values are high enough."[263]

146.    Andrew then disclosed the purported name of a potential buyer: "<u>Mrs. Zhang</u>." [264] He represented that "Mrs. Zhang will definitely make purchases, and she will give me a final list soon."[265] Andrew then asked Klein if it was possible "if she can get [a] discount for buying more paintings" and suggested that Klein "should discuss it with [Schram] today."[266] Andrew claimed that "about [a] 10% discount" is "usually give[n]" when someone buys more artworks.[267]

147.    Two days later, on December 22nd, Andrew emailed Klein a list of seventeen (17) Estate paintings for "<u>Mrs. Raymond Qu</u>" with an address at 8447 118th St., Apartment 2C, Kew Gardens, Queens, New York ("Apartment 2C").[268]

148.    Apartment 2C is a one bed, one bath apartment in a six-story, red-brick apartment building.[269] It had a rental listing of $1,875 per month as of December 2015.[270]

149.    The total sale price for the seventeen (17) classical Chinese paintings proposed to be sold to Mrs. Raymond Qu was $1,297,200.00.[271]

---

[263] Savitsky Decl. <u>Exh. 34</u> (WANG001894).

[264] Savitsky Decl. <u>Exh. 34</u> (WANG001894).

[265] Savitsky Decl. <u>Exh. 34</u> (WANG001894).

[266] Savitsky Decl. <u>Exh. 34</u> (WANG001894).

[267] Savitsky Decl. <u>Exh. 34</u> (WANG001894).

[268] Savitsky Decl. <u>Exh. 35</u> (WANG001904-1906).

[269] Savitsky Decl. <u>Exh. 77</u> (Apartment 2C listing taken from Zillow.com).

[270] Savitsky Decl. <u>Exh. 77</u> (Apartment 2C listing taken from Zillow.com).

[271] Savitsky Decl. <u>Exh. 35</u> (WANG001906).

150.    Andrew told Klein he wanted to know if the PA agreed with the sale "as soon as possible because it's close to the holidays and [Mrs. Qu] might leave the city." [272]

151.    By January 6, 2005, a sale of paintings to Mrs. Qu had been approved by the PA.[273] Klein emailed Andrew that the PA would be collecting sales tax unless the buyer filled out a New York State Form ST-120 sales tax resale certificate.[274]

152.    Klein's email regarding the "sales tax resale certificate" is the last written communication between Andrew and Klein made in relation to the proposed sale to Mrs. Raymond Qu.[275]

153.    The proposed sale of paintings to Mrs. Raymond Qu never occurred.[276]

**B.    January 10, 2005 – February 16, 2005: The Estate's First, Completed Private Sale of Paintings to "Mr. Wei Zheng."**

*i.    Documentary Record of the Estate's Sale to "Mr. Wei Zheng"*

154.    On January 10th—four days after Klein's last email regarding "Mrs. Qu's" potential purchase—Andrew emailed Klein a proposed list of 18 paintings to be sold to "Mr. Wei Zheng" at an address of 97-37 63rd Road, Apt #2F, Rego Park, New York 11374 ("Apartment 2F").[277]

155.    The total proposed sale price for the 18 paintings was $401,730.00.[278]

---

[272] Savitsky Decl. Exh. 35 (WANG001904).

[273] Savitsky Decl. Exh. 36 (WANG001928).

[274] Savitsky Decl. Exh. 36 (WANG001927-28).

[275] Savitsky Decl. at ¶13.

[276] PA Decl. at ¶50.

[277] Savitsky Decl. Exh. 37 (WANG001929-1932); Savitsky Decl. Exh. 38 (WANG003437).

[278] Savitsky Decl. Exh. 37 (WANG001932).

156.     Thirty minutes later, Andrew emailed a draft contract to Klein asking him to "double check it."[279] The draft contract defines "Mr. Wei Zheng" of Apartment 2F as "the 'Buyer'" and refers to him as the Buyer throughout the draft agreement.[280]

157.     Two weeks later, Andrew emailed and faxed a proposed list of paintings to be sold to Mr. Wei Zheng to Ms. Elin Ewald ("Ewald") of OTE (O'Toole-Ewald Art Associates), the appraisal firm which had previously catalogued the Estate's paintings and taken photographs of them between 2003 and 2004.[281]

158.     Andrew sent the listing of paintings to OTE, as it had been hired by the PA to review the appropriateness of Estate's private sales.[282]

159.     Andrew's fax and email to Ewald identified "Mr. Wei Zheng" as the potential purchaser of 17 paintings for a total price of $395,730.00 (exclusive of tax and shipping).[283]

160.     On January 27, 2005, Klein faxed Schram the list of 17 paintings which, Klein stated, "Andrew [had] received offers to purchase from Mr. Zheng."[284]

161.     The next week, on February 4, 2005, Andrew emailed Klein asking about the status of the PA's approval of the sale of paintings to Wei Zheng.[285] He then wrote "I will let my client sign the agreement as soon as I hear from you. My client will also sign

---

[279] Savitsky Decl. Exh. 39 (WANG001938).

[280] Savitsky Decl. Exh. 39 (WANG001938-1946).

[281] Savitsky Decl. Exh. 40 (WANG001949-1954).

[282] PA Decl. at ¶51.

[283] Savitsky Decl. Exh. 40 (WANG001952-1954).

[284] PA Decl. Exh. 5.

[285] Savitsky Decl. Exh. 41 (WANG001965).

the document which states that all artworks will either be shipped or hand-carried to [a] foreign country, not for resale in the U.S."[286]

162.   On February 7, 2005, Andrew sent an email to Klein stating that the paintings being purchased by Mr. Wei Zheng, who lived in Apartment 2F in Queens, needed to be shipped to Unit 704 at the Fourseas building in Hong Kong:[287]

| 寄件者: | Andrew Wang (jingguanlou_wang@yahoo.com) |
| --- | --- |
| 收件者: | martykl@kamso.com |
| 日期: | 2005年2月7日 星期一 上午11:08 [EST] |

Marty,
Here is the information for the shipment.

To: Mr. Wei Zheng
     c/o Ms. Billie Wai
     Unit #704, Forseas Building,
     #208-212,  Nathan Road,
     Kowloon,  Hong Kong
     Tel: 2866-2203
Please let me know if you need more information for the agreement. I 'll ask the buyer to make the payment as soon as the PA signs the agreement. Thanks
Andrew

163.   Andrew did not disclose to Klein that Unit 704 was Andrew's accountant's office.[288]

164.   Klein responded that he also "need[ed] wire information for the BUYER" to place into the escrow agreement:[289]

---

[286] Savitsky Decl. Exh. 41 (WANG001965).

[287] Savitsky Decl. Exh. 42 (WANG003449).

[288] Savitsky Decl. Exh. 42 (WANG003449); Savitsky Decl. Exh. 21 (Klein Dep. Trans. at 168:21-169:8).

[289] Savitsky Decl. Exh. 42 (WANG003449).

<table>
<tr><td>寄件者：</td><td>Martin Klein (martykl@kamso.com)</td></tr>
<tr><td>收件者：</td><td>jingguanlou_wang@yahoo.com</td></tr>
<tr><td>日期：</td><td>2005年2月7日 星期一 下午12:30 [EST]</td></tr>
</table>

Andrew, I need the wire information for the BUYER.  The escrow agreement provides that the Buyer can get their money back if the sale does not take palce in a certain amount of days.  Brown Raysmand needs to have the wire information for the Buyer inserted into the escrow agreement.  Thanks.  Marty

165.    Andrew promised to get the buyer's wire information "within the next two days."[290] He also re-asserted that he needed "to get [the] PA's signature as early as possible so I can arrange for the payment."[291]

166.    On February 9, 2005, Klein emailed Andrew final drafts of (1) the contract of sale ("Zheng Contract"); (2) escrow agreement ("Zheng Escrow Agreement"); (3) an export certificate ("Zheng Export Certificate"); and (4) a bill of sale ("Zheng Bill of Sale").[292] Each of the four documents listed "Mr. Wei Zheng" as the "Buyer" or "Purchaser" and the Estate of Chi-Chuan Wang as the "Seller" of the paintings, at a price of $395,730.00 (exclusive of tax and shipping fees).[293]

167.    Klein explained that "Mr. Zheng has to sign the escrow agreement, contract of sale and [export] certification before he wires money into the escrow account."[294]

168.    Klein ended his email by asking Andrew when "Mr. Zheng will be wiring the money", so that the escrow agent for the sale (Brown Raysman) would know when to expect its receipt.[295]

---

[290] Savitsky Decl. Exh. 42 (WANG003449).

[291] Savitsky Decl. Exh. 42 (WANG003449).

[292] Savitsky Decl. Exh. 43 (WANG001988-2003).

[293] Savitsky Decl. Exh. 43 (WANG001988-2003).

[294] Savitsky Decl. Exh. 43 (WANG001988).

[295] Savitsky Decl. Exh. 43 (WANG001988).

169.     Andrew responded to Klein's question about Mr. Zheng's payment several hours later stating: "[p]lease let me know as soon as the PA sign[s] the contract, I will let the buyer make the payment."[296]

170.     Within the next 24 hours, Klein notified Andrew that "Ethel [the PA] signed the [sales] agreement and escrow agreement."[297] But Klein explained that the escrow agent, Brown Raysman, "need[s] the buyer's wire instructions to insert in the contract in case the buyer elects to cancel the sale because the art is not shipped in time. As soon as you give me the buyer's wire instructions, I will get the agreement back from Brown Raysman."[298]

171.     On February 10, 2005, Andrew wrote to Klein: "The buyer has already signed all the last pages for me. He will give me his bank information by tomorrow morning."[299]

172.     In referring to "[t]he buyer" in his February 10, 2005 email to Klein, Andrew was referring to "Mr. Wei Zheng." [300] And in referring to the buyer's "bank information," Andrew was referring to Mr. Wei Zheng's bank information.[301]

---

[296] Savitsky Decl. Exh. 44 (WANG002004).

[297] Savitsky Decl. Exh. 45 (WANG003441).

[298] Savitsky Decl. Exh. 45 (WANG003440-3441).

[299] Savitsky Decl. Exh. 45 (WANG003440-3441).

[300] Savitsky Decl. Exh. 45 (WANG003440).

[301] Savitsky Decl. Exh. 45 (WANG003440).

173.   On February 11, 2005, Andrew supplied Klein with the requested wire information for the buyer identified in escrow agreement, "Mr. Wei Zheng":[302]

```
> >. At 12:05 PM 2/11/2005 -0800, you wrote:
> > >Marty,
> > >Here is the information: CITIBANK, N.A.
> > > 95-12 63RD ROAD, REGO PARK, NY
> > > 11374-0000
> > > Routing/Transit# 021000089
> > >
> > > For: Mr. Wei Zheng
> > > Account# 15873277
> > > Address is same.
> > >I am waiting for final confirmation from Crozier for total cost. I have
> > >already asked the buyer to wire $400,500.00 to the escrow account, the

> > >shipping may be less because there is no need for a crate. I believe that
> > >we can always make adjustment for the expanses at the end.
> > >Andrew
```

174.   In representing to Klein that "I have already asked the buyer to wire $400,500.00 to the escrow account," in Andrew's February 11, 2004 email, Andrew was referring to "Mr. Wei Zheng" as the buyer. [303]

175.   On February 14, 2005, Klein notified Andrew that the PA had signed the original bill of sale and suggested "you [Andrew] and Mr. Zheng should sign and then photocopy" the bill of sale.[304]

176.   Later that same day, Andrew wrote "I know the [m]oney should be at [Brown Raysman] by tomorrow (Tuesday), you can remind them to inform you as soon as [Brown Raysman] receive[s] the fund, so we can ask Crozier for the shipment afterwards."[305]

---

[302] Savitsky Decl. Exh. 45 (WANG003440).

[303] Savitsky Decl. Exh. 45 (WANG003440).

[304] Savitsky Decl. Exh. 45 (WANG003440).

[305] Savitsky Decl. Exh. 45 (WANG003440).

177.     Within the next two days, Andrew sent a copy of a bill of sale signed by him and Wei Zheng, dated February 16, 2005, to Martin Klein.[306]

178.     The Estate's records show that on February 16, 2005, Brown Raysman, as escrow agent, wired the $400,480.00 purchase price (which included shipping fees) under the Estate's contract of sale with "Mr. Wei Zheng" to the Estate's bank account.[307]

179.     Brown Raysman merged into a different law firm in 2006, which then ceased operating in 2008 or 2009.[308] No wire or other records exist in the Record which demonstrate from what source account Brown Raysman received the funds which it wired to the Estate on February 16, 2005.[309]

180.     Though the PA was unaware of it at the time of the sale, the $400,480.00 purchase price had been transferred to Brown Raysman by Andrew's, her Co-fiduciary's, offshore corporate account.[310]

181.     The Estate's duly executed contract of sale with Wei Zheng directs that the 17 paintings sold by the Estate be shipped overseas to "Mr. Wei Zheng *c/o* Billie Wai, Unit #704, Fourseas Building, #208-212, Nathan Road, Kowloon, Hong Kong."[311]

182.     Though the PA was unaware of it at the time of the sale, this was the address of her Co-fiduciary's personal accountant's office.[312]

---

[306] PA Decl. Exh. 8 (KING 005976-5977).

[307] Savitsky Decl. Exh. 46 (WANG001684-85).

[308] Savitsky Decl. Exh. 21 (6/26/19 Klein Dep. Trans. at 180:14-181:4).

[309] Savitsky Decl. ¶9.

[310] Savitsky Decl. Exh. 11 (AW 2019 Dep. Trans. at 240:2-243:2).

[311] PA Decl. Exh. 8.

[312] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 254:16-256:18; 311:13-19).

183.    Included Estate's fully executed set of documents is the Zheng Export Certificate dated February 11, 2005 which identified "Mr. Wei Zheng" as the "purchaser" of paintings from the "Estate of Chi-Chuan Wang."[313]

184.    Mr. Zheng signed the Export Certificate and acknowledged that issuing a false or fraudulent certificate could subject him to civil and criminal penalties under U.S. tax law.[314]

185.    Notwithstanding the signed documentation and emails between Klein, Ewald, and Andrew, all parties now agree "Mr. Wei Zheng" of Apartment 2F in Queens was not the buyer of Estate paintings, never intended to be the buyer, and never received or paid for any of the Estate's paintings.[315]

186.    And though Andrew claims that he knew it at the time all of the documentation was drafted and signed, he never disclosed to Klein or the PA that Wei Zheng was not the buyer and had no intention of being the buyer.[316]

187.    Nor did Andrew ever disclose the undisputed fact that Wei Zheng never read the Zheng Contract, Zheng Escrow Agreement, Zheng Export Certificate, or the Zheng Bill of Sale—all of which he indisputably signed. [317]

188.    Wei Zheng of Apartment 2F in Queens cannot speak or read English.[318]

---

[313] PA Decl. Exh. 8 (KING 005974).

[314] PA Decl. Exh. 8 (KING 005974).

[315] Savitsky Decl. Exh. 2 at ¶¶4, 191.

[316] PA Decl. at ¶50; PA Decl. Exh. 7; Savitsky Decl. Exh. 24 (AW 2013 Dep. Trans. at 943:19-944:13).

[317] PA Decl. at ¶50; PA Decl. Exh. 7; Savitsky Decl. Exh. 24 (AW 2013 Dep. Trans. at 943:19-944:13).

[318] Savitsky Decl. Exh. 2 at ¶183); Savitsky Decl. Exh. 1 at ¶183.

189.    Since Wei Zheng was not "the buyer" as represented in the Zheng Export Certificate, the signed certification was false.[319]

190.    Similarly, the signed Zheng Contract of Sales, the Zheng Escrow Agreement, and the Zheng Bill of Sale—all of which expressly identify Zheng as the "Buyer" or "Purchaser" of Estate assets—are also false.[320]

191.    No letters or emails between Wei Zheng and Andrew have ever been produced by the Wang Defendants.[321]

192.    By February 17, 2005, the 17 Paintings identified in the Zheng Contract and Zheng Bill of Sale had been picked up for shipment to Unit 704 in Hong Kong—Andrew's accountant's office.[322]

193.    On March 11, 2005, Klein sent a fax to Schram to confirm that insurance coverage at Crozier could be reduced by "the value of the paintings that were recently sold to Mr. Zheng."[323]

ii.    _Andrew Wang's 2013 Deposition Testimony Regarding the Estate's Sale to "Mr. Wei Zheng" and Admission that "Mr. Wei Zheng" Was Not the Buyer of Estate Artwork._

194.    During his four-day deposition in 2013, Andrew was questioned about his relationship with Mr. Wei Zheng.[324]

---

[319] PA Decl. Exh. 8 (KING 005974).

[320] PA Decl. Exh. 8.

[321] Savitsky Decl. at ¶7.

[322] Savitsky Decl. Exh. 27 (WANG001194).

[323] PA Decl. Exh. 7.

[324] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 941:9-947:7).

195.     Andrew was asked how he came "to be in contact" with Mr. Wei Zheng in 2005. Andrew responded that:[325]

> We were trying to find buyers, and I contact with the people in China and Asia, and also I don't remember how I met [Zheng]. At that time, maybe we had dinner. I mentioned that we could—I am looking for a buyer for estate paintings. He said he could have one. That's why I made a proposal. You know, we got a proposal first, and from the—the PA, and later the sale didn't go through. The buyer he [] did not follow the procedure.

196.     In November 2014, Dr. James Tcheng's attorney in the Removal Proceeding sent Andrew's attorney, Shields, an email to schedule a deposition of Wei Zheng. [326]

197.      The deposition was to address, among other things, Mr. Zheng's execution of a $400,500.00 contract of sale with the Estate on February 11, 2005.[327]

198.     Shields responded, on behalf of Andrew, by objecting to the proposed deposition in the Surrogate's Court action as a waste of attorney's fees since, she now represented, Wei Zheng never actually purchased any paintings from the Estate:[328]

---

[325] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 942:6-943:11).

[326] Savitsky Decl. Exh. 47 (CS014).

[327] Savitsky Decl. Exh. 47 (CS014).

[328] Savitsky Decl. Exh. 47 (CS014).

Dear Tim and Sam:

We object on behalf of the preliminary executor to your proposed deposition of Wei Zheng.  As Andrew Wang testified at his deposition (attached; see highlighted portion), Wei Zheng's principal did not come up with the money.  Andrew, therefore, found a substitute buyer, who paid the same price for the same group of paintings by wire transfer of $400,500 into the estate account on February 16, 2005.  We are particularly concerned that your proposed deposition would require the estate to incur attorney's fees needlessly.  If you ask Mr. Zheng in advance of the deposition whether he ever bought paintings from the estate, I believe he will confirm what we just said.

Thank you.

Carolyn Shields
Liu & Shields LLP
41-60 Main Street, Suite 208A
Flushing, NY 11355
718-463-1868
Attorneys for Andrew Wang

199.    At the time of the sale, however, the PA relied upon the representation that Wei Zheng was the buyer.[329]

200.    On November 18, 2014, Shields sent an email reportedly "attach[ing] the signature page of the agreement with the substitute buyer, <u>Raymond Ye</u>."[330] Shields further represented that "Andrew faxed this [Raymond Ye signature page] to his attorneys from China."[331]

201.    The lone, undated, signature page—reportedly signed by "Raymond Ye" (who Shields now represented had replaced Wei Zheng) and Andrew Wang in February 2005—was transmitted to the PA for the first time on November 18, 2014.[332]

202.    The "Raymond Ye" signature page produced by Andrew in 2014: (1) lacks the PA's counter-signature; (2) appears on a third page when the Co-fiduciaries' signatures with Wei Zheng appears a fourth page; and (3) has only thirteen paragraphs, whereas the Co-fiduciaries executed contract with Wei Zheng has fourteen paragraphs.[333]

---

[329] PA Decl. at ¶52.

[330] Savitsky Decl. <u>Exh. 31</u> (CS032).

[331] Savitsky Decl. <u>Exh. 31</u> (CS032).

[332] PA Decl. <u>Exh. 45</u>.

[333] *Contrast* Savitsky Decl. <u>Exh. 31</u> (CS033) ("Raymond Ye" signature pages) *with* Savitsky Decl. <u>Exh. 48</u> (WANG001198-99 (Wei Zheng Contract signature pages)).

203.    There are no emails or faxes in the Record indicating that the signature page of "Raymond Ye" was ever previously transmitted to the PA, Brown Raysman, or Martin Klein.[334]

204.    And while Shield's November 2014 email states that Andrew "faxed this [Raymond Ye signature page] to his attorneys from China," Andrew was actually in New York at the time of the February 2005 sale and shipment.[335]

205.    On February 13, 2005, Andrew stated "I will visit Crozier by Tuesday afternoon, So I hope the package[] can be shipped after Tuesday."[336] Then, on February 14, 2005, Andrew wrote to Klein "I will pass by your office at about 2:15 pm and wait in my car for you to come down. I will call you in a few minutes before I arrive there."[337]

206.    By February 16, 2005, the $480,500.00 purchase price had been transferred by Brown Raysman to the Estate's account pursuant to documentation identifying "Mr. Wei Zheng" as the sole purchaser of the Estate's paintings.[338]

207.    No emails or letters created in or about February 2005 between Andrew and Klein make any reference to "Raymond Ye" or indicate that Wei Zheng was not the buyer.[339]

ii.    _Andrew Wang's 2019 Deposition Testimony Regarding the Estate's Sale to "Mr. Wei Zheng."_

208.    At his 2019 Deposition, Andrew was asked if he could explain what he meant when he said there was a "special circumstance" with Mr. Raymond Ye.[340] He

---

[334] Savitsky Decl. at ¶10.

[335] Savitsky Decl. Exh. 45 (WANG003440).

[336] Savitsky Decl. Exh. 45 (WANG003440).

[337] Savitsky Decl. Exh. 45 (WANG003440).

[338] Savitsky Decl. Exh. 46 (WANG001684-1685).

[339] Savitsky Decl. at ¶10.

[340] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 109:16-110:8).

testified that the Wei Zheng sale fell through after all of the sales documentation had already been signed by him, the PA, and Wei Zheng:[341]

> I recall the buyer, possibly Mr. Ye, who took over the sale that was supposed to be—go through with Wei Zheng. And he tried to find a buyer, and I relied on his information. And I conveyed all purchase information to Marty Klein. And Marty conveyed to Peter Schram and also to Ethel [the PA]. Somehow in the last minute the sale didn't go through. So I have to find another buyer to substitute the sale. I believe Raymond Ye was the one that took over the sale, but I'm not 100% sure.

209.    Andrew went on to testify that Wei Zheng—even at the time he signed the agreements with the Estate identifying him as the "Buyer" or "Purchaser"—was never the actual buyer, but was instead helping him find a buyer for Estate paintings:[342]

> Q: How was Wei Zheng involved in this if Er Shi Fu was connecting you with the buyers?
>
> A: It's a story about Wei Zheng. And he came to this country. I mean, he used to work for the Shanghai Museum. Okay. He doesn't speak English . . . . So [Wei Zheng] was looking for the buyer, and we kept communication for a while. So finally, you know, I had gone through this, all the proceedings, paintings selections, and reports to Peter Schram—not Peter Schram—Marty Klein. And we made the final push for the sale, and I signed the contract. Ethel also signed the contract. "Somehow" he said, "the buyer is not willing to pay," at the last minute. So I said: "I have to find another buyer because we already have the contract ready." So I think I took a few weeks or so—I don't remember how many days I took—to find a second buyer, to find a substitute buyer. I think its Raymond Ye that took over the purchase. Raymond Ye, I believe is the person who took over the purchase.

---

[341] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 109:16-110:8).

[342] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 110:13-113:3).

Q: You already had the contract signed [with Wei Zheng] when the buyer backed out?

A: Correct.

Q: And then you took a couple of weeks to a month to find a new buyer?

A: To my memory, yes, within a month, I believe.

Q: How did you do that?

A: Well I have people on my side, you know, I also ask[ed] Mr. Fu about that. And I don't know who referred me about the – Raymond. I forgot. Somehow we found a [substitute] buyer. You know, we just found a new buyer who took over the sale.

Q: He was willing to buy the exact same paintings for the exact same price?

A: Yeah, that's what I presented.

210.    Andrew further claimed he notified Klein immediately upon learning that the Wei Zheng sale could not go through:[343]

Q: Did you ever tell your counsel who was assisting in coordinating the sale, Marty Klein, about Mr. Wei Zheng backing out?

A: Yes, I did.

Q: When did you tell him that?

A: As soon as I found out that Wei Zheng's deal couldn't go through, I told Marty Klein – I believe I was in Hong Kong at the time, so we have to – you know, Marty said: "We have to, you know, prepare a new contract in that – in that way." I said: "Maybe we can make a new contract or change the contract later on" because I was already in Asia for the final sale.

---

[343] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 113:4-115:7).

* * * * *

> Q: Just to re-ask my question so the record is clear: Did Marty Klein say it was a problem that you didn't draft a new contract for a new buyer?
>
> [Objection]
>
> A: I don't remember. But Marty was aware, and he might talk to the PA already. And I assume it's not a problem. As long as we make the sale, who cares who the final buyer is?

211. Andrew then elaborated that he "remember[s] clearly that we discussed that, about the change or the possibility of making a new revised contract."[344]

212. For his part, however, Klein testified that he does not "remember what [he] believed at the time" of the February 2005 sale or "what [he] knew at the time."[345]

213. Despite the records of communications between himself, Andrew, and the PA in February 2005 — which only mention "Mr. Wei Zheng" as the buyer of the Estate's 17 paintings for $400,500.00 (inclusive of shipping) — Klein testified "I don't remember anything about sending this contract in 2005."[346]

214. Klein agreed over his counsel's objection, however, that he would not have drafted or transmitted a contract to Andrew stating that "Mr. Wei Zheng" was a buyer of Estate artwork if he knew Wei Zheng was not a buyer of estate artwork.[347] He testified "I just wouldn't have done that."[348]

---

[344] Savitsky Decl. Exh. 11 (6/25/19 AW Dep. Trans. at 113:4-115:7).

[345] Savitsky Decl. Exh. 21 (6/26/19 Klein Dep. Trans. at 110:20-111:22).

[346] Savitsky Decl. Exh. 21 (6/26/19 Klein Dep. Trans. at 110:20-111:22).

[347] Savitsky Decl. Exh. 21 (6/26/19 Klein Dep. Trans. at 111:18-112:5).

[348] Savitsky Decl. Exh. 21 (6/26/19 Klein Dep. Trans. at 111:18-112:5).

215.    In fact, there are no documents in the Record evidencing that Andrew notified Klein, Schram, or anyone else that the Wei Zheng sale could not go through or that Andrew had found a substitute buyer.[349]

216.    On February 11, 2005, Andrew provided wire information for "Mr. Wei Zheng" of Apartment 2F to Klein via email.[350]

217.    Andrew emailed Klein the executed and dated Zheng Bill of Sale at some point between February 14, 2005 and February 16, 2005.[351] Payment in accordance with the Zheng Contract and Zheng Escrow Agreement cleared the Estate's account from Brown Raysman on February 16, 2005.[352]

C.    *March 8, 2005 – April 22, 2005: The Estate's Second, Completed Private Sale of Paintings to "Mr. Chen Mei Lin."*

218.    Andrew emailed Klein a "draft for the second sale" of Estate owned paintings on March 8, 2005.[353] He explained that he was waiting for information on the "custom tax in China" and would "inform the buyer as soon as [he] ha[d] the information."[354]

219.    The draft for the second sale, which Andrew attached to his email, identified the buyer as a person named "Mr. Chen Mei-Lin" and listed 25 paintings to be sold for a total of $1,416,200.00 (exclusive of shipping):[355]

---

[349] Savitsky Decl. at ¶11.

[350] Savitsky Decl. Exh. 45 (WANG003440).

[351] Savitsky Decl. Exh. 45 (WANG003440, February 14, 2005 Email by Klein asking for the Bill of Sale); and Savitsky Decl. Exh. 46 (WANG001684-1685).

[352] Savitsky Decl. Exh. 46 (WANG001684-1685).

[353] Savitsky Decl. Exh. 49 (WANG2010-2012).

[354] Savitsky Decl. Exh. 49 (WANG2010-2012).

[355] Savitsky Decl. Exh. 49 (WANG2010-2012).

Private Buyer's Name: Mr. Chen Mei-Lin
Address: #777 Lane, Apt#28-A
Xin-Ja Ave. Jing-An District
Shanghai City, P.R. China 100014
Contact Tel#: 021-13601840888

| | Appraisal | % Increase | Final Sale |
|---|---|---|---|
| 1. OTE#94-ShiTao (Attributed-Qing Dynasty) | $15,000 | 20% | $18,000 |
| 2. OTE#97-HuangGongWan (Attributed-Yuan Dynasty) | $20,000 | 20% | $24,000 |

220.     Though it was unknown to either Klein or the PA at the time,[356] the address listed for "Mr. Chen Mei-Lin" in Andrew's draft—#777 Lane, Apt#28A, Xin-Ja Ave., Jing-An District, Shanghai, P.R. China—was actually the address of Andrew's *own* apartment in Shanghai.[357]

221.     The day after sending Klein the draft for the second sale to Mr. Chen Mei-Lin, Andrew emailed Ewald of OTE with what he claimed was "another sale listing which I had worked with the buyer in China recently."[358]

222.     Klein faxed Andrew's draft for the second sale to Schram on March 11, 2005.[359]

223.     Two days later, Andrew emailed Klein asking to be notified once he heard an answer from Schram and the PA about the proposed sale to Chen Mei-Lin.[360] Andrew

---

[356] Savitsky Decl. Exh. 21 (Klein Dep. Trans. at 162:19-163:4); PA Decl. at ¶52.

[357] Savitsky Decl. Exh. 30 ¶¶115-117 (SK's Verified Answer to Tcheng Petition).

[358] Savitsky Decl. Exh. 50 (WANG2015-2018).

[359] PA Decl. at ¶28.

[360] Savitsky Decl. Exh. 51 (WANG002034).

stated that "[t]he buyer asked me to inform him as soon as I can because he needs to prepare the fund."[361]

224.    On March 21, 2005, Andrew wrote to Klein: "please have [the PA] sign the contract as soon as possible. I will send another copy to Asia and ask the buyer to wire the money at the same time. I'd like to receive the payment before April 1."[362]

225.    Andrew's emails make no reference of an intermediary, middle-man, or agent having "the direct contact" with Chen Mei-Lin.[363]

226.    Later that day, Klein sent Andrew drafts of (1) the escrow agreement; (2) the contract of sale; and (3) the bill of sale.[364]  He then directed Andrew "to have Mr. Me-Lin sign" them.[365]

227.    The documents identified "Mr. Chen Mei-Lin" as the purchaser of 24 pieces of Estate paintings for a total price of $1,380,200.00 (exclusive of shipping fees and tax).[366]

228.    In the escrow agreement draft, the address attributed to Mr. Chen Mei-Lin was #777 Lane, Apt. 28-A—Andrew's own Shanghai address.[367]

229.    In the contract of sale draft, Mr. Chen Mei-Lin is identified as "residing at" #777 Lane, Apt. #28-A—Andrew's own Shanghai address.[368]

---

[361] Savitsky Decl. Exh. 51 (WANG002034).

[362] Savitsky Decl. Exh. 52 (WANG002074).

[363] Savitsky Decl. Exh. 25 (AW-1 at 4).

[364] Savitsky Decl. Exh. 53 (WANG002050-WANG002065).

[365] Savitsky Decl. Exh. 53 (WANG002050).

[366] Savitsky Decl. Exh. 53 (WANG002064-2065).

[367] Savitsky Decl. Exh. 53 (WANG002052; WANG002057).

[368] Savitsky Decl. Exh. 53 (WANG002060; WANG002061).

230.     Within a few hours, Andrew emailed Klein telling him that the crate of paintings needed to be shipped "to Hong Kong again because China charges heavy duty taxes and the buyer is not willing to pay that."[369]

231.     On or about March 17, 2005, Ewald created a report to the PA claiming that she had "concerns" with the proposed sale prices for seven of the paintings identified in the proposed sale to Mr. Chen Mei-Lin.[370]

232.     Around that same time, Ewald emailed Andrew that she had "been working on the [Chen-Mei Lin] proposal for some time" but found that the proposed prices "seem to be well under market value."[371]

233.     In making this determination, Ewald had consulted with "experts who are well-known in the field."[372] Ewald noted, however, that she did "not hold [herself] out to be an expert on Chinese paintings."[373]

234.     Shortly thereafter, Andrew emailed Klein about Ewald's concerns claiming that Ewald did "know anything about Chinese paintings and [s]he just can't say anything without any knowledge of the field":[374]

---

[369] Savitsky Decl. Exh. 73 (WANG002066).

[370] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 91:20-98:16); Savitsky Decl. Exh. 15 at ELE-18 (Ewald Dep. Exhibit 18); and Savitsky Decl. Exh. 49 (WANG2010-2012).

[371] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 188:19-189:16); Savitsky Decl. Exh. 15 at ELE-17 (Ewald Dep. Exhibit 17).

[372] Savitsky Decl. Exh. 15 at ELE-17 (Ewald Dep. Exhibit 17).

[373] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 188:19-189:16); Savitsky Decl. Exh. 15 at ELE-17 (Ewald Dep. Exhibit 17).

[374] Savitsky Decl. Exh. 61 (WANG002044).

```
寄件者:    Andrew Wang (jingguanlou_wang@yahoo.com)
收件者:    martykl@kamso.com
日期:      2005年3月17日 星期四 下午12:40 [EST]

I agree with your suggestions.
We also need to know who is providing the information to Elin. Elin does not know anything about Chinese paintings and
She just can't say anything without any knowledge of the field and listening to senseless sayings from another "expert".
 Mr. Wender , who has an art gallery in midtown named China 2000 Fine Art, can be the person because he has
been partially dealing with Chinses paintings in New York. I can't think of anyone else in this country can be called a
Chinses paintings' "Expert".  It's likely that Mr. Wender's personality is suitable for this confusion.
Elin said that she would finish the final report this afternoon.
Thanks.
```

235.    On March 17, 2005 Andrew also wrote to the PA stating that he was "concerned about the sale matter" because he did not "know who has been providing information to [Ewald} and [she] was not willing to tell" him.[375] He wanted to know who Ewald had spoken to and explained it was "important for me to determine whether [Ewald's] source is reliable."[376]

236.    In his email, Andrew explained to the PA that the "Chinese painting market is not an easy field" and reminded her that he "worked on [the] CC Wang Family auction at Sotheby's in 1997." [377]

237.    After additional deliberation among the PA, Andrew, and Ewald, the Co-fiduciaries agreed to sell 24 Estate paintings to Chen-Mei Lin at the exact same prices which Andrew proposed in his initial email to Klein on March 8, 2005.[378]

---

[375] PA Decl. Exh. 11.

[376] PA Decl. Exh. 11.

[377] PA Decl. Exh. 11.

[378] *Compare* Savitsky Decl. Exh. 49 (WANG002010-12 (Andrew's March 8, 2005 email to Klein with the "draft for the second sale")) *with* Savitsky Decl. Exh. 54 (WANG000994-WANG000999 (Signed Contract of Sale with "Chen Mei Lin")).

238.    On March 21, 2005, Klein mailed, via DHL Express, "the proposed contract for the sale of art to Mr. Chen Mei-Lin, as well as the escrow agreement" to Schram for the PA to "countersign and return."[379]

239.    Klein then requested the shipping address from Andrew so that the contract could be updated.[380] Andrew replied that he planned on "talk[ing] with" Mr. Chen Mei-Lin that night to get the requested information:[381]



寄件者：　Andrew Wang (jingguanlou_wang@yahoo.com)

收件者：　martykl@kamso.com

日期：　2005年3月21日 星期一 下午5:56 [EST]

I will talk with the buyer tonight and get back to you by tomorrow.
Andrew

*Martin Klein <martykl@kamso.com>* wrote:

I will need the shipping address to put in the contract.

240.    The following morning, Andrew emailed Klein and represented that he was including Mr. Chen Mei-Lin's (i) banking information (an account with China Merchants Bank, Shanghai Branch); (ii) address information (which was, in fact, Andrew's Shanghai address); and (iii) shipping information (which was, in fact, Andrew's accountant's office):[382]

---

[379] Savitsky Decl. Exh. 55 (WANG001039 (March 21, 2005 Letter)).

[380] Savitsky Decl. Exh. 52 (WANG002075).

[381] Savitsky Decl. Exh. 52 (WANG002075).

[382] Savitsky Decl. Exh. 23 (WANG002084).

```
 At 10:58 AM 3/22/2005 -0800, you wrote:
>Marty,
>I believe that I have the information.
>                              Intermediary's Bank: Chase
> Manhattan Bank
>                              Beneficiary's bank in China:
> China Merchants Bank
>
>Shanghai Branch
>
>A/C No: 400-007746
>Do we need anything else ?
>Thanks
>Andrew
>
>Martin Klein <martykl@kamso.com> wrote:
>Andrew, we need the bank's routing/transit number and the name on the
>account.
>Marty
>At 07:21 AM 3/22/2005 -0800, you wrote:
> >Marty,
> >Here are the information:
> >
> >A. Mr. Chen Mei-Lin
> > #777 Lane, Apt# 28A
> > Xin-Ja Ave. Jing-An District
> > Shanghai City, P.R. China
> >
> > Name of Bank: China Merchants Bank
> > Shanghai Branch
> > A/C # 4100 6202 1018 1125
> > Address: #848 NanJing West Road
> > Shanghai City, China 200041
> >
> >
> >B. Shipping Address: Mr. Chen Mei-Lin
> > c/o Billie Wai
> > Unit #704, Forseas Building
> > #208-212 Nathan Road
> > Kowloon, Hong Kong
> > Tel# 2866-2116
> >Please let me know after Ethel signed her copy, so I can request the
> payment.
> >Thanks
> >Andrew
```

241.    Accordingly, the final version of the Estate's contract of sale with "Mr. Chen-Mei Lin" was adjusted to require the 24 paintings to be shipped to Unit 704 in Hong Kong.[383]

---

[383] Savitsky Decl. Exh. 54 (WANG000993-998 (fully executed contract of sale)).

242.   By April 22, 2005, the contract of sale, escrow agreement, and bill of sale in relation to the sale of 24 paintings to "Mr. Chen Mei-Lin" for $1,393,422.40 (inclusive of shipping) had been executed.[384]  The Estate had also been paid via a wire.[385]

243.   By April 22, 2005, the 24 paintings were shipped to Unit 704 in Hong Kong.[386]

244.   Though the PA was unaware of it at the time, this was her Co-fiduciary's personal accountant's office.[387]

245.   And though the PA was unaware of it at the time of the sale, the $1,393,422.40 had come from her Co-fiduciary's own offshore company.[388]

246.   Klein transmitted the fully executed set of documents for the sale to "Mr. Chen Mei-Lin" to Schram on April 22, 2005.[389]

> **D.   April 29, 2005 – June 21, 2005: The Estate's Third Completed Private Sale of Paintings to "Mr. Anthony Chou."**

247.   Exactly one week after Klein circulated final copies of the Chen Mei-Lin sales documentation, Andrew emailed Klein with another proposed sale of Estate paintings; this time to a person named "Mr. Anthony Chou" with an address in Beijing, China.[390]

---

[384] Savitsky Decl. <u>Exh. 54</u> (WANG000993-WANG001017 (Klein April 22, 2005 letter to Schram and emails and faxes with Brown Raysman))

[385] Savitsky Decl. <u>Exh. 46</u> (WANG001682-1683).

[386] PA Decl. <u>Exh. 12</u>.

[387] Savitsky Decl. <u>Exh. 11</u> (AW 2019 Dep. Trans. at 254:16-256:18; 311:13-19).

[388] Savitsky Decl. <u>Exh. 11</u> (AW 2019 Dep. Trans. at 240:2-243:2).

[389] Savitsky Decl. <u>Exh. 54</u> (WANG000993-WANG001017).

[390] Savitsky Decl. <u>Exh. 56</u> (WANG002098-2100).

248.     Andrew proposed that the Estate sell 16 paintings to Mr. Anthony Chou for $856,800.00.[391] He told Klein "I need the PA's approval as early as possible."[392]

249.     Klein faxed a listing for the proposed "Anthony Chou" sale to Schram on April 29, 2005.[393]

250.     Once again, Andrew coordinated shipment of his grandfather's former paintings to his accountant's office in Hong Kong.[394] On May 25, 2005, Klein asked Andrew "Where is the art being shipped? To Mr. Chou at his address in Beijing City?" Andrew replied:[395]

> China would collect custom tax if it's shipped to Beijing. So he asked me to ship them to Hong Kong. Please use the same address in HK [Unit 704] and he will pick them up there . . . . We need to know how fast we can get the signature from the PA.

251.     Andrew's email does not mention Er Shi Fu or the existence of any middleman, agent, or intermediary having "the direct contact" with Anthony Chou.[396]

252.     Several weeks later, Klein finalized a draft of the contract of sale and bill of sale for the sale to "Mr. Chou" and emailed them to Schram for the PA's signature.[397]

---

[391] Savitsky Decl. Exh. 56 (WANG002098-2100).

[392] Savitsky Decl. Exh. 56 (WANG002098-2100).

[393] PA Decl. Exh. 13.

[394] Savitsky Decl. Exh. 28 (WANG002108-2111).

[395] Savitsky Decl. Exh. 28 (WANG002108-2111).

[396] Savitsky Decl. Exh. 25 (AW 2019 Dep. Exh. 1 at 4); Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 106:17-107:25).

[397] Savitsky Decl. Exh. 57 (WANG002130-WANG002136).

253.    In his email, which he sent to Andrew as well, Klein explained that this time, unlike what occurred for the first two sales, "the buyer [would be] wiring the purchase price directly into the Estate account":[398]

---

## Estate of Wang

寄件者：   Martin Klein (martykl@kamso.com)

收件者：   pschram@mindspring.com

副本：   jingguanlou_wang@yahoo.com

日期：   2005年5月25日 星期三 下午5:44 [EDT]

Peter, attached is the contract of sale and bill of sale for Ethel's signature regarding the sale to Mr. Chou.  This is the same sale that I sent to you a few weeks ago. The buyer has agreed to pay $30,000 for item number 1 on Exhibit A. Please have Ethel sign as soon as possible as the buyer would like shipment to occur as soon as possible.  Please note that the buyer is wiring the purchase price directly into the Estate account.  He has the right to a refund if the art is not shipped within 10 business day of the Estate's receipt of the wire payment.  The buyer will wire the money sometime next week.  Please call if you have any questions.  Marty

---

254.    Though Klein's May 25, 2005 email to Schram stated that "Mr. Chou" would wire "the purchase price directly into the Estate account," [399] this never happened.[400]

255.    Instead, Andrew wired the purchase price to the Estate's account using an offshore company.[401]

---

[398] Savitsky Decl. Exh. 57 (WANG002130-WANG002136).

[399] Savitsky Decl. Exh. 57 (WANG002130-WANG002136).

[400] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 241:6-242:7).

[401] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2).

256.    On June 16, 2005, the Estate received the $909,689.41 purchase price under the executed contract with "Mr. Anthony Chou."[402] The Estate's wire records indicate the "By Order of" source of the payment only as a number: 8480185540.[403]

257.    Though the PA was unaware of it at the time, the address to which the paintings were shipped belonged to Andrew's personal accountant, Billie Wai, in Hong Kong.[404]

258.    Klein transmitted the fully executed set of documents for the sale to "Mr. Anthony Chou" to Schram on June 21, 2005.[405]

E.    *July 27, 2005 – September 22, 2005: The Estate's Fourth Completed Private Sale of Paintings to "Mr. Yong Qing Ye."*

259.    Klein sent a fax to Schram on July 27, 2005 representing that he was attaching a listing of 20 Estate paintings "that Andrew has received offers to purchase from Mr. Yong-Qing Ye."[406]

260.    Klein's fax further explained that SK's cousin in Taiwan, Hui Chen Wang Chen ("Hui Chen"), had alleged that she was the owner of six of the paintings that had previously been delivered to the Estate and stored in Crozier, but which "Yong Qing-Ye" was now offering to purchase.[407]

261.    To induce the Estate to agree to sell these paintings, Klein attached a typed letter apparently signed by Hui Chen that referenced her alleged paintings by their Estate OTE number and gave blanket approval to the Estate to sell them on the condition that

---

[402] Savitsky Decl. Exh. 46 (WANG001680-81).

[403] Savitsky Decl. Exh. 46 (WANG001680-81).

[404] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2).

[405] PA Decl. Exh. 14.

[406] PA Decl. Exh. 16.

[407] PA Decl. Exh. 16.

"my cousin, Shou-Kung Wang, [be] responsible to return [the sale price] to my family upon the sale of Apartment 8A."[408]

262.    By August 29, 2005—following a review procedure similar to that observed for the purported sales to "Mr. Wei Zheng," "Mr. Chen Mei Lin," and "Mr. Anthony Chou"—the PA agreed to sell 18 of the paintings identified on Klein's July 27th fax.[409]

263.    Once again, the fully executed contract required the C.C. Wang's former paintings to be shipped to "Billie Wai" at Unit 704 in Hong Kong.[410]

264.    Though the PA continued to be unaware of it at the time of the sale, Unit 704 was her Co-fiduciary's personal accountant's address.[411]

265.    On September 21, 2005, the Estate received a wire for the $789,810.00 purchase price under the contract executed with "Mr. Yong Qing Ye." [412]  The Estate's wire records indicate the "By Order of" source of the payment only as a number: 8480185540.[413] This is the same "By Order of" number associated with the "Anthony Chou" wire one month prior.

266.    Though the PA was unaware of it at the time of the sale, the $789,810.00 had been wired to the Estate by her Co-fiduciary's own offshore company.[414]

---

[408] PA Decl. Exh. 16; *see also* Savitsky Decl. Exh. 58 (WANG003327).

[409] PA Decl. Exh. 17.

[410] PA Decl. Exh. 18 (KING 007005).

[411] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 254:16-256:18; 311:13-19).

[412] Savitsky Decl. Exh. 46 (WANG001678-1679)

[413] Savitsky Decl. Exh. 46 (WANG001678-1679)

[414] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2).

F.     *December 13, 2005 – February 16, 2006 - The Estate's Fifth Completed Private Sale of Paintings to "Mr. Yong Qing Ye."*

267.    On December 13, 2005, Klein sent the PA another fax attaching a list with eight more paintings which he claimed that "Andrew ha[d] received offers to purchase from Mr. Yong Qing Ye."[415]

268.    Klein's fax further represented that one of the paintings which "Mr. Yong Qing Ye" offered to purchase, OTE #156, was allegedly owned by SK, even though it had been delivered to the Estate.[416]

269.    Yet Klein represented that SK had agreed to allow the Estate to sell his painting so that the Estate could "raise as much cash as possible to pay Estate expenses."[417]

270.    OTE 156—which SK claimed was his but had agreed could be sold to pay the Estate's expenses—had been appraised by Sotheby's to be worth $100,000.00 as of July 2003.[418]

271.    The total proposed sale price for the 8 paintings listed in Klein's fax was $346,800.00.[419]

272.    On December 16, 2005, after a review of the proposed sale was conducted by OTE, the PA responded to Klein that five of the proposed prices were too low to approve:[420]

---

[415] PA Decl. <u>Exh. 20</u>.

[416] PA Decl. <u>Exh. 20</u>.

[417] PA Decl. <u>Exh. 20</u>.

[418] PA Decl. <u>Exh. 20</u>.

[419] PA Decl. <u>Exh. 20</u>.

[420] Savitsky Decl. <u>Exh. 59</u> (WANG001397).

Re: **Estate of C.C. Wang**

Dear Marty:

    Elin Ewald has reviewed Andrew's proposal to sell certain items to YongQing Ye and made recommendations to the Public Administrator. Based upon those recommendations, the Public Administrator responds as follows:

| | |
|---|---|
| Items 3, 4, and 6: | Approved |
| Item 1: | Suggest a price closer to $20,000 |
| Item 2: | Suggest at least $18,000 |
| Item 5: | Suggest at least $115,000 |
| Item 7: | Suggest at least $40,000 |
| Item 8: | Suggest at least $60,000. |

    Please advise how Andrew wishes to proceed.

Very truly yours,

Peter S. Schram

273.    Notwithstanding her December 16, 2005 request for higher sales prices for five of the paintings, the PA eventually backed down from her counter position.[421]

274.    By late January 2006, the PA had signed sales documentation approving a sale to "Mr. Yong Qing Ye" at the exact same prices identified in Klein's initial fax, plus shipping, handling, and insurance fees.[422]

275.    Once again, the fully executed contract required the eight paintings—including the $100,000.00 painting SK claimed he owned—be shipped to "Mr. Yong-Qing Ye" at Unit 704 in Hong Kong.[423]

---

[421] Savitsky Decl. Exh. 60 (WANG001388 (Schram Email)).

[422] Savitsky Decl. Exh. 62 (WANG001387 (Crozier shipping invoice of $7,244.76)); PA Decl. Exh. 22.

[423] PA Decl. Exh. 22 (KING 007196).

70

276.    Though the PA continued to be unaware of it at the time of the sale, Unit 704 was the address of her Co-fiduciary's personal accountant.[424]

277.    On February 16, 2006, the Estate received a wire for the $354,045.00 purchase price under the contract executed with "Mr. Yong Qing Ye." [425]

278.    Once again, the Estate's wire records describe the wire as originating from 8480185540.[426]

279.    Though the PA was unaware of it at the time, the $354,045.00 purchase price had been wired to the Estate by her Co-fiduciary's own offshore company.[427]

### G.    *April 23, 2008 – September 2, 2009 - The Estate's Sixth and Final Completed Private Sale of Paintings to "Mr. Yue Da Jin."*

280.    On April 23, 2008, Klein faxed Schram a list of fourteen (14) Estate paintings which he claimed Andrew had "received offers to purchase from 'Mr. Yue Da-Jin.'"[428] The proposed sale price for the 14 paintings was $538,800.00.[429]

281.    On May 2, 2008, Ewald of OTE issued a report to Schram on the reasonableness of the proposed sale prices (the "2008 Ewald Report").[430]

---

[424] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 254:16-256:18, 311:13-19).

[425] Savitsky Decl. Exh. 46 (WANG001676)

[426] Savitsky Decl. Exh. 46 (WANG001678-1679)

[427] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2); PA at ¶52.

[428] PA Decl. Exh. 23.

[429] PA Decl. Exh. 23.

[430] Savitsky Decl. Exh. 14 (Ewald Dep. Trans. at 157:10-161:13); Savitsky Decl. Exh. 15 (ELE-30).

282.    Though Ewald identified her report as a "Fair Market Value Appraisal," it did not identify any comparables or nor did it include Ewald's own independent value estimates for the fourteen paintings.[431]

283.    Instead, the 2008 Ewald Report provided one to two sentences of commentary on the fourteen proposed prices in the list Klein had sent ten days earlier.[432] The 2008 Ewald Report concluded that five (5) of the proposed sale prices were possibly too low.[433]

284.    Five days after Ewald issued her report, Andrew sent her an email.[434]  He wanted her to understand that "the market for classical Chinese paintings ha[s] always been weak except [for] Chinese paintings within the [i]mperial collections."[435]

285.    Andrew defended his position as to two paintings on which Ewald had disagreed with him: stating one painting had "been damaged seriously with insect[] bites" and advising Ewald not consider the final sales prices of Chinese auction houses.[436]

286.    Ewald responded the she "definitely [did] not want to be the obstacle to a good sale" and that it was her "hope" that Andrew could get "additional money" through negotiation with the buyer.[437]

---

[431] Savitsky Decl. Exh. 14 (Ewald Dep. Trans. at 157:10-161:13); Savitsky Decl. Exh. 15 (ELE-30 at KING 007376-7377, 7381-7383).

[432] Savitsky Decl. Exh. 14 (Ewald Dep. Trans. at 157:10-161:13); Savitsky Decl. Exh. 15 (ELE-30 at KING 007376-7377, 7381-7383).

[433] Savitsky Decl. Exh. 15 (ELE-30 at KING 007376-7377, 7381-7383).

[434] Savitsky Decl. Exh. 63 (WANG002233).

[435] Savitsky Decl. Exh. 63 (WANG002233).

[436] Savitsky Decl. Exh. 63 (WANG002233).

[437] Savitsky Decl. Exh. 64 (WANG003432).

287.    Andrew replied that "the buyer would not argue with me about his purchase price as long as I have a good explanation."[438] Andrew added that he would direct Klein to prepare a contract, but explained it might take time "to finalize the deal because the purchaser has his own consultants for the sale."[439]

288.    By May 17, 2008, Ewald had spoken directly with Andrew and agreed to the sale based upon the prices which he originally proposed.[440]

289.    The proposed sale to "Yue Da Jin," however, was never completed in 2008.[441]   Andrew told Klein that the sale was on hold because the buyer wanted to negotiate even lower prices.[442]

290.    By February 26, 2009, Andrew had emailed Klein claiming that the buyer was now asking him for a 20% discount on the originally proposed $538,800.00 price for the fourteen paintings.[443] Andrew recommended giving a 10% discount because the "paintings market is very weak here":[444]

---

[438] Savitsky Decl. Exh. 64 (WANG003432).

[439] Savitsky Decl. Exh. 64 (WANG003432).

[440] Savitsky Decl. Exh. 65 (WANG002253-2257); Savitsky Decl. Exh. 66 (WANG003414-3421).

[441] Savitsky Decl. Exh. 67 (AWSK_00015263-5265).

[442] Savitsky Decl. Exh. 67 (AWSK_00015263-5265).

[443] Savitsky Decl. Exh. 67 (AWSK_00015264).

[444] Savitsky Decl. Exh. 67 (AWSK_00015264).

> Date: Thu, 26 Feb 2009 00:20:42 -0800 (PST)
> From: Andrew Wang <jingguanlou_wang@yahoo.com>
> Subject: Re: Sale to Mr. Yue
> To: martin klein <mklein@kamso.com>
>
> Marty,
> The purchaser is asking a 20% discount of the total sale, and I
> told him that I will try to get him 10% off the total value. The
> Chinese paintings market is very weak here and several
> Auction houses have already postponed their sales to the Fall.
> Can you ask the PA to agree to the 10% discount, so I can
> proceed with the sale ? The buyer is willing to make the
> payment in March. I will provide you with all necessary
> informations once I have your confirmation.
> Thanks

291.    Notwithstanding Andrew's representations in 2009 about what he "told" Yue Da Jin, Andrew testified   earlier this year that he never spoke, emailed, or communicated directly with that purported buyer—just as he claims he never spoke, emailed, or communicated with any of the five purported buyers.[445]

292.    And though he now claims all communications with the buyers occurred through someone named "Er Shi Fu," he has no emails with Mr. Fu either, because he claims Mr. Fu did not have an email account. [446]

293.    The PA eventually came to authorize the discount for "Yue Da Jin."[447]

294.    The final sale price for the 14 paintings was set in August 2009 at $489,772.00 (inclusive of shipping costs).[448]

---

[445] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 75:9-76:16; 89:25-95:22 300:24-301:17).

[446] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 86:21-25; 300:24-301:17).

[447] Savitsky Decl. Exh. 68 (WANG00534).

[448] Savitsky Decl. Exh. 68 (WANG00536).

295.    Ewald never issued an updated valuation report (despite the passage of a year and the newly reduced prices for the paintings).[449]

296.    The 14 prices set forth in the Estate's executed contract of sale with Yue Da Jin, dated August 17, 2009, are all lower than the prices which Ewald reviewed in her May 2, 2008 report.[450]

297.    Klein circulated a revised draft of the agreement to Andrew in late April 2009 and directed Andrew to date the contract of sale based "upon the date that Mr. Yue Da Jin says he will wire the purchase price."[451]

298.    On August 12, 2009, a company called "Le Style Limited" wired the $489,772.00 purchase price under the Estate's contract with "Mr. Yue Da Jin" to the Estate's bank account.[452]

299.    Though the PA did not know it at the time of the sale, Le Style Limited was owned by her Co-fiduciary, Andrew.[453]

300.    On August 14, 2009, Klein was preparing the final paperwork to complete the sale. [454] He emailed Andrew asking if "Yue Da Jin" had signed the contract yet. [455] Andrew responded "I have the signed contract. The buyer is in Europe, and I will try to contact him." [456]

---

[449] Savitsky Decl. at ¶12.

[450] Savitsky Decl. Exh. 14 (Ewald Dep. Trans. at 161:23-167:3).

[451] Savitsky Decl. Exh. 69 (WANG002318).

[452] Savitsky Decl. Exh. 46 (WANG001673-1674).

[453] PA Decl. at ¶52.

[454] Savitsky Decl. Exh. 70 (WANG002328).

[455] Savitsky Decl. Exh. 70 (WANG002328).

[456] Savitsky Decl. Exh. 70 (WANG002328).

301.    But there are no records of Andrew ever contacting a person named "Yue Da Jin."[457]

302.    The final agreed upon sales price (including shipping and insurance) in the contract of sale and bill of sale executed on August 17, 2009 by Andrew and the PA was $489,772.00.[458]

303.    Crozier then coordinated with Andrew through email concerning the best way to contact Billie Wai about the shipment of the 14 paintings.[459] The package was delivered to Unit 704 by August 21, 2009.[460]

304.    Though the PA continued to be unaware of it at the time of the sale, this was the address of her Co-fiduciary's personal accountant.[461]

### H.    O'Toole-Ewald Art Associates' Review of the Proposed Sales and Communications and Andrew Wang.

305.    Throughout the process of selling the 98 Paintings between 2005 and 2009, the PA had retained OTE to review the purchase prices offered by the five purported buyers to see if the prices were "legitimate" or "fair."[462]

306.    Ewald claims to have conducted her review by assessing the paintings "in the current market for Chinese classical art."[463]

307.    On February 25, 2005, Ewald wrote a letter that "at the suggestion of …. Andrew Wang, and with the knowledge of [the PA] and her advisory attorneys" OTE

---

[457] Savitsky Decl. at ¶7.

[458] Savitsky Decl. Exh. 68 (WANG000531).

[459] Savitsky Decl. Exh. 71 (WANG002348-2352).

[460] Savitsky Decl. Exh. 71 (WANG002348).

[461] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 254:16-256:18; 311:13-19).

[462] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 44:13-21); PA Decl. at ¶51.

[463] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 171:7-14).

"agreed to deal directly with Andrew Wang when offers are made in [the] future on the sale of one or more paintings in the estate."[464]

308.     Ewald testified that she is not, and was not at the time she was working for the Estate, an expert in Chinese classical art.[465] Nor did OTE employ any experts in this area until in or about 2015—long after it had completed its review work for the PA and the Estate.[466]

309.     Andrew, on the other hand, is an art consultant who is qualified to determine the authenticity of classical Chinese paintings.[467] He was a former specialist at Sotheby's in the 1990's where his responsibilities included cataloguing works and "helping them sell Chinese paintings."[468] He has also done consulting work for Chinese auction houses, such as the Chieftown Auction House in Hong Kong.[469]

310.     Andrew works as Chinese art specialist in China, Hong Kong, and the United States.[470] He testified in 2017 (at the trial to resolve the validity of the 2003 Fraudulent Will) that almost everyone involved in the field of Chinese classical art knows of him.[471]

---

[464] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 59:6-61:21) (and Exh. 10 thereto. KING 007570).

[465] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 46:16-47:22; 88:11-90:14) Savitsky Decl. Exh. 15 (ELE-17: "I do not hold myself out to be an expert on Chinese paintings).

[466] Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 46:16-47:22).

[467] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 25:10-31:20).

[468] Savitsky Decl. Exh. 24 (AW 2013 Dep. Trans. at 60:3-62:9).

[469] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 30:17-31:20).

[470] Savitsky Decl. Exh. 5 (Prob. Trial Trans. at 521:2-26).

[471] Savitsky Decl. Exh. 5 (Prob. Trial Trans. at 522:2-522:16.)

311.    In fact, a Chinese art periodical, 99 Art News, named Andrew Wang the "46th Most Influential Figure in the Chinese Art World" in 2015.[472]

312.    Every auction season, Chinese auction house owners invite Andrew to attend their auction and give him a hotel room to stay in for free.[473]

313.    In addition to providing consultations regarding the authenticity of Chinese paintings, Andrew has his own collection of classical Chinese paintings.[474] Andrew claims he currently owns somewhere between five and fifty pieces of classical Chinese art.[475]

314.    And though he does not think he has auctioned more than 200 classical Chinese paintings, he could not remember if he has auctioned ten, fifty, or 100 paintings from his collection in the past.[476]

315.    Some of the Chinese auction houses which Andrew recalls consigned classical Chinese paintings with are Poly Auction House, China Guardian, and Chieftown Auction House.[477]

316.    Whereas Ewald claimed she did not hold herself out to be an expert on Chinese paintings, the PA believed that Andrew did.[478] And the PA trusted Andrew as a result.[479]

---

[472] Savitsky Decl. Exh. 5 (Prob. Trial Trans. at 522:17-523:9)

[473] Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 38:9-39:19).

[474] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 25:10)

[475] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 25:10-26:22).

[476] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 31:24-34:7).

[477] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 47:21-48:21 (Poly and China Guardian); 66:4-23 (Chieftown Auction House).

[478] Savitsky Decl. Exh. 14 (6/14/19 Ewald Dep. Trans. at 105:15-107:25) Savitsky Decl. Exh. 15 (Exhibit 21 to Ewald Dep.); PA Decl. Exh. 25 (KING 007626).

[479] PA Decl. Exh. 25 (KING 007626).

317.    In an email to Schram and Ewald concerning the selection of certain works for auction at Sotheby's in 2006, the PA wrote that she relied on Andrew's judgment as an "expert" and as her "co-fiduciary."[480]

318.    For her part, Ewald acknowledged that she "very much respect[ed] [Andrew's] judgment on Chinese painting values."[481]

319.    Even when Ewald had a concern that certain of Andrew's prices were too low, she emphasized that she was "not challenging [his] values" and understood that Andrew had "a good inside market grasp of private dealers and private sales."[482]

320.    In dealing with Andrew, Ewald believed Andrew was trying "to get the best deal" he could for the Estate's paintings.[483] Indeed, prior to the Estate's very first sale, Klein had instructed Andrew that he needed to "receive the best price for the art" which the Estate was selling and thus needed to "[g]et the best offer you can from your clients" before presenting those proposed sales to the PA to "try and convince [her] . . . that the price you are getting is the best."[484]

321.    Andrew acknowledged this responsibility throughout the entire five-year sales process.[485] He told Ewald in May 2008 he understood his "purpose" was "to achieve an ideal price for the Estate."[486]

---

[480] PA Decl. Exh. 25 (KING 007626).

[481] Savitsky Decl. Exh. 65 (WANG002255).

[482] Savitsky Decl. Exh. 65 (WANG002255).

[483] Savitsky Decl. Exh. 65 (WANG002255).

[484] Savitsky Decl. Exh. 32 (WANG001890).

[485] Savitsky Decl. Exh. 32 (WANG001890 (December 2004 email between Andrew and Klein regarding the objectives of the Estate's sales); Savitsky Decl. Exh. 65 (WANG002255 (May 2008 email between Andrew and Ewald regarding the objectives of the Estate's sales)).

[486] Savitsky Decl. Exh. 32 (WANG001890 (December 2004 email between Andrew and Klein regarding the objectives of the Estate's sales)); Savitsky Decl. Exh. 65

**V.     May 2005: The Kings' and Wangs' Failed Settlement Attempt in Shanghai China.**

322.    At the same time the Co-fiduciaries were selling the Estate's classical Chinese paintings, Yien-Koo King and the Wang Defendants continued to litigate the merits of the will contest in the Surrogate's Court.[487]

323.    In the spring of 2005, after two years of litigation, the Wang Defendants and Yien-Koo agreed upon an outline to resolve all outstanding litigation.[488]

324.    To settle all existing litigation, Yien-Koo maintains that the agreed-upon arrangement was that she would deliver 46 paintings over to Andrew, as Estate fiduciary, in return for Andrew and Shou-Kung's delivery of five paintings to Yien-Koo.[489]

325.    Because many of the paintings were already located overseas, the parties agreed to meet in Shanghai, China to effectuate the exchange (referred to by the parties as the "Shanghai Exchange").[490]

326.    During a meeting at the Jinan Hotel on May 11, 2005, the exchange occurred.[491]

327.    Yien-Koo has testified that she and her husband (with the help of their son Raymond) delivered forty-six (46) rare and valuable classical Chinese paintings to Andrew in his capacity as the Estate's preliminary executor.[492]

328.    According to Yien-Koo's testimony, Andrew inspected and individually signed-for the scrolled paintings over three hours, placed all 46 in a suitcase and a nylon

---

(WANG002255 (May 2008 email between Andrew and Ewald regarding the objectives of the Estate's sales)).

[487] YK Decl. at ¶23.

[488] YK Decl. at ¶23.

[489] YK Decl. at ¶24.

[490] YK Decl. at ¶25.

[491] YK Decl. at ¶26.

[492] YK Decl. at ¶27.

bag, and took everything back home to his apartment in Shanghai.[493]

329.    An excerpt from the document which was, indisputably, initialed 46 times by Andrew and signed by him appears below:[494]

| # | KK# | SK# | Artist (Chinese) | Desc (Chinese) | Artist | Description | Initial |
|---|-----|-----|------------------|----------------|--------|-------------|---------|
| 1 | A 02C4/S | D4024 | 无款（元） | 晚渡图绢本团扇 | Anonymous | Evening Ferry | AW |
| 2 | H 0805/S | D4002 | 无款 宋人 | 秋瓜轴 | Anonymous | Autumn Pumpkin | AW |
| 3 | H 1010/S | A1065 | 八大山人（清） | 月鹿图轴 | Bada Shanren | Moon & Deer | AW |
| 4 | H 0302/S | A1008 | 八大山人（清） | 荷花水鸟图轴 | Bada Shanren | Small Bird and Lotus | AW |
| 5 | H 1111/S | A1010 | 程正揆（清） | 庚戌写御寒图轴 | Cheng Zhengkui | Blue Brook | AW |
| 6 | H 0203/S | A1297 | 戴文进（明） | 沧江渔隐图轴 | Dai Wenjin | Fisherman | AW |
| 7 | H 0608/S | JBG/A1309 | 丁云鹏（明） | 扫象图轴 | Ding Yunpeng (Nanyu) | Sweeping the Elephant | AW |
| 8 | D 0302/B | B2066 | 黄贤 半千（明/清） | 山水卷 | Gong Xian (Banqian) | Landscape | AW |
| 9 | H 0100/S | | 郭熙（宋） | 秋山行旅图轴 | Guo Xi | Travellers in the Autumn Mountains | AW |

330.    According to Yien-Koo, the Kings then took their five paintings and, after completing a final settlement task the next day, believed that Andrew would report the successful exchange and start the process of closing the litigation.[495]

331.    Yet eight months after the exchange, the settlement had failed to achieve anything. Andrew insisted that he did not receive the 46 paintings. [496]

332.    When the Kings reported to the Surrogate's Court that they had been deceived, Andrew responded with a sworn submission claiming he received and was "still holding" only fifteen (15) paintings, which he specifically identified, from the list of 46.[497]

333.    The other 31 paintings on the signed Shanghai Exchange list, Andrew swore, were not brought to the hotel meeting by the Kings and never touched his hands.

334.    Andrew claimed he only signed and initialed for all 46 paintings at the start of the meeting under duress and before receiving anything. After forcing him to preemptively

---

[493]  YK Decl. at ¶¶27-28.

[494]  YK Decl. Exh. 2 (KING 008149).

[495]  YK Decl. at ¶¶30-31.

[496]  YK Decl. at ¶¶32-33.

[497]  YK Decl. Exh. 7.

sign, so Andrew testified, the Kings gave him a fraction of what they promised.[498]

335.    One of the 31 paintings which Andrew swore in affidavits, through interrogatory responses, and during depositions that he never got was the 700-year-old masterpiece by the 14th century painter *Wu Zhen* entitled "Wild Bamboo."[499]  Another was a particularly famous work by *Guo Xi* known as "Travelers in the Autumn Mountains." [500]



| *Wu Zhen*: Wild Bamboo | *Guo Xi*: Travelers in Autumn Mountains |
|---|---|
| #38 on the Shanghai Exchange List. | #9 on the Shanghai Exchange List. |

336.    Yien-Koo, on the other hand, filed a verified petition with the Surrogate's Court in 2006 alleging that Andrew received all 46 paintings on the Shanghai Exchange list (the 2006 Removal Petition) and requesting he be removed as fiduciary for keeping them for himself, rather than turning them over to the Estate.[501]

337.    Yien-Koo's petition to remove Andrew for his alleged theft of these 46 paintings has been stayed by the Surrogate's Court for fourteen (14) years.[502]

**VI.    November 2009: Bao Wu Tang's Display of Fifteen of the Ninety-Eight Estate-Sold Classical Paintings and Three Classical Paintings Received by Andrew at the Shanghai Exchange.**

---

[498] YK Decl. at ¶34.

[499] YK Decl. at ¶¶32, 38-39.

[500] YK Decl. at ¶¶38-39.

[501] YK Decl. at ¶32.

[502] YK Decl. at ¶41.

A.   *The November 2009 Bao Wu Tang Exhibition and Its Catalogue*

338.   In November 2009, the Capital Museum of Beijing, in association with the well-known Hanhai Beijing Auction Co. Ltd., hosted a three-week long exhibition entitled "*Bao Wu Tang*—An Important Overseas Painting and Calligraphy Collection Exhibition" (the "Bao Wu Tang Exhibition").[503]

339.   Andrew was the owner/master of the Bao Wu Tang gallery at the time of the exhibition and is currently still "doing business as Bao Wu Tang."[504]

340.   The exhibition kicked off with an opening dinner ceremony attended by "600 people in the [Capital Museum's] lobby hall," and Andrew himself.[505]

341.   A 131-page hardcover, color exhibition catalogue was published for the exhibition and contained images of the pieces that were displayed (the "BWT Catalogue").[506] Inscribed on the BWT Catalogue's cover is the English phrase "Bao Wu Tang—Magnificent Collection of Classical Chinese Paintings and Calligraphy from Abroad."[507]

342.   The BWT Catalogue contains a preface attributed to Andrew and which Andrew admits he reviewed and approved prior to the catalogue's publication.[508]

343.   As the Bao Wu Tang's master/owner back in November 2009, Andrew wrote that the Bao Wu Tang Exhibition "br[ought] together the collections of the late

---

[503] YK Decl. at ¶42.

[504] Savitsky Decl. Exh. 72 (KING 003159-3161 (Translation of the Bao Wu Tang Preface)); Savitsky Decl. Exh. 2 (AW and SK answer to Amended Complaint, p. 1); Savitsky Decl. Exh. 11 (AW 2019 Dep. Trans at 16:6-11).

[505] Savitsky Decl. Exh. 24 (AW 2013 Dep. Trans. at 311:14-312:20).

[506] YK Decl. at ¶45; Savitsky Decl. Exh. 24 (AW 2013 Dep. Trans. at 477:5-11; 478:9-23).

[507] YK Decl. at ¶45.

[508] Savitsky Decl. Exh. 24 (AW 2013 Dep. Trans. at 528:20-529:2).

grandfather Wang Jiqian [C.C. Wang] and that of some of his family members." [509] He exulted "[t]he rich theme of the exhibition and brilliant content" which served to "emphasize the importance of the collection of the Wang family." [510]

344.    Turning to himself, Andrew's preface proclaims: "as one of the heirs of the Wang family, I feel obligated to organize these important family collections" for the Chinese people. [511]

345.    Andrew allegedly wanted to provide art lovers with an opportunity for a deeper knowledge of Chinese art, but regretted his inability to organize a more complete showing: [512]

> I want to give those who love ancient Chinese calligraphy and painting a chance to gain a deeper understanding of the spirit of the national culture and artistic traditions. At the same time, for special reasons, I am not currently able to organize and present the entire family collection. This is a pity and I hope that there will be another opportunity to hold such exhibitions in the near future.

346.    In addition to writing a preface, Andrew spoke on stage at the exhibition opening ceremony: [513]

---

[509] Savitsky Decl. Exh. 72 (KING003160).

[510] Savitsky Decl. Exh. 72 (KING003160).

[511] Savitsky Decl. Exh. 72 (KING 003159-3161).

[512] Savitsky Decl. Exh. 72 (KING 003160).

[513] YK Decl. at ¶44, Exh. 4.



347.    The Bao Wu Tang Exhibition displayed approximately 30 classical Chinese paintings.[514]

348.    Fifteen (15) of these were paintings which had been sold by the Estate pursuant to its contracts with Wei Zheng, Chen Mei-Lin, Anthony Chou, Yong Qing-Ye, and Yue Da-Jin.[515]

349.    Another three (3) were paintings which Yien-King claimed she had delivered to Andrew at the Shanghai Exchange in May 2005. [516] One of these three paintings was titled "Travelers in the Autumn Mountains" by the artist Guo Xi.[517] Another was titled "Wild Bamboo" by *Wu Zhen*.[518]

---

[514] YK Decl. ¶46.

[515] YK Decl. ¶46.

[516] YK Decl. ¶47.

[517] YK Decl. ¶47.

[518] YK Decl. ¶47.

350.    Though the *Guo Xi* and the *Wu Zhen* were displayed at the Bao Wu Tang Exhibition, Andrew had previously denied receiving either of these two works.[519]

351.    Below is an image of the *Guo Xi* as it hung on display at the 2009 Bao Wu Tang Exhibition in Beijing, followed by photograph of its placard:[520]





---

[519] YK Decl. ¶¶34-35; <u>Exh. 7</u> at ¶45.

[520] YK Decl. at ¶48; <u>Exh. 5</u>.

352.   Below is a photograph of the *Wu Zhen*, "Wild Bamboo" as it hung on display at the 2009 Bao Wu Tang Exhibition:[521]



**B.   *Yien-Koo's March 8, 2010 Motion to Supplement the Removal Petition and Due Diligence in Seeking Information Related to the Estate's Sales***

353.   On March 8, 2010 Yien-Koo filed a motion in the Surrogate's Court seeking leave to supplement the 2006 Removal Petition, which sought Andrew's removal as the Estate's preliminary executor for denying that he received all 46 paintings at the Shanghai Exchange and keeping them for himself.[522]

---

[521] YK Decl. at ¶48; <u>Exh. 5</u>.

[522] YK Decl. at ¶49.

354.    Based upon her attendance at the Bao Wu Tang Exhibition, Yien-Koo requested the Court's permission to include allegations that Andrew had displayed paintings that he denied receiving in the Shanghai Exchange—such as the *Guo Xi*—at his 2009 Bao Wu Tang Exhibition.[523]

355.    By March 8, 2010, Yien-Koo was still unaware of the circumstances surrounding the Estate's six private sales, or even if sales had actually occurred.[524]

356.    Specifically, it still had not been disclosed to her:  (i) which or how many of the Estate's paintings were sold; (ii) at what price they were sold;  (iii) to whom they were sold, or (iv) when they were sold.[525]

357.    Accordingly, Yien-Koo's motion to amend her 2006 Removal Petition contained no allegations that Andrew had sold paintings to himself.[526]

358.    Yien-Koo continued to seek information from the Co-fiduciaries related the Estate's sales, but was refused access to any information about the Estate's financial condition or sales.[527]

359.    On December 18, 2010, counsel for the PA, Schram, responded to Yien-Koo's written request for more information related to the Estate's sale by noting that the New York Surrogate determined an accounting of the Estate's sales to be premature, and flatly refusing to provide the requested information.[528]

360.    Schram, speaking on behalf of the PA, further remarked that, in any event, Yien-Koo had no standing to view the Estate's sales records because she had been

---

[523] YK Decl. at ¶¶50-52.

[524] YK Decl. ¶¶52, 56.

[525] YK Decl. ¶¶52, 56.

[526] YK Decl. ¶56.

[527] YK Decl. ¶56.

[528] YK Decl. Exh. 6 (KING7 - 001018-1019).

disinherited by the terms of the 2003 Fraudulent Will (which had not yet been exposed as fraudulent):[529]

> Your letter addresses me as the "Public Administrator". Please note for future correspondence that my firm is the attorney for the Public Administrator in the proceedings relating to the above estate.
>
> Essentially, you are requesting that the Public Administrator now account to your clients so that you may determine whether any item was "wrongfully sold" from estate inventory. We have discussed, most recently before Surrogate Glen, the Public Administration's belief that such an accounting is premature, as your clients have no interest in the estate under the will currently offered for probate. At the conference, Surrogate Glen did not appear to view this position as unreasonable.

361.    Yien-Koo did not receive documentation from the Co-fiduciaries concerning the sales—which identify which of the Estate's paintings had been sold, to whom they had been sold, or for how much they had been sold—until sometime in or around 2013.[530]

### VII.    It Cannot Be Genuinely Disputed That the Estate Suffered Damages as a Result of Andrew Wang's Admitted Failure to Negotiate Prices with Any of the Five Purported Buyers.

362.    The Plaintiff's expert witness, Patrick Regan, issued a report on October 11, 2019 (the "Regan Report") that included two separate appraisals and various other substantive opinions.[531]

363.    One of the appraisals included in the Regan Report was a 40-page "Retail Value Appraisal" (the "RV Appraisal") retroactively valuing the fourteen paintings sold in August 2009 under the Estate's contract with "Mr. Yue Da-Jin," as of the approximate date of that sale.[532]

---

[529] YK Decl. Exh. 6 (KING7 - 001018-1019).

[530] YK Decl. at ¶57.

[531] Declaration of Patrick Regan, dated February 13, 2020 ("Regan Decl.")

[532] Regan Decl. Exh. 2.

364.    The Estate sold 14 paintings pursuant to the Estate's contract with "Yue Da-Jin" for a total price of $484,920.00 (exclusive of shipping costs).[533]

365.    According to Mr. Regan, the combined Retail Value of these 14 paintings in August 2009 was actually <u>$1,978,000.00</u>.[534]

366.    The Wang Defendants' lone expert, Kenneth Jay Linsner, has not provided any counter-appraisal or counter-valuation of the 14 works as of 2009.[535]

367.    In fact, Mr. Linsner has not provided his own appraisal or valuation as to any of the paintings at issue in this action:[536]

> Q: Okay. Did you conduct any appraisals of the 98 classical Chinese paintings at issue in this lawsuit?
>
> A: No.
>
> Q: Did you do any appraisals of any of the 98 paintings that Andrew Wang sold from the C.C. Wang Estate?
>
> A: No.
>
> Q: So even if you did not do a formal appraisal, did you make any efforts to value any sum or all of those 98 paintings?
>
> [Objection]
>
> A: No.

368.    Mr. Linsner has, however, opined that there are "no damages" in this case:[537]

---

[533] Savitsky Decl. <u>Exh. 68</u> (WANG00536).

[534] Regan Decl. at ¶6.

[535] Savitsky Decl. <u>Exh. 75</u> (Linsner Dep. Trans. at 124:16-125:11).

[536] Savitsky Decl. <u>Exh. 75</u> (Linsner Dep. Trans. at 124:16-125:11).

[537] Savitsky Decl. <u>Exh. 75</u> (Linsner Dep. Trans. at 126:11-25).

Q: In Paragraph 44, you state: "It is my opinion that the Estate suffered no damages from the sale of the 98 artworks via private sales." Correct?

A: Yes

Q: What is the basis for that opinion?

A: The basis for that opinion is that the original document upon which the sale prices were asked was performed by a leading expert in Chinese classical paintings as of the date of death, and the addition of 20% later on, which I understood took place, was sufficient to render the sale values within reason.

Q: Any other basis for that opinion?

A: No.

369.     The "original document" Mr. Linsner refers to is the Sotheby's appraisal, which determined the value of C.C. Wang's assets as of the date of his death on July 3, 2003.[538]

370.     The sale of the 14 paintings under the Estate's contract with "Yue Da-Jin" occurred in August 2009, more than six years after the effective date of the Sotheby's Appraisal.[539]

371.     While Mr. Linsner bases his opinion that there are no damages on "the addition of 20% later on, which [he] understood took place," he is incorrect in that understanding because the sale of 14 paintings under the Estate's contract with "Yue Da Jin" were originally appraised by Sotheby's to be worth a combined $559,500.00.[540]

---

[538] Savitsky Decl. Exh. 75 (Linsner Dep. Trans. at 85:9-21; 121:20-123:20).

[539] Savitsky Decl. Exh. 68.

[540] PA Decl. Exh. 23 (indicating Sotheby's appraisal value of the 14 paintings); PA Decl. Exh. 19.

372.    For Mr. Linsner's understanding to have been correct, the Estate would have needed to sell paintings to "Yue Da-Jin" for $671,400.00 (20% more than their value as appraised by Sotheby's).

373.    Instead, the Estate sold 14 paintings under its contract with "Yue Da Jin" for $484,920.00 exclusive of shipping, handling and insurance costs—13.3% *lower* than the Sotheby's appraisal.[541]

374.    Thus, the factual basis for Mr. Linsner's opinion as to why "the Estate suffered no damages" is indisputably incorrect.


Dated: New York, New York
     February 14, 2020             Respectfully submitted:

                                    **SAM P. ISRAEL, P.C.**

                                    By: */s/ Timothy Savitsky*

                                    Sam P. Israel, Esq. (SPI 0270)
                                    Timothy Savitsky, Esq. (TS 6683)
                                    180 Maiden Lane, 6th Floor
                                    New York, New York 10038
                                    Main-646-787-9880; Fax: 646-787-9886;
                                    Email: timsavitsky@spi-pc.com
                                    *Attorneys for Yien-Koo King*

---

[541] Savitsky Decl. Exh. 68 (WANG00536).