**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

YIEN-KOO KING,

                              **Plaintiff,**

        -against-

ANDREW WANG, SHOU-KUNG WANG, BAO WU
TANG, JIAN BAO GALLERY, ANTHONY CHOU,
CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE
DA-JIN and JOHN DOES 1-9,

                              **Defendants.**

1:14-Civ-07694-(LJL) (JLC)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

**SAM P. ISRAEL, P.C.**
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

## TABLE OF CONTENTS

Table of Authorities ......................................................................................... ii

**PRELIMINARY STATEMENT** ................................................................. 1

**FACTS** ......................................................................................................... 5

I.  *CC Wang's Life, Death, and the Creation of the Fraudulent Will Names Andrew Wang as the Executor of His Estate* ......................................... 5

II.  *The Creation of the Estate of Chi-Chuan Wang, Appointment of Andrew Wang as Preliminary Executor, and the Turnover of Assets to the Estate* ........ 7

III.  *The Process by Which the Estate Sold 98 Classical Chinese Paintings to Five Purported Chinese Buyers Between 2005 and 2009* ................................. 9

    **A.**  *The Payment for the Paintings from Andrew's Own Off-Shore Accounts* ...... 10

    **B.**  *The Shipment of the Paintings to Andrew's Own Accountant's Office* .......... 11

    **C.**  *The Finding of the Five Buyers by Andrew and/or "Er Shi Fu"* .................... 13

    **D.**  *Andrew's Non-Communication with the Buyers and Non-Involvement in the Negotiating Sale Prices with Them* ................................................. 14

IV.  *Andrew Wang's Contemporaneous Representations to the Estate Concerning His Role in Negotiating Prices with the Buyers on Behalf of the Estate Between 2005 and 2009* ............................................................. 16

V.  *Calculation of the Estate's Damages Stemming From Andrew's Failure to Negotiate Prices with Yue Da Jin* ....................................................... 20

**ARGUMENT** .............................................................................................. 24

**I. Legal Standard:** *A Properly Supported Motion for Summary Judgment May Be Granted Where There Is No Genuine Disputed Issue of Material Fact* .......................... 24

**II. Andrew Wang Is Personally Liable for Breach of His Fiduciary Duty**: *Andrew Failed to Disclose Material Information to His Co-Fiduciary Concerning His Role in Negotiating Prices and the Estate Suffered Injury as a Result* ............................. 25

A.   *Andrew Was a Fiduciary of the Estate at the Time of the Estate's Sale of 98 Paintings Who Was Believed to Have Knowledge and Experience in Selling Chinese Paintings* ...................................................................25

B.   *Andrew Wang Breached His Duties of Full Disclosure, to Act with the Utmost Good Faith, and to Abstain from Self-Dealing* ..............................26

C.   *The Estate Suffered Damage as a Result of Andrew's Failure to Negotiate on Its Behalf* ...........................................................................................29

**CONCLUSION** .............................................................................................30

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................24

*Barret v. Freifeld*, 64 A.D.3d 736 (N.Y. App. Div., 2d Dep't 2009) ..........................25

*Benson v. RMJ Sec. Corp.*, 683 F.Supp. 359 (S.D.N.Y. 1988) .......................................26

*Carro, Spanbock, Kaster, & Cuiffo v. Rinzler*, 88 Civ. 5280, U.S. Dist. LEXIS 11585 (Jul. 31, 1992 S.D.N.Y.) ........................................................................26

*Clifton Land Co. LLC v. Magic Car Wash, LLC*, 165 A.D.3d 1455 (N.Y. App. Div. 3d Dep't 2018) ...........................................................................................27

*Cont'l Cas. Co. v. Marshal Granger & Co., LLP*, 6 F. Supp. 3d 380 (S.D.N.Y. 2014).. ....................................................................................................................27

*Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54 (2d Cir. 1987)................24

*In re Estate of Brandt*, 81 A.D. 268 (N.Y. App. Div. 1st Dep't 1981) ..........................27

*In re Estate of Rothko*, 43 N.Y.2d 305 (N.Y. Ct. App. 1977) .....................................4, 25

*In re Estate of Schuman*, 2009 NYLJ LEXIS 3177 (Sur. Ct. New York Cnty. Dec. 23, 2009) ...........................................................................................................24

*In re Parmalat Sec. Litig.*, 684 F.Supp. 2d 453 (S.D.N.Y. 2010) ...................................26

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ..............................................25

*Johnson v. Nextel Communcs., Inc.*, 660 F.3d 131 (2d Cir. 2011) ................................25

*Levin v. Gallery 63 Antiques Corp.*, 04-cv-1504, 2006 U.S. Dist. LEXIS 70184 (S.D.N.Y. 2006)................................................................................................29

*Meinhard v. Salmon*, 164 N.E. 545 (N.Y. Ct. App. 1928)..............................................26

*Meisel v. Grunberg*, 07-CV-11610, 2010 U.S. Dist. LEXIS 128513 (S.D.N.Y. 2010)… ...................................................................................................  3, 4, 26

*Mortiz v. Town of Warwick*, 15-cv-5424, 2017 U.S. Dist. LEXIS 173563 (S.D.N.Y. Oct. 19, 2017) ......................................................................................................25

*Rambacher v. Bemus Point Cent. Sch. Dist.*, 2007 U.S. Dist. LEXIS 41269  (W.D.N.Y. 2007) ..............................................................................................................24

*Robbins v. Moore Med. Corp.*, 894 F.Supp. 661 (S.D.N.Y. 1995) ............................4, 29

*Skyline Steel, LLC, v. Pilepro, LLC*, 13-cv-8171, 2016 U.S. Dist. LEXIS 102908 (S.D.N.Y. Aug. 4, 2016) ..............................................................................27

*Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir. 1989) ..................26

*United States v. Szur*, 289 F.3d 200 (2d Cir. 2002) ......................................................26

## STATUTES, RULES, REGULATIONS

Fed. R. Civ. P. Rule 56(a)................................................................................................24

## SECONDARY SOURCES

William Meade Fletcher, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS §14A ................................................................................................................25

Plaintiff Yien-Koo Wang King, in her capacity as preliminary executrix of the Estate of Chi-Chuan Wang ("Plaintiff" or "Yien-Koo"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and the Local Civil Rules of this Court, by and through its undersigned counsel, hereby submits this Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment (the "Motion") on Count IX (Breach of Fiduciary Duty) against Defendant Andrew Wang ("Andrew" or "AW") as set forth in her Amended Complaint.

## PRELIMINARY STATEMENT

Defendants Andrew and Shou-Kung Wang,[1] together with named accomplices and corporate entities, participated in a scheme to use five fictitious strawmen buyers to purchase 98 classical Chinese paintings (the "98 Paintings") from the Estate of Chi-Chuan Wang ("Estate") while Andrew served as a one of its two fiduciaries. Discovery has revealed that—unbeknownst to his co-fiduciary, the Public Administrator of New York County ("PA")—the sources of the $4.34 million paid to the Estate for the 98 Paintings were the Wangs Defendants' own offshore corporations. Moreover, these works were shipped—again, unbeknownst to the PA—to Andrew's personal accountant, Billie Wai, in Hong Kong. Once all the sales were completed, Andrew then organized an exhibition in Beijing where 15 of the 98 Estate-sold Paintings were hung on display as part of the "Bao Wu Tang" collection. The paintings which Andrew paid for and delivered to

---

[1] Andrew and Shou-Kung Wang ("SK") are collectively referred to as the "Wang Defendants" or "Wangs."

himself have a current market value of $71,424,000.[2] This is self-dealing of the highest order.

The intricacies of the Wang Defendants' RICO enterprise and self-dealing scheme will be the subject of ample evidence at trial. The Record is replete with proof that Andrew's five Chinese "buyers" (with the exception of Andrew's friend, "Wei Zheng") were wholly fictitious persons used to orchestrate sales of the Estate's 98 Paintings directly to the Wangs. Despite these buyers supposed purchase of $4.3 million worth of assets from the Estate through six transactions, Andrew has not produced a single email, fax, or other written communication with any of them.

Yet prior to a trial on the contours of the Defendants' RICO enterprise and Andrew's breach of his fiduciary duty of loyalty through self-dealing, as a preliminary matter, the Court should adjudge Andrew liable for breaching his duties of good faith and full disclosure. Andrew's own sworn admissions and the documentary evidence establish that he breached these obligations by misrepresenting to the PA, his Co-fiduciary, that he was actively negotiating with five buyers on behalf of the Estate to achieve the best prices possible, when, in fact, he was not.

Because Andrew's fiduciary breaches are numerous, the credibility of Andrew's denials of self-dealing (which will be resolved at trial) need not be determined by the Court in order for partial summary judgment to issue in the Plaintiff's favor on Count IX.

---

[2] *See* February 13, 2020 Declaration of Patrick Regan ("Regan Decl.") Exh. 1 at ¶27. The Wang Defendants have not submitted any independent appraisal contesting the present-day value of the 98 self-dealt paintings.

A district court may grant summary judgment for a plaintiff on a breach of fiduciary duty claim where the undisputed facts establish, as a matter of law, a fiduciary's failure to disclose material information. *Meisel v. Grunberg*, 07-CV-11610, 2010 U.S. Dist. LEXIS 128513 (S.D.N.Y. 2010) (BSJ). Here, regardless of whether he self-dealt (and it is obvious that he did), Andrew expressly represented to his Co-fiduciary that, throughout the five-year process of selling the Estate's 98 Paintings, he was himself locating and communicating with ostensible buyers and trying to convince them to purchase Estate assets at the highest possible prices. Yet we now know, through Andrew's own admissions, that he was not negotiating with anyone. At his June 2019 deposition, Andrew disavowed any participation in sales negotiations: he never had direct communications with any buyers, played no role "at all" in setting the Estate's sale prices, and deferred all determinations as to what prices the 98 Paintings would sell for to his Co-fiduciary and her hired art consultant.[3]  He claimed to have relied on nothing other than a Sotheby's tax appraisal from 2004[4] and his Co-fiduciary's opinion in agreeing to the sales of his grandfather's world-famous art collection.[5]

Andrew's 2019 denial of participation in negotiations is a transparent ploy: he needs a way to explain his utter lack of documented communications with any of the fictive buyers and to distance himself from the Estate's bargain-bin sale prices. Still, even

---

[3] Elin Ewald of O-Toole-Ewald Art Associates ("OTE"); Savitsky Decl. Exh. 11 (AW 6/25/19 Dep. Trans. at 75:9 - 76:8).

[4] February 14, 2020 Declaration of the Public Administrator of New York County ("PA Decl.") Exh. 19 (the "Sotheby's Appraisal").

[5] February 14, 2020 Declaration of Timothy Savitsky ("Savitsky Declaration") Exh. 11 (AW 2019 Dep. Trans. 90:25 - 91:14).

taking his 2019 testimony at face value, Andrew breached his fiduciary duty as a matter of law by expressly misrepresenting to the PA and her agents that he was negotiating at arm's length with the buyers on the Estate's behalf. Since he was not, summary judgment should be entered finding Andrew liable under Count IX. *See Meisel*, 2010 U.S. Dist. LEXIS 128513 (granting plaintiff partial summary judgment on liability for breach of a fiduciary duty where a fiduciary failed to disclose a fact that was material, as a matter of law, to his principal).

Andrew's admitted failure to negotiate at arm's length on the Estate's behalf caused it significant injury. Whereas the Estate sold 14 paintings in August 2009 to a purported buyer named "Yue Da Jin" for $489,772.00, those paintings' Retail Value at the time was actually $1,978,000.00 according to the Plaintiff's expert.[6]  Because the Wangs' expert has not offered his own opinion as to the value of the paintings sold to Yue Da Jin, the Court should enter partial judgment against Andrew in the amount of $1,488,228.00. *Robbins v. Moore Med. Corp.*, 894 F.Supp. 661, 670-71 (S.D.N.Y. 1995) (summary judgment may be granted where indisputable expert testimony supports a finding as a matter of law). Upon proving fiduciary duty breaches for self-dealing at trial, the Plaintiff will seek full appreciation damages for the 98 Paintings. [7]

---

[6] Regan Decl. at ¶6.

[7] Under New York law, establishing Andrew breached his duty of loyalty by self-dealing will entitle the Estate to "appreciation damages" under Count IX based on the current value of the self-dealt assets ($71,424,000). *See In re Estate of Rothko*, 43 N.Y.2d 305 (N.Y. Ct. App. 1977); Regan Decl. Exh. 1. The Plaintiff will seek this amount under Count IX at trial. On the present motion, however, the Plaintiff only seeks partial judgment on Count IX for breaches stemming from Andrew's admitted failure to negotiate with the "buyers" for the best prices attainable by the Estate and the resulting injury to the Estate.

4

## FACTS

A recitation of the undisputed material facts relevant to this case accompany this Motion and are set forth in detail in Plaintiff Yien-Koo's Rule 56 Statement of Material Facts ("SMF"). They are briefly summarized below.

### I.   CC Wang's Life, Death, and the Creation of the Fraudulent Will Naming Andrew Wang as the Executor of His Estate.

Chi-Chuan Wang ("C.C. Wang" or "CC") was a Chinese American artist, scholar, and collector of Chinese art of international renown. Savitsky Decl. Exh. 2 (Answer to Amended Complaint at ¶¶25-26) [SMF ¶¶1-2]. He first immigrated to the United States in 1949 with two of his daughters (one of which is the Plaintiff, Yien-Koo) and his wife. *Id.* at ¶27 [SMF ¶3].

CC's only son Shou-Kung Wang ("SK"), however, was left behind in China. *Id.* at ¶29 [SMF ¶4]. SK claims that, for 30 years, he suffered punishment and indignities at the hands of members of the Communist Party for having been abandoned when his father fled Mao Zedong's new government. Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 6:22-8:3) [SMF ¶4].

In 1979, changes in the relationship between the United States and Chinese governments finally gave SK an opportunity to emigrate from China to New York. Savitsky Decl. Exh. 4 [SMF ¶5]. SK left his home country that year with his wife and children (one of whom is Defendant Andrew Wang) to come live with CC in Manhattan. Savitsky Decl. Exh. 2 at ¶29 [SMF ¶5]. Once reunited with his son in New York, CC hired SK to work as his bookkeeper and assistant. Savitsky Decl. Exh. 2 at ¶¶ 29, 34 [SMF ¶6].

5

SK was entrusted to access, catalogue and help manage C.C.'s vast array of classical Chinese paintings. *Id.*

Working for his father for minimal salary displeased SK. Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 504:17-505:22) [SMF ¶7]. Nevertheless, SK agreed to work for his father and in so doing developed a deep familiarity with CC's classical Chinese paintings. Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 90:17-92:17) [SMF ¶8].

But SK eventually lost his position managing CC's art and financial affairs. Savitsky Decl. Exh. 3 (11/18/2003 SK Dep. Trans. at 142:21-145:13) [SMF ¶11]. In 1997, CC "took all of the paintings away" from SK by moving them out of C.C.'s apartment in Manhattan ("Apartment 8A"). *Id.* Then, in 1998, SK claims he learned that he would no longer be involved in his father's financial affairs either. *Id.* SK believed the Kings were responsible for C.C.'s revocation of his authority because CC appointed Yien-Koo and her husband Kenneth King to replace him. YK Decl. at ¶5. SK "was not happy" with this decision and was still having certain "disagreements" with CC years later. Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 616:26-617:11) [SMF ¶13].

Yet suddenly, in February 2003 and at the age of 96, CC executed two documents helmed by SK that purported to disinherit Yien-Koo King from his Estate while simultaneously increasing the share to be received by SK and his children. Savitsky Decl. Exh. 8 [SMF ¶17-18]. These were a purported codicil drafted by SK dated February 10, 2003 (the "Fraudulent Codicil") followed by a purported will dated February 18, 2003 (the "Fraudulent Will") whose terms were dictated by SK to an attorney named Jerome

6

Kamerman. Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 553:17- 554:4, 555:16-25) [SMF ¶18]. Both documents shared the same material terms which (a) nearly doubled SK's family share of his father's Estate to 60%; (b) disinherited SK's sister (Plaintiff, YK); and (c) named SK and Andrew as co-executors in charge of managing CC's Estate assets. Savitsky Decl. Exh. 5 (4/21/17 AW Prob. Tr. Trans. at 556:4-559:2); Savitsky Decl. Exh. 8 (1/2/20 Appellate Division, First Department Decision and Order).

On July 3, 2003, C.C. Wang passed away. A seventeen-year probate dispute to determine the validity of the Fraudulent Will and Codicil ensued. YK Decl. at ¶9; Savitsky Decl. Exh. 8. In 2018 and again in 2020 the Appellate Division of the New York State Supreme Court affirmed a unanimous jury's finding that in January and February 2003, the Wang Defendants conceived of and executed a "scheme" to fraudulently and coercively induce the 96-year-old CC Wang into executing both the Fraudulent Codicil and the Fraudulent Will. Savitsky Decl. Exhs. 7, 8 [SMF ¶28].

## II.    The Creation of the Estate of Chi-Chuan Wang, Appointment of Andrew Wang as Preliminary Executor, and the Turnover of Assets to the Estate.

The exact value and identity of all the property which C.C. Wang owned during his life has been the subject of dispute between the parties. Savitsky Decl. Exh. 2 at ¶¶32, 70) [SMF ¶30]. They agree however, that at the time of his death, C.C. had amassed a collection of hundreds of fine art works, real property, certain financial accounts, and a

collection of more than 100 classical Chinese paintings[8]—some of which were over 1000 years old. Savitsky Decl. Exh. 2 at ¶26 [SMF 30(a), (e)].

The Fraudulent Will named SK and Andrew as co-executors. Savitsky Decl. Exh. 2 at ¶74; YK Decl. at ¶14 [SMF ¶¶33-36].  In July 2003, Yien-Koo objected to its probate on the grounds that the Wang Defendants secured its execution through fraud. YK Decl. at ¶14.  While that probate contest was pending, in August 2003, the Surrogate's Court granted Andrew's application for preliminary letters testamentary because he was named a "co-executor" by the Fraudulent Will. PA Decl. Exh. 1. The Surrogate's Court also appointed the New York County PA to serve as temporary administrator to act jointly with Andrew as Co-fiduciary[9] of the Estate. *Id.* (In May 2017, after 14 years, Andrew was finally stripped of his fiduciary status when a jury found he acquired it through his defrauding of C.C. Wang). Savitsky Decl. Exh. 6 [SMF ¶37].

By late 2003, the PA—with the aid her legal counsel, Peter Schram, Esq.—began to oversee the collection of Estate property, especially Chinese artwork, that was still in the hands of C.C. Wang's surviving family members. PA Decl. at ¶¶7-8 [SMF ¶¶41-47].[10] Altogether, SK and Yien-Koo delivered a total of 133 classical Chinese paintings to the Estate. PA Decl. at ¶9. In 2004, Sotheby's appraised these paintings to have a fair market

---

[8] The phrase "classical Chinese paintings refers" to Chinese paintings created before 1911.
[9] The PA and Andrew are jointly referred to herein as the "Co-fiduciaries."
[10] The different assets turned over to the Estate, their value, and by whom they were turned over are all relevant to various arguments raised by the parties and to the overall understanding of the functioning of the Estate and its fiduciaries. Their descriptions are therefore more dully included in the Statement of Undisputed Facts.

value of $4,400,350.00 as of July 3, 2003, the date of C.C. Wang's death (the "2004 Sotheby's Appraisal"). PA Decl. at ¶19.

### III.    The Process by Which the Estate Sold 98 Classical Chinese Paintings to Five Purported Chinese Buyers Between 2005 and 2009.

When an estate has taxes and other administration expenses due, the fiduciaries of the estate are, generally, tasked with marshalling assets and selling them in order to pay those expenses. Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 20:19-21:20). [SMF ¶46]. In late 2004, after various appraisals of the Estate's assets had been completed, the two Co-fiduciaries discussed the possible sale of the Estate's assets so as to be in a position to pay the Estate's expenses. Savitsky Decl. Exh. 12 (Schram Dep. Trans. at 14:13–15:5); Savitsky Decl. Exh. 20 (December 6, 2004 email between Klein and Andrew discussing the potential private sale of Estate assets) [SMF ¶¶50-51].

Though Plaintiff Yien-Koo did not know it at the time, the Co-fiduciaries would enter into six contracts to sell a total of 98 classical Chinese paintings between February 2005 and August 2009. PA Decl. at ¶23; YK Decl. at ¶¶20-21 [SMF ¶56]. The sales were made to five purportedly different Chinese men through six contracts for approximately $4.3 million:

- "Wei Zheng" in February 2005 (17 paintings for $400,500.00);

- "Chen Mei Lin" in April 2005 (24 paintings for $1,393,422.00);

- "Anthony Chou" in June 2005 (17 paintings for $909,689.41);

- "Yong-Qing Ye" in September 2005 (18 paintings for $787,810.00);

- "Yong-Qing Ye" again in February 2006 (8 paintings for $354,045.00); and

- "Yue Da Jin" in August 2009 (14 paintings for $489,772.00).

PA Decl. at ¶¶24-42.

### A. *The Payment for the Paintings from Andrew's Own Off-Shore Accounts*

After long concealing the truth about these deals, Andrew testified at his deposition in 2019 (the "2019 Deposition"), that for "all of the five sales" the purchase prices were paid into the Estate by an offshore company which he controlled. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2). [SMF ¶¶63-68, 71-74]. Andrew also admitted to owning one company called "Le Tao Limited" and another called "Le Style Limited," which Andrew used to anonymously buy and sell multi-million-dollar assets. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 130:17-131:21; 240:10-242:7; 258:16-259:262:27); Savitsky Decl. Exh. 25 (Exhibits AW-20 and AW-21 from 6/25/2019 AW Dep. comprising $5.9 Million Residential Contract of Sale dated April 30, 2013 and Amendment). Wire records show he used Le Style Limited to wire $489,772.00 to the Estate's account in 2009 for Estate's sale of 14 paintings to "Yue Da Jin." Savitsky Decl. Exh. 46 (WANG001673-1674). The PA had no idea that her Co-fiduciary was the one paying for the paintings he was selling. PA Decl. ¶52.

The only reason Andrew confessed to owning these companies and paying for the Estate paintings in 2019 because the discovery of documentary records compelled him to do so. *See, e.g.*, Savitsky Decl. Exh. 25 (Exhibits AW-20 and AW-21 from 6/25/2019 AW Dep. comprising Le Tao Limited's Residential Contract of Sale dated April 30, 2013 and Amendment). However, in 2013 when the Plaintiff first suspected a self-dealing scheme, Andrew lied about these same facts. [SMF ¶¶65-69, 71-73, 77]. At a video deposition in

2013 (the "2013 Deposition"), counsel specifically questioned Andrew about how the Estate received payments from the five Chinese buyers who purchased C.C. Wang's famed art collection. Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:19-945:5, 949:19-950:117) [SMF ¶¶66-67]. Rather than revealing it was he who, through offshore companies, wired a total of $4.3 million into the Estate (as revealed in 2019 [11]), he testified "I don't know." Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:19-945:5; *see also id.* at 727:21-729:22). [SMF ¶¶66-67]. Andrew then claimed that the buyers, "have their way" of getting money out of China. *Id.*  The then-fiduciary suggested that maybe "[i]f a company that have import and transport, or expert business, they could get a government quota to wire the money directly to foreign countries." *Id.* This testimony was, of course, a lie: Andrew had paid. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2) [SMF ¶68].

## B. *The Shipment of the Paintings to Andrew's Own Accountant's Office*

Andrew was forced to make another confession in 2019: the Hong Kong address to which all six Estate contracts directed the 98 Paintings be shipped (Unit 704 of the Fourseas Building)[12] was actually the address of Andrew's personal accountant, Billie Wai. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 254:16-256:18, 311:13-19) ("And I even went to the bank to look for it, and including my accountant Billie Wai's

---

[11] Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 240:2-243:2).

[12] All six contracts for the 98 Paintings directed that the paintings be shipped to "*c/o* Billie Wai, Unit #704, Fourseas Building, #208-212, Nathan Road, Kowloon, Hong Kong."

office"). [SMF ¶¶79-92]. At the 2013 deposition, however, Andrew concealed his relationship with "Billie Wai":

> Q: Who is Billy Wai, W-A-I?
>
> A: Who is Billy Wai?
>
> Q: Yes. Do you know that name?
>
> A. No.
>
> * * * * *
>
> Q:[] In terms of Billie Wai, do you know who that person is?
>
> A: You mean the person in Hong Kong?
>
> Q: Yes
>
> A: That's a person that she is receiving the works.
>
> Q: Right.
>
> A: And there is an office in Hong Kong, old office. It's called like a business office, that you can let office receive fax, mails and also, you know. . . .You just use the office to receive your mail, to receive packages and you pay for their service.
>
> * * * * *
>
> Q: Do you know this person, Billie Wai, from before, before this series of transactions?
>
> A: I Contacted that person for that shipment. You know, I just – that is the time I contacted with.

Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 727:21-24; 943:19-944:13, 945:6-946:12).

This testimony about Unit 704 being a generic mailroom whose services you pay for was a lie. Billie Wai actually works for the accounting firm CK Lam, which Andrew admitted in 2019, "has been a family for friend for a long time . . . [W]e form the companies there. We also close the company there.") Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 128:4-17). The PA had no idea that her Co-fiduciary was the one receiving the paintings he was shipping overseas. PA Decl. at ¶52.

## C. *The Finding of the Five Buyers by Andrew and/or "Er Shi Fu"*

In 2013 Andrew testified to having pre-existing friendships with the five strawmen or otherwise knowing them through "friends of friends." Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 707:9-21); [SMF ¶¶93-98]. Thus, Yong Qing Ye was "a friend of mine" from Shanghai "[s]ince 1990." *Id.* at 957:3-5. Anthony Chou knew Andrew "either from Beijing or from Shanghai . . . he has a few places." *Id.* at 948:9-949:2. Chen Mei-Lin was a collector in the southern part of China who, Andrew explained, made "a lot of money" through the "selling [of] imported foreign cars." *Id.* at 961:12-13. Andrew became connected to the last of the buyers, Yue Da-Jin "through a friend in China" named "Mr. Xu," whose first name Andrew could not recall. *Id.* at 953:12-954:6.

But starting in 2018, Andrew no longer knew the buyers because they were his "friends" or "friends of "friends," but instead through Mr. Er Shi Fu—an alleged professional "intermediary who arranged the purchases and had the direct contact with the buyers." Savitsky Decl. Exh. 25 (6/25/2019 AW Dep. Exhibit AW-1 at 4) [SMF ¶¶99-100] (Andrew's September 2018 Interrogatory Responses). By 2019, the buyers were strangers with whom Andrew never spoke to directly. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 106:17-107:25); [SMF ¶¶101-110]. When asked if it was true that he "didn't meet any of [the buyers] before Er Shi Fu set [Andrew] up with them" Andrew testified "Correct." *Id.* at 94:16-21. And when asked if he had "any other relationship with these five buyers other than through Er Shi Fu," Andrew testified "No." *Id.* at 122:16-19.

13

**D.** *Andrew's Non-Communication with the Buyers and Non-Involvement in Negotiating Sales Prices with Them.*

Andrew has produced no emails or other written communications with the five people who he testified purchased $4.3 million worth of classical Chinese artwork from the Estate. Savitsky Decl. at ¶7. This, he claims, is because "Mr. Fu" had "the direct contact with the buyers." Exh. 11 (6/25/2019 AW Dep. Trans. at 109:11-15; 106:17-22). Yet there are no emails with Er Shi Fu either. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 86:21-25; 300:24-301:17); *id.* at ¶7. Nor are there any letters or faxes. *Id.* In fact, the person Andrew claims possessed all the information on the sales of his grandfather's prized art collection and through whom the Estate supposedly conducted $4.3 million worth of business is not mentioned once in any document in the Record.[13] *Id.* PA Decl. at ¶¶47-48.

As a result of the purported use of Mr. Fu as an intermediary and Andrew's claimed reliance on the 2004 Sotheby's Appraisal, Andrew testified in 2019 that he did not play any role "at all" in determining the prices at which the Estate would sell its paintings:

> Q: Did the information you gave [your attorney who assisted you in coordinating the sales, Martin Klein] include the proposed sales prices for the paintings?
>
> A: We didn't talk about the prices because we have auction house appraisal book. And I said there were buyers who are interested to buy those pieces. And I give to Marty Klein how many pieces the buyer wants to buy or are interested, and he would prepare the contract with [Schram] and [Ewald].

---

[13] As far as can be determined, Er Shi Fu is only mentioned in the Record by Andrew's own testimony and court filings beginning in 2018.

14

Regarding [] the prices, [Ewald] and the art consultant would evaluate and finalize the final sale values. So I had no control over that.

* * * * *

Q: But [in] your calls with Er Shi Fu, [] he gave you the names of the paintings the buyer was looking for and the prices?

A: No, he just gave me the name of the buyers and also the number of the paintings. You know, we have the --- on the [Sotheby's] appraisal book, each painting has a number. So I just copy down the number and tell [Klein] to prepare the list of paintings for potential sale.

Q: Who decided what the prices would be?

A: The PA and her art consultant.

Q: Did you have any role in that?

A: Not at all.

Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 89:25-95:22 (AW testifying he did not forward the prices of Estate paintings to the PA); 75:9-76:13).

The PA's "art consultant" to whom Andrew refers was Ms. Elin Ewald ("Ewald") of the New York based art appraisal firm O'Toole-Ewald Art Associates (OTE). PA ¶51; Savitsky Decl. Exh.  14 (6.14.19 Ewald Dep. Trans. at 19:4-21:15; 25:25-26:23; 27:11-31:2) [SMF ¶¶40, 157-158]. The PA hired Ewald to independently review the offers which Andrew was proposing. *Id.*; PA at ¶49.

Andrew testified that that the PA, his Co-fiduciary, never asked for his opinion or advice regarding the six sales because the PA "had her art consultant" and "the appraisal from [] Sotheby's and from [Ewald] were more truthful and reliable than what my own opinion was." *See* Savitsky Decl. Exh. 11 (6/24/19 AW Dep. Trans. 117:3-118:23); *see also*

15

116: 10-22 ("Again, I cannot control over the prices. Okay. I just follow the PA's intention to sell or the direction [of] Peter Schram.").

It is therefore undisputed that Andrew played no role in communicating directly with any buyers or in negotiating prices with them on behalf of the Estate. Whereas Andrew claims this was because he acted as a mere go-between for Mr. Er Shi Fu and the PA, Yien-Koo alleges it was because the Chinese buyers do not exist.

## IV.   Andrew Wang's Contemporaneous Representations to the Estate Concerning His Active Role in Negotiating Prices with the Buyers on Behalf of the Estate Between 2005 and 2009.

Andrew's emails to the PA (and her two agents, Schram and Ewald) between 2005 and 2009 paint a vastly different picture of his involvement in the Estate's sales. Beginning in late 2004, Andrew represented that he would seek out potential purchasers of highly valuable classical Chinese art. Savitsky Decl. Exh. 19 (WANG001878-1879); Savitsky Decl. Exh. 20 (WANG001888) [SMF ¶¶136-137]. At the time of the sales, the PA understood Andrew to be highly knowledgeable in the field of Chinese paintings and trusted his judgment. PA Decl. Exh. 26 (KING 007626) [SMF ¶¶309-316]. Andrew is a specialist in the field of Chinese paintings who has worked for Sotheby's as well as auction houses in Hong Kong and China. Savitsky Decl. Exh. 24 (AW 2013 Dep. Trans. at 60:3-62:9); *id.* Exh. 11 (6/25/2019 AW Dep. Trans. at 47:21-48:21 (Poly and China Guardian); 66:4-23 (Chieftown Auction House). In 2013, he claimed to know "[m]ost buyers" in the Chinese classical art market. Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 545:5-13; 707:9-21). So prominent is his reputation that in 2015, a Chinese art periodical, 99 Art News, named him the "46th Most Influential Figure in the Chinese Art World."

16

Savitsky Decl. Exh. 5 (Prob. Trial Trans. at 522:17-523:9). But because the PA was not an expert in the field of Chinese paintings, Ewald of OTE was responsible for working with Andrew on the PA's behalf to directly to review the offers he proposed. SMF ¶311. Though by her own admission, even Ewald was not "an expert on Chinese paintings." Savitsky Decl. Exh. 14 (6/14/19 Ewald Dep. Trans. at 105:15-107:25) *Id.* Exh. 15 (Exhibit 17 to Ewald Dep.).

His 2019 testimony notwithstanding, Andrew's unequivocal representations to the PA, Ewald, Schram, and Martin Klein ("Klein")[14] were that he was reviewing the proposed prices himself, taking an active role in negotiations with potential buyers, and attempting to receive the best possible prices for the Estate's paintings. Thus, in December 2004, Andrew wrote Klein that he was working directly with buyers to negotiate potential sale prices:

> I worked several days with my TWO clients who are willing to make some purchases . . . I can't convince them to add 20% to every painting[] as some appraisals are high enough. ***Would you please talk to [Schram] about it. I will try my best to push the price as high as 20% extra.***

Savitsky Decl. Exhs. 32, (emphasis added), 20.  In response, Klein explained that the goal of the Co-fiduciaries was to "receive the best price for the art" that the Estate was selling. *Id.* Exh. 32 (WANG001890).  He instructed Andrew to "[g]et the best offer you can from your clients" before presenting those proposed sales to the PA to "try and convince [her]

---

[14] Andrew's attorney who assisted in coordinating the sales and communicated on Andrew's behalf with the PA's own attorney, Schram. Savitsky Decl. Exh. 11 (6/24/19 AW Dep. Trans. 89:7-24).

. . . that the price you are getting is the best." *Id.* Andrew accepted his task by replying "OK." *Id.*

Andrew's representations that he was taking a hands-on approach continued in 2005. In relation to a proposed sale to "Chen Mei-Lin" in March 2005, Ewald informed Andrew that, "after consulting with experts in the field" of Chinese paintings, she determined that the sale prices he proposed for the sale "seem to be well under market value." Savitsky Decl. Exh. 14 (6.14.19 Ewald Dep. Trans. at 188:19-189:16); *id.* Exh. 15 at ELE-17 (Ewald Dep. Exhibit 17). Andrew retorted in an email to Klein that "[Ewald] does not know anything about Chinese paintings and [s]he can't just say anything without any knowledge of the field and listening to senseless saying from another 'expert.'" Savitsky Decl. Exh. 61 (WANG002044). To counter Ewald's conclusion, Andre wrote directly to the PA that he was "concerned about the sale matter" with Mr. Chen because he did not "know who has been providing information to [Ewald]." PA Exh. 11. Andrew wanted the names of the experts Ewald was consulting with and represented to the PA that this information was "important for me to determine whether her source is reliable." *Id.* After additional deliberation among the PA, Andrew, and Ewald, the Co-fiduciaries agreed to sell 24 Estate paintings to Mr. Chen at the exact same prices which were included in Andrew's initial email to Klein on March 8, 2005. Savitsky Decl. Exh. 55 (WANG001039). [SMF ¶¶237-240].[15]

---

[15] It was uncovered by one the Estate's beneficiaries in 2014 that the residential address identified as belonging to "Mr. Chen Mei-Lin" in the Estate's 2005 contract of sale was actually ***Andrew's own home address in Shanghai***. SMF ¶¶121-135. Andrew's home address was used in the $1.3 million contract as the location where Mr. Chen Mei-Lin was "residing"—according to a 2014

Andrew also represented to the PA and her agents that he was actively negotiating with purported buyer "Yue Da Jin" in 2008 and 2009. On April 23, 2008, Klein faxed Schram a list of fourteen (14) Estate paintings which he claimed Andrew had "received offers to purchase from 'Mr. Yue Da-Jin.'" PA Decl. Exh. 23. The proposed sale prices for the 14 paintings—which totaled $538,800.00—were then submitted to Ewald for review. Savitsky Decl. Exh. 14 (Ewald Dep. Trans. at 157:10-161:13); *id*. Exh. 15 (ELE-30). Ewald eventually issued a report (the "2008 Ewald Report") concluding that five (5) of the proposed sale prices to Yue Da Jin were too low. *Id*. Exh. 15 (ELE-30).

Five days after Ewald issued her report, Andrew sent her an email that "the market for classical Chinese paintings ha[s] always been weak except [for] Chinese paintings within the [i]mperial collections." Savitsky Decl. Exh. 63 (WANG002233). Ewald responded the she "definitely [did] not want to be the obstacle to a good sale," but that it was her "hope" that Andrew could get "additional money" through "negotiat[ion]" with the buyer. *Id*. Exh. 64 (WANG003432). Ewald acknowledged that she "very much respect[ed] [Andrew's] judgment on Chinese painting values." *Id*. Exh. 64 (WANG003434). But Ewald—who did not believe herself to be an expert in Chinese paintings—clarified that she was "not challenging [Andrew's] values" and professed that Andrew had "a good inside market grasp of private dealers and private sale." *Id*. [SMF ¶323]. Ewald, as the PA's hired agent, explained she believed Andrew was just trying "to

---

email from Andrew's counsel to the PA—because he "was temporarily staying in Andrew's home while his own home was being renovated." SMF ¶¶131-134. The 2014 email makes no mention of an intermediary named Mr. Fu handling all of the direct contact with Mr. Chen. *Id*.

get the best deal" he could for the Estate. Savitsky Decl. Exh. 64 (WANG003433). Andrew confirmed this belief by acknowledging that his "purpose" was "to achieve an ideal price for the [E]state." *Id.* (WANG003434). With regard to negotiating higher prices with "Yue Da-Jin," he claimed "the buyer would not argue with me about his purchase price as long as I have a good explanation." *Id.* (WANG003432)

The proposed sale to "Yue Da Jin," however, was never completed in 2008. At some point following his emails with Ewald in May 2008, Andrew told Klein that the sale was on hold because the buyer wanted to negotiate even lower prices than those that had been submitted for Ewald's review. Savitsky Decl. Exh. 67 (AWSK_0015264-65) [SMF ¶¶293-294]. Thus, by February 26, 2009, Andrew emailed Klein claiming that the buyer was now asking him for a 20% discount on the originally proposed $538,800.00 price for the fourteen paintings. *Id.* (AWSK_0015264). Andrew suggested giving a 10% discount because the "paintings market is very weak here":

---

Date: Thu, 26 Feb 2009 00:20:42 -0800 (PST)
From: Andrew Wang <jingguanlou_wang@yahoo.com>
Subject: Re: Sale to Mr. Yue
To: martin klein <mklein@kamso.com>

Marty,
The purchaser is asking a 20% discount of the total sale, and I told him that I will try to get him 10% off the total value. The Chinese paintings market is very weak here and several Auction houses have already postponed their sales to the Fall. Can you ask the PA to agree to the 10% discount, so I can proceed with the sale ? The buyer is willing to make the payment in March. I will provide you with all necessary informations once I have your confirmation.
Thanks

---

*Id.*

Later that day, Klein forwarded Andrew's email to Schram, updated him on the status of Andrew's supposed negotiations with "Mr. Yue," and asked if the PA would approve the sale at Andrew's suggestion of a 10% discount:

> From: martin klein
> To: pschram@mindspring.com
> Sent: Thursday, February 26, 2009 9:14 AM
> Subject: Fwd: Re: Sale to Mr. Yue
>
> Peter, Andrew previously negotiated a sale to Mr. Yue which Ethel approved. The sale never took place because the buyer wanted to negotiate lower prices. Please see Andrew's request below. For your reference I have attached a copy of the contract of sale and the list of art. Please advise whether Andrew can give the 10% discount that the buyer is requesting.
> Marty

Savitsky Decl. Exh. 67 (AWSK_0015264). Fifty-seven minutes later, the PA (through Schram) gave her consent to the discount Andrew had proposed. *Id.*. The final sale price for the 14 paintings was set in August 2009 at $489,772.00 (inclusive of shipping costs). *Id.* (AWSK_15263-64).

## V.   Calculation of the Estate's Damages Stemming From Andrew's Failure to Negotiate Prices with Yue Da Jin

The Plaintiff's expert witness, Patrick Regan, issued a report on October 11, 2019 (the "Regan Report") that included two separate appraisals as well as various other substantive opinions. Regan Decl. at ¶1 One of the appraisals included in the Regan Report was a 40-page "Retail Value Appraisal" (the "RV Appraisal") which retroactively valued the fourteen paintings sold in August 2009 under the Estate's contract with "Mr. Yue Da-Jin," as of the approximate date of that sale. *Id.* at ¶¶4-6.

The Estate sold 14 paintings pursuant to the Estate's contract with "Yue Da-Jin" for a total price of $484,920.00 (exclusive of shipping costs).[16] According to Mr. Regan, however, the combined Retail Value of these 14 paintings in August 2009 was actually $1,978,000.00. *Id.*

The Wang Defendants' lone expert, Kenneth Jay Linsner, has not provided any counter-appraisal or counter-valuation of the 14 artworks as of 2009. Savitsky Decl. Exh. 75 (Linsner Dep. Trans. at 124:16-125:11). In fact, Mr. Linsner has not provided his own appraisal or valuation as to any of the paintings at issue:

> Q: Okay. Did you conduct any appraisals of the 98 classical Chinese paintings at issue in this lawsuit?
>
> A: No.
>
> Q: Did you do any appraisals of any of the 98 paintings that Andrew Wang sold from the C.C. Wang Estate?
>
> A: No.
>
> Q: So even if you did not do a formal appraisal, did you make any efforts to value any sum or all of those 98 paintings?
>
> [Objection]
>
> A: No.

*Id.*

Mr. Linsner has, however, opined that there are "no damages" in this case:

> Q: In Paragraph 44, you state: "It is my opinion that the Estate suffered no damages from the sale of the 98 artworks via private sales." Correct?

---

[16] Regan Decl. Exh. 1.

A: Yes

Q: What is the basis for that opinion?

A: The basis for that opinion is that the original document upon which the sale prices were asked was performed by a leading expert in Chinese classical paintings as of the date of death, and the addition of 20% later on, which I understood took place, was sufficient to render the sale values within reason.

Q: Any other basis for that opinion?

A: No.

Savitsky Decl. Exh. 75 (Linsner Dep. Trans. at 126:11-25).

The factual predicate for Mr. Linsner's opinion that there are "no damages," however, is simply wrong. First, the "original document" Mr. Linsner refers to is the 2004 Sotheby's Appraisal, which determined the value of C.C. Wang's assets as of the date of his death on July 3, 2003. PA Decl. ¶19. The Estate's sale to "Yue Da-Jin" occurred on August 17, 2009, more than six years later. Savitsky Decl. Exh. 68. Second, Mr. Linsner relies on "the addition of 20% later on, which [he] understood took place" to support his opinion of "no damages;" yet he is indisputably incorrect in that understanding. The 14 paintings sold under the Estate's contract with "Yue Da Jin" were originally appraised by Sotheby's to be worth a combined $559,500.00. PA Decl. Exh. 23. The addition of 20% to that number would have been $671,400.00. Instead, the Estate sold those 14 paintings for $484,920.00—13.3% *lower* than the 2004 Sotheby's Appraisal. Savitsky Decl. Exh. 68. Thus, the factual basis for Mr. Linsner's opinion that "the Estate suffered no damages" stemming from the Yue Da-Jin sale is untrue. It did.

23

<u>**A**RGUMENT</u>

**I.**   <u>**Legal Standard:**</u> *A Properly Supported Motion for Summary Judgment May Be Granted Where There Is No Genuine Disputed Issue of Material Fact.*

Under Rule 56(a) of the FRCP, summary judgment should be granted if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. Rule 56(a). In determining whether a genuine dispute of material fact exists to be tried, all inferences and ambiguities must be resolved in favor of the party opposing summary judgment. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). Though inferences are weighed in favor of the non-movant, summary judgment will not be denied merely because the non-movant advances "conjecture, surmise, or the existence of metaphysical doubt concerning the facts." *Rambacher v. Bemus Point Cent. Sch. Dist.*, 2007 U.S. Dist. LEXIS 41269, *12 (W.D.N.Y. 2007) (internal citations omitted).

The Supreme Court has explained that a dispute over a material fact—such as whether Andrew breached his fiduciary duty—is only a "genuine" one for the purposes of denying summary judgment "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "By its very terms" Rule 56 "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat" a properly supported motion. *Id.* at 248 (emphasis in original). Thus, in cases where the party opposing summary judgment relies on evidence that "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249.

Though a party's sworn denial of a material fact (such as whether Andrew self-dealt) will usually create a genuine credibility issue, this is not always the case. Where a non-movant's testimony is "so replete with inconsistencies and improbabilities that no reasonable [fact-finder] would undertake the suspension of disbelief necessary to credit" it, then the credibility issue is not genuine a one and will not defeat summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotations omitted); *see also Mortiz v. Town of Warwick*, 15-cv-5424, 2017 U.S. Dist. LEXIS 173563, at *24 (S.D.N.Y. Oct. 19, 2017).

II.   **Andrew Wang Is Personally Liable for Breach of His Fiduciary Duty:** *Andrew Failed to Disclose Material Information to His Co-Fiduciary Concerning His Role in Negotiating Prices and the Estate Suffered Injury as a Result.*

A claim for breach of fiduciary duty requires (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom. *Johnson v. Nextel Communcs., Inc.*, 660 F.3d 131 (2d Cir. 2011) (citing *Barret v. Freifeld*, 64 A.D.3d 736 (N.Y. App. Div., 2d Dep't 2009)).

A.   *Andrew Was a Fiduciary of the Estate at the Time of the Estate's Sale of 98 Paintings Who Was Believed to Have Knowledge and Experience in Selling Chinese Paintings.*

As preliminary executor, Andrew served as a fiduciary to the Estate and its beneficiaries throughout the process of selling the Estate's 98 Paintings. *In re Estate of Rothko*, 43 N.Y.2d 305 (N.Y. Ct. App. 1977) (an executor "holds estate property not in his own right, but as a trustee for the benefit of creditors, those entitled to receive under the will, and . . . those entitled to distribution under the EPTL."); *In re Estate of Schuman*, 2009 NYLJ LEXIS 3177 (Sur. Ct. New York Cnty. Dec. 23, 2009) (A preliminary executor's duty

"lies to th[e] estate and its beneficiaries, whoever they are ultimately determined to be.'");

*Carro, Spanbock, Kaster, & Cuiffo v. Rinzler*, 88 Civ. 5280, U.S. Dist. LEXIS 11585 (Jul. 31,

1992 S.D.N.Y.). Andrew therefore owed the Estate fiduciary duties in undertaking those

sales.

> **B.      Andrew Wang Breached His Duties of Full Disclosure and to Act with the
> Utmost Good Faith By Failing to Negotiate for Higher Prices with the
> Purported Buyers.**

It is a bedrock principle of New York jurisprudence that, as a fiduciary, Andrew

owed to the Estate "[n]ot honesty alone, but the punctilio of an honor the most sensitive."

*Meinhard v. Salmon*, 164 N.E. 545 (N.Y. Ct. App. 1928); *see also Tucker Anthony Realty Corp.*

*v. Schlesinger*, 888 F.2d 969, 972 (2d Cir. 1989) (same). "The duties owed by a fiduciary are

plain. 'Perfect candor, full disclosure, good faith, in fact, the utmost good faith, and the

strictest honesty are required.'" *In re Parmalat Sec. Litig.*, 684 F.Supp. 2d 453 (S.D.N.Y.

2010) (*quoting* William Meade Fletcher, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS

§14A). Andrew's disregard for such obligations is manifest.


Fiduciaries owe a duty to make full disclosures of material facts to their

principals—withholding    such    information    becomes    the    "equivalent    to

misrepresentation." *Benson v. RMJ Sec. Corp.*, 683 F.Supp. 359, 377 (S.D.N.Y. 1988); *see also*

*United States v. Szur*, 289 F.3d 200 (2d. Cir. 2002) (the "duty to disclose" requires a

fiduciary to share all relevant information with its principal). Where the undisputed

evidence establishes that no reasonable finder of fact could find otherwise, a non-

disclosure or misrepresentation may be determined material as a matter of law.  *Meisel*,

2010 U.S. Dist. LEXIS 128513; *Cont'l Cas. Co. v. Marshal Granger & Co., LLP*, 6 F.Supp. 3d 380, 392-93 (S.D.N.Y. 2014) (citing New York law and granting plaintiff partial summary judgment upon finding that a misrepresentation was so significant as to be material as a matter of law).

Fiduciaries also owe a duty act with the "utmost good faith" towards their principals. *In re Estate of Brandt*, 81 A.D. 268, n.1 (N.Y. App. Div. 1st Dep't 1981). Where the undisputed facts preclude any reasonable arguments to the contrary, a finding of "bad faith" may be made on a motion for summary judgment. *Clifton Land Co. LLC v. Magic Car Wash, LLC*, 165 A.D.3d 1455, 1457-58 (N.Y. App. Div. 3d Dep't 2018) (granting partial summary judgment for plaintiff where email records established the defendants entered into an agreement "in bad faith as a matter of law."); *Skyline Steel, LLC, v. Pilepro, LLC*, 13-cv-8171, 2016 U.S. Dist. LEXIS 102908, *22  (S.D.N.Y. Aug. 4, 2016) (granting summary judgment in a patent dispute where plaintiff established "bad faith as a matter of law" since "no reasonable litigant could realistically" have found otherwise).

Andrew breached his duties disclose that he was playing no role "at all" in negotiating with any buyers to achieve the highest possible price for the Estate's assets. *See* Savitsky Decl. Exh. 11 (AW Dep. Trans. at 92:11:-93:6 (Andrew testifying he never received price information from Er Shi Fu, and instead relied on the Sotheby's appraisal to establish prices); 93:7-18 (Andrew testifying he played no role in deciding sale prices); 116: 10-22 ( Andrew testifying "Again, I cannot control over the prices. Okay. I just follow the PA's intention to sell or the direction [of] Peter Schram."); 117:3-118:23 (Andrew testifying that he did not "worry about" whether the sales were good or bad because the

27

PA "had her art consultant" and "the appraisal from [] Sotheby's and from [Ewald] were more truthful and reliable than what my own opinion was.")).

This was not what Andrew was representing to the PA at the time of the sales. Instead, Andrew agreed that his role was, as Klein stated, to "[g]et the best offer you can from your clients" before presenting those proposed sales to the PA to "try and convince [her] . . . that the price you are getting is the best." Savitsky Decl. Exh. 32 (WANG001890). In 2008, Ewald wrote Andrew that it was her "hope" that he would get "additional money" through negotiation with "Mr. Yue Da Jin" and that she respected Andrew's knowledge of the market. Savitsky Decl. Exh. 64 (WANG003432-33). Confirming Ewald's understanding that he was negotiating on the Estate's behalf, Andrew represented that "the buyer will not argue with me about the purchase price as long as I have a good explanation." *Id.* (WANG003432). As he did in 2004, Andrew again acknowledged that his purpose was to get the ideal price for the Estate. *Id*. Klein further reinforced these representations to Schram in his February 26, 2009 email in which he claimed that Andrew had "previously negotiated a sale" with "Yue Da Jin" and that Andrew was recommending the buyer—upon a request for a 20% discount—receive a 10% discount. Savitsky Decl. Exh. 67 (AWSK_0015263-64). Andrew's most recent sworn admission that he never had any direct communication with Mr. Yue and his disavowal of having any participation in determining the appropriateness of prices, despite his plain representations to the contrary, establish that Andrew breached his obligations to the Estate as a matter of law.

### C. *The Estate Suffered Damages as a Result of Andrew's Failure to Negotiate on Its Behalf.*

No genuine issue of fact will exist to preclude summary judgment where expert testimony on the issue is undisputed. *Robbins v. Moore Med. Corp.*, 894 F.Supp. 661, 670-71 (S.D.N.Y. 1995); *Levin v. Gallery 63 Antiques Corp.*, 04-cv-1504, 2006 U.S. Dist. LEXIS 70184 (S.D.N.Y. 2006). Here it is undisputed that the Wangs' expert, Kenneth Linsner, based his opinion that there were "no damages" in this case without conducting his own appraisal or valuation of any of the works at issue. Savitsky Decl. Exh. 75 (Linsner Dep. at 126:11-25). Instead, Linsner testified that he based his determination on damages exclusively upon his understanding that (a) the sales between 2005 and 2009 were based upon the exemplary 2004 Sotheby's  Appraisal and (b) the Estate's sale prices for the 98 Paintings included a 20% markup above the Sotheby's appraisal values. *Id.* at 124:16-125:3. In reality, the Estate sold 14 paintings to Yue Da Jin in 2009 for 13% *less* than their combined Sotheby's appraisal value. Compare Savitsky Decl. Exh. 68 (WANG00536, final sale prices for the Yue Da Jin Paintings) *with* PA Decl. Exh. 23 (KING 007362-7364, indicating Sotheby's valuations for the Yue Da Jin Paintings).  Accordingly, the Plaintiffs' expert's opinion—the only expert opinion on the value of the 14 paintings sold to "Yue Da Jin"—is undisputed. Because Andrew failed to fulfill his obligations and the Estate was injured as a result, the Court should therefore enter partial summary judgment against Andrew in the amount of $1,488,228.00 (representing the difference between the actual sale price of the paintings sold to Yue Da Jin and their market value at the time).

29

## CONCLUSION

Summary judgment is warranted because the parties agree that Andrew played no role "at all" negotiating on behalf of the Estate with the five purported buyers for the highest attainable prices. However, the documentary evidence shows that Andrew unequivocally *represented* to the PA and her agents that he was highly knowledgeable about the Chinese art market and actively "negotiated" on the Estate's behalf "to achieve an ideal price for the [E]state." Whether Andrew's failure to negotiate was due to the fact that the buyers were fictitious (as Yien-Koo alleges) or because Andrew simply shirked his responsibilities and relied exclusively on the PA (as he maintains) is irrelevant. His misrepresentations and lack of good faith comprise a breach of fiduciary obligations under either factual scenario. Finally, because a determination of self-dealing under Count IX of the Amended Complaint requires a credibility determination, the Plaintiff respectfully reserves her right to prove additional breaches and damages stemming therefrom at the time of trial.

Dated: New York, New York
     February 14, 2020            Respectfully submitted:

                                 **SAM P. ISRAEL, P.C.**

                                 By: */s/ Timothy Savitsky*
                                 Sam P. Israel, Esq. (SPI 0270)
                                 Timothy Savitsky, Esq. (TS 6683)
                                 180 Maiden Lane, 6th Floor
                                 New York, New York 10038
                                 Main-646-787-9880; Fax: 646-787-9886;
                                 Email: admin@spi-pc.com
                                 *Attorneys for Yien-Koo King*