**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **YIEN-KOO KING,** | |
| **Plaintiff,** | |
| -against- | **1:14-Civ-07694-(LJL) (JLC)** |
| **ANDREW WANG, SHOU-KUNG WANG, BAO WU TANG, JIAN BAO GALLERY, ANTHONY CHOU, CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE DA-JIN and JOHN DOES 1-9,** | |
| **Defendants.** | |

## DECLARATION OF YIEN-KOO WANG KING

**YIEN-KOO WANG KING**, in her capacity as Preliminary Executor of the Estate of Chi-Chuan Wang, declares pursuant to 28 U.S.C. 1746, under the penalties of perjury, as follows:

1. I am the daughter of Chi-Chuan Wang ("C.C. Wang") and presently serve as the preliminary executor of his estate (the "Estate"). I am 84 years old.

2. I currently maintain this action in my capacity as preliminary executor for the benefit of the Estate and its beneficiaries.

3. I submit this declaration in opposition to Defendants Andrew Wang and Shou-Kung Wang's ("Wangs" or "Defendants")[1] Motion for Summary Judgment [ECF Dkt. 193].

4. I submit this declaration upon my personal knowledge.

5. In their Rule 56.1 Statement of Undisputed Material Facts (the "Wang SMF"), the Wangs claim at ¶32 that "the Appel Inventory listed all artwork potentially within the scope of the Estate." The comment transforms a generalization based upon general knowledge into a hard and

---

[1] I hereby incorporate by reference each of the definitions set forth in the Rule 56.1 Statement filed February 14, 2020 in support of my motion for partial summary judgment against Andrew Wang. [ECF Dkt. 199].

fast fact. The list was created in 2004 when there was still much confusion concerning the location of approximately 400 classical Chinese paintings. My submissions to the Appel Inventory were based upon the best of my knowledge and with minimal help from my husband who was undergoing chemotherapy at the time. Though I tried to include all relevant information that I had at the time, there should be no question that this was an effort at estimating, not verifying. At a minimum, the Appel Inventory is not a complete list of paintings potentially belonging to the Estate, the Wangs, and the Kings since we did not have a complete accurate picture of what was taken by SK back in 2004 and where each of the hundreds of pieces of artwork were physically located. Moreover, much of the information in the list is not simply inaccurate, but intentionally falsified by the Wangs. To be sure, the list even contains paintings that all sides agree are not part of the Estate.

6.      At ¶43 of the Wang SMF, the Wangs assert that the amount taxed by the Estate is largely based upon my alleged claim that "CC gifted [me] millions of dollars of artwork during his lifetime on which no gift taxes were ever paid." This is not my claim and it is not true. I am the owner of a corporation, Northwich Investments Ltd. ("Northwich"), which was set up as a BVI corporation by an uncle H.H. Fang, not C.C. Wang. Moreover, the majority of Northwich's assets were never owned by my father at any point during his lifetime. In fact, they were not gifted by anyone, but rather purchased directly by Northwich from unrelated third parties. And while my husband owns a company called Soon Huat Inc. which purchased several dozen paintings from C.C. Wang, these sales were duly recorded in C.C. Wang's own handwriting and we continue to maintain the original documentation for the sales. These were not "gifts" from C.C. Wang and the paintings are not owned by the Estate.

7.      At the same time, SK and Andrew's claim that I received illegitimate gifts or received title to paintings through illegitimate transactions is not only factually untrue, it is

hypocritical. Their apparent position is that *they* have free and clear title to tens of millions of dollars of classical Chinese paintings which SK purchased through "Jian Bao Galleries," while every painting I own is stolen. *See, e.g.*, Wang SMF at ¶¶152-164.

8.  One of the paintings which SK now claims he owned, but which was (according to him) inadvertently turned over to the Estate in 2003, was a work by the 17th century artist *Wang Jian*. This painting was designated as OTE 156 in the Estate's inventory. Estate records indicate that OTE 156 was supposedly sold to a person named "Yong Qing Ye" in February 2006 for $100,000.00. *See* Wang SMF at ¶¶138-142; Kelly Exh. 50 at WANG000633.

9.  However, OTE 156 was also one of the approximately 30 paintings displayed at the 2009 "Bao Wu Tang" exhibition at the Capital Museum in Beijing—which Andrew personally coordinated and spoke at. In an email sent in May 2011 to a person named "Chien Fang Huang," Andrew admits to this fact. *See* Savitsky Decl. Exh. 85. Andrew's email also attaches scanned images of OTE 156 that are true and correct copies of pages from the Bao Wu Tang Exhibition catalogue (thereby admitting to the catalogue's accuracy).

10. Attached hereto as <u>Exhibit 8</u> is a true and correct copy of the Bao Wu Tang Exhibition catalogue as produced by the Wangs during discovery in this action.

11. Andrew further states in his May 2011 email that OTE 156 is *still within the family collection* despite its supposed sale by the Estate to a private buyer named "Yong Qing Ye" in 2006. *See* Savitsky Decl. Exh. 85. Andrew says this because, in truth, it was never sold by the Estate to "Yong Qing Ye"; the Wangs were the true purchasers of this and all of the Estate's 98 Paintings sold between 2005 and 2009.

12. The most valuable paintings owned by the Estate were not the 98 self-dealt paintings, but rather those stolen by SK and Andrew on January 31, 2003. These included the Ma

3

Yuan Landscape Album (referenced in the Wang SMF ¶¶152-156), which has a value well over $10 million dollars, as well as many other multi-million-dollar paintings.

13. Andrew also stole an additional 46 classical Chinese paintings from me, my husband, and the Estate on May 11, 2005 at the Shanghai Exchange. *See* Declaration of Yien-Koo Wang King, dated February 14, 2020 [ECF Dkt. 198] ("YK Declaration") at ¶¶23-41. Though he filed a sworn affidavit in in the Surrogate's Court testifying that he never received *Wu Zhen*'s "Wild Bamboo" from me on May 11, 2005, he is obviously lying. First, Wild Bamboo was displayed at Andrew's own Bao Wu Tang Exhibition in China in November 2009. The only way it could have appeared there—since I personally hand delivered it to him in 2005 to hold as a representative of the Estate—is through Andrew. Second, Wild Bamboo was ultimately auctioned by the Poly International Auction House for approximately $11,000,000.00. *See* Second Savitsky Decl. Exh. 94 (KING 00644). *Guo Xi*'s "Travelers in the Autumn Mountains" is even more rare and coveted by collectors than Wild Bamboo. Yet it is another painting Andrew denied receiving from me, but was brazen enough to showcase at the 2009 Bao Wu Tang Exhibition in flat contradiction to his sworn testimonies.

14. As set forth in my prior declaration, I know these facts not only from the Bao Wu Tang Exhibition catalogue, but because I attended the 2009 Capital Museum Exhibition in Beijing and saw firsthand that several of the multi-million-dollar paintings Andrew denied receiving at the Shanghai Exchange were displayed there.

15. When I returned to the United States, I immediately contacted my attorneys to present this evidence to the Surrogate's Court. Andrew was clearly exercising personal control over the 46 paintings—delivered to him in Shanghai in his capacity as preliminary executor—while at the same time submitting false statements to the Court that I was still in possession them.

16. Though I now realize that a number of other Estate paintings appeared at the 2009 Bao Wu Tang Exhibition because Andrew had sold them to himself, I had no reason to recognize Andrew's self-dealing back in 2009. For all I knew, Andrew and the PA jointly decided to loan the Estate's paintings to the Capital Museum for the purpose of the exhibition in order to generate interest for a future sale. I did not know they had already been sold, let alone sold to Andrew based upon fraudulent representations.

17. Even though I had no reason to suspect self-dealing at the time of the 2009 Bao Wu Tang Exhibition, I still acted diligently and sought additional information from the PA about how and why the Estate's and Northwich's paintings were resurfacing in Beijing. Despite repeated requests for more information, the PA refused to disclose anything to me because I was not a fiduciary of the Estate. The PA's attorney told us in no uncertain terms that I lacked standing to get any more information on the Estate's assets due to my purported disinheritance under the February 18, 2003 Will.

18. In 2010, since my requests for additional information were being ignored, my husband and I asked our attorney, Martin Garbus, to send letters to various auction houses in China seeking records related to the auctioning of any artworks formerly owned by my father. Attached hereto as Exhibit 9 is a collection of letters prepared by Martin Garbus and sent to various Chinese auction houses in December 2010.

19. Over the next several months, we were able to acquire a set of auction catalogues and auction results for the years between 2008 and 2010. Though it was a very labor-intensive project, my husband and I personally began reviewing every auction catalogue (which were written in Chinese) we could get our hands on to try and see if any of the Estate's paintings were being sold abroad. We still did not know, however, what the circumstances were behind the auctions or the extent of the PA's and Andrew's involvement.

20. By reviewing the catalogues from several Chinese auction houses we were able to reverse engineer a list of paintings which, though turned over to the Estate in 2003 and 2004, were appearing in Chinese auctions in 2008, 2009, and 2010.

21. In January 2011, the Surrogate's Court issued an order indefinitely staying the probate trial scheduled to determine the validity of the February 18, 2003 Will Andrew and SK had submitted—and through which Andrew derived his position as preliminary executor. I was eager to have the probate trial because the rationale behind the indefinite stays of each of my petitions to remove Andrew as preliminary executor was that a resolution of the will contests would be determinative of Andrew's status as fiduciary, as well as my standing as a beneficiary of C.C. Wang's Estate.  Upon a finding that the February 18, 2003 Will was fraudulent, I stood to replace Andrew as preliminary executor of the Estate.

22. A stay of the probate trial, therefore, meant another roadblock in my search for more information on what had happened to the Estate's paintings. As a result, I appealed the Surrogate's Court's decision. Despite my appeal, the order was affirmed by the First Department, Appellate Division in 2012.

23. Simultaneously with preparing the appeal of the decision to stay the probate trial, I filed another petition in May 2011 seeking a compulsory accounting of the Estate's assets. I had no idea what the circumstances surrounding the Estate's sales were (or even how many sales there were), but I knew Andrew was, generally, not to be trusted. I sought relief from the Surrogate's Court permitting me to review all records maintained by Andrew and the PA concerning the Estate's assets. *See* Declaration of Thomas Kelly dated February 14, 2020 [ECF Dkt. 202] Exh. 71 thereto.

24. Like my prior petitions, this too was stayed indefinitely by the Surrogate's Court. I did not receive Estate records related to the sales of the 98 Paintings (such as the contracts of sale

6

identifying how many paintings were sold and who they were sold to) until 2013 as a result of persistent requests by my counsel. Attached hereto as <u>Exhibit 10</u> is a true and correct copy of a letter from my counsel to the PA's special counsel (Pryor Cashman LLP) dated March 13, 2013, noting that the appearance of dozens of the OTE-designated Estate paintings in China was "inexplicable" and requesting "any information you have on how this occurred." *Id.* at p.6 (AWSK_00009133).

25. In December 2013, my counsel deposed Andrew Wang in relation to the Estate's sale of the 98 Paintings and Andrew insisted that he did not purchase the Estate's paintings himself and that they were instead sold to his friends in some instances and to "friends of friends" in others. My husband and I filed this RICO action approximately 9 months later.

26. Between their (a) thefts of CC's paintings before 1997, (b) the theft of the 25 classical works on January 31, 2003, (c) Andrew's self-dealing, and (d) Andrew's thefts from the Shanghai Exchange, the Wang Family is likely in possession of more than $500,000,000.00 worth of stolen or fraudulently acquired Chinese classical art.

27. Finally, at ¶170 of the Wang SMF, the Wangs assert that my husband and I failed to disclose ownership in Northwich and Soon Huant, Inc. in our bankruptcy. This is untrue. First, the creditors in our bankruptcy proceeding were (a) our attorneys who had represented us in the Surrogate's Court proceeding between 2003 and 2009, (b) the Estate, and (c) the Wangs. Each of these creditors were fully aware of the existence and ownership of Soon Huat, Inc. and Northwich based upon the Surrogate's Court litigation since the ownership of these companies was related to these disputes. Second, the U.S. Trustee appointed to our bankruptcy filed a petition alleging that our asset schedule was incomplete. After months of working and negotiating with the U.S. Trustee and our bankruptcy attorneys, we reached a settlement resolving those claims in their entirety. Following the Bankruptcy Court's approval of that settlement, and without objection from the

Wangs or the Estate (both of whom had appeared as creditors), my husband and I received a complete discharge from bankruptcy and we were able to retain our interests in our remaining Chinese art.

Dated: New York, New York
April 12, 2020

_____
Yien-Koo Wang King

8