**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

YIEN-KOO KING,

                            **Plaintiff,**

        **-against-**

ANDREW WANG, SHOU-KUNG WANG, BAO WU
TANG, JIAN BAO GALLERY, ANTHONY CHOU,
CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE
DA-JIN and JOHN DOES 1-9,

                         **Defendants.**

<u>1:14-Civ-07694-(LJL) (JLC)</u>

 

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE**
<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

**SAM P. ISRAEL, P.C.**
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

### TABLE OF CONTENTS

Table of Authorities .................................................................. *iii*

**PRELIMINARY STATEMENT** ......................................................1

**SUMMARY OF ARGUMENT** .......................................................3

**STATEMENT OF FACTS** ...........................................................7

          **A.**   **The Wang Family Enterprise** ......................................7

          **B.**   **Yien-Koo First Discovered the Probability of Fraudulent Self-Dealing by Andrew in 2013** ...............................16

**ARGUMENT** ..........................................................................19

   **I.**  THE CIVIL RICO CLAIMS BROUGHT ON BEHALF OF THE ESTATE OF CHI-CHUAN WANG ARE TIMELY ...................................................19

          **A.** *Yien-Koo Did Not Have Actual Notice of the Wangs' Fraudulent Self-Dealing in November 2009* .............................20

          **B.** *The Bao Wu Tang Exhibition in November 2009 Was Not a "Storm Warning" That Placed Yien-Koo on Inquiry Notice of "Probable" Fraud* ......................................................20

          **C.** *Even if on Inquiry Notice of Probable Fraud in November 2009, Yien-Koo Acted Diligently in Seeking More Information on the Estate's Sales* .............................................................22

          **D.** *This Case Is Not a "Nullity"* ....................................23

  **II.**  GENUINE ISSUES OF FACT EXIST AS TO WHETHER THE WANGS PARTICIPATED IN A RICO ENTERPRISE .........................................25

  **III.**  GENUINE ISSUES OF FACT EXIST AS TO WHETHER THE WANGS ENGAGED IN A PATTERN OF RACKETEERING .................................................26

          **A.** *Wire Fraud* ......................................................27

          **B.** *Mail Fraud* ......................................................30

          **C.** *Shipping Fraudulently Acquired and Stolen Goods* ...............30

D.  *Money Laundering in Violation of 18 U.S.C. 1956* ...................31

IV.   THE WANGS' PREDICATE ACTIVITY PROXIMATELY CAUSED THE ESTATE'S INJURY.........................................................................................................32

V.    THE ESTATE SUFFERED INJURY ......................................................................33

VI.   THE PLAINTIFF IS ENTITLED TO ADVERSE INFERENCES WITH RESPECT TO THE SK TRUST AND LE STYLE LIMITED'S INCORPORATION RECORDS .........34

**CONCLUSION** ....................................................................................................36

<u>TABLE OF AUTHORITIES</u>

## CASES

*Besroi Constr. Corp. v. Kawczynski (In re Kawczynski)*, 442 F. Supp. 413
  (W.D.N.Y. 1977) ..........................................................................................................35

*Borden, Inc. v. Spoor Behrins Campel & Young, Inc.*, 778 F.Supp. 695
  (S.D.N.Y. 1991) ...........................................................................................................23

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ...........................................27

*Butala v. Agashiwala*, 95-cv-936, 1997 US Dist LEXIS 1934
  (SDNY Feb. 24, 1997) ..................................................................................................23

*Chevron Corp. v Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ............................27, 33

*CMG Holdings Group v. Wagner*, 15-cv-5814, 2016 U.S. Dist. LEXIS 121135
  (S.D.N.Y. Sep. 7, 2016) ...............................................................................................21

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ...........................................................24

*Elsevier Inc. v. W.H.P.R., Inc.*, 692 F.Supp. 2d 297 (S.D.N.Y. 2010) ........................6, 33

*Fingerhut v. Chautauqua Inst. Corp.*, 07-cv-502, 2018 US Dist LEXIS 75234
  (W.D.N.Y. May 3, 2018) ...............................................................................................36

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ...........25

*Fisher v. Reich*, 92-cv-4158, 1994 U.S. Dist. LEXIS 17121
  (S.D.N.Y. Dec. 1, 1994) ...............................................................................................21

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 Fed. Appx. 94
  (2d Cir. 2008) .....................................................................................................4, 5, 26

*Friedman v. Meyers*, 482 F.2d 435 (2d Cir. 1973) ....................................................22, 23

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) ......................4, 26, 27

*Hemmerdinger Corp. v. Ruocco*, 976 F.Supp. 2d 401 (E.D.N.Y. 2013) ...................21, 22

*In re Estate of Rothko*, 43 N.Y.2d 305 (N.Y. Ct. App. 1977) ...............................6, 33, 34

*In re Estate of Schuman*, 3774/08, 2009 NYLJ LEXIS 3177 (Sur. Ct. New York Cnty.
  Dec. 23, 2009) ..............................................................................................................24

*King v. Wang,* 663 Fed. Appx. 12 (2d. Cir. 2016) ........................................................4, 25

*Koch v. Christie's Intl. PLC,* 699 F.3d 141 (2d Cir. 2012)................................................21

*Maersk Inc. v. Neewra, Inc.,* 687 F.Supp.2d 300 (S.D.N.Y. 2009) ................................25

*Maiz v. Virani,* 253 F.3d 641 (11th Cir. 2001) ..............................................................6, 34

*Martin Hilti Family Trust v. Knoedler Gallery LLC,* 137 F.Supp. 3d 430
(S.D.N.Y. 2015) ........................................................................................................ 20, 21

*Matter of Chi-Chuan Wang,* 92 A.D.3d 453 (1st Dep't 2012) ......................................... 18

*Metromedia Co. v. Fugazy,* 983 F.2d 350 (2d. Cir. 1992) .......................................... 26-27

*Nathel v. Siegal,* 592 F.Supp. 2d 452 (S.D.N.Y. 2008) ...........................................3, 19, 21

*Needham & Co., LLC v Access Staffing, LLC,* 15-cv-2487, 2016 US Dist LEXIS 111925
(S.D.N.Y. Aug. 12, 2016)................................................................................................22

*New York v. Suarez (In re Suarez),* 367 BR 332 (Bankr. EDNY 2007) ...........................35

*Robertson v. Seidman & Seidman,* 609 F.2d 583 (2d Cir. 1979) .....................................23

*Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178 (2d Cir. 2008) .....................27

*Terminate Control Corp. v. Horowitz,* 28 F.3d. 1335 (2d Cir. 1994)...........................6, 33

*Thaqi v. Wal-Mart Stores E., LP,* 09-cv-755, 2014 US Dist LEXIS 45107
(EDNY Mar. 31, 2014) ...................................................................................................34

*United States v. Altese,* 542 F.2d 104  (2d Cir. 1976) *cert. den.* 429 U.S. 1039 (1977) ...25

*United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg,* 255 F.Supp.2d
56 (E.D.N.Y. 2003) .........................................................................................................31

*United States v. Coppola,* 671 F.3d 220 (2d Cir. 2012) ............................................. 26-27

*United States v. Coonan,* 938 F.2d 1553 (2d Cir. 1991)....................................................4

*United States v. De Biasi,* 712 F.2d 785 (2d Cir. 1983) ...............................................5, 27

*United States v. Monaco,* 194 F.3d 381 (2d Cir. 1999) ...................................................32

*United States v. Morelli,* 169 F.3d 798 (3d Cir. 1999) ....................................................31

*United States v. Muni,* 668 F.2d 87 (2d Cir. 1981) .................................................5, 27,30

*United States v. Newson*, 531 F.2d 979 (10th Cir. 1976) ....................................................30

*United States v. Payne*, 591 F.3d 46 (2d Cir. 2010) ...........................................................26

*United States v. Portrait of Wally*, 99-cv-9940, 2002 U.S. Dist. LEXIS 6445 (S.D.N.Y. Apr. 12, 2002) ....................................................................................................................30

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ...................................................30

*United States v. Turkette*, 452 U.S. 576 (1981) ..............................................................4, 25

*Vaughn v. Consumer Home Mort. Co.*, 297 Fed. Appx. 23 (2d Cir. 2008) ............ 6, 33-34

*Wang et al. v. King et al.*, 18-cv-08948 (JFK-JLC) (S.D.N.Y.) ..........................................2

*Williams v. J.P. Morgan & Co.*, 199 F. Supp. 189 (S.D.N.Y. 2002) ...........................6, 34

## STATUTES, RULES, REGULATIONS

18 U.S.C. § 1341.................................................................................................................30

18 U.S.C. § 1343.................................................................................................................27

18 U.S.C. § 1956.................................................................................................................31

18 U.S.C. § 1961............................................................................................................25, 26

18 U.S.C. § 1962 *et seq* .............................................................................................4, 24, 26, 27

18 U.S.C. § 1964.................................................................................................................26

18 U.S.C. § 2314...........................................................................................................30, 31

S.C.P.A § 103(39)...............................................................................................................24

Fed. R. Evid. Rule 803 (17) ...............................................................................................31

Fed. R. Evid. 807 ...............................................................................................................11

## SECONDARY SOURCES

International Consortium of Investigative Journalists ("ICIJ") offshore corporation database at https://offshoreleaks.icij.org/nodes/151272 ...............................................11, 15

Rupert Neate, *Panama Papers: U.S. Launches Criminal Inquiry into Tax Avoidance Claims*, GUARDIAN (Apr. 19, 2016), https://www.theguardian.com/business/2016/apr/19/panama-papers-us-justicedepartment-investigation-tax-avoidance ........................................................................................11

# PRELIMINARY STATEMENT

The Wangs[1] attempt to frame this multi-million-dollar RICO action as a family spat too trivial for the Court's attention. The reality, however, is that they are guilty of participating in a criminal enterprise which, through various fraudulent schemes, orchestrated the international sale and shipment $71,424,000.00 worth of Chinese paintings directly to themselves from the Estate of Chi-Chuan between 2005 and 2009 through six contracts with fictitious buyers while Andrew served as the Estate's preliminary executor. Following the Wangs' receipt of these paintings through their accountant in Hong Kong, they marketed and sold many of them in China for millions of dollars, then laundered the profits back into the United States using entities formed in the British Virgin Islands and Hong Kong, an irrevocable trust, and their wives' bank accounts. Along the way, they recruited the help of friends and business associates to execute and conceal their frauds by creating false documentary records and committing barefaced perjuries.

Though Machiavellian in design, their crimes were clumsy in execution. Andrew used his *own* Shanghai apartment address in the Estate's contract to sell classical Chinese paintings to one alleged purchaser (Mr. Chen Mei-Lin), shipped all of the 98 self-dealt paintings (the "98 Paintings") to his and his father's accountant's office in Hong Kong, and paid the Estate under all six of the contracts using the same two, traceable, offshore bank accounts. Further, Andrew has himself proven incapable of keeping track of the matrix of deceit he created over the past 15 years. For

---

[1] Plaintiff Yien-Koo Wang King, in her capacity as preliminary executrix of the Estate of Chi-Chuan Wang ("Plaintiff" or "Yien-Koo"), hereby submits this memorandum of law, together with the Declaration of Yien-Koo King, dated April 12, 2020 ("Second YK Declaration"); the Declaration of Timothy Savitsky, dated April 13, 2020 ("Second Savitsky Declaration"); the Plaintiff's Responses and Objections to the Defendants' Rule 56 Statement of Undisputed Material Facts, dated April 13, 2020; as well all previous records filed herein (including the Plaintiff's own Rule 56 Statement of Material Facts [ECF Dkt. 199]) altogether, the "Record," in opposition to the Defendants' motion for summary judgment. Unless otherwise stated, the Plaintiff incorporates by reference each of the defined terms used in her Rule 56 Statement of Material Facts dated February 14, 2020 ["King SMF"; ECF Dkt. 199] and Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment [ECF Dkt. 204].

example, in 2013 he testified that he had personal relationships with each of the five purported buyers of the 98 Paintings and that some were even his friends.[2] SK confirmed Andrew's friendship with some of the buyers in his own sworn submissions in the Surrogate's Court.[3] Thus, in 2014, the Wangs' attorney reported that the above-mentioned use of Andrew's Shanghai apartment in the Estate's $1.3 million contract of sale with "Chen-Mei Lin" was necessary because this ostensible purchaser "was temporarily staying in Andrew's home while his own home was being renovated" at the time of the sale.[4] But in 2019, losing sight of these earlier deceits (and desperate to explain why he did not have a single email or other communication record with the alleged buyers), Andrew testified he did *not* have any pre-existing relationships with these truly strawmen purchasers. He now swore that he never communicated directly with them, never met them, and only transacted with them through yet another contrivance: a liaison named "Er Shi Fu."[5] But then Andrew's carelessness became even more pronounced. When testifying about one of the 98 Paintings identified as OTE 156—one which his father, SK, claimed he owned but was willing to allow the Estate to sell in February 2006 "to raise as much cash as possible" for Estate tax payments[6]—a jet-lagged Andrew mistakenly told the truth: "I bought it [OTE 156] back . . . . [M]y intention was to get the painting back for my father because my father was very emotional to [*sic*] his own paintings."[7] In other words, Andrew admitted to selling this Estate painting to himself. The remainder of the evidence in the Record proves that SK and Andrew self-dealt by buying *all* of the

---

[2] *See* King SMF [ECF Dkt. 199] a ¶¶93-99.

[3] Savitsky Decl. Exh. 30 at ¶¶113-115 (SK Verified Answer to Tcheng Petition).

[4] Savitsky Decl. Exh. 31 (November 19, 2014 email of Carolyn Shields).

[5] *See* King SMF [ECF Dkt. 199] a ¶¶100-109.

[6] PA Decl. [ECF Dkt. 200] Exh. 20 (Klein writing to Schram "We are advised by Andrew that OTE #156 is a painting that SK owns. Andrew has advised us that SK is prepared to sell the painting in order to raise as much cash as possible to pay Estate expenses.").

[7] *Compare* Kelly Decl. Exh. 50 at WANG000633 (Bill of Sale showing OTE 156's sale in 2006 to strawman "Yong Qing Ye" for $100,000.00) *with* Second Savitsky Decl. Exh. 84 (6/25/19 AW Dep. Trans. at 182:18-183:11; 204:23-206:25); *see also* Second Savitsky Decl. Exhs. 85 (AW Dep. Exh. AW-14) and 86 (photograph of OTE 156 taken in 2004).

98 privately sold paintings back from the Estate.

The Wangs contention that this action is a "textbook example of civil RICO abuse"[8] is beyond bogus.[9] Even if this were a criminal RICO prosecution held to the reasonable-doubt standard of proof, there would be sufficient evidence to convict Andrew and SK three times over.

## SUMMARY OF ARGUMENT

First, the RICO claims are timely. Yien-Koo did not learn that there was a "probability" that fraud tainted the Estate's sale of 98 classical Chinese paintings until 2013, which is when she was first provided with terms of the Estate's sales. *Nathel v. Siegal*, 592 F.Supp. 2d 452, 461 (S.D.N.Y. 2008) (inquiry notice of a RICO fraud claim is not triggered until the plaintiff should have become aware of a "probability" of fraud, not its mere possibility). Prior to 2013, Yien-Koo had no information on: which paintings the Estate sold; how many were sold; when they were sold; for how much they were sold; in what country they were sold; to whom they were sold; or, critically, pursuant to what terms and representations they were sold. Yien-Koo's attendance at the *Bao Wu Tang* museum exhibition in Beijing in 2009 at which 15 of the 98 self-dealt paintings appeared does not establish Yien-Koo was on "inquiry notice" of the Wangs' fraud. For all she knew in 2009, the displayed paintings were still owned by the Estate and, consistent with standard practices and custom, had merely been loaned to the museum for the exhibition. But even assuming Yien-Koo was on notice of a "probable" fraud merely by seeing 15 Estate paintings at the exhibition, she sought to acquire additional information about the circumstances surrounding those paintings' display. Despite her diligence, however, the PA refused to share Estate information with her until 2013 due to her purported disinheritance under the later-to-be-proven phony will which occasioned

---

[8] *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Wang Support Memorandum") at 1.

[9] Remarkably, the Wangs have appealed the dismissal of the RICO claims they brought in this supposed mere family dispute. *See Wang et al. v. King et al.*, 18-cv-08948 (JFK-JLC) (S.D.N.Y.) [ECF Dkt. 78] (notice of appeal of order dismissing the Wangs' own RICO claims against the Kings).

Andrew's executorship (the February 18, 2003 document is referred to herein as the "Fraudulent Will").[10] Meanwhile, Andrew actively lied to cover-up his self-dealing and that he was himself helming the museum exhibition.

Second, the Wangs' RICO enterprise is amply shown to be an association-in-fact of individuals and/or corporations acting in tandem to advance ongoing predicate RICO misconduct; the "enterprise" requirement of 18 U.S.C. §1962 (d) is more than satisfied. *United States v. Turkette*, 452 U.S. 576, 580 (1981). "Families" acting with a common purpose and engaging in predicate activity have been recognized as susceptible to liability under RICO in like circumstances. *See, e.g., United States v. Coonan*, 938 F.2d 1553, 1560 (2d Cir. 1991). Here, the Wangs' family enterprise existed to perpetuate a pattern of stealing, fraudulently acquiring, and reselling classical Chinese paintings. It generated as much as hundreds of millions of dollars in profits which were then laundered through foreign corporations, the SK Wang Irrevocable Trust, and their wives' U.S. bank accounts. Though Andrew and SK were its core members, the enterprise operated at various times with the knowing help and substantial assistance of: Ms. Chien-Fang Huang,  Ms. Billie Wai, Mr. Wei Zheng, Le Style Limited, Le Tao Limited, Bao Wu Tang, Mrs. Cao Ching Wang, and Mrs. Rong Luo  (altogether the "Wang Family"). *Coonan*, 938 F.2d at 1560 (affirming RICO conviction despite the changing of the enterprise's members over time).

Third, the Record bespeaks a pattern of racketeering many times more extensive than that which is required by the statute and the jurisprudence interpreting it. The United States Supreme Court and the Second Circuit have repeatedly held that the central element of a "closed-ended" pattern of racketeering is the occurrence of related predicate acts over a "substantial period of time."

---

[10] As noted, a trial was convened in April 2017 to determine the legitimacy of the February 18, 2003 will being advanced by Andrew and his father SK. A unanimous jury found the disinheriting will was fraudulent. *See* Savitsky Decl. Exhs. 6, 7, and 8.

*See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 253 (1989); *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 Fed. Appx. 94, 99 (2d Cir. 2008); *King v. Wang,* 663 Fed. Appx. 12, at *13-14 (2d. Cir. 2016) (reversing the district court in this action for dismissing Yien-Koo's original complaint for failure to plead a "pattern of racketeering"). Here, the Record chronicles repeated predicate activity of a "substantial" duration (2003-2015) and each of the secondary considerations[11] used in this Circuit is also present: (1) the number of the predicate acts (dozens); (2) the variety of predicate acts (at least four); (3) the number of victims (C.C. Wang, the Kings, the Kings' corporations, and four other beneficiaries of the Estate); and (4) the number of participants (*e.g.*, Andrew, SK, Wei Zheng, Billie Wai, Le Style). If not conclusive on their face, together these facts more than give rise to a triable issue of fact related to the "pattern" element of RICO. *See King,* 663 Fed. Appx. at *13-14.

Fourth, the Wangs' causation argument is meritless. While serving as the Estate's preliminary executor, Andrew (with SK's knowing participation) directed a network of offshore corporations to pay the Estate $4.3 million to purchase 98 Chinese paintings and used fictitious identities, false contracts, and fraudulent international wires to trick the PA into believing he was engaging in arm's length negotiations and sales with private buyers to achieve the "ideal price" for the Estate.[12] He then secretly arranged for those paintings to be shipped to his own accountant's office in Hong Kong. The 98 Paintings he sold to himself and his father have a current market value of $71 million. Since his and SK's fraudulent conduct foreseeably caused the sales (at below-market, non-arm's-length values) and their shipment to Hong Kong, the Defendants' predicate misconduct was the proximate cause of the Estate's loss of property. *United States v. De Biasi*, 712

---

[11] *See Fresh Meadow*, 282 Fed. Appx. at 99.
[12] Savitsky Decl. Exh. 32 at WANG001890 (December 2004 email between Andrew and Klein regarding the objective of the Estate's sales); Exh. 65 at WANG002255 (Andrew writing to Ewald "Please understand that we are working for the same purpose which is to achieve an ideal price for the estate").

F.2d 785, 791 (2d Cir. 1983) (citing *United States v. Muni*, 668 F.2d 87, 89-90 (2d Cir. 1981) (holding a RICO defendant commits wire fraud when he, through *intra*state conduct, foreseeably causes innocent third-parties to use *inter*state wires which cause injury).

Fifth, the Estate's injury is attributable to the sales of paintings under false pretenses by a self-dealing fiduciary acting in the absence of arm's length. To be sure, the Second Circuit has recognized that "lost profits" are an available remedy for a RICO injury. *Terminate Control Corp. v. Horowitz*, 28 F.3d. 1335, 1343 (2d Cir. 1994); *Elsevier Inc. v. W.H.P.R., Inc*., 692 F.Supp. 2d 297, 310 (S.D.N.Y. 2010). One category of lost profits is "appreciation damages." *See, e.g.*, *Vaughn v. Consumer Home Mort. Co*., 297 Fed. Appx. 23, 27 (2d Cir. 2008) (using to terms "lost profits" and "appreciation damages" interchangeably); *Williams v. J.P. Morgan & Co.*, 199 F. Supp. 189, 194-95 (S.D.N.Y. 2002) (same). The predicate acts committed by Andrew (with SK's knowledge and assistance) render the sales themselves voidable and entitle the Estate to the paintings' return or their current value since Andrew had no right to purchase them in the first place. *In re Estate of Rothko*, 43 N.Y.2d 305, 322 (N.Y. Ct. App. 1977) (where an estate fiduciary self-deals, "appreciation damages"—*i.e.* the value of the self-dealt property at the time of the finding of liability—are required "to make the estate whole.").[13]

Sixth, Yien-Koo is entitled to at least two adverse inferences against the Wangs for their spoliation of evidence. The Wangs failed to produce the completed asset schedule for the Shou-Kung Wang Irrevocable Trust (the "SK Trust") or any corporate records for Le Style or Le Tao— which they used to wire millions of dollars to the Estate to pay for the 98 Paintings.

---

[13] *See also Maiz v. Virani*, 253 F.3d 641, 663 (11th Cir. 2001) ("The touchstone of the [RICO damages] inquiry . . . is proximate cause; there is no automatic rule against the recovery of any type of lost profits or lost value damages if proximate cause is shown.").

## STATEMENT OF FACTS

In opposing the Wangs' Motion, Yien-Koo relies upon, and incorporates by reference, her Rule 56 Statement of Material Facts in Support of the Plaintiff's Motion for Partial Summary Judgment ["King SMF"; ECF. Dkt. 199]. Particularly germane to Yien-Koo's opposition to the Wangs' Motion for summary judgment are: King SMF ¶¶1-28 (background facts concerning the creation of the Wang Family enterprise by SK); ¶¶46-134 (overview of the facts and testimony surrounding the Estate's private sale of the 98 Paintings between 2005 and 2009); ¶¶280-321 (Andrew's false representations that he was negotiating with "Yue Da-Jin" and other purported buyers to achieve the "ideal price" for Estate artwork) and ¶¶322-361 (facts related to the failed settlement exchange between Yien-Koo and the Wangs due to Andrew's May 2005 theft of 46 classical Chinese paintings in Shanghai, China). Below is a brief summary of additional facts in further opposition to the Wangs' Motion.

### A.     The Wang Family Enterprise

The Wang Family enterprise was inaugurated under SK's direction on January 31, 2003 when he and his son Andrew stole 25 paintings from C.C. Wang's apartment and safe deposit box, which they then shipped to China. Second Savitsky Decl. Exh. 87 (4/24/2017 YK Prob. Tr. Trans. at 279:26 - 286:10; 293:18-25). The criminality was fluid, continuing between 2003 and 2009 with a central focus on Andrew's misappropriation of C.C. Wang Estate artwork under the guise of preliminary executor. *See* Yien-Koo's Memorandum of Law in Support of Partial Summary Judgment [ECF Dkt. 204] and King SMF at ¶¶ 46-321 [ECF Dkt. 199]. Throughout, Andrew had a coterie of persons and entities that substantially assisted his criminality and engaged in their own predicate RICO misconduct.

SK Wang may have helped C.C. Wang manage his art collection for approximately fifteen years, but in February 2003, six years after C.C. Wang fired him, he masterminded Yien-Koo's disinheritance by means of fraud. *See, e.g.,* King SMF at ¶1-28; Savitsky Decl. [ECF Dkt. 203] Exhs. 6 (May 9, 2017 Decree of the Surrogate's Court); 7 (Order of the Appellate Division affirming the May 9, 2017 Decree) and 8 (Order of the Appellate Division rejecting a second testamentary instrument filed by the Wangs on the grounds of fraud and undue influence). SK Wang admitted under oath that he wrote the fraudulent codicil that was the template for the will. *See* Second Savitsky Decl. Exh. 106 (February 10, 2003 Codicil); Second Savitsky Decl. Exh. 103 (2/2/05 SK Dep. Trans. at 401:12-22) (SK's testimony he prepared the codicil); Savitsky Decl. Exh. 8 (Appellate Division Order noting the Codicil was a part of SK and Andrew's fraudulent "scheme" to change C.C.'s testamentary plan).

Between 2005 and 2009, after 133 classical Chinese paintings were turned over to the Estate following C.C. Wang's death (see PA Decl. at ¶9(a)), Andrew and SK claimed that two of the Estate's paintings actually belonged to SK. Second Savitsky Decl. Exh. 89 at WANG002188 (SK Dep. Exh. SK-17). The first painting SK claimed ownership of was OTE 156: a work by the 17th century artist *Wang Jian* and valued by Sotheby's to be worth $100,000.00 as of July 3, 2003. Second Savitsky Decl. Exh. 88 (6/24/19 SK Dep. Trans. at 116:16-117:24; SK testifying he owns OTE 156); *id.* Exh. 86 (Estate photographs of OTE 156 taken in 2004); PA Decl. Exh. 19 at WANG000706 (Sotheby's Appraisal). The other was OTE 223: a work by the 15th century artist *Tang Ying* and valued by Sotheby's to be worth $150,000.00 as of July 3, 2003. Second Savitsky Decl. Exh. 89 (SK Dep. Exh. SK-19 at WANG002013); PA Decl. Exhs. 9 at KING006486 (Martin Klein, Esq. ("Klein") faxing SK's sale authorization of OTE 223 to Schram in 2005); 19 at WANG000725 (Sotheby's Appraisal). According to Andrew and Klein, SK gave the Estate authorization to sell these paintings because he wanted to help the Estate "to raise as much as

possible to pay the Estate tax"—even if it meant giving up a quarter-million-dollars' worth of his own alleged paintings. PA Decl. Exh. 9 at KING 006486; *see also* Second Savitsky Decl. Exh. 89 at WANG002188 (SK Dep. Exh. SK-17); Kelly Decl. Exh. 50 at WANG000633 (Bill of Sale of OTE 156 to Yong Qing Ye in February 2006). Based on SK's claims and permissions, the Estate sold OTE 156 to a supposed Chinese national named "Yong-Qing Ye" in February 2006. *Id.*

Confronted with his own emails, however, Andrew has now admitted that it was, in fact, the Wangs who purchased OTE 156 from the Estate in February 2006. In May 2011, Andrew emailed Ms. Chien Fang Huang, his art-consultant, scanned images of OTE 156 taken from the Bao Wu Tang Capital Museum Exhibition publication and told her that OTE 156 was still within the family's possession: "It's still within the family collection. Please write 'private collection.' It was exhibited at Beijing Capital Museum in 2009." Second Savitsky Decl. Exh. 85 (AW Dep. Exh. AW-14); *see also* Second Savitsky Decl. Exh. 86; Second YK Decl. at ¶¶9-10. But this *Wang Jian* painting was purportedly sold to a private buyer in 2006, Yong Wing Ye, and was, therefore, no longer supposed to be in the family collection. Kelly Exh. 50 at WANG000633. When this 2011 email of Andrew admitting OTE 156 was "still within the family collection" as of 2011 was introduced as an exhibit during Andrew's 2019 deposition, Andrew confessed that OTE 156 "is a painting that my father owned that I tried to get out from the estate. I bought it back . . . . my intention was to get the painting back for my father because my father was very emotional to his own paintings." Second Savitsky Decl. Exh. 84 (6/25/19 AW Dep. Trans. at 205:13-206:25).[14] The 2006 contract indicating that OTE 156 was being sold to Yong Qing Ye was a sham; the Wangs purchased it themselves.

---

[14] The actual reason SK authorized the sales was so that his paintings could be shipped out of the Estate's storage facility in Newark, New Jersey to his trusted accountant's office in Hong Kong. *See* ECF Dkt. 196 ("Wang SMF") at ¶¶93-95.

SK also secured permission for Andrew to sell six Estate-held paintings which, according to SK, belonged to SK's cousin in Taiwan, named Hui Chen. Klein transmitted faxes to the PA's counsel (Schram) in July 2005 representing that Hui Chen would, just like SK, permit her purported paintings to be sold by the Estate "for the purpose of estate taxes." PA Decl. Exh. 16 at KING 006941, 6945. Klein's fax to Schram included a letter from Hui Chen claiming her consent was given on the condition that "my cousin, Shou-Kung Wang, [be] responsible for the return of [the value of the paintings] to my family." PA Decl. Exh. 16 at KING 006945. In 2007, two years after the Estate's sale of six of Hui-Chen's eight alleged paintings to "Yong Qing Ye," SK sent two wires from his personal bank account to Hui Chen in Taiwan totaling $1,275,000.00 (far exceeding the sale price of her alleged paintings). Second Savitsky Declaration Exh. 89 (SK Dep. Exh. SK-24).

SK has participated in the Wang Family's money laundering schemes. In September 2013, SK (as the Grantor) and Andrew (as the Trustee) formed the Shou-Kung Wang Irrevocable Trust (the SK Trust, *supra* at 6). Second Savitsky Decl. Exhs. 88 (6/24/19 SK Dep. Trans. at 18:18-20:14); 89 (SK Dep. Exh. SK-2; the SK Trust). Unfortunately, due to the Wangs' refusal to abide their discovery obligations and produce the asset schedule for the trust,[15] the precise nature of its assets is currently unknown. The Wangs produced the 32-page, initialed, signed, witnessed, and notarized trust document itself, but the trust's asset schedule—its most critical component—is just a blank outline. Second Savitsky Decl. Exh. 89 at AWSK_00000093-95 (SK Dep. Exh. SK-2). Bank records, however, reveal that two days after the SK Trust's creation, it received a wire from a person named "Zhu Mingxia" in Hong Kong for $5,672,000.00. Second Savitsky Decl. Exh. 89 (SK Dep. Exh. SK-3). SK testified he has never heard the name "Zhu Mingxia" and does not know

---

[15] Though Yien-Koo sought to compel production of these documents, the Defendants insisted they did not have them. Second Savitsky Decl. Exhs. 104 (at 1-3) [ECF Dkt. 157] and 91 (at 8) [ECF Dkt. 158]. Magistrate Judge Cott noted that he could not order the Wangs to produce what they claimed they did not have and that the appropriate course was for the Plaintiff to seek an adverse inference based upon non-production, if deemed appropriate. *See* Second Savitsky Decl. Exh. 105 at 19 [ECF Dkt. 168].

where the $5,567,000.00 paid to his trust came from or why it was paid. Second Savitsky Decl. Exhs. 88 (6/24/19 SK Dep. Trans. at 33:13-34:15). Meanwhile, Andrew testified the $5,672,000.00 wire to the SK Trust was a *gift* to Andrew's son (SK's grandson) from someone in China. Second Savitsky Decl. Exh. 84 (6/25/19 AW Dep. Trans. at 231:12-232:8).  In any event, Andrew used the $5,672,000.00 payment to purchase a parcel of property on Long Island five days after the money was received by the SK Trust. Second Savitsky Decl. Exh. 90 at AWSK_00000002-3 ($5.9 million mansion deed dated October 2, 2013). The remainder of the SK Trust's assets are unknown.

SK was also the joint shareholder and principal of at least one of the companies which paid the Estate for the 14 paintings sold to the last of the five strawmen buyers, namely "Yue Da-Jin." The Estate received an overseas wire payment of $489,772.00 for its purported sale of paintings to Mr. Yue in August 2009. Wang SMF at ¶151. Estate bank records produced by Andrew in 2018 show that the source of this half-million-dollar payment was a company called "Le Style Limited." Savitsky Decl. Exh. 46 at WANG001673-1674.  Though Andrew testified at a deposition back in 2013 that he did not own or control *any* companies between 2003 and 2009, he more recently admitted that he was the owner of Le Style Limited and used it, in 2009, to pay hundreds of thousands of dollars to the Estate to purchase paintings.  *Compare* Savitsky Decl. Exhs. 24 (2013 AW Dep. Trans. at 97:14-98:23) *with* 11 (6/25/19 AW Dep. Trans. at 239:22-240:11).

Despite the Wangs' failure to produce any of Le Style's corporate records indicating who its shareholders or principals were, the fact is that it was jointly created and held by Andrew *and* SK. In or about 2010, an international network of more than 190 journalists calling themselves the International Consortium of Investigative Journalists ("ICIJ") uncovered, organized, and published documents divulging the identities of certain wealthy persons across the globe who held offshore

companies.[16]  The ICIJ has reported that "Le Style Limited" is a BVI entity, incorporated in 2006, and owned by Andrew and Shou-Kung Wang. *See* https://offshoreleaks.icij.org/nodes/151272.[17] These same circumstances suggest that SK was also the joint owner of the undisclosed corporation (identified as "8480185540" in the Estate's wire records) that paid for the remainder of the Estate's paintings, but for which the Wangs produced no records. Savitsky Decl. Exh. 46 at WANG001676-81; *id.* Exh. 11 (6/25/19 AW Dep. Trans. at 240:2-243:2).

SK further aided the Wang Family enterprise by giving knowingly false testimony to conceal his and Andrew's wire and mail fraud. *See, e.g.*, Savitsky Decl. Exh. 30 at ¶¶113-115 (SK Verified Answer to Tcheng Petition falsely claiming Andrew's use of his own address in the Chen-Mei Lin contract was an "accommodation to the buyer.").

Finally, SK and Andrew resold their fraudulently acquired paintings together in 2008 and 2010 by auctioning them through the Beijing and Hong Kong Chieftown International Auction Company Ltd. ("Chieftown") for millions of dollars. Second Savitsky Decl. Exh. 88 (6/24/19 SK Dep. Trans. at 141:22-144:21 (SK testifying he put up two paintings for auction years ago, identified as Nos. 150 and 328)); *Id.* Exh. 84 (6/25/19 AW Dep. Trans. at 30:17-23, 64:6-69:4 (Andrew testifying that he used to work for Chieftown and that he auctioned some of SK's paintings there); *Id.* at ¶13; Regan Decl. [ECF Dkt. 201] Exh. 1 at ¶¶30-33 (Expert Report of Patrick Regan noting that hearsay exempt market reports indicate that *sixteen* of the Estate's 98 Paintings were auctioned at Chieftown between 2008 and 2010.); *but see* Second Savitsky Decl. Exh. 84 (6/25/19 AW Dep. Trans. at 72:5-73:18; 168:21-169:13 (Andrew testifying he has no records whatsoever of

---

[16] *See, e.g*, Rupert Neate, *Panama Papers: U.S. Launches Criminal Inquiry into Tax Avoidance Claims*, GUARDIAN (Apr. 19, 2016), https://www.theguardian.com/business/2016/apr/19/panama-papers-us-justicedepartment-investigation-tax-avoidance. The ICIJ's public database is searchable *via* their website.

[17] The court should find ICIJ's publication admissible in accordance with Fed. R. Evid. 807. Since the ICIJ's publication accurately identified Andrew as the owner of Le Style, its content is corroborated and bears sufficient guarantees of trustworthiness. There is no reason to question its accuracy as to Shou-Kung Wang's joint ownership of Le Style.

his sale of paintings at Chieftown or anywhere else)). In total, at least twenty-six paintings sold by the Estate between 2005 and 2009 were resold at various auction houses throughout China for tens of millions of dollars. Second Savitsky Decl. ¶13; *Id*. at Exh. 95 (Regan Appendix A at pp. 9, 12, 14, 15, 17, 18, 22, 30, 32, 34, 44, 56, 57, 65, 67, 69, 70, 75, 76, 77, 80, 81, 83, 85, 86, 87, 89, 90).

Mr. Wei Zheng is Andrew's friend who lives in Rego Park, Queens. Second Savitsky Decl. Exh. 92 (Wei Zheng Dep. Trans. at 5:18-23, 48:22-49:5).  Zheng testified he is "a simple person" who does "not ask a whole lot of questions." Second Savitsky Decl. Exh. 92 (Wei Zheng Dep. Trans. at 32:2-7, 12:9-14). In February 2005, at Andrew's request, Mr. Zheng signed multiple documents falsely identifying him as the "buyer" of Estate paintings. PA Decl. Exh. 8 (documents signed by Wei Zheng, including a tax resale certificate, falsely identifying him as the buyer of Estate assets); Second Savitsky Decl. Exh. 92 (Wei Zheng Dep. Trans. at 53:25-58:13 (Wei Zheng testifying Andrew "pointed out for me [where to sign], and then I signed, because I don't understand English" and "I thought I was not the real buyer.")). By signing these records knowing that they contained false statements and were related to the purchase and shipment of paintings from the Estate, Zheng knowingly participated in the Wang Family enterprise's scheme.

Ms. Billie Wai is the Wang Family accountant. Her accounting firm, CK Lam, "has been a family friend for a long time . . . [the Wangs] form the[ir] companies there." Savitsky Decl. Exh. 11 (6/25/19 AW Dep. Trans. at 128:7-17). Each of the Estate's 98 Paintings were shipped to the five strawmen buyers "c/o Billie Wai" in Kowloon, Hong Kong. Wang SMF at ¶¶94, 95, 99, 120, 129, 141, 147.  By accepting artwork on behalf of people who she was not actually representing and who did not actually exist, Billie Wai knowingly served as an illicit conduit in the Wang Family enterprise's scheme.

Ms. Chien Fang Huang appeared as a last-minute witness called by the Wangs during the 2017 probate trial to determine the validity of the Fraudulent Will. Second Savitsky Decl. Exh. 87

at King-SCT-000017482 (4/25/17 Prob. Tr. Trans.). She testified, through a Chinese translator, on the issue of C.C. Wang's capacity by claiming that she visited C.C. on July 1, 2003, less than 48-hours before his death. *Id.* at King-SCT-000017487. She claimed that he was "very smart, and [was] very clear in his thought" on July 1, 2003. *Id.* at King-SCT-000017488. She also testified that during her discussion with C.C., "[h]e told me that his little daughter [Yien-Koo] and son-in-law [Kenneth King] had, on the very bad day, took from him 180 pieces of artifacts, of art." *Id.* at King-SCT-000017488. She told the court that on July 1st, C.C. seemed sharp of mind in the days before his death and "was smiling as he was flipping through the book and he also saw me with cheer on his face." *Id.* at KING-SCT-000017491. On cross examination, Chien Fang Huang claimed she appeared at trial because she was passing through New York on business. *Id.* at KING-SCT-000017492. She testified she did not speak to Andrew Wang about her court appearance and that, in fact, the last time she had spoken to Andrew was "in 2003 at a funeral of C.C. Wang." *Id.* at KING-SCT-00017493.

Chien Fang Huang's 2017 trial testimony was perjurious and given to substantially assist the Wang Family enterprise; in truth, Ms. Huang is an art consultant who works for Andrew. Discovery in this federal action in the years following Ms. Huang's probate trial testimony has revealed dozens of emails between her and Andrew discussing meeting together, selling paintings, finding potential buyers for paintings, contacting auction houses, speaking on the phone, and even sharing Andrew's Shanghai apartment. *See, e.g.*, Second Savitsky Decl. Exh. 93 at WANG002215, 2228-2229 (Chein Fang Huang emailing Andrew in 2007 "My friend . . . is able to help me to contact [two art collectors] when your family's case is finished and what you like to [] deal with them in the future. Report over, boss."; "I might go to China around Spring auction season, and if both of us are available, may we go visit your old [] home in Sutzou?"; "How are you? I'm always missing you in my mind deeply."); *Id.* at WANG002363-2365 (Chien Fang Huang emailing

Andrew in 2011: "I just called you, perhaps you are still sleeping."; "When do you go back to Shanghai? Can I stay at [your] house as we discussed?) and *Id.* at WANG002365 (Andrew emailing Chien Fang Huang in 2011: "Planning to return to Shanghai in early May, but ha[ve] already arranged for you to stay in my Shanghai apartment. Is it OK? My friend Mr. Ye will help you before my arrival to Shanghai"). By giving knowingly false testimony at the probate trial, Chien-Fang Huang willfully participated in the Wang Family enterprise.

   Le Style Limited is a corporation jointly owned by the Andrew and SK which wired $489,772.00 to the Estate in August 2009 (as payment under the Estate's contract with "Yue Da Jin") in furtherance of the Wang Family's fraudulent self-dealing. *See* Wang SMF at ¶151; Savitsky Decl. Exh. 46 at WANG001673-1674; *see also* International Consortium of Investigative Journalists ("ICIJ") offshore corporation database at https://offshoreleaks.icij.org/nodes/151272.

   Le Tao Limited is a corporation with a business address at Unit 704 Four Seas Building 208-2012, Nathan Road, KLN, Hong Kong (Billie Wai's address) which entered into a contract in April 2013 to purchase a mansion located at 117 Old House Road, Sands Point, New York ("117 Old House") for $5,900,000.00. Savitsky Decl. Exh. 25 (6/25/19 AW Dep. Exhs. AW-20, AW-21, AW-22). Andrew owned Le Tao Limited. *Id.* On May 6, 2013, he authorized a wire from Le Tao's HSBC account in Hong Kong in the amount of $590,000.00 to his real estate attorney's account in New York as the down payment for 117 Old House. *Id.* at KING 006721 (6/25/19 AW Dep. Exh. AW-22).

   Bao Wu Tang is Andrew's art gallery which he used to market stolen and fraudulently acquired paintings. *See* Savitsky Decl. Exh. 72 (translated preface to the Bao Wu Tang Exhibition catalogue); YK Decl. [ECF Dkt. 198] Exh. 4 (photograph of Andrew speaking at the Bao Wu Tang opening ceremony in 2009); Second YK Decl. Exh. 8 (Bao Wu Tang exhibition catalogue). For example, Andrew personally received a painting titled "Wild Bamboo" by *Wu Zhen* from Yien-

15

Koo as part of a failed settlement in May 2005. YK Decl. at ¶¶37-38. Though he swore in the Surrogate's Court proceeding in 2006 that he never received this multi-million-dollar painting from her, he hung it on display at his Bao Wu Tang Exhibition at the Capital Museum in Beijing in November 2009.  YK Decl. at ¶¶35-38, 48; *id.* Exh. 7 at ¶¶42-45 (Andrew's 2006 affidavit filed in the Surrogate's Court action identifying the 15 paintings he admittedly received from Yien-Koo) *id.* Exh. 5 (photograph of Wild Bamboo as it hung on display at the Bao Wu Tang Exhibition). Six years after its display at the Capital Museum, *Wu Zhen*'s Wild Bamboo sold at a public auction in China for approximately $11,000,000.00 USD. Second Savitsky Decl. Exh. 94 (KING 00644); Second YK Decl. at ¶12.

Luo Rong is Andrew's wife who, in June 2015, wired $1,450,000.00 in illicit proceeds from Chinese paintings sales to Cao Ching Wang (SK's wife) from Hong Kong. Second Savitsky Decl. Exh. 88 (6/24/19 SK Dep. Trans. at 27:23-29:22); Second Savitsky Decl. Exh. 89 (SK Dep. Exh. SK-4).

Cao-Ching Wang is SK's wife who used a $1.4 million transfer in illicit proceeds from the sale of the Estate's Chinese paintings to purchase a piece of real property in Queens in July 2015. Savitsky Decl. Exh. 89 (6/24/19 SK Dep. Exh. SK-6 at p.9). Because SK testified that: "I am in charge of the money at home, not my wife," the Record indicates that Cao-Ching Wang laundered the money at SK's direction. Second Savitsky Decl. Exh. 88 (6/24/19 SK Dep. Trans. at 27:16-21).

## B.  Yien-Koo First Discovered the Probability of Fraudulent Self-Dealing by Andrew in 2013

Upon returning to the United States following the 2009 Bao Wu Tang Exhibition (see YK Decl. at ¶¶42-48), Yien-Koo contacted the attorneys representing her in the proceedings pending in the New York County Surrogate's Court. Wang SMF at ¶180. The issue that dominated Yien-Koo's attention, since she was unaware of the circumstances surrounding the Estate's sales, was the appearance of a highly valuable painting which she had personally delivered to Andrew (along with

45 other paintings) in May 2005 as part of a failed settlement exchange: *Guo Xi*'s "Travelers in the Autumn Mountains." YK Decl. at ¶¶48-53. Like *Wu Zhen*'s "Wild Bamboo" discussed above, Andrew had previously denied his receipt of this painting in the Surrogate's Court. *Id.*

Back in 2006, shortly after the settlement exchange occurred in Shanghai, Yien-Koo filed a petition to remove Andrew as Co-fiduciary due to his apparent decision to keep for himself the 46 paintings he received from her. YK Decl. at ¶50. In opposition to YK's petition, Andrew had filed an affidavit claiming the settlement failed because he only received 15 paintings at the settlement exchange and was still owed another 31 paintings from Yien-Koo, including the *Guo Xi* and *Wu Zhen.* YK Decl. Exh. 7 at ¶¶42-45. Yien-Koo's removal petition was stayed by the Surrogate's Court. *Id.* But the *Gu Xi*'s and *Wu Zhen*'s prominent display in 2009, at an event coordinated and attended by Andrew, was irrefutable proof that his earlier denials were false. YK Decl. at ¶48. Yien-Koo thus filed a motion in March 2010 for "Leave to Amend the 2006 Removal Petition" because she believed that the new evidence of the *Guo Xi*'s public display would spur the Surrogate's Court to take action to revoke Andrew's authority to act as Estate fiduciary. YK Decl. at ¶55. But this did not work. *Id.* The Surrogate's Court denied Yien-Koo's motion to amend and kept the Removal Petition in stasis pending the outcome of certain other Surrogate's Court proceedings. *See* Kelly Decl. Exh. 17 at pp. 6-7 (January 21, 2011 Order of the Surrogate's Court).

Yien-Koo soon recognized that many of the other paintings displayed at the Bao Wu Tang exhibition were Estate-owned (*i.e.*, OTE-numbered) paintings and, over the next eight months, Yien-Koo solicited the PA for more information on how these paintings ended up in China. *See* YK Decl. Exh. 6 (December 18, 2010 Letter of Peter Schram to Yien-Koo's former attorney, Martin Garbus). These requests were denied. *Id.* At that time, however, Yien-Koo had no objective basis to believe that fraud was probable given the PA's oversight of the Estate's assets. Still, she was curious as to how and why Estate paintings were appearing in China. Second YK Decl. at ¶16.

17

Her requests for information from the PA unavailing, Yien-Koo next directed her attorney to begin contacting various auction houses to try to find out if any of Chi-Chuan Wang's former collection had resurfaced in China, which he did. Second YK Decl. Exh. 9 (collection of letters prepared by Martin Garbus and sent to various Chinese auction houses in December 2010). Yien-Koo received auction catalogues over the next five months and began reverse engineering a list of Estate paintings which had appeared in China—far from of the Estate's storage facility in Newark, New Jersey. Second YK Decl. at ¶18.

Though the Surrogate's Court had stayed each one of Yien-Koo's petitions to remove Andrew as Estate fiduciary, Yien-Koo still hoped that at the upcoming probate trial, scheduled to begin in 2011, she could prove her disinheritance and Andrew's appointment as preliminary executor were based upon a fraudulent will. Second YK Decl. at ¶20. And since the will immediately preceding the Fraudulent 2003 Will named her as executor, Yien-Koo stood to replace Andrew as Co-fiduciary following success at trial—thereby entitling her to access to Estate records. *Id.* This alternate route to receiving information on the Estate's sales was blocked, however, when the Surrogate's Court, on January 21, 2011, stayed the jury trial of the probate issues surrounding the Fraudulent Will. *See* Kelly Decl. Exh. 17 (January 21, 2011 Order of the Surrogate's Court). Yien-Koo appealed the Surrogate's decision but, one year later in February 2012, the stay was affirmed by the First Department. *See Matter of Chi-Chuan Wang*, 92 A.D.3d 453 (1st Dep't 2012).

At the same time her appeal of the stay was pending, in May 2011, Yien-Koo filed a new petition in the Surrogate's Court seeking a compulsory accounting from the Estate fiduciaries related to the Estate's private sales so that she could determine which paintings were actually sold and what the surrounding circumstances were. Kelly Decl. Exh. 71. Even as of 2011, Yien-Koo had no specific information that fraud occurred but she felt she was entitled to more information on this issue. Second YK Decl. at ¶22. Like the rest of her petitions, however, the accounting petition she

filed was stayed by the Surrogate's Court and Yien-Koo was not provided with any additional information on the circumstances surrounding the appearance of Estate paintings in China in 2011 or 2012. Second YK Decl. at ¶23.

In March of 2013, Yien-Koo still did not have answers to how and why certain of the Estate's paintings had re-appeared in China, but her counsel continued to press the PA for this information (despite the Surrogate Court's stay of her formal accounting proceeding two years earlier). Second YK Decl. at ¶23; Second YK Decl. Exh. 10 at AWSK_00009134. Within the next six months—after years of stayed petitions, motions, letters, court conferences, oral arguments, and even an appeal—Yien-Koo finally received the documentation related to the Estate's sales indicating which paintings had been sold, how much they had been sold for, to whom they had been sold, and the terms of the sales. Second YK Decl. at ¶23. In December 2013, her counsel deposed Andrew about the sales and commenced this civil RICO Action shortly thereafter. Second YK Decl. at ¶25.

## ARGUMENT

### I.   THE CIVIL RICO CLAIMS BROUGHT ON BEHALF OF THE ESTATE OF CHI-CHUAN WANG ARE TIMELY

Civil RICO claims have a four-year statute of limitations which begins to run when the plaintiff either actually knew or should have known of her RICO injury. If at some point a plaintiff becomes aware of suspicious circumstances (called "storm warnings") which indicate that it is "probable" (but not merely *possible*) that she has been defrauded, then the four-year limitations period will run from that date, unless she takes diligent steps to discover her injury. *Nathel*, 592 F.Supp. 2d at 461. A reasonably diligent inquiry into the probable fraud will toll the commencement of the RICO limitations period until such time as the investigation should have revealed the injury to the plaintiff. *Id.*

**A.    *Yien-Koo Did Not Have Actual Notice of the Wangs' Fraudulent Self-Dealing in November 2009***

The Wangs' first argument in support of summary judgment is that the statute of limitations on the RICO claims has expired because "YK had actual notice . . . of her alleged RICO injury as of November 2009 when she discovered AW's alleged self-dealing regarding the 98 paintings." ECF Dkt. 197 ("Wang Memo.") at 15. This is wrong. The Wangs' Fraudulent Will placed the reins of Estate administration in Andrew's and the PA's hands while keeping Yien-Koo blind to what was happening to her father's assets, her best efforts to gather more information notwithstanding. Savitsky Decl. Exh. 12 at 33:4- 34:5 (Schram testifying Yien-Koo was denied access to Estate sales information); YK Decl. at ¶20-21, 50-57; YK Decl. Exh. 6 (December 18, 2010 letter from Schram rejecting Yien-Koo's information requests); Kelly Decl. Exh. 71 (Yien-Koo's stayed May 2011 Petition for an Accounting). As a result, in November 2009, Yien-Koo had no information on (i) whether any of the 15 paintings on display at the Bao Wu Tang Exhibition had actually been sold by the Estate, (ii) at what prices they had been sold, (iii) what the terms of the sales agreements were, (iv) what representations had been made to the PA by Andrew or the buyers to induce the sale, (v) whether those representations were false, or (vi) whether an injury to the Estate stemmed from any misrepresentations. YK Decl. at ¶52. Because of the absence of this information, the exhibition did not give rise to "actual notice" that Andrew was the new owner of the Estate's paintings, let alone that the Estate had suffered an injury due to fraud. *See* Wangs SMF at ¶177 ("The preface to the Bao Wu Tang Exhibition does not state that the artwork on display was the property of AW.").

**B.    *The Bao Wu Tang Exhibition in November 2009 Was Not a "Storm Warning" That Placed Yien-Koo on Inquiry Notice of "Probable" Fraud***

In the absence of actual knowledge of injury, the date upon which a RICO claim will accrue depends upon (a) when the plaintiff should have first recognized that fraud had probably occurred

and (b) the plaintiff's investigative efforts into that fraud. *Martin Hilti Family Trust v. Knoedler Gallery LLC*, 137 F.Supp. 3d 430, 459 (S.D.N.Y. 2015).  Factual circumstances called "storm warnings" may, if they are sufficiently significant, put a plaintiff on "inquiry notice" of a probable fraud and obligate her to take steps to investigate and uncover further information. *Id.* If no effort to investigate is made after the plaintiff learns of the storm warnings, the limitations period is deemed as having accrued on the date the warnings first put her on inquiry notice. *Id.* at 459-60.

A set of storm warnings can trigger inquiry notice "only where 'a person of ordinary intelligence would consider it *probable* that fraud had occurred.'" *CMG Holdings Group v. Wagner*, 15-cv-5814, 2016 U.S. Dist. LEXIS 121135, at *12 (S.D.N.Y. Sep. 7, 2016) (*quoting Koch v. Christie's Intl. PLC*, 699 F.3d 141, 151 n.3 (2d Cir. 2012)) (emphasis added). A vague "suspicion of possible fraud [] is insufficient to trigger inquiry notice." *Hemmerdinger Corp. v. Ruocco*, 976 F.Supp. 2d 401, 411 (E.D.N.Y. 2013); *Nathel*, 592 F.Supp. 2d at 461  (emphasis added); *Martin Hilti Family Trust*, 137 F.Supp. 3d at 459; *Fisher v. Reich*, 92-cv-4158, 1994 U.S. Dist. LEXIS 17121, at *17-20 (S.D.N.Y. Dec. 1, 1994) (denying defendants' motion for summary judgment on RICO statute of limitations grounds where the record did not "unambiguously prove[]" sufficiency of storm warnings).

For all Yien-Koo knew in November 2009, the Estate's fifteen paintings could have been on display in Beijing for innumerable reasons having nothing to do with fraud, or even their sale. Though Yien-Koo knew the sale of some Estate assets had, at least potentially, occurred, she did not know these fifteen were part of that group. YK Decl. at ¶¶51-53. The displayed paintings could have been loaned to the Capital Museum directly by the Estate. *See* Second YK Decl. at ¶16. Alternatively, the Estate itself could have participated in organizing the Bao Wu Tang Exhibition in order to advertise the paintings for a future auction or sale. *Id.* Even if sold, the Estate could have received tens of millions of dollars to legitimate third-party collectors, Andrew's friends, or even

the Wangs themselves (if this had occurred through fully transparent and arm's-length negotiations) without the occurrence of fraud. *Id.* Without information on how the fifteen paintings actually ended up in Beijing for the Bao Wu Tang Exhibition, it would have been impossible for Yien-Koo to conclude that the "probable" explanation for their appearance was fraud. *See Nathel*, 592 F.Supp. 2d at 461; *see also Martin Hilti Family Trust*, 137 F.Supp. 3d at 462.

Though it is true that Yien-Koo's March 2010 filings in the Surrogate's Court concerned the 2009 Bao Wu Tang Exhibition, they had nothing to do with the appearance of the Estate's "OTE" numbered paintings. Rather, Yien-Koo had noticed that the exhibition displayed some of the 46 valuable classical Chinese paintings that she had personally delivered to Andrew in May 2005 in his capacity as Estate fiduciary and as part of a failed settlement, but which he told the Court and the PA he never received and did not have (most notably, *Guo Xi*'s "Travelers in the Autumn Mountains"). Second YK Decl. at ¶¶13-16. Yien-Koo did not receive inquiry notice of the Wangs' self-dealing until 2013 when the PA shared the Estate's sales records with her. *Id.* at ¶¶24-26. As a result, this action is timely.[18]

### C. *Even If on Inquiry Notice of Probable Fraud in November 2009, Yien-Koo Acted Diligently in Seeking More Information on the Estate's Sales*

Yien-Koo had no objective basis to recognize fraud in relation to the Estate sales following her attendance at the Bao Wu Tang Exhibition and had no duty to "pursue some possible, lingering suspicion of fraud" without sufficient facts to suggest its probable occurrence. *Hemmerdinger Corp.*, 976 F.Supp.2d at 411; *accord Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973) ("Suspicion will not substitute for knowledge of facts from which fraud could reasonably be inferred.") (citing New York law). Notwithstanding this, she *did*, in fact, pursue her lingering

---

[18] Moreover, the statute of limitations for the breach of fiduciary duty claims (seeking, in part, equitable relief voiding the private sales due to self-dealing and based upon fraud) is six years. *Kaufman v. Cohen*, 307 A.D.2d 113 (1st Dep't 2003). And since discovery occurred in 2013, the state law claims are indisputably timely as well.

distrust of Andrew by diligently investigating the circumstances of the Estate's sales. *See* pp. 2-4, 16-19, *supra*.

When a RICO plaintiff begins an investigation following the receipt of inquiry notice, the limitations period does not start until the date on which a "reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence." *Needham & Co., LLC v Access Staffing, LLC*, No. 15-cv-2487, 2016 US Dist LEXIS 111925, at \*28, 36 (S.D.N.Y. Aug. 12, 2016). Yien-Koo was persistently denied information related to the Estate, but kept fighting for answers until she finally received them in 2013. Particularly in the context of how burdensome (both in terms of time and money) the non-stop and sprawling Estate litigation has been, it cannot be said, as a matter of law, that Yien-Koo's efforts to acquire more information on the sales between 2010 and 2013 were not reasonably diligent. *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979) (noting "issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case . . . When conflicting inferences can be drawn from the facts . . . summary judgment is inappropriate."); *Butala v. Agashiwala*, No. 95-cv-936, 1997 US Dist LEXIS 1934, at \*23-24 (S.D.N.Y. Feb. 24, 1997) (denying defendants' motion to dismiss plaintiff's RICO claims as time barred because it could "not be said as a matter of law that the plaintiffs failed to exercise due diligence" where they consulted with their attorney about a probable fraud); *see also Borden, Inc. v. Spoor Behrins Campel & Young, Inc.*, 778 F.Supp. 695, 700 (S.D.N.Y. 1991); *Friedman*, 482 F.2d at 439.

### D.   *This Case Is Not a "Nullity"*

The Wangs argue the Estate's present RICO claims cannot relate back to the original filing because Yien-Koo did not, and did not have standing to, bring Estate claims when this action first commenced in 2014. *See* Wang Memo. at 17 ("YK only brought claims on behalf of the Estate when she filed the FAC in September 2016."). They are mistaken, however, because the original

complaint [ECF Dkt. 1] filed on September 23, 2014 sought relief on behalf of Yien-Koo *and* the Estate. *See, e.g.*, Second Savitsky Decl. Exh. 96 at p.48 (seeking, among other things, the restoration of artworks "to YK *or the Estate*, as their lawful owner and pay attendant damages.")

In fact, this argument was already litigated before the Second Circuit and it was decided that Yien-Koo *did* have Article III standing to sue on behalf of the Estate. In 2015, Yien-Koo appealed this Court's dismissal of the original complaint for failure to plead a pattern of racketeering. Second Savitsky Decl. at ¶12. In filing an opposition and cross appeal, the Wang Defendants argued that, regardless of whether a pattern of racketeering was pled, the original complaint should have been dismissed because Yien-Koo lacked Article III standing to sue on behalf of the Estate. Second Savitsky Decl. at ¶12; Exh. 97 at 17 (2/10/16 Wangs' Memorandum of Law in Support of Cross-Appeal).  The issue was fully briefed before the Second Circuit and, ultimately, the Wangs' cross-appeal argument that Yien-Koo lacked Article III standing to sue on behalf of the Estate was considered and rejected by the Second Circuit. *Compare* App. Ar. Rec.[19] at 6:27 (Court: Well are you seeking money damages *on behalf of the estate* as well as on behalf of your clients individually? Mr. Israel: Yes, that's absolutely right); 6:13 (Court: And you're entitled to raise some claims about the *bona fides* of the fiduciary, right? In that context. Mr. Israel: Absolutely.) (emphasis added) *with* Second Savitsky Decl. Exh. 98 at 2-3 (9/20/2016 Mandate of the Second Circuit holding that it had "considered the remainder of arguments raised in both appeals and f[ound] them to be without merit.").[20]

---

[19] The Appellate oral argument recording ("App. Arg. Rec.")  Full audio of the App. Arg. Rec. held on August 19, 2016 is available at: http://www.ca2.uscourts.gov/decisions/isysquery/b28d9874-f636-474d-b597-35117a65ca6f/321-330/list/

[20] The Second Circuit rejected the Wangs' attack of Yien-Koo's Article III standing to sue on behalf of the Estate based upon Yien-Koo's argument that, as a "person interested" in the Estate pursuant to S.C.P.A § 103(39) in being a potentially expectant beneficiary of the Estate of Chi-Chuan Wang, she had standing to sue. *See, e.g., In re Estate of Schuman*, No. 3774/08, 2009 NYLJ LEXIS 3177 (Sur. Ct. New York Cnty. Dec. 23, 2009) (A preliminary executor's duty "lies to th[e] estate and its beneficiaries, whoever they are ultimately determined to be.").

## II.   GENUINE ISSUES OF FACT EXIST AS TO WHETHER THE WANGS PARTICIPATED IN A RICO ENTERPRISE

Any person whose business or property has been injured by reason of a violation of 18 U.S.C. 1962 *et seq.* may recover damages from each person who caused the injury. A civil RICO claim exists where the plaintiff shows "(1) a violation of the RICO statute, 18 U.S.C. 1962; (2) an injury to business or property; and (3) that the injury was cause by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (internal quotations omitted). Section 1962(c) of RICO makes it unlawful for a "person associated with any enterprise" whose activities affect interstate commerce to conduct the enterprise's affairs by committing two or more acts constituting a pattern of racketeering activity. *See, e.g., United States v. Turkette*, 452 U.S. 576, 582-83 (1981); *King v. Wang,* 663 Fed. Appx. 12, at *13 (2d. Cir. 2016) (a pattern of racketeering requires only two related predicate acts).

A RICO enterprise may be comprised of any legal entity such as an "individual, partnership, corporation, association." 18 U.S.C. 1961(4). It may also be created by an informal association that is not a legal entity comprising "a group of persons associated together" which engage in a common purpose. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). An enterprise is proven to exist "by evidence of an ongoing organization . . . and by evidence that the various associates function as a continuing unit." *First Capital,* 385 F.3d at 173. *Any* enterprise—whether legitimate or illegitimate, formal or informal—whose activities affect interstate commerce may fall within RICO's ambit. *United States v. Altese*, 542 F.2d 104, 106, 111 (2d Cir. 1976) *cert. den*. 429 U.S. 1039 (1977).  Though a RICO claim requires that the RICO defendant himself have conducted an enterprise's affairs through certain specified predicate activity, the remaining individuals or companies which make up the enterprise need not have engaged in any predicate activity. *See Maersk Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 332-33 (S.D.N.Y. 2009) (evidence

that non-RICO defendants participated in a common law conspiracy to defraud, even without their participation in predicate acts, provided support that those non-RICO defendants were members of the RICO defendants' enterprise.).

Here, the Wang Family operated over a twelve-year span by engaging in common law fraud, the international transport of stolen/fraudulently acquired goods, wire fraud, mail fraud, and money laundering. Damages are sought by the Estate on its RICO claims because the Wang Family (led by Andrew and SK) fraudulently self-dealt 98 Estate-owned paintings (currently worth $71 million) through dozens of predicate acts. *See* pp. 7-16, *supra.* Yien-Koo alleges that defendants Andrew and SK—together with knowing aid from friends, business associates, and corporations—associated together as an enterprise to illicitly acquire tens-of-millions-of-dollars' worth of Chinese art, sell it, and launder the proceeds. *See* pp. 7-16, *supra.* An association-in-fact has been established.

## III.   GENUINE ISSUES OF FACT EXIST AS TO WHETHER THE WANGS ENGAGED IN A PATTERN OF RACKETEERING

Sections 1962(c) and 1964(c) of Title 18 create a private right of action against any person "associated with any enterprise" who conducts the enterprise's affairs "through a pattern of racketeering activity."  What comprises "predicate" racketeering activity is specifically defined by §1961(1) and includes a litany of federal crimes including wire fraud, mail fraud, money laundering, and the shipment of fraudulently acquired or stolen goods. A necessary finding of a "pattern" of predicate misconduct ensures that the statute's reach will not extend to "perpetrators of isolated or sporadic criminal acts." *United States v. Coppola*, 671 F.3d 220, 243 (2d Cir. 2012) (quoting *United States v. Payne*, 591 F.3d 46, 64 (2d Cir. 2010)). A pattern of racketeering activity can be established by identifying related predicate acts which either: (a) "amount to" or, (b) "pose a threat of" continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239

(1989); *see also Coppola*, 671 F.3d at 243; *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368-69 (2d. Cir. 1992). Acts which "amount to" continued criminal activity establish RICO's "close-ended" continuity requirement whereas, alternatively, acts which pose an ongoing threat of continued criminal activity establish "open-ended" continuity. *H.J. Inc.*, 492 U.S. at 241.

In either case, the question of "continuity" of predicate activity is "centrally a temporal concept" which requires related criminality to occur over an extended period of time. *H.J. Inc.,* 492 U.S. at 241-42; *Fresh Meadow*, 282 Fed. Appx. at 99; *Coppola*, 671 F.3d at 243; *Metromedia Co.*, 983 F.2d at 368-69. Satisfying RICO's pattern requirement can be done where predicate activity occurred over a long enough duration, even when the Plaintiff's injury was caused by only one act. *Chevron Corp. v Donziger*, 974 F. Supp. 2d 362, 601 (S.D.N.Y. 2014) ("A plaintiff . . . need not prove that every predicate act constituting the pattern injured the plaintiff in some way[]"). Though no bright-line rule exists in this Circuit, predicate activity must generally span at least two years to form a "closed-ended" pattern of racketeering activity. *See H.J. Inc.*, 492 U.S. at 253; *Metromedia Co.*, 983 F.2d at 369; *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008).

### A.  *Wire Fraud*

Section 1343 of Title 18 prohibits the use of interstate wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. 1343. The Supreme Court has expressly held that wire fraud and mail fraud can establish a pattern of racketeering even when no one relies on any statements contained in the wires or mails. *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 649 (2008) ("It thus seems plain . . . that no showing of reliance is required to establish that a person has violated 1962(c)."). Further, the Wangs' jurisdictional argument notwithstanding,[21] where a

---

[21] *See* Wang Supp. Mem. at 23.

defendant's *intra*state wires or other acts foreseeably caused an innocent third party to then send *inter*state wires which unwittingly furthered the fraudulent scheme, the defendant has violated the wire fraud statute. *United States v. De Biasi*, 712 F.2d 785, 791 (2d Cir. 1983) (citing *United States v. Muni*, 668 F.2d 87, 89-90 (2d Cir. 1981).

First, Andrew and SK used Le Style and a second, undisclosed, corporate account ("8480185540") to make six international wire payments, totaling $4.3 million, to the Estate between 2005 and 2009 and mask the source of those payments in furtherance of their self-dealing scheme. Savitsky Decl. Exhs. 46 (bank records establishing the six wire payments to the Estate) and 11 (6/25/19 AW Dep. Trans. at 241:14-242:7). As argued in Section VI, *infra*, Yien-Koo is entitled to an inference that SK ordered and funded the payments along with Andrew because the Wangs have produced neither (a) any transactional records of the payor companies (which Andrew admits he owned and controlled) nor (b) any incorporation records indicating who the owners were. *See* Second Savitsky Decl. at Exh. 91 at 8; *id.* at ¶11.

Second, Andrew and Klein coordinated the six shipments of the 98 Paintings from their storage location in Newark, NJ with Cassidy Enoch-Rex of Crozier Fine Arts, Inc. by means of interstate telephone calls, emails, and faxes. *See, e.g.,* Savitsky Decl. Exh. 52 at WANG002075 (Klein explaining to Andrew "[i]f Crozier is going to pack the art in NY we will need insurance for the transfer from NJ to NY and then for the overseas shipment."); Exh. 62 (February 2006 shipping invoice for sale to "Yong Wing Ye" faxed from Nicole Rose Bouchaed of Crozier Fine Arts. Inc. in New York, to Cassidy Enoch-Rex of Crozier Fine Arts in Newark, NJ); Second Savitsky Decl. Exh. 99 at WANG000161 (fax from Klein in New York to Cassidy Enoch Rex at Crozier to a New Jersey fax number in relation to Yong Qing Ye sale); Second Savitsky Decl. Exh. 100 at WANG001972 (email from Andrew to Cassidy Enoch-Rex of Crozier in New Jersey coordinating the Estate's sale of paintings to "Wei Zheng"); Second Savitsky Decl. Exh. 101 at WANG002008

(Andrew emailing Cassidy Enoch-Rex of Crozier in New Jersey to coordinate shipment and payment of paintings); Savitsky Decl. Exh. 71 at WANG0002349-2351 (Andrew coordinating with May McCormack regarding Crozier's agent in Hong Kong and the delivery of paintings to Billie Wai in 2009).

Third, Andrew directly <u>sent numerous fraudulent emails about the buyers to Klein and the PA</u> while he was outside of New York. *See, e.g.*, Savitsky Decl. Exh. 102 at WANG002266 (Andrew emailing Klein in mid-August 2008 that he "need[ed] to tell the buyer how much money roughly he needs to prepare in early Sept. . . . I plan to return to NY by early Sept. and still working on ticket."); Savitsky Decl. Exh. 70 at WANG002328 (Andrew coordinating the sale to Yue Da Jin and claiming "[t]he buyer is in Europe, and I will try to contact him" through an email bearing a Pacific-Time timestamp (GMT -0700)); Savitsky Decl. Exh. 67 at AWSK_00015263 (Andrew representing that the buyer was asking for a 20% discount and "I told him that I will try to get him 10% off the total value" through an email bearing a Pacific Standard Time timestamp (GMT-0800)).

Fourth, <u>SK gave his consent to have two paintings—which he claimed ownership of—sold in the self-dealing scheme,</u> thereby directly leading to the authorization for those paintings to be shipped from storage in Newark to SK's and Andrew's accountant in Hong Kong. PA Decl. <u>Exh. 20</u> (Klein email to Schram regarding SK's willingness to allow the Estate to sell OTE 156); Second Savitsky Decl. Exh. 89 at WANG002188 (SK Dep. Exh. SK-17 (Andrew email to Ewald regarding SK's willingness to allow the Estate to sell OTE 156)). The two paintings SK authorized to be sold had a combined value of $250,000.00 as of 2003. Second Savitsky Decl. Exh. 89 at WANG002013 (SK Dep. Exh. SK-19); PA Decl. Exh. 19 at WANG000706, 725 (Sotheby's Appraisal). SK also played a role in purportedly convincing his cousin Hui Chen to abandon a claim she allegedly had to eight Estate paintings (ostensibly because she wanted the Estate to be able to pay its taxes) then wired $1,275,000.00 million into her Taiwanese bank account in return for her cooperation. PA

Decl. Exh. 16 (Hui Chen's authorization to sell artwork she claimed she owned in return for payment from SK). Second Savitsky Decl. Exh. 89 (SK Dep. Exh. SK-24). In truth, SK and Hui Chen were not giving up alleged claims to hundreds of thousands of dollars in artwork because they were worried about the Estate's ability to pay its taxes. *See* PA Decl. Exhs. 9, 16. Rather, they were supplying a false pretext so that C.C. Wang's famous art collection could be shipped out of Crozier's warehouse in Newark to the Wangs' accountant in Hong Kong—back into their hands.

### B.  *Mail Fraud*

Section 1341 of Title 18 prohibits the use of any private or commercial interstate carrier in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Id*.; *see also United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991) (noting the requirements of wire fraud and mail fraud are the same). As in the wire fraud context, a violation of §1341 occurs when a defendant "does an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen, even though not actually intended." *Muni*, 668 F.2d at 89-90.

Each of the six sales were effectuated by Crozier, acting as a private interstate carrier, shipping the paintings from New Jersey to Billie Wai in Hong Kong. Wang SMF ¶¶93-95. Because this was not only foreseeable, but the very objective of the schemes, the Wangs' actions and representations also comprise mail fraud within the meaning of 1341. *See Muni*, 668 F.2d at 89-90.

### C.  *Shipping Fraudulently Acquired and Stolen Goods*

Section 2314 of Title 18 prohibits: (1) the knowing transportation in interstate or foreign commerce of property, (2) valued at $5,000 or more, (3) with knowledge that the property was stolen, converted, or taken by fraud. *Id; see also United States v. Portrait of Wally*, 99-cv-9940, 2002 U.S. Dist. LEXIS 6445, at *39 (S.D.N.Y. Apr. 12, 2002). It is not necessary to show that a defendant actually mailed or transported anything himself in violation of 2314, so long as he took

actions which reasonably caused the transportation to occur. *See e.g., United States v. Newson*, 531 F.2d 979, 981 (10th Cir. 1976).

Through their serial misrepresentations to the Estate and by their six wire transfers to the Estate's account, the Wangs caused fraudulently acquired property to be shipped from New Jersey to Hong Kong through interstate commerce between 2005 and 2009. *See* Wang SMF ¶93. The further transport of *at least* 15 of the 98 Paintings from Billie Wai's office in Hong Kong to the Capital Museum in Beijing for the 2009 *Bao Wu Tang* Exhibition comprises an additional predicate act in violation of §2314. *Compare* Wang SMF ¶93 with YK Decl. at ¶46. Finally, YK saw SK and Andrew steal approximately 25 paintings from her father's apartment in the Upper East Side and a safe deposit box on January 31, 2003. Second Savitsky Decl. Exh. 87 (4/24/2017 YK Prob. Tr. Trans. at 279:26 - 286:10; 293:18-25). Though they denied having possession of these paintings for years, Andrew finally returned five of the stolen paintings back to Yien-Koo at a hotel in Shanghai in May 2005. Second Savitsky Decl. Exh. 87 (4/24/2017 YK Prob. Tr. Trans. at 301:8-307:13). The transport of these paintings from New York to Shanghai at some point between January 31, 2003 and May 2005 comprise yet another predicate act in violation of §2314.

### D. *Money Laundering in Violation of 18 U.S.C. 1956*

Section 1956 of Title 18 makes it a federal crime for a defendant to (1) conduct a financial transaction (2) involving the proceeds of specified unlawful activity with (3) knowledge that the transaction involved the proceeds of some unlawful activity and (4) "either (a) an intent to promote the underlying specified unlawful activity or to conceal or disguise the nature [or] the source . . . of the proceeds of specified unlawful activity." *United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg*, 255 F.Supp.2d 56, 70-71 (E.D.N.Y. 2003) (citing *United States v. Morelli*, 169 F.3d 798, 804 (3d Cir. 1999)) (internal quotations omitted). "None of these requirements is very rigorous." *Id.*

The most recent predicate acts committed by SK and Andrew sound in money laundering in 2013 and 2015. Records have revealed that many of the Estate's paintings began to be auctioned at the Chieftown Beijing and Chieftown Hong Kong auction houses following their private sale by the Estate. Admissible online records drawn from art market databases[22] indicate that, between 2008 and 2015, dozens of former Estate paintings were sold for tens of millions of dollars. Second Savitsky Decl. ¶13; *Id.* at Exh. 95 (Expert Report of Patrick Regan and Regan Appendix A).

In cases such as this, "evidence of a differential between legitimate income and cash outflow is sufficient for a money-laundering conviction, even when the defendant claims income from additional sources." *United States v. Monaco*, 194 F.3d 381, 387-88 (2d Cir. 1999) (though the defendants argued they "amassed their funds by thrift . . . the jury was permitted to draw the inference that their prosperity was attributable to money laundering"). The Wang Family— particularly Andrew, SK, Cao-Ching (SK's wife), and Luo Rang (Andrew's wife)—controls an immense wealth that flows freely between its U.S. accounts and foreign accounts on an as-needed basis. Second Savitsky Decl. Exh. 89 at SK Dep. Exh. SK-2 (SK Trust); SK Dep. Exh. SK-4 (wire transfer to SK's wife, Luo Rong); SK Dep. Exh. SK-24 (SK wire transfers to Hui Chen); PA Decl. Exh. 16 at KING 006941, 6945 (Hui Chen permitting her paintings to be sold for the alleged purpose of paying "estate taxes"); Savitsky Decl. Exh. 25 (6/25/19 AW Dep. Exhs. AW-20, AW-21, AW-22; wire transfers from Le Tao and Andrew's purchase of real property using Le Tao). SK's claims that he has a net worth of around $100,000.00 and Andrew's claims that the SK Trust's receipt of $5.6 million from overseas was a *gift* to Andrew's son are simply unreasonable. Second Savitsky Decl. Exhs. 84 (6/25/2019 AW Dep. Trans. at 224:13-225:8) and 88 (6/24/19 SK Dep. Trans. at 179:15-180:9). With no evidence or legitimate explanation for their wealth and in view of

---

[22] Fed. R. Evid. Rule 803(17) (excluding from the rule against hearsay "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations.").

the evidence that 28 of the Estate's 98 Paintings were resold for tens of millions of dollars since 2008 (Second Savitsky Decl. ¶13; *Id.* at Exh. 95, Regan Appendix A), there is sufficient evidence to find the Wangs' overseas wires and property purchases constitute money laundering.

## IV.   THE WANGS' PREDICATE ACTIVITY PROXIMATELY CAUSED THE ESTATE'S INJURY

The Wangs claim that "the Wire Transfers could not cause injury because there is no evidence that anyone . . . relied on those transfers." Wang Memo. at 28. Obviously, the Estate would not have repeatedly shipped its valuable paintings off to Hong Kong unless the Wangs had first conjured up fictitious buyers, crafted fake sales documents, coordinated with Billie Wai on delivery, and used their corporate account(s) to wire six payments to the Estate. The Estate's "injuries are not indirect, incidental, or unintended—they were the very result [the Wangs] sought by [their] predicate acts." *See Chevron Corp. v. Donziger*, 974 F.Supp. 2d. 362, 601-602 (S.D.N.Y. 2014). Moreover, the documentary record makes it crystal clear that the PA and Ewald trusted Andrew as an expert and understood him to be negotiating at arm's length with the five buyers to achieve, in Andrew's own words to Ewald, the "ideal price for the Estate." Savitsky Decl. Exh. 65 at WANG002255; *see also* PA Decl. Exh. 26 at KING 007626; King SMF ¶¶280-321. By secretly selling to himself, Andrew was clearly not doing this. It is a matter of black-letter law that an estate is injured by a self-dealing fiduciary and can only be made whole either by a return of the property to the estate or, if that is impossible, payment of the value of the self-dealt property at the time of the judgment. *In re Estate of Rothko*, 43 N.Y.2d at 322.

## V.   THE ESTATE SUFFERED INJURY

The Estate's injury is attributable to the sales of paintings under fraudulent circumstances by a malfeasant fiduciary acting with the substantial assistance of persons and entities who engaged in serial misconduct cognizable under the RICO statute. The Second Circuit has recognized that "lost profits" are an available remedy for a RICO injury. *Terminate Control Corp. v. Horowitz*, 28

F.3d. 1335, 1343 (2d Cir. 1994); *Elsevier Inc. v. W.H.P.R., Inc*., 692 F.Supp. 2d 297, 310 (S.D.N.Y. 2010) (noting "Second Circuit law supports this  Court's conclusion that a plaintiff can adequately plead RICO damages by alleging lost profits where, as here, they constitute an injury to plaintiff's business, were proximately caused by the alleged racketeering, and are not merely speculative.").

One category of lost profits is "appreciation damages." *See, e.g.*, *Vaughn v. Consumer Home Mort. Co*., 297 Fed. Appx. 23, 27 (2d Cir. 2008) (using to terms "lost profits" and "appreciation damages" interchangeably); *Williams v. J.P. Morgan & Co.*, 199 F. Supp. 189, 194-95 (S.D.N.Y. 2002) (same); *see also Maiz v. Virani*, 253 F.2d 641, 663 (11th Cir. 2001) ("The touchstone of the [RICO damages] inquiry . . . is proximate cause; there is no automatic rule against the recovery of any type of lost profits or lost value damages if proximate cause is shown."). The predicate acts committed by Andrew (with SK's knowledge and assistance) were not only a blatant violation of his fiduciary duties that led to below-market sale prices without genuine negotiations,[23] they render the sales themselves voidable and entitle the Estate to the paintings' return or their current value since Andrew had no right to purchase them in the first place. *In re Estate of Rothko*, 43 N.Y.2d at 322  (where an estate fiduciary self-deals, "appreciation damages"—*i.e,* the value of the self-dealt property at the time of the finding of liability—are necessary "to make the estate whole."). Regan Decl. Exh. 1 (Regan Report at 10-11).

## VI.   THE PLAINTIFF IS ENTITLED TO ADVERSE INFERENCES WITH RESPECT TO THE SK TRUST AND LE STYLE LIMITED'S INCORPORATION RECORDS

"The record can warrant an adverse inference of spoliation where the moving party establishes that: (1) the evidence at issue existed; (2) the evidence was in the exclusive possession of the non-moving party; and (3) the non-production of the [evidence] has not been satisfactorily explained." *Thaqi v. Wal-Mart Stores E., LP*, No. 09-cv-755, 2014 US Dist LEXIS 45107, at *17,

---

[23] *See* Second Savitsky Decl. Exh. 95 (Regan Report at ¶¶25, 28-29).

23 (E.D.N.Y. Mar. 31, 2014) (denying defendant's motion for summary judgment and finding that, "for the purposes of summary judgment, plaintiff [wa]s entitled to an adverse inference concerning the allegedly missing [evidence]") (internal citation omitted). Here, the Plaintiff seeks adverse inferences with respect to (a) the asset schedule of the Shou-Kung Wang Irrevocable Trust and (b) the incorporation/transactional records for Le Style Limited and the other corporate account which Andrew used to pay money to the Estate ("8480185540"). Savitsky Decl. Exhs. 46 (Estate bank records) and 11 (6/25/19 AW Dep. Trans. at 241:14-242:7); Second Savitsky Decl. Exh. 89.

During discovery, the Wangs produced a 32-page document executed on September 25, 2013 entitled the Shou-Kung Wang Irrevocable Trust (the SK Trust, *supra*). Second Savitsky Decl. Exh. 89 (SK Dep. Exh. SK-2, SK Trust at AWSK_00000095). The trust appears complete in all respects except the most important component: its "Schedule A," listing the property in the Trust, contains only an outline with blank entries. *Id.* It is axiomatic that the creation of a valid trust requires "a clearly defined trust res." *New York v. Suarez (In re Suarez)*, 367 BR 332, 351 (Bankr. EDNY 2007) (quoting *Besroi Constr. Corp. v. Kawczynski (In re Kawczynski)*, 442 F. Supp. 413, 416 (W.D.N.Y. 1977). The SK Trust is a 32-page document carefully drafted by an attorney. It is initialed, signed, witnessed, and notarized. Second Savitsky Decl. Exh. 89 (SK Dep. Exh. SK-2, SK Trust at AWSK_00000093-95). Andrew, the trustee, testified that he did not know why Schedule A is left blank because he "didn't really understand what the trust means." *See* Second Savitsky Decl. Exh. 84 (6/25/19 AW Dep. Trans. at 225:21-227:19). Meanwhile, the trust's grantor, SK, testified that although it is his trust, he never read the trust document and no one ever explained it to him; he only signed it because Andrew prepared it and asked him to. Second Savitsky Decl. Exh. 88 (6/24/19 SK Dep. Trans. at 18:18-20:14). Under these circumstances, Andrew and SK's claims that the schedule was left blank for unknown reasons, rather than their own failure to produce the complete document, are unsatisfactory. Yien-Koo is entitled to the adverse inference that the

Wangs have not revealed the SK Trust's property because it includes Estate paintings that were stolen and self-dealt. *See, e.g.*, Second Savitsky Decl. Exh. 105 (Hr. Trans. at 19:5-19).

Likewise, the non-production of corporate records related to Le Style and "8480185540" entitles Yien-Koo to an adverse inference that both of those corporate accounts were jointly controlled by Andrew *and* SK. *See* Savitsky Decl. Exhs. 46 (Estate bank records) and 11 (6/25/19 AW Dep. Trans. at 241:14-242:7); Second Savitsky Decl. Exh. 105 (Hr. Trans. at 26:10-27:15).

In any event, the absence of such critical information in the record creates a genuine issue of material fact which should not be resolved on a motion for summary judgment. *See Fingerhut v. Chautauqua Inst. Corp.*, 07-cv-502, 2018 US Dist LEXIS 75234, at *11 (W.D.N.Y. May 3, 2018).

## CONCLUSION

For the foregoing reasons, the Wangs' Motion for Summary Judgment dismissing this action should be DENIED in its entirety.

Dated: New York, New York
      April 13, 2020

Respectfully submitted:

**SAM P. ISRAEL, P.C.**

By: */s/ Timothy Savitsky*
Sam P. Israel, Esq. (SPI 0270)
Timothy Savitsky, Esq. (TS 6683)
180 Maiden Lane, 6th Floor
New York, NY 10038
646-787-9880
Email: admin@spi-pc.com
Attorneys for Yien-Koo King