**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-   x

YIEN-KOO KING, NORTHWICH                      :
INVESTMENTS LTD., and SOON HUAT,      :
INC.                                                               :
                                                                      : Civ. Action No.: 1:14-cv-07694 (LJL)
                                   Plaintiffs,            :
                                                                      :
-against-                                                     : **DECLARATION OF ANDREW WANG IN**
                                                                      : **SUPPORT OF DEFENDANT ANDREW**
ANDREW WANG, SHOU-KUNG WANG,      : **WANG'S OPPOSITION TO PLAINTIFF'S**
BAO WU TANG, JIAN BAO GALLERY,          : **MOTION FOR PARTIAL SUMMARY**
ANTHONY CHOU, CHEN-MEI-LIN, WEI        : **JUDGMENT**
ZHENG, YE YONG-QING, YUE DA-JIN          :
and JOHN DOES 1-9,                                   :
                                                                      :
                                   Defendants.        :
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-   x

I, ANDREW WANG, do hereby declare under penalty of perjury pursuant to 28 U.S.C. §

1746, the following to be true and correct:

1.      I am the grandson of the late Chi-Chuan Wang ("CC"), and the former

Preliminary Executor of CC's estate (the "Estate").

2.      I am a defendant in the above-captioned action and respectfully submit this

declaration, which is based upon my personal knowledge, in opposition plaintiff Yien-Koo

King's ("YK") motion for partial summary judgment.

I.      **The Sale of Estate Artwork**

3.      CC passed away in July 2003.

4.      In August 2003, the Surrogate's Court appointed me Preliminary Executor of

CC's Estate.

5.      Due to a dispute regarding the validity of CC's will, the Surrogate's Court appointed Ethel Griffin, Public Administrator of the County of New York (the "PA") to serve as Temporary Administrator.  The PA and I jointly administered the Estate as co-fiduciaries.

6.      Upon her appointment, the PA began to marshal the Estate's assets.  The Estate's most important asset CC's collection of classical Chinese paintings and other artwork.  By early 2004 approximately 133 classical Chinese paintings belonging to the Estate were in the possession of the Estate.

7.       Yien-Koo King admitted to be in possession of, but refused to turn over to the Estate, dozens of additional Estate-owned paintings.

8.      In or about October 2004, the Estate filed its estate tax returns which resulted in the Estate owing approximately $5,500,000 in federal and state taxes combined.  These taxes were in addition to administrative expenses, including attorney's fees, accountants fees, and fees to store and insure artwork.   As the Estate lacked liquid funds sufficient satisfy its financial obligations, the Estate was required to liquidate much of the Estate-owned artwork.

9.      The first step in the process of selling the Estate's artwork was to retain Sotheby's, and in particular the appraiser Arnold Chang, to appraise the Estate's classical Chinese paintings.  Arnold Chang was selected because he was a long-time student of CC well-acquainted with Estate's collection.  He was also recommended and approved by Yien-Koo King, the Plaintiff in this action.  Mr. Chang physically inspected and appraised each of the classical paintings in the Estate's possession.

10.      In October 2004, Sotheby's issued an appraisal of the 133 classical Chinese paintings (the "Sotheby's Appraisal").  The appraisal values assigned by Sotheby's were as of the date of CC's death in July 2003.

11.     The second step in the process was the actual sale of the Estate-owned artwork. At the outset, the PA and I requested that Sotheby's auction all 133 classical artworks, as well as other contemporary artworks, from CC's collection.  Sotheby's refused, instead selecting only what they considered to be the 39 best classical artworks suitable for auction at the time.

12.      Due to the weak market for classical Chinese paintings, Sotheby's Chinese Paintings department had been closed since 1999.

13.     Sotheby's advised that the most appropriate market for the remaining paintings, including those that did not sell at the Sotheby's auction (the "98 Paintings"), were private sales in Asia.

14.     Given my contacts in the Chinese art market stemming from my work with CC, my work at Sotheby's, and my consulting work, the PA asked me to identify and seek out private buyers for the 98 Paintings in Asia.  I however never held myself out to the PA as an expert in the sale or valuation of classical Chinese art, and I did not make any recommendations to the PA as an expert.  I only sought to broker private sales in Asia at the direction of, and under the guidance of, the PA.

15.     The PA imposed a procedure whereby, absent extenuating circumstances, all offers had to be at least 20% higher than the Sotheby's Appraisal value.  As an additional check on the appropriateness of the proposed prices, the PA retained Elin Lake-Ewald of O'Toole-Ewald Associates, Inc. to serve as her independent art expert and to advise her on the sales.

16.     The PA required that all offers submitted include not only the buyer's name and offer price, but the Sotheby's Appraisal value as well.

17.     Between 2005 and 2009 I submitted at least six proposed offers to the PA.  As directed, each offer conspicuously listed both the offer price, as well as the Sotheby's Appraisal

value.  With respect to an overwhelming majority of the 98 Paintings, the offers I conveyed, met

or exceeded, the 20% price increase the PA required.

18.     I received no commission or other service fees for my work helping to sell these

Estate artworks.

19.     I also note that one of the artworks sold, a piece by the artist Wang Jian, belonged

to my father, but he allowed it to be sold in order to raise money for the Estate.  At the time,

Yien-Koo was holding dozens of paintings – among other of CC's assets – that belonged to the

Estate, but that she refused to turn over, and thus the Estate could not sell to raise funds.

20.     At no time did the PA, or her attorneys convey any dissatisfaction or other

concerns about the sales or the offers I was obtaining for Estate artworks.

21.     In connection with the sale of each and every one of the 98 Paintings, I negotiated

to the best of my ability, as directed by the PA, to secure fair offers based on the baseline 20%

benchmark above the Sotheby's Appraisal value established by the PA and current market

conditions.

22.     I had no authority to approve or reject any of the sales, and I did not deliberate

with the PA regarding her decisions to approve or reject sales.  The PA made decisions to

approve or reject sales on her own or in conjunction with her art advisor.

23.     There are several other facts concerning the sales that provide important context.

First, because the buyers lived in China, it was all but impossible to get them to come to New

York to physically inspect and authenticate the artworks that were for sale.  Yet the Estate

required payment by the buyer before any artwork could be shipped.  It was a significant hurdle

to convince buyers to part with hundreds of thousands of dollars, or more, to purchase paintings

from the United States that they were unable to inspect prior to sending payment.

24.     Further, it was the Estate's goal in connection with the sales to sell the paintings in large groups.  Selling the paintings individually would have increased administrative and legal costs significantly.  When buyers purchase in bulk, with art as with anything, they expect to receive some discount in consideration for the large purchase. Even with these expectations from the buyers, I was able to secure bulk prices for the artworks that in general met or exceeded the PA's 20% benchmark.

25.     I note that Plaintiff's damages expert did not take into account any discount for bulk sales in his appraisal of the artworks.

26.     Further, some of the negotiations, in particular with Yue Da Jin and his representative took place during the worst financial crisis since in many decades, a situation which caused me great concern for the Estate's future ability to sell artwork. This provided further incentive, ultimately, for the Estate to provide Yue Da-Jin a discount when the sale was ultimately consummated in August 2009.

27.     It is also important to understand that during this time period over which the 98 Paintings were sold, the Estate was under financial pressure arising from the amount of estate taxes due as well as legal and other administrative expenses.  Moreover, in or around 2007, the Estate's financial issue became more extreme when the IRS issued a $22 million estate tax deficiency notice.  Accordingly, the Estate was under significant pressure to raise funds in order to avoid any tax penalties from the IRS and to pay its service providers.  It was my understanding that if the Estate failed to raise enough money to pay its taxes and incurred penalties, I could be personally responsible for any damages to the Estate.

28.     I am aware that this lawsuit is predicated in part on allegations that I engaged in self-dealing in connection with the sales of the 98 Paintings.  While I am informed by counsel

that self-dealing allegations are not at issue in the motion currently before the Court, I would

nevertheless like to make several things abundantly clear.  I was not the buyer of any of the 98

Paintings.  Neither I, nor any entity I controlled, was the source of funds used to purchase any of

the 98 Paintings. I did not have any personal interest in the sales of the 98 Paintings.  I did not

benefit in any way from the sales of the 98 Paintings.  I earned no commissions or other fees in

connection with the sales.

## II.    My Efforts to Locate Relevant Documents

29.    In this litigation, I was required to turn over relevant documents and information

in my possession.

30.    In responding to each of Plaintiff's discovery demands, I diligently searched all

places where potentially relevant documents in my custody could be.  That said, as the events at

issue took place well over a decade ago, there were several potential sources of relevant

information that I was not longer able access given the length of time that has passed since the

sales.

31.    First, during the 2005-2009 period I maintained an email account with America

Online under the username "Yiyuanwang@aol.com" (my "AOL Account").  I utilized my AOL

Account at times when discharging my duties as Preliminary Executor, including, to my

recollection, in connection with the sales of the 98 Paintings.  I stopped using the AOL Account

at some point after 2009, though I cannot recall when specifically.  Due to lack of use, and

unbeknownst to me, my AOL Account was administratively closed by AOL at some point in

time since I last used it.  I attempted to access and search that account to locate documents

potentially relevant in this action, but was unable to do so because the account was closed.

32.     Second, in order to facilitate sales of some of the 98 Paintings to buyers in mainland China, I allowed the purchase monies to be remitted by the buyers to a Hong Kong-based HSBC bank account in the name of Le-Style Limited ("Le-Style"), a company which I owned.  The Le-Style account in Hong Kong was used to facilitate the transfer of money from mainland China to the United States.  At that time, it was difficult for individuals to transfer significant amounts of money from mainland China directly to the United States.  In general, at that time, one of the easier ways for a mainland Chinese resident to transfer funds to the United States was to first transfer the funds to an account in Hong Kong, which was allowed, and then transfer funds to the U.S.  I allowed buyers to send purchase money to Le-Style's account in Hong Kong to facilitate the sales and to make sure deals the Estate was making went smoothly.  Upon receiving purchase funds from buyers, I transferred the funds to the Estate's bank account in New York.

33.     In or around 2012, the bank accounts that I maintained for Le-Style at HSBC in Hong Kong were, along with thousands of other foreign accounts, closed by HSBC.  In or around early 2019, I attempted to obtain account records for the Le-Style account from HSBC in Hong Kong.  When I attempted to obtain the records, I was informed by HSBC that they did not maintain account records dating from the 2005 – 2009 time period.  The account records for this account from the times of the sales would reflect transfers of the sales prices by the buyers in China to the account in Hong Kong.

III.    **Shipments of the 98 Paintings to Hong Kong**

34.     Following receipt of payment, each group of artworks was shipped to the respective buyer "c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road,

Kowloon, Hong Kong." The location to which the artworks were shipped was plainly disclosed in the contracts with each of the buyers.

35.     The buyers requested that artworks be sent to Hong Kong for delivery because Hong Kong is a freeport region, due to Hong Kong's status as a Special Administration Region of China, and the buyers were able to avoid paying taxes and customs on their purchases if the artwork was shipped to Hong Kong.

36.     In order to facilitate delivery in Hong Kong, I elected to send each group of artworks to the office of my long-time and trusted accountant, C.K. Lam of C.K. Lam & Co. Billie Wai was C.K. Lam & Co.'s office manager. C.K. Lam & Co was not just my accountant, but also provided services to my grandfather, CC, for many years, and is well known to YK.

37.     I chose to send the artwork to my accountant in Hong Kong because, as a professional service provider with whom I had a long relationship, I trusted my accountant and Ms. Wai to protect Estate-property until the buyer retrieved the artwork in Hong Kong. I considered my accountant to be similar to an attorney, a professional person who was required to protect my, and by extension, the Estate's, interests. In my view at the time, there was no place safer in Hong Kong to ship the artwork than my accountant's office. The wisdom of my decision to send the artwork to my accountant is evident from the fact that no buyer ever complained that works were damaged or otherwise harmed and the transactions were completed without any problems.

38.     My goal at all times was to ensure that the transactions went smoothly, the Estate received the purchase price for artworks, and the artworks were successfully delivered to the buyers in Hong Kong.

39.     It is my recollection that I informed my attorney, Martin Klein, that the artworks were being sent to my accountant's office in Hong Kong in order to avoid taxes that would be incurred if they were sent to China.

### IV.     The Bao Wu Tang Exhibition and My Relationship to Chinese Auction Houses

40.     During his lifetime, CC operated an art studio under the trade name "Bao Wu Tang," with the "Wu" meant to signify the most distinguished piece in CC's collection:  an the "Procession of the Taoist Immortals" by artist Wu Zhongyuan.

41.     In Chinese, the name "Wu" is pronounced the same as the number "five."

42.     When the Beijing Capital Museum prepared the catalogue for the Bao Wu Tang Exhibition the museum mistakenly printed the character for the number "five" rather the character for artist's name "Wu" in "Bao Wu Tang."

43.      Thousands of catalogues were printed before the error was identified, and insufficient time remained prior to the opening ceremony to print new catalogues.  To make the best out this situation, I embraced the error and decided that, going forward, I would operate my art consulting business under the trade name "Bao Wu Tang," with the Chinese character for the number five in place of the character for the name "Wu."

44.     For avoidance of any doubt, prior to the Bao Wu Tang Exhibition, I did not operate any business under the name "Bao Wu Tang."

45.     I did not organize the Bao Wu Tang Exhibition, and I did not procure any of the artwork that was displayed.  Similarly, I did not authenticate any of the artworks that were displayed.  I confirmed that the artworks on display were once in C.C. Wang's collection, based on the images that were printed in the exhibition catalog.

Dated: New York, New York
      April 13, 2020

Andrew Wang

10