# Exhibit 114

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------- x
YIEN-KOO KING, NORTHWICH                        :
INVESTMENTS LTD., and SOON HUAT,                :
INC.                                            :
                                                :
                                                :   Civ. Action No.: 1:14-cv-07694 (JFK)
                        Plaintiffs,             :
                                                :
                                                :
            -against-                           :
                                                :
                                                :
ANDREW WANG, SHOU-KUNG WANG,                    :
BAO WU TANG, JIAN BAO GALLERY,                  :
ANTHONY CHOU, CHEN-MEI-LIN, WEI                 :
ZHENG, YE YONG-QING, YUE DA-JIN                 :
and JOHN DOES 1-9,                              :
                                                :
                                                :
                        Defendants.             :
-------------------------------------------------- x


**<u>REBUTTAL EXPERT REPORT OF KENNETH JAY LINSNER, ASA, AAA, SCV</u>**

DECEMBER 16, 2019

## **TABLE OF CONTENTS**

PROFESSIONAL BACKGROUND AND QUALIFICATIONS.................................................1

PURPOSE OF ENGAGEMENT AND COMPENSATION........................................................3

MATERIALS CONSIDERED.....................................................................................................3

METHODOLOGY........................................................................................................................4

REBUTTAL OPINIONS AND ANALYSIS................................................................................4

I. The Regan Report Applies Irrelevant "Fair Market Value" and "Retail Value" Methodologies to the Estate-Owned Artwork.........................................................5

  i. Fair Market Value Is Irrelevant and Inapplicable to the Valuation of the 98 Paintings in 2005-2009 and as of October 10, 2019.........................5

  ii. Retail Market Value Is Irrelevant and Inapplicable to the Valuation of the 14 Yue Da Jin Paintings as of August 2009.......................................10

  iii. Orderly Liquidation Value Is the Appropriate Measure of Value for Estate Assets in 2009 and/or 2019............................................................12

II. The Regan Report's Valuations are Unreliable and Not Credible Due to Its Violation of Fundamental Principles of Appraising.............................................12

  i. Mr. Regan Improperly Relies on Reported Sales at Chinese Auction Houses...........................................................................................................13

    a. An Illustration of The Problem of Mr. Regan's Reliance on Reports of Chinese Auction Results..........................................20

  ii. Mr. Regan Improperly Relies On Outdated and Thus Irrelevant Market Data in Support of His Valuations...................................................23

  iii. Mr. Regan Failed to Discuss Prior Market History of the Subject Artwork........................................................................................24

  iv. Mr. Regan's Failure to Devote Sufficient Time to the Appraisal Is a Critical Fault..............................................................................................25

  v. Mr. Regan Failed to Disclose Numerous Extraordinary Assumptions And Hypothetical Conditions That Affect His Valuation.........................26

  vi. Mr. Regan's Appraisal Is Not USPAP Compliant...................................28

III. Mr. Regan's Opinion That The Appearance of 16 Paintings at Auctions Between 2008 and 2019 Reflects Common Ownership Is Entirely Speculative.................30

IV.     Mr. Regan's Opinion Regarding the Addition of C.C. Wang Collectors' Seals to Artworks Is Not Credible ..................................................................32

V.      The Alleged Exhibition of Former Estate-Owned Artworks at Museum Exhibitions In China ...................................................................................35

Appendix A – Materials Considered ...................................................................... A-1

Appendix B – Deposition and Trial Testimony ......................................................B-1

Appendix C – CV ...................................................................................................C-1

Appendix D – Publications and Speaking Engagements......................................... D-1

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

1.    I am a graduate of New York University, and thereafter attended the Institute of Fine Arts of New York University and the Conservation Center of the Institute of Fine Arts.  I maintain a specialization in the materials and structure of works of art.  I am a Senior Member of the American Society of Appraisers and former president of its New York City chapter.  I am also a Certified Appraiser by the Appraisers Association of America.  I regularly provide expert witness services on arts valuation, appraisal, and related issues.

2.    I worked at the Brooklyn Museum from 1967 through 1973 as an undergraduate and graduate student.  At the Brooklyn Museum, I performed authentication testing and materials and structural analysis for several departments including the Asian Art and Artifacts department.  While a graduate student, I accepted a position, on a per job basis, with Appraisal Affiliates, Inc., then one of the three largest appraisal companies in the United States, where I was trained in appraisal science.  From 1975 through 1994, I performed appraisals, in the main, for family, university, and corporate fine and decorative art collections.  In 1994, I acquired the fine and decorative art and personal property portions of Appraisal Affiliates' business.  I am the appraiser of record for the Estate of Malcolm Forbes, and acted in appraisal and advisory capacities to Jacqueline Onassis and the Kennedy family as well as the Rockefeller, Mars, and Vanderbilt families.

3.    In 1983, I applied to and was accepted by the Internal Revenue Service ("IRS") as a "qualified source" for reviews of appraisals of fine and decorative arts for estate, gift, and charitable donation purposes.  In 1985, I became one of four appraisers under contract to the IRS for such reviews.  I remained under contract in that capacity with the IRS until 2001; however, I continue to consult with the IRS and review appraisals on a per case basis.  I have also

performed arts-related appraisal work for the Canadian equivalent of the IRS, the Inland Revenue Service of Canada.

4.      Since 1987, I have taught courses in appraisal studies.  First, I taught in the Appraisal Studies Program of Yeshiva University.  When Yeshiva University ceased offering an appraisal studies program, I was active in re-establishing the program under the auspices of New York University's Continuing Education Program, where I was a founding lecturer in the appraisal studies program and taught until about 1994.  I also routinely speak at conferences for the major appraisal associations.

5.      I have significant experience with Asian, in particular Chinese, fine and decorative arts, and I regularly appraise Chinese art and artifacts in the course of my profession as an appraiser, including in my work reviewing appraisals for the IRS.  My experience with respect to Chinese art includes serving as a consultant to the Imperial Palace Museum in Beijing, China from 1979 to 1983.  I also personally collect Chinese art and art objects, as well as Tibetan and Nepalese ritual bronzes and other art objects.

6.      I previously performed work in connection with the Estate of Chi-Chuan ("C.C.") Wang (the "Estate").  In November of 2003, I was hired by the Public Administrator of New York County, (the "Public Administrator"), to value certain contents of C.C. Wang's apartment, located at 150 E. 69th Street 8A, New York, New York.  The scope of the engagement was limited to Chinese decorative art objects, furniture, and several examples of C.C. Wang's personal artwork that decorated the premises, and did not include any major Classical or major modern Chinese paintings.  My report in connection with that engagement was issued in January

of 2004,[1] and was presented to the IRS, which in 2007, accepted my fair market valuations as of the date of C.C. Wang's death.

## PURPOSE OF ENGAGEMENT AND COMPENSATION

7.      In connection with the above-captioned matter, I was asked to review the F.R.C.P. 26 (2)(B) Expert Report of Patrick Regan, submitted by Plaintiffs in this action on October 11, 2019, (the "Regan Report" or "R.R."), together with its appended appraisals and supporting documentation, and to address the opinions asserted therein.  I have reviewed the Regan Report and believe that it suffers from numerous critical deficiencies, the most significant of which are discussed in this report.

8.       My compensation for this engagement is $600 for the first hour of each billing period and $250 for each hour thereafter.  My deposition fee is $1,250 for the first hour and $500 for each hour thereafter.  My travel time is billed at $100 per hour.

## MATERIALS CONSIDERED

9.      In performing my work, I have examined and considered the following documents: documents listed in my report dated October 11, 2019; the Regan Report, together with its Appendix A and Appendix B; the electronic files of supporting documents indicated to be "RV comparables" provided with the Regan Report; electronic files of supporting documents indicated to be "FMV comparables" provided with the Regan Report; additional supplemental files received from Mr. Regan, including files labeled as "1373.1 appraisal initial," "contracts," "King7- Art Photos and Records," "Selected lower value anonymous comparables," "Some market files and articles," and additional scans of books and pamphlets.  I have also reviewed

---

[1] *See* WANG_KING 00000294.

and considered the additional documents and other materials set forth in Appendix A to this report.

## METHODOLOGY

10.     The opinions expressed herein are based in part on my application of my decades of experience as an art appraiser, including as a consultant to the IRS, as set forth in the foregoing description of my professional background and qualifications.  My opinions are further supported by my application of the standards and principles of appraising set forth in the *Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019,[2] and IRS guidance. To the extent I deem necessary, I have also provided citations to other relevant authorities as applicable to the opinions expressed.  The opinions expressed herein were arrived at by my application of the foregoing to the opinions expressed by Mr. Regan and to the facts and analysis he provided (or failed to provide) in support of his opinions.  I note that this report is not an appraisal, but an assessment of the flaws and errors made by Mr. Regan in his report.  I expressly reserve the right to amend or supplement my opinions and/or this report in the event new or previously undisclosed information becomes available to me.

## REBUTTAL OPINIONS AND ANALYSIS

11.     After reviewing the Regan Report, the appendices and the supplemental documentation provided with that report, it is my opinion that Mr. Regan's opinions and conclusions about C.C.'s seals and the artwork resurfacing at auctions and museums as well as his opinions and conclusions about the Estate's artwork both in the Regan Report as well as the appendices are neither persuasive nor credible.  The Regan Report's assumptions, methodology, and resulting conclusions found in both Appendix A (fair market value of a group of 98 classical

---

[2] All references to "USPAP Standards" refer to *Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019, Washington DC: The Appraisal Foundation, 2018.

Chinese paintings sold by the Estate (the "98 Paintings"), effective date October 10, 2019) and

Appendix B (retail value, effective date August 2009, of 14 of the 98 Paintings "which appear to

have been sold by the Estate on August 17, 2009"), are flawed and unreliable because of the

myriad significant methodological and other failures described below.  Moreover, these errors

make clear that the Regan Report does not comply with the Standards and Rules found in

USPAP 2018-2019, as claimed by Mr. Regan.

I.    **The Regan Report Applies Irrelevant "Fair Market Value" and "Retail Value" Methodologies to the Estate-Owned Artwork**

12.    As extensively discussed in my earlier report, the Estate was under financial

pressure, including estate taxes and administrative expenses, at the time of the private sales.[3]

The Estate, however, lacked liquid assets sufficient to pay the taxes owed to the IRS and to cover

administration expenses.[4]  Accordingly, the Estate was required to liquidate assets, including

artwork, to raise funds to pay the taxes owed to the IRS and to cover the other Estate expenses.[5]

Mr. Regan's application of "fair market value" and "retail value" methodologies wrongly

ignored these fundamental facts regarding the assets he purported to value, and, accordingly, are

not relevant measures of artwork owned by the Estate.

i.    **Fair Market Value Is Irrelevant and Inapplicable to the Valuation of the 98 Paintings in 2005-2009 and as of October 10, 2019**

13.    Appendix A to the Regan Report purports to be a "Fair Market Value Appraisal"

(the "FMV Appraisal" or "Appendix A") of 98 classical Chinese paintings (the "98 Paintings")

that were "at some point in the possession" of the Estate but were "sold[.]"  R.R at ¶¶ 1, 19.

---

[3] See Expert Report of Kenneth Jay Linsner, dated October 11, 2019 (the "Linsner Report") at ¶ 26; AWSK_00008141; WANG003340.
[4] See AWSK_00000587; AWSK_0000604; KING-SCT-000003216 at ¶ 10.
[5] See KING-SCT-000003216 at ¶ 10; see also June 25, 2019 Deposition of Andrew Wang ("A.W. Deposition") at 77:11-79:9; 80:8-81:6; 116:4-9; June 28, 2019 Deposition of Peter Schram ("Schram Deposition") at 20:19-21:10; 23:22-25:3.

According to the Regan Report, the FMV Appraisal constitutes Mr. Regan's opinions of the fair market value of the 98 Paintings as of October 10, 2019.  R.R at ¶ 26.  It is my opinion that the requisite conditions for the 98 Paintings to be sold under the conditions for a "fair market value" sale were not present between 2005-2009 or in 2019, and, thus the assessment of "fair market value" for the 98 Paintings is a purely hypothetical exercise, ignoring the real world constraints on the Estate that bear directly on any sale of artwork by it.  The fair market value conclusions therefore are irrelevant, as they do not represent an accurate proxy for what the Estate could reasonably have expected, or expect, to realize in any sale of the 98 Paintings – whether in 2009 or 2019.

14.     In his discussion of his "methodologies," while Mr. Regan provides a definition of "fair market value," he provides no reasoning or analysis as to why that valuation is appropriate to the artwork at issue given the facts specific to the Estate.  R.R. at ¶¶ 18-20.  His assumption that the "fair market value" of the 98 Paintings is a relevant measure of anything salient to the Estate is a fundamental mistake as it ignores critical facts regarding the ownership of the 98 Paintings, the financial position of the Estate (both in the 2005-2009 time period, and currently), and other factors that make a "fair market valuation" of the 98 Paintings a valuation that is purely hypothetical and unrepresentative of the amount the Estate can, or ever should, reasonably expect to obtain in a real-world effort to sell the 98 Paintings, given the constraints faced by the Estate.[6]

15.     Indeed, while "fair market value" of a decedent's gross estate is the valuation required by the IRS for Estate tax purposes,[7] it is not always the value an estate can reasonably

---

[6] Given these facts, Mr. Regan's assumption that the conditions for a fair market value sale existed in 2005-2009 and 2019 for the 98 Paintings constitutes an "extraordinary assumption" and should have been, but was not, disclosed in the Regan Report.

[7] *See* Treasury Regulation Section 20.2031-1(b).

expect to achieve in the marketplace, regardless of what the IRS requires for purposes of calculating estate taxes.  Thus, while "fair market value" is the required measure of the assets of an estate for tax purposes -- as reflected in the IRS definition cited by Mr. Regan, and which I cite below -- the circumstances of the Estate's ownership of the 98 Paintings, make clear that "fair market value" is not a measure of value applicable to a real world sale of the 98 Paintings.

16.     Pursuant to Treasury Regulation Section 20.2031-1(b), fair market value is defined as:

> the price at which the property would change hands between a willing buyer and a willing seller, *neither being under any compulsion to buy or to sell* and both having reasonable knowledge of relevant facts.  The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price.  *Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public*, taking into account the location of the item wherever appropriate.  Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail.

17.     First, the Estate was absolutely under a compulsion to sell the artwork during the 2005-2009 time frame, and it would be if it owned the artwork as of the October 10, 2019 date of Mr. Regan's appraisal.  During the 2005-2009 time period, the Estate lacked liquid assets to pay the over $4 million in estate taxes owed to state and federal authorities, storage and insurance costs for the artwork, and other administrative expenses.[8]  In fact, in 2007, the IRS served the Estate with a Notice of Deficiency of $22,529,113.00.[9]  That amount -- plus interest and penalties that have accrued on it since 2007 -- remains outstanding as of October 10, 2019.  It is my understanding that the Estate currently lacks liquid assets to satisfy the taxes it currently

---

[8] *See* AWSK_00000587; AWSK_0000604; AWSK_00008141; WANG003340; KING-SCT-000003216 at ¶ 10; *see also* Schram Deposition" at 20:19-21:10.
[9] *See* AWSK_00000229.

owes to the IRS.  Thus, if the Estate were in possession of the 98 Paintings on October 10, 2019, its financial position -- including its debt to the IRS, the IRS tax lien over the artwork,[10] and other Estate administration expenses -- would, in my opinion, indicate a relevant pressure or compulsion to sell the artwork that must be accounted for by any appraisal.  Mr. Regan's failure to take into account the Estate's financial position -- and assumption that the conditions for a fair market value sale exist -- render his opinions as to the value of the 98 paintings irrelevant and inapplicable to the 98 Paintings.

18.     Next, Mr. Regan asserts that "[i]n 2009 (as in 2019) the most likely and appropriate marketplaces for classical Chinese paintings are at auctions in China and New York …because auctions are where the best and highest prices for these works are usually achieved." R.R. at ¶ 25; Appendix A at 8.  Neither marketplace, however, was realistically available to the Estate in 2005-2009 and should not, for purposes of Mr. Regan's exercise, be assumed to be available as part of his hypothetical 2019 valuation.  In fact, in or around 2005, the Estate sought to sell a larger group of paintings -- that included the 98 Paintings -- at auction at Sotheby's in New York.[11]  Sotheby's accepted approximately twenty-one classical Chinese paintings from the group for auction, but advised the Estate that the New York auction market was not an appropriate market for the 98 Paintings and advised that the artworks would be likely to achieve better prices via private sales to buyers in Asia.[12]  Thus, Mr. Regan's assertion that the New York auction market was the "most likely and appropriate marketplace" for the 98 Paintings in 2005-2009 is belied by the facts, and should have been addressed in his opinion.  Moreover, in my opinion, the fact that Sotheby's rejected the 98 Paintings and refused to accept them for

---

[10] Pursuant to IRC§ 6324(a), a federal tax lien automatically arises over a decedent's gross estate on the date of death.
[11] *See* KING-SCT-000003216 at ¶ 10.
[12] *See* KING-SCT-000003216 at ¶¶ 10-11; Sotheby's 000620; AWSK_00000914.

consignment to auction, indicates that reputable, objective experts in the market considered the 98 Paintings to be inferior or otherwise compromised artworks that were unlikely to sell at auction in New York.  These are facts that should be addressed in an appraisal of the same property.

19.     Practical impediments the Estate would face if it attempted to consign artwork to an auction in China demonstrate that the Chinese auction market was not in 2005-2009, and is not in 2019, a market realistically available to the Estate for the sale of the 98 Paintings.  For instance, in order for the Estate to consign classical Chinese paintings to a mainland Chinese auction house, it would likely face customs and VAT taxes upon importation of the artwork into China.  During the 2005-2009 period, and today, the Estate lacked liquid assets sufficient to so much as pay Estate taxes owed and administrative expenses,[13] and there seems to be no basis to assume it could afford to pay customs and VAT taxes that could easily reach 20% or more of the estimated value of artwork.  Further, in order to participate in an auction in China, the Estate would be required to cede physical control over the artwork to the auction house prior to receiving any payment for the sale.  Thus, the Estate would face serious risk in the event anything went wrong with the sale or consignment.  For instance, if an artwork were lost or damaged, or if the auction house failed to pay the Estate, or refused to return the artwork in the event the artwork did not sell, the Estate would be forced to seek legal redress in China, which, at the very least, would be highly impractical for the Estate.  Finally, at worst, in the event an artwork did not sell, Chinese cultural relics laws could prevent the Estate from ever getting the artwork back to the United States.  Based on these factors, and my experience with the Chinese

---

[13] *See* AWSK_00000587; AWSK_0000604; AWSK_00008141; WANG003340; KING-SCT-000003216 at ¶ 10; *see also* Schram Deposition at 20:19-21:10.

market, I would never advise that the Estate attempt to sell the 98 Paintings, or any artwork, in the Chinese market – whether in 2005-2009 or in 2019.

     **ii.**    **Retail Market Value Is Irrelevant and Inapplicable to the Valuation of the 14 Yue Da Jin Paintings as of August 2009**

     20.    Appendix B to the Regan Report purports to be a retail valuation of 14 formerly Estate-owned paintings (the "14 Paintings") as of August 17, 2009 (the "RV Appraisal" or "Appendix B").  R.R. ¶¶ 22-25, 28-29.  It is my opinion that because the requisite conditions for a "retail" sale of the 14 Paintings did not exist as a matter of fact in 2009, Mr. Regan's purported "retail value appraisal" of the 14 Paintings is a purely hypothetical exercise, ignoring the real world constraints on the Estate that existed in 2009 and bore directly on any sale of artwork by it, and is not an accurate proxy for what the Estate could have reasonably expected to have realized by its sale of the 14 Paintings in 2009, thereby rendering any RV Appraisal conclusions irrelevant.  As with the FMV Appraisal, Mr. Regan provides no analysis or reasoning as to why he chose to conduct a retail value appraisal of the 14 Paintings or what, if any, bearing the RV Appraisal has to the Estate's sale of the 14 Paintings in August 2009.

     21.    The Regan Report defines "retail value" as "a reasonable amount in terms of US dollars that would be required to purchase property of a similar age, quality, origin, appearance, provenance and condition within a reasonable length of time in an appropriate and relevant market."  R.R. at ¶ 24.  Mr. Regan further asserts that that "[i]n 2009, the most likely and appropriate marketplace for [the 14 Paintings] to sell (even for a retail appraisal) are auctions in China and New York."  Appendix B at 7.  Mr. Regan's assertion that the "most likely" and "appropriate" marketplaces for the 14 Paintings were auctions in China and New York ignores critical facts regarding the 14 Paintings that demonstrate, in reality, neither the New York or Chinese auction markets were possible -- not to mention "likely" or "appropriate" --

marketplaces for the 14 Paintings.  Again, based on the real world context of the ownership of the 14 Paintings by the Estate, and my experience with the Chinese market, I would never advise that the Estate attempt to sell the 14 Paintings, or any artwork, in the Chinese market in 2009, and I would not consider it a "likely" or "appropriate" marketplace for the 14 Paintings in 2009.

22.     As set forth above, the Estate attempted to sell the 14 Paintings at auction at Sotheby's in New York (and did sell certain other classical Chinese paintings), but Sotheby's refused to accept the 14 Paintings for auction, and in fact instructed the Estate that private sales in Asia was the best market for the paintings.[14]  Mr. Regan's failure to consider these facts constitutes a critical flaw.  His assumption that the Chinese auction market was available to the Estate is unsupported for the same reasons set forth above with respect to the FMV Appraisal.

23.     As with the FMV Appraisal, the constraints that existed on the Estate in 2009 demonstrate that the conditions for a "retail" sale of the 14 Paintings were not present in 2009, and any assessment of the "retail" value of the 14 Paintings in 2009 is a purely hypothetical exercise, with irrelevant conclusions.  At the time of sale, the Estate was not "purchasing" the subject items, and it was under specific tax related time constraints.[15]  These conditions must be ignored when conducting a "retail value" appraisal -- defined in Appendix B as "used to establish a price guideline for retail pricing" as defined by Mr. Regan.  Appendix B at 7. Because Mr. Regan's RV Appraisal ignored the real world constraints on the Estate in 2009, it is simply not a relevant valuation for the 14 Paintings in 2009, as property of the Estate.

---

[14] *See supra* at KING-SCT-000003216 at ¶ 11; *see also* Schram Deposition at 26:14-27:20
[15] *See, e.g.,* AWSK_00000229.

### iii.   Orderly Liquidation Value Is the Appropriate Measure of Value for Estate Assets in 2009 and/or 2019

24.     Because the Estate's artwork needed to be sold to raise liquid assets to pay taxes and other expenses, and because the New York and Chinese auction markets were not available to the Estate, the concept of orderly liquidation value, not fair market value or retail value, is the relevant value which the Estate could reasonably have expected to receive by reason of the sales of the 14 Paintings in 2009, or in a hypothetical sale of the 98 Paintings in 2019.  The American Appraisers Association of America's <u>Types of Value for Varied Intended Uses</u> defines orderly liquidation value as "the most probable price in terms of cash, or precisely revealed terms, for which the property would change hands under required and limiting conditions in an orderly manner, generally advertised, with reasonable time constraints, in an appropriate and relevant marketplace, with knowledgeable buyers."[16]  In my opinion, orderly liquidation value is the relevant measure of what the Estate could ever reasonably be expected to achieve by sales of its property, given the factual conditions in which it finds itself.  Orderly liquidation value aligns most closely to the factual conditions under which any sale of the 14 Paintings or 98 Paintings would, or did, take place.

## II.     The Regan Report's Valuations are Unreliable and Not Credible Due to Its Violation of Fundamental Principles of Appraising

25.     Appendix A of the Regan Report purports to provide a fair market value of each of the 98 Paintings as of October 10, 2019.  Appendix B of the Regan Report purports to provide a retail value of each of the 14 Paintings as of August, 2009.[17]  I have reviewed and analyzed Mr. Regan's Report, including the purportedly comparable artwork and other analysis and evidence

---

[16] *See* APPRAISERS ASSOCIATION, *Definitions of Value*,
https://www.appraisersassociation.org/index.cfm;jsessionid=8036EE99758C6399338C22AC80070BE9.cfusion?fuseaction=document.viewDocument&documentid=1097&documentFormatId=1858&vDocLinkOrigin=1&CFID=22066843&CFTOKEN=a4f05bfad3278b52-4DE62A32-1C23-C8EB-804B1865CCE9FE3E.
[17] Mr. Regan does not include a specific effective date of valuation in Appendix B.

cited by Mr. Regan in support of his valuations, and I find that his evidence and analysis upon which he bases his valuations to be, by and large, not credible.  In Exhibits 1 and 2 to this report, I set forth my conclusions with respect to each of the valuations in Mr. Regan's FMV Appraisal and RV Appraisal.

26.     Exhibits 1 and 2 to this report reflect my assessment, on a piece-by-piece basis, of Mr. Regan's fair market and retail valuations and my specific conclusions as to whether his specific valuations are credible.

27.     It is a fundamental principle of appraising, as reflected in the USPAP standards that Mr. Regan purports to have followed, that "[c]redible assignment results require support by relevant evidence and logic."[18]  Mr. Regan's report so thoroughly fails to abide this primary -- and indeed common sense -- principle that Mr. Regan's conclusions are not credible and should not be relied upon for any serious purpose.  In both analyses, Mr. Regan relies extensively upon results reported by mainland Chinese auction houses and comparable sales results that fall outside the time frame required to provide a supportable basis for any credible conclusion as to valuation.  As set forth herein, neither Chinese auction results nor outdated "comparables" provide methodologically sound bases for Mr. Regan's valuation conclusions.  As a result of Mr. Regan's extensive -- indeed, virtually exclusive -- reliance on either or both types of flawed comparables, it is my opinion that his value conclusions are unsound, not credible, and not rendered in compliance with USPAP, or any, principles of sound appraising.

   i.     **Mr. Regan Improperly Relies on Reported Sales at Chinese Auction Houses**

28.     Mr. Regan's valuations improperly, and in violation of sound appraising methodology, rely upon purported auction results reported by mainland Chinese auction houses

---

[18] USPAP Standards at 12, http://www.uspap.org/files/assets/basic-html/page-1.html.

to support his valuations.  As set forth herein, reported auction results from these auction houses are fundamentally unreliable and, in my opinion, it is not proper to rely upon them in an assessment of the market or as comparable sales.  This fundamental fault infects the vast majority of Mr. Regan's valuations and, thus, such valuations lack sufficient substantiation. Moreover, these extensive faults call into question Mr. Regan's purported experience and competence as an appraiser and his experience with the Chinese art market.  Further, the conditions of the Chinese art market, discussed herein, make clear that Mr. Regan's repeated recommendations of the Chinese auction market for the sale of Estate artwork and suggestions that that market was available to the Estate -- even if implicit -- are faulty, and his conclusions and assertions reflect his relative inexperience as an appraiser.

29.    Recent scholarship and reporting, including reports cited favorably in the Regan Report, estimate that in recent years 41% to over 51% of the total value of sales reported by mainland Chinese auction houses are never paid.[19]  Thus, Mr. Regan's extensive reliance on such reported results to support his valuations is improper and, based on recent scholarship, should not be considered in a fair market, or any, valuation of artwork.  Mr. Regan ignores the well-documented problems that specifically plague Chinese auction houses, including public failures to sell works.[20]  For example, a six month review by the New York Times found that many of the sales in China's auction houses did not actually take place, *i.e.,* even if the sale was reported, it

---

[19] *See* ARTNET INTELLIGENCE REPORT (Andrew Goldstein and Julia Halperin, Fall 2018) at 32.
[20] I addressed this phenomenon in detail in my opening report.  Linsner Report, Section IV.  *See* David Barboza, Graham Bowley and Amanda Cox, *Forging an Art Market in China*, N.Y. TIMES, Oct. 27, 2013, http://www.nytimes.com/2013/10/28/arts/design/chinas-counterfeit-art-boom.html ("Auction houses have typically papered over the nonpayments, reporting aborted transactions as true sales, even posting record prices and seldom correcting the record.").

was never in fact consummated.[21]  It has also been extensively reported that forgeries flood the

Chinese market, which has become a breeding ground for corruption.[22]

30.     In the words of the Fall 2018 edition of the *Artnet Intelligence Report*, "it's hard

to discern the true contours of the [Chinese] auction market, because results from mainland

Chinese auction houses are not always reliable, buyers don't always pay what they owe, and the

system of checks and balances is less rigorous than in the West."[23]  Further, the Chinese

government's interest in promoting the appearance of a robust art market is at least partly

responsible for concerns over the reliability of reported auctions.  At present, according to the

*Artnet Intelligence Report*, there appear to be approximately 358 auction houses in China.[24]

Many of these are reportedly owned or controlled by the Chinese government.  One auction

house, Poly International Auction, Co., ("Poly"), was reportedly owned by China's People's

Liberation Army ("PLA") and control was eventually transferred to another division of the

Chinese government.[25]  The current and past regimes in the People's Republic of China ("PRC")

---

[21] *See* Barboza, Bowley and Cox, *supra* note 20; *see also* Graham Bowley and David Barboza, *China's Biggest Art Auctioneer Resists Official Efforts to Reform the Market*, S. CHINA MORNING POST, Dec. 23, 2013, https://www.scmp.com/lifestyle/arts-culture/article/1389040/chinas-biggest-art-auctioneer-resists-official-efforts-reform.

[22] *See* Barboza, Bowley and Cox, *supra* note 20 (Alexander Zacke, "an expert in Asian art who runs Auctionata, an international online auction house" stated "[n]o one will take results in mainland China very seriously").  The article also includes explanations such as "as the market has grown, so has its dark underbelly.  Price manipulation is rampant, analysts say, as collectors and investors, perhaps an art investment fund with large holdings in a particular artist, bid up a work to boost the value of their entire inventory.  Sometimes, experts say, auction houses themselves throw in fake bids."  *Id*.

[23] *See* ARTNET INTELLIGENCE REPORT at 29.

[24] *See id.,* at 30, 32 (of the 525 auction houses registered on Mainland China in 2017, more than 200 existed only on paper and had no sales, and only 328 were examined for the report).  In 2005, there were 108 auction houses in Mainland China.  CLARE MCANDREW, THE EUROPEAN FINE ART FOUNDATION, TEFAF ART MARKET REPORT 2014: THE GLOBAL ART MARKET, WITH A FOCUS ON THE US AND CHINA (2014) at 118.  In 2008, there were 260 auction houses and in 2009, there were 245.  CLARE MCANDREW, THE EUROPEAN FINE ART FOUNDATION, TEFAF ART MARKET REPORT: THE INTERNATIONAL ART MARKET 2007-2009 TRENDS IN THE ART TRADE DURING GLOBAL RECESSION at 74.

[25] *See* Barbara Pollack, *China's Growing Auction Giant*, ARTNEWS, Oct. 21, 2013, http://www.artnews.com/2013/10/21/chinas-growing-auction-giant/.  *See also* Graham Bowley and David Barboza, *An Art Power Rises in China, Posing Issue for Reform*, CNBC, Dec. 16, 2013, https://www.cnbc.com/2013/12/16/an-art-power-rises-in-china-posing-issue-for-reform.html; Bowley and Barboza, *China's Biggest Art Auctioneer*, *supra* note 21; Abigail R. Esman, *China's $13 Billion Art Fraud -- And What It*

have sought to promote and aggrandize their position in all aspects of the Chinese domestic economic spectrum.  It was, and is, a goal of the current regime to create an art market, or the appearance of an art market, in China larger than the market in the West.  The current regime claims to have done so.  The Chinese government's endeavor to expand its domestic art market is and has been supported by Chairman Xi.

31.     Auction reports on Artron.net do not constitute reliable verification that the alleged sales took place.  Information published on Artron.net is not reliable evidence that money in fact changed hands at the amount reported -- or at any amount -- or that the artwork purportedly sold was authentic artwork originating with the Estate.  In the context of the Chinese art market, the mere publication of a sale record does not in itself constitute a verification of a *bona fide* transaction.  Indeed, Artnon.net does not confirm or authenticate the sales reported and expressly disclaims the accuracy or reliability of the information published on its website.[26]

32.     The unreliability of these reported sales is the product of several facts of the Chinese art and auction market that are markedly different from the United States.[27]  First, the

---

*Means For You*, FORBES, Aug. 13, 2012, https://www.forbes.com/sites/abigailesman/2012/08/13/chinas-13-billion-art-fraud-and-what-it-means-for-you/#3cd611da2837 (noting that the Poly home page says "'we are the fine art auction home of the People's Liberation Army.  Our goal is to bring the people's art back to China.'").

[26] Arton.net features a disclaimer that states, "The online auction preview and auction results information published by Artron.net is to better provide information services for auction companies and art lovers. The information therein comes from the various auction companies," and continues, "[a]ll works marked with "Source: XXX (non-Artron.net)" on this website are republished from other media. The purpose of the re-publication is to convey more information, which does not mean that Artron.net agrees with their views or is responsible for their authenticity." The disclaimer continues, "Artron.net does not declare or guarantee the correctness or reliability of any content, information or advertisements carried on this website … Users shall bear the risk of using this website."  *See* ARTRON, https://www.artron.net/aboutus/mzsm.php.

[27] *See* Jan Dalley, *Smoke and Mirrors*, FIN. T., May 11, 2012, https://www.ft.com/content/90f856bc-98f6-11e1-9da3-00144feabdc0 ("[F]orgery and [] non-payment, either singly or together, are now so common in the Chinese art market as to make the year's totals -- which purportedly show an astonishing rise -- highly unreliable.  The art market all over the world is famously a game of smoke and mirrors, unregulated and with a huge number of opaque transactions, but the difficulties of accurate reporting from China are especially acute."); Clare McAndrew, *Chinese Art Market Rebounds to $8.5 Billion in 2013*, ARTNET, Sept. 17, 2014, https://news.artnet.com/market/chinese-art-market-rebounds-to-85-billion-in-2013-83531 ("Issues related to late and non-payment, false bidding, and other illegal operations have all arisen, and although improving in many auction houses, have undermined the credibility of some.").

Chinese auction market is, and has been, rife with high rates of buyer default.[28]  That is, while a buyer may submit the highest bid at auction, it is extremely common in China for the buyer to simply walk away from, or default on, the purchase.[29]  By way of example, in 2010, 74% of Poly's earnings were never realized because of buyer default.[30]  Auction houses, however, only publicly report the result of the sale, not whether the buyer in fact pays for the artwork.[31]  No documents or other evidence was presented to me that demonstrates payments were in fact made so as to validate citation to Chinese auction market comparables.

33.     According to analysis published in the *Artnet Intelligence Report,* for the sales season of 2017-2018, approximately 51% of the total value of sales was never paid, that figure was up from 49% in 2016 and 41% in 2015.[32]  To be clear, these statistics indicate that up to half

---

[28] *See* Eileen Kinsella, *The Chinese Art Market is Reviving But Nonpayments Increasingly Plague the Sector, Our Exclusive Auction Report Reveals*, ARTNET, Aug. 9, 2018, https://news.artnet.com/market/auction-report-shows-chinese-market-rebounding-still-off-record-levels-1330379 ("It's no secret that buyers defaulting on successful bids in auctions -- including for many pricey lots -- is a problem that has plagued the market in mainland Chinese [sic] for quite some time.  According to [a] report, among all lots sold there in 2017, the percentage of the total sales value paid as of May 2018 was only 49 percent, the lowest such figure since 2011.  The nonpayment rate is even greater when applied to lots over [$1.5 million] for which only 28 percent of the value had been paid."); Enid Tsui, *China Rises to No. 2 Art Market as Billionaires More Than Double in 2017, Closely Watching Report Says*, S. CHINA MORNING POST, Mar. 14, 2018, https://www.scmp.com/culture/arts-entertainment/article/2137054/china-rises-no-2-art-market-billionaires-more-double-2017 (51% of art sold at auctions was fully paid, down from 70% in 2013-14).  *See also* Daniel Grant, *Art Market Watch: Buyer's Remorse & the Auction Business*, ARTNET ("Everyone has experienced some difficulty in getting payment from Chinese buyers. . . . [for example, Sotheby's] brought nine lawsuits against successful bidders in Hong Kong for failure to pay an aggregate $22 million on 19 lots in Asian art sales between 2008 and 2011[.]").

[29] *See* Louisa Lim, *In China's Red-Hot Art Market, Fraud Abounds*, NPR, Oct. 10, 2011, https://www.npr.org/2011/10/10/141125011/in-chinas-red-hot-art-market-fraud-abounds ("In China, non-payment for winning bids is very common indeed. . . . [T]he higher the price, the more likely it is not to be paid."); *see also* Georgina Adam, *From Van Gogh to Richer -- What Happens When Bidders Fail to Pay Up at Auction?*, ART NEWSPAPER, Jan. 23, 2018, https://www.theartnewspaper.com/news/hammer-horror-as-bidders-won-t-pay-up ("In China, bidding is not always perceived as a legal obligation . . . and the fall of a gavel can be seen as the start of a negotiating process, not the end.").

[30] *See* Allison Trupp, Note, *When the Rich Regret: The Case of Non-Payment in Art Auction Sales*, 20 Cardozo J. of Conflict Resol. 499, 503-04 n. 33 (2019).

[31] *See* Lim, *supra* note 29 ("whether or not any money actually changes hands, those record prices still stand, inflating the whole market."); *see also* Barboza, Bowley and Cox, *supra* note 20 ("Auction houses have typically papered over the nonpayments, reporting aborted transactions as true sales, even posting record prices and seldom correcting the record.  This has misleadingly burnished their revenues, making the market seem hotter and propping up prices[.]").

[32] *See* ARTNET INTELLIGENCE REPORT at 32.

17

of all reported "sales" at auction houses in China are never in fact consummated.[33]  These

reports, though recent, confirm what has been a well-known truth about the Chinese auction

market for years, including during the period of sales in Mr. Regan's Report.

34.     There are a number of factors that contribute to the extraordinarily high rate of

default in Chinese auction results.[34]  For instance, in marked difference to auction houses in the

West that will typically provide a refund if a work turns out to be a forgery or if other issues

regarding authenticity arise, auction houses in China provide no guarantee of the authenticity,

genuineness or condition of the artwork sold.[35]  A disclaimer on the website of China Guardian

(the second largest auction house in the China)[36] notes that "the company cannot guarantee the

genuineness, quality, and value of the lot and the company shall not bear any warranty liability

for a defect of the lot."[37]  As a result, the burden is on the purchaser to determine the authenticity

of the works they purchase.[38]  While in the West, artwork put up at auction will be vetted by the

auction house and placed under the scrutiny of potential buyers before it is sold, that is generally

not the case in China.[39]  Vetting of an artwork's authenticity typically occurs by buyers only

after the auction has taken place, and buyers will wait until an artwork is vetted to their

---

[33] *See* Bowley and Barboza, *China's Biggest Art Auctioneer*, *supra* note 21 ("auction houses do not always note these failed transactions . . . their reported sales figures exceed reality").  This is not a new phenomenon.  In Fall 2010, close to half of the reported hammer prices turned out to not be real sales at all.  *See* Dalley, *supra* note 27.
[34] *See* McAndrew, *Chinese Art Market Rebounds*, *supra* note 27 (the extent of "[t]he problem of late and non-payment by winning bidders at auction [in China] . . . is clearly much more marked and persistent than in other markets.  There are several reasons for high rates of late payment in the market, including issues related to authenticity or provenance, the business integrity of the buyers, and a different culture of negotiating and transacting.").  *See also* CLARE MCANDREW, THE EUROPEAN FINE ART FOUNDATION, TEFAF ART MARKET REPORT 2014: THE GLOBAL ART MARKET, WITH A FOCUS ON THE US AND CHINA (2014) at 130.
[35] *See* Lim, *supra* note 29 ("Chinese auction houses are not responsible for the authenticity of the goods they sell, as long as they issue a disclaimer.).
[36] *See* ARTNET INTELLIGENCE REPORT at 32.
[37] *See id.*
[38] *See id.*
[39] *See supra* note 35.

satisfaction to pay the auction house.[40]  The problem is not due "so much to [buyer's]

unwillingness (or inability) to pay, but rather to the hefty onus that China's auction houses put on

buyers to determine the authenticity of works they purchase."[41]  Forgery is a massive, well-

documented problem in the Chinese art market.[42]  These factors give rise to defaults by auction

buyers at rates not customary in the West.

35.     Further, bidding at the high end of the auction market is particularly susceptible to

manipulation and default.[43]  According to the most recent annual report by Artnet and the China

Association of Auctioneers (CAA), "much of the activity [at the high end of the market] was

'froth courtesy' of pure speculators, most of whom have [now] exited the art market."[44]  That is,

results reported at the high end of the market are often manufactured[45] -- whether by the auction

houses themselves, collectors, or even the owner of the artwork for sale[46] -- to give the

---

[40] *See* ARTNET INTELLIGENCE REPORT at 32-3; Caitlin Randall, *China Sets New Record for Asian Art Auctions*, ASIAN CONVERSATIONS, Mar. 2014, http://www.asianconversations.com/ChinaArt.php ("Some of [China]'s top auction houses refuse to talk about artworks sold at record prices, knowing they were never paid for once the gavel went down.  Winning bidders simply refuse to pay, fearing the piece was forged."); *see also* Tsui, *supra* note 28.
[41] ARTNET INTELLIGENCE REPORT at 32.
[42] *See, e.g.,* Barboza, Bowley and Cox, *supra* note 20 ("Artists here are trained to imitate the old Chinese masters, and they routinely produce high-quality copies of paintings and other works, such as ceramics and jade artifacts.  That tradition has intersected with the newly lucrative art market, in which reproductions that so many have the skills to create are often offered as the real thing.  It would be hard to create a more fertile environment for the proliferation of fakes."); Esman, *supra* note 25 (as much as 80% of the material at Poly is estimated to be a forgery); Lim, *supra* note 29 ("[T]he problem is that the fakery is endemic.  In all too many cases, the art is fake, the bids are rigged, the experts are crooked, and the bills are never settled.  It's difficult to know what is real, aside from the corruption."); McAndrew, *Chinese Art Market Rebounds*, *supra* note 27.
[43] *See, e.g.,* Lim, *supra* note 29 ("At Chinese auctions, the bids are sometimes fake too.  In some cases, the seller, or even the artist, may bid on their own pieces to push the prices up.  Sometimes auctions are used to pass bribes. . . . Many auction houses turn a blind eye, since the higher the price, the higher their commission.").
[44] Tim Schneider, *The Much-Hyped Chinese Art Market's Best Days May Already Be Gone, a New Study Says*, ARTNET, Mar. 15, 2019, https://news.artnet.com/market/tefaf-chinese-art-market-1488982.
[45] *See, e.g.,* Barboza, Bowley and Cox, *supra* note 20 ("Price manipulation  is rampant, analysts say, as collectors and investors, perhaps an art investment fund with large holdings in a particular artist, bid up a work to boost the value of their entire inventory.  Sometimes, experts say, auction houses themselves throw in fake bids.  The Chinese have a name for the price-boosting process.  They call it 'stir frying.'"); Esman, *supra* note 25 ("Artificially-inflated prices and manipulated sales have so disrupted the values for Chinese art and antiques that the true value of many of them remains unclear . . . . [T]here appear[s] to be a pair of schemes through which such manipulations take place, both often geared either toward money laundering or the bribing of government officials[.]").
[46] *See* Esman, *supra* note 25 ("Poly (and possibly other[ auction houses]) frequently guarantee sellers that an item attain a certain price -- and then allow the seller himself to bid.  Should general bidding stop below the level of the guarantee, the seller will bid the guaranteed amount, establishing a false but recorded value for the work.").

appearance of a strong market for a specific artist, to give the appearance of strength to an

auction house, to provide "evidence" to justify lending against artwork as collateral,[47] and,

perhaps most importantly, to provide the Chinese government "data" to demonstrate the size and

depth of the Chinese art market.[48]

36.     Based on the foregoing, it is my opinion that the Chinese auction results cited by

Mr. Regan as comparable sales to support his valuation conclusions, without any further

evidence of their validity, are not credible to serve as comparable sales in his valuation.

> a.     **An Illustration of The Problem of Mr. Regan's Reliance on Reports of Chinese Auction Results**

37.     In my opinion, there is one particularly egregious error that exemplifies the

problem of reliance on Chinese auction results and that illustrates the flawed nature of Mr.

Regan's entire valuation methodology.  On page 32 of Appendix A, Mr. Regan provides a

valuation of a work by the artist Ni Zan entitled *Trees on a River Shore*.  Appendix A at 32.  Mr.

Regan assigns a valuation of $6 million for this piece.  *Id*.  Of course, $6 million is a very high

valuation for any piece of art, and an extraordinary sales result for a classical Chinese artwork.

Accordingly, I would expect the valuation to be substantiated by valid, credible sales that should

be easy to confirm.  This is not the case in Mr. Regan's assessment of this piece.

---

[47] *See, e.g.,* Lim, *supra* note 29 (noting that a Chinese businessman commissioned a fake ancient jade burial suit, got five top expert appraisers to "vouch" for its authenticity and value it at $375 million, and used the fake suit as collateral to obtain an $100 million loan from a bank for a real estate project).

[48] *See* Esman, *supra* note 25 ("Westerners are starting to move in on the [Chinese art market], many duped by what appears to be exorbitant growth and a fabulous investment opportunity. . . . [E]fforts by both government and military branches of China's leadership to exploit the country's $13 billion art trade, profiteering off the froth and foam of its overheated market, feeds the battle for power between them."); Naomi Rovnick, *China's Art Sales Slump, But They Were Mostly Fake Anyways*, Quartz, Apr. 2, 2013, https://qz.com/69812/chinas-art-sales-slump-but-they-were-mostly-fake-anyways/ ("[China's] art market is deeply intertwined with bribery and corruption, with auction houses and galleries permitting the sales of fake pieces, which businessmen use as a means to transfer cash to corrupt government officials.  The Chinese call it 'elegant bribery': a businessman presents a government official with a fake work of art, then buys it back from him at auction for a vastly inflated price.").

38.     First, in support of this sale, Mr. Regan cites as a comparable data point what I

would consider to be a landmark sale:  lot #04045 at Poly International Auction Co., Ltd. on

Monday June 3, 2019 purportedly sold for $9,161,621.  *Id*.  With this comparable, Mr. Regan

includes the following note: "Remarkably well provenanced and documented.  A very rare and

one of a kind work in it's market envy."  *Id*.  Neither the sale, nor the "remarkable" provenance

cited by Mr. Regan are verifiable.

39.     When I tried to confirm the sale cited by Mr. Regan, a search of Artprice, a

reputable data compiling website frequently used by art appraisers, returned a search result for

this lot that stated: "hammer price, not sold."  To determine whether the Artprice record or Mr.

Regan's record was accurate, I looked up the piece on Poly Auctions' proprietary website.

Immediately, it was apparent that the record Mr. Regan cited was wrong, as a list of total sale

prices achieved for sales on June 3, 2019 at Poly Auctions totaled less than the single sale price

Mr. Regan used as a comparable data point.  I confirmed my findings again by reviewing the

completed sales prices for both the 2019 Spring Auction in which the comparable piece

supposedly bought in ("More Sublime When Looking Up"), as well as another collection

("Connoisseurship in Ancient Arts") also held on June 3, 2019.  Remarkably, the work Mr.

Regan cited as having sold for over $9 million, is reported by Mr. Regan to have sold for only

$433,226 in 2012 at the same auction house, Poly International Auctions.  Given the foregoing,

there is simply no basis for including this sale result as a completed comparable data point.

40.     Moreover, that Mr. Regan did not think it would be prudent to confirm the *bona*

*fides* of a $9 million landmark sale he cited to justify an extraordinarily high valuation, when the

other market data he cited all clustered for millions of dollars less than that single sale, and the

other record for what was purportedly the same item was a fraction of that amount, leads me to question the integrity of Mr. Regan's data collection and analytical rigor.

41.     Further, Mr. Regan's citation to a purported private sale of the subject work for $6,552,000 at a 2010 auction at Beijing Hanhai Auction Co is also not credible.  Appendix A at 32.

42.     It should be noted, however, that even if the above purported private sale of the subject work in 2010 is confirmed to be a completed sale, that Mr. Regan's analysis would still be deficient.  It would not be reasonable to base a value conclusion on a single sale, which may neither have been reflective of the market at the time of sale (if it were shown to be a landmark sale) nor on the effective date of valuation, almost ten years later.  As another example, on page 65 of the FMV report, Mr. Regan cites three purported sales of what he asserts to be the subject property.  Appendix A at 65.  Using the extraordinary assumptions that (1) the item in question in all three instances is the same piece, (2) that this piece is, in fact, the subject property formerly owned by the Estate, and (3) that all three data points represent completed transactions, this sales history demonstrates why a relevant time frame of valuation, emphasizing sales closest in time to the effective date, is relevant.  Mr. Regan includes the following: (a) 28 May 2008, Beijing Chieftown Auction, $338,560; (b) 10 May 2011, Beijing Hanhai Auction Co., $2,760,000; (c) 13 December 2015, Shanghai Jiahe Auction Co., $655,500.  Then, without any more discussion of the market from 2015 to 2019, Mr. Regan arrives at a value conclusion of $1,000,000.  Appendix A at 65.  No rationale for how this opinion of value was reached was provided.  In my opinion, this data does not indicate that four years after the most recent data point, that the price realized for the subject property would recover.

43.     As a result of my research, it is my opinion that Mr. Regan's value conclusion on the effective date of valuation is not credible.  While these examples highlight what I consider to be two of the most speculative and deficient analyses in the FMV Analysis, this is not the only time I disagreed with Mr. Regan's selection of comparable data.[49]

### ii.   Mr. Regan Improperly Relies On Outdated and Thus Irrelevant Market Data in Support of His Valuations

44.     Frequently throughout his report, Mr. Regan cites to reported auction results that are outdated or otherwise irrelevant to support his valuation conclusions.[50]  Given the vicissitudes of the art market, and in particular, the Chinese art market, it is not appropriate to cite sales of artwork more than two years prior to the date of the appraisal as comparables. Again, it is a fundamental principle of appraising, as reflected in the USPAP standards that Mr. Regan purports to have followed, that "[c]redible assignment results require support by relevant evidence and logic."[51]  In my opinion, sales of comparable artworks more than two, and at most three, years prior to the date of the appraisal are not "relevant evidence" under USPAP or otherwise.  The art market generally, and the specific markets for an individual artist's work or certain genres of art can be subject to wide swings in performance based on any number of factors from fashion, to economic conditions, to questions of fraud or forgery that may arise in connection to work by a specific artist, to any number of other factors.  Accordingly, prudent appraisal practice requires limiting the relevant time period for choosing comparable sales.  In my opinion, the prudent comparable sale time period for appraisals of the type Mr. Regan provided is two and at most, three years.  As set forth in Exhibits 1 and 2, hereto, Mr. Regan relied extensively on sales results from well outside of the relevant time period.  By way of

---

[49] *See* Exhibits 1 and 2 attached hereto.
[50] *See* Exhibits 1 and 2 attached hereto.
[51] USPAP Standards at 12, http://www.uspap.org/files/assets/basic-html/page-1.html.

example, in his FMV and RV appraisals, Mr. Regan cited sales from 2002 (OTE 86), 2004, (OTE 131), 2008 (OTE 155), 2010 (OTE 137, 150), 2011 (OTE 147), and 2013 (OTE 147, 220, 150) for comparable sales.  Mr. Regan's use of such outdated sales was a fundamental error, and such comparables do not constitute credible substantiation for Mr. Regan's valuation conclusions.[52]

### iii.    Mr. Regan Failed to Discuss Prior Market History of the Subject Artwork

45.    As discussed in my opening report, the Estate sold the 98 Paintings through a reasonable and reliable process, which, in my opinion, resulted in reasonable sales prices.[53]  In his FMV and RV appraisals, Mr. Regan does not provide either the valuations set forth in the Sotheby's Appraisal[54] or the prices realized by the Estate in the private sales.  Given that Mr. Regan includes sales data from outside of the relevant market repeatedly in both appraisals, I can only conclude that Mr. Regan actively chose to exclude this data from both appraisals.  Mr. Regan also fails to discuss that the Estate did approach Sotheby's to sell the subject properties, and does not acknowledge that Sotheby's could have accepted the consignment and placed the items in either the New York or Asian auctions.  These omissions distort how an intended user of the report situates the subject properties in the wider market for similar properties on the effective dates of valuation.  Sales and appraisal data concerning the subject artwork is always relevant to an appraisal, and to fail to disclose and ignore these data points -- especially in connection with the RV appraisal, but also in connection with the FMV appraisal -- is a fundamental error that erodes the reliability of Mr. Regan's conclusions.

---

[52] It should be noted that I did not arrive at independent valuations, and that a comment that a value conclusion is reasonable based on comparable data included does not represent an agreement in valuation.  Rather, it indicates that, based on a review of the market and the data as presented in the Regan Report, the value conclusion is either unsustainable or credible.  As is apparent from Exhibits 1 and 2, Mr. Regan's selection of comparable data consistently distorts the market for these works on the effective date of valuation.

[53] *See* Linsner Report at ¶¶ 26-31, 44.

[54] Sotheby's 000620.

iv.    **Mr. Regan's Failure to Devote Sufficient Time to the Appraisal Is a Critical Fault**

46.    Mr. Regan admits in his report that he was not given sufficient time to conduct normal course research essential to any reliable appraisal.  Mr. Regan readily admits that he "was given very limited time to research the property" and that "[a] deeper examination of any literature, scholarship or media relevant to the works appraised or to the comparables was not feasible in the time allotted by the client."  Appendix A at 5-6.  This admission, in and of itself, requires a reasonable appraiser to discount Mr. Regan's conclusions to such a degree that they cannot be given anything approaching the type of weight Mr. Regan assigns.  Moreover, as set forth above in my discussion of Ni Zan's *Trees on a River Shore*, Mr. Regan's lack of diligence is evident in his work.  Pursuant to the 2018-2019 USPAP Scope of Work Rule, "[a]n appraiser must not allow assignment conditions to limit the scope of work to such a degree that the assignment results are not credible in the context of the intended use."[55]  The commentary to the rule states that:

> if relevant information is not available because of assignment conditions that limit research opportunities (such as conditions that place limitations on inspection or information gathering), an appraiser must withdraw from the assignment unless the appraiser can:
>> (1) Modify the assignment conditions to expand the scope of work to include gathering the information; or
>>
>> (2) Use an extraordinary assumption about such information, if credible assignment results can still be developed.

47.    Time to conduct an appropriate examination of the items an appraiser deems relevant is, as should be obvious, a critical "assignment condition," especially in the context of litigation where an appraisal is to be presented as evidence in federal court.  As set forth above,

---

[55] USPAP Standards at 13, http://www.uspap.org/files/assets/basic-html/page-1.html.

when assignment conditions are limited in a material way, as Mr. Regan readily admits occurred

in connection with this report, USPAP requires an appraiser to withdraw from the engagement,

to modify the assignment to gain the time necessary to conduct a credible appraisal, or indicate

that an extraordinary assumption was made, if even possible.  In my opinion, Mr. Regan's failure

to devote adequate time to the report is a critical flaw, that not even disclosure of an

extraordinary assumption -- which he technically did not make -- can cure.  Given the lack of

sufficient time to prepare his report, the only reasonable action for Mr. Regan to take (and still

can take) was to withdraw from the engagement.

> ### v.   Mr. Regan Failed to Disclose Numerous Extraordinary Assumptions And Hypothetical Conditions That Affect His Valuation

48.    USPAP Standard Rule 8-2(a)(xi) provides that in an appraisal, the appraiser must

"clearly and conspicuously: state all extraordinary assumptions and hypothetical conditions; and

state that their use might have affected the assignment results."[56]  Under USPAP, an

"extraordinary assumption" is "an assignment-specific assumption as of the effective date

regarding uncertain information used in an analysis which, if found to be false, could alter the

appraiser's opinions or conclusions."[57]  Under USPAP, a "hypothetical condition" is a condition

that is "directly related to a specific assignment, which is contrary to what is known by the

appraiser to exist on the effective date of the assignment results, but is used for the purpose of

analysis."[58]  The Regan Report is rife with undisclosed hypothetical conditions and undisclosed

extraordinary assumptions.  First, as set forth above, the Regan Report ignored known facts with

respect to the ownership and marketability of the 98 Paintings and the 14 Paintings when he

---

[56] USPAP Standards at 51, http://www.uspap.org/files/assets/basic-html/page-1.html (Standard Rule 8-2(a)(xi) and 8-2(b)(xi), depending on type of report).
[57] USPAP Standards at 4, http://www.uspap.org/files/assets/basic-html/page-1.html.
[58] USPAP Standards at 4, http://www.uspap.org/files/assets/basic-html/page-1.html.

chose to apply fair market value and retail value appraisal conditions to his valuations.  Mr. Regan failed to disclose the fact that these valuation definitions in fact ignored critical facts about the artwork.  This was a serious violation of USPAP because the conditions Mr. Regan ignored are critical to an assessment of real-world value that the Estate could obtain for the artworks.  Moreover, if not disclosed in the report, a less informed third-party would not be aware of facts material to the value of the artwork.

49.     Second, Mr. Regan stated that "the question of title was not considered for this appraisal.  The appraised value is based on whole ownership and possessory interest undiminished by any liens, fractional interests or any other form of encumbrance or alienation." Appendix A at 5; Appendix B at 5.  Here, while Mr. Regan indicates what his appraisal is based on, he fails to disclose known facts regarding the artworks and fails to state that his appraisal imposed a hypothetical condition that is contrary to fact.  As set forth above, from the time of the decedent's death until they were sold, the 98 Paintings and the 14 Paintings were subject to the automatic lien imposed by the IRS on the gross estate of the decedent.[59]  Assuming the works were property of the Estate in 2019, that lien would continue to exist and should have been considered in the context of the valuation or it should have been disclosed as a hypothetical condition that the lien was not being accounted for.  The same is true with respect to the facts known about the market for the artwork, specifically, that Sotheby's instructed the Estate that private sales in Asia, not auctions in New York or China, was the appropriate market for the 98 Paintings and that it would not accept the works on consignment.[60]  Again, by ignoring these facts, Mr. Regan created a hypothetical condition that should have been disclosed.

---

[59] *See supra* note 10.
[60] *See* KING-SCT-000003216 at ¶¶ 10-11; Sotheby's 000620; AWSK_00000914.

50.     Finally, because the FMV Appraisal and the RV Appraisal opinions are to be used to support Plaintiffs' claimed damages in this action, the appraisals should have, but did not, include a clearly stated hypothetical condition that the 98 Paintings and the 14 Paintings were owned by the Estate as of the effective date of each of the appraisals.

51.     Mr. Regan also imposed extraordinary assumptions in his appraisal that he failed to disclose.  Primary among these, Mr. Regan failed to disclose the extraordinary assumption that all auction results cited in the report -- including results reported from Chinese auction houses -- are assumed to be correct.  As set forth above, it is beyond irresponsible for an appraiser to accept reported results out of Chinese auction houses at face value.  To do so requires disclosure of an extraordinary assumption -- albeit one that renders the appraisal as a whole worthless for its intended purpose.  Mr. Regan's report included additional extraordinary assumptions that were similarly not disclosed, including assumptions that each artwork at issue remained in the condition in 2019 as it was reported to be in 2005-2009.

### vi.     Mr. Regan's Appraisal Is Not USPAP Compliant

52.     Mr. Regan states that with respect to both the FMV Appraisal and the RV Appraisal, "the appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the 2018-2019 *Uniform Standards of Professional Appraisal Practice*."  Appendix A at 3; Appendix B at 3.  USPAP sets forth minimum criteria by which appraisals and appraisers should prepare, develop, and write their findings and conclusions.  USPAP principles range from very specific, such as the identification and statement of the intended use of the appraisal report,[61] to more conceptual, such as an appraiser "must: be aware of, understand, and correctly employ those recognized methods and techniques

---

[61]*See, e.g.,* USPAP Standards at 50, http://www.uspap.org/files/assets/basic-html/page-1.html.

that are necessary to produce a credible appraisal[.]"[62]  There are two specific USPAP standards

that apply to an appraisal of personal property: Standard 7 (Personal Property Appraisal,

Development) and Standard 8 (Personal Property Appraisal, Reporting).  It is my opinion, based

on the foregoing analysis of significant methodological, logical, factual, and other errors, as well

as my experience, that Mr. Regan failed to follow relevant USPAP 2018-2019 Standards and that

consequently neither the FMV Appraisal nor the RV Appraisal was developed or reported in

compliance with USPAP 2018-2019.

      53.     In addition to the foregoing, both the FMV and RV Appraisals deviate from the

requirements set forth in USPAP.  For example, there are two types of acceptable reports under

USPAP: an appraisal report and a restricted appraisal report.[63]  The type of report must be

"prominently state[d]" in the report.[64]  Not only is the report type not included "prominently" in

either appraisal, but also on page 7 of both, Mr. Regan writes "this report is considered an

unrestricted appraisal according to the rules of USPAP 2018-2019."  Appendix A at 7; Appendix

B at 7.  An unrestricted report is not a recognized term of art in the version of USPAP in effect

on the dates Mr. Regan developed and wrote his report.  This muddling of terminology

demonstrates how Mr. Regan manipulates accepted appraisal methodology, which would

mislead an intended user who was unfamiliar with the two report options required by USPAP.

However, for the purpose of the review of the Regan Report and Appendices A and B, I have

assumed that Mr. Regan did not intend to provide a restricted appraisal and have further assumed

---

[62] USPAP Standards at 44, http://www.uspap.org/files/assets/basic-html/page-1.html.
[63] USPAP Standards at 49, http://www.uspap.org/files/assets/basic-html/page-1.html.
[64] *Id*.

that the report was meant to comply with the requirements of an "appraisal report" found in Standard Rule 8-2(a).[65]

54.     A more important issue arises when Mr. Regan discusses the client of the report, as compared to the owner of the properties and title.  In both appendices, Mr. Regan states "owner: formerly owned by the estate of Chi-Chuan Wang" (Appendix A at 5; Appendix B at 5) but this does not clarify who the owner/owners are on the effective date of the appraisal.  That the current owners for each piece might not be known in each instance is important information to include in the report, as it is possible that provenance history after passing out of the Estate could have an effect on valuation, especially for Appendix A with an effective date of 2019.

55.     Finally, in both reports the client is identified on the first page as "The Estate of Chi-Chuan Wang," (Appendix A at 1; Appendix B at 1) while on page five the client is "Dean Nicyper from Withers Bergman LLP in relation to the Estate of Chi-Chuan Wang."  Appendix A at 5; Appendix B at 5.  While this may seem like a minor nuance, there is a large difference between the client being the Estate and its named executors in contrast to the client being a lawyer, in terms of whether Mr. Regan performed his responsibilities as an appraiser without bias.

### III.   Mr. Regan's Opinion That The Appearance of 16 Paintings at Auctions Between 2008 and 2019 Reflects Common Ownership Is Entirely Speculative

56.     Mr. Regan opines that because 16 of the subject properties were reportedly sold at auctions at the Chieftown International Auction Company in China between 2008 and 2010 after they were no longer owned by the Estate, this "would be unlikely unless there was an identity or common connection among the owner(s), such that the auction house could locate and retrieve

---

[65] Note that I am making two extraordinary assumptions for the purposes of evaluating the Regan Report and appendices.

the paintings apparently sold to these five collectors." R.R. at 11-13. Mr. Regan's opinion, however, is unsupported by any facts and constitutes sheer speculation and conjecture. The 16 paintings referred to by Mr. Regan represent less than 20% of the subject properties sold by the Estate. As the Estate was no longer in possession of these paintings, it is speculative to comment as to why and how the auction house was able to coordinate these sales, and there are simply no facts cited to support a conclusion that there was an "identity or common connection" among the owners. Again, Mr. Regan conflates multiple issues. He writes "it is noteworthy that such a large number of the 98 paintings would appear for resale at the same mid-tier auction house, particularly as opposed to one of the large auction houses, given the generally high quality and provenance of the 98 paintings." R.R. at ¶ 31.

57.     He continues "in my professional opinion and experience, this grouping of paintings for resale would be unlikely unless there was an identity or common connection among the owner(s), such that the auction house could locate and retrieve the paintings apparently sold to these five collectors." R.R. at ¶ 33. Of course, the common connection, on face value, is the provenance, *i.e.,* they were all works from the collection of C.C. Wang. Mr. Regan himself writes that "auction houses do often try to seek out different known collectors or various sources in order to increase a "themed sale's lots." *Id*.

58.     To the extent news that the 98 Paintings had reached the market in China (or were being sold in private sales) became known in the auction world -- which is not at all unlikely to have occurred -- it may have been rather easy for an auction house to track down the buyers. And, of course, there is an obvious connection amongst the buyers, insofar as they each purchased artwork from the same source, *i.e.,* the Estate. Furthermore, the 16 paintings did not appear as a single or "singular" grouping – Mr. Regan states the sales were held between 2008

and 2010, and thus his statement that it is "unlikely" that the paintings would appear "as a singular grouping" is not true unless one conflates the time frame of the sales.  The suggestion that these paintings appeared as a single group grossly overstates the "grouping" Mr. Regan purports to observe.

59.     It is further my opinion that Mr. Regan's assertions regarding the purported identity of ownership or connection amongst the owners of the paintings is far afield from the type of opinion an appraiser with his background is qualified to make.  While Mr. Regan has some apparent experience monitoring the Chinese art market and "auction practices," I see no particular expertise or experience directly working with Chinese auction houses that would be relevant to this opinion.

60.     Finally, it must be noted that the Chinese business world, and its auction market in particular, operates under significantly different conditions than the art and auction market in the U.S.  In China, as I discussed above, the government is involved directly in the ownership and management of auction houses and has an interest in advancing the art market.  The lack of transparency into the "behind the scenes" workings of the Chinese auction market, and the well-known government interventions in the market, further undermine Mr. Regan's purported conclusions regarding "identity" or "common connection" among the owners of the artworks identified.

## IV.   Mr. Regan's Opinion Regarding the Addition of C.C. Wang Collectors' Seals to Artworks Is Not Credible

61.     Mr. Regan offers the opinion that "at some point *after*" certain photographs of estate artworks were taken (the "Estate Photographs"), "new C.C. Wang collector seals were added certain (sic) of the 98 Paintings" and "[a]dditional C.C. Wang seals appear on paintings

described as having been sold to Chen Mei Lin, Anthony Chou, and Yong Qing Ye."  R.R. at ¶ 41.

62.    Mr. Regan states that he can conclude with a "sufficiently high degree of confidence that the additional seals (i) were placed on the 14 Altered Painting using genuine C.C. Wang seals and (ii) were added to the above-paintings by a person or persons in possession of the seals sometime after the Estate photographs were taken in 2004."  R.R. at ¶ 42.  Mr. Regan "rejected as unreasonable" the possibility that forged seals were added to the paintings because (1) adding the seals would not yield much benefit and (2) Mr. Regan was unable to discern any noteworthy differences between the seals on the paintings and the seal impressions he was provided.  R.R. at ¶¶ 43-45.

63.    In my opinion, Mr. Regan's opinions in this regard are entirely speculative.  It is highly dubious, based on the photographic evidence, to opine that the purportedly "new" seals were "genuine" C.C. Wang seals, let alone that they were applied to "genuine" works from the Estate.  In my opinion, the conclusions reached by Mr. Regan regarding the seals do not follow from, and are not credibly supported by, the photographic or other evidence he cites.  That evidence does not provide a sufficient basis from which to draw the conclusions expressed.

64.    First, as Mr. Regan admits in his report, forged seals are "certainly known throughout Chinese art history. . . ."  R.R. at ¶ 44. [66]  Forged seals are still a rampant problem in China -- so much so that in March of 2018, a nationwide reform was initiated to better manage the making or selling fake official seals.[67]  Thus, there is and must be doubt as to whether seals

---

[66] *See also* John Pomfret, *The Master Forger*, THE WASHINGTON POST, Jan. 17, 1999, https://www.washingtonpost.com/archive/lifestyle/magazine/1999/01/17/the-master-forger/e2a6cc6a-c60d-4abc-9d6a-c4540c0f1076/.
[67] *See* Aybek Askhar, *Police to Crack Down on Fake Seals, Documents, Certificates*, CHINA DAILY, Mar. 30, 2019, http://www.chinadaily.com.cn/a/201903/30/WS5c9e437fa3104842260b3613.html.

purportedly applied to the Estate paintings -- itself a major leap of an assumption -- are genuine. Without the benefit of physical inspection, that is not a conclusion an appraiser can legitimately make.

65.     Second, testimony from both John Wang and Arnold Chang undermine Mr. Regan's conclusion.  John Wang, who the Kings identified as a person with knowledge of C.C.'s seal collection who could authenticate a list of C.C.'s seals,[68] was unable to remember creating the "Freer List" Mr. Regan used to form his opinion.[69]  Despite admitting he was limited by the resolution of the photographs, Mr. Regan compared photographs of different resolution and quality with the Freer List to conclude with a "sufficiently high degree of confidence" that authentic C.C. seals were added to at least fourteen paintings.  R.R. at ¶ 42.  However, both Arnold Chang and John Wang testified that it would be far from ideal to compare photographs of paintings from different dates to determine the authenticity of the seals.[70]  In fact, when Arnold Chang was presented with pictures of some of the same paintings and asked to compare the seals on the paintings with the Freer List to determine if they were the same, he testified that "matching seals is not something that you can look at photos at two different resolutions, at two different sizes, and be certain that they are the same seal.  This is the nature of my business.  So I have to be very, very careful to never, based on this kind of photo, to never say that they are the same seal."[71]

66.     Third, as set forth in my initial report, art forgeries in China are a major problem.[72]  Further, C.C. Wang, through his daughter and a business partner in China, distributed

---

[68] Dkt. No. 179.
[69] July 25, 2019 Deposition of John Wang ("Wang Deposition") at 56:17-22.
[70] *See, e.g.,* Wang Deposition at 32:10-33:4.
[71] *See, e.g.,* June 20, 2019 Deposition of Arnold Chang ("Chang Deposition") at 174:16-177:12.
[72] *See, e.g.,* Linsner Report at n. 96.

high quality reproductions of artworks from C.C.'s collection over an extended period in China.[73]  Given their extensive reproduction of artwork from C.C.'s collection, it would not surprise me if "fake" collector's seals were added to the reproductions.  Without physically inspecting the artworks which Mr. Regan contends feature "new" seals, there is, in my opinion, no basis to issue conclusions regarding the genuineness of either the artwork in the photograph itself or of the purported seal.  Moreover, given modern digital reproduction technology and programs such as Photoshop, it is entirely possible in my opinion, that the photographs Mr. Regan relied upon are themselves doctored.  Without examining the actual artworks, there is simply no way to tell, and Mr. Regan's conclusions are simply unsupportable.

67.     It is my opinion that it is not reliable, based on the photographic evidence available, to issue any conclusive opinion that genuine C.C. Wang seals were applied to genuine former Estate owned artworks after they left the Estate's control based solely on photographs of C.C. Wang's seals and photographs of the purported artworks.  In my opinion, to issue that type of an opinion, the expert would need to examine the artwork to which the seal was added, as well as the known genuine seal, in person to even contemplate issuing such an opinion.  Mr. Regan did neither, and accordingly, his opinion is not credible.

## V.   The Alleged Exhibition of Former Estate-Owned Artworks at Museum Exhibitions In China

68.     Mr. Regan asserts that over a dozen of the 98 Paintings appeared at a 2009 exhibition at the Beijing Capital Museum entitled "Bao Wu Tang -- an Important Overseas Chinese Painting and Calligraphy Collection Exhibition" (the "Capital Museum Exhibition") and at an exhibition at the Poly Museum in 2010.  R.R. at ¶ 34.  I have examined the catalogs[74] from

---

[73] *See* June 27, 2019 Deposition of Yien-Koo King ("Y.K. Deposition") at 26:2-43:14; 74:25-78:9, 84:22-87:6, 87:22-88:12; PA-SCT-000003199.
[74] *See* AWSK_00001529; AWSK_00001608.

both exhibitions as well as a series of amateur videos produced in discovery by the Plaintiff

purportedly of the Capital Museum Exhibition.  The catalogs merely present images of images,

and provide no basis to conclude what if anything was in fact exhibited in the shows.  There is no

credible basis for Mr. Regan's assertion that whatever was exhibited -- if anything was exhibited

at all -- was in fact a genuine artwork that originated with the Estate.  I discussed issues of

forgery, reproduction of Estate artwork at length in my initial report, and that discussion further

supports my opinion in this regard.[75]  No source I have examined establishes that the objects

exhibited were the actual objects sold by the Estate, and not reproductions or forgeries.[76]

Kenneth Jay Linsner ASA,AAA,SCV

---

[75] *See* Linsner Report at ¶¶ 13-19; n. 96.
[76] *See, e.g.,* Chang Deposition at 155:17-156:13; 166:21-168:11; 178:15-179:11; 210:4-211:3 (Chang testified that it is impossible to determine if the images in the Bao Wu Tang book are images of Estate paintings).

## APPENDIX A – MATERIALS CONSIDERED

June 9, 2017 Deposition of Raymond King with Exhibits
June 11, 2019 Deposition of Mee-Seen Loong with Exhibits
June 12, 2019 Deposition of Alfreda Murck with Exhibits
June 14, 2019 Deposition of Elin Lake-Ewald with Exhibits
June 20, 2019 Deposition of Arnold Chang with Exhibits
June 25, 2019 Deposition of Andrew Wang with Exhibits
June 27, 2019 Deposition of Yien-Koo King with Exhibits
June 28, 2019 Deposition of Peter Schram with Exhibits
July 25, 2019 Deposition of John Wang with Exhibits

First Amended Complaint, Dkt. No. 36

American Society of Appraisers' Types of Value for Varied Intended Uses

Abigail R. Esman, China's $13 Billion Art Fraud – And What It Means For You, FORBES, Aug. 13, 2012, https://www.forbes.com/sites/abigailesman/2012/08/13/chinas-13-billion-art-fraud-and-what-it-means-for-you/#3cd611da2837.

Allison Trupp, Note, When the Rich Regret: The Case of Non-Payment in Art Auction Sales, 20 Cardozo J. of Conflict Resol.

APPRAISERS ASSOCIATION, *Definitions of Value*, https://www.appraisersassociation.org/index.cfm;jsessionid=8036EE99758C6399338C22AC800 70BE9.cfusion?fuseaction=document.viewDocument&documentid=1097&documentFormatId=1 858&vDocLinkOrigin=1&CFID=22066843&CFTOKEN=a4f05bfad3278b52-4DE62A32-1C23-C8EB-804B1865CCE9FE3E.

Artnet Intelligence Report (Andrew Goldstein and Julia Halperin, Fall 2018).

Arton.net

Artprice.com

Aybek Askhar, *Police to Crack Down on Fake Seals, Documents, Certificates*, CHINA DAILY, Mar. 30, 2019, http://www.chinadaily.com.cn/a/201903/30/WS5c9e437fa3104842260b3613.html.

Barbara Pollack, China's Growing Auction Giant, ARTNEWS, Oct. 21, 2013, http://www.artnews.com/2013/10/21/chinas-growing-auction-giant/.

Caitlin Randall, *China Sets New Record for Asian Art Auctions*, ASIAN CONVERSATIONS, Mar. 2014, http://www.asianconversations.com/ChinaArt.php.

CLARE MCANDREW, THE EUROPEAN FINE ART FOUNDATION, TEFAF ART MARKET REPORT 2014: THE GLOBAL ART MARKET, WITH A FOCUS ON THE US AND CHINA (2014).

CLARE MCANDREW, THE EUROPEAN FINE ART FOUNDATION, TEFAF ART MARKET REPORT: THE INTERNATIONAL ART MARKET 2007-2009 TRENDS IN THE ART TRADE DURING GLOBAL RECESSION.

Clare McAndrew, Chinese Art Market Rebounds to $8.5 Billion in 2013, ARTNET, Sept. 17, 2014, https://news.artnet.com/market/chinese-art-market-rebounds-to-85-billion-in-2013-83531.

Daniel Grant, Art Market Watch: Buyer's Remorse & the Auction Business, ARTNET

David Barboza, Graham Bowley and Amanda Cox, Forging an Art Market in China, N.Y. TIMES, Oct. 27, 2013, http://www.nytimes.com/2013/10/28/arts/design/chinas-counterfeit-art-boom.html.

Dkt. No. 179

Eileen Kinsella, The Chinese Art Market is Reviving But Nonpayments Increasingly Plague the Sector, Our Exclusive Auction Report Reveals, ARTNET, Aug. 9, 2018, https://news.artnet.com/market/auction-report-shows-chinese-market-rebounding-still-off-record-levels-1330379.

Enid Tsui, China Rises to No. 2 Art Market as Billionaires More Than Double in 2017, Closely Watching Report Says, S. CHINA MORNING POST, Mar. 14, 2018, https://www.scmp.com/culture/arts-entertainment/article/2137054/china-rises-no-2-art-market-billionaires-more-double-2017.

Georgina Adam, From Van Gogh to Richer – What Happens When Bidders Fail to Pay Up at Auction?, ART NEWSPAPER, Jan. 23, 2018, https://www.theartnewspaper.com/news/hammer-horror-as-bidders-won-t-pay-up.

Graham Bowley and David Barboza, An Art Power Rises in China, Posing Issue for Reform, CNBC, Dec. 16, 2013, https://www.cnbc.com/2013/12/16/an-art-power-rises-in-china-posing-issue-for-reform.html.

Graham Bowley and David Barboza, China's Biggest Art Auctioneer Resists Official Efforts to Reform the Market, S. CHINA MORNING POST, Dec. 23, 2013, https://www.scmp.com/lifestyle/arts-culture/article/1389040/chinas-biggest-art-auctioneer-resists-official-efforts-reform.

Heilbrunn Timeline of Art History, METROPOLITAN MUSEUM OF ART, https://www.metmuseum.org/toah/works-of-art/L.1997.24.1/.

Holland Cotter, C.C. Wang, 96, Art Collector and Artist Trained in China, N.Y. TIMES, July 9, 2003, https://www.nytimes.com/2003/07/09/arts/c-c-wang-96-art-collector-and-artist-trained-in-china.html.

Jan Dalley, Smoke and Mirrors, FIN. T., May 11, 2012, https://www.ft.com/content/90f856bc-98f6-11e1-9da3-00144feabdc0.

Jason Edward Kaufman, A 10th-Century Masterpiece Or Modern Fraud?, WALL ST. J., Dec. 13, 1999, https://www.wsj.com/articles/SB945047964455214525.

John Pomfret, *The Master Forger*, THE WASHINGTON POST, Jan. 17, 1999, https://www.washingtonpost.com/archive/lifestyle/magazine/1999/01/17/the-master-forger/e2a6cc6a-c60d-4abc-9d6a-c4540c0f1076/.

Judith H. Dobrzynski, 11 Major Chinese Paintings Promised to Met, N.Y. TIMES, May 19, 1997, https://www.nytimes.com/1997/05/19/arts/11-major-chinese-paintings-promised-to-met.html.

Liveauctioneers.com

Louisa Lim, In China's Red-Hot Art Market, Fraud Abounds, NPR, Oct. 10, 2011, https://www.npr.org/2011/10/10/141125011/in-chinas-red-hot-art-market-fraud-abounds.

Maxwell K. Hearn, *A Comparative Physical Analysis of Riverbank and Two Zhang Daqian Forgeries*, *in* METROPOLITAN MUSEUM OF ART, ISSUES OF AUTHENTICITY IN CHINESE PAINTING.

METROPOLITAN MUSEUM OF ART, ALONG THE RIVERBANK CHINESE PAINTINGS FROM THE C.C. WANG FAMILY COLLECTION (Maxwell K. Hearn and Wen C. Fong eds., 1999).

METROPOLITAN MUSEUM OF ART, ISSUES OF AUTHENTICITY IN CHINESE PAINTING (Judith G. Smith and Wen C. Fong eds., 1999).

METROPOLITAN MUSEUM OF ART, The Artist as Collector: Masterpieces from the C.C. Wang Family Collection (Aug. 6, 1999), https://www.metmuseum.org/press/exhibitions/1999/the-artist-as-collector-masterpieces-from-the-c-c-wang-family-collection.

Naomi Rovnick, *China's Art Sales Slump, But They Were Mostly Fake Anyways*, QUARTZ, Apr. 2, 2013, https://qz.com/69812/chinas-art-sales-slump-but-they-were-mostly-fake-anyways/.

Patrick Regan's FRCP 26(2)(B) Expert Report, dated October 11, 2019 (including appendices and supporting documentation)

PDFs of searches from Artrnet and Artprice (sent with this report on 12/16/2019)

POLY AUCTION, http://en.polypm.artron.net/.

The Heritage of Southeast Asia Important Singaporean Private Collections, available at: http://13.250.134.104/holly/site/media/hanmoguizong.pdf

Tim Schneider, *The Much-Hyped Chinese Art Market's Best Days May Already Be Gone, a New Study Says*, ARTNET, Mar. 15, 2019, https://news.artnet.com/market/tefaf-chinese-art-market-1488982.

Translation of Artron website.

Treasury Regulation Section 20.2031-1(b)

*Uniform Standards of Professional Appraisal Practice* (USPAP), 2018-2019, Washington DC: The Appraisal Foundation, 2018

Video clips of Capital Museum produced on May 21, 2019.

The Chinese Arts Auction Records.

AWSK_00000158
AWSK_00000229
AWSK_00000587

AWSK_00000914
AWSK_00001529
AWSK_00001608
AWSK_0000604
AWSK_00007404
AWSK_00007457
AWSK_00007572
AWSK_00007592
AWSK_00007700
AWSK_00008140
AWSK_00008179
AWSK_00008739
AWSK_00008856
AWSK_00014898
EWALD 00000099
EWALD_00000103
EWALD_00000210
EWALD_00000212
EWALD_00000214
EWALD_00000215
EWALD_00000221
EWALD_00000225
EWALD_00000228
EWALD_00000230
EWALD_00000232
EWALD_00000262
EWALD_00000308
EWALD_00000341
EWALD_00000342
EWALD_00000347
EWALD_00000348
EWALD_00000349
EWALD_00000353
EWALD_00000354
EWALD_00000355
EWALD_00000366
EWALD_00000522
EWALD_00000523
EWALD_00000923
EWALD_00000925
EWALD_00000983
EWALD_00001001
EWALD_00001287
EWALD_00001301
EWALD_00001316
KING 000221

KING 003147
KING 006601
KING 006604
KING 006946
KING 006952
KING 007189
KING 007200
KING 007361
KING 007375
KING 007571
KING7-000050
KING7-000053
KING7-000246
KING7-000470
KING7-000473
KING7-000554
KING7-000556
KING7-000558
KING7-000647
KING7-000660
KING7-000667
KING-SCT-000002748
KING-SCT-000003167
KING-SCT-000003216
KING-SCT-000006510
PA 000032
PA-SCT-000002192
PA-SCT-000002242
PA-SCT-000003199
Rose-SCT-00007324
Sotheby's 000620
WANG 001959
WANG_KING 00001066
WANG_KING_00000294
WANG000617
WANG000629
WANG000635
WANG000644
WANG000994
WANG001673
WANG001680
WANG002231
WANG002827
WANG003340
WANG003409
WANG003427

## APPENDIX B – DEPOSITION AND TRIAL TESTIMONY

*Rouse v. Elliot Stevens, Ltd.*, No. 13-CV-01443 (SN), 2016 WL 6520065 (S.D.N.Y. Nov. 3, 2016) (trial testimony)

*Timsit v. Circa Jewels, Inc., v. Fed. Ex. Corp.*, No. 502008CA021429XXXXMB-AF (Palm Beach County, FL, 2008) (deposition and trial testimony)

*People v. First Meridian Planning Corp.*, 86 N.Y.2d 608 (1995) (trial testimony)

*Issacs v. Comm'r*, 62 T.C.M. (CCH) 827 (T.C. 1991), Docket Nos. 31887-88, 32063-88 (trial testimony)

## APPENDIX C – CV

**EDUCATION**

| | | |
|---|---|---|
| New York University<br>Washington Square College | 1966-1970 | B.A. |
| New York University<br>Institute of Fine Arts | 1970-1973 | |
| New York University<br>Institute of Fine Arts<br>Conservation Center | 1970-1973 | |

**EXPERIENCE:  ACADEMIC**

| | | |
|---|---|---|
| New York University<br>Appraisal Studies Program | 1987-1994 | Founding Lecturer |
| New York University<br>Washington Square College | 1973-1987 | Research Associate |
| Long Island University<br>C.W. Post College | 1973-1974 | Associate Professor<br>Fine Art History |

**EXPERIENCE:  MUSEUM AND INTERNATIONAL**

| | | |
|---|---|---|
| The Heritage Arts Foundation<br>New Orleans, LA | 2002- | President |
| Maecenas World Patrimony<br>Foundation<br>Amsterdam, The Netherlands | 1998-2001 | Senior Consultant |
| Maecenas, B.V.<br>Amsterdam, The Netherlands | 1990-2001 | Appraiser of Record |
| Government of Romania | 1990-1994 | Appraisal Consultant |
| Republic of the Philippines | 1986-1990 | Appraisal Consultant |
| Imperial Palace Museum, Beijing<br>People's Republic of China | 1979-1985 | Consultant, Loan<br>Exhibitions |

| | | |
|---|---|---|
| The Brooklyn Museum of Art Department of Ancient Art | 1967-1973 | Consultant in Conservation |

**EXPERIENCE: BUSINESS**

| | | |
|---|---|---|
| Artstar.com (a division of Showstar Online, Inc.) | 1999-2000 | Content Coordinator Advisor |
| Art Services International Group | 1975- Date | Owner |

**SPECIAL DESIGNATIONS**

| | | |
|---|---|---|
| Department of The Treasury, United States Government, North Atlantic Region | 1983- | Qualified Source Under Contract (1983-2001) |
| Arbitration Association of America | 1989- | Arbitrator in Fine Arts |

**PROFESSIONAL SOCIETIES**

| | | |
|---|---|---|
| American Society of Appraisers | 1979- Date | Senior Member |
| Appraisers Association of America | 1977- Date | Member |
| International Society of Appraisers | 1983- Date | Senior Certified Valuer |
| American Institute for Conservation and Restoration of works of art | 1970-Date | Member |
| The National Arts Club New York, N.Y. | 2002 | Elected Member |
| The Salmagundi Club New York, N.Y. | 2018 | Elected Member |

C-2

### APPENDIX D – PUBLICATIONS AND SPEAKING ENGAGEMENTS

**Publications**
<u>Valuing Specific Assets in Divorce</u> – Feder, Rosoff & Tadri General Editors, Aspen Publications, New York, 2009-2017.

Advisor to "Introduction to Personal Property" and author of (5) separate chapters in the latest edition and supplements (2013) with additional parts in 2014, 2015, 2017 and 2018.

**Speaking Engagements**
"The Appraisal of Rare Books and Manuscripts" for IRS Contribution purposes, at The Grolier Club, New York, 2018

"Bullet-proofing Your Expert Testimony" at ASA Personal Property Conference, Houston, 2017

"The Role of the Appraiser as Expert in the European Union and the United States" comparisons and contradictions at ASA Personal Property Conference, Houston, 2017

"The Role of Condition in the Diminution of Value of Works of Art" at ASA International Conference, Boca Raton, 2016

"The Issue of Due Diligence in the Examination and Valuation of Works of Art" (panel) at ASA International Conference, Boca Raton, 2016

"The Appraisal of Robert Rauschenberg's Canyon for Estate Tax Purposes", legal and professional pitfalls at ASA, New York City Chapter Meeting, 2012

"The Art Market in Times of Turmoil" observations and strategies at National Arts Club, N.Y., 2011

"Legal Issues Surrounding the Use of Endangered Species in the Creation of Works of Art" at ASA, International Conference, Tampa, 2003