**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ x

YIEN-KOO KING, NORTHWICH       :
INVESTMENTS LTD., and SOON HUAT,   :
INC.       :
      :    Civ. Action No.: 1:14-cv-07694 (LJL)
      Plaintiffs,      :
      :
-against-       :
      :
ANDREW WANG, SHOU-KUNG WANG,   :
BAO WU TANG, JIAN BAO GALLERY,   :
ANTHONY CHOU, CHEN-MEI-LIN, WEI   :
ZHENG, YE YONG-QING, YUE DA-JIN   :
and JOHN DOES 1-9,       :
      :
      Defendants.     :
------------------------------------------------------ x

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.:  (212) 506-1700

*Attorneys for Defendant Andrew Wang*

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................. iii

PRELIMINARY STATEMENT ................................................................................. 1

COUNTER-STATEMENT OF UNDISPUTED FACTS ........................................... 4

The Estate's Tax Liability and Resulting Financial Pressure ................................. 6

The Sales of Estate Artwork ................................................................................... 7

The Sale of 14 Paintings to Yue Da-Jin .............................................................. 10

YK's Knowledge of the Sales of the 98 Paintings ............................................... 11

LEGAL ARGUMENT ............................................................................................ 11

I.     Plaintiff Fails To Demonstrate That She Is Entitled To Summary Judgment ................. 12

II.    The PA Was Aware Of And Approved Discounts To YDJ ................................. 12

III.   Plaintiff Fails To Make Out A Prima Facie Case For Breach Of Fiduciary Duty ........... 14

IV.   AW's Conduct Demonstrates He And The PA Appropriately Exercised
      Their Business Judgment ........................................................................... 16

      A.     AW Sought The "Highest Attainable Price" For All Estate Paintings
            By Seeking To Auction The Artwork At Sotheby's ............................................. 17

      B.     Results From The March 31, 2006 Sale Auction Of Estate
            Artworks Confirmed The Reasonableness Of The Fiduciaries'
            Pricing Scheme (As Acknowledged By The PA) ................................................ 17

      C.     AW And The PA Required All Proposed Sales Be Reviewed
            By An Independent, Third-Party Art Appraiser ................................................. 18

      D.     AW Sought, And Obtained, Prices Higher Than The Baseline
            Established By The PA ................................................................................ 19

      E.     The Estate's Financial Condition Required It To Sell Artworks ......................... 20

V.    The Purported Factual Bases For Plaintiff's Motion Are Irrelevant And Inaccurate .......... 20

      A.     The PA Was Aware Of, And Approved, AW's Efforts To
            Seek Prices Based On The Sotheby's Appraisal .............................................. 21

B. AW Did Not Represent To The PA That He Would Secure The "Highest Possible Price" For The 98 Paintings Or For The YDJ Paintings ............................................... 22

VI. Damages Are In Dispute ......................................................... 22

VII. Plaintiff's Failure To Address Defendants' Affirmative Defenses Mandates Denial Of Her Motion. ................................................... 24

VIII. Defendants' Affirmative Defenses Require Denial Of Plaintiff's Motion ...................... 25

A. Plaintiff's Breach Of Fiduciary Claim Is Untimely ............................... 25

B. Causation. ................................................................. 28

C. Unclean Hands / In Pari Delicto ........................................... 29

CONCLUSION ............................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acme Am. Repairs, Inc. v. Katzenberg*,
    2011 WL 3876971 (E.D.N.Y. Aug. 31, 2011)........................................................................30

*Am. Capital Fin. Services, Inc. v. Berry-Hill Galleries, Inc.*,
    2010 WL 4227307 (S.D.N.Y. Oct. 19, 2010).........................................................................24

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)................................................................................................................11

*Block 2829 Realty Corp. v. Community Preserv. Corp.*,
    148 A.D.3d 567 (1st Dep't 2017)...........................................................................................27

*Cifra v. G.E., Inc.*,
    252 F.3d 205 (2d Cir. 2001)....................................................................................................11

*Corcoran v. New York Power Auth.*,
    202 F.3d 530 (2d Cir. 1999)....................................................................................................27

*Cortlandt St. Recovery Corp. v. Hellas Telecom., S.a.r.l*,
    790 F.3d 411 (2d Cir. 2015)....................................................................................................28

*D.E. Properties Corp. v. Food for Less, Inc.*,
    859 S.W.2d 197 (Mo. Ct. App. 1993).....................................................................................25

*DiMeglio v. Vil. of Briarcliff Manor*,
    2010 WL 3664687 (S.D.N.Y. Sept. 17, 2010)........................................................................14

*In re Dix' Will*,
    34 Misc. 2d 421 (Sur. Ct. 1962).............................................................................................17

*In re Enron Corp.*,
    2007 WL 130865 (Bankr. S.D.N.Y. Jan. 16, 2007)................................................................24

*Matter of Estate of Kane*,
    98 A.D.2d 851 (3d Dep't 1983)..............................................................................................15

*In re Estate of Marino*,
    36 Misc. 3d 1215(A) (Sur. Ct. 2012)......................................................................................16

*Gitlin v. Chirinkin*,
    121 A.D.3d 939 (2d Dep't 2014).............................................................................................30

*Globaltex Group Ltd. v. Trends Sportswear Ltd.*,
   2010 WL 1633438 (E.D.N.Y. Apr. 21, 2010) ....................................................30

*Greenberg v. Joffee*,
   34 A.D.3d 426 (2d Dep't 2006) ....................................................29

*Hyber v. Hegeman Farms Corp.*,
   2 A.D.2d 922 (3d Dep't 1956) ....................................................24

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
   907 N.E.2d 268 (2009)....................................................26

*In re Integrated Resources, Inc.*,
   147 B.R. 650 (S.D.N.Y. 1992)....................................................17

*Katz v. Beil*,
   142 A.D.3d 957 (2d Dep't. 2016) ....................................................12

*Kennett v. Hopkins*,
   58 A.D. 407 (1st Dep't 1901) ....................................................17

*Kirschner v. KPMG LLP*,
   15 N.Y.3d 446 (2010) ....................................................29

*LNC Invs., Inc. v. First Fidelity Bank, N .A. New Jersey*,
   173 F.3d 454 (2d Cir. 1999)....................................................28

*In re Louis Frey Co., Inc.*,
   2007 WL 924206 (S.D.N.Y. Mar. 26, 2007) ....................................................29

*In re Lovell*,
   23 A.D.3d 386 (2d Dep't 2005) ....................................................16

*Mead v. Chesbrough Bldg. Co.*,
   151 F. 998 (2d Cir. 1907)....................................................17

*Moore v. Moore*,
   4 Sand Ch. 37 (N.Y. Ch. 1846)....................................................17

*Northbay Const. Co., Inc. v. Bauco Const. Corp.*,
   38 A.D.3d 737 (2d Dep't 2007) ....................................................28

*People v. DeAndressi*,
   146 A.D.2d 642 (2d Dep't 1989) ....................................................24

*Powers Mercantile Corp. v. Feinberg*,
   109 A.D.2d 117 (1st Dep't 1985) ....................................................27

iv

*Matter of Romano*,
    2005 WL 1553927 (Sur. Ct. June 29, 2005) .................................................................16

*Rule v. Brine*,
    85 F.3d 1002 (2d Cir. 1996) .........................................................................................11

*S. Waste Sys., LLC v. The City of Coral Springs, Florida*,
    687 F. Supp. 2d 1342 (S.D. Fla. 2010) .......................................................................25

*Seth v. Lakeden Realty Corp.*,
    17 Misc. 3d 1113(A) (Sup. Ct. Kings Cty. Oct. 12, 2007) ..........................................30

*Stache Investments Corp. v. Ciolek*,
    174 A.D.3d 1393 (4th Dep't 2019) ...............................................................................12

*In re Tr. under Art. Second of Will of Boyer*,
    35 Misc. 3d 1233(A) (Sur. Ct. 2012) .....................................................................15, 28

*United States v. Colasurdo*,
    453 F.2d 585 (2d Cir. 1971) .........................................................................................24

*United States v. Licht*,
    158 F.2d 458 (2d Cir. 1946) .........................................................................................24

**Statutes**

New York Surrogate's Court Procedure Act § 2103 .....................................................5

Local Rule 56.1 .........................................................................................................1, 3

N.Y. C.P.L.R. § 214(4) ................................................................................................25

New York Estates, Powers and Trusts Law §11-1.1 ...................................................15

Fed. R. Civ. P. 17(a)(3) ...............................................................................................28

Defendant Andrew Wang ("AW" or "Defendant") respectfully submits this memorandum of law in opposition to the motion of plaintiff Yien-Koo King ("YK"), in her capacity as Preliminary Executrix of the Estate of Chi-Chuan ("CC") Wang ("Plaintiff" or the "Estate"), for partial summary judgment on her breach of fiduciary duty claim against AW, and in support of his cross-motion for summary judgment on that claim.  Plaintiff's motion should be denied in its entirety.[1]

## PRELIMINARY STATEMENT

With her motion, Plaintiff seeks summary judgment on a claim that AW breached his fiduciary duty to the Estate in connection with a single sale of fourteen paintings that occurred in August 2009 to a buyer named Yue Da-Jin ("YDJ," and the transaction, the "YDJ Sale"). Plaintiff claims that, in connection with the YDJ Sale, AW failed to negotiate for the "highest attainable price"—but was instead seeking prices at a pre-determined benchmark—and simultaneously failed to disclose to his co-fiduciary, the Public Administrator for New York Count (the "PA") that he was not negotiating in that manner.  Plaintiff's motion has no basis in fact.  Documentary evidence, specifically, communications between and among AW, his attorney, and attorneys for the PA, affirmatively demonstrate that the PA was aware of, and directed, AW's negotiation of the YDJ Sale.  In fact, AW communicated an offer from YDJ to his attorney, who in turn communicated the offer to the PA.  In the same email, AW suggested a counter-offer by the Estate and requested the PA's approval to make the counter-offer.  The PA

---

[1] Defendant submits the Declaration of Thomas B. Kelly, dated April 13, 2020 ("Kelly Res. Dec.") and Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Undisputed Facts and Counterstatement, dated February 13, 2020 ("RES") in support of his opposition to Plaintiff's motion for partial summary judgment.  Defendant also refers to the Declaration of Thomas B. Kelly, dated February 14, 2020, Dkt. No. 202 ("Kelly Dec."), which was filed in support Defendants' motion for summary judgment.  Exhibits to the Kelly Dec. and the Kelly Res. Dec. are referred to as "Ex. __."  Exhibits attached to the Kelly Res. Dec. are numbered in continuation of those attached to the Kelly Dec., beginning with Ex. 92.  Defendant also submits the Declaration of Andrew Wang, dated April 13, 2020 ("AW Dec.").  Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment is referred to herein as "Pl. Mem.".

authorized AW to make the final counter-offer to YDJ.  AW did not fail to disclose anything regarding negotiations with YDJ to the PA.  He communicated YDJ's offer to the PA and made a counter-offer to YDJ at the direction of the PA.  The PA's direction to AW to make the counter-offer ultimately accepted by YDJ belies any contention that the PA was unaware of the nature and substance of negotiations with YDJ.

Moreover, Plaintiff fails to make out a *prima facie* case for summary judgment.  Even if Plaintiff's version of the facts were correct, which it is not, her description of AW's fiduciary duties—specifically, her contention that AW possessed a duty to negotiate for the "highest attainable prices"—has no basis in law.  There is no general duty for a fiduciary to seek the "highest attainable prices" when selling estate assets.  Rather, management of the sales of estate assets, including setting prices and accepting offers, are decisions that lie, unequivocally, within the business judgment of the executor.  Any contention that an executor failed to obtain an appropriate price for estate assets requires a factually intensive assessment of whether the executor acted negligently or without the prudence of an ordinary man.  Plaintiff does not contend that AW was in any way negligent in connection with the YDJ Sale, and presents no evidence that would support a finding, on a motion for summary judgment, that he was.  To the contrary, AW acted with diligence and prudence in connection with the YDJ Sale.

Plaintiff's additional contention that there is no dispute as to the amount of the Estate's purported damages is also wrong.  Plaintiff's damages expert's opinion is—as AW's expert Kenneth Linsner opined—deeply methodologically flawed.  Among other faults, Plaintiff's expert relied upon purported auction results from mainland Chinese auction houses to support his valuation, while admitting in his deposition that those results are unreliable.  Moreover, Mr. Linsner affirmatively opined that the process undertaken by the Estate to sell artworks was

reasonable and that the Estate suffered no damages in connection with any sales of Estate assets. Thus, the assertion that there is no dispute over damages in this action is baseless. Moreover, of course, it is well-established law that questions of damages belong to the jury to weigh and decide after having the benefit of testimony from both parties' experts and cross-examination by opposing counsel.

Next, in her motion, Plaintiff failed entirely to address any of the 26 affirmative defenses pleaded by AW. Not one. Plaintiff's failure to address pending affirmative defenses, in itself, requires that her motion be denied.

Finally, simultaneous with this opposition, Defendant has filed a motion to strike Plaintiff's Local Rule 56.1 statement. As detailed therein, Plaintiff's 56.1 statement is improper. Plaintiff's 93 page, 374 paragraph statement is the opposite of "short and concise" as required by the Rule. The statement is also larded with irrelevant "facts" concerning claims and issues not before the Court on this motion—including pages upon pages of "facts" that Plaintiff acknowledges in the statement concern her RICO claims, among other irrelevant material. Further, Plaintiff relies extensively upon her own declaration to support her motion. Plaintiff's credibility, though, is squarely at issue in this action, and thus her declaration is legally insufficient to support summary judgment. Finally, Plaintiff relies extensively on a declaration of the current Public Administrator, Dahlia Damas, to support her motion. Ms. Damas's declaration states on its face that she lacks personal knowledge of the events at issue in this case. Accordingly, that declaration is legally irrelevant and is not admissible to support summary judgment.[2]

---

[2]  With this motion, Defendant cross-moves for summary judgment based on its statute of limitations and causation defenses. Defendant moved on these same defenses in its own motion for summary judgment and re-asserts them here to avoid any doubt or confusion that Plaintiff's theory here—which had not previously been advanced—is addressed.

For these reasons, and for additional reasons, set forth herein, Plaintiff's motion should be denied.

## COUNTER-STATEMENT OF UNDISPUTED FACTS

CC Wang was an internationally known collector and connoisseur of classical Chinese painting and calligraphy.  (Ex. 1 at ¶ 3.)  CC was the father of YK and SK, and the grandfather of AW (who is SK's son).  (Ex. 2 at ¶ 2; Ex. 3 at ¶ 15.)  Even prior to CC's death, the Wang family was fragmented by a rivalry between, on the one side, YK (ultimately joined by her husband Kenneth King ("KK" and together with YK, the "Kings")), and on the other side, SK (with AW and other family members).

When CC died in July 2003, the rivalry exploded into a scorched-earth battle over CC's Estate that continues in the Surrogate's Court of the County of New York (the "Surrogate's Court") to this day.  Upon CC's death, the siblings submitted competing wills for probate.  SK submitted a will dated February 18, 2003 (the "2003 Will") and a codicil dated February 10, 2003 (the "2003 Codicil"), and YK submitted a will dated June 13, 2000 (the "2000 Will").  (Ex. 1 at ¶ 4; Exs. 5-6.)  Since the outset of the Surrogate's Court proceedings, and continuing through to the present, the parties have accused each other of fraud, undue influence, and outright theft concerning hundreds of artworks from the Estate valued at millions of dollars.

In August of 2003, the Surrogate's Court, per the terms of the 2003 Will, issued Letters Testamentary to AW and appointed him Preliminary Executor of the Estate.  (Ex. 7.)  Given YK's challenge of the 2003 Will, the Surrogate's Court simultaneously issued Letters of Temporary Administrator to Ethel Griffin, Public Administrator of the County of New York (the "PA"), and appointed her as the Estate's Temporary Administrator, and, along with AW, co-fiduciary.  (*Id.*)  In the face of dueling accusations between "the warring family factions," the

Surrogate's Court directed the PA to investigate the allegations made by the various family members concerning CC's art collection.  (Ex. 1 at ¶ 7.)

On October 21, 2003, the PA commenced a proceeding under the New York Surrogate's Court Procedure Act § 2103 against YK, KK, SK, and AW to recover Estate assets from the parties (the "SCPA Proceeding").  (Ex. 9.)  To facilitate the PA's efforts, on October 23, 2003, the Surrogate's Court issued an order restraining YK, KK, AW, SK and certain others from selling, transferring, encumbering, leasing, consigning, or otherwise disposing of artwork and other personal property belonging to the Estate, subject to disputes over ownership, or alleged to have been gifted by CC to either SK, YK, or others (the "TRO").  (Ex. 10.)

Despite consenting to the TRO, Ex. 1 at ¶ 9, the Kings "impeded" the PA's efforts to "inventory and appraise all estate property," by refusing to relinquish custody of scores of artworks to the PA.  (Ex. 2 at ¶ 7.)  As of December 2003, the Kings were "in possession of some 75 works of art which they concede[d] belong[ed] to the [E]state."  (Ex. 2. at ¶ 6.)  The Kings also admitted to being in possession of 93 paintings which once belonged to CC, but for which they claimed were, at the time of CC's death, owned by either Northwich Investments Limited ("Northwich") or Soon Haut Inc. ("Soon Haut"), two offshore corporations purportedly owned by the Kings.[3]  (Ex. 2 at ¶ 6; Ex. 124 at ¶ 12; Ex. 3 at ¶¶ 13-14.)  Because of the Kings' "continued refusal to deliver to the co-fiduciaries artwork which belongs to the estate," the PA considered the Kings "'*de facto*' fiduciaries" and advised the Surrogate's Court that they "should be held personally liable for any loss or destruction to the artwork and for interest and penalties

---

[3]  Despite claiming ownership of Northwich and Soon Haut, when the Kings filed for bankruptcy in 2007, their accompanying schedules of assets and liabilities did not disclose ownership of either company.  (Ex. 85; Ex. 76 at 4-8, 21, 86.)

imposed for the underpayment of estate taxes" resulting from their malfeasance.[4]  (Ex. 2 at ¶ 11.)
Plaintiff's husband has admitted to selling artwork subject to the TRO which he and YK held as
"*de facto* fiduciaries."  (Ex. 94 at 62:19-64:17.)  Plaintiff's sales of these Estate artworks led the
Surrogate's Court to revoke virtually all of her authority as Preliminary Executrix.  By order
dated February 11, 2019 (the "Revocation Order"), the Surrogate's Court revoked Plaintiff's
rights and authorities as Preliminary Executrix for all purposes except prosecution of this action,
pending resolution of a petition to permanently remove her as executrix.  (Ex. 84 at 3.)  The
Court based the revocation on allegations by SK that Plaintiff sold six works of art belonging to
the Estate—works she was holding as a *de facto* fiduciary—for a total of $34,112,250 in
violation of the TRO and for advancing legal positions as executrix that were in her personal
interest, but were inimical to the interests of the Estate.  The court held that YK failed to
"present[] 'documentary evidence'"—or the artwork itself—"that would constitute a defense to
the allegation that she is unfit to serve as preliminary executor."  (Ex. 84 at 3.)

**The Estate's Tax Liability and Resulting Financial Pressure**

In October 2004, the Estate filed its estate tax returns pursuant to which, net of prior
payments, the Estate owed approximately $5,500,000 in federal and state taxes.[5]  (*See* Ex. 15;
Ex. 19).  In addition to these debts, the Estate faced administrative expenses, including legal fees
and fees to store and insure the Estate-owned artwork and other possessions.  (Ex. 8 at 20:19-
21:10; Ex. 11 at ¶ 10.)  Financial pressure on the Estate increased exponentially in 2007, when

---

[4]  In February 2011 the law firm of Pryor Cashman LLP ("Pryor Cashman") was retained as special counsel by the PA to assist in the prosecution of the SCPA Proceeding, and in particular to help ascertain whether AW, SK, YK or KK violated the TRO.  (Ex. 123 at ¶¶ 2, 11.)  Pryor Cashman concluded that the YK not only violated the TRO, but maliciously continued Estate litigation "to direct attention away from the devastating admissions of her violations of the TRO."  (Ex. 123 at ¶¶ 7, 38.)

[5]  Despite her claims to the contrary, YK's counsel Randolph Harris of McLaughlin & Stern, LLP was provided access to the Estate's tax return, and reviewed it on June 29, 2006.  (Ex. 29 at M&S_00000016.)

the IRS issued a Notice of Deficiency to the Estate claiming an additional $22,529,000 was owed in federal estate taxes.  The IRS's claim was largely based on YK's claim, disputed by the Estate, that CC gifted her at least $18 million worth of artwork during his lifetime on which no gift taxes were ever paid.  (Ex. 23 at AWSK_00000229, 238.)

**The Sales of Estate Artwork**

The PA determined "the Estate needed to sell whatever artwork it could to be in a position to pay estate taxes and other administration expenses."  (Ex. 11 at ¶ 10; Ex. 8 at 23:22-25:3.)  To that end, the PA engaged Sotheby's to appraise the artworks, as of the date of CC's death in 2003, for estate tax purposes (the "Sotheby's Appraisal").[6]  (Ex. 13.)  The Sotheby's Appraisal, drawn at Fair Market Value for estate tax purposes, assigned an aggregate appraised value—as of the date of CC's death—of $4,400,350 to the 133 classical period artworks.[7]  (Ex. 13 at Sotheby's 000620-622.)

AW and the PA attempted to sell all of the Estate-owned artwork via auction at Sotheby's, but Sotheby's was only willing to accept the 39 "best" pieces for sale.  (Ex. 11 at ¶ 10; Ex. 13.)  At the Sotheby's auction, a few pieces sold above the Sotheby's Appraisal valuation, several sold for less, and five failed to obtain bids sufficient to meet the reserve and remained unsold.  (Ex. 11 at ¶ 13.)  According to counsel for the PA, the results of the Sotheby's auction are the "best indicator that the Sotheby's appraisal values were accurate – and [were] an appropriate barometer to be relied upon by the Public Administrator" in connection with the sales of the remaining works (the "98 Paintings").  (*Id.* at ¶ 13.)

---

[6]  YK, through her counsel, recommended that the Estate engage Sotheby's to appraise the Estate's artwork due to its affiliation with Arnold Chang, a long-time student of CC's who was intimately familiar with the Estate's art collection.  (Ex. 2 at PA-SCT-000002251; Ex. 24 at Rose-SCT-00007325; Ex. 25 at 14:18-17:8.)

[7]  The Sotheby's Appraisal was reviewed by the IRS's Art Appraisal Committee and was accepted for tax purposes pursuant to a letter from Karen E. Carolan, Chief Art Appraisal Services, to the Estate, dated February 13, 2007.  (Ex. 28.)

Sotheby's advised the PA that Asia was the appropriate market for the remaining artwork. Given AW's background with the Chinese art market, the PA requested that he attempt to find private buyers for the artwork in Asia. (*Id.* at ¶ 11.) While AW is a "specialist" with regard to classical Chinese paintings (*i.e.*, he is qualified to determine whether a painting is authentic), he has never held himself out as an "expert" in their valuation. (Ex. 22 at 28:21-29:5; Ex. 125 at 521:2-26.)

To ensure the Estate received fair prices for the artwork, prior to AW approaching potential buyers, the PA and AW agreed upon a set of procedures to govern the sales. (Ex. 11 at ¶ 11.) If a buyer was found by AW, the proposed sale would be submitted in writing to the PA and would be reviewed by a second, independent art expert retained by the PA (O'Toole-Ewald Art Associates, Inc., "OTE"). (*Id.*) The PA required all sales prices to be at least 20% higher than it was valued by Sotheby's, unless OTE's review indicated that an exception was warranted.[8] (*Id.*) While OTE reviewed the proposed sales, OTE did not approve or reject sales prices and was not the arbiter of whether sales would take place. The PA made all decisions as to whether to approve sales, and to what extent to take OTE's comments on the prices into account, in connection with the sales. When submitting offers, the PA required that AW provide the Sotheby's Appraisal value of each painting so that there would be no confusion as whether the offer satisfied her benchmark. (Ex. 31.) According to counsel for the PA, this procedure was followed by AW and the PA for the sales of "every one" of the 98 Paintings. (*Id.* at ¶ 12.) AW had no authority to sell the artworks. AW negotiated to the best of his ability, as directed by the

---

[8] The target price of 20% above the Sotheby's Appraisal value was approved of by Arnold Chang as a reasonable measure of fair value for the artworks. (Ex. 44 at EWALD_00000215.)

PA, to secure offers for the artwork based on the benchmark value for approval established by the PA and current market conditions.  (AW Dec. at ¶ 21.)

Further, it was the Estate's goal to sell the 98 Paintings in groups so as to raise funds quickly and to reduce the administrative and legal fees that would be incurred if the Estate sold the artworks individually.  When buyers purchase in bulk, with art as with anything, they expect to receive some discount in consideration for the large purchase.  Even with these expectations from the buyers, AW secured bulk prices for the artworks that in general met or exceeded the PA's 20% benchmark.  Other factors further hampered the Estate's ability to sell the artwork to private buyers in Asia.  Because the buyers lived in China, it was essentially impossible for them to come to New York to physically inspect and authenticate the artworks that were for sale prior to purchase.  Regardless, the Estate required payment by the buyer before any artwork could be shipped.  The buyers perceived this as a significant risk in transactions that ran into the millions of dollars.  This further impeded the Estate's ability to sell the artwork.  (AW Dec. at ¶ 23.)

Between 2005-2009, the Estate sold the 98 Paintings in six groups to five buyers.  In connection with the sales, the offers conveyed to the PA were, on a per painting basis, regularly and routinely for 20% more than the Sotheby's Appraisal value.  (Ex. 32; Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 54; Ex. 58; Ex. 62; Ex. 65.)  Thus, the pattern of offers presented by AW made clear to the PA, and to all involved, that AW was seeking prices for the 98 Paintings at or around 20% - 30% higher than the Sotheby's Appraisal values.  (*Id*; AW Dec. at ¶ 17.)  Neither the PA, nor Lake-Ewald, expressed any concern that the pattern of offers conveyed indicated a failure by AW to discharge his fiduciary duties to the Estate, or any other impropriety for that matter.  (Ex. 11 at ¶¶ 11-12; Ex. 8 at 14:13-15:5; AW Dec. at ¶ 20.)

Nearly all of the 98 Paintings ultimately sold for at least 20% more than the Sotheby's Appraisal value.  (*See* Ex. 33; Ex. 55; Ex. 59; Ex. 72.)  Of note, in four instances AW negotiated for prices that were at least 30%—and in one case 50%—higher than the Sotheby's Appraisal value.  (*See* chart *infra* at Section IV.d.)  Ultimately, the PA approved each of the sales of the 98 Paintings.  (Ex. 8 at 14:13-15:5.)

**The Sale of 14 Paintings to Yue Da-Jin**

The only transaction at issue in Plaintiff's motion is the August 2009 sale of 14 paintings (the "14 Paintings") to YDJ.  (Pl. Mem. at 4.)  A potential sale to YDJ first arose in the spring of 2008.  In April 2008, AW's attorney, Martin Klein, submitted a proposal to the PA's counsel, Peter Schram, to sell the 14 Paintings to YDJ for $538,800.00.  (Ex. 40.)  Ms. Lake-Ewald reviewed the proposed sale, and the PA approved it.  At some point after the approval, however, YDJ, backed out of the sale.  In February 2009, YDJ re-approached the Estate seeking to purchase the same 14 Paintings, but only if if the Estate would provide a 20% discount off the prices that had been discussed in 2008.  (Ex. 75 at AWSK_00015264.)  AW conveyed YDJ's offer to Klein and suggested that the Estate make a counter-offer of a 10% discount.  (*Id.*).  Klein then forwarded AW's email to Schram, asking Schram to "[p]lease advise whether Andrew can give the 10% discount that the buyer is requesting."  (*Id.*)  Schram responded, "Yes."  (*Id.*)  YDJ agreed to the Estate's counter-offer.  The sale was approved by the PA and consummated in August 2009 on terms that discounted sales prices from 1% to 37% (though generally 8%) of the prices previously approved.  (Ex. 40; Ex. 52 at WANG000648-649.)  The YDJ Sale took place in the midst of the worldwide financial crisis that commenced in 2008.  The financial crisis created great uncertainty and caused AW concern for the Estate's ability to sell artwork in the future. (AW Dec. at ¶ 26.)

**YK's Knowledge of the Sales of the 98 Paintings**

On December 15, 2010, YK's then-attorney, Martin Garbus, sent a letter to Schram expressing concern as to whether the sale of Estate paintings were "appropriately sold" because "many paintings that [YK] believes are Estate paintings are circulating throughout the world" and "yet the Estate has so little cash." (Ex. 111 at KINGPROD5 - 00783.) Despite her "concern" YK waited until May 9, 2011 before filing a Petition for a Compulsory Limited Accounting And Related Relief Under SCPA 2205 and 2206 ("Petition for Accounting"). (Ex. 71.) In the Petition for Accounting, YK alleged that she "has reason to believe that some or all of [the 98 Paintings] have been sold without obtaining full market value, without proper accounting to the PA and/or the estate, and otherwise by reason of improper, unauthorized unilateral acts of Mr. Wang." (Ex. 71 at ¶ 8(g).)

## LEGAL ARGUMENT

On this motion, Plaintiff bears the "burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [her] to judgment as a matter of law." *Rule v. Brine,* 85 F.3d 1002, 1011 (2d Cir. 1996). By contrast, to survive this motion, Defendant "need only present evidence from which a jury might return a verdict in [his] favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986). The Court "must resolve all ambiguities, and credit all factual inferences that could rationally be drawn," in Defendant's favor. *Cifra v. G.E., Inc.,* 252 F.3d 205, 216 (2d Cir. 2001). "[A]ssessments of credibility[,] choices between conflicting versions of events," and "[a]ny weighing of evidence [are] the prerogative of the finder of fact, not an exercise for the court on summary judgment." *Brine,* 85 F.3d at 1011. "'It is ... well established that [a summary judgment] motion should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues

11

of credibility.'" *Katz v. Beil*, 142 A.D.3d 957, 964 (2d Dep't. 2016); *see Stache Investments Corp. v. Ciolek*, 174 A.D.3d 1393, 1395 (4th Dep't 2019).  Plaintiff fails to meet her burden.

## I.       Plaintiff Fails To Demonstrate That She Is Entitled To Summary Judgment

With her motion, Plaintiff seeks judgment solely in connection with the YDJ Sale—a single transaction through which the Estate sold fourteen artworks for $489,772 on August 17, 2009.  (Pl. Mem. at 4.)  Plaintiff claims AW breached his fiduciary duties to the Estate in connection with the YDJ Sale.  (Pl. Mem. at 26-28.)  In her motion, Plaintiff describes the substance of AW's purported fiduciary duties, and his purported breach of those duties, variously as failing to "disclose that he was playing no role 'at all' in negotiating with any buyers to achieve the highest possible price for Estate assets" and failing to seek the "highest attainable prices" in connection with the YDJ Sale.  (Pl. Mem at 27, 30.)  Plaintiff further claims that there is no question of fact as to whether the Estate was damaged by the YDJ Sale nor as to the amount of damage the Estate suffered because, she claims, her damages expert's opinion is undisputed. As set forth herein, Plaintiff fails to meet her burden to demonstrate she is entitled to summary judgment, and her motion should be denied.

## II.      The PA Was Aware Of And Approved Discounts To YDJ

While there are significant issues with Plaintiff's characterization of AW's fiduciary duties in connection with the sales of Estate-assets, described below, the factual premise of Plaintiff's claim—that AW failed to disclose to the PA that he was not seeking the "highest attainable price" from YDJ—is belied by documentary evidence showing the PA participated in AW's negotiations with YDJ and even approved extending discounts (off of earlier negotiated prices) to YDJ to consummate the sale.  Simply put, the PA was aware of the prices AW offered YDJ and approved specific discounts—to the extent those prices were not the "highest attainable

price" for the artwork, the PA was aware.  If anything, documentary evidence demonstrates that, in connection with the YDJ Sale, the PA, not AW, controlled the final negotiations with YDJ.

Negotiations over a sale to YDJ commenced in the first half of 2008.  Proposed sales prices were reviewed by Ms. Lake-Ewald and the PA by May 2008.  (Ex. 128 at WANG002253.)  YDJ, however, backed out of the sale.  Months later, on February 26, 2009, AW conveyed to his attorney, Klein, that YDJ had re-approached AW and extended an offer to purchase the same group of paintings if the Estate would provide a 20% discount.  (Ex. 75 at AWSK_00015264.)  AW informed Klein of the offer by e-mail and suggested that the Estate make a counter-offer of a 10% discount.  (*Id*.).  Klein forwarded AW's email to the PA's attorney Schram, and asked "Please advise whether Andrew can give the 10% discount that the buyer is requesting."  (*Id.*)  Schram responded, "Yes."  (*Id.*)  The sale was then approved by the PA and consummated in August 2009 on terms that discounted sales prices from 1% to 37% (though generally 8%) of the prices previously approved.  (Ex. 40; Ex. 52 at WANG000648-649.)  Notably, two of the works included in the YDJ Sale were put up for sale in the Sotheby's March 2006 auction and failed to sell, even for the Sotheby's Appraisal values.  (Ex. 40 at KING 007362-363.)

These communications belie Plaintiff's contention that AW "failed to disclose" that he was not seeking the "highest attainable price" from YDJ, or anything, to the PA, because the PA approved of AW's offer to the buyer.  Prior to the sale, AW informed the PA that YDJ asked for a discount and suggested that the Estate make a counter-offer of a lesser discount.  Rather than tell AW to go seek some other "highest attainable price" (whatever that means) or to reject YDJ's offer out-of-hand, the PA approved conveying a counter-offer to the buyer.  The PA's approval of the prices AW offered to YDJ prior to AW extending the offer affirmatively

contradicts Plaintiff's contention that AW failed to disclose that was not seeking "the highest attainable price" from YDJ.  The PA was aware of the specific prices and the nature of the negotiations with YDJ.  Plaintiff's motion should be denied on this basis.

### III.    Plaintiff Fails To Make Out A Prima Facie Case For Breach Of Fiduciary Duty

Plaintiff also fails to make out a *prima facie* case for breach of fiduciary duty.  On a motion for summary judgment, it is the movant's burden to make out a *prima facie* showing for entitlement to judgment as a matter of law, and failure to do so warrants denial of the motion. *DiMeglio v. Vil. of Briarcliff Manor*, 2010 WL 3664687, at *4 (S.D.N.Y. Sept. 17, 2010).  Here, the purported fiduciary duty Plaintiff claims AW breached—a duty to negotiate for the "highest attainable price" when selling estate assets—does not exist; and, AW's purported misconduct— seeking specific prices for Estate artworks that he and his co-fiduciary agreed were presumptively reasonable—did not breach any duty to the Estate.  Because Plaintiff fails to make out a *prima facie* case for breach of fiduciary duty, her motion must be denied.

Plaintiff claims that AW breached a purported fiduciary duty as a preliminary executor of the Estate to achieve the "highest attainable price" when selling Estate artwork because he sought specific prices for Estate asset—20% above earlier appraised values—that he and his co- fiduciary, the PA, agreed, *ex ante*, were reasonable.  (Pl. Mem. at 27, 30.)  But an estate executor does not have a fiduciary duty to achieve, or to negotiate for, the "highest attainable price" when selling estate assets.  Rather, the manner by which sales of estate assets are conducted is left to the business judgment and discretion of an executor, and an executor acts within his discretion when he seeks a specific price for an estate asset that he, or he and his co-fiduciary, believe is reasonable.  Thus, even if Plaintiff's version of events was accurate, which it is not, a purported failure to not seek the highest attainable price for estate assets is not a breach of fiduciary duty.

14

An executor's fiduciary duties to an estate are described in the New York Estates, Powers and Trusts Law ("EPTL').  Pursuant to EPTL Section 11-1.1 (Fiduciaries' Powers), "fiduciaries are granted broad powers in the administration of decedents' estates."  *In re Accounting ex rel. Pub. Adm'r of Kings Cty.*, 2011 WL 7090742, at *4 (Sur. Ct. Nov. 30, 2011).  These include the power to sell Estate assets "at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein."  EPTL 11-1.1.  In connection with the sale of estate assets, an executor "is obligated to use their business judgment[.]"  *In re Tr. under Art. Second of Will of Boyer*, 35 Misc. 3d 1233(A), at *3-4 (Sur. Ct. 2012).  "Where fiduciaries are given authority to sell a decedent's property, decisions as to the time and manner of such sales involve questions of pure business judgment with which the surrogate's courts are reluctant to interfere."  *Id.*  Similarly, questions such as whether to list a property for sale and "the proper list and sale price" fall within the scope of decisions left to an executor's business judgment.  *Id.*  A fiduciary's duties in connection with the sale of estate assets does not include a general "duty to negotiate," and a purported failure to negotiate does not evidence a breach.  *See Matter of Estate of Kane*, 98 A.D.2d 851, 852 (3d Dep't 1983) (finding that a fiduciary satisfied her obligations when estate property "was neither advertised for sale, nor listed with a realtor," and was sold "without negotiation to the first prospective purchaser," who knew the co-administrators "in either a personal and/or professional capacity").[9]  Given the discretion accorded to executors in connection with sales of estate assets, "[a]bsent extraordinary circumstances, [a] court will not intervene to substitute its judgment for the business judgment of a fiduciary."  *In re Estate of Marino*, 36 Misc. 3d 1215(A), at *4 (Sur. Ct. 2012).

---

[9]  Of course, contrary to Plaintiff's contention regarding breach of a "duty to disclose"—while that "duty" is itself a contrived repackaging of the alleged substantive duty to negotiate the highest possible prices—if no underlying duty to negotiate the highest prices exists, there can be no "duty to disclose" that one is allegedly failing to discharge that duty.

AW's purported failure to negotiate for the "highest price possible" in the YDJ Sale is, as a matter of law, not sufficient to establish a breach of fiduciary duty.  To the extent a party seeks to challenge the sales price realized for estate assets, "it is not enough for the contestants to show that the representatives of the estate did not get the highest price obtainable; it must be shown that they acted negligently, and with an absence of diligence and prudence which an ordinary man would exercise in his own affairs."  *In re Lovell*, 23 A.D.3d 386, 387 (2d Dep't 2005) (quotations and citations omitted); *see Matter of Romano*, 2005 WL 1553927, at *13 (Sur. Ct. June 29, 2005) (citing *Matter of Brower*, 71 Misc. 398, 400 (Sur. Ct. 1911)) (same).

AW's purported misconduct—that he allegedly "failed to disclose he was playing 'no role' at all in negotiating with any buyers to achieve the highest possible price for the Estate's assets" and instead "relied on the Sotheby's appraisal to establish prices"—is in fact the type of decision making and conduct that, on its face, is left to the discretion of a fiduciary.  It is, on its face, not a breach of fiduciary duty; and Plaintiff fails to make out a *prima face* case and thus her motion should be denied.

## IV.    AW's Conduct Demonstrates He And The PA Appropriately Exercised Their Business Judgment

Summary judgment should also be denied because the evidence demonstrates that, in fact, AW diligently and appropriately exercised his business judgment in connection with the YDJ Sale.  The question of whether a fiduciary adequately discharged his fiduciary duty is for a trier of fact and should not be resolved on summary judgment.  *See e.g., In re Dix' Will*, 34 Misc. 2d 421, 427 (Sur. Ct. 1962); *see also In re Integrated Resources, Inc*., 147 B.R. 650, 656 (S.D.N.Y. 1992) ("a ruling on the applicability of the business judgment rule is peculiarly a question of fact") (quoting *FSLIC v. Musacchio*, 695 F. Supp. 1053, 1064 (N.D. Cal. 1988)). The facts demonstrate that AW acted prudently.

A.    **AW Sought The "Highest Attainable Price" For All Estate Paintings
By Seeking To Auction The Artwork At Sotheby's**

Contrary to Plaintiff's contention, Defendant did in fact seek out the highest price

possible for the paintings ultimately sold to YDJ, and all Estate paintings.  Prior to ever seeking

private buyers, AW and the PA sought to sell all Estate-owned artworks, which included the

artworks ultimately sold to YDJ, at auction at Sotheby's.  As early as June 2004, AW and the PA

entered negotiations with Sotheby's to appraise and auction all of the Estate's artwork, including

the YDJ Paintings.  (Ex. 11 at ¶ 10.)  The law is plain: "[a]uction sales are held for the purpose of

obtaining for the property sold the highest price which public competition will produce[.]"

*Kennett v. Hopkins*, 58 A.D. 407, 415 (1st Dep't 1901).  "The presumption is that the price

[received] on a sale at public auction … is the true value," *Moore v. Moore*, 4 Sand Ch. 37, 43

(N.Y. Ch. 1846), and "this presumption is almost conclusive."  *Mead v. Chesbrough Bldg. Co.*,

151 F. 998, 1004 (2d Cir. 1907).  Plaintiff's expert, Patrick Regan, also expressed the view that

auction is the most appropriate venue to secure the highest possible price for artwork, stating in

his expert report that:  "the most likely and appropriate marketplaces for classical Chinese

paintings are at auctions in China and New York … because auctions are where the best and

highest prices for these works are usually achieved."  (Ex. 90 at ¶ 21.)  Accordingly, Plaintiff's

contention that AW failed to seek the "highest attainable price" for the 14 Paintings, or any

paintings, is wrong.  Even though he was not under a duty to do so, AW's efforts to sell the work

at auction shows that he did in fact seek the highest attainable prices or the Estate artwork.

B.    **Results From The March 31, 2006 Sale Auction Of Estate Artworks
Confirmed The Reasonableness Of The Fiduciaries' Pricing Scheme
(As Acknowledged By The PA)**

Though AW and the PA sought to consign all of the Estate's classical artworks,

Sotheby's was only willing to accept what it considered the 39 "best" of those artworks for

17

auction.  (Ex. 11 at ¶ 10.)  These works were auctioned by Sotheby's on March 31, 2006.  (*Id.*)
Though nearly three years after the July 2003 date of the Sotheby's Appraisal, the auction failed
to result in consistently higher prices than the value at which the artworks were appraised to be
worth as of July 2003.  (Ex. 11 at ¶ 13.)  The auction resulted in (i) five Estate artworks works
failing to obtain bids sufficient to meet the reserve prices and remained unsold; (ii) seven sales
below the low estimate, i.e., below the "time of death" appraised value from the Sotheby's
Appraisal; (iii) eight sales above the high estimate; and (iv) one sale within the estimated range.
(Ex. 11 at ¶ 13.)

In the words of the PA's attorney, Peter Schram, the results of the Sotheby's Auction
were (and are):

> [T]he best indicator that the Sotheby's appraisal values were accurate – and an
> appropriate barometer to be relied upon by the Public Administrator.  An
> examination of the sales by the Estate of the 98 works of art not sold by Sotheby's
> reveals that none of the prices were out of line with the Sotheby's appraisal:  most
> of the [98 Paintings] were sold for more than the appraised values, and although
> the works were deemed to be inferior by Sotheby's, the results achieved were
> similar to the Sotheby's sales."  (Ex. 11 at ¶ 13.)

Plaintiff's complaint that the co-fiduciaries used the Sotheby's Appraisal as the baseline to
establish pricing targets for the 98 Paintings, including the YDJ Sale, is not even shared by her
co-fiduciary, the PA.  The PA's position (and the fact) is that objective evidence—the mixed
results of the Sotheby's auction—confirmed that target prices of 20% above the Sotheby's
Appraisal valuations were reasonable.

### C.    AW And The PA Required All Proposed Sales Be Reviewed By An Independent, Third-Party Art Appraiser

AW's (and the PA's) diligence and prudence in connection with the sales of the 98
Paintings, including the 14 Paintings is perhaps most plainly evidenced by the fact that rather
than relying exclusively on their own business judgment in connection with the sales of the 98

Paintings, AW and the PA required all proposed sales generated by AW to be reviewed by Ms. Lake-Ewald prior to the PA's approval.  (Ex. 11 at ¶ 11.)  Moreover, when AW developed concerns regarding Ms. Lake-Ewald's expertise dealing with classical Chinese artworks, he suggested she consult with another third-party expert, Arnold Chang, and provided Ms. Lake-Ewald with Mr. Chang's contact information.  (Ex. 96 at EWALD_00000214.)  Mr. Chang was the author of the Sotheby's Appraisal, a long-time student of CC, and intimately familiar with CC's collection.  (Ex. 13 at Sotheby's 000621; Ex. 24 at Rose-SCT-00007325; Ex. 25 at 14:18-17:8.)  Moreover, Mr. Chang was approved and recommended by Plaintiff to conduct the Sotheby's Appraisal.  (Ex. 24 at Rose-SCT-00007325.)  Ms. Lake-Ewald engaged with Mr. Chang, and other experts, including Robert Ellsworth and Peter Rosenberg, in connection with her reviews.  (Ex. 26 at ¶ 16; Ex. 48 at 65:8-66-23, 103:2-17, 186:13-187:19, 203:11-204:2; Ex. 69.)  Mr. Chang, in turn, confirmed to Ms. Lake-Ewald that the 20% increase over the Sotheby's Appraisal values was sufficient to account for any increases in the market for classical Chinese paintings since CC's death.  (Ex. 44 at EWALD_00000215.)  AW's referral of Ms. Lake-Ewald to Mr. Chang to obtain his views on the proposed prices further demonstrates that AW acted prudently.

### D.  AW Sought, And Obtained, Prices Higher Than The Baseline Established By The PA

AW's diligence is further evident by the fact that he did, in fact, negotiate for prices above the 20% benchmark established the PA.  As the chart below makes clear, with respect to at least four of the 98 Paintings, AW negotiated for, and achieved, prices 30%—and in one case 50%—higher than the Sotheby's Appraisal.

| OTE / CCW# | Sotheby's Appraisal | Contract Price | % Increase |
|---|---|---|---|
| OTE#83 | $20,000 (Ex. [] at Sotheby's 000623) | $30,000 (Ex. [] at WANG006615) | 50% |
| OTE#1000 | $30,000 (Ex. [] at Sotheby's 000699) | $39,000 (Ex. [] at WANG006615) | 30% |
| OTE#126 | $6,000 (Ex. [] at Sotheby's 000699) | $7,800 (Ex. [] at WANG000633) | 30% |
| OTE#200 | $1,600 (Ex. [] at Sotheby's 000671) | $2,080 (Ex. [] at WANG000622) | 30% |

### E.    The Estate's Financial Condition Required It To Sell Artworks

The context of the Estate's financial condition, and the world's financial condition, in 2008-2009 is also relevant to the question of AW's diligence and prudence.  At that time, the Estate was in financial straits, including as a result of a $22 million estate tax deficiency claimed by the IRS.  Retaining the 14 Paintings, and any paintings, required the Estate to pay insurance and storage costs.  (Ex. 23 at AWSK_00000229; Ex. 8 at 20:19-21:10; Ex. 11 at ¶ 10.) Moreover, the worldwide economic recession had negatively affected the market for classical Chinese art and created uncertainty for the Estate as to its ability to sell artwork in the future. (Ex. 22 at 300:17-23; Ex. 128 at WANG002253; AW Dec. at ¶ 26.)  The YDJ Sale raised needed liquid assets to pay estate taxes and other administrative expenses and reduced administrative expenses related to the maintenance of the 14 Paintings.  (AW Dec. at ¶ 27.)

## V.    The Purported Factual Bases For Plaintiff's Motion Are Irrelevant And Inaccurate

Purported facts cited to by Plaintiff as critical to her motion are either irrelevant to the YDJ Sale or are unsupported by the record.  For instance, Plaintiff relies nearly exclusively on a December 2004 email between AW and his attorney that concerns a different and apparently unconsummated sale to support her contentions about what AW allegedly "was representing to the PA at the time of the sales."  (Pl. Mem. at 17, 28; Ex. 30.)  The document, however, pre-dates the YDJ Sale by nearly five years and contains no representations to the PA at all. It establishes nothing.

Plaintiff also mischaracterizes AW's testimony concerning his "role" in the sales to manufacture a purportedly meaningful admission that he was not negotiating for the Estate. Defendant did not testify that he played "no role 'at all' in negotiating with any buyers" as Plaintiff contends. (Pl. Mem. at 27.) In context, AW's testimony conveyed that it was not his role to make final determinations as to whether sales would be approved at the prices he obtained. (Ex. 22 at 75:9-23.) Rather, ultimate control over prices and final approval of the sales rested with the PA and her art consultant. (Ex. 22 at 93:7-18, 116:10-22.) Moreover, AW's role in the negotiation of the YDJ Sale was, as discussed at length above, obvious to the PA.

A.    **The PA Was Aware Of, And Approved, AW's Efforts To Seek Prices Based On The Sotheby's Appraisal**

Contrary to Plaintiff's contention that AW "failed to disclose" that he was seeking prices based on the 20% above the Sotheby's Appraisal values, the PA was aware of, and approved, AW's seeking prices for the 98 Paintings, and the 14 Paintings in particular, based on target prices of 20% more than the Sotheby's Appraisal. Prior to any of the private sales, the PA imposed a requirement that all sales prices be at least 20% above the Sotheby's Appraisal values. (Ex. 11 at ¶ 11.) Defendant sought prices 20% above the Sotheby's Appraisal values based on this *ex ante* benchmark for reasonableness indicated by the PA. (Ex. 130; AW Dec. at ¶ 21.) It was plainly evident from the offers AW presented for approval that the prices he was obtaining were at or around the PA's benchmark. Each of the six sale proposals sent to the PA and to Ms. Lake-Ewald conspicuously listed both the Sotheby's Appraisal value, as well as the difference (in terms of a percentage deviation therefrom) that the buyer was willing to pay. (Ex. 54 at KING005956; Ex. 58 at KING 6487-488; Ex. 38 at KING 00602-603; Ex. 65 at KING 006942-943; Ex. 39 at KING 007189-190; Ex. 40 at KING 007362-364.) In connection with the

majority of sales, AW presented offers for exactly 20% above the Sotheby's Appraisal value. (*See id*.)  The pattern of the proposed prices, on their face, made obvious that AW was seeking prices at, in general, the 20% baseline above the Sotheby's Appraisal values, and belies any contention that the PA was unaware that AW was seeking these prices.

### B.     AW Did Not Represent To The PA That He Would Secure The "Highest Possible Price" For The 98 Paintings Or For the YDJ Paintings

Plaintiff accuses AW of representing to the PA that he was seeking to achieve the "highest possible price(s)" for Estate-artworks.  Setting aside the difficulty in defining what it even means to seek the "highest possible price" in any context, there is no evidence that AW ever made a representation of that nature to the PA, let alone in connection with the YDJ Sale. The email Plaintiff cites for her claim that AW "represented" something to the PA is not to the PA at all and was not written by AW.  (Pl. Mem. 27-28.)[10]  It is an email between AW and his attorney.  The email cannot reasonably be read to demonstrate any representation to the PA of any kind, or any representation by AW.  Moreover, AW's emails to the PA's art advisor regarding his negotiations with YDJ similarly do not amount to a representation that he was seeking the highest attainable price from the buyer.  Regardless, Ms. Lake-Ewald in fact considered the certain of the offers AW received in connection with the YDJ Sale—prior to the ultimate discount—to be "excellent if attainable" and "well done."  (Ex. 82 at KING 007373-374.)

### VI.    Damages Are In Dispute

Plaintiff further contends that she is entitled to summary judgment because—in her incorrect view—her damages expert's opinion as to the value of the YDJ Paintings in August

---

[10]  Despite Plaintiff's 56.1 Statement, which is replete with allegations of self-dealing, those claims are not at issue in this motion.

2009 is "undisputed." (Pl. Mem. at 29.)  Plaintiff is wrong.  Plaintiff's expert's opinion is not

"undisputed."  Defendant's damages expert, Kenneth Linsner, opined that "the process employed

by the New York County Public Administrator that included independent review of the proposed

prices by O'Toole-Ewald resulted in reasonable prices for the artwork[.]"  (*Id.*)  Mr. Linsner

further opined that the Estate suffered no damages from the sale of the 98 Paintings via private

sales, including YDJ Paintings.  (*Id.*)  Plaintiff's expert did not offer a "counter-appraisal" with

specific prices because he concluded the prices the Estate achieved were reasonable.  Of course,

that is, in itself, a statement regarding valuation.  Moreover, Mr. Linsner offered extensive

critique of the methodology applied by Plaintiff's expert, Patrick Regan, in reaching his

valuation.  Among other critiques, Linsner challenges Regan's reliance on auction results

reported by mainland Chinese auction houses, because reported results from these auction houses

are unreliable.  (Ex. 105 at ¶¶ 34-42; Ex. 114 at ¶¶ 28-36.)  Mr. Linsner also contends that Mr.

Regan's use of "retail value" methodology is improper and an irrelevant measure by which to

judge the YDJ Sale in August 2009.  (Ex. 105 at ¶ 29; Ex. 114 at ¶¶ 20-24.)  Mr. Linsner further

contends that Mr. Regan's extensive reliance on "outdated" sales data constitutes a "fundamental

error" that requires rejection of Mr. Regan's valuation conclusions.  (*Id.*)  In sum, Mr. Linsner,

and Defendant, unquestionably dispute Mr. Regan's conclusions as to the value of the 14

Paintings as of August 2009, the methodology Mr. Regan employed, and the premise that the

Estate was damaged at all.

        "[D]amages [are] a question of fact, and therefore not a matter for summary judgment."

*Am. Capital Fin. Services, Inc. v. Berry-Hill Galleries, Inc.*, 2010 WL 4227307, at *4 (S.D.N.Y.

Oct. 19, 2010) (finding that "a court may not award summary judgment to a plaintiff if the

defendant offers evidence that raises a factual question as to the proper measure and amount of

plaintiff's damages.")  Further, "[t]he weight to be given to the respective expert opinions is … a question of fact."  *Hyber v. Hegeman Farms Corp.*, 2 A.D.2d 922, 922 (3d Dep't 1956).  Indeed, where litigants "elect[] to battle it out with their own expert evidence[,] … the weight of the experts' testimony [i]s for the jury."  *United States v. Colasurdo*, 453 F.2d 585, 597 (2d Cir. 1971); *see People v. DeAndressi*, 146 A.D.2d 642, 643 (2d Dep't 1989) ("The issue of the reliability of the expert testimony was properly submitted for the jury's determination."); *United States v. Licht*, 158 F.2d 458, 458 (2d Cir. 1946) ("Whether expert's testimony was inconsistent, and weight to be given to his testimony, were for jury.")

There is a clear dispute between the parties' experts, and accordingly, the amount of Plaintiff's damages—if any—cannot be determined on this motion, but should be left to a jury with the benefit of testimony from, and cross-examination of, the parties' experts.

## VII.   Plaintiff's Failure To Address Defendant's Affirmative Defenses Mandates Denial Of Her Motion.

In his Answer, Defendant alleged 26 affirmative defenses.  (*See* Dkt. No. 78 at 33-37.) Plaintiff's motion did not address, let alone dispute, a single one.  Where a defendant properly raises affirmative defenses, a plaintiff's right to summary judgment depends upon demonstration that those defenses are not viable.  *See In re Enron Corp.*, 2007 WL 130865, at *1 (Bankr. S.D.N.Y. Jan. 16, 2007) (affirming denial of summary judgment were plaintiff "did not at any point discuss or even mention the twenty-four affirmative defenses asserted in [the] Answer"); *S. Waste Sys., LLC v. The City of Coral Springs, Florida*, 687 F. Supp. 2d 1342, 1345 n.1 (S.D. Fla. 2010) (finding the argument that plaintiff's motion for summary judgment must be denied for its failure to "address most of the affirmative defenses," "has merit"); *D.E. Properties Corp. v. Food for Less, Inc.*, 859 S.W.2d 197, 200 (Mo. Ct. App. 1993) ("A claimant moving for summary judgment in the face of a properly pleaded affirmative defense must also establish that

the affirmative defense fails as a matter of law.")  Plaintiff's failure to dispute Defendant's affirmative defenses requires denial of Plaintiff's motion.

## VIII.   Defendants' Affirmative Defenses Require Denial Of Plaintiff's Motion

In Defendants' own Motion for Summary Judgment (Dkt. No. 197), Defendants argued, and demonstrated, that undisputed facts established affirmative defenses based on statute of limitations and causation that required dismissal of all of Plaintiff's claims in this action, including her breach of fiduciary duty claim.  To the extent that motion is in any way insufficient to address the new theory of breach advanced by Plaintiff on this motion, with this opposition, Defendants cross-move for summary judgment on Plaintiff's breach of fiduciary claim based on their statute of limitations and causation defenses.  At the very least, questions of fact exist regarding these and other defenses that are not disputed by Plaintiff and cannot be resolved on this motion.

### A.      Plaintiff's Breach Of Fiduciary Claim Is Untimely

As argued in Defendants' own motion for summary judgment, Plaintiff's breach of fiduciary duty claim is untimely and should be dismissed on that basis.  Plaintiff's claim is governed by the three-year statute of limitations set forth in N.Y. C.P.L.R. § 214(4) because the sole relief sought is monetary damages.  *See* Pl. Mem. at 29 (seeking "partial summary judgment against Andrew in the amount of $1,488,228.00"); *IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 907 N.E.2d 268, 272 (2009) (applying a three-year limitations period to breach of fiduciary duty claims because the remedy sought was monetary in nature).  The earliest possible date this action can be considered "commenced" is September 23, 2014.  Thus, Plaintiff's claim is untimely if she was on notice of her claim prior to September 23, 2011.  Undisputed facts establish that she was.

On May 9, 2011, in court papers filed by Plaintiff in the Surrogate's Court, YK informed the Court that she, at that time, had "reason to believe that some or all of [the 98 Paintings] *have been sold without obtaining full market value*, without proper accounting to the PA and/or the estate, and otherwise by reason of improper, unauthorized unilateral acts of Mr. Wang."  (Ex. 71 at ¶ 8(g).)  With that filing, Plaintiff admits that she was on notice of potential breach of fiduciary duty claims relating to the sale of Estate paintings by, at the latest, May 2011, and this, on its face, demonstrates that summary judgment is warranted in Defendants' favor on limitations grounds.  Moreover, additional communications from Plaintiff put the PA on notice of potential breach of fiduciary duty claims against AW as early as December 2010 when Plaintiff's counsel raised concerns with the PA that Estate-owned artwork was "wrongfully sold."  (Ex. 111.)

At all times, the PA was in possession of all information regarding the specific terms of the sales.  As a co-fiduciary, the PA was empowered to (and required to) proceed with investigation and litigation against AW for misconduct regarding the sales of the 98 Paintings. The PA did not do so.  There is no evidence that the PA took any steps of any kind to investigate Plaintiff's allegations or diligently sought additional information to support a claim.  The PA did nothing.

Plaintiff's breach of fiduciary duty claim was required to be commenced by December 2013, or at the latest May 2014, and was thus untimely when filed on September 23, 2014 (the earliest possible date this action could be considered "commenced.").  Thus, even if Plaintiff did not personally gain total knowledge of all sales until later, the PA possessed many facts she purportedly lacked and was on notice of potential claims.

Defendants are also cognizant of the exception to the three-year limitation period for breach of fiduciary duty claims sounding fraud, but note that "courts will not apply the fraud statute of limitations if the fraud allegation is only incidental to the claim asserted." *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 120 (1st Dep't 1985). Here, Plainitff's purported claim based on alleged non-disclosure is a transparent repackaging of her substantive claim that AW failed to seek the highest possible prices for Estate-artworks. Simply alleging that AW "failed to disclose" the substantive breach he allegedly committed is not sufficient to render the claim one for fraud. In making the determination as to whether a breach of fiduciary duty claim sounds in fraud, "courts look for the reality, and the essence of the action and not its mere name." *Block 2829 Realty Corp. v. Community Preserv. Corp.*, 148 A.D.3d 567 (1st Dep't 2017). Further, "courts will not apply the fraud statute of limitations if the fraud allegation is only incidental to the claim asserted." *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 120 (1st Dep't 1985). At most, Plaintiff alleges that AW failed to disclose the substantive breach he is alleged to have committed. This is precisely the type of fraud allegation that is "incidental" to Plaintiff's primary claim, and does not warrant application of a longer limitations period. *Corcoran v. New York Power Auth.*, 202 F.3d 530, 545 (2d Cir. 1999) ("A fraud action is not incidental ***only when***: (1) the fraud occurred separately from and subsequent to the injury forming the basis of the alternate claim; ***and*** (2) the injuries caused by the fraud are distinct from the injuries caused by the alternate claim." (emphasis added)).

*Second*, September 23, 2014 is not the proper date by which to assess the timeliness of Plaintiff's breach of fiduciary duty claim. Plaintiff did not gain standing to pursue an action on behalf of the Estate until February 15, 2018, the date she was appointed Preliminary Executor of the Estate. (Dkt. 65 at 10.) Prior to that date, her claims on behalf of the Estate were a legal

27

"nullity," and the relevant commencement date is no earlier than February 15, 2018.  *See*

*Cortlandt St. Recovery Corp. v. Hellas Telecom., S.a.r.l,* 790 F.3d 411, 422-23 (2d Cir. 2015)

("[I]n the absence of a plaintiff with standing, this lawsuit was a nullity, and there was therefore

no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule

17(a)(3) or otherwise.")  Even if the her claims on behalf of the Estate could be deemed to

"relate back" to an earlier filing, Plaintiff did not bring any claims on behalf of the Estate until

she filed the FAC in September 2016.  This date was well past any possible applicable

limitations date; given Plaintiff's and the PA's notice of potential claims by reason of, among

other things, the Bao Wu Tang Exhibition in November 2009 and her admitted belief, as early as

2010, that AW had sold Estate-artworks for less than fair value.  (Ex. 77 at ¶¶ 8-9; Ex. 89 at

631:8-634:9; Ex. 111.)

       **B.**      **Causation**

     "[W]here damages are sought for breach of fiduciary duty under New York law, the

plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to

establish liability."  *LNC Invs., Inc. v. First Fidelity Bank, N .A. New Jersey,* 173 F.3d 454, 465

(2d Cir. 1999); *see Northbay Const. Co., Inc. v. Bauco Const. Corp.*, 38 A.D.3d 737, 738 (2d

Dep't 2007) ("To prove a breach of fiduciary duty, the plaintiff must establish that the alleged

misrepresentations or other misconduct were the direct and proximate cause of the losses

claimed") (quotations and citation omitted); *Greenberg v. Joffee*, 34 A.D.3d 426, 427 (2d Dep't

2006) (holding that a real estate agent's knowledge of the purchaser prior to sale "was

insufficient to raise a triable issue of fact as to whether [the real estate agent and vendor]

breached a fiduciary duty and that their conduct was the direct and proximate cause of a loss,

where the executor directed that the estate's property be sold at a price lower than recommended

by real estate agent in order "to secure a quick sale.")  Moreover, "[c]ausation generally is a

question for the finder of fact." *In re Louis Frey Co., Inc.*, 2007 WL 924206, at *5 (S.D.N.Y. Mar. 26, 2007).

Plaintiff cannot establish that any loss allegedly suffered by the Estate was proximately caused by AW.  At all times, AW acted at the direction of, and with approval from, the PA.  (*See supra* at Section V.a.)  AW did not have "control over the prices," but rather he "just follow[ed] the PA's intention to sell or the direction [of] Peter Schram."  (Pl. Mem. at 27.)  The PA took upon itself the responsibility for vetting the prices for which the 98 Paintings would be sold and only approved sales after consulting with independent third-parties.  (Ex. 11 at ¶ 11; PA Dec. ¶ 51.)  Accordingly, any damages suffered by the Estate (which Defendants contends there are none) were not caused by AW simply obtaining and conveying to the PA offers for the artworks.  Approval of all sales rested with the PA, and the PA's control over the sales process constitutes a supervening cause of any alleged injury to the Estate, thereby requiring summary adjudication in *Defendants'* favor.

## C.     Unclean Hands / In Pari Delicto

The *in pari delicto* doctrine is an affirmative defense that "mandates that the courts will not intercede to resolve a dispute between two wrongdoers."  *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010).  Under New York law, *in pari delicto* may be asserted as a defense against claims for breach of fiduciary duty.  *See e.g.*, *Gitlin v. Chirinkin*, 121 AD3d 939, 939-40 (2d Dep't 2014).  Where "plaintiffs' fault is an unresolved issue of fact … summary judgment is inappropriate."  *Acme Am. Repairs, Inc. v. Katzenberg*, 2011 WL 3876971, at *3 (E.D.N.Y. Aug. 31, 2011); *see Globaltex Group Ltd. v Trends Sportswear Ltd.*, 2010 WL 1633438, at *4 (E.D.N.Y. Apr. 21, 2010) (denying summary judgment on the basis of *in pari delicto* because there was "a genuine issue of material fact as to the parties' relative levels of fault.")

Plaintiff breached her own fiduciary duties to the Estate and thus the Court cannot intercede on her behalf.  Since 2003, Plaintiff has been required by the Surrogate's Court's TRO to maintain possession of dozens of artworks that the Estate claims are Estate property, but which she refused to turn over to the Estate.  (Ex. 2 at ¶¶ 6, 11; Ex. 3 at ¶¶ 13-14; Ex. 7 at ¶ 12.) Since then, Plaintiff has held the artworks as a *de facto* fiduciary.  *Seth v. Lakeden Realty Corp.*, 17 Misc. 3d 1113(A) (Sup. Ct. Kings Cty. Oct. 12, 2007) ("It is well settled that th[e c]ourt may deem a person to be a de facto fiduciary, even though he or she never qualified or was authorized to act in a fiduciary capacity, if that person undertook duties and responsibilities ordinarily assumed by a fiduciary.")

Indeed, because of Plaintiff's "refusal to deliver to the co-fiduciaries artwork which belongs to the estate," the PA considered the Plaintiff and her husband "'*de-facto*' fiduciaries" and advised the Surrogate's Court that they "should be held personally liable for any loss or destruction to the artwork and for interest and penalties imposed for the underpayment of estate taxes" resulting from their malfeasance.[11]  (Ex. 2 at ¶ 11.)  In this action, Plaintiff admitted to selling—but refusing to identify—artwork subject to the TRO which they held as "de-facto fiduciaries."  (Ex. 94 at 62:19-64:17.)

Plaintiff's malfeasance as a fiduciary in charge of artwork led the Surrogate's Court in February 2019 to revoke her rights and authority as preliminary executrix, leaving her solely with authority to prosecute this action.  The Court revoked YK's authority based on allegations by SK that Plaintiff and her husband had sold six Estate-owned artworks in their possession—

---

[11]  In February 2011 the law firm of Pryor Cashman LLP ("Pryor Cashman") was retained as special counsel by the PA to assist in the prosecution of the SCPA Proceeding, and in particular to help ascertain whether AW, SK, YK or KK violated the TRO.  (Ex. 123 at ¶¶ 2, 11.)  Pryor Cashman concluded that the Plaintiff not only violated the TRO, but maliciously continued Estate litigation "to direct attention away from the devastating admissions of her violations of the TRO."  (Ex. 123 at ¶¶ 7, 38.)

which they held as *de facto* fiduciaries—for $34,112,250 in violation of the TRO and that she

had advanced legal positions that were inimical to the interests of the Estate.  (Ex. 84 at 3.)  The

Court also based Plaintiff's revocation on the fact that she was unable to produce any

documentary evidence, or, for instance, the paintings she is supposed to have in her possession,

that would demonstrate any defense to the allegations against her.  (*Id*.)  The foregoing facts

regarding Plaintiff's misconduct as fiduciary and as Preliminary Executrix demonstrate that she

has breached her fiduciary duties to the Estate by reason of her improper disposal of Estate

assets.  Given Plaintiff's own misconduct, Court should not "intercede' in her dispute alleging

similar conduct by AW.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court enter an Order

denying Plaintiff's motion for partial summary judgment, granting Defendant's cross-motion for

summary judgment, and for such other just and further relief as the Court may deem proper.

Dated:  April 13, 2020
         New York, New York

By:   /s/ *Thomas B. Kelly*
       Thomas B. Kelly
       (tkelly@kasowitz.com)
       Kim Conroy
       (kconroy@kasowitz.com)
       Jonah M. Block
       (jmblock@kasowitz.com)

       KASOWITZ BENSON TORRES LLP
       1633 Broadway
       New York, New York 10019
       Tel.:  (212) 506-1700

       *Attorneys for Defendant Andrew Wang*