**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ x

YIEN-KOO KING, NORTHWICH     :
INVESTMENTS LTD., and SOON HUAT,  :
INC.                                    :

                                :  Civ. Action No.: 1:14-cv-07694 (LJL)
             Plaintiffs,  :

                                :  **PLAINTIFF YIEN-KOO KING'S**
-against-                      :  **RESPONSES AND OBJECTIONS TO THE**
                                :  **DEFENDANTS' STATEMENT OF**
ANDREW WANG, SHOU-KUNG WANG,  :  **UNDISPUTED MATERIAL FACTS**
BAO WU TANG, JIAN BAO GALLERY,  :  **PURSUANT TO LOCAL CIVIL RULE 56.1**
ANTHONY CHOU, CHEN-MEI-LIN, WEI  :
ZHENG, YE YONG-QING, YUE DA-JIN  :
and JOHN DOES 1-9,               :

                                :
                  Defendants.  :

------------------------------------------------------ x

       Pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1 and the Individual

Practices in Civil Cases of Hon. Lewis J. Liman ("Individual Practices"), Plaintiff Yien-Koo Wang

King ("Yien-Koo or Plaintiff") respectfully submits the below responses and objections to

Defendants Andrew Wang and Shou-Kung Wang's (the "Wangs" or "Defendants") Statement of

Undisputed Material Facts and in opposition to the Defendants' motion for summary judgment.[1]

In accordance with Rule 3(C)(i) of the Individual Practices, each statement (and heading) in the

Defendants' Rule 56.1 Statement is reproduced below followed by the Plaintiff's objections and

responses, if any.

---

[1] The Plaintiff incorporate by reference each of the definitions set forth in her own Rule 56.1 Statement previously submitted in support of her motion for partial summary judgment [ECF Dkt. 199] unless otherwise stated. Exhibits to the Declaration of Thomas B. Kelly, dated February 14, 2020 ("Kelly Dec.") are referred to as "Ex. __" in the Wangs' statements and as "Kelly Decl. Exh. __" in the Plaintiff's responses and objections.

## I.    Background

1.    Chi-Chuan Wang ("CC") was an internationally known collector and connoisseur of, and expert in, Classical Chinese painting and calligraphy (artwork created between the 10th and 17th centuries), and an accomplished artist in his own right.  (Ex. 1 at ¶ 3.)

2.    CC was the father of Yien-Koo King ("YK") and Shou-Kung Wang ("SK").  (Ex. 2 at ¶ 2.)

3.    CC was the grandfather of Andrew Wang ("AW").  (Ex. 3 at ¶ 15.)

4.    AW is SK's son.  (Ex. 3 at ¶ 16.)

5.    CC, his wife, and daughters, including YK, immigrated to the United States in 1949.  (Ex. 4 at 26:2-43:14.)

6.    CC and his family settled in New York City.  (Ex. 3 at ¶¶ 27-28.)

7.    CC left SK behind in China.  (Ex. 4 at 26:2-43:14.)

8.    SK and his family, including AW, immigrated to the United States in the late 1970s.  (Ex. 4 at 26:2-43:14.)

## II.    The Administration of the Estate by AW and the PA

9.    CC passed away in July 2003.  (Ex. 1 at ¶ 3.)

10.    Upon CC's death, SK submitted for probate a will dated February 18, 2003 (the "2003 Will") in the Surrogate's Court of the State of New York (the "Surrogate's Court").  (Ex. 1 at ¶ 4; Ex. 5.)

11.    Upon CC's death, YK submitted for probate a separate will dated June 13, 2000 (the "2000 Will") and a codicil dated July 10, 2002 (the "2002 Codicil").  (Ex. 1 at ¶ 4; Ex. 6.)

12.    The primary difference between the wills is that the 2003 Will disinherited YK, while the 2000 Will gave YK preferences over SK and other beneficiaries.  (Ex. 1 at ¶ 4; Ex. 5; Ex. 6.)

***Plaintiff's First Objection to ¶12***: The Plaintiff objects to the assertion in ¶12 due to its reliance on inadmissible lay opinion of the PA's former attorney, Peter Schram, about the "primary distinction" between the fraudulent February 18, 2003 Will and the June 13, 2000 Will. *See* Fed. R. Evid. Rule 701.

***Plaintiff's Second Objection to ¶12***: The Plaintiff further objects to the claim in ¶12 as false. It is untrue that YK was given preferences over SK and other beneficiaries in the 2000 Will and 2002 Codicil. *Contrast* Kelly Decl. Exhs. 5 (AWSK_00003860-61, 00003868) and 6 (AWSK_00003783). Yet even if it were true, it would still not be the "primary difference" between the wills. The 2000 Will and 2002 Codicil directed, among other things, that (i) Yien-Koo and SK each receive 35% of CC's Estate, (ii) C.C. Wang's second, living, daughter receive 20%, (iii) the three adult children of CC's third, pre-deceased, daughter share 10%, and (iv) Yien-Koo would serve as executor. *See* Kelly Decl. Exh. 6 AWSK_00003783. Yet the 2003 Will directed that (a) SK receive 40% of the Estate, (b) SK's son Andrew receive 10%, (c) SK's other son receive another 10%, (d) CC's second, living, daughter receive 20%, (e) the three adult children of CC's predeceased daughter received 20%, and (f) SK and Andrew would serve as co-executors. Kelly Decl. Exh. 5 (AWSK_00003860-61, 00003868). In the eight testamentary instruments proceeding the 2003 Will and Codicil, CC had never named any SK's children as beneficiaries and had never disinherited Yien-Koo. Savitsky Decl. Exh. 2 at ¶ 75 (Defendants' Answer to the Amended Complaint).[2] Moreover, the 2003 Will was a product of fraud and undue influence. Savitsky Decl. Exh. 7 (Decision and

---

[2] Plaintiff submits the Declaration of Timothy Savitsky, dated February 14, 2020 ("Savitsky Decl.") [ECF Dkt. 203] in support of her opposition to the Defendants' motion for summary judgment.

Order of the First Department affirming jury verdict which found the February 18, 2003

Will to be the product of fraud and undue influence). These are the actual "primary

difference[s]" between the two documents.

**A.     The Surrogate's Court Appoints AW and the PA as Co-Fiduciaries**

13.     On August 4, 2003, per the terms of the 2003 Will, the Surrogate's Court of the

County of New York (the "Surrogate's Court") issued Preliminary Letters Testamentary to AW

that appointed AW as Preliminary Executor of the Estate.  (Ex. 7 at 2202.)

14.     In the same August 4, 2003 Order, due to a dispute over the validity of the 2003

Will, the Surrogate's Court issued Letters of Temporary Administration of the Estate to Ethel

Griffin, Public Administrator of the County of New York (the "PA") as a co-fiduciary of the

Estate.  (Ex. 7 at PA-SCT-000002202; Ex. 8 at 9:23-10:5.)

15.     YK and SK both consented to the PA's appointment as Temporary Administrator

to serve as co-fiduciary with AW as Preliminary Executor.  (Ex. 1 at ¶ 6).

16.     The PA has served as Temporary Administrator and co-fiduciary of the Estate

since 2003 and continues to serve co-fiduciary of the Estate.  (Ex. 8 at 10:6-10.)

17.     The law firm of Schram, Graber & Opell, P.C., or its predecessor firm(s), has

served as legal counsel to the PA since 2003.  (Ex. 8 at 7:13-8:23.)

18.     Ethel Griffin died in 2015.

19.     As Temporary Administrator, the PA was empowered to take legal action on

behalf of the Estate, including against its co-fiduciary, AW, and in fact did so in the Surrogate's

Court.  (*See, e.g.,* Ex. 9.)

> ***Plaintiff's Objection to ¶19***: The Plaintiff objects to the assertion in ¶19 as false
>
> due to overbreadth. In the initial order appointing the PA as Andrew Wang's co-
>
> fiduciary, the Court required the PA to only ever act "jointly" with Andrew in

taking actions to administer the Estate. Savitsky Decl. <u>Exh. 12</u> at (10:11-11:16); Savitsky Decl. <u>Exh. 2</u> at p. 34 (the Wangs' Sixth Affirmative Defense to the Amended Complaint); *See* PA Decl. <u>Exh. 1</u>[3] at p. 2 (August 4, 2003 Order); Kelly Decl. <u>Exh. 2</u> at ¶8 ("the Public Administrator may not act unilaterally with regard to the administration of this estate."). A single court-ordered exception to this requirement of joint action permitted the PA to unilaterally determine the validity of CC Wang's lifetime transfers to the Wangs and the Kings. Kelly Decl. <u>Exh. 7</u> at p. 2 (August 4, 2003 Order). In accordance with this single exception, the PA commenced a Surrogate's Court Procedure Act (SCPA) §2103 proceeding to investigate whether CC's surviving family members possessed property that was invalidly transferred to them before his death. Kelly Decl. <u>Exh. 7</u> at p. 2 (permitting the PA to act unilaterally only to "determine the validity of any agreements entered into by the Deceased during his lifetime."); Kelly Decl. <u>Exh. 2</u> at ¶8.

20.     In an Order of the Surrogate's Court dated January 21, 2011, *In re Matter of the Estate of Chi-Chuan Wang, Glen, S.*, at 9, Surrogate Glen stated that the PA was the proper party to pursue an SCP 2103 turnover proceeding against AW, SK, and YK because "the Public Administrator, unlike her co-fiduciary, is not implicated in the very turnover matters that are to be pursued.")  (Ex. 17 at KING-SCT-000003489.)

   **B.     The PA's Effort to Marshal Estate Assets**

21.     Since the outset of the Surrogate's Court proceedings, the parties have each accused the other of fraud, undue influence, and outright theft concerning hundreds of artwork from the Estate valued at millions of dollars.  (Ex. 1 at ¶ 11.).

---

[3] Plaintiff submits the Declaration of Dahlia Damas, as the Public Administrator of New York County, dated February 14, 2020 ("PA Decl.") [ECF Dkt. 198] in support of her opposition to the Defendants' motion for summary judgment.

22.     In the face of dueling accusations between "the warring family factions," the Surrogate's Court directed the PA to investigate the allegations made by the various family members against each other concerning CC's art collection.  (Ex. 1 at ¶ 7.)

> ***Plaintiff's First Objection to ¶22*:** The Plaintiff objects to the assertion in ¶22 for its characterization of the Surrogate's Court dispute. *See* Fed. R. Evid. Rule 701.
>
> ***Plaintiff's Second Objection to ¶22*:** The Plaintiff further objects to the assertion in ¶22 as false in its claim that the Surrogate's Court had authorized the PA to investigate *any* allegations "concerning CC's art collection" (such as the present claims of self-dealing Estate assets). The August 4, 2003 Order appointing the PA did not give the PA full authority to investigate any allegations of misconduct or fraud of any nature lodged by the parties. Instead, the PA was specifically tasked to investigate the validity of any *lifetime* transfers of assets completed by C.C. Wang through an SCPA §2103 proceeding. Kelly Decl. Exh. 7 at p. 2 (August 4, 2003 Order ordering the PA to "determine the validity of any agreements entered into by the Deceased during his lifetime."); Kelly Decl. Exh. 2 at ¶8 ("the Public Administrator may not act unilaterally with regard to the administration of this estate.").

23.     On October 21, 2003, the PA commenced a proceeding under the New York Surrogate's Court Procedure Act § 2103 against YK, KK, SK, and AW seeking information concerning Estate assets and to recover Estate assets from the parties.  (Ex. 9.)

24.     On October 23, 2003, the Surrogate's Court issued an order restraining YK, KK, AW, SK and certain others from selling, transferring, encumbering, leasing, consigning, or otherwise disposing of artwork and other personal property belonging to the Estate, subject to

disputes over ownership, or alleged to have been gifted by CC to either SK, YK, or others.  (Ex. 10.)

> ***Plaintiff's Objection to ¶24***: The Plaintiff objects to the assertion in ¶24 as false because it mischaracterizes the terms of what was a consented-to restraining order of the Surrogate's Court by broadening its terms. The now 17-year-old order restrained four categories of property: (i) any property which is, in fact, property of the Estate, (ii) any property formerly owned by CC which either the Kings or the Wangs claimed was gifted to them or a corporate entity they controlled, (iii) any property formerly owned by CC which the Kings or the Wangs claimed was sold to them or a corporate entity they controlled, and (iv) any property formerly owned by CC which the Kings or the Wangs claimed was given on consignment to them or a corporate entity they controlled. Kelly Decl. Exh. 10. Paragraph ¶24 broadens the order by claiming any property which was "subject to disputes over ownership" was restrained. This is not the case and it is not what the order states. *See* Kelly Decl. Exh. 10. For example, it is possible for an artwork to have been subject to a dispute over ownership and claimed by the Estate, despite it never having been ever been "formerly owned by" CC, and thus unrestrained. The restraining order the Wangs describe (*i.e.* a general restraint on any allegedly "disputed" property) would be unworkably vague and amorphous: it would allow property to fall in and out of the scope of the restraining order depending on changing allegations over time. There would be no way to define what property was actually covered by the restraining order at any given time.

25.     Once appointed, the PA and her attorneys attempted to marshal CC's assets, including his collection of artwork.  (Ex. 8 at 20:19-21:10; Ex. 11 at ¶ 4.)

26.     The Estate's assets consisted primarily of CC's art collection and personal creations.  (Ex. 2 at ¶ 3.)

> ***Plaintiff's Objection to ¶26***: The Plaintiff objects to the assertion in ¶26 for its reliance on inadmissible hearsay from a third-party who was neither deposed nor identified on the Defendants' Rule 26 disclosures (*i.e.* Coleen Carew).  Second Savitsky Decl. Exh. 78.[4] The Plaintiff does not dispute, however, that CC's most valuable and numerous type of asset was his art.

27.     The Estate fiduciaries also had an obligations to inventory and appraise all Estate property.  (Ex. 2 at ¶ 7.)

> ***Plaintiffs Objection to ¶27***: The Plaintiff objects to the assertion in ¶27 for its reliance on inadmissible hearsay from a third-party who was neither deposed nor identified on the Defendants' Rule 26 disclosures (*i.e.* Coleen Carew). Second Savitsky Decl. Exh. 78 (Defendants' Amended Disclosures).  The Plaintiff does not dispute, however, that the fiduciaries were required to inventory and appraise Estate property.

28.     In the fall of 2003, the PA requested that the parties deliver all artwork they conceded belonged to the Estate.  (Ex. 2 at ¶ 8.)

> ***Plaintiffs Objection to ¶28***: The Plaintiff objects to the assertion in ¶28 for its reliance on inadmissible hearsay from a third-party who was neither deposed nor identified on the Defendants' Rule 26 disclosures (*i.e.* Coleen Carrew). Second

---

[4] Plaintiff submits the Second Declaration of Timothy Savitsky, dated April 13, 2020 ("Second Savitsky Decl.") in opposition to the Defendants' motion for summary judgment.

Savitsky Decl. Exh. 78.  The Plaintiff does not dispute, however, the fiduciaries demanded that the Kings deliver artwork formerly owned by CC to the fiduciaries.

29.     After the PA was appointed, the Estate took possession of approximately 500 artworks that were agreed by all stakeholders to be Estate property.  (Ex. 4 at 192:10-22; Ex. 12.)

30.     These included approximately 133 Classical Chinese artworks, approximately 360 modern Chinese artworks (including works by CC), and five other artworks, as well as a variety of Chinese decorative art objects.  (Ex. 11 at ¶ 4; Ex. 13; Ex. 14.)

31.     Early on in the Surrogate's Court proceedings, an attorney for the PA, Alan Appel, endeavored to create an inventory of all artworks in the Estate for tax purposes as the "Appel Inventory."  (Ex. 12.)

32.     The Appel Inventory listed all artwork potentially within the scope of the Estate, including artwork the beneficiaries agreed belongs to the Estate, as well as artwork over which there is disagreement as to whether it is property of the Estate.  (Ex. 12.)

> **_Plaintiff's Objection to ¶32_**: The Plaintiff objects to the assertion in ¶32 as inaccurate and incomplete. Not "all artwork potentially within the scope of the Estate" was included in the so-called Appel Inventory, because it was based upon the Kings' best belief as of 2004 and because it included artwork indisputably not part of the Estate. Second YK Decl. at ¶5.[5] There were hundreds of artworks identified in the Appel Inventory by both sides, but it was not a definitive and infallible list, merely it was based upon the Kings' best efforts at the time. For their part, the Wangs intentionally filled the inventory with lies. Second YK Decl. at ¶5.

[5] Plaintiff submits the Declaration of Yien-Koo Wang King, dated April 12, 2020 ("Second YK Decl.") in support of her opposition to the Defendants' motion for summary judgment.  Exhibits to the Second YK  Decl. are referred to as "Exh. __."

33.     The Appel Inventory also lists the relevant parties' positions as to ownership of each artwork as well as which party was in possession of the artwork at the time the list was compiled.  (Ex. 12.)

> **_Plaintiff's Objection to ¶33_**: The Plaintiff objects to the assertion in ¶33 as incomplete. The Appel Inventory was based upon the Kings' best belief as of 2004. Second YK Decl. at ¶5.

34.     The full scope of the Estate's assets remains in dispute.  (Ex. 4 at 192:10-22; Ex. 12.)

35.     In early 2004, the parties turned over to the Estate approximately 133 Classical Chinese artworks in their possession that were acknowledged to be Estate property.  (Ex. 11 at ¶ 7.)

**C.     The PA and AW's Obligations to Pay Estate Taxes and Administration Expenses**

36.     In discharging their obligations to the Estate, AW and the PA, with their attorneys, prepared and submitted an estate tax return to the IRS on behalf of the Estate.  (Ex. 15.)

37.     In order to prepare federal and state estate tax returns and pay estimated taxes by April 2004, the co-fiduciaries had to obtain information concerning all transfers, made after January 1, 1977, regardless of the validity of such transfer.  (Ex. 2 at ¶ 7.)

> **_Plaintiff's Objection to ¶33_**: The Plaintiff objects to the assertion in ¶37 for its reliance on inadmissible hearsay from a third-party who was neither deposed nor identified on the Defendants' Rule 26 disclosures (*i.e.* Coleen Carew).  Second Savitsky Decl. <u>Exh. 78</u>.

38.     On or around October 2004, the Estate filed its estate tax returns pursuant to which, net of prior payments, the Estate owed approximately $3,300,000 in federal and $1,200,000 in state taxes.  (*See* Ex. 18; Ex. 19.)

39.     In addition to these amounts owed to the IRS, the Estate faced administrative expenses, including legal fees and fees to store and insure the Estate-owned artwork and other possessions.  (Ex. 8 at 20:19-21:10; Ex. 11 at ¶ 10.)

40.     After calculating the outstanding debts and liabilities, the Estate determined it lacked liquid assets sufficient to pay the taxes owed to the IRS and to cover administration expenses.  (Ex. 11 at ¶ 10; Ex. 20; Ex. 21.)

41.     The Estate was required to liquidate assets, including artwork, to raise funds to pay the taxes owed to the IRS and to cover the other Estate expenses.  (Ex. 8 at 20:19-21:10; 23:22-25:3; Ex. 11 at ¶ 10; Ex. 22 at 77:11-79:9; 80:8-81:6; 116:4-9.).

> **_Plaintiff's Objection to ¶41_**: The Plaintiff objects to the assertion in ¶41 as false because it is misleading. The Plaintiff agrees that, generally, the ultimate goal of the Estate was to pay expenses—to the extent they were genuinely owed—by liquidating assets if necessary and then distributing remaining assets or the value thereof to beneficiaries. But the Plaintiff objects to any implication that the Estate was required to immediately liquidate artwork or other assets. The cited-to portion of Peter Schram's deposition (Kelly Decl. Exh. 8 at 20:19-21:10; 23:22-25:3) does not support the statement that the Estate was required to sell artwork. Peter Schram testified that it was the fiduciary's job to sell assets "*if* reasonable offers came along" (*Id.* at 23:22-24:11 (emphasis added)). Moreover, Schram testified that due to the probate contest it "was not possible to wrap up the estate" (*Id.* at 8:24:-9:18).

11

42.     Financial pressure on the Estate increased in 2007, when the IRS issued a Notice of Deficiency to the Estate claiming an additional $22,529,000 was owed in federal estate taxes. (Ex. 23.)

> ***Plaintiff's Objection to ¶42***: The Plaintiff objects to the assertion in ¶42 as false. The Estate has vigorously contested the near entirety of the IRS's Notice of Deficiency for $22,529,114 on the basis that the IRS included in its calculation assets that were not assets of the Estate and, therefore, it is the Estate's official position that the amount is not actually owed. Second Savitsky Decl. Exh. 79 at ¶¶7-9 (AWSK_00015104-105). The tax court litigation surrounding the Notice of Deficiency has yet to be resolved and it remains unclear what—if any—portion of the assessed deficiency need actually be paid by the Estate. *See* Kelly Decl. Exh. 8 at 20:19-21:10.

43.     The IRS Notice of Deficiency is largely based on YK's claim, disputed by the Estate, that CC gifted her millions of dollars of artwork during his lifetime on which no gift taxes were ever paid.  (Ex. 23.)

> ***Plaintiff's Objection to ¶43***: The Plaintiff objects to the assertion in ¶43 as false. The IRS's claim is largely based on an assumption that the IRS would find certain assets which the Estate did not possess, to be property of the Estate. Second Savitsky Decl. Exh. 79 at ¶¶ 7-9 (AWSK_00015104-105); *see also* Kelly Decl. Exh. 8 at 20:19-21:10. It is not true that all the property of Northwich Investments Ltd. (Yien-Koo's company) and Soon Huat, Inc.was gifted by C.C. Wang, nor that they are property of the Estate. Second YK Decl. ¶6.  The tax is also based upon

the theft of approximately 25 paintings which occurred on January 31, 2003, worth millions of dollars. Second YK Decl. ¶¶12, 26.

**D.      The PA and AW Enlist Sotheby's to Value and Auction Estate Assets**

44.      The Surrogate's Court's August 4, 2003 Order directed the fiduciaries to retain an expert in the field of Chinese art to catalog and evaluate CC's art collection.  (Ex. 7 at PA-SCT-000002202.)

45.      YK, through her counsel, recommended that the Estate engage Sotheby's to perform an appraisal of the artwork in CC's Estate.  (Ex. 2 at PA-SCT-000002251; Ex. 24 at Rose-SCT-00007325.)

> ***Plaintiff's Objection to ¶45***: The Plaintiff objects to the assertion in ¶45 due to its reliance on inadmissible hearsay from a third-party, Coleen Carew, who was neither deposed nor identified on the Defendants' Rule 26 disclosures.  Second Savitsky Decl. Exh. 78. The Plaintiff, however, agrees that she suggested that Sotheby's would be capable of appraising the artwork that had been received by the Estate.

46.      YK specifically suggested Arnold Chang ("Chang") of Sotheby's to perform the appraisal of Estate artwork.  (Ex. 24 at Rose-SCT-00007325.)

47.      Chang was a long-time student of CC's who was intimately familiar with CC's collection.  (Ex. 24 at Rose-SCT-00007325; Ex. 25 at 14:18-17:8.)

48.      After discussions with the major art auction houses Christie's and Sotheby's, the Estate engaged Sotheby's to perform an appraisal.  (Ex. 8 at 19:14-20:18; Ex. 26 at ¶ 17.)

49.      The Estate and Sotheby's entered into an appraisal agreement on June 17, 2004. (Ex. 11 at KING-SCT-000003230.)

50.     On October 1, 2004, Sotheby's issued an appraisal of 133 Classical Chinese artworks in the Estate (the "2004 Sotheby's Appraisal").  (Ex. 13.)

51.     The 2004 Sotheby's Appraisal was performed by Chang, recommended specifically by YK, with the assistance of Mee-Seen Loong.  (Ex. 13 at Sotheby's 000621; Ex. 24.)

52.     In conducting the appraisal, Chang physically inspected and examined each artwork.  (Ex. 11 at ¶ 9; Ex. 25 at 55:9-56:20; Ex. 27 at 15:14-16:13; 102:22-103:10.)

53.     The 2004 Sotheby's Appraisal assigned an aggregate appraised value – as of the date of CC's death – of $4,400,350 to the 133 Classical period artworks.  (Ex. 13 at 622.)

54.     The 2004 Sotheby's Appraisal was drawn at Fair Market Value for estate tax purposes.  (Ex. 13 at Sotheby's 000620-621.)

55.     The value reported for the artwork contained in the 2004 Sotheby's Appraisal was the same value at which the pieces could be expected to "change hands between a willing buyer and willing seller" in a sale.  (Ex. 26 at ¶ 18.)

56.     The 2004 Sotheby's Appraisal was submitted to the IRS by the Estate in connection with the Estate's tax filings.  (Ex. 28.)

57.     The 2004 Sotheby's Appraisal was reviewed by the IRS's Art Appraisal Committee and was accepted for tax purposes pursuant to a letter from Karen E. Carolan, Chief, Art Appraisal Services, to the Estate, dated February 13, 2007.  (Ex. 28.)

58.     The Estate needed to sell whatever artwork it could to pay estate taxes and other administration expenses.  (Ex. 8 at 23:22-25:3; Ex. 11 at ¶ 10.)

> ***Plaintiff's Objection to ¶58***:  The Plaintiff objects to the assertion in ¶58 as false because it is incomplete and misleading. At his deposition, Peter Schram testified

14

it was the fiduciary's job to sell assets "*if* reasonable offers came along." Kelly Decl. Exh. 8 at 23:22-24:11 (emphasis added). Likewise, the Public Administrator of New York County testified that (i) the office's responsibility is to achieve the best terms for the estate it is administering and (ii) the office would not have sold any of the Estate paintings for prices that it believed were below their market value, liquidity concerns notwithstanding.  PA Decl. at ¶51. In fact, the reviews conducted by Ms. Elin Lake-Ewald on behalf of the Estate evaluated the sales based upon their fair market value. *See, e.g.*, PA Decl. at ¶¶43 and 51.  Any claim that the Estate needed to liquidate its assets immediately, even if it meant selling them for less than their fair-market value, is not supported by the Record.

59.      Given that interest and penalties accrued on the estate taxes owed, the Estate expeditiously sought to address the liabilities.  (Ex. 8 at 23:22-25:3.).

***Plaintiff's Objection to ¶59***:  The Plaintiff objects to the assertion in ¶59 to the extent it implies the Estate was willing to sell assets for below market value in order to sell them expeditiously or that speed was prioritized over price. The Estate representatives stated at the time of the sales that their primary concern was achieving "the best price for its art," not selling the art as quickly as possible. Savitsky Decl. Exh. 32 (WANG001890). Similarly, Peter Schram testified at his deposition that it was the fiduciaries' job to sell assets only "*if* reasonable offers came along." Kelly Decl. Exh. 8 at 23:22-24:11 (emphasis added). The Public Administrator of New York County similarly testified that the office's responsibility is to achieve the best terms for the estate it is administering and would not have sold any of the Estate paintings for prices that it believed were below their

market value, liquidity concerns notwithstanding.  PA Decl. at ¶¶43 and 51. Elin Lake-Ewald's admitted role was to review the Estate's sale prices "and see if those seemed like the legitimate price or a fair price." Savitsky Decl. Exh. 14 at 44:13-21. In May 2008, Andrew told Ewald that he understood his "purpose" was "to achieve an ideal price for the Estate." Savitsky Decl. Exh. 32 (WANG001890). Thus, the Record irrefutably establishes that *both* fiduciaries represented to each other that their intention in selling the artwork was to achieve the best market price possible.

60.    Given the Estate's need to pay estate taxes and administration expenses, the PA and AW asked Sotheby's to auction the Estate's Classical Chinese artworks.  (Ex. 11 at ¶ 10.)

*Plaintiff's First Objection to ¶60*:  The Plaintiff objects to the assertion in ¶60 due to its reliance on fallacious and inadmissible double hearsay: Kelly Decl. Exh. 11 (Affirmation of Peter Schram dated June 16, 2014). Specifically, Schram testified at his deposition in 2019 that he could not recall having any discussions with Sotheby's "about selling the estate-owned artworks" in which he personally participated. Savitsky Decl. Exh. 12 (25:12-22). Because Schram's deposition reveals he did not have direct participation in discussions with Sotheby's about selling Estate artworks, the Wangs have failed to lay appropriate foundation for the claim in his 2014 affirmation. Fed. R. Evid. Rule 602.

*Plaintiff's Second Objection to ¶60*:  The Plaintiff also objects to ¶60 as false because the documentary record proves Schram's hearsay statement that Sotheby's was asked to auction the Estate's classical Chinese artworks is false. The emails produced by the PA establish that it was actually Andrew who first proposed selling

"some contemporary paintings, including some rocks, for 2006 spring auction at Sotheby's" in September 2005—after nearly all of the private sales of Estate assets had *already* been completed. *Compare* PA Decl. <u>Exh. 26</u> (KING 007615-7616) (Andrew in September 2005 first suggesting auctioning certain paintings through Sotheby's) *with* Wangs' Rule 56 Statement of Material Facts ("Wang SMF") at ¶¶108, 122, 130, 137, 142, *infra* (identifying the dates of the Estate's private sales). Andrew's September 2005 email to Schram and Martin Klein (Andrew's attorney) states that "[t]here are various artworks [that] are suitable [for] auction, but not for private sale" and asks Klein to find out "whether the PA agrees with me?" *Id*. Months after receiving Andrew's September 2005 email, the PA ultimately agreed to the auction not based upon conversations with Sotheby's, but instead because "Andrew, the co-fiduciary, has held himself out as a person who is knowledgeable in these matters and I find no reason to doubt his recommendation." PA Decl. <u>Exh. 26</u> (KING 007626). Conversely, Andrew first proposed the concept of private sales much earlier, in October 2004. Savitsky Decl. <u>Exhs. 19, 20</u>.

61.    Sotheby's was only willing to accept 39 of the best Classical artworks – as well as modern works and art objects – from the Estate's collection for auction.  (Ex. 11 at ¶ 10, 13; Ex. 13.)

***Plaintiff's First Objection to ¶61***:  The Plaintiff objects to the assertion in ¶61 due to its reliance on misconstrued and inadmissible, unreliable double hearsay. Kelly Decl. <u>Exh. 11</u> (Affirmation of Peter Schram dated June 16, 2014). Not only is Schram's 2014 affirmation itself hearsay, but Schram testified at his deposition in 2019 that he could not recall having any discussions with Sotheby's "about selling

the estate-owned artworks" in which he personally participated. Savitsky Decl. Exh. 12 (25:12-22). Schram, therefore, lacks personal knowledge of the alleged discussions identified in ¶10 of his affirmation and the Wang Defendants have failed to establish adequate foundation for this testimony. *See* Fed. R. Evid. Rule 602.

***Plaintiff's Second Objection to ¶61***: The Plaintiff further objects to the unreliable hearsay statement that Sotheby's accepted only "39 of the best classical artworks," because it is flatly disproven by the documentary record. First, the Estate auctioned works through Sotheby's in March 2006—*after* five of the six private sales had already been completed. *See* Wang SMF at ¶¶108, 122, 130, 137, 142, *infra*. Thus, none of the 84 classical Chinese paintings that sold between February 2005 and February 2006 were even available for selection for auction by March 2006. Second, email records establish that it was Andrew in September 2005—not Sotheby's—who first proposed selling "some contemporary paintings, including some rocks, for 2006 spring auction at Sotheby's." PA Decl. Exh. 26 (KING 007615-7616). The PA ultimately agreed with Andrew's recommendation on what to auction based not upon conversations with Sotheby's, but instead because "Andrew, the co-fiduciary, has held himself out as a person who is knowledgeable in these matters and I find no reason to doubt his recommendation." PA Decl. Exh. 26 (KING 007626). Third, in selecting which Estate paintings to auction, Andrew did not choose "the best" ones. There are a total of 19 classical Chinese paintings which Sotheby's appraised in 2004 to be worth $75,000 or more as of the date of C.C. Wang's death. Kelly Decl. Exh. 13 (Sotheby's 2004 Appraisal).  All 19 of

those were sold to the five private buyers and 16 of these were sold *prior* to the March 2006 Sotheby's auction. In no sense is it true that the Estate's "best" paintings were selected and auctioned by Sotheby's because they had already been sold to the strawmen.

62.     Sotheby's auctioned 39 works on March 31, 2006.  (Ex. 11 at ¶ 10.)

   ***Plaintiff's First Objection to ¶62***:  The Plaintiff objects to the assertion in ¶62 due to its reliance on inadmissible hearsay: Kelly Decl. Exh. 11 (Affirmation of Peter Schram dated June 16, 2014) and a lack of foundation that Schram has personal knowledge of what was auctioned. *See* Fed. R. Evid. Rules 602, 801.  The Plaintiff, however, does not dispute that 39 of the Estate's paintings (most of which were contemporary works) were auctioned on March 31, 2006. Second Savitsky Decl. Exh. 80.

63.     At the auction, only a few pieces sold for prices that "far exceeded" Sotheby's valuations set forth in the 2004 Sotheby's Appraisal, and several sold for less.  (Ex. 11 at ¶ 13.).

   ***Plaintiff's First Objection to ¶63***:  The Plaintiff objects to the assertion in ¶63 due to its reliance on fallacious inadmissible hearsay: Kelly Decl. Exh. 11 (Affirmation of Peter Schram dated June 16, 2014). The Wangs have not established that Schram has personal knowledge of the statement in ¶13 of his affirmation. *See* Fed. R. Evid. Rule 602.

   ***Plaintiff's Second Objection to ¶63***: The Plaintiff also objects to the assertion in ¶63 because it is false. Ten paintings sold at auction for equal to or less than their 2003 Sotheby's appraisal value. Twenty-nine sold at auction for *more* than their Sotheby's appraisal value. Second Savitsky Decl. Exh. 80.

64.    The results of the Sotheby's sale were the "best indicator" that the 2004 Sotheby's Appraisal values were accurate and an appropriate barometer to be relied upon by the PA.  (Ex. 11 at KING-SCT-000003230; ¶ 13.).

> ***Plaintiff's First Objection to ¶64***:  The Plaintiff objects to the assertion in ¶64 due to its reliance on inadmissible hearsay: Kelly Decl. <u>Exh. 11</u> (Affirmation of Peter Schram dated June 16, 2014). The Wangs have not established that Schram has personal knowledge of the statement in ¶13 of his affirmation. *See* Fed. R. Evid. Rule 602.
>
> ***Plaintiff's Second  Objection to ¶64:*** The Plaintiff further objects to paragraph ¶64 as an fallacious, improper, and inadmissible opinion as to the accuracy of 2004 Sotheby's Appraisal from a person (Schram) not qualified as an expert and who did not submit an expert report in accordance with Fed. R. Civ. P. Rule 26. *See* Kelly Decl. <u>Exh. 11</u> at ¶13.  The actual "best indicator" of the value of the paintings is qualified expert opinion and testimony on the subject. *See* Regan Decl. at ¶3.[6]

**E.    The Sales of the 98 Paintings**

65.    Sotheby's advised the PA that Asia was the appropriate market for the works not selected for auction.  (Ex. 11 at ¶ 11; Ex. 26 at ¶ 9.)

> ***Plaintiff's First Objection to ¶65***:  The Plaintiff objects to the assertion in ¶65 due to its reliance on fallacious inadmissible hearsay: Kelly Decl. <u>Exh. 11</u> (Affirmation of Peter Schram dated June 16, 2014) and Kelly Decl. <u>Exh. 26</u> (Affirmation of Glenn Opell dated May 20, 2015). Fed. R. Evid. Rules 602, 801. The Wangs have not provided an adequate foundation that Schram has personal knowledge of the

---

[6] Plaintiff submits the Declaration of Patrick Regan, dated February 13, 2020 ("Regan Decl.") [ECF Dkt. 201] in support of her opposition to the Defendants' motion for summary judgment.

Estate's discussions with Sotheby's concerning the sale of Estate artwork. *See* Kelly Decl. Exh. 8 at 25:17-22. As for Opell, he did not begin representing the PA until 2014—years after the Estate's 98 Paintings were sold. PA Decl. at n. 2. Thus, he too lacks personal knowledge of the Estate's pre-sale discussions with Sotheby's. Other than these two inadmissible affirmations of counsel, there are no letters, emails, reports, or other documents in the Record which substantiate the false claim in ¶65. Second Savitsky Decl. at ¶7.

***Plaintiff's Second Objection to ¶65***:  The Plaintiff further objects to ¶65 because it is a false statement disproven by the documentary record. First, the Estate auctioned works through Sotheby's in March 2006—*after* five of the six private sales at issue in this action had already been completed. *See* Wang SMF at ¶¶108, 122, 130, 137, 142, *infra*.  Thus, none of the 84 classical Chinese paintings that had been sold between February 2005 and February 2006 were available for selection for auction in March 2006 (by Sotheby's or Andrew), rendering the claim in ¶67 irreconcilable with the uncontested facts related to the timing of the private sales and the Sotheby's auction. Second, email records establish that Andrew first proposed selling "some contemporary paintings, including some rocks, for 2006 spring auction at Sotheby's" in September 2005. PA Decl. Exh. 26 (KING 007615-7616). The claim in ¶65 that Sotheby's selected artworks for auction first, and the Estate sold the remaining painting privately second gets the timeline backwards: Andrew privately sold the Estate's most valuable paintings to the strawmen buyers first, and then auctioned the leftovers, which he selected himself. PA Decl. Exh. 26 (KING 007626).

66.     As alleged in the FAC, AW is a "prominent art collector" in Asia.  (Ex. 3 at ¶ 275.)

67.     The PA and AW then agreed that AW should attempt to find private buyers in Asia for the works that Sotheby's did not want to include in an auction.  (Ex. 8 at 26:14-27:20; Ex. 11 at ¶ 11.)

> *__Plaintiff's First Objection to ¶67__*:  The Plaintiff objects to the assertion in ¶67 due to its reliance on inadmissible, unreliable double hearsay: Kelly Decl. <u>Exh. 11</u> (Affirmation of Peter Schram dated June 16, 2014). Not only is Schram's 2014 affirmation itself hearsay, but Schram testified at his deposition in 2019 that he could not recall having any discussions with Sotheby's "about selling the estate-owned artworks" in which he personally participated. Savitsky Decl. <u>Exh. 12</u> (25:12-22). Therefore, Schram lacks personal knowledge of the alleged discussions identified in ¶10 of his affirmation and the Wang Defendants have failed to establish adequate foundation for this testimony. *See* Fed. R. Evid. Rule 602.

> *__Plaintiff's Second Objection to ¶67__*:  The Plaintiff further objects to ¶67 because it is a false statement disproven by the documentary record. <u>First</u>, the Estate auctioned works through Sotheby's in March 2006—*after* five of the six private sales had already completed. *See* Wang SMF at ¶¶108, 122, 130, 137, 142, *infra*. Thus, none of the 84 classical Chinese paintings that had been sold between February 2005 and February 2006 were available for selection for auction in March 2006, rendering the claim in ¶67 irreconcilable with the uncontested facts related to the timing of the private sales and the Sotheby's auction. <u>Second</u>, email records establish that Andrew first proposed selling "some contemporary paintings,

including some rocks, for 2006 spring auction at Sotheby's" in September 2005. PA Decl. <u>Exh. 26</u> (KING 007615-7616). The claim in ¶67 that Sotheby's selected artworks for auction first, and the Estate sold the remaining painting privately second gets the timeline backwards: Andrew privately sold the Estate's most valuable paintings to the strawmen buyers first, and then auctioned the leftovers, which he selected himself. PA Decl. <u>Exh. 26</u> (KING 007626).

68.     The PA and AW agreed upon a procedure to sell the remaining works and which the PA felt ensured the prices AW proposed were the appropriate prices.  (Ex. 8 at 77:17-78:4; Ex. 11 at ¶ 11.)

> ***Plaintiff's Objection to ¶68***:  The Plaintiff objects to the assertion in ¶68 because it is false that that the PA and AW agreed to privately sell the classical Chinese paintings which were "remaining" after Sotheby's selected certain others for auction. This gets the timeline backwards. The Estate auctioned works through Sotheby's in March 2006—*after* five of the six sales had already completed. *See* Wang SMF at ¶¶108, 122, 130, 137, 142, *infra*.  Moreover, email records establish that Andrew first proposed selling "some contemporary paintings, including some rocks, for 2006 spring auction at Sotheby's" in September 2005. PA Decl. <u>Exh. 26</u> (KING 007615-7616). Thus, none of the 84 classical Chinese paintings that had been sold privately between February 2005 and February 2006 were available for selection for auction in March 2006.  The cited-to statements of Peter Schram that the privately sold paintings were first rejected by Sotheby's as unsuitable for auction (i) comprise inadmissible hearsay on matters for which Schram has no personal knowledge; (ii) have no supporting or corroborating documentary support;

and (iii) are flatly contradicted by the documents that have been produced. Savitsky Decl. Exh. 12 (25:12-22) (Schram testifying that he could not recall having any discussions with Sotheby's about selling the estate-owned artwork in which he personally participated); Second Savitsky Decl. at ¶8 (there are no emails or other communications in the Record indicating in Sotheby's rejected any Estate paintings from auction); PA Decl. Exh. 26 (KING 007615-7616) (Andrew first proposing to sell certain paintings which he claimed were unsuitable for private sale through an auction in September 2005). Moreover, both Ewald and the PA relied upon Andrew's representations that he was negotiating with the potential buyers in order to receive the best price possible for the Estate. *See* Savitsky Decl. Exhs. 32 (WANG001890); 64 (WANG003432-33); and 67 (AWSK_0015263-64).

69.     First, the PA required the proposed sales to be at least 20% higher than the 2004 Sotheby's Appraisal values, unless specific circumstances justified a lower price, to account for any upward change in the market since the date of CC's death. (Ex. 11 at ¶ 11; Ex. 30.)

>    ***Plaintiff's Objection to ¶69***: The Plaintiff objects to the assertion in ¶69 as false. Thirty-four of the 98 Paintings (more than a third) sold by the Estate were sold for *less* than 20% higher than their 2004 Sotheby's Appraisal values. Five were sold at only a 10% increase, 15 were sold at a 0% increase, and 14 were sold for *less* than their Sotheby's Appraisal valuations:
>
>    - Wei Zheng sales*: compare* PA Decl. Exh. 5 at KING 005956 (initial Wei Zheng sale proposal with Sotheby's values) *with* PA Decl. Exh. 8 at KING 006006 (final Wei Zheng sale prices);
>
>    - Chen Mei Lin sales*: compare* PA Decl. Exh. 9 at KING 006487-48 (initial Chen Mei Lin sale proposal with Sotheby's values) *with* PA Decl. Exh. 12 at KING 006506 (final Chen Mei Lin sale prices);

- Anthony Chou sales: *compare* PA Decl. <u>Exh. 13</u> at KING 006602-03 (initial Anthony Chou sale proposal with Sotheby's values) *with* PA Decl. <u>Exh. 14</u> at KING 006615 (final Anthony Chou sale prices);

- Yong Qing Ye first sales: *compare* PA Decl. <u>Exh. 16</u> at KING 006942-43 (initial Yong Qing Ye first sale proposal with Sotheby's values) *with* PA Decl. <u>Exh. 18</u> at KING 007010 (final Yong Qing Ye first sale prices);

- Yong Qing Ye second sales: *compare* PA Decl. <u>Exh. 20</u> at KING 007190 (initial Yong Qing Ye second sale proposal with Sotheby's values) *with* Kelly Decl. <u>Exh. 50</u> at WANG000633 (final Yong Qing Ye second sale prices);

- Yue Da Jin sales: *compare* PA Decl. <u>Exh. 23</u> at KING 007362-64 (initial Yue Da Jin sale proposal with Sotheby's values) *with* Savitsky Decl. <u>Exh. 68</u> at WANG000536 (final Yue Da Jin sale prices).

In fact, the Estate almost never required a mark-up for its most valuable paintings. Of the 19 paintings valued in the Sotheby's Appraisal to be worth $75,000 or more, a 20% markup was received on only four of them. *Id.*

70. In several instances, the proposed prices conveyed by AW were for more than 20% above the Sotheby's appraised values. (Ex. 54; Ex. 55.)

> ***Plaintiff's Objection to ¶70***: The Plaintiff objects to the assertion in ¶70 as false. In only two instances (not several) out of 98 did the Estate sell paintings for more than 20% of their Sotheby's July 3, 2003 appraisal values: OTE 200 sold at a 30% (a mere $480 more than its Sotheby's valuation) increase as did OTE 1000 (a mere $9,000 more). *See* Kelly Decl. <u>Exhs. 62</u> at KING 006607 and <u>64</u> at KING 006615.

71. Second, the PA retained an independent art appraiser – Elin Lake-Ewald ("Lake-Ewald") of O'Toole-Ewald Art Associates, Inc. ("OTE") – to review the proposed sales. (Ex. 8 at 36:9-37:8; 77:17-78:4; Ex. 11 at ¶ 11; Ex. 31.)

72. This procedure was followed by AW and the PA for the sales of the 98 Paintings. (Ex. 11 at ¶ 12.)

*__Plaintiff's First Objection to ¶72__*:  The Plaintiff objects to the assertion in ¶72 due to its reliance on inadmissible hearsay: Kelly Decl. Exh. 11 (Affirmation of Peter Schram dated June 16, 2014).

*__Plaintiff's Second Objection to ¶72__*:  The Plaintiff objects to the assertion in ¶72's use of the phrase "[t]his procedure" for the same reasons it objected to ¶¶69-70 of the Wang SMF.

73.    The PA required AW to submit to her, in writing, the terms of any proposed sale, including, the appraised value of each such artwork, and the purchaser's offer for each asset. (Ex. 31.)

74.    All of this information was submitted to Peter Schram ("Schram"), counsel for the PA, who then transmitted it to the PA.  (Ex. 31.)

75.    Upon obtaining an offer for a group of artworks, AW's counsel, Martin Klein ("Klein") conveyed the proposal to Schram who would send the offers to OTE and the PA.  (Ex. 8 at 68:10-69:21; Ex. 11 at ¶ 11; Ex. 32; Ex. 33; Ex. 34; Ex. 35; Ex. 36; Ex. 37; Ex. 38; Ex. 39; Ex. 40; Ex. 41.)

76.    After the PA received a proposal, she consulted with OTE, and based on her consultation with OTE, decided whether to approve the proposed sales.  (Ex. 8 at 28:23-30:8; Ex. 31.)

77.    Upon its receipt of the terms of a proposed sale, the PA sent the information to OTE, who then conducted an independent review of the proposed sale prices.  (Ex. 42; Ex. 43; Ex. 44; Ex. 45; Ex. 46; Ex. 47; Ex. 48 at 44:13-21; 46:12-15; 171:7-19; 184:10-186:6.)

*__Plaintiff's Objection to ¶77__*:  The Plaintiff objects to the assertions in ¶77 as false. In rendering her opinion, Ewald often consulted with Andrew directly and

her reviews were, therefore, not "independent." *See, e.g.*, Savitsky Decl. Exhs. 15

at KING 005585 (ELE-17); 64; and 66 at WANG003414.

78.     When reviewing proposed prices, Lake-Ewald considered relevant information at

the available time, including her review of: (Ex. 26 at ¶ 16.)

- The 2004 Sotheby's Appraisal.  (Ex. 26 at ¶ 16; Ex. 48 at 65:8-66-23; 103:2-17; 186:13-187:19; 203:11-204:2.)

- Auction results for comparable works and auction records subsequent to the 2004 Sotheby's Appraisal.  (Ex. 26 at ¶ 16; Ex. 48 at 65:8-66-23; 103:2-17; 186:13-187:19; 203:11-204:2.)

- Advice and input of subject matter experts including Robert Ellsworth and Peter Rosenberg, both of whom are noted dealers/collectors of Classical Chinese artwork.  (Ex. 26 at ¶ 16; Ex. 48 at 65:8-66-23; 103:2-17; 186:13-187:19; 203:11-204:2.)

- Consulted directly with Chang, who performed the 2004 Sotheby's Appraisal, and who was intimately familiar with the artworks based on his personal relationship with C.C.  (Ex. 69.).

***Plaintiff's First Objection to ¶78***:  The Plaintiff objects to the assertions in ¶78 due

to its reliance upon inadmissible double hearsay: Kelly Declaration Exh. 26 (the

affirmation of Glenn Opell dated May 20, 2015). Glenn Opell did not join as

counsel for the PA until January 1, 2014, long after Elin Ewald completed her

reviews. PA Decl. at n. 2. Mr. Opell therefore does not have personal knowledge

as to what Ms. Ewald did or did not consider when reviewing Estate assets between

2005 and 2009 and his affirmation comprises inadmissible double hearsay.

***Plaintiff's Second Objection to ¶78***:   Plaintiff objects to the assertion in ¶78 as

false to the extent it is attempting to imply that Ewald spoke to Robert Ellsworth,

Peter Rosenberg, and Arnold Chang with respect to her review of *each* of the six

sales. The citations made to Ewald's deposition do not support this claim. *See* Kelly Decl. Exh. 48 at 65:8-66-23; 103:2-17; 186:13-187:19; 203:11-204:2).

79.     Lake-Ewald testified that the identity of the proposed buyers was not material to her decision if proposed prices were reasonable.  (Ex. 48 at 171:20-173:14.)

80.     Lake-Ewald testified: "the price is whatever the price is that I've researched." (Ex. 48 at 173:2-14.)

> ***Plaintiff's Objection to ¶80***:  The Plaintiff objects to the assertion in ¶80 because it comprises an inadmissible opinion from a witness who was not qualified as an expert nor submitted an expert report in accordance with Fed. R. Civ. P. Rule 26.

81.     Only after receipt of Lake-Ewald's opinions of the sales, were the sales approved by the PA.  (Ex. 8 at 14:13-15:5; Ex. 49; Ex. 50; Ex. 51; Ex. 52; Ex. 53.)

82.     Schram testified: "I would not review the terms of [a] sale with the Public Administrator.  That wasn't my job, and I certainly had no expertise to evaluate the terms of the sale.  As it would be forwarded to the Public Administrator, who would consult with Elin Ewald, or I would forward it to Elin Ewald, and then the decision would come back to me and I would let Marty Klein know."  (Ex. 8 at 80:19-81:12.)

83.     Klein forwarded both proposed and finalized contracts to Schram.  (Ex. 8 at 69:16-21.)

84.     98 Estate artworks were sold pursuant to this process in six separate sales between 2005 and 2009.  (Ex. 49; Ex. 50; Ex. 51; Ex. 52; Ex. 53; Ex. 64.)

85.     YK's attorney, Hugh Mo, was made aware of the procedure followed by the Estate to sell the 98 Paintings by July 29, 2005.  (Ex. 31.)

*__Plaintiff's Objection to ¶85__*:  The Plaintiff objects to the assertion in ¶85 to the

extent it implies that Hugh Mo was made aware of the procedure described above

in the Wang SMF. Exhibit 31 to the Kelly Declaration does not support the

contention that Hugh Mo was made aware that the Estate was selling classical

Chinese paintings,  how many paintings had been sold, when they were sold, who

they were sold to, at what prices they were sold, where they were being sold, how

the sales were being negotiated, or that Elin Lake-Ewald was reviewing the sales

based upon consultations with Andrew. *Id.*; YK Decl. at ¶20;[7] Savitsky Decl. Exhs.

63, 64 and 65.

86.    The Estate raised a total of approximately $4.3 million from the sales.  (Ex. 49;

Ex. 50; Ex. 51; Ex. 52; Ex. 53; Ex. 64.)

87.    According to counsel for the PA, this procedure was followed by AW and the PA

for the sales of "every one" of the 98 Paintings.  (Ex. 11 at ¶ 12.)

*__Plaintiff's Objection to ¶87__*:  The Plaintiff objects to the assertion in ¶87 due to its

reliance on inadmissible hearsay: Kelly Decl. Exh. 11 (Affirmation of Peter Schram

dated June 16, 2014). The Wangs have failed to establish that Schram has personal

knowledge of what Elin Lake-Ewald did in preparation for the sale of "every one"

of the 98 Paintings. *See* Fed. R. Evid. Rule 602.

88.    According to counsel for the PA, all of the artwork was sold with the PA's

approval.  (Ex. 8 at 14:13-15:5.)

---

[7] Plaintiff submits the Declaration of Yien-Koo Wang King, dated February 14, 2020 ("YK Decl.") [ECF Dkt. 198] in support of her opposition to the Defendants' motion for summary judgment.

89.    To facilitate the buyers' payments from mainland China, AW, accepted payment at a bank account he controlled in Hong Kong, and, upon his receipt of the funds, forwarded the payment to the Estate's bank account in the U.S.  (Ex. 22 at 18:4-12, 22:7-21, 240:20-242:21, 245:2-14, 316:20-24.)

> ***Plaintiff's Objection to ¶89***:  The Plaintiff objects to the assertion in ¶89 as false. As an initial point, the Plaintiff agrees that the cited-to testimony of Andrew Wang, along with documentary record, indicates that the approximately $4.3 million paid to the Estate for the sale of the 98 Paintings between 2005 and 2009 came from "a bank account [Andrew] controlled in Hong Kong." *See* Kelly Decl. Exh. 22 at 240:20-245:14 (Andrew's testimony regarding corporate wires); Savitsky Decl. Exh. 46 at WANG001676; WANG001679; WANG001681 (wire records indicating three payments were made to the Estate in relation to three sales "By Order of" "8480185540" through JP Morgan Chase); WANG001674 (wire record indicating the final payment to the Estate in relation to the sale to Yue Da Jin was made "By Order of" Le Style Limited, Andrew's off-shore company).  However, ¶89's claim that the reason this occurred was to "facilitate the buyers' payments from mainland China" is untrue: it is offered by Andrew as a transparent pretext for why document discovery in this action exposed him as the source of the multi-million dollar payments to the Estate. Back in 2013—before discovery in this case had begun—Andrew testified during a deposition that he did *not* know how the purported buyers wired their payments to the Estate: "I don't know [where the payments were made from]. We just gave them [the Buyers] the account. They just wire the money here [to the U.S.]." *Compare* Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:19-945:5; *see also id.* at 727:21-729:22, 949:19-950:17) *with* Kelly Decl.

Exh. 22 at 240:2-243:2 (6/25/2019 AW Dep. Trans.). Moreover, there are no transaction records, emails, or other communications between Andrew and the purported buyers which corroborate the arrangement described in ¶89. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 245:20-246:246:22); *id.* at ¶7. In fact, emails by Andrew and Klein sent at the time of the sales expressly represent that the payments were supposedly being wired by the buyers directly into the Estate's account. Savitsky Decl. Exhs. 57 at WANG002130 (Klein email to Schram, with Andrew copied, representing: "Please note that the buyer is wiring the purchase price directly into the Estate account."); 67 at AWSK_00015264; *see also* Second Savitsky Decl. Exh. 81 at WANG003334 (Andrew emailing Klein "I will ask my client to wire the fund to the following account: Estate of Chi-Chuan Wang c/o Kamerman & Soniker P.C. North Fork Bank 750 Third Avenue, N.Y. 10017, ABA# 021407912, Estate of Chi-Chuan Wang Account #: ▮▮▮▮5635"); Second Savitsky Decl. Exh. 82 at AWSK_00007768. Thus, Andrew's brand-new, self-serving claims that there was really a whole other level of transactions between him and the five strawmen buyers (to explain why bank records prove he was paying millions to the Estate) has no documentary support whatsoever and is belied by his own testimony in 2013. Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:19-945:5; *see also id.* at 727:21-729:22, 949:19-950:17).

90.     Transfers through Hong Kong were necessary because "the only way to … transfer the money out of China is going through a company in Hong Kong," and "Chinese citizens … cannot set up a company in Hong Kong."  (Ex. 22 at 241:20-22; 245:2-14.)

        ***Plaintiff's First Objection to ¶90***:  The Plaintiff objects to the assertion in ¶90 as inadmissible opinion testimony concerning Chinese banking and financial laws

from a person who is not qualified to offer an expert opinion and who has not submitted an expert report in accordance with Fed R. Civ. P. Rule 26; Fed. R. Evid. Rule 701.

**_Plaintiff's Second Objection to ¶90_**:  The Plaintiff objects to ¶90 as false and contradicted by Andrew's deposition testimony in 2013—given before it was discovered that his offshore corporate accounts were the sources of $4.3 million in payments to the Estate. When asked in 2013 how the purported Chinese buyers were able to wire money to the Estate from China, Andrew testified: "I don't know [where the payments to the Estate came from]. We just gave them the account. They just wire the money here." Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:14-20). In discussing how the buyers could pay money out of China, Andrew surmised: "They have their way. If a company have import and transport, or export business, they could get a government quota to wire the money directly to foreign countries. You know, they could give other reasons instead of buying artworks." Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:19-945:5 *see also id.* at 727:21-729:22).

91.     AW testified that "If I don't set up the company, the money cannot be transferred here to the estate. And they always ask a favor to use my company or to set up the company for the transfer." (Ex. 22 at 242:8-21.)

**_Plaintiff's Objection to ¶91_**:  The Plaintiff objects to Andrew's 2019 deposition testimony contained in ¶91 as false and flatly contradicted by Andrew's 2013 deposition testimony. In December 2013, Andrew testified that he was ignorant of how exactly the purported buyers made payments to the Estate: "I don't know [where the payments came from]. We just gave them [the Buyers] the account. They just wire the money here [to the U.S.]." Savitsky Decl. Exh. 24 (2013 AW Dep. Trans.

32

at 944:19-945:5; *see also id.* at 727:21-729:22, 949:19-950:17). When asked how they managed to do this in view of Andrew's testimony that a person cannot wire money out of China to the United States, Andrew testified: "They have their way. If a company have import and transport, or export business, they could get a government quota to wire the money directly to foreign countries. You know, they could give other reasons instead of buying artworks." Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:19-945:5 *see also id.* at 727:21-729:22). And though he now testifies that he set up the companies at the request of the strawmen buyers, Andrew testified in 2013 that he did not have any interest in corporate entities at the time of the sales. *See* Savitsky Decl. Exh. 24 at 97:14-98:23. Moreover, his current testimony that he set up the companies and that he was the one doing the transferring on their behalf is not supported by a single bank record, email or any other document in the Record. Second Savitsky Decl. at ¶9. Andrew has not produced any financial records for the companies which he used to pay money to the Estate. He has not produced any incorporation records for these companies either. *Id.*

92.    Artworks were delivered to Hong Kong "for the purpose of saving taxes for the buyers." (Ex. 22 at 256:3-5.)

> ***Plaintiff's Objection to ¶92***:    The Plaintiff objects to the assertion in ¶92 as misleading. The reason the Estate's artworks were delivered to Hong Kong was because that is where Andrew's accountant had her office and Andrew was the buyer of all 98 Paintings. Savitsky Decl. Exh. 11 (6/25/2019 AW Dep. Trans. at 254:16-256:18; 311:13-19). If anyone saved on taxes through the shipment of the 98 Paintings to Hong Kong, it was Andrew and/or his companies since they were the ones

paying for the paintings.  *See* Kelly Decl. <u>Exh. 22</u> at 18:4-12, 22:7-21, 240:20-242:21, 245:2-14, 316:20-24.

93.      Each group of artworks was shipped to the respective buyer "c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road, Kowloon, Hong Kong."  (Ex. 33; Ex. 55; Ex. 59; Ex. 61; Ex. 72.)

> ***Plaintiff's Objection to ¶93*:**  The Plaintiff objects to the assertion in ¶93 as false to the extent it implies that the buyers are real people who actually purchased paintings from the Estate but admits that the Estate paintings were shipped to the five purported buyers "c/o Billie Wai." *See* Kelly Decl. <u>Exh. 33</u>; <u>Exh. 55</u>; <u>Exh. 59</u>; <u>Exh. 61</u>; <u>Exh. 72</u>.

94.       Billie Wae was the office manager for AW's accountant, C.K. Lam, in Hong, Kong.  (Ex. 22 at 127:14-128:9.)

> ***Plaintiff's Objection to ¶94*:**  The Plaintiff objects to the assertion in ¶94 as false. Billie Wai is Andrew's accountant at the C.K. Lam accounting firm. Savitsky Decl. <u>Exh. 11</u> (6/25/2019 AW Dep. Trans. at 311:13-19).

95.      Artworks were shipped to Ms. Wae because -- having been his accountant for 20 years -- Ms. Wae was someone AW trusted and, accordingly, Ms. Wae's office was a reliable place AW could ship the paintings.  (Ex. 22 at 319:10-18.)

### 1.      Sale #1: 17 Paintings on 02/16/2005 to Raymond Ye

96.      On January 27, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a proposal for the purchase of 17 Estate-owned artworks by Mr. Wei Zheng ("Zheng") for $395,730.00.  (Ex. 54.)

97.     On February 8, 2005, Klein emailed Schram a proposed contract for the sale of art to Zheng.  (Ex. 55.)

98.     The contract of sale listed Zheng's address as 97-37 63rd Road, Apt. #2F, Rego Park, NY 11374.  (Ex. 55.)

99.     The contract of sale listed Zheng's shipping address as: Mr. Wei Zheng, c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road, Kowloon, Hong Kong.  (Ex. 55.)

100.    AW contacted Zheng to request Zheng's assistance finding buyers for Estate artworks.  (Ex. 26 at ¶ 9.).

> **_Plaintiff's Objection to ¶100_**:  The Plaintiff objects to the assertion in ¶100 due to its reliance upon inadmissible hearsay, namely Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did not join as counsel for the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation simply reports on and characterizes the testimony of a third-party, Zheng. The statement in ¶100 is therefore hearsay and inadmissible. Fed. R. Evid. Rule 801. It is also false since the Wangs were the true purchasers.

101.    Zheng acted as a "matchmaker" and put AW in contact with the intended buyer, his friend Tan Yun.  (Ex. 26 at ¶¶ 9, 14.)

> **_Plaintiff's Objection to ¶101_**:  The Plaintiff objects to the assertion in ¶101 due to its reliance upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did not join as counsel for

the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation simply reports on and characterizes the testimony of a third-party, Zheng. The statement in ¶101 is therefore hearsay and inadmissible. Fed. R. Evid. Rule 801. It is also false since the Wangs were the true purchasers.

102.   Tan Yun was a collector in mainland China.  (Ex. 26 at ¶ 9.)

***Plaintiff's Objection to ¶102***:  The Plaintiff objects to the assertion in ¶102 due to its reliance upon inadmissible hearsay: Kelly Declaration Exh. 26 (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did not join as counsel for the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation simply reports on and characterizes the testimony of a third-party, Zheng. The statement in ¶102 is therefore hearsay and inadmissible. Fed. R. Evid. Rule 801.

103.   Zheng received no fee for introducing AW and Tan Yun.  (Ex. 26 at ¶ 11.)

***Plaintiff's Objection to ¶103***:  The Plaintiff objects to the assertion in ¶103 due to its reliance upon inadmissible hearsay: Kelly Declaration Exh. 26 (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did join as counsel for the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation simply reports on and characterizes the testimony of a third-party, Zheng. The statement in ¶103 is

therefore hearsay and inadmissible. Fed. R. Evid. Rule 801. It is also false since the Wangs were the true purchasers.

104.     After Tan Yun and AW agreed upon a price, Tan Yun asked Zheng to sign the purchase and sale agreement and bill of sale on his behalf.  (Ex. 26 at ¶ 12.)

> ***Plaintiff's Objection to ¶104***:  The Plaintiff objects to the assertion in ¶104 due to its reliance upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did not join as counsel for the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation simply reports on and characterizes the testimony of a third-party, Zheng. The statement in ¶104 is therefore hearsay and inadmissible. Fed. R. Evid. Rule 801. It is also false since the Wangs' were the true purchasers.

105.     According to Zheng, he signed the documents as a matter of convenience for Tan Yun because Tan Yun lived in mainland China and an original signature was required.  (Ex. 26 at ¶ 12.)

> ***Plaintiff's Objection to ¶105***:  The Plaintiff objects to the assertion in ¶105 due to its reliance upon inadmissible hearsay, namely Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did not join as counsel for the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation simply

reports on and characterizes the testimony of a third-party, Zheng. The statement in ¶105 is therefore hearsay and inadmissible. Fed. R. Evid. Rule 801.

***Plaintiff's Objection to ¶¶100-105***: The Plaintiff further objects to the assertions in ¶¶100-105 as demonstrably false. The Wangs and Zheng give the explanation that Zheng (who admits he was not the buyer) signed his sales contract with the Estate (which expressly identifies him as the buyer, the "Zheng Agreement") because "an original signature was required." Wang SMF ¶105, *supra*. But this not true. The Zheng Agreement states—on the signature page itself—that no original signature was required: "[a] signed telefaxed copy of this Agreement (or any subsequent amendment or addendum thereto) shall have the same force and effect as an original signed copy of this Agreement." Savitsky Decl. Exh. 48 (WANG001198). The *post hoc* explanation for why Wei Zheng signed the agreements even though he was not the true buyer is, therefore, bunk.

Instead, all emails and communications sent by Andrew to Klein in February 2005 indicate that Wei Zheng was "the Buyer" of Estate paintings because Andrew wanted the PA to believe that Wei Zheng was "the Buyer" of Estate paintings. *See, e.g.*, Savitsky Decl. Exhs. 39, 45 and 48.  In January 2005, Andrew drafted the initial Zheng Agreement identifying Zheng as "the Buyer" and titled the draft agreement "Mr. WeiZheng's Purchase.wpd." Savitsky Decl. Exh. 39.   On February 10, 2005, Klein wrote Andrew that he needed "the buyer's wire instructions to insert in the contract in case the buyer elects to cancel the sale. . .." Savitsky Decl. Exh. 45 (WANG003441). Andrew responded later that day that "the buyer has already signed all the last pages for me. He will give me his bank

information by tomorrow morning." *Id.* The next day, Andrew emailed Wei Zheng's personal bank account information to Klein. *Id.* (WANG003440). Andrew then submitted all of the paperwork Zheng had signed to Klein by February 16. Savitsky Decl. Exh. 48 (WANG001194, 1202-03). Crucially, there are no documents in the Record from the relevant time period notifying the PA, Klein, or Schram that Wei Zheng was not the actual buyer of Estate paintings. Savitsky Decl. at ¶¶10-11. Because Andrew now admits he knew Zheng was not the real buyer at the time the Zheng Agreement was drafted, circulated, and signed, he was lying to his co-fiduciary and defrauding the Estate. *See* Wang SMF ¶¶100-105, *supra.*

Moreover, it is undisputed that Andrew paid for the paintings using an offshore corporation he owned at the time and had them shipped to his accountant's office in Hong Kong. *See* Wang SMF ¶¶89, 93, 94, *supra*. It is also beyond cavil that Andrew never revealed this to the PA at the time (and took affirmative steps to cover-up) his role in paying for and receiving the paintings to delay the commencement of this action. For example, at his 2013 deposition, Andrew (1) claimed he did not know how the wire payments were made to the Estate and that he believed the buyers just wired the money to the Estate directly, (2) denied having ownership or control of *any* corporate entities at the time of the Zheng sale, and (3) denied having *any* pre-existing relationship with Billie Wai or her office. *See* Savitsky Decl. Exh. 24 (2013 AW Dep. Trans. at 944:19-945:5; *see also id.* at 727:21-729:22) (denying knowledge about how the Estate was wired money from China); *id.* at 97:14-98:23) (denying that he had any interest in any companies between 2005 and 2009); *id.* at 727:21-24; 943:19-944:13, 945:6-946:12 (denying any pre-existing relationship with Billy Wai or her office).

106.    The sale to Tan Yun was never finalized because shortly after the agreements were signed, Tan Yun was diagnosed with a terminal illness and no longer wished to purchase the paintings.  (Ex. 26 at ¶ 9.)

> ***Plaintiff's Objection to ¶106***:  The Plaintiff objects to the assertion in ¶106 due to its reliance upon inadmissible hearsay: Kelly Declaration Exh. 26 (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did not join as counsel for the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation, an out of court statement submitted in a different context and without the Plaintiff's opportunity to cross examine in the instant context, simply reports on and characterizes the testimony of a third-party, Wei Zheng. The statement in ¶106 is therefore hearsay and inadmissible. Fed. R. Evid. Rule 801. It is also false since the Wangs were the true buyers of all 98 Paintings. *See* King Rule 56 Statement of Uncontested Material Facts [ECF Dkt. 199] at ¶¶56-134.

107.    When Tan Yun backed out of the sale, AW found a replacement buyer, Raymond Ye, who stepped in to purchase the paintings.  (Ex. 16 at KINGPROD5 - 01144, ¶ 4; Ex. 22 at 109:16-110:8; Ex. 26 at KING-SCT-000006520.)

> ***Plaintiff's First Objection to ¶107***:  The Plaintiff objects to the assertion in ¶107 to the extent it relies upon inadmissible hearsay: Kelly Declaration Exh. 26 (the affirmation of Glenn Opell dated May 20, 2015). First, Glenn Opell did not join as counsel for the PA until January 1, 2014, long after the Estate's sales took place. PA Decl. at n. 2. He therefore has no personal knowledge of Andrew and Zheng's

agreement. Fed. R. Evid. Rule 602. Second, Opell's attorney affirmation, an out of court statement submitted in a different context and without the Plaintiff's opportunity to cross examine in the instant context, simply reports on and characterizes the testimony of yet another third-party, Wei Zheng. The statement in ¶107 is therefore hearsay and inadmissible. Fed. R. Evid. Rule 801.

**_Plaintiff's Second Objection to ¶107_**:  The Plaintiff objects to the assertion in ¶107 as false. First, Andrew's testimony is not credible for, *inter alia*, the reasons set forth in the Plaintiff's objections to Wang SMF ¶105, *supra*. Second, the name "Raymond Ye" and his role as a purported substitute buyer were not disclosed to the PA until November 2014—that is, after the Estate began to express an interest in determining if Wei Zheng was a strawman buyer. Savitsky Decl. at ¶¶10-11, Exh. 47; PA Decl. at ¶45, Exh. 25. The evidence indicates Andrew has been using his attorneys to submit documentation to actively conceal his fraud. *Id.*

108.    On February 16, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $400,480.00.  (Ex. 56.)

109.    On May 20, 2015, Glenn Opell ("Opell"), counsel for the PA, submitted an Affirmation in the Surrogate's Court that discussed, among other things, Wei Zheng's May 19, 20115 deposition testimony and Mr. Opell's assessment of Zheng's credibility.  (Ex. 26.)

110.    In his Affirmation, Opell stated that: "nothing learned in the Wei Zheng deposition changes the sound policies and procedures described in the Schram Affirmation that the PA instituted to ensure the integrity of the third party estate art sales."  (Ex. 26 at ¶ 7.)

**_Plaintiff's Objection to ¶110_**:  The Plaintiff objects to the assertion in ¶110 to the extent it relies upon inadmissible double hearsay, namely that set forth in: Kelly

Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). Opell's attorney affirmation, itself an out of court statement submitted in a different context and without the Plaintiff's opportunity to cross examine in the instant context, simply reports on and characterizes the out of court testimony of a third-party, Wei Zheng. The statement in ¶110 is therefore hearsay, improper lay opinion, and inadmissible. Fed. R. Evid. Rules 602; 701; 801.

111.    Opell further stated that suggestions that Zheng was a knowing participant in a fraud perpetrated by AW to conceal the true identity of buyers of Estate artwork was belied by Zheng's behavior and responses at his deposition.  (Ex. 26 at ¶ 14.)

> ***Plaintiff's Objection to ¶111***:  The Plaintiff objects to the assertion in ¶111 to the extent it relies upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). Opell's attorney affirmation, itself an out of court statement submitted in a different context and without the Plaintiff's opportunity to cross examine, simply reports on and characterizes the out of court testimony of a third-party, Wei Zheng. The statement in ¶111 is therefore hearsay, improper lay opinion, and inadmissible. Fed. R. Evid. Rules 602; 701; 801.

112.    Opell further stated that he could not ascertain from Zheng's deposition that he was lying or duped into believing such things in order to further the conspiracy.  (Ex. 26 at ¶ 14.)

> ***Plaintiff's Objection to ¶112:***  The Plaintiff objects to the assertion in ¶112 to the extent it relies upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). Opell's attorney affirmation, itself an out of court statement submitted in a different context and without the Plaintiff's opportunity to cross examine, simply reports on and characterizes the testimony of

yet another third-party, Wei Zheng. The statement in ¶112 is therefore hearsay, improper lay opinion, and inadmissible. Fed. R. Evid. Rules 602; 701; 801.

113.    Opell further stated that that Sam Israel's (YK's attorney), conclusions from Zheng's deposition were entirely premature and founded in conjecture.  (Ex. 26 at ¶ 14.)

> ***Plaintiff's Objection to ¶113:***  The Plaintiff objects to the assertion in ¶113 to the extent it relies upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015).  Opell's attorney affirmation simply reports on and characterizes the testimony of a third-party, Wei Zheng. The statement in ¶113 is therefore hearsay, improper lay opinion, and inadmissible. Fed. R. Evid. Rules 602; 701; 801.

114.    According to Opell, Zheng appeared genuine at his deposition when he stated he believed he was acting as an intermediary for AW and Tan Yun.  (Ex. 26 at ¶ 14.)

> ***Plaintiff's Objection to ¶114:***  The Plaintiff objects to the assertion in ¶114 to the extent it relies upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). Moreover, Opell's attorney affirmation merely purports to characterize the testimony of a third-party, Wei Zheng. The statement in ¶114 is therefore hearsay, and an improper expert and or lay opinion; it is inadmissible on multiple grounds. Fed. R. Evid. Rules 602; 701; 801.

115.    According to Opell, Zheng appeared genuine at his deposition when he stated that Tan Yun had no prior relationship with AW.  (Ex. 26 at ¶ 14.)

> ***Plaintiff's Objection to ¶115:***  The Plaintiff objects to the assertion in ¶115 to the extent it relies upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u>  is comprised

of an affirmation of Glenn Opell dated May 20, 2015 which simply reports on and characterizes the testimony of a third-party, Wei Zheng. The statement in ¶115 is therefore hearsay, improper lay opinion, and inadmissible. Fed. R. Evid. Rules 602; 701; 801.

116.    According to Opell, Zheng appeared genuine at his deposition when he stated that Tan Yun cancelled the sale because of his terminal diagnosis.  (Ex. 26 at ¶ 14.)

> ***Plaintiff's Objection to ¶116:***  The Plaintiff objects to the assertion in ¶116 to the extent it relies upon inadmissible hearsay: Kelly Declaration <u>Exh. 26</u> (the affirmation of Glenn Opell dated May 20, 2015). Opell's attorney affirmation simply reports on and characterizes the out of court testimony of a third-party, Wei Zheng. The statement in ¶116 is therefore hearsay, unqualified and therefore improper expert opinion, improper lay opinion, and is inadmissible on multiple grounds. Fed. R. Evid. Rules 602; 701; 801.

### 2.    Sale #2: 24 Paintings on 04/13/2005 to Chen Mei-Lin

117.    On March 11, 2005, Klein, from his office in New York, NY faxed to Schram at his office in New York, NY, a proposal for the purchase of 24 Estate-owned artworks by Mr. Chen Mei-Lin ("Mei-Lin") for $1,393,422.40.  (Ex. 58.)

118.    On March 22, 2005, Klein emailed Schram a revised proposed contract for the sale of art to Mei-Lin.  (Ex. 59.)

119.    The contract of sale listed Mei-Lin's address as: #777 Lane, Apt. #28-A, Xin-Ja Ave. Jing-An District, Shanghai City, P.R. China 100014.  (Ex. 59.)

120.    The contract of sale listed Mei-Lin's shipping address as: Mr. Chen Mei-Lin, c/o Billie Wai, Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong.  (Ex. 59.)

121.    On March 17, 2005, Lake-Ewald emailed the PA and Schram her opinion of the proposed sale.  (Ex. 44.)

122.    On April 22, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY, received a wire transfer for $1,393,422.40.  (Ex. 60.)

**3.     Sale #3: 17 Paintings on 06/16/2005 to Anthony Chou**

123.    On April 29, 2005, Klein, from his office in New York, NY faxed to Schram, at his office in New York, NY, a proposal for the purchase of 16 Estate-owned artworks by Mr. Anthony Chou ("Chou") for $856,689.41.  (Ex. 38.)

124.    On May 5, 2005, Lake-Ewald sent Klein a letter regarding the review of the proposed terms of the sale to Chou.  (Ex. 45.)

125.    On May 10, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a copy of a May 5, 2005 letter from Lake-Ewald regarding the proposed Chou sale, with the original proposal for the sale, and asked Schram "to advise whether the Public Administrator is giving her consent to the sale."  (Ex. 62.)

126.    On May 25, 2005, Klein emailed Schram the bill of sale and proposed contract of sale for the PA's signature regarding the sale to Chou.  (Ex. 33.)

127.    The file name for the document that is the Chou bill of sale is "CHou (sic) bill of sale."  (Ex. 33.)

128.    The contract of sale listed Chou's address as: Apt. #8, Sunshine Square, YaYunChun District, Beijing City, P.R. China 100014.  (Ex. 33 at 7574.)

129.    The contract of sale listed Chou's shipping address as: Mr. Anthony Chou, c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212, Nathan Road, Kowloon, Hong Kong. (Ex. 33 at 7574.)

130.     On June 16, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $909,689.41.  (Ex. 63.)

### 4.     Sale #4: 18 Paintings on 09/22/2005 to Yong-Qing Ye

131.     On July 27, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a proposal for the purchase of 20 Estate-owned artworks by Mr. Yong-Qing Ye ("Ye") for $830,400.  (Ex. 65.)

132.     On August 17, 2005, Lake-Ewald sent Schram her opinion of 8 of the paintings. (Ex. 66.)

133.     On August 25, 2005, Lake-Ewald sent Schram her opinion of 12 of the paintings. (Ex. 67.)

134.     On August 29, 2005, Schram faxed Klein the PA's signature pages to the Ye contract and bill of sale.  (Ex. 68 at KING 007001-7003.)

135.     In his August 29, 2005 fax, Schram informed Klein that the PA had approved the sale of 18 of the paintings for and asked Klein to confirm that two pieces of artwork, that were part of the initial proposal, would be removed from the final sale.  (Ex. 68.)

136.     Schram's fax to Klein informed Klein that the PA approved the sale to Ye "based on Elin Ewald's report [.]" (Ex. 68.)

137.     On September 21, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $789,810.00.  (Ex. 70.)

### 5.     Sale #5: 8 Paintings on 02/16/2006 to Yong-Qing Ye

138.     On December 13, 2005, Klein, from his office in New York, NY, faxed to Schram, at his office in New York, NY, a proposal for the purchase of eight Estate-owned artworks by Mr. Yong-Qing Ye ("Ye") for $346,800.  (Ex. 39.)

139.     On December 15, 2005, Lake-Ewald provided the PA with a letter setting forth her opinion of the proposed sale.  (Ex. 46.)

140.     The contract of sale listed Ye's address as: Mr. Yong-Qing Ye, Room #10, Building #29, An-Shang Park #3, Shanghai City, P.R. China 200092.  (Ex. 72.)

141.     The contract of sale listed Ye's shipping address as: Mr. Ye Yong-Qing, c/o Ms. Billie Wai, Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon Hong Kong.  (Ex. 72.)

142.     On February 16, 2005, the bank account for the Estate of Chi-Chuan Wang at North Fork Bank in New York, NY received a wire transfer for $354,045.00.  (Ex. 73.)

**6.     Sale #6: 14 Paintings on 08/17/2009 to Yue Da-Jin**

143.     On April 23, 2008, Klein, from his office in New York, NY faxed to Schram at his office in New York, NY, a proposal for the purchase of 14 Estate-owned artworks by Mr. Yue Da-Jin ("Da-Jin") for $538,800.00.  (Ex. 40.)

144.     On May 2, 2008, Dionis Rodriguez, on Lake-Ewald's behalf, faxed Schram Lake-Ewald's opinion of proposed prices of artwork for the sale to Da-Jin.  (Ex. 82.)

145.     On June 4, 2008, Klein emailed Schram a proposed contract and bill of sale and asked the PA to countersign.  (Ex. 74.)

146.     The contract of sale listed Da-Jin's address as: The Rui-Jing Palace, Rui-Jing Road, Nanjing City, China.  (Ex. 74 at WANG002260.)

147.     The contract of sale listed Da-Jin's shipping address as: Mr. Yue Da-Jin, c/o Ms. Billie Wai, Unit 704, Forseas Building, #208-212 Nothan Road, Kowloon, Hong Kong.  (Ex. 61.)

148.     On February 26, 2009, Klein emailed Schram to inform him that the proposed sale to Da-Jin fell through and asked if AW could give the buyer a 10% discount.  (Ex. 75 at AWSK_00015263 - 15264.)

149.     Schram responded "Yes."  (Ex. 75 at AWSK_00015263 - 15264.)

150.     The PA approved discounts ranging from 1% to 37% (though generally 8%) of the prices previously set forth reviewed by Lake-Ewald.  (Ex. 40; Ex. 52 at WANG000648 - 649.)

151.     On August 12, 2009, the bank account for the Estate of Chi-Chuan Wang at Capital One Bank in New York, NY received a wire transfer for $489,772.00.  (Ex. 78.)

**III.     SK Owned the Ma Yuan *Landscape Album* at All Relevant Times**

152.     SK purchased Ma Yuan *Landscape Album* at Sotheby's in 1987 through his "doing business as" name, Jian Bao Gallery, with his business partner at the time, George J. Goodstadt, Inc.  (Ex. 79; Ex. 80.)

> ***Plaintiff's Objection to ¶152:***  The Plaintiff objects to the assertion in ¶152 pursuant to Fed. R. Evid. Rule 1002 (requiring the production of the original document evidencing the alleged transaction).

153.     The invoice for the Sotheby's auction sale for $319,000 is directed to the account of "Jian Bao Gallery c/o George J. Goodstadt, Inc."  (Ex. 80.)

> ***Plaintiff's Objection to ¶153:***  The Plaintiff objects to the assertion in ¶153 pursuant to Fed. R. Evid. Rule 1002 (requiring the production of the original document).

154.     The invoice further states that it is to be shipped to "Jian Bao Gallery c/o George J. Goodstadt, Inc., 80 Post Road East, Westport CT, 06880."  (Ex. 80.)

> ***Plaintiff's Objection to ¶154:***  The Plaintiff objects to the assertion in ¶154 pursuant to Fed. R. Evid. Rule 1002 (requiring the production of the original document).

155.    Two contemporaneous checks from SK to Sotheby's, dated December 8, 1986 and February 27, 1987 total $119,000.  (Ex. 81.)

> ***Plaintiff's Objection to ¶155:***  The Plaintiff objects to the assertion in ¶155 pursuant to Fed. R. Evid. Rule 1002 (requiring production of the original document).

156.    Contemporaneous notes, and testimony from SK, indicate that $200,000.00 of the purchase price was paid from a bank account of Tao-Hsuan Chen and Hui-Chen Wang, relatives of the Wang family over whose assets CC Wang controlled.  (Ex. 81.)

> ***Plaintiff's Objection to ¶156:***  The Plaintiff objects to the assertion in ¶156 pursuant to Fed. R. Evid. Rule 1002 (requiring production of the original document).

## IV.    Undisputed Facts Concerning Paintings Owned By Northwich Soon Huat, and the Estate Allegedly Stolen in 2003

157.    Plaintiff's first amended complaint (the "FAC") alleges that in 2003 SK and AW stole 25 artworks belonging Northwich, Soon Huat, and CC (the "21+4") from a safe deposit box located at North Fork Bank and/or from CC's apartment.  (Ex. 3 at ¶¶ 47-69.)

158.    The FAC states that 13 of these 25 artworks were the property of dismissed plaintiffs Northwich or Soon Huat, not the Estate.  (Ex. 3 at ¶¶ 50, 52.)

159.    YK testified that she never saw AW or SK in possession of the 21+4.  (Ex. 4 at 144:17-25.)

>**_Plaintiff's Objection to ¶159:_** The Plaintiff objects to the assertion in ¶159 as false; it mischaracterizes the cited-to testimony. Kelly Decl. Exh. 4 at 144:3-25. It is not *speculation* that some of the Estate's most valuable paintings went missing on January 31, 2003 and that Andrew returned five of them to Yien-Koo in May 2005, it is YK's direct testimony based upon her personal knowledge. Second Savitsky Decl. Exh. 87 at 279-86, 293, 301-307. (Yien-Koo's probate trial testimony describing, in detail, the theft and partial return of the "21+4" paintings by the Wangs).

160.    The FAC states that five of the 25 paintings were returned to Plaintiff by AW (two of which were purportedly owned by Northwich, and one of which was purportedly owned by Soon Huat).  (Ex. 3 at ¶ 50.)

161.    YK testified that her claim that AW and SK stole the 21+4 is based on the fact that she saw AW "carrying a big bag," and in her view, "you can put two and two together." (Ex. 4 at 142:21-144:17-25.)

>**_Plaintiff's Objection to ¶161:_** The Plaintiff objects to the assertion in ¶161 as false because it mischaracterizes the cited-to testimony. Kelly Decl. Exh. 4 at 144:3-25. Yien-Koo has personal knowledge of what was stolen from the vault based upon knowing what was in the vault before and after January 31, 2003. *Id.* She has testified at length on her observations and inventorying of the artworks. *See, e.g.*, Second Savitsky Decl. Exh. 87 at 279-86, 293, 301-307.

162.    YK testified that the day after she allegedly saw AW and SK leaving CC's building with the 21+4, she "emptied out the box and took everything home," but made no record of what she personally took out of the box.  (Ex. 4 at 109:6-110:21.)

50

163.    YK testified January 31, 2003, the date she alleges AW and SK stole the 21+4, CC was in declining mental and physical health and would "forget where he put" paintings.  (Ex. 4 at 149:25-151:12.)

164.    YK testified that despite CC's declining health, she continued to allow him access to a safe deposit box she controlled and that she claims contained artwork worth millions of dollars.  (Ex. 4 at 153:16-154:23.)

## V.     The Surrogate's Court Appoints YK as Preliminary Executrix

165.    On May 9, 2017, Surrogate Mella revoked the preliminary letters issued to AW. (Ex. 83.)

166.    On February 15, 2018, the Surrogate's Court issued preliminary letters testamentary to YK and appointed YK as Preliminary Executrix of the Estate.  (Ex. 84 at 1.)

## VI.    The Surrogate's Court's Limitation of YK's Authority as Preliminary Executrix

167.    Pursuant to order of the Surrogate's Court, dated February 11, 2019, YK's authority as Preliminary Executrix was limited solely to pursuit of this lawsuit pending resolution of a petition by SK to revoke YK's preliminary letters testamentary (the "Revocation Order").  (Ex. 84 at 3.)

168.    The Revocation Order was based on allegations that YK was "dishonest and unfit to serve" as executrix because (i) in violation of a temporary restraining order, sold $34 million worth of Estate-owned artwork in her possession for her personal benefit, and (ii) advanced legal positions as executrix that were in her personal interest but were inimical to the interests of the Estate, i.e., in breach of her fiduciary duty to the Estate.  (Ex. 84 at 1-2.)

## VII.   The King Bankruptcy

169.    In 2007, YK and KK filed for bankruptcy in the United States District Court for the Southern District of New York.  (Ex. 85.)

170.    YK and KK's schedules of assets and liabilities filed did not disclose ownership of either Northwich Investments, Ltd. or Soon Huat, Inc.  (Ex. 76 at 4-8, 21, 86.).

> ***Plaintiff's Objection to ¶170:***  The Plaintiff objects to the assertion in ¶170 as incomplete. The Plaintiff's ownership stake in Northwich Investments Ltd. and Kenneth King's ownership stake in Soon Huat, Inc. and the assets thereof were known to each of the creditors participating in the bankruptcy proceeding and their attorneys. Second YK Decl. at ¶27. In fact, a settlement was reached with the appointed U.S. Trustee based upon the artworks owned by the entities. *Id.*

171.    YK and KK received a discharge from the Bankruptcy Court in 2010.  (Ex. 87.)

## VIII.   Undisputed Facts Concerning YK's Discovery of Her RICO Injury

172.    In a March 8, 2010 affidavit (the "March 2010 Affidavit") YK swore to the Surrogate's Court that she learned of an exhibition at the Beijing Capital Museum entitled *Bao Wu Tang* – an Important Overseas Chinese Painting and Calligraphy Collection Exhibition" (the "*Bao Wu Tang* Exhibition") in November 2009.  (Ex. 77 at ¶¶ 8-9.)

173.    YK received a copy of the exhibition catalog published in connection with the *Bao Wu Tang* Exhibition in November 2009.  (Ex. 77 at ¶¶ 8-9.)

174.    Contrary to her allegations in the FAC, in the March 2010 Affidavit, YK swore that, that:

> While in Shanghai, China in early November 2009, I became aware of an art exhibition, entitled "Bao Wu Tang – The Hall of Five Treasures," that would be displayed at the Beijing Capital Museum in Beijing, China from November 10, 2009 through November 29, 2009 (the "Exhibition").  The highly publicized Exhibition was the subject of extensive discussion within the Chinese art circle…. When I went to Beijing in late November 2009, a friend provided me with a catalog of the Exhibition, produced by the Beijing Capital Museum, which included images and descriptions of the artwork displayed in the Exhibition.  An internet image of the Exhibition brochure is available at:

http://book.kongfz.com/10249/78885593/.

(Ex. 77 at ¶¶ 8-9.)

> ***Plaintiff's Objection to ¶174:***  The Plaintiff objects to the assertion in ¶174 as false
>
> and misleading. The quotation from the Plaintiff's March 2010 affidavit is correct.
>
> However, the statement in Yien-Koo's March 2010 Affidavit is *not* contrary to the
>
> allegations in the FAC. *See* YK Decl. at ¶¶20, 56-57. Though the Plaintiff attended
>
> the 2009 Bao Wu Tang exhibition, she did not know how or why the paintings had
>
> appeared there until she received information in or about 2013 from the PA that
>
> those paintings had been purportedly sold by the Estate to five purported private
>
> buyers in China. *Id.*; *see also* Second YK Decl. at ¶¶14-17.

175.    The March 2010 Affidavit discussed the prefaces to the catalog, the very prefaces

that "touted the 27 works on display, including 11 that were supposed to have been sold to the

Straw Men." (Ex. 3 at 118; Ex. 77 at ¶ 10.)

> ***Plaintiff's Objection to ¶175:***  The Plaintiff objects to the assertion in ¶175 as
>
> misleading. The quotation in paragraph 175 is not taken from the March 2010
>
> Affidavit. Yien-Koo did not draft and file the March 2010 Affidavit about the Bao
>
> Wu Tang Exhibition because she suspected self-dealing. YK Decl. at ¶¶49-57. She
>
> had no information on the terms of extent of the Estate's sales at that time. *Id.*; *see*
>
> *also* Second YK Decl. at ¶¶14-17. Instead, she filed her March 2010 application
>
> because an entirely different set of classical Chinese paintings, which Andrew had
>
> stolen from YK in May 2005 and denied possession of, had appeared at the Bao
>
> Wu Tang Exhibition. YK Decl. at ¶¶49-57. It is for this reason that the March 2010
>
> Affidavit makes no allegations of self-dealing and does not comment on the fact

that the paintings privately sold to the five strawmen had appeared at the exhibition.

Yien-Koo simply did not have that information yet. YK Decl. at ¶57

176.    Y.K.'s allegation that she only learned of the *Bao Wu Tang* Exhibition and its

contents in 2013 is also contrary to her sworn deposition testimony that she personally attended

the *Bao Wu Tang* Exhibition in 2009.  (Ex. 89 at 631-634.)

> ***Plaintiff's Objection to ¶176:***  The Plaintiff objects to the assertion in ¶176 as false.
>
> The Plaintiff has been open about her attendance at the Bao Wu Tang Exhibition
>
> since 2010. *See* Kelly Decl. <u>Exh. 77</u>. The FAC does not allege that the Plaintiff first
>
> learned in 2013 that the 2009 Bao Wu Tang Exhibition occurred. Rather, it alleges
>
> that the Plaintiff first learned that certain of the paintings in the exhibition were part
>
> of a group of 98 Paintings had been sold to five strawmen at below market prices
>
> in 2013 (since it was then that the Estate first provided Yien-Koo with information
>
> concerning the Estate's sales). *See, e.g.*, YK Decl. at ¶¶49-57. Prior to 2013, Yien-
>
> Koo had no factual basis to suspect that the sales were made to Andrew himself,
>
> that the Estate was injured by the sales, or that the sales were achieved through
>
> Andrew's fraudulent representations. YK Decl. ¶¶51-53.

177.    The preface to the *Bao Wu Tang* Exhibition's catalog does not state that the

artwork on display was the property of AW; it only states that the "exhibition gather[ed] together

works from the collection of my late Grandfather Mr. Wang Jiqian [and] from partial collections

of family members [.]"  (Ex. 3 at ¶ 121; Ex. 77 at ¶ 10.)

178.    In a 2013 deposition in the Surrogate's Court proceeding, in response to

questioning about the *Bao Wu Tang* Exhibition by counsel to the Public Administrator, YK

testified that she personally attended the *Bao Wu Tang* Exhibition and closely inspected the

artwork on display, testifying that, apart from one reproduction, "everything else was real …
[e]verything else was genuine." (Id.) (Ex. 89 at 631-634.)

179.     Not only did YK attend the *Bao Wu Tang* Exhibition, but, according to February

12, 2019 email produced in this action, she and KK "even had someone film the show."  (Ex.

18.)

180.     Billing records produced by YK's former counsel at McLaughlin & Stern, LLP

confirm that on January 6, 2010 the firm met with the King's "regarding the Baowutang

paintings dispute" and on January 7, 2010 "[r]esearched and reviewed the Bao Wu Tang

Video[.]"  (Ex. 29 at 23.)

181.     At her deposition in this action, YK testified regarding her procurement crew to

videotape the *Bao Wu Tang* Exhibition as follows:

> Q.     So did you or did you not hire a video crew to make a –
> A.     I did not myself, no.
> Q.     Did your husband hire a video crew to make a video?
> A.     No, we didn't know anybody in that field.
> Q.     So who did you hire to make a video of the exhibition?
> A.     I think we mentioned to somebody.  I don't even
>        remember who.
> Q.     What did you mention to somebody about a video?
> A.     That we would love to have a film of the exhibition.
> Q.     Do you recall who you mentioned that to?
> A.     I don't recall.
> Q.     Have you ever seen a film of the exhibition?
> A.     No.

(Ex. 4 at 203:25-204:21.)

182.     Sam Israel, YK's counsel in this action and the signatory of the FAC (Ex. 3 at

67), defended YK's deposition at which YK admitted to attending the *Bao Wu Tang* Exhibition

(Ex. 89 at 533:2-19.)

183.   The undisputed facts establish that YK learned of the November 2009 *Bao Wu Tang* Exhibition – not in 2013, but in November 2009; that YK attended the *Bao Wu Tang* Exhibition in November 2009; that, in 2009, YK procured a videotape of the *Bao Wu Tang* Exhibition; that YK obtained a copy of the exhibition catalog for the *Bao Wu Tang* Exhibition in November 2009; and that YK took legal action in the Surrogate's Court it March 2010 regarding AW's purported display of Estate-owned paintings at the *Bao Wu Tang* Exhibition in March 2010. (Ex. 77 at ¶¶ 8-9.)

> ***Plaintiff's Objection to ¶183:***   The Plaintiff objects to the assertions in ¶183 as false and misleading.   Yien-Koo took legal action in March 2010 in relation to Andrew's display of a painting by the artist *Guo Xi* entitled "Travelers in the Autumn Mountains" which Andrew had denied receiving from Yien-Koo at the May 2005 settlement exchange in Shanghai. *See* King SMF ¶¶322-361; YK Decl. at ¶¶46-57.   Since Yien-Koo knew that she had hand-delivered that painting to Andrew, yet Andrew denied receiving it, she filed the March 2010 Affidavit to further expose his fraud. YK Decl. at ¶¶23-41, 49-57. It was not known to Yien-Koo at the time, however, that many of the *other* paintings on display were part of a group of 98 that had been privately sold by the Estate, paid for by Andrew's offshore companies, and shipped to Andrew's accountant in Hong Kong. YK Decl. at ¶¶51-52.   Yien-Koo had not yet been provided any confirmation as to what paintings had been sold by the Estate, who they had been sold to, when they had been sold, or how much they had been sold for. YK Decl. ¶¶20, 57. Yien-Koo did not receive records of the Estate's sales until 2013. *Id.*

184.    The PA was alerted to alleged misconduct by AW in connection with the

November 2009 *Bao Wu Tang* Exhibition, including his purported display of Estate artwork, by,

at the latest, March 2010, by YK's filing of the March 2010 Affidavit in the Surrogate's Court.

(Ex. 77 at ¶¶ 8-9.)

>   ***Plaintiff's Objection to ¶184:***  The Plaintiff objects to the assertion in ¶183 as
>
>   false and misleading.  The conduct which Yien-Koo complained of in March 2010
>
>   was related to Andrew's display of *Guo Xi*'s "Travelers in the Autumn Mountains"
>
>   which is one of the 46 classical Chinese paintings Yien-Koo hand-delivered to
>
>   Andrew on May 2005 as part of an global settlement attempt, but which Andrew
>
>   told the Surrogate's Court he never received from her.  YK Decl. at ¶¶23-41, 49-
>
>   57. It was not related to allegations of misconduct due to self-dealing. *Id.*

185.    On May 9, 2011 YK filed with the Surrogate's Court a Petition for a Compulsory

Limited Accounting And Related Relief Under SCPA 2205 and 2206 ("Petition for

Accounting").  (Ex. 71.)

186.    In the Petition for Accounting, YK sought "a limited account only with respect to

certain works of art which allegedly comprise a part of the tangible personal property of the

estate."  (Ex. 71 at ¶ 8.)

187.    To justify the Petition for Accounting YK argued, *inter alia*, that "[s]everal works

of art which are allegedly part of the estate have recently been depicted in the catalogues,

exhibited and/or offered for sale at various auction houses, studios and in museums in China and

Hong Kong and petitioner has reason to believe that some or all of such works have been sold

without obtaining full market value, without proper accounting to the PA and/or the estate, and

otherwise by reason of improper, unauthorized unilateral acts of Mr. Wang."  (Ex. 71 at ¶ 8(g).)

188.     Attached as Exhibit 1 to the Petition for Accounting "is a list of artwork which is allegedly part of the estate and which petitioner has reason to believe has been exhibited for sale and/or sold by Mr. Wang at various auction house, studios and in museums in China and Hong Kong."  (Ex. 71 at ¶ 8(h).)

189.     Exhibit 1 to the Petition for Accounting identifies 79 pieces of art, which substantially overlap with the 98 Paintings which are at issue in this litigation.  (Ex. 71 at AWSK_00009197.)

## IX.     The Regan Report

190.     Patrick Regan submitted an expert report on behalf of Plaintiff on October 11, 2019 (the "Regan Report").  (Ex. 90.)

191.     The Regan Report consists of two appraisals: (i) a fair market appraisal of the 98 Paintings, as of October 10, 2019 (the "FMV Appraisal"); and (ii) a retail appraisal of 14 of the 98 Paintings, as of August 2009 (the "Retail Appraisal" and together with the FMV Appraisal, the "Appraisals").  (Ex. 90 at ¶ 1.)

192.     Regan did not offer an opinion in the Regan Report as to the value of 84 of the 98 paintings as of the dates they were sold between 2005 and 2009.  (Ex. 91 at 212:7-213:3.)

193.      In forming his opinions as to the value of the 98 Paintings, Regan relied heavily on sales from mainland Chinese auction houses.  (Ex. 91 at 284:20-285:4.)

> ***Plaintiff's Objection to ¶185:***  The Plaintiff objects to the assertion in paragraph 185 as misleading. Though Patrick Regan testified that the majority of his comparables were taken from auction houses in mainland China, it is not necessarily the case that he relied "heavily" on those sales. Different comparables were weighed differently by Mr. Regan based upon his expertise and experience in

the fields. *See, e.g.*, Second Savitsky Decl. <u>Exh. 83</u> at 36:25-38:25; 389:12-391:18

(Deposition testimony of Patrick Regan concerning assigning weight to various

comparables).

194.    With respect to the 14 remaining paintings, which are the paintings sold in August

2009 to Yue Da-Jin, Regan offered an opinion as to the "retail value" of fourteen of the 98

Paintings (the "14 Paintings") as of August 2009.  (Ex. 90 at ¶¶ 28-29.)

195.    In connection with his valuation of the 14 Paintings, Regan opined that,

> "In 2009 … the most likely and appropriate marketplace for
> Chinese paintings of this type and caliber would have been
> auctions in China and New York – rather than Private Retail
> Markets – since that was where the best and highest prices for
> Classical Chinese paintings were usually achieved.

(Ex. 90 at ¶ 24.)

196.    Regan's admitted in his deposition that, when he issued his opinion, he was

unaware that Sotheby's had rejected the Estate's attempts to auction the 98 Paintings in New

York.  (Ex. 91 at 251:17-252:22.).

***Plaintiff's Objection to ¶196:***   The Plaintiff objects to the assertion in ¶196 because it

relies upon the false premise that Sotheby's "rejected" the privately sold paintings for the

March 2006 auction. <u>First</u>, the Estate's March 2006 auction with Sotheby's occurred *after*

five of the six private sales had already completed. *See* Wang SMF at ¶¶108, 122, 130,

137, 142, *infra*.  Thus, none of the 84 classical Chinese paintings that had been sold

between February 2005 and February 2006 were available for selection by Sotheby's for

its auction in March 2006. *Contrast id. with* Wang SMF ¶62, *supra* (setting forth the date

of the Sotheby's auction). <u>Second</u>, email records establish that it was Andrew who first

proposed selling "some contemporary paintings, including some rocks, for 2006 spring

auction at Sotheby's" in September 2005. PA Decl. <u>Exh. 26</u> (KING 007615-7616). Therefore, the claim in the Schram Affirmation that Sotheby's rejected any of the Estate's classical paintings: (a) has not been shown to be based upon Schram's own personal knowledge (Savitsky Decl. <u>Exh. 12</u> (25:12-22)) (b) lacks any independent corroboration through emails or other documents in the Record (Second Savitsky Decl. at ¶8); and (iii) is internally inconsistent with the Wang SMF's own timeline placing the private sales in 2005 and the auction in 2006 (Wang SMF at ¶¶108, 122, 130, 137, 142, *infra*.). There is no admissible evidence to support the demonstrably false claim that the Estate was required to sell the 98 Paintings privately because Sotheby's rejected them for auction.

Dated: New York, New York
      April 13, 2020                            Respectfully submitted:

                                       **SAM P. ISRAEL, P.C.**

                                     By: *<u>/s/ Timothy Savitsky</u>*
                                     Sam P. Israel, Esq. (SPI 0270)
                                     Timothy Savitsky, Esq. (TS 6683)
                                     180 Maiden Lane, 6th Floor
                                     New York, NY 10038
                                     646-787-9880
                                     Email: admin@spi-pc.com
                                     *Attorneys for Yien-Koo King*