UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YIEN-KOO KING,

                Plaintiff,

      -against-

ANDREW WANG, SHOU-KUNG WANG, BAO WU
TANG, JIAN BAO GALLERY, ANTHONY CHOU,
CHEN-MEI-LIN, WEI ZHENG, YE YONG-QING, YUE
DA-JIN and JOHN DOES 1-9,

            Defendants.

1:14-Civ-07694-JFK

<br/>

**<u>F.R.C.P. 26(A)(2)(B) EXPERT REBUTTAL REPORT OF PATRICK REGAN</u>**

**Submitted on December 16, 2019**

## INTRODUCTION AND ASSIGNMENT

1.      I was retained by counsel for Plaintiff Yien-Koo King ("YK") to review the

Expert Report of Kenneth Jay Linsner, ASA, AAA, SCV, dated October 11, 2019 (the "Linsner

Report"), and to address the opinions set forth in it. Specifically, I was asked to address the

Linsner Report's three primary conclusions:

> Linsner Opinion #1: The Estate was not damaged by reason of the
> private sales of its artwork;
>
> Linsner Opinion #2: No credible evidence supports the allegations
> that artwork from the Estate was displayed at the Beijing Capital
> Museum or the Poly Museum.
>
> Linsner Opinion #3: No credible evidence supports the allegations
> that artwork from the Estate was sold at auction in China.

## QUALIFICATIONS

2.      My qualifications are set forth in the F.R.C.P. 26(2)(B) Expert Report of Patrick

Regan (the "Regan Report"), submitted on October 11, 2019 at paragraphs 2 through 11 and

incorporated by reference herein.

## EXPERT COMPENSATION

3.      The hourly rate that Winston Art Group charges for my time spent providing

appraisal services in this matter is $395.  The hourly rate that Winston Art Group charges for my

time spent testifying at deposition or trial in this case is $500.  Winston Art Group staff has

assisted me on this matter, and their billing rates vary from $150 to $250 per hour.

## COUNTER-OPINIONS

**I.      Opinions Concerning the Chinese Art Market**

> A. *The Rise of the Chinese Art Market in the Early 2000's*

4.      The performance of the Chinese art market in the 21st century has been one of the

most interesting market developments in the art world's recent history.   From various studies

and indices, it is clear that in nearly all contexts the Chinese art market had a sharp and unprecedented rise specifically starting in 2004.  Nearly all of the economic and art related data from this period—the number of auction houses and their sales volumes, recorded statistics of the Chinese auction market in general, market figures of specific art segments, and even the changes in China's GDP for these years—clearly illustrate these dramatic increases.  This period of growth in Chinese economic history, sometimes referred to by economists as "post-SARS," is made more notable by the fact that in the decades prior the Chinese art market was virtually non-existent with very little movement at all.  In the recent online 2019 TEFAF Report, Jiang Yingchun, the CEO of Poly Culture Group (the parent company of Poly Auctions, the largest auction house in China) observed that it was after the SARS epidemic in 2003 that the Chinese art market exploded, with the mainland art market for Chinese paintings and calligraphy taking off first.[1]

5.     This explosion in wealth and interest dramatically affected not only the art market in Mainland China, but in Hong Kong as well.  Data presented in Artnet's 2019 Intelligence Report shows that in 1991 (the first year Artnet began collecting data from Hong Kong), all Hong Kong houses combined sold 313 fine artworks (by both Asian and non-Asian artists) for a total of $10.9 million. In 2018, all Hong Kong houses combined sold a total of 9,017 fine artworks, generating nearly $1.4 billion in sales: a 234-fold increase in 27 years.[2]

6.     Chinese collectors have been commanding the market throughout this period of exponential growth.  For these collectors, the preferred method, by far, for purchasing traditional works of art has been through auction houses, rather than through galleries or private sales.[3]  Art trading through auctions was perceived by many during these growth years as an investment

---

[1] https://amr.tefaf.com/chapter/chapter-five?printMode=true.
[2] 2019 Intelligence Report, News, p. 33.
[3] *See, e.g.,* Global Chinese Art Auction Market Report 2013 pg. vi.

vehicle.  Part of the reason is that the blooming generation of High Net Worth Individuals (HNWI) that emerged during China's economic reform see auction houses as a fairer system with the price transparency and discovery that gives them confidence in their purchasing. As a result, the top values for Chinese traditional arts are mostly still based on auction sales from selected houses—with these sales largely being in Mainland China or Hong Kong.  This likely explains the explosion of Chinese auction houses in China from just two in 1993 to 525 in 2017, with a total sales increase during that period of 447,748%.[4]

7.     The increase in globalized and digitally accessible information since 2004 has also helped drive the rapid development of the Chinese art market.  Besides acquiring general access to global databases with the advent of the internet, collectors gained a new Asia-centric market reporter in 2000 in the form of Artron.net, which quickly grew into the most comprehensive and reliable database on the Chinese art market.[5] Immediately published sales data from auctions and the increasing fervor of the various press outlets to report on any economic news from China meant that the surges in the market were not merely recognizable with hindsight in later years, but in "real time" by specialists and experts.  Near instantaneous feedback helped to accelerate and compound the changes in the market.

8.     The Chinese market has, in general, risen both rapidly and consistently over the past 15 years. However, like all markets, it still experienced fluctuations and can be the subject of seemingly conflicting statistics. For example, the 2018 TEFAF Report observed that the 2018 Asian Art Market saw the number of *lots offered* fall 10% from 2017, percentage of *lots sold* rise

---

[4] https://amr.tefaf.com/chapter/chapter-one.
[5] *See* TEFAF Art Market Report—2015.

to 63%, the *total value of sold lots* rise by 12%, but the *average price per lot* fall by 17%.[6]  What these numbers reflect is a maturing collector base and a more vetted market with highly selected blue-chip offerings sustaining their highest values.  Collectors are becoming market educated and careful in their purchases, but are still willing to pay great prices for enviable works.  The effect of this is that even in a downward leaning market, top lots with good provenance (especially from overseas collections, such as those in Europe or the United States) are still the most enviable in the market.  Works from the C.C. Wang New York collection certainly fall into this category.

9.      Although it has experienced intermittent dips since 2011, the Chinese art market remains robust after having gone from virtually non-existent in the early 2000s to one of the largest in the world. Classical painting/calligraphy is still the largest area of interest for collectors.[7]  AMMA developed their "400-component index for Chinese painting" to track the market specifically for Chinese traditional paintings over the long term.  Viewing the annual turnovers and the calculated index from 2000 to the spring of 2018, it is clear that the market for classical Chinese painting and calligraphy was vanishingly small in 2003/2004 when compared to the startling increase beginning in the years following C. C. Wang's passing. Currently this market is enjoying about a 600% index increase from 2003 levels having had peaks as high as a 900% increase.  Not all works in this area increased with such stamina, but for those that did (especially recognizable paintings and calligraphy from the Ming through the Qing Dynasties), increases of over 1000% for individual classical artists over 10 years are relatively common.[8]

---

[6] Global Chinese Art Auction Market Report 2018, Artnet Worldwide Corporation & China Association of Auctioneers, 2019, pp. 19-21; https://www.artprice.com/artprice-reports/the-art-market-in-2017/characteristics-of-the-chinese-art-market-in-2017-art-market-monitor-of-artron-amma/.
[7] Global Chinese Art Auction Market Report 2018, p. 15.
[8] https://www.artprice.com/artprice-reports/the-art-market-in-2018/artrons-market-trend-analysis.

B. *Reporting and Data on the Chinese Art Market*

10.    With all of this data displaying unprecedented growth of the Chinese traditional art market, one area of reported data has given many market-watchers concern:  China is seen to have a high percentage of "deadbeat-bidders." Early on in the rise of Chinese art, a significant portion of winning auction bids did not culminate in payment and paintings transfer.  The mentality of bidding and buying at auction houses in Mainland China developed independently of the Western conventions and contracts. China's auctions saw, and continue to see, a significant portion of non-payments and sales cancelled because of bidders. This phenomenon has been often stated in numerous art reporting sources, mostly basing the information on the standard industry annual market reports such as TEFAF, UBS, and the CAA/Artnet.  Percentages and figures quantifying this can change from source to source depending on the handling of the data, but all agree that incidences of "non-payment" have been a concern in the reporting from Chinese auction houses. As an example, a collector might advance five winning bids at a given auction, only to later decide that he or she only wished to keep, and thus pay for, three. Investigative reports found that many of these sales data were not retracted or corrected in the publications and databases.

11.    While the problem of "deadbeat" bidding is certainly not exclusive to Chinese auction houses (Sotheby's and Christies also experience non-payment and late payment), early on several organizations rose up to address the issue. Most of these were regional organizations focused on cultural art and artifacts.  One example would be the Shenzhen Auction Association which no longer appears active.[9]  Perhaps the most prominent of these organizations is the China Association of Auctioneers ("CAA").  It was authorized by the Ministry of Civil Affairs and since 1995 has been monitoring, reporting, and working to monitor and standardize the auction

---

[9] http://www.programmersought.com/article/2812769916/.

markets of China.[10]  In 2013, CAA partnered with Artnet to help present the most accurate and vetted auction data from mainland Chinese houses. CAA created an exhaustive 116-point Evaluation Criteria ultimately identifying 56 auction houses—representing approximately 10% of all Chinese Auction houses—that meet these rigorous standards.[11]  The two groups collaborate on the yearly Global Chinese Art Auction Market Reports and now the Artnet database reports on sales exclusively from CAA-certified auction houses.[12]

12.    Among the 56 CAA-certified auction houses are Poly International Auction Company, China Guardian, and the Chieftown Auction Company. The approximately 400 comparables utilized in my previously issued Regan Report, dated October 11, 2019, were derived almost exclusively from CAA-certified auction houses. I have identified only nine instances where comparables were cited from mainland auction houses that are not specifically on the 2014 CAA list.[13]  However, these comparables had lower impact on my opinion of value, were backed up by other auction sales data, and still appear in the CAA reports or appear on the Artnet auction lists.

13.    Concerns over deadbeat bidding are mitigated not only by reliance upon organizations such as Artnet and CAA to vet auction houses and regulate data, but by an appraiser's diligence in collecting supporting data. For instance, in issuing my Regan Report, I relied on a variety of top-tier Chinese auction houses as well as approximately 80 comparables from Sotheby's and Christie's in order to cross-check values.  Besides diligence in choosing

---

[10]http://www.classicauctioneers.com/wp-content/uploads/2010/04/China-Association-of-Auctioneers.pdf
[11]http://www.cn.artnet.com/en/chinese-art-auction-market-report/assets/pdfs/evaluation_criteria_2016_en.pdf;
http://www.cn.artnet.com/en/chinese-art-auction-market-report/assets/pdfs/auction_houses_2016_en.pdf.
[12] http://www.cn.artnet.com/en/chinese-art-auction-market-report/about-the-collaboration/.
[13] These auction houses were: Shanghai Jin Art Auction (regarding comparables for: OTE 92, OTE 123, OTE 224); Beijing Baoruiying International Auction (regarding comparables for: OTE 156, OTE 162); Beijing Prospect International Auction Co. (regarding comparables for: OTE 134); Shanghai Dowmin (Daoming) auction house (regarding comparables for: OTE 134, OTE 61, OTE 220); Shanghai Mingxuan (regarding comparables for: OTE 245); Beijing Yashide International (regarding comparables for: OTE 1008).

comparables, there needs to be consideration as to the appropriateness of each comparable and the varying weight that they may have on the opinion of value.  This is a product of the appraiser's experience and knowledge of the works and markets involved. An appraiser must also apply his or her experience and discretion in determining how much weight to give certain comparables.

14.     Using reported values from major auction houses is a critical, necessary, and universally accepted method of valuing Chinese artworks. Every day both professional appraisers and individual collectors rely on these online databases in deciding whether to engage in multi-million-dollar asset acquisitions and sales. By way of example, the Sotheby's Estate tax appraisal—cited by the Linsner Report as a reasonable valuation of the Estate's assets as of July 3, 2003[14]—placed extensive reliance on results reported by Chinese auction houses.[15] Sotheby's IRS-accepted appraisal drew twenty-two (22) different comparables from China Guardian, another twenty-four (24) comparables from various other auction houses located in Beijing, and twenty-two (22) more comparables from various auction houses located in Shanghai.[16]  This was also at a time when data from the mainland was less accessible than it is today.

15.     Based on my experience in the art appraisal world, it would fall outside industry custom for an appraiser of a classical Chinese painting to entirely disregard Chinese auction house values. In fact, rejecting this data and still rendering a usable opinion of value would not only be negligent, but nearly impossible.

---

[14] Linsner Report at ¶25.
[15] WANG000660-743 (Sotheby's appraisal of 133 classical Chinese Paintings of the Estate, the "Sotheby's Appraisal").
[16] *Id.*

C.   _Sale and Display of Reproductions of Classical Artworks_

16.      The creation and sale of handmade reproductions is a common and respected practice in the Chinese artworld. The act of copying classical paintings and calligraphy is actually one of the bedrock principles of artistic study laid out as early as the 6th century and understood by all Chinese in the artworld.[17] There are businesses in China, and even whole villages, that are known for making high-quality, hand-painted "copies" of famous paintings, including classical Chinese paintings.[18]   While there may be times where these paintings are later attempted to be passed off as originals, mostly these are copies meant as a way of learning and are sometimes distinguished from attempted forgeries by using the term "honorifics."  It is common practice for students to make these hand-copies for money and to show off their skill. This widespread and legitimate practice does not create copyright concerns in China and is well understood by collectors and others with knowledge of Chinese paintings.[19]

17.      These "honorifics," or hand-painted copies, are not intended to fool or cheat, nor are they readily capable of doing so. As long as there is an image of the original painting upon which the honorific is based, it is relatively easy for an appraiser or collector with any level of experience to tell the difference between the original and a hand-painted honorific. Distinctive markings such as creases or spots in the paper or silk, coloring, proportions, the weight of brushstrokes, spacing, and seal placement will never be 100% identical between even an expertly crafted honorific and the original painting. Photographs published online by auction houses or in an exhibition catalogue are sufficient to differentiate between an honorific and the original. Moreover, hand-painted honorifics will not typically bear the identical seals that are contained on

---

[17] _See, e.g._, Sullivan, Michael, The Arts of China, 4th Edition, University of California Press, 1999, pp. 95-96, 165.
[18] _See, e.g,_ https://www.aljazeera.com/indepth/features/dafen-oil-painting-village-world-art-factory-180213181434532.html.
[19]  "On Collecting Chinese Painting," The Metropolitan Museum of Art Bulletin, New Series, Vol. 29, No. 3 (Nov., 1970), pp. 156-162.

the original. And even if there is an attempt to replicate the seals, the placement and distinct impressions are akin to a fingerprint and are readily distinguished from the original.

18.     Although it is not unheard of for a museum to intentionally display an honorific of a classical work or even a mechanically produced copy, it is not the predominant practice—especially for larger exhibitions or prestigious museums. As in the West, exhibiting an *ersatz* version of a painting generates significantly less interest than exhibiting the actual work, if it generates any interest at all. If an honorific or mechanical print were displayed at an exhibition by any well-regarded museum (for example, the Capital Museum in Beijing), it would be expected to be marked as such, lest it risk misleading the public and art community thereby leading to potentially bad press for that exhibition and museum. The tradition of hand and mechanical copying has a long history in China and was incorporated to great effect in the post-cultural revolution period, Chinese museum and gallery visitors are certainly not ignorant in the practices and would be on alert for such works in an exhibition.[20]

19.     As for an *unintentional* display of a reproduction, it would be highly unlikely for an honorific or mechanical reproduction to pass a museum's vetting process which typically includes a museum curator's close visual examination of the work and its mountings, seals, and overall physical aspects as well as a comparison of the work to images and descriptions from known publications.  They will also examine any literature or provenance presented.

20.     Similarly, neither a legitimate hand-copy of a known work nor a mechanical print would be likely ever to pass an auction house's vetting process undetected. Original classical Chinese paintings are typically hundreds of years old and sell for tens of thousands to tens of millions of dollars. Based upon my experience in advising collectors, museums, and auction

---

[20]Committee on Scholarly Communication with the People's Republic of China, TRADITION AND IN CHINA: A Report of the Visit of the Chinese Painting Delegation to the People's Republic of China, pages 62-67, 80 (1980).

houses, it is virtually unimaginable that a mechanical print of a classical Chinese painting would be placed up for auction and sell for tens of thousands of thousands, hundreds of thousands, or millions of dollars. I have never heard of this occurring outside of eBay.

21.     The existence of certain forgeries and reproductions in the Chinese market does not render Chinese auction records of the Estate's former paintings unreliable. I therefore disagree with Mr. Linsner's opinion "that there is no evidence sufficient to establish" that any of the Estate's 98 sold paintings were re-sold at auctions in China. Linsner Report at ¶¶ 40-42, 46. There is credible evidence—in the form of auction records, news reports[21], and museum publications—sufficient for an appraiser to confidently determine that several of the paintings sold by the Estate were later auctioned in China. For example, comparing images of OTE 161 taken prior to its purported sale to "Yong Qing Ye" with auction photo records of Lot #2871 sold at the June 3, 2010 Poly International Auction Co. Ltd., clearly reveals that both items are the exact same painting: Xu Wei's *Calligraphy in Cursive Script*.[22]

## II.     Opinions Concerning the Estate's Sale of Paintings to "Yue Da Jin" on August 17, 2009

### A.  *The 2009 Retail Value of the 14 Estate Paintings Sold to "Yue Da Jin"*

22.     The Estate sold 14 classical Chinese paintings in August 2009 at values that were significantly lower than their 2009 Retail Value.[23] Had the 14 paintings been sold at their

---

[21] *See, e.g.*, http://www.cguardian.com/en/zxzx/jdxw/gsxw/2016/11/4569.shtml (discussing the auction of OTE 150) and https://auction.artron.net/paimai-art5042700454 (discussing the auction of OTE 156).

[22] Pre-sale images from the "KING 7" production and auction-record images from Artron.net also match in all observable respects for OTE 112 (Chieftown Auction, May 28, 2008, Lot #555); OTE 136 (Poly International Auction Co., Ltd. Jun. 5, 2016, Lot #5028); OTE 150 (China Guardian (Hong Kong) Auctions Co. Ltd., Nov. 28, 2016, Lot # 474); OTE 156 (Beijing Baoruiying International Auction Co., Dec. 7, 2013, Lot #454).

[23] *See* Regan Report, dated October 11, 2019 at ¶¶ 22-25, 28-29.

approximate 2009 Retail Values, they could have achieved approximately $800,000 more in profit for the Estate.[24]

23.    As discussed above, beginning in or about 2004, the Chinese art market began to experience a meteoric and unprecedented rise in turnover activity and value.[25]  This rise peaked in 2011, and although it has declined a bit in certain areas, the Chinese market is currently the second largest in the world and has been in the top three (trading spots with the US and the UK) since at least 2007.[26]

24.    While the financial crisis in the West beginning in 2007-2008 had a great effect on the art markets, the crisis did not significantly change the trajectory of the art market growth in China.[27] It did show some small downturns in 2008, but this was localized to areas such as oil painting and contemporary art.[28] It can be seen that in the specific areas of Chinese traditional painting and calligraphy (the largest sector of the market) there was no discernable downturn.[29] In fact, the average auction sales revenue more than doubled from 2007-2009 with the average prices in Chinese painting and calligraphy continuing their steady rise until finally peaking in 2011.[30] Although  the market in contemporary Chinese artists waned in 2009, the period actually saw a  renewed interest in China's modern and old masters works.[31] By 2009 the market for Chinese paintings in China was continuing to reach heights never previously attained and its

---

[24] *Id.*
[25] https://www.artprice.com/artprice-reports/the-art-market-in-2017/characteristics-of-the-chinese-art-market-in-2017-art-market-monitor-of-artron-amma/.
[26] https://www.abc.net.au/news/2008-04-01/china-becomes-worlds-3rd-largest-art-auction-market/2389250?pfmredir=sm&pfm=ms.
[27] The Art Market in 2018, AMMA Artprice, pg. 18.
[28] *Ibid.*
[29] The Art Market in 2018, AMMA Artprice, p. 18.
[30] TEFAF Art Market Report 2013, pgs. 102-108.
[31] 2009 Art Market Trends, Artprice, pg. 9 & 13 https://imgpublic.artprice.com/pdf/trends2009_en.pdf.

success became a point of well-known international discussion throughout the artworld. It was difficult to read any art or financial report without some mention of China.

25.     Most of the 98 classical Chinese paintings sold by the Estate between 2005 and 2009 (the "98 Paintings") would have been considered blue-chip paintings because of the premium Chinese collectors place on paintings created prior to the end of the Qing dynasty and on overseas collections. While some of this has to do with a "repatriation" of important cultural artworks, the fact that a collection is one of great prominence and kept outside of Chinese market also provides exceptional confidence in the authenticity and status within China.

26.     However, the prices for which the Estate allegedly sold 14 paintings to Yue Da Jin (the "Yue Da Jin Paintings") do not reflect the rise in retail values which comparable paintings saw between 2003 and 2009. In fact, the Estate's final sale prices in August 2009 are, curiously, even lower than Sotheby's July 3, 2003 appraised tax value of those same paintings.[32] Attached hereto as <u>Exhibit A</u> are a series of charts contrasting the various appraisal prices and final sale price of the 14 Yue Da Jin Paintings.[33]

27.     In his report, Mr. Linsner states that "the process employed by the New York County Public Administrator . . .  resulted in reasonable prices for the artwork under a Fair Market Value or Orderly Liquidation Value approach." Linsner Report at ¶44. He concludes that "the Estate suffered no damages from the sale of the 98 artworks via private sales." *Id.* This opinion is rather opaque in the sense that the Linsner Report fails to provide auction or retail comparables by which to gauge Mr. Linsner's assessments and methodologies. In fact, it is not

---

[32] WANG000660 (Sotheby's Appraisal of 133 classical Chinese Paintings of the Estate); WANG000531-537 (Estate August 17, 2019 contract of sale with Yue Da Jin); KING 007375-7402, EWALD_0000103 (May 2, 2008 Appraisal Letter of O'Toole Ewald Art Associates).

[33] The values in <u>Exhibit A</u> are derived from the Sotheby's July 3, 2003 tax appraisal [WANG000660]; the proposed sale values reviewed by O'Toole Ewald Art Associates as of May 2008 [KING 007375-7402]; the prices included in the executed Contract of Sale between the Estate and "Yue Da Jin" on or about August 17, 2009 [WANG000531-537], and my October 11, 2019 Retail Values [*see* Regan Report and appendices].

clear from the face of his report that Mr. Linsner engaged in any review of specific auction or retail records at all. His approval of only the *process* by which the Estate's paintings were sold is not an accepted method of determining whether the Estate's sale prices were reasonable in view of Chinese market activity.

B. *The Appropriate Valuation Methodology for the 14 Paintings Sold to "Yue Da Jin"*

28.    The Linsner Report refers to using an "Orderly Liquidation Value" appraisal approach regarding the sale of the 98 Paintings. Linsner Report at ¶44.  I disagree that in this context an Orderly Liquidation Value was an appropriate standard of valuation with respect to the 14 paintings which Andrew Wang suggested be sold to Mr. "Yue Da Jin" in August 2009. [34]

29.    As an initial point, Mr. Linsner's opinion that the Estate's sales of all 98 Paintings were in line with *either* an Orderly Liquidation Value or a Fair Market Value is itself and acknowledgment that the final sale prices were low. It is surprising that Mr. Linsner seemed to discount any difference in these two levels of value opinions when he states that the reviews by Elin Ewald of O'Toole-Ewald Art Associates ("OTE"), including the May 2, 2008 valuation letter for the Yue Da Jin Paintings (the "2008 Valuation Letter"), "resulted in reasonable prices for the artwork whether under a Fair Market Value or Orderly Liquidation Value approach." Linsner Report at ¶44. Clearly the difference of these value-opinion approaches would be at least notable or the IRS Treasury Regulations Sections and USPAP would not have taken care to define them separately.[35]

---

[34] KING 007375-7402.

[35] For sources of these specific definitions, IRS Section 1.170 and 20.2031 (b), see https://www.irs.gov/pub/irs-drop/rr-03-28.pdf p. 4 and  https://www.irs.gov/pub/irs-drop/rp96-15.pdf, p 2. For a summary illustrating the differences see:
https://www.appraisersassociation.org/index.cfm?fuseaction=document.viewDocument&documentid=1097&documentFormatId=1858&vDocLinkOrigin=1&CFID=21857956&CFTOKEN=e53e1afde5b2d8be-9ACB2701-1C23-C8EB-80450545C88E6DD2.

30.     In issuing his opinion as to the appropriateness of an Orderly Liquidation Value target, Mr. Linsner does not discuss the highly relevant fact that the 2008 Valuation Letter only utilized a "Fair Market Value" approach. While Ms. Ewald's letter defines various available market values, including "Orderly Liquidation Value", as required, Ms. Ewald specifically selected Fair Market Value as the sole appropriate target valuation.[36] She defines this target value as:

> the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.[37]

31.     According to the 1992 Technical Advisory Memorandum 9235005 that informs these USPAP definitions of value, an item's Fair Market Value "is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of an item in a market other than in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate." Comparatively, the 2008 Valuation Letter's definition of Orderly Liquidation Value, in its description of all available valuation methods, gives the definition (from the ASA 1994 Handbook, p. 2) with the notable difference being this would be the price an object would change hands under "limiting conditions . . . with reasonable time constraints." If there were limiting conditions and time constraints with respect to the sale of the Yue Da Jin Paintings, these would be expected to be included in Ms. Ewald's report. Instead, Ms. Ewald's valuation only notes that it reflects "the additions and deductions suggested by Andrew Wang." [38]

---

[36] KING 007375-7402 (ELE-Exh.30, May 2, 2008 appraisal letter).
[37] *Id.*
[38] *Id.*

32.     Also, Mr. Linsner's own citations indicate that the Public Administrator's express concern was with achieving the *best value* for the Estate's assets. The Linsner Report states that the Public Administrator purportedly "required that proposed sales had to be at least 20% higher than the Sotheby's appraised values." Linsner Report at ¶28. This express stipulation as to minimum sale *prices*—but not timing—indicates a willingness to wait out a sale in the hope of achieving a higher price. In fact, Martin Klein Esq., who represented Andrew Wang as co-fiduciary of the Estate, sent an email to Andrew Wang stressing that the fiduciaries' chief concern surrounding the Estate sales was to achieve "the best price for the art":

> Andrew, [a]s I have explained, the PA is concerned with private sale not bringing the best price to the Estate, that is why she felt that a sales price of AT LEAST 20% above Sotheby's appraised value would provide a level of comfort that she needed to defend a challenge that the Estate did not receive the best price for the art. This should also be a concern for you in case any beneficiary later complains that the sale price was too low.[39]

33.     It is my opinion that the above-noted circumstances demonstrate that the correct valuation methodology in analyzing the sale of the Yue Da Jin Paintings is the Retail Value target as opposed to the Orderly Liquidation Value target. While both types of values may utilize similar Fair Market Value source data from auction house sales (in the case of Chinese classical paintings and calligraphy, this is an appropriate market and comparable to "retail" markets in other segments of the art world), the consideration of circumstances and intent would make the specific applicable comparables very different.  For example, an Orderly Liquidation Value would lean heavily toward the quicker, lower-tier markets where speed and convenience are most important.  A Retail Value would pull comparables from the best and most appropriate markets as directed to here.  With Chinese painting and calligraphy from a prominent collection at that time, the difference would be both significant and well understood.

---

[39] WANG001890 (Exh. MK-3).

C.   *O'Toole Ewald Art Associates Purported Approval of the Estate's Sale to Yue Da Jin*

34.     The Linsner Report's conclusion that Elin Ewald of OTE acted as an independent art appraiser and appropriately approved each of the Estate's final sale prices is not accurate with respect to the August 2009 sale of the 14 Yue Da Jin Paintings. *See* Linsner Report at ¶¶ 28, 30.

35.     Although the 2008 Valuation Letter for the 14 Yue Da Jin Paintings states that it is an USPAP compliant appraisal, I think that this is not clearly demonstrated.[40] Although directions for USPAP compliant appraisals have changed over the years, it has been a consistent requirement that an "appraisal" present a clear value for an item based upon appropriate research and methodology. This value can be numerically expressed as a specific amount, as a range of number, or as a specific relationship to a previous value opinion. Ms. Ewald's letter report seems better classified as a "review" because no independently arrived at figures were presented, or at least a less formal, non-USPAP valuation opinion. Furthermore, the methodologies utilized by Ms. Ewald are not clear from the face of the letter and there is little window into any of the comparables used by Ms. Ewald to form her opinions.

36.     And yet even with all of these possible irregularities, it is clear that Ms. Ewald still made it a point to state that many of these values were low. For at least eight of the fourteen works presented, prices are noted in the report to be in some way lower than might be expected.

37.     Of course, it is difficult to analyze the accuracy and sufficiency of the 2008 Valuation Letter without knowing the actual directions or assignment details presented to Ms. Ewald. Based upon the contents of the 2008 Valuation Letter, I can surmise that Ms. Ewald's

---

[40] KING 007377 ("This appraisal has been done in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) promulgated by the Appraisal Foundation and in accordance with the requirements set forth by the American Society of Appraisers.").

task was to review specific values for a collection of paintings and comment on whether those values could be considered appropriate as private sales figures in the current market.

38.     If I were tasked to verify selling prices I would require certain information to satisfy this assignment. First, I would need some reasonable assurance that the cataloging of the paintings was correct in terms of authenticity and provenance (which the context of the collection and the Sotheby's Appraisal provide). Second, I would want to know where the presented sales value came from.  This is helpful to understand and address any expectations there may be, especially if those expectations are inappropriate to the current assignment.  Third, I would want to know the circumstances of the proposed sale (*e.g.*, whether the paintings would be auctioned, sold privately, or were required to be liquidated within a limited period of time). Even relying on the same source of comparable market data, values can be radically different depending on the type of value and circumstances of the sale. Fourth, I would want to know if there were any costs/markups added to the values (*e.g.*, for shipping or commissions). Fifth, I would want to know the location/venue for the sale. The IRS and USPAP require that when valuing artwork, an appraiser must draw a comparable from the "most appropriate marketplace."[41] This is because where paintings are being sold can make a significant difference in their value. For example, certain categories of Chinese art and antiques routinely sell for far higher prices in China or to Chinese collectors than they would in Europe, the UK, or in the U.S. This is one of the main reasons that the location of market focus for top-tier auction houses has shifted to Hong Kong and China: to be close to the mainland collectors.

39.     Looking at the face of the 2008 Valuation Letter, I do not see a lot of these questions fully addressed.  The report acknowledges that the paintings would be subject to a

---

[41]https://www.appraisersassociation.org/index.cfm?fuseaction=document.viewDocument&documentid=1097&documentFormatId=1858&vDocLinkOrigin=1&CFID=21857956&CFTOKEN=e53e1afde5b2d8be-9ACB2701-1C23-C8EB-80450545C88E6DD2

private sale to one "Yue Da Jin." However, the report does not acknowledge that the original prices were derived from a report with an effective date of 2003. And while the letter mentions that Ms. Ewald's opinions "took into account the additions and deductions suggested by Andrew Wang," there is no clear reference in the report what these were.[42] The 2008 Valuation Letter correctly notes that the Chinese art market rose "considerably in the past two years" and most dramatically for contemporary works.[43] However, the basis of the valuations was the Sotheby's Appraisal which was based upon values in 2003, not 2006. The market for traditional paintings rose far more dramatically from 2003 to 2008 than it did from 2006 to 2008.[44] Further it is not clear from the 2008 Valuation Letter that the appraiser knew the specific context of the sale in regard to the location of the collector or intended destination of the work. In 2008 (and still today), there was a much greater demand for works of such national importance and provenance to "go back" to mainland collections.[45] This would have certainly provided some background data for review and could have informed the appraisers opinion of values.

40.     The Linsner Report states that the Public Administrator required a "20% increase" over the Sotheby's Appraisal values. Even if the reason and context of this condition were clearly communicated, this itself gives evidence of a lack of knowledge about the Chinese Art Market. In other markets, 20% might be considered a reasonable increase for a few years difference, or might be considered a conservative increase going from one value type to another in the same year. However, in the years from 2004-2009, a blanket 20% increase in value for works of this provenance and market envy would be considered extremely low in most cases. And when considering the increase was added to values intended to be converted from 2003

---

[42] KING 007381.
[43] KING 007372.
[44] Various market reports show the much greater difference several market indicators between 2003 and 2008 than the smaller rise (or in the general markets some indices show a slight decline) between 2006 and 2008. *See* TEFAF Art Market Report 2013, pgs. 102-108; https://amr.tefaf.com/chapter/chapter-two.
[45] https://amr.tefaf.com/chapter/chapter-two.

Estate tax values to 2008 Retail Values (even conservative values), makes this formula highly inappropriate.

41.    Even if there were no irregulates in the 2008 Valuation Letter, Mr. Linsner would still be incorrect in stating that the sale to Yue Da Jin was reviewed and appropriately approved by Ms. Ewald. In her 2008 Valuation Letter, Ms. Ewald noted that most of the sales appeared to be within reason, but expressed concern with the low values of multiple paintings.[46]  The Estate did not heed Ms. Ewald's concerns. Instead, it sold the 14 Yue Da Jin Paintings on August 17, 2009 for prices that (i) were even *lower* than those presented to Ms. Ewald fourteen months earlier, (ii) were lower than the 2003 Sotheby's Appraisal, and (iii) did not include the Public Administrator's required 20% increase for any of the 14 paintings.[47] Notwithstanding downturns in the art market in the U.S. and the U.K in 2008 and 2009, China's market continued its rise throughout this period and substantially *increased* its global market share of auction revenue 25% by that year's end.[48] Given the changes occurring in the Chinese market, the prudent process would have been to have the 14 Yue Da Jin Paintings re-valued with a proper appraisal immediately prior to their sale in August 2009. I have not seen any records indicating that this was done, and the Linsner Report cites to none.

III.    **The November 2009 Capital Museum of Beijing's Exhibition Entitled: "Bao Wu Tang: Magnificent Collection of Classical Chinese Paintings and Calligraphy from Abroad"**

42.    Chinese auction houses and museums, like Western auction houses, are known to jointly host art exhibitions for the purpose of generating interest in paintings, in which the work

---

[46] *Id.*
[47] *Contrast* KING 007375-7402 (ELE-Exh.30, May 2, 2008 appraisal letter) *with* WANG000531-537 (Estate August 17, 2019 contract of sale with Yue Da Jin).
[48] 2009 Art Market Trends, ArtPrice p. 12, https://imgpublic.artprice.com/pdf/trends2009_en.pdf ("In contrast, China's auction revenue rose by a substantial 25% in 2009 (to 830M). Hence, the world's no.3 marketplace expanded while the UK and the USA both contracted.").

or the artists may be the subject of future auctions.[49] Display at such exhibitions adds to the provenance and prestige of a painting and can certainly increase the value.[50] In the unique realm of Chinese classical paintings and calligraphy, this added museum exposure can result in giving confidence to collectors that the displayed painting is authentic, or at least marketable as authentic.

43.    In a market segment where provenance and documentation can greatly increase the confidence in authenticity and overall market-envy of a work, this is a common sense and often employed practice. In all global markets, lending to or organizing an exhibition is considered prudent marketing for the works in question.[51] For this reason, auction houses will often advertise any book publications or museum exhibitions in which a painting appeared.

44.    As in the West, when top-tier Chinese museums advertise that a particular painting or collection is being displayed, it is generally expected that they will display originals—not a mechanical reproductions or honorifics, unless expressly stated in the exhibition. For a museum to display a mechanical or hand-painted reproduction of an original work without clearly identifying it as such would fall outside the modern, standard practice of prestigious museums. In China, reproductions may be quite common in exhibitions of archeological or sociological themes without clear labels, but these are often justified by the educational purpose of the exhibits.[52] For an exhibit of the finer arts from private collection, such as the ones held in the Beijing Capital Museum or the Beijing Poly Museum, unlabeled or otherwise indicated reproductions are certainly not as common. This is in part because art

---

[49]https://www.artprice.com/artmarketinsight/%E2%80%8B-new-relations-between-auction-houses-and-museums; https://artradarjournal.com/2015/04/03/curated-private-selling-exhibitions-at-auction-houses-sweep-the-art-world/; https://eightartgallery.wordpress.com/2013/03/28/poly-auction-opens-hk-gallery/; https://www.polyauction.com.hk/en/poly-gallery/about/.
[50] Findlay, Michael, "The Value of Art", Prestel Verlag/Munich, 2012, pg. 44.
[51] https://www.theartnewspaper.com/news/shop-and-sell.
[52] Varutti, Marzia, "Museums in China: The Politics of Representation After Mao", The Boydell Press, 2014, pg. 13.

appraisers, auction houses, and collectors routinely rely on reports of publicized museum exhibitions in order to properly value Chinese paintings. If a classical painting is displayed at a well-regarded museum, such as the Beijing Capital Museum, this would typically have a positive impact on the painting's estimated fair market value.[53] In the case of the Capital and Poly Museum exhibitions of the "Bao Wu Tang" collection, the main purpose was not seen as purely educational. So, as exposure and marketing would then be one of the main benefits of arranging such an exhibit, it would only make sense that the artworks chosen for inclusion would be actual artwork owned.

45.     In November 2009, the Capital Museum in Beijing held an exhibition entitled "Bao Wu Tang: Exhibition of an Important Overseas Collection of Calligraphy and Painting" that appeared to be held in conjunction with the 15th Anniversary of the Hanhai Auctions (established in 1994 and one of the CAA vetted Chinese auction houses).[54] This exhibit seemed to be of some note with an impressive 131-page color catalog complete with a preface written by the Deputy Director of Cultural Relics and kicked off with an opening dinner attended by 600 people (according to the testimony of Andrew Wang, the principal of Bao Wu Tang gallery and who wrote the second preface for the catalog.).[55]  Photographs (which I am informed were taken from the Capital Museum's website) depict a music and ribbon-cutting ceremony in front of a stage that has a large backdrop bearing the Chinese phrase which I translate as "Bao Wu Tang— Exhibition of Important Overseas Collection of Chinese Calligraphy and Painting."[56]

---

[53] https://www.theartnewspaper.com/news/shop-and-sell
[54] AWSK_0001608 (Bao Wu Tang Publication); KING 003155-3161 (translation of prefaces to Bao Wu Tang Publication); KING 003693-KING003694 (December 2013 deposition testimony of Andrew Wang).
[55] KING 003693-KING003694 (December 2013 deposition testimony of Andrew Wang); KING 003155-3161 (translation of prefaces to Bao Wu Tang Publication).
[56] KING 00220; KING 00192.

46. An article posted on China.com.cn reports that the exhibition displayed "the late Chinese American Jiqian [CC] Wang and [his] family's more than 30 works."[57] For its part, the Bao Wu Tang Catalogue contains images and descriptions of twenty-seven (27) paintings ostensibly from the "Wang family collection."[58] Of the 27 paintings depicted in the publication, fifteen (15) are paintings from the group of 98 which the Estate sold between 2005 and 2009 (the "15 Capital Paintings"). The 15 Capital Paintings are described in the below chart:

| OTE Number | Artist and Title | Purported Purchaser | Location in the Bao Wu Tang 2009 Exhibition Catalogue |
|---|---|---|---|
| 86 | Bian Wu *Geese* | Yong Qing Ye | pp. 28-29 |
| 100 | Ya Shao *Landscape* | Anthony Chou | pp. 56-57 |
| 108 | Hua Yan *Swallows with Bamboo and Plum in Snow* | Anthony Chou | pp.116-117 |
| 112 | Wang Shimin *Landscape After Zhao Song Xue* | Chen Mei Lin | pp. 102-103 |
| 124 | Xia Chang *Bamboo and Rock* | Yue Da Jin | pp. 40-41 |
| 129 | Ni Zan *Trees on River Shore* | Chen Mei Lin | pp. 24-25 |
| 130 | Wang Hui *Summer Woods* | Chen Mei Lin | pp.110-111 |
| 131 | Fang Cong Yi *Cloudy Landscape* | Yue Da Jin | pp.38-39 |
| 150 | Tang Yin *Landscape* | Wei Zheng | pp.66-71 |
| 152 | Wen Zheng | Anthony | pp. 64-65 |

---

[57] KING 000635-00637 (two articles published by China.com.cn).
[58] KING 003155-3161.

| | Ming<br>*Calligraphy* | Chou | |
|---|---|---|---|
| 156 | Wang Jian<br>*Landscape in Handscroll* | Yong Qing Ye | pp.106-109 |
| 157 | Shen Chou<br>*Landscape After Zhao Mengfu* | Chen Mei Lin | pp.58-63 |
| 162 | Anonymous (Chen Rong)<br>*Dragon and Pearl* | Anthony Chou | pp. 18-21 |
| 163 | Ming Dynasty Fan Paintings | Chen Mei Lin | pp92-99 |
| 219 | Yan Hui<br>*Sixteen Lohans* | Yue Da Jin | pp.30-37 |

47.     The catalogue's preface written by the Deputy Director of Beijing Cultural Relics Bureau gives special appreciation to Wang YiQiang, the Beijing Cultural and Creative Industry Leading Group, and the Beijing Hanhai Auction Co., Ltd. for their efforts in supporting, financing, and/or coordinating the exhibition.[59] It goes on to state that "Today, the descendants of the Wang family upheld Mr. Jiqian's [CC Wang's] last wish and gave part of the important paintings of the family collection to be exhibited in the Capital Museum."[60]

48.     A second article published on China.com.cn, describes the Bao Wu Tang exhibition as lasting 20 days and reports that YiQiang [Andrew] Wang "said that this exhibition was just the beginning of showcasing the collections of the Wang family, and they were considering donating important private collections to the country."[61]  In a third article, published by Artron.net, Wang YiQiang is quoted, in my approximate translation, as stating:

---

[59] KING 003155-3161.
[60] KING 003155-3161.
[61] KING 00638-00640 (articles from China.com.cn)

> As one of the heirs of the Wang family, I feel obliged to organize important collections in the family and display them in front of the Chinese, so that those who love ancient Chinese painting and calligraphy have the opportunity [to] learn more about the broad spirit of national culture and its artistic traditions.[62]

Auction records published on Artnet.com credit multiple works from the Estate as having been displayed at the 2009 Bao Wu Tang exhibition.[63] Finally, two documentary programs—approximately 8 minutes in length—published by CCTV are specifically devoted to Bao Wu Tang's exhibition and its display of the CC Wang family collection at the Capital Museum.[64]

49. In none of the above-identified records is it expressly stated or implied that the works on display were reproductions. In view of the above-noted circumstances, records, and news reports (all of which are typically relied upon by an appraiser when researching the provenance of paintings), it would be highly unusual for a museum exhibition to be accompanied by such significant fanfare and media coverage unless all, or at least the majority, of the paintings appearing at the exhibition and described in the exhibition catalogue were originals, as opposed to machine-made copies or hand-painted replicas.[65] The museum would have a business, ethical, and reputational incentive not to actively mislead the press, public, auction houses, and collectors as to what was on display—especially since the majority of the works in the two co-exhibits' opening there were specifically intended for the auction market.

50. I therefore disagree with Mr. Linsner's opinion that there is no credible evidence that the 2009 Capital Museum exhibition occurred or displayed any paintings from the Estate. In my opinion, there is more than sufficient evidence—in the form of published catalogs, news and personal video footage, written news articles, photographs, and even Andrew Wang's own

---

[62] auction.artron.net/20091116/n91890.html; KING 001565
[63] These are: OTE 112 Wang Shimin's *Untitled Landscape*; OTE 136 Wu Li's *Landscapes Album*; OTE 150 Tang Yin's *Landscape*; OTE 156 Wang Jian's *Landscape in Handscroll*; OTE 161 Xu Wei's *Calligraphy in Cursive Script*.
[64] KING 001677; KING7 – 1132.
[65] Unless the painting was specifically designated as a reproduction.

testimony—indicating that the exhibition occurred and that a portion of the 98 Paintings sold by the Estate were displayed there.

## IV.    The Short-Videos of the 2009 Bao Wu Tang Exhibition at the Capital Museum in Beijing

51.    At paragraph 43 of his report, Mr. Linsner states that he examined "a series of amateur videos produced in discovery by the Plaintiff purportedly of the Capital museum." He concludes that the images are merely "images of images and provide no basis to conclude what if anything was in fact exhibited" at the Bao Wu Tang exhibition at the Capital Museum. *Id.*

52.    I too have been provided with a series of short videos (the "Capital Videos") which I understand that the Plaintiff Yien-Koo King claims are true and accurate representations of the Bao Wu Tang exhibition at the Capital Museum. Without concluding whether the Capital Videos were, in fact, taken of the 2009 Bao Wu Tang exhibition as Mrs. King maintains, I am able to offer certain confident opinions about what is portrayed in the videos.

53.    First, several videos depict classical paintings which appear in all respects to be the exact same paintings that were sold by the Estate between 2005 and 2009.[66] Second, several of the videos depict Estate-sold paintings showing obvious signs of age (*e.g.*, creases and crackling). Creases, wrinkles and other signs of age can be seen within the paintings and along the mountings in a manner that is often seen on classical Chinese paintings of this age, but which are not typically seen on museum prints (which are newer, generally pristine reproductions).[67]

---

[66] In forming this opinion, I compared the images of the Estate paintings which I am informed by counsel were taken prior to the Estate's sales between 2005 and 2009: <u>OTE 112</u> Wang Shi Min's *Landscape* (KING7 – 000417, KING7 – 000355; KING7 - 000318); <u>OTE 86</u> Bian Wu's *Gees* (KING7 – 000746; KING7 – 000714; KING7 – 000704); <u>OTE 131</u> Fang CongYi's *Cloudy Landscape* (KING7- 000932; KING7 – 000881; KING7 – 000851); <u>OTE 130</u> Wang Hui's *Landscape* (KING7 – 000412; KING7 – 000353; KING7 – 000317); <u>OTE 124</u> Xia Chang's *Bamboo* (KING7 – 000977; KING7 – 000880); <u>OTE 108</u> Hua Yan's *Swallows* (KING7 – 00185; KING7 – 000145; KING7 - 000115); <u>OTE 100</u> Yao Shou's *Landscape* (KING7 – 000174; KING7 – 000141; KING7 - 000111).

[67] However, it is not uncommon for an original Chinese painting, even one that is hundreds of years old, to be in pristine condition such that it shows very little signs of wear.

Even if it may be argued that certain surface blemishes on the painted areas would be duplicated by the mechanical process or condition issues were artificially created to give an appearance of age, there is clear evidence of matching puckers or wrinkles on the silk mountings outside the areas of the painting itself and brocade margins that would never be duplicated in any reproduction.

54.     Specifically, the Capital Videos which, in my opinion, (1) appear in all discernable respects identical to the paintings sold by the Estate and (2) show clear signs of age are as follows:

- File 01270J, depicting OTE 112

- File 0049JN, depicting OTE 86 and OTE 131

- File 0125Z5 and 0124G5, depicting OTE 130

- File 0139AU, depicting OTE 124

- File 0131J0, depicting OTE 108

- File 0136UX, depicting OTE 100

55.     I may update this report should additional information comes to my attention.


Dated: December 16, 2019


PATRICK REGAN