**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ x
YIEN-KOO KING, NORTHWICH :
INVESTMENTS LTD., and SOON HUAT, :
INC. :
                                   :    Civ. Action No.: 1:14-cv-07694 (LJL)
                   Plaintiffs, :
                                     :
-against- :
                                     :
ANDREW WANG, SHOU-KUNG WANG, :
BAO WU TANG, JIAN BAO GALLERY, :
ANTHONY CHOU, CHEN-MEI-LIN, WEI :
ZHENG, YE YONG-QING, YUE DA-JIN :
and JOHN DOES 1-9, :
                                     :
                   Defendants. :
------------------------------------------------------ x


# DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT


KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700


*Attorneys for Defendants*
*Andrew Wang and Shou-Kung Wang*

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................. 2

I.     Plaintiff's Claims Are Time-Barred ................................................................. 2

     A.     Plaintiff Is Not Entitled To Tolling ...................................................... 4

     B.     Plaintiff's Legal Actions Prior To Gaining Standing Were A Nullity ................... 4

II.    Plaintiff's Opposition Fails To Adduce Evidence Sufficient To Prove Her RICO Claim . 5

     A.     Plaintiff's New Theories Of RICO Liability Are Improperly Raised And Cannot Defeat Summary Judgment ...................................................... 5

     B.     Plaintiff Failed To Adduce Evidence Of An Association-In-Fact Enterprise ........ 8

     C.     Plaintiff Failed To Adduce Evidence Of A Pattern Of Racketeering Activity ..... 12

          1.     Plaintiff Failed To Adduce Evidence Of Wire Fraud Or Shipping Of Stolen Goods Against AW ...................................................... 12

               a.     Plaintiff Failed Adduce Evidence Of A Scheme To Defraud ....... 12

          2.     Plaintiff Failed To Adduce Evidence Of Other Predicate Acts ............... 16

III.   Plaintiff Failed To Adduce Evidence Of Causation ........................................ 17

IV.   Plaintiff Failed To Adduce Evidence Of A RICO Injury ................................ 18

V.    Plaintiff Is Not Entitled To Adverse Inferences ............................................ 19

CONCLUSION ......................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*131 Maine St. Assoc. v. Manko*,
179 F. Supp. 2d 339 (S.D.N.Y. 2002)...........................................................................4

*Boyle v. United States*,
556 U.S. 938 (2009)........................................................................................................8

*Conway v. White*,
292 F. 837 (2d Cir. 1923).............................................................................................20

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013)...........................................................................................8

*D'Addario v. D'Addario*,
901 F.3d 80 (2d Cir. 2018).............................................................................................8

*Doe v. Trump Corp.*,
385 F. Supp. 3d 265 (S.D.N.Y. 2019)..........................................................................17

*Elsevier Inc. v. W.H.P.R., Inc.*,
692 F Supp 2d 297 (S.D.N.Y. 2010)............................................................................19

*Matter of Estate of Donner*,
82 N.Y.2d 574 (1993) .....................................................................................................3

*Glidepath Holding B.V. v. Spherion Corp.*,
2010 WL 1372553 (S.D.N.Y. Mar. 26, 2010) ...............................................................8

*Heletsi v. Lufthansa German Airlines, Inc.*,
2001 WL 1646518 (E.D.N.Y. Dec. 18, 2001) ...........................................................5, 6

*Kerik v. Tacopina*,
64 F. Supp. 3d 542 (S.D.N.Y. 2014)............................................................................18

*Koch v. Christie's Intern. PLC*,
699 F.3d 141 (2d Cir 2012)............................................................................................4

*Lyman v. CSX Transp., Inc.*,
364 F. App'x 699 (2d Cir.2010) .....................................................................................5

*Petrisch v HSBC Bank USA, Inc.*,
2013 WL 1316712 (E.D.N.Y. Mar. 28, 2013) ...............................................................5

*Red Ball Interior Demolition Corp. v. Palmadessa*,
   874 F. Supp. 576 (S.D.N.Y. 1995) ........................................................................18

*Richard v. Hoechst Celanese Chem. Group, Inc.*,
   355 F.3d 345 (5th Cir. 2003) ...............................................................................19

*Rojas v. Roman Catholic Diocese of Rochester*,
   660 F.3d 98 (2d Cir. 2011)...................................................................................13

*Matter of Rothko's Estate*,
   43 N.Y.2d 305 (1977) ..............................................................................................3

*Thaqi v. Wal-Mart Stores E.*,
   2014 WL 1330925 (E.D.N.Y. Mar. 31, 2014)......................................................20

*Town of Poughkeepsie v. Espie*,
   402 F. Supp. 2d 443 (S.D.N.Y. 2005).....................................................................4

*United States v. Prevezon Holdings, Ltd.*,
   251 F. Supp. 3d 684 (S.D.N.Y. 2017)...................................................................17

*Vaccaro v. Waterfront Homes Marina*,
   2011 WL 5980997 (S.D.N.Y. Nov. 30, 2011) ......................................................14

*Valenti v. Penn Mut. Life Ins. Co.*,
   850 F. Supp. 2d 445 (S.D.N.Y. 2012)...................................................................20

*World Wrestling Entertainment, Inc. v. Jakks Pac., Inc.*,
   530 F. Supp. 2d 486 (S.D.N.Y. 2007)...................................................................19

**Statutes**

18 U.S.C. § 1956 ..........................................................................................................16

18 U.S.C. § 2314 ..........................................................................................................17

Fed. R. Civ. P. Rule 8(a) ...........................................................................................5, 6

Fed. R. Civ. P. Rule 56 .................................................................................................1

Fed. R. of Evid. 803(17) .............................................................................................14

Restatement (Second) of Trusts § 2 (1959) ...............................................................20

Defendant Andrew Wang ("AW") and Shou-Kung Wang ("SK" and with AW "Defendants") respectfully submit this memorandum of law in further support of their motion for summary judgment pursuant to Fed. R. Civ P. 56 to dismiss this action in its entirety.[1]

## **PRELIMINARY STATEMENT**

Plaintiff's Opposition fails to adduce evidence sufficient to defeat Defendants' summary judgment motion. Close examination of the evidence cited by Plaintiff in opposition reveals that her accusations of malfeasance by Defendants – specifically, that AW engaged in self-dealing, re-sold Estate artworks at auctions in China, and laundered money he obtained from those sales – are rooted in pure conjecture and speculation based on scant, if any, admissible evidence. The evidence presented simply does not support the inferences and conclusions necessary to proceed.

The Opposition does make one thing crystal clear: this action is time-barred. Plaintiff admits to being on sufficient notice of what she believed was wrongdoing by AW as a result of attending the Bao Wu Tang Exhibition in 2009 that she solicited the PA for information as to how the artworks could have arrived there for eight months in 2010. As set forth herein, these admissions, and other evidence, demonstrates that the PA – if not Plaintiff – was on notice of claims by May 2010, and this action was untimely when commenced in September 2014.

---

[1] Defendants submits the Declaration of Thomas B. Kelly, dated May 4, 2020 ("Kelly Rep. Dec.") in further support of their motion for summary judgment. Defendants also refer to the Declaration of Thomas B. Kelly, dated February 14, 2020, Dkt. No. 202 ("Kelly Dec.") filed in support of this motion, and the Declaration of Thomas B. Kelly, dated April 13, 2020, Dkt. No. 213 (Kelly Res. Dec.), which was filed in support of AW's opposition to plaintiff Yien-Koo King's ("YK" or "Plaintiff") motion for partial summary judgment. Exhibits to the Kelly Dec., the Kelly Res. Dec. and the Kelly Rep. Dec. are referred to as "Ex. __." Exhibits attached to the Kelly Rep. Dec. are numbered in continuation of those attached to the Kelly Dec. and the Kelly Res. Dec., beginning with Ex. 131. Plaintiff's Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment is referred to herein as "Pl. Br." or the "Opposition." Defendants' Memorandum of Law in Support of Motion for Summary Judgment is referred to herein as "Op. Mem." Citations to "AW Dec." are to the Declaration of Andrew Wang submitted in opposition to Plaintiff's Motion for Partial Summary Judgment, dated April 13, 2020, Dkt. No. 212. Citations to "Luo Dec." are to the Declaration of Rong Luo, dated May 4, 2020, submitted herewith.

In addition, in their opening brief, Defendants' repeatedly contended that Plaintiff could not adduce evidence to support the claims in the First Amended Complaint (the "FAC").  In opposition, instead of adducing such evidence, Plaintiff responds with revised theories of the case and a myriad of new allegations.  Plaintiff's new theories and allegations are not properly raised in opposition to a motion for summary judgment and cannot defeat the motion. Defendants cannot, and are not required to, shoot down moving targets, and newly raised theories should be disregarded by the Court.  Regardless, the evidence cited by Plaintiff in support of her new theories is insufficient to defeat summary judgment.  As set forth herein, Plaintiff fails to adduce evidence sufficient to demonstrate the existence of an association-in-fact enterprise; of a pattern of racketeering activity; of causation; and of RICO injury.  Accordingly, Plaintiff has failed to meet her evidentiary burden and Defendants' motion should be granted in its entirety.

## **ARGUMENT**

### I.    **Plaintiff's Claims Are Time-Barred**

Plaintiff's claims are time-barred.  YK acknowledges she attended the Bao Wu Tang Exhibition in November 2009 and "recognized that many of the other paintings displayed … were Estate-owned (*i.e.,* OTE-numbered) paintings."[2]  (Pl. Br. at 17.)  She admits that seeing these paintings "led her to "solicit[] the PA for more information on how these paintings ended up in China" throughout 2010.  (*Id*.)  YK was on, at very least, inquiry notice upon viewing the exhibition.  Moreover, her "solicitations" for more information included accusations, by May 2010 at the latest, that AW was the source of the paintings displayed at the exhibition.  This is

---

[2]  This remains a contradiction to her claim in the FAC that she learned of the display of Estate-owned paintings at the Bao Wu Tang Exhibition in 2013.  (Ex. 3 at ¶ 118.)

confirmed by, among other things, a May 18, 2010 email from AW to Martin Klein that Klein

forwarded to Schram.  AW wrote:

> "I spoke with the Chinese government agency which sponsored my family's
> exhibition at the Beijing Capital Museum last year on the legal issue here in the
> US.  They promised to provide a statement that all exhibited Chinese paintings
> were provided by different owners.  Although, all artworks were previously
> owned by Wang family…I also spoke with my Chinese attorney who had assisted
> the exhibition at the Beijing Capital Museum to provide another statement
> explaining that those Chinese paintings were also came from different
> collectors…hoping that whoever appear in court on May 25th representing me can
> submit those important documents to the Surrogate Court."

(Ex. 131.)

The question is not only when was YK on notice of the Estate's claims, but when was the

PA on notice of its claims.  YK admits she solicited the PA over the course of eight months in

2010 for information as to how Estate-owned artworks ended up on display at the Bao Wu Tang

Exhibition.  (Pl. Br. at 17.)  The May 2010 email, which was sent to Schram, shows that her

"solicitations" included in some form accusations or suggestions that AW was the source of

Estate-owned paintings on display at the exhibition.[3]  In May 2010, the PA was in possession of

all relevant information concerning the sales prices for the artwork.  (*See* Exs. 33, 39, 52, 55, 59,

68.)  The PA was also aware of the facts YK points to as indicia of self-dealing by AW, namely,

that the artworks were delivered to Billie Wai in Hong Kong, not to the buyers' addresses in

mainland China and that the wire transfers of payment for the artwork came from Le Style

Limited and a single unidentified number – "8480185540" – rather than the accounts in the

buyers' names.  (*See* Exs. 55, 58, 33, 61, 72, 61 (stating address to which artwork was to be

---

[3]  If YK's "solicitations" to the PA did not include some suggestion of self-dealing by AW in connection with
Estate-paintings allegedly displayed at the BWT Exhibition, AW would have no reason to write the cited email
regarding his effort to prove that "all exhibited Chinese paintings were provided by different owners" in May 2010.
AW also procured an affidavit, dated May 20, 2010 by an attorney Bin Guo from Beijing, China who swore that "I
know that the sources of exhibited artworks came from different owners[.]"  (Ex. 132.)

shipped); Exs. 56, 60, 63, 70, 73, 78 (wire transfer documents)). Thus, the PA was on actual notice of claims by, at the latest, May 18, 2010, and the action was untimely when commenced on September 23, 2014.[4]

### A.    Plaintiff Is Not Entitled To Tolling

YK is not entitled to tolling of the statute of limitations based on her investigation into potential claims. (Op. Mem. at 16.) *First*, AW did not conceal facts concerning the sales from YK; decisions as to what information to provide her were made by the PA and supported by the Surrogate's Court. (Pl. Br. at 20; YK Second Decl. at ¶ 17; *see Koch v. Christie's Intern. PLC*, 699 F.3d 141, 157 (2d Cir 2012) (tolling unavailable where "[t]here is no allegation that any defendant took any action that prevented [plaintiff] from" discovering RICO injury)). *Second*, regardless of whatever diligence she may have conducted, YK admits to failing to pursue investigation of her claims at all in 2011 and 2102. (Pl. Br. at 19.) The passage of two full years without investigation of her claims renders tolling unavailable. *See 131 Maine St. Assoc. v. Manko*, 179 F. Supp. 2d 339, 344, 349-51 (S.D.N.Y. 2002) (failure to diligently pursue RICO claim for one year rendered tolling unavailable); *Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 456 (S.D.N.Y. 2005) (delaying prosecution of RICO claim for 1.5 years rendered tolling unavailable).

### B.    Plaintiff's Legal Actions Prior To Gaining Standing Were A Nullity

September 23, 2014 is not the bar date for Plaintiff's claims because YK did not gain standing to pursue an action on behalf of the Estate until February 15, 2018; thus the lawsuit

---

[4]  YK's contention that the PA was not empowered to take action to investigate allegations and take action against its co-fiduciary, AW, because it was not empowered to commence legal action on its own is baseless. (*See* Plaintiff's Response to Defendants' Rule 56.1 Statement at ¶ 19.) The PA's own duties obligated it to investigate allegations of harm to the Estate. *See, e.g.*, *Matter of Estate of Donner*, 82 N.Y.2d 574, 584 (1993); *Matter of Rothko's Estate*, 43 N.Y.2d 305, 319-20 (1977). Moreover, the PA could have, of course, sought permission from the Surrogate's Court.

commenced in 2014 and amended in 2016, was a nullity until she obtained standing.  (Op. Mem. at 16-17.)  Plaintiff contends her initial complaint was on behalf of the Estate because she "sought relief on behalf of Yien-Koo *and* the Estate" citing a single sentence in the demand for relief in her initial complaint that requested the Court order return of artworks to "YK or the Estate."  (Savitsky Ex. 96 at 48.)  While that relief would benefit the Estate, the Estate was not a party to the action and no claims were brought on its behalf.[5]  The action is untimely as it can only be deemed commenced as of the date YK gained standing:  February 15, 2018, or at the very earliest, the date she brought claims on behalf of the Estate, September 27, 2016.[6]

## II.   Plaintiff's Opposition Fails To Adduce Evidence Sufficient To Prove Her RICO Claim

### A.   Plaintiff's New Theories Of RICO Liability Are Improperly Raised And Cannot Defeat Summary Judgment

Rather than respond directly to Defendants' demands that Plaintiff adduce evidence to support the claims *in the FAC* (*see, e.g.,* Op. Mem. at 19-25), Plaintiff responds – virtually entirely – with new theories of liability and facts that were not alleged in the FAC.  This is improper.  Courts have repeatedly held that "[a]n opposition to a summary judgment motion is not the place to raise new claims."  *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (internal quotation omitted); *Petrisch v HSBC Bank USA, Inc.*, 2013 WL 1316712, at *18 n.16 (E.D.N.Y. Mar. 28, 2013) (refusing to consider revisions to claims alleged because defendant expended significant "resources in defending against plaintiff's claims as they were

---

[5]  Plaintiff's citation to statements by counsel in oral argument to the Second Circuit regarding the claims brought in the initial complaint do not change what was in fact pleaded in the initial complaint.  (Pl. Br. at 24.)

[6]  YK was unequivocally on actual notice of potential claims, by, at the latest, May 2011.  In a May 9, 2011 filing in the Surrogate's Court, YK alleged that "works of art which are allegedly part of the estate have recently been depicted in the catalogues, exhibited and/or offered for sale at various auction houses, studios and in museums in China and Hong Kong" – including the Bao Wu Tang Exhibition – and that she had "reason to believe that some or all of such works have been sold without obtaining full market value, without proper accounting to the [PA] and/or the estate, and otherwise by reason of improper, unauthorized unilateral acts of Mr. Wang."  (Ex. 71 at ¶ 8(g).)

alleged in her Complaint" and "would be prejudiced by the court's consideration of the new

allegations"); *Heletsi v. Lufthansa German Airlines, Inc.*, 2001 WL 1646518, at *1 n. 1

(E.D.N.Y. Dec. 18, 2001) (rejecting "new facts and theories" alleged in opposition to summary

judgment).[7]  Plaintiff's contentions that are inconsistent with the FAC should also be rejected.

*See Heletsi*, 2001 WL 1646518, at *1 (refusing to credit newly alleged facts that were

"inconsistent" with the complaint).  Accordingly, Plaintiff's new theories and allegations should

be disregarded.  They include:

**Plaintiff's New Enterprise Theory:**  The FAC alleged an association-in-fact enterprise

consisting of AW and SK, the five buyers of the 98 Paintings, Anthony Chou, Chen Mei-Lin,

Wei Zheng, Ye Yong-Qing, and Yue Da Jin (the "Five Buyers"); two entities, Bao Wu Tang and

Jin Bao Gallery.  (*See* Ex. 3 at ¶¶ 265, 274.)  The Opposition made no attempt to prove this

enterprise.  Instead, the Opposition claims a different enterprise – the so-called "Wang Family"

enterprise consisting of AW and SK, their wives Rong Luo and Cao Ching Wang, the entities Le

Style Limited, Le Tao Limited, the individuals Chien-Fang Huang, Billie Wai, and Wei Zheng,

and AW's d/b/a name Bao Wu Tang.[8]  (Pl. Br. at 4.)  Plaintiff's FAC contains no allegations at

all concerning Rong Luo, Cao Ching Wang, Le Style Limited, Le Tao Limited, Chien-Fang

Huang, or Billie Wai.

**Plaintiff's New Theory of The Purported Scheme to Defraud the Estate:**  The FAC

claimed that AW "effectuat[ed] sales" of the 98 Paintings "to himself" by selling the 98

Paintings "to his friends" (the purported "Straw Men"), "provid[ing] the funds needed for the

---

[7]  To curtail any contention that this rule only applies to new causes of action, as opposed to new factual theories,
the Court should note that to assert a "claim for relief" under Fed. R. Civ. P R. 8(a) a party must include the factual
basis for that claim for relief, *i.e.*, "short and plain statement of the claim showing that the pleader is entitled to relief
[.]"  "Claims for relief" under Rule 8(a) encompass their factual basis.

[8]  The only members of the actual Wang family are AW, SK, and their wives.

Straw Men to purchase the works," and that the buyers "played specific roles in the procurement and transfer of [Estate] assets to AW in China, thereby effectuating AW's sales to himself, and laying the groundwork for AW's subsequent laundering of the monies achieved by his re-sales of those works overseas."  (Ex. 3 at ¶¶ 265-266, 271.)  Defendants further asserted that there was no evidence that the Five Buyers "did anything other than purchase artwork from the Estate," and demanded Plaintiff prove her claim.  (Op. Mem. at 18-19.)  In response, Plaintiff abandoned her claims regarding the Five Buyers and now alleges that they were "fictitious."[9]  (Pl. Br. at 1, 5, 33.)

**Plaintiff's New Wire Fraud Claims:**  In the FAC, the crux of the alleged scheme to defraud the Estate was that AW committed wire fraud by faxing the "fraudulent" Bills of Sale to the PA.  (*See* Ex. 3 at ¶ 282.)  Defendants challenged Plaintiff to adduce evidence sufficient to demonstrate that the Bills of Sale constitute wire fraud.  (Op. Mem. at 23.)  Plaintiff made no attempt to do so, conceding that the central communications at issue did not violate RICO.  Because she could not demonstrate these communications constitute wire or mail fraud; Plaintiff advances a new theory – that AW sent a total three "fraudulent" emails to his attorney Martin Klein and new wire fraud claims against SK.  (Pl. Br. at 29.)

**Plaintiff's New Money Laundering Claims:**  The FAC alleged that AW and SK engaged in "money laundering" by "reinvest[ing] the funds gained from the sale of works stolen from the CY Art safe deposit box into the RICO enterprise for the purpose of fraudulently purchasing artwork from C.C. Wang's Estate."  (Ex. 3 at ¶¶ 282, 304.)  Plaintiff adduced no evidence of these acts.  Instead, she makes new allegations of "recent predicate acts that sound in

---

[9]  This claim, too, is in direct conflict with the allegations in the FAC and should not be credited.  The FAC admits the Five Buyers were "real" and the Court should hold Plaintiff to that factual allegation.

money laundering" allegedly occurring between 2013 and 2015 premised on an allegation that the "Wang Family … controls immense wealth that flows freely between its U.S. accounts and foreign accounts on an as needed basis."  (Pl. Br. at 31-32.)

**Plaintiff's New Claims of Shipments of Stolen Goods:**  Plaintiff also asserts anew claims of "shipments of stolen goods;" specifically, the transport (by unidentified means) of fifteen of the 98 Paintings from Hong Kong to the Beijing Capital Museum in 2009.  (Pl. Br. at 31.)  This was not alleged in the FAC.[10]

## B.    Plaintiff Failed To Adduce Evidence Of An Association-In-Fact Enterprise

Plaintiff failed to adduce evidence to support the enterprise theory advanced in the FAC, and her abandonment of the pleaded theory requires dismissal of this action.  Assuming *arguendo* that Plaintiff's "Wang Family" theory was properly asserted, Plaintiff fails to show the enterprise members acted with a sufficient degree of coordination or shared unlawful purpose, or as an organization, to constitute an association-in-fact enterprise.  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013); *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (requiring evidence of "ongoing organization" and that members function as a "continuing unit"); *see also D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir. 2018) (dismissing RICO claim against executor for failing to plead enterprise because allegations that "each defendant agreed to join forces with [the executor] to defraud the Estate in a particular way does not support an inference that they all agreed to join forces with each other to pursue a goal of defrauding the Estate over decades in a variety of ways").  Taking the new enterprise members in turn:

---

[10]  Plaintiff did not set forth her revised factual theories in a Rule 56.1 statement, or counterstatement, or even reference them in her response to Defendants' Rule 56.1 statement.  New facts raised via briefing and not set forth in a Rule 56.1 statement are "improperly raised' and should be rejected by the Court for this additional reason.  *See Glidepath Holding B.V. v. Spherion Corp.*, 2010 WL 1372553, at *5 (S.D.N.Y. Mar. 26, 2010).

**Billie Wai:**  Ms. Wai's purported role in the alleged scheme was to "accept[] artwork on behalf of people who she was not actually representing and who did not actually exist[.]"  (Pl. Br. at 13.)  But the evidence cited does not show that Ms. Wai "knowingly served as an illicit conduit" of artwork, or that she was aware of a scheme to defraud the Estate, or associated with members of the enterprise other than AW, or shared a common unlawful purpose with them.[11]

**Chien-Fang Huang:**  There is no evidence presented that Chien-Fang Huang played a role in the purported scheme to defraud the Estate.  The last predicate act even alleged was in 2010.  (Ex. 3 at ¶ 282.)  It defies logic to assert that she assisted a scheme to defraud the Estate of artworks between 2005 and 2009 by testifying, in 2017, in a trial concerning the validity of a will signed in 2003, about issues with no bearing on the disposition of Estate assets, that resulted in an unfavorable decision for AW.  The evidence cited by Plaintiff does not demonstrate any action on her part to knowingly (or even unknowingly) advance the scheme to defraud the Estate of assets, or that she participated in any way in the sale of the 98 Paintings, associated with any enterprise members other than AW, or shared a common unlawful purpose with other enterprise members.

**Rong Luo and Cao-Ching Wang:** There is no evidence that AW and SK's wives meaningfully or willfully participated in the "Wang Family" enterprise or any scheme to defraud the Estate.  AW's wife Rong Luo's sole alleged involvement in the purported enterprise was allegedly to wire "$1,450,000.00 in illicit proceeds from Chinese paintings sales to Cao Ching Wang (SK's wife) from Hong Kong."  (Pl. Br. at 16.)  Plaintiff presents no evidence to support the assertion that funds transferred were "illicit proceeds from Chinese paintings sales," or that by transferring the funds she in any way advanced a scheme to defraud.  Plaintiff fails to prove

---

[11]  The claim that the buyers do "not actually exist;" contradicts the FAC.  (*See* Ex. 3 at ¶¶ 17-21.)

any "Chinese painting sale" by which Rong Luo – or any enterprise member – obtained any

funds at any time, let alone an "illicit" sale of Chinese paintings obtained from the Estate.  The

evidence of a single transfer of funds does not establish that Ms. Luo possessed knowledge of the

alleged scheme to defraud the Estate, possessed an unlawful purpose to defraud the Estate, or

associated with other members of the alleged enterprise.

According to Plaintiff, SK's wife, Cao-Ching Wang, "used a $1.4 million transfer in

illicit proceeds from the sale of the Estate's Chinese paintings to purchase a piece of real

property in Queens in July 2015."  (Pl. Br. at 16.)  And, according to Plaintiff, this amounts to

money laundering "[b]ecause SK testified that: 'I am in charge of the money at home, not my

wife,' the Record indicates that Cao-Ching Wang laundered the money at SK's direction."  (*Id.*)

Plaintiff adduces no evidence that the $1.4 million Mrs. Wang used to purchase property in

Queens, New York in 2015 was the "illicit proceeds from the sale of the Estate's Chinese

paintings."  Evidence of a single transfer of funds six years after the last sale of Estate artwork

does not establish that Mrs. Wang was aware of the alleged scheme to defraud the Estate, shared

a common unlawful purpose to defraud the Estate, or associated with any other enterprise

members to advance the alleged scheme to defraud the Estate.

**Wei Zheng:**  Plaintiff claims Mr. Zheng as an enterprise member because he allegedly

"signed multiple documents falsely identifying him as the 'buyer' of Estate paintings[.]"  (Pl. Br.

at 13.)  These allegations were debunked in Defendants' opening brief; and have been rejected

by Plaintiff's co-fiduciary.[12]  (Op. Mem. at 9-10; Ex. 26 at ¶ 14.)

---

[12]  The Plaintiff in interest in this action is the Estate.  With respect to Mr. Zheng, among facts, the Estate is
speaking out of both sides of its mouth.  YK says one thing and the PA says another.  If the Estate's co-fiduciaries
dispute the facts between themselves, it is not for the Court to resolve. *See also,* n. 15, *infra.*

**SK:**  Plaintiff asserts that SK contributed to the scheme by allowing the Estate to sell paintings he claimed to own – OTE 156 and others – and by securing for the Estate permission to sell artworks he believed were owned by his cousin Hui-Chen.  (Pl. Br. at 8-10.)  Plaintiff's position is that by donating artwork he believed he or his cousin owned to the Estate, SK participated in a scheme to defraud.  This contention, on its face, is nonsensical.  The Estate was not harmed by SK's donation of artwork to it; the Estate benefited.  Plaintiff further fails to adduce evidence that SK was aware of a scheme to defraud the Estate of the 98 Paintings; or that he associated with other enterprise members in connection with that scheme.[13]

**Le Tao Limited:**  Plaintiff claims the entity Le Tao Limited participated in the scheme to defraud the Estate on the basis that AW "authorized a wire from Le Tao's HSBC account in Hong Kong in the amount of $590,000.00 to his real estate attorney's account in New York as the down payment for 117 Old House."  (Pl. Br. at 15.)  Again, there is no evidence tying the transfer to anything related to the purported scheme to defraud the Estate.

**Bao Wu Tang:**  Plaintiff also fails to tie "Bao Wu Tang" to the enterprise.  "Bao Wu Tang" is not a legal entity and it is not an "art gallery," it was AW's "doing business as" name beginning in 2009, and is thus not distinct from AW.  (*See* Ex. 109 at 135:3-137:2; 139:17-19; AW Dec. at ¶ 44.)  Regardless, Plaintiff cites no evidence to support her claim that AW used Bao Wu Tang "to market stolen and fraudulently acquired paintings."  There is no evidence Bao Wu Tang "marketed" any of the 98 Paintings.

---

[13] Plaintiff also claims that SK participated in the newly alleged "money laundering" scheme by setting up the Shou-Kung Wang Irrevocable Trust (the "SK Trust") for his grandson.  (Pl. Br. at 10-11.)  As set forth below, that contention is baseless.  *See infra* at 16.

C.      **Plaintiff Failed To Adduce Evidence Of A Pattern Of Racketeering Activity**

Plaintiff's Opposition confirms that she cannot adduce evidence of a pattern of racketeering activity. *First,* Defendants asserted that Plaintiff could not establish the pattern element of her RICO claim because the scheme alleged, at heart, was too narrow as it involved a single victim, and was advanced by a few participants.  In opposition, even with new allegations, Plaintiff failed to demonstrate a broader scheme than was initially pleaded. *Next*, the Opposition failed to adduce evidence of the predicate acts alleged against AW and SK.  (Op. Mem. at 19-25.)

1.      **Plaintiff Failed To Adduce Evidence Of Wire Fraud Or Shipping Of Stolen Goods Against AW**

Defendants contended that Plaintiff could not adduce evidence the Bills of Sale, the Wire Transfers and the Shipments constituted wire fraud or shipping of stolen goods because she could not adduce evidence of a scheme to defraud.  (Op. Mem. at 21-23.)  In opposition, Plaintiff drops her claim that AW's transmission of the Bills of Sale constitute wire fraud, leaving only the Wire Transfers and the Shipments at issue.[14]  (Pl. Br. at 27-30.)

a.      **Plaintiff Failed Adduce Evidence Of A Scheme To Defraud**

With respect to the alleged wire fraud and shipments of stolen goods, Defendants contended that Plaintiff could not adduce evidence of a "scheme to defraud" the Estate of something of value required to prove both predicate acts.  (Op. Mem. at 21-23.)  Plaintiff does not respond to Defendants contention that any purported intent of AW to defraud the Estate of something of value is negated by evidence that he followed the procedures for selling the

---

[14]  To the extent the Court considers the Oppositions newly alleged predicate acts of wire fraud and shipping of stolen goods, *i.e.*, AW's sending of three emails to his attorney (Pl. Br. at 29), SK's relinquishment of claims to numerous artworks (*id*. at 29-30), and transport of 15 artworks between Hong Kong and Beijing (*id*. at 31), Plaintiff's failure to adduce sufficient evidence of a scheme to defraud is fatal to these purported predicate acts.

artwork, which was confirmed by attorneys for the PA.  (*See* Op. Mem. at 22.)  Further, AW directed the PA's art consultant to a third-party, independent appraiser (Arnold Chang) to vet any proposed sales prices that she questioned.  (*See* Exs. 95, 96.)  This is not the behavior of someone attempting to abscond with Estate artwork at "fire sale prices," but of someone attempting to ensure the Estate received fair prices.  (*See* Ex. 3 at ¶¶ 107, 343.)

Plaintiff's failure to adduce evidence that 84 of the 98 artworks were sold for less than fair market value further undermines her claim that AW acted with intent to cause financial harm to the Estate.[15]  (Op. Mem. at 28-29.)  "Self-dealing," in itself, is not an injury to business or property cognizable under RICO.  Assuming *arguendo* that Plaintiff's allegations suggest self-dealing (which they do not), they fail to suggest accompanying financial harm to the Estate property, the Court cannot infer the existence of scheme to defraud as contemplated by RICO.[16]  Regardless, the evidence and allegations bearing on the purported self-dealing are either logically flawed, unsupported by evidence, or unsupported by admissible evidence and fail to provide a sufficient basis – absent speculation and conjecture – to conclude that AW purchased the 98 Paintings, let alone at "fire sale prices," as alleged in the FAC, or that he intended to cause harm to the Estate.

---

[15]  In opposition, Plaintiff attacks the admissions and statements of her own co-fiduciary, the PA, concerning the sales process.  The Court should reject Plaintiff's self-serving arguments.  The party-in-interest in this action is the Estate, not Yien-Koo King.  Plaintiff has not alleged the PA engaged in any wrongdoing in connection with the sales of the 98 Paintings, and, in fact, included a declaration of the current PA to support the Estate's motion for partial summary judgment against AW.  It is not the Court's role to resolve factual disputes between co-fiduciaries of the Estate.  Moreover, it is well-established that a party cannot defeat summary judgment by making new allegations that contradict prior sworn statements.  *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (holding the District Court properly rejected new allegations that were directly contradicted by prior sworn statements).  The Court should similarly reject Plaintiff's efforts to contradict the prior sworn statements of her co-fiduciary, the PA.

[16]  While a claim for breach of fiduciary duty may lie based solely on self-dealing, in the absence of damage, RICO requires evidence of harm to business or property, self-dealing without accompanying damage is not a cognizable RICO injury.

**The Bao Wu Tang Exhibition:**  Plaintiff further contends that AW's participation in the Bao Wu Tang Exhibition shows he is the owner of the artwork.  There is no evidence that AW, as opposed to the buyer or someone else, loaned the artworks to the Capital Museum for the exhibition (the most plausible inference).  Further, Plaintiff now admits that the preface to the Bao Wu Tang exhibition catalog does not contain any admission by AW that the artwork displayed belonged to him personally and concedes that it merely states that the artwork included in the exhibition was once in the collection of C.C. Wang.  (Plaintiff's Response to Defendants' 56.1 Statement at ¶ 177.)  Plaintiff also fails to adduce evidence that the art displayed was authentic artworks as opposed to reproductions, *i.e.*, Plaintiff fails to establish that any of the 98 Paintings were in fact exhibited at the Bao Wu Tang Exhibition.  (*See* Defendants' Response to Plaintiff's Rule 56.1 Statement at ¶ 347.)

**Purported Resales of the 98 Paintings:**  Plaintiff contends that some of the 98 Paintings came up for auction in the years after they were sold by the Estate is evidence AW was the buyer.  (Pl. Br. at 32.)  Even if true, subsequent auction of the artwork is not evidence that AW purchased the artwork from the Estate.  Further, Plaintiff submits no evidence that identifies AW or SK as the seller of the artwork.  Plaintiff's sole evidentiary support that the artwork was resold at all are excerpts from the report of her damages expert Patrick Regan.  (Pl. Br. at 12, 32-33.)  The Regan Report is inadmissible hearsay, as are the purported facts it conveys from external sources even if those alleged facts were relied upon by Regan in forming his opinion.[17]

---

[17]  Plaintiff's assertion that pages of the Regan Report cited constitute "market reports" admissible under Federal Rule of Evidence 803(17) is wrong.  FRE 803(17) provides an exception to the hearsay rule for "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."  Fed. R. Evid. 803(17).  Examples of such reports include stock market reports, telephone directories, city directories, and weather reports.  *See id.*; *Vaccaro v. Waterfront Homes Marina*, 2011 WL 5980997, at *5 (S.D.N.Y. Nov. 30, 2011).  Here, the pages cited are part of Mr. Regan's expert report and largely do not reference any source material.  No caselaw supports Plaintiff's assertion that an expert report constitutes a "market report" under FRE 803(17).  To the extent Regan references any source material, none of that falls within the rule,

Plaintiff's characterization of the cited evidence is beyond the pale.  Plaintiff claims that "SK and Andrew resold their fraudulently acquired paintings together in 2008 and 2010 by auctioning them through the Beijing and Hong Kong Chieftown International Auction Company Ltd. ("Chieftown") for millions of dollars."  (Pl. Br. at 12, 32.)  In support, Plaintiff claims SK testified that he "put up two paintings for auctions years ago, identified as Nos. 150 and 328." (*Id.*)  The paintings under discussion with SK – "Nos. 150 and 328" – were not even among of the 98 Paintings (Exs. 49, 50, 51, 52, 53, 64), and SK did not testify that he put the paintings up for auction.[18]

**The Wire Transfers:**  The fact that purchase monies were routed through an account in Hong Kong belonging to AW similarly does not allow an inference of self-dealing (let alone that that AW intended to harm the Estate).  To facilitate transfers of funds from mainland China to the Estate, buyers transferred funds to a bank account under AW's control in Hong Kong, and AW transferred the funds from that account to the Estate.  (AW Dec. at ¶ 32.)  Plaintiff commenced this lawsuit approximately five years after the last of sales at issue in this case and eight years after the first sale.  Bank records dating back to 2006 were not available to Plaintiff as a result of the passage of time and actions by the bank.  (AW Dec. at ¶ 33.)  Plaintiff did not independently seek discovery from HSBC, and she presents no evidence to contradict AW's explanation for the lack of records of the buyers' transfers of funds to his account in Hong Kong. The absence of evidence of the buyers' transfers of funds to Hong Kong – especially when

---

and Plaintiff fails to provide the factual predicate to bring such source material within the rule.  (*See* Ex. 105 at ¶¶ 34-42 (discussing unreliability of Chinese auction house records)).

[18]  Plaintiff's counsel Mr. Savitsky asked SK, "Mr. Wang did you ever put painting number 150 on SK 16 up for auction?"  SK responded, "I do not recall, but I think we tried.  I'm not sure.  Did we fail to sell it or something?  I don't remember."  (Savitsky Ex. 88 at 142:10-14.)

Plaintiff failed to seek the evidence from the HSBC – is no basis to support the assertion that AW was the "true" source of the funds.

**Shipping Artwork to Billie Wai:**  Plaintiff does not dispute that AW disclosed to the PA that the artworks were shipped to Billie Wai.  (Plaintiff's Response to Defendants' 56.1 Statement at ¶¶ 99, 120, 129, 141, 147.)  Moreover, Plaintiff does not dispute AW's explanation for sending the artwork to Billie Wai in Hong Kong, specifically, including that it was to ensure safe delivery to the buyer.  (*See id*. at ¶¶ 92, 95.)

### 2.   Plaintiff Failed To Adduce Evidence Of Other Predicate Acts

**Money Laundering:**[19]  Plaintiff adduced no evidence to support the FAC's allegations of money laundering.  (Ex. 3 at ¶¶ 282, 304; Op. Mem. at 25.)  Rather, she asserts new claims of money laundering between 2013 and 2015.  Plaintiff contends that there is "evidence of a differential between legitimate income and cash outflow" that allows an inference of money laundering.  (Pl. Br. at 32.)  But Plaintiff presents no evidence to establish any of AW, SK, or any purported enterprise member's "legitimate income" or assets.  Plaintiff's contention that it is "simply unreasonable" that SK testified that he had a "net worth of around $100,000" when an irrevocable trust in his name received a transfer of $5.6 million such as to permit an inference of money laundering is also baseless.  SK did not testify that he had a net worth "around $100,000," but that he had a net worth "over $100,000."  (Savitsky Ex. 88 at 179:25-180:4.)  Further, the assets of the SK Trust do not belong to SK, they belong to the trust.[20]  *See* 12.06 TRUSTS, 2001

---

[19]  A money laundering claim under 18 U.S.C. § 1956, requires evidence that: "(1) the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in [18 U.S.C.] § 1956(c)(7); and (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity."  *Jus Punjabi, LLC v. Get Punjabi Inc.*, 2015 WL 2400182, at *8 (S.D.N.Y. May 20, 2015) (citations omitted).

[20]  The SK Trust document states "[t]he Trustee *shall not*, under any circumstances, convey or pay over any part of the principal to or for the benefit of the Settlor.  The Settlor is permanently divested of all direct access to the principal of the Trust."  (Savitsky Ex. 89 at SK Dep. Ex. 2, AWSK_00000066-67.)

WL 643462, at 1 ("An irrevocable trust transfers the trust assets outside the grantor's ownership and is generally immune from lawsuits and creditors' claims against the grantor."). There is nothing "unreasonable" about SK's statement that his net worth was "more than $100,000" based on the assets of the SK Trust. Finally, "Zhu Mengxia" the source of the $5.6 million transfer that Plaintiff finds so suspicious, is Rong Luo's mother. (Luo Dec. at ¶ 4; Savitsky Ex. 84 at 231:12-15.) There is no contention, or evidence, that Ms. Zhu participated in the purported scheme to defraud the Estate.

**Shipments of Stolen Goods:** Plaintiff's Opposition alleges that AW violated 18 U.S.C. § 2314 by transporting 15 of the 98 Paintings from Hong Kong to Beijing. (Pl. Br. at 31.) Even if the art displayed at the exhibition is presumed to be genuine, Plaintiff cites no evidence that AW transported the artworks. Further, these purported shipments are duplicative of the shipments from the U.S. to China. Finally, 18. U.S.C § 2314 does not apply to transfers of goods within a foreign country, *i.e.* extraterritorially, unless the alleged conduct "touch[es] or concern[s] the territory of the United States." *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 691-92 (S.D.N.Y. 2017). Plaintiff does not establish these predicate acts "touched or concerned" the United States.

## III.   Plaintiff Failed To Adduce Evidence Of Causation

Defendants' contended that Plaintiff could not establish the injury alleged in the FAC, *i.e.,* that the Estate sold the 98 Paintings for less than their "true value." (Op. Mem. at 28-29.) Plaintiff does not dispute that all sales prices were vetted and approved by the PA. (Plaintiff's Response to Defendants' 56.1 Statement at ¶¶ 87, 88.) Plaintiff presents no argument in response to Defendants contention that, to the extent the Estate sold any artwork for less than its "true value," these intervening factors diminish the causal connection between AW's purported misconduct and injury to the Estate. *See Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 276-77

(S.D.N.Y. 2019) (RICO's "direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury").  Further, Plaintiff concedes that the transmission of the Bills of Sale did not constitute wire fraud, and, thus, injury attributable to that fraud was not caused by a predicate act.  Moreover, Plaintiff does dispute Defendants' contention that the Estate was not injured "by reason of" its receipt of funds through the Wire Transfers or the Bills of Sale (which she concedes were not wire fraud).[21]

Plaintiff argues that, "[o]bviously, the Estate would not have repeatedly shipped its valuable paintings off to Hong Kong unless the Wangs had first conjured up fictitious buyers, crafted fake sales documents, coordinated with Billie Wai on delivery, and used their corporate account(s) to wire six payments to the Estate."  (Pl. Br. at 33.)  But Plaintiff's contention regarding the "obvious" admits that the Shipments "would not have occurred" but-for the initial fraud, *e.g.*, "conjur[ing] up fake buyers" and "craft[ing] fake sales documents."  Further, the Shipments occurred after the PA approved the sales prices and executed the sales contracts.  (*See* Defendants' 56.1 Statement at ¶¶ 73-83, 93.)  At most, they merely "furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act."  *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F. Supp. 576, 584 (S.D.N.Y. 1995).

## IV.   Plaintiff Failed To Adduce Evidence Of A RICO Injury

In opposition, Plaintiff adduced no evidence that the Estate received less than fair value prices for 84 of the 98 Paintings.  She admits that her damages expert Regan offered no opinion

---

[21]   Additionally, Plaintiff does not contend that the Estate was injured by any of the newly alleged predicate acts.  As to the new wire fraud allegations, there is no evidence that the PA, or anyone, relied on the cited emails.

as to the purportedly "true" value of these 84 paintings when they were sold.  (Plaintiff's Response to Defendants' 56.1 Statement at ¶ 192.)  Plaintiff claims that "appreciation damages" – the theory that she is entitled to the *present day value* of the artwork – constitutes a RICO injury.  It does not.  RICO requires a party to prove a "concrete financial loss" (*Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014)); evidence of the current value of the property is not evidence of financial loss or other injury.  "Appreciation damages" is the label of a theory of measurement of *damages*, it is not evidence of *injury*; the present value of the 98 Paintings is not evidence that the Estate suffered a financial loss when they were sold.  No case has ever held "appreciation damages" to be a viable injury under RICO (let alone a viable damages theory).  "By failing to state a proper remedy, [Plaintiff's] RICO claim is void." *Richard v. Hoechst Celanese Chem. Group, Inc.*, 355 F.3d 345, 355 (5th Cir. 2003).

Plaintiff's contention that "appreciation damages" are equivalent to lost profits is baseless.  Lost profits are a form of injury to business; they are not a theory of damages, and they are only available to a plaintiff who claims injury to business.  *See Elsevier Inc. v. W.H.P.R., Inc.*, 692 F Supp 2d 297, 310 (S.D.N.Y. 2010).  The Estate is not a business and did not suffer an injury to business.  Further, Plaintiff concedes that at the time of the sales the Estate lacked liquid funds sufficient to cover Estate taxes and administration expenses.  (Plaintiff's Response to Defendants' 56.1 Statement at ¶ 40.)  The Estate was never in a position to realize the 2019 prices for the artwork; the artwork had to be sold.[22]

## V.    Plaintiff Is Not Entitled To Adverse Inferences

Plaintiff seeks two adverse inferences: (i) that the SK Trust's property includes Estate

---

[22]  As to the additional fourteen paintings, Plaintiff failed to adduce evidence that Regan's valuation of those artworks is reliable, and it should not be credited.  *See World Wrestling Entertainment, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 519, 520-521 (S.D.N.Y. 2007).

paintings that were stolen and self-dealt; and (ii) bank accounts of Le Style Limited and
"8480185540" were jointly controlled by AW and SK.  (Pl. Br. at 35-36.)  Plaintiff is not entitled
to either inference.  As to the SK Trust, the Luo Declaration submitted herewith (in addition to
AW's testimony) identifies the source of the $5.6 million transfer Plaintiff cites as
"unreasonable" and evidence of money laundering.  Plaintiff lacks any evidence tying the SK
Trust to any aspect of this case, or that its assets are relevant to her claims.[23]  Plaintiff's
speculation that additional records "should" exist is no basis for an adverse inference.[24]  *See*
*Thaqi v. Wal-Mart Stores E.,* 2014 WL 1330925, at *8 (E.D.N.Y. Mar. 31, 2014) (moving party
must establish that "the evidence at issue existed").  Next, the lack of bank records from Le Style
Limited is explained by Defendant.  (*See* AW Dec. at ¶ 33.)  There is no evidence that other
documents relating to this, or any, account still exist.  Finally, documents concerning the SK
Trust and the control of the HSBC bank account – to the extent they exist were also in possession
of third-parties.  Plaintiff did not seek these alleged documents from HSBC or the drafter of the
SK Trust formation document.[25]

---

[23]  YK similarly fails to demonstrate that AW or SK had "a culpable state of mind" or that the "missing evidence is
'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support any
claim or defense."  *Valenti v. Penn Mut. Life Ins. Co.,* 850 F. Supp. 2d 445, 452 (S.D.N.Y. 2012).

[24]  Plaintiff's contention is rooted in the misguided belief that the *res* of a trust must be listed in the trust formation
documents or that the *res* does not exist if it is not listed in the document.  Even if Plaintiff were correct that a trust
formation document must list the assets of the trust, the fact that the list of assets was never populated in this
instance does not establish that Defendants failed to meet their discovery obligations.  Further, Courts regularly
enforce trust agreements even in the absence of a *res* provided other requirements for contract formation are
satisfied.  *See Conway v. White,* 292 F. 837, 845 (2d Cir. 1923) ("[I]f nothing further remains to be done to establish
the trust, the agreement will be enforced, although there was no consideration to support it."); Restatement (Second)
of Trusts § 2 (1959) (In the absence of a *res* "there is at most an agreement to create a trust, and whether such an
agreement is binding as a contract depends upon whether the requirements for the creation of a contract are
satisfied.").

[25]  With respect to the SK Trust documents, Judge Cott suggested that Plaintiff "track[] down the original through
Mr. Nudo," – the lawyer who drafted the document – and noted that Plaintiff will "either chose to serve a third-party
subpoena or [she] wont."  (Savitsky Ex. 105 at 19:7-24, 21:12-17.)  Plaintiff chose not to do so.

**<u>CONCLUSION</u>**

Based on the foregoing, Defendants respectfully request that the Court enter an Order

dismissing this action in its entirety, and for such other just and further relief as the Court may

deem proper.

Dated:  May 4, 2020
      New York, New York

                    By:  _/s/ Thomas B. Kelly_____
                       Thomas B. Kelly
                       (tkelly@kasowitz.com)
                       Kim Conroy
                       (kconroy@kasowitz.com)
                       Jonah M. Block
                       (jmblock@kasowitz.com)

                    KASOWITZ BENSON TORRES LLP
                    1633 Broadway
                    New York, New York 10019
                    Tel.:  (212) 506-1700

                    *Attorneys for Defendants Andrew Wang and*
                    *Shou-Kung Wang*