UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/23/2020
```

-------------------------------------------------------------------X
:
YIEN-KOO KING,                                    :
:
:
                              Plaintiff,          :            14-cv-7694 (LJL)
          -v-                                     :
                                                  :            OPINION & ORDER
ANDREW WANG, et al.,                              :
:
                              Defendants.         :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

          Before the Court are summary judgment motions by Plaintiff Yien-Koo King ("Plaintiff

or "Y.K. King"), in her capacity as preliminary executrix of the C.C. Wang's estate (the

"Estate"), and Defendants Andrew Wang ("A. Wang") and Shou-Kung Wang ("S.K. Wang," and

together, the "Wangs" or "Defendants").[1]  Plaintiff moves for partial summary judgment on her

breach of fiduciary claim against A. Wang.  Defendants move for summary judgment on all of

Plaintiff's federal and state law claims.

          For the reasons set forth below, Plaintiff's motion is denied and Defendants' motion is

denied.

## BACKGROUND

          The case was previously assigned to the Honorable John F. Keenan before transfer to the

undersigned on February 4, 2020.  The Court assumes a general familiarity with the facts and

---

[1] The Complaint names sixteen additional Defendants; however, only the Wangs, individually
and on behalf of Bao Wu Tang and Jian Bao Gallery, have appeared in this action.  The other
defendants include Bao Wu Tang, Jian Bao Gallery, Anthony Chou, Chen Mei-Lein, Wei Zheng,
Yong-Qing Ye, Yue Da-Jin, and John Does 1-9.  The Court refers to A. Wang and S.K. Wang as
"Defendants" for ease of reference throughout this Opinion.

history of this case. *See King v. Wang*, 2018 WL 1478044, at *1 (S.D.N.Y. Mar. 26, 2018). Nevertheless, the Court recites the following relevant facts, which are undisputed unless otherwise noted.

This action concerns the estate of artist and collector, Chi-Chuan Wang ("C.C. Wang"). Plaintiff, Y.K. King, a New York City resident, is the daughter of C.C. Wang. She initially brought this action—together with Northwich Investments Ltd. ("Northwich") and Soon Huat, Inc. ("Soon Huat"), corporations owned by her and her husband, Kenneth King ("K. King" and with Y.K. King, the "Kings")—to recover works of fine art formerly belonging to the Estate.

Defendant S.K. Wang, a resident of New York, is the son of C.C. Wang and the brother of Y.K. King. S.K. Wang is the sole owner of Defendant Jian Bao Gallery, an art gallery conducting business in New York. Defendant A. Wang, also a resident of New York, is the son of S.K. Wang and grandson of C.C. Wang. A. Wang is the sole owner of Defendant Bao Wu Tang (the "Bao Wu Tang Gallery"), an art gallery conducting business in China. A. Wang was executor and co-fiduciary of the Estate for 15 years before a jury found that C.C. Wang's will had been the result of undue influence and/or fraud.

In short, Plaintiff alleges that her nephew Defendant A. Wang exploited his temporary status as Estate fiduciary to orchestrate a scheme by which Defendants sold the Estate's artwork to five "straw men"—the other defendants in this action—for deflated prices and then resold some of them greater amounts in auction houses abroad at the expense of the Estate (the "Straw Men Scheme") and to the detriment of Plaintiff who was a 35% beneficiary of the Estate under the legitimate will.

Plaintiff asserts claims under federal law for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and claims under New York law for conversion, common

law fraud and conspiracy to defraud, breach of fiduciary duty and aiding and abetting breach of fiduciary duty.[2]

## I.      C.C. Wang

C.C. Wang was a renowned Chinese-American artist and art collector who amassed over 400 fine and rare Chinese paintings, sculptures, and antiquities during his lifetime, valued at a total of $60 million.  C.C. Wang died in 2003, but Defendants' alleged misconduct began in the 1980s and 1990s when S.K. Wang, working as his father's bookkeeper and assistant, embezzled 160 paintings from his father's collection.  Plaintiff alleges that C.C. Wang discovered the misconduct in 1997 and thereafter fired S.K. Wang and hired Plaintiff Y.K. King to run his affairs.  In this role, Y.K. King established CY Art Ltd. to facilitate management of C.C. Wang's artwork and collection.  CY Art Ltd. owned a safe deposit box that contained artwork belonging to C.C. Wang, Northwich, and Soon Huat.

C.C. Wang's health began to deteriorate and he was hospitalized in March 2003.  He was released in April 2003, and sometime shortly thereafter, S.K. Wang moved C.C. Wang to his own home in Queens.

## II.     Safe Deposit Box and C.C. Wang's Apartment

Earlier, on January 31, 2003, Plaintiff Y.K. King took inventory of CY Art Ltd.'s safe deposit box and discovered that 21 paintings were missing, some of which were owned by Northwich, Soon Huat, and the Estate.  One of the paintings allegedly taken from the safe deposit box was the Landscape Album by Ma Yuan ("Ma Yuan Landscape Album").  Defendants maintain that S.K. Wang owned the Ma Yuan Landscape Album at all times.  That

---

[2] Plaintiff's claims for replevin, constructive trust, and violations of the New York Debtor and Creditor Law § 270 were previously dismissed by the Court as falling under the probate exception to federal jurisdiction.  *See King*, 2018 WL 1478044, at *10.

same day, Y.K. King checked her father's apartment and discovered that an additional four paintings were missing.

The Court previously dismissed RICO claims pertaining to the artwork allegedly stolen from the safe deposit box and C.C. Wang's apartment as time-barred. *See King v. Wang*, 2017 WL 2656451, at *7 (S.D.N.Y. June 20, 2017). For the artwork owned by Northwich and Soon Huat—13 of the 25 paintings stolen—the Court dismissed those claims as time-barred because Northwich and Soon Huat, through Y.K. King, had actual notice of the alleged RICO scheme as it pertained to their property no later than February 2003. *Id.* That holding was based on the facts that: (1) Y.K. King, the co-owner of Northwich and Soon Huat, discovered in January 2003 that the paintings had been stolen; (2) A. Wang allegedly admitted to Y.K. King in February 2003 that he had taken the 25 missing paintings and demanded that Y.K. King turn over control of the balance of the family's assets; and (3) the concession in Plaintiff's brief that RICO claims related to those artworks were time-barred and therefore she did not seek recovery of the missing paintings. *Id.* As for claims pertaining to the artwork from the safe deposit box and C.C. Wang's apartment belonging to the Estate, the Court did not decide whether those claims were similarly time-barred because it held that the Estate was not a party to the action at the time and therefore Y.K. King did not have standing on its behalf to assert claims. *Id.* at *8. However, Plaintiff had conceded that she was not seeking recovery of any of the 25 artworks stolen on January, 31, 2003, whether owned by the Estate or not, so that those paintings are not at issue. *Id.* at *7.

## III.    Will Contest

C.C. Wang died on July 3, 2003. Thereafter, Y.K. King submitted to New York County Surrogate's Court ("Surrogate Court") a June 13, 2000 will and July 10, 2002 codicil that named

her the executor and a principle beneficiary of the Estate, and entitled each of Y.K. King and

S.K. Wang to a 35% share of the Estate.

Contemporaneously, Defendants produced a second will allegedly executed by C.C.

Wang on February 18, 2003 (the "2003 Will"), four months before his death.  The 2003 Will

disinherited Y.K. King, designated A. Wang as executor, and made S.K. Wang and his children

chief beneficiaries.

In July 2003, Y.K. King initiated proceedings in Surrogate Court to contest the 2003

Will.  On August 4, 2003, the Surrogate Court issued temporary letters of administration to the

Public Administrator of the County of New York (the "P.A.") and preliminary testamentary

letters to A. Wang (the "August 4, 2003 Order").  A. Wang and the P.A. assumed the role of

Estate co-fiduciaries and exercised control over Estate assets.  Ethel Griffin ("Griffin") served as

P.A. during this time until her death in 2015 when she was replaced by Dahlia Damas

("Damas").  Attorney Peter Schram (the "P.A.'s counsel") represented the P.A. in connection

with its administration duties.

## IV.    The 2004 Sotheby's Appraisal

The August 4, 2003 Order directed the co-fiduciaries to "retain an expert in the field of

Chinese art to catalog and evaluate [C.C. Wang]'s works of art."  Dkt. No. 202-7.  Plaintiff

suggested Sotheby's would be capable of appraising the artwork and specifically suggested

Arnold Chang ("Chang") of Sotheby's, who had been a long-time student of C.C. Wang's and

was familiar with his collection.  The Estate and Sotheby's entered into an appraisal agreement

on June 17, 2014.

In the fall of 2003, the P.A. and/or A. Wang requested that all parties deliver all artwork

to the Estate that they conceded formerly belonged to C.C. Wang.  The Estate ultimately took

possession of approximately 500 artworks, including 133 classical Chinese artworks, 360

modern Chinese artworks, and five other artworks, as well as a variety of Chinese decorative art objects.  This artwork was kept at Crozier Fine Arts ("Crozier") storage facility in New Jersey.

On October 1, 2004, Sotheby's issued an appraisal of the 133 classical Chinese artworks in the Estate for estate tax purposes ("2004 Sotheby's Appraisal").  *See* Dkt. No. 202-13.  The 2004 Sotheby's Appraisal valued the work, as of the date of C.C. Wang's death on July 3, 2003, with an aggregate appraisal value at fair market value ("FMV") of $4,400,350.  *Id.*  It was submitted to the IRS in connection with the Estate's tax filings.

## V.       The Estate's Debts

On or around October 2004, the Estate filed its estate tax returns and learned that it owed $1.2 million in state taxes and $3.3 million in federal taxes.  The Estate faced administrative expenses, including legal fees and fees used to store and insure the Estate-owned artwork.  The parties dispute whether the Estate "needed to liquidate its assets immediately," including artwork, to pay the taxes owed and to cover the Estate's expenses.

Defendants assert that financial pressure on the Estate increased in 2007, when the IRS issued a Notice of Deficiency to the Estate, claiming an additional $22.5 million was owed in federal estate taxes.  *See* Dkt. No. 202-23.  The P.A. and A. Wang brought an action in tax court to challenge the amount, alleging that the IRS erred in including in that amount certain artwork not belonging to the Estate.  That litigation is still ongoing.

## VI.      Purported Settlement of Will Contest in 2005

After the Surrogate Court appointed the P.A. and Defendant A. Wang as co-fiduciaries in 2003, Plaintiff and Defendants continued to litigate the will contest.  At some point, Plaintiff and A. Wang reached a preliminary agreement to resolve the will contest in which the Kings would deliver 46 paintings to A. Wang in exchange for five paintings.

The Kings met with A. Wang at the Jinan Hotel on May 11, 2005 (the "May 2005 Meeting").  A. Wang states that the Kings brought only 15 of the 46 paintings they represented would be delivered and he brought one painting that had no connection to the Estate but which Plaintiff specifically requested and which actually belonged to his father, S.K. Wang.

In contrast, Plaintiff states that she and K. King gave 46 paintings to A. Wang and received five paintings from A. Wang.  She submits a document listing the 46 paintings and A. Wang's initial next to each painting; A. Wang disputes that the document is the one he initialed and signed.  Dkt. No. 198-2.  Of the 46 paintings that Plaintiff says she gave to A. Wang, two of the paintings were Wu Zhen's "Wild Bamboo" and Gu Xi's "Travelers in the Autumn Mountains."

In April 2006, Plaintiff submitted a petition in Surrogate Court to remove A. Wang as executor, alleging that he had breached his fiduciary duty to the Estate and stolen the 46 paintings ("2006 Removal Petition").  Dkt. No. 213-23.  According to Plaintiff, this petition has been stayed for the past 14 years.

## VII.    The Sales of the 98 Paintings (2005–2009)

Between February 2005 and August 2009, A. Wang and the P.A. entered into six contracts to sell 98 classical Chinese paintings from the Estate (the "98 Paintings") to five buyers (the "Five Buyers").  At some point, the P.A. obtained an independent art appraiser, Elin Lake Ewald ("Ewald") of O'Toole-Ewald Art Associates, Inc. ("OTE"), to review the proposed sales.

A. Wang submits an affidavit from the P.A.'s counsel stating that the P.A. and A. Wang agreed upon a procedure whereby when a buyer was found, any proposed sale would be submitted in writing by A. Wang to the P.A. and would be reviewed by a second, independent art expert, OTE.  Dkt. No. 202-11 ¶ 11.  No proposed sale would be approved unless it was for a price at least 20% higher than the Sotheby's appraised value in the 2004 Sotheby's Appraisal,

unless OTE agreed that an exception should be made because of special circumstances. *Id.* A. Wang and the P.A.'s counsel assert that they followed this procedure for the sale of 98 Paintings, and that any suggestion that the P.A. did not take an active role in the sales was "clearly without factual basis." *Id.* ¶ 12. A July 2005 letter from A. Wang's attorney to Plaintiff's former counsel describing the sale procedures notes that A. Wang must submit in writing the terms of any proposed sale, which the P.A. would review with the appraiser contracted by the Estate, OTE. Dkt. No. 202-31.

Plaintiff alleges that in contrast to Defendants' representation that the 98 Paintings were sold to independent third parties, in reality, the Five Buyers were either fictitious or purchased the artwork on behalf of Defendants for less than their true value.[3] The record is unclear as to how A. Wang sourced these buyers, and there has been no production of communications with any of the Five Buyers.[4] The sales were:

1. February 2005 sale of 17 paintings to a buyer identified as Wei Zheng later replaced by Raymond Ye ($400,480.00);

2. April 2005 sale of 24 paintings to Chen Mei-Lin ($1,393,422.40);

3. June 2005 sale of 17 paintings to Anthony Chou ($909,689.41);

4. September 2005 sale of 18 paintings to Yong-Qing Ye ($789,810.00);

5. February 2006 sale of 8 paintings to Yong-Qing Ye ($354,045.00); and

---

[3] Plaintiff does not contest that Zheng is a real person and not fictitious.

[4] Plaintiff points to a conflict between A. Wang's 2013 deposition testimony in which he said he knew each of the Five Buyers and his 2019 deposition testimony in which he said the P.A. had referred him to an intermediary, Er Shi Fu, who handled all of the communications. *Compare* Dkt. No. 211 ¶¶ 93-98, *with id.* ¶¶ 99-110. The P.A.'s counsel denies ever hearing of such intermediary, and A. Wang did not produce such communications. *Id.* ¶¶ 102-03. As to the lack of discovery concerning the Five Buyers, Defendants state in their response to Plaintiff's Rule 56.1 statement that Plaintiff failed to seek discovery directly from them and that "handshake deals" are a customary practice in the sales of Chinese paintings between Chinese parties. *See, e.g.*, *id.* ¶¶ 92, 102.

6.   August 2009 sale of 14 paintings to Yue Da-Jin ($489,772.00).

The Estate received approximately $4.3 million from these sales, which was wired to the

Estate's bank account located at North Fork Bank in New York (the "North Fork Bank").  For

each sale, the artwork was shipped from Crozier in New Jersey to Hong Kong.

### A.    Sale #1 of 17 paintings to Wei Zheng replaced by "Raymond Ye"

Defendants state that A. Wang requested Wei Zheng's ("Zheng") assistance in finding

buyers for Estate artworks and brought A. Wang in contact with the intended buyer, Tan Yun.

Zheng did this for no fee.  Defendants assert that Tan Yun asked Zheng to sign the purchase and

sale agreement and bill of sale on his behalf as a matter of convenience because Tan Yun lived in

mainland China and an original signature was required.

On January 27, 2005, A. Wang's counsel sent a fax from his office in New York to the

P.A.'s counsel's office in New York with a proposal for the purchase of 17 paintings to Zheng.

Dkt. No. 202-53.  In February 8, 2005, A. Wang's attorney emailed a proposed contract of sale

to the P.A.'s counsel.  Dkt. No. 202-54.  The contract of sale listed Zheng's address in Queens,

New York and, as the shipping address, Zheng's name, then "c/o Ms. Billie Wai, Unit #704,

Forseas Building, #208-212, Nathan Road, Kowlong, Hong Kong" (the "Hong Kong Address").

*Id.*  In fact, for the sales of all 98 Paintings, the shipping address listed was the Hong Kong

Address.  Billie Wai ("Wai") works at the accountant firm for A. Wang in Hong Kong.

The sale was never finalized, however, as Tan Yun was diagnosed with a terminal illness

and no longer wished to purchase the paintings.  A. Wang found a replacement buyer, Raymond

Ye, to purchase the paintings.  No contract of sale with Raymond Ye was submitted.  There is no

mention of Ewald's opinion of the proposed sale.

On February 16, 2005, the Estate received a wire transfer for $400,480.00 at the North

Fork Bank in New York.  Dkt. No. 202-55.  The source of the wire came from Brown Raysman

9

Millstein, Felder & Steiner LLP, which served as the Wangs' personal legal counsel. *Id.*; *see* Dkt. No. 211 ¶ 59.

### B.        Sale #2 of 24 paintings to "Chen Mei-Lin"

On March 11, 2005, A. Wang's counsel sent a fax from his office in New York to the P.A.'s counsel's office in New York containing a proposal for the purchase of 24 paintings. Dkt. No. 202-57. On March 22, 2005, A. Wang's attorney emailed a revised proposed contract for the sale of art to the P.A.'s counsel. Dkt. No. 202-58. The contract of sale listed Chen Mei-Lin's address in China, as well as the Hong Kong Address as the shipping address.

On March 17, 2005, Ewald emailed the P.A. and the P.A.'s counsel her opinion of the proposed sale. Dkt. No. 202-43. That opinion stated that she had "spent two days going through these appraisals, documents, catalogs and etc.," had spoken with another art appraiser, and she felt "satisfied that" the appraiser" "ha[d] explained his prices for 1997." *Id.* They "agreed that prices for Chinese paintings had gone up considerably since [1997], but that the 20% addition allows for some of that difference." *Id.* However, "[t]he experts to whom [she] spoke earlier [that] week were not able to examine the paintings and rendered a general opinion without seeing good photographs, relying primarily on the names of the artists given to them and black and white copies." *Id.* She also had "some concern" about the "Lu Ji" painting, which "is the one estimated in the Sotheby's sale at $140,000-$160,000" but was being offered at $36,000. *Id.* She stated that she had "tried to review as best as possible a great number of documents in a short time" since she had been asked to respond by that evening. *Id.* She concluded that she had "no knowledge as to absolute ownership of this particular paintings and [was] providing these opinions as an art advisor to the [P.A.] as requested." *Id.*

10

On April 22, 2005, the Estate received a wire transfer for $1,393,442.40 at the North Fork Bank in New York. Dkt. No. 202-59. The source of the wire came from a Citibank account with no listed name. *Id.*

### C. Sale #3 of 17 paintings to "Anthony Chou"

On April 29, 2005, A. Wang's counsel sent a fax from his office in New York to the P.A.'s counsel's office in New York with a proposal for the purchase of 17 paintings. Dkt. No. 202-37.

On May 5, 2005, Ewald sent A. Wang's counsel a letter regarding the review of the paintings. Dkt. No. 202-42. It said that "[g]iven a limited amount of time, we were able to find comparable prices at auction for the majority of the paintings," but could not find comparable prices for six paintings, though auction prices released over recent years led her to conclude that the offer prices for the six paintings were within norms. *Id.* She found that in "only one instance" did she believe that a slightly higher price should be provided. *Id.*

On May 10, 2005, A. Wang's attorney sent Ewald's letter to the P.A.'s counsel and asked if the P.A. would give her consent to sale. Dkt. No. 202-61. On May 25, 2005, A. Wang's counsel emailed the P.A.'s counsel the bill of sale and proposed contract of sale. Dkt. No. 202-33. That email stated that "the buyer is wiring the purchase price directly into the Estate account." *Id.* The contract of sale listed Anthony Chou's address in China, as well as the Hong Kong Address as the shipping address. *Id.*

On June 16, 2005, the Estate received a wire transfer for $909,689.41 at the North Fork Bank in New York. Dkt. No. 202-62. The source of the wire listed only a number "8480185540." *Id.*

### D.     Sale #4 of 18 paintings to "Yong-Qing Ye"

On July 27, 2005, A. Wang's counsel sent a fax from his office in New York to the

P.A.'s counsel's office in New York with a proposal for the purchase of 20 paintings.  Dkt. No.

202-64.

On August 17, 2005, Ewald sent her opinion to the P.A.'s counsel on eight of the 20

paintings.  Dkt. No. 202-65.  She noted the tight turnaround in which she had been asked to give

an opinion—again—noting that "since there appears to be a concern about a quick turnaround on

value information," she had "tried to accommodate the Wang Family" but "[i]t was not until

today that [she] received the list of Wang Collection paintings being offered for sale."  *Id.*  For

three of the eight paintings, there were no comparable public auction prices and she found the

price, "without further research" to be "within reason" or "appropriate."  *Id.*  She needed "further

price information" for another two paintings before commenting.  *Id.*  Prices for the remaining

three paintings seemed "appropriate" or "very good."  *Id.*  On August 25, 2005, Ewald sent her

opinion on the twelve remaining paintings.  Dkt. No. 202-66.

On August 29, 2005, the P.A.'s counsel faxed the P.A. signature pages on the contract

and bill of sale to A. Wang's counsel for 18 paintings, noting that he had removed two pieces of

artwork from the final sale.  Dkt. No. 202-67.  The contract of sale listed Yong-Qing Ye's

address in China, as well as the Hong Kong Address as the shipping address.  *Id.*

On September 21, 2005, the Estate received a wire transfer for $789,810 at the North

Fork Bank in New York.  Dkt. No. 202-69.  The source of the wire listed only a number

"8480185540," the same number as for sale #3, despite the fact that sale #3 was made to a

different buyer, Anthony Chou, who was said to have wired "directly" to the Estate account.  *See*

Dkt. No. 202-33; *compare* Dkt. No. 202-62, *with* Dkt. No. 202-69.

### E.      Sale #5 of 8 paintings to "Yong-Qing Ye"

On December 13, 2005, A. Wang's counsel sent a fax from his office in New York to the P.A.'s counsel's office in New York with a proposal for the purchase of 8 paintings.  Dkt. No. 202-38.  The contract of sale listed Yong-Qing Ye's address in China, as well as the Hong Kong Address as the shipping address.  *Id.*

On December 15, 2005, Ewald sent her opinion of the sale to the P.A.  Dkt. No. 202-45. In that opinion, Ewald recommended higher prices for almost all of the eight paintings, noting that the "suggested changes in value allow for the increase in prices for Chinese paintings since October of 2004 when the Sotheby's appraisal reflected the fair market values of the 1990s and first years of 2000."  *Id.*  She further noted that she had "proposed relatively modest changes, but d[id] not wish to interfere with a viable sale if these suggested changes prevent that."  *Id.*

On February 16, 2006, the Estate received a wire transfer for $354,045 at the North Fork Bank in New York.  Dkt. No. 202-72.  The source of the wire listed only a number "8480185540," the same number as for sales #3 and #4.  *Id.*

### F.      Sale #6 of 14 paintings to "Yue Da-Jin"

On April 23, 2008, A. Wang's counsel sent a fax from his office in New York to the P.A.'s counsel's office in New York containing a proposal for the purchase of 14 paintings.  Dkt. No. 202-39.

On May 2, 2008, someone on Ewald's behalf faxed her opinion of the sale to the P.A.'s counsel.  Dkt. No. 202-81.  With the exception of offer prices for two paintings that were "excellent" and "well done," prices for the other paintings appeared "in line," "probably within range," "a little low," "fine," "reasonable," and "may be accurate."  *Id.*

On June 4, 2008, A. Wang's counsel emailed the P.A.'s counsel a proposed contract and bill of sale.  Dkt. No. 202-73.  The contract of sale listed Yue Da-Jin ("YDJ")'s address in China, as well as the Hong Kong Address as the shipping address.  *Id.*

On February 26, 2009, A. Wang's counsel emailed the P.A.'s counsel to inform him that the proposed sale to YDJ fell through and asked if he could give a 10% discount to YDJ.  The P.A.'s counsel replied yes a few hours later.  Dkt. No. 202-74.  The buyer was ultimately YDJ.

 On August 12, 2009, the Estate received a wire transfer for $489,772 at the North Fork Bank in New York.  Dkt. No. 202-77.  The source of the wire listed Le Style Limited ("Le Style").  *Id.*

In deposition testimony as part of the probate proceeding in 2013, A. Wang testified that he owned an interest in only one privately held company at this time, which was not Le Style.  Dkt. No. 203-24 at 97:14-98:23.  He also testified that he did not know how the buyers of the artwork wired money out of China to the Estate to pay for the artwork.  *Id.* at 944:14-945:5.

A. Wang has since admitted that Le Style is his company.  Dkt. No. 203-11 at 15:11-15; Dkt. No. 211 ¶ 78.  It is a Hong-Kong based company with a bank account at HSBC in Hong Kong.  *Id.*  In 2019 deposition testimony, A. Wang stated that Le Style was used to help the buyers transfer funds out of China for each of the five sales.  Dkt. No. 203-11 at 242:3-17.  However, A. Wang stated that he has no banking records for Le Style because HSBC bank did not maintain records dating back to 2009.  Dkt. No. 211 ¶ 78.

**VIII.   Sotheby's Auction in 2006**

After five of the sales, but before the sixth and last purported sale to YDJ, Sotheby's auctioned 39 additional artworks from the Estate on March 31, 2006.  It is unknown when the P.A. and A. Wang first contacted Sotheby's regarding the auction and when the list of artwork and starting prices were finalized, though Plaintiff submits an email from A. Wang to Ewald on

14

January 17, 2006 that notes the Sotheby's deadline for accepting artworks for the spring auction is mid-January and that asks whether she or the P.A. feels comfortable having a sale.  Dkt. No. 200-26.  A. Wang replied that he felt the auction was "worth a try for a limited number of estate artworks" and he noted that he was "also waiting for the private sale listing."  *Id.*

Defendants assert that the P.A. and A. Wang had asked Sotheby's to auction the Estate's 133 classical Chinese artworks, but Sotheby's was willing to accept only 39 artworks, and they attach a 2014 declaration from the P.A.'s counsel stating such.  Dkt. No. 202-11 ¶ 10.  Plaintiff, disputes this assessment, pointing to deposition testimony from the P.A.'s counsel in which he said he did not recall discussions with Sotheby's about selling the artworks.  Dkt. No. 203-12 at 25:12-26:13.

The parties also dispute the significance of the auction's outcome.  Defendants assert that because only a few pieces sold for prices that "far exceeded" the valuations in the 2004 Sotheby's Appraisal, the results of the 2006 auction were the "best indicator that the Sotheby's appraisal values [dated as of July 2003] were accurate—and [were] an appropriate barometer to be relied upon by" the P.A. in approving the private sales to the Five Buyers.  Dkt. No. 196 ¶¶ 63-64.  Plaintiff objects to the characterization of the auction, arguing that while 10 paintings sold at auction for equal or less than their valuations in the 2004 Sotheby's Appraisal, 29 paintings sold at auction for more than their Sotheby's appraisal value.  Dkt. No. 218 ¶ 63.  She also responds that Defendants' conclusion is made only in hindsight because at the time of the auction, 84 classical Chinese paintings had already been sold to Five Buyers, some of which were the Estate's best paintings, and thus they were not available for the Sotheby's auction in 2004.  *Id.* ¶ 61.

IX.     **Bao Wu Tang Exhibition in 2009**

In November 2009, the Capital Museum of Beijing ("Capital Museum") hosted an exhibition entitled, "Bao Wu Tang—An Important Overseas Painting and Calligraphy Collection Exhibition" (the "Bao Wu Tang Exhibition").  A. Wang testified that some of the artworks shown at the Bao Wu Tang Exhibition were owned by him and some had been previously owned by the Estate, but had been sold at the time of the exhibition.  Dkt. No. 213-21 at 760:17-761:6.

Plaintiff attended the Bao Wu Tang Exhibition and asserts that she recognized Estate paintings that she thought should have been in storage at Crozier in New Jersey and wondered why they were in China.  She also saw on display paintings that she had given to A. Wang—and which he denied receiving—at the May 2005 Meeting, including Wu Zhen's "Wild Bamboo" and Guo Xi's "Travelers in the Autumn Mountains."  She asserts that the two paintings displayed were the originals.

A. Wang says that Plaintiff has not established that any artworks at the Bao Wu Tang Exhibition were original, authentic paintings from the collection of C.C. Wang, and that he did not authenticate the artworks in the Bao Wu Tang Exhibition.[5]  A. Wang, through counsel, states that his involvement in the exhibition was limited to: "(i) referring organizers to sources for artworks to exhibit; (ii) reviewing and signing off on the preface to the catalogue; and (iii) attending the opening dinner for the exhibition."  Dkt. No. 211 ¶ 344 (citing A. Wang's deposition testimony).  A. Wang also denies that he received either of the two identified

---

[5] A. Wang also states that it is impossible for Plaintiff to confirm that the artworks on display at the Bao Wu Tang Exhibition were originals, citing testimony from Chang, the Sotheby's appraiser, who was unable to confirm or deny whether the artwork were originals based on pictures he received from the catalogue, Dkt. No. 213-16, and testimony from an expert could not testify as to whether the artwork at the exhibition was original without seeing them in person, Dkt. No. 213-12.

paintings at the May 2005 meeting, and states that the displayed Guo Xi's "Travelers in the Autumn Mountains," which was not part of the sales to the Five Buyers, was a reproduction.

In March 2010, Plaintiff sought leave in Surrogate Court to amend her 2006 Removal Petition.  Dkt. No. 213-22.  She sought to add new allegations to her petition that A. Wang had displayed at the Bao Wu Tang Exhibition paintings he denied receiving at the May 2005 Meeting.  The supplemental petition included allegations related only to A. Wang's sworn denial that he had not received the paintings in question at the May 2005 Meeting, and it did not contain allegations about self-dealing.

## X.    Plaintiff's Investigation and Alleged Resale of the 98 Paintings

Over the next several months, Plaintiff and her attorney sought to acquire information from the P.A. about the paintings displayed at the Bao Wu Tang Exhibition and the Estate's sales.  Plaintiff states that, at that time, because she had no legal involvement with the Estate, she did not have any information on sales made by the Estate.  A. Wang disputes this and argues that Plaintiff was "aware of many of the circumstances surrounding the Estate's private sales and was aware that artworks from the Estate had been sold and were circulating in the world prior to March 8, 2010."  Dkt. No. 211 ¶ 355.  He further states that she was "made aware of facts concerning the sales of Estate paintings beginning in 2005 and was aware that Estate paintings had been sold by, at the latest, November 2009."  *Id.* ¶¶ 355-56.  However, the exhibits to which A. Wang cites as evidence of this awareness demonstrate no such thing.  *See id.* ¶¶ 354-55 (citing Dkt. Nos. 202-29 (attorney billing records), 202-31 (July 29, 2005 letter from A. Wang's attorney to Plaintiff's attorney describing procedure of sales without specifics), 202-76 (Plaintiff's affidavit about Bao Wu Tang Exhibition), 213-22 (Plaintiff's March 2010 petition to amend the 2006 Removal Petition).

An affidavit from the P.A.'s counsel from the probate proceedings, dated June 16, 2014, states that "information and complete documentation relating to these sales [of the 98 Paintings] were made available" to Plaintiff's counsel, but it does not provide a date as to when that occurred.  Dkt. No. 202-11 ¶ 12.  And in a 2019 deposition, the P.A.'s counsel said that the Kings "were aware that we were selling some of the artwork that had been turned over to the estate, but they were not given specific details" and "I don't believe that they were given the details of the private sales."  Dkt. No. 202-8 at 33:21-34:5.

Plaintiff says her requests for information about the Estate's artwork were denied by the P.A.  Her counsel sent a letter, dated December 15, 2010, to the P.A.'s attorney, stating that:

> [M]any paintings that we believe [are] estate painting are circulating throughout the world.
>
> Because there has not been transparency, my client [cannot] tell if sales or consignments of those paintings were appropriate and we do not [know] if you are fully aware of all the sales.  It is of concern that it appears that . . . paintings were "appropriately" sold and yet the estate has so little cash.
>
> As you confirmed to Judge Glen at our last meeting, I [re]quested information about these sales and you declined to give it.
>
> I do know which paintings were allegedly appropriately sold by the estate and I do not know the circumstances of the sale.
>
> It would be helpful if you would tell me which paintings [of] the estate were sold through the Public Administrator's and the Executor's offices so [that] we may determine if any of the paintings that were sold were wrongfully sold.

Dkt. No. 213-20.  The P.A.'s counsel responded by letter, dated December 18, 2010:

> Essentially, you are requesting that the Public Administrator now account to your client so that you may determine whether any item was "wrongfully sold" from estate inventory.  We have discussed, most recently before Surrogate Glen, the Public Administration's belief that such an accounting is premature, as your clients have no interest in the estate under the will currently offered for probate.  At the conference, Surrogate Glen did not appear to view this position as unreasonable.
>
> I have discussed with you—more than once—the procedure that has been followed by the Public Administrator for the sale of the artwork that was marshaled by the

> Public Administrator and Andrew Wang.  All proposed sales were reviewed by an
> independent art appraisal firm retained by the Public Administrator before approval
> was given for the sale of any item.

Dkt. No. 198-6.  Because the P.A. would not provide information, Plaintiff states that she and her

husband reached out to Chinese auction houses to see if any of the Estate's paintings had been

sold abroad and tried to reverse engineer sales by the Estate.  *See* Dkt. No. 209-4 (December

2010 letters).

On May 9, 2011, Plaintiff filed a petition in Surrogate's Court seeking a compulsory

limited accounting from A. Wang with regard to specific artworks that "are part of the estate and

may have been sold."  Dkt. No. 202-70 ¶ 2.  The petition stated that:

> Several works of art which are allegedly part of the estate have recently been
> depicted in catalogues, exhibited and/or offered for sale at various auction houses,
> studios and in museums in China and Hong Kong and [Y.K. King] has reason to
> believe that some or all of such works have been sold without obtaining full market
> value, without proper accounting to the Public Administrator and/or the estate, and
> otherwise by reason of improper, unauthorized unilateral acts of Mr. Wang.

*Id.* ¶ 8(g).

Plaintiff asserts that she did not receive records concerning sales of the Estate's artwork

until sometime in or around 2013 and her counsel was able to depose A. Wang in December

2013 about those records in connection with probate proceedings.  It was then that she allegedly

learned that the Estate's paintings were sold by Defendants to the Five Buyers.  She further

learned that the 98 Paintings, which were supposedly sold to those five buyers, resurfaced at

auction houses between 2008 and 2012 and were sold at many multiples times the price paid to

the Estate.

Plaintiff submits the report of her expert, Patrick Regan ("Regan"), which offers (1) the

FMV of the 98 Paintings sold to the Five Buyers in 2005, 2006, and 2009, as of October 19,

2019; and (2) the "retail value" of the 14 paintings sold to YDJ in August 2009, also as of

August 2009.[6]  Dkt. No. 217-18; Dkt. No. 213-30.  The report estimates that the FMV of the 98

Paintings was $71,424,000—93% more than their actual sale price.  Dkt. No. 217-18 ¶ 27.  It

estimates that the retail value of the 14 paintings sold to YDJ was $1,978,000—75.49% more

than their actual sale price.  *Id.* ¶ 29.  The report notes that at least 32 of the 98 Paintings were

resold at auction.  *Id.* ¶ 16.[7]

The report provides information on each artwork, including the resale price at auction,

Regan's FMV of the painting, and a list of comparable paintings that he assessed and their FMV

that he used to determine the FMV of the Estate paintings.  The Regan report notes that the

grouping of paintings for sale at the various auction houses "would be unlikely unless there was

an identity or common connection among the owner[s], such that the auction house could locate

and retrieve the paintings apparently sold to" the Five Buyers.  *Id.* ¶ 33.  The Regan report does

not indicate the seller of the paintings at the auctions, and Plaintiff has also not submitted such

evidence.

## XI.    Revocation of the 2003 Will

On May 9, 2017, the Surrogate Court revoked the 2003 Will after a jury returned a

verdict finding that C.C. Wang was not of sound mind and memory at the time of the execution

of the 2003 Will, that the will had been the result of undue influence by S.K. Wang and A.

Wang, and that the will had been the result of fraud by S.K. Wang and/or A. Wang.  Dkt. No.

202-82.

---

[6] Regan stated that his measure of "retail value" was "the most likely and appropriate
marketplace for Chinese paintings of this type and caliber," which would "have been auctions in
China and New York—rather than Private Retail Markets—since that was where the best and
highest prices for classical Chinese paintings were usually achieved."  Dkt. No. 217-18 ¶ 25.
[7] Plaintiff's counsel reproduces a table of the resales that lists 28 paintings, which is also the
figure referenced in Plaintiff's opposition brief.  Dkt. No. 217 at 5; Dkt. No. 210 at 32.

On February 15, 2018, after the 2003 Will was held invalid, the New York Surrogate Court appointed Y.K. King as the Estate's preliminary executrix.  The P.A. remained co-fiduciary of the Estate and continues to be co-fiduciary.

On February 11, 2019, the Surrogate Court limited Y.K. King's authority as executrix to prosecution of this action and certain other proceedings.  Dkt. No. 202-83.  That action was done in response to S.K. Wang's petition to revoke Plaintiff's status based on the allegation that Y.K. King violated a court order from 2003 restraining the disposition of the Estate's assets when she sold six pieces of artwork that belonged to the Estate.

## PROCEDURAL HISTORY

This action was filed on September 23, 2014.  Dkt. No. 1 ("Compl." or "Complaint").  It was initially brought by the Kings against the same set of Defendants.

On July 13, 2015, the Court granted Defendants' motion to dismiss the Complaint.  *See King v. Wang*, 2015 WL 4207076 (S.D.N.Y. July 13, 2015).  It held that the Kings lacked standing to assert claims concerning the Estate's artwork and that the Complaint failed to establish a pattern of racketeering activity.  Without a valid federal cause of action, the Court declined to exercise supplemental jurisdiction over the state law claims.  The Kings appealed the dismissal.  Defendants also appealed the Court's refusal to dismiss the complaint for lack of subject matter jurisdiction by virtue of the probate exception.

On August 26, 2016, the Second Circuit affirmed in part and vacated in part.  *See King v. Wang*, 663 F. App'x 12 (2d Cir. 2016).  The Second Circuit held that the Complaint adequately pleaded closed-end continuity so as to plead a pattern of racketeering activity.  In response to Defendants' argument, the Second Circuit agreed with the district court that the RICO claims fell within the probate exception so as to confer subject matter jurisdiction.  It further agreed that the Kings lacked standing but suggested that could be easily cured by amending the Complaint to

add the real parties in interest as plaintiffs, and it directed the district court to allow plaintiffs to file an amended complaint.  Thereafter, the Kings filed the First Amended Complaint on September 27, 2016.  They added their companies, Northwich and Soon Huat, as plaintiffs.  The First Amended Complaint said that Y.K. King's claims were on behalf of herself individually and the Estate.

On June 20, 2017, the Court granted Defendants' motion to dismiss the First Amended Complaint.  *See King*, 2017 WL 2656451, at *8.  As discussed *supra*, it held that Y.K. King did not have standing to bring claims on behalf of the Estate because she had not been named executrix or administratrix of the Estate as required to bring suit on behalf of a decedent's estate under New York law.  It also dismissed RICO claims based on paintings owned by Northwich and Soon Huat as time-barred.  It declined to exercise supplemental jurisdiction over the remaining state law claims.

But, on February 15, 2018, after the 2003 Will was held invalid, the Surrogate Court appointed Y.K. King as the Estate's preliminary executrix.

Thereafter, on March 26, 2018, the Court granted a motion to reconsider its June 20, 2017 opinion.  *See King*, 2018 WL 1478044, at *10.  It permitted Y.K. King to be substituted as the real party in interest as preliminary executrix pursuant to Fed. R. Civ. P. 17(a) and held that she had standing to pursue RICO claims on behalf of the Estate.  The Court dismissed Plaintiff's claims for replevin, constructive trust, and violations of New York Debtor and Creditor Law § 270.  The Court denied Defendants' motion for reconsideration of this opinion on May 11, 2018.  *See King v. Wang*, 2018 WL 2186408 (S.D.N.Y. May 11, 2018).

Due to the parties' extensive motion practice, a case management plan setting discovery deadlines was not entered until May 16, 2018—four years after the initiation of this action.  Dkt.

No. 75.  Between May 2018 and the filing of the instant motions in February 2020, the parties engaged in further motion practice and contentious discovery disputes.

On June 29, 2018, as amended on July 25, 2018, Defendants filed a third-party complaint against Y.K. King, as well as K. King, Raymond King Lynn King, Does 1-10, and the P.A.  That complaint brought claims of conversion, contribution, and indemnification and alleged that Y.K. King and the other plaintiffs unlawfully retained possession of and sold certain paintings belonging to the Estate and sold others.  Dkt. Nos. 84, 87.  Defendants dismissed the complaint against all of the plaintiffs except the P.A. on August 14, 2018, Dkt. No. 94, and dismissed the complaint against the P.A. on December 4, 2018, Dkt. No. 132.

Three months later, on September 30, 2018, Defendants initiated a separate action that asserted two federal law claims against Y.K. King, her husband, and their family members for violation of RICO and conspiracy to commit a RICO violation and two state law claims for breach of fiduciary duty and conversion (the "Wang Action").  *See Wang v. King*, No. 18-cv-8948 (S.D.N.Y.).  The Court dismissed the action on April 22, 2019.  *See Wang v. Yien-Koo King*, 2019 WL 1763230 (S.D.N.Y. Apr. 22, 2019).  The Court further denied Defendants' motion to amend the complaint on January 27, 2020.  *Wang v. Yien-Koo King*, 2020 WL 417690 (S.D.N.Y. Jan. 27, 2020).  Defendants appealed on February 26, 2020, but withdrew the appeal on June 11, 2020 and the action terminated.

Defendants filed their summary judgment motion and Plaintiff filed her partial summary judgment motion on February 14, 2020.  Dkt. Nos. 193, 194.  Their opposition briefs were filed on April 13, 2020, Dkt. Nos. 210, 214, and their replies were filed on May 4, 2020, Dkt. Nos. 221, 224.

## LEGAL STANDARD

Summary judgment under Fed. R. Civ. P. 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, i.e., that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014).  The Court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (quoting *Lunds, Inc. v. Chem.* Bank, 870 F.2d 840, 844 (2d Cir. 1989)) (internal quotation marks omitted).

## DISCUSSION

Defendants move for summary judgment on all claims while Plaintiff moves for summary judgment on her breach of fiduciary claim against A. Wang only.

## I.      Timeliness of Claims

Defendants make several arguments about the timeliness of Plaintiff's claims.  First, they argue that the action can only be deemed commenced as of the date Plaintiff gained standing,

*i.e.*, when she was substituted as the party in interest in February 2018.  Second, they argue that Plaintiff's claims are time-barred because she had inquiry notice, if not actual notice, of her alleged injury as of November 2009.  Third, and in response to Plaintiff's opposition, Defendants argue that Plaintiff's claims were not tolled by her investigative efforts.

### A.      Relation Back Doctrine

Defendants argues that initial Complaint date of September 23, 2014 is not the proper date by which to assess the timeliness of Plaintiff's RICO and state law claims, but rather February 15, 2018, when she was appointed preliminary executrix and gained standing to pursue the action.  Defendants argue, in the alternative, that Plaintiff's claim should be assessed at the time of the filing of the FAC on September 27, 2016, rather than the Complaint on September 23, 2014, because claims were brought on behalf of the Estate only in the FAC.

Fed. R. Civ. P. 17(a)(3) prohibits federal courts from dismissing a case "for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."  Fed. R. Civ. P. 17(a)(3).

In its March 26, 2018 Opinion & Order, after Plaintiff was appointed preliminary executrix of the Estate, the Court substituted Plaintiff as the real party in interest under Fed. R. Civ. P. 17(a)(3), holding that "[a]llowing Y.K. King to proceed with claims brought on behalf of the estate is essentially a technical change that in no way alters the factual allegations in the amended complaint."  *King*, 2018 WL 1478044, at *6.  In reaching its holding, Judge Keenan was "persuaded by the rationale of the[] cases and by the policy underlying Rule 17(a)" that found "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants."  *Id.* (citation omitted).  He further stated:

> [A]llowing "substitution" of the real party in interest serves the interests of justice, especially where the delay in appointment as executor was allegedly due to fraud on the part of Defendants. Further, Defendants are not prejudiced by substitution "as they had clear notice of the claims against them in the initial complaint." Finally, Plaintiffs' request to substitute the real party in interest was made within a "reasonable time" under Rule 17(a)(3) because "no prejudice to [Defendants] has occurred and there is no evidence that the delay was a tactic undertaken in bad faith" on the part of Plaintiffs. The Court will allow Plaintiffs to "substitute" the real party in interest, Y.K. King as preliminary executor, although the Court sees no need for Plaintiffs to further amend their complaint because Y.K. King already alleges some claims in the amended complaint on behalf of the Estate.

*Id.* This Court will not revisit that holding now, which is law of the case. *See Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) ("The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case.").

Fed. R. Civ. P. 17(a)(3) provides that "after . . . substitution, the action proceeds as if it had been *originally* commenced by the real party in interest." Fed. R. Civ. P. 17(a)(3) (emphasis added). The language of that Rule thus provides that Plaintiff's claims relate back to when the action was originally commenced, with the filing of the Complaint in 2014.

Defendants cite to no case for the proposition that Plaintiff's claims should begin to accrue when she was substituted as party in interest in February 2018 or when she amended the Complaint in 2016. In fact, the one case they cite undermines their position. *See* Dkt. No. 197 at 16 (citing *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 421 (2d Cir. 2015) ("Crucially for statute of limitations purposes, the claim of the [substituted] real party in interest . . . dates back to the filing of the complaint.")).

In permitting substitution under Fed. R. Civ. P. 17(a)(3), the Court previously held that the FAC contains "essentially the same claims" as the Complaint, *King*, 2018 WL 1478044, at *3, and in "no way alters the original complaint's factual allegations as to the events or the

participants," *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir.

1997).  Although the FAC "newly alleges some claims by Y.K. King on behalf of the Estate,

rather in an individual capacity," *King*, 2018 WL 1478044, at *3, those new claims (Counts II,

III, and IX) and the allegations in connection with those new claims, had been asserted in the

Complaint on behalf of Y.K. individually, and were added merely as separate claims in the FAC

as "on behalf of the Estate of C.C. Wang."  The relief requested in the Complaint was also

brought for the benefit of the Estate and is almost identical to the relief requested in the FAC so

that Defendants "had clear notice of the claims against them in the initial complaint."  *Id.*, at *6.

The Court's decision repeated the principle that "[a]n amendment under [Rule 17(a)] relates back

to the date of initial filing of the action."  *Id.* at *5-6 (quoting *Brohan on Behalf of Brohan v.

Volkswagen Mfg. Corp. of Am.*, 97 F.R.D. 46, 49 (E.D.N.Y. 1983)).  Indeed, after holding that

Y.K. King had standing to bring claims on behalf of the Estate, the Court held that the RICO

claims were not time-barred, referring specifically to the Complaint filing date of September 23,

2014.  *See id.*, at *7.

Thus, the Court adheres to the view that the commencement date of this action,

September 23, 2014, is the proper date by which to assess the timeliness of Plaintiff's claims.

*See, e.g.*, *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2011 WL 6434009, at *1

(S.D.N.Y. Dec. 21, 2011) (holding substitution would relate back to the filing of the original

complaint, not the third amended complaint); *Soroof Trading Dev. Co. v. GE Microgen, Inc.*,

2014 WL 1378115, at *6 (S.D.N.Y. Apr. 8, 2014) (stating Rule 17 substitution would cause third

amended complaint to relate back to the original complaint filing date); *In re Vivendi Universal,

S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 585 (S.D.N.Y. 2009) ("Amendments will relate back to the

original filing of the complaints."); *see also BlackRock Allocation Target Shares: Series S

*Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 3610511, at *21 (S.D.N.Y. Aug. 21, 2017) ("Supplementing the facts supporting these claims [in the Second Amended Complaint] does not render them untimely" because the real party in interest's "claims relate back").

### B.   Inquiry or Actual Notice

RICO claims are governed by a four-year statute of limitations which "begins to run when the plaintiff discovers or should have discovered the RICO injury," such that the plaintiff has "actual or inquiry notice of the injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58, 60 (2d Cir. 1998). A plaintiff need not have known of the cause of action for the limitations period to begin; instead, the four-year period begins upon "discovery of the injury, not discovery of the other elements of the claim." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). Accordingly, "[t]he first step in the statute of limitations analysis is to determine when the [parties] sustained the alleged injury for which they seek redress." *Merrill Lynch*, 154 F.3d at 59. The Court "then determine[s] when they discovered or should have discovered the injury and begin[s] the four-year statute of limitations period at that point." *Id.* Here, discovery of the injury would be when Plaintiff learned that Defendants sold the 98 Paintings for less than their market value, in 2013.

Alternatively, a plaintiff may be said to have inquiry notice of the injury "when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008). A plaintiff should have discovered the "injury if there are sufficient 'storm warnings' of the wrongful conduct forming the basis of the plaintiff's claims." *Marshall v. Milberg LLP*, 2009 WL 5177975, at *3 (S.D.N.Y. Dec. 23, 2009). However, the "existence of 'storm warnings' sufficient to trigger inquiry notice does not begin the clock when the plaintiff actually pursues an investigation." *Koch*, 699 F.3d at 153. Instead, the knowledge is imputed to a plaintiff in one of

two ways.  First, "in the case of a [plaintiff] who undertook a reasonable effort of inquiry once 'storm warnings' had been posted, when a reasonable [person] would have discovered the facts necessary to bring a cause of action."  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003).  Second, if the plaintiff "makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty [to inquire] arose."  *Koch*, 699 F.3d at 153 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005)).

"Whether a plaintiff has such 'inquiry notice' or 'constructive notice' is judged under an objective standard and requires an evaluation of the totality of the circumstances."  *Marshall*, 2009 WL 5177975, at *3 (citing *Staehr*, 547 F.3d at 427).  Specifically, "[i]nquiry notice means that sufficient facts exist to suggest to a plaintiff of normal intelligence that wrongdoing is 'probable, not merely possible.'"  *Id.* (quoting *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006)).  In other words, a plaintiff must obtain "knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured is dispositive."  *Koch*, 699 F.3d at 153.

Defendants seek summary judgment on the affirmative defense that the limitations period for the RICO claims started to accrue in 2009 and that the action was therefore untimely filed in September 2014.  "Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued."  *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995); *see also Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) ("[T]he burden is on the defendant to establish when a federal claim accrues.").  Having held that the claims relate back to the date of September 23, 2014, Defendants must demonstrate that Plaintiff had actual or inquiry notice before September 23, 2010.  Defendants have not met their burden here.

Defendants argue that Plaintiff had actual or inquiry notice of her injury by November 2009 when she attended the Bao Wu Tang Exhibition and saw artwork on display that had been sold to the Five Buyers.  Plaintiff responds that the exhibition did not put her on notice because she did not learn of the private sales or A. Wang's self-dealing until 2013 and therefore she was not on notice of her injury in 2009.

The Court cannot find, as a matter of law, that the Bao Wu Tang Exhibition would have put Plaintiff on actual notice that A. Wang was allegedly selling the Estate's artwork at lower prices than the artwork was worth.  It would not necessarily even have put Plaintiff on notice that the Estate's artwork had been sold.  The preface to the Bao Wu Tang Exhibition does not state whether the artwork was owned by A. Wang or separate owners; it merely states that the "exhibition gathers together works from the collection of my late-Grandfather [C.C. Wang], from partial collections of family members, and include rare treasures from the Song, Yuan, Ming and Qing periods."  Dkt. No. 202-76 ¶ 10.  Defendants do not provide any evidence that would have revealed to Plaintiff that the artwork had been privately sold by the Estate and for much less that it would have been sold, at a price below its fair market value.  A reasonable person could have assumed that the Estate loaned its artwork for display at the Capital Museum, not that the works of art were sold to private buyers and then placed on display.

Even if Plaintiff could be said to be on inquiry notice based on the Bao Wu Tang Exhibition—and the Court is not persuaded that she was—she began an investigation.  The evidence submitted shows that in December 2010, one year after the Bao Wu Tang Exhibition, Plaintiff's counsel reached out to various auction houses to learn if any of the Estate's paintings had been sold abroad, thus tolling the clock on the statute of limitations as of that date.  Also, in December 2010, Plaintiff's counsel sent a letter to the P.A. asking for information on "which

paintings [of] the estate were sold through the Public Administrator's and the Executor's offices so [that] we may determine if any of the paintings that were sold were wrongfully sold."  Dkt. No. 213-20.  The P.A.'s counsel refused to give her that information, stating that "such an accounting is premature, as your clients have no interest in the estate under the will currently offered for probate" and referring Plaintiff to the procedure followed by the P.A. and A. Wang for selling artwork.  Dkt. No. 198-6.  Defendants have put forward no evidence that demonstrates Plaintiff knew of the Estate's alleged below-market sales before 2013.  Thus, even if the Bao Wu Tang Exhibition could trigger a duty to inquire, Plaintiff's "reasonably diligent investigation" would not have "revealed the injury to a person of reasonable intelligence," such the statute of limitations began running.  *Koch*, 699 F.3d at 144.

Defendants offer an alternative theory, for the first time in a footnote in their reply, that Plaintiff "unequivocally" was on actual notice by May 2011 and offer evidence of a May 9, 2011 state court filing in which Plaintiff sought a compulsory limited accounting from A. Wang with regard to specific artworks that "are part of the estate and may have been sold."  Dkt. No. 224 at 5 n.6; Dkt. No. 202-70 ¶ 2.  That filing said that, after having seen "[s]everal works of art which are allegedly part of the estate have recently been depicted in catalogues, exhibited and/or offered for sale at various auction houses, studios and in museums in China and Hong Kong," Plaintiff "reason to believe that some or all of such works have been sold without obtaining full market value, without proper accounting to the Public Administrator and/or the estate, and otherwise by reason of improper, unauthorized unilateral acts of Mr. Wang."  Dkt. No. 202-70 ¶ 8(g).  Given that the Court has already determined that the Complaint relates back to September 23, 2014, which would make Plaintiff's RICO claims still timely if she had actual or inquiry notice in May 2011, it need not address this argument.  As to the statute of limitations for

31

the state law claims, Plaintiff's petition for a compulsory accounting sought to obtain information on the artworks that the P.A.'s counsel refused to give her in December 2010; it was part of her investigation and attempt to obtain facts, but the petition itself does not show she had the "facts necessary to bring a cause of action." *In re Global Crossing*, 313 F. Supp. 2d at 204. And that petition was stayed by the Surrogate Court so that Plaintiff did not obtain the information requested at that time.

Finally, Defendants seek to rely on the P.A.'s notice and attribute it to the Estate and thereby also to Plaintiff.[8]  Defendants argue in a footnote that the P.A. was on notice of potential claims in 2010 due to Plaintiff's March 8, 2010 motion in Surrogate Court to amend her 2006 Removal Petition in order to add allegations that A. Wang had displayed at the Bao Wu Tang Exhibition the three paintings he denied receiving at the May 2005 Meeting.  Dkt. No. 197 at 16 n.9.  In their reply, Defendants then reverse course and argue P.A. was at least on inquiry notice as of May 18, 2010 when the P.A.'s counsel received an email from A. Wang's counsel, forwarded from A. Wang, in which A. Wang said he was gathering information to prove that the artwork at the Bao Wu Tang Exhibition came from different owners.  Dkt. No. 224 at 3.  As an afterthought, Defendants add that the P.A. was aware of facts that Plaintiff points to indicia of self-dealing, such as the fact that the artworks were delivered to Wai in Hong Kong and that the wire transfers of payment for the artwork came from Le Style Limited and "8480185540."  *Id.*

None of these theories suffices.  Defendants' first theory—though it is unclear whether it is now since abandoned—is based on a March 2010 petition that concerns only allegations that

---

[8] Importantly, Defendant A. Wang does not argue that his own knowledge of his alleged fraud on the Estate can be imputed to the Estate.  There is clearly a material disputed fact of whether A. Wang had an adverse interest to the Estate through his self-dealing, which would prevent imputation of his knowledge of the sales to the Estate.  *See Kirschner v. KPMG LLP*, 938 N.E.2d 941, 947 (2010).

A. Wang stole paintings at the May 2005 Meeting, and not allegations about the 98 Paintings sold to the Five Buyers and resale auctions.  *See* Dkt. No. 213-22.

On the second theory, A. Wang's May 18, 2020 email stating that the Chinese government agency sponsoring the Bao Wu Tang Exhibition "promised to provide a statement which states that all exhibited Chinese paintings were provided by different owners" does not discuss the sales of the 98 Paintings or that they were sold at below-market prices and could just as easily have been sent in response to the March 2010 petition concerning the May 2005 Meeting.  Dkt. No. 225-1.  That email does nothing to demonstrate that the P.A. was on notice of its RICO injury.

As to Defendants' third theory, Plaintiff's claim and her allegation of injury do not rely solely on the Hong Kong Address and the wire transfer information—yet even alone, they would not have put the P.A. on actual notice of the alleged RICO injury to the Estate—but also on other evidence obtained in discovery to which the P.A. did not have access.  For example, Plaintiff submits emails that contain alleged admissions by Defendants that they had not sold certain paintings to the Five Buyers as part of those sales.  *See* Dkt. No. 210 at 8-9; *compare* Dkt. No. 202-49 (2006 bill of sale to Yong-Qing Ye listing OTE 156 as one of the paintings sold), *and* Dkt. No. 217-8 (2011 email from A. Wang to Chien Fang Huang stating OTE 156 is "still within the family collection. . . [i]t was exhibited at Beijing Capital Museum in 2009.").[9]  Plaintiff also relies on A. Wang's alleged conflicting deposition testimony in 2013 and 2019 describing who wired the money for the sales to the Estate's bank account.  Defendants do not argue that the

---

[9] At his deposition in 2019, A. Wang said that he "bought [OTE 156] back" because he "believe[d] that this painting belonged to [his] father" and was "mistakenly collected by the estate."  Dkt. No. 217-7 at 205:14-206:19.

P.A. knew of, or had reason to know, that A. Wang was the owner of the company listed on one of the wire transfers, Le Style, or to question the source of the funds from the other accounts.

## II.      RICO Claims

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  A RICO claim thus contains three elements:  1) a violation of 18 U.S.C. § 1962; (2) injury to plaintiff's business or property; and (3) causation of the injury by the violation.  *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994).

### A.      Section 1962(c)

To state a violation of Section 1962(c), a plaintiff must plead "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity."  *Anatian v. Coutts 223 Bank Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999).[10]

#### 1.      Enterprise

"Enterprise" is defined to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  A RICO enterprise can also be "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *First Cap. Asset Mgmt.,*

---

[10] Defendants argue that Plaintiff's claims under 18 U.S.C. §§ 1962(a) and 1962(d) should be dismissed for the same reasons as her claim under § 1962(c).  Dkt. No. 197 at 18 n.11.

*Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

"[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). Such an enterprise must comprise three features: (1) a purpose, (2) relationships among the individuals associated with the enterprise, and (3) longevity sufficient to permit the associates to pursue the purpose of the enterprise. *See Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 305-06 (S.D.N.Y. 2010) (citing *Boyle*, 556 U.S. at 945-46); *see also Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 184 (S.D.N.Y. 2018). "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Cap. Asset Mgmt.*, 385 F.3d at 174 (quoting *First Nationwide Bank*, 820 F. Supp. at 98).

Defendants do not contest that the evidence demonstrates longevity, nor could they as "Defendants' charged association in connection with the Estate has persisted" for several years. *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018). Instead, Defendants argue that Plaintiff has failed to adduce evidence of a shared purpose and of relationships among the individuals associated with the alleged enterprise. Defendants argue that, at most, A. Wang associated with the other alleged enterprise members individually and without evidence of collective association. Because there are no allegations that the Five Buyers did anything other than purchase artwork through A. Wang and interact only with him, Defendants argue that Plaintiff alleges only a "series of similar but essentially separate frauds" independent of each other, each of which could be "effective without the perpetration of any other act of fraud." Dkt.

No. 197 at 19 (quoting *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565, at *6 (S.D.N.Y. Aug. 4, 2016)).

However, Plaintiff no longer argues that the Five Buyers are part of the enterprise, instead asserting that, with the exception of Zheng, the Five Buyers are "fictitious" and "conjured" by Defendants who created their "identities."  Dkt. No. 210 at 1, 5, 33.  Instead, Plaintiff says that the enterprise is the "Wang Family enterprise," which includes only a few of the Defendants, such as A. Wang, S.K. Wang, Bao Wu Tag Gallery, and Zheng.  It also includes the following non-parties:  A. Wang's wife, S.K. Wang's wife, Wai, Chien Fang Huang, Le Style, and Le Tao Limited.  *See* Dkt. No. 210 at 7-16; *cf. Tardibuono-Quigley v. HSBC Mortg. Corp. (USA)*, 2017 WL 1216925, at *7 (S.D.N.Y. Mar. 30, 2017) ("[A] RICO enterprise can carry out its fraudulent scheme through third-party intermediaries.").  Plaintiff offers the following evidence as to the non-Defendants:

- A. Wang's wife, Luo Rong: Ms. Rong is alleged to have wired $1.45 million in proceeds from sales of the 98 Paintings to Cao-Ching Wang in June 2015.

- S.K. Wang's wife, Cao-Ching Wang:  Ms. Wang is alleged to have used $1.4 million in proceeds from sales of the 98 Paintings to purchase property in Queens, New York.

- Billie Wai:  Ms. Wai works in the office of A. Wang's accountant in Hong Kong, and her name and office address were used to receive the shipments of the 98 Paintings sold to the Five Buyers.

- Chien Fang Huang:  Ms. Huang testified as to the validity of C.C. Wang's now defunct 2003 Will during the probate proceedings and is alleged to have remained A. Wang's art consultant.

- Le Style:  A corporation owned by A. Wang and allegedly also owned by S.K. Wang used to wire money to the Estate to purchase paintings.

- Le Tao Limited:  A corporation owned by A. Wang whose address is identical to the Hong Kong Address and that purchased a home in New York for $5.9 million.

The evidence offered for defendant and non-defendant members of the enterprise are sufficient to create a triable issue as to a shared purpose and a relationship among the associates. Plaintiff alleges that A. Wang, S.K. Wang, their spouses, and their companies had a shared purpose of and played a role in furthering the Wang Family enterprise, first through fraudulently procuring C.C. Wang's will and then by enabling the below-market sale of the 98 Paintings to the Five Buyers, which enabled the Wang Family to own the 98 Paintings and potentially resell some of them at auction for higher prices. There is also a triable issue as to whether Wai shared in this common purpose because her address was used to receive each of the 98 Paintings. Similarly, Plaintiff presents evidence that raises the question of whether Huang continued to act as A. Wang's art consultant and assisted Defendants and their businesses in selling the 98 Paintings at the resale auctions. *See* Dkt. No. 210 at 14-15; Dkt. No. 217-16; *see also D'Addario*, 901 F.3d at 100.

## 2. Conduct

Only persons who "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs," 18 U.S.C. § 1962(c), such that each defendant participated "in the operation or management of the enterprise" may be held liable under RICO, *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). Under this standard, a person may not be held liable merely for taking directions and performing tasks that are "necessary and helpful to the enterprise," or for providing "goods and services that ultimately benefit the enterprise." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451-52 (S.D.N.Y. 2004) (internal citations and quotation marks omitted). Instead, the "defendant must have had some part in directing [the enterprise's] affairs." *DeFalco*, 244 F.3d at 310 (internal citation omitted); *see D'Addario*, 901 F.3d at 104 (conduct established

through active assistance by individual defendants and mere "formation and existence" of entity defendants used to effectuate the schemes).

A. Wang and S.K. Wang do not contest that there is sufficient evidence for a jury to find that they participated in the conduct of an enterprise.  A. Wang secured the Five Buyers (either directly or through the alleged intermediary), conveyed the offer prices to the P.A., and arranged for the sale of the 98 Paintings.  Plaintiff submitted evidence that S.K. Wang participated in the sale of certain of the Estate's paintings, and is alleged to be a joint owner of Le Style, which wired money to the Estate for the sale to YDJ, and to have participated in the auction resales and alleged money laundering.  There is evidence from which a reasonable jury could conclude that each participated in the "operation or management" of the enterprise.

### 3.    Predicate Acts

RICO defines racketeering activity to mean "any act which is indictable" under specified provisions of Title 18, including mail fraud. 18 U.S.C. § 1961(1)(B).

Plaintiff alleges predicate acts of: (1) mail and wire fraud, 18 U.S.C. §§ 1341, 1343, through six faxes of fraudulent bills of sale allegedly sent by A. Wang to the Estate (the "Bills of Sale"); (2) wire fraud, 18 U.S.C. § 1343, through six wire transfers by A. Wang of sale proceeds to the Estate (the "Wire Transfers"); (3) mail fraud and transportation of stolen goods, 18 U.S.C. §§ 1341, 2314, through six shipments of stolen goods (the "Shipments"); and (4) money laundering of the proceeds from the resale of the paintings through auction, 18 U.S.C. § 1956. *Id.*  Plaintiff also alleges predicate acts concerning the Ma Yuan Landscape Album.

Defendants argue that Plaintiff has failed to establish the commission of at least two predicate acts of racketeering by them.  At this stage, the Court need only determine whether there is sufficient evidence to create a triable issue of fact as to at least two predicate acts of racketeering (and whether, as to the acts of which there is sufficient evidence, they establish a

pattern of racketeering).  The Court need not, and does not, reach a conclusion as to each alleged predicate act.

### a.    Wire Fraud

The elements of a wire fraud claim are: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (citation and internal quotation marks omitted).

To constitute a scheme to defraud, a plaintiff must show that defendant possessed a fraudulent intent, but the actual wires need not be "false or contain misrepresentations—only the scheme must be fraudulent."  *Capital 7 Funding v. Wingfield Capital Corp.*, 2020 WL 2836757, at *11 (E.D.N.Y. May 29, 2020) (quoting *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 552 (S.D.N.Y. 2005)); *see also Greenberg*, 835 F.3d at 305-06.  "The gravamen of the offense is the scheme to defraud, and any 'mailing [or wire] that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing [or wire] itself 'contain[s] no false information.'"  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)).

Defendants argue that Plaintiff has not proffered evidence demonstrating that they engaged in a scheme to defraud the Estate and that in fact, the evidence refutes that allegation because it shows A. Wang's compliance with the P.A.'s procedures.  They thus contend that any wires sent cannot have been in furtherance of a fraudulent scheme.  But Plaintiffs have introduced sufficient evidence to create a triable question of whether Defendants engaged in a scheme to defraud, specifically to defraud the Estate of money and property by fictitiously claiming that the art was sold to Five Buyers independent of A. Wang, and thus that the price was reached as a result of arms-length negotiations between a disinterested buyer and seller

when, in fact and unbeknownst to the P.A., the beneficial owner and purchaser of the art would be A. Wang, the fiduciary. That scheme is alleged to have had the intent to deprive the Estate of its artwork and at a below-market price.

Plaintiff has offered "ample circumstantial evidence" that Defendants acted with fraudulent intent. *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 644 (S.D.N.Y. 2015). That evidence includes, *inter alia*: the shipment of the artwork from Crozier to the office of A. Wang's accountant; the wires of the payment for the artwork from A. Wang's personal legal counsel, account "8480185540," and Le Style; the wires from account "8480185540" for two separate buyers, Anthony Chou and Raymond Ye, despite the fact Chou was said to have wired the funds directly into the Estate's account; A. Wang's conflicting testimony in 2013 that he knew each of the Five Buyers as compared to his 2019 deposition testimony in which he said the P.A. had referred him to an intermediary, Er Shi Fu, who handled all of the communications with the Five Buyers; the denial of the P.A.'s counsel of the existence of such intermediary; A. Wang's conflicting testimony in 2013 that he owned an interest in only one privately held company, which was not Le Style, as compared to his 2019 testimony that he owned Le Style; and A. Wang's conflicting testimony in 2013 that he did not know how the buyers of the artwork wired money out of China to pay for the artwork as compared to his 2019 testimony that he used his accounts to transfer money the money on behalf of the Five Buyers. *See De Sole*, 139 F. Supp. 3d at 650 (listing evidence).

Thus, on the record here, the issue of whether Defendants "acted with fraudulent intent cannot be resolved at summary judgment." *Id.* at 657 (describing defendant's "state of mind, her knowledge, and her intent" as "classic jury questions"); *see Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984) ("[W]here subjective issues regarding a litigant's state of mind, motive,

sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable.").

### i.      Wire Transfers

These predicate acts are based on Defendants' transfer of funds from Hong Kong to the Estate's bank account in New York through Le Style and the undisclosed corporate account listed as "8480185540" in the Estate's bank statements.

As an initial matter, Defendants have not named the owner of the "8480185540" account that wired payment for three of the sales. A. Wang's personal legal counsel, Brown Raysman, wired funds for one of the sales, Le Style wired funds for one of the sales, and an unknown Citibank account wired funds for the last sale. Plaintiff argues that the non-production of corporate records related to "8480185540" entitles her to an adverse inference it was used by Defendants to pay the Estate. She also seeks an adverse inference that Le Style and "8480185540" were jointly controlled by both A. Wang and S.K. Wang (as opposed to only A. Wang) for the same reasons.[11] Defendants argue that the lack of bank records for Le Style is explained by the A. Wang's statement that he has no banking records for Le Style because HSBC bank did not maintain records dating back to the sales. They say nothing about Plaintiff's argument regarding S. Wang. The Court declines to decide this issue now and will direct the parties to submit briefing on whether each side is entitled to an adverse inference jury instruction as part of pre-trial motions.

_____

[11] Separately, Plaintiff argues that she is also entitled to an inference that Shou-Kung Wang Irrevocable Trust (the "S.K. Trust"), a trust established by S.K. Wang in 2013 after the sales to the Five Buyers but during the period of the alleged resales at auctions, possessed Estate paintings that were stolen and self-dealt. This argument is based on the facts that in 2013, S.K. Trust received a payment of $5.672 million from A. Wang's mother-in-law and that Defendants were unable to explain why documentation for the S.K. Trust listed its real property as blank.

Defendants' only real challenge to the wire transfers is that, assuming a scheme to defraud exists, any allegedly fraudulent wire transfers "merely 'facilitated' [A. Wang]'s purported self-dealing." Dkt. No. 197 at 3. But once a scheme to defraud has been established, it is "sufficient for the [wire] to be 'incident to an essential part of the scheme'" to satisfy the wire element of the offense. *Schmuck*, 489 U.S. 705 at 710-11 (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)); *see id.* at 710 ("To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme."). The wires were "incident to an essential" part of the scheme. If the funds had not been wired to the Estate, the Estate either would not have released the artwork, or having released it, would have tried to retrieve it. Each separate wire transfer thus constitutes a separate predicate act.

### ii.        Bills of Sale and Emails

The FAC lists predicate acts based on faxes from A. Wang's counsel in New York to the P.A.'s counsel in New York containing the allegedly fraudulent bills of sale for the painting in question. In her opposition brief, however, Plaintiff no longer lists these faxes as predicate acts, which—as Defendants note and Plaintiff does not dispute—are intrastate. "[P]urely intrastate communication [is] beyond the statute's reach." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 243 (2d Cir. 1999). The Bills of Sales cannot suffice as predicate acts.

Instead, Plaintiff alleges that A. Wang "sent numerous fraudulent emails about the buyers to [his counsel] and the P.A. while he was outside of New York." Dkt. No. 210 at 29. She lists three emails between A. Wang and his counsel: (1) a 2009 email arranging the sale to YDJ that indicates A. Wang is outside New York, Dkt. No. 217-25; (2) a 2009 email concerning the same and bearing a Pacific time zone timestamp, Dkt. No. 203-70; and (3) a 2008 email in which A. Wang asks his counsel for a quote for the total wire payments for a potential (unknown) purchaser and also bearing a Pacific time zone timestamp, Dkt. No. 203-67. Each of these

emails was in furtherance of the scheme because they were necessary in arranging the sales and part of the overall scheme to sell the Estate's artwork.  The scheme "naturally depended on the successful passage of title" from the Estate to the Five Buyers, and the emails discussing and arranging for the sales were part of that.  *Schmuck*, 489 U.S. at 713.  The emails need not contain misrepresentations as "innocent" emails may supply the wire element.  *See id.* at 715.  The three emails concerning the existence of YDJ suffice as predicate acts.

### b.       Shipment of Stolen Goods and Money Laundering

Having presented evidence of more than two related predicate acts, the Court need not address Defendants' remaining arguments as to the shipment of stolen goods and money laundering.

### 4.       Pattern of Racketeering

A "pattern of racketeering activity" requires the plaintiff to "plead at least two predicate acts, show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997).  The two predicate acts must have been committed within ten years of each other.  18 U.S.C. § 1961(5).  "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Schlaifer Nance & Co.*, 119 F.3d at 97 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 240 (1989)).

Racketeering activities must "amount to or pose a threat of continued criminal activity."  *Cofacredit*, 187 F.3d at 242 (quoting *H.J.*, 492 U.S. at 239).  To meet this so-called "continuity" requirement, a "plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a

substantial period of time)." *First Cap. Asset Mgmt*, 385 F.3d at 180 (quoting *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995)).  "Given the routine use of mail and wire communications in business operations, . . . 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'"  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000), *cert. denied*, 532 U.S. 905 (2001)).

When determining whether there is closed-circuit continuity, the Second Circuit has directed district courts to look to "non-dispositive factors, including, *inter alia*, the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes."  *GICC Cap.*, 67 F.3d at 467.  In its August 26, 2016 Opinion, the Second Circuit held that the Complaint's allegations of a pattern of racketeering activity that began in 2003, when A. Wang tried to persuade Y.K. King to turn over assets in exchange for artwork of hers that he had misappropriated and that continued until June 3, 2010 when the defendants auctioned off two unlawfully acquired paintings, were sufficient to plead closed-ended continuity.  *See King*, 663 F. App'x at 14.

Defendants challenge three of the factors set forth in *GICC Capital*, arguing that the "undisputed facts indicate that the alleged 'scheme,' was, at most, advanced by a single actor (AW), against a single alleged victim (the Estate), with a single, narrow goal (to obtain artwork from the Estate)."  Dkt. No. 197 at 20.  Those arguments are without merit.

First, the Second Circuit recognized that Plaintiff had alleged—and the Court now finds that Plaintiff has put forward sufficient evidence to create a triable issue—that there is not merely one single actor but two actors who were primary perpetrators of the scheme, A. Wang

and S.K. Wang.  *See King*, 663 F. App'x at 14.  The Second Circuit cited *Jacobson v. Cooper*, 882 F.2d 717 (2d Cir. 1989) for the proposition that a pattern of racketeering activity can exist "where two codefendants wrongfully failed to account for the income and proceeds derived through their management and sale of certain real property, constituting an enterprise, with which they had been entrusted by the plaintiff."  *Id.*

Second, that the Estate is the alleged victim does not rule out a RICO claim as "[t]he Second Circuit has noted that the presence of only one victim does not by itself preclude a RICO pattern."  *Jerome M. Sobel & Co. v. Fleck*, 2003 WL 22839799, at *12 (S.D.N.Y. Dec. 1, 2003) (citing *Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.*, 113 F.3d 308, 310 (2d Cir. 1997)). Here, Defendants had the goal of obtaining paintings from the Estate through separate contracts with separate alleged buyers, and, if the money laundering claims suffice as predicate acts, the goal of selling some of those paintings to personally profit.  *See World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 509 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009) (citing cases); *State Wide Photocopy v. Tokai Fin. Servs., Inc.*, 909 F. Supp. 137, 140 (S.D.N.Y.1995) (defendants who tried to lure multiple clients away from a single entity committed a pattern of racketeering activity, where each act of luring constituted a separate economic injury); *see also Jacobson*, 882 F.2d at 720 (pattern of racketeering established where "separate acts involving separate properties" and "all had the supposed purpose and effect of depriving" the single victim "of interests in his real estate enterprise").

Third, the Second Circuit has "expressly noted that Congress did not intend 'to exclude from the reach of RICO multiple acts of racketeering simply because . . . they further but a single scheme.'"  *World Wrestling Entm't*, 530 F. Supp. 2d at 509 (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989)).   "Multiple schemes are not required in all circumstances."

*GICC Cap.*, 67 F.3d at 467; *see Sobel*, 2003 WL 22839799, at *6 ("[I]t is not necessary to allege multiple schemes."). "Congress' preoccupation in enacting RICO was to curb the incidence of long-term criminal conduct." *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 523 (7th Cir. 1995) (citing *H.J.*, 492 U.S. at 241-42). The conduct here mirrors that long-term criminal conduct.

The evidence is sufficient on the summary judgment record to establish a pattern of racketeering activity that began with the first predicate act, the wire transfer to the Estate for the first sale of paintings to Raymond Ye in February 2005 and the corresponding shipment of artwork and that continued at least through the wire transfers in connection with the separate sales to each of the Five Buyers through 2009. *See DeFalco*, 244 F.3d at 321 (noting that the Second Circuit has never held a period of less than two years to suffice for racketeering activity).[12] This pattern is different from the garden variety fraud "relating to one basic transaction" that cannot support a RICO claim. *Crawford*, 758 F.3d at 489. Here, each sale of artwork was independent and did not assume that there would be a subsequent sale to a straw man. Each sale involved different paintings and was made to a separate buyer. Each predicate act of wire fraud and shipment inflicted separate harms, and each on its own deprived Plaintiff of the artwork and of its fair market value. If the predicate acts associated with the sale to the first buyer, Raymond Ye, did not occur, the remaining sales and their associated acts still would have inflicted harm on Plaintiff. Therefore, this scheme was not "one basic transaction" but rather akin to the extortion of a business or person through several transactions over a period of several years where each harm is independent of another.

---

[12] The Court need not reach, and expresses no view, on whether the subsequent sales at auction of artworks also constitute separate predicate acts part of the pattern of racketeering activity.

B.      Causation

Section 1964(c) provides, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).

"To sue under RICO, a plaintiff must also establish that the underlying § 1962 RICO violation was 'the proximate cause of his injury.'"  *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 140 (2d Cir. 2018) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010)); *see Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) ("Th[e] predicate acts must be the 'proximate cause' of the alleged injury").  However, "the term 'proximate cause' in this context does not mean precisely what it means at common law."  *Alix v. McKinsey & Co.*, 404 F. Supp. 3d 827, 833 (S.D.N.Y. 2019).  Instead, "proximate cause requires some direct relation between the injury asserted and the injurious conduct alleged, and a link that is too remote, purely contingent, or indirect is insufficient."  *Empire Merchs.*, 902 F.3d at 141; *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

Defendants argue that the predicate acts did not lead directly to an injury to the Estate, *i.e.*, they did not cause the sale of the 98 Paintings for less than their purported true value.  Further, they argue that the Estate was not injured "by reason of" the Wire Transfers or the Shipments because the Wire Transfers and Shipments occurred after the Estate signed contracts for the sale of the paintings.  They also argue that the Wire Transfers could not cause injury to the Estate because there is no evidence that anyone relied on those transfers.

These arguments mistake the relevant inquiry and understate the evidence.  The relevant inquiry is whether the Estate was injured in its business or property through a pattern of

racketeering acts.  *See Empire Merchs.*, 902 F.3d at 141.  Here, the relevant acts are acts indictable as mail or wire fraud.  *See Bridge*, 553 U.S. at 647.  The "gravamen of the offense is the scheme to defraud" and each of Defendants' use of the mails or wires in furtherance of a fraudulent scheme is an "act which is indictable" and thus a separate racketeering act.  *Id.*  The mailing or use of the wires is merely an "incident" of the fraudulent scheme that supplies federal jurisdiction and makes the act an "indictable act."  Plaintiff can recover under RICO if the Estate is the "direct" victim of the scheme to defraud; she need not show that the Estate was the direct victim of (or that it even was aware of) the use of the wires and mails.

With the test properly understood, there is sufficient evidence of causation to meet Defendants' summary judgment motion.  The Estate's injury, the loss occasioned by the sale of the 98 Paintings for less than their true value, was the "direct result" of the scheme to defraud. The scheme's object was precisely to induce the Estate to part with the paintings for less than the paintings were worth based on the false representation that the buyers were independent third parties rather than straw purchasers.  The harm to the Estate followed necessarily from the scheme to defraud—the scheme's object was to convince the Estate to part with the paintings. As to each separate sale of paintings, the Estate is the party who was directly injured.

Defendants' last argument that the Estate did not rely on receipt of the funds or the confirmation that the paintings had in fact been mailed also fails.  "[A] person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."  *Bridge*, 553 U.S. at 649.  "[R]eliance on the defendant's alleged misrepresentation is not an element of a RICO mail-fraud claim."  *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015).

C.      Injury

"[A] plaintiff asserting a claim under 18 U.S.C. § 1964(c) must allege actual, quantifiable

injury."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008), *abrogated on other*

*grounds by Bridge*, 553 U.S. at 659.  "[A] plaintiff can adequately plead RICO damages by

alleging lost profits where, as here, they constitute an injury to plaintiff's business, were

proximately caused by the alleged racketeering, and are not merely speculative."  *Elsevier*, 692

F. Supp. 2d at 310.

Defendants argue that Plaintiff has failed to provide quantifiable injury because its

expert: (1) did not offer an opinion on the value of 84 of the 98 Paintings as of the dates they

were sold between 2005-2009, but rather as of October 11, 2019; and (2) inappropriately valued

the remaining 14 paintings sold to YDJ in August 2009 by using a purported "retail value,"

which he defined as the value the paintings would be sold at auction, rather than through the

private retail markets.  As to their first argument, Defendants claim that the FMV of the 84

Paintings as of October 11, 2019 is not evidence that the Estate suffered a loss as a result of the

sales because those paintings were sold between 2005-2009, not in 2019.  As to the second

argument, Defendants claim that Regan should not have used the value at auction because the

P.A.'s counsel affirmed that the Estate attempted to auction those artworks at Sotheby's but they

were rejected by the auction house.

Plaintiff's evidence is sufficient to survive summary judgment.  Plaintiff offers evidence

of an actual, quantifiable injury to the Estate by a lost profits theory—that, as a result of

Defendants' fraudulent scheme, the Estate received lower payment for the 98 Paintings than it

would have received if it had transacted with independent third party buyers.  Defendants'

arguments here are better understood as a challenge to Reagan's method of using 2019 data in

calculating lost profit damages under Fed. R. Evid. 702 rather than as a challenge to whether

Plaintiff has suffered injury on summary judgment.  For now, Defendants have provided an estimate of lost profits, but the Court reserves judgment as to whether "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand" are reliable and will direct the parties to submit *Daubert* motions.  Fed. R. Evid. 702; *see Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."); *see also United States v. Teva Pharm. USA, Inc.*, 2019 WL 1245656, at *25 n.7 (S.D.N.Y. Feb. 27, 2019).[13]

**III.    Plaintiff's Motion for Partial Summary Judgment on Breach of Fiduciary Duty**

Plaintiff moves for partial summary judgment on her breach of fiduciary claim against A. Wang.

A claim for breach of fiduciary duty requires (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.  *See Johnson v. Nextel Communcs., Inc.*, 660 F.3d 131 (2d Cir. 2011) (citing *Barret v. Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)).  However, it is "clear that on a summary judgment motion a court's only role is to determine if a genuine issue of fact exists: it cannot assume the role of the jury on a *sensitive factual issue like fiduciary duty*."  *A & E Television Networks, LLC v. Pivot Point Entm't, LLC*., 2013 WL 1245453, at *19-20 (S.D.N.Y. Mar. 27, 2013).

Plaintiff argues that A. Wang breached his fiduciary duty of good faith and full disclosure to the Estate when he misrepresented that he was actively negotiating with the Five Buyers on

---

[13] Defendants argue that because Plaintiff's RICO claims fail as a matter of law, the Court lacks subject matter jurisdiction over the remaining state law claims.  Because the Court denies Defendants' motion for summary judgment on the RICO claims, it also denies their motion with respect to the state law claims.

behalf of the Estate to achieve the best possible price.  Plaintiff alleges A. Wang did not

negotiate at all, but rather relied only on "a Sotheby's tax appraisal from 2004 and his

co-fiduciary's opinion" in agreeing to the sales.  Dkt. No. 204 at 3.  Although Plaintiff asserts

this breach of fiduciary claim as to A. Wang's failure to negotiate at arm's length for sales of all

98 Paintings, she seeks partial summary judgment only as to A. Wang's August 2009 sale of 14

paintings to YDJ for $489,772.  Plaintiff's expert, Patrick Regan, estimated the retail value of the

sale to be $1,978,000, and Plaintiff asks for damages for the difference in the amount of

$1,488,228.

A. Wang does not deny that he was a fiduciary, but disagrees as to whether his duties

included a general duty to attain the highest attainable price and whether he breached that duty.

He argues that management of the Estate's assets naturally includes business judgment of the

executor, and thus any contention that an executor failed to obtain an appropriate price for estate

assets requires a "factually intensive assessment of whether the executor acted negligently or

without the prudence of an ordinary man."  Dkt. No. 214 at 2.  He further argues that to the

extent he did not achieve the "highest attainable price," the P.A. knew of and approved A.

Wang's counteroffers and ultimate prices for the 14 paintings.  Finally, A. Wang argues that

Plaintiff has not met her burden with respect to damages, and he raises several affirmative

defenses, including untimeliness, causation, and unclean hands.

Resolution of Plaintiff's motion is not appropriate for summary judgment.  There are

genuine factual issues as to whether A. Wang failed to attempt to attain the "highest attainable

price" and if so, whether that failure violated his fiduciary duties to the Estate.  There are also

fundamental disputes as to whether YDJ (and the Five Buyers) are real or fictitious persons and

whether A. Wang interacted with YDJ at all or relied on Er Shi Fu.

## IV.     Motion to Strike

Defendants move to strike the majority of Plaintiff's 56.1 statement on the theory that

those facts are not relevant to her motion for partial summary judgment on the breach of

fiduciary duty claim, are unsupported by the evidence, or contain improper argument.  Dkt. No.

215.  They also move to strike any paragraphs that rely on Plaintiff's declaration because they

argue that Plaintiff lacks credibility and also fails to cite evidence in support of certain assertions.

Finally, they move to strike portions of the declaration submitted by Damas, the current P.A., on

the grounds that she did not become P.A. until 2015.

There is no question that Plaintiff's 56.1 statement is not a "short" statement but "the

mere fact that a Local Rule 56.1 statement is lengthy does not render it in violation of the Rule."

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 395

(S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of

Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).  Moreover, "[a] district court has broad discretion to

determine whether to overlook a party's failure to comply with local court rules."  *Holtz v.

Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).

The Court here is capable of disregarding statements that are unsupported by evidence or

are argumentative because, on a motion for summary judgment, the Court "is not to weigh the

evidence but is instead required to view the evidence in the light most favorable to the party

opposing summary judgment, to draw all reasonable inferences in favor of that party, and to

eschew credibility assessments."  *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996); *see

Anderson*, 477 U.S. at 248 ("Factual disputes which are irrelevant or unnecessary" to the claims

at issue "will not be counted").  The Court declines to make a "blanket ruling on the relevance

of" the 56.1 statement and need not delineate which paragraphs of Plaintiff's 56.1 statement are

improperly asserted or argumentative, but rather notes that it has disregarded such statements in

its opinion on summary judgment. *Congregation Rabbinical Coll. Of Tartikov*, 138 F. Supp. 3d at 396.

Similarly, the Court is able to disregard statements by Plaintiff that would be inadmissible, but whether Plaintiff lacks credibility such that statements based on her declaration should be disregarded is not a proper determination for this Court. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *see also Kelly v. Provident Life & Acc. Ins. Co.*, 695 F. Supp. 2d 149, 153 (D. Vt. 2010) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."). The Court leaves Plaintiff's credibility to the jury.

Finally, Damas admits in her declaration that she has "no personal knowledge regarding the allegations in this proceeding" because she was not P.A. at the time of the events in this action. Dkt. No. 200 ¶ 5. Federal Rule of Civil Procedure 56(c)(4) requires that declarations "used to support or oppose a motion must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4). The Court therefore "decline[s] to consider those aspects of" Damas' declaration "that do not appear to be based on personal knowledge or are otherwise inadmissible." *Grewal v. Cuneo Gilbert & LaDuca LLP*, 2017 WL 1215752, at *16 (S.D.N.Y. Mar. 31, 2017), *aff'd*, 803 F. App'x 457 (2d Cir. 2020) (quoting *Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. 2013)).

## CONCLUSION

For the reasons stated herein, the motions for summary judgment are DENIED.

Defendants' motion to strike is DENIED.

A status conference is scheduled for December 11, 2020 at 2:30 p.m. Parties are directed to dial into the Court's teleconference at 888-251-2909, Access Code 2123101, and follow the necessary prompts.

The Clerk of Court is respectfully directed to close Dkt. Nos. 193, 194, 215.


SO ORDERED.

Dated: November 23, 2020
      New York, New York
                                        LEWIS J. LIMAN
                              United States District Judge