# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

YIEN-KOO KING,

              Plaintiff,

      v.

ANDREW WANG, et al.,

          Defendants.

**Case No: 14-cv-7694**

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PATRICK REGAN

---

KAMERMAN, UNCYK, SONIKER & KLEIN P.C.
Akiva M. Cohen, Esq.
Attorneys for Defendants
1700 Broadway, 16th Floor
New York, New York  10019
(212) 400-4930
acohen@kusklaw.com

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

    A.    The Regan Report ....................................................................................4

    B.    The Chinese Art Market's "Deadbeat Bidder" Problem ..................................5

    C.    The Deficiency Notice ................................................................................7

ARGUMENT 9

    I.    PLAINTIFF BEARS THE BURDEN OF DEMONSTRATING THAT
        HER EXPERT'S OPINIONS ARE ADMISSIBLE ........................................9

    II.    REGAN'S APPRAISALS SHOULD BE EXCLUDED AS
        IMPERMISSABLE "BLACK BOX" OPINIONS ........................................10

    III.    REGAN'S APPRAISALS SHOULD BE EXCLUDED AS IRRELEVANT
        TO PLAINTIFF'S DAMAGES CLAIM ........................................................14

    A.    The FMV Appraisal is Irrelevant and Inadmissible ..................................16

    B.    The Retail Appraisal is Likewise Irrelevant and Inadmissible....................18

    IV.    REGAN'S APPRAISALS SHOULD BE EXCLUDED AS BASED ON
        UNRELIABLE DATA ................................................................................20

    V.    REGAN'S APPRAISALS SHOULD BE EXCLUDED FOR FAILURE TO
        DISCLOSE ALL FACTS AND DATA REGAN CONSIDERED IN
        FORMING HIS OPINIONS ........................................................................23

CONCLUSION................................................................................................................26

# Table of Authorities

**Cases**

*Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256 (2d Cir. 2002) ......................................9, 10, 11

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)....................................................................10

*Bourjaily v. United States*, 483 U.S. 171 (1987) .........................................................................................9

*Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169 (S.D.N.Y. 2006)....................................................22

*Cohlmia v. Ardent Health Servs., LLC*, 254 F.R.D. 426 (N.D. Okla. 2008) ..................................................24

*Cornell Univ. v. Hewlett-Packard Co.*, No. 01-CV-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008).........................................................................................................................................10

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) ......................................................... 9, 15

*Davis v Carroll,* 937 F. Supp. 2d 390 (S.D.N.Y. 2013) ...............................................................................20

*Delozier v. First Nat. Bank of Gatlinburg*, 109 F.R.D. 161, 164 (E.D. Tenn. 1986)...................................25

*Dornberger v. Metro Life Ins. Co.*, 961 F. Supp. 506, 521 (S.D.N.Y. 1997) ..................................................15

*Employees Committed for Justice v. Eastman Kodak Co.*, 251 F.R.D. 101 (W.D.N.Y. 2008) ........................24

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870 (E.D. Wis. 2010)............................................14

*Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.,* 412 F.3d 745 (7th Cir. 2005) ......... 23, 25

*In re Ambac Financial Group, Inc.* 457 B.R. 299 (S.D.N.Y. Bankr. Sept. 23, 2011).....................................20

*In re Crazy Eddie Sec. Litig.*, 812 F. Supp. 338 (E.D.N.Y. 1993) ...............................................................15

*In re Mirena IUD Products Liab. Litig.*, 169 F Supp 3d 396 (S.D.N.Y. 2016)........................ 22, 23, 25, 26

*Jackson v. Kansas City Kansas Pub. Sch. Unified Sch. Dist. No. 500*, 378 F. Supp. 3d 1016 (D. Kan. 2019) *aff'd*, 799 F. App'x 586 (10th Cir. 2020), *cert. denied*, 140 S. Ct. 2834, 207 L. Ed. 2d 162 (2020))............................................................................................................................25

*Jinghong Song v Yao Bros. Group LP*, 10-civ-04157 RKE, 2012 WL 1557372 (S.D.N.Y. May 2, 2012).........................................................................................................................................26

*Kerik v. Tacopina*, 64 F. Supp. 3d 542 (S.D.N.Y. 2014)..............................................................................15

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) .........................................................................9, 10, 22

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) ..................................17

*Lawrence v. Raymond Corp.*, No. 3:09 CV 1067, 2011 WL 3418324 (N.D. Ohio Aug. 4, 2011)..............14

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ..............................10

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ....................................18

*Malvar Egerique v. Chowaiki*, No. 19 CIV. 3110 (KPF), 2020 WL 1974228 (S.D.N.Y. Apr. 24, 2020)..................................................................................................................................................18

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ..............................................................10

*Oleg Cassini, Inc. v Electrolux Home Products, Inc.*, No. 11-cv-1237 (LGS)(JCF), 2014 WL 1468118, at (S.D.N.Y. Apr. 15, 2014) ........................................................................................11

*Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, No. 1:04 CV 1082 TWT, 2006 WL 1663357 (N.D. Ga. June 14, 2006), *aff'd*, 496 F.3d 1231 (11th Cir. 2007) ............................16

*Pauls v. Green*, 816 F. Supp. 2d 961 (D. Idaho 2011)....................................................................24

*Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08CV0931PKCJO, 2014 WL 12788845, (E.D.N.Y. Mar. 31, 2014)................................................................................................10

*Redmond-Nieves Okuma Am. Corp.*, 332 F.R.D. 418 (D. Mass. 2019) ........................................24

*Schiller v. City of New York*, No. 04-civ-7921(RJS)(JCF), 2008 WL 4525341 (S.D.N.Y. Oct. 9, 2008)..................................................................................................................................................24

*Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*, No. 08-CV-6256, 2012 WL 6628878, (W.D.N.Y. Dec. 19, 2012) ................................................................................................................16

*Skolnick v. Comm'r of Internal Revenue*, 117 T.C.M. (CCH) 1319 (T.C. 2019)............................11

*U.S. v. Weaver*, 860 F.3d 90 (2d Cir. 2017) ..................................................................................18

*Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)............................................17

*United States v. 12.94 Acres of Land in the County of Solano*, CIV S-07-2172 FCDEFB, 2009 WL 4828749 (E.D. Cal Dec. 9, 2009) ..............................................................................................22

*United States v. Figueroa*, 618 F.3d 934 (2d Cir. 1980)................................................................17

*United States v. Massino*, 546 F.3d 123 (2d Cir. 2008) ................................................................17

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ..................................................................9

*Universe Antiques, Inc. v. Vareika*, 10 CIV. 3629, 2011 WL 5117057 (S.D.N.Y. Oct. 21, 2011)..............26

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001)..................................................23

*Zaremba v. Gen. Motors Corp.,* 360 F.3d 355 (2d Cir. 2004)........................................................................22

**Other Authorities**

*Artnet Intelligence Report,* Fall 2018 ..............................................................................................................6

The Appraisal Foundation, *Valuation of Fine and Decorative Art* ................................................................11

USPAP Standards Rule 7-4(a)..........................................................................................................................25

**Rules**

Fed. R. Civ. P. 26(a)(2)(B)...............................................................................................................................23

Fed. R. Civ. P. 37(c)(1) ...................................................................................................................................23

Fed. R. Evid. 403 .............................................................................................................................................17

Fed. R. Evid. 702. ..............................................................................................................................................9

Defendants Andrew Wang ("Andrew") and Shou-Kung Wang ("S.K." and with Andrew, the "Wangs") respectfully submit this memorandum of law in support of their motion to exclude the proffered expert opinions and testimony of Patrick Regan, offered by plaintiff, Yien-Koo King ("Plaintiff") in her capacity as Preliminary Executrix of the Estate of Chi-Chuan Wang ("Plaintiff" or the "Estate"), pursuant to Rule 37 of the Federal Rules of Civil Procedure, Rule 702 of the Federal Rules of Evidence, under *Daubert*, and as irrelevant.

## PRELIMINARY STATEMENT

In furtherance of her RICO action, Plaintiff retained Patrick Regan to appraise 98 classical Chinese works of art (the "98 Paintings") in an effort to establish that the Estate was injured by their sale because they were improperly sold at below-market value. Regan's appraisal opinions, however, are inadmissible, for multiple reasons.

First, Mr. Regan's opinion should be precluded for failure to disclose the reasoning or methodology by which he derived an appraised value for the 98 Paintings based on the comparables he selected for each painting, and for significant departure from the standards governing such appraisals. As discussed in Point II below, Mr. Regan's opinion is essentially a black box; he identifies an appraised value for each of the paintings, and lists the "comparables" he relied on in connection with each of the paintings, but provides no explanation for how the data regarding the comparable paintings supported or led to the values he reached. Worse, as to some 15 of the paintings, Regan identified no comparable sales at all, in violation of the USPAP standards governing appraisals of the type Mr. Regan claimed to have conducted. Because his *ipse dixit* opinions are inadmissible, Mr. Regan should be precluded from offering them.

-1-

Second, Mr. Regan's opinion should be precluded as irrelevant. Plaintiff alleges that the purported RICO scheme harmed the Estate by selling the 98 Paintings, in six separate sales over a period of years, for less than their fair market value at the time of each of the sales. Thus, Plaintiff alleges, "the Estate received lower payment for the 98 Paintings than it would have received if it had transacted with independent third party buyers." Doc. No. 229 at 49. But for multiple reasons, Mr. Regan's opinion provides no basis to assess what the Estate might have received in such a hypothetical transaction. Why not?

For one thing, Mr. Regan's "Fair Market Value" appraisal assessed the value of the 98 Paintings *as of October 19, 2019*, more than 14 years after the earliest of the sales and more than a decade after even the latest of them, and thus cannot assist the jury in determining whether the 98 paintings were sold for less than fair value at the time of their sales. Mr. Regan did not opine that there was any way to use his October 2019 valuation to assess what a hypothetical "independent third-party buyer" might have paid for the 98 Paintings at the relevant times, and implicitly rejected the claim that any such calculation was possible by providing a wholly separate "Retail Valuation" for the 2009 sale of 14 paintings to Yu Da Jin. Because the October 2019 valuation is thus admittedly irrelevant to Plaintiff's alleged damage claim, and also far more prejudicial than probative, the Court should preclude Mr. Regan from testifying to it.

For another, even that retail appraisal is focused on the wrong date. Plaintiff proffers the retail appraisal as evidence that Andrew Wang intended to induce the Estate to sell its paintings for well below their retail value. But the retail appraisal is as of August, 2009, and Andrew negotiated the sale on behalf of the Estate in the Spring of 2008; the sale was delayed for various reasons until March 2009. And the difference in timing is critical; as discussed below, for one painting alone, the difference in timing added almost $1,000,000 to the appraised value of the piece. So the retail

appraisal likewise does not shed any light at all on whether the prices for the 2009 sale were below market when they were proposed, and is substantially more prejudicial than probative.

Third, Regan's methodology was fundamentally unreliable, because it was based on unreliable data: as discussed in Point IV below, he based his appraisals overwhelmingly on the reported results from mainland Chinese auction "sales" of paintings he deemed comparable, but which results Regan himself admits are uncertain. Indeed, industry literature establishes, and Regan readily admits, that "deadbeat bidders" are a significant issue in the Chinese auction market: at the mainland Chinese auction houses whose data Regan relies upon, only half of the reported auction results were for items that actually sold for the price the auction houses reported, and bidders are known to artificially inflate the prices of pieces they have no intention of buying in an attempt to increase the market value of pieces they already own. Indeed, in the high-end market – paintings selling for $1,400,000 or more – less than 30% of the value of reported "sale prices" was actually timely paid. As a result, Regan cannot know for certain if *any* of the reported Chinese auction prices he relies on in forming his opinion are valid; they all may be, or none may be, or any proportion in between. Yet Regan applied no discount to account for that uncertainty, and his appraisal thus relies on pure speculation that the reported prices he relied on were actual prices paid for the paintings he deemed comparable. Regan's dependence on unconfirmed sales data renders his opinions regarding the value of the 98 Paintings unreliable and thus inadmissible.

Fourth, Regan's appraisal opinions also must be excluded as a result of his failure to preserve – and thus Plaintiff's failure to disclose – the full "facts or data [Regan] considered" as required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. As discussed in Point V below, an appraisal is only as valid as the comparability of the datapoints on which it is based, and as such potential comparables considered and rejected by an appraiser are critical bases for cross-examination. Indeed,

-3-

it is precisely because the facts considered by an expert but rejected for inclusion in a report often provide the most fertile ground for cross-examination that Rule 26 requires disclosure of all facts or data the expert *considered*, rather than merely the subset of facts or data the expert *relied* upon. Yet, compounding the black-box nature of his opinions, Regan failed to preserve and disclose information about all of the external sources he considered or databases he reviewed, the precise searches he ran on those databases, or the particular paintings he considered (but did not ultimately select) as potential comparables on which to base his appraisal. Those failures substantially prejudiced the Wangs, precluding them from meaningfully cross-examining Mr. Regan on the core of his opinion: his selection of the "comparable" paintings from which he derived his valuations.

Each of these serial failures independently requires preclusion of Mr. Regan's report and testimony; in the aggregate, they overwhelmingly demand it. The motion should be granted.

## STATEMENT OF FACTS

### A. The Regan Report

Plaintiff's damages theory is simple: if not for the Wangs' alleged misdeeds, the Estate would have sold the 98 Paintings at higher prices, and the Wangs are thus liable to the Estate for its lost profits. The sole support for the Estate's claim that it suffered any damages at all, and the sole basis for quantifying the alleged damage, is the expert report of Patrick Regan, an art appraiser (the "Regan Report").[1] Mr. Regan offers two opinions in the Regan Report: (i) an opinion of the fair market value of the 98 Paintings, as of October 10, 2019, based on an appraisal annexed to his report as Exhibit A (the "FMV Appraisal"); and (ii) an opinion of the retail value of 14 of the 98 Paintings, as of August 2009, based on an appraisal annexed to his report as Exhibit B (the "Retail

---

[1] A copy of the Regan Report, including Exhibit A and B thereto (the "Appraisals") is annexed to the accompanying Declaration of Akiva M. Cohen ("Cohen Dec") as Ex. 1. Regan's Reply Report is annexed to the Cohen Dec as Ex. 2.

Appraisal" and together with the FMV Appraisal, the "Appraisals").  In both Appraisals, Regan relied heavily on sales results from mainland Chinese auction houses, citing such results in support of his valuation of 78 of the 98 paintings in the FMV Appraisal, and for 12 of the 14 paintings in the Retail Appraisal. *Id. See also* Deposition of Patrick Regan ("Regan Dep.") at 284:20-285:4.[2]

Mr. Regan relied on "[his] professional experience, and research regarding the market conditions, historical conditions, and sales of comparable paintings." Regan Report, ¶ 17. But Mr. Regan only disclosed that his research "included" certain specified sources on the historical markets, and did not disclose *all* of the sources he relied upon. *Id.* Similarly, in his Appraisals, Mr. Regan disclosed that his "Method of Research" involved consulting unspecified "sale catalogues, catalogues raisonné, and other printed materials that support the appraisal." *See id.*, Ex. A at 7.

**B.  The Chinese Art Market's "Deadbeat Bidder" Problem**

Sales results from mainland Chinese action houses are near-universally regarded as unreliable as they include data from unconsummated sales resulting from "a high percentage of 'deadbeat-bidders.'" Regan Reply Report, ¶ 10. See also Cohen Dec Exs. 4 ("forgery and [] non-payment… are now so common in the Chinese art market as to make the year's totals -- which purportedly show an astonishing rise -- highly unreliable. … the difficulties of accurate reporting from China are especially acute."); 5 ("Issues related to late and non-payment, false bidding, and other illegal operations have all arisen, and … have undermined the credibility of some."); 6 ("Some of [China]'s top auction houses refuse to talk about artworks sold at record prices, knowing they were never paid for...") The art industry understands that there are fundamental differences between Western and mainland Chinese auction houses in terms of sale consummation and thus reported data. Cohen Dec

---

[2] A copy of relevant pages from the Regan Dep is annexed to the Cohen Dec as Ex. 3

Ex. 5 ("The problem of late and nonpayment by winning bidders at auction [in China] . . . is clearly much more marked and persistent than in other markets. There are several reasons … including issues related to authenticity or provenance, the business integrity of the buyers, and a different culture ...")  "In China, bidding is not always perceived as a legal obligation . . . and the fall of a gavel can be seen as the start of a negotiating process, not the end." Cohen Dec Ex. 7

As the Fall 2018 *Artnet Intelligence Report* put it, "it's hard to discern the true contours of the [Chinese] auction market, because results from mainland Chinese auction houses are not always reliable, buyers don't always pay what they owe, and the system of checks and balances is less rigorous than in the West." Cohen Dec Ex. 8 at 29.  Indeed, "[i]t's no secret that buyers defaulting on successful bids in auctions – including for many pricey lots – is a problem that has plagued the market in mainland Chin[a] for quite some time. According to [a] report, among all lots sold [in China] in 2017, the percentage of the total sales value paid as of May 2018 was only 49 percent." Cohen Dec Ex. 9. *See also* Cohen Dec Ex. 10 (51% of art sold at auctions was fully paid).  Worse still, "[t]he nonpayment rate is even greater when applied to lots over [$1,500,000] for which only *28 percent of the value had been paid*." Cohen Dec Ex. 9. *See also* Regan Dep. at 310:12-19; Cohen Dec Ex. 11 ("In China, non-payment … is very common … the higher the price, the more likely it is…").

Even China's leading art auctioneer, Poly International Auction, Co. ("Poly"), recognized the problem. In its IPO prospectus's "Risk Factor" section, Poly cautioned that "as of October 31, 2013, the accumulated settlement rate for our art auction sales for the year ended December 31, 2010, 2011 and 2012 and the ten months ended October 31, 2013 was 74.0%, 55.8%, 55.5% and 52.9%, respectively." Cohen Dec Ex. 12 at 45.  These statistics indicate, and Regan concedes, that up to half of all sales reported by mainland Chinese auction houses are never in fact consummated.

As Regan testified, he has no reason to doubt that the nonpayment percentage for Chinese auctions in general "was hovering around 50." Regan Dep at 301:24-303:2.

These problems are not limited to individual bad actors, but rather extend to the Chinese auction houses, which "typically paper[] over the nonpayments, reporting aborted transactions as true sales, even posting record prices and seldom correcting the record." Cohen Dec Ex. 13. *See also* Cohen Dec Exs. 11 ("whether or not any money actually changes hands, those record prices still stand, inflating the whole market."), 14 ("auction houses do not always note these failed transactions . . . their reported sales figures exceed reality"). As such, "[n]o one will take [auction] results in mainland China very seriously." Cohen Dec Ex. 13.

As he must, Regan acknowledges the relevance of this issue. Regan Dep. at 317:22-318:7. By his own admission, "China's auctions saw, and continue to see, a significant portion of non-payments and sales canceled because of bidders." Regan Reply Report, ¶ 10. Regan further concedes that "standard industry annual market reports … all agree that incidences of 'non-payment' have been a concern in the reporting from Chinese auction houses." *Id.* Regan plainly admitted this is a "problem." Regan Dep. at 329:22-330:17. Critically, Regan concedes there is no database that can provide consummated sales data for mainland Chinese auction houses with any degree of confidence. Regan Dep. at 323:8-14. As such, Regan was not able to claim that any of the mainland Chinese auction house data upon which he relies was the product of a consummated sale with even 50 percent certainty. *Id.* at 335:18-336:12.

## C.  **The Deficiency Notice**

By letter dated November 6, 2019, Defendants issued a detailed 10-point letter articulating the ways the Regan Report failed to comply with the disclosure requirements of Rule 26 (the "Deficiency Letter"). Cohen Dec Ex. 15. As most relevant here, it noted that the addenda

purportedly containing the comparable sales information Mr. Regan considered in conducting his appraisals "only include[d] documentation of artworks [Regan] deemed comparable, but fail[ed] to include what artworks he considered but rejected as comparables for purposes of his report." *Id.* at 2. At deposition, Mr. Regan made clear that he "gave significant attention to" and "engaged in a thorough analysis of" at least some auction results (the "Rejected Comparables") before ultimately deciding not to rely on them as "comparables" for purposes of his appraisal. Regan Dep. at 41:2-16.

Plaintiff's November 11, 2019 response to the Deficiency Letter, Cohen Dec Ex. 16, offered no meaningful explanation. Rather than producing the potential comparables Regan considered but ultimately rejected, Plaintiff instead insisted the Regan Report "identifie[d] the dates ranges, auction houses, and auction market reporters (*e.g.* Artron.net and Artnet.com) from which the comparables were drawn," and proclaimed that "[t]o require an appraiser to disclose every piece of artwork which he or she physically saw but did not consider as a relevant comparable is absurd." *Id.* at 2. Plaintiff further declared that Defendants were "free to cross-examine Regan on any examples from the thousands of records available on Artron.net and Artnet.com, or any other sources disclosed by Regan, since these were the databases on which Regan relied." *Id.*

As noted above, at his deposition, Regan confirmed Defendants' concerns, acknowledging the existence of the Rejected Comparables, Regan Dep. at 36:2-8, the ease by which he could have preserved evidence of the Rejected Comparables had he chosen to, *id.* at 33:6-21, and that he failed to maintain a complete record of the Rejected Comparables. *Id.* at 36:25-37:5. Most importantly, however, Regan confirmed that he "gave significant attention to" and "engaged in a thorough analysis of" certain of the Rejected Comparables that were not identified in his report, and which he could not particularize, at his deposition. *Id.* at 41:2-16.

## **ARGUMENT**

### I.   **PLAINTIFF BEARS THE BURDEN OF DEMONSTRATING THAT HER EXPERT'S OPINIONS ARE ADMISSIBLE**

Rule 702 requires the Court to act as a gatekeeper of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 590 (1993).[3] "The objective . . . is to ensure the *reliability* and *relevancy* of expert testimony." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999) (emphasis added). *See also Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 259 (2d Cir. 2002). If the expert testimony (i) is not based on sufficient facts or data, (ii) does not stem from reliable principles and methods, or (iii) misapplies the principles or methods to the relevant facts, the testimony must be excluded. *See Daubert,* 509 U.S. 579; Fed. R. Evid. 702. As the proponent of expert evidence, Plaintiff has the burden of establishing the admissibility of Regan's opinions by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 175 (1987); *Daubert,* 509 U.S. at 592; *United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007). To do so, Plaintiff must first demonstrate that Regan is qualified through "knowledge, skill, experience, training, or education," and second, establish that Regan's "testimony is the product of reliable principles and methods." Fed. R. Evid. 702.

The test for reliability, which is the heart of *Daubert,* "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93. To assess reliability, the "court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos,* 303 F.3d, at 267.

---

[3] This gatekeeping role applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999).

In assessing reliability under *Daubert*, "expert testimony should be excluded if it is speculative or conjectural." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). *See also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). There must be "a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). "Nothing in either *Daubert* or the [] Rules of Evidence requires a district court to admit expert opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157. If the expert's data or methodology "are simply inadequate to support the conclusions reached, [then] *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d, at 266.

## II.    REGAN'S APPRAISALS SHOULD BE EXCLUDED AS IMPERMISSIBLE "BLACK BOX" OPINIONS

It is well-settled that expert testimony is admissible only if it sufficiently connected to the data on which it is based in a manner that the jury can follow and an opposing party can critique; the Court may not allow an expert to testify to conclusions connected to the data only by the expert's *ipse dixit*. *See Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08CV0931PKCJO, 2014 WL 12788845, at *10 (E.D.N.Y. Mar. 31, 2014) (precluding damages report where expert did not explain how he derived the proposed 2% royalty rate from the data he considered; "a fact-finder reading [the] report would have no more (or less) reason to accept (or reject) a proposed royalty rate of one percent, or of five percent"); *Cornell Univ. v. Hewlett-Packard Co.*, No. 01-CV-1974, 2008 WL 2222189, at *2 (N.D.N.Y. May 27, 2008) (excluding patent damages opinion because the need for "'some approximation' in the reasonable royalty context" doesn't vitiate the "requirement of 'sound economic and factual predicates' for that analysis"). Rather, under *Daubert*, the Court must ensure that Mr. Regan's conclusions are supported by reliable data at *each step in the analysis*, and therefore that "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony*

*inadmissible.*" *Amorgianos*, 303 F.3d at 267 (emphasis in original). That includes the means by which

the expert links the facts on which he relies to the conclusions he proffers. *Id.*

      In an art appraisal based on comparable sales, the analysis must include "making adjustments

to the sale prices of the comparables based on their differences with the property being appraised …

based on marketplace conditions and the objects' characteristics of value." The Appraisal

Foundation, *Valuation of Fine and Decorative Art*, (Last Modified 9/23/20).[4] Thus, an art appraisal

must be excluded where the report fails to explain what factors were considered in selecting

comparable works, "lacks any actual calculations with detailed and complete information elucidating

how the expert arrived at the damage figure," and "fails to explain how [the expert] applied [the

market comparison] approach to the nature and quality of the works []he viewed in order to arrive at

the dollar values []he assigned to each piece," because the Court "ha[s] no way of assessing whether

[the expert's] application of the comparative market data approach to th[e] facts was reliable." *Oleg

Cassini, Inc. v Electrolux Home Products, Inc.*, No. 11-cv-1237 (LGS)(JCF), 2014 WL 1468118, at *8

(S.D.N.Y. Apr. 15, 2014) (excluding art appraisal) (internal quotation omitted).[5] *See also Skolnick v.

Comm'r of Internal Revenue*, 117 T.C.M. (CCH) 1319 (T.C. 2019) (excluding horse appraisal where

appraiser "offers no explanation or analysis to show how he derived these dollar figures").

      Mr. Regan's proposed testimony here suffers from precisely the defect that the experts'

testimony in *Protostorm* and *Oleg Cassini* did – it fails to disclose *how* he derived his appraised values

---

[4] Available at https://appraisalfoundation.sharefile.com/share/view/sc7c4624217e403d8. The Appraisal Foundation is a
non-profit that "serves as an umbrella organization for two independent Boards," including the Appraisal Standards
Board. *See* https://appraisalfoundation.org/imis/TAF/TAF_FAQs.aspx (last accessed January 20, 2021). The Appraisal
Standards Board promulgates the Uniform Standards of Professional Appraisal Practice ("USPAP"), *id.*, by which Mr.
Regan concedes he is bound. Regan Report, ¶ 3. Copies of relevant pages of the USPAP cited herein are annexed to the
Cohen Dec as Ex. 17.

[5] The appraisal report in *Oleg Cassini* also failed to identify the comparable sales on which the appraiser relied, a defect
not present here.

from the underlying data he considered, or the adjustments he made to the price of *any* comparable

sale on which he relied, and thus prevents the Court, opposing counsel, and the jury from

meaningfully evaluating the validity of his conclusions or selection of comparables. For instance, in

his Retail Appraisal, Mr. Regan appraises a Chang Xia painting, *Bamboo and Rock*, at $100,000 as of

August 2009. Cohen Dec Ex. 1, Ex. B at 20. Regan identifies four "Comparables": (1) a painting

sold for $65,550 on June 30, 2009 (described as "Very similar, slightly smaller"); (2) one sold for

$1,859,903 on June 30, 2005; (3) one sold for $61,111 in April 2004; and (4) one sold for $92,400,

five months after the appraisal date, which Mr. Regan identifies as "a useful data point to show

some trajectory." *Id.*[6] Under "Further Details," Mr. Regan provides the only further 'explanation' for

his valuation: "Valuation based on an examination of the comparables and from a review of the

overall appropriate market for these works. See addendum comparables appendix document with

examples." *Id.* The "addendum comparables appendix" consisted only of screenshots of the auction

information for the comparables Mr. Regan relied on. Cohen Dec Ex. 18.

That is the sum-total of Mr. Regan's explanation for how he derived a $100,000 retail value,

as of the appraisal date, for the subject Chang Xia painting. As with the report at issue in *Oleg Cassini*,

Mr. Regan provided no explanation of how he selected those four paintings as relevant comparables,

or why he valued the subject painting at $35,000 more than the "very similar, slightly smaller" Chang

Xia that sold at auction just over a month before the "as of" appraisal date. Nor does he explain why

he valued the subject painting at $1,760,000 less than the painting that sold at auction four years

---

[6] In so doing, Mr. Regan violated the USPAP rules which governed his appraisal. Advisory Opinion 34 of the USPAP provides that, in making retrospective appraisals, appraisers may not use data from after the effective date of the appraisal unless there is "market evidence that data subsequent to the effective date was consistent with market expectations as of the effective date." USPAP at pp 164-165. Mr. Regan neither identifies any such "market evidence" nor suggests that the post-effective date auction price was consistent with market expectations on the effective date. Instead, he appears to have relied on it to determine what a reasonable market value would have been at the time.

earlier, or for *any* of the variance from *any* of the "comparables." He identified no "adjustment factors" that led him to value the subject painting at more or less than any particular comparable, let alone explained the particular amount (or range) of the deviation. He provided no explanation for why he deemed a painting that – in his opinion as expressed in the appraisal – was more than *18 times* more valuable than the subject painting a reasonable "comparable."[7] He identified no market conditions that impacted the appraisal, let alone enabled anyone to follow or challenge *how* they impacted his final valuation or compare the adjustments he made for the Chang Xia against the adjustments he made for any other painting he appraised, so as to assess their reliability or even internal consistency. As with the Rapoport opinion the Eastern District rejected in *Protostorm*, Regan's report gives the jury "no more (or less) reason to accept (or reject)" his $100,000 valuation than it would have to accept or reject his opinion if he had appraised the painting at any other value, from $67,000 to $670,000. In the end, Mr. Regan's opinion boils down to "because I'm experienced in this, trust me" – precisely the type of opinion that cannot be allowed before the jury.[8]

And that fatal error is pervasive, infecting each and every one of the 112 individual appraisals that make up Mr. Regan's FMV Appraisal and Retail Appraisal. While some of the individual appraisals provide additional detail in the "Further Details" section of each painting's appraisal,[9]

---

[7] By analogy, in Mr. Regan's view, the $1.8 million Chang Xia was roughly as comparable to the subject work as a $100,000 apartment is to a $1,800,000 mansion. The use of such a "comparable" in a real estate appraisal would be self-evidently ludicrous, and Mr. Regan's failure to even attempt to justify it here is telling.

[8] Mr. Regan's $15,000 appraisal of the Bian Wu painting identified at page 72 of his FMV Appraisal highlights his "because I say so" appraisal method. The sole "comparable sale" Mr. Regan identifies is a 2002 sale, 17 years before his "October 2019" appraisal date, for $9,000. Mr. Regan provides no explanation for how a sale conducted nearly two decades prior to the valuation date he chose, and before what he described as "exponential growth" in the relevant market, *see* FMV Appraisal at 104, could possibly be meaningfully comparable, and no explanation for how he adjusted his opinion to account for the differences between the works or the major time difference. His valuation is simply pronounced from on high.

[9] Only 44 of the 98 paintings appraised in the FMV Appraisal (the paintings listed on pages 9, 11, 13, 20, 21, 27, 30, 33, 35, 36, 37, 38, 39, 41, 42, 43, 48, 50, 51, 52, 58, 59, 61, 63, 66, 66, 67, 69, 71, 76, 77, 78, 83, 88, 89, 90, 96, 98, 99, and 102) had "Further Details" beyond the stock "[v]aluation based on an examination …See addendum …" or mention of

none explains how Mr. Regan selected his "comparables" or factored in any of the relevant data to derive an appraised value for the subject painting. For *none* of the appraisals does Mr. Regan discuss how he adjusted even one of the "comparable" sales he relied upon to arrive at the appraised value, let alone the basis for any specific adjustment. For *none* of the appraisals does Mr. Regan identify a specific market trajectory he believed relevant or explain how that trajectory supports the specific valuation he intends to testify to. He conducted no statistical analysis of the "comparable" sales or market developments. Defendants are utterly incapable of assessing or attacking the consistency or justifiability of his adjustments, because they are undisclosed. His opinion is the quintessential "black box": certain data, only some of which is specified, went in, and a valuation came out. As such testimony cannot assist the jury, it must be precluded. *Lawrence v. Raymond Corp.*, No. 3:09 CV 1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) ("An expert is not a black box into which data is fed at one end and from which an answer emerges at the other; the Court must be able to see the mechanisms in order to determine if they are reliable and helpful") *aff'd*, 501 F. App'x 515 (6th Cir. 2012); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (precluding expert opinion where "[a]ll of Dr. Keegan's analysis is in a black box out of the view of the court … and the court cannot simply take an expert's word for a specific proposition").

### III.   REGAN'S APPRAISALS SHOULD BE EXCLUDED AS IRRELEVANT TO PLAINTIFF'S DAMAGES CLAIM

It is a fundamental requirement that to be admissible, expert opinion must actually be relevant to the issue on which it is introduced. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597

---

the 2009 Bao Wu Tang exhibition. Of those 44 paintings, only 17 – the paintings at pages 11, 30, 33, 35, 42, 48, 63, 67, 69, 71, 76, 77, 78, 83, 89, 96, and 99 of the FMV Appraisal – had additional *general* discussion of the factors Mr. Regan considered in deriving a value from the listed comparables; none discussed the specifics of how those factors led to any particular appraised value. In addition, for 13 of those paintings with non-stock "Further Details" sections – the ones on pages 21, 27, 38, 41, 50-52, 58, and 66 of the FMV Appraisal – Mr. Regan identified no comparables, and apparently based his appraised values for those 13 paintings on no identified data at all.

(1993)(trial judge must ensure expert testimony is "relevant to the task at hand"). Plaintiff's complaint alleges claims under RICO, and it therefore must prove that it suffered an "injury to its property" under RICO, as a result of the alleged RICO violations, because Andrew Wang sold the 98 Paintings for less than the Estate could have received in a "fair" sale to a hypothetical different purchaser. *See Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014) (to establish a RICO injury, Plaintiff must show a "concrete financial loss"); *Dornberger v. Metro Life Ins. Co.*, 961 F. Supp. 506, 521 (S.D.N.Y. 1997) (plaintiff must demonstrate "some actual, out-of-pocket financial loss"). And, Plaintiff must show that Andrew *intended* to cause such financial loss. *In re Crazy Eddie Sec. Litig.*, 812 F. Supp. 338, 348 (E.D.N.Y. 1993) ("To show intent to defraud, plaintiffs must allege that Peat Marwick acted knowingly to deceive contemplating causing financial loss to another"). To make that showing, Plaintiff must introduce not only evidence of what the Estate could have received in such hypothetical sales, but that Andrew believed the sale prices to be below market value when made. Regan's opinion fails that to provide that information, for several reasons.

First, although the sales at issue took place in 2005, 2006, and 2009, Regan's "Fair Market Value" appraisal purported to assess the value of the 98 Paintings as-of October 9, 2019 – a date completely irrelevant to any claims in this action. Because that opinion cannot assist the jury in determining whether the 98 Paintings were sold for less than fair value *at the time of sale*, it is irrelevant and prejudicial. And second, Mr. Regan's Retail Appraisal is likewise focused on the wrong date, and therefore irrelevant. Andrew Wang first proposed the Yu Da Jin sale to the Estate in late April or early May, 2008 – making that date the relevant date for evaluating any alleged fraudulent intent on Andrew's part. *See* Cohen Dec Ex. 19. Yet Regan's Retail Appraisal is made as of August 17, 2009 – the date the sale was finally consummated after a lengthy delay. Retail Appraisal. Regan's

Retail Appraisal thus provides no evidence that Andrew Wang intended to cause the Estate any

financial loss. For both of those reasons, his opinions are irrelevant and should be precluded.

### A. The FMV Appraisal is Irrelevant and Inadmissible

An expert report that uses the wrong dates to calculate damages is irrelevant and

inadmissible. *See, e.g.*, *Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*, No. 08-CV-6256, 2012 WL

6628878, at *6 (W.D.N.Y. Dec. 19, 2012) (that expert used wrong dates to calculate damages

warranted preclusion under *Daubert*). Mr. Regan's own reports make clear his appraisal of the "fair

market value" of the 98 Paintings as of October 2019 cannot "logically advance" the jury's

consideration of whether Plaintiff was damaged by the sales. *See Optimum Techs., Inc. v. Henkel*

*Consumer Adhesives, Inc.*, No. 1:04 CV 1082 TWT, 2006 WL 1663357, at *4 (N.D. Ga. June 14, 2006)

(precluding expert testimony that could not logically advance plaintiff's damages claims), *aff'd*, 496

F.3d 1231 (11th Cir. 2007). Nowhere in Mr. Regan's report or appraisals does he suggest that the

purported October 2019 values are relevant to whether the 2005, 2006, and 2009 sales were made at

fair prices, let alone provide a mechanism for using the 2019 values to answer that question. In fact,

that Regan provided a separate "as of the date of sale" appraisal for the 14 paintings sold to Yu Da

Jin confirms that there is no easy, straight line the jury could draw from the 2019 appraised values –

even if believed to be accurate – to the 98 Paintings' "true values" on their dates of sale.

Simply comparing the differing appraisals for the Yu Da Jin paintings confirms as much,

because there is no consistency in the variation between their appraised value as of 2019 and their

appraised value as of 2009. Mr. Regan's appraisal of the "Lu Ji" more than triples, from $55,000 (as

of 2009) to $185,000 (as of October 2019). *Compare* FMV Appraisal at 89 *with* Retail Appraisal at 9.

The value of the next painting in the appraisals – a piece attributed to Zeng Jing – only doubles

from 2009 to 2019, though Mr. Regan relied on the same three comparable sales in his analysis of

both pieces. *Compare* FMV Appraisal at 90 *with* Retail Appraisal at 10. The Fang Congyi appreciates

800%, *compare* FMV Appraisal at 91 *with* Retail Appraisal at 11, while the Yan Hui appreciates 20%.

*Compare* FMV Appraisal at 101 *with* Retail Appraisal at 21. Consistent with the general lack of

disclosure discussed in Point II above, Mr. Regan provides no explanation for this variation, and

even if there were an explanation in the undisclosed data he considered, there is simply no way that a

lay jury could ever correctly reason it out and apply it to reach any understanding, based on Mr.

Regan's FMV Appraisal, of what the "fair value" of the 98 Paintings was at the time of sale.

Moreover, even if a 2019 fair market valuation could have some attenuated relevance to the

value of sales that occurred a decade or more prior, the Court would still be required to exclude

Regan's testimony as substantially more prejudicial than probative. A court may exclude otherwise

relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

Fed. R. Evid. 403. Evidence is unfairly prejudicial when "it tends to have some adverse effect upon a

defendant beyond tending to prove the fact or issue that justified its admission into evidence."

*United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008), *quoting United States v. Figueroa*, 618 F.3d 934,

943 (2d Cir. 1980). Here, there is a substantial threat that the jury would be swayed by hearing an

expert testify to an allegedly large, but fundamentally irrelevant, 2019 value of the paintings at issue,

which "cannot help but skew the damages horizon for the jury." *LaserDynamics, Inc. v. Quanta*

*Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) (explaining that 'entire market value' rule is designed

to prevent patentees from placing large but tenuously relevant dollar figures before the jury and then

"adjusting" with a low royalty rate to make "proffered damages amount appear modest by

comparison, and to artificially inflate the jury's damages calculation"), *quoting Uniloc USA Inc. v.*

*Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011). Lending such testimony the "special weight" of

"expert" testimony is unwarranted, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 5662

(S.D.N.Y. 2007) (exclusion on Rule 403 grounds particularly warranted in the context of moderately probative expert testimony), and the Court must exclude Regan's testimony for that reason, as well.

**B.   The Retail Appraisal is Likewise Irrelevant and Inadmissible**

For the same reasons, the Retail Appraisal should be excluded as irrelevant. In this RICO action, Plaintiff alleges that Andrew Wang sought to defraud the Estate by selling its paintings at far below their true value. Doc. No. 229 at 49. As such, Plaintiff must provide evidence at trial that Andrew knew *at the time that he proposed the sales* that the prices on offer were too low. *Malvar Egerique v. Chowaiki*, No. 19 CIV. 3110 (KPF), 2020 WL 1974228, at *10 (S.D.N.Y. Apr. 24, 2020) (RICO plaintiff must prove intent to defraud) *quoting U.S. v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). Regan's Retail Appraisal cannot provide that evidence, because it, too, is made as of the wrong date.

After Andrew Wang proposed the sale to Yu Da Jin, on May 2, 2008, Elin Ewald provided her review of the proposed valuations, identifying the overall package as reasonable and two paintings in particular as true coups for the Estate based on the available comparables – a Fang Congyi, at a proposed $75,000.00 sale price, and a Yan Hui at a proposed price of $200,000.00. Cohen Dec. Ex. 20 at KING 002645-47. While Ewald did have concerns about the pricing of two of the paintings – a Huang Shen and a Wang Yuan-Qi, *id.* – she eventually agreed that the price point for the Wang Yuan-Qi was appropriate given that it had suffered insect damage. Cohen Dec Ex. 20. And while she continued to believe that the Huang Shen was priced too low, the overall package was so good for the Estate that she did not want that issue to prevent the sale. *Id.* In June 2008, based on Ewald's approval, Andrew's counsel forwarded the contract to counsel for the Public Administrator for final approval, Cohen Dec Ex. 21, and Andrew began making arrangements to consummate the sale. But the Estate had difficulty gathering all of the paintings, some of which had previously been put out for auction, *see* Cohen Dec Ex. 22**,** and the buyer

eventually decided to insist on a discount. Cohen Dec Ex. 23. The sale was therefore not finally approved until March 2009. Cohen Dec Ex. 24. Yet Regan's Retail Appraisal values the 14 Yue Da Jin Paintings not as of May 2008 – when the price was negotiated – but as of August 17, 2009, when the sale contract was fully executed. The difference was critical, vastly skewing the appraised value.

For example, the initial offering price for the Yan Hui was $200,000.00. Cohen Dec Ex. 19 at KING 002647. Elin Ewald identified that as far in excess of the value indicated by the available marketplace information, *id.* ("[i]f possible to obtain this amount it is well done"), and Regan effectively agrees in his Retail Appraisal: the two comparable sales he identified as predating May 2008 were one piece that reportedly sold for $13,285 in 2005, and another that reportedly sold for $10,894 in June 2004. Retail Appraisal at 21. Yet Regan appraised the Yan Hui at $1,000,000 as of August 2009, apparently on the strength of a *December, 2008* sale of an extraordinarily famous Yan Hui for $1,163,000. *Id.* While Regan's decision to appraise the Estate's Yan Hui in line with the December sale is questionable for various reasons, any opinion based on the December sale is inadmissible for a very basic one: time is linear. Andrew Wang – like Elin Ewald – couldn't have been expected to know when he negotiated the $200,000 sale price in May 2008 that another, far more famous Yan Hui would sell for over $1,000,000 months later, and using that subsequent sale in an attempt to prove fraud is both irrelevant and self-evidently far more prejudicial than probative.

Nor was the time element limited to the Yan Hui. Of the paintings Regan assessed in the Retail Appraisal, his appraisal values for four of them – the Zeng Jing, Fang Congyi, Mo Shilong, and Wu Wei – were primarily based on auction results occurring after the parties to the sale had agreed on the baseline prices. For the Fang Congyi, the May 2008 price ($75,000) is roughly twice the value of the highest of Regan's pre-May 2008 comparables ($36,769). Retail Appraisal at 11. That is consistent with Ewald's description of the proposed price as "considerably higher than any

records we found." Cohen Dec Ex. 19 at King 002646. Because the Retail Appraisal, like the FMV

Appraisal, examines the paintings' values on a wrong and irrelevant date, it should be excluded.

### IV.   REGAN'S APPRAISALS SHOULD BE EXCLUDED AS BASED ON UNRELIABLE DATA

"Where an appraisal or other expert testimony rests on inadequate factual foundations,

problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded

under Rule 702." *Davis v Carroll,* 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013) (excluding art appraisal

expert for "lack[ing] an adequate factual basis for [his] general conclusion"). Here, the Court must

exclude Mr. Regan's appraisals of the 15 paintings on pages 21, 27, 38, 41, 51, 52, 53, 58, and 61 of

the FMV Appraisal, because they rely on no foundation at all beyond Mr. Regan's say so; he does

not identify a single comparable sale for any of those paintings. In addition, the Appraisals must be

excluded to the extent they are based on the "inadequate factual foundation" of mainland Chinese

auction sales records, which do not necessarily represent actual consummated sales. Not only did

Regan rely on that data in his appraisals, but he failed to apply any discount to correct for the

"deadbeat bidder" problem, effectively assuming that each of the sales on which he relied was

actually consummated at that price. Because this assumption is unsupportable, it is fatal to Regan's

analysis. *See In re Ambac Financial Group, Inc.* 457 B.R. 299 (S.D.N.Y. Bankr. Sept. 23, 2011) (excluding

expert valuation testimony which relied on assumptions that failed to take into account the troubled

circumstances of the market and thus were "at odds with reality").

The prevalence of deadbeat bidders in the mainland Chinese auction market is well

understood in the art industry. "It's no secret that buyers defaulting on successful bids in auctions –

including for many pricey lots – is a problem that has plagued the market in mainland [China] for

quite some time." Cohen Dec Ex. 8. Since approximately 2011, roughly half of the sales reported by

mainland Chinese auction houses were never in fact consummated. Cohen Dec Exs. 8, 10, 12.

Further, "[t]he nonpayment rate is even greater when applied to lots over [$1.5 million] for which [as of the date of the report] only *28 percent of the value had been paid*." Cohen Dec Ex. 8. *See also* Cohen Dec Exs. 7 ("In China, bidding is not always perceived as a legal obligation . . . and the fall of a gavel can be seen as the start of a negotiating process, not the end."); 11 ("In China, non-payment for winning bids is very common indeed… [T]he higher the price, the more likely it is not to be paid"). Sometimes that is because, rather than reflecting a price that the bidder is willing to pay, some auction participants in mainland Chinese auctions "just bid up a price to increase the value of works by a particular artist they collect." Cohen Dec Ex. 13. As a result, "[n]o one will take [auction] results in mainland China very seriously." *Id.*

Even Regan openly acknowledges the prevalence of deadbeat bidders, Regan Dep. at 294:8-12 (defining a deadbeat-bidder as "somebody who doesn't either completely pay or decides after the sale I have changed my mind, I don't want to buy it, buyer's remorse in a sense"), conceding, as he must, that "standard industry annual market reports such as TEFAF, UBS and the CAA/Artnet … all agree that incidences of 'non-payment' have been a concern in the reporting from Chinese auction houses." Regan Reply Report, ¶ 10.  In fact, Regan squarely admits that mainland Chinese auction houses "are not great," Regan Dep. at 172:24-173:25, and that industry data evidencing an unconsummated sales rate for mainland Chinese auction houses approaching 50% presents a "problem" for his analysis. *Id.* at 329:22-330:17. Critically, Regan was unable to confirm with even 50% certainty whether *any* of the mainland Chinese auction house data upon which he relies were the product of consummated sales. *Id.* at 335:18-336:12.

To be clear, Regan has not established, because he cannot, that any of the mainland China auction data upon which he relies were the product of legitimate, consummated sales. Regan's excuse for relying on such potentially invalid data – that if he didn't rely on such data he wouldn't

have been able to do any appraisal at all, Regan Dep. at 327:18-328:9 – cannot justify his reliance on unreliable sale prices. *See In re Mirena IUD Products Liab. Litig.*, 169 F Supp 3d 396, 445 (S.D.N.Y. 2016) (expert's "lack of access to reliable data does not justify use of unreliable data, and militates against admission under *Daubert.*").

Because Regan cannot establish that the mainland Chinese auction records upon which he relied resulted from consummated sales, Plaintiff cannot show his analysis is reliable. Because Regan relied on mainland Chinese auction records as "comparable sales" for 78 of the 98 Paintings in the FMV Appraisal, and 12 of the 14 paintings in the Retail Appraisal,[10] but has no basis beyond his own assumptions to support the claim that those sale prices were real, Regan's valuation opinions with respect to those paintings should be excluded.[11] *See Kumho Tire*, 526 U.S. at 157; *Zaremba v. Gen. Motors Corp.,* 360 F.3d 355, 357-58 (2d Cir. 2004) (affirming exclusion of expert opinion based on "unsupported conjecture"); *United States v. 12.94 Acres of Land in the County of Solano*, CIV S-07-2172 FCDEFB, 2009 WL 4828714, at *7 (E.D. Cal Dec. 9, 2009) (excluding appraisal expert opinion "based on unreliable data."). *See also Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 182 (S.D.N.Y. 2006) (excluding expert who failed to justify relationship between variables in analysis).

---

[10] In the Retail Appraisal, the Lu Ji (Retail Appraisal at 9) and Wen Shu (*id.* at 18) were not based on at least one "comparable sale" from a mainland China auction house. In the FMV Appraisal (aside from the 15 paintings for which Mr. Regan identified no comparables), only his appraisals of the 5 paintings appraised on pages 11, 35, 79, 86, and 89 do not rely on at least one "comparable sale" result from a mainland China auction house. *See* FMV Appraisal. Thus, if the Court excludes Mr. Regan's appraisals relying on mainland China auction sales, as well as those without any comparables at all, his testimony would be limited to his appraisals of the Lu Ji and Wen Shu on the Retail Appraisal, and, on his FMV Appraisal, of the Anonymous *Horses & Grooms* (at page 11 of the FMV Appraisal), Qian Xuan (page 35) Anonymous in the Style of Wang Meng (page 79), Yu Zhiding (page 86), and Lu Ji (page 89).

[11] Because (as discussed in Point II above) Regan did not disclose how he adjusted from the comparable sales to derive his appraised values, the Court cannot simply exclude the unreliable comparables and allow Mr. Regan to mechanically adjust his math accordingly; it must exclude the entire opinion.

### V.   REGAN'S APPRAISALS SHOULD BE EXCLUDED FOR FAILURE TO DISCLOSE ALL FACTS AND DATA REGAN CONSIDERED IN FORMING HIS OPINIONS

Testifying experts such as Regan are required to disclose all "facts or data considered … in forming [their opinions]." Fed. R. Civ. P. 26(a)(2)(B) (2021). This disclosure obligation is "interpreted broadly" and includes "any facts or data 'considered' by the expert …, not only those relied upon." Fed. R. Civ. P. 26, Advisory Committee Notes to 2010 Amendments, note to subdivision (a)(2)(B). "[C]ourts have embraced an objective test that defines 'considered' [in Rule 26(a)(2)(B)(ii)] as anything received, reviewed, read, or authored by the expert, before or in connection with the forming of his opinion, if the subject matter relates to the facts or opinions expressed." *In re Mirena IUD Products Liab. Litig.*, 169 F. Supp. 3d 396, 470 (S.D.N.Y. 2016).

Broad disclosure of information "considered" by an expert is required because "[a]llowing [an expert] to testify without having fully disclosed the bases for [his] opinions is harmful to [litigants] because they cannot effectively cross-examine [such experts]." *Id.* at 472. Indeed, an expert must disclose all materials considered "even if in the end he does not rely on them in formulating his expert opinion, because such materials often contain effective ammunition for cross-examination." *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.,* 412 F.3d 745, 751 (7th Cir. 2005). Thus, Rule 37 requires preclusion of expert testimony where a party fails to disclose all facts and data the expert considered, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (2021). Because the rule focuses on the prejudice to the receiving party rather than the bad faith of the propounding party, exclusion of expert testimony for failure to disclose is appropriate even in the absence of such bad faith. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). "The burden to prove substantial justification or harmlessness rests with the dilatory

party." *Schiller v. City of New York*, No. 04-civ-7921(RJS)(JCF), 2008 WL 4525341, at *3 (S.D.N.Y. Oct. 9, 2008) citing *Yeti by Molly,* 259 F.3d at 1107.

Here, there is no doubt that Plaintiff failed to comply with Rule 26's disclosure obligations. Regan confirmed the existence of the Rejected Comparables, Regan Dep. at 36:2-8, which are not merely works of art Regan incidentally viewed while collecting the comparables he included in the Appraisals. Rather, they include works of art that Regan admittedly "gave significant attention to" and "engaged in a thorough analysis of" before deciding not to rely on them. Regan Dep. at 41:2-16. As such, they are materials Regan "considered" in forming his opinions, and had to be disclosed. *Employees Committed for Justice v. Eastman Kodak Co.*, 251 F.R.D. 101, 104 (W.D.N.Y. 2008) ("Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires disclosure of materials considered, reviewed or generated by the expert in forming the opinion, irrespective of whether the materials were actually relied on by the expert"). Nevertheless, Plaintiff has refused to produce evidence of the Rejected Comparables despite Defendants' requests, and despite the risk that Regan's opinion might be excluded if Plaintiff failed to supplement the disclosures. *Cohlmia v. Ardent Health Servs., LLC*, 254 F.R.D. 426, 429 (N.D. Okla. 2008) ("These directives are mandatory. A litigant who fails to comply with these requirements does so at his own peril").

Plaintiff must therefore show that the failure to disclose was either justified or harmless in order to avoid preclusion of Regan's testimony. It was neither. Failure to disclose may be substantially justified where disclosures or amendments are late but complete and correct, if enough time remains for the opposing party to adequately prepare. *See Redmond-Nieves Okuma Am. Corp.*, 332 F.R.D. 418, 420 (D. Mass. 2019) (delayed disclosure due to illness). It may be justified if the failure to disclose is due to the opposing party's failure to produce essential documents, *Pauls v. Green*, 816 F. Supp. 2d 961, 977 (D. Idaho 2011), or if the disclosure is in a different format but includes all

relevant information. *Jackson v. Kansas City Kansas Pub. Sch. Unified Sch. Dist. No. 500*, 378 F. Supp. 3d 1016, 1024 (D. Kan. 2019) (disclosure sufficient when documents were not disclosed, but information sufficient to allow requesting party to locate them was), *aff'd*, 799 F. App'x 586 (10th Cir. 2020), *cert. denied*, 140 S. Ct. 2834, 207 L. Ed. 2d 162 (2020). Indeed, disclosure is required even if burdensome. *Delozier v. First Nat. Bank of Gatlinburg*, 109 F.R.D. 161, 164 (E.D. Tenn. 1986). Here, of course, none of this applies; Plaintiff has entirely failed to disclose the relevant documents, and there was no burden; disclosure would have required nothing more than Regan utilizing the "print screen" function while performing his research. Regan Dep. at 33:6-21.

Nor was the failure to disclose harmless; to the contrary, it was deeply prejudicial. In any "market comparison" appraisal, the comparables relied upon are the bedrock that supports the appraiser's opinion of value. *See* USPAP Standards Rule 7-4(a) ("When a sales comparison approach is necessary for credible assignment results, an appraiser *must* analyze such comparable sales data as are available to indicate a value conclusion") (emphasis added). Accordingly, it is critical that parties challenging an appraisal be afforded the opportunity to cross-examine the appraiser not just on the comparables explicitly relied upon, but also those considered, but ultimately rejected (*i.e.*, the Rejected Comparables). Plaintiff's failure to produce evidence of the Rejected Comparables has thus improperly deprived Defendants of what would have been the most fertile ground for cross-examining Regan on his choice of comparable sales. *See In re Mirena IUD Products Liab. Litig.*, 169 F Supp 3d 396, 472 (S.D.N.Y. 2016). *See also Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005) (expert must disclose materials reviewed "even if in the end he does not rely on them in formulating his expert opinion, because such materials often contain effective ammunition for cross-examination").

Nor is that prejudice correctable. In response to Defendants' deficiency letter, Plaintiff suggested that her failure to disclose the Rejected Comparables was harmless, because Defendants could access the same databases Mr. Regan did and select other sales to cross-examine Mr. Regan on. Not so, for two reasons. First, because Mr. Regan *also* failed to disclose the particular searches he ran on those databases, Defendants cannot even recreate the broad lists from which Mr. Regan selected the sales he considered, including both the comparables and the Rejected Comparables. Second, even if Defendants could recreate the broadest of Mr. Regan's searches (for example, by searching only by artist names), that would generate thousands of results,[12] leaving identifying the Rejected Comparables, as to which cross-examination would be most useful, the equivalent of looking for a needle in a haystack.

Given these facts, the Court must exclude Regan's Appraisals. *In re Mirena IUD Products Liab. Litig.*, 169 F Supp 3d 396, 471-472 (S.D.N.Y. 2016) (excluding portions of expert's opinion for failure to disclose all information considered); *Jinghong Song v Yao Bros. Group LP*, 10-civ-04157 RKE, 2012 WL 1557372, at *2 (S.D.N.Y. May 2, 2012) (excluding expert for failing to "adequately identify the 'facts or data' considered by the witness in forming his opinions as required by Rule 26"); *Universe Antiques, Inc. v. Vareika*, 10 CIV. 3629, 2011 WL 5117057, at *6 (S.D.N.Y. Oct. 21, 2011) (excluding expert art appraiser for failure to comply with Rule 26).

## CONCLUSION

In sum, Regan's proposed testimony fails nearly every conceivable test of admissibility. His opinion violates the methodological requirements for art appraisals, depends primarily on unreliable

---

[12] For instance, searching for the artist Shitao in the artnet.com database – just one artist on one of the many databases of auction results Mr. Regan searched to identify his comparables, *see* Regan Report ¶ 17, yields 892 auction results. *See* Cohen Dec Ex. 25. A search of the artnet.com database for Bada Shanren yields 998 auction results. *Id.*, Ex. 26.

data, and fails to detail how the data on which he relied supported his conclusions, which are in any

event irrelevant to the damages issues before the jury – all of which require exclusion of his opinion

under *Daubert*. And, Plaintiff and Mr. Regan failed to disclose the full facts and data he considered in

forming his opinions, requiring exclusion under Rule 37. The motion should be granted.


Dated:    New York, New York             Kamerman, Uncyk, Soniker & Klein P.C.
          February 26, 2021
                                         _____/s/ *Akiva M. Cohen*_____
                                         Akiva M. Cohen
                                         Attorneys for Defendants
                                         1700 Broadway
                                         New York, New York  10019
                                         (212) 400-4930
                                         acohen@kusklaw.com