**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

YIEN-KOO KING,

                            **Plaintiff,**

      -against-

ANDREW WANG, SHOU-KUNG WANG, BAO WU
TANG, JIAN BAO GALLERY, ANTHONY CHOU,
CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE
DA-JIN and JOHN DOES 1-9,

                            **Defendants.**

<u>1:14-Civ-07694-(LJL) (JLC)</u>

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE EXPERT
TESTIMONY OF PATRICK REGAN

**SAM P. ISRAEL, P.C.**
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ........................................................................1

FACTS ...................................................................................................5

    **A.** **The Estate's Collection of Assets in 2003 and the 2004 Sotheby's Appraisal** ..5

    **B.** **The Initial Report of Kenneth J. Linsner** ................................................6

    **C.** **The Initial Report of Patrick Regan** ........................................................8

    **D.** **The Rebuttal Report of Kenneth J. Linsner** ...........................................11

    **E.** **The Rebuttal Report and Deposition of Patrick Regan** ............................12

ARGUMENT ...........................................................................................13

**I.**      **The Regan Report Is Not a Black Box and Is Admissible Under Rule 702: The Report Fully Discloses the Market Data/Comparables Relied Upon and the Wangs' Case Citations Are Easily Distinguishable** ..........................................13

**II.**     **Patrick Regan's FMV and RV Appraisals Are Both Relevant and Admissible** ........................................................................................20

        **A.** *The FMV Appraisal Is Relevant to All Claims: Under Both RICO and State Law, the Measure of Damages for the Estate's Property Injury Is the "Present Value" of the 98 Self-Dealt Paintings, Not Simply the Price Differential Between Market Value and Actual Price at the Time of Sale* ........................................................................................20

        **B.** *The RV Appraisal Is Relevant to All Claims: The 2009 Retail Value Is Relevant to Show the Wangs' Fraud and as an Alternative Measure of Damages under the RICO and the State Law Claims* ..........................23

**III.**    **The FMV and RV Appraisals Are Reliable: Mr. Regan's Reports Are Compliant with Industry Standards and the Wangs' Speculation that *Some* of the Comparable Sales *May* Have Never Been Consummated Is Insufficient to Preclude Them** ..................................................................................25

**IV.**    **Patrick Regan Disclosed All Facts Considered in Forming His Opinion and Even If Any Deficiency Exists, It Is Substantially Justified and Harmless** ....27

CONCLUSION ........................................................................................30

# Table of Authorities

**CASES**

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ...........................................................................................14

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
769 F.Supp.2d 269 (S.D.N.Y. 2011).....................................................................15, 16

*Chevron Corp. v. Donziger*,
974 F.Supp. 2d 362 (S.D.N.Y. 2014)...........................................................................23

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d. 1036 (9th Cir. 2014) ....................................................................................26

*Coene v. 3M Co.*,
303 F.RD. 32 (W.D.N.Y. 2014)...................................................................................28

*Commercial Union Assurance Co. v. Milken*,
17 F.3d 608 (2d Cir. 1994)...........................................................................................22

*Cornell Univ. v. Hewlett-Packard Co.*,
No. 01-cv-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008) ...........................17, 19

*Daubert v. Merrel Dow Pharm., Inc.,*
509 U.S. 579 (1993).....................................................................................................13

*DeMauro v. DeMauro,*
115 F.3d 94 (1st Cir. 1997).......................................................................................3, 22

*Design Strategy, Inc. v. Davis,*
469 F.3d 284 (2d Cir. 2006)..........................................................................................28

*E.J. Brooks Co. v. Cambridge Sec. Seals,*
31 N.Y.3d 441 (N.Y. Ct. App. 2018)............................................................................21

*Estate of Rothko,*
84 Misc.2D 830 (Dec. 18, 1975)..........................................................................3, 20, 21

*Evans v. Catalino,*
88 A.D.2d 780 (N.Y. App. Div. 1982) ..........................................................................22

*Evans v. Wash. Metro Area Transit Auth.*,
647 F.Supp. 2d 175 (Dist. D.C. 2009) ..........................................................................16

*Haas v. Delaware &Hudson Ry., Co.*,
282 F.App'x 84 (2d Cir. 2008) ...................................................................................29

*Hoffman v. L&M Arts*,
2013 U.S. Dist. LEXIS 15101 (N.D. Tex. Feb. 5, 2013)..............................................16

*Hogan v. Vandewater*,
2016 U.S. Dist. LEXIS 194494 (N.D.N.Y. Apr. 27, 2016).........................................29

*In re Creekside Senior Apts.*, LP,
477 B.R. 40 (6th Cir. Bankr. App. Pan. 2012)..............................................................16

*In re Estate of Rothko*,
43 N.Y.2d 305 (N.Y. Ct. App. 1977)....................................................................... *passim*

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
643 F.Supp.2d 471, 482 (S.D.N.Y. 2009) ............................................................16, 27

*Integrated Liner Techs., Inc. v. Specialty Silicone Prods.*,
No. 09-cv-1285, 2012 U.S. Dist. LEXIS 157381 (N.D.N.Y. Nov. 2, 2012) ................15

*Isaak v. Trumbull Sav. & Loan Co.*,
169 F.3d 390 (6th Cir. 1999) ...............................................................................3, 22

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................................................................................................13

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982).............................................................................................3, 22

*Lynch v. Trek Bicycle Corp.*,
374 Fed. Appx. 204 (2d Cir. 2010).............................................................................15

*McCoy v. Whirlpool Corp.*,
214 F.R.D. 646 (Kan. Dist. 2003) ..............................................................................27

*Moore v. Keller*,
No. 15-cv-1230, 2020 WL 6384691, 2020 U.S. Dist. LEXIS 201472
(N.D.N.Y. Oct. 28, 2020) ...........................................................................................26

*Oleg Cassini, Inc. v. Electrolux Home Prods.*,
Index No. 11-cv-1237, 2014 U.S. Dist. LEXIS 9967 (S.D.N.Y. Jan. 21, 2014) .................2, 17, 18

*Outley v. City of New York*,
837 F.2d 587 (2d Cir. 1988)........................................................................................29

*Protostorm, LLC v. Antonelli, Terry, Stout & Kruas, LLP*,
No. 08-cv-0931PKCJO, 2014 WL 1278845 (E.D.N.Y. Mar. 31, 2014) ................................17, 19

*SEC v. Nutmeg Grp., LLC*,
09-cv-1775, 2017 U.S. Dist. LEXIS 65196 (N.D. Ill. Apr. 28, 2017)..........................................16

*Sirois v. USAA Cas. Ins. Co.*,
No. 3:16-cv-1172, 2019 U.S. Dist. LEXIS 7617;
 2019 WL 235326 (Dist. Conn., Jan. 16, 2019) ..........................................................................29

*Skolnick v. Comm'r*,
T.C. Memo. 2019-64 (U.S.T.C. Jun. 3, 2019) ...................................................................2, 17, 18

*Smith v. City of New York*,
12-civ.-4922, 2015 U.S. Dist. LEXIS 102669 (S.D.N.Y. Aug. 5, 2015) ....................................26

*United States v. Coppola*,
No. CV-88-3456, 1994 U.S. Dist. LEXIS 16848,
(E.D.N.Y Nov. 17, 1994) *aff'd* 85 F.3d 1015 (2d Cir. 1996) .....................................................23

*Wal-Mart Stores, Inc. v. Qore Inc.*,
No.06CV326, 2009 U.S. Dist. LEXIS 6145 (N.D. Miss. Jan. 28, 2009) ....................................16

*Walsh v. Chez*,
583 F.3d 990 (7th Cir. 2009) ......................................................................................................27

*Whitehouse Hotel L.P. v. Comm'r*,
615 F.3d 321 (5th Cir. 2010) ......................................................................................................16

*Will of Rothko*,
56 A.D.2d 499 (N.Y. App. Div. 1977) ..............................................................................20, 21, 23

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Trans., LLC*,
571 F.3d 206 (2d Cir. 2009) ..................................................................................................13, 14

## STATUTES, RULES, REGULATIONS

18 U.S.C. 1964(c)  ....................................................................................................22

Fed. R. Evid. Rule 702.......................................................................................... *passim*

Fed. R. Civ. P. Rule 26(a)(2)(B) ............................................................................. *passim*

Fed. R. Civ. P. 37(c)(1)...............................................................................................28

Plaintiff Yien-Koo Wang King ("Plaintiff" or "Y.K. King"), on behalf of the Estate of Chi-Chuan Wang (the "Estate"), submits this memorandum in opposition to Defendant Andrew Wang ("A.Wang") and Shou-Kung Wang's ("S.K. Wang," together, the "Wangs" or "Defendants") motion to preclude the testimony of Patrick Regan at trial (the "Motion").

## PRELIMINARY STATEMENT

In the face of overwhelming evidence of guilt, the Wangs have deliberately chosen not to submit any appraisal of their own in this self-dealing case notwithstanding the fact that it revolves around the value of 98 classical Chinese paintings (the "98 Paintings"). They made this decision, almost certainly, because it would be impossible for any qualified and credible expert to appraise the paintings at a value that is not in the scores of millions of dollars. As the last play in their all-or-nothing gambit, the Wangs now seek to entirely preclude from trial the testimony of the Plaintiff's expert—Patrick Regan, an Asian art specialist from the Winston Art Group. They claim his report on the value of the 98 Paintings is an irrelevant, "black-box" appraisal based on unreliable data. Careful review, however, of Mr. Regan's submissions and the inapplicable case-law the Wangs tortuously cite compel the Motion's complete denial.

First, Mr. Regan's report (consisting of two USPAP-compliant[1] appraisals; the "Regan Report") is sufficiently detailed in accordance with Fed. R. Civ. P. Rule 26(a)(2)(B) and reliable in accordance with Fed. R. Evid. Rule 702. Mr. Regan supports his conclusions with direct citation to nearly 500 comparable auction sales; citations to Chinese market reports, data, and trends; partial reliance on an IRS-approved appraisal from Sotheby's; and well-recognized appraisal methodologies. The Wangs' argument that Mr. Regan's valuations are seemingly plucked from thin air is absurd.  In fact, his valuations for thirty-five (35) of the 98 Paintings are based in part

---

[1] The Uniform Standards of Professional Appraisal Practice ("USPAP"). *See* Declaration of Timothy Savitsky dated March 19, 2021 ("Savitsky Declaration") Exh. 19 (USPAP Standard 8, governing appraisal contents).

on the *actual* auction hammer prices for those same paintings following their sale by the Estate between 2005 and 2009. The combined sales prices of these thirty-five resales is $42,155,085.00—more than half the 98 Paintings' total value.

In attacking the Regan Report as an inadmissible black box, the Wangs cite a total of two cases in which a court rejected an expert's appraisal of property: (1) *Oleg Cassini*[2] (concerning an appraisal of a series of damaged art sketches) and (2) *Skolnick*[3] (concerning the appraisal of a stable of horses). But the Wangs reliance on these cases ignores a crucial distinguishing fact. The appraisals in both instances were rejected because they failed to identify *any* (*i.e.* zero) market comparables. These were not just errors in appraisal detail either: the experts effectively admitted they did not consider or even look at the relevant markets at all. In stark and dispositive contrast, Mr. Regan's Fair Market Value Report of the October 2019 value of the 98 Paintings[4] cites to 414 unique market comparables and his Retail Value Report[5] of the 14 Paintings sold to "Yue Da Jin" cites to 63 unique market comparable. And though there are twelve instances where Mr. Regan could not locate a specific comparable for an appraised painting, he relied in those cases on a collection of miscellaneous "Low Value General Comparables," (which were produced); general market trends (which were disclosed), and a tax appraisal of the Estate's paintings conducted by Sotheby's in 2004 (which all parties have deemed reasonably reliable; the "Sotheby's Appraisal"). In any event, the combined value of the 12 paintings that have no specific comparables assigned to them is only 1% of the aggregate fair market value of the 98 Paintings.

---

[2] *Oleg Cassini, Inc. v. Electrolux Home Prods.*, Index No. 11-cv-1237, 2014 U.S. Dist. LEXIS 9967 (S.D.N.Y. Jan. 21, 2014) (U.S.M.J. Francis).

[3] *Skolnick v. Comm'r*, T.C. Memo. 2019-64 (U.S.T.C. Jun. 3, 2019).

[4] The "FMV Appraisal."

[5] The "RV Appraisal."

Second, the Wangs' argument that the FMV Appraisal is irrelevant reveals their misunderstanding of the applicable injury and damages law in this case.[6]  The present value of the 98 Paintings matters because it represents the injury to the Estate's property. This is true for both the state law and RICO claims. "'Injury to property' for RICO purposes is generally determined by state law."[7] In New York, it is black-letter law that when an executor fraudulently sells estate assets to himself, the estate is injured by the loss of property through the "inherently wrongful transactions," not "merely," per the New York Court of Appeals, by a difference between the self-dealt property's fair market value at the time of the sale and the amount for which it sold.[8] For this reason calculating the financial loss suffered by an estate due to self-dealing entails determining "appreciation damages" (*i.e.* the "present value" of the property).[9] The $71,424,000 in damages here are therefore not special or "punitive damages in a true sense, rather they are damages intended to make the estate whole."[10] They represent the actual, concrete injury to the Estate's property due to the Wangs' fraud and are recoverable under federal and state law.[11] If it were otherwise, the Wangs would retain a $70 million windfall in appreciation value despite their crimes.

---

[6] The Plaintiff disclosed her expected calculation of damages in the Rule 26(a) disclosures. *See* Savitsky Decl. Exh. 16 at p. 9.

[7] *Isaak v. Trumbull Sav. & Loan Co*., 169 F.3d 390, 397 (6th Cir. 1999) (*citing DeMauro v. DeMauro*, 115 F.3d 94, 96 (1st Cir. 1997)); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law.").

[8] *In re Estate of Rothko*, 43 N.Y.2d 305, 322 (N.Y. Ct. App. 1977) ("*Rothko*").

[9] *Estate of Rothko*, 84 Misc.2d 830, 874 (Dec. 18, 1975) ("*Estate of Rothko*") (When a fiduciary self deals "beneficiaries have the option of charging the fiduciary with the value of the property at the time of sale with interest, or with the value of the property at the time of suit.");  *Rothko*, 43 N.Y.2d at 322 (affirming the trial court's decision to receive reasonable estimates for the "present value" of the self-dealt paintings). The FMV Appraisal thus represents the "present value" of the paintings.

[10] *Rothko*, 43 N.Y.2d at 322.

[11]*Id*.

The Wangs' third argument, that Mr. Regan's report is unreliable because it uses sale results from Mainland Chinese auction houses, speculative and self-defeating. Appraisers of classical Chinese paintings universally—albeit carefully—rely on Chinese auction results to value classical Chinese paintings. They *must*. That is where classical Chinese paintings are predominately sold.[12] In fact, the Wangs' own expert lauded the Sotheby's Appraisal as not only accurate and reliable, but "conducted [by] one of the leading experts, if not the leading expert, in Chinese classical paintings as of the date of the report."[13] Yet of the 147 total comparables cited by this Sotheby's appraiser, *seventy* were from Mainland Chinese auction houses. And as Mr. Linsner pointed out, the Sotheby's Appraisal was "reviewed by the IRS's Art Appraisal Committee and was accepted."[14] To date neither the IRS nor USPAP have issued any regulations or guidelines prohibiting the use of Mainland Chinese auction houses in appraisals. The Wangs' fringe theory that such auction results cannot be used at all in an appraisal, if it is itself admitted despite lacking any support, would only go to the weight of Mr. Regan's opinion, not its admissibility.

Finally, the Court should not issue the "extreme sanction of preclusion" of expert testimony based upon alleged violations of Fed. R. Civ. P. 26(a)(2)(B). Mr. Regan identified all of the information he considered in rendering his valuations including all the publicly accessible market databases from which that information was drawn. It is telling that the Wangs do not cite a single case in which an appraiser's report was rejected for the reasons they argue justify the rejection of Mr. Regan's report. Instead, what their cited cases show is that it is the *database* which the expert considered and the *comparables* on which he relied that must be disclosed. Regardless, there clearly has been no surprise or prejudice since the Wangs appear capable of attacking Mr. Regan's

---

[12] *See, e.g.*, Savitsky Decl. Exh. 24 at p. 4 (Artnet and CAA 2012 China Auction Report).

[13] Savitsky Decl. Exh. 5 at 122:15-123:9 (January 27, 2020 Deposition Transcript of Kenneth J. Linsner)

[14] *See* Savitsky Declaration Exh. 3 at ¶25 (the Report of Kenneth J. Linsner; the "Linsner Report").

selection of comparables, research, and opinions both in their Motion papers and in their own expert's report.[15] This is all that Rule 26(a)(2)(B) was designed to enable.

## FACTS

### A. The Estate's Collection of Assets in 2003 and the 2004 Sotheby's Appraisal.

Chi-Chuan ("C.C.") Wang died on July 3, 2003. Several weeks later his son S.K. Wang and grandson A. Wang submitted his purported last will and testament dated February 18, 2003 to the New York County Surrogate's Court for probate. On August 4, 2003, the Surrogate's Court appointed A.Wang as preliminary executor of the Estate and the Public Administrator of New York County (the "PA") as temporary administrator. *See* Savitsky Decl. Exh. 1 (August 4, 2003 Order). A.Wang and the PA were to act as co-fiduciaries to take such "appropriate actions as are necessary to identify, marshal, and preserve the assets of [C.C. Wang's] estate." *Id.* Only the first two mandates were complied with.

Following A.Wang's appointment as preliminary executor, the Estate began to collect assets from C.C. Wang's apartment, storage facilities, and family members. *See* Savitsky Decl. Exh. 2 at ¶¶8-9 (Declaration of the PA). It collected 133 classical[16] Chinese Paintings from the Wangs and Y.K. King. *Id.* The fiduciaries next hired Sotheby's to issue an appraisal of the Estate's classical Chinese paintings for tax purposes in 2004. *See* Savitsky Decl. Exh. 7 (the Sotheby's Appraisal). According to the Sotheby's Appraisal, the value of the 133 classical Chinese paintings as of the date of C.C. Wang's death on July 3, 2003 was $4,400,350.00. *Id.* at Sotheby's 000622. The appraisal cites to 147 comparables, seventy of which are auction results from Mainland Chinese auction houses. *See id.*; Savitsky Decl. Exh. 23 (chart identifying each unique comparable and auction house cited in the Sotheby's Appraisal).

---

[15] *See* Savitsky Decl. Exh. 4 at Exh. 1 thereto (Linsner Rebuttal Report Exhibit 1).

[16] A "classical" Chinese painting refers to a painting created in China before the end of the Qing dynasty in 1912.

Between 2005 and 2009, A.Wang and the PA sold 98 of the Estate's 133 classical Chinese paintings to five private buyers whom A.Wang had supposedly sourced. Savitsky Decl. Exh. 2 at ¶22. The Plaintiff has brought the present action on behalf of the Estate because evidence has been uncovered establishing that A.Wang and S.K. Wang fraudulently paid for the paintings and had them shipped to themselves. The Plaintiff and Wangs both hired experts to assess what, if any, damages have been suffered by the Estate if the self-dealing charges are true.

### B.  The Initial Report of Kenneth J. Linsner.

The Wangs' testifying expert in this case, Kenneth J. Linsner,[17] submitted an initial expert report and a rebuttal report. His initial report, dated on October 11, 2019 (the "Linsner Report"), provided three opinions. *See* Savitsky Decl. Exh. 3 at ¶¶44-46 (Linsner Report).  First, it stated that Mr. Linsner believed the Estate suffered "no damages" by reason of the six private sales of artwork. *Id.* Second, it stated that there was "no credible evidence" that artwork sold by the Estate was displayed at the Beijing Capital Museum in 2009 or the Poly Museum in 2010.  *Id; But see* Savitsky Decl. Exhs. 8 (A. Wang email regarding exhibitions). Third, it claimed that there was "no credible evidence" that the artwork sold by the estate was resold at auctions in China. *Id. But see* Savitsky Decl. Exh. 9 (A. Wang emails regarding his auctioning of paintings in China).

The Linsner Report does not contain an appraisal or valuation of any of the art at issue in this case. It does, however, fully endorse the quality and accuracy of the 2004 Sotheby's Appraisal. Mr. Linsner's report acknowledges that the appraisal was conducted by Arnold Chang who, Mr. Linsner claims, was "a long-time student of C.C. Wang who was intimately familiar with C.C.'s collection." Savitsky Decl. Exh. 3 at ¶23 (Linsner Report). It further states that though the

---

[17] Mr. Linsner had initially been retained by the Estate back in 2003. Whereas Sotheby's provided an appraisal for the Estate's classical paintings, Linsner provided an appraisal for the non-art property left in C.C.'s apartment. *See* Savitsky Decl. Exh. 6 (Linsner November 2003 Appraisal for the Estate). It cites no comparables at all. *Id.*

Sotheby's Appraisal was admittedly not USPAP compliant, it was reliable and accepted by the IRS. *Id.* at ¶25.

During his deposition in January 2020, Mr. Linsner elaborated on his opinion of the Sotheby's Appraisal. He acknowledged that the appraisal was reliable and that his "only criticism" of its methodology or its content was that he would have "preferred" that Mainland Chinese auction houses were not used:

> Q: So in your view, is the Sotheby's 2004 Appraisal reliable?
>
> A: Yes.
>
> * * * * *
>
> Q: Do you have any criticisms concerning the Sotheby's reports content, method, or results?
>
> A: I will tell you this, that the gentleman that conducted the appraisal was considered to be one of the leading experts, if not the leading expert, in Chinese classical paintings as of the date of the report. My only criticism is that he did use Chinese auction records and refer[ed] to them several times. I would have preferred that those be verifiable sales.

Savitsky Decl. Exh. 5 at 122:15-123:9 (Linsner Deposition). But Mr. Linsner underplays Arnold Chang's reliance on Mainland Chinese auctions. The Sotheby's Appraisal did not refer to Mainland auction houses "several" times; it referred to them *seventy* times. *See* Savitsky Decl. Exh. 23. This matters because Mr. Linsner explained that his own opinion that there were "no damages" suffered by the Estate rests on the fact that the Estate's paintings were sold using the Sotheby's Appraisal prices. Savitsky Decl. Exh. 5 at 126:11-25. At no point either in his report or during his deposition did Mr. Linsner object that the Sotheby's Appraisal's methodology (*i.e.*, its use of market comparables to justify appraisal value) or its extensive citation to Mainland Chinese auction houses rendered it unreliable, inaccurate, or unusable. *See* Savitsky Decl. Exhs. 3 and 5.

### C.  The Initial Report of Patrick Regan.

Y.K. King retained Patrick Regan of Winston Art Group as her testifying expert in this action in 2019. Winston Art Group is an independent art appraisal firm with offices in ten cities worldwide and which employs more than 75 art market specialists.[18] Mr. Regan is a Specialist in Asian works for the firm. Savitsky Decl. Exh. 10 at ¶2 (Regan Report).  He has worked as a private art dealer, fine art appraiser, auction specialist, art collections advisor, and arts business consultant. *Id.* at ¶¶4-7. Mr. Regan can read Chinese and has lectured and taught courses on topics including the China art market and Chinese art. *Id.*  at ¶¶4-11 (Regan Report).

Regan's initial report in this action, dated October 11, 2019, (the "Regan Report") consists of three parts. The first is a 26-page summary of Mr. Regan's professional background, the scope of his opinions, the market reports and data upon which he relied, his selected methodology, and his explanation for the appropriate marketplaces in which the values of the Estate's paintings should be analyzed. *Id.* at ¶¶1-29 (Regan Report). It also contains opinions that certain of C.C. Wang's missing personal seals were added to many of the 98 Paintings at some point after they were photographed by the Estate in 2003/2004. *Id.* at ¶¶35-48.

The second and third parts of the Regan Report consist of Appendices A and B (the "Appendices"). Appendix A is a 119-page USPAP-compliant fair market value appraisal of each of the 98 Paintings as of October 10, 2019, the date the report was prepared. *See* Savitsky Decl. Exh. 11 (the FMV Appraisal). Appendix B is a 40-page USPAP-compliant retail value appraisal of 14 paintings sold to "Yue Da Jin," as of the time of their sale in August 2009. *See* Savitsky Decl. Exh. 12 (the RV Appraisal). Both Appendices identify the scope of Mr. Regan's appraisal, the method of examination (reliance on the photographs taken by O'Toole-Ewald Art Associates),

---

[18] *See* www.WinstonartGroup.com/our-team.

the method of research (use of Atron, Artnet, Artprice databases), the methodology of valuation (the "market comparison" approach), the type of valuation employed (fair market and retail), the type of appraisal being rendered (an USPAP-compliant, unrestricted appraisal), and a bibliography of sources considered (in addition to those identified at ¶¶1-29 of his report). *See id.* Exh. 11 at pp. 3-8 (the FMV Appraisal) and Exh. 12 at pp. 3-8 (the RV Appraisal).

In the FMV Appraisal, the next ninety-three pages contain Mr. Regan's opinions as to the present values of each of the 98 Paintings based upon his review of the public sales of comparable paintings. *See* Savitsky Decl. Exh. 11 at pp. 9-103. In this section, Mr. Regan identifies the comparable sale information (*e.g.*, the selling auction house, lot number, size, sale price, and date) and includes notes on relevant aspects of his analysis. Mr. Regan's use of comparables to justify valuations is precisely the same method applied in the Sotheby's Appraisal that was accepted by the IRS and endorsed by Linsner. *Compare* Savitsky Decl. Exh. 7 (Sotheby's Appraisal), *with* Exh. 11 (FMV Appraisal) *with* Exh. 5 at 122:15-123:9 (Linsner Deposition). All told, the FMV Appraisal cites to 414 unique comparables to support Mr. Regan's appraisal of the 98 Paintings. *Id.* These include sales results from Sotheby's, Christies, Holly's, China Guardian, Poly International, and many other prominent auction houses both in China and elsewhere. *See* Savitsky Decl. Exh. 11.

Mr. Regan's estimates of value in the FMV Appraisal are supported by more than merely similar paintings that were sold in China, Hong Kong, and New York—they are supported by the actual sales of the subject works after they left the Estate. Specifically, a total of thirty-five (35) of the 98 Paintings were auctioned in China at some point after being privately sold by the Estate.

*See* Savitsky Decl. Exh. 11 (FMV Appraisal).[19] These thirty-five paintings sold at various auction houses for a combined price of $42,155,085. *Id.*

Though the Wangs omit the fact from their brief, some of the valuations in the Regan Report are not subject to any dispute whatsoever. Mr. Regan appraised eleven (11) of the 98 Paintings in Appendix A with either no reliance or very minimal reliance on Mainland Chinese auction house data. *See id.* Exh. 11 ("Client Reference"/OTE Nos. 154, 233, 240, 157, 112, 239, 119, 88, 101, 155, and 225). In his rebuttal report, Mr. Linsner conceded that these eleven valuations were "credible." *See id.* Exh. 4, Exh. 1 thereto (Linsner Rebuttal Report Exh. 1). Thus, the undisputed fair market value of those eleven paintings is $9,370,00.00. *See id.* Exh. 11 (FMV Appraisal at "Client Reference"/OTE Nos. 154, 233, 240, 157, 112, 239, 119, 88, 101, 155, 225).

There are twelve appraised paintings (not fifteen as the Wangs' brief misstates) in the FMV Appraisal that do not have specific comparables assigned to them. *See id.* Exh. 11 (FMV Appraisal at "Client Reference"/OTE Nos. 210, 142, 211, 139, 163, 140, 141, 145, 146, 237, 148, and 160). Cumulatively, the appraised value of these twelve paintings comprises only 1% of the total FMV Appraisal value. *Id.* As Mr. Regan explained under the "Further Details" heading for these low value works, he was able to appraise the paintings by relying heavily on the value given in the Sotheby's Appraisal and general Chinese art market trends (as set forth in the disclosed literature). *See, e.g., id.* Exh. 11 at p. 27 (FMV Appraisal noting bases for valuation of OTE Nos. 142 and 211); Exh. 10 at ¶17 (Regan Report disclosing market reports relied on); Exh. 14 at ¶¶4-15 (December 16, 2019 Regan rebuttal report, "Regan Rebuttal," detailing the general art market trends and addressing Chinese auction reporting issues); Exh. 17 at 167:13-169:16 (January 17,

---

[19] The thirty-five re-sold paintings were "Client Reference"/OTE Nos.: 135, 1001, 241, 92, 240, 112, 136, 115, 150, 224, 126, 88, 156, 121, 120, 101, 161, 87 (identified as resold in Appendix A in the "Subject Work Sold" heading) and 158, 159, 128, 227, 89, 202, 201, 137, 147, 127, 83, 92, 94, 129, 153, 106, and 133 (identified as resold in Appendix A in the "Provenance" heading).

2019 Deposition of Patrick Regan ["Regan Deposition"] excerpts regarding reliance on market reports). Mr. Regan also relied on a set of "Low Valued General Comparables," which was produced to the Wangs on November 1, 2019. *See* Savitsky Decl. Exhs. 11 (Regan Report at above-cited "Client Reference" Nos.); Exh. 18 (screenshots of expert materials produced on November 1, 2019) Cohen Decl. Exh. 16 at pp. 1-2 (Nov. 11, 2019 letter disclosing Mr. Regan's reliance on "Low Valued General Comparables" folder). Towards the end of the FMV Appraisal, Mr. Regan provided a Market Overview discussing trends and considerations relevant to his appraisal. Savitsky Decl. Exh. 11 a pp. 104-105. The RV Appraisal utilizes the same method of appraisal, but with respect to the 14 Paintings sold to "Yue Da Jin" as of their time of sale in August 2009. *See* Savitsky Decl. Exh. 12 (RV Appraisal).

In terms of document disclosure, the Plaintiff produced two compendia containing screenshots of each of the comparables cited to by Mr. Regan, one containing the 414 unique comparables cited in Appendix A and one containing the 63 comparable cited in Appendix B. *See* Cohen Exh. 18 (comprising an excerpt of the 477 comparable screenshots with citation to the database from which they were drawn). Several weeks later, based upon a mutual agreement by the parties, the Plaintiff produced the remaining records relied on by Mr. Regan. *See* Savitsky Decl. Exh. 18 (screenshots of list of market reports and other records produced on November 1, 2019). This production included, among other items, (a) the "Low Value General Comparables" and (b) the specific Art Market reports which contain charts of the trends market for classical Chinese Art during the relevant time. *Id.*; *see also* Savitsky Decl. at ¶¶2-7, 27-31 (copying certain market trend charts from the art-market reports Mr. Regan relied on, disclosed, and produced).

### D.   The Rebuttal Report of Kenneth J. Linsner.

Mr. Linsner submitted a rebuttal report to the Regan Report on December 16, 2019. *See* Savitsky Decl. Exh. 4 (the "Linsner Rebuttal"). In his rebuttal, Mr. Linsner challenges a number

of decisions and opinions offered in the Regan Report, chief among which was Mr. Regan's partial reliance on Mainland Chinese auction houses. Linsner's rebuttal, like his initial report, cites to newspaper/magazine articles, websites, and market reports concerning the consummation rate at Chinese auction houses. *Id.* Absent from his citations, however, is any appraiser's guideline or rule that Mainland Chinese auction results cannot, or should not, be used in appraisals of classical Chinese paintings. *Id.*

At the end of his rebuttal report, Mr. Linsner attached two exhibits. *Id.* The exhibits are spreadsheets of Mr. Linsner's position on the appropriateness of Mr. Regan's choices of comparables for each of the 98 Paintings in Appendix A (Linsner Rebuttal Exhibit 1) and the 14 Paintings in Appendix B (Linsner Rebuttal Exhibit 2). These exhibits do not suggest that Mr. Regan's choices were opaque or incomprehensible. To the contrary, Mr. Linsner was apparently able to follow Mr. Regan's logic such that he was able to conclude that Regan was placing "Disproportionate Reliance" on certain data and comparables. *Id.* And as noted in the previous section, Exhibit 1 to the Linsner Rebuttal identifies eleven painting valuations (totaling $9,370,00.00) which Linsner concedes—because they did not rely on Mainland Chinese auction results—are "credible." Savitsky Decl. Exh. 4 at Exh. 1 thereto (Linsner Rebuttal Exhibit 1).

### E.  The Rebuttal Report and Deposition of Patrick Regan.

On December 16, 2019, Patrick Regan issued a rebuttal report further explaining the data behind the well-recognized rise in the Chinese art market beginning in 2003 and trends continuing through 2018. *See* Savitsky Decl. Exh. 14 at ¶¶4-9 (Regan Rebuttal). Mr. Regan also addressed the reporting issues raised in the Linsner Report—and which the Wangs' brief in support of the Motion regurgitates. *Id.* at ¶¶10-15. Rather than copying his testimony in full, we respectfully refer the Court to the Regan Rebuttal and the citations therein for a refutation of the Wangs' arguments concerning Chinese art market trends and so-called "deadbeat bidding." *See also* Savitsky Decl.

Exhs. 20-22, 24 (excerpts from literature cited by Mr. Regan). We further refer the Court to selected excerpts from Mr. Regan's deposition on these same topics. Savitsky Decl. Exh. 17 at 276:4-284:9 (discussing comparable selections); 291:18-292:22 (discussing timing of comparables); 317:19-337:16 (discussing consummation rates); 338:13-362:2 (discussing comparable selections and auction results); 362:3-393:20 (discussing comparable choices and weight for specific works in the FMV and RV Appraisal); *see also* Savitsky Decl. at ¶¶27-29 (copying graphs from Mr. Regan's cited sources).

## ARGUMENT

I.   **The Regan Report Is Not a Black Box and Is Admissible Under Rule 702: The Report Fully Discloses the Market Data/Comparables Relied Upon and the Wangs' Case Citations Are Easily Distinguishable.**

Federal Rules of Evidence Rule 702 governs the threshold admissibility of expert testimony. It requires the expert's testimony to be (a) based on specialized knowledge that would be helpful to jurors, (b) based on "sufficient facts or data;" (c) the product of "reliable principles and methods;" and (d) formed by the application of reliable methods to the facts of the case. *Id.* In *Daubert v. Merrel Dow Pharm., Inc.* the Supreme Court created a list of suggested, non-exclusive factors to help judges determine if a given expert's opinion was sufficiently based on reliable science to comprise admissible evidence. 509 U.S. 579 (1993). The Court then elaborated on that decision in *Kumho Tire Co. v. Carmichael* with respect to cases, such as this one, involving expert testimony based upon non-scientific knowledge or expertise. 526 U.S. 137 (1999). The *Kumho Tire* Court held that with respect to non-scientific testimony, a trial judge must exercise her "gatekeeping" role to ensure a testifying expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Within this framework, what expert testimony is admitted "is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Trans., LLC*, 571 F.3d 206, 213 (2d Cir. 2009). "[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152. Rule 702 is "flexible" but trial judges in this circuit are instructed "to exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples to oranges comparison.'" *Zerega*, 571 F.3d at 213-14. (*quoting Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). All "other contentions that the assumptions are unfounded" are attacks on the weight of an expert opinion, not its admissibility under Rule 702. *Id.*

The Wangs' complaint that the Regan Report is an impenetrable black-box appraisal finds no support in (a) the contents of Mr. Regan's initial and rebuttal reports, (b) accepted standards in the appraisal industry, or (c) the Wangs' case citations. Each is addressed in turn below.

With respect to the reports themselves, the Regan Report and Regan Rebuttal cite to articles that Mr. Regan relied on in discerning market trends for classical Chinese paintings. *See* Exh. 10 at ¶17 (Regan Report); Exh. 11 at pp. 104-105 (FMV Appraisal Market Overview); Exh. 14 at ¶¶4-9 (Regan Rebuttal describing Chinese market changes and trends with citations). In the Appendices, Mr. Regan describes in detail the relevant attributes of all 98 Paintings (size, age, publications, authorship, *etc.*) and then cites to nearly 500 points of market data (*i.e.*, the comparables) to justify his opinions as to value. Savitsky Decl. Exh. 11 and 12 (the Appendices). When he believed his choice of comparables required specialized explanation, he included dozens of substantive notes to aid a reader not familiar with appraisal practices in following his logic as to how comparables were weighed. The factors considered included:

14

(1) <u>How enviable or well-established a given auction house is</u> [*see e.g.*, "Subject Work Unsold" description on p.10; "Subject Work Unsold" description on p.18; Comparable No. 4 on p. 97; Comparable No. 4 on p. 48];

(2) <u>The renown of the provenance of a given painting</u> [*see, e.g.*, Comparable No. 2 on P. 10; Comparable No. 3 on p. 42];

(3) <u>Whether the subject painting was put up for auction, but left unsold</u> [*see, e.g.*, "Further Details" heading on p. 67; "Further Details" heading on p. 69];

(4) <u>The differences in size between a comparable and a subject work</u> [*see, e.g.*, Comparable No. 4 on p. 69; Comparable No. 2 on p. 101; Comparable No. 5 on p. 102];

(5) <u>The level of color, level of detail, brushwork, or subject matter of a given painting</u> [*see, e.g.*, Comparable No. 1 on p. 50; Comparable No. 1 on p. 75; Comparable No. 2 on p. 47; Comparable No. 3 on p. 47; Comparable 3 on p. 81];

(6) <u>Whether the subject painting had actually sold at an auction house after its sale by the Estate</u> [*see, e.g.*, "Subject Work Sold" heading on p. 35; "Provenance" heading on p. 76; "Provenance" heading on p. 77; "Subject Work Sold" heading on p. 80; "Further Details" and "Comparables" headings on p. 59];

(7) <u>The significance of certain collectors' seals on a given painting</u> [*see, e.g.*, "Further Details" heading on p. 89];

(8) <u>Whether a given painting was displayed in a publication or at a museum exhibition</u> [*see, e.g.*, "Further Details" heading on p. 91; "Further Details" heading on p. 96; Comparable No. 5 on p. 97; "Further Details" heading on p. 100]; and

(9) <u>The level of confidence of a paintings' "attribution" to a given artist</u> [*see, e.g.*, "Further Details" heading on p. 76; "Further Details" heading on p. 79; Comparable No. 2 on p. 96].

Savitsky Decl. Exh. 11. Such detail and expressed reliance on actual market data is more than enough to satisfy Rule 702. *See, e.g., Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F.Supp.2d 269, 284-85 (S.D.N.Y. 2011) (once minimum sufficiency of data reliance is established, remaining objections that conclusions are unfounded go to weight not admissibility); *see also Lynch v. Trek Bicycle Corp*., 374 Fed. Appx. 204, 206 (2d Cir. 2010) (noting that the extent to which a report and that data upon which it is based are deemed reliable under Daubert "is fluid and will necessarily vary from case to case.").

The Wangs' criticisms in their Rule 702/Daubert argument about how exactly Mr. Regan rendered his valuations numbers based on the comparables is not a question of Rule 702

15

admissibility (since he is clearly relying on comparable market data), but instead one of disclosure (since the Wangs are apparently questioning *how* he chose to weigh the comparables). Though this point is more fully discussed in <u>Section IV</u> below, it is relevant here that Mr. Regan has issued a comprehensive rebuttal report addressing the art market trends he considered as well as the reliability of Chinese auction house results. Savitsky Decl. Exh. 14 (Regan Rebuttal); *Integrated Liner Techs., Inc. v. Specialty Silicone Prods*., No. 09-cv-1285, 2012 U.S. Dist. LEXIS 157381 (N.D.N.Y. Nov. 2, 2012) (noting rebuttal report mitigated the claimed deficiencies in an initial report). He also sat for a seven-hour deposition and answered questions relating to his choice of comparables and the Chinese art market. *See* Savitsky Decl. Exh. 17 at 3:2-4 and 393:24-394:4 (Regan Deposition start and end times); *Evans v. Wash. Metro Area Transit Auth.*, 674 F.Supp. 2d 175, 180 (Dist. D.C. 2009) (finding the brevity of an expert report mitigated since opposing counsel "had the opportunity to depose [the expert] to examine more fully the bases for his opinions."). To the extent the Wangs seek to probe even further, they will have their own expert at trial and may cross-examine Mr. Regan. *See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig*., 643 F.Supp.2d 471, 482 (S.D.N.Y. 2009); *Cedar Petrochemicals*, 769 F.Supp.2d at 286.

Mr. Regan's adherence to industry USPAP standards is also compelling, though not required, evidence of admissibility. *See Wal-Mart Stores, Inc. v. Qore Inc.*, No.06CV326, 2009 U.S. Dist. LEXIS 6145, *5 (N.D. Miss. Jan. 28, 2009) (finding that compliance with USPAP not required, but is "evidence to support a finding of reliability."); *SEC v. Nutmeg Grp., LLC*, 09-cv-1775, 2017 U.S. Dist. LEXIS 65196, *55 (N.D. Ill. Apr. 28, 2017) (same); *Whitehouse Hotel L.P. v. Comm'r,* 615 F.3d 321, 332 (5th Cir. 2010) (same). There can be no doubt, for instance, that Mr. Regan's stated use of "the 'fair market value' as the type of valuation and the 'market data comparison' as his valuation approach [] is neither unreliable nor irrelevant." *Hoffman v. L&M*

16

*Arts*, 10-cv-0953, 2013 U.S. Dist. LEXIS 15101, *41 (N.D. Tex. Feb. 5, 2013); *see* Savitsky Decl. Exh. 10 at ¶¶18-25 (Regan Report explaining the chosen methodology); Exh. 11 at p. 7 (FMV Appraisal explaining Mr. Regan's application of the "market comparison" approach). In fact, Mr. Linsner was apparently able to track Mr. Regan's logic and comparables. Though he rejected many valuations based on a perceived "disproportionate reliance" on certain comparables, he accepted other valuations as credible: $9,370,000 worth to be exact. *Compare* Savitsky Decl. Exh. 4 at Exh. 1 thereto (Linsner Rebuttal Exh. 1) *with* Exh. 11 (FMV Appraisal). This shows Mr. Regan's report is not *ipse dixit*. It is standard appraisal practice, and it is admissible. *In re Creekside Senior Apts*., *LP*, 477 B.R. 40, 65 (6ᵗʰ Cir. Bankr. App. Pan. 2012) (noting that "[a]s long as an appraiser uses a methodology that is accepted in the industry, his report is admissible.").

Nor do the Wangs' criticisms establish otherwise. For example, the Wangs' claim of non-compliance with USPAP Standard 7-4(a) (regarding analyzing comparables) is wrong. Standard 7 governs what must be *substantively done* while appraising. *See* Savitsky Decl. Exh. 19 (USPAP Standards 7 and 8). In contrast, Standard 8 governs what must be *written* in an appraisal. *See id.* (governing appraisal contents and noting the level of detail necessary may vary). By indicating in his report he analyzed comparables (see list on pp. 15, *supra*), Mr. Regan satisfied both Standard 7 and Standard 8 of USPAP's requirements.

Finally, the Wangs' case citations are devastating to their own argument. The Wangs cite to two patent infringement cases (*Protostorm*[20] and *Cornell*[21]) and two property damage cases (*Oleg Cassini*[22] and *Skolnick*[23]) to support their claim that Regan's report is a black box and

---

[20] *Protostorm, LLC v. Antonelli, Terry, Stout & Kruas, LLP*, No. 08-cv-0931PKCJO, 2014 WL 1278845 (E.D.N.Y. Mar. 31, 2014) ("*Protostorm*").

[21] *Cornell Univ. v. Hewlett-Packard Co*., No. 01-cv-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008) ("*Cornell*").

[22] *Oleg Cassini, Inc.*, 2014 U.S. Dist. LEXIS 9967.

[23] *Skolnick*, T.C. Memo. 2019-64 (U.S.T.C. Jun. 3, 2019).

inadmissible under Rule 702. Yet all have a single, glaring commonality: not only did the expert in each case fail to disclose in his or her report what market data and comparables were relied on, the expert effectively admitted no such comparables were relied on at all.

In *Oleg Cassini*, the disqualified expert wrote in her report that she used a "comparative market data approach." The court noted, however, that the facts did not support this statement. It found the expert:

- "included no information [in her report] as to . . . which artist or sketches were used as comparators and whether the comparison pieces were sold at auction or by private sale;"
- "[c]ould not remember" at her deposition what sources or comparables she had used to assign value to the appraised artwork;
- testified that there was no "general market for the type of sketches" which she had appraised to help inform her opinion on value; and
- could not be fairly cross-examined by counsel as to the reason for her supposed selection of and reliance on the undisclosed comparables.

*Id.* at 2014 U.S. Dist. LEXIS 52085 at *9-*10. None of these deficiencies exist here. Mr. Regan disclosed and produced all 491 of the auction house comparables he relied upon. Savitsky Decl. at ¶6; *see, e.g.*, Cohen Exh. 18 (compendium of RV Appraisal comparables). He specifically identified the "general market" for classical Chinese paintings and its trends between 2003 and the date of his appraisal. Savitsky Decl. Exh. 10 at ¶¶17, 20-25 (Regan Report); Exh. 11 at pp. 104-105 (FMV Appraisal Market Overview) Exh. 14 at ¶¶4-9 (Regan Rebuttal and citations); Exh. 18 (screenshots of various market reports and articles produced Nov. 1, 2019). And unlike the expert in *Oleg Cassini*, he was able to be questioned during his deposition on his reasons for selecting and weighing the various comparables. Savitsky Decl. Exh. 17 at 362:3-393:20 (Regan Deposition).

In the same vein, the disqualified expert in *Skolnick* wrote in his report that he determined the value of a stable of horses based on his "experience in the marketplace" and also his own company's "sales database from previous sales in the industry." *Skolnick*, T.C. Memo 2019-64

*4-5. Yet just as in *Oleg Cassini*, (i) his report did not identify which comparables he supposedly used, (ii) he never produced his supposed database of comparables, (iii) he had no way of describing what comparables he used, and (iv) he failed to identify any type of general market data or trends to support his valuations. *Id.* The disqualified expert simply attached two spreadsheets to his report listing the subject horses in one column, and his opinion on value in the other. *Id.* Mr. Regan's 200-page report on the market value of the Estate's paintings suffers from none of these major deficiencies.

The reports at issue in the Wangs' patent damages cases were rejected for the exact same reason: a failure to use comparable market data. *See Protostorm*, 08-cv-0931PKCJO, 2014 WL 1278845 and *Cornell*, No. 01-cv-1974, 2008 WL 2222189. In patent infringement cases, reasonable royalty damages are measured by estimating the hypothetical fair market value of an infringing license assuming that the patent holder "is a willing licensor and the infringer a willing licensee." *Cornell*, 2008 U.S. Dist. LEXIS 41848 at *3-4. In *Protostorm,* for example, the disqualified expert failed to provide any comparable market data to indicate how large of a royalty rate the defendant infringer would have reasonably paid for a comparable patent. Instead, the expert simply came up with a number, 2%, which had no underlying comparative market basis and which the court noted "would assign the exact same value to a hypothetical patent for literally any product or process." *Protostorm*, 2014 U.S. Dist. LEXIS at *38-40. By analogy, this would be like Mr. Regan assigning the same value to every painting without reference to a comparable auction result. The facts in *Protostorm* and its holding are thus clearly inapplicable. If the Wangs' cited-to cases prove anything, it is that identification of justifying market comparables is the *sine qua non* of an admissible appraisal or valuation. Mr. Regan used and disclosed such foundational information; his report easily clears Rule 702's minimal threshold as a result.

## II.   Patrick Regan's FMV and RV Appraisals Are Both Relevant and Admissible.

A.   *The FMV Appraisal Is Relevant to All Claims: Under Both RICO and State Law, the Measure of Damages for the Estate's Property Injury Is the "Present Value" of the 98 Self-Dealt Paintings, Not Simply the Price Differential Between Market Value and Actual Price at the Time of Sale.*

The case at bar is somewhat novel in the sense that the Defendants' RICO activities did not merely cause a plaintiff's loss of fungible property by conversion, or by physical damage, or by fraud. Instead, they caused loss of irreplaceable *estate paintings* by fraudulent *self-dealing*. The meaningfulness of this distinction was first explained by the New York Court of Appeals in the *Estate of Rothko* forty-four years ago. 43 N.Y.2d 305 (N.Y. Ct. App. 1977). In that case—also involving a fiduciary's fraudulent self-dealing of estate paintings—the Court of Appeals made two interrelated holdings that render the "present value" of the 98 Paintings as set forth in the FMV Appraisal recoverable under both RICO and state law.

*Rothko*'s first holding is that when a fiduciary self deals in estate assets, the estate suffers inherent injury to its property regardless of the value received. *Rothko*, 43 N.Y.2d at 321-22 (noting a fiduciary's self-dealings comprise "inherently wrongful transfers which should allow the owner to be made whole" and affirming the trial court's decision to receive reasonable estimates for the "present value" of the self-dealt paintings). As a result of this approach, the injured estate is entitled to the free choice between (a) the difference in the market value at the time of the sale and the self-dealing price, plus interest and (b) the "present value" of the self-dealt property. *Estate of Rothko*, 84 Misc.2d. at 874 (noting the estate's choice of recovery for self-dealing); *see also Rothko*, 43 N.Y.2d at 322-23 (affirming); *Will of Rothko*, 56 A.D.2d 499, 503 (N.Y. App. Div. 1977) (observing that under New York law, conversion of a unique item of fluctuating value—other than stock securities—permits appreciation damages at the time of decree). Here, the Estate has selected the present value of the 98 Paintings as its measure of damages. The FMV Appraisal is therefore admissible—at a bare minimum—to establish damages under New York *state law* for breach of

20

fiduciary duty and aiding and abetting breach of fiduciary duty. This, without more, defeats the Wangs' argument that the October 11, 2019 FMV Appraisal is irrelevant and prejudicial.[24]

*Rothko*'s second holding is also critical because it renders the option of present value/appreciation damages recoverable under the *federal* RICO claims. The Court of Appeals ruled that present-value damages are not speculative, consequential, or punitive but instead "they are damages intended to make the estate whole." *Rothko*, 43 N.Y.2d at 322. In other words, present-value damages are direct, compensatory damages under New York law tied directly to the property injury suffered when appreciable assets are stolen through inherently wrongful self-dealing. *See E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 448 (N.Y. Ct. App. 2018) (citing *Rothko* for the proposition that "the fundamental purpose of compensatory damages is to have the wrongdoer make the victim whole.") (internal quotation omitted).

In making this holding, the *Rothko* court expressly rejected the dissent in the lower appellate court. *Rothko*, 43 N.Y.2d at 322. The dissenters had argued that since appreciation damages were not typically available for conversion or fraudulent inducement claims, they could not be direct damages to property on a self-dealing claim; they must instead be considered some form of punitive damages. *Will of Rothko*, 56 A.D.2d at 508-09 (dissent). On review, the Court of Appeals explained that because a self-dealing fiduciary is never permitted to sell estate assets to himself in the first place, an estate is entitled to be placed in the same position as if the paintings were never sold. *Rothko*, 43 N.Y.2d at 322. To be put in the same position requires that the estate receive the present value of its lost property. *Id.* ("[S]ince the paintings cannot be returned, the

---

[24] Nor can the Defendants' change tack and try to argue that the October 11, 2019 FMV Appraisal is still not relevant because it is not the value of the 98 Paintings "at the time of decree" or the "time of trial" or the "present value." Once again, the on-point case of *Rothko* is instructive. There, the trial court determined appreciation damages after admitting a valuation of the self-dealt artwork as of "January, 1974." *Estate of Rothko*, 84 Misc.2d at 884-85. It accepted this January 1974 valuation even though the "time of decree" was not until December 18, 1975. *Id.* Thus, the Court accepted the most recent valuation on record given disclosure deadlines and other realties of trial scheduling.

estate is therefore entitled to their value at the time of decree, *i.e.*, appreciation damages."). Such value compensates for the concrete and tangible property injuries suffered by the Estate. *See Evans v. Catalino*, 88 A.D.2d 780, 781 (N.Y. App. Div. 1982) (citing *Rothko* for the proposition that a malfeasant fiduciary "must make [the beneficiary] whole" for any damage caused by a breach of the fiduciary's duty). The property injury suffered is not having Estate property at the time of judgment due its wrongful removal by self-dealing.

The above principles concerning what constitutes injury to estate property are determinative of the injury and damages issues under RICO. As a threshold point, there is nothing in the RICO statute or the jurisprudence interpreting it that would categorically preclude present-value/appreciation damages. Section 1964(c) provides:

> Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue . . . and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fees.

18 U.S.C. 1964(c). Critically, "'[i]njury to property' for RICO purposes is generally determined by state law." *Isaak*, 169 F.3d at 397 (*citing DeMauro*, 115 F.3d at 96; *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law."). This means that because under New York law an estate (a) sustains injury to its property by a self-dealing fiduciary by the inherently wrongful transaction and (b) cannot be "made whole" without receiving the "present value" of the stolen property, the same is true for the purposes of identifying an injury to property under RICO. *See Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994) ("[D]amages as compensation under RICO § 1964(c) for injury to property must, under the familiar rule of law, place [plaintiffs] in the same position they would have been in but for the illegal conduct."); *Rothko*, 43 N.Y.2d at 322 (holding appreciation damages for self-dealing "are damages intended to make the estate whole."). Since a RICO injury is based on New York property law, the injury in this case and

22

resulting damages spring directly from the "inherently wrongful" loss (caused directly by wire and mail fraud) of the 98 Paintings themselves, regardless of the self-dealing price paid for them. *Rothko*, 43 N.Y.2d at 322. And the Estate cannot be made whole without present-value damages.

Finally, just as there is no limitation barring appreciation damages under RICO, there is no general limitation on a federal court's authority to grant appreciation damages to an estate due to self-dealing. *See United States v. Coppola*, Index No. CV-88-3456, 1994 U.S. Dist. LEXIS 16848, *29 (E.D.N.Y Nov. 17, 1994) (Weinstein, J) (ordering self-dealt property or its value be returned to a New York probate estate so as to compensate the estate "as if [it] had retained its interests [in the self-dealt property] all along") *aff'd* 85 F.3d 1015 (2d Cir. 1996); *Chevron Corp. v. Donziger*, 974 F.Supp. 2d 362, 570 (S.D.N.Y. 2014) (holding equitable relief is permitted under RICO); *c.f. Will of Rothko*, 56 A.D. at 502 ("[T]he rule of damages should not depend upon the form of the action * * * the inquiry must always be, what is an adequate indemnity to the party injured, and the answer to that inquiry cannot be affected by the form of he action in which he seeks his remedy.") (internal quotation and citation omitted).  Any other interpretation of these principals would render RICO's penalties meaningless in this case and permit the Wangs to walk away from the Estate with nearly $70 million in net proceeds derived from their criminal scheme.

   B.  *The RV Appraisal Is Relevant to All Claims*: *The 2009 Retail Value Is Relevant to Show the Wangs' Fraud and as an Alternative Measure of Damages under the RICO and the State Law Claims.*

The Wangs also attack the August 2009 RV Appraisal as irrelevant for appraising the 14 Paintings sold to "Yue Da Jin" as of the date of their sale.[25] In doing so, they ignore the significance of that appraisal as an alternative measure of the Plaintiff's damages and focus solely on how it pertains to A.Wang's state of mind. They argue that the date on which A.Wang first negotiated the

---

[25] This is an immediate reversal from the Defendants' preceding section, which argued that the FMV Appraisal was irrelevant because it *did not* appraise the 98 Paintings as of the date of their sale.

sale of paintings to "Yue Da Jin" in May 2008—rather than the date the sale contract was finalized in August 2009—is the _only_ date relevant to the question of A.Wang's "intent." This is nonsense, and the Wangs know it. Damages under RICO and state law are tied to the time of the injury, not the time of intent.  A burglar who steals a $10 million diamond is not liable only for the value he thinks the diamond was worth at the time he planned the job; he is liable for the actual loss. As an executor of the Estate, A.Wang had a duty to ensure that the 14 Paintings were _sold_ at a fair price. _See_ Cohen Decl. Exh. 23 (A.Wang's February 2009 emails regarding his re-negotiations to achieve a further 10 percent discount).

Further, the Wangs' argument completely ignores that this case is about them _defrauding the Estate by self-dealing_. _See_ Section II(A) above. A. Wang knew he was defrauding the Estate when he first "negotiated" with a fictitious person in 2008 and when he sold the paintings to that same phantom in August 2009. _See_ Cohen Decl. Exh. 23 (A.Wang's February 2009 emails regarding price re-negotiations and a "very weak" art market). The paintings were substantially more valuable than they had been on July 3, 2003 and A.Wang—who held himself out as an expert with knowledge of the market—would have been acutely aware of this fact. _See_ Cohen Decl. Exh. 23. Thus, the RV Appraisal reveals that A.Wang's representations about the weakness of the Chinese art market in 2009 are lies meant to induce sales at a low value. _See_ Savitsky Decl. Exhs. 14, 19, 20, 21, 22, 24 (collecting data on the rise of the Chinese art market).

Separately, the RV Appraisal is relevant to the extent the Estate were to choose the difference between the actual price paid by "Yue Da Jin" and the market value at the time of that sale as the basis for the Estate's RICO or fiduciary breach damages. _Rothko_, 43 N.Y.2d at 322-23 (an estate has the choice of damages for self-dealing). In that event, the August 2009 RV Appraisal would be controlling on the appropriate market value of the 14 Paintings and damages.

24

III.   **The FMV and RV Appraisals Are Reliable: Mr. Regan's Reports Are Compliant with Industry Standards and the Wangs' Speculation that *Some* of the Comparable Sales *May* Have Never Been Consummated Is Insufficient to Preclude Them.**

Mr. Regan's report and understanding of how the Chinese art market operates are reliable and admissible. As Mr. Regan explains in his Rebuttal Report, reliance on Chinese auction house results "is a critical, necessary, and universally accepted method of valuing Chinese artworks." Savitsky Decl. Exh. 14 at ¶14 (Regan Rebuttal). Notwithstanding final consummation rates reportedly being lower in China than they are in the West, "both professional appraisers and individual collectors rely on these online databases in deciding whether to engage in multi-million-dollar asset acquisitions and sales." *Id.* This is precisely why the 2004 Sotheby's Appraisal utilized seventy Mainland comparables and was still accepted by the IRS. *Id*. Exh. 7. As Mr. Regan explained "rejecting this data and still rendering a usable opinion of value would not only be negligent, but nearly impossible." *Id.* at ¶15; Savitsky Decl. Exhs. 20-22, 24 (collecting market reports discussing the realities of the rise and concentration of the Mainland Chinese auction market). The Wangs and their expert have been unable to cite any appraisal rules or guidelines from the IRS, USPAP, or any other professional organization prohibiting the use of Chinese Auction results in appraisals. None exist.

Instead, experienced appraisers rely on organizations such as Artnet and the China Association of Auctioneers ("CAA") to help present the most reliable auction data possible. Savitsky Decl. Exh. 14 at ¶¶11-12. Concerns over consummation rates are further mitigated, Mr. Regan has explained, by collecting multiple comparables from multiple auction houses, including Western ones such as Sotheby's and Christie's. *Id*. at ¶13; Savitsky Decl. Exh. 17 at 317:19-336:22 (Regan Deposition).

The Court should not be fooled by the Wangs attempt to dodge liability by discrediting an entire multi-billion-dollar industry. *See* Savitsky Decl. Exhs. 20-22, 24 (collecting Chinese art market reports and graphs). It is *they* who are advancing a blatantly speculative claim that *some* of the reported, public auction results *may* have never been consummated and are therefore irrelevant to value. *But see, id.* And in doing so they demand that the Plaintiff prove a negative as to the approximately 500 cited comparables, even though such comparables are universally relied upon in this industry. The correct way to resolve such a conflict "[u]nder Daubert's liberal standard" is by a "battle of the experts before the fact finder, not by judicial fiat." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d. 1036, 1049 (9th Cir. 2014). On one side of this battle is Mr. Regan's methodology which is used by auction houses around the world (such as Sotheby's), leading independent art appraisers (such as Winston Art Group), collectors, and the IRS. On the other side is Mr. Linsner's fringe opinion that lower-than normal consummation rates at Chinese auction houses renders ancient, rare, and highly coveted Chinese valuables effectively un-appraisable. Which expert is correct is a matter that should be resolved by the jury. *Smith v. City of New York*, 12-civ.-4922, 2015 U.S. Dist. LEXIS 102669, Note 6 (S.D.N.Y. Aug. 5, 2015) (ruling reasonable disagreement by experts regarding the reliability of an industry practice or methodology necessitates a trial).

At bottom, the Defendants ask this Court to render a watershed ruling that the classical Chinese paintings they stole—even authentic ones, hundreds of years old—have no discernable value as a matter of U.S. law. No court has ever made such a ruling and no known organization which promulgates or regulates appraisal practices has issued such an edict.

**IV.   Patrick Regan Disclosed All Facts Considered in Forming His Opinion and Even If Any Deficiency Exists, It Is Substantially Justified and Harmless.**

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure governs expert disclosure. The purpose of this disclosure is "to avoid surprise or trial by ambush." *Moore v. Keller*, No. 15-cv-1230, 2020 WL 6384691, 2020 U.S. Dist. LEXIS 201472, *22 (N.D.N.Y. Oct. 28, 2020) (citation omitted). The rule therefore requires an expert report to set forth a "complete statement of all opinions the witness will express" along with the "basis and reasons" for those opinions and the "facts or data" considered by the expert. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii).

Rule 26(a)(2)(B) does not require, however, that a report's disclosures be so granular that an expert's eventual trial testimony will be limited "simply to reading his report." *MTBE*, 643 F.Supp.2d at 482 (internal quotations omitted); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 652 (Kan. Dist. 2003) (noting the Federal Rules do not "require the expert to anticipate every criticism or articulate every nano-detail that might be involved in defending the opinion on cross examination."). Instead, the "rule contemplates that the expert will supplement, elaborate upon, explain, and subject himself to cross-examination upon his report." *MTBE*, 643 F.Supp.2d at 482. The guiding principle behind the determination of whether a report contains sufficient substance, detail, and analysis is whether its contents fairly enable an opponent to prepare to "rebut, cross-examine, and to offer a competing expert." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009).

Regan disclosed the comparables, market reports, market trends, photographs, and databases he relied on. *See* pp. 10-11, *supra* (discussing Regan's document disclosure); Savitsky Decl. Exhs. 10 at ¶¶17, 20-25 (Regan Report); Exh. 11 at pp. 8, 104-105 (FMV Appraisal Bibliography and Market Overview); Exh. 14 at pp. 4-15 (Regan Rebuttal); Exh. 18 (expert production); Exh. 17 at 32:2-6-38:25 (Regan Deposition testimony regarding searching for and selecting comparables); Cohen Exh. 18 (comparables for RV Appraisal with database sources).

27

The defendants have not cited to any cases in which an appraiser was required to produce any more than this. To the contrary, the cases cited by the Wangs in support of their black-box argument, for example, all turn on whether a market database, market trends, and/or specific market comparables were (a) relied on and (b) disclosed. *See* pp. 17-19, *supra*. Here, they were.

The Wangs seem to argue that Mr. Regan should have produced each of his thousands of potential comparables from his search results since that would be the only way to ensure physical production of each of auction sales he "considered." As Mr. Regan testified, however, complying with such a demand would effectively require him to "download an entire database." Savitsky Decl. Exh. 17 at 36:25-38:25. Instead, Mr. Regan complied with Rule 26 by disclosing what he searched and how he searched it. The key here is that nothing is being retained by Mr. Regan and Mr. Regan has not considered anything that Wangs and their expert have not had access to since November 2019 at the latest. The Plaintiff complied with Rule 26(a)(2)(B).

Fed. R. Civ. P. 37(c)(1) governs the effect of a party's failure to comply with Rule 26(a)(2)(B). Where an otherwise qualified expert submits a report, testimony may still be barred under this rule if (i) the report fails to satisfy the disclosure requirements of 26(a)(2)(B); (ii) the failure to disclose is not substantially justified; *and* (iii) the failure to disclose is not harmless. Preclusion, however, is never mandatory. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006).

Here, any alleged "non-disclosure" is substantially justified. For the purposes of the Rule 37(c)(1) "[s]ubstantial justification means justification to a degree that could satisfy a reasonable person that the parties could difference as to whether the party was required to comply with the disclosure request." *Coene v. 3M Co*., 303 F.RD. 32, 44 (W.D.N.Y. 2014). Mr. Regan did not retain or print out screenshots of hundreds or thousands of works he could have relied on, but ultimately decided not to. In a letter filed on November 11, 2019, the Plaintiff took the position

that such a production was impossible and outside the scope of Rule 26 and that the disclosure of the databased used satisfied Rule 26. *See* Savitsky Decl. at ¶¶6-7; Cohen Decl. Exh. 16. The Wangs never filed a motion to compel or replied with case law to support their argument as the Plaintiff requested. *Id.* The issue seemed resolved.

Moreover, any failure to disclose was harmless for several reasons. First, the databases Mr. Regan relied on were disclosed and can be—and have been—searched by the Wangs' and their expert. Second, Mr. the Linsner Rebuttal claims to have analyzed Mr. Regan's comparable selections to determine their "credibility." *See* Savitsky Dec Exh. 4 at Exhs. 1 & 2 (Linser Rebuttal at Exhibits 1 and 2). Third, Mr. Regan will be subject to cross-examination on the entire database and there is no threat of ambush to the Wangs.

The "'extreme sanction of preclusion'" should be issued only where necessary to prevent significant prejudice to the opposing party. *Sirois v. USAA Cas. Ins. Co.*, No. 3:16-cv-1172, 2019 U.S. Dist. LEXIS 7617 *; 2019 WL 235326 (Dist. Conn., Jan. 16, 2019) (quoting *Outley v. City of New York,* 837 F.2d 587, 591 (2d Cir. 1988)). This is because the purpose of Rule 37(c)(1) is "to prevent the practice of 'sandbagging' an opposing party with new evidence" not render draconian penalties for a minor or technical deficiency. *Haas v. Delaware &Hudson Ry., Co.*, 282 F.App'x 84, 86 (2d Cir. 2008).Therefore, even if this Court finds that Mr. Regan failed to comply with Rule 26 and that the failure was not substantially justified nor harmless, preclusion of Mr. Regan's testimony *still* is not warranted. In cases in which preclusion of an expert would have a significant impact at trial "the Second Circuit has cautioned against automatically precluding an expert's testimony." *Hogan v. Vandewater*, 2016 U.S. Dist. LEXIS 194494, *11 (N.D.N.Y. Apr. 27, 2016) (refusing to preclude expert testimony despite unjustified and prejudicial violations of Rule 26(a)(2)(B)). Precluding Mr. Regan's expert testimony when a $70 million self-dealing case hinges on it would be grossly disproportionate to the complained of prejudice and contrary to law.

29

## CONCLUSION

The Wangs' Motion to preclude Patrick Regan's expert testimony is simply a dressed-up cross examination that seeks the total exclusion of crucial testimony. It is also a motion seeking a $70 million windfall from their criminal scheme. It should be denied.

Dated: New York, New York
      March 19, 2021

Respectfully submitted:

**SAM P. ISRAEL, P.C.**

By: */s/ Timothy Savitsky*
Sam P. Israel, Esq. (SPI 0270)
Timothy Savitsky, Esq. (TS 6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
Main-646-787-9880; Fax: 646-787-9886;
Email: timsavitsky@spi-pc.com
*Attorneys for Yien-Koo King*