**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **YIEN-KOO KING,** | |
| **Plaintiff,** | **1:14-Civ-07694-LJL** |
| -against- | |
| **ANDREW WANG, SHOU-KUNG WANG, BAO WU TANG, JIAN BAO GALLERY, ANTHONY CHOU, CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE DA-JIN and JOHN DOES 1-9,** | |
| **Defendants.** | |

# Plaintiff's Memorandum of Law in Support of Motion for Fed. R. Civ. P. Rule 37 Sanctions Striking the Defendants' Affirmative Defenses and Issuing Adverse Inference Jury Instructions

**Sam P. Israel, P.C.**
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTS ................................................................................................................................... 3

    **A. The Appointment of A. Wang as Preliminary Executor Based Upon a Fraudulent Document Submitted to the Surrogate's Court by the Wangs** ........... 3

    **B. A. Wang and S.K. Wang's False Testimony and Incomplete Disclosures Related to the Sale of Estate Assets at Issue in This RICO Action** ...................................... 4

        *i.  The Wangs' Contradictory Testimony and Incomplete Disclosures Regarding the Identities of the Five Buyers of the 98 Paintings* ..................................................... 5

        *ii.  The Wangs' Contradictory Testimony and Incomplete Disclosures Regarding Their Corporate and Financial Account Holdings and the Source of Payments for the 98 Paintings* ............................................................................................................... 7

        *iii.  The Wangs' Contradictory Testimony and Incomplete Disclosures Regarding the Shipment of All 98 Paintings to "Billie Wai" in Hong Kong—the Wangs' Family Accountant* ................................................................................................................ 14

    **C. The Wangs Called a Chinese Witness to Lie Under Oath During the 2017 Probate Trial in the Surrogate's Court** ................................................................... 16

ARGUMENT ........................................................................................................................ 18

    **I.    The Court Should Issue an Order Pursuant to Fed. R. Civ. P. Rule 37(b) and (c) Striking the Wangs' Affirmative Defenses for Blatant, Repeated, and Willful Violation of Discovery Orders and the Federal Rules of Civil Procedure** ...................................................................................................... 18

        *A.  Legal Standard for a Motion for Sanctions Pursuant to Fed. R. Civ. P. 37* .......... 18

        *B.  The Wangs Failed to Satisfy Their Discovery Obligations in This Action to Preserve Evidence, Truthfully Answer Interrogatories, and Produce Documents Related to Le Style Ltd., A. Wang's Other Corporations, Billie Wai, and the S.K. Trust* ....... 19

        *C.  The Wangs Have Culpable Mind States.* ............................................................ 22

        *D.  The Non-Disclosed Information Was Relevant to and Would Likely Have Supported the Estate's Case* ................................................................................................... 23

*i*

E. An Order Striking of the Wangs' Affirmative Defenses Is an Appropriate Sanction; Additionally, or Alternatively, the Court Should Give an Adverse Inference Jury Instruction .......................................................................................................24

**CONCLUSION** .......................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prods.*,
19-cv-3766, 2020 WL 7342724, 2020 U.S. Dist. LEXIS 234361 (Dec. 11, 2020 S.D.N.Y.) 19, 22

*Byrnie v. Town of Cromwell Bd. Of Educ.*,
243 F.3d 93 (2d Cir. 2000)..............................................................................................22

*Communispond Inc. v. Kelly*,
No. 96 Civ. 1487, 1998 WL 473951, 1998 U.S. Dist. LEXIS 12336 (S.D.N.Y. Aug. 10, 1998) 18

*Friends of Animals Inc. v. United Sates Surgical Corp.*,
131 F.3d 332 (2d Cir. 1997)............................................................................................18

*Heng Chan v. Triple 8 Palace*,
No. 03 Civ. 6048, 2005 WL 1925579, 2005 U.S. Dist. LEXIS 16520
(S.D.N.Y. Aug. 11, 2005) ..........................................................................................21, 22

*In re Sept. 11 Liab. Ins. Coverage Cases*,
243 F.R.D. 114 (S.D.N.Y. 2007) .....................................................................................19

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998)............................................................................................25

*NHL v. Metro Hockey Club*,
427 U.S. 639 (1976)........................................................................................................18

*Matter of Sanchez*,
No. 2001-3187/G, 2017 N.Y. Slip Op. 32685(U) (Sur. Ct., N.Y. Cnty. Dec. 28, 2017)...............21

*Metro Found. Contrs., Inc. v. Arch Ins. Co.*,
551 Fed. Appx. 607 (2d Cir. 2014)..................................................................................24

*Turner v. Hudson Tr. Lines, Inc.*, 142 F.R.D. 68 (S.D.N.Y. 1991) .................................................

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999)............................................................................................24

**STATUTES, RULES, REGULATIONS**

Fed. R. Civ. P. Rule 26(e)................................................................................................19

Fed. R. Civ. P. Rule 37(b)...............................................................................................18

*iii*

Fed. R. Civ. P. Rules 37(b)(2)(A)(iii) ............................................................19

Fed. R. Civ. P. Rule 37(c)............................................................................2, 18

Fed. R. Civ. P. Rules 37(c)(1)(C) ......................................................................

Fed. R. Civ. P. Rule 26(e)................................................................................19

## PRELIMINARY STATEMENT

This is a RICO suit involving a self-dealing fiduciary and an international art enterprise that deals in stolen property. Defendants Shou-Kung ("S.K. Wang") and Andrew Wang ("A. Wang"; the "Wangs") and their accomplices (together the "Wang Family") participated in a scheme to illegally acquire and transport 98 Estate paintings (the "98 Paintings") worth $70,000,000 of artwork from New York to Hong Kong over six years. The Wangs used fake identities and offshore shell companies to purchase the Estate's paintings, then resold them at auction houses in China and Hong Kong. The Wangs next transferred some of the overseas profits back to United States through other offshore shell companies and their wives' bank accounts.

Plaintiff Yien-Koo King ("Y.K. King" or "Plaintiff") now moves pursuant to Fed. R. Civ. P. 37 for sanctions striking the Wangs' affirmative defenses and issuing adverse inferences as jury instructions (the "Sanctions Motion"). Sanctions are warranted for: (a) the Wangs' repeated submissions of false interrogatory responses denying ownership of Le Style Ltd. (which A. Wang has since admitted he owned); (b) their intentional failure to produce incorporation or financial records for any of the corporations they now claim paid millions of dollars to the Estate for the 98 Paintings (despite a clear obligation to preserve and produce the records); (c) their intentional failure to produce any records or communications whatsoever with Billie Wai (the Wangs' accountant who set up all of their offshore companies and received the shipments of all of the Estate's 98 Paintings); and (d) their failure to produce an asset schedule for a multi-million-dollar trust they set up in 2013 (despite producing every other page of the trust).

The Wangs' discovery fraud began to unravel in late 2018. In September of that year, the Plaintiff subpoenaed evidence from a third-party real-estate law firm which had represented the Wangs in their purchase of a $5.9 million home on Long Island in 2013. Transactional records produced from that subpoena exposed that the Wangs had been lying under oath in state and federal

court for years. The records ultimately proved the Wangs were the owners of companies they previously denied control over and which, as a point of indisputable fact, had paid the Estate for its paintings. Yet notwithstanding numerous meet and confers, discovery conferences, and court orders, the Wangs failed to produce records for the entities and accounts they owned and which A. Wang now—after six years of sworn denials—admits he used to pay for the Estate's paintings.

The Wangs' false submissions outlined herein were not mistakes or isolated incidents of misconduct. Instead, they were part of a pattern of fraud on the American court system. Both Wangs operate with a complete lack of fear of perjury, but A. Wang's careless and free flowing deceptions in particular suggests he enjoys lying as if for sport—knowing that in seventeen years, no real penalty has come from it. For S.K. Wang's part, even though clear documentary proof establishes him as a co-owner of Le Style Ltd., he continues to deny ownership of the company, leaving A. Wang to take the heat alone.  Because discovery in this matter has not been conducted on an even playing field, the striking of the Defendants' affirmative defenses is appropriate. As an additional or alternative sanction under Fed. R. Civ. P. Rule 37(c), the Plaintiff also seeks adverse inferences based on records that once existed, should have been preserved, were requested during discovery, but which the Wangs either destroyed or failed to produce. Specifically, the Plaintiff seeks adverse inferences related to Le Style Ltd. and the other corporations they used to pay the Estate $4.3 million, an unproduced trust asset schedule, and their accountant Billie Wai.

The Plaintiff asks this United States District Court to take corrective action against a group of defendants who have brazenly perjured themselves during live testimony, recruited at least one witness (Chien Fang Huang) to testify falsely on their behalf during a Surrogate's Court trial, submitted falsified evidence during discovery, repeatedly lied in interrogatories, and flagrantly ignored production demands for crucial financial and corporate records. While many of these charges are often leveled by adversaries during highly contentious litigation, the degree to which

2

they occurred here goes far beyond vigorous advocacy or mere gamesmanship. Instead, the parties' factual and procedural history establishes that the Wangs have been waging all-out war against the truth-seeking function of the American judicial system itself for decades. Millions of dollars in legal fees have been utterly wasted on countering their false court submissions. And while the Plaintiff is confident that the jury will reach a verdict in her and the Estate's favor, the Court should issue sanctions to let the Wangs and other litigants know that fraud on the court is not a viable litigation strategy.

## FACTS

### A.   The Appointment of A. Wang as Preliminary Executor Based Upon a Fraudulent Document Submitted to the Surrogate's Court by the Wangs

C.C. Wang died on July 3, 2003. Several months later, the New York County Surrogate's Court appointed his grandson, A. Wang, as estate preliminary executor based upon his and his father's submission of a purported last will and testament dated February 18, 2003 that the Wangs jointly filed with the court. Savitsky Decl. Exh. 1 (Aug. 4, 2003 order of the N.Y. Surrogate's Court (the "Aug. 2003 Order"). A trial held in April 2017 would eventually determine that this supposed will was created by the Wangs' fraud and undue influence of C.C. Wang. Savitsky Decl. Exh. 2 (May 9, 2017 Decree of the Surrogate's Court; the "Probate Decree"). In 2003, however, the fraudulent nature of the Wangs' will had not yet been determined. In the face of objections filed by Y.K. King, the Surrogate required A. Wang to serve alongside a disinterested party, the Pubic Administrator of New York County (the "PA"). Savitsky Decl. Exh. 1. A. Wang and the PA then collected various Estate assets including 133 classical Chinese Paintings from Y.K. King and S.K. Wang. Savitsky Decl. Exh. 3 at ¶9 (Declaration of Dahlia Damas dated February 14, 2020; the "PA Declaration").

**B. A. Wang and S.K. Wang's False Testimony and Incomplete Disclosures Related to the Sale of Estate Assets at Issue in This RICO Action**

Between 2005 and 2009 A. Wang coordinated six sales transactions to sell 98 of the Estates' classical Chinese paintings to five purported buyers in China. Savitsky Decl. Exh. 3 at ¶23. Because each of the five buyers was sourced by A. Wang, the Plaintiff demanded at the start of discovery all records concerning A. Wang's sale of Estate assets between 2005 and 2009 including communications with (a) the various buyers and (b) the individual to whom all 98 Paintings were shipped, Billie Wai. *See* Savitsky Decl. Exh. 20 at Demand Nos. 10, 20-27, 29 (Y.K. King's document demands dated Aug. 8, 2018 to A. Wang [the "A. Wang Demands"]). She also demanded both Wangs produce documents related to "any corporate entity which, since 2003" the Wangs held shares of or held corporate office. *Id.* at Demand No. 122 (A. Wang Demands) and Savitsky Decl. Exh. 21 at Demand No. 100 (Y.K. King's document demands dated Aug. 9, 2018 to S.K. Wang [the "S.K. Wang Demands"]). Yet neither of the Wangs have produced any communications with the Chinese buyers, any communications with Billie Wai, any documents relating to Billie Wai, any incorporation records for the companies A. Wang now admits he used to pay the Estate $4.3 million, or any financial records for those same companies. *See, e.g.*, Savitsky Decl. Exh. 6 at 131:22-132:9 (A. Wang explaining he had no records for Le Style); 245:20-246:22 (A. Wang testifying he has no transaction records for the purported intermediary favors he performed for the buyers); Savitsky Decl. Exh. 22 (Mar. 15, 2019 email from A. Wang's counsel that they reached out to their BVI corporate agent, Portcullis, for documents related to Le Style Ltd. and Le Tao Ltd., but received no response); Savitsky Decl. at ¶17. Finally, Y.K. King demanded the Wangs produce all records concerning the 2013 "Shou-Kung Wang Irrevocable Trust," (the "S.K. Trust") of which A. Wang serves as trustee. *See* Savitsky Decl. Exh. 20 at Demand No. 119 and Exh. 21 at Demand No. 97. Yet the version the Wangs' produced has a blank asset schedule. Savitsky Decl. Exh. 19 at p. 31.

A summary of the false attestations, non-productions, and court conferences relevant to the current motion to strike the Wangs' affirmative defenses and for adverse inferences are as follows.

      *i.*   *The Wangs' Contradictory Testimony and Incomplete Disclosures Regarding the Identities of the Five Buyers of the 98 Paintings.*

The Plaintiff first received records related to the Estate's sales in 2013. Shortly thereafter, in December 2013, the Plaintiff's counsel and counsel for the PA deposed A. Wang for four days. *See* Savitsky Decl. at ¶5, Exh. 4.  One of the topics extensively drilled into was how A. Wang sourced and located the five purported individuals who purchased the 98 Paintings. A. Wang testified that he had personal relationships with the buyers and knew them as part of the small circle of Chinese art collectors.  He claimed that Mr. Yong Qing Ye was "a friend of mine" from Shanghai since 1990. Savitsky Decl. Exh. 4 at 957:3-5 (2013 AW Dep. Trans.).  He claimed he was connected to Mr. Yue Da Jin through another friend called "Mr. Xu"—whose first name A. Wang claimed he could not recall. *Id*. at 953:12-954:6 (2013 AW Dep. Trans.). When asked if he knew Mr. Anthony Chou, A. Wang responded "Yes, I know him." *Id*. at 948:2-12. Mr. Chou was supposedly known by A. Wang "either from Beijing or Shanghai" but A. Wang was unsure which because he claimed to know that Mr. Chou "has a few places." *Id*. at 948:13-19.  Mr. Chen Mei-Lin was supposedly "in [the] car business selling imported foreign cars." *Id*. at 961:12-23. A. Wang explained that Mr. Chen "you know he ha[d] a lot of money at that time," but that he is no longer in the field. *Id.*; *see also id.* at 544:25-545:19 (A. Wang testifying he knew the buyers "personally" or "through other friends" or "through auction house.")

Yet when he first answered sworn interrogatories in this RICO action five years later, A. Wang *completely* changed his testimony. For the first time ever, he claimed that he had no documents or communication with the alleged buyers because he had actually used an "intermediary" to find them and set up the sales. Savitsky Decl. Exh. 5 at p. 4 (A. Wang initial interrogatory responses

verified on September 7, 2018).  A. Wang claimed in his initial interrogatory responses in 2018 that it was this intermediary, named Er Shi Fu, that "had the direct contact with the buyers." *Id.* Yet A. Wang has not produced any emails, faxes, contracts, or communications of any kind with Mr. Fu either—despite ostensibly using him to conduct six transactions totaling $4 million. *See* Savitsky Decl. at ¶5; *id.* Exh. 6 at 86:21-87:11; 92:11-93:6 (2019 AW Dep. Trans.).  A. Wang claims this is because Mr. Fu did not have an email account or a fax machine. *Id.* Exh. 6 at 86:21-87:11; 92:11-93:6. A. Wang testified he simply wrote all the information from Mr. Fu "down on a piece of paper and give to [Martin] Klein." *Id.* at 92:14-21. But his call notes were not produced either. Savitsky Decl. at ¶5. A. Wang also claims Mr. Fu is now dead. Savitsky Decl. Exh. 5 at p. 4. A. Wang testified that he never met any of the five buyers prior to the sales, but that he might have subsequently met "one or two" after the sales "while staying in the hotel." Savitsky Decl. Exh. 6 at 93:12-94:15 (AW 2019 Dep. Trans.). A. Wang confirmed that if he met any of the five buyers it was "definitely" after the sales had already occurred through Er Shi Fu. *Id.* at 94:9-15.[1]

A. Wang went on to elaborate during his deposition in 2019 that it was supposedly the deceased New York County PA, Ethel Griffin, who first referred him to Mr. Er Shi Fu, approximately "one year" before the Estate's sales. *Id.* at 76:14-23. A. Wang vividly recalled a supposed dialogue between himself and Ethel Griffin, now deceased, about Er Shi Fu that took place in the hallway of the New York County Surrogate's Court. *Id.* at 76:24-79:23. However the former PA's long-time counsel—who had been Martin Klein's direct contact with respect to all six sales— had not only never heard of Er Shi Fu, but testified that "in my opinion the chances of [A. Wang's] testimony [that Ethel Griffin referred A. Wang to Mr. Fu] being true is somewhere between zero and nil." Savitsky Decl. Exh. 7 at 105:9-106:23 (Jun. 28, 2019 Deposition of Peter Schram, Esq.).

---

[1] Neither Er Shi Fu's name nor his supposed role was mentioned once during A. Wang's four days of deposition testimony in 2013 nor was any document in the record prior to A. Wang's 2018 interrogatories in this action. Savitsky Decl. at ¶5; Savitsky Decl. Exh. 3 at ¶¶47-48 (February 14, 2020 declaration of Dahlia Damas (the "PA Decl.").

Schram explained "If [the PA] had known of such—of such a person, I would have heard about it, and I did not." *Id.*; *see also* Exh. 3 at ¶¶47-48 (PA Decl.).  A. Wang made it all up.

> ii.   *The Wangs' Contradictory Testimony and Incomplete Disclosures Regarding Their Corporate and Financial Account Holdings and the Source of Payments for the 98 Paintings.*

It is now undisputed that A. Wang used offshore companies to wire approximately $4 million dollars to the Estate as payment for the 98 Paintings. Savitsky Decl. Exh. 6 at 241:14-242:21 (2019 AW Dep. Trans.). But this was not always the case, and it is relevant to this Sanctions Motion that A. Wang initially lied, repeatedly, under oath about his involvement in the payments to the Estate. First, back in 2013, A. Wang testified that he did not know how the buyers (who at that point he claimed he personally knew, see pp. 5-6 *supra*) actually transferred their payments to the Estate, only that they "have their way":

> Q: Back to here. From China?
>
> A: I don't know, from anywhere. We just gave them the account. They just wire the money here.
>
> Q: Well, it couldn't be from China, right, because China doesn't allow you to make the money transfers outside the country?
>
> A: They have their way. If a company that have import and transport, or export business, they could get a government quota to wire the money directly to foreign countries. You know, they could give other reasons instead of buying artworks.

Savitsky Decl. Exh. 4 at 944:14-945:5 (2013 AW Dep. Trans.); *see also id.* at 727:21-728:25 (A. Wang testifying he did not know who Billie Wai was and the buyers "have their way of transporting money").  Andrew then testified that this was the "standard procedure for . . . all of the private sales" and explained that "we have to receive the money first. The money has to be wired here first and then the artwork would go." Savitsky Decl. Exh. 4 at 949:19-950:17 (2013 AW Dep. Trans.).

At the same deposition in 2013, A. Wang was also asked if he held an interest in any companies between 2003 and 2013 (other one called "BWT Asian Arts" which he claimed to have

formed in 2012); A. Wang testified that he did not.  Savitsky Decl. Exh. 4 at 97:14-23 (A. Wang testifying he formed BWT Asian Arts one year before his deposition); 98:12-23 (A. Wang testifying he did not own any interest in any other companies from 2003 through 2013).

In September 2018 in this RICO action, the Plaintiff served interrogatories on A. Wang and S.K. Wang asking them to list all financial accounts—personal or corporate and in the U.S. or abroad—for which either was a signatory between 2003 and 2018. The Wangs both initially objected and provided no substantive response. *See, e.g.*, Savitsky Decl. Exh. 5 at p. 11 (A. Wang Initial Interrogatory Responses dated Sept. 7, 2018). Two months later, after a discovery dispute, A. Wang provided a supplemental response disclosing that between 2003 and 2018 he was the signatory to the following accounts:

> Without waiver of the above General and Specific Objections, Defendant identifies the following accounts:
>
>   A personal account at Chase bank.
>
>   A joint account with his wife at Chase bank.
>
>   A trust account for the Shou Kung Wang Irrevocable Trust at Chase bank.
>
>   A trust account for the Jie Wang Irrevocable Trust at Chase bank.
>
>   An account in the name of Bao Wu Tang at Chase bank.

Savitsky Decl. Exh. 8 at p. 21, (A. Wang's second supplemental interrogatory responses dated Nov. 7, 2018).

Y.K. King soon learned from *outside* sources that A. Wang's November 7, 2018 Second Supplemental Reponses were omitting crucial evidence of self-dealing. A few months before A. Wang had submitted his second supplemental responses, the Plaintiff had subpoenaed a third-party law firm named Lau & Associates because publicly filed land records indicated that the firm had represented A. Wang when he purchased a $5.9 million mansion in 2013 as trustee on behalf of the S.K. Trust. Savitsky Decl. at ¶11 Exh. 9 at AWSK_00000002 (Bargain and Sale Deed of the

purchase of $5.9 million property at 117 Old House Rd. Sands Point, NY ("117 Old House") and identifying Lau & Associates, P.C. as counsel).

The Lau & Associates firm's third-party production revealed a few major insights. First, A. Wang had *originally* signed the contract to purchase 117 Old House in April 2013 on behalf of a previously undisclosed corporate entity named "Le Tao Limited." Savitsky Decl. Exh. 10 at p. 2 ($5.9 million Contract of sale for 117 Old House Rd. dated April 2013 produced by Lau & Associates). After signing the contract of sale, A. Wang amended it to make the "Shou-Kung Wang Irrevocable Trust" the buyer on the publicly published deed. *See id.* at p. 1.  The second revelation was that A. Wang had used Le Tao Ltd.'s overseas HSBC account to wire $590,000.00 to Lau & Associates as a 10% down payment for the $5.9 million mansion; the firm even produced the wire authorization form in A. Wang's handwriting. *See* Exh. 11 (Le Tao Ltd. 2013 wire transfer record); Exh. 6 at 261:12-262:20 (A. Wang authentication the Le Tao Ltd. 2013 wire transfer record). Yet A. Wang had not disclosed this account in his interrogatory responses.[2] Savitsky Decl. Exh. 8 at p. 21 (A. Wang's Nov. 6, 2018 interrogatory responses). The third revelation was that the contract of sale A. Wang's real estate lawyer produced identified Le Tao Ltd.'s business address as "*Unit #704, Forseas Building, #208-212 Nathan Road, Kowloon, Hong Kong*." Savitsky Decl. Exh. 10 at p. 2 (KING 006703). As explained more fully in the next section, this was the address to which all 98 Estate Paintings were shipped and it was the first time the Plaintiff had seen it connected to A. Wang outside of the six sales contracts. Savitsky Decl. Exh. 8 at p. 18 (A. Wang stating only that he stores financial records in his home and in Hong Kong).

On December 12, 2018, with records of Le Tao Ltd.'s existence in hand, the Plaintiff filed a pre-motion letter with Magistrate Judge James L. Cott. The letter accused the defendants of, among

---

[2] He had also not disclosed the company during his December 2013 deposition.

other things, "hiding corporate entities, accounts, paintings and assets all which provide proof of their self-dealing, by lying in their discovery response." Savitsky Decl. Exh. 12 at 2, 4 (December 12, 2018 Letter of Sam P. Israel to Hon. James L. Cott) [ECF Dkt. No. 136]. The Plaintiff specifically noted the Wangs' interrogatory responses failed to identify their corporate accounts and that they had produced no corporate financial records either. *Id.*

Following a pre-motion conference held on December 19, 2018, the Wangs were ordered to go back to their client and correct any mistake in failing to include any of A. Wang corporations. *See* ECF Dkt. 140. Shortly thereafter, A. Wang once more supplemented his interrogatory response. The only additional corporate account entry was the one he had just been caught lying about: "Le Tao Ltd. at HSBC"

> A trust account for the Jie Wang Irrevocable Trust at Chase bank.
>
> An account in the name of Bao Wu Tang at Chase bank.
>
> An account for Le Tao Ltd. at HSBC.

Savitsky Decl. Exh. 14 at pp. 21-22 (A. Wang's Third Supplemental Responses to Interrogatories dated December 21, 2018). This answer was sworn to under the penalties of perjury on December 21, 2018. *Id.* at p. 25. For his part, S.K. Wang submitted supplemental interrogatory responses identifying only two accounts. Savitsky Decl. Exh. 23 at Resp. No. 7.

But that was not the end of the Wangs' non-disclosures and falsely verified interrogatory responses. The Plaintiff next noticed that the name of A. Wang's newly disclosed offshore company, Le Tao Ltd., was uncannily similar to the name of the company that had wired the Estate $489,772.00 as the purchase price for the 14 paintings supposedly sold to "Yue Da Jin" in 2009: "Le Style Ltd." *See* Savitsky Decl. Exh. 15 (Estate's Aug. 2009 bank statement showing incoming wire from "Le Style Ltd." in relation to the "Yue Da Jin" sale):

10

| DATE | DESCRIPTION | CHECK# | DEBITS | CREDITS | BALANCE |
|------|-------------|--------|--------|---------|---------|
| | Beginning Balance | | | | 463,558.05 |
| 08-12 | Wire transfer deposit | | | 489,772.00 | 953,330.05 |
| | LE STYLE LIMITED   C/O DBSCS | 081209 | | | |
| 08-12 | Wire transfer fee | | 15.00 | | 953,315.05 |
| | LE STYLE LIMITED   C/O DBSCS | 081209 | | | |

*Id.* The Wangs' material non-disclosures were unraveling.

The Plaintiff next filed another letter with the magistrate judge explaining that an online whistleblower organization called the International Consortium of Investigative Journalists (the "ICIJ"), and responsible for the leak of the Panama Papers, had released information that identified "Le Style Ltd." as a BVI corporation formed on October 13, 2006 and jointly owned and controlled by ***both*** "Andrew Wang" ***and*** "Shou-Kung Wang.":



Savitsky Decl. Exh. 16 at p. 5 (Jan. 15, 2019 Letter of Sam P. Israel to Hon. James L. Cott); Website available at https://offshoreleaks.icij.org/nodes/151272. There was, and is no, reason to doubt the accuracy of the ICIJ publication. It was independently verified by the Estate's 2009 wire record identifying Le Style Ltd as a payor using "DBS Corporate Services (HK) Ltd." as an intermediary: both entities accurately appear on the ICIJ's database. *See* Savitsky Decl. Exh. 15 (Estate's Aug. 2009 bank statement indicating the Yue Da Jin Wire was made "c/o DBSCS"); Exh. 6 at 310:2-

11

311:12 (A. Wang testifying as to his knowledge of "DBSCS"). The Jan. 15, 2019, letter also noted the Wangs' failure to produce the asset schedule for the S.K. Wang Trust. *See* Savitsky Decl. Exh. 16 at 2.

At the subsequent discovery conference, the Wangs' counsel promised to get more information on Le Style Ltd. Savitsky Decl. Exh. 13 at 76:23-79:1 (Jan. 18, 2019 Conference Transcript). Yet no documents (whether incorporation or financial records) related to Le Style Ltd. were ever produced by the Wangs. Savitsky Decl. at ¶17.

Yet another discovery conference was held on March 4, 2019 and two issues relevant to the current Sanctions Motion were discussed at length. First, the Court heard arguments on the Wangs' failure to produce an actual, filled-in asset schedule for the S.K. Trust. Savitsky Decl. Exh. 18 at 15:2-19:25 (3/4/19 Conf. Trans.; ECF Dkt. 168). As noted at p. 9 *supra*, the Plaintiff learned of the existence of the S.K. Trust through publicly filed land records for the $5.9 million purchase of 117 Old House in 2013. Yet when the Wangs produced the S.K. Trust in response to the Plaintiff's discovery demands, they produced a signed, witnessed, and initialed trust that was complete in every way—except that it had an asset schedule with only blank, numbered entries for both "Real Property" and "Personal Property." *See* Savitsky Decl. Exh. 19 at 31 (the S.K. Trust). At the conference, the Plaintiff's counsel argued they had been unable to find a personal address to serve a subpoena on the Wangs' attorney, Mr. Nicholas Nudo, who apparently drafted the S.K. Trust. Savitsky Decl. Exh. 18 at 18:8-18 (3/4/19 Conf. Trans.). In fact, the Wangs' counsel stated Mr. Nudo had "not returned our calls." *Id.* at 17:23-18:5 (3/4/19 Conf. Trans.). The Plaintiff argued that to not have an asset schedule on such a carefully drafted and large trust would be irrational since a trust is void without one; it would be like producing a social security card with blank number entry. *Id.* at 15:13-16:13 (3/4/19 Conf. Trans.). The Court acknowledged that if the Wangs could not produce

the schedule, the remedy might be an adverse inference at the appropriate time. *Id.* at 19:5-25 (3/4/19 Conf. Trans.).

The second issue addressed at the March 4, 2019 conference was the Wangs' complete lack of production for Le Style Ltd., which the Wangs had failed to disclose in their interrogatories. *Id.* at 22:23-28:16 (counsel and court discussing the lack of production of Le Style Ltd. incorporation records from the Wangs' BVI corporate trust agency, Portcullis). During the March 4th conference, the Wangs counsel represented to the Court that the first time the Plaintiff requested records for Le Style Ltd. was immediately before the conference in their pre-motion letter. *Id.* at 26:23-27:11 (3/4/19 Conf. Trans.). But that was inaccurate: all corporate records were demaned by YK in August 2018. *See* Exhs. 5, 20, 21, 23. Moreover, Le Style Ltd.'s records had been demanded in the Plaintiff's pre-conference letter filed in January prior to the January 18, 2019 conference and "Portcullis Trustnet BVI" was identified in the same letter as one of the offshore company's intermediaries. Savitsky Decl. Exh. 13 at 76:23-79:1; Savitsky Decl. Exh. 16 at p. 5 (identifying Le Style Ltd. as undisclosed by the Wangs and identifying Portcullis as its "intermediary"). In any event, the Wangs' had an affirmative obligation to truthfully and completely respond to the interrogatories.

Though he never produced its corporate or financial records, A. Wang, at his June 2019 deposition, admitted that he owned Le Style Ltd. (since the ICIJ website had effectively forced him to) and used it to transfer $489,772.00 into the Estate in relation to the sale to "Yue Da Jin" in 2009. Savitsky Decl. Exh. 6 at 15:11-15, 16:12-17:19, 416:20-24. He claimed, however, that he no longer had records for the company. *Id.* at 311:13-312:2; Savitsky Decl. Exh. 22 (Mar. 15, 2019 email from A. Wang's counsel that they reached out to their BVI holding company, Portcullis, for documents related to Le Style Ltd., but received no response).

At the same 2019 deposition A. Wang also surprisingly confessed—for the first time and six years after originally being deposed about his role in the Estate's sales of the 98 Paintings—that he

had used his own Hong Kong/BVI companies (*i.e*, Le Style Ltd. and others) to pay the Estate in relation to <u>all</u> of the Estate sales. He explained the buyers were "always" asking him for the "favor" of using his company because "if ever the money come out from China, that's the only way it can come out." Exh. 6 at 242:2-21 (AW 2019 Dep. Trans.). Of course, A. Wang has also produced no communications with the five buyers—or Er Shi Fu—asking him for these "favors." He has also produced no bank records or incorporation records for any of the companies he claims he used to perform multi-million-dollar services for them while he served as executor of the Estate. *Id.* at 245:16-24; 311:3-19; ¶17. When asked in 2019 if he thought he had an obligation as fiduciary to preserve bank records of the "favors" for the buyers, A. Wang said he did not because they were not related to the Estate. *Id*. at 246:7-20 (AW 2019 Dep. Trans.). But such transfer and account details obviously go to core of the fraud, self-dealing, and RICO claims.

> iii. *The Wangs' Contradictory Testimony and Incomplete Disclosures Regarding the Shipment of All 98 Paintings to "Billie Wai" in Hong Kong—the Wangs' Family Accountant.*

For all six contracts, A. Wang directed the Crozier art storage facility in New Jersey to ship the sold paintings to each of the five buyers as follows:

> [*Buyer's name*]
> *c/o* "Billie Wai"
> Unit #704, Forseas Building,
> #208-212 Nathan Road, Kowloon, Hong Kong

*See* Savitsky Decl. Exh. 6 at 254:16-255:8. When A. Wang's attorney, Martin Klein, was coordinating the third sale shipment to "Anthony Chou" in May 2005, he asked A. Wang if the paintings were being shipped to "Mr. Chou at his address in Beijing City?" Savitsky Decl. Exh. 17. A. Wang replied "China would collect custom tax if it's shipped to Beijing." *Id.* Therefore, A. Wang claimed "he [the buyer] asked me to ship them to Hong Kong. Please use the same address in HK

and he will pick them up there." *Id.* Billie Wai's shipping address was then used for the remainder of the contracts as well. *See e.g.*, Savitsky Decl. Exh. 6 at 254:16-255:8.

At his 2013 deposition, A. Wang was questioned about the reasoning for sending all six shipments to same address. When first asked if he knew Billie Wai, A. Wang straight-up lied and said that he did not:

> Q: Who is Billy Wai, W-A-I?
> A: Who is Billy Wai?
> Q: Yes. Do you know that name?
> A: No.

Savitsky Decl. Exh. 4. at 727:21-24 (2013 AW Dep. Trans). When asked again later on during the deposition, however, A. Wang claimed Billy Wai was a person at a business office in Hong Kong that offered a package reception service:

> Q:[] In terms of Billie Wai, do you know who that person is?
> A: You mean the person in Hong Kong?
> Q: Yes
> A: That's a person that she is receiving the works.
> Q: Right.
> A: And there is an office in Hong Kong, old office. It's called like a business office, that you can let office receive fax, mails and also, you know. . . . You just use the office to receive your mail, to receive packages and you pay for their service.

*Id.* at 945:6-21. He testified "the office received the package and they would make arrangement for the receipt of the buyer." *Id.* at 946:6-19. And when asked if he knew "Billie Wai, from [] before this series of transactions," A. Wang testified that he did not: "I contact that person for that shipment. You know, I just—that is the time I contacted with." *Id.* at 945:24-946:5.

But discovery in this action, once again, forced A. Wang to change his 2013 testimony. The $5.9 million public land record discussed in the previous section was signed by A. Wang on behalf of Le Tao Ltd. and listed the company's business address as "Unit 704 Four Seas Building 208-212, Nathan Road, KLN, Hong Kong"—*i.e.*, the same address to which the 98 Paintings were shipped,

Billie Wai's address. Savitsky Decl. Exh. 10 at p. 2 (KING 006703 from Lau & Associates third-party production).

And so, at A. Wang's 2019 deposition he confessed that Unit 704 is the office of his accounting firm in Hong Kong and Billie Wai is his accountant. Savitsky Decl. Exh. 6 at 127:4-128:17; 311:13-19 (A. Wang testifying regarding his search for relevant records: "And I even went to the bank to look for it and including my accountant Billie Wai's office").  In direct conflict with his 2013 testimony, A. Wang explained that Billie Wai's accounting firm, CK Lam, "has been a family for friend for a long time . . . [W]e form the companies there. We also close the company there." Savitsky Decl. Exh. 6 at 128:4-17 (6/25/2019 AW Dep. Trans.). But A. Wang had never previously listed Billie Wai's office as a location at which he stored records. *See, e.g.*, Savitsky Decl. Exh. 5 at Inter. No. 8 (A. Wang's Sept. 7, 2018 Inter. Resp.); Exh. 8 at p. 18 (A. Wang's Nov. 6, 2018 Inter. Resp.  stating only that "Defendant stores his financial records in his home and in Hong Kong."); Exh. 14 at p. 19 (A. Wang's Dec. 21, 2018 Inter. Resp. stating that he stores financial records with "an accountant located in Hong Kong."). Moreover, neither of the Wangs have produced any communications with Billie Wai or other records referencing her work for them or her receipt of the 98 Paintings. Savitsky Decl. at ¶17. Savitsky Decl. Exh. 20 at Demand No. 26 (A. Wang demands); Exh. 21 at Demand No. 23 (S.K. Wang demands). Documents and communications concerning the shipments to Billie Wai and the international corporations she set up obviously go to the heart of this RICO case.

## C. The Wangs Called a Chinese Witness to Lie Under Oath During the 2017 Probate Trial in the Surrogate's Court

A jury trial to adjudicate Y.K. King's objections to the Fraudulent 2003 Will which had named A. Wang as preliminary executor was held in April 2017. One of the witnesses who testified on behalf of the Wangs at the 2017 Probate Trial was Chien Fang Huang. *See* Savitsky Decl. Exh.

16

26 (appellate record certified by the Wangs' counsel and containing the entire April 25,2017 probate trial testimony Ms. Chien ("4/25/17 Prob. Tr. Trans.") at King-SCT-000017480 (appellate index listing Ms. Chein as the final probate trial witness) and 17482 (Ms. Chien being sworn in at trial). She testified, through a Chinese translator, on the issue of C.C. Wang's capacity by claiming that she visited C.C. less than 48-hours before his death on "July 1st of 2003." *Id.* at 825:10 - 826:3 (4/25/17 Prob. Tr. Trans.). Ms. Chien told the jury that C.C. Wang was "very smart, and [was] very clear in his thought" on July 1, 2003. *Id.* at 826:23-26. She also testified that during her discussion with C.C., "[h]e told me that his little daughter [Yien-Koo] and son-in-law [Kenneth King] had, on the very bad day, took from him 180 pieces of artifacts, of art." *Id.* at 826:17-19. She claimed that C.C. seemed sharp of mind and "was smiling as he was flipping through the book and he also saw me with cheer on his face." *Id.* at 829:2-8. This is Ms. Chien's preposterously false sworn testimony as to what C.C. Wang was doing and saying less than 48 hours before the 96-year-old finally succumbed to late-stage metastatic cancer.

On cross examination, Ms. Chien testified she did not speak to A. Wang about her court appearance and that, in fact, the last time she had spoken to A. Wang was "*in 2003 at a funeral of C.C. Wang*." *Id.* at 831:9-14 (emphasis added). Subsequent discovery in this RICO action revealed that Ms. Chien's 2017 trial testimony was recruited by A. Wang and perjurious. A. Wang and Ms. Chien apparently work together and are very close friends. *See, e.g.*, Savitsky Decl. Exh. 27 at WANG002215, 2228-2229 (Ms. Chien emailing A. Wang in 2007 "My friend . . . is able to help me to contact [two art collectors] when your family's case is finished and what you like to [] deal with them in the future. Report over, boss."); *Id.* at WANG002363-2365 (Ms. Chien emailing A. Wang in 2011: "I just called you, perhaps you are still sleeping."; "When do you go back to Shanghai? Can I stay at [your] house as we discussed?") and *Id.* at WANG002365 (A. Wang emailing Ms. Chien in

17

2011: "Planning to return to Shanghai in early May, but ha[ve] already arranged for you to stay in my Shanghai apartment. Is it OK? My friend Mr. Ye will help you before my arrival to Shanghai.").

## ARGUMENT

I.    **The Court Should Issue an Order Pursuant to Fed. R. Civ. P. Rule 37(b) and (c) Striking the Wangs' Affirmative Defenses for Blatant, Repeated, and Willful Violation of Discovery Orders and the Federal Rules of Civil Procedure.**

A.    *Legal Standard for a Motion for Sanctions Pursuant to Fed. R. Civ. P. 37*

Rule 37 of the Federal Rules of Civil Procedure lists the potential ramifications of a litigant's failure to satisfy discovery obligations. Fed. R. Civ. P. Rule 37. A district court has "broad power" to impose "sanctions in response to abusive litigation practices." *Friends of Animals Inc. v. United Sates Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997). The purpose of such sanctions is twofold. First, they are meant to prevent a litigant from gaining an advantage from his own misconduct. *See Communispond Inc. v. Kelly*, No. 96 Civ. 1487, 1998 WL 473951, 1998 U.S. Dist. LEXIS 12336, *12 (S.D.N.Y. Aug. 10, 1998) (striking defendant's answer as a sanction to discovery abuses and deceptive conduct). Second, they serve to send a warning to future litigants that willful discovery abuses to conceal crucial and damaging evidence is not a worthwhile litigation strategy. *See NHL v. Metro Hockey Club*, 427 U.S. 639, 643 (1976) (explaining that district courts have discretion to look even beyond the harm inflicted or suffered by the immediate parties to send a message to future litigants that certain abuses are unacceptable and affirming dismissal for repeated untimely and inadequate discovery responses). Thus, so long as misbehaving litigants show—like the Wangs do here—a "callous disregard" for discovery obligations and "flagrant bad faith," a court is within its discretion to strike the litigants' pleadings *in toto* and with prejudice. *Id.*

Rule 37(b) exists to impose sanctions based upon non-compliance with a court's direct discovery order. Rule 37(c) entails the imposition of sanctions, even absent a discovery order, based upon a party's failure to observe the disclosure requirements set forth in Rule 26. Under both Rule

18

37(b) and (c), a court may strike a party's pleadings in whole or in part as a sanction for discovery abuses. *See* Fed. R. Civ. P. Rules 37(b)(2)(A)(iii) and (c)(1)(C). The rules also permit a court to grant adverse inferences as to spoliated evidence. *Id.*

Here, the relevant Fed. Rule Civ. P. Rule 26 discovery obligations concern Rule 26(e)'s requirement that a party continue to provide complete and correct document production and interrogatory responses, along with several discovery conference orders stating the same. Fed. R. Civ. P. 26(e); *see also Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prods.*, 19-cv-3766, 2020 WL 7342724, 2020 U.S. Dist. LEXIS 234361 (Dec. 11, 2020 S.D.N.Y.) ("*Beverly Hills*") (granting sanctions for violations of Rule 26(e) based on incomplete production and evasive interrogatory responses). To determine if a violation of Rule 26(e) warrants sanctions under Rule 37(c), courts conduct a three-factor analysis by asking (1) whether the party had control of the evidence and had an obligation to produce it, (2) whether the party had a "culpable state of mind," and (3) whether the withheld evidence was relevant to and would support the moving party's claim or defense. *In re Sept. 11 Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007).

B. *The Wangs Failed to Satisfy Their Discovery Obligations in This Action to Preserve Evidence, Truthfully Answer Interrogatories, and Produce Documents Related to Le Style Ltd., A. Wang's Other Corporations, Billie Wai, and the S.K. Trust.*

The first element for sanctions is satisfied here because the Wangs breached their discovery obligations by not producing any records related to Le Style Ltd., communications or other records with Billie Wai (and not disclosing her as their accountant until 5 days before the close of discovery), or the asset schedule of the S.K. Trust. *See* Savitsky Decl. Exh. 20 at Demand Nos. 10, 20-27, 29 (the A. Wang Demands seeking documents related to Billie Wai, the sales, and the buyers); *id.* at Demand No. 122 (A. Wang Demands seeking corporate records) and Savitsky Decl. Exh. 21 at Demand No. 100 (S.K. Wang Demands seeking corporate records); Exh. 16 at 2, 5. It is not in any way redeeming that the A. Wang has finally admitted to owning Le Style Ltd. because he did so

only after a tortuous six-year period of denial—beginning with his deposition in 2013 and continuing through his falsely attested third supplemental interrogatory responses dated December 21, 2018. *See* pp. 6-13. For his part, S.K. Wang continues to deny that he was a shareholder and officer of Le Style Ltd. Exh. 24 (S.K. Wang Jun. 24, 2019 Dep. Trans.) at 14:15-15:6. *See also* Exh. 6 at 18:18-19:5 (A. Wang denying S.K. Wang's involvement with Le Style). S.K. Wang holds firm on this despite clear and corroborated evidence from the ICIJ that he was a co-owner with his son. Savitsky Decl. Exh. 16 at p. 5 (Jan. 15, 2019 Letter of Sam P. Israel to Hon. James L. Cott); Website available at https://offshoreleaks.icij.org/nodes/151272. Finally, as argued to Judge Cott, the Wangs had an obligation to produce the original S.K. Trust records and asset schedule. Exh. 18 at 15:3-16:13 (Plaintiff's counsel explaining the S.K. Trust production deficiency); 17:7-12 (the Court agreeing "It can't be this schedule had nothing listed" and the Wangs' counsel responding that is "what they got."); 19:15-24 (court and counsel discussing adverse inference) (3/4/19 Conf. Trans.). *See also* Savitsky Decl. Exh. 16 at pp. 2, 5.

In *Beverly Hills,* the Court awarded sanctions in part because a plaintiff's answer to an interrogatory demanding the names of "all" persons involved with the creation of a certain product, stated that it would only identify two people "most intimately involved with the product." *Beverly Hills*, 2020 U.S. Dist. LEXIS 234361 at *21. The court found this to be unacceptable gamesmanship. *Id.* Here, the Wangs' continued failure to disclose Le Style Ltd. and Le Tao Ltd.[3] and to produce records of them issue was not mere gamesmanship. It was perjury. The Wangs have been lying under oath at least since A. Wang's 2013 deposition and continuing through this proceeding. *See e.g.,* ECF Dkt. 36 (First Amended Complaint alleging A. Wang caused wire transfers to be paid to the Estate) at ¶¶150, 171, 195, 209, 217, and 224 and ECF Dkt. 78 at *id.* (the Wangs Answer to the Amended

---

[3] These are just two of the corporations which the Plaintiff discovered on her own. There is simply no telling how many other corporations the Wangs currently and previously controlled.

Complaint denying that A. Wang caused the wires to be transferred to the Estate); Exh. 8 at p. 21 (omitting Le Tao Ltd. and Le Style Ltd. from supplemental interr. responses); Exh. 14 at pp. 21-22 (omitting Le Style Ltd. from third supplement interr. responses); Exh. 4 at 98:12-23 (A. Wang testifying he did not own any interest in any other companies from 2003 through 2013)/

The Wangs will likely argue in opposition to this Sanctions Motion that they do not have control of the Le Style Ltd. or other corporate documents anymore and that they were justifiably destroyed in the ordinary course of business by Billie Wai, A. Wang, or S.K. Wang. *See* Savitsky Decl. Exh. 6 at 246:7-20 (AW 2019 Dep. Trans.) (A. Wang testifying he had no obligation to preserve records of his multi-million payments to the Estate). But that argument is legally and factually meritless: A. Wang, at the very least, had an obligation to preserve these corporate records. "It is well-established that a fiduciary has an absolute obligation to account and, in order to meet this obligation, it must maintain adequate records of its fiduciary transactions." *Matter of Sanchez*, No. 2001-3187/G, 2017 N.Y. Slip Op. 32685(U) (Sur. Ct., N.Y. Cnty. Dec. 28, 2017) (citing (7th Warren's Heaton, Surrogate's Court Practice 91.01 at 91-2 [7th ed 2017]; *Matter of Anolik*, 274 A.D.2 515 [N.Y. App. Div. 2000])). A. Wang was a fiduciary of the Estate between 2003 and 2017. He therefore had an obligation to keep transaction records of the $4.3 million worth of transactional "favors" he did for the buyers of Estate assets. *Id.* Exh. 6 at 262:2-21 (AW 2019 Dep. Trans.). Moreover, even if he was not a fiduciary, he would have been required to maintain the records since he was put on notice of Y.K. King's potential claim as early as 2011.[4] *See Heng Chan v. Triple 8 Palace*, No. 03 Civ. 6048, 2005 WL 1925579, 2005 U.S. Dist. LEXIS 16520 (S.D.N.Y. Aug. 11, 2005) (issuing sanction for failure to place a litigation hold on document destruction at the outset of a case); *Turner v. Hudson Tr. Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (noting a party may be

---

[4] Noticing the Estate's paintings were appearing at Chinese auctions, Y.K. King filed a petition in the Surrogate's Court demanding A. Wang account. Savitsky Decl. Exh. 28 (Y.K. King's May 9, 2011 Petition for an Accounting of A. Wang).

sanctioned when it should have known that evidence would be relevant to future litigation). Failure to preserve relevant records in the face of possible litigation concerning them is sufficient for a finding that the records were spoliated. *See Byrnie v. Town of Cromwell Bd. Of Educ.*, 243 F.3d 93, 108 (2d Cir. 2000) (reversing district court's denial of request for an adverse inference sanction on summary judgment).

C.   *The Wangs Have Culpable Mind States.*

A culpable mind state may be established where it is shown that a party failed to answer an interrogatory, produce a record, or preserve a record due to its own gross negligence. *See Beverly Hills*, 2020 U.S. Dist. LEXIS 234361 at \*31-32 (noting gross negligence in destroying or not producing evidence can justify sanctions); *Heng Chan*, 2005 U.S. Dist. LEXIS 16520, \*27 (same). Here, the full scope of the timeline as outlined in pp. 4-17 *supra* make it clear beyond any reasonable doubt that A. Wang and S.K. Wang have been knowingly lying. For example, A. Wang failed to identify Le Style Ltd. or Le Tao Ltd. during his deposition in December 2013, despite the fact that he had just used Le Tao to enter into a \$5.9 million contract in April of that year. And though he was being questioned about his role in the Estate's sale, he omitted from his testimony that he owned corporations that had paid the Estate *millions* of dollars for its paintings. *See* pp. 7-16, s*upra*. The Wangs' non-disclosures and non-productions are plainly intentional. Moreover, A Wang's 2019 testimony in this action on how he sourced the buyers is not merely in conflict with his 2013 testimony, the two accounts are of parallel universes. In one A. Wang is friends with the buyers and has known some for decades, in the other he never met them and communicated only by phone with a Chinese intermediary who had no fax or email account and is now dead. *See* pp. 5-7 *supra.* This is fraud on the court.

Likewise, S.K. Wang's current denials of knowledge and participation are lies. For example, S.K. Wang filed a verified pleading in the Surrogate's Court specifically attesting to the supposed

22

fact that A. Wang was "friends" with the buyers. *See* Savitsky Decl. Exh 25 at ¶¶34, 113-119 (S.K. Wang's verified answer to a 2014 petition to remove A. Wang for self-dealing). Thus, S.K. Wang admitted the residential address listed for the buyer in the Estate's contract with Chen Mei Lin was A. Wang's own Shanghai apartment address. *Id.* S.K. Wang explained that A. Wang let the buyer, Chen Mei Lin, use his address as an "accommodation"—whatever that means. *Id.* The Wangs are partners and co-conspirators. *See e.g.,* Exh. 2 (2017 Probate Decree); Exh. 16 at p. 5 (1.15.19 Letter to Judge Cott explaining the ICIJ's publication re Le Style's co-ownership by the Wangs); Exh. 25 ¶¶34, 113-119 (S.K. Wang's verified pleading regarding A. Wang's sales to his "friends"); Exh. 19 (the S.K. Wang Trust); Exh. 29 (the Wangs' joint answer to the amended complaint; ECF Dkt. 78).

D. *The Non-Disclosed Information Was Relevant to and Would Likely Have Supported the Estate's Case*

The Wangs failed to disclose information and produce records relating to *the* central question in this case: *Who paid for the Estate's paintings?* It was not until June 25, 2019—five days before the close of discovery, after six years of litigation in this and other proceedings, after millions of dollars had been spent on attorneys, after nearly half-a-dozen discovery conferences had been held, and after dozens of days of depositions—that A. Wang admitted for the first time that he was the source of the $4.3 million payments to the Estate.

Though A. Wang confessed to this discreet issue, the remaining holes in the Wangs' discovery responses continue to be relevant. Without Le Style Ltd.'s corporate and financial records along with other records from Billie Wai, it will be impossible to fully vet A. Wang's claim that his payments were merely transitory in nature. It is also more difficult to prove S.K. Wang was a co-owner of Le Style Ltd. and an active RICO co-conspirator. With respect to the S.K. Trust, there is a "Personal Property" section that is blank on the document the Wangs' produced. Given the nature

of this case it is likely that this would have identified certain valuable Estate paintings as being held in trust.

E. *An Order Striking of the Wangs' Affirmative Defenses Is an Appropriate Sanction; Additionally, or Alternatively, the Court Should Give an Adverse Inference Jury Instruction*

Where a party's bad-faith or willful discovery misconduct persists over a significant period of time or evidence is spoliated that is "central" to a case, outright dismissal of a pleading is warranted. *Metro Found. Contrs., Inc. v. Arch Ins. Co.*, 551 Fed. Appx. 607, 610 (2d Cir. 2014) (affirming dismissal of complaint due to discovery abuse and spoliation). Though the Wangs' multi-decade fraud upon multiple state and federal courts certainly warrants it, the Plaintiff seeks "less drastic sanctions" than an order striking their answer *in toto* and entry of default. *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999) (noting that outright dismissal of a pleading is an extreme sanction that should only be imposed in extreme circumstances). She seek an order striking the Wangs' affirmative defenses in order to allow the matter to be tried and proven on the merits, while sufficiently punishing the Wangs for their abuses and warning future litigants that committing perjury during depositions and through interrogatories about matters central to the case are not tolerated by federal courts. *See West*, 167 F.3d at 780 (reversing district court's outright dismissal of an action and remanding to the district court to select any remedy, in its sound discretion, other than outright dismissal). The Wangs' fraud does not merely permeate every aspect of this multi-million-dollar case, it extends back into nearly two decades of state court proceedings. *See* Exh. 2 (Probate Decree) and pp. 5-17, *supra*. The Wangs have invented Chinese identities out of whole cloth and then lied about their relationships with them. *Id.* They also repeatedly lied in interrogatories and have failed to produce records on which the Plaintiff's case hinges. *See* pp. 7-13 (non-production of corporate formation and financial records). Because the non-disclosures, contradicting

testimonies, and destruction of crucial corporate financial records have been so egregious, we respectfully submit that the only just remedy is a striking of the Wangs' affirmative defenses.

The Court should also issue a jury instructions permitting the drawing of an adverse inference for spoliation due to the Wangs' the failure to preserve and produce the following:

(1) <u>Le Style Ltd.'s incorporation records</u>: If produced, these would have likely proven S.K. Wang was a co-owner of Le Style Ltd. *See e.g.*, Savitsky Decl. Exh. 15 at 5 (ICIJ publication identifying S.K. Wang as a co-owner of Le Style Ltd.);

(2) <u>Le Style Ltd.'s financial records</u>: If produced, these would have likely proven the funds in Le Style's account that were paid to the Estate did *not* come from "Yue Da Jin." They would have also likely establish acts of money laundering. *See* pp. 7-14 (A. Wang's continually changing testimony regarding the payments to the Estate and relationship with buyers);

(3) <u>Any incorporation records for other companies A. Wang claims he used to pay the Estate</u>: If produced, these would have likely proven S.K. Wang's co-ownership and that the funds in their accounts did not come from the five purported buyers. *See e.g.*, Savitsky Decl. Exh. 15 at 5 (ICIJ publication identifying S.K. Wang as a co-owner of Le Style Ltd.); pp. 7-14 (A. Wang's changing testimony regarding what offshore companies and accounts he controlled)

(4) <u>Communications or documents from Billie Wai</u>: If produced, these records would likely have corroborated Nos. 1-3, above. They would have also likely established Billie Wai's participation. *See* pp. 15-17 (A. Wang's drastically changing testimony regarding his relationship with Billie Wai and the nature of her office); and

(5) <u>The S.K. Wang Trust asset schedule</u>: If produced, this would likely prove the Estate held assets under the "Personal Property" heading of the Schedule. *See* Exh. 25 at ¶¶34, 113-119 (S.K.'s verified pleading confirming A. Wang's misstatements about his relationships with the buyers).

The circumstantial evidence here is sufficient to establish that these destroyed and unproduced documents which the Plaintiff requested "may have contained" the information set forth above; that is all that is required for an adverse inference. *See Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) (warning that too high an evidentiary burden of establishing what destroyed/unproduced documents might contain would eviscerate the purpose of the adverse inference sanction).

## CONCLUSION

This is a RICO case involving offshore bank accounts, Chinese witnesses, and Chinese auction houses that cannot be subpoenaed. Truthful testimony and complete disclosures were

therefore of paramount importance. For the Wangs' total disregard for oaths and obligations, the Court should send a clear message to the Wangs and future litigants that lying under oath and ignoring discovery obligations has serious repercussions. Therefore, the Plaintiff asks the Court to strike the Wangs' affirmative defenses and issue the requested adverse inference jury instructions due to spoliation of evidence.

Dated: New York, NY
April 8, 2021

SAM P. ISRAEL, P.C.

By:/s/ Timothy Savitsky
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886