**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

YIEN-KOO KING,

**Plaintiff,**

-against-

ANDREW WANG, SHOU-KUNG WANG, BAO WU
TANG, JIAN BAO GALLERY, ANTHONY CHOU,
CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE
DA-JIN and JOHN DOES 1-9,

**Defendants.**

**1:14-Civ-07694 (LJL) (JLC)**

# Plaintiff's Memorandum of Law in Support of Omnibus Motions in Limine

**SAM P. ISRAEL, P.C.**
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

# Table of Contents

Table of Authorities ..................................................................................... ii

Preliminary Statement ................................................................................ 1

Facts ................................................................................................................ 5

   A.  Commencement of the Wangs' RICO Enterprise and Collection of C.C. Wang's Assets Following His Death ................................................. 5

      i.  S.K. Wang and A. Wang's Knowledge of C.C. Wang's Art Collection and Their Scheme to Control It ................................................ 5

      ii.  A. Wang and the PA's Collection and Inventorying of Assets ...................... 6

   B.  The Estate's Sale of 98 Classical Chinese Paintings to Fictitious Buyers Between 2005 and 2009 ................................................................ 11

   C.  The Display of the Estate's Paintings at the Beijing Capital Museum's *Bao Wu Tang* Exhibition in 2009 ..................................................... 12

   D.  Auction Records Published by Arton.net and Artnet.com ................... 14

   E.  Relevant Procedural History ............................................................... 15

      i.  Commencement of the Instant RICO Action in 2014 ................................. 15

      ii.  Resolution of the Surrogate's Court Will Probate Contests Between 2017 and 2020 ................................................................................................ 15

      iii.  Disclosure by the Wangs of Two Non-Retained Experts Pursuant to Fed. R. Civ. P. 26(a)(2)(C): John S. Wang and Alfreda Murck ............................... 17

Argument ..................................................................................................... 19

   I.  Legal Standard for Motions in Limine ................................................. 19

   II.  **Motion No. 1**: Y.K. King Is Entitled to Collateral Estoppel and a Jury Instruction with Respect to the Determinations Contained in the 2017 Probate Decree and the 2020 Appellate Decision ......................................... 19

   III.  **Motion Nos. 2 and 3**: Evidence of Purported Misconduct by Yien-Koo King in Relation to C.C. Wang's Assets, TRO Violations, or Her 2007 Bankruptcy Filing and Discharge Are Irrelevant, Prejudicial, and Confusing; Such Evidence Should Be Barred ........................................................................... 22

      a.  *Motion No. 2: Purported Evidence of Y.K. King's Theft from C.C. Wang Prior to His Death Is Barred by Collateral Estoppel, Irrelevant, and Highly Prejudicial* ............................................................................................ 22

      b.  *Motion No. 3: Evidence of Y.K. King's Purported Violation of a TRO or Bankruptcy Fraud Is Irrelevant and Highly Prejudicial* ............................. 26

IV.  **Motion Nos. 4 and 5**: **The Court Should Rule that the 2009 Beijing Capital Museum Exhibition Catalogue and the Arton.Net and Artnet.Com Auction Records Fall Within Specified Exceptions to Hearsay and Are Admissible** ..28

    a.  *Motion No. 4*: *The 2009 Bao Wu Tang Exhibition Catalogue Is Not Hearsay and Is Admissible Because It Is a Statement of a Party Opponent or, alternatively, an Adoptive Admission Under Fed. R. Evid. Rule 801(d)(2)* ...28

    b.  *Motion No. 5*: *The Arton.net and Artnet.com Auction Results Are Excepted from the Hearsay Bar under Fed. R. Evid. Rules 803(17) and 803(18) and are Admissible for Both (a) Their Photographs of the Auctioned Works Along with Other Identifying Characteristics and (b) Their Auction Prices* ...................31

V.  **Motion No. 6**: **The Opinion of John S. Wang Concerning Counterfeiting Recently Designated by the Wangs Pursuant to Fed. R. Civ. P. 26(a)(2)(C) Should Be Precluded Because the Designated Opinion Is Unrelated to the Witness's Perception of Relevant Facts and the Designation Was Untimely** .33

CONCLUSION ......................................................................................................35

# TABLE OF AUTHORITIES

### CASES

*Avnet, Inc. v. Motion, Inc.*,
No. 12 cv 2100, 2016 WL 927194, 2016 U.S. Dist. LEXIS 29534 (N.D. Ill. Mar. 4, 2016) ..........34

*Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.*,
747 F.2d 844 (3d Cir. 1984)..................................................................................25

*Colon v. Coughlin*,
58 F.3d 865 (2d Cir. 1995)....................................................................................20

*Dunlop-McCullen v. Local 1-S*,
149 F.3d 85 (2d Cir. 1998)................................................................................25, 27

*Fade v. Pugliani*,
8 A.D.3d 614 (N.Y. App. Div. 2004) ....................................................................25

*Hoblock v. Albany County Bd. Of Elections*,
422 F.3d 77 (2d Cir. 2005)....................................................................................20

*Hourani v. Wells Fargo Bank, N.A.*,
158 F.Supp.3d 142 (E.D.N.Y. 2016) ....................................................................20

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 Civ. 3288DLC, 2005 WL 578109 (S.D.N.Y. Mar. 4, 2005) ...........................................19

*Kleveland v. United States*,
345 F.2d 134 (2d Cir. 1965)..................................................................................30

*Linde v. Arab Bank, PLC*,
97 F.Supp.3d 287 (E.D.N.Y. 2015) ...................................................................30, 31

*Matter of Chi-Chuan Wang*,
162 A.D.3d 447 (N.Y. App. Div. 2018) ..................................................................21

*Matter of Wang*,
179 A.D.3d 418 (N.Y. App. Div. 2020) ..................................................................21

*Mehlman v. Avrech*,
146 A.D.2d 753 (N.Y. App. Div. 1989) .............................................................25, 26

*Mem'l Hall Museum v. Cunningham*,
455 F.Supp.3d, 347 (W.D. Ken. 2020) ..................................................................34

*Morales v. N.Y. City Dep't of Educ.,*
808 Fed. Appx. 35 (2d Cir. 2020) ...............................................19

*Nath v. Select Portfolio Servicing, Inc.,*
2017 U.S. Dist. LEXIS 28095, 2017 WL 782914 (S.D.N.Y. Feb. 28, 2017) .........................19, 20

*Palmieri v. Defaria,*
88 F.3d 136 (2d Cir. 1996)..............................................................19

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,*
262 F.Supp.2d 251 (S.D.N.Y. 2003)............................................29, 30

*Schneider v. Richter,*
01CV01798, 2008 U.S. Dist. LEXIS 137852 (D. Conn. Jul. 25, 2008).........................................19

*United States v. Bueno,*
No. 98-Cr-534, 2000 WL 246271, 2000 U.S. Dist. LEXIS 2433 (N.D.N.Y. 2000) ....................21

*United States v. Bumagin,*
136 F.Supp.3d 361 (E.D.N.Y. 2015) .............................................19

*United States v. Dwyer,*
539 F.2d 924 (2d Cir. 1976)............................................................25

*United States v. Stevens,*
83 F.3d 60, 68 (2d Cir. 1996)..........................................................22

*United States v Tyrell,*
No. 18-3029-cr, 2021 WL 21775, 2021 U.S. App. LEXIS 7 (2d Cir. Jan. 4, 2021)  ...................29

*United States v. Valencia,*
826 F.2d 169 (2d Cir. 1987)............................................................19

*United States v Vázquez-Soto,*
939 F.3d 365 (1st Cir. 2019)......................................................31, 33

*U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.,*
205 F.Supp.3d 386 (S.D.N.Y. 2016)................................................32

*U.S. v. Tocco,*
135 F.3d 116 (2d Cir. 1998)............................................................30

*Wang et al. v. King et al.,*
No. 18 Civ. 8948 (JFK), 2020 WL 417690, 2020 U.S. Dist. LEXIS 13382 (S.D.N.Y. 2020) .....27

*Zoeller v. Lake Shore Sav. Bank,*

140 A.D.3d 1601 (N.Y. App. Div. 2016) ..................................................................................20

**STATUTES, RULES, REGULATIONS**

Fed. R. Evid. Rule 401 ........................................................................................................ 25, 28

Fed. R. Evid. Rule 402 ............................................................................................................. 25

Fed. R. Evid. Rule 403 ............................................................................................................. 25

Fed. R. Evid. Rule 801(d) ......................................................................................................28, 29

Fed. R. Evid. Rule 803(17) .......................................................................................................31

Fed. R. Evid. Rule 803(18) .......................................................................................................33

Fed. R. Evid. Rule 807 .............................................................................................................33

Fed. R. Civ. P. Rule 26(a)(2)(C) ..............................................................................................34, 35

Fed. R. Civ. P. Rule 26(a)(2)(D) ...............................................................................................35

Plaintiff Yien-Koo Wang King ("Plaintiff" or "Y.K. King"), in her capacity as preliminary executrix of the Estate of Chi-Chuan Wang (the "Estate"), hereby submits her omnibus motions in limine (altogether, the "Omnibus Motions") asking the Court to issue rulings regarding the admissibility of certain anticipated evidence in advance of the trial between the Plaintiff and defendants Andrew Wang ("A. Wang") and Shou-Kung Wang ("S.K. Wang," together the "Wangs" or "Defendants").

<u>**PRELIMINARY STATEMENT**</u>

This is a RICO suit involving a self-dealing fiduciary and an international art enterprise that deals in stolen property. The participants who have answered the summons to defend themselves are Defendants A. Wang, a former fiduciary of a Chinese art-collector's estate (the "Estate"); A. Wang's art gallery business, "Bao Wu Tang;" A. Wang's father S.K. Wang, and S.K. Wang's art gallery business "Jian Bao Gallery."[1] Many other accomplices residing outside this court's jurisdiction, however, have been revealed through discovery. Together, the Wangs and their accomplices (collectively, the "Wang Family") participated in a scheme to illegally acquire and transport $70,000,000.00 worth of artwork from New York to Hong Kong over six years. The Wangs then resold the artwork at auction houses in China and Hong Kong and transferred some of the overseas profits back to United States through offshore shell companies and their wives' bank accounts. Trial is currently scheduled to begin on June 21, 2021.

Prior to the start of trial, the Plaintiff seeks an order precluding certain categories of evidence and exhibits and determining that other categories are admissible. The Plaintiff requests the Court grant the following six requests for relief.

---

[1] *See* Declaration of Timothy Savitsky dated April 8, 2021 (the "Savitsky Declaration") Exh. 1 (the Wangs' Answer to Amended Complaint; ECF Dkt. 78).

1

First Category of Motions: The Plaintiff invokes the doctrine of offensive collateral estoppel to request a jury instruction that certain previous state-court determinations concerning a related subject matter be deemed uncontestable in nature and binding on the jury's deliberations:

(1)     The Court should issue a jury instruction that the facts and determinations set forth in the following are binding: (a) the decree of the Surrogate's Court dated May 17, 2017 rejecting a purported will of Chi-Chuan Wang dated February 18, 2003 from probate on the grounds of lack of capacity, undue influence, and fraud on the part of the Wangs (the "2017 Probate Decree") and (b) the order of the New York State Supreme Court, Appellate Division, First Department dated January 2, 2020 (the "2020 Appellate Decision") applying collateral estoppel to prevent the probate of a codicil dated February 10, 2003 filed by S.K. Wang in 2018 on the grounds of undue influence and fraud. The First Department has already held that the trial (the "Probate Trial") that led to 2017 Probate Decree collaterally estopped the Wangs from contesting that "the petitioner [S.K. Wang] and respondent Andrew Wang had engaged in fraudulent conduct and exerted undue influence on the decedent [C.C. Wang] to induce him to eliminate respondent King as a beneficiary of his estate and increase the percentage bequeathed to them." These determinations are identical to issues necessary to prove the formation of the Wang Family enterprise and the plan and preparation of the Wangs' scheme to gain control of C.C.'s Estate and its paintings.

Second Category of Motions: The Plaintiff seeks an order of preclusion of certain irrelevant and highly prejudicial evidence:

(2)     For the same reasons identified in support of Motion No. 1, the Court should bar evidence offered by the Wangs designed to relitigate Y.K. King or her husband's possession, ownership, or purported theft of C.C. Wang's assets prior to his death in July 2003. The Wangs already argued to the jury at the Probate Trial that the basis for Y.K. King's

2

disinheritance on February 10, 2003 and February 18, 2003 was her purported thefts from C.C. Wang prior to his death. The jury and appellate court necessarily rejected this argument and found that she was only disinherited due to the Wangs' fraud. Thus, all allegations of misconduct by Y.K. King prior to the execution of the rejected will should be precluded on collateral estoppel grounds. Even if not barred by collateral estoppel, such attacks are irrelevant to any claim or defense in this action, which is brought by Y.K. King on behalf of the Estate. Accusations against Y.K. King for alleged misconduct occurring prior to February 2003 would be highly prejudicial and used only for the improper purpose of arguing that the Estate of Chi-Chuan should not receive recovery for the Wangs' RICO violations because Y.K. King supposedly committed some wrongdoing before C.C. Wang died.

(3)  The Court should bar the Wangs from introducing evidence of Y.K King or her late husband's (together, the "Kings") alleged "prior bad acts" in support of their "unclean hands" equitable defense. Though this ruling would be similar to the one requested in Motion No. 2 above, the bar would extend beyond the issues litigated during the Probate Trial to purported misconduct by the Kings occurring after the date of C.C. Wang's death on July 2, 2003. Such barred evidence would include alleged misconduct in relation to the Kings' bankruptcy filing in 2007 or the Wangs' claim that the Kings violated a temporary restraining order ("TRO") issued in October 2003 by the Surrogate's Court. First, these allegations are untrue, utterly irrelevant to the claims at issue, and highly prejudicial since there are no counterclaims in this action. The Kings' alleged misconduct is thus unrelated to the pending claims and injuries. Second, this action is brought on behalf of the entire Estate of Chi-Chuan Wang, not merely Y.K. King. Therefore, alleged violations of the TRO occurring before Y.K. King became the preliminary executrix of the Estate would

3

not, under equitable principles, have any bearing on an "unclean hands" defense. Such personal attacks would waste time and confuse the jury; they should be completely excluded from trial.

Third Category of Motions: The Plaintiff seeks an order that certain evidence is admissible based upon prior admissions of the Wangs and exceptions to the rule against hearsay.

(4)    The Court should rule that the 2009 Bao Wu Tang Capital Museum Exhibition Catalogue (the "BWT Catalogue") is excepted from the hearsay bar because it is a statement of a party opponent or, alternatively, an adoptive admission. At the very least, the photographs within the book are not hearsay because they are not statements.

(5)    The Court should also rule that auction market data from the Artron.net and Arnet.com related to certain of the 98 Paintings' (a) auction sale price and (b) identifying information (such as auction date, size, provenance, and photographs of auctioned paintings) are not barred by the rule against hearsay. The auction records are admissible under Fed. R. Evid. Rule 803(17)'s "Market Reports and Similar Commercial Publications" exception to hearsay since they are "compilations that are generally relied on by the public or by persons in particular occupations." *Id.*  They are also admissible under Rule 803(18) since both the Plaintiff's expert and the Defendant's expert have testified that Arton.net and Artnet.com are market compilations and that collectors, museums, auction houses, and appraisers routinely rely on them to determine the provenance and value of paintings. Many of the market records are in Chinese, and the Plaintiff requests a ruling in advance of trial to have the records translated for the jury.

Fourth Category of Motions: The Plaintiff seeks the preclusion of certain non-retained expert opinions recently designated by the Wangs pursuant to Fed. R. Civ. P. 26(a)(2)(C).

(6)      John S. Wang (no relation to the parties) is a Chinese seals expert who was disclosed by

Y.K. King as a potential fact witness because he made a record of certain of C.C. Wang's

personal seals in May 2001. The Wangs subpoenaed and deposed him in July 2019. Though

he is a qualified expert at reading seals, he should not be permitted to give opinion

testimony that the advent of new technologies has made seal counterfeiting much easier to

accomplish and more difficult to catch and that best practices in authentication require

physical inspection of the original seal and original painting. This opinion testimony, taken

from the Wangs' deposition of John S. Wang and designated only three weeks ago, does

not spring from the witness's relevant factual perceptions. Moreover, John S. Wang's

opinion testimony about counterfeit seals would serve only *to rebut* the opinions of Mr.

Patrick Regan regarding the placement of C.C. Wang's seals on some of the 98 Paintings

after their sale by the Estate. The disclosure of Mr. Wang's opinion testimony concerning

counterfeiting is therefore untimely since it was not made within 30 days after Mr. Regan

served his initial report in October 2019. *See* Fed. R. Civ. P. Rule 26(a)(2)(d)(ii).

## FACTS

Much of the facts underlying this case were made a part of the Plaintiff's Rule 56 Statement in the preceding summary judgment motion and will not be repeated in their entirety herein. The Plaintiff submits the following chronological recitation of substantive and procedural facts most germane to the relief requested by the Motions.

**A.  Commencement of the Wangs' RICO Enterprise and Collection of C.C. Wang's Assets Following His Death.**

   i.   *S.K. Wang and A. Wang's Knowledge of C.C. Wang's Art Collection and Their Scheme to Control It.*

The enterprise began when the Wangs—conspiring together—defrauded and unduly influenced a 96-year-old collector, Chi-Chuan Wang ("C.C. Wang") to give them assets and

control of his estate. The Wangs fraudulently convinced C.C. Wang (S.K. Wang's father and A. Wang's grandfather) to execute a will, dated February 18, 2003,[2] appointing them as co-fiduciaries of his probate estate and nearly doubling their bequeathed share of his assets. *See* Savitsky Decl. Exhs. 2 (2017 Probate Decree); 3 (Jun. 7, 2018 Decision and Order of the New York Supreme Court Appellate Division, First Department ["First Department"] affirming the 2017 Probate Decree); 4 (Jan. 2, 2020 Decision and Order of the First Department discussing the Wangs' scheme). C.C. Wang then died several months later. Within a matter of weeks of his death on July 3, 2003, the Wangs jointly filed their Fraudulent Will with the New York County Surrogate's Court and sought to be appointed as co-executors. Savitsky Decl. Exh. 5 (Aug. 4, 2003 order of the N.Y. Surrogate's Court (the "Aug. 2003 Order")). In the face of objections by the Plaintiff that they could not be trusted, the Surrogate's Court appointed only A. Wang as executor and required him to serve the Estate alongside a disinterested party, the Public Administrator of New York County (the "PA"). *Id.* With S.K. Wang denied official control of the Estate and A. Wang subject to the PA's oversight, the Wangs would need to find another way to steal C.C. Wang's classical paintings.

Yien-Koo soon objected to the probate of the Fraudulent Will on the grounds of fraud, undue influence, and lack of testamentary capacity. *See* Savitsky Decl. Exh. 2 (2017 Probate Decree). Her objections, however, would not be adjudicated until fourteen years later. *Id.* As a result, A. Wang retained his status as preliminary executor from August 2003 until May 2017. *See id.* (2017 Probate Decree removing A. Wang as estate executor).

### ii.   *A. Wang and the PA's Collection and Inventorying of Assets.*

Following A. Wang's appointment as preliminary executor in August 2003, the Estate began to collect assets from C.C. Wang's apartment, storage facilities, and family members.

---

[2] The February 18, 2003 testamentary instrument, hereinafter the "Fraudulent Will."

Savitsky Decl. Exh. 6 at ¶8 (Feb. 14, 2020 Affidavit of the Public Administrator of New York County [the "PA"]). After collecting 133 classical[3] Chinese Paintings from the Wangs and the Kings in 2003, the Estate hired O'Toole-Ewald Art Associates ("OTE") to inventory and photograph the Estate's paintings. *Id*. at ¶12. OTE assigned identification numbers (the "OTE Nos.") to all of the Estate's paintings (contemporary and classical), created a spreadsheet of the Estate's classical paintings with notes on their physical condition, and photographed the paintings and the seals placed on them. *Id.* at ¶13; Exh. 7 (June 14, 2019 Deposition of Elin Ewald, president of OTE ("Ewald Dep. Trans.") at 24:4-26:23 (Ewald discussing the creation of Ewald Exhibit 2, a chart of the Estate's paintings), 27:8-20, 30:3-31:8 (Ewald testifying that OTE took photographs of all the Estate's paintings and that photographs in Ewald Exhibit 3 were taken by OTE), Ewald Exh. 2 and 3.

The Estate also collected 108 of C.C. Wang's Chinese art "seals." Savitsky Decl. Exh. 6 at ¶8. These are carved objects that are traditionally dipped in red paste and pressed onto paintings— essentially stamps.  C.C. Wang and other Chinese collectors and artists commonly use seals to indicate provenance, ownership, authorship, or authenticity. A. Wang claims that he personally retrieved all of C.C. Wang's seals from his apartment in September 2003. Savitsky Decl. Exh. 8 (Oct. 21, 2003 letter from A. Wang's attorney Martin Klein ("Klein") to the PA's attorney, Peter Schram ("Schram") regarding A. Wang's search for C.C.'s seals); Exh. 9 (A. Wang's Jun. 25, 2019 deposition transcript ("AW 2019 Dep. Trans.")) at 59:23-61:8 (A. Wang testifying he found C.C. Wang's seals in his apartment after his death and turned them over to the Estate).

As it turned out, however, *dozens* of C.C.'s well-documented seals—including the ones he used to perform the all-important function of authenticating paintings—were never turned over to

---

[3] A "classical" Chinese painting refers to a painting created in China before the end of the Qing dynasty in 1912.

the Estate.[4] For example, a record created by the Smithsonian Museum in Washington, D.C. shows that as of May 2011, the below seals were in C.C. Wang's personal collection and possession:



*See* Savitsky Decl. Exh. 10 (list of C.C. Wang seals based upon impressions created by John S. Wang of the Smithsonian Museum in May 2001 and identified as "Chang 10" at the Jul. 25, 2019 deposition of John S. Wang ("JSW Dep. Trans."); Exh. 11(a) (JSW Dep. Trans.) at 10:1-22; 111:20-114:11; 115:18-19 (John S. Wang testifying that though he does remember assembling Savitsky Exh. 10, the exhibit depicting these 106 seals must have been made by him or someone else at the Smithsonian using his file because he recognizes the 106 seals in Chang 10 as being C.C. Wang seals which he made impressions of in 2001); Exh. 11(b) at p. 20 (John S. Wang Exhibit 1, draft records of C.C. Wang's seal collection produced by John S Wang and depicting impression of seal No. 604-3). Yet most of these seals never found their way into the Estate's inventory after C.C. Wang died. *Compare* Exh. 10 (impressions created by the Smithsonian's John S. Wang in May 2011) *with* Exh. 12 (WANG000064-71; the Estate's record of C.C. Wang seals in its

---

[4] As a proffer to the Court, this will be established through documentary records of C.C.'s seals alongside the testimony of (a) plaintiff Yien-Koo King, (b) John S. Wang (a seals expert for the Smithsonian Museum), (c) Alfreda Murck, (d) the PA, and (e) A. Wang himself, who says he located 250 seals at C.C. Wang's apartment in 2003, but only gave 108 to the Estate.

possession and produced by A. Wang in this action). A. Wang confirmed that many of C.C. Wang's seals were missing from the Estate's inventory when he testified at his deposition in 2019 that he found a total of 250 seals in C.C. Wang's apartment after his death. Exh. 9 at 59:23-61:8 (AW 2019 Dep. Trans.). A. Wang claims he turned these 250 seals over to the Estate. *Id*. at 60:15-22. However, the Estate's inventory indicates it only ever received 108 seals. *See* Savitsky Decl. Exh. 12 WANG000064-71 (inventory of 108 C.C. Wang seals); Exh. 6 at ¶8 (PA Declaration).

The disappearance of more than half of C.C. Wang's seals after his death will be critical evidence of self-dealing at trial because they have since reappeared in China. The photographs taken by OTE in 2004 prove that several of C.C.'s missing seals—including seal No. 604-3 above—were *added* to certain of the 98 Paintings *after* they were sold by the Estate. Below are two examples taken from the Regan Report that show missing C.C. Wang seal No. 604-3 (as denominated by John S. Wang in 2001[5]) was added to two of the 98 Estate paintings following their sale. Mr. Regan reviewed the left image from the Estate's photo-records of the 133 classical Chinese paintings taken in 2004 by OTE and the right image from online auction databases for auctions occurring in 2010 and 2014. Savitsky Decl. Exh. 13 at ¶¶40-42 (Regan Report). Mr. Regan will testify the left-side (taken by OTE in 2004) and right-side images (from online records of auctions occurring in 2010 and 2014) are of the exact same paintings, but that right-side images show the addition of missing C.C. Wang seal No. 604-3.

---

[5] Savitsky Decl. Exh. 11(a) at 108:20-109:15 (JSW Dep. Trans.).



**OTE #120**
**Work:** Wang Yuanqi *"Landscape after Huang Gongwang"* **Collector:** Yong Qing Ye
**Added Seal Nos.:** 510, 307, 604-3

KING7-000772
2004

https://auction.artron.net/paimai-art5047841019
Poly Hong Kong Auction Co., 6 Apr. 2014 Lot 1019



**OTE #137**
**Work:** Anonymous *"Horse and Groom"* **Collector:** Anthony Chou
**Added Seal No.:** 604-3

KING7-000169
2004

https://auction.artron.net/paimai-art66470561
Chieftown Beijing Auction, 21 Jun. 2010 Lot 561

Savitsky Decl. Exh. 12 at ¶¶40-42 (Regan Report).

In 2004, the fiduciaries next hired Sotheby's to issue an appraisal of the Estate's 133 classical Chinese paintings for tax purposes (*i.e.,* the "Sotheby's Appraisal"). Savitsky Decl. Exh.

6 at ¶19. According to the Sotheby's Appraisal, the value of the 133 classical Chinese paintings as of the date of C.C. Wang's death on July 3, 2003 was $4,400,350.00. *Id.*

**B. The Estate's Sale of 98 Classical Chinese Paintings to Fictitious Buyers Between 2005 and 2009.**

In late 2004 the Wangs' attorney, Klein, wrote to A. Wang that he was preparing the Estate's tax filings and that "[n]o tax will be due, but you will need to sign the return." Savitsky Decl. Exh. 14 (Oct. 7, 2004 emails between A. Wang and Klein). A. Wang responded "I would like to pay more taxes, as much as we can to avoid interests. Can you talk with the PA? . . . . Please tell the PA that I will raise enough cash to cover all legal exp[e]nses upon my return." *Id*. A. Wang's unprompted concern about raising cash to pay taxes marks the beginning of the Wangs' scheme to sell the Estate's classical paintings to themselves.

Between 2005 and 2009 A. Wang coordinated six sales transactions to sell 98 of the Estates' classical Chinese paintings (the "98 Paintings") to five purported buyers in China. Each of the five buyers was sourced by A. Wang and all 98 Paintings were shipped to the address of "Billie Wai" in Hong Kong. Though A. Wang continues to deny the charges of self-dealing, he has now admitted that his own offshore corporations were the source of the $4.3 million in payments to the Estate. He testified at his deposition in 2019 that he did this because the Chinese buyers were "always" asking him for the "favor" of using his companies to wire money out of China, and A. Wang claims to have obliged. Exh. 9 at 242:2-21 (A. Wang 2019 Deposition testimony). A. Wang also testified in 2019 that Billie Wai—the person to whom all 98 Paintings were shipped—is the Wangs' family accountant who sets up all their offshore corporations. *Id*. at 311:13-19 (A. Wang testifying he looked for records of his wire transfers to the Estate at "my accountant Billie Wai's office" but could not find any); 127:14-128:17 (A. Wang testifying the address to which the paintings were shipped was his accountant's office). He claims the firm, CK

Lam, has been his accountant for many years and he became connected to it through is grandfather, C.C. Wang.[6]

**C. The Display of the Estate's Paintings at the Beijing Capital Museum's *Bao Wu Tang* Exhibition in 2009.**

Bao Wu Tang is the name of A. Wang's Chinese classical art business. Savitsky Decl. Exh. 1 (Wangs' Joint Answer to Amended Complaint, p. 1 admitting that A. Wang is "doing business as Bao Wu Tang"). In November 2009, the Beijing Capital Museum held an art exhibition entitled "*Bao Wu Tang—Magnificent Collection of Classical Chinese Paintings and Calligraphy from Abroad*" (the "BWT Exhibition"). Savitsky Decl. Exh. 17(a), (b), and (c) (the 133-page Bao Wu Tang Exhibition Catalogue ["BWT Catalogue"], as produced by the Wangs during discovery in this action). A. Wang has admitted that he participated in coordinating this exhibition. Savitsky Decl. Exh. 18  at 527:18-529:20; 478:14-479-17 (AW 2013 Dep. Trans.) ("I introduced a few connections or a few buyers that purchase my family's paintings and ask them for their – and I just get in contact with Capital Museum for a brief show." And explaining "I had my own pieces put in [the exhibition]."). In the preface to the BWT Catalogue, A. Wang wrote that "as one of the heirs of the Wang family, I feel obligated to organize these important family collections" for the Chinese people. Savitsky Decl. Exh. 19 (certified translation of BWT Catalogue Prefaces). Though the Plaintiff will argue A. Wang wrote the preface himself, he did, at the very least, review and

---

[6] The Plaintiff demanded all records concerning A. Wang's sale of Estate assets between 2005 and 2009. *See* Savitsky Decl. Exh. 15 at Demand Nos. 10, 20-27, 29 (Y.K. King's document demands dated Aug. 8, 2018 to A. Wang [the "A. Wang Demands"]). She also demanded both Wangs produce documents related to "any corporate entity which, since 2003" the Wangs held shares of or held corporate office. *Id.* at Demand No. 122 (A. Wang Demands) and Savitsky Decl. Exh. 16 at Demand No. 100 (Y.K. King's document demands dated Aug. 9, 2018 to S.K. Wang [the "S.K. Wang Demands"]). Yet neither of the Wangs have produced any communications with the Chinese buyers, any communications with Billie Wai, any documents relating to Billie Wai, any incorporation records for the companies A. Wang used to pay the Estate $4.3 million, or any financial records for those same companies. Savitsky Decl. Exh. 9 at 131:22-132:9 (A. Wang explaining he had no records for Le Style); 245:20-246:22 (A. Wang testifying he has no transaction records for the intermediary favors he performed for the buyers); Savitsky Decl. Exh. 27 (Mar. 15, 2019 email from A. Wang's counsel that they reached out to their BVI holding company, Portcullis, for documents related to Le Style Ltd. and Le Tao Ltd., but received no response).

approve the preface prior to the BWT's Catalogue's publication. *See* Exh. 18 (AW 2013 Dep. Trans. at 528:20-529:2 (A. Wang acknowledging that he approved the preface to the BWT Catalogue be published under his name)).   A. Wang's forward goes on to say that he wanted to provide art lovers with an opportunity for a deeper knowledge of Chinese art, but regretted his inability to organize a showing of a more complete show:

> I want to give those who love ancient Chinese calligraphy and painting a chance to gain a deeper understanding of the spirit of the national culture and artistic traditions. At the same time, for special reasons, I am not currently able to organize and present the entire family collection. This is a pity and I hope that there will be another opportunity to hold such exhibitions in the near future.

Finally, in the signature block of the preface, A. Wang declares himself the "owner" of Bao Wu Tang. Savitsky Decl. Exh. 19.; *see also* Savitsky Decl. Exh. 9 at 139:14-19 (AW 2019 Dep. Trans. (A. Wang acknowledging his preface describes him as the owner of Bao Wu Tang)).

      Several years after the BWT Exhibition, A. Wang (using his baowutang@yahoo.com email account) emailed an associate—Chien Fang Huang—five pictures of one of the 98 Estate Paintings. *See* Savitsky Decl. Exh. 20 at AWSK_00009023-9028 (A. Wang's emails to Chien-Fang Huang on May 11, 2011). The attached pictures were of OTE 156 (a handscroll by the 17th century artist Wang Jian) that was supposedly sold by the Estate to "Yong Qing Ye" in 2006. The OTE 156 pictures were taken from the BWT Catalogue. *Compare id.* Exh. 20 (email attachments) at AWSK_00009021 (p.113 of the BWT Catalogue), 00009024-9028 (pp. 106-109, 130 of the BWT Catalogue) *with* Exh. 17(c) at AWSK_00001728 (p.113 of the BWT Catalogue), AWSK_00001721-24 (pp.106-109 of the BWT Catalogue), AWSK_00001744 (p. 130 of the BWT Catalogue). A. Wang wrote in his 2011 email to Chien Fang Huang that OTE 156 "was exhibited at Beijing Capital Museum in 2009" and that "[i]t's still within the family collection." Savitsky Decl. Exh. 20 at AWSK_00009023.   But he asked Chien Fang Huang to "[p]lease write 'private collection.'" *Id.* Questioned at his 2019 Deposition as to why he wrote this even though the

painting was supposed to have been sold outside the family in 2006 to "Yong Qing Ye," A. Wang responded:

> I don't remember how I wrote this email, why I wrote the email. But I believe that this painting belonged to my father…I don't know why I wrote that email, but [] I still believe that this painting should belong to my father.

Savitsky Decl. Exh. 9 at 205:13-206:7 (AW 2019 Dep. Trans.); Exh. 28(a) (OTE photographs of OTE 156) and 28(b) (photographs of OTE 156 from BWT Catalogue). A. Wang's confusion by his own statements aside, the emails establish his acceptance and use of the BWT Catalogue as a reliable record of what was displayed at the BWT Exhibition.

### D.  Auction Records Published by Arton.net and Artnet.com

The Estate collected, inventoried, photographed, and appraised 133 classical Chinese paintings and collected 108 of C.C. Wang's Chinese seals between 2003 and 2004. It then sold and shipped a total of 98 Paintings to five supposed Chinese buyers between 2005 and 2009 for approximately $4 million. Thirty-five (35) of these paintings went on to be publicly resold at auction houses in China and Hong Kong over the next decade at a combined selling price of $42,155,085.

High resolution images of the thirty-five re-sold paintings along with other identifying information and their auction prices are publicly available on Artron.net and Artnet.com. *See e.g.*, Savitsky Decl. Exh. 21 (attaching sample records of the Estate's 98 Paintings from Arton.net and Artnet.com). The web databases list identifying information about the re-sold paintings (*e.g.*, their titles, authorship, provenance, size, prior exhibition displays, *etc.*) and contain images of the paintings at the time of the auction. *See, e.g.*, Exh. 13 at ¶¶40-42 (Regan Report). Both experts have testified that Artron.net and Artnet.com are two leading art market databases that compile auction results and other information related to classical Chinese paintings. *See, e.g.*, Savitsky Decl. Exh. 22 at 191:22-193:15 (Defendants' expert Kenneth Linsner identifying Artnet.com and

Artron.net as compilers of auction house market data); Exh. 13 ¶¶16-17 (Regan Report identifying Artnet and Arton as art market databases relied upon the general public, collectors, and experts in appraising the value and tracking the provenance of Chinese artworks).

### E. Relevant Procedural History

#### i. Commencement of the Instant RICO Action in 2014

The instant action was initially filed in 2014 by Y.K. King and two corporations owned by her and her husband. They sought relief for themselves, their companies, and for the Estate based upon the Wangs' myriad schemes of systematic theft of millions of dollars' worth of highly valuable, ancient Chinese artwork. After an initial dismissal of the original complaint by the district court for a failure to plead a pattern of racketeering, the plaintiffs appealed and had the district court's ruling reversed. On remand, the district court struck claims brought by the Kings in their individual and corporate capacities as time-barred, but permitted the action to proceed to the extent it sought recovery on behalf of the Estate. *King v. Wang*, No. 14-cv-07694, 2018 WL 1478044, 2018 U.S. Dist. LEXIS 49659 at *30 (S.D.N.Y. Mar. 26, 2018).

#### ii. Resolution of the Surrogate's Court Will Probate Contests Between 2017 and 2020

A jury trial to adjudicate Y.K. King's objections to the Fraudulent 2003 Will which had named A. Wang as preliminary executor was finally held in April 2017. Among other evidence, the Wangs submitted a document attached to the purported February 18, 2003 will that had been signed by C.C. Wang and that alleged Y.K. King and her husband had denuded his assets to various corporate entities without his knowledge. Savitsky Decl. Exh. 23 at KING-SCT-000017180 (Probate Trial Appellate Record index identifying the Fraudulent 2003 Will and the "Statement read by Chi-Chuan Wang after Will Execution" as the Wangs' first two Probate Trial exhibits); *id*. at KING-SCT-000017697-699 (statement of C.C. Wang read at will signing regarding Y.K. King and Kenneth King's alleged thefts from C.C. Wang entered into evidence during the 2017 Probate

15

Trial); KING-SCT-000017700 (photograph of C.C. Wang, S.K. Wang, and Jerome Kamerman at 2003 Fraudulent Will execution entered into evidence during the 2017 Probate Trial). This attachment to the 2003 Fraudulent Will stated that C.C. Wang no longer knew where his paintings were or what corporations they were in and that the Kings refused to return them to him. Savitsky Decl. Exh. 23 at KING-SCT-000017697-699.

For her part, Y.K. King presented counter evidence that, while she held several dozen classical Chinese paintings through corporate entities in her own name, the letter's allegations were false and that the Wangs had unduly influenced and defrauded C.C. Wang to (a) nearly double S.K. Wang's family share of C.C.'s Estate to 60%, (b) disinherit Y.K. King; and (c) name S.K. Wang and A. Wang as co-executors in charge of managing C.C.'s Estate assets. *See, e.g.,* Exh 23 at KING-SCT-00001781-83 (index of Y.K. King's admitted exhibits in 2017 Probate Decree appellate record); Exh. 3 (affirmation of Probate Decree by the First Department).

After a seven-day trial, a unanimous jury returned a verdict in favor of Y.K. King. It determined that the documents C.C. Wang executed on February 18, 2003 were the products of fraud, undue influence, and lack of testamentary capacity. Savitsky Decl. Exh. 2. The Wangs appealed the jury verdict, but it was unanimously upheld by the New York Supreme Court Appellate Division for the First Department. Savitsky Decl. Exh. 3; *see also* Exh 23 (excerpts from appellate record for 2017 Probate Decree).

In 2018—with the Fraudulent 2003 Will conclusively rejected—S.K. Wang tried another approach. He submitted to the Surrogate's Court a previously unfiled *codicil* dated February 10, 2003 (the "Fraudulent 2003 Codicil") which, though only one page in length, had the exact same operative terms as the Fraudulent 2003 Will. *See, e.g.*, Savitsky Decl. Exh. 4 (Jan. 2, 2020 Order). Y.K. King moved the Surrogate to dismiss S.K. Wang's petition to probate the Fraudulent 2003 Codicil on collateral estoppel grounds. When her motion was initially denied by the Surrogate,

Y.K. King appealed. *Id.* By order dated January 2, 2020, the First Department reversed the Surrogate's Court and dismissed S.K. Wang's petition to probate the Fraudulent 2003 Codicil. *Id.* (Jan. 2, 2020 Order, hereinafter the "2020 Appellate Decision"). It found that the initial trial had already adjudicated that both S.K. Wang and A. Wang executed a "scheme" of fraud and manipulation in early 2003 to seize greater control of C.C. Wang's assets. *Id.* Both the Fraudulent Codicil and Fraudulent Will were a part of that scheme, and neither could be countenanced by the Surrogate.

Therefore, multiple decisions issued in New York State Court render it a binding and irrefutable fact that the Wangs' explanations for why C.C. Wang signed documents disinheriting Y.K. King were the products of fraud and undue influence, not reality. *Compare* Savitsky Decl. Exh. 23 at KING-SCT-000017697-699 (statement supposedly read by C.C. Wang at February 18, 2003 will signing) *with* Exhs. 2 and 4 (New York Supreme Court orders determining the February 18, 2003 will signing was induced by the Wangs' fraud).

### iii. Disclosure by the Wangs of Two Non-Retained Experts Pursuant to Fed. R. Civ. P. 26(a)(2)(C): John S. Wang and Alfreda Murck.

On March 18, 2021, the Wangs' counsel, Akiva Cohen, sent an email disclosing that "[p]ursuant to Rule 26(a)(2)(C)" the Wangs were designating John S. Wang to testify at trial, by deposition, as a non-retained expert. Mr. Cohen designated Mr. Wang's expert opinion to be that:

> the advent of new technologies has made seal counterfeiting both much easier to accomplish and much more difficult to catch after the fact, and that a key and best practice for anyone purporting to authenticate a seal with any certainty is to physically examine the painting on which the seal is placed, and that it is impossible to reach a definitive conclusion from review of photographs because a key factor will be the size of the seal, which cannot be reliably be determined from a photograph.

Savitsky Decl. Exh. 24. As noted in <u>Section A(ii)</u> above, John S. Wang was a volunteer from the Smithsonian who made a record of certain of C.C. Wang's seals in May 2001. Exh. 11(a) at 10:1-

22; 107:17-108:5 (JSW 2019 Dep. Trans.). Y.K. King identified him on her Rule 26 initial disclosures as having knowledge relevant to establishing that many of C.C. Wang's seals had not been turned over to his Estate. During his deposition in 2019 (which the Wangs subpoenaed), the Wangs' attorney asked John S. Wang questions about how to identify counterfeit seals versus genuine ones. *See* Exh. 11(a) at pp. 28-37 (JSW Dep. Trans.). However, Mr. Wangs' relevance as a fact witness was based on his creation of a record of certain of C.C. Wang's seals in 2001, not identifying counterfeit seals generally. Mr. Cohen's subsequent Rule 26(a)(2)(C) expert designation is apparently an attempt to undercut the testimony of Patrick Regan who will testify about the addition of C.C. Wang's missing seals on some of the 98 Paintings at the time of their resale by auction houses in China between 2008 and 2018.

On March 23, 2021, the Wangs' counsel made a second disclosure pursuant to Rule 26(a)(2)(C) that they would call Alfreda Murck to testify as a non-retained expert in relation to the following three opinions. Savitsky Decl. Exh. 24. First, that there are authenticity concerns regarding paintings in C.C. Wang's collection and issues relating to authenticating Chinese are and seals. Second, that there are questions of authenticity with paintings that come from an artist/collector named Zhang Daqian (C.C.'s former friend who died in 1983). Third, that the normal practice of Chinese museums is to display original art rather than reproductions, but that some still display reproductions. *See* Savitsky Decl. Exh. 24.[7] It is unclear what relevance supposed authenticity concerns of C.C. Wang's collection has or why C.C. Wang's pre-deceased friend Zhang Daqian has any relevance to the self-dealing claims in this action. The last disclosed

---

[7] The Plaintiff does not, at this time, move in limine to preclude Ms. Murck's opinions as designated, but preserves the right to do so at trial as irrelevant and substantially more prejudicial than probative. Moreover, Ms. Murck at no point identified herself as an expert in museum practices in China and is therefore not properly qualified to give the third disclosed opinion.

opinion of Ms. Murck, however, is expected to be part of an attempt to argue that A. Wang's BWT Exhibition did not display the Estate's actual paintings.

## ARGUMENT

### I.      Legal Standard for Motions in Limine

The district judge "ha[s] discretion in deciding whether a pretrial ruling on evidence may be made in advance of trial." *United States v. Valencia*, 826 F.2d 169, 172 (2d Cir. 1987); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). This includes prohibiting irrelevant and prejudicial arguments or references at trial. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288DLC, 2005 WL 578109, at \*4 (S.D.N.Y. Mar. 4, 2005). It includes motions concerning the application of collateral estoppel. *See Schneider v. Richter*, 01CV01798, 2008 U.S. Dist. LEXIS 137852 (D. Conn. Jul. 25, 2008) (granting application of collateral estoppel in limine). It also includes a party's request for an affirmative, pre-trial determination that certain evidence is admissible. *See United States v. Bumagin*, 136 F.Supp.3d 361, 371 (E.D.N.Y. 2015) (granting government's motion in limine to admit certain evidence).

### II.     Motion No. 1: Y.K. King Is Entitled to Collateral Estoppel and a Jury Instruction with Respect to the Determinations Contained in the 2017 Probate Decree and the 2020 Appellate Decision.

The doctrine of collateral estoppel holds that "when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit." *Nath v. Select Portfolio Servicing*, *Inc.*, 2017 U.S. Dist. LEXIS 28095, 2017 WL 782914, at \*9 (S.D.N.Y. Feb. 28, 2017) (internal quotation omitted). When prior judgments were made by a state court—as they were here—federal courts apply the doctrine based upon that state's law. *See Morales v. N.Y. City Dep't of Educ.,* 808 Fed. Appx. 35, 37 (2d Cir. 2020); *see also Nath,* 2017 U.S. Dist. LEXIS 28095, 2017 WL 782914, at \*9 ("Because the

Foreclosure Action occurred in New York, this Court applies New York's . . . collateral estoppel doctrine"); *Hourani v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 142, 146 (E.D.N.Y. 2016).

Under New York Law, collateral estoppel will apply if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Hoblock v. Albany County Bd. Of Elections*, 422 F.3d 77, 94 (2d Cir. 2005). "The party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Nath*, 2017 U.S. Dist. LEXIS 28095, 2017 WL 782914, at \*9 (*quoting Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995) (internal quotation marks omitted)). Both elements of collateral estoppel are met here and it matters not that Y.K. King brings this action on behalf of the Estate. *Zoeller v. Lake Shore Sav. Bank,* 140 A.D.3d 1601, 1602 (N.Y. App. Div. 2016) (noting mutuality of parties is not required for offensive collateral estoppel under New York law).

The facts and determinations contained in the 2017 Probate Decree, issued following the Probate Trial should be binding in this action based on the doctrine of offensive collateral estoppel. Most critically, the Probate Trial jury already determined that: (1) C.C. Wang was not of sound mind and memory at the time he executed the purported February 18, 2003 will which S.K. Wang and A. Wang submitted for probate and which led to A. Wang's appointment as executor; (2) C.C. Wang executed the purported February 18, 2003 will due to the exertion of undue influence by S.K. Wang and A. Wang; and (3) C.C. Wang executed the purported February 18, 2003 will as a result of fraud by S.K. Wang and/or A. Wang. Savitsky Decl. Exh. 2 (2017 Probate Decree). As is evident from the plain language of the decree, these issues were actually litigated and decided against the Wangs. And since they both participated in the trial, they had a full and fair opportunity

to litigate. *Id.* In fact, the Wangs both appealed the 2017 Probate Decree and lost. *See Matter of Chi-Chuan Wang*, 162 A.D.3d 447 (N.Y. App. Div. 2018).

The analysis of the scope of collateral estoppel in this case under New York law is made easy by the fact that the First Department has *already* heard and ruled on Y.K. King's and S.K. Wang's arguments as to what factual issues were necessarily determined by the 2017 Probate Trial and Probate Decree. *Matter of Wang*, 179 A.D.3d 418 (N.Y. App. Div. 2020). After losing the 2017 Probate Trial, S.K. Wang sought to probate C.C. Wang's purported February 10, 2003 codicil (containing the same essential terms as the Fraudulent 2003 Will). *See id.* The First Department found that the codicil was barred from probate by the doctrine of collateral estoppel based on the prior jury's rejection of the February 18, 2003 purported will—even though eight days separated 2003 Fraudulent Codicil from the 2003 Fraudulent Will and there was no specific jury question or charge regarding the Fraudulent Codicil. Specifically, the First Department held that S.K. Wang's attempt in 2018 to probate the Fraudulent Codicil was "barred by the doctrine of collateral estoppel" because:

> A jury found that petitioner [S.K. Wang] and respondent Andrew Wang had engaged in fraudulent conduct and exerted undue influence on the decedent [C.C. Wang] to induce him to eliminate respondent [Y.K.] King as a beneficiary of his estate and increase the percentage bequeathed to them. This finding is dispositive of the issue of the validity of the codicil, the first document that embodied the changed testamentary plan and was the consummation of [S.K. Wang] and Andrew's scheme.

*Id.* Accordingly, Y.K. King seeks that the jury in this case be instructed that the following prior determinations are binding on their deliberations (1) the Wangs unduly influenced and defrauded C.C. Wang to induce him to eliminate Y.K. King as a beneficiary of his estate and increase the percentage bequeathed to them and appoint A. Wang and S.K. Wang as Estate executors; (2) the Wangs unduly influenced and defrauded C.C. Wang on February 18, 2003, at a time when he lacked testamentary capacity; and (3) the Wangs also unduly influenced and defrauded C.C. Wang

21

to induce him to execute a codicil of February 10, 2003 as part of S.K. Wang and A. Wang's same disinheritance and asset acquisition scheme.

The prior judgments' determinations of the Wangs' collaborative fraud are fundamental and identical to relevant issues here. Under the RICO and RICO conspiracy claims, the Wangs' defrauding and undue influencing of C.C. Wang to increase their inheritances and gain control of his Estate and paintings establishes the formation of the Wang Family enterprise. In addition, under Fed. R. Evid. Rule 404(b), the evidence is relevant and admissible to establish motive, opportunity, intent, preparation, and plan because it shows that the Wangs committed fraud upon a 96-year-old man in order to place A. Wang and S.K. Wang at the Estate's helm. Once A. Wang was appointed preliminary executor by the Surrogate through the fraudulent instrument, he lied to and manipulated his co-fiduciary, the PA, and her art consultant to ensure that the Wang Family retook possession of the 98 Paintings from C.C. Wang's classical art collection through self-dealing. This evidence is also relevant to establishing that *both* of the Wangs participated in the Estate-control and self-dealing conspiracy. *See United States v. Bueno*, No. 98-Cr-534, 2000 WL 246271, 2000 U.S. Dist. LEXIS 2433, *11 (N.D.N.Y. 2000) (the "Second Circuit 'takes an inclusive approach to prior bad act testimony: such testimony can be admitted for any purpose except to show criminal propensity.'") (*quoting United States v. Stevens*, 83 F.3d 60, 68 (2d Cir. 1996)). It should be admitted as uncontested.

III.   **Motion Nos. 2 and 3**: Evidence of Purported Misconduct by Yien-Koo King in Relation to C.C. Wang's Assets, TRO Violations, or Her 2007 Bankruptcy Filing and Discharge Are Irrelevant, Prejudicial, and Confusing; Such Evidence Should Be Barred.

a.   *Motion No. 2*: *Purported Evidence of Y.K. King's Theft from C.C. Wang Prior to His Death Is Barred by Collateral Estoppel, Irrelevant, and Highly Prejudicial.*

For the reasons discussed in the previous section, Y.K. King should be able to introduce evidence to provide basic context to the factual determinations decided by the Surrogate's Court

and affirmed by the Appellate Division and receive a jury instruction that such determinations are binding on their deliberations. Through <u>Motion No. 2</u>, however, Y.K. Kings seeks to ensure that the Wangs are barred from using any reference of their 2003 fraud as a springboard to inject their alleged reasons for Y.K. Kings' alleged disinheritance by C.C. Wang in 2003. Such reasons were listed in an attachment to the 2003 Fraudulent Will which the Wangs had C.C. Wang sign. *See* Savitsky Decl. Exh. 23 at KING-SCT-000017180 (appellate record index identifying the Wangs' 2017 Probate Trial exhibits), KING-SCT-000017698 (supposed statement listing the reasons for Y.K. King's disinheritance).   The letter and other evidence in support of the Wangs' claim that Y.K. King had embezzled from C.C. Wang were entered into evidence to justify her removal from C.C. Wang's will. *See id.*   But these attempted justifications were clearly rejected by the unanimous jury. Savitsky Decl. Exhs. 2, 3.  The Plaintiff seeks to ensure that the mere mentioning of the circumstances surrounding the Wangs' "scheme" (as the First Department phrased it) to disinherit Y.K. King and increase their inheritances through fraud, will not serve to "open the door" to relitigation of the entire 2017 Probate Trial or the legal theories dismissed in the Wang's own RICO suit.

The Wangs' exhibit list indicates that this is precisely what they aim to do. *See* Savitsky Decl. Exh. 25 (Defendants' Preliminary Exhibit List). Specifically, proposed exhibits <u>DX 6-28</u>, <u>DX 30-32</u>, and <u>DX 36-45</u> are all composed of pre-February 18, 2003 (a) letters signed by C.C. Wang; (b) personal financial records of C.C. Wang, (c) corporate documents signed by C.C. Wang, (d) checks signed by C.C. Wang, (e) contracts to sell paintings to Soon Huat signed by C.C. Wang, and (d) wire requests and transfer forms directed by C.C. Wang. *See id.* (Defendants' Preliminary Exhibit List). These pre-February 18, 2003 records are the same ones that the Wangs designated during the Probate Trial as their evidence of the misconduct they claim made C.C. Wang disinherit

her. *See* Savitsky Decl. Exh. 26 (highlighted entries on the "Proponent's Revised Exhibit List" dated February 28, 2017 and served by the Wangs prior to the Probate Trial).

Moreover, in an apparent attempt to re-litigate the issues of C.C. Wang's capacity, the Wangs also designate pictures of C.C. Wang taken at his birthday party in early 2003 (DX 47-49), pictures of C.C. Wang taken at the February 18, 2003 will signing (DX 51-54), medical records of C.C. Wang from March 2003 (DX 56-58), and a demonstrative supposedly establishing C.C. Wang's transfers to Y.K. King (DX 149). These were all exhibits related to the 2017 Probate Trial and have no relevance here other than to attack the 2017 Probate Decree and the 2020 Appellate Division's ruling on collateral estoppel. *See* Savitsky Decl. Exh. 26 (highlighted entries on the "Proponent's Revised Exhibit List" for the 2017 Probate Trial).

For the reasons set forth in support of Motion No. 1, the issues related to Y.K. King's alleged disinheritance should not be re-litigated again. Collateral estoppel is absolute bar to the Wangs' attempt to cast Y.K. King as thief of her father's assets prior to his death since this was exactly what was presented to the jury in 2017. *See* Savitsky Decl. Exh. 23 at KING-SCT-000017698. Thus, the Plaintiff asks the Court to bar any mention of the Wangs' claimed reason for her disinheritance under the Fraudulent 2003 Codicil or the Fraudulent 2003 Will.

Yet even if collateral estoppel did not apply to categorically bar the Wangs' attacks on Y.K. King based upon purported pre-February 18, 2003 misconduct, their identified evidence on this issue would *still* be inadmissible pursuant to Fed. R. Evid. Rules 402 and 403. The alleged misconduct has absolutely nothing to do with the claims or the purported defenses in this case. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Moreover, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403 (advisory committee's note). "In the balancing of probative value against unfair prejudice required by Rule 403, the trial judge has wide discretion." *United States v. Dwyer*, 539 F.2d 924, 927 (2d Cir. 1976).

The Plaintiff anticipates that the Wangs will argue that their pre-February 18, 2003 misconduct evidence shows Y.K. King stole from C.C. Wang prior to the execution of the Fraudulent 2003 Will and, therefore, is relevant to an "unclean hands" defense. But it is not. To the extent the Wangs have an unclean hands defense (and they don't), the evidence they submit to advance such a defense must be "directly related to the subject matter in litigation and the party seeking to invoke the doctrine must be" injured by such conduct. *Fade v. Pugliani*, 8 A.D.3d. 614 (N.Y. App. Div. 2004).  Here, the subject matter is the Wangs' fraudulent placement of themselves in a position of power and control of C.C. Wang's estate, followed by their self-dealing from it between 2005 and 2009. The Wangs' exhibits show that they want to focus on events occurring in 1979 (DX 2), 1999 (DX 5-7), 2000 (DX 18-31), and other events immediately preceding Y.K. King's purported disinheritance (DX 32 -54). *See* Savitsky Decl. Exh. 25.

Where a defendant seeks to introduce evidence of a wrongdoing that long-precedes the injury for which the Plaintiff seeks recovery, such evidence does not establish an unclean hands defense. *See Mehlman v. Avrech*, 146 A.D.2d 753, 754 (N.Y. App. Div. 1989). The unclean hands doctrine only concerns fraud or deceit as it relates to the controversy in issue before the court. *See Dunlop-McCullen v. Local 1-S*, 149 F.3d 85, 90 (2d Cir. 1998) ("We have held, however, that 'misconduct . . . unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands.'"); *see also Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 855 (3d Cir. 1984) (stating that an unclean hands defense "requires a showing by defendant that plaintiff's

25

conduct is inequitable and that it involves the subject matter of the plaintiff's claim."). The subject matter in this case are the paintings which the Wangs fraudulently sold to themselves while A. Wang was fiduciary of the Estate based upon the Fraudulent 2003 Will that the Wangs previously created and filed with the Surrogate's Court. The Defendants seek to introduce unrelated transactions in the hope of suggesting the Plaintiff committed fraud in 1999 or 2000, as opposed to defending against the Plaintiff's claims that they committed fraud between 2005 and 2009. Introduction of transactions of this time period, however, would be a relitigation of the 2017 Probate Trial. It would thus be an immense waste of time—potentially adding dozens of exhibits and weeks of trial time related to matters unrelated to the Estate's complained of injury.

Finally, the Wangs' proposed pre-February 18, 2003 evidence is especially irrelevant to an unclean hands defense because this action is brought on behalf of the Estate of C.C. Wang, not Y.K. King individually, and Y.K. only became a fiduciary in 2018. *See Mehlman* 146 A.D.2d at 754 (unclean hands defense asserted against a co-fiduciary must be connected to the transaction and claim at issue). It is also relevant that the state law claims brought by Y.K. King in her individual capacity and on behalf of her corporations are no longer part of the complaint because they were found to be barred by the statute of limitations. Therefore, the remaining subject matter in this action consists of (1) the formation of the Wangs' RICO enterprise based on the creation of the Fraudulent 2003 Codicil and Fraudulent 2003 Will and (2) the Wangs' maintenance of that enterprise through fraudulent activities after A. Wang became Estate fiduciary. Evidence of Y.K. King's supposed theft from C.C. Wang before he died in 2003 should be excluded from trial.

b. *Motion No. 3: Evidence of Y.K. King's Purported Violation of a TRO or Bankruptcy Fraud Is Irrelevant and Highly Prejudicial.*

For similar reasons as stated in support of Motion No. 2, Motion No. 3 seeks to preclude from evidence documents or testimony relating to Y.K. King's alleged *post*-February 18, 2003

26

conduct—*i.e.*, the subjects of the now-dismissed Wang's RICO suit. *See Wang et al. v. King et al.*, No. 18 Civ. 8948 (JFK), 2020 WL 417690, 2020 U.S. Dist. LEXIS 13382 at *3-4 (S.D.N.Y. 2020) (setting forth complained of injuries and dismissing the Wangs' complaint). Though not itself directly barred by collateral estoppel, such evidence of misconduct by Y.K. King is still irrelevant the claims for which the Estate now seeks relief and would only be offered to shoehorn in issues related to the Wangs' allegations that Y.K. King stole from C.C. Wang in 2003. All post-2003 misconduct is entirely based upon Y.K. King's supposed control of Chinese paintings she acquired prior to February 18, 2003. *See Wang*, 2020 U.S. Dist. LEXIS 13382 (dismissing the Wangs' RICO action against the Kings because all alleged claims boiled down to the claim that the Kings improperly acquired assets from C.C. Wang prior to his death in 2003; they were therefore time barred).

As noted in the previous section, the only evidence of unclean hands—a doctrine available solely to preclude equitable relief—that could *potentially* be relevant here would be evidence that Y.K. King and the other Estate beneficiaries somehow participated in the Wangs' self-dealing scheme and, in so doing, caused the Wangs harm. *Dunlop-McCullen*, 149 F.3d at 90 (noting direct relationship of wrongs required and that the doctrine "may be related if defendant has been guilty of misconduct that is more unconscionable than that committed by plaintiff."). Claims that Y.K. violated a TRO issued by the Surrogate's Court are therefore not relevant to that defense.

Instead, any evidence offered by the Wangs to establish Y.K. King's perceived violation of the TRO (which restrained the sale of any property once owned by C.C. Wang) or any bankruptcy fraud are of no moment to whether the Wangs denuded the Estate through acts of mail and wire fraud between 2005 and 2009. Ad hominem attacks against Y.K. King and her family that are unrelated to the actual transactions under scrutiny do not make the Estate's claims or the Wangs' defenses "more or less probable." Fed. R. Evid. 401. They will be advanced only to

confuse the jurors and unfairly prejudice the Estate's legitimate claims. They should therefore be precluded.

**IV.**   **Motion Nos. 4 and 5: The Court Should Rule that the 2009 Beijing Capital Museum Exhibition Catalogue and the Arton.Net and Artnet.Com Auction Records Fall Within Specified Exceptions to Hearsay and Are Admissible.**

   a.   *Motion No. 4: The 2009 Bao Wu Tang Exhibition Catalogue Is Not Hearsay and Is Admissible Because It Is a Statement of a Party Opponent or, Alternatively, an Adoptive Admission Under Fed. R. Evid. Rule 801(d)(2).*

The BWT Catalogue is admissible as a statement of a party opponent. Rule 801(d)(2) of the Federal Rules of Evidence exempts from the definition of hearsay statements made by an opposing party [801(d)(2)(A))]; adopted by the party [801(d)(2)(B)], or made by a person whom the party authorized to make a statement on the subject [801(d)(2)(C)].

The BWT Catalogue is A. Wang's own statement. A. Wang and Bao Wu Tag, his art gallery, were both named as defendants to this action. In answering the Amended Complaint, A. Wang has admitted that he does business as "Bao Wu Tang." Savitsky Decl. Exh. 1 at p. 1. During his deposition, he also admitted he is the "owner" of Bao Wu Tang. Exh. 9 139:14-19 (A. Wang 2019 Deposition testimony). The BWT Catalogue sought to be introduced is Bao Wu Tang's own book entitled "Bao Wu Tang—Magnificent Collection of Classical Chinese Paintings and Calligraphy from Abroad." *See* Exh, 17(a) at p. 1. In the publication's preface, A. Wang wrote that he was responsible for the exhibition:

> I want to give those who love ancient Chinese calligraphy and painting a chance to gain a deeper understanding of the spirit of the national culture and artistic traditions. At the same time, for special reasons, I am not currently able to organize and present the entire family collection. This is a pity and I hope that there will be another opportunity to hold such exhibitions in the near future.

Savitsky Decl. Exh. 19 at KING 003160. He also described himself as the "owner" of Bao Wu Tang at the time. *Id.* at KING 003161. Therefore since this is Bao Wu Tang's book and A. Wang has answered the complaint admitting he effectively *is* Bao Wu Tang, the book is simply a

statement of a party opponent and not hearsay. *See* 801(d)(2)(A) (exempting from hearsay a statement "made by the party in an individual capacity or representative capacity.").

Even if A. Wang had not been responsible for the publication of the BWT Catalogue, it would *still* be exempted from hearsay as an adopted admission per Fed. R. Evid. Rule 801(d)(2)(B). A party may adopt the statement of another where the party's behavior and the surrounding context manifests the party's agreement or reliance on the statement. *See Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F.Supp.2d 251, 258 (S.D.N.Y. 2003) ("Adoption is evaluated by examining the behavior of the party it is to be offered against."); *see also United States v Tyrell*, No. 18-3029-cr, 2021 WL 21775, 2021 U.S. App. LEXIS 7 at *11-12 (2d Cir. Jan. 4, 2021) (ruling a Facebook post on a party's account exempted from hearsay bar as an adoptive admission even if not proven to be written by the party). Courts should take a "generous treatment" of the adoptive-admission standard as a means of rendering a statement admissible. Fed. R. Evid. 801(d)(2), advisory comm. notes.

Each of the factual points which support a finding that the BWT Catalogue is effectively A. Wang's own statement alternatively support a finding that A. Wang at least *adopted* the book's contents. Since A. Wang admittedly does business as Bao Wu Tang and is its owner, if the publication (even if published unilaterally by some other person or organization) contained misstatements or inaccuracies, A. Wang "would have been expected to take issue with the contents." *Penguin Books U.S.A.* 262 F.Supp.2d at 259. Because he did not and instead contributed its preface and attended the exhibition's opening ceremony, he adopted the publication. In addition, A. Wang also emailed an associate—Chien Fang Huang—from his baowutang@yahoo.com account five pictures of one of the 98 Estate paintings taken from the BWT Catalogue. *Compare id.* Exh. 20 (email attachments) at AWSK_00009021 (p.113 of the BWT Catalogue), 00009024-9028 (pp. 106-109, 130 of the BWT Catalogue) *with* Exh. 17(c) at

AWSK_00001728 (p.113 of the BWT Catalogue), AWSK_00001721-24 (pp.106-109 of the BWT Catalogue), AWSK_00001744 (p. 130 of the BWT Catalogue). A. Wang wrote that OTE 156 "was exhibited at Beijing Capital Museum in 2009" and that "[i]t's still within the family collection." Savitsky Decl. Exh. 20 at AWSK_00009023. Like in the case of *Penguin Books U.S.A.*, A. Wang's use of the book in his email to Chien Fang Huang was an adoption of its accuracy. 262 F.Supp.2d at 259 (finding a publisher's dissemination of a document constituted an adoptive admission). And true to 801(d)(2)(B)'s purpose, the rule should be liberally construed here to allow the BWT Catalogue to come into evidence with "any ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess." *Id.* (*citing U.S. v. Tocco*, 135 F.3d 116, 129 (2d Cir. 1998)). The BWT Catalogue, authenticated by A. Wang himself, is therefore not hearsay because it either is directly A. Wang/Bao Wu Tang's statement or otherwise was adopted by them as true.

At the very least, the photographs of the Estate's paintings within the catalog—like the photographs in the Artron.Net and Artnet.com databases discussed in the next section—are not hearsay because they are not statements. Such photographs, even when published or taken by an unknown third-party, can be properly authenticated by a witness with knowledge of what the photographs depict. *See Kleveland v. United States*, 345 F.2d 134, 137 (2d Cir. 1965); *Linde v. Arab Bank, PLC*, 97 F.Supp.3d 287, 338 (E.D.N.Y. 2015) (noting that lack of evidence of how video tapes—which may be "authenticated on the same principles as still photographs"—were made or handled before coming into a witnesses possession does not preclude their authentication); *United States v Vázquez-Soto*, 939 F.3d 365, 368 (1st Cir. 2019) ("A witness qualifying a photograph need not be the photographer or see the picture taken; it is sufficient if he recognizes and identifies the object depicted and testifies that the photograph fairly and correctly represents it.").

b. <u>Motion No. 5</u>: *The Arton.net and Artnet.com Auction Results Are Excepted from the Hearsay Bar under Fed. R. Evid. Rules 803(17) and 803(18) and Are Admissible for Both (a) Their Photographs of the Auctioned Works Along with Other Identifying Characteristics and (b) Their Auction Prices.*

The Plaintiff's expert, Patrick Regan, has rendered opinions as to (a) the value of the Estate's paintings and (b) the addition C.C. Wang's missing seals on certain of them sometime after the time they were photographed by the Estate in 2004, but before their resales at auction in China between 2008 and 2018.  In rendering these opinions, Mr. Regan relied on several online art-auction databases including Artron.net and Artnet.com. *See* Savitsky Decl. at Exh. 13 at ¶¶16-17, 40-42 (Regan Report). Both experts have acknowledged that these websites are compilers of auction house market date. *See, e.g.*, Savitsky Decl. Exh. 22 at 191:20-193:24 (Defendants' expert Kenneth Linsner identifying Artnet.com and Artron.net as compilers of auction house market data); Exh. 13 at ¶¶16-17 (Regan Report identifying Artnet.com and Arton.net as art market databases relied upon the general public, collectors, and experts in appraising the value and tracking the provenance of Chinese artworks). Because they are typically relied on in the appraisal industry and by collectors, museums, and auction houses, they fall under the hearsay exception of Fed. R. Evid. Rule 803(17). *Id.* (excluding from the rule against hearsay "Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."); *see also U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.*, 205 F.Supp.3d 386, 441 (S.D.N.Y. 2016) (finding online databases used by expert underwriters in the ordinary course of their work were and admissible under Rule 803(17)).

Though the Wangs argue that these databases are unreliable because of reports that there is a higher rate of defaulting in China than in the West, these arguments do not preclude admission. First, the fact is that the Artnet.com and Artron.net databases are well-known and universally relied upon market reporters used by the appraisal industry and collectors. That is all Rule 803(17)

requires to overcome the hearsay bar. The Wangs will be free to probe default rate issues on Mr. Regan's cross-examination and through the testimony of their own expert, Mr. Linsner. These objections therefore go to weight not admissibility. Second, the images of the paintings and other identifying notations on the market reporters are not subject to any reliability objections; the Wangs' argument only extends to consummation rate, not that auctions never actually happened or that the paintings displayed on the market reporters are different from the ones actually placed up for auction. Therefore, even if the Court precludes direct admission of the hammer prices, it should still admit the remainder of the reports, including the images of the paintings, size and provenance.

The above reliable pieces of identifying information for the Estate's paintings are crucial for establishing that: (1) many of the 98 Paintings reappeared at auction houses in China following their sale by the Estate, (2) the 98 Paintings could have been, and should have, been auctioned in China in the first place rather than sold privately, (3) A. Wang and/or S.K. Wang *added* several of C.C. Wang's missing seals to the Estate's paintings, thereby further proving their self-dealing, and (4) that the clustering of so many of the 98 Paintings at the middling Chieftown auction house between 2008 and 2008 indicates self-dealing. On this last point regarding the relevance of Chieftown, the Plaintiff alleged from the very outset of the case that the localized auctioning of Estate paintings sold to different buyers at Chieftown was probative of self-dealing. *See* Amended Complaint at ¶268. The fact that A. Wang admitted during his 2019 deposition that he used to *work for Chieftown* as a consultant confirmed her theory. *See* Savitsky Decl. Exh. 9 at 30:17-31:8 (AW 2019 Dep. Trans.).

These records of Chinese auctions are also admissible under Fed. R. Evid. Rule 807(a), the residual hearsay exception. They have sufficient guarantees of trustworthiness and are more probative than any other evidence that can be reasonably obtained about Chinese auction results.

The images of the paintings from 2003 (taken by OTE), descriptions and measurements of the paintings in 2004 (conducted by Sotheby's), photographs from 2009 (used in the BWT Catalogue), photographs and descriptions of the paintings appearing at auction (published by Arton and Arnet), and Mr. Regan's own review and analysis all serve to cross-confirm the identity of the paintings and the accuracy of the auction records' descriptions thereof. There is no reason to doubt that market reports' images or painting descriptions are correct. Such critical and highly probative evidence should not be precluded. *See also* Fed. R. Evid. Rule 803(18) permitting introduction of pamphlets or periodicals where it is (a) relied on by an expert and (b) established as a reliable authority by the expert's testimony).

Finally, as discussed in the preceding section, (a) photographs are not necessarily hearsay and (b) photographs taken and published by unknown third parties can be properly authenticated by a live witness with independent personal knowledge of what the image depicts. *See Vázquez-Soto*, 939 F.3d at 368.

**V.     Motion No. 6: The Opinion of John S. Wang Concerning Counterfeiting Recently Designated by the Wangs Pursuant to Fed. R. Civ. P. 26(a)(2)(C) Should Be Precluded Because the Designated Opinion Is Unrelated to the Witness's Perception of Relevant Facts and the Designation Was Untimely.**

Rule 26(a)(2)(C) of Federal Rules of Civil procedure provides that a nonretained witness who qualifies as an expert may testify as to her opinions without providing a written report. *Compare* Fed. R. Civ. P. Rule 26(a)(2)(B) (concerning witnesses who must provide reports) *with* Rule 26(a)(2)(C) (concerning witness who need not provide a report). Rather, the party calling the witness must provide a disclosure identifying (i) he subject matter on which the witness is expect to present evidence under Fed. R. Evid. 702 and (ii) a summary of the facts and opinions to which the witness is expected to testify. Fed. R. Civ. P. 26(a)(2)(C)(i)-(ii).

Courts consistently interpret the rule for nonretained experts, however, to require the expert's opinion to spring from her perception of relevant facts. The distinction between a 26(a)(2)(B) witness and a 26(a)(2)(C) witness "is most aptly illustrated by the distinction that courts have drawn between treating physicians and physicians recruited for the purpose of giving expert opinion testimony." *Downey v. Bob's Disc. Furniture Holdings*, 633 F.3d 1, 6 (1st Cir. 2011). Thus, a party cannot simply locate an expert with no underlying knowledge of the facts in the case, depose her about her opinions, and then offer her as an expert. *See Caruso v. Bon Secours Charity Health Sys.*, 703 Fed. Appx. 31, 33 (2d Cir. 2017) (ruling where an expert's only connection to the matter was the fact that they were recruited to provide expert testimony, though not formally retained, a district court properly precluded them from trial). Similarly, a party cannot, as the Wangs are now attempting to do, depose an expert with some specific percipient knowledge of a relevant fact and then elicit opinion testimony from that witness that has nothing to do with their role as factual witnesses in the case. *Downey*, 633 F.3d at 6 (a nonretained expert is permitted to provide opinions under 26(a)(2)(C) where "his opinion testimony arises not from his enlistment as an expert but, rather, from *his ground-level involvement in the events giving rise to the litigation.*"); *Architects Collective v. Pucciano & English, Inc.*, 247 F.Supp. 3d 1322, 1334 (N.D. Ga. 2017) (same); *Mem'l Hall Museum v. Cunningham*, 455 F.Supp.3d, 347, 363 (W.D. Ken. 2020) (same); *see also Avnet, Inc. v. Motion, Inc*. No. 12 cv 2100, 2016 WL 927194, 2016 U.S. Dist. LEXIS 29534, *14 (N.D. Ill. Mar. 4, 2016) (ruling that a disclosed opinion, if not "developed . . . in the ordinary course" of the expert's factual observations, requires a report); *Advance Trust & Lift Escrow Servs. v. Sec. Life of Denver Ins. Co*., No. 188-cv-01897, 2020 U.S. Dist. LEXIS 246759 (Dist. Co. Oct. 26, 2020) (precluding expert disclosed under 26(a)(2)(C), because the disclosed opinions were "outside his percipient knowledge of the facts underlying" the litigation).

Here, the opinion the Wangs disclosed for John S. Wang concerning counterfeiting is not admissible because it is not connected in any way to his status as a fact witness. His factually relevant testimony concerned his making a record of C.C. Wang's seals in 2001. *See* pp. 8-9, *supra*. Commercial counterfeiting therefore has no relevance to Mr. Wangs' "ground-level involvement in the events giving rise to the litigation." *Downey*, 633 F.3d at 6.

In any event, the disclosure is untimely. The opinion designated for Mr. Wang is only potentially relevant to <u>*rebut*</u> the opinion of Patrick Regan regarding the addition of C.C. Wang's seals to the Estate's paintings after their sale. *See* Savitsky Decl. Exh. 13 at ¶¶43-45 (Regan Report discussing the addition of new C.C. Wang seals appearing on the Estate's paintings after their sale). The Plaintiff anticipates that the Wangs will use Mr. Wang's opinion to suggest that maybe the added C.C. Wang seals are not genuine. They would make this argument hoping to dodge Mr. Regan's discovery that they were adding C.C. Wang's missing seals to paintings after they shipped them to their accountant in Hong Kong between 2005 and 2009. But any responsive testimony would have needed to have been disclosed under Rule 26(a)(2)(D)(ii) within "30 days" of the issuance of Mr. Regan's report. Because Mr. Akiva Cohen's Rule 26(a)(2)(C) email disclosure was sent 18 months after the receipt of Mr. Regan's Report, it is untimely.

## CONCLUSION

For he forgoing reasons, each of the Plaintiff's motions in limine should be GRANTED in their entirety.

Dated: New York, NY                    SAM P. ISRAEL, P.C.

April 9, 2021                          BY: */s/ Timothy Savitsky*
                                       Sam P. Israel (SPI0270)
                                       Timothy Savitsky (TS6683)
                                       180 Maiden Lane, 6th Floor
                                       New York, New York 10038
                                       T: (646) 787-9880 | F: (646) 787-9886