# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YIEN-KOO KING,

          *Plaintiff,*

    v.

ANDREW WANG, et al.,

          *Defendants.*

**Case No: 14-cv-7694**

---

## OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ANDREW AND SHOU-KUNG WANG'S MOTIONS *IN LIMINE*

---

KAMERMAN, UNCYK, SONIKER &
   KLEIN P.C.
Akiva M. Cohen, Esq.
Attorneys for Defendants
1700 Broadway, 16th Floor
New York, New York  10019
(212) 400-4930
acohen@kusklaw.com

# TABLE OF CONTENTS

**Page**

Motion to Limit the Scope of the Trial to the 98 Paintings ................................................. 1

Motion to Exclude Reference to the Probate Verdict or, in the
Alternative, to the Fraud and Undue Influence Verdicts ................................................. 6

    A.   The Fraud Verdict Is Equivocal and More Prejudicial Than
        Probative, and Must Be Excluded ................................................. 6

    B.   The Undue Influence Verdict Must be Excluded as Irrelevant
        and More Prejudicial Than Probative ................................................. 9

    C.   The Capacity Verdict Should Be Excluded as Irrelevant and Prejudicial ................ 10

    D.   The Probate Verdicts Should Be Precluded, as Their Admission
        Would Result in Significant Collateral Litigation ................................................. 11

Motion to Exclude Settlement Evidence ................................................. 15

Motion to Exclude Certain Exhibits Purporting to Show Chinese
Auction Results and Information ................................................. 16

    A.   The Auction Exhibits Are Unauthenticated ................................................. 17

    B.   The Auction Exhibits Are Hearsay ................................................. 17

Motion to Exclude Any Reference to the So-Called "21+4" ................................................. 19

Motion to Preclude Certain Evidence Relating to Chinese Museum Exhibitions ..................... 21

    A.   Plaintiff's Purported Videos of the 2009 Exhibition Must Be Excluded ................ 21

    B.   Media Reports of the Exhibition Are Inadmissible Hearsay ................................ 22

    C.   The Exhibition Catalogs Are Inadmissible ................................................. 24

Motion to Exclude Evidence of Defendants' Wealth ................................................. 25

Motion to Exclude Evidence of Appreciation Damages or Bifurcate the Trial ........................ 29

Conclusion ................................................. 32

# TABLE OF AUTHORITIES

**Page**

**CASES:**

*AgroFresh Inc. v. Essentiv LLC,* No. CV 16-662-MN-SRF, 2018 WL 9578196
(D. Del. Dec. 11, 2018) ......................................................................................................... 15

*Air Crash at Detroit Metro. Airport, Detroit, Mich. on Aug. 16, 1987,*
776 F. Supp. 316 (E.D. Mich. 1991) .................................................................................... 14

*In re Ancona,* No. 14-10532 CGM, 2016 WL 828099 (Bankr. S.D.N.Y. Mar. 2, 2016) ................. 17

*Avalon Holdings Corp. v. Gentile,* No. 18-CV-7291 (VSB), 2019 WL 4640206
(S.D.N.Y. Sept. 24, 2019) ...................................................................................................... 24

*BBS Norwalk One, Inc. v. Raccolta, Inc.,* 117 F.3d 674 (2d Cir. 1997) .................................... 7

*Beastie Boys v. Monster Energy Co.,* 983 F. Supp. 2d 369 (S.D.N.Y. 2014) ............................ 3

*Blakely v. City of Clarksville,* 244 Fed. App'x 681 (6th Cir. 2007),
*quoting Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975) ...................... 8-9

*Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.,* 402 U.S. 313 (1971) ........................... 11

*Bottaro v. Hatton Assocs.,* 96 F.R.D. 158 (E.D.N.Y. 1982) ...................................................... 16

*Boykin v. W. Express, Inc.,* No. 12CV7428NSRJCM, 2016 WL 8710481
(S.D.N.Y. Feb. 5, 2016) .......................................................................................................... 22

*Butler v. Stover Bros. Trucking Co.,* 546 F.2d 544 (7th Cir. 1977) .................................... 12, 13

*Castruccio v. Barclay,* No. 1234, SEPT. TERM, 2017, 2018 WL 6629235
(Md. Ct. Spec. App. Dec. 17, 2018 ......................................................................................... 12

*Chaset v. Fleer/Skybox Int'l, LP,* 300 F.3d 1083 (9th Cir. 2002) ............................................. 29

*Childress Cattle, LLC v. Cain,* No. 3:17-CV-00388-JHM, 2017 WL 3446182
(W.D. Ky. Aug. 10, 2017) ........................................................................................................ 12

*In re Columbia Sec. Litig.,* 155 F.R.D. 466 (S.D.N.Y. 1994) ................................................... 23

*Conopco, Inc. v. Wein,* No. 05 CIV. 09899RJHTHK, 2007 WL 2119507
(S.D.N.Y. July 23, 2007) ......................................................................................................... 25

*David v. Nettles,* No. 15 C 1645, 2016 WL 1660503 (N.D. Ill. Apr. 27, 2016) ......................... 11

*Diaz v. Cianci,* 737 F.2d 138 (1st Cir. 1984) .......................................................................... 9

# TABLE OF AUTHORITIES
## (cont'd.)

**Page**

**CASES (cont'd.):**

*Doe v. Lima,* No. 14 CIV. 2953 (PAE), 2020 WL 728813 (S.D.N.Y. Feb. 13, 2020) ...................... 4

*E.I. Dupont De Nemours & Co. v. Kolon Indus., Inc.,* No. 3:09CV58,
2011 WL 13079473 (E.D. Va. May 16, 2011) ................................................... 11

*ESPN, Inc. v. Office of Com'r of Baseball,* 76 F. Supp. 2d 383 (S.D.N.Y. 1999) .................................. 21

*Eid v. Saint-Gobain Abrasives Inc.,* 377 F. App'x 438 (6th Cir. 2010) ................................... 16

*In re Estate of Chi-Chuan Wang,* 162 A.D.3d 447 (1st Dep't 2018), *leave to
appeal denied sub nom. Matter of Estate of Chi-Chuan Wang,* 32 N.Y.3d 904 (2018) ............................ 13

*In re Estate of Chi-Chuan Wang,* 179 A.D.3d 418 (1st Dep't 2020) ................................... 14

*Fred Olson Motor Serv. v. Container Corp. of Am.,* 81 Ill. App. 3d 825 (Ill. App. 1980) ........................ 12

*Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38 (2d Cir. 1986) ........................................ 14

*Gen. Dynamics Corp. v. Am. Tel. & Tel. Co.,* 650 F. Supp. 1274 (N.D. Ill. 1986) ............................ 14

*Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.,* 786 F.3d 400 (5th Cir. 2015) ........................ 29

*Glictronix Corp. v. Am. Tel & Tel. Co.,* 603 F. Supp. 552 (D.N.J. 1984) ........................... 14

*Guidi v. Inter-Cont'l Hotels Corp.,* No. 95 CIV. 9006 (LAP), 2003 WL 1846864
(S.D.N.Y. Apr. 8, 2003) ........................................................ 31

*Guidi v. Inter-Cont'l Hotels Corp.,* No. 95 CIV. 9006 (LAP), 2003 WL 1907904
(S.D.N.Y. Apr. 16, 2003) ...................................................... 8, 10

*Hecht v. Com. Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990) ............................................. 29

*Matter of Hedges,* 100 A.D.2d 586 (2d Dep't 1984) ............................................. 10

*Highland Capital Mgmt., L.P. v. Schneider,* 551 F. Supp. 2d 173 (S.D.N.Y. 2008) .............................. 8

*Holmes v. Sec. Inv. Prot. Corp.,* 503 U.S. 258 (1992) ............................................. 29

*Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.,* 744 F.2d 118 (D.C. Cir. 1984),
*cert. denied,* 469 U.S. 1196 (1985) ........................................... 14

*Matter of Janes,* 223 A.D.2d 20 (4th Dep't 1996), *aff'd sub nom.
Matter of Est. of Janes,* 90 N.Y.2d 41 (1997) ........................................ 30

**TABLE OF AUTHORITIES**
**(cont'd.)**

**Page**

**CASES (cont'd.):**

*Kelso v. Noble,* 162 F.3d 1161 (6th Cir. 1998) ...................................................... 26

*Kemling v. Country Mut. Ins. Co.,* 107 Ill. App. 3d 516, 437 N.E.2d 1253
(Ill. App. 1982) ...................................................................................................... 12

*King v. Wang,* No. 14 CIV. 7694 JFK, 2015 WL 4207076 (S.D.N.Y. July 13, 2015),
*aff'd in part, vacated in part sub. Nom. King v. Shou-Kung Wang,* 663 F. App'x 12
(2d Cir. 2016) .......................................................................................................... 2

*King v. Wang,* No. 14 CIV. 7694 (JFK), 2018 WL 1478044 (S.D.N.Y. Mar. 26, 2018) .................... 2

*Kleveland v. U.S.,* 345 F.2d 134 (2d Cir. 1965) ................................................... 24

*Leather v. Eyck,* 180 F.3d 420 (2d Cir. 1999) ....................................................... 7
*Major League Baseball Properties, Inc. v. Price,* 105 F. Supp. 2d 46 (E.D.N.Y. 2000) .......................... 30

*McCray v. City of Albany New York,* No. 113CV00949MATHBS, 2019 WL 289777
(W.D.N.Y. Jan. 23, 2019) ...................................................................................... 21

*Molina v. State,* 244 Md. App. 67 (2019) ...................................................... 25, 26

*Moon v. Advanced Med. Optics, Inc.,* No. 4:08-CV-0021-HLM, 2010 WL 11509121
(N.D. Ga. Dec. 29, 2010) ...................................................................................... 23

*Morrell v. Allfortish,* No. CIV.A. 10-924, 2010 WL 4668429 (E.D. La. Nov. 9, 2010) .................... 29

*Murray v. Billings Garfield Land Co.,* No. CV 14-106-BLG-SPW, 2016 WL 2963419
(D. Mont. May 20, 2016) ...................................................................................... 24

*Neal v. U.S.,* 102 F.2d 643 (8th Cir. 1939) .................................................... 25, 28

*Novak v. Tucows, Inc.,* No. 06-CV-1909, 2007 U.S. Dist. LEXIS 21269
(E.D.N.Y. Mar. 26, 2007, *aff'd* 330 Fed. App'x 204 (2d Cir. 2009) ................................ 17

*Oster v. Huntington Bancshares Inc.,* No. 2:15-CV-2746, 2017 WL 3208620
(S.D. Ohio July 28, 2017) ...................................................................................... 16

*Pilliard v. Sotheby's, Inc.,* No. 95 CIV 7775 (JFK), 1997 WL 381795
(S.D.N.Y. July 10, 1997), *on reconsideration in part,* No. 95 CIV. 7775 (JFK),
1998 WL 126060 (S.D.N.Y. Mar. 19, 1998 ........................................................... 17

*Postlewaite v. McGraw-Hill,* 333 F.3d 42 (2d Cir. 2003) ....................................... 7

# TABLE OF AUTHORITIES
## (cont'd.)

**Page**

**CASES** (cont'd.):

*Ricketts v. City of Hartford,* 74 F.3d 1397 (2d Cir. 1996), *as amended on reh'g in part*
(Feb. 14, 1996) ................................................................................................................... 4

*Matter of Rothko's Estate,* 43 N.Y.2d 305 (1977) ............................................................ 30, 31

*Sanders v. City of New York,* No. 98 CIV. 3374 (VM), 2001 WL 1568422
(S.D.N.Y. Dec. 5, 2001) ...................................................................................................... 24

*In re Sept. 11 Litig.,* 621 F. Supp. 2d 131 (S.D.N.Y. 2009) ................................................ 18

*Shell Oil Co. v. United States,* 896 F.3d 1299 (Fed. Cir. 2018) ......................................... 16

*Snider v. Consolidation Coal Co.,* 973 F.2d 555 (7th Cir. 1992) .................................. 11-12

*Trustees of the New York City Dist. Council of Carpenters Pension Fund Welfare Fund,*
*Annuity Fund v. Ne. Serv. Grp. Ltd.,* No. 12 CIV. 2010 KBF KNF, 2012 WL 2861337
(S.D.N.Y. July 9, 2012) ........................................................................................................ 17

*United States v. Aboumoussallem,* 726 F.2d 906 (2d Cir. 1984) ......................................... 3

*U.S. v. Al Kassar,* 660 F.3d 108 (2d Cir. 2011) ................................................................... 4

*U.S. v. Coppola,* No. CIVA.CV-88-3456 (JBW), 1994 WL 665751
(E.D.N.Y. Nov. 17, 1994), *a'ffd,* 85 F.3d 1015 (2d Cir. 1996) ........................................... 30

*U.S. v. Fawwaz,* 691 F. App'x 676 (2d Cir. 2017) .............................................................. 18

*U.S. v. Hatfield,* 685 F. Supp. 2d 320 (E.D.N.Y. 2010) ................................... 25-26, 27, 28

*U.S. v. Ingrao,* 844 F.2d 314 (6th Cir. 1988) ...................................................................... 25

*U.S. v. Sanders,* 211 F.3d 711 (2d Cir. 2000) ..................................................................... 23

*United States v. Thai,* 141 F.3d 1182 (9th Cir. 1998) ......................................................... 24

*In re Walther's Will,* 6 N.Y.2d 49 (1959) v......................................................................... 9

*Watkins v. New York City Transit Auth.,* No. 16 CIV. 4161 (ER), 2020 WL 1888839
(S.D.N.Y. Apr. 16, 2020) ...................................................................................................... 26

**TABLE OF AUTHORITIES**
**(cont'd.)**

**Page**

**CASES** (cont'd.):

*Wells Fargo Bank, N.A. v. Ullah,* No. 13 CIV. 0485 JPO, 2014 WL 470883
(S.D.N.Y. Feb. 6, 2014, *on reconsideration in part,* No. 13 CIV. 0485 HPO,
2014 WL 2117243 (S.D.N.Y. May 21, 2014), *quoting Howard v. Stature Elec., Inc.,*
20 N.Y.3d 522 (2013) ...........................................................................................................6-7

*Williams v. U.S.,* 168 U.S. 382 (1897) .............................................................................. 25

*Yien-Koo King v. Wang,* No. 14 CIV. 7694 (JFK), 2017 WL 2656451
(S.D.N.Y. June 20, 2017) ..................................................................................................... 2


**STATUTES:**

F.R.E. 401 ............................................................................................................................ 9

F.R.E. 408(a) (2021) ......................................................................................................... 15

F.R.E. 408(b) ..................................................................................................................... 15

F.R.E. 601 ......................................................................................................................... 12

F.R.E. 801 ......................................................................................................................... 17

F.R.E. 805 ......................................................................................................................... 18


**MISCELLANEOUS:**

Fed. R. Evid. 408 Advisory Committee Notes Regarding the 2006
Amendment to Rule 408 .................................................................................................... 15

Pursuant to the Court's Individual Rules, Defendants Andrew and Shou-Kung ("S.K.")

Wang respectfully submit this omnibus memorandum of law in support of their motions *in limine*:

1)   To limit the scope of the trial to issues relating to the 98 Paintings,[1] pursuant to Rule 403 of the Federal Rules of Evidence;

2)   To exclude reference to the probate verdict, in whole or in part, as irrelevant and under Rule 403;

3)   To exclude evidence of settlement efforts, communications, and documents under Rule 408;

4)   To exclude unauthenticated and hearsay evidence relating to certain alleged Chinese auction results;

5)   To exclude evidence relating to the so-called "21+4" given Plaintiff's recantation, at deposition in 2019, of her prior testimony that she and her husband had identified particular paintings as missing from the Decedent's bank vault;

6)   To exclude certain exhibits relating to Chinese museum exhibitions as unauthenticated and/or hearsay;

7)   To exclude evidence of Defendants' wealth as prejudicial and irrelevant absent a nexus to the alleged subsequent "re-sales" of certain of the 98 Paintings; and

8)   To exclude evidence of "appreciation damages" as unavailable in this action or, in the alternative, to bifurcate the trial to avoid the significant prejudice to Defendants of having evidence of subsequent appreciation in value available to the jury as it determines liability.

For the reasons set forth below, the motions should be granted.

## MOTION TO LIMIT THE SCOPE OF THE TRIAL TO THE 98 PAINTINGS

As the Court is aware, this case has a complex procedural history, in which multiple parties attempted to pursue various claims against Defendants in support of their RICO allegations, most of which have since been dismissed: Yien-Koo King ("Y.K."), personally, alleged that Defendants had stolen or converted art allegedly belonging to her corporations (the so-called "21+4"), Amended

---

[1] Defined below.

Complaint, ¶¶ 47-54; Y.K. King's corporations[2] alleged that Defendants had stolen or converted art allegedly belonging to them, *id.*, ¶¶ 334-341; the Estate[3] alleged that Defendants had converted certain paintings the Estate claimed to own, *id.*, ¶¶ 225-227; and the Estate alleged that Defendants had self-dealt 98 paintings the Estate sold to buyers in 2005, 2006, and 2009 (the "98 Paintings"). *Id.*, ¶¶ 104-224. In July 2015, the Court dismissed Y.K.'s claims regarding the allegedly stolen corporate art for lack of standing, and the Second Circuit affirmed that dismissal. *King v. Wang*, No. 14 CIV. 7694 JFK, 2015 WL 4207076, at *4 (S.D.N.Y. July 13, 2015), *aff'd in part, vacated in part sub nom. King v. Shou-Kung Wang*, 663 F. App'x 12 (2d Cir. 2016) (affirming dismissal for lack of standing). In June 2017, the Court dismissed the corporations' claims as time-barred and Y.K.'s claims on behalf of the Estate for lack of standing. *Yien-Koo King v. Wang*, No. 14 CIV. 7694 (JFK), 2017 WL 2656451, at *7 (S.D.N.Y. June 20, 2017). In March 2018, after Y.K.'s appointment as preliminary executrix, the Court granted reconsideration and allowed Y.K. to bring claims on behalf of the Estate, but held that ***only*** the Estate's claims with respect to the 98 Paintings were not time barred.[4] *King v. Wang*, No. 14 CIV. 7694 (JFK), 2018 WL 1478044, at *6 (S.D.N.Y. Mar. 26, 2018). Thus, the sole claim before the jury is Plaintiff's allegation that Defendants themselves purchased the 98 Paintings from the Estate, for less than fair value, thereby damaging the Estate.

Despite that limited scope, Plaintiff's preliminary exhibit list indicates that Plaintiff intends to litigate every complaint Y.K. has against her brother[5] and nephew[6] in this now 20-year family fight. Plaintiff's exhibit list includes: (1) Exhibits relating to C.C. Wang's 2003 will and codicil, which

---

[2] Ownership of the corporations is disputed, but that dispute is irrelevant for these purposes.

[3] The Estate of Chi-Chuan Wang ("C.C." or "Decedent").

[4] The Court also allowed Plaintiff to proceed with her associated state law damages claims in relation to the 98 Paintings: for conversion, common law fraud and conspiracy to defraud, and breaches of (and aiding and abetting breaches of) fiduciary duty. 2018 WL 1478044 at *8.

[5] S.K. Wang.

[6] Andrew Wang ("Andrew").

are not at issue in this action; (2) Exhibits relating to C.C. Wang's finances in 2003, which can have

no bearing on the sales of the 98 Paintings; (3) Exhibits relating to the so-called "Shanghai

Exchange," a failed settlement discussion also addressed in a separate motion *in limine* (evidence

relating to settlement under Rule 408); (4) Evidence relating to the dismissed claims regarding the

"21+4" (also the subject of a separate motion *in limine*, to the extent that the Court declines to limit

the scope of the trial to Plaintiff's live claims); (5) Exhibits relating to C.C. Wang's 2003 revocation

of a revocable trust and power of attorney, which have no connection to the 98 Paintings; and

(6) Exhibits relating to the whereabouts and dispositions of paintings other than the 98 Paintings,

none of which are in issue in this action. In total, Plaintiff proposes to offer at least some 41 exhibits

relating to these separate disputes not before the jury.[7]

The Court should preclude her from doing so, and limit the trial to the sole question that

will be before the jury: Did Defendants defraud the Estate by having Andrew, as Preliminary

Executor, mastermind a series of Estate sales of art purportedly to third parties, but really to himself,

at below fair market value? It is well-settled that a core purpose of Rule 403 is to preserve an orderly

trial by preventing a "trial-within-a-trial" on issues of only tangential (if any) relevance to the

question being determined by the jury. *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 375

(S.D.N.Y. 2014) ("the paradigmatic concern under Rule 403 [is] an orderly proceeding's being

derailed by a 'trial within a trial'"). For instance, relying on Rule 403 the Second Circuit and the

judges of this District have excluded (or affirmed the exclusion of): (a) an allegedly probative

licensing agreement, *Beastie Boys*, 983 F. Supp. 2d at 375; (b) evidence relevant to whether a criminal

defendant acted with the requisite knowledge, *United States v. Aboumoussallem*, 726 F.2d 906, 913 (2d

Cir. 1984) (affirming exclusion); (c) past contacts between the defendants and the government,

---

[7] Copies of the referenced exhibits are annexed to the accompanying Declaration of Akiva M. Cohen (the "Cohen Dec") as Exhibits 1-41.

*U.S. v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) (affirming exclusion of evidence where "its probative value was properly discounted … and 'would require a trial within a trial before the jury could determine whether there was any meaningful analogy at all'"); (d) evidence of past crimes, *Doe v. Lima*, No. 14 CIV. 2953 (PAE), 2020 WL 728813, at *6 (S.D.N.Y. Feb. 13, 2020) (admission "would invite a 'trial within a trial,' hijacking a targeted inquiry into damages and converting it into an exploration of decades-old crimes. This would at once promote delay, risk confusing the jury as to its finite mission, and create a high risk of unfair prejudice to plaintiffs"); and (e) evidence, in a suit against the city for police use of excessive force, that the same officer who injured the plaintiff then attacked an innocent bystander immediately after arresting the plaintiff. *Ricketts v. City of Hartford*, 74 F.3d 1397, 1414 (2d Cir. 1996), *as amended on reh'g in part* (Feb. 14, 1996) ("a trial within a trial concerning the subsequent engagement with Williams would have been more confusing than helpfully probative").

Here, Rule 403, these precedents, and sound administration of an orderly trial all counsel against the dramatic expansion of the scope of this trial represented by Plaintiff's proposed exhibits. Indeed, were the Court to admit these exhibits and issues, it is not only conceivable but likely that the majority of the parties' time at trial would be spent litigating issues not particularly relevant to any of the elements of Plaintiff's claims, at clear risk of confusing the jury and unduly delaying the trial. Admission of these exhibits would throw the doors open to not just one mini-trial-within-a-trial, but several.

For instance, Plaintiff seeks to introduce evidence relating to C.C. Wang's revocation of his revocable trust, no doubt to argue that he lacked capacity to do so on his deathbed or that it was fraudulently induced by Defendants. Cohen Dec Exs. 5-8. Should such exhibits be admitted, Defendants will need to introduce testimony relating to the revocation – which has nothing at all to do with the 98 Paintings – from Joe Erlichster (Decedent's long time attorney and friend who

oversaw the revocation), Chona Sianson-Lippert and Preciosa Roque (Decedent's nurses who took care of him through his death), among others, and the jury would need to evaluate, for example, Decedent's mental status in July 2003 and the impact of the Kings' withholding from him 93 of the most valuable paintings in his collection, including his favorite painting, Wu Zhongyuan's *Procession of the Taoist Immortals to Pay Homage to the King of Heaven* (the "Wu"), on his intentions in July. Plaintiff also seeks to conduct a trial-within-a-trial on the current whereabouts of the Wu, which Y.K. claims Andrew somehow removed from a safe deposit box in a Chinese bank in which she contends they jointly placed the Wu and which required her signature *and* Andrew's to open. Indeed, that claim was *already* the subject of a litigation, *in China*, in which the Chinese courts rejected jurisdiction over Y.K.'s claims for lack of evidence that the Wu was ever placed in the safe deposit box in the first place.[8] Nevertheless, in purported support of her RICO claim relating to the 98 Paintings Plaintiff proposes to have the jury determine whether Andrew Wang conducted a bank heist in China, a subject on which the parties have conducted no meaningful discovery and for which the most relevant witnesses and evidence – the bank employees and security tape – are unavailable. Any limited probative value such an inquiry might have would be dwarfed by the delay and confusion it would cause, and the prejudice to Defendants.

In sum, admission of the challenged exhibits would require distinct mini-trials on side issues for the jury's determination, at risk of significant confusion. The exhibits should be excluded, and Plaintiff precluded from submitting evidence relevant only to these tangential issues at trial.

---

[8] At Y.K.'s urging based on her 'suspicion' that the Wu had somehow been removed, the court ordered the safe deposit box opened and found that it contained a reproduction of the Wu rather than the original. Cohen Dec Ex. 42 at 47:4-53:13, Ex.43 at 608:12-614:2, Ex. 44 at 34:21-51:4. Of course, the Chinese court's conclusion – that absent any evidence that the original painting was ever present in the safe deposit box to begin with, they had no jurisdiction to litigate its purported theft, Cohen Dec Ex. 45– would support the conclusion that it is just as, if not more, plausible that Y.K. may have caused a reproduction to be deposited in the safe deposit box in the first instance, rather than the claim that Andrew somehow cracked the bank safe or avoided the security protocols after it was deposited, particularly given Y.K.'s incoherent explanation for her sudden interest in having a Chinese court open the box. Indeed, even assuming that the original had been placed in the box, Kenneth King testified at deposition that he had a nephew who managed a Chinese bank, raising another possibility the jury would need to consider. Cohen Dec Ex. 46 at 43:15-45:5.

# MOTION TO EXCLUDE REFERENCE TO THE PROBATE VERDICT OR, IN THE ALTERNATIVE, TO THE FRAUD AND UNDUE INFLUENCE VERDICTS

The Court should also preclude Plaintiff from introducing evidence of the outcome of the probate trial relating to Decedent's 2003 will, in its entirety. At the very least, the Court should preclude evidence relating to the fraud and undue influence verdicts.

## A. The Fraud Verdict Is Equivocal and More Prejudicial Than Probative, and Must Be Excluded

The Court must exclude evidence that the probate jury found that the 2003 will (the "Will") had been procured by fraud, because the verdict is equivocal as to *who* committed the fraud. In this RICO action, Plaintiff alleges that Andrew, S.K., and various other actors conspired together, in a RICO enterprise, to defraud the Estate by selling paintings to themselves at below market prices. The probate jury verdict, in contrast, did not unequivocally find that either Andrew or S.K. committed fraud, let alone that they conspired to do so. Rather, the jury found that "the execution of the will dated February 18, 2003 [was] the result of fraud by Shou-Kung Wang **and/or** Andrew Wang." Cohen Dec Ex. 45. (emphasis added). Thus, it is impossible to determine from the verdict whether the jury found that: (1) the Will had been procured by fraud by S.K. Wang but not by Andrew Wang; (2) the Will had been procured by fraud by Andrew Wang but not S.K. Wang; or (3) the Will had been procured by fraud by both Andrew and S.K. Wang, acting together.

That requires its exclusion. Plaintiff seeks to collaterally estop each of Andrew and S.K. Wang from denying that they defrauded Decedent in his lifetime, and to use the verdict as evidence that they conspired together in connection with the alleged predicate acts because they also "conspired" together before C.C. Wang's death. Cohen Dec, Ex. 47. Collateral estoppel requires two elements: (1) that the identical issue was "necessarily decided" in the prior proceeding; and (2) that the estopped litigant have had a "full and fair opportunity to litigate" the prior proceeding. *Wells*

*Fargo Bank, N.A. v. Ullah*, No. 13 CIV. 0485 JPO, 2014 WL 470883, at *4 (S.D.N.Y. Feb. 6, 2014), *on reconsideration in part*, No. 13 CIV. 0485 JPO, 2014 WL 2117243 (S.D.N.Y. May 21, 2014), *quoting Howard v. Stature Elec., Inc.*, 20 N.Y.3d 522, 525 (2013). As the party asserting collateral estoppel, plaintiff "bears the burden of showing with clarity and certainty what was determined by the prior judgment," *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997) including, most critically with respect to fraud, that the prior jury *unequivocally* found that either Andrew and S.K. acting together, or a specific one of Andrew or S.K., committed a fraud. *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 49 (2d Cir. 2003) ("This is a heavy burden that cannot be met with evidence that is 'equivocal'"), *quoting BBS Norwalk*, 117 F.3d at 677.

Given the equivocation in the probate jury's finding, Plaintiff simply cannot meet that burden. Because the jury's fraud finding could have been reached if it found that Andrew, but not S.K., defrauded Decedent into executing the Will, the probate jury did not actually and necessarily find that S.K. Wang made knowingly false statements to C.C. Wang to procure the execution of the Will, individually or in concert with Andrew. As such, the probate jury's finding on fraud cannot collaterally estop S.K. Wang from contesting the claim that he defrauded his father. *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999) ("… on this record, we cannot say that the question … was 'clearly raised' … or 'actually decided …'"). And the same is true in reverse; the jury could have reached its same fraud finding on a determination that only S.K., but not Andrew, made knowingly false statements to C.C. Wang, and therefore Andrew cannot be collaterally estopped in this action from contesting the allegation that he defrauded his grandfather into executing the Will. *Id.*

Nor can the jury's finding be admitted into evidence at all, given its equivocal nature, minimal probative value and highly prejudicial impact. There is no allegation that procuring the 2003 Will – an event that involved purely intrastate conduct – could conceivably be a predicate act under RICO. Nor does Plaintiff allege that the 2003 Will is relevant to the claimed scheme at issue here, to

sell paintings to Defendants at below-market prices. Rather, upon information and belief, Plaintiff intends to introduce it as evidence of intent or plan under Rule 404(b) of the Federal Rules of evidence. But the same equivocation that prevents it from having any estoppel effect prohibits its use under 404(b). The jury did not clearly find that S.K. acted with any fraudulent intent or plan, so it cannot be used as 404(b) evidence against S.K. And the jury did not clearly find that Andrew acted with any fraudulent intent or plan, so it cannot be used as 404(b) evidence against Andrew, let alone as evidence of conspiracy. Moreover, whatever minimal probative value the probate jury's finding might have, the reference to fraud, in a RICO case, and particularly on a nonagenarian family member, will undoubtedly inflame the jury and "suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176-77 (S.D.N.Y. 2008) (Evidence is prejudicial under Rule 403 if it "involves some adverse effect ... beyond tending to prove the fact or issue that justified its admission into evidence"). That is even truer where, as here, there is a clear risk that the RICO jury would hold the fraud finding against a Defendant – whether Andrew or S.K. – who the probate jury did not find committed any fraud at all.

As this Court has previously held, Rule 403 has particular force where a party seeks to introduce a prior verdict. *Guidi v. Inter-Cont'l Hotels Corp.*, No. 95 CIV. 9006 (LAP), 2003 WL 1907904, at *1 (S.D.N.Y. Apr. 16, 2003) ("Rule 403 is also properly utilized to prevent the jury from reaching its decision based on a prior finding—in essence, ratifying the earlier decision—instead of basing its verdict on the evidence presented in the instant case"). *See also Blakely v. City of Clarksville*, 244 Fed. App'x 681, 683–84 (6th Cir. 2007) ("Evidence of a prior verdict is likely to mislead the jury because '[a] jury is likely to give a prior verdict against the same defendant more weight than it warrants. Admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it'") *quoting Coleman Motor Co. v.*

*Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975). As the First Circuit explained, "the value of introducing the conclusion of a prior fact finder" is "substantially less weighty than the unfair prejudice it might cause." *Diaz v. Cianci*, 737 F.2d 138, 139 (1st Cir. 1984) (affirming exclusion of plaintiff's conviction for assaulting defendant police officers in trial of plaintiff's excessive force claim against those officers). Because the fraud verdict cannot collaterally estop either S.K. or Andrew Wang, and is far more prejudicial than probative, it should be excluded.

### B.  The Undue Influence Verdict Must be Excluded as Irrelevant and More Prejudicial Than Probative

The undue influence verdict is also inadmissible, because it is wholly irrelevant to any issue in this action, and far more prejudicial than probative. Evidence is relevant only when it has a tendency to make "a fact of consequence in determining the action" more or less likely to be true. F.R.E. 401. That the probate jury found Andrew and S.K. Wang unduly influenced C.C. Wang in the execution of his Will, however, has absolutely no bearing on any issue in this action.

Undue influence, in New York law, means only that the will in question was the product "a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist." *In re Walther's Will*, 6 N.Y.2d 49, 53 (1959). The finding that C.C. Wang did not act of his own free will when he changed his will to disinherit Y.K. and increase the share of his estate going to S.K.'s family does not tend to make any more likely the only allegations of the Complaint that remain in the case: that Andrew and S.K. conspired to extract paintings from the Estate at below market prices using straw-man buyers. And, like the fraud finding, and prior verdicts generally, its admission would be significantly more prejudicial than probative, raising the specter that the jury might find Defendants liable for the alleged RICO violations not based on the evidence, but based on animus towards the Defendants' prior conduct or the presumption that if Defendants were in the wrong in the prior

trial, they must be in the wrong here. Given its general lack of probative value, it should thus be excluded under Rule 403. *Guidi*, 2003 WL 1907904, at *1.

### C.  The Capacity Verdict Should Be Excluded as Irrelevant and Prejudicial

For effectively the same reasons, Plaintiff should not be permitted to place the probate jury's verdict on capacity before the RICO jury. Indeed, not only is the capacity verdict irrelevant to the issues in this RICO action and prejudicial for all the reasons discussed above, but admitting the capacity verdict would dramatically expand the scope of this trial to a host of issues relevant, if at all, only tangentially. While the probate jury found that Decedent lacked capacity to execute a will on February 18, 2003,[9] Cohen Dec Ex. 47, it did ***not*** make any finding that either S.K. or Andrew Wang were ***aware*** that C.C. Wang was not mentally competent to execute a will on that date. Because of the significant prejudice that would result from the jury being informed that S.K. and Andrew procured a will from their father and grandfather at a time he was not competent, Defendants would need to introduce the compelling evidence that they not only did not know of his incapacity but could not have been expected to know of it: testimony from C.C.'s friends and attorneys regarding their evaluations of C.C.'s mental status in and around that time frame, admissions from Yien-Koo and Kenneth King that they believed C.C. Wang mentally competent to transact business in that time frame, and the evaluations of C.C. Wang's medical professionals, including doctors who determined that C.C. had the mental wherewithal to make life or death medical decisions in March and April 2003. Because it is more prejudicial than probative, and would necessitate yet another "mini-trial," Rule 403 requires the exclusion of the capacity verdict.

---

[9] As a matter of New York law, the finding as to testamentary capacity established only that the jury did not find sufficient evidence of testamentary capacity on the date and at the time the 2003 will was executed; it has nothing to say about C.C. Wang's capacity at any other time. *Matter of Hedges*, 100 A.D.2d 586, 588 (2d Dep't 1984) ("evidence relating to the condition of the testatrix before or after the execution is only significant insofar as it bears upon the strength or weakness of mind at the exact hour of the day of execution").

### D.  The Probate Verdicts Should Be Precluded, as Their Admission Would Result in Significant Collateral Litigation

Finally, the Court should exclude the entirety of the probate verdict because its admission would result in extensive litigation on tangential side issues. Because the verdicts are of minimal (if any) relevance but significant prejudice, Defendants, the Court, and the jury will be forced to expend a disproportionate amount of time litigating the allegations that Andrew and S.K. committed fraud or unduly influenced Decedent, as well as the allegations relating to his capacity. As such, they should be precluded. *E.I. Dupont De Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09CV58, 2011 WL 13079473, at *1 (E.D. Va. May 16, 2011) (precluding documents where "any marginal relevance that could be found in such evidence is outweighed substantially by the prejudicial effect of the jury confusion, delay, and in the satellite litigation which admission of those documents would generate"). *See also David v. Nettles*, No. 15 C 1645, 2016 WL 1660503, at *1 (N.D. Ill. Apr. 27, 2016) (refusing to "open the doors to satellite litigation regarding a relatively unimportant matter in the case").

Plaintiff will no doubt argue that no time would be required because Defendants would be collaterally estopped from arguing that they did not commit a fraud or unduly influence C.C. Wang. Not so. Under the applicable federal precedents, Defendants did not have a full and fair opportunity to litigate those issues at the probate trial because the New York Dead Man's Statute barred Plaintiffs from presenting their testimony regarding their interactions with C.C. Wang as evidence at the probate trial, and they thus did not have the "full and fair opportunity to be heard" required to invoke issue preclusion. *See Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 333, (1971) ("[d]etermining whether a [party] has had a full and fair chance to litigate … in an earlier case is of necessity not a simple matter.  … whether without fault of his own the [litigant] was deprived of crucial evidence or witnesses in the first litigation" is a factor); *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 559 (7th Cir. 1992) ("A party has not had the requisite full and fair opportunity if he or she

was unable to present critical evidence in the initial proceeding"). Courts applying this standard have *universally* refused to allow preclusion where a state Dead Man's Statute prevented a party from adducing relevant evidence in the underlying proceeding but would not bar the evidence in the new proceeding. *Butler v. Stover Bros. Trucking Co.*, 546 F.2d 544, 551 (7th Cir. 1977) (no preclusion where Illinois Dead Man's Act barred introduction of important testimony in prior proceeding); *Childress Cattle, LLC v. Cain*, No. 3:17-CV-00388-JHM, 2017 WL 3446182, at *9 (W.D. Ky. Aug. 10, 2017) (following *Butler* and refusing to "give preclusive effect to the Indiana probate proceeding" where Dead Man's Statute barred important testimony); *Kemling v. Country Mut. Ins. Co.*, 107 Ill. App. 3d 516, 522, 437 N.E.2d 1253, 1257 (Ill. App. 1982) (no collateral estoppel where evidence barred by the Dead Man's Act would be available in second proceeding); *Fred Olson Motor Serv. v. Container Corp. of Am.*, 81 Ill. App. 3d 825, 830-31 (Ill. App. 1980) (same, in further state court litigation relating to same underlying facts as *Butler*).[10]

Defendants – painted as "fraudsters" who "unduly influenced" C.C. Wang into making a will for their benefit – were absolutely barred at the probate trial from testifying to any of their actual interactions with C.C. Wang relating to any of the will, the Kings' prior art thefts, C.C. Wang's instructions to them with respect to his art, or C.C. Wang's anger at his daughter and her husband. The Dead Man's Statute, however, has no application in this action based on the Federal RICO statute. F.R.E. 601. This was clearly critical evidence as to Defendants' state of mind and conduct,

---

[10] Defendants' counsel has reviewed all 51 state and federal court decisions returned by Westlaw on a search of "'Dead Man's' & 'collateral estoppel'"; no federal court collaterally estopped a party who had been barred from introducing relevant evidence on the underlying action by a state Dead Man's statute where that evidence would be available in the second litigation. In addition, of the 29 state court cases returned by the same search terms, one state court found that a party whose testimony had been barred by the Dead Man's Statute had a "fair opportunity to be heard," *specifically because* she had strategically refused to waive the Dead Man's Statute in the underlying case despite having been offered the opportunity to do so. *Castruccio v. Barclay*, No. 1234, SEPT. TERM, 2017, 2018 WL 6629235, at *10 (Md. Ct. Spec. App. Dec. 17, 2018) ("Sadie's strategic decision not to waive the Dead Man's Statute does not in any way suggest that she was deprived of a fair opportunity to be heard in the Deed Case"). The Maryland court's emphasis on the plaintiff's strategic choice not to testify implies that, like the other courts to have considered this issue, it would not have applied collateral estoppel if the plaintiff had not had (and rejected) the opportunity to introduce such evidence. No other state court decision addressed the issue at all.

and while its absence at the underlying trial (in accordance with New York law) does not invalidate the probate decree, it does prevent Plaintiff from seeking to preclude Defendants from arguing to this jury that they did not commit any fraud or undue influence at all, given that such evidence would be admissible here. *See Butler*, 546 F.2d at 551.

Moreover, in the probate trial, Defendants were unable to obtain the testimony of Jerome Kamerman, the attorney-draftsman of the 2003 will, who was outside the jurisdiction at the time of the trial. *In re Estate of Chi-Chuan Wang*, 162 A.D.3d 447, 449 (1st Dep't 2018) (noting Mr. Kamerman's unavailability in finding adverse inference was granted in error). Mr. Kamerman will be available to testify at the RICO trial, and will do so if the Court allows the validity of the 2003 will to be raised to the jury by Plaintiff.[11] Declaration of Hilton Soniker ("Soniker Dec"), ¶ 3. There can be no dispute that Mr. Kamerman's absence at the probate trial was significant; Plaintiff sought *and obtained* an adverse inference from his absence, arguing that Mr. Kamerman had been involved in the purported fraud and undue influence and that Defendants' failure to secure his testimony at trial was evidence of that. Cohen Dec Ex. 49. Mr. Kamerman, who is himself a nonagenarian who splits his time between Florida and New York, has confirmed that he will be in New York for the scheduled trial and Defendants will thus be able to compel him to attend. Soniker Dec, ¶ 5. Again, that Defendants would have critical evidence available to them in this action that they were unable to obtain in the context of the probate trial means they cannot be estopped from denying the purported fraud or undue influence in this action.

Indeed, the adverse inference – which the New York Appellate Division later held was erroneously granted given Mr. Kamerman's unavailability – is a separate and sufficient reason that Defendants cannot be estopped. Collateral estoppel cannot apply where there was unfairness in the

---

[11] If reference to the validity of the will is precluded, Mr. Kamerman's testimony would not be relevant or necessary.

underlying action, including significant evidentiary errors, *even if those errors are found to be "harmless"* for purposes of appellate review of the underlying decision. *Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 128-129 (D.C. Cir. 1984) (the standards for assessing reversible error and fairness for estoppel purposes are different, and thus acknowledged error in evidence presented to the jury, even though found to be "harmless" on appeal, presented "serious obstacle" to estoppel claim), *cert. denied*, 469 U.S. 1196 (1985); *Gen. Dynamics Corp. v. Am. Tel. & Tel. Co.*, 650 F. Supp. 1274, 1289 (N.D. Ill. 1986) (adopting the *Faucett* court's reasoning on the intersection between harmless error and preclusion); *Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552, 575 (D.N.J. 1984) (same). *Cf. In re Air Crash at Detroit Metro. Airport, Detroit, Mich. on Aug. 16, 1987*, 776 F. Supp. 316, 326 (E.D. Mich. 1991) ("Since the court has rejected Northwest's assertions in their entirety, not just as harmless error, there is no unfairness to Northwest in permitting offensive estoppel").

Here, as in *Faucett*, the appellate court reviewing the underlying proceeding found a significant evidentiary error – the adverse inference – which it nonetheless deemed harmless error **solely with respect to the jury's finding as to capacity**. *In re Estate of Chi-Chuan Wang*, 162 A.D.3d 447, 449 (1st Dep't 2018) ("The court's missing witness charge with respect to the attorney, Jerome Kamerman, was in error. Mr. Kamerman was living in Florida at the time of trial and was unavailable to proponents ... **In light of the testimony at trial regarding decedent's testamentary capacity**, we find the error to be harmless as a matter of law"),[12] *leave to appeal denied sub nom. Matter of Estate of Chi-Chuan Wang*, 32 N.Y.3d 904 (2018). Thus, Defendants were both

---

[12] In January, 2020, the Appellate Division ruled that, *for purposes of probating a February 10, 2003 codicil*, S.K. Wang had a full and fair opportunity to be heard on fraud and undue influence and was therefore estopped from submitting it for probate. *In re Estate of Chi-Chuan Wang*, 179 A.D.3d 418, 419 (1st Dep't 2020). But that decision: (1) could not consider the availability of evidence barred by the Dead Man's Statute as a factor in whether there had been a full and fair opportunity, as the Dead Man's Statute would have applied equally to the probate of the codicil; (2) applied New York State law of issue preclusion. But, because this RICO action is heard under the Court's federal question jurisdiction, this Court must apply *federal* law regarding issue preclusion. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 42 (2d Cir. 1986). While federal preclusion doctrine bars preclusion where a serious but ultimately harmless error impacted the verdicts, no New York case has so-held. For both of those reasons, the Appellate Division's ruling as to whether Andrew Wang had a full and fair opportunity to be heard as a matter of *New York* law is not determinative here.

prevented from submitting critical evidence that might have impacted the outcome, and the probate jury was improperly allowed to base its conclusions as to fraud and undue influence on an erroneously drawn adverse inference. As such, the applicable federal precedents make clear that Defendants cannot be estopped by the outcome of the probate trial. If the Court allows evidence on these issues, it will be countenancing a trial-within-a-trial on the events of 2003, which are not relevant to the core issue in this action: whether Defendants purchased the 98 Paintings and, even if so, whether the Estate was financially harmed by the sales. The evidence should be excluded.

## MOTION TO EXCLUDE SETTLEMENT EVIDENCE

Plaintiff proposes to introduce several exhibits relating to the parties' abortive attempts to settle the overall estate dispute since 2003.[13] Rule 408 of the Federal Rules of Evidence, however, bars parties from relying on evidence of either an offer of settlement or "conduct or a statement made during compromise negotiations" as evidence to prove the validity or amount of a disputed claim. F.R.E. 408(a) (2021). Moreover, while such evidence is admissible when offered for another purpose, such as negating a claim of undue delay or proving prejudice or bias, F.R.E. 408(b), the proffered exhibits serve no such purpose here. And settlement evidence may not be used to impeach a witness's credibility with evidence of prior inconsistent statements or conduct. F.R.E. 408(a) (evidence inadmissible "to impeach by a prior inconsistent statement or a contradiction"); Fed. R. Evid. 408 Advisory Committee Notes Regarding the 2006 Amendment to Rule 408 ("The amendment prohibits the use of statements made in settlement negotiations when offered to impeach by prior inconsistent statement or through contradiction"); *AgroFresh Inc. v. Essentiv LLC*, No. CV 16-662-MN-SRF, 2018 WL 9578196, at n.3 (D. Del. Dec. 11, 2018) (citing Advisory Notes

---

[13] Copies of the relevant exhibits are annexed to the Cohen Dec as Exhibits 9-13, 19-31. At various times, Plaintiff has referenced in her filings distortions of certain other discussions Andrew Wang had with Raymond King in an attempt to settle the dispute, which Raymond surreptitiously recorded and the Kings have since repeatedly attempted to twist the meanings of. Those discussions are not included on Plaintiff's exhibit list, but reference to them at trial should be precluded as well.

in rejecting argument that Rule 408 permits the use of settlement evidence for purposes of impeachment; such an exception would "swallow the exclusionary rule").

Nor does categorizing the Shanghai Settlement Document or any other evidence relating to the Shanghai Settlement as an "admission of fact" avoid that result. *Shell Oil Co. v. United States*, 896 F.3d 1299, 1313 (Fed. Cir. 2018) (Rule 408 "excludes factual admissions made in the course of settlement negotiations"); *Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 445 (6th Cir. 2010) ("Rule 408 specifically rejects this approach [prior precedent allowing settlement evidence if there was a factual admission], and instead adopts a rule excluding factual admissions made in the course of settlement negotiations"); *Oster v. Huntington Bancshares Inc.*, No. 2:15-CV-2746, 2017 WL 3208620, at *6 (S.D. Ohio July 28, 2017) ("factual admission" in settlement context could not be used to "rebut" plaintiff's claims); *Bottaro v. Hatton Assocs.*, 96 F.R.D. 158, 160 (E.D.N.Y. 1982) (Congress "expressly overruled [the common law exception allowing settlement evidence of 'factual admissions'] when it enacted Rule 408 of the Federal Rules of Evidence in 1975"). The Court should exclude the proffered exhibits.

## MOTION TO EXCLUDE CERTAIN EXHIBITS PURPORTING TO SHOW CHINESE AUCTION RESULTS AND INFORMATION

Plaintiff's Preliminary Exhibit List identifies a series of purported auction-related webpages and catalogs as exhibits Plaintiff intends to offer (the "Auction Exhibits"),[14] presumably for purposes of showing that: (1) certain of the 98 Paintings were purportedly auctioned in China after their sale by the Estate (the "Supposedly Auctioned Paintings"); and (2) that the Supposedly Auctioned Paintings brought a particular price in those subsequent auctions. The Auction Exhibits are not admissible for either purpose, and must be excluded.

---

[14] Copies of the Auction Exhibits are annexed to the Cohen Dec as Exhibits 50-81.

### A.  The Auction Exhibits Are Unauthenticated

As an initial matter, the Auction Exhibits have not been authenticated. "Proper authentication requires submission with an affidavit or other sworn statement attesting to what the [exhibit] actually is and whether it is a true and correct copy of what it purports to be." *Trustees of the New York City Dist. Council of Carpenters Pension Fund Welfare Fund, Annuity Fund v. Ne. Serv. Grp. Ltd.*, No. 12 CIV. 2010 KBF KNF, 2012 WL 2861337, at *3 (S.D.N.Y. July 9, 2012). *See also In re Ancona*, No. 14-10532 CGM, 2016 WL 828099, at *11 (Bankr. S.D.N.Y. Mar. 2, 2016) (webpage printout inadmissible for lack of authentication and hearsay); *Novak v. Tucows, Inc.*, No. 06–CV–1909, 2007 U.S. Dist. LEXIS 21269, at *15–19 (E.D.N.Y. Mar. 26, 2007) (granting motion to strike certain exhibits of web page printouts as hearsay and for lack of authentication under Fed.R.Evid. 901), *aff'd,* 330 Fed. App'x 204 (2d Cir. 2009). No witness from any auction company, with personal knowledge of the auction company's websites or catalogs, has testified to the authenticity of the Auction Exhibits, and as these are foreign entities that cannot be subpoenaed to appear at trial, there does not appear to be any prospect that Plaintiff will be able to authenticate them at trial. In the absence of valid authentication, the Auction Exhibits cannot be admitted.

### B.  The Auction Exhibits Are Hearsay

Separately, the Auction Exhibits cannot be admitted as evidence that particular paintings were auctioned or sold as described in the Auction Exhibits. The Auction Exhibits are out of court statements being offered to prove the facts referenced therein, and, as such, are hearsay. F.R.E. 801. *See also Pilliard v. Sotheby's, Inc.*, No. 95 CIV. 7775 (JFK), 1997 WL 381795, at *9 (S.D.N.Y. July 10, 1997) (catalog raisonne was hearsay, but admissible under the learned treatise exception), *on reconsideration in part*, No. 95 CIV. 7775 (JFK), 1998 WL 126060 (S.D.N.Y. Mar. 19, 1998) (dismissing conversion claim as barred by the statute of limitations). Given the relevant testimony about Chinese auction houses, no hearsay exception can rescue the Auction Exhibits, including the business

records exception (even were Plaintiff somehow able to obtain the requisite authenticating testimony from a knowledgeable witness).

At deposition, Plaintiff's expert, Patrick Regan, conceded that Chinese auction houses do not independently vet the works they put up for auction; rather, questions of authenticity and provenance are to be addressed by the buyer after submitting a successful bid. Cohen Dec, Ex. 82 at 295:23-299:17. Thus, unlike, say, a Sotheby's listing, which effectively communicates *Sotheby's* claim that a particular painting offered for auction is genuine and accurately described, Chinese auction listings do no more than pass along the seller's claims about the item, without any guaranty as to the accuracy of those claims. *Id.* at 297:7-15. As such, any description in the Auction Exhibits is not merely hearsay, but hearsay-within-hearsay: the auction house's out of court statement about the seller's out of court statement about the work, and would be admissible only if *the seller's* statements would be independently admissible. *See* F.R.E. 805 (hearsay within hearsay admissible if each component part is admissible); *U.S. v. Fawwaz*, 691 F. App'x 676, 677 (2d Cir. 2017) ("Where, as here, the statements that Fawwaz seeks to admit constitute hearsay within hearsay not subject to an exception, the district court did not abuse its discretion in denying the statements' admission"); *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 157 (S.D.N.Y. 2009) ("A statement recorded in a public record made by an individual with no business duty to report is considered hearsay-within-hearsay and is excluded, unless it satisfies some other hearsay exception"). There is no argument that the seller of any item up for auction was under a business duty to create the auction listings, and a seller of inauthentic art would have every motivation to lie about the art's status or provenance, so there are no external indicia of reliability that could be used to admit the seller's claims absent the seller appearing in court to testify to them. As such, the Auction Exhibits cannot be used as evidence that the very paintings sold by the Estate later appeared at auction. Nor are they valid evidence of what the auctioned lot (whether genuine or not) actually sold for; as Mr. Regan also conceded, reports of

hammer prices achieved at a Chinese auction are not sufficient evidence that the lot was actually

purchased at that price (or any other). Cohen Dec, Ex. 82 at 320:21-323:14.[15] Nor is the hammer

price itself independently relevant regardless of whether the price was actually paid; Plaintiff's claim

is that the Estate could have actually sold the 98 Paintings at higher prices, not that the Estate could

have received a higher bid for the painting from a buyer who then failed to pay. As such, no fact

contained in the Auction Exhibits that could conceivably be admitted under the business records

exception has any relevance at all.

      For that reason, the Auction Exhibits cannot be allowed before the jury, and the motion

should be granted.

## MOTION TO EXCLUDE ANY REFERENCE TO THE
## SO-CALLED "21+4"

      To the extent that the Court does not limit the scope of the trial to the actual claims at

issue – the sale of the 98 Paintings – it should nevertheless preclude any reference to the so-called

"21+4." From the outset of this protracted estate litigation, Y.K. King has made the false claim that

Defendants Andrew and S.K. Wang stole some 21 paintings from Decedent's North Fork Bank

vault on January 31, 2003, and another 4 from his apartment. According to Y.K., she identified the

allegedly stolen paintings by comparing the paintings she subsequently removed from the North

Fork vault (days later) against a purported inventory of what had been in the vault, and was thus able

to identify what paintings were "missing." Cohen Dec, Ex. 83 at 162:10-164:7; 84 at 488:22-489:19;

85 at 923:3-16; 43 at 547:22-548:20.

      That testimony – and any reference to the "21+4" cannot be allowed before the jury,

because Y.K. expressly repudiated it at deposition in 2019, admitting – after 16 years of lies under

---

[15] To the extent that Plaintiff might argue the report should be admissible as showing something other than the actual price of a completed sale, the exhibits should be excluded as far more prejudicial than probative.

oath – that there was *no* inventory and no careful comparison of the paintings she stole from Decedent's vault. Rather, in a "chaotic situation," Cohen Dec Ex. 86 at 172:16, Y.K. reviewed "what we thought was in the bank vault," *id.* at 176:3-8, doing her "very best at that time, by deduction" to the "best of our knowledge at the time." *Id.* at 185:15-21. But Y.K. finally admitted that as they made these "deductions" they did not physically check every painting, *id.* at 196:2-3, and may not have been looking at physical paintings at all, just lists. *Id.* at 195:15-22. Indeed, Y.K. now claims that some of the "deductions" about what was or wasn't in the vault "could be from a note" rather than from "the physical painting itself" or a preexisting inventory. *Id.* at 198:6-10. And Y.K. went on to claim that she was "deducing" the list of paintings she had from "[w]hat we should have," rather than reviewing what they *did* have. *Id.* at 200:9-13.

At a subsequent deposition, Y.K. dug the hole even deeper: she took only a "general look quickly just to get an idea what's missing" and just "generally felt how much was taken" but "do[es]n't remember what specifically [she] did" to identify the so-called "21+4" as missing. Asked how she figured out which paintings were missing, Y.K. testified "I think we just figured out the basic number, in general … there were about 21 missing from the box and 4 from the house that was hanging on the wall, or, you know, hanging on the wall probably." *Id.*, Ex. 87 at 221:20-222:19. Pressed on the number, Y.K. testified "[t]here must be a reason why I came up with that number. I can't recall right now." *Id.* at 222:20-223:4.

Given that testimony, Y.K. cannot be allowed to place before the jury her claim that Andrew and S.K. Wang stole 25 paintings – or any particular pieces – from C.C. Wang's vault and apartment. Y.K.'s deposition testimony makes clear that: (1) she has absolutely no recollection of how she came up with that number or that list; (2) did not rigorously compare the paintings she removed from the vault against a pre-existing list that would have allowed her to viably identify the supposedly "missing paintings"; and (3) even as to the four paintings allegedly missing from Decedent's

apartment, she has no specific recollection that they were there in the first instance. Indeed, at least one of the paintings Y.K. continues to insist on calling the "21+4" was actually in her own possession the entire time. *Compare* Docket No. 36 at ¶ 49 (identifying Wen Riguan, *Grapes*, as one of the "stolen" paintings) *with id.* Ex. 88 (listing Wen Riguan, *Grape Vines*, as an asset of the Kings in their possession on their bankruptcy filings). Particularly given the limited probative value of this separate accusation against Defendants, which has no bearing on the core allegations with respect to the 98 Paintings, having the jury distracted by a trial within a trial on the issue of the "21+4" would be inappropriate. *See ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 407 (S.D.N.Y. 1999) ("I decline to allow the jury to determine whether the 1993 substitutions were preemptions. The probative value of such an exercise is vastly outweighed by the confusion and delay that would inevitably result from conducting a trial within a trial").

## MOTION TO PRECLUDE CERTAIN EVIDENCE RELATING TO CHINESE MUSEUM EXHIBITIONS

Plaintiff proposes to introduce certain hearsay and unauthenticated exhibits relating to the "Bao Wu Tang" exhibitions at the Beijing Capital Museum in 2009 and the Beijing Poly Museum in 2010.[16] They must be excluded.

### A. Plaintiff's Purported Videos of the 2009 Exhibition Must Be Excluded

Plaintiff's preliminary exhibit list includes 36 video clips that purport to be videos taken at the Beijing Capital Museum show in 2009. They must be excluded, because they cannot be authenticated. Before a video may be admitted into evidence, the proponent must demonstrate "that the video is authentic and that the events are accurately depicted." *McCray v. City of Albany New York*, No. 113CV00949MATHBS, 2019 WL 289777, at *2 (W.D.N.Y. Jan. 23, 2019). Authenticating the

---

[16] Copies of the relevant documentary exhibits are annexed to the Cohen Dec as Exhibits 89-124, 130-135. Due to file size limitations imposed by PACER, Exhibits 133 and 135 have been split into two parts each. In addition, Plaintiff seeks to introduce certain video clips not submitted herewith, but which are also a subject of this motion.

videos that purport to be of the Capital Museum exhibition thus requires testimony from someone who recognizes the events depicted in the videos or can testify regarding the creation of the videos and their chain of custody. *Boykin v. W. Express, Inc.*, No. 12CV7428NSRJCM, 2016 WL 8710481, at *5 (S.D.N.Y. Feb. 5, 2016).

Discovery confirms that no such evidence is possible here. Plaintiff produced the videos in discovery without any explanation as to their provenance. She conceded at deposition that she had never watched the videos and did not know who took them. Cohen Dec Ex. 44 at 203:20-204:24. To the contrary, she claimed – both at that deposition and in an email to a third party – that though she had paid some unidentified third party to film the exhibition, she never received the video from them. *Id.*; Cohen Dec Ex. 125. Y.K. did not identify in discovery the individual who took the video clips, though their identity was called for by Defendants' very first interrogatory to Plaintiff. Cohen Dec Ex. 126. And Plaintiff did not produce any communications by which she received copies of the video clips, though such communications were called for by Defendants' document requests. Cohen Dec Ex. 127 at Request No. 7. Given Plaintiff's inability to authenticate the videos and refusal to allow Defendants to conduct any discovery regarding them, they cannot be admitted.

Nor can Andrew Wang authenticate the videos for Plaintiff; though he was not specifically asked about the videos at deposition, his testimony about the exhibition made clear that he was there only for the opening and did not recall seeing particular paintings on display. Cohen Dec Ex. 128 at 151:2-152:24. Thus: (1) Plaintiff cannot authenticate the videos herself; and (2) there is nobody else who can authenticate the videos. As such, they are inadmissible.

### B.  Media Reports of the Exhibition Are Inadmissible Hearsay

Similarly, Plaintiff seeks to introduce a purported copy of footage from CCTV (a Chinese broadcaster) that, in part, purports to depict certain paintings displayed at the museum exhibition. Cohen Dec Ex. 129. The footage is included in a produced, edited package, which compiles clips of

C.C. Wang during his life, computer graphics, historical background on the artist Guo Xi, and videos that the reporter describes as being taken at the museum exhibition. Cohen Dec, Ex 130. The video contains no 'establishing shot' showing the museum exhibition as a whole with a continuous, unedited recording of the camera view showing the "walk" from the museum entrance to the paintings; rather, there are edited clips: an image that purports to be the entrance to the exhibit at 4:00 in the video, followed by a jump cut to video of patrons looking at art at 4:03 of the video, and later cuts to clips of art on display, somewhere, at 4:05 of the video and then again in a series of clips edited together, from 7:29-8:21 of the video. Cohen Dec, Ex. 130. In other words, the only source for the claim that the art shown in the video is what was displayed at the Capital Museum show is the statements of the CCTV reporter. It is well settled that factual claims made in media reports are hearsay that may not be offered for the truth of the matter asserted in the reports. *See, e.g., U.S. v. Sanders*, 211 F.3d 711, 718 (2d Cir. 2000) (purported FBI statement reported by *NBC Nightly News* was hearsay); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 475 (S.D.N.Y. 1994) (News accounts are generally inadmissible hearsay, particularly when the reporter cannot be cross-examined on the accuracy of the narration); *Moon v. Advanced Med. Optics, Inc.*, No. 4:08-CV-0021-HLM, 2010 WL 11509121, at *2 (N.D. Ga. Dec. 29, 2010) (excluding media reports, including photographs, because news reports are inadmissible hearsay). As such, while Y.K. may be able to authenticate the footage as CCTV footage, *CCTV's* assertion that the footage is of the Capital Museum exhibition is inadmissible hearsay, and the footage itself thus cannot be admitted.[17]

Similarly, Plaintiff intends to offer two Chinese web reports relating to the exhibition: a November 9, 2009 piece purportedly posted to China.com, titled "Domestic and Foreign Treasures

---

[17] Indeed, by email dated March 3, 2021, Plaintiff's counsel indicated that Plaintiff intended to "offer [the CCTV video] through Y.K. and without audio," Cohen Dec, Ex. 129, presumably in recognition of the fact that any of the *information* conveyed by CCTV was hearsay. But that also includes the claim that the paintings shown in the video were displayed at the Capital Museum exhibition, which Y.K. cannot separately testify to.

Gathered in Beijing" and a November 13, 2009 piece purportedly posted to China.com titled "Invaluable Original Painting 'Xishan Xianguan' from Ni Zan." Plaintiff has not authenticated these exhibits, but even if she had, as noted above, the contents of media reports are hearsay and thus inadmissible. *Avalon Holdings Corp. v. Gentile*, No. 18-CV-7291 (VSB), 2019 WL 4640206, at \*4 (S.D.N.Y. Sept. 24, 2019) (court could not consider media reports, as they are hearsay); *Sanders v. City of New York*, No. 98 CIV. 3374 (VM), 2001 WL 1568422, at \*3 (S.D.N.Y. Dec. 5, 2001) ("news articles, as a general matter, are inadmissible hearsay")..

### C.  The Exhibition Catalogs Are Inadmissible

Plaintiff also seeks to introduce the catalogs for the two exhibitions, and those catalogs, and any statements within them, are unauthenticated and inadmissible hearsay that is more prejudicial than probative.

First, as to the images of the paintings within the catalogs, authentication of a photograph requires the same type of testimony that authentication of a video does: evidence that the picture is an accurate representation of the item it purports to depict. *Kleveland v. U.S.*, 345 F.2d 134, 137 (2d Cir. 1965). Without testimony by a person with knowledge that the images in the auction catalogs accurately depict the paintings actually displayed at the exhibition, those images are inadmissible as evidence of what was displayed at the exhibitions.

Second, the catalogs are inadmissible as hearsay to the extent that they are offered to prove what was displayed at the exhibition or for the truth of any matters asserted therein, particularly including the preface by Cui Guomin, a non-party. *See, e.g., United States v. Thai*, 141 F.3d 1182 (9th Cir. 1998) (trial court properly excluded letter from Chinese national museum as hearsay); *Murray v. Billings Garfield Land Co.*, No. CV 14-106-BLG-SPW, 2016 WL 2963419, at \*3 (D. Mont. May 20, 2016) (museum descriptive text was inadmissible hearsay). As such, they are inadmissible.

## MOTION TO EXCLUDE EVIDENCE OF
## DEFENDANTS' WEALTH

Plaintiff intends to introduce evidence of Defendants' wealth,[18] purportedly as evidence that Defendants received and used the proceeds of subsequent sales of the 98 Paintings after the Estate sold the paintings to the buyers. But Plaintiff has not established the necessary "special circumstances" for evidence of Defendants' wealth to be relevant: Evidence of a "nexus between Defendant[s'] financial status" and her allegations. *Molina v. State,* 244 Md. App. 67, 134 (2019). The cases in this area all recognize a basic reality: for wealth to be evidence of wrongdoing, there must be at least some connection between the wealth and the alleged wrongdoing – either the sudden and otherwise unexplained appearance of wealth after the wrongdoing or evidence (beyond the wealth itself) linking the money to the wrongful act. *See Williams v. U.S.*, 168 U.S. 382, 396 (1897) (evidence of financial status should not have been admitted without some evidence connecting the money to the acts the defendant was accused of); *U.S. v. Ingrao*, 844 F.2d 314, 316 (6th Cir. 1988) ("*sudden unexplained* wealth occurring after the commission of an offense is admissible evidence") (emphasis added); *Neal v. U.S.*, 102 F.2d 643, 648 (8th Cir. 1939) (possession of large sum of money can be evidence of wrongdoing where it is "immediately after" an alleged theft, but was irrelevant where there was evidence that the defendant had funds prior to alleged misconduct); *Conopco, Inc. v. Wein*, No. 05 CIV. 09899RJHTHK, 2007 WL 2119507, at *2 (S.D.N.Y. July 23, 2007) (allowing discovery of defendant's personal finances only after the plaintiff introduced testimony from defendant's accountant linking Wein's personal accounts to the conduct alleged); *U.S. v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) (financial evidence excluded because while "the sudden acquisition of money, without any apparent legal source, may, when taken with proof of other facts" be evidence

---

[18] Copies of the relevant exhibits are annexed to the Cohen Dec as Exhibits 136-151.

of wrongdoing, the funds at issue in *Hatfield* were not unexplained) (quotation omitted); *Molina*, 244 Md. App. At 134 (prosecution introduced evidence linking the funds to the charged conduct).

Here, however, Plaintiff has shown neither sudden and inexplicable wealth nor other evidence linking it to the alleged resales of Estate art. Instead, Plaintiff speculates – and would have the jury speculate – that any wealth the Defendants have *must have* come from resales of the 98 Paintings. Particularly given Plaintiff's own allegations that Defendants had wealth from other sources, that is simply not enough.

For example, Plaintiff seeks to introduce evidence that S.K. Wang established an irrevocable trust that purchased Andrew Wang's home in Sands Point, New York in 2013 for $5,900,000. But there is no mystery about the source of the funds for that purchase. Defendants produced a copy of the bank records for the irrevocable trust, which shows that it received a $5,670,000 transfer from Zhu Mingxia on September 27, 2013, and that those funds were immediately used for the purchase. Cohen Dec Ex. 152**.** As Andrew explained at deposition, Ms. Zhu is his mother-in-law, who wired money for the benefit of her grandson (for whom the trust was established). Cohen Dec Ex. 128 at 231:12-25, 232:1-5. Of course, it is no answer for Plaintiff to argue that Zhu Mingxia must therefore also be part of the "conspiracy." Plaintiff never previously identified Ms. Zhu, a non-party, as an alleged "conspirator" and the parties never conducted any discovery on the source of her wealth; as such, it would be deeply prejudicial to allow Plaintiff to suggest, at trial and without any evidence whatsoever, that Ms. Zhu, too, must only have obtained her wealth through the alleged resale of some of the 98 Paintings. *Watkins v. New York City Transit Auth.*, No. 16 CIV. 4161 (ER), 2020 WL 1888839, at *2, n. 4 (S.D.N.Y. Apr. 16, 2020) (new factual argument raised for the first time in opposition to motion in limine precluded as prejudicial).

Moreover, in the absence of any evidence that Ms. Zhu's transfer was derived from the proceeds of subsequent sales of the paintings, Plaintiff's evidence relating to the purchase of

Andrew's Long Island home would "require[] pure speculation on the part of the jury" and should not be admitted. *Kelso v. Noble*, 162 F.3d 1161 (6th Cir. 1998) (affirming exclusion of evidence where its relevance would have "depended entirely on an impermissibly long chain of inferences upon inferences"). Nor is the suggestion remotely plausible; Plaintiff's complaint alleges that as of 2010, Defendants had "resold" some $7,785,000 worth of paintings at various auctions years before the purchase of the house. Amended Complaint, ¶ 110. But Plaintiff makes no effort to trace the proceeds of those sales to Ms. Zhu's account, or to explain why it was in Ms. Zhu's account to begin with, or why the money was held for years before being used; she simply intends to ask the jury to speculate that Andrew and S.K. Wang parked millions of dollars with Andrew's mother-in-law for several years, though – as Plaintiff pointed out in her summary judgment motion, S.K. did not even recognize Ms. Zhu's name. Doc. No. 210 at 10. As in *Kelso*, Plaintiff seeks to have the jury stack inference atop inference atop inference to reach the conclusion that any money Defendants ever had or spent or even received as a gift must have come from their supposed resales of the 98 Paintings. Absent some evidence the funds for these purchases come from anywhere other than the "pre-existing fortunes" of the Defendants and Ms. Zhu, that theory cannot be allowed in front of the jury. *Hatfield*, 685 F. Supp. 2d at 326.

Moreover, aside from being speculative, Plaintiff's theory is internally contradictory. According to Plaintiff, Andrew and S.K. had millions of dollars available to *purchase* the 98 Paintings from the Estate in the first instance, which money obviously couldn't derive from their alleged *subsequent* resale of the 98 Paintings. All told, the Estate sold the 98 Paintings for $5,175,970, Cohen Dec Exs. 153-158, or almost the same amount that Ms. Zhu transferred to the irrevocable trust. Because Plaintiff's entire theory of the case presupposes that Andrew and S.K. Wang had millions of dollars in wealth (or access to funds) that ***did not*** derive from the sale of the 98 Paintings, she

cannot be allowed to argue that mere evidence that Defendants had wealth (or access to funds) is

evidence that they must therefore have purchased and resold the 98 Paintings.

Indeed, Plaintiff **affirmatively alleged** that Andrew and S.K. Wang had millions of dollars

from sources **other than** the resale of the 98 Paintings. According to the Amended Complaint,

S.K. Wang stole millions of dollars in art from C.C. Wang in the 1980s and 1990s, and millions more

from erstwhile plaintiffs Northwich, Inc. ("Northwich") and Soon Huat, Inc. ("Soon Huat"), whose

claims were dismissed as time-barred. Amended Complaint, ¶¶ 28-30 (alleging that SK had "secretly

pillaged" artwork from Decedent's collection between 1979 and 1997), 49-51 (alleging that the

paintings taken from Northwich and Soon Huat had been valued at $11,150,000 as of 2003).

Plaintiff also alleges that S.K. stole a Ma Yuan album – which the documentary evidence shows was

purchased in the 1980s by S.K. Wang's Jian Bao Gallery with funds C.C. Wang loaned to him for the

purpose, Cohen Dec. Exs. 159-162, and which Plaintiff contends (without any evidence at all) was

"really" purchased by S.K. acting as C.C. Wang's agent – valued at another $2,500,000 as of 2003.

Amended Complaint, ¶ 49. Thus, even if Plaintiff had some evidence that Ms. Zhu's money actually

came from Defendants (and she does not), she **still** would not be able to tie Defendants' wealth and

subsequent transactions to resales of the 98 Paintings, because she has alleged that they had more

than $13,000,000 of assets from sources other than the alleged resales. *See Neal*, 102 F.2d at 648

(evidence of possession of money inadmissible as irrelevant to prove charged theft where it could

have derived from prior thefts not subject to the court's jurisdiction). Simply put, Plaintiff's

affirmative allegation that Defendants had "sizable pre-existing fortune[s]" from sources other than

resale of the 98 Paintings renders the allegation that their later spending came from such resales

"entirely speculative." *Hatfield*, 685 F. Supp. 2d at 326 (financial evidence inadmissible because "it is

entirely speculative whether Mr. Brooks' funding for his 'lavish' personal spending came from the

alleged scheme or from his sizable pre-existing fortune").

## MOTION TO EXCLUDE EVIDENCE OF APPRECIATION DAMAGES OR BIFURCATE THE TRIAL

Finally, Plaintiff seeks to proceed on a theory of "appreciation damages" that is not available under either RICO or New York law. As to RICO, the Supreme Court made clear in *Holmes* that mere "but-for" causation is not a sufficient basis to award *RICO* damages; rather, the asserted RICO violation must also be the *proximate* cause of the damages. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265-268 (1992) (a RICO plaintiff must show proximate causation, not merely that the defendant's RICO violation was a but-for cause of the alleged injury). Thus, Plaintiff can recover only damages for which the alleged RICO violation was the *direct* cause, rather than damages "attributable to … other, independent, factors." *Id.* at 269. The damages must also have been "reasonably foreseeable or anticipated as a natural consequence" of Defendants' alleged secret purchases of the 98 Paintings for fair value at the time. *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) (explaining proximate causation). Moreover, it is well-settled that a RICO injury requires some actual "out of pocket" loss, rather than the mere loss of a future expectancy. *See, e.g., Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 409 (5th Cir. 2015) (explaining holding in prior 5th Circuit case: "plaintiffs could not show injury under RICO because they suffered no harm to a property interest" when they "bought [] exactly what they bargained for"); *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002) (party who "received value" in transaction did not suffer RICO injury); *Morrell v. Alfortish*, No. CIV.A. 10-924, 2010 WL 4668429, at *5 (E.D. La. Nov. 9, 2010).

Plaintiff's "appreciation damages" theory, in contrast, seeks to recover from Defendants damages attributable to a host of independent factors – particularly "market trends" that Plaintiff's expert asserts caused the market for classical Chinese art to rise dramatically in the 12-16 years since the time of the complained-of sales, including subsequent purchases, by *other* buyers, of *other* paintings by the same artists at various other times, without any evidence that such market changes

were foreseeable and apparently independent of whether the Estate received the benefit of its
bargain by way of prices that were fair at the time they were paid. Recovery of such purported
damages would be particularly unjust in this case, where it is undisputed that the Estate was required
to sell millions of dollars in art to raise the funds necessary to pay Estate taxes and administrative
expenses. *See U.S. v. Coppola*, No. CIVA.CV-88-3456 (JBW), 1994 WL 665751, at *6 (E.D.N.Y.
Nov. 17, 1994) (executor has duty to marshal and sell assets to pay such expenses), *aff'd*, 85 F.3d
1015 (2d Cir. 1996). Given those facts, the Estate would have lost the benefit of subsequent market
growth for ***whatever*** art it sold, to ***whatever*** purchaser; its loss of that art's later appreciation in
value was a function of the fact that the Estate had to sell the art when it did, and had no
relationship to the identity of the purchaser. In other words, it is simply not RICO damages. *See
Major League Baseball Properties, Inc. v. Price*, 105 F. Supp. 2d 46, 52 (E.D.N.Y. 2000) (no RICO injury
where party got what they paid for because "it does not follow that any injury for which a plaintiff
might assert a state law claim is necessarily sufficient to establish a claim under RICO").

    In any event, appreciation damages are not available as a matter of New York law, for much
the same reason. Though Plaintiff relies on the Court of Appeals' seminal decision in *Rothko* for the
proposition that appreciation damages are available in some cases, the *Rothko* opinion establishes for
a certainty that they are unavailable in *this* case. Under *Rothko*, appreciation damages for "wrongfully
sold" property are available ***only*** where the executor or trustee was under a "duty to retain" that
property and had no authorization to sell it. *Matter of Rothko's Estate*, 43 N.Y.2d 305, 322 (1977)
(New York law "allow[s] appreciation damages, where there is a duty to retain, and only date of sale
damages[] where there is authorization to sell"). In *Rothko*, two weeks after Mark Rothko's death, the
executors of estate, two of whom had conflicts of interest, "hastily" executed a contract selling
100 Rothko paintings to a corporation and another contract consigning the remainder of Rothko's
paintings to the corporation's related gallery on terms that included an exorbitant 50% commission

-30-

and a 12-year exclusivity period. 43 N.Y.2d at 314-15. Restoring the Rothko estate to the position it would have been in had the executors not breached their trust meant granting appreciation damages, "since if it had not been for the breach of trust the property would still have been a part of the trust estate." *Id.* at 321 (quotation omitted). *See also Matter of Janes*, 223 A.D.2d 20, 35 (4th Dep't 1996) (distinguishing *Rothko* as based on the fact that the property would have remained in the estate if not for the breach of trust)*, aff'd sub nom. Matter of Est. of Janes*, 90 N.Y.2d 41, 55 (1997) (affirming the Appellate Division's rejection of appreciation damages).[19]

Here, where there is no dispute that the sales were authorized by the Public Administrator, and indeed compelled by black-letter law, the only conceivable harm to the Estate – and the only thing for it "to be made whole" for under *Rothko*, 43 N.Y.2d at 322 – would be the alleged failure to sell those assets for their true value. To the extent that Plaintiff can convince a jury that the 98 Paintings were sold for less than their actual value at the time, the Estate would be entitled to be placed in the same position it would be in had the sales been made at fair value. Even if Plaintiff can convince the jury that the sales involved self-dealing, however, the Estate has no entitlement to a windfall appreciation profit that no party contends the Estate could ever have reaped the benefit of. The appreciation damages evidence should thus be precluded.

Finally, to the extent that the Court declines to preclude the appreciation damages evidence, it should bifurcate the trial to prevent the jury from hearing the evidence of the alleged appreciation during the liability phase. As set forth in Defendants' *Daubert* motion and reply, the appreciated value is both admittedly irrelevant to liability and highly prejudicial. Given the limited practical impact on the schedule that admitting appreciation evidence in a brief post-trial damages phase would have, to the extent that the Court allows such evidence at all, it should exercise its discretion

---

[19] Though other cases have identified self-dealing as a basis for awarding appreciation damages under *Rothko*, none of those cases involved an executor or trustee who was independently *compelled* to sell the property at issue, such that the trust or estate in question could not have retained the property under any circumstances even absent the self-dealing.

to bifurcate the trial in order to minimize the resulting prejudice to Defendants. *See Guidi v. Inter-Cont'l Hotels Corp.*, No. 95 CIV. 9006 (LAP), 2003 WL 1846864, at *2 (S.D.N.Y. Apr. 8, 2003) (bifurcating where there was limited overlap between liability and damages evidence and defendant would "suffer substantial prejudice if bifurcation is not granted").

## CONCLUSION

For the reasons set forth above, Defendants' motions *in limine* should be granted.

Dated:     New York, New York
           April 9, 2021

                                            Kamerman, Uncyk, Soniker & Klein P.C.

                                            _____/s/  Akiva M. Cohen_____
                                            Akiva M. Cohen
                                            Attorney for Defendants
                                            1700 Broadway
                                            New York, New York 10019
                                            (212) 400-4930
                                            acohen@kusklaw.com