## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YIEN-KOO KING,

                *Plaintiff,*

    v.

ANDREW WANG, et al.,

              Defendants.

**Case No: 14-cv-7694**

---

## OMNIBUS MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTIONS *IN LIMINE*

---

KAMERMAN, UNCYK, SONIKER &
    KLEIN P.C.
Akiva M. Cohen, Esq.
Attorneys for Defendants
1700 Broadway, 16th Floor
New York, New York  10019
(212) 400-4930
acohen@kusklaw.com

# **TABLE OF CONTENTS**

**Page**

Argument ..............................................................................................................1

    A.   Motion # 1: Defendants Cannot Be Collaterally Estopped by the Probate Verdict ................................................................................1

    B.   Motion # 2: Defendants Are Not Estopped from Raising U.K.'s Theft of Art ...........................................................................2

    C.   Motion *in Limine* No. 2 Is an Egregious Breach of Y.K.'s Fiduciary Duty ................4

    D.   Evidence of Y.K.'s Bankruptcy Fraud and TRO Violations Are Admissible ..............6

    E.   The Bao Wu Tang Exhibition Catalog Is Not a Party Admission ...............................7

        a.   Relevant Background ........................................................................7

        b.   Argument ........................................................................................8

    F.   The Artnet and Artron Listings Are Inadmissible ....................................................12

    G.   John Wang's Expert Testimony Is Admissible ........................................................20

        a.   Relevant Background ......................................................................20

        b.   Argument ........................................................................................22

    H.   Plaintiff's Seventh Motion *in Limine,* for Sanctions, Must Be Denied, and Plaintiff Precluded from Raising Her "Perjury" Argument to the Jury .....................27

        a.   Introduction .................................................................................27

        b.   Relevant Factual Background ........................................................31

            i.   Defendants' Productions and Discovery Responses .................31

            ii.   Chien Fang Huang .....................................................................32

        c.   Argument ........................................................................................34

            i.   Standard on a Motion for Spoliation Sanctions ......................34

            ii.   Plaintiff Is Not Entitled to Adverse Inferences with Respect to Corporate Records .....................................................36

# TABLE OF CONTENTS
## (cont'd.)

**Page**

iii.   Plaintiff Is Not Entitled to Adverse Inferences with
Respect to Communications with Billie Wai or the
SK Wang Irrevocable Trust ............................................................... 43

iv.   Plaintiff Is Not Entitled to Strike Defendants'
Affirmative Defenses ....................................................................... 45

Conclusion .............................................................................................................. 45

## TABLE OF AUTHORITIES

Page

**CASES:**

*Advance Trust & Life Escrow Services, LTA v. Security Life of Denver
Insurance Company,* No. 18-CV-01897-DDD-NYW, 2020 WL 7979020
(D. Colo. Oct. 26, 2020), *report and recommendation adopted,*
No. 118CV0189DDDNYW, 2021 WL 62339 (D. Colo. Jan. 6, 2021 ............................................. 26

*Amtrust N. Am., Inc. v. KF&B, Inc.,* No. 17-CV-5340 (LJL), 2020 WL 5578817
(S.D.N.Y. Sept. 16, 2020) 22-23 ..........................................................................................23, 24

*In re Arcade Pub., Inc.,* 455 B.R. 373 (Bankr. S.D.N.Y. 2011) ...............................................6-7

*Architects Collective v. Pucciano & Eng., Inc.,* 247 F. Supp. 3d 1322 (N.D. Ga. 2017) .........25

*Arista Recs. LLC v. Usenet.com, Inc.,* 633 F. Supp. 2d 124 (S.D.N.Y. 2009) .........................43

*Avnet, Inc. v. Motio, Inc.,* No. 12 CV 2100, 2016 WL 927194 (N.D. Ill. Mar. 4, 2016) ............25, 27

*B&D Boatworks, Inc. v. Doors, Inc.,* No. 2:05-CV-38 F(3), 2007 WL 9718184
(E.D.N.C. Sept. 7, 2007) ........................................................................................................ 34-35

*Beck v. Test Masters Educ. Servs., Inc.,* No. CV 04-1391 (JDB),
2012 WL 10817176 (D.D.C. Sept. 25, 2012), *modified on reconsideration,*
289 F.R.D. 374 (D.D.C. 2013) ................................................................................................. 43

*Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prod. Inc.,*
No. 1:19-CV-3766-GHW, 2020 WL 7342724 (S.D.N.Y. Dec. 11, 2020) ...............................34, 35

*Butler v. Stover Bros. Trucking Co.,* 546 F.2d 544 (7th Cir. 1977) ........................................... 2

*In re C.R. Bard, MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.,*
810 F.3d 913 (4th Cir. 2016) .................................................................................................... 13

*Cao v. Reidbord,* No. 04 CIV. 3987 (NRB), 2008 WL 11517113
(S.D.N.Y. Mar. 27, 2008) ........................................................................................................ 15

*Caruso v. Bon Secours Charity Health Sys., Inc.,* 703 F. App'x 31 (2d Cir. 2017) ................. 25

*Castruccio v. Barclay,* No 1234, 2018 WL 6629235 (Md. Ct. Spec. App. Dec. 17, 2018) .................. 2

*Childress Cattle, LLC v. Cain,* No. 3:17-CV-00388-JHM, 2017 WL 3446182
(W.D. Ky. Aug. 10, 2017) ........................................................................................................ 2

*Colon v. Coughlin,* 58 F.3d 865 (2d Cir. 1995) ....................................................................... 2

## TABLE OF AUTHORITIES
### (cont'd.)

**Page**

**CASES (cont'd.):**

*Conoco Inc. v. Dep't of Energy,* 99 F.3d 387 (Fed. Cir. 1996), *as amended
on reh'g in part* (Jan. 2, 1997) ..................................................................................... 13

*Downey v. Bob's Disc. Furniture Holdings, Inc.,* 633 F.3d 1 (1st Cir. 2011) ..................................... 24-25

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,* No. CIV 87-987 PHX RCB,
1990 WL 126500 (D. Ariz. July 25, 1990) ...................................................................... 14

*Eastern Profit Corp. v. Strategic Vision US, LLC,* No. 18-cv-2185, 2020 WL 7490107
(S.D.N.Y. Dec. 18, 2020) ....................................................................................17, 19

*Fred Olson Motor Serv. v. Container Corp. of Am.,* 81 Ill. App. 3d 825
(Ill. App. 1980) ..............................................................................................................2

*In re: Gen. Motors LLC,* No. 14-MD-2543 (JMF), 2015 WL 8578945
(S.D.N.Y. Dec. 9, 2015) .................................................................................... 9-10, 11

*Goldsmith v. Comm'r,* 86 T.C. 1134 (1986) ......................................................................... 19

*Harlas v. Barn, LLC,* No. 18-CV-02320-RM-NYW, 2019 WL 7290928
(D. Colo. Oct. 1, 2019) ................................................................................................ 26

*Hawley v. Mphasis Corp.,* 302 F.R.D. 37 (S.D.N.Y. 2014) ..................................................... 34

*Hynes as Tr. of Calling Card Distribution Tr. v. Giambalvo,* No. 09 CV 2599 (ARR)(LB),
2010 WL 11626954 (E.D.N.Y. May 5, 2010), *quoting Residential Fund. Corp. v.
DeGeorge Fin. Corp.,* 306 F.3d 99 (2d Cir. 2002) ......................................................... 36

*Kemling v. Country Mut. Ins. Co.,* 107 Ill. App. 3d 516, 437 N.E.2d 1253
(Ill. App. 1982) ..............................................................................................................2

*Leidig v. Buzzfeed, Inc.,* No. 16CIV542VMGWG, 2017 WL 6512353
(S.D.N.Y. Dec. 19, 2017) ............................................................................................. 34

*Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534 (D. Md. 2007)
(*quoting* Advisory Committee Note on Rule 8903(17)) ...................................................... 14

*Magnetar Techs. Corp. v. Six Flags Theme Park Inc.,* 886 F. Supp. 2d 466
(D. Del. 2012), *aff'd sub nom. Magnetar Techs. Corp. v. Six Flags Theme
Parks Inc.,* No. CV 07-127-LPS-MPT, 2014 WL 545440 (D. Del. Feb. 7, 2014) ...........38

**TABLE OF AUTHORITIES**
(cont'd.)

**Page**

**CASES** (cont'd.):

*In re Martin,* No. 1:15-BK-03259-MDF, 2017 WL 535267 (Bankr. M.D. Pa.
Feb. 9, 2017), *quoting In re Cocreham,* No. 13-26465-A-13J, 2013 WL 4510694
(Bankr. E.D. Cal. Aug. 23, 2013) ................................................................................. 15

*McGrory v. City of New York,* No. 99 CIV. 4062 (LTSFM), 2002 WL 31388713
(S.D.N.Y. Oct. 22, 2002), *quoting Parsons v. Honeywell,* 929 F.2d 901 (2d Cir. 1991) ...................... 17

*Mem'l Hall Museum, Inc. v. Cunningham,* 455 F. Supp. 3d 347 (W.D. Ky. 2020) ............................. 25

*Morales v. New York City Department of Education,* 808 F. App'x 35 (2d Cir. 2020) ........................... 2

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.,* 322 F.R.D. 1 (D.D.C. 2017) ......................... 19

*Pekelis v. Transcom. & W. Air, Inc.,* 187 F.2d 122 (2d Cir. 1951) ...................................................... 11

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,*
262 F. Supp. 2d 251 (S.D.N.Y. 2003) ..................................................................................10, 12

*Pers. Audio, LLC v. CBS Corp.,* No. 2:13-CV-270-JRG-RSP, 2014 WL 1202698
(E.D. Tex. Mar. 20, 2014) ............................................................................................... 14-15

*Pilgrim v. Trustees of Tufts Coll,* 118 F.3d 864 (1st Cir. 1997) ..................................................... 11

*Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99 (2d Cir. 2002) ........................... 35

*Samborski v. Linear Abatement Corp.,* No. 96 CIV. 1405 (DC), 1997 WL 55949
(S.D.N.Y. Feb. 11, 1997) ..................................................................................................... 7

*Matter of Sanchez,* No. 2001-3187/G, 2017 N.Y. Slip. Op. 32685(U),
(Sur. Ct., N.Y. County, Dec. 28, 2017 ................................................................................... 37

*In re Sept. 11 Litig.,* 621 F. Supp. 2d 131 (S.D.N.Y. 2009) ......................................................... 16-17

*Siani v. State Univ. of New York at Farmingdale,* No. CV09-407 JFB WDW,
2010 WL 3170664 (E.D.N.Y. Aug. 10, 2010) ........................................................................... 43

*Matter of Sterling Nav. Co, Ltd.,* 444 F. Supp. 1043 (S.D.N.Y. 1977) ........................................... 18-19

*Town & Country Linen Corp. v. Ingenious Designs LLC,* No. 18-CV-5075 (LJL),
2020 WL 3472597 (S.D.N.Y. June 25, 2020) ........................................................................... 45

*United States v. Bourke,* No. S2 05 CR 510 SAS, 2011 WL 6376711
(S.D.N.Y. Dec. 15, 2011), *aff'd,* 488 F. App'x 528 (2d Cir. 2012) ................................................. 33

# TABLE OF AUTHORITIES
### (cont'd.)

**Page**

**CASES (cont'd.):**

*U.S. v. Fawwaz,* 694 F. App'x 676 (2d Cir. 2017) ............................................................ 16

*U.S. v. Shulman,* 624 F.2d 384 (2d Cir. 1980)  ..........................................................9, 11

*United States v. Tocco,* 135 F.3d 116 (2d Cir. 1998) ........................................................ 9

*U.S. v. Tyrell,* No. 18-3029-cr, 2021 WL 21775 (2d Cir. Jan. 4, 2021)  ........................ 12

*United States v. Woods,* 321 F.3d 361 (3d Cir. 2003) ...................................................... 14

*U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.,* 205 F. Supp. 3d 386 (S.D.N.Y. 2016) ...................... 15

*Wright-Simmons v. City of Okla. City,* 155 F.3d 1264 (10th Cir. 1998) .................................. 11

*Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309 (S.D.N.Y. 2003) .......................................... 19

*Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212 (S.D.N.Y. 2003) .......................................... 37

**STATUTES:**

F.R.C.P. 26(a)(2)(B) & (C) .............................................................................. 22

F.R.C.P. 37(e)(1) ...................................................................................... 34

F.R.E. 608 ............................................................................................... 7

F.R.E. 801(d)(2)(A) ...................................................................................... 8

F.R.E. 803(18) ......................................................................................... 16

F.R.E. 805 ............................................................................................. 16

N.Y.S.C.P.A. § 2209 ................................................................................37, 38

**TREATISES:**

Powell, Lam & Kwan, *Hong Kong,* in *International Fraud & Asset Tracing*
(3rd Edition, 2014) .................................................................................... 18

**TABLE OF AUTHORITIES**
**(cont'd.)**

**Page**

**MISCELLANEOUS:**

Advisory Committee Notes to the 2010 Amendments to Rule 26 .................................................22

Advisory Committee Notes to the 2015 Amendments to Rule 37 .................................................36

Kagan, *Mortgage Electronic Registration System – MERS,* Investopedia.com
(last updated 11/27/2020), available at https://www.investopedia.com/
terms/m/mortgage-electronic-registration-system-mers.asp. .........................................................15

Defendants Andrew and Shou-Kung ("S.K.") Wang respectfully submit this omnibus memorandum of law in opposition to Plaintiff Yien-Koo ("Y.K.") King's motions *in limine*. As shown herein, they should be denied.

### ARGUMENT[1]

**A. Motion # 1: Defendants Cannot be Collaterally Estopped by the Probate Verdict**

Defendants respectfully incorporate by reference herein their discussion of collateral estoppel at pages 6-8 and 11-15 of their memorandum of law in support of Defendants' motions *in limine*. Docket No. 257. Briefly, Defendants cannot be collaterally estopped by the probate verdict because: (1) the fraud finding was equivocal and unclear as to who the jury found had committed the alleged fraud: Andrew acting alone, S.K. acting alone, or Andrew and S.K. acting together; and (2) for purposes of this litigation, Defendants did not have a full and fair opportunity to litigate the fraud, capacity, and undue influence claims, because (a) the New York Dead Man's statute, which would have no application in this action, barred Defendants from introducing critical testimony regarding their interactions with Decedent Chi-Chuan ("C.C.") Wang; (b) Jerome Kamerman, the attorney draftsman of the will, was a critical witness who was unavailable to Defendants in the probate trial would be available to testify in this action; and (c) the New York Appellate Division confirmed that the probate judge erroneously granted an adverse inference with respect to Mr. Kamerman.

As set forth in Defendants' earlier brief, *no* court has *ever* found that a litigant had the requisite "full and fair opportunity to litigate" a prior action when that party had been prevented

---

[1] Plaintiff's memorandum of law in support of her motions *in limine* (the "Moving Brief" or "MB") opened with a 14-page recapitulation of Plaintiff's view of the facts of the case. Because this is a motion *in limine*, rather than a summary judgment motion, and because Defendants believe that the Court is fully familiar with the parties' disparate view of the facts, Defendants will address Plaintiff's factual claims only in the context of, and where they are relevant to, Plaintiff's *in limine* requests. To the extent that Defendants do not directly address any particular factual assertion made by Plaintiff in her brief, that should be viewed not as a concession that Plaintiff's claims are correct, but as a recognition that Plaintiff's mistaken view of those facts does not impact her lack of entitlement to the relief she seeks.

1

from introducing critical evidence in that proceeding by a state Dead Man's statute, but would be able to present that critical evidence in the second proceeding. Docket No. 257 at 11-15. While Plaintiff predictably suggests that the Appellate Division's ruling in the context of the probate of the codicil that Defendants had a full and fair opportunity to litigate resolves the issue for this Court, MB at 21, that is wrong, for a blindingly obvious reason: The Dead Man's Statute applied equally to the probate of the codicil, so the previously barred evidence was not available to Defendants on that action, either. It is available to Defendants in this action, and – as **every** court to have considered the issue has ruled, that makes all the difference. *Butler v. Stover Bros. Trucking Co.*, 546 F.2d 544, 551 (7th Cir. 1977); *Childress Cattle, LLC v. Cain*, No. 3:17-CV-00388-JHM, 2017 WL 3446182, at *9 (W.D. Ky. Aug. 10, 2017); *Kemling v. Country Mut. Ins. Co.*, 107 Ill. App. 3d 516, 522, 437 N.E.2d 1253, 1257 (Ill. App. 1982); *Fred Olson Motor Serv. v. Container Corp. of Am.*, 81 Ill. App. 3d 825, 830-31 (Ill. App. 1980). *Cf. Castruccio v. Barclay*, No. 1234, 2018 WL 6629235, at *10 (Md. Ct. Spec. App. Dec. 17, 2018). The reasoning expressed in those cases is sound – to the extent that any of this is relevant, neither the parties nor this jury should be bound by the determination of a jury that was legally forbidden from reviewing the most relevant evidence on these issues – and this Court should not be the first in the country reach a contrary decision. The motion should be denied.[2]

### B. Motion # 2: Defendants Are Not Estopped from Raising Y.K.'s Theft of Art

As an initial matter, Defendants do not intend to pursue an unclean hands defense, and to the extent that certain evidence relating to Y.K.'s theft of art is relevant only to the claim that

---

[2] The cases cited by Plaintiff are not to the contrary. Of the cases she cites at pages 19-22 of the Moving Brief, none addresses any issues of a party's new access to evidence they were innocently deprived of, or harmless but significant error. Yet those are the issues supporting the "full and fair opportunity" analysis that prevents the Court from affording the Surrogate's Court decision any estoppel effect in this action, given the availability of previously barred or unavailable evidence and the Kamerman adverse inference instruction. Indeed, the only case cited by Plaintiff to engage in any detailed analysis of the "full and fair opportunity" prong was *Colon*, which held that a prior determination had no preclusive effect for lack of a full and fair opportunity to litigate. *Colon v. Coughlin*, 58 F.3d 865, 870 (2d Cir. 1995). That said, *Morales v. New York City Department of Education*, 808 F. App'x 35 (2d Cir. 2020) makes clear that the Court should apply New York preclusion law, and Defendants withdraw the contrary argument in their motions *in limine*, which was based on a misreading of *Gelb*.

Defendants defrauded C.C. Wang into executing the 2003 will, or unduly influenced him, its admissibility rises or falls entirely on Plaintiff's motion *in limine* No. 1 and Defendants' motion *in limine* No. 2: if Defendants are collaterally estopped from providing the jury with evidence of C.C. Wang's conduct and statements to them, which were the basis for their actions in 2003 (and which they were barred by the Dead Man's Statute from introducing into evidence at the probate trial), then they will not proffer evidence which serves only that purpose. And if the Court excludes the probate verdict entirely given the inevitable mini-trials and jury confusion that would ensue (and Defendants entirely agree that the probate issues are a distraction that will only confuse the jury, as Plaintiff effectively concedes by arguing that Defendants' evidence relating to her disinheritance should be barred as more prejudicial than probative even if Defendants are allowed to litigate her claim that they procured the 2003 will through fraud, MB at 24-25), then Defendants will have no need to introduce exhibits that go only to those issues.

But few of the exhibits Plaintiff identifies are focused solely on those issues. For instance, Defendants' Exhibits 7, 13, 14, 30, 31, and 32 are contracts for the sale of paintings in C.C. Wang's collection – many of which Y.K. later identified as having a significantly greater value than that for which "her" entity purchased them from her father. Given that this action revolves, in large part, around the valuation of classical Chinese art and the implications of such art's significant subsequent appreciation in value, those exhibits (and others in this category, such as Defendants' Exhibit 25) are relevant for reasons having nothing to do with her thefts of art or disinheritance. Thus, even if the Court finds that issues relating to Y.K.'s theft of art are estopped (or irrelevant because the probate verdict is excluded), these exhibits would be admissible for other purposes.

Similarly, if the Court finds that Defendants are estopped from litigating the issue of C.C. Wang's capacity in 2003 (and it should not), it would then become absolutely critical for Defendants to make certain the jury understood why they believed C.C. had capacity at the time, even if that

belief was wrong.[3] Thus, exhibits demonstrating why they and others would have formed that opinion – and particularly that others, including C.C.'s medical professionals and especially Plaintiff herself *did* have that opinion – would be relevant and admissible for that purpose. Exhibits in this category include Defendants' Exhibits 36-43 and 46-59.

Moreover, the exhibits relating to Y.K. and her family, her thefts of art, and her animus to S.K. and Andrew are relevant to impeaching Y.K.'s credibility and elucidating her bias and motive for pursuing this action. In that regard, there is no question Y.K.'s credibility will be in issue at the trial given Plaintiff's stated intention to testify.

Thus, Plaintiff's motion *in limine* No. 2 should be denied. But, and without exhaustively detailing the various alternative purposes for which Defendants might introduce each exhibit, to the extent that the Court grants the motion, it should make clear that any grant of the motion does not preclude Defendants from offering the referenced exhibits for purposes other than demonstrating that Y.K.'s theft of art was the reason her father disinherited her.

### C.  Motion *in Limine* No. 2 is An Egregious Breach of Y.K.'s Fiduciary Duty

Separately, the Court should be aware that Plaintiff's second motion *in limine* is a spectacular overreach in its request for a ruling that the probate decision estops Defendants from asserting, as a factual matter, that she stole art from her father. That is simply not so. The validity of her claim that she was gifted the art her father accused her of stealing was not actually and necessarily decided in the probate litigation; as counsel for the Public Administrator put it when informed that Y.K. intended to abuse her position as the Estate's fiduciary in this litigation to seek such a ruling, while the Estate is separately pursuing those very claims against her in the Surrogate's Court:

> the [Public Administrator] has concerns and would have to submit opposition if they
> are trying to obtain a determination in the RICO action that the findings in the

---

[3] Even if the Court found estoppel on the issue of C.C.'s capacity, the probate jury was not asked to rule on, and did not actually rule on, the reasonableness of Defendants' subjective belief that he had sufficient mental wherewithal to make a will. As such, there is not even a theoretical argument that Defendants could be estopped from litigating that issue.

4

> probate proceedings collaterally estop any litigation over the ownership of paintings owned at, or transferred prior, to death.  As everyone knows, those matters are the subject of the SCPA 2103 proceeding.

Opposition Declaration of Akiva M. Cohen ("Cohen Opp Dec") Ex. 1.

And that is true as a simple factual matter. At the probate trial, Y.K. argued that Andrew and/or S.K. had defrauded C.C. Wang by misleading him into believing that Y.K. had stolen 25 paintings that, she alleged and the jury apparently believed, they had actually taken themselves. Cohen Opp Dec Ex. 2 at A-1985:13-A-1986:7. Nothing in that finding required the jury to believe that Y.K. had not *also* stolen art from C.C., let alone that C.C. had gifted the majority of his collection to Y.K. in the 1990s – which is Y.K.'s claim with respect to the Northwich and Soon Huat entities, and which, unbelievably, did not come up at the trial. *See id.* at A-2259:20-2261:10 (Y.K. testifying that HH Fang created Northwich for her benefit but no discussion of alleged gift of C.C.'s art); A-2265:23-A-2266:24 (testifying that C.C.'s niece "decided [to] sell [to] Northwich [] a group of paintings that her family owned"); A-2267:17-A-2268:5 (discussing, generally, the transfer of shares in Northwich); A-2384:13-18 (testifying, in the only questions on cross-examination about Northwich, that some of the paintings she claimed Andrew and S.K. stole were those "Hui Chen already sold [] to Northwich"); A-2391:2-9 (the Wangs' then-attorney, Carolyn Shields, describing Northwich as Y.K.'s company). The sales to Soon Huat never even came up at the trial at all. Cohen Opp Dec, ¶ 3.[4]

Similarly, as Surrogate Glen explained in denying Defendants' motion for summary judgment in the probate proceeding, the jury could have found that the will was invalid for undue influence based on the fact that Y.K.'s prior share of C.C.'s estate was committed to Andrew and his brother in the 2003 will, regardless of its position as to the ownership of Northwich or Soon Huat.

---

[4] The failure to actually litigate these core issues is exactly why Plaintiff is so desperate to obtain a ruling on the basis of collateral estoppel; she knows that she cannot win an action at which Defendants' claims and defenses are actually presented, especially if Defendants can introduce evidence of C.C. Wang's behavior and conversations with them.

*Id.*, Ex. 2 at A-22-23 ("Even assuming CC had the desire and the capacity to disinherit YK, the legacy of 20% of the residuary to two of SK's children is an unexplained departure from a previously expressed intention of the decedent") (quotation omitted). *See also id.* at A-2011:17-A-2012:24 (Y.K.'s counsel arguing in his closing that S.K. Wang chose to redo his father's will while C.C. was confused and unilaterally added his children as beneficiaries "in [Y.K.'s] place"). Thus, the issue of Y.K.'s ownership of Northwich and Soon Huat was not "actually and necessarily decided" in the probate trial, and Y.K.'s attempt to obtain a contrary ruling from this Court is an absolute abandonment of her fiduciary duty to the Estate in this action she is meant to be pursuing *solely* in her capacity as its representative. Defendants leave to the Court the determination of whether any sanction for that violation beyond denial of the motion is appropriate, and if so, what that sanction might be.[5]

### D.  Evidence of Y.K.'s Bankruptcy Fraud and TRO Violations Are Admissible[6]

By Motion No. 3, Y.K. seeks to prevent Defendants from submitting evidence of her bankruptcy fraud.[7] But Y.K.'s bankruptcy petition – and its omission of any claim to either Northwich or Soon Huat – was a binding judicial admission that she was not the owner of either of those entities and thus that her father's belief that she had stolen art from him when she refused to return the Northwich and Soon Huat paintings in 2003 was 100% accurate and correct. *In re Arcade*

---

[5] When the ethical implications of this issue were raised to Plaintiff's counsel, counsel argued that the estoppel request on the ownership of Northwich and Soon Huat was not truly adverse to the Estate, because only the Wangs, not the Estate, would be bound by any estoppel. But when asked to stipulate that Plaintiff would not make such an estoppel argument against the Estate in the future – an argument that would obviously be impacted by any ruling here that these issues were actually and necessarily decided in the probate proceeding – Plaintiff's counsel simply stopped responding, and no such stipulation has been entered. Cohen Opp Dec Ex. 3 and ¶ 4. The Court can draw its own conclusions from that conduct.

[6] Plaintiff's motion does not identify which proposed exhibits she believes fall into this category of documents, and, indeed, Defendants do not believe they identified any exhibits at all relating to Plaintiff's violations of the TRO. Defendants' Exhibits 126 and 127 relate to Plaintiff's bankruptcy.

[7] Y.K. notably describes her violations of the TRO as "perceived" but appears to admit her fraud. MB at 27 ("any evidence … to establish Y.K. King's perceived violation of the TRO … or any bankruptcy fraud are of no moment …").

*Pub., Inc.*, 455 B.R. 373, 383 (Bankr. S.D.N.Y. 2011) ("Bankruptcy schedules, executed under penalty of perjury, when offered against a debtor are eligible for treatment as judicial admissions").[8] To the extent that the Court allows Y.K. to introduce her claims about the will and does not find Defendants estopped from responding to those claims, the bankruptcy schedules are thus relevant (and indeed critical) evidence.

Moreover, while Defendants cannot use exhibits as extrinsic evidence of Y.K.'s untruthfulness, they are entitled to inquire about her fraudulent bankruptcy at trial to attack Plaintiff's credibility. Y.K. will be obligated to acknowledge that she and her husband failed to list Northwich and Soon Huat as assets on their bankruptcy schedules, despite repeatedly claiming under oath to own those corporations, which have millions of dollars in cash and other assets. *See* F.R.E. 608; *Samborski v. Linear Abatement Corp.*, No. 96 CIV. 1405 (DC), 1997 WL 55949, at *1 (S.D.N.Y. Feb. 11, 1997) ("It is well-settled that evidence of false statements may be admissible to impeach the credibility of a witness"). While Y.K.'s desire to prevent the jury from learning facts that would damage her credibility is understandable, it is no basis for preclusion, and the motion should be denied.

### E.  The Bao Wu Tang Exhibition Catalog is Not a Party Admission

#### a.  Relevant Background

In 2009, the Beijing Capital Museum held an exhibition of paintings that had once been in C.C. Wang's family collection, which it referred to as "Bao Wu Tang." Cohen Opp Dec Ex. 4 at 143:8-20. "Bao Wu Tang" was intended to mean "Studio of the Treasured Wu" (i.e. the collection that had housed the famous Wu Zhongyuan painting, *Procession of the Taoist Immortals to Pay Homage to the King of Heaven*). *Id.*, Ex. 4 at 135:5-10. *See also* Cohen Opp Dec Ex. 6 at 82:4-83:10. But the printer

---

[8] That counsel in the probate trial did not rely on this rule, seek to have Y.K. judicially estopped from claiming ownership of the Northwich and Soon Huat art, or even put this information in evidence for the jury to consider was simply inexplicable.

handling the exhibition catalog made an error; the Chinese word "wu" – like the English words "deer," "to," and "hear" – is a homonym. *Id.*, Ex. 4 at 135:5-25, Ex. 6 at 82:4-22; Ex 7. One Chinese character pronounced "wu", 武 – the one that was supposed to be used – is the surname of Wu Zhongyuan, 武宗元 . But another Chinese character pronounced "wu" is the character for the number "5," 五. Cohen Opp Dec Ex. 4 at 135:13-15, Ex. 6 at 82:11-83:22, Ex. 7 p. 1. The printer handling the exhibition catalog accidentally printed it with the wrong "wu" – effectively "Bao 5 Tang" or "Studio of 5 Treasures – and the error was not caught until the copies of the catalog were awaiting binding. Cohen Opp Dec Ex. 4 at 135:16-20. To help the museum avoid the large financial loss of reprinting the catalogs, Andrew – who had consulted on the exhibition by advising the museum on whether particular paintings gathered from various collectors had ever been in his grandfather's collection, *id.* at 143:24-145:24 – decided to adopt "Bao Wu Tang" – with the version of "Wu" meaning "5" – as his own d/b/a name for his work consulting on the authenticity of classical Chinese art, and authorized the museum to draft a preface for the exhibition catalog that would be submitted with his signature as "owner of Bao Wu[5] Tang." *Id.* at 139:16-19.

By motion No. 4, Plaintiff seeks a ruling that the Bao Wu Tang exhibition catalog published by the Capital Museum for its 2009 exhibition of paintings that had once been in C.C. Wang's Family Collection is admissible non-hearsay as the statement of a party opponent (whether directly or as an adoptive admission). MB at 28-30. The request is unsupportable, and must be denied.

b.   Argument

As an initial matter, because the Capital Museum was the publisher of the catalog and it is not a party to this action, the catalog cannot be the "statement of a party-opponent" under Rule 801(d)(2)(A). Rule 801(d)(2)(A), by its express terms, applies only to statements of the party themselves – here, Andrew Wang. F.R.E. 801(d)(2)(A) (addressing statement that was "made by the party"). While Plaintiff asserts, without citation or explanation, that the catalog was the statement of

"Bao Wu Tang," that is obvious nonsense. The catalog was expressly an exhibition catalog, and there is no dispute that the exhibition was put on by the Capital Museum. Andrew's deposition testimony makes clear that he was not responsible for the catalog.[9] Cohen Opp Dec Ex. 4 at 139:5-12. Moreover, time is linear, and there is no evidence, *at all*, that Andrew used the name "Bao Wu Tang" until after the museum used the name for its exhibition and printed its catalog. *Id.* at 139:16-19; Cohen Opp Dec. Ex. 5 at 729:23-730:10.

Nor is the catalog admissible as an "adoptive admission" under Rule 801(d)(2)(B). A party can make an adoptive admission either by affirmatively and unambiguously[10] adopting another person's statement as his own, or by silently accepting a statement that is incriminating, defamatory, or otherwise against his own interest. *U.S. v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980) (distinguishing affirmative adoptions, which need not be of statements against interest, from adoption by silence, which can only be of statements against interest). "The rationale of [limiting adoption-by-silence to statements against interest] is that a person ordinarily will respond to an incriminatory or defamatory statement with a denial, or at least with some indication that he objects to the statement as untrue." *Id.* Where the allegedly adopted statement is a document in the possession of a party, the test is whether "the adoptive party accepted and acted upon the evidence by, for example, taking an action of some importance." *In re: Gen. Motors LLC*, No. 14-MD-2543

---

[9] A portion of the catalog – the preface Andrew allowed to be included under his name, which the museum drafted and he "rough[ly]" reviewed, Cohen Opp Dec Ex. 5 at 528:4-529:2, is admissible as Andrew's adopted statement.

[10] Plaintiff suggests that the Court can leave to the jury "any ambiguities and questions" regarding whether Andrew adopted the catalog. MB at 30. While that is true for adoption by silence in the face of an incriminating claim, because the party would be expected to "vigorously assert" a denial, *see United States v. Tocco*, 135 F.3d 116, 128–29 (2d Cir. 1998) ("[a]bsent circumstances that render it more probable that a person would not respond to an accusation against him than that he would, such person's silence or other ambiguous conduct is admissible as an adoptive admission"), it does not apply to an ambiguous response to statements that a person would not normally be expected to deny if untrue. With respect to those statements, as the Second Circuit explained in *Shulman*, there must be an *unambiguous* affirmative adoption of the statement before it can be admitted to evidence as a party admission. 624 F.2d at 390.

(JMF), 2015 WL 8578945, at *2 (S.D.N.Y. Dec. 9, 2015) (quotation omitted). Here, Andrew cannot be found to have adopted the catalog as a whole by either silence or affirmative adoption.

As an initial matter, there is obviously no basis to suggest that Andrew "adopted" the exhibition catalog by silence. As an initial matter, the doctrine of adoption by silence does not apply at all to statements contained in written material, such as the catalog, in the absence of a special relationship between the parties. *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 259 (S.D.N.Y. 2003). Y.K. does not argue that there was any such relationship between Andrew and the museum, and there was none. In any event, the catalog was not (and did not contain) statements against (or in any way relating to) Andrew's interests at the time of the exhibition, and Y.K. never attempts to argue otherwise. Indeed, the catalog very clearly identified itself as a publication of the Capital Museum, not of Andrew Wang or his d/b/a, and there would therefore have been no reason for Andrew to "protest" the catalog even if it contained an inaccuracy Andrew was aware of. Nor is there any evidence that Andrew reviewed the catalog as a whole for accuracy at the time; to the contrary, he testified that he only gave the preface that was going in under his name a "rough" look. Cohen Opp Dec Ex. 5 at 528:4-529:2.

Even if he had reviewed it in depth, there is no reason why he would have been expected to protest the catalog's failure to identify certain of the paintings being displayed as reproductions; as both he and Professor Murck explained, that is not uncommon in Chinese museums, and therefore not an "inaccuracy" at all, let alone of the type that would have triggered a protest or concern about Andrew's reputation. Cohen Opp Dec Exs. 5 at 534:12-19, 8 at 38:6-17. Indeed, that is clear from the fact that Plaintiff acknowledges that the Wu Zhongyuan displayed at the museum exhibition was a reproduction, Cohen Opp Dec Ex. 9 at 614:25-615:3, yet the catalog does not describe it as a reproduction, Doc No. 261, Ex. 133-A at AWSK_00001619 and 133-D at AWSK_00001734, and Andrew did not "protest." Nor was there any reason at the time for Andrew to have expected the

catalog to impact him in the future. Simply put, nothing about the catalog comes remotely close to the type of statement to which "a person ordinarily will respond … with a denial" if untrue. *Shulman*, 624 F.2d at 390. As such, he cannot have "adopted" the catalog by silence**.**

Nor did he adopt the catalog by an affirmative and unambiguous manifestation of agreement. In support of her spurious claim to the contrary, Plaintiff cites Andrew Wang's emails to Chien Fang Huang, attaching "five pictures of *one*" painting from the catalog. MB at 29 (emphasis added). But those emails are not an "action of some importance" that would be required to support an adoptive admission. *Cf. General Motors*, 2015 WL 8578945 at *3 (General Motors sufficiently relied on report when it submitted it to Congress and other government officials and affirmatively accepted it as valid in testimony to Congress). *See also Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1267 (10th Cir. 1998) (adoptive admission where employer fired employee based on report); *Pilgrim v. Trustees of Tufts Coll.*, 118 F.3d 864, 870 (1st Cir. 1997) ("removing Fischer from all supervisory duties was a serious enough action that we cannot but think that Mayer would not have carried this out unless he accepted the Report's conclusions as the truth"); *Pekelis v. Transcon. & W. Air, Inc.*, 187 F.2d 122, 128 (2d Cir. 1951) (admitting report used "as a company investigation to determine the truth of what had happened and to aid the company in future operations"). And, even were emailing pictures from the catalog a significant enough act to render those pictures admissible as having been adoptively admitted, Plaintiff provides no explanation at all for how the Court could magically transmute Andrew's adoption of ***five pictures from the catalog*** into an adoption of ***the catalog as a whole***. Yet Plaintiff provides no other "action of some importance" by which Andrew could be said to have affirmatively adopted the catalog in its entirety. Indeed, the difference between Andrew's emails and the conduct at issue in *Penguin Books*, the primary case Plaintiff cites in support of her adoptive admission argument, makes clear.

11

In *Penguin Books*, the Court found an adoptive admission where the plaintiffs had "published and disseminated" a book making statements they sought to contest in litigation. 262 F. Supp. 2d at 259-260. Because they had published and distributed the book as a whole, the book as a whole was admissible. Here, Plaintiff is seeking to admit the catalog as a whole – more than 130 pages – based on evidence that Andrew Wang "disseminated" images from *6* of those pages. *See* MB at 29 (asserting that Andrew attached images from pages 106-109, 113, and 130 of the catalog). Plaintiff's adoptive admission argument is akin to suggesting that a party who sends someone a page from the Encyclopaedia Britannica as a good source of information on aardvarks has thereby adopted every statement contained in the encyclopedia, all the way through *ZZ Top* (the Britannica's final entry). That is simply not how adoptive admissions work; absent sufficient evidence that Andrew manifested that he was adopting the entire catalog, Rule 801(d)(2) provides no basis to admit it.[11]

Finally, the pictures in the catalog are not separately admissible as evidence that the listed paintings were actually displayed at the museum exhibition absent testimony from someone that the catalog pictures fairly depict what was displayed at the exhibition. Plaintiff is correct that the images in the catalog can be authenticated by someone "with knowledge of what the photographs depict." MB at 30. But no witness available at the trial can testify to what was actually displayed in the Bao Wu Tang exhibit at the museum. Docket No. 257, at 21-24. As such, the catalog photographs are inadmissible as evidence of the contents of the Bao Wu Tang exhibition.

### F.  The Artnet and Artron Listings Are Inadmissible

By Motion No. 5, Plaintiff seeks a ruling from the Court that printouts from the Artnet and Artron databases are admissible, under Rules 803(17) and (18) of the Federal Rules of Evidence, or the residual exception, to show (1) what works were auctioned in various auctions in China and (2)

---

[11] Similarly, in *U.S. v. Tyrell*, No. 18-3029-cr, 2021 WL 21775 (2d Cir. Jan. 4, 2021), the defendant was found to have adoptively admitted a Facebook post he denied writing but left live, *in its entirety*, on his Facebook account.

the prices actually paid for those works. Plaintiff's motion betrays a fundamental misunderstanding of both the exceptions for market compilations (under Rule 803(17)) and learned treatises (under Rule 803(18), and of how the Court is required to treat hearsay within hearsay of the variety reflected in those auction results. The motion must be denied.

First, Rule 803(17) is wholly inapplicable to the Artnet and Artron databases. The types of records admissible under rule 803(17) are those which "recite established factual information," *In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 924 (4th Cir. 2016) (materials data safety sheet was erroneously admitted under Rune 803(17)), and which carry "indicia of reliability," *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 393 (Fed. Cir. 1996), *as amended on reh'g in part* (Jan. 2, 1997) (documents inadmissible under Rule 803(17) where the source of the information contained in the documents did not stake their business or public reputations on the reliability of at information). Nothing in these records could be described as a recitation of established facts; the facts they contain could only be established via testimony from the buyer or seller listed within the records, which Plaintiff has notably declined to secure.

Indeed, even if these records are relied upon by appraisers in some circumstances,[12] that alone would not be enough to bring the evidence under 803(17). Rather "publications upon which

---

[12] The "reliance" Plaintiff proffers is the tepid "reliance" of her expert, Patrick Regan, who expressly acknowledged that the data the Artnet and Artron databases compiled was not particularly reliable or verifiable, and in fact that he "wish[ed] that [it] was much more reliable … ***everybody does***." Cohen Opp Dec Ex. 10 at 332:5-6 (emphasis added). Indeed, Regan (and other appraisers) risk nothing at all if the data in Artnet or Artron is wrong or in any way inaccurate; to the contrary, Regan's report specifically identified his reliance on the accuracy of information he reviewed about the comparables as an "extraordinary assumption" that might impact value if incorrect (and thereby took no responsibility or liability for that assumption if it was found to be incorrect). *See* Cohen Opp Dec Ex. 11 at 5-6. For his part, Ken Linsner, Defendants' expert, explained that the data from Chinese auction sites is so unreliable that it should not be used by an appraiser, *id.*, Ex. 12, ¶¶ 28-36, while Arnold Chang (a non-party and acknowledged expert) explained that its use should be minimized to the extent possible given its lack of reliability. *Id.*, Ex. 13 at 168:12-169:2, 201:24-203:6. That is exactly the opposite of the type of "reliance" that provides the necessary indicia of reliability to allow admission of otherwise hearsay materials under Rule 803(17). In fact, public reporting suggests that participants in the art industry do ***not*** consider this data reliable. *Id.*, Ex. 14 ("[n]o one will take [auction] results in mainland China very seriously"). Indeed, ***Artnet itself*** confirmed, in its 2018 *Artnet Intelligence Report*, that there are significant reliability issues with the information it compiles. *Id.*, Ex. 15 at 29 ("… results from mainland Chinese auction houses are not always reliable, buyers don't always pay what they owe …").

persons in a particular trade rely but which do not necessarily compile only objective facts must be shown to be trustworthy." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, No. CIV 87-987 PHX RCB, 1990 WL 126500, at *4 (D. Ariz. July 25, 1990) (excluding articles taken from specialty trade publications). That trustworthiness must be evidenced by both the "general reliance by the public or by a particular segment of it, ***and*** the motivation of the compiler to foster reliance by being accurate." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 575 (D. Md. 2007) (*quoting* Advisory Committee Note on Rule 803(17)) (emphasis added). The trustworthiness implied by such reliance stems from the presumption that "if it is inaccurate, the public or the trade will cease consulting their product." *United States v. Woods,* 321 F.3d 361, 364 (3d Cir. 2003). Here, neither Artron nor Artnet purport to do any investigation to verify the accuracy of the auction listings and results they compile; to the contrary, the information on Artron is expressly presented with "no representations or certification as to the accuracy or reliability of any content, information or advertisement contained in, linked from, downloaded from or otherwise obtained regarding this website." Cohen Opp Dec Ex. 16. Artnet likewise disclaims the "accuracy or reliability of any … information displayed or distributed through the Content, Site, or Services," provides that all content on the site is provided "ON AN 'AS-IS' 'AS AVAILABLE' BASIS WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER," and expressly states that "NEITHER ARTNET NOR ITS CONTENT PROVIDERS WARRANT THAT THE … CONTENT CONTAINED IN THE SITE … WILL BE … ACCURATE…" Cohen Opp Dec Ex. 17, at ¶ 10 (capitalization in original).

 As such, the fact that documents are in the Artnet or Artron databases does not make them admissible under Rule 803(17). The cases are clear that a compiler's explicit disclaimer of the accuracy and reliability of the underlying data precludes their admission under Rule 803(17). *Pers. Audio, LLC v. CBS Corp.,* No. 2:13-CV-270-JRG-RSP, 2014 WL 1202698, at *4–5 (E.D. Tex. Mar.

20, 2014) (internet compilation of user-uploaded information was excluded under Rule 803(17) because the compiler made no attempt to verify authenticity); *In re Martin,* No. 1:15-BK-03259-MDF, 2017 WL 535267, at *2 (Bankr. M.D. Pa. Feb. 9, 2017) (internet compilations of user-reported valuation data "are not compilations made admissible under 803(17)"), *quoting In re Cocreham*, No. 13-26465-A-13J, 2013 WL 4510694, at *3 (Bankr. E.D. Cal. Aug. 23, 2013); *Cao v. Reidbord*, No. 04 CIV. 3987 (NRB), 2008 WL 11517113, at *9 (S.D.N.Y. Mar. 27, 2008) (evidence procured from a website with an accuracy disclaimer was inadmissible). And, that rule applies with particular force here, where the providers of the underlying listings that Artron and Artnet compile *themselves* disclaim the reliability of any information about the auctioned paintings' "characteristics," which are provided by the seller. *See* Cohen Opp Dec Ex. 18 (Chieftown catalog disclaimer page warning that "[t]he description of the condition of the lot in this catalogue is for reference only and the Company shall not be liable for defects in the lot. Bidders should examine the original lot in person and ***judge for themselves whether the lot conforms to its description***") (emphasis added).

At base, Plaintiff's argument is that auction listings that would clearly be inadmissible and unreliable hearsay if taken by the *Plaintiff* from individual auction company websites and publications mysteriously transform into admissible evidence if *Artron* or *Artnet* first compile those individual listings into a database, and Plaintiff then takes the listings from that compiled database. As the cases cited above make clear, Rule 803(17) provides for no such alchemical transmutation; rather, without any guarantee that the underlying data is reliable,[13] it does not become admissible merely by being

---

[13] In that way, the Artnet and Artron databases are vastly different from the MERS database that was at issue in *U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.*, 205 F.Supp.3d 386 (S.D.N.Y. 2016). There, the MERS database was a registry of mortgage data that the banks and other entities, including government entities, who submitted the data to MERS themselves relied on, without hesitation, to engage in multi-million-dollar transactions in mortgage-backed securities, and for which the information-providers entering data into the database could be sued for fraud if the entries were materially misleading. *Id.* at 441. *See also* Kagan, *Mortgage Electronic Registration System – MERS*, Investopedia.com (last updated 11/27/2020), available at https://www.investopedia.com/terms/m/mortgage-electronic-registration-system-mers.asp.

stored in a third-party database. And, because Y.K. admits that she is seeking to introduce these exhibits as evidence of what was actually auctioned and how much that art was actually sold for, not merely "what the auction companies have claimed about their auctions," *see* MB at 31 (arguing that the auction exhibits should be admissible to show the "characteristics" of the auctioned works and the prices at which the works sold), Rule 803(17) cannot be the basis for their admission.

Second, Rule 803(18) clearly has no application here. For one thing, the Artron and Artnet databases are not "treatise[s], periodical[s], or pamphlet[s]" in the first place, so Rule 803(18) (which only applies to "statement[s] contained in" such publications, F.R.E. 803(18)) is expressly inapplicable to them. For another, Rule 803(18)(B) makes clear that even such publications must be "established as a reliable authority" by expert testimony or judicial notice. Far from testifying that the Artron or Artnet databases were reliable, Plaintiff's expert specifically acknowledged that he could not confirm whether even one of the auction sales he reviewed in those databases actually occurred as described. Cohen Opp Dec Ex. 10 at 335:18-336:4. And, as noted above, both the Artron and Artnet databases expressly disclaim any representation regarding the accuracy of the listings they include. Cohen Opp Dec Exs. 16 and 17.

Third, even if either of those exceptions applied (and they do not), Plaintiff is simply ignoring the hearsay-within-hearsay problem with the auction listings she proposes to admit into evidence. *See* F.R.E. 805 (hearsay within hearsay admissible only if each component part is separately admissible); *U.S. v. Fawwaz*, 691 F. App'x 676, 677 (2d Cir. 2017) ("Where, as here, the statements that Fawwaz seeks to admit constitute hearsay within hearsay not subject to an exception, the district court did not abuse its discretion in denying the statements' admission"); *In re Sept. 11 Litig.*, 621 F.

---

As noted in footnote 12 above, the "reliance" of appraisers on the descriptions and information contained in the listings compiled by the Artnet and Artron databases is very different: conditional, caveated, and reluctant. Indeed, while Plaintiff's own expert said he – and "everybody" – wished Artron and Artnet were "more reliable," Defendants are unaware of any similar sentiment about the MERS database, and certainly no evidence of such sentiment was mentioned by the Court in *U.S. Bank*.

Supp. 2d 131, 157 (S.D.N.Y. 2009) ("A statement recorded in a public record made by an individual with no business duty to report is considered hearsay-within-hearsay and is excluded, unless it satisfies some other hearsay exception"). And there is no question at all that the descriptions of the paintings – and other information – included in the auction listings is classic hearsay-within-hearsay. Not only does Plaintiff's expert effectively concede as much, Cohen Opp Dec Ex. 10 at 296:2-23 (agreeing that in China, due diligence into authenticity sometimes occurs after the purchase), but, as noted above, the auction catalogs Plaintiff produced in this action confirm it. *Id.*, Ex. 18 (Chieftown disclaiming responsibility for descriptions).

And for all of those reasons, the residual exception cannot rescue Plaintiff's proposed exhibits. Plaintiff offers a view of the residual exception that would, if accepted by the Court, "eviscerate the hearsay rule." *Eastern Profit Corp. v. Strategic Vision US, LLC*, No. 18-cv-2185, 2020 WL 7490107, *4 (S.D.N.Y. Dec. 18, 2020) (quotation omitted). "The Second Circuit has recognized that the residual exception is to be used 'very rarely, and only in exceptional circumstances.'" *McGrory v. City of New York*, No. 99 CIV. 4062 (LTSFM), 2002 WL 31388713, at *1 (S.D.N.Y. Oct. 22, 2002) (rejecting application of exception), *quoting Parsons v. Honeywell*, 929 F.2d 901, 907 (2d Cir.1991). To show the trustworthiness required for the residual exception to apply, Plaintiff must show that her evidence sufficiently "minimizes the 'four class hearsay dangers,' namely, insincerity, faulty perception, faulty memory, and faulty narration." 2020 WL 7490107, *4 (quotation omitted). Plaintiff does not even attempt to explain how the 2003 O'Toole-Ewald photographs or 2004 Sotheby's descriptions could conceivably confirm, for example, that an auction listing from a Chinese auction house over a decade later accurately identified "the characteristics" of a painting auctioned by that house, or distinguished the painting auctioned as authentic rather than forged. Nor could she, when even the auction house itself disclaims any responsibility for the accuracy of its

information, which it is simply conveying from the seller (and which therefore abounds with risks of insincerity, faulty perception, and faulty narration).

Nor is there any external corroboration that the painting actually auctioned in any one of the listings Plaintiff seeks to admit was as described, or sold for the reported hammer price. Instead, Plaintiff's view seems to be that the exhibits' importance to her case, standing alone, should impact the Court's application of hearsay rules. *See* MB at 33 ("[s]uch critical and highly probative evidence should not be precluded"). Particularly given the admitted prevalence of forged art in the Chinese auction market and the notorious lack of reliability of auction sale results reported by Chinese auction houses, the residual exception cannot apply here, either, and the suggestion that the exhibits are "critical" to the claims against Defendants only highlights Defendants' rights not to face potential 9-figure liability on the basis of inadmissible hearsay.

Moreover, Plaintiff cannot argue to this Court that the auction exhibits are the best available evidence relating to the supposed subsequent auction sales she could obtain using reasonable efforts, when she did not make *any* attempt to pursue other avenues of available discovery, such as seeking *Norwich Pharmacal*[14] or *Bankers Trust*[15] discovery in Hong Kong. *Matter of Sterling Nav. Co., Ltd.*, 444 F. Supp. 1043, 1046 (S.D.N.Y. 1977) (rejecting application of residual exception where plaintiff made

---

[14] Under the *Norwich Pharmacal* line of cases, Hong Kong courts allow third-party discovery of third parties alleged to have been innocently caught up in a wrong-doer's misconduct, to allow the plaintiff to trace assets or information. *See* Powell, Lam, & Kwan, *Hong Kong*, in *International Fraud & Asset Tracing* (3rd Edition, 2014), a copy of which is annexed to the Cohen Dec as Ex. 19, at 195-196. The rule would appear to squarely cover any auction house at which the 98 Paintings were allegedly "resold by the Wangs" and would have allowed Plaintiff (but not Defendants) to obtain *admissible* evidence from the auction houses regarding (1) the sellers of the paintings at those auctions; (2) the prices at which the sales were actually consummated, if any; and (3) the identities of the accounts to which any such funds were paid.

[15] Under the *Bankers Trust* line of cases, plaintiffs (but not defendants) may seek discovery of account information and other documents relating to the movement of money and assets at issue. Cohen Dec Ex. 19 at 196-197. In combination with any account information received from the auction houses as a result of a *Norwich Pharmacal* application, Plaintiff (but, again, not Defendants) could have obtained information about the individuals or entities who she claims later sold some of the 98 Paintings (which evidence would have confirmed that any such resales were *not* made by Defendants).

no effort to obtain admissible evidence through foreign discovery).[16] *See also Goldsmith v. Comm'r*, 86 T.C. 1134, 1141 (1986) (collecting cases and explaining that "reasonable efforts" under the rule requires attempt to "depos[e] the statement declarant, procure[] alternative documentary evidence, or [obtain] testimony of knowledgeable persons other than the declarant concerning the material facts).

Indeed, as the *Goldsmith* case recognized, a party seeking application of the residual exception must do more than conclusorily state, as Plaintiff does in her motion, that no other evidence "can reasonably be obtained about Chinese auction results." MB at 32. *Cf. Goldsmith*, 86 T.C. at 1141 ("it is insufficient merely to state, as respondent does, that the proffered exhibits are the most probative evidence which can be procured 'through reasonable efforts.' Some indication of what reasonable efforts have been undertaken is essential"). As in *Eastern Profit*, Plaintiff "had ample opportunity to take discovery in this case," 2020 WL 7490107, *5, and it would be deeply prejudicial to allow Plaintiff to choose not to seek relevant documents (which would have supported Defendants if obtained, and which, due to the nuances of Hong Kong law, Defendants could not themselves obtain) and then to use that choice to bootstrap reliance on hearsay. Indeed, if anything, the Court should instruct the jury that Plaintiff had available to her, but opted not to take, legal steps that could have enabled the discovery of information confirming or disproving her theories that Defendants were the actual purchasers of the 98 Paintings and later resold some of them, and that the jury can draw whatever inference it chooses from Plaintiff's failure to take such steps.[17] That

---

[16] In the context of an action seeking damages of over $200,000,000.00, there is no question that an effort to obtain discovery in Hong Kong would have been reasonable, even if nominally expensive in the abstract. *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003) (even discovery expenses of $100,000 may not be unduly burdensome "in a case potentially worth millions of dollars"). *See also Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 8 (D.D.C. 2017) (discovery expected to cost $140,000 not unduly expensive given that litigation sought $150,000,000 in damages).

[17] Defendants intend to request such a charge in their proposed jury instructions.

failure cannot instead be the basis for admission of admittedly unreliable hearsay about such auctions, and the motion should be denied.

### G. John Wang's Expert Testimony is Admissible

a. <u>Relevant Background</u>

By Motion No. 6, Plaintiff seeks to prevent the jury from hearing the opinion testimony of John Wang, a witness *she* belatedly disclosed as having relevant information. Plaintiff added Mr. Wang (no relation to the parties) to her initial disclosures on June 21, 2019, as a witness with knowledge of C.C. Wang's seals, and due to that late disclosure the Court allowed Defendants to take Mr. Wang's deposition out of time. Docket No. 180. Mr. Wang was deposed on July 25, 2019. Cohen Opp Dec Ex. 6. At that deposition, he was represented by Plaintiff's counsel. *Id.* at 5:19-6:1.

Mr. Wang testified to his understanding that he was being deposed because he was the individual who had made images of C.C. Wang's seals for the Smithsonian's Freer Sackler museum in 2001. *Id.* at 9:8-10:22. He explained that he volunteers for the museum because "the Chinese department needs some translations in Chinese, and seals, and things like that," and as a seal carver and calligrapher, his job is to interpret and translate seals for the museum. *Id.* at 12:8-13:12. Mr. Wang is an expert in reading seal script, carving seals, and calligraphy. *Id.* at 13:19-14:5. Expertise with seals is rare; Mr. Wang estimated that less than .1% of people understand how to read seal script, *id.* at 18:15-19:4, though seal carvers and calligraphers generally will be able to do so. *Id.* at 19:13-17.

Mr. Wang was tasked with creating an image of C.C. Wang's seals that both C.C. and the museum could use to determine if they wanted to donate (on C.C.'s part) and accept the donation of (on the museum's) any or all of his seals. Cohen Opp Dec Ex. 6 at 21:8-22:4. Testifying about C.C.'s seals, the general context of seals in Chinese art, and C.C.'s relationship with the notorious (but in a good way) artist and forger Zhang Daqian, Mr. Wang explained that Zhang Daqian used fake seals

on the paintings he forged, and that given advances in photo technology, forged seals are much more difficult to identify today than in the past, because "you can take a picture and make a plate, right, that would be identical except the size, you're not able to tell exactly what is the size." *Id.* at 28:13-17. He continued to testify that for that reason, an image of a seal (such as the ones he created of C.C. Wang's seals) simply is not enough to allow an expert to determine whether a seal on a painting is authentic; one needs to measure the original and measure the seal on the physical painting to confirm that they are identically sized. *Id.* at 30:3-31:10. And he confirmed that if you only had one physical copy of a painting in front of you, you could "guess" but you cannot come to an accurate conclusion about the authenticity of the seal in question. *Id.* at 31:4-32:1.

Reviewing the seal impressions in two exhibits at his deposition, John Wang 1 (Cohen Opp Dec Ex. 20) and Chang 10 (Cohen Opp Dec Ex. 21), Mr. Wang reiterated that the size of a seal stamp is important to assessing its genuineness, and testified that the seal impressions on the documents were of different sizes for the same seals. Cohen Opp Dec Ex. 6 at 73:10-74:13. And Mr. Wang confirmed that he could not tell, based on the small photographs in the Bao Wu Tang exhibition catalog, whether the "seals" depicted in the photographs were the real C.C. Wang seals that he had created the impressions of and for which Y.K. had put him forward as a witness. *Id.* at 97:15-101:4. Indeed, Mr. Wang testified that he could not use the seal impressions he had created to assess the genuineness of a seal on a photograph of a painting. *Id.* at 99:3-22. In fact, he testified that even comparing the impressions he created with a physical painting would only be second best; the ideal would be to compare the physical painting in question to the seal itself or a known, physical impression on another painting. *Id.* at 101:9-102:8 ("based on the impression, copy impression, no one should say this is exactly the same seal, no one should say that"). After Defendants' counsel was finished questioning Mr. Wang, Plaintiff's counsel then cross-examined him for less than an hour, before determining that they had no further questions for the witness. *Id.* at 105:16-142:22.

Because Defendants had not retained Mr. Wang as an expert (indeed, he was Plaintiff's witness), and because his testimony and opinion had been fully disclosed to Plaintiffs, by means of his deposition, in advance of the parties' conduct of expert discovery, on March 18, 2021 Defendants counsel provided Plaintiff with Rule 26(a)(2)(C) notice that they intended to introduce his opinion testimony from deposition at trial. Cohen Opp Dec Ex. 22. It is this critical testimony that Y.K. wants to keep from the jury by her sixth motion *in limine*. The motion should be denied.

b.  Argument

Rule 26(a)(2) of the Federal Rules of Civil Procedure draws a clear distinction between witnesses who must produce an expert report before their opinion testimony may be offered at trial – those who were "retained or specially employed to provide expert testimony" (or who are generally employed by a party for the purpose of offering expert testimony) under Rule 26(a)(2)(B) – and those witnesses who do not fall under Rule 26(a)(2)(B), who, pursuant to Rule 26(a)(2)(C), may testify to opinions within the scope of their expertise so long as the party proffering the testimony disclosed "the subject matter" of the anticipated testimony and "a summary of the facts and opinions to which the witness is expected to testify." F.R.C.P. 26(a)(2)(B) & (C). Rule 26(a)(2)(C) was adopted in 2010 specifically to "resolve[] a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement." Advisory Committee Notes to the 2010 Amendments to Rule 26. As the Advisory Committee explained, the distinction is sensible, because experts who "have not been specially retained [] may not be as responsive to counsel as those who have." *Id.* Such experts therefore "may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705." *Id.*

Plaintiff does not challenge the sufficiency of Defendants' disclosure of Mr. Wang under Rule 26(a)(2)(C), only its timing, MB at 35, and whether Mr. Wang could have been disclosed under

Rule 26(a)(2)(C) at all, arguing that such a witness may only testify to opinions "spring[ing] from her perception of relevant facts." MB at 34. Neither objection has merit.

As to the timeliness objection, it is easily disposed of. As an initial matter, and as Plaintiff herself noted in her opposition to Defendants' *Daubert* challenge, preclusion of an expert witness for a party's failure to follow the requirements of Rule 26(a)(2) will be granted only if the party seeking preclusion was prejudiced by that failure. *Amtrust N. Am., Inc. v. KF&B, Inc.*, No. 17-CV-5340 (LJL), 2020 WL 5578817, at *1 (S.D.N.Y. Sept. 16, 2020) (court must consider prejudice to opposing party if information is not precluded, and finding prejudice where plaintiff had not had an opportunity to cross-examine defendant's expert on previously undisclosed testimony). Because Plaintiff did not (and, as discussed below, literally cannot) identify any prejudice from the purportedly "late" disclosure, it cannot be a basis to preclude Mr. Wang's testimony.

In any event, the disclosure was not late at all; rather, because Defendants intend to introduce Mr. Wang's testimony by means of his deposition, Plaintiff was informed not only of the "summary of facts and opinions" required by Rule 26(a)(2)(C), but of Mr. Wang's full and complete testimony, word for word, on July 25, 2019 – months before the deadline for disclosure of affirmative reports. And Plaintiff's counsel cross-examined Mr. Wang on those opinions at that deposition. Cohen Opp Dec Ex. 6 at 106:6-19 (asking what he meant by "genuine"), 116:7-121:3 (questioning Mr. Wang on the Bao Wu Tang catalog and his ability to identify the seal impressions), 131:13-132:8 (questioning Mr. Wang on the size issue in the comparison between the documents, and his inability to say with certainty that the seals were identical), 135:5-142:22 (returning to question Mr. Wang about the Bao Wu Tang catalog again). After doing so, counsel confirmed that they had no further questions for Mr. Wang. *Id.* at 142:20-22.

Moreover, as Plaintiff correctly notes, Mr. Wang's opinions are relevant as rebuttal of her expert, Mr. Regan, who claimed he could authenticate seals from photographs. MB at 35. As such,

though Defendants' counsel did not formally identify his (previously given) testimony under Rule 26(a)(2)(C) until March 2021,[18] to the extent that the rule requires identification (and not merely full disclosure of the testimony, which Plaintiff indisputably had), the timing of that identification could not have prejudiced Plaintiff: as a rebuttal expert, Plaintiff would have had no opportunity to issue a responsive report or retain new experts to address Mr. Wang's opinions. The only step Plaintiff could have taken in response to a 26(a)(2)(C) disclosure of Mr. Wang 30 days after Defendants received Mr. Regan's report, theoretically, would have been to depose Mr. Wang in order to cross-examine him on his opinions. But, as recited above, Plaintiff's counsel *had already done so*, and had declared themselves satisfied that they had asked everything they needed to ask. *Cf. Amtrust*, 2020 WL 5578817, at *1 (S.D.N.Y. Sept. 16, 2020) ("The duty to disclose information concerning expert testimony is intended to allow opposing parties to have a reasonable opportunity to prepare for effective cross examination and, perhaps, arrange for expert testimony from other witnesses") (cleaned up). As such, there can be no prejudice, and no preclusion, based on the timing of the disclosure.

Nor does Plaintiff's substantive objection fare any better. Indeed, her brief substantially mischaracterizes the primary case on which it relies, *Downey v. Bob's Discount Furniture Holdings*, Inc., 633 F.3d 1 (1st Cir. 2011). In *Downey*, the First Circuit addressed the question of whether an exterminator whom the plaintiffs had hired to inspect their furniture after a bedbug infestation was "retained" for purposes of giving expert testimony. 633 F.3d at 3-5. Construing the phrase "retained or specially employed" – which defines the scope of witnesses who must provide a report under Rule 26(a)(2)(B) – the First Circuit held that a witness is "retained or specially employed" if the

---

[18] As the Court is aware, Defendants' prior counsel at Kasowitz withdrew from the litigation on January 20, 2021. Docket No. 232. While current counsel cannot speak to the Kasowitz firm's decision not to so identify Mr. Wang, current counsel identified Mr. Wang under Rule 26(a)(2)(C) as soon as they reviewed his deposition transcript and realized it contained opinion testimony that would be useful to Defendants at trial. Cohen Opp Dec, ¶ 23.

"expert comes to the case as a stranger and draws the opinion from facts supplied by others, in preparation for trial." *Downey*, 633 F.3d at 7. A percipient witness who also has expertise, in contrast, and has a connection to the case other than as an expert from whom a party seeks opinion testimony, may testify under Rule 26(a)(2)(C). *Id.* In *Caruso*, also (mis)cited by Plaintiff, the Second Circuit adopted just that distinction: a party may offer opinion testimony under Rule 26(a)(2)(C) from a non-retained witness who has some connection to the case as a fact witness, but not from a witness who has no involvement in the case other than to offer opinions developed for purposes of litigation. *Caruso v. Bon Secours Charity Health Sys., Inc.*, 703 F. App'x 31, 33 (2d Cir. 2017) (the "distinction [between witnesses who need not provide a Rule 26(a)(2)(B) report and those who must] is between an expert who happened to have personal involvement with the events giving rise to litigation and an expert whose *only* involvement consists of aiding the already-initiated litigation") (emphasis added). Thus, experts whose "*only* connection to the matter was their being 'recruited to provide expert opinion testimony,'" were required to provide a report. *Caruso*, 703 F. App'x at 34 (emphasis added).[19]

Here, of course, John Wang was not "a stranger to the case" who Defendants sought out for the purpose of obtaining expert testimony on their behalf. Rather, he was a fact witness with a "connection to the case" specifically identified by *Plaintiff* in her June 2019 amendment to her initial disclosures, and the opinions he testified to at deposition were elicited by Defendants' counsel in their exploration of his background and knowledge as the percipient fact witness Plaintiff disclosed.

---

[19] The other cases Plaintiff cites for this point mostly stand for the same proposition. *See Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 363 (W.D. Ky. 2020) (defendant could testify under Rule 26(a)(2)(C) because "Cunningham does not come to this case as a stranger as he is a party, or draw his opinion from facts supplied by others"); *Architects Collective v. Pucciano & Eng., Inc.*, 247 F. Supp. 3d 1322, 1333 (N.D. Ga. 2017) (architect who was principal of a party could testify about similarity of allegedly infringed and infringing plans "based on his specialized and particularized knowledge garnered from his years of experience as an architect designing his own architectural plans"). *Avnet, Inc. v. Motio, Inc.*, No. 12 CV 2100, 2016 WL 927194 (N.D. Ill. Mar. 4, 2016), in contrast, follows the narrower rule applied in other circuits, and is discussed in that context below.

Indeed, Defendants intend to rely on some aspects of Mr. Wang's fact testimony at trial, as well. And Mr. Wang's opinions were not drawn from facts supplied to him by Defendants' counsel (or anyone else), or developed specifically for litigation; they were purely the product of his experience. Under the *Caruso* rule that governs cases in this Circuit, Mr. Wang is ***precisely*** the type of witness who can provide opinion testimony under Rule 26(a)(2)(C), and Plaintiff's objection is unwarranted.

Moreover, Mr. Wang's testimony would be *still* admissible under Rule 26(a)(2)(C) even if this Circuit applied the narrower test used in other jurisdictions. Plaintiff misreads *Advance Trust & Life Escrow Services, LTA v. Security Life of Denver Insurance Company*, No. 18-CV-01897-DDD-NYW, 2020 WL 7979020 (D. Colo. Oct. 26, 2020) as suggesting that a 26(a)(2)(C) witness's opinion testimony must arise directly from his relevant percipient testimony. MB at 34.[20] But the issue in *Advance Trust* was not that the witness's opinion did not spring from his particular factual involvement, but that the opinion to which the witness proposed to testify was *developed specifically for use in litigation* rather than arising out of his general experience and knowledge. *Advance Trust*, 2020 WL 7979020, at *4 (explaining that the witness intended to testify based on "new calculations, new assumptions, and new cash flow data, at the least, not gained through his employment" and had adjusted his opinion testimony in response to the opposing experts), *report and recommendation adopted*, No. 118CV01897DDDNYW, 2021 WL 62339 (D. Colo. Jan. 6, 2021). Indeed, the *Advance Trust* court specifically relied on *Harlas v. Barn, LLC*, No. 18-CV-02320-RM-NYW, 2019 WL 7290928 (D. Colo. Oct. 1, 2019), for the proposition that the determining factor was whether the witness intended to

---

[20] Even under that misreading, which invents a test stricter than that applied even in jurisdictions that require more than the Second Circuit, Mr. Wang's testimony would still be admissible. Mr. Wang's factual connection to this litigation is as a witness who knew how many seals C.C. Wang owned and used, and who made the seal impressions that Plaintiff contends allow her expert to identify certain seal images in various auction records as genuine. Mr. Wang's opinion testimony goes directly to the utility of those seal impressions, which he himself created, as a basis for determining that a purported seal on a painting was genuine – in general, and particularly when it is being compared to a photograph of a painting rather than the actual painting. Even under the strictest possible reading of Rule 26(a)(2)(C), then, Mr. Wang's testimony would be admissible.

testify to an opinion developed specifically for litigation, on the basis of new information provided for that purpose, or simply to a general opinion developed over the course of their career which happened to apply to the litigation. *Avnet*, also cited by Plaintiff, likewise turned on the fact that the proffered expert developed the opinions to which he proposed to testify not in his normal experience as the defendant's CEO, but specifically for purposes of litigation. 2016 WL 927194 at *5. There is, of course, no suggestion that Mr. Wang's opinions were developed for purposes of litigation or based on anything but his personal experience; as such, even if the Second Circuit followed this narrower rule – and as it made clear in *Caruso*, it does not – Mr. Wang's opinion testimony would still be subject to Rule 26(a)(2)(C).

Finally, even if the Court believes that Defendants would have somehow been required to obtain a rebuttal expert report from Mr. Wang under Rule 26(a)(2)(B) before the jury could benefit from Mr. Wang's expertise – though Defendants' counsel had no way to compel Mr. Wang, who was not only not retained but was being represented by *Plaintiff's* counsel, to provide one – it should rule that the failure to provide an expert report was harmless in light of the fact that the entirety of Mr. Wang's testimony was disclosed to Plaintiff, *in haec verba*, months before what would have been the deadline to produce such a rebuttal report. Again, because Plaintiff does not argue she was prejudiced by the failure to produce a report, preclusion of Mr. Wang's testimony would not be an available sanction even were her view of the law correct. Because it is not, and because there was no prejudice regardless, this motion should be denied as well.

## H. Plaintiff's Seventh Motion *in Limine*, for Sanctions, Must be Denied, and Plaintiff Precluded from Raising Her "Perjury" Argument to the Jury

### a. Introduction

Plaintiff's seventh motion *in limine* is a rhetorical firework, all short-lived flash, in which Plaintiff makes – but fails to support – incendiary accusations of perjury and spoliation. Indeed, for all her enthusiastic table-pounding, Plaintiff's motion is the very essence of "sound and fury,

signifying nothing," and must be denied, for multiple reasons. Moreover, because Plaintiff's counsel has repeatedly made the "perjury" allegation, and it is not only unsupported but actively contradicted by the probate trial record, the Court's only order on this motion *in limine* should be to direct Plaintiff's counsel not to engage in similar rhetoric in front of the jury.

Substantively, Plaintiff's motion, which focuses on bank records and other ESI she contends that Defendants must have had and withheld, simply ignores the 2015 amendments to Rule 37. Those amendments worked a sea-change in the law of sanctions and made expressly clear that neither a permissive nor a mandatory adverse inference may be granted for spoliation of ESI unless the party against whom the inference was sought ***deliberately*** destroyed documents ***for the intended purpose*** of shielding them from discovery. Instead, citing almost exclusively to cases predating the rule change,[21] Plaintiff argues that she is entitled to an adverse inference because Defendants were, she alleges, "grossly negligent" in failing to preserve relevant documents, claiming that Andrew had an obligation as an executor to retain them. Not only is that factually wrong, as discussed below, but it is a concession that Plaintiff cannot be granted the adverse inference she seeks. There is no evidence that either Andrew or S.K. Wang deliberately destroyed documents to prevent them from being discovered, and as such, Rule 37 precludes, rather than allows, any adverse inference. Indeed, as discussed below, Plaintiff fails to so much as show that the documents she complains were lost were in Defendants' possession at a time when they had any duty to preserve them (or, for some of the documents, ever existed in the first place), precluding any sanction at all, even under the prior version of the rule.

---

[21] The 2015 Amendments, which became effective on December 1, 2015, were approved by the Supreme Court and submitted to Congress for approval on April 29, 2015. Cohen Opp Dec. Ex. 23. Plaintiff's brief cites only two cases dated in or after 2015: *Matter of Sanchez*, a New York Surrogate's Court case from 2017 relating to an executor's record-keeping obligations, MB at 21, and *Beverly Hills Teddy Bear Co.*, MB at 19, a 2020 decision of this Court in which, as discussed below, the plaintiff actually had and deliberately withheld relevant documents from production. Plaintiff cites ***no*** case discussing spoliation sanctions – and the showing needed to obtain an adverse inference for spoliation (as opposed to for withholding an extant document) – under the currently operative rules. *See* MB at iii.

In reality, and contrary to Plaintiff's false narrative, as discussed below, Andrew Wang has been remarkably transparent in discovery, even going so far as to waive attorney-client privilege in his correspondence with counsel who represented him as the executor to make clear that he was not trying to "hide" anything. Andrew produced more than 45,000 pages of documents, and while Plaintiff complains that his emails do not include communications with the buyers or Mr. Fu, that is consistent with Andrew's testimony that he did not have such communications over email, not evidence of spoliation. Indeed, Plaintiff has presented **none** of the analysis that courts have found persuasive in showing that a party has deleted documents – evidence of inexplicable gaps in email dates, routines, or other artifacts – and that is for a simple reason: no emails were deleted, and everything that Andrew Wang had was produced, as required.

And as a factual matter, Plaintiff's motion is built on distortions of the record, wild claims that simply find no support when the citations are closely reviewed. For instance, Plaintiff insists that "the Wangs called a Chinese witness to lie under oath during the 2017 probate trial in the Surrogate's Court," Moving Brief in Support of Motion for Sanctions ("MB2") at 16 (capitalization altered). Their evidence for that incendiary claim? That a third-party Taiwanese citizen who testified in Mandarin through an interpreter did not identify her *written* communications with Andrew Wang when asked at trial when the last time she *spoke* with Andrew was. MB2 at 17. And Y.K. insists that Ms. Chien gave "preposterously false" substantive testimony because she described C.C. Wang as clear-headed shortly before his death. MB2 at 17. Of course, if so, then other members of the imaginary Wang conspiracy must include such unlikely parties as C.C. Wang's home hospice nurses, Preciosa Roque and Chona Sianson-Lippert, Cohen Opp Dec Exs. 24-25, C.C. Wang's long-time friend and attorney, Joe Erlichster, *id.*, Ex. 26 at 9:6-13:5 (testifying to 20 years of work for C.C. Wang through June 2003), 14:7-21:2 (testifying to extensive and special personal relationship with C.C. Wang), 41:15-44:18 (testifying to C.C.'s mental state in June 2003), and even Plaintiff's own

son, Raymond King. *Id.*, Ex. 27 at 63:11-64:22 (testifying that C.C. recognized him and asked him a usual question after C.C.'s wife's funeral in June 2003).

Nor are Plaintiff's forays into creative extrapolations from the record limited to tangential issues such as Ms. Chien's testimony. She engages in wholesale distortion of Andrew Wang's deposition testimony in her attempts to show that he "lied." For instance, in his 2013 deposition, Andrew truthfully testified that he had no relationship with Billie Wai, the individual employee of his family's long-time Hong Kong accounting firm, CK Lam & Co., who was designated to receive the art shipped to that location – and then, when shown the document reflecting her name, recalled that she was the person at CK Lam who had been so designated. Cohen Opp Dec Ex. 5 at 945:6-21. *See also* Cohen Opp Dec Ex. 28 (identifying CK Lam's office as located at Unit 704 in the Forseas Building in Hong Kong). And Andrew explained that the office functioned as a business services office for its clients, allowing corporations with no other headquarters to receive mail at that location. *Id.*, Ex. 5 at 945:13-21. Completely blind to the meaning of that testimony, Plaintiff then insists to the Court that Andrew "changed" (rather than confirmed) his testimony when he explained that he had done just that for a corporation, Le Tao Ltd., and attempted to obtain any back records relating to his corporations from CK Lam in order to produce them in discovery. MB at 16. And Y.K. insists on misinforming the Court that Andrew testified that he was the source of the payments for the paintings purchased from the Estate, when he actually testified that the buyers used his corporation as a conduit to pay the Estate because of China's restrictions on the export of funds. Cohen Opp Dec Ex. 4 at 240:20-241:22. *See also* Ex. 10 at 272:11-15 (Plaintiff's expert explaining why buyers would prefer to have their purchase made in Hong Kong rather than China). As discussed below, Y.K.'s distortion of Andrew's deposition testimony is serial and pervasive, and while she is of course entitled to disbelieve Andrew's testimony and argue her theories to the fact

finder, she is not entitled to either a mandatory or permissive adverse inference that those theories are correct.

Third, as discussed below, Plaintiff is *certainly* not entitled to an adverse inference against S.K. Wang, a defendant she barely mentions in her brief. In essence, Plaintiff argues as follows: (1) S.K. Wang did not disclose documents or provide interrogatory responses relating to corporations S.K. Wang says he has no involvement with or connection to; (2) Plaintiff believes S.K. Wang is lying; therefore (3) Plaintiff is entitled to an adverse inference that S.K. Wang is lying. To say that is not how the adverse inference process works is a vast understatement; were the Court to adopt Plaintiff's approach, it would turn the absence of evidence supporting a litigant's claim into irrefutable proof of the claim (because if there is no evidence, the opposing party is obviously lying). At the end of the day, Plaintiff's application is an attempt to turn both the burdens of proof and the entire trial process on their head, and to allow her to argue to the jury that her claims *must* be true specifically because she has no evidence to prove them. Particularly in light of Plaintiff's failure to pursue other avenues of discovery that would have enabled her to locate relevant documents, as discussed in Section F, *supra*, the motion must be denied.

  b.  Relevant Factual Background[22]

  i.  Defendants' Productions and Discovery Responses

In this action, which began in 2014, Defendants have produced over 45,000 pages of documents (including discovery first produced in the probate proceeding), and timely responded to Plaintiff's interrogatories and document requests. Cohen Opp Dec, ¶ 30. To facilitate discovery, Andrew Wang waived privilege in his communications with the Estate's transactional counsel while

---

[22] As with her brief in support of motions *in limine* 1-6, Plaintiff's brief in support of her motion *in limine* for sanctions goes into alleged factual background – such as the probate proceeding – that is entirely unrelated to the supposed basis of the motion, which is an allegation that Defendants withheld or spoliated documents in discovery. Defendants' focus on the *relevant* facts in this opposition should not be read as a concession that the *irrelevant* allegations are any more accurately described than the relevant ones.

he was executor. *Id.*. Defendant Andrew Wang opened his email addresses to counsel, who reviewed

them and produced any relevant documents. Cohen Opp Dec, ¶ 30. Defendants – who had

previously been deposed 11 times, totaling 2528 pages of transcript across more than a decade of

litigation – sat for over 16 hours of additional deposition and answered each and every question

asked by Plaintiff's counsel, even where Plaintiff's counsel was re-plowing ground exhaustively

covered in prior depositions. Cohen Opp Dec Exs. 4, 30. In obtaining documents for production,

Defendants reached out to their banks and accountants for documents that might be in their

possession, *id.*, Ex. 4 at 72:23-73:15, 131:12-132:2, 311:15-312:2, and when Plaintiff's counsel

suggested that a trust company in the British Virgin Islands, Portcullis (BVI) Ltd., might have

relevant documents, Defendants' counsel at Kasowitz asked Portcullis to provide Kasowitz with any

incorporation documents, which Plaintiff's counsel agreed was sufficient. Cohen Opp Dec Ex. 31 at

27:4-18. Counsel have repeatedly informed Plaintiff and the Court that they did not withhold

documents. *Id.*, Ex. 32 at 73:4-75:1; Ex. 33 at 3; Ex. 34 at 3-5.

      ii.  <u>Chien Fang Huang</u>

      Plaintiff spins a conspiracy theory about Chien Fang Huang, a Taiwanese citizen and art

magazine editor with whom Andrew Wang is friendly. Cohen Opp Dec Ex. 2 at A-2907:13-20, A-

2908:4-12, A-2909:8-9, A-2916:15-19. According to Plaintiff, Defendants "called her to lie under

oath" during the probate trial MB2 at 16.. The basis for this frivolous claim is that when Plaintiff's

counsel asked Ms. Chien at the probate trial when the last time she *spoke* to Andrew Wang was,

Cohen Opp Dec Ex. 2 at A-2918:9-10, she testified that it was in 2003 and did not testify about her

*emails* with Andrew Wang in the intervening period. MB2 at 17. Ms. Chien testified at trial in

Mandarin, with an interpreter, MB2 at 17 ("[s]he testified, through a Chinese translator …"), and the

Chinese word for "oral communication" with someone, 说话, is different from the word for

"written communication," 写.  Cohen Opp Dec Ex. 7 pp 2-3. As such, the emails at issue do not

contradict Ms. Chien's testimony at all, let alone render that testimony perjurious. More, Ms. Chien

testified in 20*17* and the emails Plaintiff is fixated on are dated in 20*07* and 20*11*. MB2 at 17. Thus,

even if the emails had been specifically called for by the question, or even if the emails had directly

referenced a phone conversation, suggesting that a witness perjured herself when testifying in 2017

because they did not recall telephone conversations or emails from 6 or 10 years earlier is ludicrous.

*See United States v. Bourke*, No. S2 05 CR 510 SAS, 2011 WL 6376711, at *6 (S.D.N.Y. Dec. 15, 2011)

(noting that "faulty memory" is not perjury), *aff'd*, 488 F. App'x 528 (2d Cir. 2012).[23]

Plaintiff separately takes issue with Ms. Chien's substantive testimony, arguing that it was

"preposterously false" that C.C. Wang recognized her, was clear headed, and complained about his

daughter's – Plaintiff's – theft of his art shortly before his death. MB2 at 17. Not only was that

testimony true, it is corroborated by multiple disinterested witnesses, including C.C. Wang's home

health nurses, long-time friends, and Plaintiff's own son. Cohen Opp Dec Exs. 24 (Affidavit of

Preciosa Roque, attesting to C.C. Wang's mental status and anger at Plaintiff), 25, (Affidavit of

Chona Sianson-Lippert, doing the same); 26 (testimony of Decedent's long-time friend and attorney,

Joe Erlichster); 27 (testimony of Plaintiff's son, Raymond King, that C.C. Wang recognized him and

engaged him in conversation regarding cars, as usual, shortly before his death). No matter how

loudly or emphatically Plaintiff's counsel makes the contrary assertion, Plaintiff's desire to believe

that her father was unaware of her thefts or not in his right mind when he died is simply and entirely

not true, and the evidence makes that crystal clear. In any event, it is no basis on which to find that

Ms. Chien perjured herself, let alone that Defendants suborned perjury in the probate trial.

    c.  <u>Argument</u>

---

[23] Apparently relying on Ms. Chien's bantering use of the word "boss" in an email by which she said she had contacts who could help Andrew sell art on behalf of the Estate once the litigation was completed, Plaintiff also claims, apparently in total earnest, that it reflects that Andrew and Ms. Chien "work together." MB2 at 17. There is no evidence of that, because it isn't so, and Plaintiff does not even bother attempting to explain *where* she imagines they "work together," or in what way.

i.  <u>Standard on a Motion for Spoliation Sanctions</u>

As set forth in Rule 37(e), where a party seeks sanctions for failure to preserve electronically stored discoverable information (such as the corporate documents and bank records Plaintiff alleges Defendants failed to turn over), the Court may only order "measures no greater than necessary to cure the prejudice" to the requesting party, and only upon separately finding that the failure to preserve prejudiced the other party. F.R.C.P. 37(e)(1). In order to find that the failure to preserve caused prejudice, the requesting party must produce extrinsic evidence that the contents of the missing records would have been favorable to the requesting party. *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 47–48 (S.D.N.Y. 2014). And even where the requesting party can show prejudice, the Court may not grant any adverse inference absent evidence that the failure to preserve was intentional, in an attempt to deprive an opposing litigant of documents for use in a litigation. F.R.C.P. 37(e)(2). Negligence is no longer enough. *Leidig v. Buzzfeed, Inc.*, No. 16CIV542VMGWG, 2017 WL 6512353, at *10 (S.D.N.Y. Dec. 19, 2017) ("Prior to the 2015 amendments to Rule 37(e), … harsh spoliation sanctions such as an adverse inference instruction, were available on a showing that a party acted negligently … Now, however, the new version [allows an adverse inference] only in instances in which the spoliating party acted with 'intent to deprive another party of the information's use in the litigation'"). Moreover, Plaintiff must demonstrate that the information in question – bank and corporate records relating to Andrew facilitating buyers' purchases of Estate paintings by using a corporate entity to enable the transfer of funds out of China – existed and was in Defendants' possession after litigation over the method by which the buyers paid for the Estate sales was "reasonably foreseeable." *See B&D Boatworks, Inc. v. Doors, Inc.*, No. 2:05-CV-38 F(3), 2007 WL 9718184, at *5 (E.D.N.C. Sept. 7, 2007) ("Not all destruction of evidence, however, constitutes 'spoliation.' As this court has already noted, litigation must have been reasonably foreseeable in order for the duty to preserve evidence to arise").

The standard for sanctions where a party *actually has, yet still withholds* evidence from production is different; in that situation, even a grossly negligent decision not to produce a specific document as "irrelevant" is sufficient to warrant an adverse inference. *Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prod., Inc.*, No. 1:19-CV-3766-GHW, 2020 WL 7342724, at *11 (S.D.N.Y. Dec. 11, 2020) (CEO's unilateral decision to intentionally withhold relevant documents, without consulting with counsel, was grossly negligent at best and therefore sanctionable). Here, Plaintiff's application is for alleged spoliation sanctions, not for withholding documents. As discussed above, both Defendants and now multiple counsel have confirmed that they did not withhold documents relating to the corporations Plaintiff complains about; Defendants' email was searched and reviewed by counsel, and the responsive documents produced. Other than her own incredulity, Plaintiff has no evidence at all that Defendants are in possession of documents they withheld from counsel, and expressly argues that sanctions ought to be granted for failure to preserve. MB2 at 21-22. As such, Plaintiff must show intentional destruction, and cannot rely on the less demanding "gross negligence" standard articulated in *Beverly Hills Teddy Bear*. [24] Indeed, the amendment to Rule 37 was intended *specifically* to "reject[] cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence *or gross negligence*." Advisory Committee Notes to the 2015 Amendments to Rule 37 (emphasis added).

---

[24] Plaintiff's counsel engages in an unjustifiable distortion in citing *Beverly Hills* as holding that "gross negligence in **destroying or** not producing evidence can justify sanctions." MB2 at 22 (emphasis added). The *Beverly Hills* Court did not in any way deal with evidence that had been destroyed (or, to use more accurate language for "destroyed by gross negligence" – had not been preserved). Rather, it dealt with a party's conscious decision not to produce documents actually in its possession, based on the (at best) grossly negligent determination that they were irrelevant even if directly called for by the opposing party's document production. 2020 WL 7342724 at *11. The inclusion of "destroying or" in Plaintiff's description of the case was Plaintiff's edit of the facts and holding to fit her desired rule, and not supported by the actual facts or language of that decision.

ii.   Plaintiff is Not Entitled to Adverse Inferences With Respect to Corporate Records

Applying this standard to Plaintiff's requests for adverse inferences with respect to corporate records – that "Le Style Ltd.'s incorporation records … would have likely proven S.K. Wang was a co-owner of Le Style," that "Le Style Ltd.'s financial records … would have likely proven the funds … that were paid to the Estate did *not* come from 'Yue Da Jin,'" and that incorporation records for unnamed and unspecified "other companies … would have likely proven S.K. Wang's co-ownership and that the funds in their accounts did not come from the purported buyers,"[25] MB2 at 25 – cannot be granted, for multiple reasons.

First, Plaintiff has not come forward with evidence that any of these documents were in Defendants' possession, custody, and control at any time when they had a duty to preserve them, and therefore sanctions for failure to preserve such documents are entirely unavailable to them. *Hynes as Tr. of Calling Card Distribution Tr. v. Giambalvo*, No. 09 CV 2599 (ARR)(LB), 2010 WL 11626954, at *1 (E.D.N.Y. May 5, 2010) ("For sanctions to be imposed, the moving party 'must establish [] that the party having control over the evidence had an obligation to preserve it at the time it was destroyed'"), *quoting Residential Fund. Corp. v. DeGorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Taking the opposite position from her arguments with respect to statutes of limitations, Plaintiff now claims that Andrew was "put on notice of Y.K. King's potential claim as early as 2011" because she filed an accounting petition based on the fact that paintings the Estate had sold were appearing at auction in China. MB2 at 21 and n. 4. But Plaintiff fails to explain why a pleading that gave Andrew notice only that 'paintings that the Estate had sold are being resold by their buyers' should have put him on notice that Y.K. would later claim that the buyers were acting on his behalf when they purchased the paintings. Declaration of Andrew Wang ("Wang Dec"), ¶¶ 13-14. And, in

---

[25] The overreach in asking for an instruction as to unspecified "other companies" is emblematic of Plaintiff's motion as a whole.

any event, Plaintiff is complaining that Defendants no longer had documents that would have been dated in *2005, 2006, and 2009* – the dates of the sales. Thus, even if the accounting petition were sufficient notice, evidence of notice in 2011 – two years after the latest sale by the Estate – is not evidence that Andrew still had the documents at issue when the duty to preserve arose. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) (the party's duty is to "retain all relevant documents … *in existence at the time the duty to preserve attaches*, and any relevant documents created thereafter"). Absent evidence that Defendants had the documents in question in 2011, which Plaintiff does not provide, the Court must deny the motion.

Similarly, Y.K. suggests that Andrew had a duty as the preliminary executor to preserve records relating to the mechanical means by which the buyers of Estate art transferred money to the Estate, for purposes of later accounting. MB2 at 21 (citing *Matter of Sanchez*, No. 2001-3187/G, 2017 N.Y. Slip. Op. 32685(U) (Sur. Ct., N.Y. County, Dec. 28, 2017) for the proposition that an executor must maintain documents sufficient to allow an accounting). But Y.K. does not attempt to explain why the transfer records would have been necessary to an accounting, which is a procedure by which the fiduciary sets out how he handled the Estate property in his control, documenting the disbursement and use of Estate funds and the sales of Estate assets. *See* N.Y. S.C.P.A. §2209 (accounting must be accompanied by an affidavit stating that it accurately details the executor's "receipts and disbursements on account of the estate and of all money or other property belonging to the estate which have come into his hands or been received by any other person by his order or authority for his use"). In such an accounting, Andrew would merely be required to show (1) that the Estate sold the art in question; (2) that the contracted price for the art was appropriate, in his reasonably founded business judgment; (3) that the Estate received the contracted price; and (4) what the Estate then did with those funds. *Id.* No provision of New York law requires an executor to be generally able to document the accounts from which a buyer of Estate assets paid for those

assets. Until Y.K. put forward her fantastical claims that Andrew had "invented" the buyers, none of the records as to which Y.K. is now seeking an adverse inference were at all relevant, or expected to be relevant.[26] Wang Dec, ¶¶ 10-14. Thus, in the absence of a duty to preserve, Plaintiff cannot be awarded an adverse inference against Defendants for failure to preserve.

Second, Plaintiff cannot show any prejudice from Andrew's failure to preserve the Le Style corporate or bank records. As noted above, Plaintiff had other avenues of discovery in Hong Kong – such as *Norwich Pharmacal* discovery of the auction houses – that she opted not to pursue, strategically relying on the Court to make obtaining evidence for her claims unnecessary. *See* pp 19-20, *supra*. There is no extrinsic evidence supporting the claim that such bank records would have shown that the funds came from sources other than the buyers, which is required to prove any prejudice from the loss of the bank records. And the only extrinsic evidence she proffers that the incorporation records would show any connection to S.K. Wang is a screenshot of a hearsay summary (not even an underlying document), from an internet source, claiming that *it* has corporate records for Le Style listing S.K. Wang as a shareholder and director. MB2 at 11. Yet, though the ICIJ is based in Washington D.C., Cohen Opp Dec Ex. 35, and though Y.K.'s counsel has been citing the ICIJ website to this court for more than 2 years as a reliable source, MB2 at 11 (citing to letter from January 2019), Y.K. has never even attempted to subpoena the underlying documents from the ICIJ

---

[26] Of course, Y.K. is likely to argue on reply that because Andrew "knew" that the transactions were fraudulent and self-dealing at the time, he "should have known" the records would be relevant to later claims against him. But this type of circular logic – "as long as you assume that my claims against Defendants are true, then I would be entitled to have the jury instructed that they can or must assume that my claims against Defendants are true" – is not sufficient to support a high school term paper, let alone an adverse inference in a 9-figure federal lawsuit. While Andrew could reasonably have foreseen litigation over the adequacy of the prices paid to the Estate, given Y.K.'s litigiousness, no objectively reasonable party could have imagined Y.K. alleging that the buyers themselves were fraudulent, such that the transaction records of *how* the Estate got paid would be relevant to that litigation. *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 480 (D. Del. 2012) (litigation is reasonably foreseeable when "a reasonable party in the same factual circumstances would have reasonably foreseen litigation"), *aff'd sub nom. Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, No. CV 07-127-LPS-MPT, 2014 WL 545440 (D. Del. Feb. 7, 2014). That no reasonable party in Defendants' position could have expected Y.K.'s claims is clear from the fact that the possibility of fraudulent buyers never crossed the Public Administrator's mind; the only issue the fiduciaries were focused on (and thus had an obligation to preserve records relating to) was the price of the sales.

or obtain any testimony or evidence that would allow her to admit the ICIJ website itself. Rather, she strategically chose to sit back and rely on obtaining an adverse inference instead of pursuing available discovery.

Third, Plaintiff absolutely cannot show that the failure to preserve was deliberate and intended to prevent documents from becoming available in litigation. First, as noted above, there is no evidence at all that any relevant documents were possessed after Y.K. claims Andrew should have been on notice of her claims. Second, by all accounts both Le Tao and Le Style were inactive corporations that conducted no business at all beyond enabling the transfer of funds out of China. Cohen Opp Dec Ex. 4 at 18:4-15, 130:14-131:11, 240:20-241:13, 257:8-12; Wang Dec ¶ 15. Andrew had no independent reason to preserve their records that would have motivated him to do so despite not being under any duty to preserve them, and there is nothing remotely unreasonable or inherently suspicious in his not having done so. *Id.*, ¶¶ 10-14. For the same reason, Andrew's failure to identify Le Style at deposition in 2013 or when preparing his interrogatory responses, MB2 at 8, is not indicative of any intent to destroy evidence, particularly given his testimony, without hesitation, once his memory was refreshed in advance of the 2019 deposition. Wang Dec ¶¶ 15-17.

Indeed, Y.K.'s theory seems to be that Andrew was willing to lie in interrogatory answers and depositions until 2019, and to destroy documents to avoid evidence of Le Style being available to Plaintiff at trial – but inexplicably decided to tell the truth in 2019 when asked. Yet the only admissible evidence that Andrew in fact incorporated and used Le Style is that very testimony; all he had to do to complete his imagined scheme to hide his ownership was to ('continue to') lie about it in the 2019 deposition. Instead, when his memory was refreshed by reference to the bank record listing Le Style, Andrew forthrightly acknowledged that Le Style was his company and that he did not recall whether had used it (and not Le Tao) to facilitate the buyers' transfers of money to the Estate. Cohen Opp Dec Ex. 4 at 19:21-20:2, 130:14-131:11, 240:20-241:13, 316:20-317:19. His 2013

deposition testimony – in which he testified that he did not know where the buyers got their funds to pay the Estate, Cohen Opp Dec Ex. 5 at 727:25-729:17, is not to the contrary, because it addresses how buyers got funds from their accounts *to Hong Kong* for transfer to the Estate, not how buyers' funds got from Hong Kong to the Estate (via Le Style). *Id.* at 728:4-25 (answering questions *specifically* about how the buyers got funds *from China to Hong Kong)*[27] The only buyer who Andrew testified was going to send money to the U.S. directly, and not through Hong Kong, was the buyer who Wei Zheng had procured, Tan Yun. *Id.* at 941:12-942:20 (testifying about how he knew Wei Zheng); 942:21-943:11 (explaining that he had asked Wei Zheng to find him a buyer, and that Mr. Wei had procured a buyer who fell through); 943:12-944:13 (explaining that the buyer wanted to receive the paintings in Hong Kong); 944:14-945:5 (the testimony wrongly cited by Y.K. as referring to each of the buyers, explaining that *that particular buyer* was going to send money directly to the United States and had their own methods for getting money out of China). For Plaintiff to distort that into *general* testimony about *each* of the buyers, using the hook of Andrew's use of the words "them" and "they" to describe Mr. Wei and his buyer and without disclosure of the true context,[28] is completely unjustifiable.

Indeed, Y.K.'s motion pervasively distorts Andrew Wang's deposition testimony. With respect to the buyers, Andrew testified in 2013 not that he had "personal" relationships with the buyers but that he knew them (or of them) through art circles and contacts. Cohen Opp Dec Ex. 5 at 956:19-25. English is not Mr. Wang's native language and he testified through an interpreter and

---

[27] Having obtained testimony that Andrew did not know how the buyers got the money to Hong Kong, it was unreasonable for Plaintiff's counsel not to ask, in 2013, the natural follow up question: *why* would the buyers need to transfer money to Hong Kong? Had Plaintiff's counsel asked that question in 2013, that would have triggered Andrew to explain the mechanics of the transaction, and the use of an intermediary company to enable it, in 2013. Plaintiff simply never asked.

[28] That the distortion was deliberate is clear from the fact that Plaintiff's counsel prefaces this discussion of testimony about Mr. Wei's proposed buyer – in which Andrew is excruciatingly clear that he knew only Mr. Wei, and not Mr. Wei's buyer – with a claim that Andrew had "claimed he personally knew" who "the buyers" were. MB2 at 7.

in English at deposition. Wang Dec, ¶ 3.  When asked about Mr. Chou, for example, his testimony "yes, I know him" meant "yes, I know who he is." *Id.*, ¶ 4. Indeed, far from suggesting a personal friendship with Mr. Chou, Andrew could not even recall whether Mr. Chou was based in Beijing or Shanghai, Cohen Opp Dec. Ex. 5 at 948:11-15, cities in China that are nearly 1,000 miles apart. Wang Dec, ¶ 5. Similarly, each of his answers with respect to Chen Mei Lin and Yu Da Jin were consistent with Andrew knowing *of* them and *about* them without suggesting any meaningful personal relationship. Cohen Opp Dec Ex. 5 at 953:11-22 (testifying that he knew Mr. Yu through a referral); 962:12-24 (testifying to his belief that Mr. Chen was no longer in the art business). Indeed, Andrew specifically explained at his 2013 deposition that sometimes he deals with buyers "indirectly." *Id.* at 545:6-13. He also specifically explained that the buyers were not his "friends" as that term is typically used: "Not friends, to buyers … in terms of friends, it could be friend's friend, it's like through connections." *Id.* at 707:12-18. Adopting that definition of "friends," counsel followed up "*so*, some of your buyers were friends; right?" and Andrew agreed. *Id.* at 707:19-21; *see also* Wang Dec ¶ 6.. The testimony then continued with that predicate – that what Andrew was referring to as "friends" meant "people who were introduced through connections." At no point in his 2013 deposition did Andrew say or suggest that he had met with the buyers prior to the sales, but that is irrelevant, because the 2019 deposition testimony Plaintiff miscites for the proposition that Andrew was certain he had only met the buyers "after the sales had already occurred through Er Shi Fu," MB2 at 6, explicitly says *the exact opposite*:

> A: I met one or two of them, you know, while staying at the hotel, but not in the direct arrangements or direct contact.
>
> Q: When did you meet one or two of them in the hotel?
>
> A: I don't remember the date, but I think I met one or two of the buyers.
>
> Q: Was that at the time you met Mr. Fu?
>
> A: No, later.

Q: Later. *It was before the sales were completed or after?*

A: *I don't remember, before or after.*

Q: But it was after you met Mr. Fu; it was later?

A: Yes, <u>definitely</u>, I met with Mr. Fu first before I gave all the information to him, and he would have discussed it with the buyer. And then later we met one or two buyers, *but I don't know when, whether it was after or before*.

Cohen Opp Dec Ex. 4 at 93:20-94:15. Wrenching the underlined word "definitely" wildly out of context, Plaintiff's counsel amazingly quotes it for a proposition that is 180 degrees from the actual testimony. It is, of course, entirely inappropriate for Plaintiff to violate her duty of candor to the Court in this manner, regardless of the substance of her motion. But to engage in this type of chicanery in a motion for *sanctions* is absolutely breathtaking.

Similarly, at deposition in 2013, Andrew was asked if there were any corporations he held an interest in "from 2003 until now," and he answered "no." That answer is consistent with Andrew not only not recalling Le Style at the time, but interpreting the question as asking whether there were any corporations he had owned continuously from 2003 through the time of the deposition. Wang Dec, ¶ 16. Indeed, in his interrogatory responses, Andrew conflated Le Tao and Le Style, not recalling that they had been separate corporations until his memory was refreshed preparing for deposition in 2019. *Id.*, ¶ 15. While Y.K. is, of course, free to argue to the jury that it should not believe Andrew's testimony, her disbelief is no basis for a jury instruction that they must not believe him.[29] And the fact that Plaintiff must resort to naked distortions of the testimony in an attempt to

---

[29] Oddly, Y.K. argues that Andrew's interrogatory responses in the RICO action "*completely* changed his testimony" because "for the first time ever" he claimed that sales had been set up through an intermediary and therefore had no documented communications with the buyers. MB2 at 5 (emphasis in original). Not only is that answer *consistent* with his prior testimony (that the buyers came through referrals), but Andrew had never before suggested that he had any written communications with the buyers. While Plaintiff is not seeking an adverse inference relating to the supposedly missing communications with the buyers, so this allegation in her brief is gratuitous and irrelevant, it highlights the extent to which Plaintiff's rhetoric about documents, testimony, and events is utterly disconnected from their reality.

support her claims is powerful evidence that they are completely meritless. The request for an adverse inference as to the corporate documents must be denied.

        iii.   <u>Plaintiff is Not Entitled to Adverse Inferences with Respect to Communications with Billie Wai or the SK Wang Irrevocable Trust</u>

Plaintiff's request for adverse inferences with respect to "communications or documents from Billie Wai" and the "S.K. Wang Trust asset schedule" for an even more fundamental reasons: she provides no evidence that such documents ***ever*** existed, let alone that they were spoliated at a time when Defendants had a duty to preserve them.

As to the imagined Billie Wai documents, Defendants have produced whatever documents were in their possession, custody, and control. Andrew Wang's email was not self-collected; his accounts were turned over to counsel and searched for responsive documents. Cohen Opp Dec ¶ 30 and Ex. 29. Counsel did not withhold any communications with Ms. Wai. *Id.* Thus, Plaintiff's spoliation conspiracy theory must posit that Andrew somehow managed to delete all traces of such communications from his email accounts, despite the difficulty of doing so. *See Siani v. State Univ. of New York at Farmingdale*, No. CV09-407 JFB WDW, 2010 WL 3170664, at *1 (E.D.N.Y. Aug. 10, 2010) (deletion of emails evidenced by "'gaps' in production of electronic messages"); *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 137 (S.D.N.Y. 2009) (noting "gaps" in the organization of a server). Because Y.K. has no evidence such emails ever existed, she cannot make the threshold showing that they were spoliated at all. *Beck v. Test Masters Educ. Servs., Inc.*, No. CV 04-1391 (JDB), 2012 WL 10817176, at *6 (D.D.C. Sept. 25, 2012) (no finding of spoliation as to post-2007 email where "plaintiffs have not persuasively shown that post–2007 internal emails [on the topic] must have existed" in the first instance), *modified on reconsideration*, 289 F.R.D. 374 (D.D.C. 2013) (modifying adverse inference regarding other documents, which the court had found were spoliated, as too harsh). And even in the imaginary universe where Andrew had and deleted written communications with Ms. Wai – who was simply the employee at CK Lam designated to receive the

shipments – Plaintiff has made no effort to provide extrinsic evidence of their contents or to show that any deletion came after a duty to preserve attached, let alone that the (hypothetical) deletions were intended to deprive her of evidence in litigation.[30]

Similarly, as to the S.K. Wang Trust asset schedule, Defendants have repeatedly informed Plaintiff that they produced the documents they had. Cohen Opp Dec Ex. 31 at 17:9-11. Plaintiff's sole evidence that Defendants *ever* had anything more than what they produced is her incredulity that the attorney who set up the trust might have botched it by failing to list the assets being placed in trust. MB2 at 12 ("Plaintiff argued that to not have an asset schedule on such a carefully drafted and large trust would be irrational since a trust is void without one …"). But Plaintiff also noted to the Court that that attorney, Mr. Nudo, had been disciplined for doing something fraudulent with an affidavit, Cohen Opp Dec Ex. 31 at 18:11-15, which is hardly the hallmark of a careful attorney the Court can assume dotted his I's and crossed his T's. Nor does Plaintiff provide evidence that: (a) Mr. Nudo ever provided Defendants with a version showing the included assets, assuming he ever created one; (b) Defendants ever had a duty to preserve such evidence before losing that version, assuming they ever got one; or (c) that Defendants intentionally destroyed a version listing the assets, rather than lost it, assuming they ever had it. Instead, the sum total of Plaintiff's argument is, effectively, "come on, they must have had it and destroyed it." In other words, Plaintiff's motion does not even gesture at, let alone overcome, the high barriers to obtaining an adverse inference instruction. Again, Plaintiff is free to argue to the jury that they should not believe Defendants. But that does not entitle her to an instruction from the Court that the jury should or must disbelieve Defendants. The motion must be denied.

---

[30] Plaintiff's certainty that the imagined communications with Ms. Wai would have "likely established her participation," MB2 at 25, fits with her generally conspiratorial approach to Ms. Chien and Ms. Zhu Mingxia – anyone who doesn't support her claims, or gifts money to the Wangs, must therefore be a member of a conspiracy against her.

iv.   Plaintiff is Not Entitled to Strike Defendants' Affirmative Defenses

Finally, for all the reasons set forth above, there is no basis to grant Plaintiff's request to strike Defendants' affirmative defenses. Plaintiff has not provided any evidence at all that Defendants lost or destroyed documents, whether negligently or intentionally, at a time that Defendants were under a duty to preserve them. To the contrary, she affirmatively argues that the duty to preserve documents relating to Le Style arose, at the earliest, in 2011 – two years after the last of the transactions at issue. In reality, no duty attached with respect to those documents, or the hypothetical communications with Billie Wai, until Plaintiff made clear her contention that the transactions were self-dealing, still further years after that. Similarly, no duty to preserve documents relating to the SK Wang Irrevocable Trust existed until Plaintiff  identified her belief that it was relevant to her claims. Striking pleadings or dismissing affirmative defenses "are the most extreme sanctions available" and cannot be granted absent a showing of bad faith or willfulness. *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075 (LJL), 2020 WL 3472597, at *9 (S.D.N.Y. June 25, 2020). Where there is no evidence that any of the documents alleged to be spoliated existed at a time Defendants had a duty to preserve them (or, in some cases, ever existed at all), the Court cannot grant such a sanction. The motion must be denied.

## CONCLUSION

For all the reasons set forth above, Plaintiff's motions should be denied in their entirety.

Dated:   New York, New York                           Kamerman, Uncyk, Soniker & Klein P.C.
        April 23, 2021
                                                       */s/ Akiva M. Cohen*
                                           Akiva M. Cohen
                                         Attorneys for Defendants
                                         1700 Broadway
                                         New York, New York  10019
                                         (212) 400-4930
                                         acohen@kusklaw.com