# EXHIBIT 19

# Hong Kong

**Latham & Watkins**
Simon Powell, Eleanor Lam & Kwan Chi Ho*

## 1. INTRODUCTION

A fundamental objective of any internal investigation is to obtain and secure evidence so that a case against the wrongdoer can be proven. When conducting internal investigations, it is imperative to observe the statutory and regulatory requirements applicable to the collection of evidence, to ensure that the company is not exposed to liability for breach of those requirements, and to protect the integrity of the investigation. Equally important is the need to consider issues of legal privilege.

## 2. MANAGING THE INTERNAL INVESTIGATION

### 2.1/2.2 Hard copy documents/Electronic documents

When employees are suspected of engaging in fraud, access to hard copy and electronic documents will inevitably be required. Hard copy documents are likely to be located in a variety of places and will include memoranda, board minutes, notes, diaries, reports and receipts. Electronic documents are also likely to be located in a variety of media, including network servers, the hard drives of desktop and handheld computers, palmtop devices, tapes and CDs. We summarise the requirements relevant to the gathering of such evidence in the paragraphs below.

#### Internal policies

General counsel should consider whether there are any internal policies in place which govern the gathering of documents and/or the monitoring of employees, and whether employees can reasonably be said to have consented to the same. Investigations must be conducted in accordance with such policies.

#### Human rights legislation

Care must be taken when conducting searches, given that personal as well as business-related materials may be located on desks, computers and elsewhere before any searches are conducted. Due regard must therefore be given to the right to privacy enshrined in the Bill of Rights Ordinance (Cap 383) and the Basic Law.

* This is an updated version of the chapter by Gareth Thomas, Kate Meakin & Priya Aswani of Herbert Smith LLP.

Article 14 of the Bill of Rights confers on individuals the right to be free from arbitrary or unlawful interference with their privacy, family, home or correspondence. This includes a right to be secure against intrusion by search or seizure of property. Similar protection is afforded by Article 29 of the Basic Law which provides that arbitrary or unlawful search of, or intrusion into, a Hong Kong resident's home or 'other premises' is prohibited. Further, the employees' right to privacy at work has been recognised by the Hong Kong courts. Further protection is found in Article 30 of the Basic Law, which generally provides that the freedom and privacy of communication shall be protected by law and that no individual may, on any grounds, infringe the freedom and privacy of communication.

Infringement of the right of privacy may, however, be justified in certain circumstances. In *X v Commissioner of the Independent Commission Against Corruption* [2004] 3 HKLRD K8 the court stated that a breach of the right to privacy is justified where it is proportionate to the aims sought to be achieved, absolutely necessary to attain a legitimate purpose and on reasonable suspicion of wrongdoing. It is crucial that companies satisfy themselves of these matters before carrying out any searches, given that evidence obtained in breach of the right to privacy will be inadmissible in court.

## Data protection

General counsel must also consider the requirements under the Personal Data (Privacy) Ordinance (Cap. 486) (the PDPO). The PDPO protects individuals (the 'data subject') from the abuse of personal data held by entities and restricts the manner in which those who control the collection, holding or use of data (the 'data user') can 'process' data. The definition of process is sufficiently broad to cover the monitoring (whether it be telephone, email, internet or video monitoring) and gathering of data in the context of internal investigations.

A detailed analysis of the PDPO is beyond the scope of this chapter, but, in summary, the PDPO stipulates that any data which relates to a data subject must not be collected except for a lawful purpose directly related to a function or activity of the data user; personal data must be collected by means which are lawful and fair in the circumstances; and all practicable steps must be taken to ensure that the data subject is informed of the purpose for which the data is to be used before or when that data is collected. One exception to this latter requirement is where informing the data user of the purpose for which the data collected is to be used would be likely to prejudice the prevention and detection of a crime. Companies can therefore avoid 'tipping off' employees about the fact of an investigation and its subject matter. At present there is no prohibition against transferring any data outside of Hong Kong. However, section 33 of the PDPO will provide for certain prohibitions against the transfer of personal data to places outside Hong Kong as and when it comes into operation, though no date has yet been set for when this will occur.

General counsel should consider whether there is reasonable cause to justify the monitoring of personal data, before doing so, by conducting

a systematic assessment of the risks and benefits of the monitoring and weighing the alternatives. For further information see the 'Privacy Guidelines: Monitoring and Personal Data Privacy at Work' issued by the Office of the Privacy Commissioner for Personal Data.

The implications of failing to comply with this legislation might be serious, as evidence obtained in breach of the PDPO will be inadmissible in court. Further, non-compliance can result in a fine of up to HK$1,000,000 and imprisonment for five years (see eg section 64 of the PDPO). In addition, an individual who suffers damage (including 'injured feelings') by reason of a breach is entitled to seek compensation from the data user.

#### Surveillance

Companies may consider monitoring employees' emails, telephone conversations and/or internet use when employees are suspected of engaging in fraud. There is no legislation in Hong Kong specifically governing the surveillance of communications by non-government bodies. Surveillance, whether electronic or otherwise, interceptions of telephonic and other forms of communication, wire-tapping and recording of telephone conversations are arguably prohibited by the right to privacy. However, as noted above, monitoring of 'data' is permitted in certain circumstances under Hong Kong's data protection legislation.

#### Employment law issues

There is no employment legislation in Hong Kong restricting an employer's ability to conduct searches and monitoring. Nevertheless, general counsel should review the employment contracts of employees subject to investigation to ascertain whether those contracts contain any restrictions. General counsel might also wish to consider suspending any employees pending the outcome of the investigation. Suspensions without notice or payment in lieu are permitted under section 11 of the Employment Ordinance (Cap 57) for up to 14 days pending a decision on whether to terminate the employment contract. However, the employee may resign without serving notice or making payment in lieu while on suspension. Where there is a conflict of interest between an employee and the company, general counsel should insist that the employee obtains separate legal representation.

### 2.3 Obtaining oral evidence from employees

An internal investigation will very likely involve the questioning of the alleged wrongdoers and witnesses to gather evidence. General counsel will need to consider the most appropriate approach to obtaining such evidence and whether there are any restrictions in the employment contracts of those involved or any policies and procedures governing interviews with employees. For example, employees may be entitled to advance notice of the matters to be discussed and/or to be provided with copies of documents to be referred to before being questioned.

### Warning

Prior to questioning, the employee should be given a warning along the following lines: 'I act for the company and not for you. This interview is to enable me to provide legal advice to the company and therefore any attorney-client privilege belongs to the company and not to you. It is for the company to decide whether or not to waive that privilege. You should keep the matters we discuss confidential, but the company may choose in the future to disclose all or part of those matters to third parties as it deems appropriate, without notice to you.'

### Legal representation

Under Article 35 of the Basic Law, all individuals have a right to confidential legal advice. Those being questioned will therefore have the right to consult lawyers before, during and after any questioning. However, under this provision of the Basic Law, individuals are only entitled to legal representation in proceedings before the Hong Kong courts; employees cannot insist on legal representation during any questioning in an internal investigation conducted by their employer. Lawyers may, however, be present during the interview (although they should not speak on the employee's behalf). The right to a fair hearing enshrined in Article 10 of the Bill of Rights might assist employees in obtaining legal representation if they are subject to a criminal charge, and fairness requires that they be so represented in all the circumstances.

### Right to silence

The Bill of Rights provides for a right to silence, in that people cannot be compelled to testify against themselves or confess guilt (Article 11(2)(g)). However, this safeguard is only triggered when a person is faced with a criminal charge. If, at the time of the interview, the employee has not been charged with a criminal offence in relation to matters on which he is to be interviewed, the employee will not be entitled to refuse to give answers to questions put to him.

### Interview notes

Notes of interviews may well have to be disclosed in any subsequent civil proceedings, as parties are obliged to disclose all documents that are or have been in their possession, custody or power relating to matters in question in the action, whether those documents are harmful or helpful (Order 24, Rules of the High Court (RHC)). However, notes will be protected from disclosure if they are legally privileged (see below). To assist in making out a claim for privilege and to help guard against inadvertent disclosure, interview notes should clearly record on their face the fact that they are being prepared in anticipation of litigation and for the purpose of obtaining legal advice. Employees should not be encouraged to take their own notes in interviews, given that these are unlikely to be privileged. Further, care must be taken not to show privileged documents to witnesses, given that privilege over the document may consequently be waived.

## 2.4 Legal privilege

A number of documents will likely be produced by the in-house legal team and external lawyers, and by employees in response to requests from these lawyers, where an internal investigation is being conducted. Many of these documents will be highly sensitive. It is therefore important to ensure that such documents are protected from disclosure in any subsequent litigation by creating them in a way which attracts and maintains the privilege.

There are two main types of legal privilege: legal advice privilege and litigation privilege.

### Legal advice privilege

Legal advice privilege arises in communications between a client and lawyer, the dominant purpose of which is the giving or obtaining of legal advice. This privilege applies whether or not litigation is in contemplation. It does not apply to communications with third parties. Following the English case of *Three Rivers District Council v the Governor and Company of the Bank of England* [2003] QB 1556, legal advice privilege protects both advice as to legal rights and obligations and advice as to what should prudently and sensibly be done in a relevant legal context. The Hong Kong courts would likely follow this decision. The types of documents that will not be covered by legal advice privilege include: communications recording business advice or factual information; and advice on presentational evidence to a non-adversarial inquiry.

General counsel should carefully consider, both at the outset of an investigation and as the investigation progresses, which employees constitute the 'client'. Following the Court of Appeal decision in *Three Rivers*, only employees who are expressly or impliedly tasked with obtaining or receiving legal advice can properly be deemed to be the 'client'. Communications between lawyers and 'non-client' employees will not attract legal advice privilege, given that they are deemed to be communications with third parties. Comments by the Hong Kong Court of Final Appeal in *Akai Holdings Ltd v Ernst & Young* [2009] 2 HKC 245 suggest that Hong Kong courts may take a less restrictive approach than England and Wales on the question of who is a client, but in circumstances where this is untested, it remains prudent to identify, and to ensure communications are with, the 'client'.

### Litigation privilege

Litigation privilege protects confidential communications between a lawyer and client or between a lawyer and a third party, the sole or dominant purpose of which is the preparation for or collection of evidence in relation to adversarial proceedings which are actual or reasonably in prospect.

### Privilege in the context of internal investigations

The same privilege issues in the context of internal investigations carried out in England and Wales apply to those conducted in Hong Kong.

## 3. DISCLOSURE FROM THIRD PARTIES

### General

Pre-action disclosure can be sought from those who are likely to be parties to subsequent civil proceedings in Hong Kong. Applications can also be made for post-commencement, pre-trial disclosure from third parties in civil proceedings in Hong Kong.

There are also a number of narrow circumstances where pre-action disclosure can be obtained against third parties, as follows:

- under the Norwich Pharmacal jurisdiction (see the section on Norwich Pharmacal relief below);
- following the Banker's Trust line of cases (see the section on Bankers Trust below); and
- under section 21 of the Evidence Ordinance (Cap 8), generally referred to as the 'bankers' books' jurisdiction (see the section on Bankers' Books Evidence below).

To obtain pre-action third party disclosure under any of these heads, the party seeking disclosure has to meet the particular requirements of that category outlined below.

### Civil procedure rules

*Pre-action disclosure against a likely party*

The Court's power to order pre-action disclosure against those who are likely to be parties to subsequent proceedings extends to all types of civil actions (Order 24, rule 7A RHC and section 41 of the High Court Ordinance (HCO) (Cap 4)). This is intended to assist an applicant who is aware or suspects that its legal rights have been infringed but does not have sufficient details to advance a claim. The applicant will need to show that the documents sought are:

- likely to be or have been in the possession, custody or power of the person against whom the order is sought;
- 'directly relevant' to the issues in the anticipated proceedings, ie documents which would be likely to be relied on by the parties themselves or documents which support or adversely affect any party's case in the anticipated proceedings. Consequently, it is not possible to apply for pre-action disclosure of 'background' documents or possible 'train of inquiry documents', which would be disclosable under the Peruvian Guano principles in standard discovery, under Order 24, rule 7A RHC; and
- necessary either for disposing fairly of the anticipated proceedings or for saving costs (Order 24, rule 13 RHC).

The scope of pre-action discovery is therefore confined to documents which the applicant knows exist or which must exist and which are of central relevance to the dispute.

*Post-commencement, pre-trial disclosure against third parties*

Post-commencement, pre-trial disclosure against third parties is available in all types of civil actions (Order 24, rule 7A RHC and section 42 HCO). This

assists an applicant who is aware of the identity of the alleged wrongdoer, as proceedings against the wrongdoer will need to be on foot. A more flexible approach to relevance has been adopted under this head than for obtaining pre-action disclosure against a likely party. Under this head, the documents need only be shown to be relevant to an issue arising out of the claim in question (as the issues will generally be defined with some clarity in the pleadings and other filed documents, the relevance and need for the documents sought should be evident). Other than this, the requirements for obtaining disclosure (as set out above) are the same as for pre-action disclosure against a likely party.

## Norwich Pharmacal relief

*Nature of relief*

A Norwich Pharmacal Order is an order for disclosure against third parties in advance of commencement of proceedings against the wrongdoers. It enables the applicant to trace the passage of information or assets, putting it in a position to commence proceedings or to preserve assets, whether in Hong Kong or abroad.

Norwich Pharmacal applications are appropriate where innocent parties are caught up or have become involved in the tortious or wrongful activities of others, facilitating the perpetration (or continuation) of such activities. In such circumstances, these innocent persons come under a duty to assist the victim of the tort or wrongful activities, by providing 'full information', even though they cannot be shown to have incurred any personal liability at that stage. This principle was established in *Norwich Pharmacal Co v Customs & Excise Commissioners* [1974] AC 133 and has been consistently applied in Hong Kong.

*Scope of relief*

Norwich Pharmacal relief is restricted to requiring the provision of information necessary for the purpose of enabling the applicant to identify and sue the alleged wrongdoer: names; addresses; and information relating to the involvement of the wrongdoer in the tort. The Hong Kong courts have made it clear that in exceptional cases they are prepared to order wider discovery, such as to require a party to provide details of a customer's bank accounts.

*Availability of relief*

The threshold for establishing an entitlement to Norwich Pharmacal relief is high. It is not a usual order and the Hong Kong court will not lightly grant relief in the absence of powerful factors. In deciding whether to grant relief, the Hong Kong court will balance the competing interests of the victim of the alleged wrongdoing and the innocent party caught up in the wrongdoing.

To obtain relief, the applicant will have to:

(i) Put cogent and compelling evidence before the court which demonstrates that serious wrongful or tortious activities have taken

place (the degree of proof required is particularly high with fraud allegations). This is all the more necessary when the alleged wrongdoer is not and will not likely be before the court at the time of the application.

(ii) Demonstrate that the order will or will very likely reap substantial and worthwhile benefits for the applicant. Where it is likely that, for example, a tracing claim will subsequently be made by the applicant, there must be a serious possibility that the discovery sought will either allow the applicant to preserve what may well be his assets or realistically lead to the discovery of such assets.

(iii) Satisfy the court that the discovery sought is not unduly wide. There is no entitlement to general discovery. Any application must therefore be specific, and restricted to those documents or classes of documents that are necessary to enable the applicant to preserve or discover assets and/or to identify the wrongdoer. However, wide-reaching discovery orders can be obtained as long as the discovery sought is necessary. The applicant does not need to go so far as to show that there are no other practicable means of obtaining the information; rather, necessity is to be assessed having regard to all the circumstances of the case, including: the resources of the applicant for disclosure; the urgency of the applicant's need for the information; and any public interest in the satisfaction of that need.

A Norwich Pharmacal application cannot be used to obtain material to enable an applicant to decide whether to bring proceedings against the alleged wrongdoer; this would fall foul of the 'mere witness' rule. A mere witness is someone not involved in the wrongdoing but who could, in due course, be compellable either by oral testimony as a witness or on a *subpoena duces tecum* in any subsequent proceedings. The Hong Kong courts have also made it clear that Norwich Pharmacal relief will not be ordered if it would require a party to peruse very large numbers of documents and expend considerable time and costs in the exercise.

*Notice*

A Norwich Pharmacal order will often contain a term prohibiting the third party required to provide disclosure (oftentimes, a bank) from disclosing to the wrongdoer the existence of the order.

### Bankers Trust

*Nature of relief*

This form of relief is derived from the decision of the English Court of Appeal in *Bankers Trust Company v Shapira* [1980] 1 WLR 1274. In this case, the order required a bank to disclose correspondence, cheques and banking records relating to accounts held by two suspected fraudsters.

Bankers Trust orders are usually obtained against banks or professional advisers, where there are particular issues relating to the question of confidentiality. A Bankers Trust order can be sought where the applicant claims a proprietary interest in assets of the alleged wrongdoer and/or

the application is made in aid of an interlocutory application for Mareva or Anton Piller relief. The jurisdiction to grant such orders is based on a combination of the powers of equity to take appropriate steps to restore a trust fund and an extension of the Norwich Pharmacal principle.

*Scope of relief*

The scope of Bankers Trust relief is wide and not restricted to the disclosure of the names of alleged wrongdoers. The Hong Kong courts have extended it to the discovery of bank books and documents such as account opening forms, signature cards and bank statements, to assist the applicant in the investigation of the movement of money in and out of bank accounts in tracing a potential claim. Orders made under the Bankers Trust line of authority may go beyond the scope of any order that might be obtained under either section 21 of the Evidence Ordinance (see below) or conventional Norwich Pharmacal principles.

*Availability of relief*

An applicant must demonstrate that there is a real prospect that the information sought might lead to the location or preservation of assets to which the applicant might make a proprietary claim to obtain relief. Any potential advantage to the applicant is weighed against any detriment to the third party against whom the order is sought, in particular in the invasion of privacy and breach of confidence to others.

*Notice*

In a pre-action context where the grant of the relief is ancillary to an application for Mareva or Anton Piller relief and the case is urgent, it is likely that the application will be made *ex parte*, without informing the suspected wrongdoer.

### Bankers' Books Evidence

*Nature of relief*

A banker in Hong Kong has a general implied duty to maintain secrecy about its customers' affairs. However, under section 21 of the Evidence Ordinance (Cap. 8), a bank can be ordered to provide a third party with access to entries in a banker's record. The Hong Kong courts have observed that section 21(1) is substantially the same as section 7 of the Bankers' Books Evidence Act 1879 in England and Wales.

*Scope of orders*

Any disclosure ordered is likely to be confined to documents necessary for the purpose of the particular interlocutory application, which may or may not be relevant to any subsequent fraud proceedings.

### Availability of orders

Under section 21, any party to any legal proceedings may make an application to the court for inspection and copying of entries in a banker's record for the purposes of those proceedings. For example, an application under section 21 might be made in a pre-action context in aid of proceedings to obtain a pre-action Mareva injunction or Anton Piller order.

The Hong Kong courts are cautious in exercising their jurisdiction under section 21 against third parties' bank accounts to avoid it being used as a means of oppression. An applicant will need to satisfy the court that, although the bank account is in the name of a third party, the account is in fact sufficiently closely connected to the alleged wrongdoer that items in it would be evidence against the wrongdoer at any subsequent trial.

*Use of material disclosed*

A copy of any entry obtained from a banker's record under section 21 can be admitted in any proceedings and is *prima facie* evidence of the matters, transactions and accounts recorded in the record, so long as:

(i) the entry was made or the matter was recorded in the ordinary course of business;
(ii) the record is in the custody or control of the bank; and
(iii) if not a photographic copy or a copy made by computer process within the meaning of section 20(3), the copy has been examined with the original and is correct.

*Notice*

Although an order under section 21 might be made without summoning the bank or any other party, in practice the court will usually require that notice be given to appropriate third parties before the order is made.

## 4. STEPS TO PRESERVE ASSETS/DOCUMENTS

### Preservation of assets

*Operation of freezing injunctions*

Consideration of whether and, if so, what steps should be taken to preserve the assets of the wrongdoer is a key aspect of an investigation into fraud. In Hong Kong, courts have the discretionary power to order freezing injunctions (referred to as Mareva injunctions following the English case *Mareva Compania Naviera SA v International Bulk Carriers SA* [1980] 1 All ER 213). Such injunctions have the effect of restraining wrongdoers (whether within the jurisdiction or not) from removing assets, whether money or goods, from any jurisdiction or from disposing of or otherwise dealing with assets. Mareva injunctions will be granted in respect of assets sufficient to satisfy an anticipated or existing judgment and take effect from the moment the injunction is pronounced.

Courts have the power to grant unlimited Mareva injunctions, but these will only be granted in wholly exceptional circumstances because such injunctions are considered to be highly intrusive in nature, given that an injunction seriously affects the rights of a person to deal with their assets.

*Grounds of grant*

The jurisdiction to grant a Mareva injunction is exercisable where it appears just and convenient to do so (this is often referred to as the 'balance of convenience' test). The court is likely to conclude that it is just and convenient to grant the injunction if the applicant can show on the evidence that:

- There is a 'good arguable case' on a substantive claim that it will succeed at trial. A Mareva injunction will only be granted in respect of an actual or threatened cause of action (an anticipated claim is not sufficient).
- There is a 'real risk' of dissipation of assets within the jurisdiction, or removal of assets from the jurisdiction, which would render the applicant's judgment of no effect. If a strong arguable case of fraud is established, that may be sufficient for the judge to infer that there is a risk of dissipation of assets.

*Other requirements*

The Hong Kong courts will only grant a Mareva injunction where it appears likely that the applicant will recover judgment against the wrongdoer for a certain or approximate sum. Further, the applicant must have reason to believe that the wrongdoer has assets within the jurisdiction (and be able to identify them) to meet the judgment, wholly or in part, but might deal with them so that they would not be available or traceable when judgment is given against him. The applicant is also expected to give an undertaking to pay damages to the respondent for any loss sustained by reason of the injunction if it subsequently transpires that it ought not to have been granted.

*Third parties*

Anyone who has notice or knowledge of a domestic Mareva injunction is obliged to do whatever they reasonably can to preserve the assets covered by its terms. If they assist in disposing of the assets or any part of them, they will be guilty of contempt of court as an act of interference with the course of justice. However, a third party served with a Mareva injunction owes no duty to the applicant to take reasonable care to comply with the terms of the injunction to prevent the dissipation of the assets. Accordingly, if a bank inadvertently pays funds out of the frozen accounts after receiving a Mareva injunction, it will be in contempt of court but will not be liable in damages to the party which obtained the order.

Worldwide Mareva injunctions differ from domestic injunctions in that third parties who are abroad will not be affected by the order until the order is recognised by the relevant foreign court by way of separate proceedings commenced in that foreign jurisdiction.

*Enforcement of worldwide Mareva injunctions in Hong Kong*

The English Court of Appeal has laid down eight guidelines for parties to follow when seeking permission to enforce worldwide Mareva injunctions obtained overseas (*Dadourian Group Int Inc v Simms* [2006] EWCA Civ 399).

The guidelines, which have been held to be applicable in Hong Kong, are as follows:

(i) The granting of Mareva injunctions in respect of assets located abroad should be just and convenient and not oppressive to the parties to the Hong Kong proceedings or to third parties who may be joined to the foreign proceedings.

(ii) All relevant circumstances and options need to be considered.

(iii) The interests of the applicant should be balanced against the interests of the other parties to the proceedings and any new party likely to be joined to the foreign proceedings.

(iv) Permission should not normally be given in terms that would enable the applicant to obtain relief in the foreign proceedings which is superior to the relief given by the Hong Kong injunction.

(v) The evidence in support of the application for leave should contain all the information (insofar as it can reasonably be obtained in the time available) necessary to enable the judge to reach an informed decision.

(vi) The applicant must show that there is a real prospect that assets are located within the jurisdiction of the foreign court.

(vii) There must be evidence of a risk of dissipation of the assets in question.

(viii) Normally the application should be made on notice to the respondent, but in cases of urgency, where it is just to do so, leave may be given without notice to the party against whom relief will be sought in the foreign proceedings. That party, however, should be given the earliest practicable opportunity of having the matter reconsidered by the court at a hearing of which it is given notice.

## Preservation of documents

*Operation of search and seizure orders*

Taking steps to preserve documents in order to prevent the destruction of evidence is often another central part of an internal investigation. One means of preserving documents is to obtain a search and seizure order (referred to as an Anton Piller order in Hong Kong, following the English case *Anton Piller KG v Manufacturing Processes Ltd* [1976] 1 All ER 779). Such orders require the wrongdoer to permit the applicant to enter the wrongdoer's premises to search for documents which relate to the infringement of the applicant's rights (and in some circumstances remove such documents, and detain and preserve them pending the trial of the action). As an Anton Piller order does not amount to a search warrant, no forcible entry to the wrongdoer's premises can be made. The party executing the order is not permitted to break open the wrongdoer's door and enter the premises if the wrongdoer refuses entry. However, a wrongdoer who fails to comply with the order can be committed for contempt of court and may be liable to imprisonment.

Granting an Anton Piller order is a matter of discretion for the court, as is whether an Anton Piller order should be granted in respect of persons or premises located abroad.

*Grounds of grant*

The court will only grant an Anton Piller order where it is necessary in the interests of justice, and then in terms no wider than is necessary to achieve the legitimate objective of the order. The court will also be wary of avoiding misuse of the procedure. Case law has established the following four conditions for the granting of an Anton Piller order:

(i) there must be a strong *prima facie* case of a civil cause of action: suspicion that there may be a cause of action is not sufficient;

(ii) the danger (actual or potential) to be avoided by the grant of the order must be serious to the applicant;

(iii) the respondent has relevant materials or documents in his possession and there is a real possibility that he might destroy or dispose of them before an *inter partes* hearing; and

(iv) the harm likely to be caused by the execution of the order to the respondent and his business affairs must not be excessive or out of proportion with the legitimate object of the order.

The applicant will also be required to enter into an undertaking as to damages in favour of the respondent (see paragraph 3.1 above).

## Other preservatory steps

Before an action is commenced in Hong Kong, the court also has the power to make other orders in respect of property which may become subject to subsequent proceedings. These powers enable the courts to make orders providing for the inspection, photographing, preservation, custody and detention of such property.

## Privilege against self-incrimination

Generally, a person cannot be compelled to produce any document or answer any question if to do so would tend to expose that person to criminal proceedings under Hong Kong law (save in certain specific circumstances under various statutes, such as in relation to offences under the Theft Ordinance (Cap. 210), investigations under the Securities and Futures Ordinance (Cap. 571) and proceedings relating to intellectual property rights (section 44A HCO)). The privilege applies in the context of Mareva injunctions and Anton Piller orders (and ancillary orders; see the section on Procedure below) but does not extend to criminal proceedings overseas. The court should not grant such orders if it would be contrary to the privilege against self-incrimination.

A distinction is drawn between (i) statements that come into existence under compulsion with regard to an offence previously committed and (ii) statements made in the course of committing the offence. The former are protected by the privilege against self-incrimination; the latter are not. This reflects the purpose of the privilege – to respect the right of an accused to remain silent, ensuring that they are not compelled to provide proof of their own guilt. Consequently, the privilege has no application in respect of evidence which exists independently of this right of an accused (*HKSAR v Lee Ming Tee* [2001] 1 HKLRD 599).

In the context of searches, a wrongdoer may be entitled to refuse to deliver up potentially self-incriminating documents.

## Procedure

*When steps should be taken*

An applicant can apply for a Mareva injunction or Anton Piller order at any stage of proceedings, including before an action is commenced in cases of urgency, eg where there is a risk that the wrongdoer will dissipate assets on learning of the proceedings. In any event, the application should be made without undue delay. If there is a significant delay, the application may be refused.

*Without notice applications*

An applicant can apply for a Mareva injunction or Anton Piller order without notice to the respondent, in cases of urgency or where the purpose of the order would be frustrated by notice being given. Where this is the case, applicants must comply with a strict duty of full and frank disclosure. Material non-disclosure could lead to the discharge of the injunction.

*Ancillary orders*

For the purpose of rendering Mareva injunctions and Anton Piller orders effective, the Hong Kong court also has the power to make orders requiring the wrongdoer to:

(i) make a statement disclosing his assets;
(ii) give discovery of relevant documents; and
(iii) answer interrogatories.

In the case of Mareva injunctions, such orders will be granted where designed to ascertain the existence, nature and location of assets, although not to provide information to show that the respondent has been dissipating such assets.

*Breach*

A person who has disobeyed a Mareva injunction (for example by dissipating assets) or an Anton Piller order (for example by destroying documents) is guilty of contempt of court, punishable by imprisonment.

*Discharge*

A party whose property is subject to an injunction may apply to have the injunction set aside on the ground that: (i) there has been a material change of circumstances since the injunction was first granted (for example a crucial new factual development); or (ii) since the injunction was granted, it has become apparent that the injunction was founded upon an erroneous view of the law. The Hong Kong court is also prepared to set aside injunctions which were granted without notice, if full and frank disclosure has not been made, or on the ground that the applicant has been guilty of delay in proceeding with the action.

## 5. CIVIL PROCEEDINGS

### General

Following an internal investigation into fraud, the company will need to give consideration to whether to bring civil proceedings against the wrongdoer and/or any third parties who may have assisted in the commission of the fraud or handled the company's assets in order to recover the value of those assets and, if so, the nature of the proceedings to bring. This section outlines the processes of following and tracing, and considers some of the civil causes of action and remedies that are available to a defrauded company in Hong Kong.

### Asset following and tracing

*General*

The processes of following and tracing are separate means by which fraudulently obtained assets or their value can be located, enabling the defrauded party to exert equitable ownership over the asset in question. The principle of following can be applied to identify fraudulently obtained assets which have been passed from one party to another. Tracing can be used where assets have been dissipated or converted and new assets are identified as substitutes for the original assets.

A company seeking to follow or trace assets and obtain their return has largely the same causes of action and remedies in Hong Kong as are available in England and Wales. There has been little codification or statutory modification in this area of law.

*Following assets*

Assets can be followed wherever a fiduciary relationship exists between the parties. The principle can also be applied where legal title to fraudulently acquired assets has been passed to an innocent volunteer and, due to the previous breach of trust or breach of fiduciary duty, an equitable proprietary interest has attached to those assets. However, trust property cannot be followed into the hands of 'equity's darling', ie the purchaser for valuable consideration without notice of the breach of trust. In this situation the claim of a defrauded company would be extinguished, although it might be possible to trace the company's equitable interest into the proceeds of sale.

*Tracing assets*

The general rule of asset tracing is that the value of money or property which has been wrongfully dissipated or converted in breach of trust can be followed into the proceeds (including mixed funds), so long as and to the extent that it is capable of being identified.

Tracing involves the defrauded party proving:

- what has happened to its assets;
- that identifiable proceeds exist;
- the identity of third parties who have handled or received them; and
- that the proceeds can properly be regarded as representing the value in the defrauded party's assets.

Tracing is only possible where fraudulently obtained money still exists either as a separate fund, as part of a mixed fund or as the value in property acquired using such funds.

## Constructive trust claims

*Cause of action*

A company might be able to obtain relief against fraud in equity. The wrongdoer or any other person sufficiently implicated in a fraud can be held liable to account in equity for fraudulently obtained assets as a constructive trustee. This includes third parties who have knowingly received trust property or its traceable proceeds which were transferred in breach of trust or who have knowingly assisted in a trustee's breach of trust.

Notwithstanding the use of the term constructive trustee, a recipient of fraudulently acquired assets can be held accountable as a constructive trustee notwithstanding that they are neither a trustee nor owe a fiduciary duty to the defrauded company. The recipient of the fraudulently acquired assets is simply treated as a trustee in equity for the purposes of being held to account for the defrauded assets.

*Remedies*

If a wrongdoer mixes fraudulently acquired funds with their own money, the defrauded party will have a charge on all the money or securities which includes the value of the fraudulently acquired money as against the wrongdoer. If a mixed fund has appreciated in value, the charge will be over an amount corresponding to the proportional increase in the value of the fund that can be attributed to the trust money, and not just the original amount of the trust money.

Where the wrongdoer has made a profit from the improper use of funds held on constructive trust (for example, by investment in trade or speculation), the wrongdoer will be held liable to make good to the defrauded company the amount of any profit made, as well as the amount defrauded, or for damages representing the financial return the defrauded company would have received for the same period had it not been defrauded of the trust property.

## Tort of conspiracy

*Cause of action*

Where two or more employees have conspired together to commit fraud, their company could consider bringing a civil claim against the fraudulent employees in the tort of conspiracy. Even where the primary or predominant purpose of the employees in committing the fraud was to further or protect some legitimate interest of their own if, in addition, they intended to cause damage to their employer, their actions will be tortious as they used unlawful means to protect their interests.

In order to make out a tortious claim of conspiracy, the defrauded company must establish:

- the existence of an agreement;

- that the employees committed unlawful acts (ie the fraud);
- the fact that the fraud was committed pursuant to the agreement: a combination and common intention between the parties will suffice as an agreement; and
- the intended damage to the defrauded company. The Hong Kong court has held that actual damage need not be shown, as long as the intended actions were expected to cause damage.

*Remedies*

If a defrauded company successfully makes out a claim of conspiracy, it can obtain damages for the loss suffered as a result of the conspiracy. Due to the involvement of fraud, the scope of damages recoverable is wider than for tortious claims involving negligence – it is arguable that only indirect consequences of the wrongdoer's fraudulent conduct would be irrecoverable. It has been held that expenses incurred by the defrauded company in exposing and resisting the fraudulent activities of the wrongdoers can be sought as damages directly caused by the conspiracy.

### Fraudulent misrepresentation

*Cause of action*

A fraudulent misrepresentation by an employee can be used as a base on which to found a civil action for the tort of deceit in circumstances where the employer relies on that representation and suffers loss as a result. The threshold for establishing a fraudulent misrepresentation is relatively low. It is necessary to show that:

(i) the employee knew or believed the representation to be false when they made it; or

(ii) the employee did not actually and honestly believe the false representation to be true when they made it. In other words, they were reckless as to the truth of their statement.

The employee's motive in making the misrepresentation is irrelevant if the two criteria stated above are proved. Proof of absence of actual and honest belief in the statement is all that is necessary. However, an employee will not be fraudulent if they believed their statement to be true in the sense in which they understood it, provided that was a meaning which might reasonably be attached to it.

Where a representation is a continuing one and the employee subsequently discovers that their representation was false or that there has been a change in circumstances which has rendered it false, the employee is under a duty to disclose the changed situation to the company. Failure to discharge this duty could result in the employee being liable for dishonestly failing to disclose the change in the situation.

*Remedies*

Where a company relies on an employee's fraudulent misrepresentation and is induced to alter its position as a consequence, the defrauded company can seek common law damages or an account of profits in equity.

The damages sought can cover:

- loss arising out of a contract entered into in reliance on the fraudulent misrepresentation;
- loss of money paid to the wrongdoer or a third party;
- loss of property;
- in certain circumstances, loss of profits; and
- any other detriment which is ascertainable in monetary terms.

## 6. ANTI-BRIBERY/ANTI-CORRUPTION LEGISLATION

### Legislative framework

*General*

Corrupt activities in both the private and public sectors in Hong Kong are prohibited under the Prevention of Bribery Ordinance (Cap. 201) (the POBO).

*Public sector bribery*

Under the POBO, the offence of bribery of domestic public officials is committed when any person, whether in Hong Kong or elsewhere offers an 'advantage' to a public servant or the Chief Executive of Hong Kong for performing, or influencing the performance of, any act in his capacity as a public servant or the Chief Executive, or for influencing any business transaction between any person and a public body. This provision gives extra-territorial effect to the prohibition against public sector bribery (note the words 'whether in Hong Kong or elsewhere').

There are also specific public sector bribery offences in relation to:

- offering, soliciting or accepting an 'advantage' in connection with a contract with, or an auction conducted by or on behalf of, a public body;
- offering, soliciting or accepting an 'advantage' for procuring the withdrawal, or the refraining from the making, of a tender for any contract with a public body;
- offering an 'advantage' to a prescribed officer or public servant whilst having dealings with the government or a public body that employs that officer or public servant; and
- a prescribed officer or the Chief Executive possessing unexplained property.

The POBO does not specifically prohibit the bribery of foreign public officials in Hong Kong. However, in *B v The Commissioner of the Independent Commission Against Corruption* (2010) 13 HKCFAR 1, the Hong Kong Court of Final Appeal confirmed that it is an offence for a foreign public official to solicit or accept an 'advantage' in Hong Kong, without his principal's informed consent, in connection with performing or abstaining from performing certain acts (in his capacity as a foreign public official) in a place outside Hong Kong.

*Private sector bribery*

An offence is committed under the POBO when any of the following acts take place without lawful authority or reasonable excuse:

- offering an 'advantage' to an agent without the permission of his principal, as an inducement to, a reward for or otherwise in connection with his performance or abstaining from performance of any act, or his favouring/disfavouring of any person; or
- as an agent, soliciting or accepting an 'advantage' as an inducement to, a reward for or otherwise in connection with his performance or abstaining from performance of any act, or his favouring/disfavouring of any person, in relation to his principals' affairs or business.

If an agent/employee solicits or accepts an advantage with the permission of his principal/employer then neither they nor the person who offered the advantage will be guilty of an offence. For the principal's/employer's consent to be a defence it must be given before the advantage is offered, solicited or accepted, or, in any case where an advantage has been offered or accepted without prior permission, the permission must be applied for and given as soon as reasonably possible after the offer or acceptance. Furthermore, the permission will only be effective if, before it is given, the principal/employer has regard to the circumstances in which it is sought.

*The meaning of 'advantage' and the completion of the offences of soliciting and accepting*

'Advantage' is broadly defined to mean any money, gifts, commissions, offices, contracts, services, favours and discharge of liability, in whole or in part, but does not include an election donation within the meaning of the Elections (Corrupt and Illegal Conduct) Ordinance. Entertainment is specifically excluded from the definition. So, for instance, providing food and drink for consumption on the occasion when it is provided, and any other entertainment connected with or provided at the same time as the food and drink, is not prohibited.

The offences of soliciting and accepting an advantage are complete at the moment when the solicitation is made or the acceptance takes place. It does not matter whether, subsequently, the act or omission in respect of which the solicitation or acceptance was made actually takes place, or whether the corrupt purpose is achieved.

*Offences attributable to corporate entities*

The POBO does not contain a specific offence for corporate entities relating to bribery. Nor does it expressly attribute the liability of a corporation to its directors or officers. Cases involving the prosecution of a corporate entity for a substantive bribery offence under the POBO are rare. Usually individuals, and not corporations or partnerships, are held criminally liable.

However, the ambit of the POBO is wide enough to hold corporations liable for offences committed by their employees or agents. Where individuals are the controlling mind of the company, these individuals are more likely to be the subject of prosecution than the corporate entity,

and they can be held liable for the acts of their company which amount to offences under the POBO.

## Enforcement

*The Independent Commission Against Corruption*

The Independent Commission Against Corruption Ordinance (Cap. 204) sets out the scope of the investigative and enforcement powers of the Independent Commission Against Corruption (the ICAC), which is the principal agency responsible for fighting corruption in Hong Kong through law enforcement, prevention and community education. It is independent from the civil service and reports directly to the Chief Executive of Hong Kong as an autonomous unit.

*The powers of the ICAC*

The ICAC has extensive investigative powers. During the course of an investigation, the ICAC may:

- require a witness to provide information and produce documents by court order;
- arrest and require that person to attend interviews under caution;
- require a suspect to disclose details of property, expenditure and liabilities;
- generally, with the court's sanction, search premises and, with or without the court's sanction, seize evidence; and
- require a suspect to surrender his travel documents by court order.

The ICAC can also apply *ex parte* to the court under the POBO for a restraining order to freeze property which might represent the proceeds of a corruption offence, pending the conclusion of the investigation or any subsequent proceedings.

## Criminal sanctions and recovery from the agent/employee

*General*

The Hong Kong courts take a serious view of corruption. Public and private sector bribery are regarded as equally serious because both affect the public interest. The imposition of deterrent sentences is advocated by the Hong Kong courts and immediate custodial sentences are not uncommon. The maximum sentence under the POBO is 10 years' imprisonment and a fine of HK$1,000,000.

*Confiscation of assets and return of property to victim*

Section 12(1) of the POBO provides that a person convicted of an offence *'shall be ordered to pay to such person or public body and in such manner as the court directs, the amount or value of any advantage received by him, or such part thereof as the court may specify'*.

Section 84 of the Criminal Procedure Ordinance (Cap. 221) empowers the court to order the return of property from the convicted person to a victim direct by ordering the return of property.

A number of remedies in the civil proceedings context are also available to recover the proceeds of an offence under the POBO, including proprietary claims, actions based on breach of contract and/or unjust enrichment.

The Hong Kong courts have granted equitable relief to ensure that wrongdoers are disgorged of their profits. If the proceeds of corruption have been invested, then the wronged principal/employer may also be entitled to recover the profits made or interest earned by the wrongdoer as well as the principal sum, especially where the wrongdoer stood in a fiduciary relationship to the principal/employer. In *Attorney General for Hong Kong v Reid* [1994] 1 AC 324, the Privy Council held that the fiduciary who received a bribe held it on constructive trust for the principal. The Hong Kong courts considered *Reid* in *Secretary for Justice v Hon Kam Wing* [2003] 1 HKLRD 524, and accepted that equity regarded the bribe as a legitimate payment which was intended for the principal. Such payment had to be handed over to the principal immediately upon receipt and equity imposed a constructive trust over it for the benefit of the principal.

Other, more traditional, civil remedies can also be sought against the wrongdoers by a party harmed by their conduct. The relevant relief will depend upon the particular circumstances; for example, a principal/employer might be able to sue a corrupt agent/employee for breach of service or employment contract.