UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
YIEN-KOO KING,                                          :
                                                        :
                        Plaintiff,          :     Civ. Action No.: 1:14-cv-07694 (LJL)
                                                        :
        -against-                                     :     **DECLARATION OF**
                                                        :     **ANDREW WANG**
ANDREW WANG, et al.,                                    :
                                                        :
                        Defendants.         :
-----------------------------------------------------------X

        1.        I am a Defendant in this action. I make this declaration in opposition to Plaintiff's motion for sanctions, and have personal knowledge of the facts set forth herein.

        2.        I understand that my aunt, Y.K. King, is suggesting that I perjured myself or changed my testimony from my 2013 deposition to my 2019 deposition. That is simply not true.

        3.        It is important to understand that I am not a native English speaker. I was born in China and my first language is Mandarin Chinese; I learned English after immigrating to the United States in 1979. While I speak and understand English well enough to communicate, my English is not always perfect in idiom or nuance, or grammatically correct. I understand that my aunt is leveraging that to make it seem like my deposition testimony was contradictory when it was not.

        4.        For example, I am informed that Y.K. is arguing that when I testified in 2013 that "I kn[e]w" the buyers of the Estate paintings, that contradicted my 2019 testimony that I did not have personal relationships with some of the buyers, and that the negotiations were conducted through the buyers' agent, Er Shi Fu. There is no contradiction. When I testified (about, for example, Anthony Chou and Chen Mei Lin) that "I know him," that meant only "yes, I know who that person is." If you asked me "do you know Michael Jordan" my answer would be "yes, I know him." That doesn't mean that Michael Jordan and I have ever met, let alone that we are friends in the sense that the word "friend" is used in English.

5. That is exactly why, for example, I testified that I was not even sure whether Mr. Chou was based in Shanghai or Beijing. Though both Shanghai and Beijing are major Chinese cities, they are more than 1,000 kilometers apart.

6. The same applies to Yong Qing Ye, a modern Chinese painter I have met personally. I understand that Y.K. is arguing that my use of the word "friend" implies some sort of close personal relationship. It does not. In Chinese grammar, we refer to someone as a "friend" if they travel in the same general circles, even if we have only personally met once or twice; Mr. Ye was a friend through Mr. Fu's.

7. I understand that Y.K. is arguing that I "changed" my testimony because I mentioned Fu Ershi in my 2019 testimony, but not in 2013. Mr. Fu's role did not become relevant until Y.K. developed her crazy theory, during the course of this litigation, that I invented the buyers, and Y.K. did not ask any questions in 2013 about how the negotiations were conducted, which would have prompted me to mention Mr. Fu. The questions were about whether I knew who the buyers were, and about how they paid, and – for one buyer, Yue Da Jin, who the first person to introduce me to him was. If I remember correctly, by that point Y.K. had not even claimed that the buyers were "straw men" buying on my behalf (which is not true) let alone invented people (which is also not true). It was only when Y.K. started suggesting that my lack of direct correspondence with the buyers meant that they must not have existed that it became meaningful for me to explain how we communicated in arranging the sales. Had I been asked at deposition in 2013 about my communications in arranging the sales, I would have testified about Mr. Fu at that time, as well.

8. I understand that Y.K. is similarly misconstruing my testimony about Billie Wai, who was the employee of my Hong Kong accounting firm, CK Lam & Co., who was designated to be the addressee who would receive the art shipments on behalf of the buyers. As I testified at deposition in 2013, Billie Wai was not a person I was familiar with or who I had any real communications with

other than learning that she was the person at CK Lam to whom the shipments should be addressed. I had not given her any thought since 2009. For that reason, I did not recognize Ms. Wai's name when I was first asked about her at deposition in 2013, and that is why I was able to answer questions about her once my memory was refreshed that she was the person at CK Lam who had received the shipments – or, at least, I was able to explain that she was that person, that I did not really know her previously, and that she was simply the person at the office who was receiving the shipments. Ms. Wai was not someone I had not paid particular attention to until she was designated to receive the shipments, as she generally just sat quietly in the office.

9. In 2019, the transcript of my deposition reads like I testified that I had attempted to obtain documents from "my accountant Billie Wai's office." I was not saying that Billie Wai, personally, was my accountant - I said that I went to seek documents from my accountant, and continued to clarify that I meant the same office that Billie Wai worked in. I am informed that the video and audio from my deposition confirms that I said "I even went to the bank to look for it, including my accountant, [pause] uh, Billie Wai's office …"

10. I understand that Y.K. King is also suggesting that I destroyed or decided not to keep documents relating to Le Style Ltd., which I understand the bank records suggest was the corporation I used to enable buyers to transfer money out of China to pay for the paintings, in order to prevent her from having access to the documents in this litigation. That is absolutely not so. In fact, I wish I had kept those documents, so they would be available to prove that her claims are the crazy conspiracies that they are.

11. The reality is that I never made any effort at all to retain documents relating to Le Style – which I would have formed around the time of the first of the transactions, given that the bank records tell me that was the corporation I used for that purpose – because I never expected to need them. The only purpose of Le Style was to facilitate those funds transfers – it never did any

business and I had no personal need to keep the records. Even in my wildest nightmares, I never imagined that Y.K. would ever come up with a conspiracy theory so crazy that she would suggest that the buyers did not actually exist, and that the money for the purchases of the paintings really came from me; if I had any idea that would eventually be a claim, I would have kept the records. From my standpoint as the Preliminary Executor, and based on what I knew at the time of the transactions – 2005, 2006, and 2009 – the only documentation I needed was documentation that the prices had been set based on the process the Public Administrator had established, and that the Estate had received the purchase prices for the sales. I had no reason to expect that documents relating to the mechanics of how the buyers transferred that money would ever be relevant to anything, and no reason to keep those records.

12. For that reason, I did not maintain files on Le Style's incorporation, and I didn't maintain a file of Le Style's bank records. Because I had no reason to print those bank records, they were gone in 2005, 2006, and 2009 – when the transactions happened. Similarly, I have no reason to think that I still had any documents relating to Le Style's corporate formation in 2011, when Y.K. claims I should have known she would invent her conspiracy theory.

13. To be clear, Y.K.'s accounting petition did not give me any notice at all that she would later claim that the buyers of the Estate's art were acting on my behalf or were fictional. Her petition alleged only that "[s]everal works of art which are allegedly part of the estate have recently been depicted in the catalogues, exhibited and/or offered for sale at various auction houses, studios and museums in China and Hong Kong and petitioner has reason to believe that some or all such works have been sold without obtaining full market value …"

14. The only things that petition informed me was: (1) some of the art the Estate had sold was being exhibited or resold by the buyers (or people who had bought from them in the interim), which I already knew; and (2) that Y.K. was alleging that the Public Administrator and I

4

had not achieved a good enough price for the art when we sold it. Nothing in that petition warned me about the nonsense that Y.K. would later claim.

15. I also understand that Y.K. is claiming that I "lied" by not listing Le Style in my interrogatory answers as a bank account I had once controlled. At the time that I provided answers to my attorneys, I did not recall that Le Tao Ltd. and Le Style were two separate companies, and thought that Le Tao was the corporation I had used to aid the buyers in sending money to the Estate to pay for the paintings. (By then, it was roughly a decade since the transactions and Le Tao, like Le Style, was a corporation that had no business at all. I had set up Le Tao as the purchaser of my family's Long Island home, to receive the gift of the purchase money from my mother-in-law, before being advised that it would be better to have the purchase done by a trust rather than a corporation, which is why I had the SK Wang Irrevocable Trust set up. From that point forward, I did not think about or remember Le Tao until I learned that Y.K. had identified it and raised it in this litigation, and therefore added it to my interrogatory responses). I only realized and remembered that I had used a different corporation to facilitate the transactions – Le Style – when I saw that name on documents as I prepared for my deposition in 2019.

16. Having had my memory refreshed, I testified about Le Style in that 2019 deposition. (I understand that Y.K. is also claiming I "lied" in my 2013 deposition by not mentioning Le Style in response to a question about companies I owned from 2003-2013. I understood that question as asking about companies I had owned *continuously* through that period, not "at any point during that period" – but even if I had understood the question correctly, I still wouldn't have mentioned Le Style by name, because I had forgotten the name by then.) Unlike Y.K., who either lied to the bankruptcy court (by leaving Northwich and Soon Huat off of her bankruptcy schedules) or to this Court and the Surrogate's Court (by repeatedly claiming to own Northwich and Soon Huat, which

she does not), I do not lie in court proceedings or filings, even if I think it might help my case. I tell the truth to the best of my ability and memory.

17. Given how long this litigation has gone on, and how far back the events in question were, I am not surprised that my memory has not been perfect in every detail. For example, I am informed that in my deposition testimony in 2013 I forgot Elin Ewald's name, though we had interacted many times in 2005, 2006, and 2009, when the sales were occurring, and though I now remember her name after having had my memory refreshed by litigation. But at the time of my deposition in 2013, I could not recall her name, because it had just been too long since I had thought about it, or her. (Obviously, nobody will suggest that my failure to recall Ms. Ewald's name was a stratagem or a lie). That is exactly what happened with Billie Wai, Le Tao, Le Style, and other names from a decade ago – I forgot about them, until my memory was refreshed.

18. I have not lied to this Court, and I will continue to tell the truth – whether Y.K., or the jury, or anyone else believes what I am saying or not. It is all I can do.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 22, 2021

ANDREW WANG