UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YIEN-KOO KING.

                                    Plaintiff,

          -against-

ANDREW WANG, SHOU-KUNG WANG, BAO WU
TANG, JIAN BAO GALLERY, ANTHONY CHOU,
CHEN-MEI LIN, WEI ZHENG, YE YONG-QING, YUE
DA-JIN and JOHN DOES 1-9,

                                    Defendants.

1:14-Civ-07694 (LJL) (JLC)

# PLAINTIFF'S COMBINED REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HER OMNIBUS MOTIONS IN LIMINE AND MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. RULE 37

SAM P. ISRAEL, P.C.
Sam P. Israel (SPI0270)
Timothy Savitsky (TS6683)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

# T<small>ABLE OF</small> C<small>ONTENTS</small>

T<small>ABLE OF</small> A<small>UTHORITIES</small> ...................................................................................................... ii

P<small>RELIMINARY</small> S<small>TATEMENT</small> ...........................................................................................1

A<small>RGUMENT</small>...............................................................................................................2

**Point 1**: **The Wangs Are Collaterally Estopped from Contesting the Issues Already Decided by the 2017 Probate Trial Verdicts** ....................................................2

**Point 2**: **The Bao Wu Tang Catalogue Is Not Hearsay Because It Is a Statement of A. Wang and His Gallery or, Alternatively, Was Adopted by Them** ...............5

**Point 3**: **The Artron and Artnet Records Are Excepted from Hearsay** .......................7

**Point 4**: **The Wangs Spoliated Evidence, Submitted False Interrogatory Responses, and Extensively Lied Under Oath—Striking Their Affirmative Defenses and Issuing Adverse Inferences Are Appropriate Sanctions**................................13

    *i.*    *The 2015 Amendment to Rule 37(e) Does Not Alter the Outcome of the Motion Since the Plaintiff Has Provided Evidence That the Non-Production Was Intentional and the Sanctions Are Not Premised on the Destruction of ESI* 14

    *ii.*   *The Wangs Had an Obligation to Retain the Incorporation Records and Their Corporate Financial Records and Their Failure to Do So Prejudiced the Estate* ...........................................................................................................16

    *iii.*  *The Plaintiff Has Not Distorted A. Wang's Deposition Testimony* .............18

    *iv.*  *The Failure to Produce an Asset Schedule Related to the S.K. Trust Warrants Sanctions* ....................................................................................................21

    *v.*   *The Court Has Inherent Power to Strike the Wangs' Affirmative Defenses Because of the Their Non-Disclosures, False Interrogatory Responses, and Extensive Perjuries and Should Exercise that Power*...................................23

C<small>ONCLUSION</small> .........................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*ABF Freight Sys., Inc.* v. *N.L.R.B.*,
510 U.S. 317 (1994)..................................................................................................23

*CIT Grp./Equip. Fin., Inc. v. Landreth,*
2007 U.S. Dist. LEXIS 93372, 2007 WL 4554224 (E.D. Tenn. 2007).......................................10

*Doe v. Norwalk Cmty. College*,
248 F.R.D. 372 (Dist. Conn. 2007) ........................................................................22

*Goldman v. Rio*,
788 Fed. Appx. 82 (2d Cir. 2019)...........................................................................4

*In re Anolik*,
274 A.D.2d 515 (2d Dep't 2000)..............................................................................16

*In re Gonch*,
435 B.R. 857 (Bankr. S.D.N.Y. 2010) .......................................................................11

*In re Robson*,
369 B.R. 377 (Bankr. N.D. Ill. 2007) ......................................................................11

*Lewin v. Richard Avedon Found.*,
No. 11-cv-8767, 2015 U.S. Dist. LEXIS 83452, *31-32, 2015 WL 3948824
(S.D.N.Y. Jun. 26, 2015) ........................................................................................3

*Marcelino v. 374 Food, Inc.* ("*Marcellino I*"),
No. 16-Civ.-6287, 2018 WL 1517205, 2018 U.S. Dist. LEXIS 51582
(S.D.N.Y. Mar. 27, 2018) ................................................................................ 2, 23-24

*Marcellino v. 374 Food Inc.* ("*Marcellino II*"),
No. 16-Civ.-6287, 2019 U.S. Dist. LEXIS 213664 (S.D.N.Y. Dec. 11, 2019) ...........................24

*Matter of Sanchez*,
No. 2001-3187/G, 2017 N.Y. Slip Op. 32685(U), (Sur. Ct. New York Cnty. Dec. 28, 2017)......16

*Mosdos Chofetz Chaim Inc. v. Mosdos Chofetz Chaim Inc.* (*In re Mosdos Chofetz Chaim Inc.*),
624 B.R. 576 (Bankr. S.D.N.Y. 2021).........................................................................13

*Ottoson v. SMBC Leasing & Fin., Inc.*,
268 F.Supp. 3d 570 (S.D.N.Y. 2017).........................................................................15

*Pastorello v. City of New York*,
No. 95-CV-470, 2003 WL 1740606, 2003 U.S. Dist. LEXIS 5231 (S.D.N.Y. Apr. 1, 2003) ......13

*Raymond v. City of New York*,
No. 15-cv-6885, 2020 WL 1847556, 2020 U.S. Dist. LEXIS 64601(S.D.N.Y. Apr. 13, 2020) ...15

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002)................................................................................................13

*Shaid v. Consolidated Edison Co.*,
95 A.D.2d 610 (N.Y. App. Div. 1983) ...............................................................................5

*Sovereign Bank, F.S.B. v. Finnegan*,
358 B.R. 644 (Bankr. M.D. Pa. 2006) ...............................................................................10

*United States v. Dunnigan*,
 507 U.S. 87 (1993)............................................................................................................24

*United States v. Roldan-Zapata*,
916 F.2d 795 (2d Cir. 1990)................................................................................................2

*United Sates v. Tocco*,
135 F.3d 116 (2d Cir. 1998)................................................................................................6

*United States v. White*,
571 Fed. Appx. 20 (2d Cir. 2014).......................................................................................5

## STATUTES, RULES, REGULATIONS

18 U.S.C. §1621 ................................................................................................................24

N.Y. C.P.L.R. 4519 ............................................................................................................3

Fed. R. Evid. Rule 801(d)(2)(A) ........................................................................................5

Fed. R. Evid. Rule 803(17) ...........................................................................................7, 10

The Plaintiff Y.K. King[1] submits this combined reply memorandum of law (the "Reply Brief") in further support of her motion in limine for evidentiary rulings prior to trial (the "King Motion in Limine"; ECF Dkt. 251) and her motion for sanctions and adverse inferences (the "Sanctions Motion"; ECF Dkt. 248). The Reply Brief is submitted in response to the Defendants' combined memorandum of law in opposition to the King Motion in Limine and the Sanctions Motion (the "Wang Opposition Brief"; ECF Dkt. 262), and the Declaration of Akiva Cohen in Opposition, dated April 23, 2021 (the "4/23/21 Cohen Declaration"; ECF Dkt. 264), together with the Declaration of Andrew Wang, dated April 22, 2021 (the "A. Wang Declaration"; ECF Dkt. 265). The Reply Brief incorporates by reference the Declaration of Timothy Savitsky, dated April 8, 2021, filed in support of the Sanctions Motion (the "4/8/21 Savitsky Decl."; ECF Dkt. 249) and the Declaration of Timothy Savitsky, dated April 9, 2021, filed in support of the King Motion in Limine (the "4/9/21 Savitsky Decl."; ECF Dkt. 252).

## PRELIMINARY STATEMENT

The Wangs' most recent submission makes one thing clear: they fully intend to continue their perjury at trial. The A. Wang Declaration attempts to reconcile his past testimonies and label this self-dealing action—in which he, the former Estate fiduciary, indisputably paid for 98 Estate Paintings, shipped them to his accountant, then displayed them at the BWT Exhibition without disclosing his actions to anyone—the product of the Plaintiff's "crazy conspiracies" and "crazy theory" of liability. A. Wang Decl. at ¶¶7, 10. The Wangs' attempt to dodge the implications of their handling of the paintings, however, merely highlights the need for this Court to take corrective action for their misconduct during discovery and prophylactic action to prevent their incoherent perjury from undermining the integrity of the judicial process at trial.

---

[1] The Plaintiff hereby incorporates by reference each of the definitions of terms set forth in her Omnibus Memorandum of Law in Support of Motion in Limine.

The Plaintiff respectfully submits that this level of misconduct cannot simply be sorted out by the jury; it necessitates judicial stewardship. As in the case of *Marcelino v. 374 Food, Inc.* ("*Marcellino I*") A. Wang has clearly been "making up answers as he [goes] along" regardless of how fantastical or blatantly inconsistent they are. No. 16-Civ.-6287, 2018 WL 1517205, 2018 U.S. Dist. LEXIS 51582, (S.D.N.Y. Mar. 27, 2018).  Just as in that case—in which the Court ultimately tossed out a favorable verdict in the plaintiff's favor because of his extensive perjury—this Court should review the Wangs' impossible testimonies and take action against them lest they be emboldened to dial-up their efforts at trial.

<u>**ARGUMENT**</u>

<u>**Point 1**</u>**: The Wangs Are Collaterally Estopped from Contesting the Issues Already Decided by the 2017 Probate Trial Verdicts.**

The three verdicts from the 2017 Probate Trial are probative of the criminal narrative and the formation of the Wang Family enterprise in 2003. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) ("Here, the prior act evidence was admissible 'to inform the jury of the background of the conspiracy charged,' *id.*, 'to complete the story of the crimes charged' *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986), *cert. denied*, 490 U.S. 1022, 109 S. Ct. 1750, 104 L. Ed. 2d 187 (1989), and to 'help explain to the jury how the illegal relationship between participants in the crime developed,' *id.* at 590.").

The Wangs' arguments against jury instructions relating to the three verdicts under the doctrine of collateral estoppel are addressed as follows. First, they claim the fraud verdict is "equivocal" because it does not specifically identify *which* of the two Wang defendants spoke the words which defrauded C.C. Wang into executing the February 18, 2003 will—despite the verdict unequivocally stating that it was one or both of them. Wang. Opp. Brf. at 1. If one of the two defrauders identified by the fraud verdict was a non-defendant to this action, the Wangs might

2

have a legitimate argument. But since they are both co-defendants here charged with conspiring to commit the same crimes on behalf of the same criminal enterprise, they do not.  The fraud verdict is therefore relevant and preclusive. *See Matter of Wang*, 179 A.D.3d 418 (N.Y. App. Div. 2020) (finding collateral estoppel precluded the probate of a codicil filed by S.K. Wang in 2018 because "[a] jury found that petitioner (S.K. Wang) *and* respondent Andrew Wang had engaged in fraudulent conduct and exerted undue influence on the decedent to induce him to eliminate respondent King as a beneficiary of his estate and increase the percentage bequeathed to them.") (emphasis added).

Second, the Wangs argue that they did not have "a full and fair opportunity to litigate" during the 2017 Probate Trial because they were barred from submitting, and the jury was "legally forbidden" from considering, "the most relevant evidence." Wang Opp. Brf. at 2. But this is untrue. Y.K. King waived the protections of the N.Y. C.P.L.R. 4519 (the Dead-Man's Statute) by extensively questioning A. Wang about his interactions with C.C. Wang and his mental health, his purported complaints about the Kings, and the purported disinheritance of Yien-Koo King on February 10, 2003 and February 18, 2003. *See Lewin v. Richard Avedon Found.*, No. 11-cv-8767, 2015 U.S. Dist. LEXIS 83452, *31-32, 2015 WL 3948824 (S.D.N.Y. Jun. 26, 2015) ("By testifying to its version of events, the Foundation has 'opened the door' to Lewin's testimony and cannot seek to preclude Lewin from testifying about the same communication or transaction."). The Wangs were free to interject whatever testimony they wished about C.C. Wang and communications with him during their direct examination, during their cross-examination, or during rebuttal. *See id.* The Probate Trial record of A. Wang's extensive testimony concerning his communications and interactions with C.C. Wang makes clear that they took advantage of this waiver, and they have not identified a single fact that they would be able to place before this jury

3

that they were precluded from placing before the last one. For that reason, they are incapable of arguing they lacked a "full and fair opportunity" to litigate the issue. *See Matter of Wang*, 179 A.D.3d 418 (rejecting the Wangs' argument that they lacked a full and fair opportunity to litigate the Probate Trial); *see also Goldman v. Rio*, 788 Fed. Appx. 82, 83 (2d Cir. 2019) (holding a state court judgment's determination that an action was barred by res judicata, was itself a binding on the federal court under the doctrine of res judicata).

Third, the Wangs' argument that the Jerome Kamerman adverse inference charge during the Probate Trial—and which was given solely in relation to the testamentary capacity claim— somehow undermines the collateral estoppel effect of the fraud and undue influence verdicts has already been rejected by the First Department. *See* Declaration of Timothy Savitsky dated April 30, 2021 ("4/30/21 Savitsky Decl.") Exh. 1 at p. 12 (Y.K. King's state court appellate brief replying to S.K. Wang's argument that the Mr. Kamerman adverse inference infected the fraud and undue influence verdicts by quoting the jury charge to show the harmless adverse inference was given only "on the question of the testator's mental capacity to execute a will."); *Matter of Wang*, 179 A.D.3d 418 (rejecting the Wangs' argument that they did not have a full and fair opportunity to litigate during the Probate Trial and that the undue influence and fraud verdicts lacked preclusive effect).

Lastly, the fact that the Wangs now wish to recruit Mr. Kamerman to participate in trial is not "new" evidence that can undermine collateral estoppel. The law firm of Kamerman, Uncyk, Soniker and Klein, P.C., of which Mr. Kamerman is a member, has been representing A. Wang since the time of the very first strawman sale at issue in this action. If the Wangs and their counsel thought that Mr. Kamerman's testimony would have been helpful, he would have testified at the 2017 Probate Trial. They simply chose not to call him and provided no evidence that he was

unavailable to appear. *See Shaid v. Consolidated Edison Co.*, 95 A.D.2d 610, 626 (N.Y. App. Div. 1983) ("[P]olicies of promoting fairness for all parties and of promoting judicial efficiency are hardly furthered by encouraging litigants to keep some evidence from the fact finder in the first case so that, if there is an adverse verdict, this 'new' evidence can magically appear to prevent collateral estoppel.").

### Point 2:  The Bao Wu Tang Catalogue Is Not Hearsay Because It Is a Statement of A. Wang and His Gallery or, Alternatively, Was Adopted by Them.

Authenticating a documentary statement as one made by an opposing party for the purposes of Fed. R. Evid. Rule 801(d)(2)(A) only requires "a rational basis from which the jury could infer that the document did, in fact, belong to him." *United States v. White*, 571 Fed. Appx. 20, 23 (2d Cir. 2014) (holding there was "adequate circumstantial evidence—stemming from when and how refund proceeds and other funds were withdrawn, transferred, and spent, among other evidence— for a juror to conclude" that certain tax and financial documents belonged to the Defendant and thus were "statements of an opposing party.") (internal quotations omitted). Here, there is sufficient evidence to authenticate the BWT Catalogue as either a direct statement of a party opponent or, alternatively, an adopted admission because (i) the catalogue's title bears the name of A. Wang's own admitted *Bao Wu Tang* gallery;[2] (ii) the catalogue contains a preface written by A. Wang in his capacity as "Owner of the Bao Wu Tang Gallery,"[3] (iii) the catalogue contains photographs of many of the 98 Estate paintings which A. Wang paid for and had shipped to his

---

[2] 4/9/21 Savitsky Decl. [ECF Dkt. 252] <u>Exh. 17(a)</u> at AWSK_00001608 (BWT Catalogue cover as produced by the Wangs during discovery in this action); *id.* <u>Exh. 9</u> at 132:10-15 (A. Wang 6/25/2019 Dep. Trans.) (counsel reading the title of the BWT Catalogue cover).

[3] 4/9/21 Savitsky Decl. [ECF Dkt. 252] <u>Exh. 19</u> at KING_003160-61 (Translation of BWT Catalogue preface describing A. Wang as the "Owner of the Bao Wu Hall"). *Id.* at <u>Exh. 9</u> at 139:14-16 (A. Wang acknowledging his preface describes him as the "Owner of Bao Wu Tang").

accountant in Hong Kong;[4] (iv) the catalogue contains photographs of paintings Y.K. King personally delivered to A. Wang at a settlement in Shanghai on May 10, 2005;[5] (v) the catalogue was distributed after A. Wang gave permission to the museum to do so;[6] and (vi) the catalogue was published in relation to an art exhibition that was organized by A. Wang and whose opening ceremony was attended by A. Wang.[7]

The Wangs think they have the answer to all this evidence, contending: "Andrew's deposition testimony makes clear he was not responsible for the catalogue." Wang Brf. at p. 9. Unfortunately for them, however, A. Wang's attempt at self-preservation by disavowing his own art gallery's publication is simply an argument he should make to the jury, not one which can exclude the evidence altogether. *See United Sates v. Tocco*, 135 F.3d 116 (2d Cir. 1998) ("The so-called ambiguity surrounding the meaning of Mario Ferranti's nod [as an adoptive admission] does not undermine the district court's admissibility determination. This evidentiary determination was preliminary to a decision as to what inference should be drawn from it, which was ultimately a question for the jury to assess."). There is ample evidence for a jury to conclude that the BWT

---

[4] 4/9/21 Savitsky Decl. [ECF Dkt. 252] Exh. 9 at 139:23-140:21 (A. Wang testifying his role at the BWT Exhibition was to check to make sure the paintings displayed were "once in my family collection," which, as a matter of undisputed fact, included about 16 of the 98 Paintings at issue in this action); Exh. 18 at 478:24-479:20 (A. Wang testifying that "50 percent" of the paintings in the BWT Catalogue and Exhibition were from the Estate sales).

[5] 4/9/21 Savitsky Decl. [ECF Dkt. 252] Exh. 18 at 477:5-16 (A. Wang testifying that he saw the Guo Xi painting at the Capital Museum show in Beijing).

[6] Declaration of Timothy Savitsky dated April 23, 2021 ("4/23/21 Savitsky Declaration") [ECF Dkt. 266] Exh. 12 at 485:2-488:22 (A. Wang testifying about his approval of the BWT Catalogue's distribution of 6,000 copies prior to exhibition, despite his claim that the publishers accidentally misprinted the name of his grandfather's gallery. A. Wang claimed he took the misprinted gallery name as his own gallery's name).

[7] 4/23/21 Savitsky Declaration [ECF Dkt. 266] Exh. 12 at 311:14-312:20 (A. Wang testifying regarding his involvement in planning the BWT Exhibition, attending the opening dinner with 600 people, and walking around the exhibition afterwards); 4/9/21 Savitsky Decl. [ECF Dkt. 252] Exh. 19 at KING_003160-61 (Translation of BWT Catalogue preface describing A. Wang's role and explanation for his motivation in organizing the show as the "Owner of the Bao Wu Hall").

Catalogue is just as much, if not significantly more so, a statement made by defendants A. Wang and *Bao Wu Tang* as it is a statement made by the Capital Museum.

### Point 3: The Artron and Artnet Records Are Excepted from Hearsay.

Fed. R. Evid. Rule 803(17) permits relevant and authenticated "Market Reports and Similar Commercial Publications" to be admitted into evidence without a live witness testifying that the records are accurate or trustworthy. Rather than trustworthiness hinging upon the credibility of a witness with personal knowledge, "[t]he basis for trustworthiness is general reliance by the public or a particular segment of it, and the motivation of the compiler to foster reliance by being accurate." Fed. R. Evid. 803(17), advisory comm. note.

The Arton.net and Artnet.com art market data records are *precisely* the types of commercial data records that fall into this exception because they are indisputably what the art industry relies on to determine the value and provenance of paintings, including Chinese paintings. Even the reports and news articles cited by both the Plaintiff and Defendants in relation to the Wangs' pending Daubert Motion are ultimately based on the data that comes from Arton.net and Artnet.com. For example, Exhibit 9 to the 2/26/21 Cohen Decl. (ECF Dkt. 234-12)[8] is a South China Morning Post article stating: "Using a variety of sources, art economist Clare McAndrew calculated that global art sales reached US $63.7 billion in 2017, up 12 percent from 2016, and a strong turnaround after two consecutive years of decline." (emphasis added). This art economist, Dr. Clare McAndrew, is the same professional who prepared the TEFAF Art Market Report 2015 excerpted in Exhibit 20 to Declaration of Timothy Savitsky dated March 19, 2021 ("3/19/21

---

[8] The 2/26/21 Cohen Declaration was submitted in support of the Wangs' Motion in Limine to preclude Patrick Regan from testifying at trial.

Savitsky Decl."; ECF Dkt. 238-20). Footnote 4 to Dr. McAndrew's TEFAF Art Market Report

2015, makes clear that she recognizes and draws data from both Arnet and Artron:



3/19/21 Savitsky Decl. Exh. 20 (ECF Dkt. 238-20). Moreover, exhibits 8a and 8b to the 2/26/21

Cohen Decl. are Fall 2018 market analysis reports published by Artnet. *Id.*; ECF Dkt. Nos. 234-9

and 234-10. The Wangs thus hope to eat their cake and have it too by using Artnet's publications

to preclude Patrick Regan's testimony, then have the raw data from Arnet deemed unreliable. The

Court should see through this trick and recognize that Artron and Artnet are industry leading

authorities on Chinese auction results and their raw data reporting is admissible.[9]

---

[9] This is not to say that anything published by Artron.net or Artnet.com is admissible. Instead, the only aspects that the Plaintiff seeks to introduce are the various categories of objectively verifiable data that the websites report. The Plaintiff does not seek to introduce opinion-based descriptions as to the condition of the works, their authenticity, or the subjective quality of the paintings.

The Wangs argue that it is a "rule" that a "compiler's explicit disclaimer of the accuracy and reliability of the underlying data precludes their admission under Rule 803(17)." *See* Wang Opp. Brf. at 14-15. They are wrong; such disclaimers are standard and do not affect the reliability analysis under Rule 803(17). Simply because a compiler disclaims liability for accuracy does not mean that they do not have a business incentive to compile reliable, accurate records in order to be considered an industry authority and foster reliance.[10]  The Wangs' allegation, based on the disclaimer, that Artron.net and Artnet.com do not vet their listings in any way is based on nothing other than the surmise of their counsel. S*ee* Wang Brf. at 14. For example, the widely relied upon used-car valuation guide called the Kelley Blue Book has been repeatedly found admissible under Rule 803(17) but contains an explicit disclaimer nearly identical to the ones cited for Artnet and Artron:

**16. Disclaimer of Warranties:**
You Expressly Understand and Agree that:
* * * *
e. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations are based upon current available information and analysis of market conditions, and will vary depending on specifications, vehicle condition or other particular circumstances pertinent to a particular vehicle or the transaction or the parties to the transaction**. Kelley Blue Book assumes no responsibility for the accuracy of vehicle values and no responsibility for errors or omissions.**

**17. Limitation of Liability**
* * * *
b.    **IF YOU RELY ON KBB.COM** OR ANY INFORMATION, PRODUCT, OR SERVICE AVAILABLE THROUGH KBB.COM, **YOU DO SO AT YOUR OWN RISK**. YOU UNDERSTAND THAT **THERE MAY BE DELAYS, OMISSIONS, INTERRUPTIONS, INACCURACIES, AND/OR OTHER**

---

[10] Western auction house websites expressly disclaim reliability on the accuracy of the content which they publish on their websites. *See, e.g.*, Christies' auction official website terms specifically disclaims its content, website available at https://www.christies.com/about-us/contact/terms-and-conditions-for-website-use. ("[T]he Company makes no representations about the accuracy, reliability, completeness, or timeliness of the material or about the results to be obtained from using the Web Site. . . .  THE COMPANY DOES NOT WARRANT THAT THE WEBSITE WILL OPERATE ERROR-FREE . . . .THE WEB SITE AND MATERIAL ARE PROVIDED ON AN 'AS IS' BASIS WITHOUT ANY WARRANTIES OF ANY KIND.").

**PROBLEMS WITH THE INFORMATION, PRODUCTS, AND SERVICES** PUBLISHED ON OR PROMOTED THROUGH KBB.COM. KBB.COM AND THE **SERVICES ARE PROVIDED TO YOU "AS IS."** KELLEY BLUE BOOK AND ITS AFFILIATES, AGENTS, AND LICENSORS **CANNOT AND DO NOT WARRANT THE ACCURACY, COMPLETENESS, CURRENTNESS, NONINFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE INFORMATION OR SERVICES AVAILABLE THROUGH KBB.COM** (OR ANY INFORMATION, GOODS, OR SERVICES THAT ARE REFERRED TO, ADVERTISED OR PROMOTED ON, OR SOLD THROUGH KBB.COM). **NOR DO WE OR THEY GUARANTEE THAT KBB.COM OR THE SERVICES WILL BE ERROR FREE** . . . .

*See* Kelly Blue Book official website available at *https://www.kbb.com/company/terms-of-service/*

(capitalization in original, bold emphases added).

Despite these explicit disclaimers, the Kelley Blue Book and other automotive valuation guides which disclaim liability and accuracy, such as J.D. Power's NADA Guides[11], are "routinely admitted" by federal courts "as falling under the exception provided in Rule 803(17)." *CIT Grp./Equip. Fin., Inc. v. Landreth,* 2007 U.S. Dist. LEXIS 93372, 2007 WL 4554224, *5 (E.D. Tenn. 2007) (admitting the "Official Bus Blue Book" under 803(17)); *Sovereign Bank, F.S.B. v. Finnegan,* 358 B.R. 644, 649 (Bankr. M.D. Pa. 2006) (admitting Kelley Blue Book value under 803(17)); *In re Robson,* 369 B.R. 377, 380-81 (Bankr. N.D. Ill. 2007) (admitting both J.D. Power's NADA Guide and the Kelley Blue Book under Rule 803(17) to aid in establishing the value of the subject vehicle; *In re Gonch*, 435 B.R. 857, 861-62 (Bankr. S.D.N.Y. 2010) (admitting Kelley

---

[11]   J.D. Power's Official NADA Guides website is available at https://www.nadaguides.com/?psvar=cars#OptNADA. The NADA Guides website's "Terms of Use" (available through a link on nadaguides.com's front page) specifically disclaim the accuracy of all of J.D. Power's content, including NADA Guides. *See* https://www.jdpower.com/Terms-of-Use ("16. **Disclaimer of Representations and Warranties**: ALL THE INFORMATION CONTAINED IN THE SEVICES, INCLUDING ALL INFORMATION SURVEYS, DATA ANALYTICS, PRODUCT TESTING, CONTENT, MATERIAL AND COMMENTARY IS PROVIDED "AS IS" WITHOUT ANY WARANTIES OR GUARANTEES OF ANY KIND.") (emphasis in original).

Blue Book retail value under Rule 803(17)). The Wangs' disclaimer argument is thus contrary to the weight of the authorities.[12]

The Plaintiff agrees, however, that information published on Artron.net and Artnet.com "does not become admissible merely by being stored in a third-party database." Wang Opp. Brf. at 15-16. Instead, it becomes admissible because there is a multi-billion-dollar art industry that relies on these websites to be *the* authorities on auction results, just as Kelley Blue Book and NADA Guides are *the* authorities on used-car sales data. What Rule 803(17) does, then, is allow a professional industry's reliance on certain data and records to substitute-in for a live witness. Thus, to the extent the Wangs seek to attack the credibility of this figurative witness because default rates are higher at Chinese auctions than they are in the West, they are free to do so on cross-examination, through their expert, or through citation to appropriate learned treaties. But their argument should not preclude records that are expressly excepted from the hearsay bar.

And regardless of the default rates, the Court should not preclude the other categories of relevant data in the market report (*i.e.*, other than final sale price) that are not subject to any credibility attacks whatsoever. The Plaintiff seeks to introduce the following pieces of information from the databases: (1) the identity of the auctioned work (its name, artist and physical characteristics such as size); (2) the location and time of the auction; (3) the photograph of the auctioned work; and (4) the final auction price of the subject work. There is no basis to preclude any of these categories of information under Rule 803(17), but there is *especially* no reason to preclude categories (1)-(3)—each of which is unimpeachable and independently relevant to establishing that the Estate's paintings were being auctioned overseas in clusters and that the

---

[12] The Wangs citation to *Cao v. Reidbord*, No. 04 Civ. 3987 (NRB), 2008 WL 11517113, at *9 (S.D.N.Y. Mar. 27, 2008) for finding a website with an accuracy disclaimer inadmissible is inapplicable because the case did not even involve the Rule 803(17) hearsay exception.

Wangs were adding stolen C.C. Wang's seals to them beforehand (thereby supporting a finding of self-dealing and an award of punitive damages).

Additional analysis or opinion concerning the "condition" of the auctioned paintings published by the online databases—though still admissible under Rule 803(17)—is not of the highest relevance (aside from further confirming that the works auctioned were the same works sold by the Estate). Therefore, if the court deems these aspects to be inadmissible under Rule 803(17), it should not throw the baby out with the bathwater and preclude the other objective data.

Finally, the Wangs' "hearsay within hearsay" argument fails. *See* Wang Brf. at 16-17. *All* market-data compilers necessarily compile third-party information, but none of the cases relying on the Rule 803(17) have excluded the reports on that basis, which is why the Wangs do not cite to any. The Rule 803(17)'s exception would, in any event, extend to public auction data reported by various auction houses (*i.e.* from Sotheby's, Christies', Poly Auction, Chieftown Auction, and China Guardian). This is not merely because the results are published on those businesses' websites—since information on a business's website is not generally admissible without the testimony of a custodian. It is instead because the public data on the outcome of public auctions is relied upon by the entire art valuation industry as well as by the IRS. Each auction house has an incentive to accurately report what was publicly auctioned, when the auction occurred, and what the final, public hammer price was. The Wangs' argument that the hammer price is not, in all cases, paid does not render the reported information false, but instead goes to the weight of that evidence.

**Point 4**: **The Wangs Spoliated Evidence, Submitted False Interrogatory Responses, and Extensively Lied Under Oath—Striking Their Affirmative Defenses and Issuing Adverse Inferences Are Appropriate Sanctions.**

A party seeking spoliation sanctions must establish, by a preponderance of the evidence, three elements. *See Mosdos Chofetz Chaim Inc. v. Mosdos Chofetz Chaim Inc.* (*In re Mosdos Chofetz Chaim Inc.*), 624 B.R. 576, 582-83 (Bankr. S.D.N.Y. 2021). These are that (1) the evidence existed and that the party having control over it had an obligation to preserve it when it was altered or destroyed, (2) the evidence was altered, destroyed, or made to be unavailable with a culpable state of mind, and (3) the evidence would likely have supported the moving party's claim or defense. *Id*. at 582; *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*,[13] 306 F.3d 99 (2d Cir. 2002) (finding district court abused discretion in denial of motion for an adverse inference jury instruction based upon untimely produced records and noting making records unavailable due to non-production may justify an adverse inference charge just as if the record was physically destroyed). Y.K. King's opening submissions established each of those elements and further established that the Wangs have engaged in a pattern of false attestations and non-disclosures that render their explanations for why these records were unavailable wholly incredible. *See Pastorello v. City of New York*, No. 95-CV-470, 2003 WL 1740606, 2003 U.S. Dist. LEXIS 5231 (S.D.N.Y. Apr. 1, 2003) (granting an adverse inference under Fed. R. Evid. Rule 37(c) where plaintiff brought "not only a spoliation claim but allege[d] that the defendants' response to her interrogatory was false and misleading.").

---

[13] "Although the Advisory Committee rejects *Residential Funding Corp.*  to the extent it authorizes 'the giving of adverse-inference instructions under Rule 37(e) on a finding of negligence or gross negligence,' . . there is no indication that a broader rejection of the holding in that case was intended." *Resnik v. Coulson*, No. 17-cv-676, 2019 U.S. Dist. LEXIS 92159, (E.D.N.Y. Jan. 4, 2019) (discussing the limited, though significant, impact of Rule 37(e) with respect to granting adverse inference motions due to the destruction of ESI) (internal citation omitted).

This is not a case in which a single category of documents or string of emails were deleted or inexplicably unproduced. Rather, the Wangs have thumbed their noses at the entire discovery process. As outlined in the Sanctions Motion, they gave false testimony during depositions, repeatedly served knowingly false interrogatory responses, and failed to produce corporate any financial records for companies that paid millions of dollars to the Estate as *favors* for the supposed buyers. The Plaintiff is confident that there is no jury on earth that could fail to see through the Wangs' incredible and inconsistent positions. Yet this does not change the fact that they violated their obligations under the Federal Rules of Civil Procedure and are subject to sanctions as a result.

    i.    *The 2015 Amendment to Rule 37(e) Does Not Alter the Outcome of the Sanctions Motion Since the Plaintiff Has Provided Evidence That the Non-Production Was Intentional and the Sanctions Are Not Premised on the Destruction of ESI.*

In opposition to the Sanctions Motion, the Wangs place a heavy focus on the 2015 amendment to Rule 37(e) concerning the destruction of ESI evidence and that rule's requirement that intentional destruction with intent to deprive an opposing party of discovery must be shown before an adverse inference will be granted. *See* Wang Brf. at 28, 34-35. This focus misses the mark for two reasons: The unproduced records were *physical*, not ESI, and the Wangs *have* intentionally made them unavailable.

 First, the S.K. Trust, the offshore-entity incorporation records, and corporate financial records were all paper documents rather than ESI. As previously submitted to the Court, the S.K. Trust document was a document signed by A. Wang and S.K. Wang, witnessed, and notarized. *See* 4/8/21 Savitsky Decl. Exh. 19 (ECF Dkt. 249). The BVI incorporation records were also physical: the only incorporation record A. Wang produced was for Le Tao Ltd. and it consists of scanned pages bearing A. Wang's ink signature as of the date of incorporation. *See* 4/30/21 Savitsky Decl. Exh. 2 (AWSK_00008940-44). Therefore, the evidence indicates that Le Style

Ltd.'s records, another BVI corporation, were also papered and signed by the Wangs, not merely ESI. Finally, the corporate bank statements were physical and sent to Billie Wai. A. Wang testified that he checked for the requested corporate financial records with HSBC and Billie Wai's office "because that's where the bank statements were sent." 4/8/21 Savitsky Decl. (ECF Dkt. 249) Exh. 6 at 311:13-312:2 (A. Wang's 2019 Dep. Trans.). Because the documents at issue were physical and not exclusively ESI, the gross negligence standard is still applicable. *See Raymond v. City of New York*, No. 15-cv-6885, 2020 WL 1847556, 2020 U.S. Dist. LEXIS 64601 at *28 (S.D.N.Y. Apr. 13, 2020) (awarding adverse inference for grossly negligent destruction of a physical "memo book" relevant to a plaintiff's retaliation claim).

Second, with respect to *all* of the unproduced documents—including corporate financial records, incorporation records, records relating to Billie Wai, and the S.K. Trust asset schedule— the Plaintiff's opening brief makes emphatically clear that the Wangs' non-production was not merely negligent, but intentional and done for the purpose of concealing corporate holdings, corporate owners, corporate accounts, and corporate transactions. Y.K. King is not required to prove A. Wang and S.K. Wang's intentional destruction/non-production of records they controlled beyond a reasonable doubt or even by clear and convincing evidence to receive an adverse inference. She need only show their intentional non-production or destruction of relevant evidence they were obligated to preserve "by a preponderance of the evidence." *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F.Supp. 3d 570, 580 (S.D.N.Y. 2017). Under either the Fed. R. Civ. P. Rule 37(c) standard, the Rule 37(e) standard, or a common law spoliation standard, the evidence is sufficient to establish that these corporate asset records existed, were either destroyed or made unavailable by the Wangs, and that they did so with intent to deprive the Plaintiff of relevant evidence.

15

ii.    *The Wangs Had an Obligation to Retain the Incorporation Records and Their Corporate Financial Records; Their Failure to Do So Prejudiced the Estate.*

The Wangs' first argument for why sanctions are unsupported is that the Plaintiff failed to establish A. Wang (and S.K. Wang, at least in the case of Le Style Ltd.) had a duty to preserve the unproduced (and allegedly destroyed) incorporation and corporate financial records relating to the 2005, 2006, and 2009 sales as well as any subsequent corporate transactions (since these might have provided evidence of receipts for self-dealing). Wang Brf. at 36. This was, however, established in the Plaintiff's opening brief. Specifically, A. Wang, as Estate fiduciary, was required to "maintain adequate records of [his] fiduciary transactions." *Matter of Sanchez*, No. 2001-3187/G, 2017 N.Y. Misc. LEXIS 5105, 2017 N.Y. Slip Op. 32685(U), (Sur. Ct. New York Cnty. Dec. 28, 2017). Especially considering A. Wang was accused of attaining the position of preliminary executor *through fraud,* any reasonable fiduciary acting with care and in good faith would have preserved records showing that he set up foreign corporations and used them to pay the Estate to have his grandfather's multi-million art collection shipped to his own accountant in Hong Kong. *See, e.g., In re Anolik*, 274 A.D.2d 515, 516 (2d Dep't 2000) (a fiduciary bears the burden of showing proper "care and management of estate assets" through records and testimony). If the five buyers paid the Estate *through* A. Wang's corporations, as he unbelievably claims, then those transactions in Hong Kong were done on behalf of the Estate. They were in turn Estate transactions and the Estate has a right to review the records. The Wangs' straight-faced argument to the contrary exposes them as hopelessly disconnected from reality. A finding that A. Wang had no obligation to preserve records indicating that money paid to the Estate came from his own offshore corporate accounts (allegedly on behalf of others) would set an outlandish precedent.

Second, the Estate was prejudiced by A. Wang's failure to preserve the corporate and financial records related to the sales. The Wangs argue—without case citation—that Y.K. King is

incapable of showing prejudice for the missing records because she never subpoenaed the Wangs' corporate trustee (Portcullis TrustNet) in the British Virgin Islands, the Wangs' corporate accountant (Billie Wai) in Hong Kong, or the Wangs' corporate bank (HSBC) in Hong Kong. *See* Wang Brf. at 38-39 (citing to the *Norwich Parmacal* method of discovery in Hong Kong). Yet each of these entities was admittedly under A. Wang's control and he has already taken the position that none of them possessed the sought-after records. *See* Wang Brf. at 22 (regarding the Wangs' inquiries to Portcullis TrustNet); 4/8/21 Savitsky Decl. (ECF Dkt. 249) Exh. 6 at 311:13-312:2 (A. Wang testifying "I tried to look for all the records in Hong Kong here. And I even went to the bank to look for it and including my accountant Billie Wai's office."). The Wangs do not cite to any law that the Plaintiff needed to engage in an international goose chase for evidence A. Wang had control over, should have preserved and produced himself, but now claims is missing or destroyed.[14] And though this action does seek $200,000,000 in damages from the Wangs, that is only because so much had been stolen from the Estate. The Plaintiff is not a multi-national company with endless resources.

Third, the Wangs' failure to preserve evidence of their payments to the Estate for C.C. Wang's classical art collection was, without question, intentional. The undisputed record bespeaks intentional non-production and pervasive false testimony. The only reason A. Wang confessed to owning "Le Style Ltd." five days before the close of discovery was damage control after being caught red-handed for owning a company called "Le Tao Ltd." A. Wang thus made the calculated decision to admit he made all the payments to the Estate, but deny that he had any records of them. This allowed him to spin another yarn about how he only acted as a "conduit" for the payments as

---

[14] As for the ICIJ records, even if they responded to a subpoena, the leaked records would be subject to the same hearsay and authentication objections the Wangs are currently making. Y.K. King would still be prejudiced.

a self-less "favor" for the buyers, but had no evidence of it. A. Wang should not receive any credit for his confessions because they came only after he was check-mated on his prior testimony and have only bred additional lies.

### iii. The Plaintiff Has Not Distorted A. Wang's Deposition Testimony.

The Wangs' counsel bends over backwards to make sense of A. Wang's contradictory testimonies. *See* Wang Opp. Brf. at 40-42. Their effort, however, falls far short of coherency and underscores the necessity for the requested relief. For example, the Wangs now try to distance themselves from A. Wang's 2013 testimony that he was friends with the buyers to whom he sold Estate paintings by re-defining what the word "friends" means and what it means "to know" someone. *See* Wang Opp. Brf. at 41. They argue that "[a]t no point in his 2013 deposition did Andrew say or suggest that he had met with the buyers prior to the sales" and that A. Wang never testified "that he had 'personal' relationships with the buyers." Wang Opp. Brf. at 40, 41. Actually, he did. A. Wang testified buyer "Yong Qing Ye" (who made two purchases from the Estate in 2005 and 2006) was "a friend of mine" from Shanghai since 1990:

```
18        A      Yes, that is another sale.
19        Q      Okay.  Do you know Mr. Yong-Qing
20   Ye?
21        A      Yes.
22        Q      And how do you know that person?
23        A      I know him in person, yes.  In
24   Shanghai.
25        Q      You know him in Shanghai?
```

TSG Reporting - Worldwide   877-702-9580

KING 004340

Page 957

```
1                  A. Wang
2        A      Yeah.  It's a friend of mine.
3        Q      All right.  And how long have you
4   known him?
5        A      Since 1990.
6        Q      And in terms of this sale, you
7   followed the same procedure as you just
8   described?
9        A      Correct.
```

4/8/21 Savitsky Decl. (ECF Dkt. 249) Exh. 4 at 957:3-5 (2013 AW Dep. Trans.). Likewise, A. Wang's 2013 story for "Yue Da Jin" is in flat contradiction to his new "Er Shi Fu" middle-man narrative:

```
5          And this, you followed the same
6    procedure with this as with the other private
7    sales that we talked about --
8         A    Right.
9         Q    -- in terms of valuing it and
10   effectuating the sale?
11        A    Yes.
12        Q    And who -- do you know Mr. Yue
13   Da-Jin?
14        A    Yes.
15        Q    How do you know that person?
16        A    Through a friend.
17        Q    Which friend?
18        A    Through a friend in China.
19        Q    What's the name of the friend?
20        A    I remember his last name is Xu,
21   Mr. Xu, but I don't remember.  But, you know,
22   we were just in the same circle at that time.
23        Q    Okay.  And you tried to sell this
24   painting, first, at auction but it wouldn't
25   sell; is that right?
```

TSG Reporting - Worldwide   877-702-9580

KING 004337

4/8/21 Savitsky Decl. (ECF Dkt. 249) Exh. 4 at 953:3-5 (2013 AW Dep. Trans.); *see also id.* at 545:5-19 (A. Wang testifying in 2013 "Most buyers I know, but there are always new buyers come on the market. So, personally, I know them or through other friends, you know, through auction house, because sometimes I deal with them, the buyers indirectly, sometimes we have a dinner together or have a lunch, but we are not so close as a friend, yeah."). At the time, there was no suggestion of Er Shi Fu or a middle-man, setting up the sales and locating the buyers.

For his part, S.K. Wang joined in A. Wang's false testimony by filing a verified pleading in the Surrogate's Court admitting (1) that "the Estate sold some Estate paintings to AW's friends

20

and connections within the Chinese art community" and "that the Wang Executor had friendships with some of the buyers." *See* 4/9/21 Savitsky Decl. Exh. 25 at ¶¶ 34, 119 (S.K. Wang Verified Answer dated August 28, 2014). The Wangs' and their attorneys' attempts to rescue this testimony from the jaws of perjury are frivolous.[15]

Finally, the Plaintiff acknowledges a minor and irrelevant mis-citation to A. Wang's testimony regarding when he supposedly met one or two the buyers. *See* Wang Brf. at 41-42. A. Wang testified in 2019 that he "definitely" did not meet any of the buyers until *after* he had already met Er Shi Fu (who A. Wang claims he was introduced to by the former PA, Ethel Griffin prior to the Estate sales) and after he had already given Mr. Fu all the information related to the Estate's paintings. *See* Wang Brf. at 42 (citing Cohen Op. Decl. Exh. 4 at 93:20-94:15). A. Wang claimed during his 2019 deposition that he could not remember if this supposed meeting was before, during, or after the Estate sales had been completed. The Plaintiff mistakenly cited A. Wang's serpentine testimony to be that he did not meet the buyers until after the sales were completed. *See* Wang Brf. at 41-42. This is truly a distinction without a difference. The point being advanced is exactly the same: A. Wang's testimony that he did not know or meet any of the buyers before Er Shi Fu discovered them plainly contradicts A. Wang's earlier, detailed testimony about how he knew them as well as S.K. Wang's verified pleading.  *See e.g.,* pp. 19-20 *supra* (citing A. Wang's 2013 testimony regarding how he came into contact with "Yong Qing Ye" and "Yue Da Jin").

---

[15] To the extent the Wangs try to place the blame for A. Wang's contradicting testimony on a Chinese interpreter, the Court should know that A. Wang's 2013 deposition was almost entirely in English with the translator barely participating. 4/30/21 Savitsky Decl. at ¶4. No translator was present for A. Wang 2019 deposition. *Id.*

     iv.    *The Failure to Produce an Asset Schedule Related to the S.K. Trust Warrants Sanctions.*

Courts in this Circuit have held that where circumstantial evidence establishes that a record was likely to have once existed in the control of a litigant, unsubstantiated and incredible claims to explain a failure to produce the records may be rejected. *See Doe v. Norwalk Cmty. College*, 248 F.R.D. 372 (Dist. Conn. 2007) (circumstantial evidence established a hard drive had been wiped rather than automatically "re-imaged" or experienced a mechanical failure); *Moody v. CSX Transp., Inc.*, 271 F.Supp.3d 410, 427 (W.D.N.Y. 2017) ("Of course, a court is not required to credit explanations for the loss of the relevant evidence that it finds incredible.").

    With respect to the S.K. Wang Trust, it is beyond cavil that a 32-page witnessed, and signed trust document should have included its asset schedule as part of its production. In omitting it, the Wangs have left out the single most important page of the trust. *See* 4.8.21 Savitsky Decl. (ECF Dkt. 249) Exh. 18 at 15:3-16:13 (Plaintiff's counsel explaining the S.K. Trust production deficiency); 17:7-12 (the Court agreeing "It can't be this schedule had nothing listed" and the Wangs' counsel responding that is "what they got."); 19:15-24 (court and counsel discussing adverse inference) (3/4/19 Conf. Trans.). *See also* Savitsky Decl. Exh. 16 at pp. 2, 5. The unavailability of the drafting attorney and the asset schedule—just like the unavailability of documents related to the five buyers, Er Shi Fu, the Wangs' auction activities and communications with auction houses, the Wangs' offshore accounts, the Wangs' offshore companies, and A. Wang's organization of the BWT Exhibition (other than the BWT Catalogue itself)—all belie the benign explanation offered by the Wangs for why these crucial records are missing. Whereas the circumstances establish that the S.K. Trust asset schedule existed by a preponderance of the evidence, the Wangs explanations that the document might not have ever existed or been in their control at all should be rejected as unreasonable. *See Moody*, 271, F.Supp. 3d at 427; *see also*

4/23/21 Savitsky Decl. (ECF Dkt. 266-15) Exh. 15 at 20:2-24:18 (S.K. Wang unbelievably claiming during his 2019 deposition that he signed the S.K. Trust without reading it, without having it explained to him, and without understanding it). An adverse inference instruction, whether due to spoliation or Rule 37(c), should be given that the jury may draw an inference that the reason the asset schedule was left unproduced is because it included certain Estate assets.

Finally, the Wangs had a duty to preserve the asset schedule. Prior to the creation of the S.K. Trust, both of the Wangs were respondents to the Public Administrator's Surrogate's Court Procedure Act §2103 proceeding concerning the whereabouts of Estate assets. Any corporate or trust entity which reposed assets held by the Wangs were subject to inquiry, which is precisely why the PA's counsel questioned A. Wang about whether he owned or controlled any corporate entities between the time of C.C. Wang's death in July 2003 and the date of the deposition in December 2013. 4/8/21 Savitsky Decl. (ECF Dkt. 249) Exh. 24 at 97:14-98:23 (A. Wang falsely testifying in response to the PA's questioning that he held no interest in any entities between the date of C.C. Wang's death through the date of his deposition, other than "BWT Asian Arts"). The Wangs failure to preserve the asset schedule, or more likely their simple refusal to produce it, was a violation of their discovery obligation and a spoliation of evidence.

> v. *The Court Has Inherent Power to Strike the Wangs' Affirmative Defenses Because of the Their Non-Disclosures, False Interrogatory Responses, and Extensive Perjuries; It Should Exercise that Power.*

"The principle that a perjurer should not be rewarded with a judgment—even a judgment otherwise deserved—where there is discretion to deny it, has a long and sensible tradition in the common law." *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 329 (1994) (Scalia, J., concurring). In *Marcellino I*, the district court, following a bench trial, issued an opinion which recognized that the lying plaintiff appeared to be—as A. Wang has clearly been doing here—

"making up answers as he went along." No. 16-Civ.-6287, 2018 WL 1517205, 2018 U.S. Dist.

LEXIS 51582, (S.D.N.Y. Mar. 27, 2018). The court explained that it:

> disbelieved much (indeed, most) of Plaintiff's testimony. And while
> [the Court] has tried to imagine benign reasons for such
> demonstrably false statements, such as lack of sophistication or an
> innocent failure of recall on Plaintiff's part, the Court remains
> convinced that on several issues—in particular the length of time he
> worked at Tribeca Bagels—Plaintiff perjured himself a trial.

*Id.* at \*21. The primary lie espoused by the plaintiff in *Marcelino* was the creation of "a timeline

out of whole cloth" in which he pled that he worked at a bagel store for eight months, but the

evidence established that he had actually only worked at the store for four to six weeks. *Id.* at \*5

(quoting testimony from a witness that the plaintiff had only worked at the bagel store for "at most,

six weeks."); \*58 ("The Court sees no reason to mince words. Plaintiff repeatedly testified falsely

at trial and, at least with respect to his period of employment, Plaintiff created a timeline out of

whole cloth. Whatever defects in recollection one might attribute to the passage of time, there is

plainly a difference between four and one-half weeks and eight months. The Court finds that

Plaintiff committed perjury at trial") (*citing United States v. Dunnigan*, 507 U.S. 87, 94 (1993);

18 U.S.C. §1621).

   This finding of perjury notwithstanding, the district court in *Marcelio I* concluded that the

Plaintiff had, putting his perjured testimony aside, met his burden with respect to several claims.

*Id.* at \*56. It therefore ultimately awarded a judgment in the perjurer's favor on certain issues but

directed the parties to submit briefings on the appropriate sanctions in view the court's finding of

perjury. Over a year later, in *Marcellino v. 374 Food Inc.* ("*Marcellino II*"), the district court

vacated its prior judgment in favor of the plaintiff based upon the court's "inherent power to order

the forfeiture" of a judgment in response to perjury. No. 16-Civ.-6287, 2019 U.S. Dist. LEXIS

213664 (S.D.N.Y. Dec. 11, 2019) (KPF). The court reiterated that during trial the plaintiff had

24

given "extensive perjury" which warranted the severe sanction of vacating the judgment it had received with prejudice. *Id.* at *3.

For the factual and legal reasons identified in Y.K. King's opening brief in support of her Sanctions Motion, this Court should find that it is impossible to harmonize A. Wang and S.K. Wang's testimonies, interrogatory responses, and lack of production. It should therefore exercise its authority under Rule 37(c) and as well as its inherent authority under common law to prevent serial perjurers from achieving a judgment based upon their affirmative defenses. Issuing the requested adverse inferences and striking the Wangs' affirmative defenses will also likely have the prophylactic effect of curtailing even more aggressive perjury at trial.

## CONCLUSION

For all off the above reasons and those identified in Y.K. King's prior submissions, the King Motion in Limine and the Sanctions Motion should both be granted in their entirety.

Dated:    New York, NY          **SAM P. ISRAEL, P.C.**
            April 30, 2021

                                        *BY: /s/ Timothy Savitsky*
                                        Sam P. Israel (SPI0270)
                                        Timothy Savitsky (TS6683)
                                        180 Maiden Lane, 6th Floor
                                        New York, New York 10038
                                        T: (646) 787-9880 | F: (646) 787-9886
                                        *Attorneys for Plaintiff*