L5J3KINH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KING, et al.,

                    Plaintiffs,           New York, N.Y.

          v.                              14 CV 7694 (LJL)

WANG, et al.,

                    Defendants.

------------------------------x           Daubert Hearing (Remote)

                                          May 19, 2021
                                          12:00 p.m.

Before:

                    HON. LEWIS J. LIMAN,

                                          District Judge


                              APPEARANCES


WITHERS BERGMAN, LLP
     Attorneys for Plaintiffs
BY:  DEAN R. NICYPER
          -and-
SAM P. ISRAEL P.C.
     Attorneys for Plaintiffs
BY:  TIMOTHY SAVITSKY


KAMERMAN, UNCYK, SONIKER & KLEIN P.C.
     Attorneys for Defendants
BY:  AKIVA M. COHEN
          DYLAN SCHMEYER

L5J3KINH

1          (Via Zoom)

2          THE COURT:  Good afternoon, counsel.

3          Matt, you need to call the case.

4          THE DEPUTY CLERK:  Yes, Judge.  In the matter of King

5     et al v. Wang et al, 14 CV 7694.  Please state your appearance

6     for the record.

7          MR. SAVITSKY:  Timothy Savitsky, your Honor, from the

8     law firm Sam P. Israel P.C. on behalf of the plaintiff Yien-Koo

9     King.

10          THE COURT:  Good afternoon, Mr. Savitsky.

11          MR. SAVITSKY:  Good afternoon.

12          MR. NICYPER:  Dean Nicyper at the law firm of Withers

13     Bergman LLP, and we're also counsel for the plaintiff.

14          THE COURT:  Good afternoon.

15          MR. NICYPER:  Good afternoon, your Honor.

16          MR. COHEN:  Good afternoon.  Akiva Cohen, Kamerman,

17     Uncyk, Soniker & Klein, and I have with me my associate Dylan

18     Schmeyer as counsel for defendants SK and Andrew Wang.

19          THE COURT:  Good afternoon, Mr. Cohen.

20          So, let me tell you what I have in mind for this

21     afternoon, and then I'll ask if there are any questions and

22     then we'll proceed directly to testimony.  I've scheduled this

23     as a -- did we lose Mr. Cohen?

24          MR. COHEN:  No, unfortunately my phone setup is a

25     little precarious, and I'm going to have to figure out a

1    different way to take notes than on the desk it's balanced on.

2    I apologize.

3              THE COURT:  We have Mr. Cohen back.

4              So, I've scheduled this as a Daubert hearing.  I am

5    looking forward to hearing testimony of both of the expert

6    witnesses, and then I'll take under advisement the Daubert

7    motion and try to get you a decision fairly shortly.

8              We'll start with the testimony of Mr. Linsner, and

9    then we will go to the testimony of the plaintiff's expert,

10   Mr. Regan.

11             If there is time at the end of the two examinations,

12   and I expect there will be, I'm prepared to hear brief argument

13   from each side.  I set aside two and a half hours for this.

14   I've got a hard stop at 2:30 p.m. and we'll just go straight

15   without any breaks.

16             I have the time allocations that the parties have

17   given me.  I will be the time keeper.  If the parties would

18   like notice at five minutes before their allotted time, I'm

19   prepared to do that.

20             Would that be helpful for the plaintiffs?

21             MR. NICYPER:  Yes, absolutely, your Honor.

22             THE COURT:  And for defendants, Mr. Cohen?

23             MR. COHEN:  Yes, please, your Honor.  Thank you.

24             THE COURT:  Will do.  Is there anything that the

25   plaintiffs have to raise before we get started?

1          MR. SAVITSKY:  Just that if we do in fact get to the

2     oral argument portion, which as you stated you expect we will

3     be able to, I'll be doing the argument rather than Mr. Nicyper.

4          THE COURT:  Very well.  Mr. Cohen, anything?

5          MR. COHEN:  Nothing to raise, your Honor.  Thank you.

6          THE COURT:  Okay.  Can we call the first witness which

7     is Mr. Linsner.

8          MR. NICYPER:  One question I have, will both witnesses

9     be hearing each other's testimony or will just one witness?

10          THE COURT:  Is there an application to exclude

11     Mr. Regan from -- to exclude the witnesses from the testimony

12     of the other witness?

13          MR. NICYPER:  I have no application in that regard.

14     Since they're both experts, it seems appropriate to have them.

15          THE COURT:  Mr. Cohen, any issue?

16          MR. COHEN:  I have no issue.

17          THE COURT:  Good afternoon, Mr. Linsner.

18          THE WITNESS:  Good afternoon, Judge.

19          THE COURT:  Mr. Linsner, I would ask you to please

20     keep your voice up and try to speak clearly, that's helpful for

21     the court reporter's sake and for me.

22          The plaintiffs may inquire, Mr. Linsner.

23          MR. NICYPER:  Thank you.  I just have one question is

24     Mr. Regan, I don't see him on screen.  Will he be joining?

25          THE COURT:  There he is.

1        MR. NICYPER:  There he is, great.  Thank you, your

2   Honor.

3    KENNETH LINSNER,

4        called as a witness by the Plaintiff,

5        having been duly sworn, testified as follows:

6   DIRECT EXAMINATION

7   BY MR. NICYPER:

8   Q.  Good afternoon, Mr. Linsner.  My name is Dean Nicyper.  I'm

9   one of the attorneys for the plaintiff in this case.

10       You'll recall that you and I met when I took your

11  deposition in this case on January 28, 2020.  Did you see, you

12  received a copy of the transcript of your deposition?

13  A.  I did.

14  Q.  Have you reviewed that transcript?

15  A.  I've read it.

16  Q.  You're engaged by the defendants to serve as an expert in

17  this case?

18  A.  Yes.

19  Q.  You prepared an expert report on October 11, 2019, in this

20  case, correct?

21  A.  I did.

22  Q.  You also prepared an expert rebuttal report dated

23  December 16, 2019, in this case; is that correct?

24  A.  I did.

25  Q.  Regarding your background and qualifications, you have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    never taken a course regarding classical Chinese painting,

2    correct?

3    A.   Correct.

4    Q.   You have never taken any courses on the Chinese art market

5    covering the past 20 years, correct?

6    A.   I don't believe there were any courses.  What I did take

7    was a webinar which was offered as continuing education credit

8    by the American Society of Appraisers.

9    Q.   Prior to this case, you had never held yourself out as

10   someone with special expertise in the Chinese art market,

11   correct?

12   A.   That's not true.  I worked with the Chinese government

13   extensively from 1984 until approximately 2006 as an advisor to

14   the Imperial Palace Museum with regard to appraisal and

15   condition analysis of works of art that were to be included in

16   traveling expeditions.

17   Q.   Mr. Linsner, let me refer you to your deposition testimony.

18   At page 12, I asked the question:

19   "Q.   Prior to this case, you have held yourself out as

20   someone -- have you held yourself out as someone with special

21   expertise in the Chinese art market?

22   "A:   No."

23         Prior to this case, Mr. Linsner, you have never held

24   yourself out as someone with special expertise in Chinese

25   classical paintings, correct?

1    A.   That is correct.

2    Q.   In fact, you do not consider yourself an expert in the

3    Chinese classical paintings, correct?

4    A.   I do not.

5    Q.   You do not speak Chinese?

6    A.   I do not.

7    Q.   And you cannot read Chinese text, correct?

8    A.   Text, yes, I cannot read.

9    Q.   You have not attended any auctions in China, correct?

10   A.   I have not.

11   Q.   You do hold yourself out as an appraiser, correct?

12   A.   I do.

13   Q.   And to find comparables, appraisers generally look at sales

14   records; is that correct?

15   A.   That is true.

16   Q.   You have testified in this case, generally, that when

17   appraisers -- when you do appraisals, you refer to auction

18   records as opposed to private sales records, correct?

19   A.   I would suppose auction records would be the most available

20   to the average appraiser.  Private sale records are often very

21   difficult to gain access to.

22   Q.   In conducting an appraisal, it is necessary to look at the

23   relevant market for the art you are appraising, correct?

24   A.   It is.

25   Q.   At issue here are Chinese classical paintings commonly sold

1   in China; is that correct?

2   A.  Well, they're commonly sold in China.  If you are making a

3   case for the most common market being in China, I'm not so

4   sure.

5   Q.  At issue here also -- strike that.

6           Are you aware that the defendant Andrew Wang sold

7   these paintings from the estate into China, correct?

8           MR. COHEN:  Objection.

9           THE COURT:  What's that?

10          MR. COHEN:  Objection to the characterization of

11  Andrew selling it.

12          THE COURT:  Overruled.

13  Q.  You can answer.

14  A.  I said I've read that he has.  I have no personal knowledge

15  of.

16  Q.  You stated at your deposition that the relevant market for

17  an appraisal is where the works of art are being sold, correct?

18  A.  No.  I may have said that, but what I meant was, if in fact

19  it's exactly what I said prior to this, that the most common

20  market is where the majority of verifiable sales and the

21  activity in that market resides.

22  Q.  At your deposition, page 187, I asked you:  But the

23  relevant market is where the works are being sold, you have

24  stated, correct?

25          Answer:  I have.

L5jekinh                    Linsner - Direct

1    A.   Yes.

2    Q.   You have testified also that you have a complete set of

3    Chinese auction house sales records from 1986 to at least 2020,

4    correct?

5    A.   That is correct.

6    Q.   You additionally testified that if you were to appraise a

7    Chinese classical painting, due diligence requires that you

8    look at those Chinese auction house records, correct?

9    A.   It is.

10   Q.   You are also familiar with viewing various Chinese auction

11   house records on websites such as Artron, Artprice, Artnet, and

12   Live Auctioneers, correct?

13   A.   I am.

14   Q.   All of these websites list sales of Chinese classical

15   paintings; is that correct?

16   A.   That is correct.

17   Q.   You were previously engaged in 2004 by the estate of CC

18   Wang, correct?

19   A.   Yes.

20   Q.   At that time you were engaged by the public administrator

21   who was then acting as co-executor of the estate of CC Wang?

22   A.   Correct.

23   Q.   Yes.  At that time the defendants in this case, Andrew

24   Wang, was a co-executor together with the public administrator;

25   is that correct?

1    A.  I believe so.

2    Q.  That was prior to the time that a jury determined that the

3    will which Andrew Wang and Shou-Kung Wang had submitted to the

4    surrogates court in New York had been procured by fraud and

5    undue influence; is that your understanding?

6    A.  Well, I understand that happened much later.  I didn't

7    follow the case.

8    Q.  But at the time in 2004 you prepared an appraisal for the

9    CC Wang estate; is that correct?

10   A.  I prepared an appraisal for the artwork, the decorative

11   artwork and the antiquities in the estate.

12   Q.  I'll ask if you can please put up that appraisal, please.

13   Showing you a document entitled appraisal of the property of

14   the estate of Chi-Chien Wang.  Do you see that?

15   A.  Yes.

16   Q.  This is a report you prepared in 2004, correct?

17   A.  Correct.

18   Q.  This was a fair market appraisal; is that correct?

19   A.  Yes.

20   Q.  And in it you appraised furniture, decorations, and among

21   other things, a modern Japanese wooden lantern, a pair of

22   Breuer style wassily chairs, and an old Panasonic portable

23   AM/FM stereo?

24   A.  It is.

25   Q.  In this fair market appraisal, you do not identify any

L5jekinh                    Linsner - Direct

 1  comparables; is that correct?

 2  A.  I don't believe I do.

 3  Q.  So you don't identify a single comparable in this fair

 4  market appraisal; is that correct?

 5  A.  I don't believe I do. It is not required of an appraiser to

 6  do so, except when certain limits are met in terms of dollar

 7  amount.  Otherwise it would be impractical for an appraiser to

 8  perform an appraisal of more than one or two objects, simply

 9  because of the time constraints of producing comparables.  Do I

10  have access to comparables in my work file that is where I

11  look?  Yes.  Are they included?  No.

12  Q.  At the time you appraised the estate's furniture and

13  decorations, did the estate ask you to appraise CC Wang's

14  collection of classical Chinese paintings?

15  A.  No.

16  Q.  The estate engaged Sotheby's to prepare an appraisal of the

17  estate's classical Chinese paintings; is that correct?

18  A.  That is.

19  Q.  Given you previously were engaged as an appraiser of the

20  estate of CC Wang, and now you are acting in an expert in

21  opposition to the estate of CC Wang, in the world of

22  appraisers, why is that not a conflict of interest?

23  A.  I was engaged by Mr. Shram, not by any of the heirs or any

24  of the individuals involved in that estate.  And Mr. Shram was

25  the counsel for the public administrator.  So as far as I'm

L5jekinh                    Linsner - Direct

 1  concerned, my client was the public administrator.

 2  Q.  And the public administrator was a co-executor with Andrew

 3  Wang of the estate, correct?

 4  A.  I have no idea.

 5  Q.  In paragraph 32 of your rebuttal report, you referred to

 6  reported auction sales from Chinese auction market as being

 7  unreliable, correct?

 8  A.  I do.

 9  Q.  But there are many art experts who disagree with you; isn't

10  that correct?

11  A.  I wouldn't say that.  Not in my circle.

12  Q.  Okay.  If we can please look at an article that you cite

13  and rely on in your report.  Let's look at this article titled

14  Chinese Art Market Rebounds to 8.5 billion in 2013.

15          Do you see that?

16  A.  I do.

17  Q.  This is an article that you cite three times in your

18  initial report in footnotes 81, 88, and 96, correct?

19  A.  I would assume so.  I don't have the report in front of me.

20  Q.  This is an article by Dr. Clare McAndrew, correct?

21  A.  Yeah, I can barely see.  Yeah, it is.

22  Q.  We can blow that up if you'd like to see that.

23  A.  Okay.  There it is.

24  Q.  And Dr. McAndrew is a well-known art market economist,

25  correct?

1   A.   I think she is, yes.

2   Q.   And you agree in your deposition that she is certainly

3   better known in the art world than you are, correct?

4   A.   Yes.

5   Q.   You are familiar with the art market report that she issues

6   every year?

7   A.   I am.

8   Q.   So if you'd please look at page two of this article, there

9   is a heading in the middle that reads "auctions as the engines

10  for growth."

11           Do you see that heading?

12  A.   I do.

13  Q.   And then if you go a couple paragraphs down with that

14  paragraph.  And please feel free to read the entire paragraph,

15  but I want to point you to a couple of statements in that

16  paragraph that begin toward the end of the third line.  It says

17  in China -- maybe we can highlight that.

18  A.   Okay.

19  Q.   It says, "In China, on the other hand, auction sales have

20  been the main engine of growth and account for close to

21  70 percent of the market.  The remaining 30 percent of sales

22  are made by galleries who deal primarily in contemporary art,

23  private dealers, and sales directly from artists.  The power

24  and influence of auction houses in the art market in China

25  extends significantly beyond their impact in the West.  Because

L5jekinh                    Linsner - Direct

1    consistent sources of information and platforms for discussion

2    on subjects relating to quality and value are still developing,

3    auctions have played a major role in determining valuations as

4    well as developing the general public's exposure to and

5    ultimately taste in art."

6          Do you see that?

7    A.  I do.

8    Q.  So Dr. McAndrew is not only relying on Chinese auction

9    sales data in her article, she says they are 70 percent of the

10   art market and play a major role in determining valuations,

11   correct?

12   A.  I disagree with that.  I read it differently.  I read it as

13   an overview of the art market, and in fact, where she states

14   70 percent of the sales take place, I would agree with that.

15   It doesn't discuss the quality of the sales.

16   Q.  It also says they play a major role in determining

17   valuations, correct?

18   A.  I have no idea what she means by that.  That would be if

19   someone wanted to rely upon them, they could.  And it would be

20   risky at best, but she doesn't go far enough with this.  She

21   simply states that the average person looking at this might

22   well decide that these were worthy of attention, and indeed

23   some of them are.

24   Q.  Okay.  But whether or not you agree with Dr. McAndrews'

25   reliance on Chinese auction house sales data, you will agree

1   that there are other art market authors and experts who do not

2   share your view, correct?

3   A.  I said.  So I said, in my circle, in the active appraisal

4   circle of this type of property, I have few opponents.  But

5   they do exist.

6   Q.  If we could, can we look at Exhibit 4.

7           Mr. Linsner, this is an article titled -- and this is,

8   I'm sorry.  Yes, that's correct.  Article titled "China Set New

9   Records for Asian Art Auctions."  Do you see that?

10  A.  I do.

11  Q.  And this is an article you cite to and rely on in footnote

12  94 on page 20 of your report, correct?

13  A.  I don't know.  I don't have the report in front of me.  I

14  presume you're correct.

15  Q.  If we can look at the second page of this document about

16  halfway down the page.  There is a quote there that begins with

17  the word "auctions."  Do you see that?

18  A.  "Auctions have been the main engines, yes."

19  Q.  It says "Auctions have been main engines of growth and

20  heavily dominate the market, accounting for close to 70 percent

21  of sales in China."  Do you see that?

22  A.  I do.

23  Q.  Again, that article and that author is not only referring

24  to and relying on Chinese auction house sales data, but says

25  those auction house sales dominate the market, correct?

L5jekinh                    Linsner – Direct

1    A.  It does.

2    Q.  You stated at your deposition that due diligence requires

3    that you look at Chinese auction data for Chinese paintings

4    sold in the Chinese market, correct?

5    A.  I did so state.

6    Q.  The extent to which an appraiser incorporates Chinese

7    auction sales data into an appraisal requires the appraiser to

8    apply his or her judgment, but data from a source that

9    dominates the market cannot properly be ignored by an

10   appraiser, correct?

11   A.  I wouldn't ignore it totally.  As I said, something to take

12   into consideration.

13   Q.  In your initial expert report, you referred to the

14   appraisal Sotheby's prepared of the Chinese classical paintings

15   in the CC Wang estate in 2004, correct?

16   A.  Yes.

17   Q.  And this was an appraisal Sotheby's prepared at or about

18   the time you prepared your appraisal of the estate's household

19   items, correct?

20   A.  Yes.

21   Q.  Let's take a look at that.  I want to mark this as

22   Plaintiff's Exhibit 1 if I could.  This is a document entitled

23   "Property from the Estate of CC Wang" dated October 1, 2004.

24   Mr. Linsner, is this a copy of the Sotheby's appraisal that you

25   referred to in your expert report?

1   A.  I can't tell based on what you have on the screen, unless

2   you blow it up and go down.

3           So I can see it says prepared by Sotheby's.  Okay,

4   yes.

5   Q.  Okay.  So is this a copy of the Sotheby's appraisal you

6   referred to in your report.  I apologize for the difficulty of

7   doing this.

8   A.  I would assume.  I would assume that it is, based on just

9   the cover page.  Although it doesn't really, the rest of it

10  would have -- you'd have to show me the following pages.

11  Q.  Okay.  We will actually be able to do that.

12          MR. NICYPER:  And your Honor, I'd ask that this

13  document be entered into evidence for the purposes of this

14  hearing.

15          THE COURT:  Any objection, Mr. Cohen?

16          MR. COHEN:  No objection.

17          THE COURT:  Received.

18  Q.  In your expert report in this case, Mr. Linsner, you state

19  that the Sotheby's appraisal was performed by Arnold Chang,

20  correct?

21  A.  Yes.

22  Q.  In your view, Mr. Chang was considered to be one of the

23  leading experts, if not the leading expert, in Chinese

24  classical painting, correct?

25  A.  At the time, yes.  There were others, there were others

1    like James Cahill and a numbers of others in museum situations

2    in terms of their expertise with paintings, but he was the one

3    that put himself forward as a valuation expert.

4    Q.  Yes.  Well, in your deposition at page 122, I asked the

5    question:  Do you have any criticisms concerning the Sotheby's

6    report content, method or results?

7         You answered:  I will tell you this.  That the

8    gentleman that conducted the appraisal was considered to be one

9    of the leading experts, if not the leading expert, in Chinese

10   classical paintings as of the date of the report.

11        Mr. Linsner, in your view, the Sotheby's 2004

12   appraisal is reliable, correct?

13   A.  Yes.

14   Q.  You consider Andrew Chang to be more knowledgeable than you

15   with respect to Chinese classical paintings?

16        MR. COHEN:  Objection.  Arnold?

17   Q.  You considered Arnold Chung --

18   A.  Chang.

19   Q.  Chang.  Thank you very much.  To be more knowledgeable than

20   you with respect to Chinese classical painting, correct?

21   A.  Yes.

22   Q.  The Sotheby's appraisal of the CC Wang estate, Arnold Chang

23   and Sotheby's repeatedly rely on sales reported from Chinese

24   auction houses for comparables, correct?

25   A.  I have seen that.

1    Q.  So let's look at a little bit of this if we could.  If we

2    can go to the first painting in this appraisal.  Painting

3    number one.

4            You see in the comparable is a painting sold to China

5    Guardian, correct?

6    A.  I do.

7    Q.  And China Guardian is a mainland auction house in China,

8    correct?

9    A.  Yes.

10   Q.  If we can flip to item five, two pages in.  Again there we

11   look at the comparables.  There is another comparable from

12   China Guardian, correct?

13   A.  There is.  But there is also one from Sotheby's.

14   Q.  I see that.  So he cites to both, correct?

15   A.  Right.  I think you have to look at it this way.  When you

16   have no other choice, you want to at least state that you've

17   examined a potential comparable from a Chinese art market, and

18   that's what he's doing.  He is not saying these are absolute

19   comparables and I stand on them.  He is saying, well, to

20   support my opinion, I have gone into both markets.

21   Q.  Let's continue on just a little bit.  If we can look on the

22   bottom, item six, that same one.  Refers to a work sold at

23   Sungari Beijing, correct?

24   A.  Yes.

25   Q.  And that's the only comparable there.  And that's another

1   auction house in China, correct?

2   A.  It is.  But again, when you have nothing else to rely on,

3   you take your chances and then you have to describe the

4   extraordinary assumptions that led you to use those

5   comparables.

6           THE COURT:  Excuse me for one moment.  There is a

7   Kathryn Tewson I think it is who entered a note in the chat box

8   indicating to everyone.  I'm not going to look at that, but I

9   would caution everybody to be careful about the chat box and

10  how they use it.

11          Mr. Nicyper, you may continue.

12          MR. NICYPER:  Thank you.

13  Q.  Let's, we'll look at one more here.  We'll look on page

14  seven, item seven.  And this is one sold at Jinghua is the

15  comparable there.

16  A.  Okay.

17  Q.  Correct?

18  A.  Yeah.

19  Q.  And that's another Chinese auction house, correct?

20  A.  It is.

21  Q.  And then you can even look at number eight just below that.

22  There is another one sold in a Chinese auction house, correct?

23  A.  Yes.

24  Q.  And we can go on and on, but we only have 30 minutes.  So

25  suffice it to say there are many comparables from mainland

1    China auction houses in this Sotheby's appraisal report

2    prepared by Arnold Chang, correct?

3    A.   There are.  But again, he's utilizing them when there are

4    no other comparables in the West.  When there are comparables

5    in the West, he is using them.  When he's not, he's using

6    these.  Whether how much he relied upon them, I do not know,

7    because there is no appendix here.

8    Q.   But, Mr. Linsner, we in fact looked at one that you pointed

9    out -- at least one, maybe others -- where he had comparables

10   from both Western auction houses and the Chinese mainland

11   auction houses?

12   A.   Absolutely.

13   Q.   So your statement is not accurate, is it?

14   A.   What statement is not accurate?

15   Q.   That he only used China auction houses when he had no

16   others?

17   A.   Well, no, no, that's not what I meant.  What I meant was,

18   that when he has single issues and he's gone to a Chinese

19   auction house and he's found what he thinks might be a

20   comparable, he's used it.  In the face of potentially, you

21   know, having to run up against questioning later on, that's

22   all.

23   Q.   But in fact, 70 of the 147 comparables in the Sotheby's

24   appraisal are mainland auction house sales, correct?

25   A.   I have no idea.  I would not have added them up.

1   Q.  I invite you to do so.  If my math is wrong, somebody can

2   correct me.

3           The Internal Revenue Service guidelines posted on its

4   website, they do not say that Chinese auction house sales are

5   unreliable, correct?

6   A.  I have no idea.  I haven't looked at their website in quite

7   a while.  I would presume they would not.

8   Q.  In fact, you state in your initial expert report that

9   Sotheby's appraisal was reviewed by the IRS's art appraisal

10  committee and was accepted by them, correct?

11  A.  I'd have to look and see who actually reviewed it.  There

12  is -- there is no such thing as the art appraisal committee.

13  However, there is the art appraisal service, the AAS.  And then

14  there is the art panel.  So, I'm not sure what you're referring

15  to.

16  Q.  Well, I'm referring to your report at page 25, I'm sorry.

17  Paragraph 25 on page 11.  The Linsner October 19 expert report.

18  Paragraph 25.

19          Keep going, scroll down just a little bit more.

20          You say was reviewed by the IRS's art appraisal

21  committee and was accepted.  Do you see that?

22  A.  Art appraisal committee.  Yeah, actually, it should have

23  said art appraisal services.

24  Q.  I see.  But those are your words, correct?

25  A.  Oh yeah, absolutely.

L5jekinh                         Linsner - Direct

1    Q.  In any event, the IRS accepted the Sotheby's appraisal with

2    the Chinese auction mainland house comparables, correct?

3    A.  I have no idea.  I presume they did.

4    Q.  Well, you say they did.

5    A.  Well, I was told they did.

6    Q.  Okay.

7    A.  I have no internal knowledge, okay.

8    Q.  But you make that statement in your report.  You don't say

9    you don't have any internal knowledge, correct?

10   A.  Well, I think that was -- I don't know what the footnote is

11   on that.  Do you have the footnote on whatever that was?  That,

12   footnote 46.  That's 46.  Okay.

13   Q.  I don't know what footnote is.

14   A.  It says see Id.  Yeah, so this came from a document that

15   was provided to me.  It is not anything that I personally came

16   from the estate or the administrator.  It is nothing that I

17   personally researched.

18   Q.  So you have no reason and no evidence to dispute that the

19   IRS accepted?

20   A.  No, I have none.  But I would take a look at the dates of

21   these appraisals and take a look at the dates of the documents.

22   And between 2000 and 2007, there was less of a problem with

23   these Chinese art auction records than there is now.

24          THE COURT:  Mr. Nicyper, five minute warning.

25          MR. NICYPER:  Oh my God.  Okay.

1    Q.  In your expert reports, you do not cite any appraisal

2    guidelines that state appraisers should not use auction house

3    results from mainland China auctions, correct?

4    A.  I state my own opinion.

5    Q.  You do not cite any guidelines that state appraisal

6    guidelines from any organization that say you should not do so,

7    correct?

8    A.  There is, yeah, unfortunately, there are none in writing.

9    However, verbally and internally there is some question about

10   it.  And there have been some solutions to that problem.

11   Q.  Well, I object to your referencing verbally and internally

12   if that hasn't been provided in your report.

13         You did not conduct any appraisals of the 98 paintings

14   at issue in this case, correct?

15   A.  I did not.

16   Q.  You did ask your assistant to look at those, correct?

17   A.  No I didn't ask her to appraise anything.  We appraised

18   nothing in this case.

19   Q.  But you did ask her to look up the comparables?

20   A.  I did ask her to examine the comparables that were used by

21   Mr. Regan, yes.

22   Q.  In your rebuttal report, you do not identify any

23   comparables that you think Mr. Regan should have used but did

24   not, correct?

25   A.  That was not my assignment.

1   Q.  If we could please go to Exhibit 6.  And this is your

2   initial report, Mr. Linsner, page 18, paragraph 37.  It says

3   there that you show an example that in 2007, 2010, 74 percent

4   of Poly's earnings were never realized because of buyer

5   default, correct?

6   A.  That's what it states.

7   Q.  But in fact, we covered this at your deposition, you were

8   absolutely wrong; isn't that correct?

9   A.  Yes.  My assistant took responsibility for that error, yes.

10  Q.  In fact, the statement in the cited materials said

11  74 percent were paid, correct?

12  A.  Yes, it did.  Which leaves us with 26 percent uncollected.

13  Q.  But your statement in the report is not correct, correct?

14  A.  It is an error on the basis -- well, my assistant took

15  responsibility for it.  I read it, but I didn't read it

16  carefully enough.

17  Q.  We addressed this point fully at your deposition?

18  A.  We did.

19  Q.  And you acknowledged then that it was an error, correct?

20  A.  I did.

21  Q.  But you never corrected that in your report, did you?

22  A.  Why would I correct it after my deposition?

23  Q.  I see.  Because the defendants have submitted that report

24  to this Court with that error, and never disclosed to the Court

25  that the statement was wrong, correct?

1           MR. COHEN:  Objection, your Honor.

2           THE COURT:  That's argument.  Move on, Mr. Nicyper.

3           MR. NICYPER:  Okay.

4   Q.  Let me ask about one last section here.  Again, if you

5   would look at your rebuttal report, please.

6   A.  I'm not going to look at that.  I don't have it in front of

7   me.

8   Q.  We'll pull it up here.  In paragraph 37, you accuse

9   Mr. Regan of making -- and I quote -- one particularly

10  egregious error that exemplifies the problem of reliance on

11  Chinese auction results.  Do you see that?

12  A.  Let's see.  Okay, yes.

13  Q.  And this egregious error that you accuse Mr. Regan of

14  making was his use of a citation to an auction result from Poly

15  International in the spring of 2019 auction, correct?

16  A.  Yes.

17  Q.  And that comparable was for an artist Ni Zan, and Mr. Regan

18  said he relied on that painting for his appraisal that it sold

19  for approximately $9 million, correct?

20  A.  I believe so.

21  Q.  In paragraph 38 of your report, you state in the last

22  sentence, you state that the 9 million comparable to appraise

23  was not verifiable, correct?

24  A.  Yes.

25  Q.  And you say that it was not verifiable because you were

L5jekinh                    Linsner - Direct

1   unable to find that when you looked for it, correct?

2   A.  Correct.

3   Q.  So you concluded that he was wrong, correct?

4   A.  I presume we did.

5   Q.  If you look again at paragraph 38, you actually say that

6   his not verifying it and your not verifying it led you to

7   question the integrity of Mr. Regan's data collection and

8   analytical rigor, correct?

9   A.  Yes.

10  Q.  Those are pretty serious allegations, correct?

11  A.  They're average allegations, yeah.

12  Q.  I see.  But at your deposition, we discussed the fact it

13  was in fact you or your assistant who made the particularly

14  egregious error, correct?

15  A.  That is correct.

16  Q.  In fact the price Mr. Regan had reported was absolutely

17  correct, wasn't it?

18  A.  It was.

19          MR. COHEN:  Objection.

20          THE COURT:  Overruled.  But Mr. Nicyper, you're now at

21  time.  You can go into what you want to use for your other

22  witness.

23          MR. NICYPER:  I just have a couple last questions.

24  Q.  We established again this error at your deposition,

25  correct?

1    A.   Yes.

2    Q.   And you acknowledged then that it was an error, correct?

3    A.   Yes.

4    Q.   But you never corrected it in your report, correct?

5    A.   I never did.

6    Q.   But are you aware that nonetheless that report was

7    submitted with that error, and no one disclosed that the

8    accusation, the accusation you were making was unfounded,

9    correct?

10   A.   No one.

11             MR. COHEN:  Objection.

12             THE COURT:  Overruled.

13             MR. NICYPER:  Okay, your Honor, I will cede my time.

14   I appreciate it very much.

15             THE COURT:  Mr. Cohen, you've got 15 minutes.

16             MR. COHEN:  Your Honor, I apologize.  Ms. Tewson is my

17   paralegal.  I think she was intending to send me a direct

18   message for a note on this redirect.  Not intending to send it

19   to everybody.

20   CROSS-EXAMINATION

21   BY MR. COHEN:

22   Q.   Mr. Linsner, what is the American Society of Appraisers?

23   A.   It's one of the two largest appraisal organizations for

24   professional appraisers in the United States.

25   Q.   Does the ASA provide continuing education courses?

1    A.  It does.

2    Q.  What's the purpose of continuing education courses?

3    A.  It is to provide information to professional appraisers, to

4    help them make their services more valuable to their clients,

5    and at the same time, to apprise them of changes in the laws or

6    codes.

7    Q.  Now, in your experience, is the information provided in ASA

8    continuing education courses generally accurate?

9    A.  Yes.

10   Q.  There has been a whole discussion about reliance on Chinese

11   auction results in appraisals.  Do you know whether that

12   subject was touched on at any ASA continuing education courses?

13   A.  It was in a webinar in February of 2020.

14              MR. COHEN:  Kathryn, can we pull up that ASA newsroom

15   piece, please.

16   Q.  Mr. Linsner, while that's happening.  Are you familiar with

17   the ASA's appraisal newsroom blog?

18   A.  I am.

19              MR. NICYPER:  Just note my objection that none of this

20   material was covered in the report or produced prior to late

21   last night.

22              THE COURT:  Objection noted.  Continue.

23   BY MR. COHEN:

24   Q.  What is the appraisal newsroom blog, generally speaking?

25   A.  Well, it is a kind of a rapid information system that's

1   used, appraisers can go in, read notes, read changes in the law

2   that may have happened a day ago or two days ago, or they are

3   advised about courses and upcoming events.  That kind of thing.

4   Q.  If we scroll down to the third paragraph of this blog.

5   Scroll up just to the end of that first page.

6           So you see that the discussion of this webinar says

7   that Dr. Thompson will address the following, and one of the

8   things there is why the IRS will not accept realized sales from

9   Chinese auction houses.

10          Do you see that?

11  A.  I do.

12  Q.  Okay.  When you attended the webinar, was that topic

13  actually discussed?

14  A.  It was.

15  Q.  And what was the ASA advising people about the IRS's policy

16  on accepting Chinese auction sales?

17          MR. NICYPER:  I do note objection to extensive

18  hearsay, although I realize this is expert testimony.

19          THE COURT:  All right.  The objection is overruled.

20  A.  There is some issues that were raised, including fiduciary

21  conduct and controls of the auction houses, the lack of

22  significant vetting of the property being offered, and the

23  reporting of the post sale results.  These are the three areas

24  of major weakness that were emphasized in this examination of

25  why the IRS will not accept the results.

L5jekinh                    Linsner - Cross

1   Q.  As a result of that, you were informed that the IRS policy

2   is no longer to accept Chinese auction results, correct?

3              MR. NICYPER:  Again, objection.

4              THE COURT:  Mr. Linsner, is this something you have

5   personal knowledge of?

6              THE WITNESS:  Yes, I do.  I was under contract in the

7   Internal Revenue Service from 1983 to 2001, and I currently

8   hold a contract with the commissioner of Internal Revenue

9   Service for a major case, which I cannot discuss, which

10  involves contributions, over $9 billion worth.

11             I'm in contact with chief counsel Bill White, and with

12  the entire staff on a weekly basis.  And I personally have

13  contacted my compatriot here in New York in 1533 Group who is

14  an appraiser, the only appraiser in Northeast region, who is

15  not a part of the art advisory service.  And we all agree there

16  is a significant problem in accepting Chinese auction results.

17  Q.  Were you --

18             MR. NICYPER:  I maintain my objection, your Honor.

19  All of this is unverifiable hearsay.

20  BY MR. COHEN:

21  Q.  Were you informed in those conversations about whether the

22  IRS has a policy as described in the ASA?

23  A.  I had been in touch with Joe Rosica who was in the AAS.  He

24  said, and of course, apparently, other people have attempted to

25  find out if there is any written policy.  There is no written

1    policy.  But, he verbally concurred that these are the

2    problems, and if you have other alternatives, you should use

3    them and not the Chinese art auction records.

4    Q.  Now, did you do anything after you attended the webinar to

5    follow up with Dr. Thompson?

6    A.  I did.  Because as you probably would, due diligence

7    requires that I find out where this information came from that

8    she used in her webinar.

9            MR. COHEN:  Kathryn, you can pull that down.

10   Q.  And what did Dr. Thompson tell you about the source of her

11   information?

12   A.  She said it went back as far as --

13           MR. NICYPER:  Objection.

14           THE COURT:  I'm going to take the testimony subject to

15   a motion to strike.

16   A.  As far as back as 2017, the Appraisers Association of

17   America, which is a different organization, AAA, had had -- and

18   they've had them on an almost yearly basis -- something called

19   ask IRS panel discussions.  And during that panel discussion,

20   the issue was broached.  And again, Rosica, Robin, Bonner,

21   others that were attending or part of that panel, stated that

22   they had problems with all of the issues that I've raised.  The

23   fiscal issues, the vetting issues and the reporting issues.

24   Q.  And the reporting issues, by that you mean that sometimes

25   or fairly often the sale price listed never actually happened,

1    correct?

2              MR. NICYPER:  Objection.  Leading.

3              THE COURT:  Sustained.

4    Q.  Mr. Linsner, what do you mean by the reporting issues?

5    A.  There have been significant reporting of sales which never

6    took place or took place at huge, huge multiples of what the

7    object was worth.  Some of this is due to something called

8    courtesy froth, which the Chinese like to use to pump up their

9    auction records.  People bid on objects, do not collect them.

10   I was in fact -- an estate that I represented was a victim of

11   courtesy froth.  And the uncollectible portion of these sales

12   has been well, you know, in the 50, 52, 53 percent.  So when

13   you use a Chinese auction record, it's 50-50 whether that's a

14   real sale or not.

15   Q.  By the way, this information that you've been discussing

16   that you gathered from Dr. Thompson, from the CE courses,

17   otherwise from the organization.  Is that the type of

18   information that appraisers generally rely on in their practice

19   as they decide what to include and what not to include?

20   A.  It is.

21             MR. NICYPER:  Objection.

22             THE COURT:  Overruled.

23   A.  In March of 2018, I found an e-mail blast from the chair of

24   the personal property committee of the ASA in which he says the

25   IRS does not accept auction results.  This is a -- from Chinese

auction houses and their branches.  And this is an e-mail

blast, that means it was the only issue.  It wasn't part of a

blog, and it was sent out to sort of warn appraisers about the

use of these records.

          MR. NICYPER:  I note my further objection.  None of

this has been provided and was not in his reports that he had

time to prepare.

          MR. COHEN:  Let's move on from this subject.

Q.  Now, Mr. Linsner, Mr. Regan's appraisal didn't disclose any

of the adjustments that he made to the comparables that he

included.  Was that compliant with USPAP?

A.  It probably was not.  And I'll tell you why.  Because, when

you make an adjustment, obviously these are not fungible items.

They are not three identical paintings, one of which has been

sold or attempted to be sold.  These are all different

subjects, they're different types of painting, and so forth.

So the question is, even if by same artist, what are the

adjustments you are making.  Just as in a house that has two

bathrooms, you decide to use a comparable with four bathrooms,

you have to disclose the fact that your comparable had two more

bathrooms and therefore you are adjusting the sale price to a

certain level.  Same is true with these works of art.

Q.  And if Mr. Regan had disclosed his adjustments, would you

have been able to review those adjustments for consistency and

reasonableness?

L5jekinh                    Linsner - Cross

1    A.   Yes.

2    Q.   Without that disclosure, did you have any way to conduct

3    that review of his adjustments?

4    A.   No.

5    Q.   Mr. Regan testified at his deposition that there were

6    potential comparables he had given serious consideration to,

7    but didn't end up relying on in his appraisal.

8         Would it have been useful for you in critiquing his

9    appraisal to know what those rejected comparables were?

10   A.   When you mention, when you even bring up a comparable and

11   say I looked at this but I decided not to use it, you're

12   obligated to describe your methodology and why you chose not to

13   use it.  If he had not mentioned it at all, well, that's a

14   different story.  Because, you know, but once you say I

15   rejected these comparables, well then, why did you reject them?

16   Q.   Now, Mr. Regan's fair market value appraisal is conducted

17   as of October 2019.  Can an appraisal as of October 2019 --

18        THE COURT:  Pardon me, Mr. Cohen.  You've got three

19   minutes to go.

20        MR. COHEN:  Thank you, your Honor.

21   Q.   Can an appraisal as of October 2019 tell you anything at

22   all about whether the sales at issue were for fair value when

23   they were made in 2005 or 2006 or 2009?

24   A.   Absolutely not.  The market changed significantly.

25   Q.   We were talking about -- speaking of market change.  We

 1  were talking about the IRS accepting the appraisal in 2007.

 2  Were these issues with the Chinese auction houses and the

 3  reporting issues and the vetting issues, were those as well

 4  known and well documented in 2007 as they are now?

 5  A.  No.

 6  Q.  And by the same token, when Arnold Chang was relying on

 7  Chinese auction values in 2004, when he did that Sotheby's

 8  appraisal, did he have all of the information about their

 9  unreliability that Mr. Regan had in 2019?

10  A.  No.

11  Q.  Just briefly, let's talk about some of those articles that

12  you looked at.  I'm going to pull that up and share the screen

13  with you for a second.

14          This is the Clare McAndrew article that you looked at.

15  I am going to scroll down to page six of that article and

16  highlight four issues here.

17          Ms. McAndrew writes about the problem of late and

18  non-payment by winning bidders at auction, and says it is more,

19  it's much more marked and persistent than in other markets.

20          What is she talking about here?

21  A.  Well, I presume she's talking about Chinese auction houses

22  and there are a number of problems.  The lack of fiduciary

23  controls and vetting and all of that.

24  Q.  So she is discussing the unreliability of some of these

25  results?

L5jekinh                    Linsner - Cross

1          MR. NICYPER:  Objection --

2     Q.  In this article?

3          MR. NICYPER:  Objection.  Leading.

4          THE COURT:  Overruled.

5     A.  Yes.

6     Q.  And same token the other -- the art conversations article.

7     I am going to scroll down to page four of that one.  And here

8     you see the highlighted paragraph in this piece.

9     A.  Yeah, I am going to have to take my glasses off to see it,

10    yeah, okay.

11    Q.  Again, is this article as well discussing issues with the

12    reliability of Chinese auction house data?

13    A.  Yeah, it does, talks about the inability to uncover the

14    sales data which would lead to your opinion as to whether the

15    sale was actually real or not.

16    Q.  Okay.

17         THE COURT:  Mr. Cohen, your time.

18         MR. COHEN:  Thank you, I have one last question.

19    Q.  Mr. Regan testified that he did not discount Chinese

20    auction sales at all to account for unreliability for the

21    non-payment issue.

22         In your view, is it a realistic assumption to assume

23    that all of the 300, 400 or so comparables from Chinese

24    auctions that Mr. Regan relied on actually consummated at that

25    sale price?  Is that a realistic assumption?

L5jekinh                    Linsner - Cross

1  A.  Not at all.

2          MR. COHEN:  I have nothing further, your Honor.

3          THE COURT:  Mr. Linsner, I've got two questions for

4  you.  My first question is, what information would you have

5  needed in Mr. Regan's report to be able to review his

6  appraisals for reasonableness and consistency?

7          THE WITNESS:  I would need to know his adjustments

8  that he made for the comparables.

9          THE COURT:  Meaning what?

10          THE WITNESS:  Judge, can I give you like a 20 second

11  précis?

12          There was the head of Wildenstein -- very short -- the

13  head of Wildenstein research division, we are talking about

14  Wildenstein the big art dealer.  His name was Roy Fisher, and I

15  knew him and I discussed one day with him pricing of objects.

16  He said when he first came in, Daniel Wildenstein handed him a

17  drawing by Toulouse-Lautrec that he had just brought from

18  Paris, and he said but we have one here just like it.  He

19  pulled it out, and put it on the table, and he said, well, how

20  would you price this, Roy?  And Roy said, well, we have the one

21  for 10,000 and the other one I am going to price it 10,000.

22  And he said, I'll give you 15 minutes and I will come back.  He

23  came back in 15 minutes and said, Roy, how would you price

24  them?  He said 10,000 and 10,000.  They're almost identical.

25  He said, but did you count the heads of the people in the

1   audience in the circus tent?  There were four more heads in one

2   drawing than the other, so that is an adjustment, and he

3   appraised it at 12,000 instead of 10.

4        So that kind of a fine adjustment is what we are

5   talking about.  And by the way, there are cases --

6        THE COURT:  So, Mr. Linsner, my second question is if

7   I am to credit what you've said about the unreliability of

8   Chinese auction house results, why would an appraiser include a

9   Chinese auction house result at all in an appraisal, even if it

10  was the only result that's available?

11       THE WITNESS:  Good question.  I would suggest that in

12  the 2000 to 2004 or 5 range, there might have been a

13  possibility of relying upon some of those sales.  As we move

14  forward, I think you have to have a disclaimer in your

15  appraisal saying, well, I couldn't find anything else.  I've

16  used the Chinese auction records, and it is a crapshoot.  50-50

17  the actual sale is consummated.

18       THE COURT:  Very well.  Mr. Linsner, you are excused.

19  Thank you very much.

20       (Witness excused)

21       THE COURT:  Mr. Regan, we'll now hear from you.

22  Mr. Regan, please try to keep your voice up and speak clearly

23  for the benefit of the court reporter.

24       Mr. Cohen, you may inquire.  You've got 44 minutes.

25       MR. COHEN:  Thank you, your Honor.

1      MR. NICYPER:  Your Honor, can I just note Mr. Cohen

2  asked for 15 minutes for Mr. Linsner and then 45 for Mr. Regan,

3  but he actually took 30 minutes for Mr. Linsner.

4      THE COURT:  No, no.  He took 16 minutes.  That's the

5  reason why he's got 44.

6      MR. NICYPER:  That was 16 minutes?  Okay.

7   PATRICK REGAN,

8      called as a witness by the Defendant,

9      having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. COHEN:

12  Q.  Mr. Regan, my name is Akiva Cohen.  I represent the

13  defendants.

14      In terms of appraisals, you'll agree it is important

15  to rely on multiple comparables, correct?

16  A.  Definitely, yes.

17  Q.  One reason for that is that auctions can have outlier

18  results at times, right?

19  A.  Yes.

20  Q.  For example, you can get two people with egos competitively

21  bidding up a piece well beyond its expected worth, because they

22  just don't want to lose to the other guy, right?

23  A.  That could certainly happen, yes.

24  Q.  Or you can have an auction where it just so happens that

25  pretty much all the buyers who would be interested in a piece

1    got lucky and spent their money on other pieces before, so it

2    ends up going undervalue or being bought in, correct?

3    A.   Right.

4    Q.   Ideally, you want to be able to look at multiple

5    comparables and triangulate value based on those multiple

6    comparables?

7    A.   Correct, yes.

8          MR. COHEN:  Kathryn, if you can share the fair market

9    value appraisal that we have lined up.

10   Q.   So, I'd like you to take a look at it as it comes up.  And

11   this is your fair market value appraisal, but as we look at the

12   top of page 76 of that appraisal, you'll notice that this

13   version has the actual appraised values redacted.  Do you see

14   that?

15   A.   Oh, I thought it was cropped.  Yes.

16   Q.   No, we're just focused in at the top of page 76.

17   A.   Right.

18   Q.   Sitting here today, do you recall the value at which you

19   praised that Ma Yuan fan painting?

20   A.   I believe I do.  But are you asking me to perform an

21   appraisal now?

22   Q.   Well, right now I just want to know if you remember the

23   value you placed on it.

24   A.   I believe, I believe I do, I mean.

25   Q.   What was it?

1    A.  I have to look at the comparables and everything else at

2    the data.

3    Q.  Right now I want to know if you remember it sitting it

4    right now off the top of your head?

5    A.  I can -- I think I do, yes.

6    Q.  So what is that you think you recall?

7    A.  I have to move my screen so I can see the image.  This is

8    the one with the scholar.

9    Q.  Yes.

10   A.  And the crane.  So that's I think -- not as great of an

11   image.  I believe there was one that was, I remember selling

12   prices were like, I think it was 6 and 4 million.  I believe.

13   I'd have to see.  I can only see a small bit of the screen

14   here.  If you can scroll down.

15   Q.  Okay.  So you don't recall off the top of your head without

16   further review?

17   A.  That's why I write things to the Court.

18   Q.  That's fine.  Scrolling down, and Kathryn, if you can

19   scroll down so we can see the whole page.  You'll see you have

20   a number of comparables here.

21        Now, taking a look at the comparable there for

22   $1,696,000 that was sold at Christie's Hong Kong, do you see

23   that?

24   A.  Yes, getting smaller, but yes.

25   Q.  Okay.  Now, on that one, do you recall the specific

 1 | adjustments that you made to that comparable as you were doing

 2 | your valuation?

 3 | A.  I think it would be more illustrative to show how I would

 4 | look at these comparables that I chose.  And --

 5 | Q.  Mr. Regan, right now I am asking you a different question.

 6 | A.  Okay.

 7 | Q.  Right now I want to know, do you have a specific memory of

 8 | what you did in 2019 with respect to that comparable?

 9 | A.  Yes.

10 | Q.  Okay.  What is it that you recall specifically doing with

11 | just that comparable sale?

12 | A.  Absolutely.  First of all, this is an interesting case,

13 | because we have what I would call a direct comparable, which is

14 | we actually have that piece that sold.  So, technically, a lot

15 | of other appraisers would not even bother to put in other

16 | comparable, because we actually have that piece in a relatively

17 | recent auction.  That exact piece selling.

18 | So when I would look at in this case the Christie's in

19 | 2017, which is a -- it's not an attributed artist.  It wasn't

20 | labeled as from that artist.  So, it was obviously at that

21 | range, there was enough people who believed it was that artist,

22 | but it was not an attributed artist.

23 | The other thing I would look at, the other thing why I

24 | would adjust or at least less put less weight on that

25 | comparable, and I do put that right there, not an attributed

1    artist, but put less weight on that comparable would be the

2    fact that not only is it not officially attributed or

3    recognized at least by Christie's as authentic, but we have

4    such a huge direct comparable.

5           So, I would list the other comparables in the sense of

6    disclosure to show even a non-attributable piece that has some

7    market recognition that this could be the work, even that can

8    sell for $1.7 million.

9    Q.  Okay.  As to that $1.7 million sale, by what percentage did

10   you increase the implied value to account for the fact that it

11   wasn't attributed?

12   A.  That's not how appraisers usually work.  And actually the

13   IRS kind of shies upon any sort of strict mathematical, except

14   in the case of blockage discounts or things like that.  We

15   don't have a specific mathematical formula, because there are

16   far too many nuances between the objects.

17          In this case, the adjustment would be in a sense that

18   would be a very low weighted comparable.  The adjustment would

19   be more so to the recent sale of actual item, which would be

20   4.05 million, and fair market value I would I do -- I have a

21   tendency to be a lot more a lot more conservative.  I probably

22   would have put, I would say, probably around 4 for that.  I

23   would have to spend a little more time.

24   Q.  That's okay.  Looking at the 500 --

25   A.  I do want to note, in the sense --

1   Q.  Mr. Regan, I'm sorry.  I have limited time.

2   A.  No problem.

3   Q.  I want to go to a different comp.  Looking at the $516,000

4   comparable from the September 2017, that's an attributable

5   painting, right?

6   A.  This is a good illustration of how it is nuanced.  You

7   can't just put numbers on to it.  Again, I included it because

8   I wanted to include all my data.  This is a Tokyo Chou auction

9   house, would be understood as not top-most tier.  The reason it

10  is a lower price, and I even say slightly less enviable auction

11  venue.  When you have a less enviable auction venue, it is all

12  about market confidence.  And if the collectors don't expect a

13  Ma Yuan piece to be there, I included it because I wanted to

14  show more data that can give a little bit of insight as to the

15  market for, in this case, at least, Ma Yuan.

16  Q.  So, what we have here is a set of three comparables in

17  2017, 2018 --

18  A.  Four.

19  Q.  No, just the ones in 2017 and '18.

20  A.  Sorry.

21  Q.  Would have ranged between $517,000 at a slightly less

22  enviable auction venue, and 1.7 million, or sorry, 2.3 million

23  in Christie's Hong Kong just the year before your appraisal.

24  You see that?

25  A.  I do.

1  Q.  Yes, and then six years earlier, you have what's listed as

2  a sale of the same painting sold for 4 million.  Do you see

3  that?

4  A.  Yes.

5  Q.  How did you adjust that sale in 2013, given what you were

6  seeing from the market as it continued to develop through 2017,

7  2018?

8  A.  I guess, to refer to Mr. Linsner's they're not the same

9  painting, he had an analogy about counting heads.  They're not

10  the same paintings.  So of course when you are looking at data,

11  you want to find choose comparables that are as relatable as

12  possible to the appraised work.

13        In this case is an example where we actually have that

14  appraised work.  And again, talking about adjustment, the

15  actual appraised work was in 2013.  I am appraising the value

16  for 2019.  It would be justifiable, and certainly to many

17  appraisers to say, well, the market has changed.  This already

18  has a sale for 4.05 million, you could easily increase that by

19  whatever percentage or whatever round it up to whatever you

20  feel the new market would be.

21        Instead, to be conservative, and to be a little more

22  true to the data we see in front of us, I chose to keep it at

23  the last sale price.  Or at least close to it.  Again, it's

24  redacted.  But I would assume I would have kept it pretty close

25  to that sale.

1    Q.  Can I ask you, did you disclose any of this thought process

2    or analysis in your report?

3    A.  Well, in this case you can see slightly less enviable

4    auction sale.  You can see this actual piece was the one that

5    sold.  And again --

6    Q.  So --

7    A.  -- so that's in a sense, that is the disclosure.

8    Q.  So saying slightly less enviable auction venue should have

9    told me that, in reality, you were just pegging it to the prior

10   sale, you weren't really looking at the other three comparables

11   you listed.

12   A.  That should be understood since we have a direct

13   comparable, yes.

14   Q.  Okay.  Is there a reason you didn't specifically say that

15   in the report?  You just assumed we would understand it?

16   A.  Well, traditionally, or actually, technically, in an

17   appraisal report, especially fair market value appraisal, when

18   you have a large number of items, and I try to put as many

19   comparables as possible.  Actually I put all of my comparables

20   as much data as possible into the report.  And then put that

21   into the background of all my market analysis.  Knowing I'm

22   presenting this in this framework.  That's -- the goal of an

23   appraiser who has to review an appraisal is to do an appraisal.

24   You should provide enough data in that appraisal, which I have,

25   to make it repeatable.  So I put in, for instance, more, more

 1  data than is usually necessary.  Each of that data has in this

 2  case, it even has links.  It has what's a recorded sale price,

 3  it has the information about the different pieces, it has

 4  information about the auction house.  We even give I believe

 5  screenshots and other information showing where this came from

 6  the database.  And then if you look at my fair market value,

 7  that should direct the person into which comparables were

 8  weighted more.  So, and in this case, I think I even put

 9  further details where I explain it.  So in a sense, I mean --

10  Q.  Mr. Regan --

11          MR. NICYPER:  Can the witness finish his answer.

12  A.  -- I was making the point --

13          THE COURT:  Actually, Mr. Regan, I am going to

14  instruct you to just answer Mr. Cohen's questions directly.

15  You can finish this answer briefly.  But you'll have an

16  opportunity on redirect to answer questions.

17          THE WITNESS:  Okay.  Okay.

18          Sorry, so it is a hard question.  It is not typical

19  that you would need to put in such level of detail of how much

20  percentage you adjusted, because I gave such level of detail in

21  the comparable it is a totally repeatable appraisal.  So that's

22  kind of --

23  Q.  And we can scroll down a little more, Kathryn, so looking

24  at this one, this one also had $6.7 million sale in that same

25  sale as the prior painting, correct?

1   A.   Yes.  Different lot, same sale.

2   Q.   Okay.  Looking at the information you provided there, can

3   you figure out exactly what value you placed on this Scholar by

4   a Pine Stream fan paining?

5   A.   Again, you are asking me to do an evaluation kind of on the

6   spot.  However, without really giving it as much thought as I

7   would normally give it during the actual appraisal, I would

8   probably say here I have the same comparables that I would use

9   previously, because it's obvious it is the same paining, same

10  sale.  Similar.  This one is a little bit more recognized as a

11  pretty painting, as a better composition, which is why it sold

12  here for or 6 million.  6.7 million.  I would have probably put

13  around 6 million for the same reasons I had stated before.

14        If I were to reproduce this, I wouldn't be doing it

15  like this over a Zoom call.  I would actually go into the web

16  pages again, and check all the data, which is what

17  appraisers --

18  Q.   Understood.  Understood.  Can I ask you, do you have any

19  idea why on your appraisal for the prior painting you actually

20  listed a value that had increased from that prior sale?  You

21  appraised it at 4.2 million versus a prior sale value of 4

22  million or so.  And on this one, you decreased it significantly

23  from the value of that prior sale.  It went from 6.7 to 6.2?

24  A.   Okay.  So, I was in the ballpark.  Actually, I think now

25  that I do recall this.  And I think I mentioned it even in the

deposition.  This is an interesting fact where we know who

bought the works and we know it was purchased by the same

person.  It is a famous collector, and he's usually very

public.  So, what -- now knowing where the two works are

presiding and this was, there was articles about this.  This

was a -- this was not a hidden thing.  Then now that they are

in the same collection owned by same person, again, you had

mentioned how during the auction sale itself, there's a lot

things going on in the sale room itself.  Whether that's

excitement of bidding etc., etc.

          Now this is the same collector, I probably would have

leveled them slightly.  I still want to be true as possible to

the actual sale of that object.  But I would probably level

them down a little bit, which is why I would adjust it to, I

guess, I guess you are saying 4.2 and 6 point I can't remember.

Q.  6.2.  Was that rationale disclosed anywhere in your report?

A.  No.  No.

Q.  I'd like to take you to page 27 of the appraisal.  Looking

at page 27.  We have two appraisals here with no comparables

listed.  And they both say they were based on the 2004

Sotheby's appraisal.

          Do you recall how you adjusted the 2004 appraisal for

Scholar with Qin?

A.  Do I recall specifically my thought process about this

painting?

L5jekinh                    Regan - Direct

1    Q.  Yes.

2    A.  What I do recall was, going over the Sotheby's appraisal,

3    these were ones that were of lower value.  Obviously I want to

4    take the time I had to spend on the higher value.  Lower value,

5    these were the ones that were -- sorry.  These were the ones

6    that I believe we did have comparables for these.  I think we

7    called them general comparables for the art market itself.

8    Because when you have an anonymous work of art, I can't really

9    directly compare it to a specific artist.  So you have to be a

10   little bit more broad and use a little bit more market

11   knowledge.  So --

12   Q.  Okay.

13   A.  Sorry, would you like me to finish?

14   Q.  Yes.  Please.

15   A.  Sure.  Anyways, going from my reliance on the 2003

16   appraisal, which we all agree was a good appraisal.  And then

17   in this case, since we don't really have direct comparables, I

18   would look more at the general comparables, which I believe we

19   listed as low value comparables somewhere.  And then I would

20   look at the art market change itself.

21        So, when you don't have a specific artist's market to

22   look at, you'd have to look at that segment of the art market

23   itself, which would have gone up significantly, but it's still

24   an anonymous work so I don't imagine this would be in the

25   millions of dollars.

L5jekinh                    Regan - Direct

1    Q.  You generally expect those two to moving to the right

2    because you are looking at the same set of comparables for

3    them.  Same general art market trends, right?

4    A.  Well, it's, I mean, yes, but that's, that's -- yeah.

5    That's kind of an open ended question.

6    Q.  Okay.

7    A.  I'm not -- yeah.

8    Q.  If I told you that you valued that Crane Under Pine --

9    A.  I'm having trouble reading it on the screen.

10   Q.  If I told you that Crane Under Pine was valued at $12,000

11   in the 2004 appraisal, and you had no comp listed at the time.

12   It was bought in at Sotheby's in 1990 with a 20 to $30,000

13   estimate.  And it was -- and a note it was documented in

14   Suzuki's catalog of painting and foreign collections.  Would

15   that allow you to tell me what your appraised value was?

16   A.  Can you scroll down a little more.  Yeah, that would

17   certainly, that certainly could help.  Again, you're kind of

18   asking me to do a full appraisal of two objects in this

19   context.

20   Q.  And you don't have enough information right now based on

21   your report to do that, do you?

22   A.  No, I certainly do.  I just have to --

23   Q.  Looking at the report.  Just looking at the report.  Do you

24   have enough information sitting here today to do that

25   appraisal?

L5jekinh                    Regan - Direct

1    A.   That's not how appraisals work.  Yes.

2    Q.   Okay.

3    A.   Yes, I have enough information to perform an appraisal on

4    these works.  Absolutely.

5    Q.   Just with what's on this page?

6    A.   That's what the information I was given when I did the

7    appraisal originally, so I would say yes.

8    Q.   So, how much would you appraise Crane Under Pine for

9    sitting here today?

10   A.   If you'd like me to do an appraisal, I would be happy to,

11   but that's going to require more time.

12   Q.   Why?  You have all the information you need in front of

13   you, don't you?

14   A.   If you'd like, I can do research.  That's how appraisals

15   work.

16   Q.   You would need to do more research, correct?

17   A.   Yes, that's -- that's how -- valuation works.

18   Q.   Good.  Now, these two paintings, Crane Under Pine in the

19   2004 appraisal was valued at 12,000.  Scholar with Qin was

20   valued at 16,000 in the 2004 appraisal.  In your 2019

21   appraisal, you appraised them both at 20,000.

22   A.   Okay.

23   Q.   Can you think of a reason why these two paintings would

24   have identical values in 2019, when you based it on a 2004

25   appraisal that had different values, and in the same set of

L5jekinh                    Regan - Direct

1   data about the general comparables and the general market

2   frame.

3           Can you think of a reason -- I don't want you to tell

4   me what that reason is -- but can you think of a reason why

5   those would have the same appraisal value given those?

6   A.   Absolutely.

7   Q.   Is that reason disclosed anywhere in your report?

8   A.   Specifically, no.  Well, actually, well, no, I mean.

9   Q.   Okay.

10  A.   If you'd like me to expand on this.  I think you are asking

11  something of an appraisal that is not required of an appraisal.

12          THE COURT:  Mr. Regan, you can expand on examination

13  by your counsel.

14  Q.   Mr. Regan, let's move on to a different subject.

15  A.   Sure.

16  Q.   Your fair market value appraisal is as of October 2019, and

17  for purpose of the next questions, let's assume it is an

18  accurate appraisal.  Is there any way to use the paintings'

19  values as of October 2019 to determine what their values were

20  in 2005, 2006 or 2009 on their dates of sale?

21  A.   I am going to restate the question because I want to make

22  sure I understand it.  You are saying the fair market value

23  appraisal of 2019, that's the effective date.

24  Q.   Yes.

25  A.   Would that be used to determine specifically the value of

1    2005, 2006, 2000 --

2    Q.   Yeah.  Can you do that?

3    A.   That wouldn't be the purpose of the appraisal specifically,

4    but with that information, you certainly could do a retroactive

5    appraisal.

6    Q.   Is that something a non-expert would be able to figure out

7    just from having the 2019 appraisal?

8    A.   I would think so, since the dates are very different.

9    Q.   That you would or wouldn't think so?

10   A.   I would think they would understand that since the dates

11   are different.

12           THE COURT:  No, Mr. Regan, let me ask the question.

13   My question.  If you have the 2019 appraisal, would I or any of

14   the other lawyers here who don't have any expertise be able to

15   figure out just from that number what the value was several

16   years earlier?

17           THE WITNESS:  Several years earlier, possibly, if you

18   look at the comparables.  If you're looking at my entire

19   report, then that certainly would give you an indication.  But

20   the purpose of that fair market value appraisal was to

21   determine the value of those works at that effective date.

22           I know it's confusing.

23   Q.   So, I just want to nail this down.  If I pick a random

24   person on the street and I tell them, look, this Ma Yuan fan

25   painting was worth $6,200,000 in October of 2019.  You'd expect

1   him to be able to figure out what it was worth in 2005?

2   A.  A random person off the street?

3   Q.  Yes.

4   A.  No.  But I don't think that's the situation here.

5   Q.  And did you disclose in your report any method for

6   calculating date of sale values based on your 2019 appraisal?

7   A.  Calculating date of sale values.  Can you clarify?

8   Q.  Did you disclose in your report any method that the jury

9   could use to say, well, if this Ma Yuan fan painting was worth

10  6 million in October of 2019, then it must have been worth X

11  when it was sold -- and I am going to make up a date because I

12  don't have it off the top of my head -- in August of 2005?

13  A.  Did I specifically put that in this appraisal?  No.

14  Q.  Let's talk about what we've been referring to as rejected

15  comparables.

16          Do you recall giving deposition testimony that there

17  were certain potentially comparable paintings that you gave

18  serious attention to in your review and your work on the

19  appraisal, but ultimately decided not to list as comparable

20  paintings in the actual appraisal?

21  A.  I recall that we did discuss that.  Yes.

22  Q.  Okay.  So I am going to take you right now to the search

23  page for Artnet.  You recognize this as the search page for the

24  Artnet database, correct?

25  A.  Yes.

1  Q.  Artnet is telling me there are 886 results that would come

2  back on this search.  Do you see that?

3  A.  I do.

4  Q.  When you searched for comparables for Shitao painting in

5  your appraisal, did you use any modifiers to the search, other

6  than just the artist's name?

7  A.  The initial way I do this type of research, actually first

8  I would go to Artron.net and then go to Artnet.  Artron has a

9  lot more information, a lot more sales data, and a lot more

10 detail for each item as well as incredibly good images, which

11 is how most of the initial kind of culling of the data is

12 through comparable images.  First I would go through without

13 any qualifiers.

14       Now, here at Artnet, usually they only show the

15 first 100, no matter how many are there to begin with, even if

16 you have a subscription.  So, to make sense, the first thing --

17 if you can scroll down to the bottom -- there is something

18 called -- here it is.  Sort results by.  First thing I would do

19 was sales date descending.  That would automatically put the

20 most that the -- the closest to, if you are doing a current

21 appraisal.  That would give you the closest to that date in a

22 sense.  I think that's clear.

23       And then I'll see the number of results, and I'll

24 scroll through and I'll look at the results and automatically

25 obviously just by imagery, just by size, I can look at the web

1   page and just decide if there is too many, if there not enough.

2   Then I may go through a specific date.  Maybe I don't want to

3   find things that are too old.  I don't want to clog it up.  Or

4   I want to put a specific size in there.  If the artist is known

5   for very small works or very big works.  And I try to find a

6   reasonable set of data that I can then look through and from

7   that pull comparables to look at.

8            That's, again, one of the reasons why I like Artron a

9   little better, at least as a primary source, because the level

10  of data that you can see in the image as well as in the

11  descriptions, it is a little trickier to navigate, but you can

12  see in the descriptions can give you more information about if

13  that data will end up being a comparable.

14  Q.  But did you run searches that included more filtering than

15  just the name of the artist, correct?

16  A.  Well, yes.

17  Q.  Okay.  Did you disclose to us what those searches were so

18  we could replicate them?

19  A.  No.  That would be -- well, I guess mostly that would be

20  common sense.

21  Q.  Now, let's take a look.  Just I am going to burn one of my

22  subscription searches because I am generous that way.  And just

23  to take a look at what the results page looks like.  And we

24  have this sort of list of Shitao results and you can click on

25  them to expand and to see full details?

1    A.   Correct.

2    Q.   And Artron has a little bit more detail, but a very similar

3    interface in terms of you get some and then you can click to

4    expand and look closely, right?

5    A.   Yes, aggregate database.

6    Q.   Am I correct in assuming that you did not include as

7    comparables every potential item that you clicked on to expand?

8    A.   Yes, definitely that's -- then they wouldn't become a

9    comparable.

10   Q.   So you had different items here that, okay, so for example,

11   you would say, you know what?  I know I don't want to look at

12   the first one, I know I don't want to look at the second one,

13   this third one I want to take a look at.  You click on it, you

14   look at it in more detail, and then you decide is this a

15   potential comparable or not.  Correct?

16   A.   Correct.

17   Q.   Did you keep any record of those search results that you

18   then clicked on and took a more detailed look at?

19   A.   No.  I mean, that would be in the thousands.

20   Q.   So you actually clicked on thousands of individual results

21   as you were going through?

22   A.   Sadly, yes, I did.

23   Q.   Doesn't your work file rule require you to keep records of

24   what you're looking at in more detail?

25   A.   Reasonably, sure.  And in this case, because I knew of the

1    situation, everything that I found that was a comparable went

2    into actually my report.  For instance, taking this kind of

3    exercise --

4    Q.  Hold on.  Mr. Regan, didn't you testify at deposition that

5    there were things that you gave real attention to but

6    ultimately decided not to include in your report?

7    A.  I don't -- I don't know exactly where I said that.  But, I

8    certainly gave consideration to data points, deciding whether

9    or not it became a comparable.

10   Q.  And then there were some that you said, you know what, this

11   isn't a comparable, I'm not going to include it?

12   A.  There was a lot, I'm sure.

13   Q.  Okay.  And you did not do anything to document what those

14   were for us to be able to review, did you?

15   A.  Nor would any appraiser.  That's not how it works.  I mean,

16   when you were listing court cases to compare to, you didn't

17   list all the court cases you looked at that you didn't find

18   applicable.  It, I again, I apologize, it is hard for me to

19   describe something that seems reasonable.

20   Q.  It's fine.  Mr. Regan, when you were -- this is the first

21   time you've ever served as an expert, isn't it?

22   A.  Yes, this is, yeah.

23   Q.  Okay.  When you were retained, were you informed that your

24   obligation was to or that the plaintiff's obligation was to

25   disclose to the other side any detail that you considered, even

1   if you didn't ultimately rely on it?

2   A.  It was my work file, which you have.

3   Q.  Did they instruct you to keep a record of anything that you

4   were considering, even if you weren't relying on it?

5   A.  I wouldn't think so.  Because, again, that would, that

6   wouldn't make any sense.  Literally I would be looking at

7   thousands of web pages, and how would that even -- that would

8   actually be more confusing to anybody trying to reproduce.

9   Q.  So to be clear, you did not keep a record and disclose to

10  us everything you considered.  Just the stuff you relied on,

11  right?

12  A.  Yes.  As would any appraiser.

13  Q.  Okay.  Now, you testified at deposition that you were aware

14  of the reliability issues with Chinese auction results,

15  correct?

16  A.  Yes.

17  Q.  And in fact I believe you said you wished that the

18  information you had was much more reliable, and that everybody

19  wishes it was much more reliable, correct?

20  A.  That's across the board.  All auction houses, yes.

21  Q.  Now, Artron and Artnet, they both expressly disclaim any

22  responsibility for the reliability of information in their

23  databases, do they not?

24  A.  I would too.  It's a liability.  Yeah.

25  Q.  And in fact, you did do that.  You included a disclaimer,

1    you said this is an extraordinary assumption, and if it's

2    wrong, if these auction results that I'm relying on aren't

3    accurate, then I'm wrong.  My appraisal is not going to be

4    accurate and I take no liability for that, correct?

5    A.   Those extraordinary assumptions are in every appraisal,

6    yes, we can only have -- sorry.  Go on.

7    Q.   And I believe you testified at deposition that you didn't

8    do anything at all to discount the Chinese auction results to

9    take into account the prevalence of non-consummated sales,

10   correct?

11   A.   I remember this conversation, and I found it odd to even

12   request a discount in this case.  Because I hate to use an

13   analogy.  I guess Linsner kind of used an analogy.

14        If I were saying -- let's get rid of art.  Let's say I

15   was selling a car and I am aware of Craigslist that half of the

16   time the car doesn't -- the person never shows up to pay for

17   it.  And I know that these cars are worth about $3,000.  At

18   least I know half the time they go for $3,000, I would never

19   put it up on the site and say, well, since half of them don't

20   sell, I am going to sell it for 1500.

21   Q.   Mr. Regan, let's work with that analogy, because your

22   determination that the car is worth $3,000 in the first place

23   was based on these results that you know 50 percent of are

24   inaccurate.  Correct?

25   A.   I'd like to unpack that if I could.  Because there is a lot

1   of misconception.  When, when the numbers are put out, whether

2   it's I think it's 47 percent was the highest calculated in past

3   couple of years.  That's all based on collected revenue from an

4   auction house within a certain period of time, held against

5   what they would expect to have collected from hammer prices and

6   buyer's premiums at that certain amount of time.

7          So when you say it's not that 50 percent of the

8   sales -- just to round it up for your sake.  50 percent of the

9   sales are not consummated.  What it is saying is this

10  percentage of revenue hasn't or has not yet been collected.  A

11  lot of that, this is all stated very clearly in all the

12  documents.  That has a late payment, we talked about the

13  reasons for late payment.  There is a statement of negotiation,

14  I don't want buyer's premium and give me a break, I am a big

15  collector, that type of thing.  That's the one aspect.

16         The other aspect is, well, going the opposite, then

17  all the other ones that were consummated.  And then the other

18  thing is you have more than one simple snapshot.  You have a

19  seller agreeing to a specific price, you have an auction house

20  agreeing to specific estimates and specific price.  You have

21  more than one person in that auction sale bidding up, so at

22  least close to, you have another person who was willing to pay

23  that amount of money.  And the other thing that's not --

24  Q.  You don't know that for certain, do you?

25  A.  I'm sorry.  That there is more than one bidder?

L5jekinh                    Regan - Direct

1   Q.  You don't know for certain that the other bidder was any

2   more willing to pay than the one who took it at the hammer

3   price and then bailed on the purchase, do you?

4   A.  Of course we never know.  But, it is --

5   Q.  Mr. Regan --

6   A.  It is not really noted.

7   Q.  Mr. Regan --

8   A.  There is one more point that's very important --

9           THE COURT:  Mr. Regan, just answer the question.

10          THE WITNESS:  Okay, okay.  Sorry.  I get a little

11  passionate about this.

12  Q.  Listen, it is the things we love.  We do them because we

13  love them and it does you credit.

14  A.  I hope I continue to love it after this.

15  Q.  Yes.  Me too.

16  A.  Sure.

17  Q.  Would you agree with Mr. Linsner that it would be

18  unrealistic to assume that every one of your comparable sales

19  actually consummated?

20  A.  Fully, yeah, of course it would be unreasonable, which is

21  why I list a lot of comparables.

22  Q.  You would agree with me that if it happened to be that the

23  highest priced comp that you relied on for a particular

24  painting was the one that didn't sell, that would dramatically

25  decrease the real value of the piece?

1   A.  It could.

2   Q.  For example, those Ma Yuan sales?

3   A.  Yes.

4   Q.  You said, you know, you said you have some information

5   about, but assuming that those Ma Yuan sales of the prior sales

6   of that comparable item that you are talking about, if those

7   had not consummated, that would very dramatically impact the

8   price you put on the item in your appraisal, correct?

9   A.  It could, sure.

10  Q.  Again --

11  A.  But looking --

12          THE COURT:  Mr. Regan, answer the question.

13  Q.  Again, it would be unreasonable to assume that 100 percent

14  of those actually consummated, correct?  The law of averages?

15  A.  With every auction house, of course.

16  Q.  You heard the testimony about the IRS no longer accepting

17  comparables from Chinese auction houses, correct Mr. Regan?

18  A.  I heard that stated.

19          THE COURT:  Five minute warning.

20          MR. COHEN:  Thank you.

21          THE COURT:  Eight minute warning.

22  A.  I did hear that statement.  Although, I don't think that, I

23  don't think that's true.  But I did hear the statement.

24  Q.  Are you aware of -- well, let me put it this way.  Have you

25  conducted any tax appraisals recently where the IRS did accept

L5jekinh                    Regan - Direct

1    a mainland Chinese auction comp?

2    A.  I do tax appraisal quite often, yes, and never an issue so

3    far.

4    Q.  When was the last time that you can recall the IRS

5    accepting a mainland Chinese auction comp?

6    A.  Usually when I do an appraisal, I only hear if the IRS

7    doesn't accept it.

8    Q.  So you don't know?

9    A.  No, I mean.

10           THE COURT:  When was the last appraisal, sir, that you

11   submitted to the IRS in which you used a Chinese auction house

12   result?

13           THE WITNESS:  I'd have to look back through my, my

14   work files, but probably within the last month I would think.

15   Normally, like, since, for instance, for Winston I do the

16   appraisals, and then Winston is the one that sends it to the

17   client and they submit it.  But, I use them a lot.  I will say,

18   I did research and there is nothing in the IRS that says

19   anything about this.  And actually the only place that ever

20   says this is --

21           THE COURT:  Mr. Regan, actually, I didn't ask that

22   question.

23           THE WITNESS:  I'm sorry.  I'm sorry.

24   Q.  Your appraisal leans quite a bit on mainland Chinese

25   auction results.

1    A.   Yes.

2    Q.   Is it your testimony that for those auction, for those

3    comps, you couldn't find comparables in the U.S. or at auction

4    houses that don't have the types of problems that we're

5    discussing?

6    A.   I guess, I certainly looked.  If I found data that I felt

7    was a strong comparable, I would have included and I did in

8    many cases, sure.

9    Q.   Can I ask you what diligence you did to mitigate concerns

10   over deadbeat bidding?

11   A.   Well, first and foremost, is I try to get the vetted

12   auction houses at least so my data is more a little bit more

13   reliable.  So, I think we explained this in my report.  But

14   there is a list of like 56 or so vetted auction houses.  I try

15   to weight which auction houses are the most recognized.  Plus I

16   add a lot of different, I add a lot of comparables, far more in

17   this report than would be in a normal appraisal.  So that's one

18   way to help mitigate any possible gaps.

19   Q.   So again, if you have a lot of comparables and the one that

20   happens to be the one that didn't sell was the highest priced

21   one or a couple of the higher priced ones, that's going to

22   dramatically impact the value, correct?

23   A.   Impact the value for me or for the market?

24   Q.   For the market.

25   A.   Not necessarily.  We're all the looking at the same data.

L5jekinh                    Regan - Direct

1    Q.  Mr. Chang, I think you heard Mr. Linsner testify about

2    Mr. Chang's frankly status as one of the leading appraisers of

3    Chinese art?

4    A.  Yes.

5    Q.  You agree with that?

6    A.  I don't know him such as an appraiser.  I know him as a

7    connoisseur and expert and he is a fantastic painter too.  He

8    is certainly an expert in Chinese painting.  I would put that

9    down, sure.

10   Q.  He testified he tried to limit the comparables to Sotheby's

11   and Christie's and avoid mainland China sales that didn't

12   follow the same standards ethically and legally from London and

13   New York.  Is that an approach you agree with?

14   A.  For his appraisal?  Sure.

15   Q.  For your appraisal practice, do you try to avoid the

16   mainland Chinese auction sales if you can?

17   A.  Yes, I mean, I obviously first go to ones for -- but the

18   market was very different in 2003.  There wasn't, there wasn't

19   this 70 percent market share that auctions have in China.  It

20   wasn't the second -- or I think now it is the first largest

21   market in the world.

22   Q.  And there wasn't the same information about deadbeat

23   bidding and failure to consummate sales, correct?

24   A.  Not reported.  I lived over there in around that time, and

25   everybody knew that some data coming out of China you always

1    had to be a little more careful about, even back then.  But,

2    only now it's become more of an issue.

3              THE COURT:  Mr. Cohen, one minute.

4              MR. COHEN:  I was just going to say that concludes my

5    time with Mr. Regan, which I quite enjoyed, and I hope you did

6    as well, sir.

7              THE COURT:  Mr. Regan, I've got one question for you.

8    If we don't know the potential comparables that you looked at

9    and rejected and we can't replicate that, how can we determine

10   that you haven't cherrypicked the comparables that you have

11   chosen to use to reach a preordained result or a result that

12   the plaintiffs would like?

13             THE WITNESS:  Sure.  That's a good question.  There is

14   a three-part answer.  I think one would be --

15             I'm sorry.  I missed that.

16             THE COURT:  Try to keep it short.

17             THE WITNESS:  I will try to keep it short.

18             One way would be if you look at my comparables, I use

19   a wide range of comparables.  If I were trying to cherrypick, I

20   wouldn't even bother putting in a low one.  I would try to hide

21   that.

22             Number two, I didn't have any reject comparables.  I

23   had rejected data things I didn't think was actually

24   comparable.  Which is why this has far more comparables than a

25   normal appraisal would.

1    And the third part of the answer would be the same way

2    any appraisal is checked in the industry, which is another

3    appraiser does an appraiser review, which is the same thing I

4    did in the 2003 report, which is you take the same data that's

5    presented in the report, and you search out your comparables

6    and you do your own search, and you can see, do that did this,

7    did he do that?  That's far more reasonable than having, again,

8    literally I think it would be thousands of web page links to

9    sales that I didn't feel were comparable.  We have to produce a

10   repeatable report.

11             THE COURT:  Mr. Nicyper, you may inquire.  You've got

12   44 minutes, sir.

13             MR. COHEN:  Your Honor, I believe they had 35.

14             THE COURT:  You've got 29 minutes.  After you got 29

15   minutes.

16             MR. COHEN:  You're welcome, Mr. Regan.

17             MR. NICYPER:  Thank you, your Honor.

18   CROSS-EXAMINATION

19   BY MR. NICYPER:

20   Q.  Good afternoon, Mr. Regan.  As you know, I'm Dean Nicyper,

21   one of the attorneys for the plaintiff here.

22             If I could, I think before we do anything else I just

23   want to follow up on that same point.  We are probably going to

24   go to Exhibit 8.

25             Have you reviewed the defendant's reply where they

L5jekinh                    Regan - Cross

1    refer to this, they coin this term "rejected comparables"?  Do

2    you see that?

3    A.  I don't see it yet, but I do remember it, yes.

4    Q.  Were there any works of art that you looked at when doing

5    the appraisals in this case that you would consider to be

6    rejected comparables?

7    A.  I think in those terms, no.  Because if I considered a

8    comparable, I did include it.  I mean, there is data that I

9    thought wasn't relevant.  But if it was a comparable, I

10   included it, yes.

11   Q.  In selecting comparables you used in your appraisals, was

12   there any work of art you determined was a comparable but

13   nonetheless you did not include in the appraisal?

14   A.  I wouldn't say so.  No.  If it got to that level, then I

15   felt it was a comparable, I included it in the report.

16   Q.  In selecting your comparables, was there any work of art

17   you determined was comparable but you went ahead and rejected

18   it anyway?

19   A.  No.  If I understand -- no.

20   Q.  In fact, the defendants use that phrase, and if I could,

21   can we look at paragraph, page 14 to 15 of the defendant's

22   reply brief.  You'll see the last paragraph here on page 14,

23   they say, one of the things is whether you'd have to download

24   the entire database.  They say that's not the issue.  They then

25   go on to say:  Defendants are focused on Regan's failure to

1    disclose the more limited finite subset of reject comparables,

2    works that Regan -- in his own words at deposition -- gave

3    significant attention to and engaged in a thorough analysis of

4    before deciding not to rely on them in his appraisal.

5              Do you see that?

6    A.  I do.

7    Q.  And they cite for that statement there page 41 of your

8    deposition.  If we can please look at page 41 of Mr. Regan's

9    deposition.  On line 10, there is a question there.  It says:

10   So there might be comparables that you gave significant

11   attention to and you engaged in a thorough analysis of, but

12   ultimately did not include in your report?

13             Do you see that?

14   A.  I do.

15   Q.  Are the words that just read your words or defendant's

16   counsel's questioning words?

17   A.  They're actually Mr. Kelly, Mr. Kelly's words, the defense

18   counsel.

19   Q.  So was it Mr. Kelly who used the phrases "gave significant

20   attention to and engaged in a thorough analysis of"?

21   A.  Yes.

22   Q.  So they were not -- were they your words?

23   A.  No.  It didn't sound like my words to begin with, no.

24   Q.  Were the defendants being truthful when they said those

25   were --

L5jekinh                    Regan - Cross

1          MR. COHEN:  Objection.

2          THE COURT:  Sustained.

3  Q.  So please if you go in your deposition, read on because

4  let's look at your response.  You said:

5          Possibly, but if I gave significant consideration to

6  and really felt they are a strong comparable enough, at least

7  as how you are describing it, I probably would use it in some

8  way as a listed comparable.

9          Do you see that?

10  A.  Yes, that sounds more like what I would say.

11  Q.  When you say, at least how you are describing it, I

12  probably would use it in some way as a listed comparable.

13  Where did you mean you would list that?

14  A.  In my report.

15  Q.  Would that have, would that comparable then have been

16  listed either in your appraisal or your work file or both?

17  A.  In this case, both.  Because I put them in -- I put all

18  comparables for my work file in the report in this case.

19  Q.  Okay.  We can take that down, please.

20          Let me go more generally.  What is your professional

21  specialization?

22  A.  As an appraiser, art appraiser, and my specialization is

23  Asian art.  Specifically, Chinese art.

24  Q.  Do you have any postgraduate educational degrees?

25  A.  I do.  I have a master's in fine arts.

L5jekinh                    Regan - Cross

Q.  Have you lectured or taught any courses on the China art

market?

A.  I have.  I've taught some courses, I taught a course on --

several courses at New York University on the art market in

general, focusing as well on Chinese art market.  I've taught,

I've given some lectures on the art market at New Art Academy,

various other places.  And taught Chinese art history at

Sotheby's most recently and a number of places.

Q.  Prior to this case, have you previously appraised Chinese

works of art?

A.  Yes.  Quite a bit.

Q.  Approximately how many times?

A.  This question came up in the deposition.  I think -- I

think I estimated about 5,000.  It would be hard for me to go

back and look at everything.  But, ballpark figure.  Probably

over 5,000.

Q.  Prior to this case, had you previously appraised classical

Chinese paintings?

A.  Yes, I valued quite a number of classical Chinese

paintings, not all as nice as these.

Q.  Approximately how many?

A.  Probably over -- well over 300, maybe 500, at this point,

maybe probably over 300.  I'm trying to think of a few larger

ones I've done, yeah.

Q.  And you were asked a question about submitting IRS

appraisals.  Can you tell me approximately how many times you

have done an appraisal for IRS that has included Chinese

auction house results?

A.   Hard to say.  But any time that I would have, I guess I

would never have not given a Chinese auction house appraisal,

I'm sorry, a comparable if it was something that was necessary.

I would say probably at least out of those hundreds I did in

the past couple of years, I'm sure probably more than half had

at least one or two auction house comparables, in some cases

much more from China, mainland China.

Q.   When those appraisals were submitted to the IRS, did you

ever hear the IRS rejected those appraisals?

A.   No, never.

Q.   Does your work require you to monitor the Chinese art

market?

A.   It does.

Q.   How do you do that?

A.   Well, besides actually doing appraisals where I'm

constantly looking at original data from auction sales and

upcoming and past, etc., I do read all the art market reports,

the big ones especially.  I also look at some of the art market

reporting that kind of gets filter down.  I do attend

occasional webinars, and in some cases do an occasional

lecture.  And plus I have good colleagues in my circle, which

would be more Chinese and Asian appraisers and experts.

1    Q.  Regarding the market reports you said you review.  Are you

2    familiar with an art economist named Dr. Clare McAndrew?

3    A.  Yes, very well.

4    Q.  Is she a recognized expert in art markets?

5    A.  Probably I would say the most recognized, yeah.  She did --

6    you want me to expand?  I can expand.

7    Q.  Just very briefly.

8    A.  Sure.  I would say because of her role in creating the TFAF

9    report, the industry standard, and now Art Basel, the UBS

10   report, and plus all of her many lectures and books, I think I

11   have a book of hers somewhere here.  She is pretty much

12   recognized as the leading authority in the art market.

13   Q.  In your experience, in looking at her reports, does she

14   rely, does she refer to and include in her reports data from

15   Chinese auction houses?

16   A.  Quite a bit, yes.

17   Q.  Let's if we could, did you prepare an expert report in a

18   rebuttal report in this case?

19   A.  I did.

20   Q.  Did you also prepare two appraisals of classical Chinese

21   paintings to this case?

22   A.  I did.

23   Q.  In this case.  Were they appended to your expert report?

24   A.  I believe so, yes.

25   Q.  So here I have on the screen we'd like to mark this as

1    Plaintiff's Exhibit 1, the expert report of Patrick Regan,

2    submitted on October 11, 2019.  Do you see that?

3    A.  I do.

4    Q.  Is this the report you prepared?

5    A.  Yes.

6    Q.  Are there are two appraisals appended to it.  Please put up

7    1.

8            Can you please describe this first appraisal that is

9    appendix A to your report?

10   A.  Sure.  This is the, well, the cover page of the fair market

11   value appraisal which I was asked to perform with an effective

12   date of October 10, 2019.  That's the effective date is the

13   date of what I'm valuing it.  And then, front cover just

14   happens to list the total.

15   Q.  I'd like to cover that, because Mr. Cohen was asking some

16   questions about the effective date.

17   A.  Sure.

18   Q.  When you say effective date, what -- you are appraising the

19   value of paintings as of what date in this report?

20   A.  Well, it would be as of the effective date.  Depending on

21   the appraisal, that could change.  The effective date may be

22   the date of death.  The effective date may be whatever the

23   client or the IRS requires for that appraisal.

24   Q.  So here, the effective date was October 10, 2019.

25   A.  Yes.

L5jekinh                    Regan - Cross

1   Q.  Were you intending that somebody would use this appraisal

2   to determine the value in 2005 of these works?

3   A.  No, that wouldn't be the purpose of the appraisal.

4   Q.  So the effective date is the as-of date of an appraisal; is

5   that correct?

6   A.  Correct.

7   Q.  So if we could, let's look the appendix B to your report.

8   Can you please describe this second appraisal.

9   A.  Sure.  This is a retail value appraisal.  On a subset, it

10  says here a subset of 14 specific paintings from the original

11  collection.  And the effective date here is August 2009.

12  Sometimes I would refer to this as a retrospective appraisal.

13  So I'm looking at the valuation date of a date specifically in

14  the past.

15  Q.  So is this, this appraisal -- strike that.

16          Is this appraisal recording your opinion as to the

17  value of these paintings as of a specific date?

18  A.  Yes.

19  Q.  And what is the date that your values are stated as of in

20  this report?

21  A.  August 2009.

22  Q.  You weren't intending people to look at this report and say

23  these were current appraisals, were you?

24  A.  No, no.

25          MR. NICYPER:  Your Honor, we ask that Mr. Regan's

L5jekinh                    Regan - Cross

1    expert report and its two attached appraisals be submitted into

2    evidence in this hearing.

3              THE COURT:  Any objections for purposes of this

4    hearing?

5              MR. COHEN:  No.

6              THE COURT:  They're received for the hearing.

7              MR. NICYPER:  Then I'd like to mark Plaintiff's FRCP

8    26(2)(b) expert rebuttal report of Patrick Regan submitted on

9    December 16, 2019.

10             THE COURT:  Any objection?

11   Q.  The rebuttal report you prepared and submitted in this

12   case --

13             MR. COHEN:  None.

14             THE COURT:  It's received.

15   A.  That's the report, yes.

16   Q.  When you prepare an appraisal, is it important to determine

17   the applicable market for the work you are appraising?

18   A.  Definitely, paramount.

19   Q.  Why?

20   A.  For, besides the obvious, I would state the obvious

21   reasons, if I'm going to look at the market value of a specific

22   work or collection of works, I would have to look at what

23   market those works are predominantly bought and sold in.  And

24   in this case that would be Chinese auction houses or auction

25   houses in Hong Kong, as well as to a lesser extent New York.

L5jekinh                    Regan - Cross

Q.  Is it also relevant -- this case is somewhat unusual and

involves sales that -- did you learn in this case that these

were sales that were supposed to have been made from the estate

at some point in time?

A.  These 14 --

Q.  Let me rephrase that.

        Did you learn that Mr. Andrew Wang, acting as executor

for estate of CC Wang, sold the 98 works of art that you

appraised at one point in time?

A.  Yes, I was given documents referring to that.

Q.  Into what market did you learn that Mr. Wang sold those?

A.  It appeared he sold it to, through -- private sales into

the mainland Chinese market or mainland Chinese individuals.

Q.  In these circumstances, what sales market should one look

at when conducting an appraisal?

A.  Geographically certainly it would be mainland Chinese and

Hong Kong auction houses, since that's the most appropriate

marketplace.  For retail value, because of certain

circumstances in the Chinese market, I think you point out

Clare McAndrew said that 70 percent of the market is auction

houses.  So even for a retail valuation, you would still be

reliant predominantly on auction results, rather than say

private sales, just very few galleries dealing with this at all

in China.  And obviously very hard to get information on

private sales.  So you'd still rely on the most appropriate

L5jekinh                    Regan - Cross

1    market, which would be the Chinese auction markets.

2    Q.  Is that something that appraisers commonly do to your

3    knowledge in your profession?

4    A.  Sure.  Especially those in my specialty.

5    Q.  Your specialty being what?

6    A.  Asian and Chinese art.

7    Q.  Are you aware of any appraisers who appraise art in the

8    Chinese art -- strike that.

9          Are you aware of any appraisers who appraise Chinese

10   art where the relevant market is mainland China that do not

11   rely on Chinese auction house results?

12   A.  No.  Well, no.  Maybe with the exception of Mr. Linsner,

13   but he would be the only one.

14          THE COURT:  Mr. Regan, do you tend to get the Chinese

15   auction results from the auction house themselves?  Is that the

16   most reliable way to get them?

17          THE WITNESS:  That's a good question.  Some Chinese

18   auction houses like Poly and Guardian I do double check.

19   Especially higher value pieces or more notable pieces, I do try

20   to double check.  A lot of auction houses, they don't list a

21   lot of their archived values.  So, that's why we're reliant,

22   primarily at least, on the aggregate database, the two most

23   prominent being Artron, which has a great relationship with

24   these auction houses, at least for data for sure and images.

25   And Artnet.  So, when I feel it's necessary, and when it's

L5jekinh                    Regan - Cross

1  possible, I do like to go back to the actual auction house

2  themselves and seek out just for some confirmation.

3  Q.  Did you do that -- strike that.

4       Let me just briefly refer to the Sotheby's appraisal.

5  Did you see the Sotheby's appraisal?

6  A.  I did.

7  Q.  Did you review it when you prepared your appraisals in this

8  case?

9  A.  Yes, first thing I did.

10 Q.  Were the 98 works of art that you appraised also included

11 in this earlier Sotheby's appraisal?

12 A.  Yes.

13 Q.  Is this the appraisal that you looked at?

14 A.  The cover page, yeah, this is the one.

15      MR. NICYPER:  Your Honor, we'd ask this appraisal also

16 be entered into evidence for this proceeding.

17      THE COURT:  Any objection, Mr. Cohen?

18      MR. COHEN:  No.  And my understanding, your Honor, and

19 you can correct me if I am wrong, that any of the exhibits that

20 were submitted are on the various papers are in evidence for

21 purposes of your consideration on the Daubert motion.

22      THE COURT:  Only for the purpose of this hearing.  It

23 would be hearsay if they came in at trial.  Go ahead,

24 Mr. Nicyper, proceed.

25 BY MR. NICYPER:

1   Q.  And again, we've talked about the extent to which the

2   Sotheby's appraisal relied -- did it rely -- or strike that.

3        Where did the comparables in that appraisal, where are

4   they reported to have been sold?

5   A.  In this appraisal, both in Chinese auction markets as well

6   as in I guess non-Chinese auction markets.

7   Q.  Do you recall approximately how many comparables the

8   Sotheby's appraisal included?

9   A.  I do.  I believe it was 140 something total comparables for

10  the 98.

11  Q.  And for how many of those were from sales records of

12  mainland China auction houses?

13  A.  It was nearly half.  I think it was 70.

14  Q.  You heard the testimony of Mr. Linsner regarding various

15  art market reports.  In particular, do you recall

16  Dr. McAndrews' statements about auction house records in China?

17  A.  Yes.

18  Q.  And if you recall them, and I am happy to put it back up,

19  but if you can do it from recollection, what is the

20  significance of what Dr. McAndrew was stating?

21  A.  I think basically what she's stating, which she stated in a

22  lot of her reports, is that looking at the predominance, the

23  importance of the auction market specifically within mainland

24  China, how that auction market, those sales, those auction

25  houses, and that, that data how it's presented, especially in

1    places like Artron, that is what's driving the values right

2    now.  That is what's determining the values in the sense of the

3    Chinese art market, which makes sense.  That's where the buyers

4    are, that's the data we are all looking at.  That's where work

5    is being sold.  So, just kind of in a sense those can't be

6    ignored.  It is impossible.

7    Q.  Have you seen other reports on Chinese art market that rely

8    on Chinese auction house sales data?

9    A.  Sure.

10   Q.  Are you aware of any Chinese art market experts who do not

11   rely on Chinese auction house sales?

12   A.  I -- no.

13   Q.  Do you interact with other Chinese art market experts?

14   A.  I do.

15   Q.  How often?

16   A.  This year's been strange socially.  But, no.

17   Q.  I apologize.

18   A.  I do interact.

19   Q.  Prior to COVID.

20   A.  Yeah.  Whether it's through correspondence or collaborating

21   on valuation.  Actually, the author of one of the reports I

22   look at, I used to work with and am friends with.  So yeah, I

23   do.

24           MR. COHEN:  I'm going to make the same objection for

25   the record.  That some of these the questions about other

L5jekinh                    Regan - Cross

1    experts and the statements about other experts weren't noted in

2    the report.  I don't think it is actually an issue, but to

3    whatever extent it was an issue for Mr. Linsner, it is

4    certainly same issue for Mr. Regan.

5               THE COURT:  Noted.

6    Q.  Mr. Regan, do you know any appraisers who appraise Chinese

7    art that is sold in the China art market who do not use Chinese

8    auction house sales data?

9    A.  I know of no one, no.

10   Q.  Would it be appropriate to ignore Chinese auction house

11   sales data when appraising Chinese art that is sold in the

12   China art market?

13   A.  It would be inappropriate for certain to ignore that.

14   Q.  Why?

15   A.  Well, again, not to beat up a point, but when you have I

16   think either the second or the first largest market is in China

17   currently.  I think it is bumped up to first the auction market

18   because of COVID.  And you have 70 percent of that market

19   taking place at the auction houses, and predominantly, as you

20   can see from looking at the auction house data, the majority of

21   that is taking place in those auction houses.  It would be kind

22   of egregious to ignore that, that data.

23   Q.  Prior to reading Mr. Linsner's report, had you ever read an

24   appraisal report which categorically rejected reliance on

25   mainland Chinese auction house data?

1    A.  No.

2    Q.  Are you aware of any appraisal organizations or

3    professional guidelines for appraisers which categorically

4    reject the use of mainland Chinese auction house data in

5    creating appraisals?

6    A.  No.

7    Q.  There was some discussion about the extent to which, about

8    whether at all Chinese auction sales are consummated or not

9    consummated.  When sales are not consummated from an auction

10   house, first off -- let me strike that.

11          THE COURT:  Five minute warning.

12          MR. NICYPER:  Thank you.

13   Q.  Do all sales at U.S. auction houses, Christie's, Sotheby's

14   in New York, are all of those sales consummated?

15   A.  Certainly not, no.

16   Q.  Yet do appraisers nonetheless rely on them?

17   A.  Yes.  We have to.

18   Q.  And with respect to Chinese -- or any auction house sales,

19   or let's focus on China.

20   A.  Sure.

21   Q.  What happens, you talked about the relationship between the

22   consignor or seller and the auction house.  To your

23   understanding, based on your experience, what happens when if

24   in fact a buyer does not pay the hammer price for those sales?

25   A.  Sure.  Well, I mean, we went into a lot here and in other

1    places about why those reasons may be.  But, one of the reasons

2    I think I was trying to make the point before, which is

3    overlooked, and it is very relevant to doing a market

4    appraisal.  Is that the reason this issue of default or delay

5    payment was first put in the Poly's IPO document in 2014 that

6    everybody seems to refer to, is it was put in the risk factor

7    because when a sale isn't fully consummated or there is a

8    delay, or there is an argument about whether they should pay an

9    extra fee or something like that.  I believe it is even stated

10   in that report.  Nearly all of the cases, the consignor is

11   still paid their money.

12   Q.  Paid by whom?

13   A.  Paid by the auction house.  It is literally just the

14   auction house that has to then negotiate to get the full money.

15   So --

16   Q.  For recorded sale, there is a consummated sale to the

17   actual seller consignor?

18   A.  Sure.  That would be the hammer price or minus any sellers

19   commission there was negotiated.  So, that's why it was put in

20   the risk factor.  So in a sense, when we're look at this data,

21   it's very sexy to say for a lot of the art market reporting,

22   look at how much stuff isn't buying.  But actually, money has

23   been changing hands in this case.  And it is more of a question

24   is this data relied upon and why.  And it is relied upon

25   because this is the data that we have, and that's the data that

1    the market itself is using to drive.

2            If I have an opinion about a piece and I don't really

3    think it might not be authentic, say, or I particularly don't

4    like a style of a work, that doesn't matter.  I have to look at

5    what the market is looking at, and the market is looking at the

6    sales.  The market is looking at this data.  And in a sense,

7    the sellers are still getting paid their money.

8            So, that's why, although it is an issue, you can't

9    categorically throw out all this huge amount of important data,

10   because the market certainly doesn't throw it out.  And our job

11   is to report on what the market is valuing this stuff.  I hope

12   I made that clear.

13   Q.  Have any market reports or commentators said that market

14   data with respect to the identification of a particular work

15   listed there is not accurate?

16   A.  On the database, no.

17   Q.  Have any of those reports or articles claimed that the data

18   is inaccurate with respect to the picture that's being sold on

19   a particular date?

20   A.  No, especially, especially the photographs, yeah.

21   Q.  Does anybody claim that the hammer price is inaccurate with

22   respect to that sale on that date?

23   A.  No.

24           THE COURT:  Mr. Nicyper, one minute warning.

25           MR. NICYPER:  Thank you, your Honor.

L5jekinh

1  Q.  Did Mr. Linsner in his reports identify any comparable that

2  is not listed in your report that in his view he thinks you

3  should have relied on?

4  A.  No, he didn't.

5  Q.  Does your expert report conform to USPAP appraisal

6  standards?

7  A.  Yes.

8  Q.  Do you feel you provided sufficient detail in your report

9  to explain the basis for your opinions?

10  A.  I believe so.

11  Q.  And if Mr. Linsner had wanted to evaluate and criticize

12  your opinions or your comparables or your application of them,

13  was there enough information there for him to do that?

14  A.  More than enough, certainly.

15          THE COURT:  You're done, Mr. Nicyper.

16          MR. NICYPER:  Okay.

17          THE COURT:  Thank you very much, Mr. Regan.  You are

18  excused.  Thank you very much.

19          THE WITNESS:  Thank you.

20          (Witness excused)

21          THE COURT:  So, I had said that I have a hard stop at

22  2:30 and that I would hear counsel.  It's now 2:15 as a result

23  of some of my questions and witnesses going over a little bit.

24          I can take 10 minutes of argument from each side right

25  now.  In the alternative, I can give you time Friday at 1:45

1    and give you each about 20 minutes to argue.

2            Mr. Cohen, it is your Daubert motion so I'll give you

3    the option of arguing now or 1:45 on Friday.

4            MR. COHEN:  I think I'd prefer to just go ahead and

5    argue it now if that's all right, your Honor.

6            THE COURT:  It's your motion so you have got 10

7    minutes and then I'll hear from Mr. Savitsky.

8            MR. COHEN:  Thank you, your Honor.

9            We made this Daubert motion and we made it basically

10   on four bases.  The first one was the black box nature of the

11   opinion.  And what we heard from Mr. Regan today essentially is

12   we don't, we don't disclose what the specifics of the

13   adjustments were, that's not how it works, it's really more

14   experiential in how he chooses to weight different things.

15           The cases are really clear.  An expert can't come in

16   and say, I relied on these 500 data points, and based on my

17   experience, that tells me that the value is X.  They need to

18   disclose how they got from the data to the value that they

19   reached.  And that's just not present in Mr. Regan's report.

20   There are some minor indications in some places, this is a

21   slightly less enviable auction house or a different

22   attribution.  But there is no discussion of:  And therefore I

23   have weighted this less, and this is why.  With these two, my

24   value comes up to here.  There is none of that specifics of

25   what went on behind the scenes of how he got from the data to

1    the valuation.

2          In plaintiff's opposition for Daubert motion, they

3    talked about *Oleg Cassini* as really turning on, well, they

4    didn't disclose -- the expert didn't disclose the specifics of

5    the comparables.  The *Oleg Cassini* court was actually really

6    specific.  They said the report contains only two terse

7    paragraphs explaining what the market comparison approach is,

8    fails to explain how the expert applied that approach to the

9    nature and quality of each of the works that she viewed, in

10   order to arrive at the dollar value she assigned to each piece.

11   The court didn't distrust the expert's testimony that she had

12   in fact looked at comparables.  What the court said was, you

13   didn't disclose what the comparables are.  But also, right, you

14   didn't disclose and there is a direct quote from the decision

15   at page eight.  You didn't disclose "what factors were

16   considered in selecting the comparable works and how those

17   factors were weighed."

18          And it cited to another case, which was the *Davis*

19   case, and this is *Davis v. Carroll* at page 417 where the Court

20   notes, at no point in his report deposition or declaration does

21   Rosenberg clarify the full set of factors that played a role in

22   this analysis, nor does Rosenberg explain how these factors

23   interact or how much weight each factor is assigned in his

24   calculus.

25          And those cases, that language could be written word

1    for word about Mr. Regan's appraisal.  We simply have no

2    visibilty into how each factor interacted.  The only way we

3    could have learned that, your Honor, would be to have deposed

4    him and asked him the very specific questions that we asked

5    about those two paintings, which took 20, 30 minutes on just

6    two paintings.  We would have been able to spend that time on

7    each and every one of these 98 paintings to get that

8    information out of his appraisal.  And the cases are really

9    clear, that's not our obligation when deposing an expert

10   witness.  It was his obligation to disclose it.

11        So I think on the black box issue, what we have is I

12   think a very good, very reputable appraiser who treated this as

13   though he were doing an appraisal for a client and not an

14   expert report for use in litigation, which requires a lot more

15   information to be disclosed than a standard appraisal.  And I

16   think that became really clear, your Honor, when we talked

17   about what was the last issue that we listed in our papers,

18   which was the disclosure of what we called the rejected

19   comparables, and there was some rehabilitation on that on the

20   idea that, well, if he considered it a comparable, he listed

21   it.  That's great.  But the problem is we didn't have any

22   insight into the things that he said, hmm, I am going to take a

23   hard look at this, and you know what, I was on fence, I don't

24   really think it's comparable.  And he said it himself.  We

25   asked him.  Did you disclose everything you considered but

L5jekinh

1    didn't rely on, which is the standard.  That's the requirement.

2    And his answer was no, I didn't do that.

3         And I don't think that was malicious on his part.

4    This is the first time he's ever served as an expert.  But at

5    the end of the day, that deeply prejudiced us.  We don't have

6    the ability to look at the pieces that he considered, that he

7    clicked on, looked at, gave real attention to, and decided, you

8    know what, on balance, I don't think this is comparable at all.

9         And frankly, your Honor, the fact that he said no, I

10   didn't consider them comparable at all, just makes that a

11   stronger issue and a bigger issue.  Because it's much less

12   credible to say, hey, I looked at a painting by this same

13   artist, that I click on off search result list because I

14   thought this could be a comparable, and looking at it, I don't

15   think it's even in the conversation as a comparable.

16        THE COURT:  Let me pick up on that last point.  I am

17   understanding your argument about black box, but with respect

18   to this issue, I mean, isn't one of the purposes of listing

19   what is considered so that you can do what is going to be your

20   extraordinarily effective cross-examination, is show that he

21   didn't even consider the vast number of those things and that

22   didn't even factor into his knowledge.

23        MR. COHEN:  Yes and no, your Honor.  I think in this

24   case, your Honor, the cross-examination that I would want to do

25   is, so you looked at this particular painting that has a lower

1    value and you decided it wasn't a comparable.  And you noticed

2    it, you knew it existed, you decided it wasn't a comparable.

3    Isn't it by the same artist?  Doesn't it have, you know, isn't

4    it the same type of painting?  It is a hanging scroll versus a

5    hand scroll.  Doesn't it have the same general composition?

6    Whatever I can ask to highlight the fact that his decision not

7    to consider it was wrong.  And without that listing of, look,

8    these were the ones I looked at, it is impossible for me to do.

9    I have an 880 painting database that I can pull from, and I

10   have no way of knowing if the one I'm pulling from is one he is

11   going to say, yeah, I looked at it, I thought about it, and I

12   decided on balance it's not.

13        THE COURT:  Why does that make a difference?  I am not

14   sure whether it would be effective cross-examination in the

15   right lens, but let's assume it is.  Isn't the

16   cross-examination even more effective when he didn't even -- he

17   glanced at it but he didn't even consider it?

18        MR. COHEN:  I don't think it is.  That might go to,

19   look, I have an 880 painting database, I can't look at each

20   one, and if that was one I should have considered, maybe I

21   should have, maybe I shouldn't have.  But unless you give me

22   time to consider it, I can't tell you how it's going to impact

23   the appraisal.  But this is one that, yes, I looked at, I paid

24   attention to, and decided wasn't a comparable.  Now I can

25   cross-examine you on aren't you cherrypicking.  Aren't you

L5jekinh

1    really just taking the ones that support your astronomically

2    high valuation and leaving off to the side.  And especially, in

3    the aggregate, if it's more than just once, if it's twice,

4    three times, four times, five times, the more of that

5    information I have, the better I can discredit his opinion.  I

6    just don't have access to that to be able to do that.  And

7    that's not anybody's fault.  But, it is a failure of

8    disclosure, it is a clear violation of the rules, it is clearly

9    prejudiced us, and I don't know how to fix it.  There is no way

10   to fix it.  That's on the comparable issue.

11        And then on reliability of the data issue, your Honor,

12   this would be a different conversation if Mr. Regan had said,

13   look, I don't know for certain which of these consummated, I

14   don't know for certain which of these are reliable sales, so I

15   am going to apply some discount.  I am going to account for

16   that in my opinion in some way.  He did not do that.  That

17   might go to weight.  If there was a disagreement about how do

18   we account for the fact that some level of this is unreliable.

19   He didn't do that.  He just full on assumed, that every sale

20   was a reliable data point.

21        And what the Second Circuit said in *Zerega* was that

22   you, your Honor, should exclude expert testimony if it is

23   speculative or conjectural or based on assumptions that are so

24   unrealistic and contradictory as to suggest bad faith or to be

25   in essence an apples and oranges comparison.  And both

1    Mr. Regan and Mr. Linsner agreed it would be unrealistic to

2    assume that every comparable sale he relied on was an actually

3    consummated sale, where that was actually reflective of the

4    market value of the piece.  They both --

5         THE COURT:  The testimony we just heard at the very

6    end is that from the seller perspective, it was consummated

7    because the auction house --

8         MR. COHEN:  Your Honor, this is one of the

9    difficulties of not having the chance to recross.  Because if I

10   had a chance to ask Mr. Regan a question, I would have asked

11   him if he really is asserting that every sale does that.  There

12   are times when auction houses enter into such agreements with

13   sellers.  But it's not true that every sale has that agreement.

14   Every auction house says, if a seller defaults, if a buyer

15   defaults, we are going to pick up the tab on every sale.

16        And it wouldn't make any sense.  Because if that were

17   the case, I could get two of my friends to go bid on my piece

18   and bid it up by $10 million and then just not have the money

19   to pay and leave the auction house on the hook.  That's not

20   happening.  The auction houses are very clear they are not even

21   taking on liability for whether or not the description of the

22   piece is accurate.  There is no way they are taking on

23   responsibility to pay for every sale where a buyer falls

24   through.  That's not going to happen.  So, this is the first

25   time that that concept has ever come up.  I didn't get a chance

1    to cross-examine him on it.  I didn't get a chance to put any

2    contrary opinion in or contrary evidence in, because it's never

3    come up in the papers.  It's never come up in the report.  It

4    never came up in his deposition.  So I think to rely on that,

5    where, again, every piece of testimony has been you can't make

6    this assumption that these are real sales, 100 percent.  You

7    just can't, it's unrealistic.  I think that would not be

8    appropriate.

9          So on the reliability issue I think Zerega, given the

10   testimony by both parties' expert it is would be an unrealistic

11   assumption to assume what Mr. Regan did that it was 100 percent

12   authentic and 100 percent real.  I think *Zerega* requires its

13   exclusion for that reason as well.  Those are the three key

14   issues.

15         We talked about the *Rothko* issue and the valuation

16   issue.  I think you have that in front of you on the motions in

17   limine.  So, depending on how you rule on that issue, whether

18   the fair market value appraisal comes in or not, on relevance

19   is a separate question.  But for purposes of this motion,

20   without getting into the *Rothko* stuff that didn't come up in

21   this particular hearing, I think on the black box, I think on

22   the failure to disclose, as he said he did not disclose

23   everything he considered but didn't rely on.  And I think on

24   the fact that he acknowledges that it would be unrealistic to

25   assume what he did as an extraordinary assumption, he can't put

L5jekinh

1   those opinions in.  Thank you, your Honor.

2          THE COURT:  Thank you very much.  Mr. Savitsky, I'll

3   hear from you now, 10 minutes.

4          MR. SAVITSKY:  Thank you, your Honor.  Basically, the

5   Wangs' goal is to lull the Court into rejecting a

6   comprehensive, thorough, reliable appraisal conducted by a

7   qualified expert.  An appraisal that is very similar to what

8   everyone else in the industry is doing, except it's more

9   thorough.

10         THE COURT:  Mr. Savitsky, I guess, two points.  First

11  of all, isn't the question before me whether it satisfies Rule

12  702, which may be informed by what's necessary for an appraisal

13  but it goes a little bit further; and number two, if this comes

14  in, what's to prevent any expert in any art case in the future

15  from just simply saying, well, I think this piece of art is

16  worth X, and here are three things that I think are

17  comparables, you figure it out how I decided that they are

18  comparables and what weight they had in evaluation.

19         MR. SAVITSKY:  Your Honor, obviously, and the case law

20  that we cited states that an appraiser's compliance with USPAP

21  is obviously material to whether or not the report satisfies

22  Rule 702.  So we do think it's probative of the fact, even

23  though it may not be dispositive.

24         And as Patrick Regan testified, his compliance with

25  USPAP guidelines and his use of comparables are done

L5jekinh

specifically, designed to be done by USPAP so the report can be
replicated and it can be understood why certain values were
chosen, and why comparables were chosen, and why the ultimate
value was arrived at, the ultimate appraisal.  And on this
point, I was going to get to it, but I will state that there is
a reason why in the -- well, we think in the Wangs' moving
papers they only cited to two paintings that they had a problem
with.  It was a Bian Wu (ph) which is on page 72 of the fair
market appraisal, and the Jian Chang (ph) painting which is on
page 20.  The only two paintings that are referenced in the
Wangs' moving papers that this appraisal is impenetrable, we
don't understand how Patrick Regan arrived on it.

They ignored all the other multimillion dollar
appraisals, and there is a reason why they ignored the other
multimillion dollars appraisals, and that's because it's
extraordinarily obvious how Mr. Regan came to these valuations.
And I'll give you a few examples.

On page 14 of the fair market value appraisal, work
135, Mr. Regan valued a painting at approximately $300,000
based on a notation that that exact same painting had been
auctioned at China Guardian for $285,000 in 2009.  So he values
the painting at approximately $300,000, based on the fact that
exact painting sold for $285,000 several years before.  That's
not a black box valuation.  That's not we have no idea how he's
arriving at these numbers.  That's not ipse dixit.  It is the

1    actual price that the painting is sold.  There is a lot of

2    these.

3            Page 30, work 94, this is still a fair market value

4    appraisal.  Patrick Regan valued at $1.2 million based on the

5    fact that that exact same painting sold for $1.2 million

6    several years earlier.  And here is a big one.  And this was

7    discussed in our papers.  But on page 35, work 240.  Mr. Regan

8    valued a painting at $4.6 million, in part because the work

9    sold in Hong Kong for $4.6 million in 2019.  There is nothing

10   ipse dixit.  There is nothing black box about saying one equals

11   one, 4.6 million equals 4.6 million.

12           On top of that, this is something that wasn't

13   addressed at all by the defendant's counsel although it was

14   raised in our brief.  Mr. Linsner agreed that 11 of Patrick

15   Regan's appraisals were credible.  He went through every single

16   one of them.  He didn't raise a single comparable that

17   Mr. Regan missed.  So while we have this hypothetical debate

18   about, well, this should have been disclosed or Mr. Cohen

19   doesn't have the expertise to look at these things, the fact of

20   the matter is Mr. Linsner professes to have the expertise to

21   review this, he did in fact review it, and he couldn't find a

22   single comparable that Patrick Regan missed.  In fact, he

23   agrees with 11 of Patrick Regan's appraisals.  And when you add

24   those 11 up, this is Exhibit 1 to Mr. Linsner's rebuttal

25   report, it is approximately $9 million worth of appraisals.

L5jekinh

1          So this is what the Wangs want you to do.  The

2     defendants, they want you to throw out the entire appraisal,

3     based off complaints they had the with the Bian Wu, which was

4     valued at $10,000, and the complaint about the Jian Chang,

5     which is on page 75 I believe of the -- on page 20 of the

6     retail value appraisal, which is $100,000.  They want you to

7     throw out multimillion dollar appraisals that their own expert

8     concedes are credible because of a black box theory.  There is

9     no --

10          THE COURT:  Mr. Savitsky, let me challenge you on

11     that.  Let's assume different, somewhat different case but

12     similar expert testimony.  The defendant just decides not to

13     have an expert at all.  Isn't the defendant in that

14     circumstance still entitled to get the information necessary to

15     examine your expert and to understand what was looked at, what

16     was not considered and rejected?  And how, even in the

17     instances where it might be in your view obvious that there is

18     a one-to-one correspondence, to understand there is a

19     one-to-one correspondence, the market didn't change between

20     2017 and 2019 -- or I'm making up the dates.

21          MR. SAVITSKY:  Well, yes, your Honor.  There is a,

22     first, the rejected comparable phrase is a myth.  They miscite

23     blatantly Patrick Regan's testimony.  So he did not actually

24     testify that there was something that he gave significant deep

25     close attention to and he just chose not to use it.

L5jekinh

1    And your question, your Honor, was that but

2  hypothetically in a different case where a Mr. Linsner was not

3  retained and didn't review this, are they entitled to have a

4  clear explanation.  And what I would say is they did get a

5  clear explanation.  I believe an attorney is able to follow

6  these points, because I believe I'm able to follow Mr. Regan's

7  appraisal and understand that when he appraises something to be

8  worth $4.6 million in 2019, because that work sold for $4.6

9  million in 2019, anybody could do it.

10    But, in this case, if you're looking to have the

11  extreme sanction -- and it is a sanction -- for not disclosing

12  something under Rule 26(a), of the extreme sanction for failure

13  to disclose something of precluding an expert, there needs to

14  be some prejudice and there isn't any prejudice here for,

15  frankly, the reason your Honor stated that, we didn't put in

16  our brief because we didn't think of it, but that's absolutely

17  right.  It is a much bigger problem if Patrick Regan didn't

18  realize, for example, that if there was a four -- if there was,

19  that $4.6 million painting, if that got put up for auction more

20  recently and didn't sell, and Patrick Regan didn't consider

21  that, that would be a very big problem for Mr. Regan.  And it

22  would cast doubt not only on that valuation, but on the entire

23  report.

24    Those things don't exist.  And we know they don't

25  exist because we know Mr. Linsner went through every single

L5jekinh

1    valuation, came up with the ones he thought were credible, and

2    then has apparently some argument on other ones, but we just

3    haven't heard what those are yet.

4        I do want to speak, your Honor, though, about the

5    *Rothko* case because there is another major, major miscite from

6    the Wangs on the *Rothko* case.  Page eight of their reply brief

7    they state that *Rothko* -- and there three *Rothko* cases, but I

8    am referring right now to the court of appeals case.  On page

9    nine they state, quote, the court of appeals in *Rothko* held

10   that appreciation damages are available only -- and the word

11   only is bolded and italicized -- internal quote, if it was the

12   executor's duty to retain the property rather than sell it.

13   The theory being the beneficiaries are entitled to be placed in

14   the same position they would have been had the property been

15   retained.

16       I messed up the quote at the end.  But would have been

17   and quote had the property been retained.

18       They're citing the what the defendants in the court of

19   appeals --

20       THE COURT:  I've read the court of appeals decision in

21   *Rothko*.  I know that it has the additional language of "serious

22   conflict of interest."

23       MR. SAVITSKY:  In *Rothko*, those defendants were

24   authorized to sell, and the court said regardless of their

25   authorization to sell, that's the whole point of *Rothko*.

L5jekinh

1          THE COURT:  But Mr. Savitsky, it is a very different

2   case in *Rothko* where the sale did not have to be made

3   immediately.  And in fact, what they did was within days sell

4   it.

5          MR. SAVITSKY:  Your Honor, there are millions of

6   dollars of estate paintings today, May 19, 2021, that have not

7   been sold.  These paintings did not need to be sold.  The

8   testimony that comes out at trial will prove beyond question

9   they didn't need to be sold.  Andrew Wang wanted to sell them

10  so he and his father could purchase them.

11         We'll prove that through counsel for the public

12  administrator, we'll prove it through the documentary record.

13  They just didn't need to be sold.  That's a factual question.

14         THE COURT:  So why we're at it, and I'll give

15  Mr. Cohen two minutes to respond on *Rothko*.  What do you take

16  serious conflict of interest to mean?  I had not before reading

17  *Rothko* understood that that was a term of art in law just

18  different from conflict of interest.

19         MR. SAVITSKY:  Well, a serious conflict of interest,

20  your Honor, is selling paintings to yourself, paying for those

21  paintings fraudulently using false identities.

22         THE COURT:  How is that different from a conflict of

23  interest?  How does one measure what's a serious conflict of

24  interest and what's just a conflict of interest?  Presumably,

25  if I read *Rothko* for a conflict of interest, there is no

1    appreciation damages.

2         MR. SAVITSKY:  Your Honor, the number one cardinal

3    rule of being a fiduciary is you do not self deal.  There is

4    nothing more serious than being a person who purchases

5    paintings through fraud than here.  What the Wangs want, your

6    Honor, with the mainland Chinese auction attack and the black

7    box issue is to say, well, even if we stole these things, which

8    is a factual issue at trial and even, we get to keep them --

9         THE COURT:  Mr. Savitsky, in your view is there a

10   hierarchy of conflicts of interest where some are serious and

11   some are not serious conflicts of interest?  And where do I

12   get, where do I look to for that?

13        MR. SAVITSKY:  All I would say is -- I don't know if

14   there is a hierarchy.  But if there is, you can be sure selling

15   to yourself by fraud is at the top.  I can't conceive of

16   something that would be a greater conflict of interest, and

17   that is what happened in *Rothko*.  They sold to an entity with

18   whom they had a self interest.  That's the quote from, your

19   Honor, the *Rothko* case.  And they didn't disclose it and it

20   allowed the estate to be made whole.

21        This is another point that I do think we make.  But,

22   the appreciation damages are recoverable under RICO.

23        THE COURT:  They are not recoverable under RICO.  But

24   let me, is there anything else that you've got?  You are going

25   to lose on the recoverability of the RICO.  There is a more

1    serious issue with respect to whether they are recoverable

2    under the breach of fiduciary duty.  But, you know.  I'm just

3    advising you where to spend your time.

4         MR. SAVITSKY:  Understood, your Honor.  I think that

5    is all I have for now.

6         THE COURT:  Mr. Cohen, doesn't this case read on

7    *Rothko* with respect to the common law breach of fiduciary duty?

8         MR. COHEN:  Very briefly, no, your Honor, it doesn't.

9    And the primary reason why, as you honed in on, is there was an

10   actual compulsion to sell to pay taxes and administrative

11   expenses.  Frankly, this estate has as it currently stands is

12   bleeding money and insolvent.  But beyond that, your Honor, if

13   you look at *Rothko*, what the court of appeals did and what the

14   underlying case did is they said, okay, was there a conflict of

15   interest.  Now, given that conflict of interest we have to ask

16   the question was that transaction at fair market value.

17   Because if the sale had been at fair market value at the time,

18   then the fact that it went to a gallery who they had an

19   interest in, really wouldn't have made a difference because if

20   it was at fair market value at the time, it was a reasonable

21   sale at the time.  The court of appeals had to look into that

22   issue, and what the court of appeals found, and again, I

23   haven't look at *Rothko* in a little bit so I don't remember, the

24   court of appeals or appellate division decision that focused in

25   on it.  I think it was the court of appeals that also said the

1    evidence was clear this was not fair market value at the time.

2    And if you have that evidence, it's not fair market value at

3    the time, then you have a serious conflict of interest because

4    what you have is somebody who is essentially abusing their

5    position to harm the estate by giving themselves an advantage.

6    As opposed to a situation where, at best, what's alleged here.

7    Given for everything but that the Udon Jin (ph) sale there is

8    no evidence on fair market value of these paintings.  At best

9    what's alleged here is he sold it to himself at fair market

10   value.  That's not what happened.  He sold it to third parties

11   at fair market value.

12        But either way, the estate doesn't get a windfall,

13   because the way it raised funds to pay taxes they think was a

14   sale to a non-disclosed purchaser with connection to them,

15   where the estate's appraisal expert says who the paintings were

16   selling to, that didn't matter to me in terms of what I was

17   advising on.

18        THE COURT:  Mr. Cohen, I thought, and I recognize you

19   haven't looked at *Rothko* for a while.  I've looked at probably

20   more recently.  I think the issue you are identifying in terms

21   of whether there was fair market value may go to whether there

22   is a breach of fiduciary duty at all.  That's what *Rothko* talks

23   about.  On the assumption there is a breach of fiduciary duty,

24   and that you are on both sides of the transaction.  Isn't what

25   *Rothko* stands for, is that since you can recover the

L5jekinh

1    depreciated value from the party on the other side of the

2    transaction, then you can also recover from the fiduciary.

3              MR. COHEN:  Right.  And your Honor, frankly, if there

4    is a breach of fiduciary duty separate and apart from the

5    identity of the purchaser, I think that's right, and I think

6    that's what makes it a serious breach.  Is that not only is it

7    a non-disclosed self-dealing transaction, but it is a

8    self-dealing transaction that actually caused in the moment

9    harm to the estate.  And that's what makes it serious breach,

10   as opposed to, you know, I sold this property that was $100,000

11   property, I sold it for $100,000, and it happened to be my

12   daughter.  That is not a serious conflict of interest.  It is

13   not breach of fiduciary duty at all.  Where the duty is to sell

14   assets to raise funds.

15             I do have to raise one more issue, your Honor, outside

16   of *Rothko*.  When Mr. Linsner said that those sale results were

17   credible, he was very specifically saying there were a number

18   of auction, there were a number of appraisals that did not

19   depend on mainland Chinese auction house results.

20             So as to the comparables that they relied on, those

21   comparables didn't have the reliability issues that the

22   mainland Chinese auction results had.  He wasn't opining on

23   whether the ultimate appraisal was a valid appraisal or hit the

24   right result.  He just said the comparables they looked at

25   didn't have the underlying reliability issues.  He couldn't

L5jekinh

1  opine on actual appraisal because he didn't know the

2  adjustments.

3          THE COURT:  I'm going to look at that, at the

4  testimony.  Thank you both, thank you to the court reporter.

5  Argument was very helpful.  The Court will take this under

6  advisement.  Thank you all.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25