UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/09/2021
```

------------------------------------------------------------------------X
            :

YIEN-KOO KING,                 :

                   :

         Plaintiff,     :         14-cv-7694 (LJL)

                   :

     -v-               :        OPINION AND ORDER

                   :

ANDREW WANG, et al.,       :

                   :

         Defendants.   :

                   :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants Andrew Wang ("A. Wang") and Shou-Kung Wang ("S.K. Wang," and

together, the "Wangs" or "Defendants")[1] move to exclude the testimony of the expert Patrick

Regan ("Regan") proposed to be offered at trial by Plaintiff Yien-Koo King ("Plaintiff" or "Y.K.

King"), in her capacity as preliminary executrix of C.C. Wang's estate (the "Estate").  Dkt. No.

234.[2]  The Court previously denied this motion as moot after the parties indicated at a telephone

conference that they were in settlement discussions.  Dkt. No. 281.  However, Defendants

renewed the motion after the case was reset for trial.  Dkt. No. 287.   For the reasons that follow,

---

[1] The Complaint names sixteen additional Defendants; however, only the Wangs, individually and on behalf of Bao Wu Tang and Jian Bao Gallery, have appeared in this action. The other defendants include Bao Wu Tang, Jian Bao Gallery, Anthony Chou, Chen Mei-Lein, Wei Zheng, Yong-Qing Ye, Yue Da-Jin, and John Does 1–9. The Court refers to A. Wang and S.K. Wang as "Defendants" for ease of reference throughout this Opinion.

[2] The Court assumes familiarity with the lengthy facts and history of this case that have been repeatedly laid out, most recently in this Court's opinion denying summary judgment. *See King v. Wang*, 2020 WL 6875403, at *1–11 (S.D.N.Y. Nov. 23, 2020).  The Court adopts the terms defined therein unless otherwise stated.

the Court grants the *Daubert* motion and excludes Regan's testimony as to his appraisals of the fair market value of the 98 paintings and retail value of the fourteen YDJ paintings.[3]

## BACKGROUND

The Court finds the following facts based on Regan's expert report, Dkt. No. 234-2, Regan's rebuttal expert report, Dkt. No. 234-3, Regan's deposition, Dkt. Nos. 234-4, 238-17, the expert report provided by Kenneth Jay Linsner ("Linsner"), Defendants' expert, Dkt. No. 238-3, Linsner's deposition, Dkt. No. 238-5, as well as the *Daubert* hearing held on May 19, 2021 and the credibility determinations the Court has made as a result of that hearing.  Dkt. No. 289-1.

## I.    The Regan Report

Patrick Regan is an Asian-art specialist from the Winston Art Group.  Winston Art Group is an independent art-appraisal firm with offices in ten cities worldwide, and it employs more than 75 art-market specialists.  Defendants do not question Regan's qualifications as an expert. Regan has worked as a private art dealer, fine art appraiser, auction specialist, art collections advisor, and arts business consultant.  He can read Chinese and has lectured and taught courses on topics including the Chinese art market and Chinese art.  He states that he has been compliant with the Uniform Standards of Professional Appraisal Practice ("USPAP") since 2013. Although Regan has engaged in numerous appraisals, he has never previously been retained to provide an expert report in connection with any litigation.  Plaintiff retained Regan to provide a fair market value appraisal ("FMV"), as of October 19, 2019, of the 98 Paintings and to provide

---

[3] Defendants' motion seeks to "exclude the proffered expert opinions and testimony of Patrick Regan," Dkt. No. 234-33 at 1, and is not limited just to his appraisal opinions; however, the reasons cited in their memorandum of law in support of the motion all relate exclusively to the appraisal opinions.  As such, the Court considers and excludes only those portions of Regan's proffered testimony.

a retail appraisal, as of August 2009, of fourteen of those 98 Paintings that appear to have been sold by the Estate on August 17, 2009 (the "Regan Report").  *See* Dkt. No. 234-2.

The Regan Report is in several sections.  The first section contains his fair market appraisal, as of October 19, 2019, of the 98 Paintings that appear to have been sold by the Estate on August 17, 2009.  *See* Dkt. No. 234-2 at 10.  Other sections of the report contain (1) his appraisal of the total retail value of the fourteen Yue Da Jin Paintings on August 2009, Dkt. No. 234-2 at 11; (2) his opinion that it would be unlikely that thirteen of the Paintings which were apparently sold to five collectors would appear for auction at the same mid-tier Chinese auction house due to chance alone, Dkt. No. 234-2 at 12; (3) his opinion that the exhibition of paintings at the Capital Museum would have increased market envy and confidence in those paintings, usually translating into better sales results, Dkt. No. 234-2 at 13; and (4) his opinion that C.C. Wang collector seals were added to at least fourteen of the 98 Paintings following C.C. Wang's death, Dkt. No. 234-2 at 13.

The FMV appraisal purports to measure, for each of the 98 Paintings, as of October 19, 2019, the price at which the painting would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.  Dkt. No. 234-2 ¶ 20.  Regan opines that "[i]n 2019, the most likely and appropriate marketplaces for classical Chinese paintings [were] at auctions in China and New York, rather than Private Retail Markets, such as independent galleries and dealers – because auctions are where the best and highest prices for these works are usually achieved."  *Id.* ¶ 21.

Regan separates the 98 Paintings into six different groups corresponding to a previous separate sale by the Estate.  He calculates the aggregate total FMV of all 98 Paintings as of

3

October 10, 2019 to be $71,424,000.  *Id.* ¶¶ 26–27.  The total FMV calculated by Regan for all of the 98 Paintings as a group is simply the sum of the appraisals he provides for each of the 98 Paintings, which are contained in an appendix to his report.  The appendix contains Regan's certification that his "analyses, opinions, and conclusions were developed, and [his] report has been prepared, in conformity with the 2018-2019 Uniform Standards of Professional Appraisal Practice."  Dkt. No. 234-2 at 30.  It also contains the disclaimer that Regan "has not made a personal inspection of the property that is the subject of this report," *id.*, and that he "relied on information available through online databases, dealers, and/or galleries and assumed authenticity, condition and value information to be accurate," *id.* at 33.

The appendix lists as Regan's "method of research" that "[r]esearch was conducted in the offices of Winston Art Group and with on-line auction result databases, such as Invaluable, Artron, Artnet, Artprice, AskArt, Sotheby's website and catalogues, and Christie's website and catalogues and relevant retail galleries and databases, such as 1st Dibs and Artsy when necessary to identify sale prices of comparable property.  The appraiser regularly attends auction previews and sales in this genre, as well as major fairs exhibiting comparable material and discusses the market trends with auction house professionals and dealers.  In addition, the appraiser consulted sale catalogues, catalogues raisonné, and other printed materials that support the appraisal."  *Id.* at 34.  It contains no information about the criteria that Regan used to identify the material that he believed to comparable to the items being appraised.  It states as his approach to value:  "The appraiser has employed the 'market comparison' approach to arrive at the appraised 'Fair Market Value.'  The 'income' approach was not considered applicable as the property in this report is not used to generate income.  The 'cost' approach was not considered applicable as there is no need to determine the value of the subject property based on the cost of manufacturing or

recreating an identical object at this time." *Id.*  It also contains no further information about the criteria or methodology used in connection with the market comparison approach.

The appendix then contains Regan's appraisal for each of the 98 Paintings at issue.  With rare exceptions, each of those appraisals is limited to a single page, which contains at the top a picture of the subject item being appraised and a description of it, including the attribution to an artist, the title of the work, its materials, whether it contains a seal, and—in some but not all instances—its size.  The appraisal then lists the work's provenance (including prior sales), "FURTHER DETAILS," and "comparables."  The FURTHER DETAILS sections for many of the works contain the identical language:  "Valuation based on an examination of the comparables and from a review of the overall appropriate market for these works.  See addendum comparable appendix document with examples."  Occasionally but infrequently the FURTHER DETAILS section contains information about the work such as whether it was included in a prominent exhibition, *see* Dkt. No. 234-2 at 37, or additional datapoints purporting to support the appraisal, such as the Sotheby's appraisal done in 2004 for estate-tax purposes, as of the date of death in July 2003.  There is no consistency with respect to the choice of comparables, either in terms of their number, the date of their sales, or the artist and how the artist relates to the artist of the work being appraised.  In some instances, an appraisal is based on a single prior sale of the same work of art but with no information regarding contemporaneous sales of similar works.  *See* Dkt. No. 234-2 at 36.  In other instances, there is a single comparable.  In other instances, Regan lists a price at which the subject work was listed but remained unsold in the past, as well as a couple of other comparables that sold for as much as 40 times the value that Regan put on the painting being appraised.  *See* Dkt. No. 234-2 (valuing item 162 at $1.4 million based on fact that work was unsold at $3.6 million and a "comparable" sold

for $49 million in 2017).  The dates of the comparables range from 2007 to 2017.  In virtually all instances the dimensions of the comparable works are described (but occasionally the dimensions of the work being appraised are not described), but the report does not set forth the relationship between the size of a work being appraised and the size of the comparables, and in some instances the dimensions of the work being appraised are not provided.  Sometimes the report lists the artists who created the comparable works but—with extremely rare exceptions— makes no effort to compare the market value of those artists to the market value of the artists who created the subject works.  The report for each item being appraised also lists the venue where the comparable was sold but makes no effort to say how the appraised value adjusts for that venue.  The report does not reference, when assessing comparables, any other factors such as motif or material.  No further information is provided as to how Regan determined that a particular work was comparable or how Regan adjusted the data points from prior comparable sales to arrive at his appraisal values.

At the end of the last of the 98 Paintings being appraised, Regan attached a "market overview."  Dkt. No. 234-2 at 131.  The market overview states that "in nearly all contexts the Chinese art market had a sharp and unpredicted rise specially starting from the year 2004" and that "all paintings and calligraphy from the Ming through the Qing Dynasties saw some demonstrable rise during this period, the market records show that for works by the more recognized or revered artists – and those exhibiting the most enviable histories or provenances – may have increased in value by up to several hundredfold."  *Id.*  The same market overview contains information about Chinese decorative artists including ceramics and "contemporary Asian art as well as the top Modern and Contemporary Western art names."  *Id.* at 132.  No effort is made to set forth the amount of the "rise" in value, whether it affected all "contexts"

equally, and whether the market rose in a straight line or instead experienced ups and downs based on the fate of the world, the Chinese economy, or fluctuating aesthetic and market judgments.

## II.     The Linsner Report and Rebuttal Report

Kenneth Jay Linsner, Defendants' expert, is an art appraiser who regularly provides expert witness services on arts valuation, appraisal, and related issues.  He is a Senior Member of the American Society of Appraisers and former president of its New York City chapter; he is also a Certified Appraiser by the Appraisers Association of America.  He has worked as an appraiser, as a reviewer of appraisals for the IRS, and he has taught courses in appraisal studies. He has experience with Asian artwork from his work as an appraiser, his work for the IRS, and from serving as a consultant to the Imperial Palace Museum in Beijing, China.  In November 2003, he was hired by the Public Administrator of New York County to appraise certain contents of C.C. Wang's apartment, but that did not include any of the paintings at issue here.

Linsner's report asserts the following opinions: (1) that the estate was not damaged by reason of the private sales of artwork, because the process used to sell the paintings included a review of the proposed prices by O'Toole-Ewald and "resulted in reasonable prices for the artwork," Dkt. No. 238-3 ¶ 44; (2) that there is no credible evidence that supports the allegations that artwork from the Estate was displayed at the Beijing Capital Museum or the Poly Museum, *id.* ¶ 45; and (3) that there is no credible evidence "sufficient to establish that artworks alleged in the Complaint to have been sold at auctions in China (i) were in fact sold at the prices reported or (ii) were the actual artworks sold by the Estate via the private sales," *id.* ¶ 46.

As relevant to the issues now before the Court, Linsner opines that "[a]uthenticity is always a serious concern in assessing Chinese art and artifacts," that "forgeries and other

authenticity issues plague the market for Classical Chinese art . . . requir[ing] serious study, in-person examination of an artwork, education in the field of Classical Chinse [sic] painting, and reasoned consideration of an artwork's provenance, its formal artistic structure and style, its physical medium and the historical record concerning the artist, his or her milieu, and the artwork itself," and that "[a]rtwork in C.C.'s collection has not been immune from authenticity concerns." *Id.* ¶¶ 12–13. He also opines that "[t]he 2004 Sotheby's Appraisal was not, and did not claim to be, performed according to the Uniform Standards of Professional Appraisal Practice ("USPAP")." *Id.* ¶ 24.

A major thrust of Linsner's report is that the art market in China is "complex, opaque, [and] government manipulated." *Id.* ¶ 34. Linsner opines that the reports of sales from Mainland Chinese auction houses are unreliable for several reasons including—in addition to the prevalence of forgery—(1) "the Chinese auction market is, and has been, rife with high rates of buyer default" and "while a buyer may submit the highest bid at auction, it is extremely common in China for the buyer to simply walk away from, or default on, the purchase," *id.* ¶ 37; (2) "in marked difference to auction houses in the West that will typically provide a refund if a work turns out to be a forgery or if other issues regarding authenticity arise, auction houses in China provide no guarantee of the authenticity, genuineness or condition of the artwork sold," giving rise to an "extraordinarily high rate of default in Chinese auction results," *id.* ¶ 39; and (3) "bidding at the high end of the auction market . . . are particularly susceptible to manipulation and default [including] most importantly to provide the Chinese government 'data' to demonstrate the size and depth of the Chinese art market," *id.* ¶ 40.

Linsner's report does not offer its own appraisal of the relevant artworks.

Linsner also provided a rebuttal expert report, dated December 16, 2019.  Dkt. No. 238-4. The rebuttal report opines (1) that the fair market value of the paintings is irrelevant because the Estate was under a compulsion to sell the artwork and because the Estate would have faced difficulties in selling the paintings in China in 2005–2009, *id.* ¶¶ 12–19, and that the retail value of the YDJ paintings is irrelevant for the same reasons, *id.* ¶¶ 20–23; (2) that Regan's valuations are unreliable and not credible because he relies on data from Mainland Chinese auction houses, *id.* ¶¶ 28–43, utilizes outdated comparables, *id.* ¶ 44, does not provide the valuations in the Sotheby's appraisal or the sale prices realized by the Estate, *id.* ¶ 45, did not devote sufficient time to the appraisal, *id.* ¶¶ 46–47, and fails to disclose extraordinary assumptions and hypothetical conditions that affect his valuation, *id.* ¶¶ 48–51, and because the appraisal is not USPAP-compliant in Linsner's view, *id.* ¶¶ 52–55; (3) that Regan's opinion that the fact that 16 of the paintings appeared at auctions at the same auction house suggests that they were owned by the same person is speculative, *id.* ¶¶ 56–60; (4) that Regan's opinion that C.C. Wang collector seals were added to some of the paintings is speculative, given the prevalence of forged seals and the difficulty of comparing seals in photographs, *id.* ¶¶ 61–67; and (5) that Linsner cannot conclude from the catalogs and videos of the BWT exhibition that any genuine artworks from the Estate were displayed, *id.* ¶ 68.

In opining that Regan's valuations are not credible, Linsner focuses first on Regan's reliance on auction results reported by Mainland Chinese auction houses.  Linsner cites a report estimating that "in recent years 41% to over 51% of the total value of sales reported by mainland Chinese auction houses are never paid."  *Id.* ¶ 29.  He reiterates that many auction houses in China "are reportedly owned or controlled by the Chinese government," *id.* ¶ 30, and that "auction houses in China provide no guarantee of the authenticity, genuineness or condition of

the artwork sold," *id.* ¶ 34.  He further opines that "bidding at the high end of the auction market is particularly susceptible to manipulation and default," due to "courtesy froth," meaning that "results reported at the high end of the market are often manufactured – whether by the auction houses themselves, collectors, or even the owner of the artwork for sale – to give the appearance of a strong market for a specific artist, to give the appearance of strength to an auction house, to provide 'evidence' to justify lending against artwork as collateral, and, perhaps most importantly, to provide the Chinese government 'data' to demonstrate the size and depth of the Chinese art market." *Id.* ¶ 35.

Linsner also asserts that Regan "cites to reported auction results that are outdated or otherwise irrelevant to support his valuation conclusions," opining that "[g]iven the vicissitudes of the art market, and in particular, the Chinese art market, it is not appropriate to cite sales of artwork more than two years prior to the date of the appraisal as comparables." *Id.* ¶ 44.  He cites instances in which Regan relied on "outdated" comparables—including, in one instance, a sale in 2002—calling Regan's reliance on such sales "a fundamental error." *Id.*  He further critiques the Regan Report for failing to include in the analysis and report the valuations from the Sotheby's appraisal and the "prices realized by the Estate in the private sales," opining that "[t]hese omissions distort how an intended user of the report situates the subject properties in the wider market for similar properties on the effective dates of valuation." *Id.* ¶ 45.

Linsner further critiques the Regan Report because "Mr. Regan admits in his report that he was not given sufficient time to conduct normal course research essential to any appraisal." *Id.* ¶ 46 (citing Regan Report, Appendix A at 5–6).  He contends that "when assignment conditions are limited in a material way . . . USPAP requires an appraiser to withdraw from the engagement, to modify the assignment to gain the time necessary to conduct a credible appraisal,

or indicate that an extraordinary assumption was made, if even possible"; Linsner opines that even disclosure of an extraordinary assumption would be insufficient to "cure" this "critical flaw" and that "the only reasonable action for Mr. Regan to take . . . was to withdraw from the engagement." *Id.* ¶ 47.

Linsner's next critique is that the Regan Report fails to disclose various "hypothetical conditions"[4] that affected the valuation, including that "the Regan Report ignored known facts with respect to the ownership and marketability of the 98 Paintings and the 14 Paintings when he chose to apply fair market value and retail value appraisal conditions to his valuations," *id.* ¶ 48; that Regan did not disclose that "[a]ssuming the works were property of the Estate in 2019," they would have been "subject to the automatic lien imposed by the IRS on the gross estate of the decedent," *id.* ¶ 49; that "the appraisals should have, but did not, include a clearly stated hypothetical condition that the 98 Paintings and the 14 Paintings were owned by the Estate as of the effective date of each of the appraisals," *id.* ¶ 50; as well as the "extraordinary assumptions"[5] that "all auction reports cited in the report – including results reported from Chinese auction houses – are assumed to be correct," and "that each artwork at issue remained in the condition in 2019 as it was reported to be in 2005–2009," *id.* ¶ 51.

Finally, Linsner critiques the Regan Report as not USPAP compliant, for all the reasons summarized above and because the Report does not "clarify who the owner/owners are on the

---

[4] Linsner's report defines this term under the USPAP:  "[A] 'hypothetical condition' is a condition that is 'directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of the analysis.'"  Dkt. No. 238-4 ¶ 48 (quoting USPAP Standards at 4).

[5] Linsner's report defines this term under the USPAP:  "[A]n 'extraordinary assumption' is 'an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.'" Dkt. No. 238-4 ¶ 48 (quoting USPAP Standards at 4).

effective date of appraisal," which "is important information to include in the report, as it is possible that provenance history after passing out of the Estate could have an effect on valuation," and because the Report is inconsistent in whether the client for the appraisal is the Estate itself or "Dean Nicyper from Withers Bergman LLP in relation to the Estate of Chi-Chuan Wang." *Id.* ¶¶ 52–55.

Attached to the report is a one-and-a-half-page chart indicating which of Regan's appraisals Linsner feels were too reliant on Mainland Chinese auction house data, untimely comparables, or both, and therefore concluding that all but eleven of the FMV appraisal valuations are not credible and all but one of the retail appraisal valuations are not credible. *Id.* at 49–50.

## III.   The Regan Rebuttal Report

Plaintiff also submitted Regan's rebuttal expert report, dated December 16, 2019.  Dkt No. 234-3.  The rebuttal report contains Regan's responses to Linsner regarding (1) the rise of the Chinese art market in the early 2000s; (2) reporting and data on the Chinese art market; and (3) the sale and display of reproductions of classical artworks.  It also responds to Linsner's critique with respect to the August 2019 estate sale of paintings to Yue Da Jin; the November 2009 capital museum exhibition; and the short videos at that exhibition.

As relevant here, Regan opines that "in nearly all contexts the Chinese art market had a sharp and unprecedented rise specifically starting in 2004," *id.* ¶ 4, and that while "[t]he Chinese market has, in general, risen both rapidly and consistently over the past 15 years," it also "still experienced fluctuations and can be the subject of seemingly conflicting statistics," *id.* ¶ 8, and "has experienced intermittent dips since 2011," *id.* ¶ 9.  He further opines that while "this market

is enjoying about a 600% index increase from 2003 levels, . . . [n]ot all works in this area

increased with such stamina," *id.* ¶ 9.[6]

Regan acknowledges that "one area of reported data has given many market-watchers

concern: China is seen to have a high percentage of 'deadbeat-bidders,'" that "[e]arly on in the

rise of Chinese art, a significant portion of winning auction bids did not culminate in payment

and paintings transfer," that "China's auctions saw, and continue to see, a significant portion of

non-payments and sales cancelled because of bidders," and that "all agree that incidences of

'non-payment' have been a concern in the reporting from Chinese auction houses."  *Id.* ¶ 10.  He

asserts, however, that concerns with the unreliability of Mainland Chinese auction house

information are mitigated by the collaboration between the China Association of Auctioneers

("CAA"), which was authorized by the Chinese Ministry of Civil Affairs, and Artnet since 2013

to certify auction houses whose data is deemed to be "most accurate and vetted," *id.* ¶ 11, and by

his use of comparables, including those from Sotheby's and Christie's, "in order to cross-check

values," *id.* ¶ 13.  He opines "[b]esides diligence in choosing comparables, there needs to be

consideration as to the appropriateness of each comparable and the varying weight that they may

have on the opinion of value" including the appraiser's experience and discretion "in

determining how much weight to give certain comparables" and that "[u]sing reported values

from major auction houses is a critical, necessary, and universally accepted method of valuing

Chinese artworks."  *Id.* ¶¶ 13–14.  He also opines that "[t]he existence of certain forgeries and

reproductions in the Chinese market does not render Chinese auction records of the Estate's

---

[6] Elsewhere in the rebuttal report, Regan opines that the financial crisis of 2007–2008 did not
significantly change the trajectory of the art market growth in China and that "the average prices
in Chinese painting and calligraphy continu[ed] their steady rise until finally peaking in 2011."
Dkt. No. 234-3 ¶ 24.

former paintings unreliable," *id.* ¶ 21, although he does not directly address whether the existence of those forgeries renders the information regarding the comparables unreliable.

## II.      The Experts' Deposition Testimony

In addition to their reports—as well as rebuttal reports—both experts also sat for depositions.

The excerpts of Regan's deposition testimony that are before the Court focus, in relevant part, on his methods for searching the databases he used and selecting comparables.  He asserted that he considered artist, size, provenance, condition, location, and time in selecting comparables.  Dkt. No. 238-17 at 276:13–284:9.  The testimony, however, did not reveal any general criteria for how, or even to what extent, those factors were used in selecting comparables and which factors were most important or the circumstances in which a work was considered as a potential comparable but then excluded.  He testified that he would query Artron and depending on "the amount of data available to us, we need to quickly cull down what we think are important comparables."  *Id.* at 31:20–24.  "[F]or instance, Artron, depending on the artist's name or the specifics, how I'm doing the search, it may be a search for the artist's name, it may be a search for a style, it may be a search for a time period."  *Id.* at 31:25–32:6.  He testified that the number of comparables was a function of how many paintings were "relatively similar enough," how many comparables are needed, and whether the comparable was "important": "there were some cases I'm sure that I looked at comparables, and then upon further review, decided maybe this wasn't as important or this one was important or maybe this wasn't as important, but I wanted to include it with a small note.  Again, that's why we have people doing this and not computers."  *Id.* at 38:5–25.  He did not testify as to a view as to how many comparables would be needed.  In the end, he testified that an important basis for his listing an artwork as a comparable was whether he gave significant consideration to whether the artwork

14

was comparable:  "[I]f I gave significant consideration to and really felt they are a strong comparable enough, at least as how you are describing it,[7] I probably would use it in some way as a listed comparable."  *Id.* at 41:16–21.  Regan also testified that there was no time frame component to his choice of comparables where a sale was just too far outside of the range to be a relevant comparable, *id.* at 282:5–284:9, and acknowledged that his own personal opinions about an artwork were irrelevant and he had to be objective, *id.* at 283:18–23.

Regan also was questioned about the reliability issues with data from Mainland Chinese auction houses.  He acknowledged that there might be legitimate reasons for a buyer to default, including reasons relating to authenticity and forgery.  Dkt. No. 234-4 at 295:10–296:23, 298:20–299:17.  He also testified that the percentage of non-payment for Chinese auctions within the marketing period "was hovering around 50" percent, *id.* at 302:12–18, 303:23–304:4, and that for works where the total hammer price is reported as over $1.4 million, only 28 percent have been fully paid by May 15 of the year after their sale, *id.* at 310:13–19.  He testified that the default rates were relevant to his appraisal in the sense that it affected how he chose his comparables, "in a sense to have as much information as I can, knowing what – again, can I go to slightly more vetted auction houses?" and to "double-check comparables and try to stick to the auction houses I'm most comfortable with."  *Id.* at 318:19–319:4.[8]  He further testified that it

---

[7] The antecedent to "strong enough comparable, at least how you are describing it" was provided in the prior question and answer where counsel described a "strong enough comparable" as a potential comparable to which Regan "gave significant attention to and . . . engaged in a thorough analysis of, but ultimately did not include in your report."  Dkt. No. 238-17 at 41:10–13. In other words, according to Regan, he selected comparables to use for an appraisal from all of the potential comparables that could have been chosen based not on whether they were the absolutely most instructive comparable but on whether he gave them "significant consideration" in order to determine whether they would be instructive.

[8] Regan acknowledged that there is no database that confirms whether a sale actually was consummated at the reported price for an auction.  *Id.* at 321:8–326:10.

would be "impossible to get a fair market value" by looking only at Western auction houses, "because that's not where the market is happening.  We have to accept the fact that there are some statistics that we have to be concerned about and try to mitigate against, but we cannot throw out the entire Chinese art market where these works are being sold."  *Id.* at 327:5–23.

As relevant here, the excerpts of Linsner's deposition testimony focus on the Chinese art market and on the Sotheby's appraisal.  Linsner testified that the information regarding the size of the Chinese art market was skewed because there were a significant number of sales that were never consummated, and the information was released by the Chinese government because the Chinese auction houses report directly to the government.  Dkt. No. 238-5 at 119:2–121:15.  Linsner testified that the Sotheby's appraisal was not USPAP compliant but that this did not undermine its reliability because "[a]uction houses usually don't issue USPAP compliant appraisals" because "[t]hey are in the business or obtaining goods for sale or advising about the sale of works of art, so they rarely issue strictly USPAP compliant documents."  Dkt. No. 238-5 at 122:6–17.  He further testified that "the gentleman that conducted the appraisal was considered to be one of the leading experts, if not the leading expert, in Chinese classical paintings at the time.  My only criticism is that he did use Chinese auction records and refer to them several times.  I would have preferred them to be verifiable sales."  *Id.* at 123:2–9.  He added that the sales from the Chinese auction houses were not verifiable sales but testified that IRS guidelines do not specifically say that Chinese auction house reports are not verifiable sales.  *Id.* at 123:11–20.  He testified that he did not appraise the 98 Paintings because he was not asked to, and "[y]ou cannot value what cannot be examined."  *Id.* at 125:4–7.

## IV.   The *Daubert* Hearing

The Court held a *Daubert* hearing on May 15, 2021, at which both experts testified.

Under examination from Defendants' counsel, Regan confirmed the importance of relying on multiple comparables in conducting an appraisal because the result of any one auction might be idiosyncratic—two people with egos might competitively bid up a piece well beyond its expected worth or, alternatively, people who might otherwise be interested in a piece might already have successfully bid for other pieces and no longer be able to bid on the piece, resulting in it being undervalued.  He confirmed that ideally you want to be able to look at multiple comparables and triangulate value based on those multiple comparables.  *Id.* at 40:14–41:7. Regan was then shown various appraisals and asked how he made the adjustments to the comparables.  He was asked about his appraisal of the Ma Yuan fan painting of Scholar and Crane Fan, appearing at page 76 of his report, which he appraised for $4,200,000 as of August 2019.  The appraisal report reflects that the same Ma Yuan painting was reported sold at a Chinese auction house in 2013 for $4,058,000 and lists three other comparables—a 13th century work from an anonymous painter reported sold at Christie's Hong Kong for $1,696,000, a painting by a comparable artist reported sold at Christie's Hong Kong for $2,308,150 in 2018, and a painting sold at a slightly less enviable auction venue in 2017 for $516,982.  When asked about the adjustments made to the $1,696,000 comparable to arrive at the appraised value, he testified he "would list the other comparables in the sense of disclosure to show even a non-attributable piece that has some market recognition," but when asked by what percentage he adjusted the comparable to account for the fact that it was not attributed would only say "[t]hat's not how appraisers usually work," that it is not a "mathematical" formula, and that "[i]n this case, . . . [t]he adjustment would be more so to a recent sale of [the] actual item, which would be 4.05 million, and fair market value I would I do – I have a tendency to be a lot more a lot more conservative.  I probably would have put, I would say, probably around 4 for that."  *Id.* at 44:5–

17

22.  When asked about the adjustments made to the 2017 comparable sold for $516,982 and the adjustments made to arrive at the appraisal of $4,200,000, he testified: "This is a good illustration of how it is nuanced.  You can't just put numbers on to it.  Again, I included it because I wanted to include all my data. . . . I included it because I wanted to show more data that can give a little bit of insight as to the market for, in this case, at least, Ma Yuan." *Id.* at 45:6–15.  Ultimately, he explained—in some tension with his earlier testimony about the importance of having multiple comparables and triangulation—"we have what I would call a direct comparable, which is we actually have that piece sold.  So, technically, a lot of other appraisers would not even bother to put in other comparable, because we actually have that piece in a relatively recent auction.  That exact piece selling." *Id.* at 43:12–17.  When asked how he adjusted for the fact that the comparable item was reported sold in 2013 and he was providing an appraisal value for 2019, he stated:  "It would be justifiable, and certainly to many appraisers to say, well, the market has changed.  This already has a sale for 4.05 million, you could easily increase that by whatever percentage or whatever round it up to whatever you feel the new market would be.  Instead, to be conservative, and to be a little more true to the data we see in front of us, I chose to keep it at the last sale price." *Id.* at 46:16–23.  Regan was asked if "in reality, [he was] just pegging it to the prior sale [and wasn't] really looking at the other three comparables [he] listed," and he responded, "[t]hat should be understood since we have a direct comparable, yes." *Id.* at 47:8–13.  He was asked, "Is there a reason you didn't specifically say that in the report? You just assumed we would understand it?" *Id.* at 47:14–15.  His answer was not responsive:

> Well, traditionally, or actually, technically, in an appraisal report, especially fair market value appraisal, when you have a large number of items, and I try to put as many comparables as possible. Actually I put all of my comparables as much data as possible into the report. And then put that into the background of all my market analysis. Knowing I'm presenting this in this framework. That's -- the goal of an appraiser who has to review an appraisal is to do an appraisal. You should provide enough data in the appraisal, which I have, to make it repeatable. So I put in, for instance, more, more data than is usually necessary. Each of that data has in this case, it even has links. It has what's a recorded sale price, it has the information about the different pieces, it has information about the auction house. We even give I believe screenshots and other information showing where this came from the database. And then if you look at my fair market value, that should direct the person into which comparables were weighted more. So, and in this case, I think I even put further details where I explain it."

Dkt. No. 289-1 at 47:14–48:21. He stated that with respect to appraisals he had done in the past (but not with respect to expert reports): "It is not typical that you would need to put in such level of detail in the comparable it is a totally repeatable appraisal." *Id.*

Regan was also asked about his appraisal of another Ma Yuan fan painting at a $6,200,000 fair market value as of August 2019, which lists as a comparable only the earlier sale of the same Ma Yuan painting for $6,700,000, which was sold in the same 2013 auction as the comparable in earlier Ma Yuan appraisal. *Id.* at 48 (discussing Dkt. No. 234-2, FMV appraisal at 77). No other comparables are listed. He was not able to give an answer as to why the value of the prior work would have appreciated and the value of this work have depreciated in the time period from 2013 to 2019 other than that the works were bought by the same collector and said that "I probably would have leveled them slightly." *Id.* at 50:11–15.

Regan was asked about his appraisal of two anonymous works as having a fair market value of $20,000 as of August 2019. *Id.* at 53:18–54:5. Neither are listed as having comparables. Both appraisals are based on the 2004 Sotheby's appraisal and what is stated as "an examination of the comparables and from a review of the overall appropriate market for these works." Dkt No. 234-2, FMV appraisal at 27. The appraisal does not list the 2004

appraisal value, but one of the works was valued at $16,000 and the other was valued at $12,000 in that appraisal.  Dkt. No. 289-1 at 53:18–21.  Regan could not identify any reason disclosed in the report for why one of the works would have increased in value by only $4,000 and the other by double that amount or $8,000.  *Id.* at 54:3–11.

Regan was also asked about his selection of comparables and his methodology for selecting them.  *Id.* at 56:22–60:19.  He testified that he ran searches on Artron.net and then on Artnet by artist, starting with the descending sales date and using a cut-off date if there were too many results.  Then, depending on the number of results, he would look at the results and search by imagery or size if an artist was known for very small works or very big works to find a "reasonable set of data" that he could then look through to pull comparables.  *Id.* at 57:7–58:13. He would click on "thousands" of search results to look at in detail and decide whether it was a potential comparable.  *Id.* at 59:10–22.  He did not keep a record of everything that he considered but only on what he relied upon.  *Id.* at 61:3–12.  When questioned about his use of data from Mainland Chinese auction houses, Regan agreed that "it would be unreasonable to assume that 100 percent of these actually consummated," *id.* at 65:13–15, which is why, he testified, he lists a lot of comparables.  He also agreed that if the highest price comparable that he relied upon for a particular painting, including for the Ma Yuan paintings, was one that did not sell that could dramatically decrease the real value of the piece.  *Id.* at 64:22–65:3.  He testified that he tries to use vetted auction houses and multiple comparables "to help mitigate any possible gaps," *id.* at 67:9–18.

On examination by Plaintiff, Regan testified that there were no "rejected comparables"— if he considered a comparable, he included it.  *Id.* at 71:4–19.  He reiterated the testimony from his deposition that if there was an item he gave significant consideration to, he listed it as a

comparable.  *Id.* at 73:3–18.  He further testified that appraisers in his profession rely on

Mainland Chinese auction house results, *id.* at 81:2–13, and that the 2004 Sotheby's appraisal

listed comparables from Chinese auction house results, *id.* at 83:3–13.  He also testified that his

report conformed to USPAP appraisal standards and that he believed he provided sufficient

detail in his report to explain the basis for his opinions.  *Id.* at 89:5–10.

  For his part, under examination from Plaintiff's counsel, Linsner testified that when

appraising a Chinese classical painting, due diligence would require him to look at Chinese

auction house sales records that he has.  *Id.* at 9:1–9.  He testified that his belief is that reported

auction sales from Chinese auctions are unreliable and that "in [his] circle," he wouldn't say that

many people disagree with him.  *Id.* at 12:5–11.  Linsner was presented with various articles that

referred to the significance of Chinese auction sales in the market for such artworks and in

valuations, and he reiterated his belief and said that "in the active appraisal circle of this type of

property, [he] has few opponents.  But they do exist."  *Id.* at 15:3–5.  He further testified that the

Sotheby's 2004 appraisal was reliable, *id.* at 18:11–13, and acknowledged that it does use data

from Mainland Chinese auction houses, *id.* at 19:1–13.  He testified that the appraiser conducting

that report was "utilizing them when there are no other comparables in the West.  When there are

comparables in the West, he is using them.  When he's not, he's using these.  Whether how much

he relied upon them, I do not know, because there is no appendix here."  *Id.* at 21:3–7.[9]

  On examination from Defendants' counsel, Linsner testified that it was IRS policy to no

longer accept Chinese auction results, *id.* at 31:1–17, and that if the appraiser had other

alternatives, the appraiser should not use Chinese art auction records, *id.* at 32:1–3.  He testified

---

[9] However, as Linsner testified, the Sotheby's appraisal did in at least one instance use data from
Mainland Chinese auction houses in addition to data from Western auction houses.  *See* Dkt. No.
289-1 at 21:8–22.

that there "have been significant reporting of sales which never took place or took place at huge,

huge multiples of what the object was worth," some of which was due to "courtesy froth, which

the Chinese like to use to pump up their auction records." *Id.* at 33:5–14.  Linsner also testified

about the Regan Report.  He testified that the fact that the Report "didn't disclose any of the

adjustments that he made to the comparables that he included" was "probably" not

USPAP-compliant, because:

> when you make an adjustment, obviously these are not fungible items.  They are
> not three identical paintings, one of which has been sold or attempted to be sold.
> These are all different subjects, they're different types of paintings, and so forth.
> So the question is, even if by the same artist, what are the adjustments you are
> making.  Just as in a house that has two bathrooms, you decide to use a comparable
> with four bathrooms, you have to disclose the fact that your comparable had two
> more bathrooms and therefore you are adjusting the sale price to a certain level.
> Same is true with these works of art.

*Id.* at 34:9–22.  He further testified that if Regan had disclosed his adjustments, he would have

been able to review them for consistency and reasonableness but that he could not conduct such a

review without that disclosure.  *Id.* at 34:23–35:4.

As a general matter, the Court finds Linsner's testimony to be credible.  He gave direct

answers to the questions that were supported by the evidence.  Regan, by contrast, was evasive.

The Court finds his testimony not to have been credible.

## GENERAL PRINCIPLES

### I.      General Principles Under Rule 702

"[T]he proponent of expert testimony has the burden of establishing by a preponderance

of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v.*

*Jones*, 965 F.3d 149, 161 (2d Cir. 2020).   That rule requires the proponent to establish and the

trial judge to find "that any and all scientific testimony or evidence admitted is not only relevant,

but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  This

"gatekeeping obligation" applies "to all expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Relevancy is determined by whether the proffered evidence "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002). Under the Federal Rules of Evidence, reliability is determined by considering if (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Amorgianos*, 303 F.3d at 266 (citing this standard).

Although courts are to adhere to a "liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005), beginning with "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)), a court still must determine that the evidence is "sufficiently reliable so as to be admissible." *Amorgianos*, 303 F.3d at 268. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. "[I]t is critical that an expert's analysis be reliable at every step." *Id.* Even "[i]f the witness is relying solely or primarily on experience, [he still] must explain how that experience leads to the conclusion reached, why that experience

23

is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Alto v. Sun Pharmaceutical Industries, Inc.*, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) (internal quotation marks omitted) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 advisory committee's note)).  "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos*, 303 F.3d at 265–66 (quoting *Kumho Tire*, 526 U.S. at 152).

"[M]any factors 'will bear on the inquiry' of whether Rule 702 is satisfied, . . . and . . . 'the inquiry envisioned by Rule 702 is a flexible one.'" *Jones*, 965 F.3d at 161 (quoting *Daubert*, 509 U.S. at 593–94) (alteration omitted).  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## II.    Principles Applicable to Appraisals of Fair Market Value

Plaintiff offers Regan's testimony in support of her damages claim.

"Damages analyses based on appraisals usually have two parts.  . . .  The starting point for an appraisal is the choice of comparable properties or businesses.  . . .  The second step in an appraisal is the adjustment of the comparable to account for differences between each comparable business or property and the one at issue."  Federal Judicial Center, Reference Manual on Scientific Evidence 445 (3d ed. 2011).  Numerous cases have involved the use of market comparisons to arrive at fair market value in contexts ranging from the valuation of a business, *see, e.g.*, *Albert Trostel & Sons Co. v. Notz*, 2010 WL 3835117, at *15–16 (E.D. Wis. Sept. 28, 2010), *aff'd*, 679 F.3d 627 (7th Cir. 2012) (stating that experts selected comparables

businesses based initially on the similarity of the products they sold to those sold by the company

to be valued and then based either on size or their exposure to relevant industry and then made

adjustments based on relationships between value and EBITA margin, revenue, size and growth

rates based on observable data); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 693–94, 697 (S.D.N.Y.

2003) (Chin, J.) (excluding comparable companies analysis because expert could not explain his

choice of comparables and could not explain why he failed to make an adjustment other than in a

conclusory manner), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *Steiner Corp. v. Benninghoff*, 5 F.

Supp. 2d 1117, 1127 (D. Nev. 1998) (explaining that the "utility of the comparable company

approach depends on the similarity between the company the court is valuing and the companies

used for comparison" (internal quotation marks omitted) (quoting *In re Radiology Assocs., Inc.

Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991))), to real estate, *see, e.g.*, *720 Lex Acquisition LLC v.

Guess? Retail, Inc.*, 2014 WL 4184691, at *8 (S.D.N.Y. Aug. 22, 2014) (stating that expert

looked at comparable properties and made appropriate adjustments); *In re Morse*, 2018 WL

6721090, at *7 (Bkr. N.D.N.Y. Dec. 20, 2018) (noting that in comparable properties analysis

"fail[ure] to make adjustments to the comparable properties to account for the Property's known

deficiencies" was a "fatal flaw"), and to art and personal property, *see* The Appraisal

Foundation, *Valuation of Fine and Decorative Art* at 12, available at

https://appraisalfoundation.sharefile.com/share/view/sc7c4624217e403d8 (last updated Sept. 23,

2020) (defining the sales comparison appraisal approach as "[a] set of procedures in which a

value is derived by comparing the property being appraised to similar properties that have been

sold recently, then making adjustments to the sale prices of the comparables based on their

differences with the property being appraised" and explaining that "[a]djustments to comparable

object prices are based on marketplace conditions and the objects' characteristics of value"); *see*

*also Al Hirschfeld Foundation v. Margo Feiden Galleries Ltd.*, 328 F. Supp. 3d 232, 237

(S.D.N.Y. 2018) (considering expert appraisal using this approach in assessing damages for

breach of contract and conversion of various cartoons).  In each context, the analysis requires

criteria for the identification of comparable properties, the identification of sufficient

comparables, and the making of appropriate adjustments to account for differences between the

comparable and the property being appraised to reach an inference from the sales of each of the

observed items to the valuation of the appraised item.  *See Lippe v. Bairnco Corp.*, 288 B.R. at

697 ("In making a comparable companies analysis, of course, a valuation expert must consider

earnings data from comparable companies.  The more comparable a company, the more relevant

its data.  If there are differences between the comparables and the company being valued,

adjustments should be made."); *720 Lex Acquisition LLC*, 2014 WL 4184691, at *8 (expert

"looked to existing leases on comparable properties and made appropriate adjustments involving

lease type, market conditions, location, size, frontage, and signage").

Similar principles apply to the appraisal of art—it must turn on the correct identification

of comparables (including an appropriate number of comparables) and an appropriate weighting

of the factors relevant to the commercial value of the type of art to reach a reasonable estimate of

the appraised value from the observable sales.  The parties have cited, and the Court has

identified, a limited number of cases involving a market comparison approach to the fair market

value of an item of art.[10]  Each of those cases is informative in that it looks to a correct selection

---

[10] Similar principles also have been applied when the question has been the admissibility of
expert damages testimony regarding the value of a license for a patent.  In *Protostorm*, for
example, the question was the value of a license for an online computer game.  After examining
a database that consisted of the total revenue generated by all companies in the world with
products or services using the in-game advertising that the patent at issue would have covered,
Plaintiffs' expert opined that the Plaintiff would have earned a royalty of two to three percent for

of comparables and an appropriate weighting of factors even though none is dispositive.  In *Oleg Cassini*, the court granted a motion to exclude testimony from art expert, purporting to use the comparative market data approach to value a collection of items of art.  The expert report in *Oleg Cassini* was particularly deficient—among other things, it "included no information [regarding] which artists or sketches were used as comparators and whether the comparison pieces sold at auction or by private sale."  *Oleg Cassini, Inc. v. Electrolux Home Products, Inc.*, 2014 WL 1468118, at *4 (S.D.N.Y. Apr. 15, 2014).  But the reasons the court gave for granting the *Daubert* motion were not limited to the absence of information about the comparators.  The court found that the report did not provide "sufficient information regarding how [the expert] compared Mr. Cassini's sketches to other similar works in order to ascertain their value – whether she looked at auctions or private sales, when comparable sales occurred, and what factors were considered in selecting the comparable works and how those factors were weighed."  *Id.* at *8.  The court found that the expert was qualified to testify including because she had "significant training in relevant fields," had a USPAP license, had been involved in valuing property of the kind described in the appraisal for several decades, and was an active member in the Appraisers Association of America.  *Id.* at *7.  After concluding that the comparative market approach was an appropriate method to value art, the court found that plaintiff had not met its burden to show that the comparative market approach had been reliably applied to the facts of

---

a non-exclusive license to the video game.  *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 2014 WL 12788845, at *10 (E.D.N.Y. Mar. 13, 2014).  The court excluded the testimony because the expert failed to "offer examples of patent licenses for products or methods similar to the Invention with the same or similar royalty rate or evidence of the alleged high margins."  *Id.* The judge concluded that "a fact-finder reading [the expert's] report would have no more (or less) reason to accept (or reject) a proposed royalty rate of one percent, or of five percent, if [the expert] had substituted either of those numbers for those he actually endorsed—nothing in his reports provides any more insight into his selection of a reasonable royalty rate other than his assurance that it accords with his experience."  *Id.*

the case.  The court held that it could not conduct the "rigorous examination" required by the Second Circuit and that the testimony should be excluded because "[m]ost problematically," it had "no way of assessing whether [the expert's] application of the comparative market data approach to those facts was reliable."  *Id.* at *8.  "The report fail[ed] to provide sufficient information regarding how Ms. Rogoff compared Mr. Cassini's sketches to other similar works in order to ascertain their value – whether she looked at auction or private sales, when comparable sales occurred, and *what factors were considered in selecting the comparable works and how those factors were weighed*."  *Id.* (emphasis added).

In *Davis v. Carroll*, the court granted a *Daubert* motion to exclude expert testimony regarding a bespoke analysis of the reasonable offering prices of a portfolio of art from an expert who "possesse[d] ample qualifications as an art appraiser and expert in the norms of the market for artwork," and who had served as an art appraiser for 40 years.  937 F. Supp. 2d 390, 415 (S.D.N.Y. 2013).  The court excluded the valuation based on the expert's appraisal methodology. It was not compliant with USPAP and "hinge[d] on nothing more than [the expert's] ungrounded speculations about what prices might have seemed reasonable at the time [to the relevant parties], accounting for a battery of unspecified circumstantial considerations."  *Id.*  Judge Oetken's analysis again is informative.  Assuming that the USPAP form of appraisal was not appropriate for the case and that the case required "methodological innovation," the court still found the expert's analysis wanting under *Daubert* and *Kumho Tire*:  "[A]t no point in his report, deposition, or declaration does [the expert] clarify the full set of factors that play a role in this analysis, or does [the expert] explain how these factors interact or how much weight each factor is assigned in his analysis."  *Id.* at 417.

In *Joseph P. Carroll Ltd. v. Baker*, 889 F. Supp. 2d 593, 600 (S.D.N.Y. 2012), the court did not have to address a *Daubert* motion.  The court had to decide which expert analysis to adopt in its findings as part of a bench trial.  Still, the court did identify the factors relevant to an appraisal of art based on comparative sales.  The experts there not only identified a number of comparables, but described their methodology for selecting the comparables and analyzed the point in the artist's career when the work was created, the relative sizes of the work being appraised and those to which it was compared, the similarity and dissimilarity of the work being appraised to that to which it was compared, the condition, whether the works had been on public display, the length of time they were on consignment, and the market conditions at the time of the sale of each of the comparables.

*Estate of Mitchell v. Commissioner of Internal Revenue*, decided by the Tax Court, both describes both the comparative market approach to the valuation of art and the factors and information the experts must describe for a factfinder to make a judgment with respect to value. 101 T.CM. 1435, at *12 (T.C. 2011).  Several experts submitted appraisals of works of art by the American artists, Frederic Remington (who painted "Casuals on the Range") and Charles Marion Russell (who painted "Creased").  In addition to considering more works than Regan considered here, each expert identified the factors on which they were judging the comparables including "the period during which it was painted, its condition, its . . .  style, the signature on the painting and the market conditions on the valuation date" as well as "the subject matter of the painting" and its provenance and whether those factors were to be viewed as a positive or negative factor in the valuation.  *Id.* at *13.  The experts then compared the painting to be appraised against each of the comparables, measuring the extent to which the subject painting had positive or negative

factors with respect to each particular comparable, to arrive at a fair market value for the painting.  In no instance did the experts rely on a single "comparable."

From these cases, the Court discerns at least three principles which guide it here.  First, as the experts here seem to agree, an appraisal based on comparable sales cannot rest on one sale alone—even a prior sale of the identical property; any one sale might be idiosyncratic and not representative of the current fair market value of the item to be appraised.  Regan so testified. Second, to satisfy its burden under Rule 702 for receipt of testimony regarding the fair market value of property (including art) that is based on a comparative market approach, it is not sufficient that the proponent of an expert appraisal set forth the comparators the expert considered.  The proponent must also identify (whether in a report or in some other form of evidence) "what factors were considered in selecting the comparable works and how those factors were weighed," *Oleg Cassini*, 2014 WL 1468118, at *8, or, put otherwise, what the relevant factors are, "how these factors interact, [and] how much weight each factor is assigned in [the expert's] calculus," *Davis*, 937 F. Supp. 2d at 417.   In the absence of any testimony regarding how and why the comparators were identified and how they were weighed, the Court is left only with the expert's *ipse dixit*.  The Court is deprived of the means to "assess whether [the expert's] application of the comparable market data approach to those facts was reliable." *Oleg Cassini*, 2014 WL 1468118, at *8.  Third, Plaintiff's argument that the expert need not reduce the appraisal to a mathematical calculation sets up a false dichotomy.  An appraisal of art or an antiquity, no less or more than an appraisal of real estate or of a company, which may be based on an evaluation of its products or its management, may make some room for "subjective" judgment regarding, for example, artistic merit and its correspondence to commercial value, but that room for subjective judgment must be identified and isolated and may not be the entirety of

the analysis. *See U.S. v. Romano*, 794 F.3d 317, 327–29, 331–34 (2d Cir. 2015) (upholding district court's decision to admit expert testimony regarding coin grading and valuation even where it was undisputed that the valuation had a "subjective component," because the precise methodology and its application were explained in detail by the experts). Were it otherwise, all a court would have to consider is whether the witness was "qualified" by experience or training or education. The other Rule 702 factors would be surplusage.

In short, the choice between objective mathematical formula and precision on the one hand and purely subjective judgment on the other is a false dichotomy. The cases teach that an art appraisal is not entirely dissimilar from a real-estate appraisal or the appraisal of any other asset—both measure the value of an asset in a market governed by supply and demand and neither entirely exclude matters of based on a judgment that translates to commercial value and cannot be calculated based on formula. An appraisal of art will not be excluded because it relies on the judgment of the expert as to a feature that will attract value in the marketplace any more than would an appraisal of real estate that relies on the architecture of a building (and not just the identity of the architect) or the valuation of a company that is based in part on a subjective judgment as to how the market will value its particular managers. But an appraisal will also not be deemed reliable just because it reflects the judgment of a qualified expert. The proponent of the appraisal still must present sufficient evidence to show that it rests on sufficient data, that it is the product of reliable principles and methods, and that those principles and methods have been reliably applied to the facts of the case.

## DISCUSSION

Defendants move to preclude Regan's testimony under *Daubert* on four separate grounds. First, they argue that the Regan Report is an "inadmissible black box" because it fails to disclose the reasoning or methodology by which Regan derived an appraised value for the paintings.

Second, they argue that the Regan Report is unreliable because it is based in large part on reported results from Mainland Chinese auction houses, which do not necessarily represent actual consummated sales.  Both of these arguments speak to the question whether the Report is reliable.  Relatedly, Defendants argue that Plaintiff failed to preserve and to disclose the full facts or data that Regan considered, because the Report references only the artworks Regan deemed comparable but not those he considered and rejected as non-comparables; Defendants ground this argument in the language of Federal Rule of Civil Procedure 26(a)(2)(B), which states that an expert witness must include in their written report "the facts or data considered by the witness in forming" their opinions.  Defendants also argue that the Report is irrelevant because the FMV appraisal assesses the value of the 98 Paintings as of October 19, 2019, more than fourteen years after the earliest of the sales and more than a decade after the latest of them, and because the retail appraisal focuses on the August 2009 date of the sale of the YDJ paintings rather than on the time when the sale was negotiated between April and June of 2009.  Plaintiffs respond that the FMV appraisal is relevant to appreciation damages—damages based on how much the property has increased in value up to the present—which they argue they are entitled to on both their state and federal claims, and that the retail appraisal is relevant as an alternate measure of damages.  Because the Court concludes that Regan's testimony regarding appraisal values should be excluded on reliability grounds, the Court does not opine on Defendants' arguments as to relevance.

I.      **Reliability**

        The Court finds that Plaintiff has not satisfied its Rule 702 burden to show that the appraisals are reliable.  The arguments Defendants raise challenge all three aspects of reliability—the facts and data upon which the testimony is based, the principles and methods used, and the application of those principles and methods to the facts of the case.

### 1.    Sufficient Facts and Data

Defendants argue that Regan based his appraisal on insufficient facts and on unreliable data.  They argue that certain of the appraisals—such as those which contain no comparables—contain insufficient data to support Regan's appraisal.  They also argue that all of the appraisals are based on unreliable data because a large portion of that data is reported results from Mainland Chinese auction houses, which do not necessarily represent actual consummated sales. They contend that Regan should have either eschewed data from those auction houses altogether or used a discount to account for the "well understood" problem of the "deadbeat bidder" and the misreporting of information by the auction houses and the Chinese government.

The Court finds that Plaintiff has failed to satisfy its burden to show that certain of the appraisals relied on sufficient facts and data.  Regan's willingness to rely on insufficient facts and data with respect to those appraisals also gives the Court concern with respect to the remainder of his appraisals.  In particular, Regan does not identify comparables for twelve paintings whose appraisals are contained on pages 21, 27, 38, 41, 51, 52, 53, and 58 of his report. Each of these appraisals is supported by a short explanation in the "FURTHER DETAILS" section as to what data Regan considered to assess the value of the painting.  Most of these contain similar language:

> Besides examining a wide range of comparables and a general examination of the current markets for similar works, the assessment of this work considered its 2004 appraised value in the context of the collection as an indication of either a less confident attribution of general lower market envy.  Factored in were general market trends and increases.

*See* Dkt. No. 234-2, FMV Appraisal at 21, 27, 38, 51, 52, 53, 58.  This language, with little to no additional information, is used to explain appraisal values ranging from $8,000 to $20,000. Plaintiff's brief does not do any better.  It admits that Regan was not able to identify a "specific

comparable" for any of those appraised paintings but argues that he relied on "miscellaneous 'Low Value General Comparables'" for his appraisal.   Dkt. No. 239 at 2.

The evidence at the *Daubert* hearing, including Regan's admission, and the record before the Court demonstrate that for an appraisal to be reliable, it must rest on the selection of more than one "comparable" and that the items to which the appraised item is compared in order to derive value must be comparable in some sense.  Otherwise, there would be no basis to extrapolate or estimate from the observed value to the appraised value.  But there is no evidence that the "miscellaneous 'Low Value General Comparables'" are comparable in any sense to the paintings being appraised other than in the insufficient sense that they are low value—like Regan assumes but does not demonstrate for the appraised paintings.  The Court finds that the real reason why no comparables were selected for these paintings was that which Regan admitted at the hearing—"I want to take the time I had to spend on the higher value," Dkt. No. 289-1 at 51; in the words of Plaintiff's brief—"the combined value of the 12 paintings that have no specific comparables assigned to them is only 1% of the aggregate fair market value of the 98 Paintings," Dkt No. 239 at 2.  In short, it was not worth it to do a proper appraisal for these paintings given their assumed value relative to the value of the other paintings on which Plaintiff grounds its claim.

A similar problem plagues other appraisals in Regan's report.  The appraisals on pages 9, 35, 63, 72, 77, and 86 are each based on a single prior sale, one of which took place in 2002 (page 72), another of which took place in 2010 (page 9), still others of which took place in 2013 (pages 77, 86), and two of which took place in 2019 (pages 35, 63).  Based on Regan's own testimony, a single prior sale is not sufficient evidence upon which to base an appraisal.  The price at which an item sold at auction on that occasion, assuming a sale was consummated, might

be idiosyncratic and not a reflection of value.   *See Lippe*, 288 B.R. at 693 (stating that "reliance

on only one comparable . . . was problematic"). That is particularly so where, as here, there is no

evidentiary basis upon which a factfinder could compare the value of an item at the point when it

was sold from 2002 on to the appraised value as of 2019. These appraisals too would be

excluded solely on the basis that they are grounded on insufficient data.

The remaining appraisals are based on sufficient facts and data to pass the

*Daubert*/*Kumho Tire* screen albeit in some cases just barely.  Although in some cases Regan

offers very few other comparables to support his appraisal of market value, the Court cannot find

that the facts and data he does offer are insufficient.  *Cf., e.g., Oleg Cassini*, 2014 WL 1468118,

at *4 (rejecting expert opinion that "included *no* information [regarding] which artists or

sketches were used as comparators and whether the comparison pieces sold at auction or by

private sale"); *In re Rezulin Products Liability Litig.*, 309 F. Supp. 2d 531, 565–66 (S.D.N.Y.

2004) (finding that expert opinion rested on insufficient facts or data when that opinion relied on

a misinterpretation of data that was contradicted by the record).  As to these paintings, Regan

offers information about more than one comparable, including information about where and

when the comparables were sold, for how much they were sold, their size, and any notable facts

about their provenance.

The Court also rejects Defendants' argument that Regan's appraisals rely on insufficient

facts and data because they rely primarily on information from Mainland Chinese auction

houses.  The evidence at the hearing and before the Court demonstrates that information from

Chinese auction houses frequently is unreliable and is far less reliable than information from

auction houses outside of China for the same type of art.  Defendants proved, and Plaintiff did

not successfully refute, that a great majority of the prices from the Chinese auction houses are

inflated—whether because the buyers renege on a purchase because of authenticity concerns or because the Chinese government or the Chinese auction houses simply misreport the figures.  At the same time, however, Plaintiff offered evidence that experts in the field do use information from Chinese auction houses in their appraisals.  Regan testified that appraisers in his area of specialty of Asian and Chinese art commonly rely on results from the Chinese auction market, Dkt. No. 289-1 at 81, and that he is not aware of any appraiser (other than the defense expert) who does not rely on Chinese auction house results, *id.* at 81.  He also testified that the Sotheby's appraisal utilized results from 70 sales from Chinese auction houses and that it was still accepted by the IRS.  *Id.* at 83.  Plaintiff further notes that "neither the IRS nor USPAP have issued any regulations or guidelines prohibiting the use of Mainland Chinese auction houses in appraisals." *Id.*  Although Defendants offered evidence that knowledge of the unreliability of Chinese auction house results has increased since 2004 and that the IRS will no longer accept appraisals based on information from Chinese auction houses if other information is available, that evidence is insufficient to overcome Plaintiff's showing, particularly given the presumption that expert testimony be admitted.

## 2.   Reliable Principles and Methods

"[T]he comparative market approach allegedly used by [Regan] [is] a technique that has been accepted by other courts in art appraisal cases."  *Oleg Cassini*, 2014 WL 1468118, at *7 (citing cases).  The Court finds that it is a reliable principle and method to appraise the value of art.  A different question is presented whether Regan properly used the comparative market approach.  That question is better addressed through the lens of the third Rule 702 inquiry— whether the expert reliably applied the principles and methods to the facts of the case.

### 3.      Reliable Application of the Principles and Methods to the Facts

The Court finds that Plaintiff did not satisfy its burden to show that Regan reliably

applied the principles and methods to the facts of the case.  Plaintiff did not show that Regan

reliably applied the comparative market or sales approach either to the selection of comparables

or to the adjustments made to those comparables to derive the market value of the appraised

painting.

As to the former, although Regan asserted that he considered the artist, size, provenance,

condition, location, and time in his selection of comparables, Dkt. No. 238-17 at 276:13–284:9,

the Court finds that testimony not to be credible.  Regan's testimony regarding how he actually

selected comparables failed to support that he applied careful or consistent judgment to the

selection of comparables for inclusion in his report.  Confronted with questions at deposition

regarding his failure to retain evidence of any paintings he considered as a potential comparable

but ultimately rejected, Regan was evasive at first.  He then testified that, after identifying a

universe of potential comparables (somehow), he included as a comparable every painting to

which he gave significant consideration.  Dkt. No. 238-17 at 41:2–21.   In either event, Regan's

testimony and the evidence before the Court fail to sustain Plaintiff's burden.  It is not sufficient

that Regan testified that he identified comparables based on a wide range of factors that might

make a piece of art comparable or not; Plaintiff must show that he actually did select

comparables based on a judgment as to what would be similar or not.  Accepting the latter

testimony, for example, the inclusion of a piece as a comparable in his report was a function of

his initial assessment of what he should look at closely with respect to any particular valuation as

opposed to any consistent approach to what kinds of factors would make a work comparable

applied across the board as a methodology to all works being appraised.   His inability to

articulate at deposition or at the hearing or in his report how he selected comparables, when

combined with (1) the absence of any evidence that there were paintings he considered as potential comparables and then excluded (or any evidence of how he excluded such paintings as comparables), and (2) the failure to identify comparables for a large number of paintings for which he offered appraisals in his report, casts doubt on whether Regan had a reliable or consistent method to choose comparables or whether his approach and his identification of comparables was a result of cherry-picking or chance in what he decided to look at. Though Regan testified that the selection of comparables would be important to account for the unreliability of Chinese auction house results, there is no evidence that he did so with respect to any particular valuation. Indeed, the Court notes that when asked to explain his choice to include the $516,000 alleged comparable that he used to derive the value of $4,200,000 for the Ma Yuan appraised at page 76 of his report, Regan offered only "I included it because I wanted to include all my data" and the conclusory "I included it because I wanted to show more data that can give a little bit of insight as to the market for, in this case, at least, Ma Yuan." Dkt. No. 289-1 at 45. Absent from his testimony was any evidence that he selected comparables because of the insight he believed those comparables could offer in deriving the market value of the appraised item or what his thought process was with selecting some items as comparable and others as not.[11]  *See Lippe*, 288 B.R. at 691 (excluding testimony where expert could not say what his thought process was in not considering certain companies as competitors).

---

[11] Defendants also argue that Regan's testimony should be excluded because the Report does not disclose the artworks Regan considered and rejected as non-comparables. Defendants ground this argument in the language of Federal Rule of Civil Procedure 26(a)(2)(B), which states that an expert witness must include in their written report "the facts or data considered by the witness in forming" their opinions. The Court need not consider this issue and whether Regan's testimony should be excluded for the asserted violation of discovery rules.

As to the latter, the evidence in the record is even more concerning.  There is no evidence in the record—from the Report or the deposition or the *Daubert* hearing—as to "*how* [Regan] derived his appraised values from the underlying data he considered, or the adjustments he made to the price of *any* comparable sale on which he relied," Dkt. No. 234-33 at 12, and such evidence as there is suggests that he did not use the comparables at all for the information they could provide about the fair market value of the paintings he appraised or even to calculate a range of value but only at most to set an outer limit of a value below which they would not be appraised.  *See Lippe*, 288 B.R. at 693–94 (excluding expert testimony based on expert's inability to explain adjustments or lack of adjustments).

The Report itself simply lists alleged comparables with occasional, but not consistent, remarks regarding the provenance of a comparable or the venue at which it was sold.  There is no information provided regarding the weighting of items and the relative and directional value of factors such as artist, material, motif, size, condition, or date of sale.  There is no information about which factors are most important and what impact they have on valuation.  There is no analysis that ties Regan's appraisals either to evidence or to experience.  For example, with respect to a matter as basic as date of sale and the market for classical Chinese market at or about each of the relevant dates (for sales of comparables), Regan's work contains only the most general information insufficient to permit a court to determine whether his ultimate analysis has any grounding in evidence or experience.  The Report states that the market for Chinese art generally has risen since 2004.  But no information is provided regarding the performance of the market in any of the fifteen years between 2004 and 2019, whether there were fluctuations in market price, or periods of greater or lesser appreciation.  Most importantly, the Report contains no information regarding the market for Chinese classical paintings in particular and thus no

information on which the Court can judge how Regan reasoned from the value of a comparable at any particular time in the past to the appraised value of the item at issue in 2019. The same can be said with respect to other of the factors. Regan mentions some of them, but he does not provide an assessment of how important the factors were in determining market value (and at what time) either as a general overall matter or in connection with the appraisal of a particular item. His appraisal is truly a black box. Without such information, the Court is left without any basis to conduct a "thorough" examination—or any examination at all—to determine whether there was any method to how Regan derived his appraised value from the observed values. It is left only with the fact that the appraised values come from someone with credentials who has conducted appraisals in the past.

Those failings were not mitigated, but instead were aggravated, by the evidence from deposition at the hearing. Defendants showed that Regan's appraisals for the twelve paintings he considered to be low value—but were still valued in the thousands of dollars—were a black box. They rely entirely on Regan's say-so. The evidence at the hearing demonstrated that Regan's valuation of the higher valuation items were similarly a black box.

The evidence regarding the Ma Yuan Scholar and Crane Fan Painting, Dkt. No. 234-2 at 103, appraised at $4.2 million, and the Ma Yuan Scholar by a Pine Stream Fan Painting, Dkt No. 234-2 at 104, is telling. Regan was unable to testify how he used any of the three comparables for the Ma Yuan Scholar and Crane Painting to derive its value. He based the appraisal solely on the 2013 sale of the same item for $4,058,000. But, even when asked "[h]ow did you adjust that sale in 2013, given what you were seeing from the market as it continued to develop through 2017," Regan failed to articulate any coherent methodology as to what adjustments he made to bring that data point to present value. *Id.* at 46:5–25. Rather, he answered:

> In this case is an example where we actually have that appraised work. And again, talking about adjustment, the actual appraised work was in 2013. I am appraising the value for 2019. It would be justifiable, and certainly to many appraisers to say, well, the market has changed. This already has a sale for 4.05 million, you could easily increase that by whatever percentage or whatever round it up to whatever you feel the new market would be.
>
> Instead, to be conservative, and to be a little more true to the data we see in front of us, I chose to keep it at the last sale price. Or at least close to it. . . . But I assume I would have kept it pretty close to that sale.

*Id.* In other words, he applied no market analysis whatsoever. While one could easily increase the value of the Ma Yuan "by whatever percentage or . . . whatever you feel the new market would be," Regan did not do so. He simply chose the same approximate number without any analysis, in order to be "conservative."

The defect is even more glaring with respect to the next appraisal—that of $6.7 million for a Ma Yuan fan entitled Scholar by a Pine Stream Fan. Dkt. No. 234-2 at 104. Regan cites no comparables he used to derive the appraised value for this work—only the earlier sale for $6,700,532 of the same artwork in December 2013 at the same auction house as the earlier sale in the previous appraisal. *Id.* But there is no information in his report or elsewhere regarding the relative value of the market for Ma Yuan paintings in 2013 relative to the market in 2019—whether it increased and, if so, by how much. Regan simply assumes that the sale in 2013 is representative of the value of the painting in 2013 and not idiosyncratic, and then assumes that the market would have stayed the same or, in this case, have fallen between 2013 and 2019. His appraisal value is inexplicably *lower* than the 2013 sale by half a million dollars.

The absence of any information regarding the weighting of the comparables and the basis upon which Regan derived appraised value from observed value is not limited to those two examples. This defect is pervasive, and it affects every valuation in the Regan Report. Even where Regan offers some insight into particularly noteworthy features of the comparables he

considered, he does so by including notes like "extensive documentation," Dkt. No. 234-2 at

108, or "[s]maller, but enviable script and documentation," *id.* at 112.  For example, Regan

appraises a scroll attributed to Shitao from the 17th Century for $1.2 million.  Dkt. No. 234-2 at

57.  He notes that the same item was reported privately sold in 2008 for $732,160 and in 2010

for $1,209,600, that "[t]he artist seems to have had his peak sales in 2009–2012," and that

"[r]ecent comparable offering have been selling for substantially less than this period," but he

then states that his valuation "relied heavily on the two past sales" from 2008 and 2010.  But,

aside from that caveat, no information is provided as to why the sales from 2008 and 2010 would

be a reliable measure of the work's value a decade later in 2019.  There is one other

"comparable" listed—a work that has no attribution but is stated to be "similar in style and size"

that was reported sold at auction in 2018 for $1.8 million, but no information is provided as to

the relative value of the Shitao attribution to the artist for the 2018 sale or how the information

about the 2018 sale contributed in any way (if it did at all) to the valuation of the Shitao in 2019.

The comparable appears to have been selected at random—or perhaps to show that the value

should not be greater than $1.8 million.

Another hanging scroll from the 14th century is appraised at $6 million.  Dkt. No. 234-2

at 59.  The appraisal notes that the same item was reported privately sold for $6,552,000 in 2010.

The appraisal also lists four other comparables, ranging in reported sale value of $9,161,621 (for

a sale from a Chinese auction house in 2019) to $667,500 (for a sale by Christie's New York in

2017).  Although the appraisal lists features of the appraised work including its size and the

number of collectors seals, as well as the size of the comparables (and in some instances the

number of seals), no information is provided as to the relationship of the reported sale of the

comparables to the value of the appraised item or why, if the same item sold for $6,552,000 in 2010, it was worth half a million dollars less a decade later.

Defendants' expert points to another example. Regan appraises a painting by Yunpeng Ding, on page 65 of the FMV appraisal, for $1 million. The three cited comparables are all from sales of the subject work itself—for $338,560 in May of 2008, for $2,760,000 in May of 2011, and for $655,500 in December of 2015. Apparently based on these three data points alone, Regan values the fair market value of the painting in 2019 at $1 million. As Linsner points out, this analysis lacks "any more discussion of the market from 2015 to 2019." Dkt. No. 238-4 ¶ 42. Linsner argues that "this data does not indicate that four years after the most recent data point, that the price realized for the subject property would recover," *id.*, and once again Regan provides no insight into how he reached his conclusion that the artwork would be work $300,000 more in 2019 than it sold for in 2015, after it dropped over $2 million from 2011 to 2015.

The valuations in the retail appraisal are similarly flawed. For example, on page twelve of that appraisal, Regan assigns a hanging scroll by Feng Han Gao a value of $60,000 as of August 2009. The cited comparables are a sale for $32,000 in May of 2008, a sale for $52,800 in May of 2008, a sale for $33,600 in May of 2009, and a sale for $47,000 in June of 2009. These four paintings are all different sizes, and no correlation is apparent from the face of the report between size and price or any other factor; for example, the painting sold for $32,000 in May 2008 is 90 x 49.5cm and the painting sold for $47,040 in June 2009—for $15,000 more—is approximately the same size, at 92 x 48 cm, but the painting sold for $33,600 in May 2009 appears to be larger than those paintings, at 114.6 x 43.5 cm. The appraisal also cites the fact that the subject painting was privately sold in 2016 for $86,250, seven years after the effective date of the appraisal. The Report provides no further insight into how Regan reached his

43

conclusion that this piece—which is smaller than the piece sold for $52,000 in May of 2008—was worth $60,000 in August 2009, a price higher than that of any of his cited comparables.

In yet another example, the Chang Xia hanging scroll on page twenty of the retail appraisal is valued at $100,000. The cited comparables include a $65,550 sale in June 2009 of a painting that the Report describes as "[v]ery similar, slightly smaller"; a $61,111 sale in April of 2004; a $92,400 sale in December 2009 which the Report notes is "[p]ast the requested earlier appraisal date by a few months, but a useful data point to show some trajectory"; and a $1,859,903 sale in June 2005 which the Report does not distinguish or explain in any way. Once again, the Report provides no insight as to why this piece is valued, as of August 2009, at about $35,000 more than the "[v]ery similar, slightly smaller" piece sold in June 2009, or why the June 2005 sale for over eighteen times the appraisal value is a useful data point and how it factored in to this appraisal, or why, if the $92,400 sale in December 2009 shows "trajectory," this painting of similar size would be worth more than that at the earlier date.

The Court could go on. From its review of the Report and from the evidence before it, there is no apparent relationship between the reported sale of any purported comparable and the appraised value of any item considered by Regan whether on the basis of date of sale, size of item, artist, or any other factor or combination of factors. Although Regan bases his appraisal in many instances on the prior sale of the same item, there is no analysis of how the value of that item at any particular time (whether in 2004, 2010, 2013, or any other date) relates to the value it should have in 2019. There also is no information in the record to suggest that if Regan did not use the comparables (other than the exact item) to inform his valuation of the two Ma Yuan items, he used the comparables to inform his valuation of the other items.

In the end, as the court was left in *Oleg Cassini*, this Court is left insufficient information to conduct the "rigorous examination" required by *Amorgianos*.  There is "no way of assessing whether [Regan's] application of the comparative market data approach to th[e] facts was reliable."  *Oleg Cassini*, 2014 WL 1468118, at *8.  The record fails to provide sufficient information regarding how Regan compared the appraised items "to other similar works to ascertain their value," including "what factors were considered in selecting the comparable works and how those factors were weighed."  *Id.*

The teaching of *Daubert*, *Joinder*, and *Kumho Tire* is that expert testimony is not admissible when its proponent cannot show it is connected to existing data by anything other than the "*ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.  "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Fed. R. Evid. 702 advisory committee's note (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995)).  Regan may well be a qualified art appraiser.  Plaintiff's showing here, however, would have the Court rely on that fact and on nothing more.  Plaintiff thus has not made the showing required by Rule 702.

## CONCLUSION

For the foregoing reasons, the *Daubert* motion is GRANTED.  Dkt. No. 234.  The Clerk of Court is respectfully directed to close the motion renewing the *Daubert* motion at Dkt. No. 287.


SO ORDERED.

Dated: November 9, 2021
   New York, New York

                                    LEWIS J. LIMAN
                          United States District Judge