UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/09/2021
```

------------------------------------------------------------------X
                                                                  :
YIEN-KOO KING,                                                    :
                                                                  :
                                  Plaintiff,                      :
                                                                  :        14-cv-7694 (LJL)
                 -v-                                              :
                                                                  :        OPINION AND ORDER
ANDREW WANG, et al.,                                              :
                                                                  :
                                  Defendants.                     :
                                                                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Before the Court are motions in limine brought by plaintiff Yien-Koo King ("Plaintiff" or

"Y.K. King"), in her capacity as preliminary executrix of C.C. Wang's estate (the "Estate"), and

by defendants Andrew Wang ("A. Wang") and Shou-Kung Wang ("S.K. Wang," and together,

the "Wangs" or "Defendants").[1]  Dkt. Nos. 251, 256.

        For the following reasons, the Court grants in parts and denies in part the motions in

limine.[2]

---

[1] The complaint names sixteen additional defendants; however, only the Wangs, individually and
on behalf of Bao Wu Tang and Jian Bao Gallery, have appeared in this action.  The other
defendants include Bao Wu Tang, Jian Bao Gallery, Anthony Chou, Chen Mei-Lein, Wei Zheng,
Yong-Qing Ye, Yue Da-Jin, and John Does 1–9.  The Court refers to A. Wang and S.K. Wang as
"Defendants" for ease of reference throughout this Opinion.

[2] Defendants have also brought a *Daubert* motion to exclude Plaintiff's expert, Dkt. No. 234, and
Plaintiff has also brought a motion to strike Defendants' affirmative defenses based on allegedly
willful violations of discovery orders or, in the alternative, for an adverse inference jury
instruction, Dkt. No. 248; the Court will address each of these separately.  The Court will also
address separately Defendants' motion to exclude evidence of appreciation damages or bifurcate
the trial.

## DISCUSSION

The Court assumes familiarity with the lengthy facts and history of this case that have been repeatedly laid out, most recently in this Court's opinion denying summary judgment.  *See King v. Wang*, 2020 WL 6875403, at *1–11 (S.D.N.Y. Nov. 23, 2020).[3]

## I.    Motions in Limine

Each party submitted motions in limine, but Plaintiff's motion, with a few exceptions, primarily seeks to admit rather than exclude several pieces of evidence.  The Court thus considers the motions and the parties' arguments together below.

"The purpose of an in limine motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'"  *United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)).  "The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."  *Id.* (quoting *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164–65 (S.D.N.Y. 2006) (citations omitted)).

### A.    2017 Jury Verdict in Probate Proceeding

Defendants move to exclude, under Federal Rules of Evidence 403 and 404, evidence that on May 9, 2017, the Surrogate Court revoked the 2003 Will by C.C. Wang after a jury returned a verdict finding that C.C. Wang was not of sound mind and memory at the time of the execution of the 2003 Will, that the 2003 Will had been "the result of undue influence by Shou-Kung Wang and Andrew Wang," and that the 2003 Will had been "the result of fraud by

---

[3] The Court adopts the terms defined therein unless otherwise stated.

Shou-Kung Wang and/or Andrew Wang." Dkt. No. 259, Ex. 47.[4]  On the fraud verdict, the

Wangs argue that this evidence is more prejudicial than probative because procuring the 2003

Will is not a predicate act under RICO.  They also argue that the fraud verdict is not subject to

collateral estoppel because it did not unequivocally find which of S.K. or A. Wang committed

fraud given the "and/or" language of the verdict and because Defendants did not have a full and

fair opportunity to litigate the issue as the New York Dead Man's Statute barred them from

presenting their testimony regarding interactions with C.C. Wang.  Defendants seek to exclude

the undue influence verdict as irrelevant and similarly prejudicial because the finding that C.C.

Wang did not act of his own free will when he changed his will to disinherit Y.K. Wang and

increase the share for S.K. Wang's family does not tend to make the allegations regarding the

Straw Man Scheme any more likely.  They similarly argue that the capacity verdict should be

excluded as irrelevant and prejudicial because the verdict does not reflect a finding that either

S.K. or A. Wang were aware that C.C. Wang was incompetent to execute a will, and it would

expand the scope of the trial to other issues regarding their knowledge.  Defendants warn that

introduction of the probate verdict would result in extensive litigation on tangential side issues,

such as the allegations that the Wangs committed fraud or unduly influenced C.C. Wang.

The Court will admit the jury verdict in full but, assuming it is requested, with a limiting

instruction.  The fact that the Wangs—either individually or jointly—were found by a jury to

have used fraud or undue influence to secure the Estate's assets through the 2003 Will is relevant

to the RICO allegations pleaded in the first amended complaint ("Complaint" or "FAC"), Dkt.

No. 36.  The FAC pleads that the "Wang defendants have expertly stolen, embezzled and

---

[4] Plaintiff also moved, in her motion in limine, for a ruling regarding the admissibility of the probate proceedings.  Her request for relief is addressed here as well.

converted property owned by the Plaintiffs and the Estate over the course of at least ten years," *id.* ¶ 6, and "deceived the Plaintiffs, the Public Administrator of New York County and others (including authorities in New York's Probate Court)," *id.* ¶ 5.  It further pleads that the conspiracy launched by the defendants began with "a scheme to exploit [C.C. Wang's] infirmity to procure fraudulent documents, including a substitute will, and thereby overcome [Plaintiff's] stewardship of family assets." *Id.* ¶ 45.  It continues that, among the acts engaged in by the conspirators to further their fraudulent scheme were acts to procure a revised will from the weakened and manipulated C.C. Wang and to perpetrate a fraud on the probate court in order to obtain control of the estate of C.C. Wang and its valuable artwork.  *Id.* ¶¶ 70–85.  The FAC explicitly alleges the procurement of the will and the fraud on the probate court as one of the predicate acts forming the alleged pattern of racketeering activity.  *Id.* ¶¶ 259–263.

Indeed, the Second Circuit held at the motion to dismiss stage that the Complaint in this case had adequately pled closed-ended continuity (i.e., past criminal conduct extending over a substantial period of time) when it alleged that the "pattern of racketeering activity here . . . beg[a]n in 2003, when Andrew Wang tried to persuade Yien-Koo King to turn over assets in exchange for artwork of hers that he had misappropriated." *King v. Shou-Kung Wang*, 663 F. App'x 12, 14 (2d Cir. 2016).[5]

Evidence that the 2003 Will was obtained by Defendants while C.C. Wang was under their undue influence and that a fraud was perpetrated is thus relevant to proof of the pattern of racketeering activity as alleged in the Complaint.  It also is relevant to proving the Wangs'

---

[5] Without deciding whether the acts before the sales of the 98 Paintings in 2005 could establish a pattern of racketeering, this Court also held, at the summary judgment stage, that the evidence was sufficient to establish a pattern of racketeering activity that began, at least, with a wire transfer to the Estate for the first sale of paintings in 2005.  *See King*, 2020 WL 6875403, at *24.

4

opportunity and plan in connection with the alleged RICO enterprise as well as the relationship between A. Wang and S.K. Wang; it is because of their control of the Estate that they allegedly were able to perpetrate the scheme to defraud.  *See, e.g.*, *United States v. Watts*, 2011 WL 167627, at *6 (S.D.N.Y. Jan. 11, 2011) (admitting tax fraud conviction because although it "is not itself a RICO predicate, the tax conviction is (1) relevant to prove that there is a pattern of racketeering activity, and (2) relevant under Rule 404(b) to show Watts's knowledge and intent with respect to particular offenses charged as part of the RICO conspiracy, and (3) integral background information to the case on trial"); *see also United States v. Hart*, 2021 WL 1685603, at *2 (2d Cir. Apr. 29, 2021) ("We have long recognized that 'it is within the [trial] court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.'" (quoting *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999))).  However, as the verdict found that the 2003 Will was the result of fraud by either A. Wang or S.K. Wang, but not which one of them in particular and not necessarily both, the jury will be instructed as to that distinction.  The Court will also allow the introduction of the undue influence verdict for the same reason.  *See In re Beneway's Will*, 71 N.Y.S.2d 361, 366 (3d Dep't 1947) ("Undue influence . . . is a species of fraud, and . . . also embraces coercion."); *accord In re Bogen*, 2014 WL 5827936 (N.Y. Sur. Nov. 7, 2014); *In re Hollenbeck's Will*, 318 N.Y.S.2d 604, 609 (Sur. 1969), *aff'd sub nom. Matter of Hollenbeck*, 325 N.Y.S.2d 736 (4th Dep't 1971).  In addition, the lack of capacity verdict is admissible as relevant to complete the narrative of how the Wangs were able to unduly influence and defraud C.C. Wang.

Introduction of the jury verdict will not cause prejudice as it does not involve conduct "any more sensational or disturbing than the charged offenses" in this action alleging a RICO enterprise and conspiracy so as to prejudice the jury against Defendants.  *United States v. Barrett*, 153 F. Supp. 3d 552, 570 (E.D.N.Y. 2015) (quoting *United States v. Reese*, 933 F. Supp. 2d 579, 582 (S.D.N.Y. 2013)); *see also United States v. Sanchez*, 518 F. Supp. 2d 615, 616 (S.D.N.Y. 2007) (noting further that gap of nine years between prior acts and charged offense "is not sufficient by itself to preclude its use at trial if other relevant criteria are satisfied").  Nor is the verdict "so tangential to the main disputes that it would risk confusing the issues or misleading the jury."  *Barrett*, 153 F. Supp. 3d at 570.  Indeed, it is part of the res gestae of the violation.  *See U.S. v. Pepin*, 514 F.3d 193, 208 (2d Cir. 2008) (finding that evidence was admissible "[e]ven after factoring the potential for unfair prejudice," because of "its importance in the context of the case as a whole—its 'res gestae,' as the district court termed it").

It is true that Defendants will not be able to be held liable absent a jury verdict that they committed fraud in connection with the 98 Paintings.  That is a function of the four-year statute of limitations under RICO, which begins to run when the plaintiff discovers or should have discovered the RICO injury.  *See, e.g.*, *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998).  Proof that Defendants obtained C.C. Wang's will by fraud and defrauded the Estate in 2003 would not on its own support the claim in this case.  The jury will be instructed that Plaintiff must prove a fraud in connection with the 98 Paintings.

However, the fact that the events in 2003 alone cannot support a racketeering claim given the statute of limitations does not mean that they are irrelevant.  Section 1961(5) of Title 18 defines "pattern of racketeering activity" as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten

years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).

Racketeering activity means "any act which is indictable" under specified previsions of Title 18.

*See id.* § 1961(1)(B).  Section 1961(5) contemplates that there can be racketeering activity that

occurs after the statute of limitations has run but that nonetheless constitutes part of the "pattern"

of racketeering activity.  Indeed, given the fact that establishing a RICO pattern requires the

plaintiff to demonstrate "at least two predicate acts, show that the predicate acts are related, and

that they amount to, or pose a threat of, continuing criminal activity," *Schlaifer Nance & Co. v.*

*Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997), meaning either "past criminal conduct coupled

with a threat of future criminal conduct," or "past criminal conduct extending over a substantial

period of time," *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir.

2004) (quoting *GICC Cap. Corp. v. Tech. Fin. Grp. Inc.*, 67 F.3d 463, 466 (2d Cir. 1995)), RICO

cases frequently plead and rely on evidence of racketeering acts that are outside the limitations

period, so long as the pattern of racketeering activity continued within the limitations period, *see,*

*e.g.*, *U.S. v. Pizzonia*, 577 F.3d 455, 459 (2d Cir. 2009) (affirming trial judge's determination

that "even though the predicate acts proved in this case were outside the statute of limitations,

other trial evidence permitted to jury to conclude that both the charged racketeering conspiracy

and [defendant's] membership in it continued into the limitations period").

Defendants ask that if the verdict is admitted, it is not given collateral estoppel effect.

They also note that the verdict employed the following language with respect to the fraud claim:

"[T]he execution of the will dated February 18, 2003 [was] the result of fraud by Shou-Kung

Wang *and/or* Andrew Wang."  Dkt. No. 257 at 6 (quoting Dkt. No. 259-47) (second alteration in

original) (emphasis in original).  The Court agrees with Defendants.  The verdict will not be

given collateral estoppel effect.

"A federal court must give to a state court judgment the 'same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered.'" *Ganci v. Sweeney*, 1987 WL 15902, at *3 (E.D.N.Y. Aug. 17, 1987) (quoting *Migra v. Warren*, 465 U.S. 75, 81 (1984)). "New York preclusion law applies to New York state court judgments." *Morales v. New York City Dep't of Educ.*, 808 F. App'x 35, 37 (2d Cir. 2020); *see also Rodriguez v. N.Y. State Dep't of Parole*, 2019 WL 6973568, at *16 (S.D.N.Y. Dec. 20, 2019) ("The state law of collateral estoppel is controlling when a federal court determines the preclusive effect of a state court decision." (citing *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 79 (1984))). "Under New York law, collateral estoppel will apply if '(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue in the first proceeding.'" *Morales*, 808 F. App'x at 37–38 (quoting *Hoblock v. Albany Cty. Bd. Of Elections*, 422 F.3d 77, 94 (2d Cir. 2005)).

Defendants argue that they did not have a "full and fair opportunity" to litigate the verdict in the probate trial because the New York Dead Man's Statute, N.Y. C.P.L.R. § 4519, barred S.K. Wang from testifying about his interactions with C.C. Wang relating to the 2003 Will, Y.K. King's alleged art theft, and C.C. Wang's views on Y.K. King. *See* Dkt. No. 272-5 at A-2983. They assert that "no court in the country has found collateral estoppel where a state dead man act prevented the party to be estopped from introducing critical evidence in the initial action." Dkt. No. 271 at 11. They point to cases within the Seventh Circuit that have "summarily denied giving preclusive effect to original judgments that limited the testimony and evidence put on by the parties due to dead man acts." *Childress Cattle, LLC v. Cain*, 2017 WL 3446182, at *8 (W.D. Ky. Aug. 10, 2017) (collecting cases); *see also Butler v. Stover Bros. Trucking Co.*, 546

F.2d 544, 551 (7th Cir. 1977) ("Allowing plaintiff to invoke collateral estoppel would also subvert the policy of the Dead Man Act by permitting a live plaintiff to benefit from the operation of that Act and thereby obtain a footing superior to defendant.").  The parties have not submitted, and the Court has not found, a case in this jurisdiction addressing the statute.

New York's Dead Man's Statute states in relevant part:

Upon the trial of an action . . . , a party or a person interested in the event . . . shall not be examined as a witness in his own behalf or interest, or in behalf of the party succeeding to his title or interest against the executor, administrator or survivor of a deceased person . . . , concerning a personal transaction or communication between the witness and the deceased person . . . , except where the executor, administrator, [or] survivor . . . is examined in his own behalf, or the testimony of the . . . deceased person is given in evidence, concerning the same transaction or communication.

N.Y. C.P.L.R. § 4519.  Like other Dead Man's Statutes, this law "prohibit[s] the admission of a decedent's statement as evidence in certain circumstances, as when an opposing party or witness seeks to use the statement to support a claim against the decedent's estate."  Black's Law Dictionary (11th ed. 2019).  It "prevents any person 'interested in the event' from testifying to a 'personal transaction' with the deceased unless the representative of the deceased has waived the protection of the statute by testifying himself or introducing the testimony of the decedent into evidence at trial."  *Matter of Wood's Est.*, 418 N.E.2d 365, 367 (N.Y. 1981); *see also 25-35 Bridge St. LLC v. Excel Auto. Tech Ctr. Inc.*, 87 N.Y.S.3d 823, 830–31 (N.Y. Sup. Ct. 2018); *Pro Bono Invs., Inc. v. Gerry*, 2005 WL 2429777, at *7 (S.D.N.Y. Sept. 30, 2005) (citing cases); *Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996) (a plaintiff in an action is "interested") *Duncan v. Clarke*, 125 N.E.2d 569, 570 (N.Y. 1955) ("[T]he 'interest' which renders a witness incompetent under [the statute] is only such as results from the 'direct legal operation of the judgment.'" (internal citations omitted)).  The "fundamental purpose of the statute . . . is to protect the estate of a decedent from claims of the living who, through their own perjury, could

make factual assertions which the decedent cannot refute in court." *Kuznitz v. Funk*, 133 N.Y.S.3d 46, 50 (2d Dep't 2020).

Plaintiff argues that the Dead Man's Statute did not bar Defendants' testimony in the underlying action because she waived it when she questioned A. Wang about his interactions with C.C. Wang. *See* Dkt. No. 268 at 11–12; Dkt. No. 269 at 3–4.[6] But the trial transcript does not support that there was such a waiver.

In the probate trial, Plaintiff cross-examined A. Wang about conversations between him and C.C. Wang. Dkt. No. 266-23 at A-2522. Defendants objected on the basis of the Dead Man's Statute, N.Y. C.P.L.R. § 4519, and the court overruled the objection, finding that the statute did not bar such testimony because "4519 does not bar a party from calling their opponent. It's only in their case in chief that a party cannot offer testimony or evidence that would be precluded by the statute." Dkt. No. 266-23 at A-2522. Later, Defendants again objected to Plaintiff's cross-examination of A. Wang regarding his conversations with C.C. Wang, but the court again found that the Dead Man's Statute did not apply because it did not "bar[] the party that has an adverse interest to the witness to call the witness to testify. That's the way I understand the law, so I don't believe it would be barred by 4519." *Id.* at A-2568. The court did not hold that Plaintiff's questioning waived the Dead Man's Statute; it found that the statute did not bar the testimony in the first place. Moreover, at the time that Plaintiff examined A. Wang, she was not the Estate's representative or executor and could not waive the statute on

---

[6] Plaintiff also argues that the Appellate Division rejected a similar collateral estoppel challenge brought by S.K. Wang, but S.K. Wang made such argument in connection with his claim that he had received ineffective assistance of counsel, not because of the Dead Man's Statute. *See Est. of Chi-Chuan Wang*, 113 N.Y.S.3d 527, 528 (1st Dep't 2020) (rejecting S.K. Wang's "claim that he did not have a full and fair opportunity to litigate the issue of fraud and undue influence because he received ineffective assistance of counsel").

its behalf.  *See, e.g.*, *Rosenfeld*, 78 F.3d at 92 ("It is when the estate advances evidence of the events that it has opened the door, and in such case a claimant against the estate may elicit such other testimony as needed to complete the picture."); *Matter of Wood's Est.*, 418 N.E.2d at 367 (stating that statute bars testimony "unless the representative of the deceased has waived the protection of the statute by testifying himself or introducing the testimony of the decedent into evidence at trial"); *Klugman v. Laforest*, 29 N.Y.S.3d 625, 628 (3d Dep't 2016) (stating that dead man's statute "is waived if the estate's representative elicits testimony from an interested party").  Plaintiff thus did not waive the Dead Man's Statute because the statute did not bar A. Wang's testimony in the first place.  There was nothing to waive.

As to S.K. Wang, the trial transcript shows that Plaintiff sought an adverse inference jury instruction after Defendants failed to call S.K. Wang for their case-in-chief.  Dkt. No. 272-5 at A-2968–69, 2977–78.  Plaintiff argued that S.K. Wang's testimony "wouldn't have been a violation of the dead man's statute."  *Id.* at A-2978.  The court rejected that argument, agreeing with Defendants that if they had called S.K. Wang for their case-in-chief, the testimony that he would have provided would have been about his conversations with his father, C.C. Wang, which would have been barred by the Dead Man's Statute.  *See* Dkt. No. 272-5 at A-2968 (defense counsel arguing that "everything we wanted him to testify about would be barred by the dead man's statute" and thus "I don't see why he should have sat through a trial and not been able to testify on the material issues of the case"); *id.* at A-2981 (court agreeing that "I just don't see how [defense counsel] could have called S.K. and asked questions about anything that has to do with this will and who provided that testimony and the transactions, because I'm assuming that he would have said, I got it from conversations with my father, and that would have bolstered his position").  The court thus refused to give the adverse instruction because it found

Defendants' argument, "that the missing witness charge [sh]ould not be given because [S.K. Wang's] testimony would have been barred by 4519," to be the "better argument." *Id.* at A-2983; *see also id.* at A-2968 ("[N]o inference may be drawn when a witness is available, but his or her testimony is excluded because it's incompetent under CPLR 4519, the dead man's statute.").

Moreover, collateral estoppel effect may not be given to the fraud component of the jury verdict for a second reason. Collateral estoppel applies only to an issue that was "actually and necessarily decided." *See Morales*, 808 F. App'x at 37–38 (quoting *Hoblock*, 422 F.3d at 94). While the fact that the 2003 Will was the result of fraud by A. Wang and/or S.K. Wang was necessarily and actually decided, which of the Wangs was responsible for the fraud was not. *See* Dkt. No. 272-5 at A-23 ("To prevail, objectant must prove that SK or Andrew 'knowingly made a false statement to the testator which caused him to execute a will that disposed of his property in a manner differently than he would have in the absence of that statement.'" (quoting *Matter of Ryan*, 34 A.D.3d 212, 215 (1st Dep't 2006)). Thus, while the verdict will be received in evidence, Defendants will not be collaterally estopped from arguing that they did not commit fraud or unduly influence C.C. Wang in connection with the 2003 Will or from offering evidence to that effect.[7]

---

[7] Given this holding, the Court need not address Defendants' second argument that collateral estoppel cannot apply where there was unfairness in the underlying action, such as significant evidentiary errors even if those errors are found to be harmless for purposes of appellate review. The "unfairness" Defendants point to is a missing witness charge given to the jury on the unavailability of Jerome Kamerman, who was the attorney drafting the 2003 Will. The Appellate Division held that this charge was in error, but that the error was harmless as a matter of law because "viewing the charge as a whole, and in light of the evidence presented, counsel's arguments and the otherwise proper jury instructions, there is no indication that the 'error in judgment' charge clouded the issue or negatively influenced the jury's determination." *In re Est. of Chi-Chuan Wang*, 78 N.Y.S.3d 329, 331–32 (1st Dep't 2018) (quoting *Nestorowich v. Ricotta*, 767 N.E.2d 125, 130 (2002)); *see also* N.Y. C.P.L.R. § 2002 ("An error in a ruling of the court

B.      **Other Evidence of Alleged Misconduct**

1.      **Events Before or Concerning the 2003 Will**

Plaintiff also moves to exclude exhibits that she asserts the Wang Defendants intend to

use to defend against the claim that they defrauded or unduly influenced C.C. Wang into

executing the 2003 Will by alleging that Y.K. King stole from C.C. Wang and that was the

reason why he disinherited her in 2003.  Specifically, Plaintiff seeks to exclude exhibits that

were created prior to the signing of the 2003 Will on February 18, 2003, and which were

introduced by the Wang Defendants during the probate trial, including (a) letters signed by C.C.

Wang, (b) personal financial records of C.C. Wang, (c) corporate documents signed by C.C.

Wang, (d) checks signed by C.C. Wang, (e) contracts to sell paintings to Soon Huat signed by

C.C. Wang, and (d) wire requests and transfer forms directed by C.C. Wang.  Dkt. No. 253 at

23–24; *see also* Defendants' Proposed Exhibit List, Dkt. No. 252-28, DX 6–28, 30–32, 36–45.

She also seeks to exclude pictures of C.C. Wang taken at his birthday party in early 2003, Dkt.

No. 252-28, DX 47–49, pictures of C.C. Wang taken at the 2003 Will signing, *id.*, DX 51–54,

C.C. Wang's medical records from March 2003, *id.*, DX 56–58, and a demonstrative purporting

to establish C.C. Wang's transfers to Y.K. King, *id.*, DX 149.

Defendants move to exclude evidence regarding whether the Wangs caused King to be

fraudulently disinherited from C.C. Wang's estate in February 2003 and caused the July 1, 2003

fraudulent revocation of the Chi-Chuan Wang Revocable Trust.  With respect to Defendants'

---

shall be disregarded if a substantial right of a party is not prejudiced.").  Defendants claim that
"the standard for 'reversible error' and the standard for 'errors precluding offensive estoppel'" is
not the same, based on the D.C. Circuit's opinion in *Jack Faucett Associates, Inc. v. American
Telephone & Telegraph Co.*, 744 F.2d 118, 128 (D.C. Cir. 1984).  But that case analyzed
whether a prior federal court judgment, rather than a state court judgment, should be given
preclusive effect, and thus applied the federal doctrine of collateral estoppel.  It did not consider
the separate question whether the standard for harmless error and errors precluding collateral
estoppel were identical under New York law.

motion, Plaintiff argues that evidence regarding the events concerning the 2003 Will is relevant "to establish that both A. Wang *and* S.K. Wang were co-participants in various predicate and non-predicate fraudulent schemes to steal from the Estate" which Plaintiff claims "establish[es] the existence of a RICO enterprise."  Dkt. No. 268 at 4.

With respect to Plaintiff's motion, the Wang Defendants respond that most of the exhibits Plaintiff cites are not focused on this issue and can be received for purposes other than demonstrating that Y.K. King's alleged art theft was the reason her father disinherited her. Indeed, the Wang Defendants acknowledge that to the extent that they intend to use the exhibits to defend against claims related to the 2003 Will, the admissibility of that evidence rises or falls upon the competing motions in limine regarding the probate jury verdict and regarding the admission of evidence offered by Plaintiff as to the 2003 Will.  If the Court admits the verdict and collaterally estops Defendants from relitigating that issue (as Plaintiff requests), then the Wang Defendants will be unable to offer evidence that serves only that purpose.  It would be irrelevant to any issue in dispute.  If the Court excludes the verdict (as the Wang Defendants request), and evidence regarding the 2003 Will, then the Wang Defendants would have no need to introduce exhibits that go to that issue.[8]  If the Court decides to admit the verdict or to permit evidence to be offered by Plaintiff that the Defendants committed fraud in connection with the 2003 Will, then Defendants must also be permitted to offer evidence on the subject.

As the Court has ruled to admit the verdict but not to apply collateral estoppel, *see supra*, evidence introduced for the purpose of relitigating C.C Wang's capacity and whether the 2003

---

[8] The Wang Defendants also represent that they do not intend to pursue an unclean hands defense.  Dkt. No. 262 at 2.

Will and the revocation of the Chi-Chuan Wang Revocable Trust was the result of fraud or undue influence by the Wang Defendants is permitted.

For the same reasons, Defendants will be permitted to offer evidence that Y.K. King was disinherited by C.C. Wang in the 2003 Will because she committed art theft in 2003 if Plaintiff opens the door by offering evidence that the 2003 Will was procured by fraud or while C.C. Wang lacked capacity or was under undue influence.

### 2.     TRO and Bankruptcy Fraud

Plaintiff moves to exclude evidence of documents or testimony relating to Y.K. King's alleged misconduct occurring after the 2003 Will.  But she does not identify any evidence, including exhibits or expected testimony, and only states that evidence offered "to establish Y.K. King's perceived violation of the TRO (which restrained the sale of any property once owned by C.C. Wang) or any bankruptcy fraud are of no moment to whether the Wangs denuded the Estate through acts of mail and wire fraud between 2005 and 2009." Dkt. No. 253 at 27.[9]  She makes no further mention of the evidence she seeks to exclude in her reply or in her opposition to Defendants' motion. *See* Dkt. Nos. 268, 269.  The Wang Defendants also state that they have not identified any exhibits relating to Plaintiff's violations of the TRO, and they identify only DX 126 and 127 as relating to bankruptcy.  Dkt. No. 262 at 6 n.6.  The Court declines to rule in the abstract on Plaintiff's motion as it pertains to the TRO.  The Court also declines to rule on the motion with respect to the bankruptcy fraud as Plaintiff fails to identify the exhibits she seeks to exclude, the content of those exhibits, and the precise reasons for the exclusion of those exhibits.

---

[9] On February 11, 2019, the Surrogate Court limited Y.K. King's authority as executrix to prosecution of this action and certain other proceedings in response to S.K. Wang's petition to revoke Plaintiff's status based on the allegation that Y.K. King violated a court order from 2003 restraining the disposition of the Estate's assets when she sold six pieces of artwork that belonged to the Estate. *See King*, 2020 WL 6875403, at *11.

### C.       The "21+4" Paintings

Defendants seek to exclude any reference to the so-called "21+4" paintings.  The "21" paintings refer to Plaintiff's account that, on January 31, 2003, she discovered 21 paintings were missing, some of which were owned by her companies and some owned by the Estate.  The "4" paintings refer to Plaintiff's account that, also on that same day, Plaintiff checked her father's apartment and discovered that an additional four paintings were missing.

The Court previously held that RICO claims relating to the 21 paintings were time-barred while also noting that Plaintiffs did not seek recovery with respect to any of the 25 paintings. *King v. Wang*, 2017 WL 2656451, at *7–8 (S.D.N.Y. June 20, 2017); *see also King v. Wang*, 2018 WL 1478044, at *7 (S.D.N.Y. Mar. 26, 2018) (finding that only the Estate's claims with respect to the 98 Paintings were not time-barred).  Accordingly, Plaintiff admits here that "this action only seeks damages in relation to the self-dealing of the 98 Paintings," but she nonetheless argues that evidence about the alleged theft of the "21+4" paintings should "be introduced to establish that both A. Wang and S.K. Wang were co-participants in various predicate and non-predicate fraudulent schemes to steal from the Estate [to] establish the existence of a RICO enterprise."  Dkt. No. 268 at 4.

Plaintiff's theory is that, as with the 2003 Will and the jury verdict in connection therewith, the "21+4" paintings "help to establish the Wangs' pattern of racketeering and the existence of their criminal enterprise."  Dkt. No. 267 at 3.  Plaintiff's theory is that A. Wang and S.K. Wang obtained funds to purchase the 98 Paintings as fictitious buyers through their earlier theft of C.C. Wang's art, like the "21+4."  This theory goes to pattern and may help to establish the existence of the RICO enterprise.  *See id.* at 4.  The motion to exclude the evidence is denied.

D.        **Settlement Evidence**

Defendants seek to exclude, under Rule 408, evidence regarding the May 2005 Meeting in which the Kings met with A. Wang at the Jinan Hotel in Shanghai in an attempt to reach a settlement to resolve the will contest.  Plaintiff refers to this as the Shanghai Exchange Embezzlement.  Dkt. No. 268 at 2.  As noted in this Court's summary judgment opinion, each party has a different account of what happened at the meeting.

A. Wang claims that the Kings agreed to deliver 46 paintings to him in exchange for five paintings, but "brought only 15 of the 46 paintings they represented would be delivered and he brought one painting that had no connection to the Estate but which Plaintiff specifically requested and which actually belonged to his father, S.K. Wang."  *King*, 2020 WL 6875403, at *3.  In contrast, Plaintiff claims she and K. King gave 46 paintings to A. Wang and received five paintings in return.  Plaintiff claims those five paintings had been part of the "21+4" paintings in 2003.  During summary judgment briefing, Plaintiff submitted a document listing the 46 paintings with A. Wang's initial next to each painting; A. Wang disputed that the document is the one he initialed and signed.  *See id.*  Of the 46 paintings that Plaintiff says she gave to A. Wang, two of the paintings were Wu Zhen's "Wild Bamboo" and Gu Xi's "Travelers in the Autumn Mountains," which later appeared at the Bao Wu Tang ("BWT") Exhibition at the Beijing Capital Museum ("Capital Museum") in 2009 and which prompted Y.K. King to begin investigating the sales by the Estate.  These two paintings, however, are not alleged to have been part of the 98 Paintings sold to the Five Buyers.  Plaintiff argues that, in response to Defendants' anticipated statute of limitations argument, she intends to introduce evidence that in 2010 her concern—and the reason she filed the 2010 removal petition—was A. Wang's display at the BWT Exhibition of paintings he previously denied receiving from her.  Dkt. No. 268 at 6.  Plaintiff also argues that the display of the two paintings at the BWT Exhibition supports the

proposition that A. Wang was "the one providing the paintings to the Capital Museum," *id.*, on the theory that if he supplied those two paintings he must have supplied the remainder of the paintings as well.

Federal Rule of Evidence 408 prohibits, either to prove or dispute the validity or amount of a disputed claim or to impeach by prior inconsistent statement, "(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority."  Fed. R. Civ. P. 408(a).

The settlement evidence is not barred by Rule 408 because the claims under negotiation at the time, i.e., the will contest and the alleged theft of the "21+4" paintings, are different from the ones being currently litigated, i.e. the RICO and state law claims.  When "evidence is 'offered for another purpose' apart from liability for (or damages resulting from) the claim under settlement discussion, that evidence may be admitted."  Dkt. No. 268 at 15 (quoting *Carr v. Health Ins. Plan of Greater New York, Inc.*, 2001 WL 563722, at *4 (S.D.N.Y. May 24, 2001)); *see also Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 125, 133 (D. Conn. 2010) ("[W]hen settlement-related evidence is related to a claim not under consideration by the jury, courts generally permit its introduction, so long as it is otherwise admissible, if it is relevant to a claim that is at issue.").

The Court will exclude the evidence under Rules 401 and 403, with one limited exception.  Even if it is proved that A. Wang was in possession of the two paintings and was the one who contributed those paintings to the BWT Exhibition, those facts would provide only the

most tenuous support—if they provided any support whatsoever—to the proposition that Defendants owned and controlled the other paintings contributed to the exhibition.  A. Wang need not have contributed the other paintings for him to have contributed the two that are allegedly part of the Shanghai Exchange Embezzlement.  Thus, the evidence is properly excluded under Rule 401.  Moreover, any probative value that the Shanghai Exchange Embezzlement would have with respect to the alleged fraud concerning the 98 Paintings is far outweighed by the danger of unfair prejudice, confusion of the jury, and waste of time that testimony regarding the incident could create.  Plaintiff admits that the Shanghai Exchange Embezzlement is "a separate wrongdoing."  Dkt. No. 268 at 5.  It involves a separate incident, involving separate paintings, occurring at a different time, and with dramatically different allegations.  To permit testimony on the issue would be to permit a wasteful sideshow.

The one limited exception is that if Defendants do raise a statute of limitations defense, and testimony regarding the reasons why Plaintiff filed the 2010 removal petition becomes relevant, Plaintiff will be permitted to testify regarding the reasons she filed the 2010 removal petition.

### E.     Disappearance of the "Procession of the Taoist Immortals" by Wu Zhongyuan at Some Unidentified Time Between May 2005 and April 2009

Defendants seek to exclude evidence about the disappearance of the painting "Procession of the Taoist Immortals" by Wu Zhongyuan from a safe deposit box in Shanghai between 2005 and 2009.  Plaintiff alleges that during settlement negotiations between Plaintiff and A. Wang they agreed to jointly donate the artwork and for A. Wang to place it in a safe deposit for storage in the meantime, which he assured could be accessed only if both Plaintiff and A. Wang were present.  FAC ¶¶ 228–240.  Plaintiff later commenced proceedings to compel an examination of the safe deposit box and learned in April 2009—a few months before the last sale of the 98

Paintings in August 2009—that the artwork was missing; she claims that thereafter, in November 2009, A. Wang began giving interviews portraying himself as the owner of the artwork.

The evidence is excluded under Rules 401 and 403.  Plaintiff proffers no evidence that either Defendant had anything to do with the removal of the artwork from the safe deposit box. Nor does Plaintiff connect the claim that A. Wang stole the Wu painting from a Shanghai Bank to the issue for trial whether Defendants were the "real" buyers of the 98 Paintings.

### F.    Bao Wu Tang Exhibition

#### 1.    Videos

Defendants move to exclude 36 video clips taken at the BWT Exhibition on the grounds that they cannot be authenticated without testimony from a person who attended the exhibition that the videos depict what actually was displayed at the exhibition.  Plaintiff responds that Y.K. King has reviewed the videos and that she would be prepared to testify that they are accurate representations of the exhibition which she attended and that A. Wang should also be capable of authenticating the videos.  Assuming that a witness testifies that the videos are fair and accurate representations of the exhibition, they will be received.  It is sufficient that a witness with personal knowledge of what the video or photograph purports to depict testify that it is a fair and accurate representation of what they observed.  *See Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 337 (E.D.N.Y. 2015) ("Videos may be authenticated 'on the same principles as still photographs,' and still photographs may be authenticated by a witness familiar with what is pictured." (internal citations omitted)), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018); *United States v. Ida*, 1997 WL 122753, at *3 (S.D.N.Y. Mar. 18, 1997) (holding that video tapes were authenticated and admissible where an agent "testified that the originals marked for identification by the government in this trial in fact are the original recordings made").

Defendants concede that Plaintiff's anticipated testimony would suffice to authenticate the videos but raise in reply the question whether the failure to provide information about the videographer's identity and communications regarding the video constitute a discovery violation that warrants sanctions, including preclusion. Preclusion is a harsh remedy and assuming there is a discovery violation, the Court is instructed to consider alternative remedies. *See Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) ("[P]reclusion of evidence and dismissal of the action are harsh remedies and should be imposed only in rare situations."). The Court will hear argument and address the matter at the final pretrial conference.

### 2. Media Reports

Defendants move to exclude media reports on the BWT Exhibition as inadmissible hearsay. These reports include CCTV footage purporting to depict certain paintings displayed at the Beijing Capital Museum show and two Chinese web reports relating to the BWT Exhibition—one from November 9, 2009 and one from November 13, 2009.

Plaintiff responds that she no longer intends to introduce the CCTV footage and articles in her affirmative case but reserves the right to use them as impeachment.[10] Defendants respond that hearsay is no less hearsay when used on cross-examination. That may be so, but it depends on how the evidence is used during cross-examination and the Court cannot rule on the use of the footage or news article in the abstract and without knowing how they will be used.

Accordingly, the motion is denied as moot.

---

[10] She also notes, for authentication purposes, Y.K. King can introduce portions of the CCTV footage based upon on attendance at the Beijing Capital Museum show and her familiarity with C.C. Wang's paintings displayed in the footage and at the exhibition.

### 3.   Exhibition Catalogues

Defendants seek to exclude the exhibition catalogue for the BWT Exhibition (the "BWT Catalogue") on the grounds that it is unauthenticated and inadmissible hearsay that is more prejudicial than probative.[11]  The purported relevance of the BWT Catalogue is for its implicit representation that the BWT exhibition showed authentic works of art from the collection of C.C. Wang.  Plaintiff argues for admission as the statement of a party opponent under Rule 801(d)(2)(A) or an adoptive admission under Rule 801(d)(2)(B).

The BWT Catalogue is not an admission of a party opponent under Rule 801(d)(2)(A). Although the BWT Catalogue bears the name Bao Wu Tang and A. Wang admitted that he was owner of the Bao Wu Tang gallery, the publisher of the book was the Capital Museum and the book was expressly an exhibition catalogue for an exhibition put on by the Capital Museum. Plaintiff's argument is akin to the argument that a museum catalogue at the Metropolitan Museum of Art hosting work from the Frick Collection or the Rockefeller Collection is necessarily a statement by each Frick or each Rockefeller.  A museum may distribute a catalogue pertaining to an art collection or exhibit without converting the statements in it about the collection into evidentiary admissions by the particular artist, collector, or donor whose name the museum borrows for its exhibition.  Further, although it may be that A. Wang recognized some of the images in the BWT Catalogue as artworks in the family collection, that does not make the BWT Catalogue his own.

Plaintiff also argues that the BWT Catalogue is an adoptive admission.  Under Rule 801(d)(2)(B), a statement is not considered to be hearsay if offered against the opposing party

---

[11] Defendants' opening brief argued to exclude catalogues for two "'Bao Wu Tao' exhibitions at the Beijing Capital Museum in 2009 and the Beijing Poly Museum in 2010," Dkt. No. 257 at 21, 24, but the parties appear to argue only about the BWT Catalogue at the Capital Museum.

and it "is one the party manifested that it adopted or believed to be true." Fed. R. Evid.

801(d)(2)(B). A witness can adopt a statement in one of two circumstances. The witness can

"unambiguously manifes[t] adoption of another person's statement"; in that circumstance, "the

content of the statement need not be against his interest." *United States v. Shulman*, 624 F.2d

384, 390 (2d Cir 1980). Alternatively, "[w]here the defendant's adoption of another person's

statement purportedly is manifested by silence, or other ambiguous conduct, courts will consider

the incriminatory content of the statement in order to determine whether the defendant actually

has adopted the statement by his silence." *Id.* If the witness is silent in the face of a statement

that incriminates or defames the witness, the witness is deemed to have adopted it. "The

rationale of such cases is that a person ordinarily will respond to an incriminatory or defamatory

statement with a denial, or at least with some indication that he objects to the statement as

untrue." *Id.* (citing *United States v. Flecha*, 539 F.2d 874, 876–77 (2d Cir. 1976)); *see also*

*United States v. Ho*, 984 F.3d 191, 208 (2d Cir. 2020) (same).

"Where . . .  the statement at issue is a document, the adoptive admission test is whether

the surrounding circumstances tie the possessor and the document together in some meaningful

way." *In re General Motors LLC*, 2015 WL 8578945, at *2 (S.D.N.Y. Dec. 9, 2015) (citation

and quotation marks omitted). For example, an entity can adopt a report by submitting it to

Congress to use as the entity's account of events of significance, *id.*, by relying on the report's

contents in seeking the resignation of an employee, *Wright-Simmons v. City of Okla. City*, 155

F.3d 1264, 1268 (10th Cir. 1998), by adopting the report's recommendations, *Pilgrim v. Trs. of*

*Tufts College*, 118 F.3d 864, 870 (1st Cir. 1997), or by printing, publishing, and disseminating

the report when it "contains statements that pertain in some way to the organization or

company," *Penguin Books U.S.A. Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F.
Supp. 2d 251, 259 (S.D.N.Y. 2003).

Recognizing both that the rules call for "generous treatment of the avenue of
admissibility," Fed. R. Evid. 801(d)(2) advisory committee notes, and that a party's adoption of
some statements in a report may be sufficient to manifest the party's adoption of the report in its
entirety, *Wright-Simmons*, 155 F.3d at 1268–69, the Court nonetheless holds that Plaintiff has
not offered sufficient evidence to support a conclusion that the BWT Catalogue is an adoptive
admission of Defendants.  Plaintiff has presented no evidence that A. Wang reviewed the
catalogue as a whole; the deposition testimony is that he asked someone in Beijing to write the
preface of the BWT Catalogue and that he only "roughly" looked it because it was to go
underneath his name.  Dkt. No. 264-5 at 528–29.  No party asks for the preface to be admitted in
isolation.  In addition, no party argues that at the time A. Wang saw the BWT Catalogue he
would have understood it to have been incriminatory or defamatory.  It purported to show images
from the C.C. Wang family collection.  On this record, there would have been no particular
reason for A. Wang to object to the BWT Catalogue or distance himself from it even if he had
been aware that some of the images were of reproductions and not of the originals.  Plaintiff also
has not proffered evidence that A. Wang manifestly adopted the BWT Catalogue and the
statements of it as his own (save for the introduction that went out over his name).

Plaintiff has four responses.  First, A. Wang adopted the BWT Catalogue by authoring
the preface in which he stated with respect to the exhibition:  "I feel obligated to organize these
important family collections to present to the fellow Chinese.  I want to give those who love
ancient Chinese calligraphy and painting a chance to gain a deeper understanding of the spirit of
the national culture and artistic traditions.  At the same time, for special reasons, I am currently

24

not able to organize and present the entire family collection." Dkt. No. 252-22.  Second, A. Wang sent an email to Chien Fang Huan to which A. Wang attached five pictures of one of the 98 Paintings taken from the BWT Catalogue, purportedly representing that the five paintings were shown at the exhibition.[12]  Third, after the name "Wu" was misspelled on the cover of the BWT Catalogue, A. Wang changed the name of his studio to match the name on the cover rather than having the museum reprint the BWT Catalogue.  Fourth, certain of the images depict the Estate's paintings that Y.K. King or A. Wang should recognize.

This evidence is not sufficient to render the BWT Catalogue as a whole an adoptive admission.  Plaintiff has identified no language from the preface in which A. Wang adopts the entire BWT Catalogue as his statement or vouches the catalogue as a whole.  From its face, the preface is about the collection and not about the contents of the BWT Catalogue itself.  The preface itself is an admission, but it does not make the entire BWT Catalogue—of which it is one part—an admission.  Second, although the emails might constitute an adoptive admission with respect to the five photographs, there is nothing in the emails by which A. Wang manifests his adoption of the BWT Catalogue as a whole.  The cases holding that a party's explicit adoption of a portion of a report is sufficient to show adoption of the report as a whole find that the party treats the report "as a unitary item."  *See In re General Motors LLC*, 2015 WL 8578945, at *3. From the evidence submitted, A. Wang adopted, at most, the images in the five photographs as an authentic representation of one of the family's art collection.  He manifested no adoption of the statements in the BWT Catalogue itself.  Third, while A. Wang may have adopted the BWT name as his own after the error in the BWT Catalogue was discovered, that act of convenience to

---

[12] Chien Fang Huan testified as to the validity of C.C. Wang's now defunct 2003 Will during the probate proceedings and is alleged to have remained A. Wang's art consultant.  *See King*, 2020 WL 6875403, at *19.

the Capital Museum does not manifest an adoption of the statements in the BWT Catalogue themselves.

Finally, testimony by witnesses that they recognize an image does not support the representation from the BWT Catalogue that the image is of a work of art shown in the exhibition.  It may well be that the image is of a work that the witness recognized but it was not shown in the exhibition.  However, on the assumption that a witness can testify that the images in the BWT Catalogue were images he or she saw at the BWT Exhibition, those images will have been authenticated and the Court will receive the images themselves not for their testimonial value that they were shown at the exhibition but for the proposition that they are fair and accurate representations of what the witness says he or she saw at the exhibition.

### G.    Artron.net and Art.net Auction Exhibits

Defendants move to preclude auction-related webpages and catalogues offered by Plaintiff on the grounds that they are unauthenticated and hearsay.  These webpages are printouts from Artron.net and Artnet.com, which according to Plaintiff are online databases that compile information reported to them regarding sales of Chinese paintings from various Chinese auction houses.  Plaintiffs seek to use these printouts to show (1) that the 98 Paintings were auctioned at auction houses in China, (2) the location and time of the auctions, including which auction houses put them up for auction, (3) the photographs of the auctioned works, and (4) the prices actually paid for those works at auction.  Plaintiff claims the printouts will show that: (1) many of the 98 Paintings reappeared at auction houses in China following their sale by the Estate, (2) the 98 Paintings could have been, and should have been, auctioned in China in the first place rather than sold privately, (3) A. Wang and/or S.K. Wang added several of CC. Wang's missing seals to the Estate's paintings, and (4) where the paintings were offered for sale, and particularly

that they were offered at what Plaintiff characterizes as "the middling Chieftown auction house between 2008 and 2018." Dkt. No. 253 at 32.

In connection with his report, Plaintiff's expert Patrick Regan ("Regan") reviewed records of the resale of 32 of the 98 Paintings that were located on or from Artron.Net and "[r]ecent and historical sales of paintings by the same artists as certain of the 98 Paintings on auction record databases such as Artnet and Artron.net." Dkt. No. 252-14 ¶¶ 16–17.  In performing his appraisal in this case, Regan listed as an "Extraordinary Assumption" in his expert report the assumption that the information available through these online databases was accurate and stated that if the information was found to be false it could alter his opinions or conclusions.  Dkt. No. 264-11 at 6.  Defendants' expert Kenneth Linsner ("Linsner") testified that he relied in part on a website called Artprice in his rebuttal report.  He also testified that Artnet and Artron are also compilers of auction house market data, that Artron is owned by Artprice, and that he has used Artnet before in preparing an appraisal.  Dkt. No. 252-25 at 191– 193.

The evidence from Artron and Artnet arises in two different contexts.  First, Regan relies upon information from Artron and Artnet in his expert report.  Although Defendants argue that Regan's report should be excluded on *Daubert* grounds, they do not dispute that he can rely on such data for the expert report.  Federal Rule of Evidence 703 specifically permits an expert to rely on facts or data that are not admissible in evidence so long as the facts or data are of the sort that "experts in the particular field would reasonably rely on." Fed. R. Evid. 703.[13]  Second, Plaintiff seeks to have the relevant pages from the auction website pages received as

---

[13] This form of reliance may be moot in light of the Court's order excluding Regan's appraisal on Rule 702 and *Daubert* grounds.

free-standing evidence.  It is that latter use that Defendants challenge on the grounds of authenticity and hearsay.

"The bar for authentication of evidence is not particularly high."  *United States v. Gagliardi*, 506 F. 3d 140, 151 (2d Cir. 2007).  The proponent of the evidence must simply "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Proof of authenticity "may be direct or circumstantial," *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008), and "Rule 901 provides several examples of proper authentication techniques in different contexts, and the advisory committee's note states that these are 'not intended as an exclusive enumeration of allowable methods but are meant to guide and suggest, leaving room for growth and development in this areas of the law.'"  *United States v. Vayner*, 769 F.3d 125, 131 (2d Cir. 2014) (quoting Fed. R. Evid. 901 advisory committee's note (Note to Subdivision (b))).  The Second Circuit has expressed skepticism that any greater scrutiny should be applied to evidence derived from the Internet than to any other evidence.  *Id.* at 131 n.5.  Plaintiff offers a number of different ways in which she believes she will be able to authenticate the webpages.  There is no basis to "prejudge" or to doubt that Plaintiff will meet that standard.  *Ulbricht*, 79 F. Supp. 3d at 488.

Even if the webpages from Artnet and Artron are authentic, they are still hearsay if Plaintiff seeks to offer them for the truth of their contents—i.e., that the items displayed on the pages were authentic, were auctioned, and were sold at the "hammer" prices reflected on webpages.  Plaintiff argues that these exhibits should be admitted under Rule 803(17) as market compilations.[14]

---

[14] Plaintiff previously argued that the webpages could also be admitted under Rule 803(18) for learned treatises or under the residual exception of Rule 807(a), but she appears to have abandoned that argument.  *Compare* Dkt. No. 262 at 32–33, *with* Dkt. No. 268 at 16–20, *and*

Rule 803(17) creates an exemption to the hearsay rule for "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."  Fed. R. Evid. 803(17).  Under that rule, it is not enough that the information Plaintiff seeks to use is drawn from a compilation.  It must also be "generally relied on by the public or by persons in particular occupations."  "The basis of trustworthiness is general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate."  Fed. R. Evid. 803(17) advisory committee note.  "[T]he admissibility of market reports and commercial publications under Rule 803(17) is predicated on the two factors of necessity and reliability."  5 Weinstein's Federal Evidence § 803.19[1] (2021).  Reliability is based, at least in part, on evidence that the compilers "stake their business or public reputations on the accuracy" of a compilation.  *Conoco Inc. v. Dep't of Energy,* 99 F.3d 387, 393 (Fed. Cir. 1996), *as amended on reh'g in part* (Jan. 2, 1997).  It is not sufficient simply that a plaintiff's expert relies on the information in rendering his or her opinion.  The Federal Rules of Evidence specifically contemplate that in rendering an opinion an expert might rely on "fact or data [that] would otherwise be inadmissible."  Fed. R. Evid. 703.

In his expert report, Regan stated:  "As a general principle, my reliance upon the accuracy of the photographs and records published by Artron.net is reasonable, typical, and necessary in this industry.  Appraisers and collectors throughout the world, myself included, rely on the market data and photo records accumulated and published by Artron.net on a daily basis."  Dkt. No. 252-14 ¶ 46.  He also states in his rebuttal report:  "Using reported values from major auction houses is a critical, necessary, and univerally accepted method of valuing Chinese artworks" and "[e]very day both professional appraisers and individual collectors rely on these

---

Dkt. No. 269 at 7–12.

online databases in deciding whether to engage in multi-million-dollar asset acquisitions and sales." Dkt. No. 234-3 ¶ 14. Regan's testimony at the *Daubert* hearing supported these contentions. He testified, and Plaintiff presented evidence, that appraisers in the Chinese art market use and rely upon these auction webpages in making appraisals. Regan acknowledged that the databases could be "more reliable" and that the auction webpages disclaimed reliability of the accuracy of the content published on their websites. Dkt. No. 289-1 at 61. However, he also explained that the disclaimers did not prevent appraisers from relying on the auction webpages because such disclaimers were intended to protect the websites from liability and were not a reflection of their unreliability or inaccuracy.

Based on that testimony, the Court will receive the pages from Artron and Artnet. Defendants may argue, and offer evidence tending to support, that the photographs are of reproductions and that the hammer price does not reflect that actual exchange of value. But the evidence cited by Defendants does not support denying the jury the right to see the Internet pages and to judge for itself the credibility of Defendants' arguments. *See, e.g.*, *In re Gonch*, 435 B.R. 857, 862 (Bankr. N.D.N.Y. 2010); *United States v. Pac. Chem. Int'l, Inc.*, 2019 WL 4451214, at *2 (C.D. Cal. Apr. 25, 2019).

To the extent that there are photographs on the internet pages, those stand on an additional and even more secure footing. Assuming that the auction webpages are authenticated and that a witness can testify that the artworks are fair and accurate representations the art, the photographs will be received. *See Kleveland v. United States*, 345 F.2d 134, 137 (2d Cir. 1965).

## H. Evidence of Defendants' Wealth

Defendants seek to exclude evidence of the wealth of S.K. Wang and A. Wang to prove that they bought and sold the 98 paintings. Plaintiff seeks to introduce evidence of Defendants' wealth before and after the sale of the 98 paintings to show: (1) Defendants had the financial

30

wherewithal to purchase the 98 paintings through straw purchasers; (2) Defendants' purchases of

real estate from 2014 to 2017 are evidence that they must have resold the paintings for a profit;

and (3) punitive damages should be imposed.

Plaintiff alleges that Defendants purchased the 98 paintings from the Estate for

$4,336,738.40 from 2005 to 2009.  Dkt. No. 268 at 25.  In 2007 and 2008, S.K. Wang wired

$1.625 million to Hui-Chen Wang's daughter, Chen Tao Hsaun, *id.* at 28; in 2013, the S.K.

Wang Irrevocable Trust purchased a $5.9 million property in Sands Point, Long Island,

substantially with $5.67 million transferred to the trust from A. Wang's mother-in-law, Zhu

Mingxia ("Zhu"), *id.* at 26–27; *see also* Dkt. No. 257 at 26; Dkt. No. 259-128 at 230–32; in

2014, S.K. Wang's wife, Cao Ching Wang, signed a contract to purchase a property in Queens,

New York for $1.6 million, Dkt. No. 268 at 28–29; in 2015, A. Wang purchased a property in

Oyster Bay, Long Island, as trustee of the Jie Wang Irrevocable Trust for $3.85 million, Dkt. No.

268 at 27; and in 2017, A. Wang and his wife purchased a condominium in Manhattan for

$922,000, *id.* at 268.  Plaintiff's theory is that the funds for these acquisitions must have come

from the proceeds of the fraud they allege in the Complaint.

Defendants focus on the transactions that post-date the sale of the 98 Paintings.  They

argue that Plaintiff is asking the jury to pile speculation upon speculation.  There is no mystery

about the source of funds for the Sands Point purchase—the funds came from A. Wang's

mother-in-law, Zhu.  There is no evidence that she lacked the funds to make the contribution to

the S.K. Wang Irrevocable Trust or that she obtained those funds from the sale of the paintings.

They also argue that the Complaint alleges that Defendants had "resold" $7,785,000 worth of

paintings at various auctions as of 2010.  Defendants argue that Plaintiff does not explain why, if

the paintings were resold in 2010, the money was held for years before being used.  They further

argue that Plaintiff has alleged that A. and S.K. Wang had millions of dollars from sources other than the resale of the 98 Paintings including monies from other alleged thefts and that therefore there is no basis to assume that any purchases that were made in the 2013–2017 period were made with the illicit proceeds of unlawful transactions.

The Court reserves judgment on the question whether Plaintiff may offer evidence that Defendants had sufficient wealth in the period from 2005 to 2009 to fund the purchase of the 98 Paintings.  It is not clear from the briefing whether there is any dispute that Defendants had sufficient funds or sufficient "wherewithal" to consummate the fraud alleged in the Complaint. There is no indication that Defendants have put that at issue.

The Court will exclude the evidence of the post-2009 transactions in real property.  "It is well-settled in this Circuit that unexplained wealth is relevant to create an inference of illicit gain." *United States v. Napoli*, 173 F.3d 847, at *3 (2d Cir. 1999) (summary order); *see also United States v. Reyes*, 821 F.2d 168, 170 (2d Cir. 1987) (same); *United States v. DeJesus*, 2021 WL 1885162, at *9 (S.D.N.Y. May 11, 2021) (same).  For wealth evidence to be relevant, however, it must be "unexplained."  Where there is evidence that the wealth came from licit sources or was preexisting, it is properly excluded.  *See, e.g.*, *United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) (excluding evidence of lavish personal spending where it was undisputed that defendant was "a very wealthy man").

Plaintiff has failed to proffer evidence to support the proposition that the funds spent on the transactions in 2013–2017 are unexplained.  Plaintiff offers no evidence to refute that the funds for the largest of the transactions—the purchase of the Sands Point property for $5.9 million—came from A. Wang's mother-in-law.  It would be pure speculation, and illogical speculation at that, to assume without any evidence that the proceeds of the scheme alleged in

the Complaint were funneled to A. Wang's mother-in-law only to be held by her for several years before being used to purchase the Sands Point property. Tellingly, there is no evidence that Zhu otherwise lacked the funds to contribute to the S.K. Wang Irrevocable Trust. The evidence is no stronger with respect to the remainder of the transactions. Plaintiff offers no evidence of unexplained wealth with respect to the purchase of the Oyster Bay property by the Jie Wang Irrevocable Trust. As to the condominium purchase, Plaintiff argues that A. Wang testified that he is self-employed as a specialist and consultant and that he has produced no records of income or any corporate records related to his consulting business. Dkt. No. 268 at 26. But Plaintiff offers no reason to believe that A. Wang would not have earned the money necessary for the purchases from his consulting businesses. The burden was not on A. Wang to show all of the sources of his income and to justify how much he made from his consulting business. The burden to prove the relevance of evidence—here, that wealth is unexplained—is on the proponent of the evidence. As to S.K. Wang, Plaintiff notes that he testified at deposition in 2019 that his net worth was not $5 million, stating, "$5 million? I have like over 100,000," Dkt. No. 266-15 at 179–80, after stating that he did not know his net worth, *id.* There is no evidence of his net worth in 2014 or of his wife's net worth. Nor is there evidence that the property purchased for $1.6 million was purchased entirely with cash or was the result of unexplained wealth.

Finally, Plaintiff argues that Defendants' wealth is relevant to the question of punitive damages under New York law. The Second Circuit, however, "favor[s] bifurcation of the amount of punitive damages as the 'preferred method.'" *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 283 (2d Cir. 1990) (quoting *Smith v. Lightning Bolt Prods, Inc.*, 861 F.2d 363, 374 (2d Cir. 1988)); *see also In Re: General Motors LLC Ignition Switch Litig.*, 2016 WL 4410008,

at *5 (S.D.N.Y. Aug. 18, 2016).[15]  The Court will follow that approach here, permitting the jury

to consider the amount of punitive damages only after Plaintiff has established to the jury's

satisfaction an entitlement to punitive damages.  Accordingly, the Court defers consideration as

to whether the evidence will be received with respect to the amount of punitive damages until the

jury returns a verdict that Plaintiff is entitled to punitive damages.  Evidence of the post-2009

transactions will not be received with respect to the issue of liability.

## I.      John S. Wang

Plaintiff moves to exclude the opinion testimony by non-retained expert John S. Wang

("J.S. Wang") concerning counterfeiting on the grounds that it is not connected in any way to his

status as a fact witness and is untimely.  J.S. Wang is a seal carver and calligrapher who was a

volunteer at the Smithsonian Institution and made a record of certain of C.C. Wang's seals in

May 2001.  He was identified by Plaintiff on June 21, 2019 in her Rule 26 initial disclosures as

having knowledge relevant to establishing that not all of C.C. Wang's seals had been turned over

to the Estate.  Due to that late disclosure, the Court allowed Defendants to take J.S. Wang's

deposition testimony in 2019.  Dkt. No. 180.

At the deposition, J.S. Wang testified that given advances in technology, forged seals are

more difficult to identify than in the past because "you can take a photo and make a replicate . . .

that would be identical except the size" and that "you're not able to tell exactly what is the size."

Dkt. No. 252-11 at 28–29.  For that reason, J.S. Wang testified, an image of a seal is not enough

---

[15] Defendants rely upon *Rupert v. Sellers*, in which the appellate division stated a "split trial
procedure should be used [and] the Court should take a special verdict as to whether defendant
was guilty of such conduct that plaintiff is entitled to punitive damages" before plaintiff can
discover such evidence or present it to the jury.  48 A.D.2d 265, 272 (4th Dep't 1975).  However,
the Second Circuit has since made clear that federal law, not state law, applies to the question
whether punitive damages should be bifurcated on a state law claim.  *Simpson*, 901 F.2d at 283.

to allow an expert to determine whether a seal on a painting is authentic; one needs also to measure the original seal and to measure the seal on the physical painting to confirm that they are identically sized.  *Id.* at 29–31.  He testified that he could not tell, based on the photographs in the BWT Catalogue, whether the seals depicted in the photographs were the real C.C. Wang seals of which he had created impressions in 2001 or whether they were fake.  Dkt. No. 264-6 at 97–102.  On March 18, 2021, Defendants designated J.S. Wang as an expert pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) to testify that:

> [T]he advent of new technologies has made seal counterfeiting both much easier to accomplish and much more difficult to catch after the fact, and [] a key and best practice for anyone purporting to authenticate a seal with any certainty is to physically examine the painting on which the seal is placed, and that it is impossible to reach a definitive conclusion from review of photographs because a key factor will be the size of the seal, which cannot reliably be determined from a photograph.

Dkt. No. 264-25.

Under Federal Rule of Civil Procedure 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "[D]espite the mandatory language of the rule, the Second Circuit views preclusion as discretionary."  *Amtrust N. Am., Inc. v. KF&B, Inc.*, 2020 WL 5578817, at \*1 (S.D.N.Y. Sept. 16, 2020) (citing *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006)).  "In determining whether preclusion is appropriate, a court is directed to consider: (1) the party's explanation for the failure to disclose; (2) the importance of the evidence to be precluded; (3) the prejudice suffered by the opposing party if the evidence were not precluded; and (4) the possibility of a continuance."  *Id.* (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

Rule 26(a)(2) draws a distinction between expert witnesses who are "retained or specially employed to provide expert testimony in the case or . . . whose duties as the party's employee regularly involve giving expert testimony" and those who are not so "retained or specially employed." Fed. R. Civ. P. 26(a)(2). In the case of the former, the party offering the expert testimony must timely disclose both the identity of the expert and a written report prepared and signed by the witness containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). In the case of the latter, the disclosure must contain only the identity of the witness, "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705," and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). In either case, the disclosure must be made at the time ordered by the court or, in the absence of a stipulation or court order and in the case of a rebuttal expert, "within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D). Moreover, communications between a party's attorney and an expert witness "retained or specially employed" are protected from disclosure except for communications that, among other things, "identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed." Fed. R. Civ. P. 26(b)(4)(C)(ii). By contrast, communications with persons who are not so retained or specially employed but who happen to have expert opinions are not specially addressed by Rule 26(b)(4)(C); they are governed by the ordinary rules that cover attorney-client relationships and attorney work-product material.

The distinction between a witness who is "retained or specially employed" and one who is not "does not turn solely on an expert's compensation or lack thereof." *Caruso v. Bon Secours Charity Health Sys.*, 703 F. App'x 31, 33 (2d Cir. 2017). Were that the case, a litigant could

36

avoid the report requirement by the simple expedient of recruiting a volunteer to provide opinions. "Rather, the more relevant distinction is between an expert who happened to have personal involvement with the events giving rise to the litigation and an expert whose *only* involvement consists of aiding the already-initiated litigation." *Id.* (emphasis added). As the First Circuit put it in the case upon which the *Caruso* court relied, a witness is "retained or specially employed" where she is "retained or specially employed for the purpose of offering expert opinion testimony" or "recruited" or "enlisted" to provide testimony. *Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011). "[A] percipient witness who happens to be an expert" is not specially retained or employed. *Id.* The distinction makes common sense. Where an expert is retained or specially employed by a party, it is only reasonable to require that party to produce an expert report—the party who retains or employs the expert has the capacity to generate such a report. And, where the expert has no prior knowledge of the facts and where the testimony will be based exclusively on information provided by the counsel who retained her or someone acting on counsel's behalf, it is especially important that the adverse party be informed of the facts or data considered by the expert forming the opinion and that such information not be protected from disclosure.

The Court need not reach the question of whether preclusion would be appropriate because there has been no violation of Rule 26(a) here. J.S. Wang fits comfortably within the category of an expert witness who is not retained or specially employed. By Plaintiff's own account, he had personal involvement with the events giving rise to the litigation. Dkt. No. 253 at 5, 8–9. His involvement did not begin after litigation was commenced and he was not recruited by Defendants. He was identified by Plaintiff as a relevant percipient witness because in 2001 he was engaged to make images of C.C. Wang's seals for the Freer Sackler museum at

the Smithsonian Institute and was tasked with creating an image of C.C. Wang's seals that both

C.C. Wang and the museum could use to determine if they wanted to donate (on C.C. Wang's

part) and accept the donation of (on the museum's part) any or all of his seals.  The testimony

Defendants propose to offer arises out of that work.  It is not that of a stranger to the litigation.  It

pertains directly to the impressions J.S. Wang created and the seals:  J.S. Wang would testify, in

the portions offered by Defendants, that he could not use the seal impressions he had created to

assess the authenticity of a seal on a photograph of the painting, and that even comparing the

impressions with a physical painting would only be "second best" as he would still need the

original physical seal.  Dkt. No. 264-6 at 101–02.

The Court specifically rejects Plaintiff's argument that the opinion of an expert who is

not retained or specially employed must be limited to that which is rationally based on the

expert's observation.  That argument conflates expert testimony under Federal Rules of Evidence

702 and 703 with lay opinion testimony under Federal Rule of Evidence 701 and is flatly

contrary to the language of Federal Rule of Civil Procedure 26(a)(2)(A).  Rule 701 permits a

party to offer as lay opinion testimony, testimony in the form of an opinion that is "rationally

based on the witness's perception."  Fed. R. Evid. 701(a).  It is not as expansive as Rules 702 and

703, which permit expert opinions based on "facts or data in the case that the expert has been

made aware of or personally observed."  Fed. R. Evid. 703.  Federal Rule of Civil Procedure

26(a)(2) does not require disclosure of lay opinion testimony at all.  It is limited to "Disclosure of

Expert Testimony" and specifies that it relates to "any witness [a party] may use at trial to

present evidence under Federal Rule of Evidence 702, 703, or 706."  Fed. R. Civ. P. 26(a)(2)(A).

In arguing that the only "expert testimony" that can be offered without an expert report under

Rule 26(a)(2)(C) is opinion testimony that is "rationally based on a witness's perception," Fed.

R. Evid. 701, Plaintiff would limit Rule 26(a)(2)(C) to a null set; lay opinion testimony need not be disclosed at all under Rule 26(a)(2).

Finally, Plaintiff argues that the disclosure is untimely because its only relevance is to rebut the opinion of Plaintiff's expert Regan regarding the addition of C.C. Wang's seals to the Estate's paintings after their sale and that any responsive testimony to Regan's expert report was due within 30 days of the issuance of the report under Rule 26(a)(2)(D)(ii).

Defendants, however, respond that because they intend to introduce J.S. Wang's testimony by means of his deposition, which occurred on July 25, 2019, Plaintiff had J.S. Wang's full and complete testimony, word for word, months before the deadline for disclosure of affirmative reports. All Plaintiff was missing was the formal designation. Moreover, Defendants stress, Plaintiff's counsel cross-examined J.S. Wang on his opinions on July 25, 2019 and thus there was no prejudice. As J.S. Wang is being offered as a rebuttal expert, Plaintiff would never have had a right to do more—she would have not had a right to issue a responsive report or to retain new experts. They state that their current counsel—who appeared on September 6, 2018 but did not become lead counsel until co-counsel Kasowitz Benson Torres LLP withdrew on January 20, 2021—identified J.S. Wang as an expert as soon as they reviewed his deposition transcript and realized it contained opinion testimony that would be useful to Defendants at trial. *See* Dkt. Nos. 98, 116-18, 232.[16] For that reason, the disclosure was not untimely and, even if it were, Plaintiff has suffered no prejudice and any error was harmless.

---

[16] Plaintiff also cites several cases that either support Defendants, *see Architects Collective v. Pucciano & English, Inc.*, 247 F. Supp. 3d 1322, 1334 (N.D. Ga. 2017) (expert was not specially employed where his testimony was "based on his direct personal knowledge and familiarity with his own copyrighted plans and Defendant's plans"); *Avnet, Inc. v. Motion, Inc.*, 2016 WL 927194, at *4–5 (N.D. Ill. Mar. 4, 2016) (expert was "specially employed" because there was "nothing to indicate that [the expert] derived his opinions for any purpose other than this lawsuit"), or are otherwise distinguishable, *see Mem'l Hall Museum v. Cunningham*, 455 F.

## CONCLUSION

For the foregoing reasons, the motions in limine are each granted in part and denied in part.  Dkt. Nos. 251, 256.  The Clerk of Court is directed to close the motion to renew the in limine motions at Dkt. No. 287.

SO ORDERED.

Dated: November 9, 2021
     New York, New York
                                       LEWIS J. LIMAN
                            United States District Judge

---

Supp. 3d 347, 363 (W.D. Ky. 2020) (Rule 26(a)(2)(C) expert's reliance on reference to his deposition transcript did not provide a "summary of the facts and opinions" where such mere reference was high-level).